## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

REGINALD T. ALLISON, Individually and on Behalf of All Others Similarly Situated,

        Plaintiff,

vs.

OAK STREET HEALTH, INC., et al.,

        Defendants.

Case No. 1:22-cv-00149

Judge Matthew F. Kennelly

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS LEAD PLAINTIFFS' COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

July 25, 2022

Andrew J. Ehrlich (*pro hac vice*)
Daniel S. Sinnreich (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: 212-373-3000
Facsimile: 212-373-3990
Email: aehrlich@paulweiss.com
Email: dsinnreich@paulweiss.com

-and-

Peter A. Silverman (Il. ARDC # 6196081)
Rebecca R. Kaiser (Il. ARDC # 6306280)
**SMITH, GAMBRELL & RUSSELL, LLP**

10 S. LaSalle Street, Suite 3600
Chicago, Illinois 60603
Telephone: 312-264-1004
Facsimile: 312-251-4610
Email: psilverman@sgrlaw.com
Email: rfournier@sgrlaw.com

***Counsel for Defendants Oak Street Health, Inc., Michael Pykosz, Timothy Cook, General Atlantic LLC, General Atlantic (OSH) Interholdco, L.P., Newlight Partners LP, Newlight Harbour Point SPV LLC, Geoff Price, Griffin Myers, Regina Benjamin, Carl Daley, Cheryl Dorsey, Mohit Kaushal, Kim Keck, Julie Klapstein, Paul Kusserow, Robbert Vorhoff, and Srdjan Vukovic***

Scott D. Musoff (pro hac vice)
**SKADDEN, APS, SLATE, MEAGHER, & FROM LLP**
One Manhattan West
New York, New York 10001
Telephone: (212) 735-7852
Email: scott.musoff@skadden.com

-and-

Marcie L. Lape (Il. ARDC # 6286676])
Clare Lilek (Il. ARDC # 6336261)
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
155 North Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 407-0700
Email: marcie.lape@skadden.com

***Counsel for the Defendants J.P. Morgan Securities LLC, Goldman Sachs & Co. LLC, Morgan Stanley & Co. LLC, William Blair & Company L.L.C., and Piper Sandler & Co.***

ii

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND ................................................................................................................ 4

    A.    Oak Street's Business ........................................................................................ 4

    B.    Oak Street's Patient Recruitment Strategies ................................................... 5

    C.    Plaintiffs' Allegations Concerning Oak Street's Allegedly Improper Patient Recruitment Efforts.............................................................................. 6

    D.    Oak Street's Public Offerings And Risk Disclosures ...................................... 8

    E.    Alleged Misleading Statements ....................................................................... 9

    F.    Alleged Corrective Disclosure ...................................................................... 10

ARGUMENT .................................................................................................................... 11

I.    Plaintiffs Do Not Adequately Allege Violations Of Section 10(b) And Rule 10b-5........ 11

    A.    Plaintiffs Do Not Adequately Allege Any Materially Misleading Statements Or Omissions .................................................................................. 11

        1.    Defendants Had No Independent Duty To Disclose The Uncharged, Unadjudicated Alleged Misconduct That Is The Subject Of The DOJ Inquiry.............................................................................. 12

        2.    None Of The Challenged Statements Are Adequately Alleged To Be False Or Misleading............................................................... 15

        3.    Many Challenged Statements Are Non-Actionable Opinions ................. 19

        4.    Many Challenged Statements Are Non-Actionable Puffery..................... 22

        5.    Plaintiffs Fail To Allege Violations Of Items 303 And 105 Of Regulation S-K............................................................................ 23

    B.    Plaintiffs Do Not Adequately Allege A Strong Inference Of Scienter................. 25

        1.    Plaintiffs Plead No Facts Demonstrating That Any Officer Defendant Knew About Supposed AKS Violations.................................................... 26

        2.    Plaintiffs' Speculation That Officer Defendants Must Have Known About Violations Because They Held Senior Positions, "Monitored" The Business, And Spoke Generally About Patient Acquisitions, Is Insufficient .............................................................................. 28

        3.    Plaintiffs' Stock Sale And Compensation Allegations Are Insufficient... 31

        4.    Oak Street's Purported "Widespread Tactics Of Aggressively Pursuing Revenue" Are Irrelevant And Do Not Support Scienter ........... 33

    C.    Plaintiffs Do Not Adequately Allege Loss Causation .......................................... 34

i

II.    Plaintiffs Do Not Adequately Allege Violations Of Sections 11 And 12(a)(2) ............... 36

    A.    Plaintiffs Fail To Adequately Allege Any Materially Misleading Statements Or Omissions Under Rule 9(b) ............................................................. 37

    B.    Plaintiffs Fail To Plead Section 11 Standing For The SPOs And Section 12(a)(2) Standing For Any Offering ..................................................... 38

        1.    Section 11 ......................................................................................... 38

        2.    Section 12(a)(2) ............................................................................... 40

    C.    Individual Defendants And Sponsor Defendants Are Not "Sellers" Under Section 12(a)(2) ........................................................................... 40

III.    Plaintiffs Fail To State A Claim For Control Person Liability ......................................... 42

CONCLUSION.................................................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson* v. *Abbott Labs.*,
140 F. Supp. 2d 894 (N.D. Ill. 2001) ....................................................12, 13, 15, 17

*Heavy & Gen. Laborers' Local 472 & 172 Pension & Annuity Funds* v. *Fifth Third Bancorp*, 2022 WL 1642221 (N.D. Ill. May 24, 2022) ........................................ *passim*

*Ark. Teacher Ret. Sys.* v. *Bankrate, Inc.*,
18 F. Supp. 3d 482 (S.D.N.Y. 2014)........................................................................45

*Bastian* v. *Petren Res. Corp.*,
892 F.2d 680 (7th Cir. 1990) ...................................................................................35

*In re BISYS Sec. Litig.*,
397 F. Supp. 2d 430 (S.D.N.Y. 2005)......................................................................32

*Borsellino* v. *Goldman Sachs Grp., Inc.*,
477 F.3d 502 (7th Cir. 2007) ...................................................................................37

*Brasher* v. *Broadwind Energy, Inc.*,
2012 WL 1357699 (N.D. Ill. Apr. 19, 2012) ...............................................42, 44, 45

*Carlson* v. *Bear, Stearns & Co. Inc.*,
906 F.2d 315 (7th Cir. 1990) ...................................................................................42

*In re Carnival Corp. Sec. Litig.*,
2022 U.S. Dist. LEXIS 58526 (S.D. Fla. Mar. 30, 2022)........................................14

*Carvelli* v. *Ocwen Fin. Corp.*,
934 F.3d 1307 (11th Cir. 2019) .........................................................................22, 23

*In re Century Aluminum Co. Sec. Litig.*,
729 F.3d 1104 (9th Cir. 2013) .................................................................................38

*Chandler* v. *Ulta Beauty, Inc.*,
2022 WL 952441 (N.D. Ill. Mar. 30, 2022).............................................................29

*In re CitiGroup Inc. Bond Litig.*,
723 F. Supp. 2d 568 (S.D.N.Y. 2010)......................................................................40

*City of Livonia Emps.' Ret. Sys. & Local 295/Local 851* v. *Boeing Co.*,
711 F.3d 754 (7th Cir. 2013) ...................................................................................25

*City of New Orleans Emps.' Ret. Sys.* v. *PrivateBancorp, Inc.*,
    2011 WL 5374095 (N.D. Ill. Nov. 3, 2011) ...........................................................26

*City of Roseville Emps.' Ret. Sys.* v. *EnergySolutions, Inc.*,
    814 F. Supp. 2d 395 (S.D.N.Y. 2011)...................................................................25

*City of Warren Police & Fire Ret. Sys.* v. *Zebra Techs. Corp.*,
    2020 WL 6118571 (N.D. Ill. Oct. 16, 2020).........................................................22

*City of Westland Police & Fire Ret. Sys.* v. *MetLife, Inc.*,
    928 F. Supp. 2d 705 (S.D.N.Y. 2013)...................................................................41

*Confie Seguros Holding II Co.* v. *J.C. Flowers & Co. LLC*,
    2018 WL 4563068 (N.D. Ill. Sept. 24, 2018)........................................................44

*Cornielsen* v. *Infinium Capital Mgmt., LLC*,
    916 F.3d 589 (7th Cir. 2019) ................................................................................11

*Cox* v. *Blackberry Ltd.*,
    660 F. App'x 23 (2d Cir. 2016) ............................................................................29

*Diehl* v. *Omega Protein Corp.*,
    339 F. Supp. 3d 153 (S.D.N.Y. 2018)...................................................................13

*Donohoe* v. *Consolidated Operating & Production Corp.*,
    30 F.3d 907 (7th Cir. 1994) ..................................................................................42

*Dura Pharm., Inc.* v. *Broudo*,
    544 U.S. 336 (2005)..............................................................................................34

*In re Facebook, Inc. Sec. Litig.*,
    405 F. Supp. 3d 809 (N.D. Cal. 2019) ..................................................................13

*Heavy & Gen. Laborers'* v. *Fifth Third Bancorp*,
    2021 WL 1648117 (N.D. Ill. Apr. 26, 2021) ........................................................29

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    308 F. Supp. 2d 249 (S.D.N.Y. 2004)...................................................................44

*Fulton County Employees Retirement System* v. *MGIC, Investment Corporation*,
    675 F.3d 1047 (7th Cir. 2012) ....................................................................43, 44, 45

*Garden City Employees' Ret. Sys.* v. *Anixter Int'l, Inc.*,
    2011 WL 1303387 (N.D. Ill. Mar. 31, 2011).............................................11, 25, 30, 32

*In re GeoPharma, Inc. Sec. Litig.*,
    411 F. Supp. 2d 434 (S.D.N.Y. 2006)...................................................................34

*In re Global Crossing, Ltd. Sec. Litig.*,
  2005 WL 1907005 (S.D.N.Y. Aug. 8, 2005) ..........................................................44

*In re Guidant Corp. Securities Litigation*,
  536 F. Supp. 2d 913 (S.D. Ind. 2008) ..................................................................28

*Harrison* v. *Dean Witter Reynolds, Inc.*,
  79 F.3d 609 (7th Cir. 1996) ..................................................................................42

*Higginbotham* v. *Baxter Intern., Inc.*,
  495 F.3d 753 (7th Cir. 2007) ..................................................................25, 27, 30

*Hill* v. *The Trib. Co.*,
  2006 WL 2861016 (N.D. Ill. Sept. 29, 2006) .......................................................27

*Howard* v. *Arconic Inc.*,
  395 F. Supp. 3d 516 (W.D. Pa. 2019) ...................................................................13

*Ikeda* v. *Baidu, Inc.*,
  2021 WL 1299046 (N.D. Cal. Apr. 7, 2021) .........................................................20

*Klaczak* v. *Consolidated Medical Transport*,
  458 F. Supp. 2d. 622 (N.D. Ill. 2006) .....................................................................7

*Knox* v. *Yingli Green Energy Holding Co. Ltd.*,
  2016 WL 6609210 (C.D. Cal. May 10, 2016) ......................................................34

*In re Kosmos Energy Ltd. Sec. Litig.*,
  955 F. Supp. 2d 658 (N.D. Tex. 2013) ............................................................43, 44

*Levie* v. *Sears Roebuck & Co.*,
  676 F. Supp. 2d 680 (N.D. Ill. 2009) ...............................................12, 15, 17, 18

*Loos* v. *Immersion Corp.*,
  762 F.3d 880 (9th Cir. 2014) ................................................................................35

*Lopez* v. *CTPartners Exec. Search Inc.*,
  173 F. Supp. 3d 12 (S.D.N.Y. 2016) .....................................................................24

*Makor Issues & Rights, Ltd.* v. *Tellabs, Inc.*,
  513 F.3d 702 (7th Cir. 2008) ................................................................................26

*McCauley* v. *City of Chicago*,
  671 F.3d 611 (7th Cir. 2011) ................................................................................11

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
  568 F. Supp. 2d 349 (S.D.N.Y. 2008) ...................................................................36

*Metzler Inv. GMBH* v. *Corinthian Colleges, Inc.*,
  540 F.3d 1049 (9th Cir. 2008) ............................................................32

*Meyer* v. *Greene*,
  710 F.3d 1189 (11th Cir. 2013) ..........................................................35

*In re Midway Games, Inc. Sec. Litig.*,
  332 F. Supp. 2d 1152 (N.D. Ill. 2004) ................................................22

*MiMedx Grp., Inc.* v. *DBW Partners LLC*,
  2018 WL 4681005 (D.D.C. Sept. 28, 2018) .......................................33

*Mogell* v. *Calhoun*,
  2016 WL 3369233 (C.D. Ill. Mar. 15, 2016) ......................................13

*In re Nokia Ojy (Nokia Corp.) Sec. Litig.*,
  423 F. Supp. 2d 364 (S.D.N.Y. 2006) .................................................24

*Nurlybayev* v. *ZTO Express (Cayman) Inc.*,
  2019 WL 3219451 (S.D.N.Y. July 17, 2019) ......................................23

*In re NVIDIA Corp. Sec. Litig.*,
  768 F.3d 1046 (9th Cir. 2014) ............................................................23

*Omnicare, Inc.* v. *Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015)......................................................................19, 20

*Oran* v. *Stafford*,
  226 F.3d 275 (3d Cir. 2000)................................................................23

*Pension Tr. Fund for Operating Engineers* v. *DeVry Educ. Grp., Inc.*,
  2017 WL 6039926 (N.D. Ill. Dec. 6, 2017).........................................13

*Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund* v.
  *Allscripts-Misys Healthcare Sols., Inc.*,
  778 F. Supp. 2d 858 (N.D. Ill. 2011) ..................................................22

*Plumbers & Pipefitters Loc. Union* v. *Zimmer*,
  673 F. Supp. 2d 718 (S.D. Ind. 2009) ...........................................24, 27

*Premier Cap. Mgmt., L.L.C.* v. *Cohen*,
  2003 WL 21960357 (N.D. Ill. Aug. 15, 2003) ....................................41

*Pugh* v. *Tribune Co.*,
  521 F.3d 686 (7th Cir. 2008) .....................................................4, 31, 35

*Ray* v. *Citigroup Glob. Markets, Inc.*,
  482 F.3d 991 (7th Cir. 2007) ..............................................................34

*Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund* v. *Hewlett-Packard Co.*,
 845 F.3d 1268 (9th Cir. 2017) ....................................................................................14

*In re Rigel Pharms., Inc. Sec. Litig.*,
 697 F.3d 869 (9th Cir. 2012) ......................................................................................38

*Rombach* v. *Chang*,
 355 F.3d 164 (2d Cir. 2004).........................................................................................38

*Rossy* v. *Merge Healthcare Inc.*,
 169 F. Supp. 3d 774 (N.D. Ill. 2015) ....................................................................27, 28

*Scheller* v. *Nutanix, Inc.*,
 450 F. Supp. 3d 1024 (N.D. Cal. 2020) ......................................................................31

*Sears* v. *Likens*,
 912 F.2d 889 (7th Cir. 1990) ......................................................................................38

*Shah* v. *Zimmer Biomet Holdings, Inc.*,
 348 F. Supp. 3d 821 (N.D. Ind. 2018) ..................................................................40, 41

*Singh* v. *Cigna Corp.*,
 918 F.3d 57 (2d Cir. 2019)....................................................................................13, 14

*Société Générale Sec. Servs., GbmH* v. *Caterpillar, Inc.*,
 2018 WL 4616356 (N.D. Ill. Sept. 26, 2018) .......................................................13, 21

*St. Lucie Cnty. Fire Dist. Firefighters' Pension Tr. Fund* v. *Motorola, Inc.*,
 2011 WL 814932 (N.D. Ill. Feb. 28, 2011) ...........................................................18, 36

*Stavros* v. *Exelon Corp.*,
 266 F. Supp. 2d 833 (N.D. Ill. 2003) ..........................................................................33

*Stephenson* v. *Hartford Life & Annuity Ins. Co.*,
 2003 WL 22232968 (N.D. Ill. Sept. 26, 2003) ...........................................................33

*Stransky* v. *Cummins Engine Co.*,
 51 F.3d 1329 (7th Cir. 1995) ......................................................................................12

*Stratte-McClure* v. *Morgan Stanley*,
 776 F.3d 94 (2d Cir. 2015)..........................................................................................23

*In re Supreme Indus., Inc. Sec. Litig.*,
 2019 WL 1436022 (N.D. Ind. Mar. 29, 2019).............................................................32

*Teamsters Loc. 282 Pension Tr. Fund* v. *Angelos*,
 762 F.2d 522 (7th Cir. 1985) ......................................................................................36

vii

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..................................................................................................25

*Tricontinental Indus., Ltd.* v. *PricewaterhouseCoopers, LLP*,
    475 F.3d 824 (7th Cir. 2007) ....................................................................................34

*Twin Master Fund, Ltd.* v. *Akorn, Inc.*,
    2020 WL 564222 (N.D. Ill. Feb. 5, 2020) ...............................................................23

*Veal* v. *LendingClub Corp.*,
    423 F. Supp. 3d 785 (N.D. Cal. 2019) ....................................................................13

*In re VMS Sec. Litig.*,
    752 F. Supp. 1373 (N.D. Ill. 1990) ..........................................................................42

*W. Palm Beach Firefighters' Pension Fund* v. *Conagra Brands, Inc.*,
    495 F. Supp. 3d 622 (N.D. Ill. 2020) ................................................................. *passim*

*In re Weight Watchers Int'l Inc. Sec. Litig.*,
    504 F. Supp. 3d 224 (S.D.N.Y. 2020)......................................................................41

*Zishka* v. *Am. Pad & Paper Co.*,
    2001 WL 1748741 (N.D. Tex. Sept. 28, 2001).......................................................44

**Statutes**

15 U.S.C. § 77k(a) ...........................................................................................................36

15 U.S.C. § 77l(a) ......................................................................................................36, 40

Private Securities Litigation Reform Act of 1995 ("PSLRA"),
    *codified at* 15 U.S.C. § 78u-4 ........................................................................... *passim*

**Other Authorities**

17 C.F.R. § 229.105 .........................................................................................................25

17 C.F.R. § 229.303(b)(2)(ii)......................................................................................23, 24

42 C.F.R. § 1001.952(d)(1)(iv)..........................................................................................7

Fed. R. Civ. P. 9(b) ................................................................................................. *passim*

## PRELIMINARY STATEMENT

Plaintiffs' securities fraud complaint is fatally defective. It is premised on the unremarkable fact that Oak Street Health, Inc. ("Oak Street," "OSH" or the "Company"), which operates primary care centers for adults on Medicare, received a civil investigative demand ("CID") from the Department of Justice ("DOJ") seeking information about its patient recruitment strategies. Plaintiffs lever off the mere existence of this inquiry—out of which no complaint has been brought by a government agency, and may never be brought—to make the audacious claim that Oak Street's general statements about patient growth and marketing strategies, and its opinions about regulatory compliance, were intentionally false and misleading. Courts in this circuit and elsewhere routinely dismiss claims that are based on the mere existence of a government inquiry, particularly where, as here, no agency complaint has been filed and no violations have been found. This fundamental flaw infects the Complaint fully, and gives rise to several distinct and independent reasons why it should be dismissed in full and with prejudice.

*First*, the Complaint fails to identify any materially false or misleading statements—a defect that is fatal to all of Plaintiffs' claims. Plaintiffs challenge numerous highly general factual statements about Oak Street's business, including that Oak Street "employ[s] a multi-channel marketing strategy" and has a "fleet of over 100 green vans" that "provide transportation for our patients to get to and from our centers." Plaintiffs do not allege that *any* of these statements are false. Instead, Plaintiffs allege that *every* challenged statement is misleading because Oak Street "omitted to disclose" two "improper patient acquisition tactics" that are purportedly the subject of the CID: Oak Street's (i) payments to insurance agents who connect Oak Street with potential patients, and (ii) marketing and providing free transportation to prospective patients. In making this argument, Plaintiffs ask the Court to adopt their unfounded legal conclusion that these strategies violated the False Claims Act ("FCA") and federal Anti-

Kickback Statute ("AKS"), despite the fact that no agency or regulator has even alleged that Oak Street violated the law (let alone has any tribunal so adjudicated). More important, even assuming that misconduct existed (which OSH does not concede), the law is clear that public companies have no independent duty to disclose uncharged, unadjudicated wrongdoing— precisely the obligation that Plaintiffs seek to impose here.

Plaintiffs also completely ignore Oak Street's robust risk disclosures, which warned investors that the laws governing the health care industry are "complex, changing and often subject to varying interpretations," and that "there is no guarantee we will be able to adhere to all of the laws and regulations that apply to our business." Oak Street disclosed that it could face government "lawsuits" and "investigations," which could have a "material adverse impact on [its] business." Oak Street even disclosed that it used third parties to assist with patient recruitment, which "could potentially implicate the Anti-Kickback Statute," although Oak Street opined that it "believe[s]" its arrangements "do not violate the Anti-Kickback statute or other applicable laws." Plaintiffs plead no *facts* (as opposed to conclusory statements) to suggest Oak Street did not genuinely believe that these practices were lawful.

*Second*, Plaintiffs' fraud claims fail because they do not plead facts raising a strong inference that any Defendant acted with fraudulent intent. The Complaint does not plead a single fact showing that either CEO Michael Pykosz or CFO Timothy Cook (the "Officer Defendants") ever learned about an alleged violation of the FCA or AKS or had any reason to *believe* that Oak Street's recruitment tactics violated the law. The Complaint relies on allegations from four low-level, anonymous former employees ("FEs"), to support its scienter allegations, but *none* has any insight into either Officer Defendant's state of mind. No FE purports to have knowledge of any violations, to have ever spoken with the Officer Defendants, or to have conveyed facts to the

Officer Defendants contradicting their public statements. Their allegations are untethered to the individuals speaking to the market and should be heavily discounted under Seventh Circuit law.

Plaintiffs' other scienter allegations fare no better. Plaintiffs allege that the Officer Defendants *must have known* about alleged violations because they occupied senior positions, signed SEC filings, and spoke broadly about Oak Street's business. These types of generic allegations fail to meet the exacting standard for pleading scienter and are regularly rejected. Plaintiffs also allege that Oak Street executives were motivated to lie to investors to capitalize on stock sales, but plead no facts suggesting that any sale was unusual or suspicious in timing or amount. Plaintiffs also ignore that the Officer Defendants retained the vast majority of their shares and that nearly every sale was pursuant to a non-discretionary Rule 10b5-1 plan, which cut against an inference of scienter.

*Third*, Plaintiffs fail to plead loss causation because the disclosure of the CID did not reveal any allegedly concealed information. As several circuit courts have held, the disclosure of a government *investigation* is categorically insufficient to establish loss causation. Moreover, Plaintiffs do not allege that Defendants concealed the existence of the DOJ investigation itself. And the recruitment practices mentioned in Oak Street's disclosure—the Company's use of "third-party marketing agents" and provision of "free transportation"—were disclosed in public filings and openly discussed with investors and never "concealed" in the first place.

*Fourth*, Plaintiffs' claims under the Securities Act of 1933 fail because they challenge the same public statements discussed above, which are not pleaded to be false. These claims also fail because Plaintiffs do not adequately allege that they purchased shares in or traceable to Oak Street's public offerings, or directly from any Defendant, and Plaintiffs thus lack statutory standing to pursue these claims.

*Finally*, Plaintiffs overreach by pursuing control person claims against General Atlantic LLC and General Atlantic (OSH) Interholdco, L.P. ("General Atlantic"), and Newlight Partners LP and Newlight Harbour Point SPV ("Newlight," collectively, the "Sponsor Defendants"). These claims fall flat because Plaintiffs plead no facts demonstrating that the Sponsor Defendants exercised general or specific control over Oak Street by actively participating in its operations or public statements and SEC filings.

## BACKGROUND

### A.      Oak Street's Business

Oak Street operates primary care centers throughout the United States, "deliver[ing] value-based care focused exclusively on Medicare patients."  Ex. A at 7; *see also* ¶ 40.[1]  Under its care system, which differs from a traditional fee-for-service system, Oak Street aims to incentivize healthcare providers to increase quality while lowering the cost of care.  *See* Ex. A at 7-10.  "As of December 31, 2021, the Company operated 129 centers across 19 states, which provided care for approximately 153,400 patients."  *Id.* at 7.

Oak Street is compensated pursuant to its arrangements with Medicare Advantage ("MA") plans and the Centers for Medicare & Medicaid Services ("CMS"), which take the form of "risk contract[s]."  *See* Ex. A at 9, 25; ¶¶ 42-43.  Oak Street receives a fixed payment per patient per month from the MA plan or CMS, and, in return, Oak Street is "responsible for providing healthcare services required by that patient population" and "incurring or paying for the cost of healthcare services required" beyond those that the Company provides.  Ex. A at 25;

---

[1]     References to "¶ __" refer to paragraphs of the Complaint.  References to "Ex. __" refer to exhibits to the attached Declaration of Daniel S. Sinnreich.  Page citations refer to the PDF pagination of exhibits, inclusive of exhibit cover page.  All exhibits cited are either incorporated by reference in the Complaint or subject to judicial notice, and thus may be considered without converting this motion to a motion for summary judgment.  *See Pugh* v. *Tribune Co.*, 521 F.3d 686, 691 n.2 (7th Cir. 2008).

*see also* ¶¶ 42-43.  If medical costs for its patients are less than the fixed payment Oak Street receives, Oak Street retains the surplus amount, which it can use to further reinvest in its care model and realize a return on its investment in primary care services.  *See* Ex. A at 14, 20-21; ¶ 43.

### B. Oak Street's Patient Recruitment Strategies

To grow its patient population, Oak Street employs a multichannel marketing strategy that is directed to its target patients.  *See* Ex. B at 4.  The Company principally relies on a grassroots approach led by its community outreach team who engage and educate Medicare-eligible individuals on the importance of primary care and why Oak Street is a great care provider.  *See* ¶¶ 101(d), 103(c) 117(a); Ex. B at 25; Ex. C at 9.  Oak Street's outreach personnel also educate community partners, such as senior living facilities, food banks, and faith-based organizations, to connect Oak Street to older adults who are eligible to become Oak Street patients and for whom Oak Street may be an appropriate provider of primary care services relative to their healthcare needs.  *See* ¶ 101(d); Ex. B at 28.  Oak Street supplements these recruitment techniques with traditional marketing techniques, such as television, digital and social media, print, mail, and telemarketing.  *See* ¶¶ 8, 101(b), 108(b), 117(a); Ex. B at 30-31; Ex. D at 15.

In some instances, Oak Street's payor partners direct patients to Oak Street, "either by assigning patients who have not yet selected a primary care provider to Oak Street Health or through insurance agents who will tell their clients about Oak Street Health, which [Oak Street] believe[s] results in the patient selecting [Oak Street] as their primary care provider when they select an MA plan."  ¶ 101(c).  Defendant Pykosz explained to investors that, although the "vast majority of our patients comes through our efforts," "insurance advisers or health plan[s]" also sometimes "push . . . patients" to Oak Street, and that Oak Street takes "as many [pushed

patients] as we can get." ¶ 117(b).

### C. Plaintiffs' Allegations Concerning Oak Street's Allegedly Improper Patient Recruitment Efforts

Plaintiffs' fundamental theory is that Oak Street concealed from investors that two of its patient acquisition techniques purportedly violated the AKS and FCA, which generally prohibit payments in exchange for referring an individual for services made under a federal health care program. ¶ 54. Plaintiffs specifically allege that Oak Street concealed its purportedly unlawful (i) payment of "referral fees" to insurance agents and (ii) provision of "free transportation" to "prospective patients." *See* ¶¶ 104(a)-(e), 109(a)-(f), 116(a)-(b), 122(a)-(d), 126, 128. Critically, *no government regulator has alleged that Oak Street engaged in any such violation.*

<u>Payments to Insurance Agents</u>. Plaintiffs rely on anecdotes from anonymous FEs who recalled that Oak Street launched a Client Awareness Program ("CAP") in certain territories. *E.g.*, ¶ 79. Under the CAP, an insurance agent would reach out to his or her clients to locate potential leads for Oak Street. *See id.* After speaking with the agent about Oak Street's primary care services, "*if* the person contacted by the agent was interested in or ready to schedule an initial visit to Oak Street," the agent would connect the patient with an Oak Street employee who would continue the conversation and ultimately try to schedule an initial visit. *Id.* Oak Street paid agents up to $200 or $250 for patient leads that "scheduled an initial visit at Oak Street," regardless of whether the patient attended the visit or ever used any Oak Street services. *See id.*; *accord* ¶ 95. Oak Street acquired less than 10% of its new patients through this program. ¶¶ 138, 149 n.10.

Plaintiffs allege that these payments violated the AKS's proscription on referral payments. ¶¶ 68-71, 157-162. The Company has expressed its "belie[f]" that these arrangements do not violate the AKS because they meet, among other lawful regulatory

provisions, the "Personal Services Safe Harbour" (¶ 139; Ex. A at 18), which permits fair market value payments for, among other things, bona fide services (such as marketing and patient education) by third parties. 42 C.F.R. § 1001.952(d)(1)(iv). Plaintiffs fail to explain how these leads are the same as "referrals" prohibited under the AKS, particularly where prospective patients may *never* come to Oak Street for a single visit or use a single service as a result of this lead generation program. The Company's presentations to insurance agents about CAP—several of which are explicitly discussed in the Complaint (¶ 69)—make clear that Oak Street is "compensating for *qualified leads*, regardless of whether they visit or become a patient at one of our centers," and instructs agents to connect their clients with Oak Street only if they "communicate[] unmet medical and/or social needs and also consent to being connected to OSH." Ex. E at 7, 9.

Free Transportation. Plaintiffs allege that the AKS prohibits providers from marketing and providing free transportation to "prospective patients." ¶¶ 58-59.[2] Plaintiffs rely on anecdotes from the same FEs who recall that free transportation was commonly used as a selling point during patient recruitment (¶¶ 80-82, 84, 87, 97, 99), and that free transportation was offered to patients for their "Welcome Visit, testing/labs, and Welcome Return Visit" (¶ 87).[3] Plaintiffs also allege that Oak Street discussed free transportation in a variety of print and digital advertisements, *see* ¶¶ 72-74, SEC filings, *see* Ex. G rows 18-20, and investor calls and industry

---

[2] Plaintiffs rely principally on "advisory opinions" from the OIG to support their interpretation of the AKS. *See* ¶¶ 55, 58-59, 71. However, these advisory opinions are not binding on Oak Street. *See, e.g.*, *Klaczak* v. *Consolidated Medical Transport*, 458 F. Supp. 2d. 622, 685 n.45 (N.D. Ill. 2006). Indeed, the advisory opinions cited in the Complaint expressly note that they are "issued only to . . . the requestor of this opinion," and have "no application [to], and *cannot be relied upon by*, any other individual or entity." *E.g.*, Ex. F at 7 (cited ¶¶ 55, 58) (emphasis added).

[3] A patient visiting an Oak Street care center for a "Welcome Visit" has already selected Oak Street as its primary care provider and is not a "prospective patient."

conferences, *see* Ex. H at 19. Plaintiffs allege that this conduct violated the AKS, although no regulator has alleged any such violation.

### D. Oak Street's Public Offerings And Risk Disclosures

Pursuant to its August 5, 2020 Form S-1, Oak Street offered 15.6 million shares in its initial public offering ("IPO"). Ex. B at 3; ¶¶ 237-39. Oak Street completed secondary public offerings ("SPOs") of 5.6 million shares on December 2, 2020, Ex. I at 2, 10.7 million shares on February 10, 2021, Ex. J at 2, and 12.1 million shares on May 26, 2021, Ex. K at 2. ¶¶ 243-45, 249-51, 254-56.

Oak Street's IPO Registration Statement disclosed that, as a healthcare provider, the Company operated "in a highly-regulated industry" and that its operations are subject to numerous law and regulations, including the FCA and AKS. *See* Ex. B at 8, 11-12, 15-16, 34-40, 44, 51, 54; ¶ 52. The Company disclosed that, although it "endeavor[s] to comply with all legal requirements," "the laws and regulations in these areas are complex, changing and often subject to varying interpretations," and, "[a]s a result, there is no guarantee we will be able to adhere to all of the laws and regulations that apply to our business, and any failure to do so could have a material adverse impact on our business." Ex. B at 16; *see id.* at 18-19. The Company warned that it could be subject to "lawsuits, demands, claims . . . [and] investigations," which could lead to "suspension or termination of our participation in government payment programs" and "criminal or civil liability, fines, damages or monetary penalties." ¶ 61; Ex. B at 17.

Oak Street also explicitly warned investors about the risks of using third parties to assist with recruitment, disclosing that it "enter[s] into several arrangements that could potentially implicate the Anti-Kickback Statute." Ex. B at 36. The Company disclosed that "[t]he OIG has expressed concern regarding the use of non-employed sales forces to recruit or facilitate the recruiting of patients or referrals, especially when the sales agent is compensated in a manner

that provides rewards or incentives on a volume or value basis," and that Oak Street "use[s] external companies to assist with certain aspects of these efforts, *but only in arrangements that we believe do not violate the Anti-Kickback Statute or other applicable laws*." *Id.* (emphasis added). Immediately thereafter, the Company warned that if its "arrangements . . . were found to violate the federal Anti-Kickback Statute," it could result in "material adverse impact[s] on our business," including "possible exclusion from participation in Medicare." *Id.* at 37.

These extensive cautionary statements and risk disclosures were carried forward in the registration statements and prospectuses accompanying Oak Street's SPOs as well as Oak Street's quarterly and annual SEC filings.[4] *See* ¶¶ 243-45, 249-51, 254-56.

### E.    Alleged Misleading Statements

Plaintiffs challenge dozens of Defendants' public statements during the Class Period. *See* Ex. G. In *every* instance, Plaintiffs allege that the statement was misleading because it "omitted to disclose material improper patient acquisitions tactics," namely, "(1) paying external insurance agents kickbacks of at least $200 for each patient the agents referred to Oak Street; and/or (2) marketing and providing free transportation to prospective patients." ¶¶ 104(a-e), 109(a-f), 116(a-b), 122(a-d). The challenged statements fall generally into four categories:

- General statements about Oak Street's patient acquisition and marketing strategies. Ex. G (rows 1-17).

- General statements about patient transportation. *Id.* (rows 18-20).

- Statements about the role of third parties in patient acquisition. *Id.* (rows 21-26).

- Oak Street's opinions about its regulatory compliance. *Id.* (row 27).

---

[4]    Ex. L at 4-5, 8-11, 14-20, 23, 26, 29; Ex. I at 4-5, 8-11, 14-20, 23, 26, 29; Ex. M at 4-5, 8-11, 14-20, 23, 26, 29; Ex. J at 4-5, 8-11, 14-20, 23, 26, 29; Ex. N at 3 (incorporating by reference Exs. Q and R); Ex. K at 3 (incorporating by reference Exs. Q and R); Ex. O at 4-5; Ex. P at 4; Ex. Q at 4-9, 12-13, 16-19, 21; Ex. R at 4-5; Ex. S at 4-5.

### F.    Alleged Corrective Disclosure

Plaintiffs allege that the "truth" about Oak Street's "improper" recruitment practices was revealed on November 8, 2021, when Oak Street disclosed in its quarterly SEC filing that it had received a CID from the DOJ.  ¶ 129; Ex. T at 4, 7, 9.  The Company disclosed that the DOJ was "investigating whether the Company may have violated the False Claims Act," and had "request[ed] certain documents and information related to the Company's relationships with third-party marketing agents and related to the Company's provision of free transportation to federal health care beneficiaries."  Ex. T at 4.  On the next trading day, Oak Street's share price declined by approximately 20%.  ¶ 133.  Plaintiffs do *not* allege that the DOJ or any other agency has filed a complaint against Oak Street arising out of this investigation.

* * *

Plaintiffs seek to represent a class of purchasers of Oak Street common stock between August 6, 2020 and November 8, 2021 (the "Class Period"), including those who purchased shares of Oak Street common stock pursuant or traceable to the registration statements and prospectuses issued in connection with Oak Street's IPO and SPOs (collectively, the "Offerings").  ¶ 1.  Plaintiffs assert claims under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 against Oak Street and the Officer Defendants; and under Section 20(a) of the Exchange Act against the Officer Defendants and the Sponsor Defendants.  Plaintiffs also assert claims under Section 11 of the Securities Act of 1933 (the "Securities Act") against Oak Street, the Officer Defendants, certain of Oak Street's current and former directors (¶¶ 217-229) (the "Director Defendants," together with the Officer Defendants, the "Individual Defendants"), and certain underwriters of the Offerings (¶¶ 231-236) (the "Underwriter Defendants"); under Section 12(a)(2) of the Securities Act against all Defendants; and under Section 15 of the Securities Act against the Officer Defendants and the Sponsor

Defendants.[5]

## ARGUMENT

## I.     Plaintiffs Do Not Adequately Allege Violations Of Section 10(b) And Rule 10b-5

To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5, a plaintiff must plead "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Cornielsen* v. *Infinium Capital Mgmt., LLC*, 916 F.3d 589, 598 (7th Cir. 2019). Securities fraud claims are subject to the "[h]eightened pleading requirements" of Federal Rule of Civil Procedure 9(b), which require plaintiffs to "state with particularity the circumstances constituting the fraud," including "describing the who, what, when, where, and how of the fraud." *Id.* at 598-99. Plaintiffs must also satisfy the "heightened pleading requirements" of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), which requires plaintiffs to "specify each statement alleged to have been misleading," and "the reason or reasons why the statement is misleading," and to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* at 600-01. Together, Rule 9(b) and the PSLRA impose the "most stringent pleading requirement in American civil law." *McCauley* v. *City of Chicago*, 671 F.3d 611, 625 (7th Cir. 2011) (Hamilton, J., dissenting in part).

## A.     Plaintiffs Do Not Adequately Allege Any Materially Misleading Statements Or Omissions

To plead a material misstatement, Plaintiffs must identify statements that were materially false or misleading "when made (not incorrect in retrospect)." *Garden City Employees' Ret. Sys.*

---

[5]    The Underwriter Defendants join this motion only with respect to arguments applicable to claims under Sections 11 and 12(a)(2) of the Securities Act. *Infra* 36-42.

v. *Anixter Int'l, Inc.*, 2011 WL 1303387, at \*20 (N.D. Ill. Mar. 31, 2011). Plaintiffs must specifically identify concealed facts that are "sufficiently linked to the express statements made so as to render them inaccurate or misleading." *Levie* v. *Sears Roebuck & Co.*, 676 F. Supp. 2d 680, 687 (N.D. Ill. 2009). To plead an actionable omission, a plaintiff must establish either that the defendant had an affirmative duty to disclose, or that the omitted information rendered an affirmative statement materially misleading. *See Stransky* v. *Cummins Engine Co.*, 51 F.3d 1329, 1331 (7th Cir. 1995). "Mere silence about even material information is not fraudulent absent a duty to speak." *Id.* "Merely mentioning a topic," moreover, "does not require the company to disclose every tangentially related fact that might interest investors." *Anderson* v. *Abbott Labs.*, 140 F. Supp. 2d 894, 903 (N.D. Ill. 2001), *aff'd sub nom.*, 269 F.3d 806 (7th Cir. 2001). Plaintiffs fail to adequately identify *any* materially misleading statement or omission.

1. **Defendants Had No Independent Duty To Disclose The Uncharged, Unadjudicated Alleged Misconduct That Is The Subject Of The DOJ Inquiry**

Plaintiffs contend that *every* challenged statement is false or misleading because it "omitted to disclose" Oak Street's "improper patient acquisition tactics," which purportedly violated the AKS and FCA. *Supra* 9. Even assuming that these "tactics" were wrongful (which Oak Street does not concede), the law is clear that a public company has no independent, affirmative duty to disclose alleged misconduct that is the subject of a government investigation where no complaint has been filed and no violations have been proven. Courts in this circuit routinely reject claims based on precisely this theory. In *Heavy & Gen. Laborers' Local 472 & 172 Pension & Annuity Funds* v. *Fifth Third Bancorp*, 2022 WL 1642221 (N.D. Ill. May 24, 2022), for example, plaintiffs alleged that an issuer's statements about regulatory compliance and its "consumer-growth strategy"—substantially similar to the challenged statements here—were misleading because they concealed supposed violations that were the subject of an ongoing

12

CFPB investigation *during the class period*. 2022 WL 1642221 at *18-19. The court rejected the argument in part because the securities laws "do not impose [] a duty upon publicly traded corporations to confess to uncharged, unadjudicated claims of wrongdoing." *Id.* at *15. Similarly, in *Société Générale Sec. Servs., GbmH* v. *Caterpillar, Inc.*, 2018 WL 4616356, at *6 (N.D. Ill. Sept. 26, 2018), the court rejected plaintiffs' argument that statements about legal compliance were rendered misleading by the existence of an IRS investigation, the execution of search warrants, and a Grand Jury subpoena *during the class period*, because the issuer was not "required to admit liability for uncharged, unadjudicated claims while the investigation into its tax position was ongoing." *Accord Pension Tr. Fund for Operating Engineers* v. *DeVry Educ. Grp., Inc.*, 2017 WL 6039926, at *7 (N.D. Ill. Dec. 6, 2017); *Mogell* v. *Calhoun*, 2016 WL 3369233, at *5 (C.D. Ill. Mar. 15, 2016); *Anderson*, 140 F. Supp. 2d at 906-07.

Here, Plaintiffs' claims are even more remote than in *Fifth Third* and *Caterpillar* because there was *not* an ongoing investigation during the Class Period. If a company is not required to disclose conduct that is the subject of a formal investigation, then it clearly does not need to disclose conduct *before* an investigation even begins if it does not believe the conduct is illegal. Accordingly, Defendants had no duty to "engage in self-flagellation" by disclosing the uncharged, unadjudicated "violations" purportedly identified in the Complaint. *See In re Facebook, Inc. Sec. Litig.*, 405 F. Supp. 3d 809 (N.D. Cal. 2019).[6]

The challenged statements also could not have misled a reasonable investor because Oak Street specifically cautioned about the extent of its regulatory oversight and the risk of government investigations. The Second Circuit's decision in *Singh* v. *Cigna Corp.* is instructive.

---

[6]  Additional decisions from courts in other circuits are in accord. *See, e.g.*, *Veal* v. *LendingClub Corp.*, 423 F. Supp. 3d 785, 805-06 (N.D. Cal. 2019); *Diehl* v. *Omega Protein Corp.*, 339 F. Supp. 3d 153, 164-65 (S.D.N.Y. 2018); *Howard* v. *Arconic Inc.*, 395 F. Supp. 3d 516, 572 (W.D. Pa. 2019).

918 F.3d 57 (2d Cir. 2019). The court there rejected a securities fraud theory based on supposed regulatory violations where the issuer cautioned that its Medicare business was "subject to . . . numerous and complex regulations and requirements," which "suggest[ed] caution (rather than confidence) regarding the extent of [defendant's] compliance." *Id.* at 64. Judge Ellis's recent decision in *Fifth Third* rejected a substantially similar theory because the challenged statements discussed the issuer's efforts to "mitigate" compliance risk and thus "clearly acknowledge[d] the potential for noncompliance." 2022 WL 1642221, at *16; *see also Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund* v. *Hewlett-Packard Co.*, 845 F.3d 1268, 1278 (9th Cir. 2017) (statements promoting code of ethics were not rendered misleading by allegations of misconduct because defendants "did not reasonably suggest that there would be no violations").

Here, Oak Street repeatedly warned investors that it was subject to "complex, changing" laws, and that as a result it could "no[t] guarantee" total legal compliance and could be subject to "lawsuits" and "investigations" that could have a "material adverse impact on its business." *Supra* 8-9. Oak Street even cautioned that although it "attempts" to comply with the law and "believe[s]" its arrangements with third parties "do not violate the [AKS] or other applicable laws," it nonetheless "enter[s] into several arrangements that could potentially implicate the [AKS]." *Supra* 8-9. These statements "clearly acknowledge the potential for noncompliance"— far more explicitly than the reference to "mitigation" efforts in *Fifth Third*. 2022 WL 1642221, at *16. That these disclosed risks may have materialized does not convert alleged violations— which have not been asserted—into actionable securities fraud. *See Singh*, 918 F.3d at 59–60 (rejecting "creative attempt to recast . . . significant regulatory violations" as securities fraud).

Finally, even if Plaintiffs had adequately identified certain isolated regulatory violations (which they do not), they still would not state a claim because Plaintiffs do not "adequately

allege a systemic organizational disregard for compliance." *See In re Carnival Corp. Sec. Litig.*, 2022 U.S. Dist. LEXIS 58526, at *56 (S.D. Fla. Mar. 30, 2022) (rejecting similar theory of securities fraud premised on alleged regulatory violations). To the contrary, Plaintiffs allege that the CAP accounted for "less than 10%" of Oak Street's new patients in 2021. ¶ 149 n.10; *see* ¶ 138. Plaintiffs do not allege that Oak Street's other patient acquisition strategies violate any law or regulation, and come nowhere near pleading the type of company-wide, systemic disregard for compliance that courts have found adequate in comparable securities fraud cases.

### 2. None Of The Challenged Statements Are Adequately Alleged To Be False Or Misleading

Beyond the flawed contention that OSH had an independent obligation to disclose alleged uncharged and unadjudicated misconduct, there is not much more to the Complaint. Plaintiffs simply challenge dozens of general and innocuous statements about Oak Street's marketing and patient acquisitions strategies, but do not allege that *any* of these statements are actually false. Plaintiffs, instead, appear to allege that merely by speaking at a high level about Oak Street's marketing and recruitment, Defendants assumed a duty to disclose *all* information about these topics, including the supposed violations alleged in the Complaint. "Merely mentioning a topic, however, does not require the company to disclose every tangentially related fact that might interest investors." *Anderson*, 140 F. Supp. 2d at 903. Rather, the allegedly concealed information must "relate directly to or be sufficiently linked to the express statements made so as to render them inaccurate or misleading." *Sears,* 676 F. Supp. 2d at 687.

Here, none of the challenged statements are "sufficiently linked" to the allegedly concealed recruitment techniques and AKS violations to render the statements misleading. Moreover, as discussed below, Plaintiffs' *own allegations* fatally undermine their theory of falsity because the Complaint confirms the accuracy of nearly every challenged statement. *See,*

*e.g.*, *Fifth Third*, 2022 WL 1642221, at *17 (rejecting argument that statement about "risk from potential employee misconduct" was misleading because the statement was "true on its face").

General Statements About Patient Acquisition and Marketing Strategies. Plaintiffs challenge Defendants' statements about Oak Street's "multichannel marketing" strategy, which includes "traditional marketing, including television, digital and social media, print, mail and telemarketing," as well as "engaging community partners, such as senior living facilities and faith-based organizations, to obtain referrals of older adults who could benefit from our services and care model." *See, e.g.*, ¶¶ 101(b), (d); *see also* Ex. G, rows 1-3. Plaintiffs, however, do not allege that Oak Street *did not* utilize multiple channels in connection with its marketing and sales efforts. To the contrary, the Complaint *confirms* that Oak Street engaged in "community outreach activities and events," *e.g.*, ¶ 62 (Oak Street "hosted approximately 18,700 local events in the communities surrounding [its] centers"), *confirms* that Oak Street used digital, social media, print, and telemarketing strategies, *e.g.*, ¶¶ 72-74 (discussing Oak Street's marketing through pamphlets, brochures, and social media), and *confirms* that Oak Street engaged community partners in its marketing efforts, *e.g.*, ¶ 8 (discussing Oak Street's recruitment efforts at "churches or other community-based organizations"). *See also* ¶¶ 77, 79, 82, 91, 95-97.

Even Plaintiffs' FE allegations confirm this point. FE3 recalls that "Outreach Executives from his center were going out into the community where people were already gathering, including nursing homes, food banks/pantries, shelters, community centers, and Walmart to recruit new patients." *Id.* ¶ 91. And FE4 recalls that he "would focus on food pantries, treatment centers, and other stores or locations where he could talk to potential clients." *Id.* ¶ 97.

Plaintiffs also challenge several statements about the Company's efforts to "educate people about the importance of primary care and why Oak Street Health is a great place to get

16

that primary care." *E.g.*, ¶ 103(c); *see also* Ex. G, rows 4, 6, 11, 15, 23. Again, however, there is no allegation that Company representatives were *not* educating potential patients about primary care and Oak Street, as Plaintiffs concede. *See* ¶ 104(c) ("Oak Street's outreach teams were not soliciting patients based *solely* on educating them.") (emphasis added). The Complaint once again confirms the accuracy of these statements. *See, e.g.*, ¶ 92 (FE3 recalls that "prospective patients met with the [Patient Relations Manager] who 'gives them all the information about Oak Street, walks them through the details about what plans they're eligible for, and what those plans cover, and help people make decisions about what plans they'd like to be on'").

General Statements About Patient Transportation. Plaintiffs challenge a series of banal, factual statements about patient transportation made in SEC filings and during investor calls, including that Oak Street's "contracted and employed drivers . . . typically transport patients to our centers," and that Oak Street's "fleet of over 100 green vans . . . typically provide transportation for our patients to get to and from our centers." *See, e.g.*, ¶ 101(f), 103(a); *see also* Ex. G, rows 18, 20. Plaintiffs do not allege that these statements were factually inaccurate; indeed, the allegations in the Complaint—including from all four FEs—confirm the accuracy of these challenged statements. *See, e.g.*, ¶¶ 72-74, 80-82, 84, 87, 97, 99. Even if Plaintiffs adequately alleged that the provision of free transportation to patients violated the AKS—a violation that has never been asserted—it would not render these factually accurate statements about patient transportation misleading. *See Sears*, 676 F. Supp. 2d at 687. Nor does the mere mention of patient transportation in SEC filings obligate Oak Street to disclose the uncharged, unadjudicated violations alleged in the Complaint. *See Anderson*, 140 F. Supp. 2d at 903.

Statements About the Role of Third Parties in Patient Acquisition. Plaintiffs challenge several statements in which Oak Street explained that, although "most of [its] new patient

growth" occurs through its internal marketing efforts, the Company's "payor partners will also direct patients to Oak Street." *See, e.g.,* ¶¶ 101(c), 102(a); *see also* ¶ 117(b) (challenging Pykosz's statement that "some" patients are "pushed" from "insurance advisers or health plans"). Plaintiffs plead no facts contradicting the statement that "most" patient growth is attributable to the Company's own sales and marketing efforts. The Complaint is replete with examples of Oak Street's internal marketing efforts, *see* ¶¶ 62, 72-74, 82, 84, 91, 94, 97, and Plaintiffs concede that patients acquired through CAP *accounted for less than 10% of patient growth in 2021*. *Supra* 6. Nor do Plaintiffs dispute that Oak Street's MA plan partners directed "some" patients to Oak Street. *See, e.g.,* ¶¶ 70, 78-79, 82, 85, 88-90, 95-96.

None of these factually accurate statements are rendered false by Plaintiffs' insistence that Oak Street's use of third parties to assist with recruitment violated the law. *See Sears*, 676 F. Supp. 2d at 687. The challenged statements did not discuss payments to insurance agents, opine on the legality of the arrangements, or promise that they would never be subject to regulatory inquiry. To the contrary, Defendants warned investors of those very risks. *Supra* 8-9. Nor did the mere mention of these recruitment practices "open[] the door" such that Defendants assumed an obligation to disclose the uncharged violations alleged in the Complaint. *See St. Lucie Cnty. Fire Dist. Firefighters' Pension Tr. Fund* v. *Motorola, Inc.*, 2011 WL 814932, at *12 (N.D. Ill. Feb. 28, 2011).

Plaintiffs also challenge Defendant Pykosz's January 2021 statement in which he described Oak Street's patient acquisition strategy as a "B[usiness to] C[onsumer] sale" where "[w]e are selling individuals on becoming a patient on Oak Street Health. We're not getting push[ed] patients from someone else, et cetera. [It i]s not a B[usiness to] B[usiness] contract with a plan." ¶ 108(c); Ex. H at 19. Plaintiffs misconstrue the statement as suggesting that Oak

Street *never* acquired new patients that were directed by insurance agents or plan partners.  *See* ¶¶ 11, 109(d).  No reasonable investor would have interpreted the statement that way in light of Defendants' repeated disclosures that its "payor partners direct patients to Oak Street," that Oak Street grows its patient base through "assignments from our MA plan partners," and that the Company "love[s] when insurance advisers or health plans . . . push those patients" to Oak Street.  Ex. G, rows 21, 22, 24.  When reviewed in context, the statement conveyed that Oak Street's *principal* patient acquisition strategy was to "educate people individually" (B2C) and not to acquire existing books from other businesses (B2B).  Ex. H at 19.  Plaintiffs' allegations confirm the veracity of this statement.  *Supra* 16-17.

Statements About Regulatory Compliance.  Finally, Plaintiffs challenge Oak Street's repeated disclosure that the "OIG has expressed concern regarding the use of non-employed sales forces to recruit or facilitate the recruiting of patients or referrals," and that "in limited instances we use external companies to assist with certain aspects of these efforts, but only in arrangements that we believe do not violate the Anti-Kickback Statute or other applicable laws." Ex. G, row 27.  To the extent this statement includes verifiable facts—including that the OIG has "expressed concern" about the arrangements—Plaintiffs do not allege they are false.  To the extent the statement expresses Oak Street's opinion that the arrangements were lawful, it is not actionable because Plaintiffs fail to allege the opinion was not genuinely held.  *Infra* 19-22.

### 3.  Many Challenged Statements Are Non-Actionable Opinions

Several challenged statements are not actionable because they reflect Defendants' sincerely-held opinions and Plaintiffs plead no facts showing that the statements were subjectively disbelieved when made.  An opinion is actionable under the securities laws where the speaker does not "actually hold[] the stated belief."  *Omnicare, Inc.* v. *Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 176, 184 (2015).  To satisfy this standard, a plaintiff

19

must allege particular facts indicating that the speaker "did not honestly believe th[e] opinion when he gave it." *Fifth Third*, 2022 WL 1642221, at *17; *accord W. Palm Beach Firefighters' Pension Fund* v. *Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 650 (N.D. Ill. 2020), *aff'd sub nom.*, 2022 WL 1449184 (7th Cir. May 9, 2022).[7] No such facts are pleaded here.

Plaintiffs allege that Oak Street misled investors when it said that "in limited instances we use external companies to assist with certain aspects of [recruitment] efforts, but only in arrangements that ***we believe*** do not violate the Anti-Kickback Statute or other applicable laws." ¶ 101(h) (emphasis added); *see also* Ex. B at 36. Plaintiffs plead *no facts* suggesting that Oak Street did not genuinely hold this belief during the Class Period. There are no allegations suggesting that any current or former employee raised concerns about these practices with senior management, much less that any Individual Defendant or senior executive *believed* that these practices violated the law. This pleading failure is fatal. *See Fifth Third*, 2022 WL 1642221, at *17 (opinion that company was "doing a good job managing risk" was not rendered misleading by alleged regulatory violations because plaintiff did "not allege that [defendant] did not honestly believe that opinion when he gave it"); *Ikeda* v. *Baidu, Inc.*, 2021 WL 1299046, at *9 (N.D. Cal. Apr. 7, 2021) (dismissing opinion statements about regulatory compliance where "Plaintiff has not alleged specific facts that . . . [Defendant] did not believe . . . legal opinion that it was in compliance with [relevant] regulations").

If anything, the nature of the statement and the context in which it was made strongly suggest that the opinion *was* genuinely held. Oak Street regularly disclosed its use of third

---

[7]    An opinion may also be misleading if an investor identifies "facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have[,] whose omission makes the opinion statement at issue misleading." *Omnicare*, 575 U.S. at 194. Plaintiffs plead no facts about the bases for any Defendant's opinion and cannot satisfy the omissions prong of *Omnicare*.

parties to assist with patient acquisition in its public filings and discussed it during investor calls and presentations. *Supra* 17-19. The challenged statement itself also acknowledged that these arrangements carry risks, including that they "are closely scrutinized by federal agencies" and "could potentially implicate the [AKS]." *E.g.*, ¶ 101(h). These warnings undermine any inference that the Company intended to mislead investors about the legality of the recruitment practices. *See Caterpillar*, 2018 WL 4616356, at *5 (opinion that company "is complying with the law" not rendered misleading by alleged regulatory violations when "put in context by [issuer's] accompanying disclosures" regarding regulatory scrutiny of the practice at issue).

Plaintiffs also allege that Defendant Pykosz "admitted . . . after the Class Period" that "Oak Street began to 'pay' outside insurance agents or brokers for referrals to Oak Street, even though the AKS prohibits payments for referrals." ¶ 69. This is a blatant mischaracterization of Pykosz's statement, which never mentioned "referrals." What Pykosz *actually* said was that Oak Street "believe[s] that the term third-party agents [in the CID] refers to insurance agents and advisors who work with older adults to help them select the right Medicare advantage plan for them. And we have engaged and we pay these agents to help educate older adults about Oak Street Health and with the older adults['] consent, connect them to our employed [salespeople] that they are interested in learning more about Oak Street Health." Ex. U at 3. This statement is entirely consistent with Defendants' earlier statements about the use of third parties in patient recruitment, *supra* 18-19, and is not an "admission" that the arrangement violates the AKS.

Plaintiffs challenge several other opinions, including Defendants' statements that "we have developed, and continue to develop, new methods of outreach that we believe will be effective"; "I guess we can get the best of both worlds having our central and -- digital and other central [marketing] channels up and running"; and "we believe [our payor partners' efforts to

direct patients to Oak Street] results in the patient selecting us as their primary care provider."
Ex. G, rows 3, 14, 21.  Once again, Plaintiffs plead no facts suggesting that any speaker did not
honestly believe these opinions when made.  *Supra* 19-20.  Other courts have dismissed claims
based on similar opinions about a company's development of marketing and growth strategies.
*See, e.g.*, *Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund* v. *Allscripts-
Misys Healthcare Sols., Inc.*, 778 F. Supp. 2d 858, 872 (N.D. Ill. 2011) (statements that the issuer
was "'confiden[t] in [its] ability to deliver solid results,' and was 'in position to capitalize' on a
significant market opportunity," were nonactionable opinions that were "devoid of any
substantive content"); *Carvelli* v. *Ocwen Fin. Corp.*, 934 F.3d 1307, 1323 (11th Cir. 2019)
(statement that "[w]e believe significant investments in our servicing operations . . . will position
us favorably" was nonactionable opinion).

### 4.  Many Challenged Statements Are Non-Actionable Puffery

Challenges to numerous non-verifiable statements about the Company's patient growth
strategy should be dismissed as classic non-actionable puffery.  These include that the Company
"fundamentally control[s] [its] own destiny," "innovated and tried new things that are showing
good results," and "really scaled [its] digital [marketing] up in a big way."  Ex. G, rows 1, 5, 7.
Such "loosely optimistic statements that are so vague, so lacking in specificity, or so clearly
constituting the opinions of the speaker" are not actionable because no reasonable investor would
rely on them.  *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1164 (N.D. Ill. 2004).
Courts routinely dismiss claims based on statements like those challenged here.  *See, e.g.*, *Fifth
Third*, 2022 WL 1642221, at *18 (rejecting statements about "consumer-growth strategy,"
including that company is "harvesting" customer relationships); *City of Warren Police & Fire
Ret. Sys.* v. *Zebra Techs. Corp.*, 2020 WL 6118571, at *6 (N.D. Ill. Oct. 16, 2020) (rejecting
statements that system was "functioning really well" and "working well for us"); *Conagra*, 495

F. Supp. 3d at 653-54 (rejecting statement that business segment was driven by "robust innovation"). Claims based on similarly vague and optimistic statements should be dismissed.

### 5. Plaintiffs Fail To Allege Violations Of Items 303 And 105 Of Regulation S-K

Item 303. Plaintiffs allege that Defendants violated Item 303 of Regulation S-K by failing to disclose the two "improper patient acquisition tactics" discussed above in their regular SEC filings. ¶ 126. Item 303 requires issuers to disclose any "known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii). Plaintiffs' Item 303 allegations fail for several independent reasons.[8]

*First*, Plaintiffs allege that these practices created an "uncertainty that the government could seek fines or penalties, and Medicare could seek Oak Street's exclusion from participation." ¶ 126. But this *very uncertainty* was disclosed when Oak Street warned investors that its use of third parties in recruitment could "implicate the AKS," and that it could be subject to government "claims" and "investigations" which could lead to "fines," "penalties," and even "termination" of participation in Medicare. *Supra* 8-9. There can be no Item 303 liability for *disclosed* uncertainties. *See Nurlybayev* v. *ZTO Express (Cayman) Inc.*, 2019 WL 3219451, at *8 (S.D.N.Y. July 17, 2019).

---

[8] The Third, Ninth, and Eleventh Circuits have held that Item 303 violations cannot serve as the basis for an omissions-based claim under Section 10(b) because the duty to disclose under Item 303 "varies considerably from the general test for securities fraud materiality set out by the Supreme Court." *Oran* v. *Stafford*, 226 F.3d 275, 287–88 (3d Cir. 2000) (Alito, J.); *Carvelli*, 934 F.3d at 1331; *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014). The Second Circuit has held to the contrary. *See Stratte-McClure* v. *Morgan Stanley*, 776 F.3d 94, 102-03 (2d Cir. 2015). The Seventh Circuit has not addressed this issue, but this Court explained in *Twin Master Fund, Ltd.* v. *Akorn, Inc.*, 2020 WL 564222, at *7 (N.D. Ill. Feb. 5, 2020), that it found the Second Circuit's reasoning "more persuasive." Defendants respectfully ask the Court to reconsider this position, and also preserve the issue for further proceedings and appeal.

*Second*, Plaintiffs fail to plead that any Defendant had "actual knowledge" of any violations alleged in the Complaint. *See Conagra*, 495 F. Supp. 3d at 646-47. The "actual knowledge" requirement of Item 303 is even more exacting than the "recklessness" standard for pleading scienter; "[i]t is not enough that [an issuer] *should have known* of the existing trend, event, or uncertainty." *Id.*; *see also Lopez* v. *CTPartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 25 (S.D.N.Y. 2016) ("actual knowledge" requires "proof of knowing falsity"). Plaintiffs allege that Defendants "knew" about the allegedly unlawful patient acquisition strategies because "they were kickbacks under AKS." ¶ 126. This conclusory allegation is plainly insufficient to meet the "actual knowledge" requirement of Item 303. In any event, as discussed *infra* 25-31, Plaintiffs fail to plead scienter under Rule 9(b) and the PSLRA, and thus cannot satisfy the more stringent "actual knowledge" standard under Item 303. *See Conagra*, 495 F. Supp. 3d at 646-47.

*Finally*, Plaintiffs do not adequately allege that the supposedly omitted information was "reasonably likely" to have a "material" impact on sales, revenue, or income. 17 C.F.R. § 229.303(b)(2)(ii). "[O]missions are not material where they present or conceal insignificant data that simply would not matter to a reasonable investor." *Plumbers & Pipefitters Loc. Union* v. *Zimmer*, 673 F. Supp. 2d 718, 734 (S.D. Ind. 2009) (quotation marks omitted). Here, Plaintiffs make no attempt to quantify the impact of Oak Street's patient transportation practices on the Company's $1.4 billion business, and thus cannot establish the materiality of the practice. *See In re Nokia Ojy (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 408 (S.D.N.Y. 2006) (dismissing claim where plaintiffs did not "approximate the magnitude or degree of the alleged misstatements in relation to Nokia's total financial picture"). Plaintiffs' unspecific allegation that the CAP accounted for less than 10% of patient growth in 2021 is similarly inadequate to establish the materiality of the practice. *See supra* 6; *Zimmer*, 673 F. Supp. 2d at 734-35 & n.15

(materiality not pleaded where recalled product "constituted a total of six percent of Zimmer's revenue . . . [and] Plaintiff offers no convincing rationale for information of such relative insignificance as this triggering a duty of [] disclosure").

Item 105.  Plaintiffs allege that the same purported omissions also violated Item 105 of Regulation S-K, which requires a "discussion" of factors that make an investment "speculative or risky." ¶ 127; 17 C.F.R. § 229.105.  As discussed *supra* 8-9, Defendants *did* disclose this information.  In any event, Plaintiffs' Item 105 claim fails for the same reasons that their Section 10(b) claim fails.  *See City of Roseville Emps.' Ret. Sys.* v. *EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 426 (S.D.N.Y. 2011) ("Item [105] violations . . . track Rule 10b-5 violations.").

## B.    Plaintiffs Do Not Adequately Allege A Strong Inference Of Scienter

The PSLRA requires plaintiffs to "state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind," namely, an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false."  *Higginbotham* v. *Baxter Intern., Inc.*, 495 F.3d 753, 756 (7th Cir. 2007); 15 U.S.C. § 78u-4(b)(2)(A).  Recklessness, in this context, means "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *City of Livonia Emps.' Ret. Sys. & Local 295/Local 851* v. *Boeing Co.*, 711 F.3d 754, 756 (7th Cir. 2013).

A strong inference of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).  This "inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts?"  *Garden City*, 2011 WL 1303387, at *19.  Plaintiffs must plead a strong inference of scienter as to *each* defendant.  *Id.*  With respect to a corporate defendant, the

scienter inquiry focuses on "the state of mind of the individual corporate official or officials who ma[d]e or issue[d] the statement[s] . . . rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment." *Makor Issues & Rights, Ltd.* v. *Tellabs, Inc.*, 513 F.3d 702, 708 (7th Cir. 2008).

The Complaint comes nowhere near meeting this exacting pleading requirement. Plaintiffs plead *no facts* suggesting that *any* Officer Defendant knew (or was reckless in not knowing) that Oak Street's patient acquisition strategies violated the law, or that any Officer Defendant *believed* that these strategies were improper. The far more compelling inference, supported by Plaintiffs' own allegations, is that Defendants believed (and continue to believe) that these strategies did not violate the law, while recognizing the risk that the government might take an opposing view—a risk that has *not* materialized. That is not securities fraud.

### 1. Plaintiffs Plead No Facts Demonstrating That Any Officer Defendant Knew About Supposed AKS Violations

Plaintiffs' theory is that Defendants' statements throughout the Class Period concealed that Oak Street's third-party recruitment practices and provision of free transportation violated the AKS. Remarkably, however, the Complaint does not plead a *single fact* showing that any Officer Defendant knew about or recklessly disregarded a *single violation* during the Class Period. Plaintiffs do not identify any meetings or calls where violations (or potential violations) were discussed, much less ones attended by an Officer Defendant. Nor do Plaintiffs identify any internal data or reports flagging violations (or potential violations), much less ones sent to or reviewed by an Officer Defendant. "[A]llegations regarding unspecified reports, conversations, and meetings" contradicting Defendants' public statements "*fall far short* of the particularity requirements of the PSLRA and Rule 9(b), which require a plaintiff to specifically identify the reports or statements containing this information." *City of New Orleans Emps.' Ret. Sys.* v.

*PrivateBancorp, Inc.*, 2011 WL 5374095, at *8 (N.D. Ill. Nov. 3, 2011) (emphasis added). Here, Plaintiffs do not allege "unspecified reports, conversations, and meetings"—they allege *no* reports, conversations, or meetings. This requires dismissal. *See Hill* v. *The Trib. Co.*, 2006 WL 2861016, at *11 (N.D. Ill. Sept. 29, 2006) (rejecting scienter where there were "no allegations regarding any interim internal reports that were made that would have provided [defendants] with information that was inconsistent with any of the" challenged statements).

Plaintiffs also rely on anecdotes from four low-level FEs who recall details of the CAP and instances of Oak Street offering "free transportation" to prospective patients. ¶¶ 79-81, 84, 87, 95-96, 99; *supra* 6-7. The Seventh Circuit has instructed that allegations from confidential witnesses must be given a "steep" "discount" because "[i]t is hard to see how information from anonymous sources could be deemed compelling or how we could take account of plausible opposing inferences." *Higginbotham*, 495 F.3d at 756-57 ("Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist."). Even assuming their truth, the FEs' allegations do not support a strong inference of scienter because no FE purports to have knowledge of any violations. Nor do the FEs reveal anything about any Officer Defendant's knowledge or state of mind. Plaintiffs do not allege that any FE met or spoke with any Officer Defendant or senior executive, much less conveyed facts contradicting any Defendant's public statements. These allegations are inadequate. *See, e.g.*, *Rossy* v. *Merge Healthcare Inc.*, 169 F. Supp. 3d 774, 783-84 (N.D. Ill. 2015) (scienter allegations insufficient where confidential witness did not "reference any defendant or allege any specific information known to any of them"); *Zimmer*, 673 F. Supp. 2d at 747 (scienter allegations insufficient where "the Complaint [did] not specify any contact or communication between any confidential witness and any of the Defendants, nor [did] it include any allegation that any individual Defendant had

been actually aware of any material information").[9]

### 2. Plaintiffs' Speculation That Officer Defendants Must Have Known About Violations Because They Held Senior Positions, "Monitored" The Business, And Spoke Generally About Patient Acquisitions, Is Insufficient

"Must have known" allegations do not pass muster as securities fraud. But lacking any well-pleaded facts to support their scienter theory, that is precisely the improper speculation that Plaintiffs offer: the Officer Defendants *must have known* about AKS violations because they occupied senior positions and spoke broadly about patient acquisition strategies. These allegations are routinely rejected in this circuit, and should be rejected here.

*First*, Plaintiffs allege that the Officer Defendants were the "most senior executive officers at Oak Street," and thus "determine[d] the Company's strategies, decisions, and messaging" (¶¶ 143, 150); "determined the content of" and "signed or certified" SEC filings (¶¶ 144, 152); "were privy to confidential and proprietary information" (¶ 146); and stayed informed about "the Company's day-to-day business and operations" (¶ 147). But "'senior positions' within a company 'do not suggest scienter without additional support from internal documents or communications,'" none of which are alleged here. *Conagra*, 495 F. Supp. 3d at 661. In *In re Guidant Corp. Securities Litigation*, for example, plaintiffs alleged that defendants were "core members of the senior management team" and thus "privy to proprietary information about [the company's] growth and financial condition, had direct involvement in day-to-day

---

[9]   Only one FE purports to have communicated his observations to *anyone*. FE3 allegedly questioned the "legal and compliance group" about the presence of insurance agents at the clinics, and was told that the agents were there to "just answer questions," and that the practice was "above board." ¶ 90. Plaintiffs do not allege that the presence of insurance agents at Oak Street clinics was unlawful, nor do they allege it is being investigated by the DOJ. Moreover, the fact that the Company's legal and compliance personnel did not find the practice concerning undermines any inference of scienter. *See Rossy*, 169 F. Supp. 3d at 782 (rejecting scienter where former employee flagged concerns for senior manager, who was "dismissive" of the concerns, "undermining any inference that [the manager] thought enough of them to alert other members of . . . senior management").

operations, and controlled the dissemination of information by the company." 536 F. Supp. 2d 913, 932 (S.D. Ind. 2008), *aff'd sub nom.*, 583 F.3d 995 (7th Cir. 2009). The court dismissed these "conclusory" allegations because plaintiffs did "not demonstrate with *any* particularity that *any* Individual Defendant had knowledge of the product defects, nor a duty to monitor modifications to specific device lines." *Id.* Similarly, the court in *Fifth Third* rejected scienter allegations based on a defendant's attendance at investor meetings and signatures on SEC filings because the complaint "does not include any allegations that, in attending the investor meetings or signing the statements, [defendant] was told of the falsity of any of the representations or otherwise knew of the alleged problems." *Heavy & Gen. Laborers'* v. *Fifth Third*, 2021 WL 1648117, at \*16 (N.D. Ill. Apr. 26, 2021). So too here.

*Second*, Plaintiffs insist that scienter can be inferred because the Officer Defendants "monitored" patient growth and recruitment strategies. *E.g.*, ¶ 150. But allegations that defendants "monitored" a certain aspect of the business are inadequate where "the Complaint fails to allege any particularized facts suggesting that defendants actually possessed information contradicting their public statements." *Cox* v. *Blackberry Ltd.*, 660 F. App'x 23, 25 (2d Cir. 2016). Plaintiffs plead no such facts, and rely instead on Pykosz's general statements that Oak Street had "'innovated and tried new' patient acquisition strategies," which were "working" (¶ 151); that "insurance advisers or health plans" sometimes "push" patients to Oak Street (¶ 154); and that Oak Street "'is a really natural place' for seniors to receive primary care 'because we offer free transportation'" (¶ 155). At best, these statements demonstrate Pykosz's high-level awareness of certain patient acquisition strategies. But these allegations do *not* raise a strong inference that Pykosz knew about discrete violations, or believed that the practices violated the AKS. *See Chandler* v. *Ulta Beauty, Inc.*, 2022 WL 952441, at \*27-28 (N.D. Ill.

29

Mar. 30, 2022) (allegations that senior executives "monitored" certain aspects of the business "on a weekly basis" were inadequate absent allegations that executives "reviewed specific information that would have meant [they] knew that any of the alleged misrepresentations were false"); *see also Higginbotham*, 495 F.3d at 758 ("[T]here is a big difference between knowing about [reports] and knowing that the reports are false.").

*Third*, Plaintiffs allege that the Officer Defendants must have known that Oak Street's patient acquisition strategies violated the AKS because the Officer Defendants signed public filings with AKS risk disclosures and because the Company's Code of Conduct discusses the AKS. *See* ¶¶ 157-62. But these documents do not indicate that Oak Street violated the AKS or raise a strong inference that any Officer Defendant knew about specific violations, and these allegations thus "add nothing substantial to the scienter calculus." *Fifth Third*, 2022 WL 1642221, at *22 (rejecting allegations based on "signatures on SEC filings and certifications").

In fact, the very public filings that Plaintiffs cite demonstrate that Defendants "believe[d]" their third-party recruitment arrangements "*do not violate* the [AKS] or other applicable laws." *Supra* 8-9. Plaintiffs plead no facts suggesting that any Defendant did not sincerely believe that these strategies were lawful. *Supra* 19-20. To the contrary, Defendants discussed these recruitment strategies publicly and disclosed the attendant risks. *Supra* 8-9. The most compelling inference to draw is not that Defendants misrepresented their own opinions about the legality of these practices, but that Defendants sincerely believed that they are proper.

Plaintiffs also point to Oak Street's "post hoc claim in the 2021 10-K" that its third-party recruitment efforts are "structure[d] to meet the Personal Services Safe Harbour." ¶¶ 139, 161. Plaintiffs allege that this additional language "confirms" that Defendants "were aware" that the arrangements "were *prima facie* violations of AKS." ¶¶ 161-62. These "[p]ost-class period

statements . . . do nothing to suggest" what any Officer Defendant knew or believed during the Class Period.  *See Garden City*, 2012 WL 1068761, at *12.  And even if these arrangements are "prima facie violations of the AKS"—indeed, even if the DOJ were one day to accuse OSH of a violation—it would not raise a strong inference that Defendants did not genuinely "believe" that these arrangements "do not violate the [AKS]" when the challenged statements were made.[10]

### 3. Plaintiffs' Stock Sale And Compensation Allegations Are Insufficient

Plaintiffs allege that the Officer Defendants were motivated to lie to investors so that they could capitalize on stock sales during the Class Period.  ¶¶ 166-171.  Because "executives sell stock all the time," however, such allegations only support scienter if an insider's sales were "unusual or suspicious"  *Pugh*, 521 F.3d at 695.  A "complaint [that] merely sets forth the aggregate amount of shares sold during the class period and the value of those shares" is inadequate.  *Id.*  The Complaint here does just that; Plaintiffs simply set forth the number of shares that the Officer Defendants sold and their gross proceeds from those sales.  *See* ¶¶ 167-68. With one exception (discussed below, *infra* 32 n.12), the Complaint does not identify the date of any particular sale and allege why it was "suspicious or unusual," and does not "tie the timing of [any] sale to any specific misleading or false statements."  *Fifth Third*, 2022 WL 1642221, at *23.  Plaintiffs point out that the Officer Defendants realized most of the "proceeds" from their sales "within seven months of the November 2021 corrective disclosure." ¶¶ 167-68.  But the Officer Defendants were subject to a "180-day lock-up period" after the IPO that *prevented* them from selling shares until February 2021—*nine months* before the alleged corrective disclosure.

---

[10]   Plaintiffs' conclusory allegation that Defendants "had no good faith belief" that the CAP complied with the Personal Services Safe Harbour does not satisfy their burden of pleading *facts* demonstrating subjective disbelief.  ¶ 162.  In any event, Defendants "believe" that the CAP is compliant because, among other reasons, payments are made for leads regardless of patient conversions.  *Supra* 6-7.

*See* Ex. B at 49. The fact that Defendants' sales increased after the lock-up period ended is plainly not "unusual or suspicious." *See Scheller* v. *Nutanix, Inc.*, 450 F. Supp. 3d 1024, 1042 (N.D. Cal. 2020) (lack of sales during a "180-day lock-up period" following an IPO not suspicious).[11]

Plaintiffs omit several other details about Defendants' stock sales that weigh against scienter. Plaintiffs omit the fact that each Officer Defendant sold less than 20% of his holdings after the lock-up period, far below amounts that other courts have found are not "suspicious." *See* Exs. W & X; *see, e.g.*, *Metzler Inv. GMBH* v. *Corinthian Colleges, Inc.*, 540 F.3d 1049, 1067 (9th Cir. 2008) (sale of 37% of executive's holdings not suspicious); *Fifth Third*, 2022 WL 1642221, at *23 (sale of 26% of executive's holdings not suspicious). Plaintiffs omit that, after the lock-up ended, the Officer Defendants sold a relatively consistent number of shares at a relatively consistent rate, which cuts against scienter. *See* Ex. V; *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 444-45 (S.D.N.Y. 2005) (rejecting insider sales allegations where "Defendants' sales appear to have been distributed fairly evenly throughout the Class Period, not clustered at its end, when insiders theoretically would have rushed to cash out before the fraud was revealed and stock prices plummeted").[12] Further, although Plaintiffs allege facts about the Officer Defendants' "gross proceeds," ¶¶ 167-170, they plead no facts about "net profits," as case law

---

[11] Plaintiffs also point to sales by two non-defendants. *See* ¶ 169. But "stock sales of insiders not named as defendants are 'irrelevant to alleging scienter allegations against the [ ] named Defendants.'" *In re Supreme Indus., Inc. Sec. Litig.*, 2019 WL 1436022, at *10 (N.D. Ind. Mar. 29, 2019). In any event, Plaintiffs do not allege—even in conclusory fashion—that these sales were "unusual or suspicious."

[12] Plaintiffs note that Defendant Pykosz sold 50,000 shares of stock on November 2, 2021, one day after Oak Street received the CID. ¶ 167. This sale of *0.67%* of Pykosz's holdings is not "suspicious." The timing and amount of this sale was entirely consistent with the seven prior sales of 50,000 shares that Pykosz executed between August and October 2020. Ex. V. Pykosz also had no discretion to exercise this sale, which was made pursuant to a pre-arranged 10b5-1 plan. Ex. W; *see* ¶ 168 n.11.

requires. *Garden City*, 2012 WL 1068761, at *14 ("Pleading only gross proceeds," as opposed to "net profit[s]," is "insufficient to support a strong inference of scienter"). Finally, Plaintiffs omit the fact that nearly every stock sale was made pursuant to a non-discretionary Rule 10b5-1 trading plan, which further undermines any inference of scienter. *Id.* at *13 (collecting cases); Exs. W & X.

Plaintiffs also allege that the Officer Defendants were motivated to conceal the alleged AKS violations to "maximize their compensation." ¶¶ 172-73. But "a plaintiff cannot allege scienter based merely upon . . . a desire to increase incentive compensation, or similar factors that would be true for nearly all corporate executives." *Stephenson* v. *Hartford Life & Annuity Ins. Co.*, 2003 WL 22232968, at *9 (N.D. Ill. Sept. 26, 2003); *Stavros* v. *Exelon Corp.*, 266 F. Supp. 2d 833, 848 (N.D. Ill. 2003) ("[M]aximizing . . . executive compensation [is] the goal[] of all corporate executives; as such, they do not even remotely suggest fraudulent motivation.").

### 4. Oak Street's Purported "Widespread Tactics Of Aggressively Pursuing Revenue" Are Irrelevant And Do Not Support Scienter

As a last-ditch effort, Plaintiffs allege that Oak Street "sought to increase revenue at all costs, even beyond the misconduct referenced in the DOJ's investigation." ¶ 175. Plaintiffs reference allegations from FE3 and several articles from *The Capitol Forum*[13] that cite anonymous "former employees" who paint Oak Street in a negative light. ¶¶ 136-38, 141, 176-77, 183. As discussed above, FE allegations merit a "steep" "discount." *Supra* 27. In any event, these allegations are irrelevant. Although Plaintiffs suggest generally that Oak Street engaged in improper conduct—such as distributing "gift cards" and utilizing "improper diagnoses

---

[13] *The Capitol Forum* has been accused of publishing negative articles about public companies to benefit short sellers. *See MiMedx Grp., Inc.* v. *DBW Partners LLC*, 2018 WL 4681005, at *2 (D.D.C. Sept. 28, 2018). In 2018, a federal judge denied a motion to dismiss claims for libel, slander, and defamation brought by one such public company against *The Capitol Forum*. *Id.* at *6.

practices," ¶¶ 136, 175—neither the cited articles nor FE3 identifies a *single specific instance* of any improper conduct, nor do they tie *any* of the conduct to any Officer Defendant. Even if the Complaint contained such allegations, they concern conduct that is concededly "beyond . . . DOJ's investigation," ¶ 175, and thus shed no light on what any Officer Defendant knew about the supposed violations that are the subject of this lawsuit. *See Knox* v. *Yingli Green Energy Holding Co. Ltd.*, 2016 WL 6609210, at *16 (C.D. Cal. May 10, 2016) ("[Defendant's] alleged misappropriation of corporate funds is completely unrelated to the accounts receivable issue and thus also does not help to establish scienter."). Moreover, even if Plaintiffs could demonstrate that OSH was "aggressively pursuing revenue," this evinces an intent to *benefit* shareholders, not defraud them. *See In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 444 (S.D.N.Y. 2006) (conduct that "would benefit all shareholders" does not demonstrate intent to defraud).

## C. Plaintiffs Do Not Adequately Allege Loss Causation

The securities laws "protect [investors]" only "against those economic losses that misrepresentations actually cause." *Dura Pharm., Inc.* v. *Broudo*, 544 U.S. 336, 345 (2005). To satisfy loss causation, a plaintiff must show "that it was the very facts about which the defendant lied which caused its injuries." *Tricontinental Indus., Ltd.* v. *PricewaterhouseCoopers, LLP*, 475 F.3d 824, 842 (7th Cir. 2007). Where plaintiffs plead loss causation based on a corrective disclosure, they "must show both that the defendants' alleged misrepresentations artificially inflated the price of the stock and that the value of the stock declined once the market learned of the deception." *Ray* v. *Citigroup Glob. Markets, Inc.*, 482 F.3d 991, 995 (7th Cir. 2007).

Plaintiffs attempt to plead loss causation by pointing to a single corrective disclosure: the Company's November 8, 2021 disclosure that the DOJ was "investigating whether the Company may have violated the False Claims Act," and received a "CID [that] requests certain documents and information related to the Company's relationships with third-party marketing agents and

related to the Company's provision of free transportation to federal health care beneficiaries." ¶ 129.  This disclosure supposedly "revealed that [Oak Street] was under investigation for the improper tactics that had been concealed from the investing public during the Class Period." ¶ 190.  This theory is deficient because it did not "reveal" the truth of any misstatement.

An *investigation* is not proof of wrongdoing and the announcement of such does not establish loss causation.  Multiple circuit courts have explicitly held that "the announcement of an investigation, standing alone, is insufficient to establish loss causation" because "the market cannot possibly know what the investigation will ultimately reveal."  *Loos* v. *Immersion Corp.*, 762 F.3d 880, 883, 890 (9th Cir. 2014); *accord Meyer* v. *Greene*, 710 F.3d 1189, 1200-01 (11th Cir. 2013) (reaching same conclusion because "[t]he announcement of an investigation reveals just that—an investigation—and nothing more").  The Seventh Circuit used similar reasoning to affirm dismissal of securities fraud claims in *Pugh*.  521 F.3d 686.  There, plaintiffs argued that civil lawsuits against the issuer accusing it of fraud sufficed to show defendants' "actual knowledge of the fraud."  The court held that this argument "completely misses the boat" because the lawsuits only demonstrated defendants' "knowledge of *accusations* of fraud, not fraud itself."  *Id.* at 695.  Here, the DOJ has not even accused Oak Street of any wrongdoing, and its investigation of certain conduct does not show that the conduct was unlawful or establish loss causation.

The only incrementally new information revealed by the disclosure was the existence of the DOJ investigation itself.  But Plaintiffs do not (and cannot) allege that Defendants ever misled investors about the existence of the CID or DOJ investigation.  Nor can Plaintiffs pursue a theory that the disclosure demonstrated the materialization of an undisclosed risk (a theory not pleaded) because Defendants repeatedly and prominently disclosed the risk of a government

35

investigation. *Supra* 8-9. The materialization of a *disclosed* risk cannot satisfy loss causation. *See Bastian* v. *Petren Res. Corp.*, 892 F.2d 680, 686 (7th Cir. 1990) (rejecting loss causation where plaintiffs "were not told that oil and gas partnerships are risk-free" and plaintiffs alleged that "the materializing of that risk caused their loss"); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 568 F. Supp. 2d 349, 363 (S.D.N.Y. 2008) (rejecting loss causation where "Defendants did not conceal the risk").

To the extent Plaintiffs allege that the corrective disclosure revealed Oak Street's "improper tactics," they are wrong because both "tactics" were publicly disclosed and discussed with investors long before November 8, 2021. The alleged corrective disclosure reported that the CID requested information about "the Company's relationships with third-party marketing agents." Ex. T at 4. But the Company repeatedly disclosed—beginning at its IPO—that it used "external companies to assist with" recruitment and that insurance agents and health plans "pushed" patients to Oak Street. *Supra* 5-6, 8. The alleged corrective disclosure also reported that the CID requested information about "the Company's provision of free transportation to federal health care beneficiaries." Ex. T at 4. Again, however, Defendants publicly disclosed and discussed their provision of "free transportation" throughout the Class Period. *Supra* 7-8. Because the supposed corrective disclosure revealed "tactics" that were already known, it cannot satisfy Plaintiffs' burden of pleading loss causation. *See Motorola*, 2011 WL 814932, at *6 (loss causation not pleaded where the "facts and circumstances allegedly omitted or represented have actually been disclosed") (quotation marks omitted); *Teamsters Loc. 282 Pension Tr. Fund* v. *Angelos*, 762 F.2d 522, 530 (7th Cir. 1985) (an "investor cannot ask a court to . . . ignore [information] already available to others and reflected in the price of the security").

## II.   Plaintiffs Do Not Adequately Allege Violations Of Sections 11 And 12(a)(2)

Section 11 of the Securities Act creates liability for an issuer, the underwriters of an

offering, and signatories to a registration statement, for material misstatements or omissions in the registration statement. *See* 15 U.S.C. § 77k(a). Section 12(a)(2) of the Securities Act creates liability for certain "sellers" in a securities offering for material misstatements or omissions in a prospectus. *See* 15 U.S.C. § 77l(a). Plaintiffs allege that the very same statements that misled investors in violation of Section 10(b) similarly violate Sections 11 and 12(a)(2) because they were made in the registration statements and prospectuses ("Offering Materials") accompanying the Offerings. The Section 11 and 12(a)(2) claims fail because Plaintiffs do not adequately allege any actionable statement or omission. They also fail because Plaintiffs do not satisfy statutory standing requirements.

### A. Plaintiffs Fail To Adequately Allege Any Materially Misleading Statements Or Omissions Under Rule 9(b)

Plaintiffs have failed to plead that the Offering Materials contained any material misstatements or omissions with the particularity required by Rule 9(b). *Supra* 11-25. "Rule 9(b) applies to 'averments of fraud,' not claims of fraud, so whether the rule applies will depend on the plaintiffs' factual allegations." *Borsellino* v. *Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007). Here, Plaintiffs' Securities Act claims are based on precisely the same allegedly fraudulent conduct as their Exchange Act claims, namely, Defendants' purported concealment of improper patient acquisition strategies and AKS violations. ¶¶ 104(a)-(e), 109(a)-(f), 116(a)-(b), 122(a)-(d), 126, 128, 261-62. Every alleged misstatement or omission that forms the basis of the Securities Act claims is also alleged to be a fraudulent misrepresentation under the Exchange Act,[14] and Plaintiffs cite the same factual allegations as support for both sets of claims.[15] Plaintiffs even begin their Complaint by explaining that "[t]his case arises from an

---

[14] *Compare* ¶¶ 101(a-h), 102(b), 107(a-b), 110, 115, *with* ¶¶ 240 (a-h), 246, 247, 252, 257.

[15] *Compare* ¶¶ 199-203 (Section 10(b)), ¶¶ 263-71 (Section 11), *and* ¶¶ 272-82 (Section 12(a)(2)) (each

unfortunate *securities fraud pattern*." ¶ 3 (emphasis added). *See Borsellino*, 477 F.3d at 507 (applying Rule 9(b) to non-fraud claims where the complaint began: "This action arises out of a *pattern of fraud*") (emphasis added). Because the Complaint alleges "a unified course of fraudulent conduct," Plaintiffs' Securities Act claims sound in fraud and must meet the heightened pleading requirements of Rule 9(b). *Conagra*, 495 F. Supp. 3d at 636-37; *see Sears* v. *Likens*, 912 F.2d 889, 892-93 (7th Cir. 1990) (affirming dismissal of Securities Act claims for failing to satisfy Rule 9(b)); *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 886 (9th Cir. 2012) (applying Rule 9(b) to a Securities Act claim that "merely relies on the same alleged misrepresentations . . . that are central to Plaintiff's section 10(b) fraud claim").[16]

Even if Rule 9(b) did not apply, Plaintiffs' Securities Act claims would still fail because, as demonstrated above, they have not plausibly identified any material misrepresentations or omissions. *Supra* 11-25; *see In re Rigel*, 697 F.3d at 886 n.15.

### B. Plaintiffs Fail To Plead Section 11 Standing For The SPOs And Section 12(a)(2) Standing For Any Offering

#### 1. Section 11

An investor has standing to sue under Section 11 only if she purchased shares that are "traceable" to an offering with a materially false or misleading registration statement. *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1106 (9th Cir. 2013). Where, as here, a company has issued shares under more than one registration statement, the plaintiff must plead

---

citing ¶¶ 17-20, 23-61, 66-99, and 129-39 as supporting factual allegations).

[16] Although Plaintiffs purport to "disclaim" any allegations of fraud with respect to their Securities Act claims, ¶ 212, they make "little, if any, effort to differentiate their asserted negligence claims from the fraud claims which permeate the Complaint." *Rombach* v. *Chang*, 355 F.3d 164, 171-72 (2d Cir. 2004). "Courts generally look beyond such disclaimers to determine whether a Securities Act claim sounds in fraud." *Conagra*, 495 F. Supp. 3d at 636. Here, Plaintiffs' "disclaimer" cannot shield their Securities Act claims from the rigor of Rule 9(b).

facts demonstrating that "her shares were issued under the allegedly false or misleading registration statement, rather than some other registration statement." *Id.*

Plaintiffs have failed to adequately allege Section 11 standing for the SPOs because they plead no facts demonstrating that any Plaintiff purchased shares traceable to those Offerings. Plaintiffs do not allege that any Lead Plaintiff purchased shares in or traceable to any particular offering. Instead, they allege that, as "set forth in the attached Certification, [non-Lead Plaintiff] Dearborn purchased shares of Oak Street common stock in the Company's IPO, December 2020 [SPO], and February 2021 [SPO]." ¶ 26. Because no Plaintiff purports to have purchased shares in or traceable to the May 2021 SPO, no Plaintiff has standing to sue for misrepresentations in the May 2021 registration statement. Further, the bare allegation that Dearborn purchased shares "in" the December 2020 and February 2021 SPOs is inadequate to establish standing for those Offerings. Judge Pacold's thorough opinion in *Conagra* is on point. There, the court rejected plaintiffs' allegation that one plaintiff "purchased shares in the SPO" as a "formulaic recitation of that element." *Id.* at 669. Plaintiffs also pointed to a certification showing that one plaintiff purchased shares "on the day of the SPO and at the SPO price." *Id.* at 668-69. The court rejected this allegation because shares purchased "on the SPO date at the SPO price could have been purchases of previously issued shares," and faulted plaintiffs for failing to "include allegations about the identity of the seller in these purchases," despite being "in the best position to know whether the [plaintiffs] purchased stock directly from an underwriter." *Id.* at 670-71. The SPO also accounted for "only around 4% of the total outstanding [issuer] stock," making plaintiffs' traceability allegations implausible. *Id.*

The same reasoning requires dismissal here. Plaintiffs' "formulaic recitation" of the standing requirement should be afforded no weight. And unlike *Conagra*, the referenced

plaintiff Certification does *not* show purchases on the SPO dates. *See* Dearborn Cert., Ex. A (no

purchases on December 2, 2020, February 10, 2021, or May 26, 2021). Even if it did, Plaintiffs

do not "include allegations about the identity of the seller in these purchases." And the shares

issued in each SPO accounted for no more than 33% of the total outstanding shares of Oak Street

stock. *See supra* 8. The Section 11 claims should thus be dismissed with respect to the SPOs.

### 2. Section 12(a)(2)

Plaintiffs only have standing under Section 12 if they purchased shares directly from a

defendant in an offering. *See Conagra*, 495 F. Supp. 3d at 671-72. "[A]llegations that . . .

plaintiffs 'purchased shares in the SPO,' are insufficient to plausibly plead that . . . plaintiffs

purchased shares directly from the underwriters," and therefore "do not adequately plead

statutory standing for the Section 12 claim." *Id.* at 672; *see In re CitiGroup Inc. Bond Litig.*, 723

F. Supp. 2d 568, 585 (S.D.N.Y. 2010) (no Section 12(a)(2) standing where complaint did not

"identify a particular purchase from a particular defendant pursuant to a particular prospectus").

Here, Plaintiffs' bare allegation that Dearborn purchased shares "in" certain Offerings (¶ 280) is

inadequate because it does not suggest that Dearborn purchased shares directly from any

Defendant. Plaintiffs thus lack statutory standing to pursue any claims under Section 12(a)(2).

### C. Individual Defendants And Sponsor Defendants Are Not "Sellers" Under Section 12(a)(2)

Under Section 12(a)(2), any person who "offers or sells a security" can be liable *only* to

"the person purchasing such security from him." 15 U.S.C. § 77I(a)(2). "The Supreme Court

has made the categorically narrow nature of Section 12 liability clear and limited it only to 'the

buyer's immediate seller; remote purchasers are precluded from bringing actions against

remote sellers.'" *Shah* v. *Zimmer Biomet Holdings, Inc.*, 348 F. Supp. 3d 821, 847 (N.D. Ind.

2018) (quotation marks omitted). The Section 12(a)(2) claims against the Individual Defendants

and Sponsor Defendants should be dismissed because Plaintiffs do not allege that any of these Defendants solicited or sold Oak Street securities to any Plaintiff.

Individual Defendants.  Plaintiffs allege that the Individual Defendants "were sellers, offerors, and/or solicitors of purchasers of Oak Street's common stock," and that some were "selling shareholders" in certain offerings.  ¶ 277.  But Plaintiffs plead no facts about any Individual Defendant's role in soliciting the sale of Oak Street stock.  These allegations fail because "individual officers and directors are not liable absent allegations that they actually promoted or solicited the sale of securities."  *Premier Cap. Mgmt., L.L.C.* v. *Cohen*, 2003 WL 21960357, at *11 (N.D. Ill. Aug. 15, 2003) (quotation marks omitted); *see City of Westland Police & Fire Ret. Sys.* v. *MetLife, Inc.*, 928 F. Supp. 2d 705, 720 (S.D.N.Y. 2013) (dismissing Section 12(a)(2) claims where complaint was "largely silent as to the role played by the Individual and Director Defendants in the solicitation of the securities at issue").  The allegation that certain Individual Defendants "signed the Registration Statements and Prospectuses" (¶¶ 216-228) is similarly insufficient because "[a] pleading must allege that a defendant did more than merely sign a registration statement or prospectus to allege liability under Section 12(a)(2)." *In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 245 (S.D.N.Y. 2020).

Sponsor Defendants.  Plaintiffs insist that Newlight and General Atlantic are statutory "sellers" for the "Offering Materials used in offerings for which they were selling shareholders." ¶ 277.  Again, however, "[i]n order to plead a plausible Section 12 claim, a plaintiff must allege that the defendant sold to plaintiffs, and that has not been alleged."  *Shah*, 348 F. Supp. 3d at 848 (dismissing Section 12(a)(2) claims against private equity defendants who sold shares in SPO where plaintiffs did not allege that they "purchased any securities directly from any of the Private Equity Defendants . . . or that any of the Private Equity Defendants solicited plaintiffs'

purchase of any security"). The Sponsor Defendants thus are not alleged to be statutory sellers and the Section 12(a)(2) claims against them must be dismissed.

## III.  Plaintiffs Fail To State A Claim For Control Person Liability

In Counts II and V, Plaintiffs assert control person claims under Section 20(a) of the Exchange Act and Section 15 of the Securities Act against the Officer Defendants and Sponsor Defendants. ¶¶ 204-211; ¶¶ 283-290.[17] To state a viable control person claim, Plaintiffs must allege (1) a primary violation of the securities laws by a person or entity under the defendant's control, (2) that the defendant exercised general control over the issuer's operations ("general control"), and (3) that the defendant possessed the power or ability "to control the specific transaction or activity that is alleged to give rise to liability" ("specific control"). *Donohoe* v. *Consolidated Operating & Production Corp.*, 30 F.3d 907, 911-12 (7th Cir. 1994); *Conagra*, 495 F. Supp. 3d at 672-73. Both general and specific control must be pleaded with particularity under the heightened pleading standard of Rule 9(b).[18] *See Brasher* v. *Broadwind Energy, Inc.*, 2012 WL 1357699, at *12 (N.D. Ill. Apr. 19, 2012).

Here, the control person claims must be dismissed because Plaintiffs have failed to meet any of the three pleading requirements. *First*, Plaintiffs have not adequately alleged a primary violation of the Exchange Act or Securities Act. *See Conagra*, 495 F. Supp. 3d at 672-73.

*Second*, Plaintiffs plead no particular facts demonstrating that either Sponsor Defendant exercised general control over Oak Street. The test for general control is "whether the alleged control person actually participated in, that is, exercised control over, the operations of the

---

[17] The same analysis applies to claims under both Section 20(a) and Section 15. *See In re VMS Sec. Litig.*, 752 F. Supp. 1373, 1402 (N.D. Ill. 1990).

[18] Rule 9(b) governs the Securities Act claims as well as the Exchange Act claims because the entire Complaint sounds in fraud. *See supra* 37-38.

[controlled] person in general." *Harrison* v. *Dean Witter Reynolds, Inc.*, 79 F.3d 609, 614 (7th Cir. 1996); *Carlson* v. *Bear, Stearns & Co. Inc.*, 906 F.2d 315, 318 n.2 (7th Cir. 1990) ("active control of the principal violator" is required). Here, the Complaint does not allege *any* particular facts describing how either Sponsor Defendant actively participated in Oak Street's operations. Instead, Plaintiffs rely on passive allegations of stock ownership and board nominations, and consistently imply that General Atlantic and Newlight should be viewed as a single controlling entity. ¶¶ 207-210. This inference should be rejected because the Complaint pleads no facts describing how the two distinct entities worked together or jointly controlled Oak Street.

In *Fulton County Employees Retirement System* v. *MGIC, Investment Corporation*, the Seventh Circuit affirmed dismissal of control person claims against a shareholder that held 46% of the issuer's shares when there was a second shareholder that equally held 46% of the issuer's shares. 675 F.3d 1047, 1051 (7th Cir. 2012). Judge Easterbrook explained that the issuer could operate as it pleased unless *both* large shareholders agreed, and therefore that "it would be inappropriate to hold [one 46% shareholder] liable under § 20(a) for statements made by managers of a different firm that [the 46% shareholder] could not control without the assent of a third party holding an equally large bloc." *Id.* Here, like in *MGIC*, Plaintiffs do not plead any facts suggesting that Newlight and General Atlantic worked in concert, and accordingly neither Sponsor Defendant could exercise control "without the assent" of the other. *Id.*; *see also In re Kosmos Energy Ltd. Sec. Litig.*, 955 F. Supp. 2d 658, 676-77 & n.24 (N.D. Tex. 2013) (rejecting "conclusory assertion" that private equity sponsors acted "jointly" for purposes of control).

Properly considering the allegations regarding each Sponsor Defendant separately, the Complaint does not adequately plead control person liability under Rule 9(b). During the Class Period, General Atlantic held roughly 34.3% to 28.5% of Oak Street's common stock and

nominated three out of Oak Street's 12 directors; and Newlight held roughly 22.6% to 18.8% of

Oak Street's common stock and also nominated three of Oak Street's directors.  *See* ¶¶ 207-10;

Ex. B at 47; Ex. N at 6.  These share ownership allegations are insufficient to demonstrate that

either Sponsor Defendant exercised "active control" of Oak Street.  *See MGIC*, 675 F.3d at 1051;

*Brasher*, 2012 WL 1357699, at *12 (allegation that the defendant owned 47.7% of the issuer's

stock was insufficient to allege general control).  Similarly, the power to nominate three of 12

board members is not sufficient to "effectively control[] a majority of the board."  *See Confie*

*Seguros Holding II Co.* v. *J.C. Flowers & Co. LLC*, 2018 WL 4563068, at *5 (N.D. Ill. Sept. 24,

2018) (general control adequately pleaded where plaintiff plausibly alleged that "Defendants

effectively controlled a majority of the board").[19]

 Moreover, Oak Street's directors owed fiduciary duties to *Oak Street* and its

shareholders, and Plaintiffs plead no facts suggesting that the directors nominated by the Sponsor

Defendants merely did the Sponsors' bidding.  *See MGIC*, 675 F.3d at 1051 (rejecting control

person allegations where plaintiffs did not allege that the issuer's executives "promised to

support the [control defendant's] party line," but instead "appeared to be speaking for

themselves"); *In re Global Crossing, Ltd. Sec. Litig.*, 2005 WL 1907005, at *10 (S.D.N.Y. Aug.

8, 2005) ("[T]he power to appoint a representative to the [issuer's] board" is insufficient to raise

an inference of control where plaintiffs "allege no facts from which it could be inferred that these

individuals acted at the behest of [the alleged controlling entities] in exercising their duties as

---

[19] *See also Kosmos Energy*, 955 F. Supp. 2d at 676 (rejecting control person claims against private
equity companies that were "devoid of any allegations of . . . control over [issuer] aside from their
stock ownership and the fact that they designated their own employees as directors"); *Zishka* v. *Am.*
*Pad & Paper Co.*, 2001 WL 1748741, *1 (N.D. Tex. Sept. 28, 2001) (allegations that investment
funds held 38–50% of issuer's stock and appointed three of six directors insufficient to establish
control); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 273 (S.D.N.Y. 2004)
(allegations that Verizon owned almost 30% of issuer's stock, was the largest shareholder, and
appointed three of nine directors insufficient to establish control).

directors,").  Finally, Plaintiffs' allegation that, prior to February 2020, Oak Street disclosed that it was a "controlled company" under the NYSE rules, ¶¶ 207-08; Ex. B at 22, merely reflects share ownership and is "largely irrelevant" to the question of active control under the securities laws.  *See Kosmos Energy*, 955 F. Supp. 2d at 676-677.

*Third*, Plaintiffs plead no particularized facts showing that either Sponsor Defendant had the power to exercise specific control over Oak Street's public statements.  Plaintiffs point to general statements in SEC filings indicating that the Sponsor Defendants could have "significant influence with respect to [Oak Street's] management, business plans, and policies."  ¶ 208. Judge Zagel rejected nearly identical allegations in *Brasher*, where plaintiffs relied on the control defendant's 47.7% ownership and "general statements" in SEC filings that the control defendant "influences [the issuer's] affairs significantly."  2012 WL 1357699, at *12.  The court held that "[t]hese facts do not state with adequate particularity how the Defendants were in a position to control the specific conduct that constitutes the alleged primary securities violation."  *Id.*; *see MGIC*, 675 F.3d at 1051 ("[Plaintiff] does not contend that [the control person] directed [the primary violators] to say what they did."); *Ark. Teacher Ret. Sys.* v. *Bankrate, Inc.*, 18 F. Supp. 3d 482, 486 (S.D.N.Y. 2014) (dismissing control person claim against private equity firm Apax which "controlled more than 50% of Bankrate's stock" and "had four sitting representatives on Bankrate's seven person board," because the complaint "alleged no particularized facts suggesting that the Apax entities had control over the alleged misrepresentations at issue"). Because "the complaint does not contain a single allegation that the [Sponsor] Defendants possessed the power or ability to control the content of [Oak Street's] SEC disclosure statements," Counts II and V must be dismissed.  *Brasher*, 2012 WL 1357699, at *12.

## CONCLUSION

The Complaint should be dismissed with prejudice.

45

Dated: July 25, 2022

Respectfully submitted,

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

By:  /s/ *Andrew J. Ehrlich*

Andrew J. Ehrlich (*pro hac vice*)
Daniel S. Sinnreich (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY  10019-6064
Telephone:  212-373-3000
Facsimile:  212-373-3990
Email: aehrlich@paulweiss.com
Email: dsinnreich@paulweiss.com

-and-

Peter A. Silverman (Il. ARDC # 6196081)
Rebecca R. Kaiser (Il. ARDC # 6306280)
**SMITH, GAMBRELL & RUSSELL, LLP**
10 S. LaSalle Street, Suite 3600
Chicago, Illinois  60603
Telephone: 312-264-1004
Facsimile: 312-251-4610
Email: psilverman@sgrlaw.com
Email: rfournier@sgrlaw.com

***Counsel for Defendants Oak Street Health, Inc., Michael Pykosz, Timothy Cook, Director Defendants, and Sponsor Defendants***

Scott D. Musoff (*pro hac vice*)
**SKADDEN, APS, SLATE, MEAGHER, & FROM LLP**
One Manhattan West
New York, New York  10001
Telephone: (212) 735-7852
Email: scott.musoff@skadden.com

-and-

Marcie L. Lape (Il. ARDC # 6286676)
Clare Lilek (Il. ARDC # 6336261)

46

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
155 North Wacker Drive
Chicago, Illinois  60606
Telephone: (312) 407-0700
Email: marcie.lape@skadden.com

*Counsel for the Defendants J.P. Morgan Securities LLC, Goldman Sachs & Co. LLC, Morgan Stanley & Co. LLC, William Blair & Company L.L.C., and Piper Sandler & Co.*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 25, 2022, I electronically filed the foregoing Memorandum of Law in Support of Defendants' Motion to Dismiss Lead Plaintiffs' Complaint for Violations of the Federal Securities Laws with the Clerk of the Court through the CM/ECF system, which will automatically send notification of the filing to all counsel of record.

/s/ *Andrew J. Ehrlich*
Andrew J. Ehrlich