# Exhibit A

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-K

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2021**

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE TRANSITION PERIOD FROM TO**

**Commission File Number 001-39427**

# Oak Street Health, Inc.
**(Exact name of Registrant as specified in its Charter)**

| | |
|---|---|
| **Delaware** | **84-3446686** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| **30 W. Monroe Street, Suite 1200** | |
| **Chicago, Illinois 60603** | **60603** |
| **(Address of principal executive offices)** | **(Zip Code)** |

**Registrant's telephone number, including area code: (312) 733-9730**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| **Common Stock, $0.001 per share par value** | **OSH** | **NYSE** |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. YES ☒ NO ☐

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. YES ☐ NO ☒

Indicate by check mark whether the Registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. YES ☒ NO ☐

Indicate by check mark whether the Registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit such files). YES ☒ NO ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | | |
|---|---|---|---|---|
| Large accelerated filer | ☒ | | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | | Smaller reporting company | ☐ |
| Emerging growth company | ☐ | | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). YES ☐ NO ☒

The aggregate market value of voting shares held by non-affiliates of the Registrant was $6,653,442,635 as of June 30, 2021, the last business day of the Registrant's most recently completed second fiscal quarter (based on a closing price of $58.57 per share). Shares of common stock held by each executive officer, director, and holder of 5% or more of the outstanding common stock have been excluded in that such persons may be deemed to be affiliates. This determination of affiliate status is not necessarily a conclusive determination for other purposes.

The number of shares of Registrant's Common Stock outstanding as of February 23 , 2022 was 240,990,805.

List hereunder the following documents if incorporated by reference and the Part of the Form 10-K (e.g., Part I, Part II, etc.) into which the document is incorporated: (1) Any annual report to security holders; (2) Any proxy or information statement; and (3) Any prospectus filed pursuant to Rule 424(b) or (c) under the Securities Act of 1933. The listed documents should be clearly described for identification purposes (e.g., annual report to security holders for fiscal year ended December 24, 1980).

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the information called for by Part III of this Annual Report on Form 10-K is hereby incorporated by reference from the definitive proxy statement for the Registrant's annual meeting of stockholders, which will be filed with the Securities and Exchange Commission no later than 120 days after the Registrant's fiscal year ended December 31, 2021.

**Table of Contents**

|  |  |  | Page |
|---|---|---|---|
| **PART I** | | | |
| Item 1. | Business | | 4 |
| Item 1A. | Risk Factors | | 24 |
| Item 1B. | Unresolved Staff Comments | | 62 |
| Item 2. | Properties | | 62 |
| Item 3. | Legal Proceedings | | 62 |
| Item 4. | Mine Safety Disclosures | | 63 |
| **PART II** | | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | | 64 |
| Item 6. | Reserved | | |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | | 66 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | | 80 |
| Item 8. | Financial Statements and Supplementary Data | | 81 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | | 81 |
| Item 9A. | Controls and Procedures | | 81 |
| Item 9B. | Other Information | | 82 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | | 82 |
| **PART III** | | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | | 84 |
| Item 11. | Executive Compensation | | 84 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | | 84 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | | 84 |
| Item 14. | Principal Accounting Fees and Services | | 84 |
| **PART IV** | | | |
| Item 15. | Exhibits, Financial Statement Schedules | | 85 |
| Item 16. | Form 10-K Summary | | 88 |
| | Signatures | | 89 |
| | Index to the Consolidated Financial Statements | | F-1 |

i

## FORWARD-LOOKING STATEMENTS

Throughout this Annual Report on Form 10-K, we make "forward-looking statements" within the meaning of the U.S. Private Securities Litigation Reform Act of 1995. Forward-looking statements describe future expectations, plans, results or strategies and can often be identified by the use of terminology such as "may," "will," "estimate," "intend," "plan," "continue," "believe," "expect," "anticipate," "target," "should," "could," "potential," "opportunity," "goal" or similar terminology. The forward-looking statements contained in this Annual Report on Form 10-K are generally located in the material set forth under the heading "Management's Discussion and Analysis of Financial Condition and Results of Operations" but may be found in other locations as well. These statements are based upon management's current expectations, assumptions and estimates and are not guarantees of timing, future results or performance. Therefore, you should not rely on any of these forward-looking statements as predictions of future events. Actual results may differ materially from those contemplated in these statements due to a variety of risks and uncertainties and other factors, including, among other things:

- our history of net losses and our ability to achieve or maintain profitability in an environment of increasing expenses;

- the impact of the Coronavirus disease 2019 ("COVID-19") pandemic or any other pandemic, epidemic or outbreak of an infectious disease in the United States or worldwide on our business, financial condition and results of operations;

- the effect of our relatively limited operating history on investors' ability to evaluate our current business and future prospects;

- the viability of our growth strategy and our ability to realize expected results;

- our ability to manage our growth effectively, execute our business plan, maintain high levels of service and patient satisfaction and adequately address competitive challenges;

- our ability to attract new patients;

- the dependence of our revenues and operations on a limited number of key payors;

- the potential adverse impact of legal proceedings and litigation;

- the risk of termination or non-renewal of the Medicare Advantage contracts held by the health plans with which we contract, or the termination or non-renewal of our contracts with those plans;

- the impact on our business from changes in the payor mix of our patients and potential decreases in our reimbursement rates;

- our ability to compete in the healthcare industry;

- our ability to timely enroll new physicians and other providers in governmental healthcare programs before we can receive reimbursement for their services;

- the impact on our business of reductions in Medicare reimbursement rates or changes in the rules governing the Medicare program;

- our dependence on reimbursements by third-party payors and payments by individuals;

- our assumption under most of our agreements with health plans of some or all of the risk that the cost of providing services will exceed our compensation;

- the impact on our business of renegotiation, non-renewal or termination of capitation agreements with health plans;

- the impact on our results from operations from Medicare's risk adjustment payment system;

- risks associated with estimating the amount of revenues and refund liabilities that we recognize under our risk agreements with health plans;

- the impact on our business of security breaches, loss of data or other disruptions causing the compromise of sensitive information or preventing us from accessing critical information;

- the impact on our business of disruptions in our disaster recovery systems or management continuity planning;

- the impact of reductions in the quality ratings of the health plans we serve;

- the risk of our agreements with the physician equity holder of our practices being deemed invalid;

- our ability to maintain and enhance our reputation and brand recognition;

2

- our ability to effectively invest in, implement improvements to and properly maintain the uninterrupted operation and data integrity of our information technology and other business systems;

- our ability to obtain, maintain and enforce intellectual property protection for our technology;

- the potential adverse impact of claims by third parties that we are infringing on or otherwise violating their intellectual property rights;

- risks associated with existing securities class action litigation;

- our ability to protect the confidentiality of our trade secrets, know-how and other internally developed information;

- the impact of any restrictions on our use of or ability to license data or our failure to license data and integrate third-party technologies;

- risks associated with our use of "open-source" software;

- our dependence on our senior management team and other key employees;

- the concentration of our primary care centers in Illinois, Michigan, Pennsylvania, Ohio and Texas;

- the impact on our business as a result of an economic downturn;

- our ability to attract and retain highly qualified personnel;

- our management team's limited experience managing a public company;

- the impact on our business of the termination of our leases, increases in rent or inability to renew or extend leases;

- the impact of failures by our suppliers, material price increases on supplies, lack of reimbursement for drugs we purchase or limitations on our ability to access new technology or products;

- our ability to maintain our corporate culture;

- the impact of competition for physicians and nurses, shortages of qualified personnel and related increases in our labor costs;

- our ability to attract and retain the services of key primary care physicians;

- the risk that our submissions to health plans may contain inaccurate or unsupportable information regarding risk adjustment scores of members;

- our ability to accurately estimate incurred but not reported medical expense;

- the impact of negative publicity regarding the managed healthcare industry;

- the impact of state and federal efforts to reduce Medicaid spending;

- the impact on our centers of adverse weather conditions and other factors beyond our control;

- our ability to develop and maintain proper and effective internal control over financial reporting; and

- other factors disclosed in the section entitled "Risk Factors" and elsewhere in this Annual Report on Form 10-K.

We derive many of our forward-looking statements from our operating budgets and forecasts, which are based on many detailed assumptions. While we believe that our assumptions are reasonable, we caution that it is very difficult to predict the impact of known factors, and it is impossible for us to anticipate all factors that could affect our actual results. Important factors that could cause actual results to differ materially from our expectations, or cautionary statements, are disclosed under the sections entitled "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" in this Annual Report on Form 10-K. All written and oral forward-looking statements attributable to us, or persons acting on our behalf, are expressly qualified in their entirety by these cautionary statements as well as other cautionary statements that are made from time to time in our other SEC filings and public communications. You should evaluate all forward-looking statements made in this Annual Report on Form 10-K in the context of these risks and uncertainties.

We caution you that the important factors referenced above may not contain all of the factors that are important to you. In addition, we cannot assure you that we will realize the results or developments we expect or anticipate or, even if substantially realized, that they will result in the consequences or affect us or our operations in the way we expect. The forward-looking statements included in this Annual Report on Form 10-K are made only as of the date hereof. We undertake no obligation to update or revise any forward-looking statement as a result of new information, future events or otherwise, except as otherwise required by law.

3

**PART I**

## Item 1. Business

### Overview

Oak Street Health, Inc. (collectively with its subsidiaries is referred to as "Oak Street Health," "OSH," "we," "us," "our," or the "Company") was formed as a Delaware corporation on October 22, 2019 for the purpose of completing a public offering and related restructuring transactions (collectively referred to as the "IPO") in order to carry on the business of Oak Street Health, LLC ("OSH LLC") and its affiliates. As the managing member of OSH LLC, Oak Street Health, Inc. operates and controls all of the business affairs of OSH LLC and its affiliates. Following the IPO, Oak Street Health, Inc. consolidates the financial results of OSH LLC. Our common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "OSH."

The Company operates primary care centers within the United States serving Medicare beneficiaries. The Company, through its centers and management services organization, combines an innovative care model with superior patient experience. The Company invests resources into primary care to prevent unnecessary acute events and manage chronic illnesses. The Company engages Medicare eligible patients through the use of an innovative community outreach approach. Once patients are engaged, the Company integrates population health analytics, social support services and primary care into the care model to drive improved outcomes. The Company contracts with health plans and the Center for Medicare & Medicaid Services ("CMS") to generate medical costs savings and realize a return on its investment in primary care. As of December 31, 2021, the Company operated 129 centers across 19 states, which provided care for approximately 153,400 patients. We, together with our affiliated physician practice organizations, employed approximately 4,800 team members, including approximately 500 primary care providers as of December 31, 2021. Our operations are organized and reported under one segment.

### Mission

Since our founding in 2012, our mission has been to build a care delivery platform, built on a chassis of primary care that directly addresses rising costs and poor outcomes, two of the most pressing challenges facing the United States healthcare industry. Our approach shifts the allocation of healthcare resource delivery from traditional acute and specialist care into an enhanced, patient- centered care delivery platform which is designed to meaningfully improve the quality of care and outcomes for high-risk populations. It represents the frontline implementation of the solutions addressing the most powerful trends in healthcare, mainly the shift towards value-based care and increasing patient consumerism. Our approach also disrupts the current state of care delivery for Medicare-eligible patients and aligns the incentives of our patients, our providers and our payors by simultaneously improving health outcomes and care quality, lowering medical costs and improving the patient experience.

To pursue our mission, we created a *technology-enabled*, *integrated* platform, which we refer to as the Oak Street Platform, to deliver *value-based* care *focused* exclusively on Medicare patients. The key attributes that differentiate the Oak Street Platform include:

- *Our patient focus.* We are focused on the Medicare-eligible population, which generally has consistent, clinically cohesive needs and which we believe represents the greatest potential for cost savings, while still benefiting patient health outcomes, in our current healthcare system.

- *Our technology-enabled model.* We leverage technology that compiles and analyzes comprehensive patient data and provides actionable health insights through applications that are embedded in care delivery workflows, including at the point of patient-provider interaction.

- *Our integrated approach to care delivery.* We integrate a personalized approach to primary care, proactive management of our patients' health needs and expanded preventive services to keep our patient population healthy, reducing the number of hospitalizations and other expensive and unnecessary utilization of the healthcare system. As such, we focus on delivering what we believe to be the right care in the right setting, encouraging our patients to visit us in our centers, while also offering robust virtual and digital engagement options.

- *Our value-based relationships.* Our value-based capitation contracts reward us for providing high- quality care rather than driving a high volume of services.

4

**Organization**

- We operate through our direct and indirect subsidiaries, primarily, Oak Street Health MSO, LLC ("OSH MSO"). OSH MSO operates as a management services organization and is in the business of providing management and other administrative services to our affiliated physician practice organizations under long-term management and/or administrative services agreements ("MSAs"), pursuant to which OSH MSO manages certain non-medical services for the physician practice organizations and has authority over all non-medical decision making related to ongoing business operations.

- Some states have laws that prohibit business entities with non-physician owners from practicing medicine, which are generally referred to as the corporate practice of medicine. States that have corporate practice of medicine laws require only physicians to practice medicine, exercise control over medical decisions or engage in certain arrangements with other physicians, such as fee-splitting.

- Therefore, in addition to our subsidiaries, we mainly operate by maintaining long-term management services agreements with our affiliated physician practice organizations, which are owned, directly or indirectly, and operated by certain licensed physicians who hold shares, and which employ or contract with additional physicians to provide medical services. Under such agreements, we provide and perform non-medical management and administrative services, including financial management, information systems, marketing, risk management and administrative support.

- We have entered into MSAs with affiliated physician practice organizations (each, a "PC"). These affiliated PCs contract with various managed care organizations or licensed health care service plans, each of which pays a fixed capitation payment to that particular PC. In return, that PC provides health care services by employing physicians and other providers of primary care services. The applicable PC assumes the financial risk of the cost of delivering health care services in excess of the fixed amounts received. The risk is subject to stop-loss provisions. The physicians employed by the PC are exclusively in control of, and responsible for, all aspects of the practice of medicine for their patients. In accordance with relevant accounting guidance, each of these PCs is determined to be a variable interest entity ("VIE") of Oak Street Health as Oak Street Health has the ability, through the MSA, to direct the activities (excluding clinical decisions) that most significantly affect the PC's economic performance. Therefore, all PCs are consolidated in the accompanying financial statements.

- As of October 20, 2021, we acquired RubiconMD Holdings, Inc. ("Rubicon" or "RMD"), a leading technology platform in New York providing access to specialist expertise. The acquisition enables Oak Street Health to integrate virtual specialty care into its existing care model, which is expected to significantly streamline the referral process and better manage costs, enhance patient experience and provide comprehensive care far beyond traditional primary care.

- Lastly, we are the majority interest owner in three joint ventures: OSH-PCJ Joliet, LLC; OSH-RI, LLC and OSH-ESC Joint Venture, LLC, which are consolidated in the accompanying financial statements.

**Industry Overview, Challenges and our Opportunity**

According to the Centers for Medicare & Medicaid Services ("CMS"), healthcare spending in the United States reached nearly $4.1 trillion, and Medicare accounted for approximately $830 billion of spending in 2020. We believe the core addressable market for the Oak Street Platform is approximately 27 million Medicare eligible patients in our target demographic, which we believe represents an approximate $356.4 billion annual industry revenue opportunity. We determine the core addressable market by multiplying an estimate of average annual revenue of $13,200 per member, which is derived from our experience and industry knowledge and which we believe represents a reasonable national assumption, by the number of Medicare eligibles in our target markets. Average spending on Medicare is projected by CMS to grow approximately 7.4% annually, driven primarily by the aging United States population as well as the high prevalence of chronic conditions and the associated cost of care for these conditions among the Medicare eligible population.

We reimagined the approach to caring for a patient population with a high prevalence of chronic conditions and purpose-built the Oak Street Platform to improve health outcomes and combat wasteful spending. The Oak Street Platform consists of (i) Our Centers, (ii) Our Interdisciplinary Care Teams, (iii) Canopy: Our Purpose-Built, End-to-End Technology and (iv) Our Care Delivery Approach (further discussed below).

Although we have incurred net losses since inception, we believe that the Oak Street Platform has enabled us to create a healthcare model where all constituencies involved have the ability to "Win." Our patients, payors and providers are incentivized to adopt the Oak Street Platform, and each has the potential to benefit in a meaningful way.

- *Patients*. We leverage our differentiated care delivery model to improve the health of our patients, effectively manage their chronic conditions and avoid unnecessary hospitalizations while greatly improving their patient experience.

- *Payors*. We enter into arrangements with Medicare Advantage ("MA") plans and CMS to manage the care of our patients, allowing us to control the plans' medical costs, increase the plans' Medicare quality scoring, improve the plans' profit margin and help the plans grow membership.

- *Providers*. We enable our providers to focus on improving the lives of their patients and improve their job satisfaction by providing them with meaningful clinical support and customized technology resources.

We believe we can translate these "Wins" into economic benefits. Since 2016, our performance has been driven by our multi-year, contractual arrangements with payors on a per patient, per month ("PPPM") basis, which create recurring revenue streams and provide significant visibility into our financial growth trajectory. By focusing on interventions that keep our patients healthy, we can capture the cost savings the Oak Street Platform creates and reinvest them in our care model. We believe these investments lead to better outcomes and improved patient experiences, which will drive further cost savings, power patient retention and enable us to attract new patients. We believe increasing cost savings over a growing patient population will deliver an even greater surplus to the organization, enabling us to reinvest to scale and fund new centers, progress our care model and enhance our technology.

We have demonstrated an ability to rapidly scale, expanding our model to a network of 129 centers across 19 states, which provided care for approximately 153,500 patients as of December 31, 2021, of which approximately 75% are under capitation arrangements (which we refer to as "at-risk patients") and approximately 25% are fee-for-service, although fee-for-service accounted for less than 1% of our revenues for the year ended December 31, 2021. As of December 31, 2021, we, together with our affiliated physician practice organizations, employed approximately 4,800 team members, including approximately 500 primary care providers. For the years ended December 31, 2021 and 2020, our total revenues were $1,432.6 million and $882.8 million, respectively, representing a year-over-year growth rate of 62%.

**The U.S. healthcare system is at a transition point in its evolution**

*Unsustainable and rising healthcare costs*

Healthcare spending in the United States reached nearly $4.1 trillion in 2020 according to CMS, representing approximately 19.7% of U.S. Gross Domestic Product ("GDP"). The United States spent approximately $12,530 per person on healthcare in 2020, more than any other country in the world and twice the Organization for Economic Co-operation and Development ("OECD") average. Healthcare expenditures are particularly concentrated in the Medicare-eligible population due to the high rate of chronic conditions. While representing only 15% of the United States population, the 65 and older age group accounted for 34% of all healthcare spending in 2014, with an average spend of $19,098 per person. Additionally, two-thirds of the Medicare population lives with two or more chronic health conditions, and treatment of these conditions represents 96% of Medicare spending.

*Prevalence of wasteful spending and sub-optimal outcomes*

A 2019 study estimated that approximately 25% of all healthcare spending is for unnecessary services, excessive administrative costs, fraud and other problems creating waste, implying approximately $760 billion to $935 billion of annual wasteful spending at current levels.

In 2017, hospital care accounted for the largest portion of healthcare spending in the United States, representing 33% of the total. In 2018, over 60% of Medicare expenditures (including both Medicare Part A spend and Medicare Part B institutional spend), or approximately $455 billion, were dedicated to hospitalization, compared to only approximately 3% dedicated to primary care. Proper management of chronic conditions can significantly reduce the incidence of acute episodes, which are the main drivers of trips to the emergency room and hospitalization, particularly among the elderly.

Despite high levels of spending, the United States healthcare system struggles to produce better health outcomes and to keep doctors and patients satisfied. Life expectancy in the United States was 78.6 years in 2017, compared to 82.2 years in comparable developed countries, and patient satisfaction with the healthcare system is low, as evidenced by a Net Promoter Score of 3 for the average provider, as shown in a 2015 Advisory Board survey.

*New payment structures have begun to address the problem*

Policymakers and healthcare experts generally acknowledge the fundamental challenges and opportunities for improvement in the delivery of healthcare in the United States. Historically, healthcare delivery was centered around reactive care to acute events,

6

which resulted in the development of a fee-for-service payment model. By linking payments to volume of encounters and pricing for higher complexity interventions, the fee-for-service model does not reward prevention but rather unintentionally incentivizes the treatment of acute care episodes as they occur. Policymakers have responded by creating programs like MA and pushing for transitions to value- based reimbursements.

- *Medicare Advantage.* MA works as an alternative to traditional fee-for-service Medicare. In MA, CMS pays health plans a monthly sum per member to manage all health expenses of a participating member. This provides the health plans with an incentive to deliver lower-cost, high-quality care.

- *Value-based payments.* In response to rising healthcare spending in the United States, commercial, government and other payors are shifting away from fee-for-service payment models towards value-based models, including risk-based payment models that tie financial incentives to quality, efficiency and coordination of care. Value-based refers to the goal of incentivizing healthcare providers to simultaneously increase quality while lowering the cost of care. While not a policy-setting body, the Health Care Payment Learning & Action Network, an active group of public and private healthcare leaders, indicated in October of 2019 its desire to move 100% of Medicare payments to being tied to value-based care by 2025. Additionally, the Center for Medicare and Medicaid Innovation ("CMMI") launched the Global and Professional Direct Contracting ("GDPC") Model (the "Direct Contracting Model") as of April 2021 to create value-based payment arrangements directly with provider groups for their current Medicare fee-for-service patients similar to the value-based contracts that we enter into with our MA partners. On February 24, 2022, CMMI announced that the Direct Contracting Model will continue through the end of 2022 after which it will be transformed into the new Accountable Care Organization (ACO) Realizing Equity, Access, and Community Health (REACH) Model (the "ACO REACH Model"), which seeks to encourage health care providers to coordinate care to improve the care offered to people with Medicare - especially those from underserved communities. We believe that patient-centered, outcome driven reimbursement models will continue to grow in prominence. We already receive substantial value-based payments, and as valued-based payment systems continue to increase in prominence, it is our view that our strong clinical outcomes will be increasingly rewarded.

*Legacy healthcare delivery infrastructure has been unable to transition from reactive and episodic care to proactive and comprehensive care models*

In order for shifts to value-based payment models to drive meaningful results, there must be a corresponding shift in care delivery models. To date, such care delivery models have been slow to develop. While there has been significant investment by providers, payors and technology companies in developing solutions to drive higher quality and lower cost of care, these investments have not resulted in meaningful change within a healthcare delivery infrastructure that remains optimized for the fee-for-service model.

In order to maintain economically viable practices in a fee-for-service payment model, typical primary care providers:

- need to see an ever-increasing number of patients per day with limited support from staff, which limits time spent with each patient during office visits;

- experience time constraints that restrict their ability to engage with patients outside of office visits, which is a key component of ensuring that patients continue to proactively manage their health and do not fall through the cracks of the healthcare system; and

- experience financial constraints that limit their ability to invest in technology and provide patients with many of the supplemental services they need, such as home-based primary care, medication management and behavioral health services.

Advances in technology have disrupted multiple industries when the technology was thoughtfully applied and integrated. These new business models, systems and approaches have replaced legacy offerings and driven significant changes in consumer behavior. We believe that an integrated, value-based care platform enabled by data and technology has the potential to similarly revolutionize the healthcare industry.

The COVID-19 pandemic has highlighted challenges with the current legacy healthcare delivery system. As healthcare providers were faced with dwindling fee-for-service visits in light of the stay-at-home orders and general patient fear, the revenues of traditional healthcare providers plummeted thereby putting a strain on those providers and their ability to provide needed care for their patients.

7

*Our Market Opportunity*

We have designed the Oak Street Platform to bring technology-enabled, value-based care to the Medicare- eligible population, which represents the highest proportion of healthcare spending in the United States. We target populations of Medicare beneficiaries in high-density urban and suburban areas and further refine our target markets by utilizing socioeconomic data to target areas suffering from poor care quality and higher unnecessary spend.

As of 2021, there were approximately 63 million Medicare beneficiaries in the United States, with additional individuals reaching the age of eligibility every day. Healthcare spending in the United States reached nearly $4.1 trillion and Medicare accounted for $830 billion of spending in 2020. We estimate our addressable market of Medicare eligibles, based on the criteria set out above, to be 27 million patients. Based upon our experience and industry knowledge, we estimate average annual revenue of $13,200 per member. Multiplying this figure by the number of Medicare eligibles in our target markets, we arrive at what we believe is an annual total addressable market size of approximately $356.4 billion.

*The Oak Street Platform is Re-Defining Primary Care*

We reimagined the approach to caring for a patient population with a high prevalence of chronic conditions and purpose-built the Oak Street Platform to improve our patients' health outcomes and combat wasteful spending, providing a higher-quality alternative to the status quo. Our Oak Street Platform consists of (i) *Our Centers*, (ii) *Our Interdisciplinary Care Teams*, (iii) *Canopy: Our Purpose-Built, End-to-End Technology* and (iv) *Our Care Delivery Approach*.

*Our Centers*

Our novel approach starts with retail-like, community-based centers that implement a branded and consumer-focused design to create a welcoming environment that engages our patients. These centers are leased or licensed by OSH MSO or an affiliated entity and, pursuant to the terms of certain contractual relationships between OSH MSO and our affiliated physician practice organizations, made available for use by the medical practices in the provision of primary care services. While traditional healthcare facilities are often located in medical office buildings that are removed from where patients spend a majority of their time, we target locations in highly accessible, convenient locations close to where our patients live. Each of our centers has a consistent look and feel, which we believe differentiates Oak Street and contributes to our success in acquiring patients.

*Our Interdisciplinary Care Teams*

We utilize a team-based approach in our patient-focused primary care delivery model and staff interdisciplinary care teams ("Care Team") to execute our model. Each Care Team is led by a Primary Care Physician or Nurse Practitioner who is partnered with a Registered Nurse, a Medical Assistant and a Scribe to deliver value-based, coordinated care. As a center grows, we increase the number of Care Teams serving that center in order to keep the average number of patients per Care Team low to ensure optimal care quality and patient experience.

Our Care Teams are trained in preventive and comprehensive care designed to address the whole person, across medical, social and behavioral attributes, in a welcoming and friendly manner. Our Care Teams meet daily to discuss their approach for each patient they will see that day and have weekly and monthly planning and review sessions for their sickest patients to assess their progress and determine the next steps in improving their health. Care is provided in several different ways, including face-to-face visits, telehealth visits, remote patient monitoring and in-home care.

*Canopy: Our Purpose-Built, End-to-End Technology*

Canopy is a key driver of the success of our care model and underlies every aspect of our day-to-day patient engagement and workflows. Canopy comprises of internally developed software that connects a suite of population health analytics and technology applications designed to fit seamlessly into our care delivery model and Care Team virtual and in-person workflows.

Our position in the healthcare ecosystem allows Canopy to access and capture an immense amount of data about our patients from a broad set of sources, including payor claims data, pharmacy data and medical records from hospitals and specialists. Canopy enhances our ability to quickly structure and sort these disparate data sets to develop a comprehensive view of both our patients and our target demographic across medical, behavioral and social health attributes. We leverage artificial intelligence and machine learning capabilities to create and refine our clinical rules engine (predictive models and prescriptive algorithms) that informs care delivery and addresses hospital admissions and readmissions, medical costs and patient retention. Our algorithms are internally developed and optimized for the primary care setting, undergo rapid iteration cycles and benefit from clinician partnership and input.

8

When paired with our operational expertise, we believe Canopy is a key driver in our ability to scale our platform quickly and consistently, while delivering evidence-based care in a value-based model.

*Our Care Delivery Approach*

Our care delivery approach consists of three core components:

- *Personalized Primary Care*. We provide preventative care addressing the needs of the whole person- medical, social and behavioral. Upon joining Oak Street Health, our patients undergo a structured geriatric assessment to understand their care needs. We input these assessments, along with other available data, into Canopy, which analyzes multiple patient risk factors using our internally developed algorithms to stratify patients by the risk of their experiencing an acute event. Based on this analysis, we create a tailored, individualized care plan that determines the ideal frequency of primary care visits and use of disease-specific programs. Our patients experience the results of this differentiated approach through approximately eight physician visits per year, significantly more visits than a patient can expect with a typical primary care physician, with our sickest patients being seen even more frequently. In addition, we manage the total number of patients assigned to a Care Team at each center to allow each Care Team to spend more time with their patients and reduce wait times.

- *Proactive Patient Health Management*. In addition to spending more time with our patients, our smaller ratio of patients to Care Teams allows our physicians to reserve time daily to review their patients' care plans and each week conduct a deeper dive on high-risk patients. The Oak Street Platform leverages Canopy's robust data and analytics to generate insights, which are fed into our custom-built workflow applications in order to identify additional actions to take, gaps to close and interventions to perform on our patients. This systematic review of each of our patients is designed to ensure that once a Medicare member becomes an Oak Street patient, they stay current with their recommended health management plan, do not fall through the cracks of the healthcare systems and therefore remain on the path to better health.

- *Enhanced Clinical Services*. Using Canopy's internally developed algorithms, we identify high-risk patients with specific needs outside of primary care and provide multi-disciplinary interventions to improve outcomes and reduce cost. We offer a number of programs that are integrated into our care model and that would not typically be available to patients under legacy fee-for-service models, including behavioral health, home-based primary care by dedicated provider teams, virtual digital offerings, medication management, social determinant support, 24x7 live phone support by our clinical call center and transitional care support to help our patients navigate the care journey outside of our centers.

*Environmental, Social, and Governance and Impact*

At Oak Street Health, we believe the success of our business is intertwined with our impact on and relationships with our employees, customers, suppliers and the communities we serve, as well as the accountability of our leadership to shareholders and our impact on the environment. We measure our impact, in part, based on outcomes for our patients, the communities we serve and the U.S. healthcare system. Our care model has consistently demonstrated outstanding clinical results, removed costs and delivered an industry-leading patient experience. By reducing utilization of high-cost, and often unnecessary, episodes of care and focusing on providing less expensive preventive care to our patients, we can reduce instances of expensive emergency care and hospitalization, which lowers the overall cost of care in the healthcare system. As we deliver on keeping our patients healthier, we capture the cost savings and drive our profitability. And as we have expanded across the country, we have targeted working class and underserved communities whose residents need and deserve the care that Oak Street Health provides. In fact, as of December 31, 2021, approximately 42% of our patients are dual eligible, meaning they qualify for both Medicare and Medicaid.

More broadly, we have undertaken a number of strategies and set goals to further what we believe to be the drivers of our success, including strategies and goals to promote diversity, equity and inclusion in our workforce, initiatives to engage and protect the health and well-being of our employees, and concerted efforts to connect with and invest in our communities. See "Human Capital Management" for a more comprehensive description of our workforce and social initiatives. With respect to our environmental initiatives, we recognize that environmental health and public health are interrelated, and we place a high priority on operating sustainably and mitigating our impact on the environment.

Looking ahead, we are committed to strengthening these pillars of success, enhancing our impact and fostering healthy and productive relationships with our key stakeholders.

*We Are Engineered to be Scalable*

We have proven our ability to execute our model, evidenced by the consistency of our performance as we have grown to date. Our performance has improved each year across all markets as our centers mature.

We believe that we have created a repeatable, data-driven playbook to expand our brand and presence across the United States and we have made substantial investments to support each key component of our approach. The fundamental aspects of our playbook include an algorithmic approach to site selection based on our key criteria, a focused approach to recruiting and developing talent (including physicians, nurse practitioners, Care Team members and regional leaders) and an efficient go-to-market model with grassroots community outreach to engage and attract patients.

*Our Value Proposition*

We believe that, despite a history of net losses, our healthcare ecosystem provides all constituencies involved in our care delivery model with the opportunity to "Win." The Oak Street Platform incentivizes our patients, our payors and our providers to adopt our vision and rewards them each in a meaningful way.

*Our Patients "Win" due to Measurably Better Health Outcomes and Patient Experience*

Our patients have complex health needs. As of 2021, the average income of our patient base, as self- reported to us, was less than $17,000, and the average age was 68 years old. More than 50% identify as African American, Latino or Indigenous. Approximately 42% of our patients are dual eligible for both Medicare and Medicaid as of the year ended December 31, 2021. Approximately 60% of our patients have a behavioral health diagnosis and approximately 50% struggle with one or more social risk factors like isolation and lack of access to housing and food that are considered social determinants of health. Approximately 86% of our at-risk patients have one or more chronic conditions, with the average at-risk patient having three or more chronic conditions. We currently provide care to this population in at least seven different languages. The Oak Street Platform is designed to address their needs and drive top-rated quality performance, outstanding health outcomes and an experience our patients love.

The Company has also formed a Diversity, Equity and Inclusion ("DE&I") Committee working group to stop the use of race-based estimated glomerular filtration rate (eGFR) for Black/African American patients for Chronic Kidney Disease (CKD) testing. This is a step towards reducing health disparities by eliminating potential sources of bias in our clinical protocols and will give our Black/African American patients increased access to appropriate kidney care.

*Our Payors "Win" as Medical Costs Decline, Membership Volumes Increase, and Medicare Quality Metrics Improve*

Although we have limited experience managing contracts with full risk, since entering into our first fully capitated contracts in 2016 we have worked closely with key payors to improve outcomes for patients. Our demonstrated track record of improving patient outcomes enables payors to become net beneficiaries when we open centers in locations where they have insured Medicare members or desire to grow. Payors dedicate a large share of their efforts to reducing medical costs and they have a strong desire to engage with solutions proven to achieve that goal. We believe that our ability to remove unnecessary costs through a comprehensive approach to patient care makes us a partner of choice for payors and allows payors to lock in improved medical cost performance. Also, our strong performance in Medicare quality metrics, as demonstrated by our achievements in addressing Healthcare Effectiveness Data and Information Set ("HEDIS") gaps and adherence to evidence-based care guidelines, supports improvements in payors' quality score, which increases their revenues. On the whole, we believe we represent an attractive opportunity for payors to meaningfully improve their financial results.

As of December 31, 2021, we had contractual relationships with 32 payor partners, including all of the top five national MA payors. A significant portion of our revenues is concentrated with the following three large payors: Humana, WellCare/ Meridian and Cigna HealthSpring, which together comprised approximately 62% of our capitated revenue for the year ended December 31, 2021, with 36% from Humana, 17% from WellCare/ Meridian and 9% from Cigna HealthSpring.

*Our Providers "Win" because the Oak Street Platform Allows Them to Focus on Improving the Lives of Their Patients*

Our providers are supported by integrated Care Teams that partner together to take care of patients and allow providers to spend more time with patients. Additionally, the Oak Street Platform is enabled by technology that our providers leverage to ensure they are aware of each patient's health history and potential risks, helping to inform proper diagnoses. The Oak Street Platform is designed to reward quality, not quantity, of care. Provider compensation is determined by quality measures across the population of patients for which they are responsible and is not linked to visit volume. This dynamic is valued by providers because it reduces the potential for burnout and rewards them for making decisions in the best interest of their patients.

The net result of our model is that our providers have a smaller number of patients to care for, more time with patients, more support from our Care Teams and better technology to help them care for patients.

***We "Win" through a Virtuous Cycle that Promotes Growth across All Facets of Our Business and Drives Our Financial Results***

The Oak Street Platform generates a positive feedback loop that can drive our expansion and can perpetuate growth, unlocking the embedded economics of our business as we add centers and those centers mature. We built Oak Street Health to serve patients and provide measurably better health in all communities we serve. By reducing overall cost by increasing the investment in primary and preventive care, we put the dollars where they better serve our patients and increase their overall wellbeing. We have created a model that incentivizes all constituencies to work together because everyone "Wins." When all constituencies benefit, we can share in the value. By structuring the majority of our contracts with MA plans and CMS as fully capitated arrangements for managing their members, we capture the meaningful value we create by increasing care quality, improving health outcomes and saving the healthcare system money. This potential surplus can then be reinvested in the business to expand and improve our care model which leads to more savings, powering a self-driven cycle of investment and growth that we believe allows us to scale nationally and rebuild healthcare as it should be.

***Our Competitive Advantages***

***We Purpose-Built the Oak Street Platform from the Ground Up***

The Oak Street Platform was designed to manage Medicare-eligible patients' total cost of care through capitated, value-based payments. We designed a brand-new model because the existing primary care infrastructure was not built to be able to provide the type of care necessary to drive the massive improvements in cost and quality the health system needs. We decided to focus on the Medicare market due to its size, growth tailwinds and largely clinically cohesive population. We designed the Oak Street Platform to take risk in managing patients' health below an agreed-upon baseline cost because we believed there was a meaningful opportunity to generate system-wide cost savings and we saw an opportunity to capture the value we created by delivering those results. The purposeful design of the Oak Street Platform against a specific population with similar clinical needs differentiates it from the majority of other players in the healthcare delivery system.

***We Have a First Mover Advantage***

Our care delivery model is the result of years of research, observation, iteration, and enhancement, and we continue to invest in improving our approach. Due to our existing scale, growth trajectory and demonstrated ability to drive improving center-level financials, we believe we have access to more capital and operational expertise than potential new entrants, meaning we will be able to continue to improve our model more quickly than new entrants are able to develop their models, build scale and become our competitors.

***Positive Feedback Loop Accelerates Our Business***

We have created an environment in which our strong performance in one dimension accelerates performance in another, which, in turn, leads to growth in yet another aspect of our business.

***Custom-Designed, Integrated End-to-End Technology***

Canopy is designed to fit seamlessly into our care delivery model and Care Team workflows. As we scale, so does our technology. With the benefit of larger data pools as our business grows, Canopy will be able to produce increasingly powerful data insights that will equip us with more tools to improve the health of our patients. We believe that we have only begun to unlock the value of our data assets, which are growing rapidly as we open new centers and add more patients.

***Organic, Community-Based Marketing and Patient Recruitment***

We employ a multichannel marketing strategy that goes directly to our target customer. We fundamentally control our own destiny and can scale the number of centers on our platform rapidly and fill them with any interested patients we attract.

***Highly Recurring Customer Base Creates Subscription-Like Revenue Model***

Our patients benefit from our offering, and they rarely leave. Because we generate the majority of our revenue on a PPPM basis and we are able to consistently retain patients, we have significant visibility into our future financial performance. This provides us the

flexibility to quickly adapt to changing circumstances and deliver what we believe to be the right care in the right setting, as we did with telehealth in the period from March to June 2020, without having an immediate adverse impact to our revenue.

*A Flexible Model Able to Match Patient Needs and Preferences*

The COVID-19 pandemic has been creating difficulties for traditional fee-for-service model providers to provide care while causing changes to patient's preferred means of engagement. The changes in preference are not uniform, with some patients preferring traditional in-person visits while others would prefer leveraging telehealth. It is unknown how these preferences will evolve both during and after the pandemic. Additionally, clinical needs of patients vary. Given the high disease burden of our patients, we believe in-person care will remain a necessity for the vast majority, with our sickest patients generally requiring more in-person care.

However, we believe we have been able to effectively complement in-person care with telehealth visits and can continue to do so. For reasons of both patient preference and clinical need, we believe our model's adaptability and our ability to effectively engage our patients in numerous ways without negatively impacting our capitated revenue will be an advantage for Oak Street Health.

*Mission-Driven Team with Unique "Oaky" Culture*

Our team has a steadfast commitment to executing on the mission and vision of our business. To achieve our goals, we have developed an "Oaky" culture centered around creating an unmatched patient experience, driving clinical excellence, taking ownership, fostering innovation and radiating positive energy.

*Our Growth Strategy*

The key elements of our growth strategy include:

- increase patient enrollment within existing centers;

- add additional centers in existing markets;

- expand into new markets;

- movement of current patients from fee-for-service to value-based arrangements; and

- continue to optimize the Oak Street Platform.

**Impact of the COVID-19 Pandemic on Our Operations**

On March 11, 2020, the World Health Organization designated COVID-19 as a global pandemic. The rapid spread of COVID-19, including its variants, around the world and throughout the United States has altered the behavior of businesses and people, with significant negative effects on federal, state and local economies, the duration of which is unknown at this time. Various policies were implemented by federal, state and local governments in response to the COVID-19 pandemic that caused many people to remain at home and forced the closure of or limitations on certain businesses, as well as suspended elective procedures by health care facilities. While some of these restrictions have been eased across the U.S. since the beginning of the pandemic, some restrictions remain in place, and many state and local governments are re-imposing certain restrictions due to the increasing rates of COVID-19 cases and new variants, such as Delta and Omicron. The virus disproportionately impacts older adults, especially those with chronic illnesses, which describes many of our patients.

In response to the COVID-19 pandemic, we took the following actions to ensure the safety of our employees and their families and to address the physical, mental and social health of our patients:

- Created a COVID-19 Response Team as of March 2020 that is supported by team members from across our organization to ensure a coordinated response to the pandemic;

- Re-opened all of our corporate offices as of summer 2021, which were temporarily closed since March 2020, with the expectation that our corporate work force will continue to work remotely at least part-time;

- Transitioned much of our center-based care to be delivered by our providers virtually through newly developed telehealth capabilities, including video and telephone from March through June 2020 but have transitioned our business back to a more normal operating cadence as of July 2020, including seeing a larger proportion of our patients via in-

12

**Seasonal Variations in Business**

Our business experiences some variability depending upon the time of year. We experience the largest portion of our at-risk patient growth during the first quarter, when plan enrollment selections made during the prior Annual Enrollment Period ("AEP") take effect. While we also add patients throughout the year, including during Special Enrollment Periods when certain eligible individuals can enroll in MA midyear, we would expect to see approximately half of our at-risk patient growth occur in connection with the annual enrollment period. In addition, in January of each year, CMS revises the risk adjustment factor for each patient based upon health conditions documented in the prior year, leading to an overall increase in per-patient revenue. As the year progresses, our per-patient revenue declines as new patients join us typically with less complete or accurate documentation (and therefore lower risk-adjustment scores) and patient mortality disproportionately impacts our higher-risk (and therefore greater revenue) patients.

Medical costs will vary seasonally depending on a number of factors, but most significantly the weather. Certain illnesses, such as the influenza virus, are far more prevalent during colder months of the year, which will result in an increase in medical expenses during these time periods. We would therefore expect to see higher levels of per-patient medical costs in the first and fourth quarters. Medical costs also depend upon the number of business days in a period. See the summary of quarterly results (unaudited) in Note 18, Quarterly Financial Information, to the Consolidated Financial Statements included in Part IV, Item 15 below.

**Working Capital Practices**

The Company uses various techniques to maintain working capital. The Company has historically financed its operations through private placements of our equity securities, payments received from various payors, through the issuance of convertible notes and our IPO. For additional information, see Liquidity and Capital Resources section in "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Part II, Item 7, below.

**Competitive Conditions**

The U.S. healthcare industry is highly competitive. We compete with large and medium-sized local and national providers of primary care services, such as ChenMed, Cano Health, OneMedical and health system affiliated practices, for, among other things, contracts with payors, recruitment of physicians and other medical and non-medical personnel and individual patients. Our principal competitors for patients and payor contracts vary considerably in type and identity by market. Because of the low barriers of entry into the primary care business and the ability of physicians to own primary care centers and/or also be medical directors for their own centers, competition for growth in existing and expanding markets is not limited to large competitors with substantial financial resources. There have also been increasing indications of interest from non-traditional providers and others to enter the primary care space and/or develop innovative technologies or business activities that could be disruptive to the industry. For example, payors have and may continue to acquire primary care and other provider assets. Our growth strategy and business could be adversely affected if we are not able to continue to penetrate existing markets, successfully expand into new markets, maintain or establish new relationships with payors, recruit qualified physicians or if we experience significant patient attrition to our competitors. See "Risk Factors-Risks Related to Our Business-The healthcare industry is highly competitive."

We believe the principal competitive factors for serving the healthcare market for adults on Medicare include: patient experience, quality of care, health outcomes, total cost of care, brand identity and trust in that brand. We believe we compete favorably on these factors.

**Government Regulations**

Our operations and those of our affiliated physician practice organizations are subject to extensive federal, state and local governmental laws and regulations. These laws and regulations require us to meet various standards relating to, among other things, billings and reports to government payment programs, primary care centers and equipment, dispensing of pharmaceuticals, management of centers, personnel qualifications, maintenance of proper records, and quality assurance programs and patient care. If any of our operations or those of our affiliated physicians are found to violate applicable laws or regulations, we could suffer severe consequences that would have a material adverse effect on our business, results of operations, financial condition, cash flows, reputation and stock price, including:

- suspension or termination of our participation in government and/or private payment programs;
- refunds of amounts received in violation of law or applicable payment program requirements dating back to the applicable statute of limitation periods;
- loss of our licenses required to operate healthcare facilities or administer pharmaceuticals in the states in which we operate;

15

- criminal or civil liability, fines, damages or monetary penalties for violations of healthcare fraud and abuse laws, including the federal Anti-Kickback Statute, Civil Monetary Penalties Law of the Social Security Act, Stark Law, the FCA and/or state analogs to these federal enforcement authorities, or other regulatory requirements;
- enforcement actions by governmental agencies and/or state law claims for monetary damages by patients who believe their health information has been used, disclosed or not properly safeguarded in violation of federal or state patient privacy laws, including the regulations implementing HIPAA and the Privacy Act;
- mandated changes to our practices or procedures that significantly increase operating expenses or decrease our revenue;
- imposition of and compliance with corporate integrity agreements that could subject us to ongoing audits and reporting requirements as well as increased scrutiny of our billing and business practices which could lead to potential fines, among other things;
- termination of various relationships and/or contracts related to our business, including joint venture arrangements, contracts with payors, real estate leases and provider employment arrangements;
- changes in and reinterpretation of rules and laws by a regulatory agency or court, such as state corporate practice of medicine laws, that could affect the structure and management of our business and its affiliated physician practice corporations;
- negative adjustments to government payment models including, but not limited to, Medicare Parts A, B and C and Medicaid; and
- harm to our reputation, which could negatively impact our business relationships, the terms of payor contracts, our ability to attract and retain patients and physicians, our ability to obtain financing and our access to new business opportunities, among other things.

We expect that our industry will continue to be subject to substantial regulation, the scope and effect of which are difficult to predict. Our activities could be subject to investigations, audits and inquiries by various government and regulatory agencies and private payors with whom we contract at any time in the future. Adverse findings from such investigations and audits could bring severe consequences that could have a material adverse effect on our business, results of operations, financial condition, cash flows, reputation and stock price. In addition, private payors could require pre-payment audits of claims, which can negatively affect cash flow, or terminate contracts for repeated deficiencies.

There is no requirement in the states in which we operate for a risk-bearing provider to register as an insurance company, and we have not registered as such in any of the states in which we operate.

***Federal Anti-Kickback Statute***

The federal Anti-Kickback Statute prohibits, among other things, knowingly and willfully offering, paying, soliciting or receiving remuneration, directly or indirectly, in cash or kind, to induce or reward either the referral of an individual for, or the purchase, order or recommendation of, any good or service, for which payment may be made under federal and state healthcare programs such as Medicare and Medicaid.

Federal criminal penalties for the violation of the federal Anti-Kickback Statute include imprisonment, fines and exclusion of the provider from future participation in the federal healthcare programs, including Medicare and Medicaid. Violations of the federal Anti-Kickback Statute are punishable by imprisonment for up to ten years, fines of up to $100,000 per kickback or both. Larger fines can be imposed upon corporations under the provisions of the U.S. Sentencing Guidelines and the Alternate Fines Statute. Individuals and entities convicted of violating the federal Anti-Kickback Statute are subject to mandatory exclusion from participation in Medicare, Medicaid and other federal healthcare programs for a minimum of five years. Civil penalties for violation of the Anti-Kickback Statute include up to $100,000 in monetary penalties per violation, repayments of up to three times the total payments between the parties to the arrangement and suspension from future participation in Medicare and Medicaid. Court decisions have held that the statute may be violated even if only one purpose of remuneration is to induce referrals. The ACA amended the federal Anti-Kickback Statute to clarify the intent that is required to prove a violation. Under the statute as amended, the defendant does not need to have actual knowledge of the federal Anti-Kickback Statute or have the specific intent to violate it. In addition, the ACA amended the federal Anti-Kickback Statute to provide that any claims for items or services resulting from a violation of the federal Anti-Kickback Statute are considered false or fraudulent for purposes of the FCA.

16

The federal Anti-Kickback Statute includes statutory exceptions and regulatory safe harbors that protect certain arrangements. These exceptions and safe harbors are voluntary. Business transactions and arrangements that are structured to comply fully with an applicable safe harbor do not violate the federal Anti-Kickback Statute. However, transactions and arrangements that do not satisfy all elements of a relevant safe harbor do not necessarily violate the law. When an arrangement does not satisfy a safe harbor, the arrangement must be evaluated on a case-by-case basis in light of the parties' intent and the arrangement's potential for abuse. Arrangements that do not satisfy a safe harbor may be subject to greater scrutiny by enforcement agencies.

We enter into several arrangements that could potentially implicate the Anti-Kickback Statute if requisite intent was present, such as:

- Joint ventures. We operate certain of our centers under joint ventures with managed care plans or other healthcare providers. For the years ended December 31, 2021, 2020 and 2019, these joint ventures represented an immaterial portion of our total revenues. Although we do not expressly seek to enter into new joint ventures, it is possible that the payor landscape in certain markets we may attempt to enter in the future may make entering into additional joint ventures attractive. Our relationships with payors may not fully satisfy a safe harbor. Although failure to comply with a safe harbor does not render an arrangement illegal under the federal Anti-Kickback Statute, an arrangement that does not operate within a safe harbor may be subject to increased scrutiny and the Office of Inspector General (the "OIG") of HHS has warned in the past that certain joint venture relationships have a potential for abuse. Joint ventures that fall outside the safe harbors are evaluated on a case-by-case basis under the federal Anti-Kickback Statute. In this regard, we have endeavored to structure our joint ventures to satisfy as many elements of the safe harbor for investments in small entities as we believe are commercially reasonable. For example, we believe that these investments are offered and made by us on a fair market value basis and provide returns to the investors in proportion to their actual investment in the venture. However, since the arrangements may not satisfy all of the requirements of an applicable safe harbor, these arrangements could be subject to scrutiny on the ground that they are intended to induce patient referrals.

- Lease arrangements. We lease space for certain of our centers from one of our payor partners. We endeavor to structure these arrangements to comply with the federal Anti-Kickback Statute safe harbor for space rentals in all material respects.

- Discounts. Our centers sometimes acquire certain items and services at a discount that may be reimbursed by a federal healthcare program. We endeavor to structure our vendor contracts that include discount or rebate provisions to comply with the federal Anti-Kickback Statute safe harbor for discounts.

- Sales forces and patient recruitment. The OIG has expressed concern regarding the use of non-employed sales forces to recruit or facilitate the recruiting of patients or referrals, especially when the sales agent is compensated in a manner that provides rewards or incentives on a volume or value basis. Accordingly, commissions or per-patient based compensation methodologies are closely scrutinized by federal agencies. We employ our own sales force and attempt to meet the Anti-Kickback Safe Harbor for Bona Fide Employment; however, in limited instances we use external companies to assist with certain aspects of these efforts and attempt to structure to meet the Personal Services Safe Harbour. In doing so, we believe that these arrangements do not violate the Anti-Kickback Statute or other applicable laws. Additionally, the provision of free or discounted items, services or other renumeration in connection with patient recruitment has been scrutinized by OIG. We attempt to structure any offer or actual transfer of renumeration to prospective or current patients in a manner consistent with applicable exceptions and guidance issued by OIG. On November 1, 2021, the Company received a civil investigative demand ("CID") from the United States Department of Justice. According to the CID, the Department of Justice is investigating whether the Company may have violated the False Claims Act, 31 U.S.C. §§ 3729-3722. The CID requests certain documents and information related to the Company's relationships with third-party marketing agents and related to the Company's provision of free transportation to federal health care beneficiaries and requests information and documents related to such matters. We are cooperating with the Department of Justice and are in the process of producing information and documentation in response to the CID. We are currently unable to predict the outcome of this investigation or whether litigation is probable.

- As a result of this CID, January 10, 2022, plaintiff Reginald T. Allison, commenced a purported securities class action in the Northern District of Illinois, against Oak Street Health, Inc., Michael Pykosz, our CEO, and Timothy Cook, our CFO, alleging that we, and such executive officers, made false and/or misleading statements and failed to disclose material adverse facts about our business, operations and prospects related to matters that are the subject of the CID. Regardless of the outcomes, either of these matters has the potential to have an adverse impact on us due to any related defense and settlement costs, diversions of management resources and other factors.

If any of our business transactions or arrangements, including those described above, were found to violate the federal Anti-Kickback Statute, we could face, among other things, criminal, civil or administrative sanctions, including possible exclusion from

17

participation in Medicare, Medicaid and other state and federal healthcare programs. Any findings that we have violated these laws could have a material adverse impact on our business, results of operations, financial condition, cash flows, reputation and stock price.

### Risk Bearing Provider Regulation

Certain of the states where we currently operate or may choose to operate in the future regulate the operations and financial condition of risk bearing providers like us and our affiliated providers. These regulations can include capital requirements, licensing or certification, governance controls and other similar matters. While these regulations have not had a material impact on our business to date, as we continue to expand, these rules may require additional resources and capitalization and add complexity to our business.

### Stark Law

The Stark Law prohibits a physician who has a financial relationship, or who has an immediate family member who has a financial relationship, with entities providing Designated Health Services ("DHS") from referring Medicare patients to such entities for the furnishing of DHS, unless an exception applies. Although uncertainty exists, federal agencies and at least one court have taken the position that the Stark Law also applies to Medicaid. DHS is defined to include clinical laboratory services, physical therapy services, occupational therapy services, radiology services including magnetic resonance imaging, computerized axial tomography scans, and ultrasound services, radiation therapy services and supplies, durable medical equipment and supplies, parenteral and enteral nutrients, equipment, and supplies, prosthetics, orthotics and prosthetic devices and supplies, home health services, outpatient prescription drugs, inpatient and outpatient hospital services and outpatient speech-language pathology services. The types of financial arrangements between a physician and an entity providing DHS that trigger the self-referral prohibitions of the Stark Law are broad and include direct and indirect ownership and investment interests and compensation arrangements. The Stark Law prohibits any entity providing DHS that has received a prohibited referral from presenting, or causing to be presented, a claim or billing for the services arising out of the prohibited referral. Similarly, the Stark Law prohibits an entity from "furnishing" a DHS to another entity in which it has a financial relationship when that entity bills for the service. The Stark Law also prohibits self-referrals within an organization by its own physicians, although broad exceptions exist that cover employed physicians and those referring DHS that are ancillary to the physician's practice to the physician group. The prohibition applies regardless of the reasons for the financial relationship and the referral. Unlike the federal Anti-Kickback Statute, the Stark Law is a strict liability violation where unlawful intent need not be demonstrated.

If the Stark Law is implicated, the financial relationship must fully satisfy a Stark Law exception. If an exception is not satisfied, then the parties to the arrangement could be subject to sanctions. Sanctions for violation of the Stark Law include denial of payment for claims for services provided in violation of the prohibition, refunds of amounts collected in violation of the prohibition, a civil penalty of up to $15,000 for each service arising out of the prohibited referral, a civil penalty of up to $100,000 against parties that enter into a scheme to circumvent the Stark Law prohibition, civil assessment of up to three times the amount claimed and potential exclusion from the federal healthcare programs, including Medicare and Medicaid. Amounts collected on claims related to prohibited referrals must be reported and refunded generally within 60 days after the date on which the overpayment was identified. Furthermore, Stark Law violations and failure to return overpayments in a timely manner can form the basis for False Claims Act ("FCA") liability, as discussed below.

If CMS or other regulatory or enforcement authorities determine that claims have been submitted for referrals by us that violate the Stark Law, we would be subject to the penalties described above. In addition, it might be necessary to restructure existing compensation agreements with our physicians. Any such penalties and restructuring or other required actions could have a material adverse effect on our business, results of operations, financial condition and cash flows.

### Fraud and Abuse under State Law

Some states in which we operate centers have laws prohibiting physicians from holding financial interests in various types of medical facilities to which they refer patients. Some of these laws could potentially be interpreted broadly as prohibiting physicians who hold shares of our publicly traded stock or are physician owners from referring patients to our centers if the centers perform services for their patients or do not otherwise satisfy an exception to the law. States also have laws similar to or stricter than the federal Anti-Kickback Statute that may affect our ability to receive referrals from physicians with whom we have financial relationships. Some state anti-kickback laws also include civil and criminal penalties. Some of these laws include exemptions that may be applicable to our physician relationships or for financial interests limited to shares of publicly traded stock. Some, however, may include no explicit exemption for certain types of agreements and/or relationships entered into with physicians. If these laws are interpreted to apply to physicians who hold equity interests in our centers or to physicians who hold our publicly traded stock, and for which no applicable exception exists, we may be required to terminate or restructure our relationships with these physicians and could be subject to criminal, civil and administrative sanctions, refund requirements and exclusions from government healthcare programs, including Medicare and Medicaid, which could have a material adverse effect on our business, results of operations, financial condition, cash flows, reputation and stock price.

18

Convertible Senior Notes- We hold borrowings under our Convertible Senior Notes, which have a 0% interest rate. The Convertible Senior Notes are governed by an indenture ("Indenture"), dated as of March 16, 2021, between the Company and U.S. Bank National Association, as trustee. Under the Indenture, the Convertible Senior Notes are general senior, unsecured obligations of the Company and will mature on March 15, 2026, unless earlier redeemed, repurchased or converted.

Operating Lease Obligations- The Company leases offices, operating facilities, vehicles and IT equipment, which are accounted for as operating leases. These leases have remaining lease terms of up to 30 years, inclusive of renewal or termination options that the Company is reasonably certain to exercise.

Contingent Consideration- As part of the acquisition of RMD, the Company may be obligated to pay contingent consideration of up to a maximum earn-out of $60 million during the fiscal year 2022 or 2023 should the acquired company achieve certain internal usage volumes in the year following the acquisition. We recorded the contingent consideration at fair value by calculating the present value of the probability weighted consideration expected to be transferred. We also recorded $0.1 million of contingent consideration related to immaterial acquisitions of medical practices. The key unobservable inputs used to determine the fair value are the probabilities of achieving the stated objectives.

Other Obligations- The Humana Alliance Provision contains an arrangement for a license fee that is payable by the Company to Humana for the Company's provision of health care services in certain centers owned or leased by Humana. The license fee is a reimbursement to Humana for its costs of owning or leasing and maintaining the centers, including rental payments, center maintenance or repair expenses, equipment expenses, special assessments, cost of upgrades, taxes, leasehold improvements, and other expenses identified by Humana and is included in cost of care expenses in the consolidated statement of operations.

**Emerging Growth Company Status**

Based on the aggregate worldwide market value of our shares of common stock held by our non-affiliate stockholders as of December 31, 2021, we have become a "large-accelerated filer" and have lost emerging growth status for the year ended December 31, 2021. We are no longer exempt from the auditor attestation requirements of Section 404(b) of the Sarbanes-Oxley Act of 2002, as amended, and our independent registered public accounting firm will evaluate and report on the effectiveness of internal control over financial reporting.

**JOBS Act Accounting Election**

The JOBS Act permits an emerging growth company to take advantage of an extended transition period to comply with new or revised accounting standards applicable to public companies. On June 30, 2021, the last business day of the Company's second fiscal quarter in 2021, the market value of the Company's common stock held by non-affiliates exceeded $700 million. Accordingly, the Company was deemed a large-accelerated filer as of December 31, 2021, and can no longer take advantage of the extended timeline to comply with new or revised accounting standards applicable to public companies beginning with this Annual Report on Form 10-K.

*Critical Accounting Policies and Estimates*

Management prepared the consolidated financial statements of the Company under accounting principles generally accepted in the United States. The application of these principles requires the use of estimates, judgments and assumptions that affect the reported amounts of assets and liabilities, revenue and expenses and related disclosures of contingent assets and liabilities. We believe that our estimates, judgments and assumptions are reasonable based upon available information and our past experience; we evaluate our estimates on an ongoing basis. Accordingly, actual results could materially differ from these estimates under different assumptions or conditions, impacting our reported results of operations and financial condition. We refer to accounting estimates of this type as critical accounting policies, which we further discuss below.

Please see Note 2, "Summary of Significant Accounting Policies" in the Notes to Consolidated Financial Statements (Part IV, Item 15) for a summary of our significant accounting policies. Some of the more critical policies and estimates include capitated revenue, medical claims expense, business combinations, goodwill and intangible assets and impairment of long-lived assets.

*Capitated Revenue*

The transaction price for our capitated payor contracts is variable as it primarily includes per patient, per month ("PPPM") fees associated with unspecified membership. PPPM fees can fluctuate throughout the contract based on the health status (acuity) of each individual enrollee. In certain contracts, PPPM fees also include "risk adjustments" for items such as performance incentives, performance guarantees and risk shares. The capitated revenues are recognized based on the estimated PPPM earned net of projected performance incentives, performance guarantees, risk shares and rebates because we are able to reasonably estimate the ultimate

PPPM payment of these contracts. We recognize revenue in the month in which eligible members are entitled to receive healthcare benefits. Subsequent changes in PPPM fees and the amount of revenue to be recognized are reflected through subsequent period adjustments to properly recognize the ultimate capitation amount. We also assess the profitability of our capitation arrangements to identify contracts where current operating results or forecasts indicate probable future losses. If anticipated future variable costs exceed anticipated future revenues, a premium deficiency reserve is recognized.

Certain third-party payor contracts include a Medicare Part D payment related to pharmacy claims, which is subject to risk sharing through accepted risk corridor provisions. Under certain agreements the fund risk allocation is established whereby we, as the contracted provider, receive only a portion of the risk and the associated surplus or deficit. We estimate and recognize an adjustment to Part D capitated revenues related to these risk corridor provisions based upon pharmacy claims experience to date, as if the annual risk contract were to terminate at the end of the reporting period.

For our capitated revenue arrangements, we evaluate whether we are the principal, and report revenues on a gross basis, or an agent, and report revenues on a net basis. In this assessment, we consider if we obtain control of the specified services before they are transferred to our customers, as well as other indicators such as the party primarily responsible for fulfillment.

We review our assumptions and adjust these estimates accordingly on a quarterly basis. Our consolidated financial statements could be materially impacted if actual risk scores are different from the estimated risk scores. If our accrual estimates for risk scores at December 31, 2021 were to differ by +/- 5%, the impact on revenues would be approximately $2.7 million.

*Medical Claims Expense*

Medical claims expenses are costs for third party healthcare service providers that provide medical care to our patients for which we are contractually obligated to pay through our full-risk capitation arrangements. The estimated reserve for our liability for incurred and not reported claims is included in the liability for unpaid claims in the consolidated balance sheets. Actual claims expense will differ from the estimated liability due to factors in estimated and actual member utilization of health care services, the amount of charges and other factors. We assess our estimates with an independent actuarial expert to ensure our estimates represent the best, most reasonable estimate given the data available to us at the time the estimates are made. The actuarial models consider factors such as time from date of service to claim processing, seasonal variances in medical care consumption, health care professional contract rate changes, medical care utilization and other medical cost trends, membership volume and demographics, the introduction of new technologies and benefit plan changes.

We review our assumptions and adjust these estimates accordingly on a quarterly basis. Our consolidated financial statements could be materially impacted if actual claims expense is different from our estimates. If our liability for incurred and not reported claims at December 31, 2021 were to differ by +/- 5%, the impact on medical claims expense would be approximately $13.3 million.

*Business Combinations, Goodwill and Intangible Assets*

The Company accounts for business combinations using the acquisition method of accounting, which requires that once control is obtained, all the assets acquired and liabilities assumed be recorded at their respective fair values at the date of acquisition. The determination of fair values of assets and liabilities acquired requires estimates. The determination of fair values of assets and liabilities acquired requires estimates and the use of valuation techniques when market value is not readily available.

For intangible assets, the Company generally uses the income approach to determine fair value. The income approach requires management to make significant estimates and assumptions. These estimates and assumptions primarily include, but are not limited to: discount rates, terminal growth rates, royalty rates, forecasts of revenue, operating income, depreciation, amortization and capital expenditures. The discount rates applied to the projections reflect the risk factors associated with those projections.

Our acquisitions may also include contingent consideration, or earn-out provisions, which provide for additional consideration to be paid to the seller if certain future conditions are met. These earn-out provisions are estimated and at fair value at the acquisition date based on certain internal volumes in the year following the acquisition.

Although the Company believes its estimates of fair value are reasonable, actual financial results could differ from those estimates due to the inherent uncertainty involved in making such estimates. Changes in assumptions concerning future financial results or other underlying assumptions could have a significant impact on the determination of the fair value of the intangible assets acquired.

Judgment is also required in determining the intangible asset's useful life.

79

Goodwill represents the excess of consideration paid over the fair value of net assets acquired through business acquisitions. Goodwill is not amortized but is tested for impairment at least annually. We test goodwill for impairment annually on October 1st or more frequently if triggering events occur or other impairment indicators arise which might impair recoverability. These events or circumstances would include a significant change in the business climate, legal factors, operating performance indicators, competition, sale, disposition of a significant portion of the business or other factors.

*Impairment of Long-Lived Assets*

The Company evaluates the recoverability of long-lived assets whenever events or changes in circumstances indicate that the carrying value of such an asset may not be recoverable. The evaluation of long-lived assets is performed at the lowest level of identifiable cash flows. Long-lived assets related to the Company's centers include property, plant and equipment, definite-lived intangibles, right of use assets as well as operating lease liabilities. If the asset group fails the recoverability test, then an impairment charge is determined based on the difference between the fair value of the asset group compared to its carrying value. Fair value of the asset group is generally determined using an income approach based on cash flows expected from the use and eventual disposal of the asset group.

The determination of the fair value of the asset group requires management to estimate a number of factors including anticipated future cash flows and discount rates. Although we believe these estimates are reasonable, actual results could differ from those estimates due to the inherent uncertainty involved in making such estimates.

**Recent Accounting Pronouncements**

See Note 2 to our consolidated financial statements (Part IV, Item 15) "Summary of Significant Accounting Policies-Recent Accounting Pronouncements" for more information.

**Item 7A. Quantitative and Qualitative Disclosures About Market Risk**

Market risk represents the risk of loss that may impact our financial position due to adverse changes in financial market prices and rates. Our market risk exposure is primarily a result of exposure due to potential changes in inflation or interest rates. We do not hold financial instruments for trading purposes.

*Interest Rate Risk*

As of December 31, 2021, we had cash, cash equivalents and restricted cash of $120.4 million, held primarily in cash deposits for working capital purposes. We had marketable debt securities of $671.1 million as of December 31, 2021, compared to $0.0 million as of December 31, 2020, consisting of U.S. Treasury obligations, corporate bonds, available-for-sale securities and others. Our investments are made for capital preservation purposes. We do not enter into investments for trading or speculative purposes. All our investments are denominated in U.S. dollars. As of December 31, 2021, we had total outstanding debt of $920.0 million which has a 0% interest rate.

Our cash and cash equivalents, marketable debt securities and debt are subject to market risk due to changes in interest rates. Fixed rate securities may have their market value negatively impacted due to a rise in interest rates, while floating rate securities may produce less income than expected if interest rates fall. Due in part to these factors, our future investment income may fall short of expectation due to changes in interest rates or we may suffer losses in principal if we are forced to sell securities that decline in market value due to changes in interest rates.

We do not believe that an increase or decrease in interest rates of 100 basis points would have a material effect on our business, financial condition or results of operations.

## Item 8. Financial Statements and Supplementary Data

All information required by this item is included in Part IV, Item 15 of this Annual Report on Form 10-K and is incorporated in this item by reference.

## Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure

None.

## Item 9A. Controls and Procedures

### Evaluation of Disclosure Controls and Procedures

Under the supervision and with the participation of our management, including the Chief Executive Officer and Chief Financial Officer, we have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 3a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as of the end of the period covered by this report. Based on their evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that these disclosure controls and procedures were effective as of December 31, 2021.

Under guidelines established by the SEC, companies are allowed to exclude acquisitions from their assessment of internal control over financial reporting during the first year of an acquisition while integrating the acquired company. Accordingly, our assessment of internal controls excluded our acquisition of Rubicon that was completed on October 20, 2021. Operations from this acquisition represented approximately 8.8% of total assets and 0.1% of total revenue as of and for the year ended December 31, 2021.

### Report on Internal Control over Financial Reporting

Management's report on internal reporting over financial reporting. Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rules 13a-15(f) and 15d-15(f) of the Exchange Act. Internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with generally accepted accounting principles. Our management, including our Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 31, 2021 based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission in 2013. Based on the results of this evaluation, our management concluded that our internal control over financial reporting was effective as of December 31, 2021. The effectiveness of our internal control over financial reporting as of December 31, 2021 has been audited by our independent registered public accounting firm, as stated in their attestation report, which is below.

### Attestation Report of the Independent Registered Public Accounting Firm

#### Report of Independent Registered Public Accounting Firm

To the Shareholders and the Board of Directors of Oak Street Health, Inc.

### Opinion on Internal Control Over Financial Reporting

We have audited Oak Street Health, Inc's internal control over financial reporting as of December 31, 2021, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria). In our opinion, Oak Street Health, Inc. (the Company) maintained, in all material respects, effective internal control over financial reporting as of December 31, 2021, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets of Oak Street Health, Inc. as of December 31, 2021 and 2020, the related consolidated statements of operations, comprehensive loss, changes in redeemable investor units and stockholders' equity/members' deficit, and cash flows for each of the three years in the period ended December 31, 2021 and the related notes and our report dated February 28, 2022 and expressed an unqualified opinion thereon.

As indicated in the accompanying Evaluation of Disclosure Controls and Procedures, management's assessment of and conclusion on the effectiveness of internal control over financial reporting did not include the internal controls of RubiconMD Holdings, Inc. which is included in the 2021 consolidated financial statements of the Company and constituted approximately 8.8% and 288.7% of total and net assets, respectively, as of December 31, 2021 and 0.1% and 0.5% of revenues and net loss, respectively, for the year then ended. Our audit of internal control over financial reporting of the Company also did not include an evaluation of the internal control over financial reporting of RubiconMD Holdings, Inc.

81

quantitative and qualitative disclosures for leasing arrangements and gives rise to other changes impacting certain aspects of lessee and lessor accounting. The two permitted transition methods under the guidance are the modified retrospective transition approach, which requires application of the guidance for all comparative periods, and the cumulative effect adjustment approach, which requires prospective application from the adoption date.

The Company adopted ASC 842 effective January 1, 2021 under the modified retrospective transition method. Under this method, financial statements for periods after the adoption date are presented in accordance with ASC 842 and prior-period financial statements continue to be presented in accordance with ASC 840, the accounting standard originally in effect for such periods. The package of practical expedients included that the Company was not required to reassess under the new standard its prior conclusions about lease identification, lease classification and initial direct costs. Also, as part of the adoption, the Company elected to not recognize short-term leases (those with lease terms less than a year) on the consolidated balance sheets, not separate lease and non-lease components and did not use hindsight to determine lease term. The ROU assets represent the right to use an underlying asset for the lease term, and lease liabilities represent an obligation to make lease payments arising from the lease at lease commencement date. The Company's operating leases resulted in the recognition of additional assets and the corresponding liabilities on its consolidated balance sheets, however it did not have a material impact on the consolidated statements of operations or cash flows for the twelve months ended December 31, 2021. The Company recognized ROU assets and lease liabilities for operating leases of $108.1 million and $126.8 million, respectively, upon adoption as of January 1, 2021. The difference between the lease liability and right-of-use asset mainly related to the reversal of existing deferred rent balances.

The Company utilized a comprehensive approach to assess the impact of this guidance on the consolidated financial statements and related disclosures, including the increase in assets and liabilities on the consolidated balance sheets and the impact on the current lease portfolio. See Note 10 for further detail.

In August 2020, the FASB issued Accounting Standards Update ("ASU") 2020-06 *Debt with Conversion and Other Options (Subtopic 470-20) and Derivatives and Hedging-Contracts in Entity's Own Equity*. Among other changes, ASU 2020-06 removes the liability and equity separation model for convertible instruments with a cash conversion feature, and as a result, after adoption, entities will no longer separately present in equity an embedded conversion feature for such debt. Similarly, the embedded conversion feature will no longer be amortized into income as interest expense over the life of the instrument. Instead, entities will account for a convertible debt instrument wholly as debt unless (1) a convertible instrument contains features that require bifurcation as a derivative under ASC Topic 815, Derivatives and Hedging, or (2) a convertible debt instrument was issued at a substantial premium. Additionally, ASU 2020-06 requires the application of the if-converted method to calculate the impact of convertible instruments on diluted earnings per share and updates the disclosure requirements in ASC 470-20, making them easier to understand for financial statement preparers and improving the decision-usefulness and relevance of the information for financial statement users. This ASU was early adopted on January 1, 2021 and applied to the Company's 0% Convertible Senior Notes due 2026 issued in March 2021. The guidance was not applied to any other debt arrangements at the Company.

In December 2019, the FASB issued ASU 2019-12, *Income Taxes Topic 740-Simplifying the Accounting for Income Taxes* ("ASU 2019-12"), which intended to simplify various aspects related to accounting for income taxes. ASU 2019-12 removes certain exceptions to the general principles in Topic 740 and also clarifies and amends existing guidance to improve consistent application of ASC 740. This guidance is effective for fiscal years beginning after December 15, 2020, including interim periods therein. The Company adopted the new guidance on January 1, 2021, noting no impact on its consolidated financial statements and related disclosures.

In January 2020, the FASB issued ASU 2020-01, *Investments-Equity Securities (Topic 321), Investments-Equity Method and Joint Ventures (Topic 323), and Derivatives and Hedging (Topic 815)-Clarifying the Interactions between Topic 321, Topic 323, and Topic 815* ("ASU 2020-01"). ASU 2020-01 clarifies the interaction of the accounting for equity securities under Topic 321 and investments accounted for under the equity method of accounting in Topic 323 and the accounting for certain forward contracts and purchased options accounted for under Topic 815. The Company adopted the new guidance on January 1, 2021, noting no impact on its consolidated financial statements and related disclosures.

In October 2018, the FASB issued ASU 2018-17, *Consolidation - Targeted Improvements to Related Party Guidance for Variable Interest Entities (Topic 810)* ("ASU 2018-17"). ASU 2018-17 eliminates the requirement that entities consider indirect interests held through related parties under common control in their entirety when assessing whether a decision-making fee is a variable interest. Instead, the reporting entity will consider such indirect interests on a proportionate basis. ASU 2018-17 is effective for public companies for fiscal years beginning after December 15, 2019, and interim periods within fiscal years beginning after December 15, 2020. All entities are required to apply the adjustments in ASU 2018-17 retrospectively with a cumulative-effect adjustment to retained earnings at the beginning of the earliest period presented. The Company adopted the new guidance for the year ended December 31, 2021 as we lost EGC status, noting no impact on its consolidated financial statements and disclosures.

F-22

*Recent Accounting Pronouncements Not Yet Adopted*

In October 2021, the FASB issued ASU 2021-08, *Business Combinations (Topic 805): Accounting for Contract Assets and Contract Liabilities from Contracts with Customers*. The new guidance requires contract assets and contract liabilities acquired in a business combination to be recognized and measured by the acquirer on the acquisition date in accordance with ASC 606, Revenue from Contracts with Customers, as if it had originated the contracts. Under the current business combinations guidance, such assets and liabilities are recognized by the acquirer at fair value on the acquisition date. The new standard is effective for our fiscal year beginning after December 15, 2022. Early adoption is permitted. The standard will not impact acquired contract assets or liabilities from business combinations occurring prior to the effective date of adoption, and the impact in future periods will depend on the contract assets and contract liabilities acquired in future business combinations. We are currently evaluating the impact of ASU 2021-08 on our consolidated financial statements.

In November 2021, the FASB issued ASU 2021-10, Government Assistance (Topic 832): Disclosures by Business Entities about Government Assistance. This update requires annual disclosures about transactions with a government that are accounted for by applying a grant or contribution accounting model by analogy. This standard is effective for fiscal years beginning after December 15, 2021 and should be applied either prospectively or retrospectively. Early adoption is permitted. We are currently evaluating the impact of ASU 2021-10
on our consolidated financial statements.

## NOTE 3. REVENUE RECOGNITION

The Company earns revenue from our capitated arrangements, care coordination and management arrangements, subscription license arrangements, fee for services and other arrangements. We disaggregate revenue from contracts with customers by service type within our consolidated statements of operations.

*Capitated Revenue and Accounts Receivable*

Capitated revenue consists primarily of capitated fees for medical services provided by us under capitated arrangements directly made with various Medicare Advantage managed care payors or the Centers for Medicare and Medicaid Services ("CMS"). The Company receives a fixed fee per patient under what is typically known as a "risk contract." Risk contracting, or full risk capitation, refers to a model in which the Company receives from the third-party payor a fixed payment per patient per month ("PPPM" payment) for a defined patient population, and the Company is then responsible for providing healthcare services required by that patient population. The Company is responsible for incurring or paying for the cost of healthcare services required by that patient population in addition to those provided by the Company. Fees are recorded gross in revenues because the Company is acting as a principal in arranging, providing and controlling the managed healthcare services provided to the eligible enrolled members. Neither the Company nor any of its affiliates is a registered insurance company because state law in the states in which it operates does not require such registration for risk-bearing providers.

The Company's payor contracts generally have a term of one year or longer, but the contracts between the enrolled members (our customers) and the payor are one calendar year or less. In general, the Company considers all contracts with customers (enrolled members) as a single performance obligation to stand ready to provide healthcare services. The Company identified that contracts with customers for capitation arrangements have similar performance obligations and therefore groups them into one portfolio. This performance obligation is satisfied over time as the Company stands ready to fulfill its obligation to enrolled members.

Our revenues are based upon the estimated PPPM amounts we expect to be entitled to receive from Medicare Advantage managed care payors and CMS. Under our managed care contracts, the PPPM rates are determined as a percent of the premium the Medicare Advantage plan receives from CMS for our at-risk members. Those premiums are determined via a competitive bidding process with CMS and are based upon the cost of care in a local market and the average utilization of services by the patients enrolled. Under our contract with CMS, the PPPM rates are determined as a percentage of the premium, also adjusted for the cost of care in a local market and the average utilization of services, for our at-risk members.

CMS pays capitation using a "risk adjustment model," which compensates providers based on the health status (acuity) of each individual patient. Payors with higher acuity patients receive more, and those with lower acuity patients receive less. Under the risk adjustment model, capitation is paid on an interim basis based on enrollee data submitted for the preceding year and is adjusted in subsequent periods after the final data is compiled. As premiums are adjusted via this risk adjustment model, our PPPM payments will change in unison with how our payor partners' premiums change with CMS. The Company determined the transaction price for these contracts is variable as it primarily includes PPPM fees which can fluctuate throughout the contract based on the acuity of each individual enrollee. Our capitated accounts receivable includes $54.0 million and $12.3 million as of December 31, 2021 and December 31, 2020, respectively, for acuity-related adjustments that are estimated to be received in subsequent periods. In certain contracts, PPPM fees also include adjustments for items such as performance incentives or penalties based on the achievement of certain clinical quality metrics as contracted with payors. There were no material PPPM adjustments related to performance incentives/penalties for quality-related metrics for the years ended December 31, 2021, 2020, and 2019.

The capitated revenues are recognized based on the estimated PPPM transaction price to transfer the service for a distinct increment of the series (i.e. month) and is recognized net of projected acuity adjustments and performance incentives/penalties because the Company is able to reasonably estimate the ultimate PPPM payment of these contracts. We recognize revenue in the month in which eligible members are entitled to receive healthcare benefits during the contract term. Subsequent changes in PPPM fees and the amount of revenue to be recognized by the Company are reflected through subsequent period adjustments to properly recognize the ultimate capitation amount. As the period between the time of service and time of payment is typically one year or less, the Company elected the practical expedient under ASC 606-10-32-18 and did not adjust for the effects of a significant financing component.

Certain third-party payor contracts include a Medicare Part D payment related to pharmacy claims, which is subject to risk sharing through accepted risk corridor provisions. Under certain agreements the fund risk allocation is established where the Company, as the contracted provider, receives only a portion of the risk and the associated surplus or deficit. The Company estimates and recognizes an adjustment to Part D capitated revenues related to these risk corridor provisions, based upon pharmacy claims experience to date, as if the annual risk contract were to terminate at the end of the reporting period. Medicare Part D comprised 2%, 2% and 3% of capitated revenues for the years ended December 31, 2021, 2020 and 2019, respectively. Medicare Part D comprised 2%, 3% and 5% of medical claims expense for the years ended December 31, 2021, 2020 and 2019, respectively.

The Company had agreements in place with the payors listed below, and payor sources of capitated revenue for each period were as follows:

| | For the twelve-months ended | | |
| --- | --- | --- | --- |
| | December 31, 2021 | December 31, 2020 | December 31, 2019 |
| Humana | 36% | 45% | 57% |
| Wellcare/Meridian | 17% | 15% | 14% |
| Cigna-HealthSpring | 9% | 11% | 9% |
| Other | 38% | 29% | 20% |

*Other Revenue and Accounts Receivable*

Other revenue is comprised of ancillary fees earned under contracts with certain managed care organizations for the provision of certain care coordination service and care management services, fee-for-service revenue, license subscriptions and fees, implementation services and CARES Act grant income.  The composition of other revenue for each period was as follows:

| | For the twelve-months ended | | |
| --- | --- | --- | --- |
| | December 31, 2021 | December 31, 2020 | December 31, 2019 |
| Care coordination and care management services | $ 24.7 | $ 24.3 | $ 10.5 |
| License subscription and other fees | 1.9 | - | - |
| CARES Act grant income | - | 2.2 | - |
| Fee for service | 9.0 | 5.0 | 6.2 |
| Total other revenue | $ 35.6 | $ 31.5 | $ 16.7 |

The Company has entered into multi-year agreements with Humana and its affiliates to provide services at certain centers to members covered by Humana. The agreements contain an administrative payment from Humana in exchange for the Company providing certain care coordination services during the term of the contract ("Care Coordination payment"). The Care Coordination payments are recognized in other revenue ratably over the length of the terms stated in the contracts and are refundable to Humana on a pro-rata basis if the Company ceases to provide services at the centers within the length of the term specified in the contracts. We have identified a single performance obligation to stand ready to provide care coordination services to patients, which constitutes a series of distinct service increments. As of December 31, 2021 and 2020, the Company's contract liabilities related to these payments totaled $33.9 million and $16.7 million, respectively. The short-term portion is recorded in other liabilities and the long-term portion is included in other long-term liabilities in the accompanying consolidated balance sheets.

Care management services are provided to enrolled members of certain contracted managed care organizations regardless of whether those members are Oak Street Health patients. Similar to the other care management services provided to the Company's centers, the Company provides delegated services and other administrative services to plans in order to assist with the management of its Medicare population, therefore, we have identified a single performance obligation to stand ready to provide care management services, which constitutes a series of distinct service increments.

F-24