# Exhibit B

Case: 1:22-cv-00149 Document #: 59-3 Filed: 07/25/22 Page 1 of 55 PageID #:658

**Table of Contents**

**As filed with the Securities and Exchange Commission on August 5, 2020**

No. 333-239818

# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## Amendment No. 4 to the
# FORM S-1
# REGISTRATION STATEMENT
*UNDER*
*THE SECURITIES ACT OF 1933*

# Oak Street Health, Inc.
**(Exact name of registrant as specified in its charter)**

| | | |
|---|---|---|
| **Delaware** | **8000** | **84-3446686** |
| **(State or other jurisdiction of incorporation or organization)** | **(Primary Standard Industrial Classification Code Number)** | **(I.R.S. Employer Identification No.)** |

**30 W. Monroe Street**
**Suite 1200**
**Chicago, Illinois 60603**
**Telephone: (312) 733-9730**
**(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)**

**Mike Pykosz**
**Chief Executive Officer**
**30 W. Monroe Street**
**Suite 1200**
**Chicago, Illinois 60603**
**Telephone: (312) 733-9730**
**(Name, address, including zip code, and telephone number, including area code, of agent for service)**

*Copies of all communications, including communications sent to agent for service, should be sent to:*

| | |
|---|---|
| **Robert M. Hayward, P.C.** | **Michael Kaplan** |
| **Robert E. Goedert, P.C.** | **Marcel Fausten** |
| **Michael P. Keeley** | **Pedro J. Bermeo** |
| **Kirkland & Ellis LLP** | **Davis Polk & Wardwell LLP** |
| **300 North LaSalle** | **450 Lexington Avenue** |
| **Chicago, IL 60654** | **New York, New York 10017** |
| **(312) 862-2000** | **(720) 566-4000** |

**Approximate date of commencement of proposed sale to the public:** As soon as practicable after this Registration Statement becomes effective.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, check the following box: ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☐

**CALCULATION OF REGISTRATION FEE**

| Title of Each Class of Securities to be Registered | Amount to be Registered(1) | Proposed Maximum Offering Price Per Share(2) | Proposed Maximum Offering Price(1)(2) | Amount of Registration Fee |
|---|---|---|---|---|
| Common Stock, par value $0.001 per share | 17,968,750 | $20.00 | $359,375,000 | $46,646.88(3) |

(1) Includes 2,343,750 additional shares that the underwriters have the option to purchase.

(2) Estimated solely for the purpose of calculating the registration fee in accordance with Rule 457(a) of the Securities Act of 1933, as amended.

(3) A portion of this amount totaling $39,649.84 was previously paid in connection with the previous filing of this Registration Statement on July 29, 2020. The remaining $6,997.04 has been paid herewith.

**The registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until this Registration Statement shall become effective on such date as the Securities and Exchange Commission, acting pursuant to said Section 8(a), may determine.**

**Table of Contents**

**The information in this preliminary prospectus is not complete and may be changed. These securities may not be sold until the registration statement filed with the Securities and Exchange Commission is effective. This preliminary prospectus is not an offer to sell nor does it seek an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.**

**Subject to Completion. Dated August 5, 2020**

# 15,625,000 Shares



## COMMON STOCK

This is an initial public offering of Oak Street Health, Inc. We are selling 15,625,000 shares of our common stock.

Prior to this offering, there has been no public market for the common stock. It is currently estimated that the initial public offering price will be between $19.00 and $20.00 per share. Our common stock has been approved for listing on the New York Stock Exchange (the "NYSE") under the symbol "OSH."

We are an "emerging growth company" as defined under the federal securities laws, and as such, we have elected to comply with certain reduced reporting requirements for this prospectus and may elect to do so in future filings.

**See "Risk Factors" beginning on page 21 to read about factors you should consider before buying shares of our common stock.**

Immediately after this offering, assuming an offering size as set forth above, we expect to be a "controlled company" within the meaning of the corporate governance standards of the NYSE. See "Management—Controlled Company Status."

**Neither the Securities and Exchange Commission nor any other regulatory body has approved or disapproved of these securities or passed upon the accuracy or adequacy of this prospectus. Any representation to the contrary is a criminal offense.**

|  | Per Share | Total |
|---|---|---|
| Initial public offering price | $ | $ |
| Underwriting discount(1) | $ | $ |
| Proceeds, before expenses, to Oak Street Health, Inc. | $ | $ |

(1)   See "Underwriting" for a description of compensation payable to the underwriters.

We have granted the underwriters the option for a period of 30 days after the date of this prospectus to purchase up to an additional 2,343,750 shares of our common stock at the initial public offering price less the underwriting discount.

The underwriters expect to deliver the shares of common stock against payment in New York, New York on , 2020.

| | | |
|---|---|---|
| **J.P. Morgan** | **Goldman Sachs & Co. LLC** | **Morgan Stanley** |
| **William Blair** | | |
| | | **Piper Sandler** |
| **Baird** | | **Truist Securities** |

**Prospectus dated , 2020.**

Table of Contents

*Organic, Community-Based Marketing and Patient Recruitment*

We employ a multichannel marketing strategy that goes directly to our target customer. We fundamentally control our own destiny and can scale the number of centers on our platform rapidly and fill them with any interested patients we attract.

*Highly Recurring Customer Base Creates Subscription-Like Revenue Model*

Our patients benefit from our offering and they rarely leave. Because we generate the majority of our revenue on a PPPM basis and we are able to consistently retain patients, we have significant visibility into our future financial performance. This provides us the flexibility to quickly adapt to changing circumstances and deliver what we believe to be the right care in the right setting, as we did with telehealth in the spring of 2020, without having an immediate adverse impact to our revenue.

*A Flexible Model Able to Match Patient Needs and Preferences*

The COVID-19 pandemic is creating difficulties for traditional fee-for-service model providers to provide care while causing changes to patient's preferred means of engagement. The changes in preference are not uniform, with some patients preferring traditional in-person visits while others would prefer leveraging telehealth. It is unknown how these preferences will evolve both during and after the pandemic. Additionally, clinical needs of patients vary. Given the high disease burden of our patients, we believe in-person care will remain a necessity for the vast majority, with our sickest patients generally requiring more in-person care. However, we believe we have been able to effectively complement in-person care with telehealth visits and can continue to do so. For reasons of both patient preference and clinical need, we believe our model's adaptability and our ability to effectively engage our patients in numerous ways without negatively impacting our capitated revenue will be an advantage for Oak Street.

*Mission-Driven Team with Unique "Oaky" Culture*

Our team has a steadfast commitment to executing on the mission and vision of our business. To achieve our goals, we have developed an "Oaky" culture centered around creating an unmatched patient experience, driving clinical excellence, taking ownership, fostering innovation and radiating positive energy.

### Our Growth Strategy

The key elements of our growth strategy include:
- increase patient enrollment within existing centers;
- add additional centers in existing markets;
- expand into new markets;
- movement of current patients from fee-for-service to value-based arrangements; and
- continue to optimize the Oak Street Platform.

### Impact of the COVID-19 Pandemic on Our Operations

The severity, magnitude and duration of the current COVID-19 pandemic is uncertain and rapidly changing. As of the date of this prospectus, the extent to which the COVID-19 pandemic may impact our business, results of operations and financial condition remains uncertain. Furthermore, because of our business model, the full impact of the COVID-19 pandemic may not be fully reflected in our results of operations and overall financial condition until future periods.

10

Table of Contents

The ultimate impact of the COVID-19 pandemic on our business, results of operations and financial condition will depend on certain developments, including: the duration and spread of the outbreak; government responses to the pandemic; its impact on the health and welfare of our patients, our employees and their families; its impact on patient, industry, or employee events; delays in hiring and onboarding new employees; and effects on our partners and supply chain, some of which are uncertain, difficult to predict, and not within our control.

In response to the COVID-19 pandemic, in the first and second quarters of 2020, we took the following actions to ensure the safety of our employees and their families and to address the physical, mental and social health of our patients:

- Temporarily closed all of our corporate offices and enabled our entire corporate work force to work remotely;
- Implemented travel restrictions for non-essential business;
- Transitioned much of our center-based care to be delivered by our providers virtually through newly developed telehealth capabilities, including video and telephone which has enabled us to increase our visits per center per day by 12% from February 2020 to April 2020;
- Made operational changes to the staffing and operations of our centers, which remain open as "essential" businesses, to minimize potential exposure to and transmission of COVID-19;
- Temporarily delayed planned openings of new centers;
- Temporarily halted community outreach and other marketing initiatives which drive new patients to our platform;
- Acquired and deployed significantly greater amounts of personal protective equipment ("PPE") to ensure the safety of our employees and patients;
- Created a program called "COVID Care" to actively monitor our patients for suspected COVID-19 infections with the goal of managing those symptoms to keep our patients safely out of the hospital unless and until necessary due to the potential infection risks in the hospital environment; and
- Redeployed our contracted and employed drivers, who typically transport patients to our centers, to deliver food from food pantries to our patients to address food supply issues or challenges.

These changes remain in effect and could extend into future quarters. It is critical to note that, as detailed in "Management's Discussion and Analysis of Financial Condition and Results of Operations—Components of Results of Operations—Revenue," over 97% of our total revenues are recurring, consisting of fixed monthly per-patient-per-month capitation payments we receive from MA plans. Due to our recurring revenue base, we experienced minimal impact to our revenue in the first quarter of 2020 and expect minimal impact to revenue on our existing patient base in 2020. The contracted nature of our revenue allowed us to rapidly transition our business from delivering the majority of our care via our retail-based centers to virtual care/telehealth modalities without concern for any changes to reimbursement or revenue impact to our business, as we are paid the same to care for our at-risk patients regardless of how we deliver care services to our patients. Our business model and its underlying economics align our interests with our patients' health and wellbeing needs; therefore, we quickly invested to address those needs to ensure the safety and health of our patients without material financial impact to our company. Furthermore, as we continue to leverage our employed base of healthcare providers, we are able to continue to assess and meet the clinical needs of our patients, without concern for how the vast majority of those services may be reimbursed, as only 1.1% of our total revenues for the year ended December 31, 2019 (a pre-COVID-19 period) was related to fee-for-service payments and represented only minimal incremental cost to our organization. During April and May 2020, we engaged with 80% of our patients in some form, with 62% of our patients completing an audio, in-person or video visit, and the remaining 18% receiving a non-visit touch point such as a call with a social worker to discuss social determinants of health needs.

11

Table of Contents

We expect COVID-19 to affect our medical claims expense. Measuring from the beginning of the pandemic until May 31, 2020, we estimate that approximately 1,906 of our at-risk patients had symptoms that suggested possible COVID-19 infection, representing 3% of our at-risk patients. As we are financially responsible for essentially all of the healthcare costs associated with those patients whether we provide that care or a third party provides that care, we suspect that the healthcare costs of these patients will be greater than had COVID-19 not occurred. It is impossible, however, to know what other healthcare issues these patients may have encountered in their pre-COVID-19 lives and whether the COVID-19 costs are or will be greater or lesser than the costs these patients would otherwise incur. Additionally, because of the extraordinary measures taken by local governments in our markets, all of our patients had more limited access to healthcare services, including healthcare specialists such as cardiologists or orthopedists, to schedule both inpatient and outpatient surgeries, and to some hospital care. We expect that beginning in late March 2020 and extending through most of the second quarter of 2020, our patients who were not infected with COVID-19, which represents over 97% of our at-risk patients, incurred lower healthcare costs than we would have otherwise expected, which will result in lower medical claims expense that we incur. We expect the vast majority of these costs are just delayed and will be incurred at future points in time and it is possible that the deferral of healthcare services could cause additional health problems in our existing patients, which could increase our costs in the future. We cannot accurately estimate the net potential impact, positive or negative, to medical claims expense at this time. Furthermore, given the time it takes for medical claims to be submitted to MA plans, adjudicated, and sent to us, we believe it will be several quarters before we will be able to accurately calculate the impact on medical claims expense from the COVID-19 pandemic. We do not believe, however, that the impact of medical claims related to COVID-19 that we have experienced to date will have a materially detrimental effect on our long-term financial performance. This belief is based on several indicators that the Company regularly tracks, including:

- Hospital admission rates — inpatient hospital costs represent approximately 48% of our at-risk patients' medical claims. Therefore, we closely monitor the number of our patients that are admitted to the hospital. Through May 31, 2020, our hospital admission rates are within the normal bounds of what we have historically experienced and are at approximately the same levels we experienced in 2019.
- Approximately 90% of our patients are in an HMO-like product, which generally requires a referral from our providers to see specialists. The cost of specialist visits, independent lab work, ambulatory surgery centers, and hospital outpatient expenses, all of which are impacted by specialists' visits, account for approximately 30% of our at-risk patients' medical claims. Our specialist referral volumes declined approximately 70% when we compare our providers' weekly ordering patterns for the first full 10 weeks of 2020 to the subsequent 12 weeks.

Although we plan to increase our efforts in summer 2020, we expect the temporary cessation of our outbound marketing efforts to be a potential headwind on growth in 2020 and potentially beyond. We believe one of the effects of COVID-19 has been increased focus on health and wellbeing across all patients and therefore there is still strong demand for the type of quality care we deliver and a desire to receive that care in our centers. In light of that, we have developed, and continue to develop, new methods of outreach that we believe will be effective in the current environment. For example, we are engaging community partners, such as senior living facilities and faith-based organizations, to obtain referrals of older adults who could benefit from our services and care model. Given, however, that much of our historic growth has come from in-person meetings and events, our historical growth is not necessarily a reliable indicator of our future growth.

The impact, if any, of these and any additional operational changes we may implement is uncertain, but changes we have implemented to date have not affected and are not expected to materially affect our ability to maintain operations, including financial reporting systems, internal control over financial reporting, and disclosure controls and procedures. See "Risk Factors" for further discussion of the possible impact of the COVID-19 pandemic on our business and the section titled "Business—Impact of the COVID-19 Pandemic."

Table of Contents

**Recent Unaudited Operating Results**

Set forth below are certain preliminary estimates of our operating results for the three months ended June 30, 2020 compared to our actual operating results for the three months ended June 30, 2019. We have not yet finalized our operating results for the three months ended June 30, 2020, and our consolidated statements of operations and related notes as of and for the three months ended June 30, 2020 are not expected to be available until after this offering is completed. Consequently, our final operating results for the three months ended June 30, 2020 will not be available to you prior to investing in this offering. While we are currently unaware of any items that would require us to make adjustments to the financial information set forth below, it is possible that we or our independent registered public accounting firm may identify such items as we complete our interim financial statements and any resulting changes could be material. Accordingly, undue reliance should not be placed on these preliminary estimates. These preliminary estimates are not necessarily indicative of any future period and should be read together with "Risk Factors," "Forward-Looking Statements" and our consolidated financial statements and related notes included in this Registration Statement.

The preliminary financial data included below has been prepared by, and is the responsibility of, our management. Our independent auditors have not audited, reviewed, compiled or performed any procedures with respect to such preliminary financial data or the accounting treatment thereof. Accordingly, our independent auditors express no opinion or any other form of assurance with respect thereto.

We are providing the following preliminary estimates of our operating results for the three months ended June 30, 2020:

| | For the Three Months Ended June 30, | | |
| --- | --- | --- | --- |
| | 2019 | 2020 | |
| | | Low | High |
| **Financial Results** | | | |
| Total revenues | $ 126.5 | $ 209.0 | $ 215.0 |
| Medical claims expense | $ 84.3 | $ 154.0 | $ 160.0 |
| Cost of care, excluding depreciation & amortization | $ 31.4 | $ 39.0 | $ 45.0 |
| Net loss attributable to Oak Street Health, LLC | $ (20.2) | $ (26.0) | $ (33.0) |
| | | | |
| **Key Metrics** | | | |
| Centers | 44 | 54 | 54 |
| Total Patients | 64,000 | 86,500 | 86,500 |
| *At-Risk* | 63% | 66% | 66% |
| *Fee-for-service* | 37% | 34% | 34% |
| | | | |
| Patient Contribution | $ 38.7 | $ 48.0 | $ 53.0 |
| Platform Contribution | $ 10.8 | $ 14.0 | $ 20.0 |

*Comparison of the Three Months Ended June 30, 2020 and 2019*

The estimated increase in total revenues of 65% to 70% is primarily attributable to patient growth of 35%, as well as an increase in total revenues per patient and $6 million of revenues resulting from prior period adjustments. Total revenues per patient increased by a range of 22% to 26% (19% to 22%, excluding prior period adjustments) due to a shift in patient mix toward higher-premium at-risk patients that had a higher level of acuity on average and thus higher capitation payments.

The estimated increase in medical claims expense of 83% to 90% is primarily attributable to patient growth of 35%, as well as an increase in medical claims expense per patient driven by medical costs trends and mix shift of patients to higher cost markets and an increase in medical claims expense related to prior periods.

13

Table of Contents

Excluding the increase in the medical claims expense related to prior period adjustments, the estimated increase in medical claims expense was 64% to 71%.

The estimated cost of care, excluding depreciation and amortization increased during the period by a range of 24% to 43% compared to the three months ended June 30, 2019, primarily due to increases in salaries and benefits, occupancy, transportation, and medical supply costs related to our 35% growth in patients and growth of centers of 10.

The estimated net loss attributable to Oak Street Health, LLC changed during the period by a range of $6 million to $13 million from the three months ended June 30, 2019 primarily due to increases in total operating expenses for the period compared to the three months ended June 30, 2019, partially offset by higher revenues. The increase in total operating expenses was primarily due to medical claims expense and salaries and benefits, including stock-based compensation, as we continued to expand our team to support our growth and prepared to become a public company.

### Risks Associated with Our Business

There are a number of risks related to our business, this offering and our common stock that you should consider before you decide to participate in this offering. You should carefully consider all the information presented in the section entitled "Risk Factors" in this prospectus. Some of the principal risks related to our business include the following:

- our history of net losses, with an accumulated deficit of $369.4 million as of March 31, 2020, and our ability to achieve or maintain profitability;
- the impact of the COVID-19 pandemic on our business;
- difficulty evaluating our current business and future prospects given our limited operating history;
- the success of our growth strategy and our ability to achieve expected results;
- our ability to attract new patients;
- the dependence of our revenues and operations on a limited number of key payors;
- the risk of termination or non-renewal of the Medicare Advantage contracts held by the health plans with which we contract, or of our contracts with those plans;
- changes in the payor mix of our patients and potential decreases in our reimbursement rates;
- the risk that the cost of providing our services will exceed our compensation;
- risks related to regulation, as we operate in a highly regulated industry;
- the fact that the Lead Sponsors control us, and their interests may conflict with ours or yours; and
- the other factors set forth under "Risk Factors."

These and other risks are more fully described in the section entitled "Risk Factors" in this prospectus. If any of these risks actually occurs, our business, financial condition, results of operations, cash flows and prospects could be materially and adversely affected. As a result, you could lose all or part of your investment in our common stock.

### General Corporate Information

Oak Street Health, Inc. was incorporated as a Delaware corporation on October 22, 2019 in anticipation of this offering. Our principal executive offices are located at 30 W. Monroe Street, Suite 1200, Chicago, Illinois

14

Table of Contents

60603. Our telephone number is (312) 733-9730. Our website address is www.oakstreethealth.com. The information contained on, or that can be accessed through, our website is not incorporated by reference into this prospectus, and you should not consider any information contained on, or that can be accessed through, our website as part of this prospectus or in deciding whether to purchase our common stock. We are a holding company and all of our business operations are conducted through our subsidiaries and affiliated medical groups.

This prospectus includes our trademarks and service marks such as "Oak Street Health", which are protected under applicable intellectual property laws and are the property of us or our subsidiaries. This prospectus also contains trademarks, service marks, trade names and copyrights of other companies, such as "Humana," "WellCare," and "Cigna HealthSpring," which are the property of their respective owners. Solely for convenience, trademarks and trade names referred to in this prospectus may appear without the ® or ™ symbols, but such references are not intended to indicate, in any way, that we will not assert, to the fullest extent under applicable law, our rights or the rights of the applicable licensor to these trademarks and trade names.

### Implications of Being an Emerging Growth Company

We qualify as an "emerging growth company" as defined in the Jumpstart Our Business Startups Act of 2012, or the JOBS Act. We will remain an emerging growth company until the earlier of (1) the last day of the fiscal year following the fifth anniversary of the completion of this offering, (2) the last day of the fiscal year in which we have total annual gross revenue of at least $1.07 billion, (3) the date on which we are deemed to be a large accelerated filer (this means the market value of common that is held by non-affiliates exceeds $700.0 million as of the end of the second quarter of that fiscal year), or (4) the date on which we have issued more than $1.0 billion in non-convertible debt securities during the prior three-year period.

An emerging growth company may take advantage of reduced reporting requirements that are otherwise applicable to public companies. These provisions include, but are not limited to:

- not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act of 2002, as amended (the "Sarbanes-Oxley Act");
- reduced disclosure obligations regarding executive compensation in our periodic reports, proxy statements and registration statements; and
- exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and shareholder approval of any golden parachute payments not previously approved.

We have elected to take advantage of certain of the reduced disclosure obligations regarding financial statements and executive compensation in this prospectus and expect to elect to take advantage of other reduced burdens in future filings. As a result, the information that we provide to our shareholders may be different than you might receive from other public reporting companies in which you hold equity interests.

In addition, under the JOBS Act, emerging growth companies can delay adopting new or revised accounting standards until such time as those standards apply to private companies. We intend to take advantage of the longer phase-in periods for the adoption of new or revised financial accounting standards under the JOBS Act until we are no longer an emerging growth company. Our election to use the phase-in periods permitted by this election may make it difficult to compare our financial statements to those of non-emerging growth companies and other emerging growth companies that have opted out of the longer phase-in periods permitted under the JOBS Act and who will comply with new or revised financial accounting standards. If we were to subsequently elect instead to comply with public company effective dates, such election would be irrevocable pursuant to the JOBS Act.

15

Table of Contents

including PHI or other PII, or other sensitive information we or our contractors or third-party service providers maintain or otherwise process, could harm our reputation, compel us to comply with breach notification laws, cause us to incur significant costs for remediation, fines, penalties, notification to individuals and for measures intended to repair or replace systems or technology and to prevent future occurrences, potential increases in insurance premiums, and require us to verify the accuracy of database contents, resulting in increased costs or loss of revenue. If we are unable to prevent or mitigate such security breaches or privacy violations or implement satisfactory remedial measures, or if it is perceived that we have been unable to do so, our operations could be disrupted, we may be unable to provide access to our systems, and we could suffer a loss of patients, and we may as a result suffer loss of reputation, adverse impacts on patient and investor confidence, financial loss, governmental investigations or other actions, regulatory or contractual penalties, and other claims and liability. In addition, security breaches and other inappropriate access to, or acquisition or processing of, information can be difficult to detect, and any delay in identifying such incidents or in providing any notification of such incidents may lead to increased harm.

Any such breach or interruption of our systems or those of any of our third-party service providers could compromise our networks or data security processes and sensitive information could be made inaccessible or could be accessed by unauthorized parties, publicly disclosed, lost or stolen. Any such interruption in access, improper access, disclosure or other loss of information could result in legal claims or proceedings, liability under laws and regulations that protect the privacy of member information or other personal information, such as the Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act of 2009 (the "HITECH Act"), and their implementing regulations (collectively known as "HIPAA"), and regulatory penalties. Unauthorized access, loss or dissemination could also disrupt our operations, including our ability to perform our services, access patient health information, collect, process, and prepare company financial information, provide information about our current and future services and engage in other patient and clinician education and outreach efforts. Any such breach could also result in the compromise of our trade secrets and other proprietary information, which could adversely affect our business and competitive position. While we maintain insurance covering certain security and privacy damages and claim expenses, we may not carry insurance or maintain coverage sufficient to compensate for all liability and in any event, insurance coverage would not address the reputational damage that could result from a security incident.

***As a result of becoming a public company, we will be obligated to develop and maintain proper and effective internal control over financial reporting in order to comply with Section 404 of the Sarbanes-Oxley Act. We may not complete our analysis of our internal control over financial reporting in a timely manner, or these internal controls may not be determined to be effective, which may adversely affect investor confidence in us and, as a result, the value of our common stock. In addition, because of our status as an emerging growth company, you will not be able to depend on any attestation from our independent registered public accountants as to our internal control over financial reporting for the foreseeable future.***

When we become a public company following this initial public offering, we will be required by Section 404 of the Sarbanes-Oxley Act to furnish a report by management on, among other things, the effectiveness of our internal control over financial reporting in our second annual report following the completion of this offering. The process of designing and implementing internal control over financial reporting required to comply with this requirement will be time-consuming, costly and complicated. If during the evaluation and testing process we identify one or more other material weaknesses in our internal control over financial reporting or determine that existing material weaknesses have not been remediated, our management will be unable to assert that our internal control over financial reporting is effective. See "—Our independent registered public accountants have identified several material weaknesses in our internal control over financial reporting. If we are unable to remediate the material weaknesses, or if other control deficiencies are identified, we may not be able to report our financial results accurately, prevent fraud or file our periodic reports as a public company in a timely manner." In addition, if we fail to achieve and maintain the adequacy of our internal controls, as such standards are modified, supplemented or amended from time to time, we may not be able to

Table of Contents

ensure that we can conclude on an ongoing basis that we have effective internal controls over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act.

Even if our management concludes that our internal control over financial reporting is effective, our independent registered public accounting firm may issue a report that is qualified if it is not satisfied with our controls or the level at which our controls are documented, designed, operated or reviewed. However, our independent registered public accounting firm will not be required to attest formally to the effectiveness of our internal control over financial reporting pursuant to Section 404 of the Sarbanes-Oxley Act until the later of the filing of our second annual report following the completion of this offering or the date we are no longer an "emerging growth company," as defined in the JOBS Act. Accordingly, you will not be able to depend on any attestation concerning our internal control over financial reporting from our independent registered public accountants for the foreseeable future.

We cannot be certain as to the timing of completion of our evaluation, testing and any remediation actions or the impact of the same on our operations. If we are not able to implement the requirements of Section 404 of the Sarbanes-Oxley Act in a timely manner or with adequate compliance, our independent registered public accounting firm may issue an adverse opinion due to ineffective internal controls over financial reporting, and we may be subject to sanctions or investigation by regulatory authorities, such as the SEC. As a result, there could be a negative reaction in the financial markets due to a loss of confidence in the reliability of our financial statements. In addition, we may be required to incur costs in improving our internal control system and the hiring of additional personnel. Any such action could negatively affect our results of operations and cash flows.

### *Disruptions in our disaster recovery systems or management continuity planning could limit our ability to operate our business effectively.*

Our information technology systems facilitate our ability to conduct our business. While we have disaster recovery systems and business continuity plans in place, any disruptions in our disaster recovery systems or the failure of these systems to operate as expected could, depending on the magnitude of the problem, adversely affect our operating results by limiting our capacity to effectively monitor and control our operations. Despite our implementation of a variety of security measures, our information technology systems could be subject to physical or electronic break-ins, and similar disruptions from unauthorized tampering or any weather-related disruptions where our headquarters is located. In addition, in the event that a significant number of our management personnel were unavailable in the event of a disaster, our ability to effectively conduct business could be adversely affected.

### *We may be subject to legal proceedings and litigation, including intellectual property and privacy disputes, which are costly to defend and could materially harm our business and results of operations.*

We may be party to lawsuits and legal proceedings in the normal course of business. These matters are often expensive and disruptive to normal business operations. We may face allegations, lawsuits and regulatory inquiries, audits and investigations regarding data privacy, security, labor and employment, consumer protection and intellectual property infringement, including claims related to privacy, patents, publicity, trademarks, copyrights and other rights. We may also face allegations or litigation related to our acquisitions, securities issuances or business practices, including public disclosures about our business. Litigation and regulatory proceedings may be protracted and expensive, and the results are difficult to predict. Certain of these matters may include speculative claims for substantial or indeterminate amounts of damages and include claims for injunctive relief. Additionally, our litigation costs could be significant. Adverse outcomes with respect to litigation or any of these legal proceedings may result in significant settlement costs or judgments, penalties and fines, or require us to modify our services or require us to stop serving certain patients or geographies, all of which could negatively impact our geographical expansion and revenue growth. We may also become subject to periodic audits, which would likely increase our regulatory compliance costs and may require us to change our business practices, which could negatively impact our revenue growth. Managing legal proceedings, litigation and audits, even if we achieve favorable outcomes, is time-consuming and diverts management's attention from our business.

34

Table of Contents

The results of regulatory proceedings, litigation, claims, and audits cannot be predicted with certainty, and determining reserves for pending litigation and other legal, regulatory and audit matters requires significant judgment. There can be no assurance that our expectations will prove correct, and even if these matters are resolved in our favor or without significant cash settlements, these matters, and the time and resources necessary to litigate or resolve them, could harm our reputation, business, financial condition, results of operations and the market price of our common stock.

We also may be subject to lawsuits under the False Claims Act (the "FCA") and comparable state laws for submitting allegedly fraudulent or otherwise inappropriate bills for services to the Medicare and Medicaid programs. These lawsuits, which may be initiated by government authorities as well as private party relators, can involve significant monetary damages, fines, attorney fees and the award of bounties to private plaintiffs who successfully bring these suits, as well as to the government programs. In recent years, government oversight and law enforcement have become increasingly active and aggressive in investigating and taking legal action against potential fraud and abuse.

Furthermore, our business exposes us to potential medical malpractice, professional negligence or other related actions or claims that are inherent in the provision of healthcare services. These claims, with or without merit, could cause us to incur substantial costs, and could place a significant strain on our financial resources, divert the attention of management from our core business, harm our reputation and adversely affect our ability to attract and retain patients, any of which could have a material adverse effect on our business, financial condition and results of operations.

Although we maintain third-party professional liability insurance coverage, it is possible that claims against us may exceed the coverage limits of our insurance policies. Even if any professional liability loss is covered by an insurance policy, these policies typically have substantial deductibles for which we are responsible. Professional liability claims in excess of applicable insurance coverage could have a material adverse effect on our business, financial condition and results of operations. In addition, any professional liability claim brought against us, with or without merit, could result in an increase of our professional liability insurance premiums. Insurance coverage varies in cost and can be difficult to obtain, and we cannot guarantee that we will be able to obtain insurance coverage in the future on terms acceptable to us or at all. If our costs of insurance and claims increase, then our earnings could decline.

### *Reductions in the quality ratings of the health plans we serve could have a material adverse effect on our business, results of operations, financial condition and cash flows.*

As a result of the ACA, the level of reimbursement each health plan receives from CMS is dependent, in part, upon the quality rating of the Medicare plan. Such ratings impact the percentage of any cost savings rebate and any bonuses earned by such health plan. Since a significant portion of our revenue is expected to be calculated as a percentage of CMS reimbursements received by these health plans with respect to our patients, reductions in the quality ratings of a health plan that we serve could have a material adverse effect on our business, results of operations, financial condition and cash flows.

Given each health plan's control of its plans and the many other providers that serve such plans, we believe that we will have limited ability to influence the overall quality rating of any such plan. The Balanced Budget Act passed in February 2018 implemented certain changes to prevent artificial inflation of star ratings for MA plans offered by the same organization. In addition, CMS has terminated plans that have had a rating of less than three stars for three consecutive years, whereas MA plans with five stars are permitted to conduct enrollment throughout almost the entire year. Because low quality ratings can potentially lead to the termination of a plan that we serve, we may not be able to prevent the potential termination of a contracting plan or a shift of patients to other plans based upon quality issues which could, in turn, have a material adverse effect on our business, results of operations, financial condition and cash flows.

35

Table of Contents

*If our agreements or arrangements with any physician equity holder of our practices are deemed invalid under state law, including laws against the corporate practice of medicine, or federal law, or are terminated as a result of changes in state law, or if there is a change in accounting standards by the Financial Accounting Standards Board ("FASB") or the interpretation thereof affecting consolidation of entities, it could have a material adverse effect on our consolidation of total revenues derived from such practices.*

Our financial statements are consolidated in accordance with applicable accounting standards and include the accounts of our majority-owned subsidiaries and certain non-owned associated and managed practices. Such consolidation for accounting and/or tax purposes does not, is not intended to, and should not be deemed to, imply or provide us any control over the medical or clinical affairs of such practices. In the event of a change in accounting standards promulgated by FASB or in interpretation of its standards, or if there is an adverse determination by a regulatory agency or a court, or a change in state or federal law relating to the ability to maintain present agreements or arrangements with such practices, we may not be permitted to continue to consolidate the total revenues of such practices.

*If we are not able to maintain and enhance our reputation and brand recognition, including through the maintenance and protection of trademarks, our business and results of operations will be harmed.*

We believe that maintaining and enhancing our reputation and brand recognition is critical to our relationships with both patients and payors and to our ability to attract new patients. The promotion of our brand may require us to make substantial investments and we anticipate that, as our market becomes increasingly competitive, these marketing initiatives may become increasingly difficult and expensive. Our marketing activities may not be successful or yield increased revenue, and to the extent that these activities yield increased revenue, the increased revenue may not offset the expenses we incur and our results of operations could be harmed. In addition, any factor that diminishes our reputation or that of our management, including failing to meet the expectations of or provide quality medical care for our patients, or any adverse publicity or litigation involving or surrounding us, one of our centers or our management, could make it substantially more difficult for us to attract new patients. Similarly, because our existing patients often act as references for us with prospective new patients, any existing patient that questions the quality of our care could impair our ability to secure additional new patients. In addition, negative publicity resulting from any adverse government payor audit could injure our reputation. If we do not successfully maintain and enhance our reputation and brand recognition, our business may not grow and we could lose our relationships with patients, which would harm our business, results of operations and financial condition.

The registered or unregistered trademarks or trade names that we own or license may be challenged, infringed, circumvented, declared generic, lapsed or determined to be infringing on or dilutive of other marks. We may not be able to protect our rights in these trademarks and trade names, which we need in order to build name recognition with patients, payors and other partners. In addition, third parties may in the future file for registration of trademarks similar or identical to our trademarks. If they succeed in registering or developing common law rights in such trademarks, and if we are not successful in challenging such third-party rights, we may not be able to use these trademarks to commercialize our technologies in certain relevant jurisdictions. If we are unable to establish name recognition based on our trademarks and trade names, we may not be able to compete effectively and our brand recognition, reputation and results of operations may be adversely affected.

*Our business depends on our ability to effectively invest in, implement improvements to and properly maintain the uninterrupted operation and data integrity of our information technology and other business systems.*

Our business is highly dependent on maintaining effective information systems as well as the integrity and timeliness of the data we use to serve our patients, support our care teams and operate our business. Because of the large amount of data that we collect and manage, it is possible that hardware failures or errors in our systems could result in data loss or corruption or cause the information that we collect to be incomplete or contain inaccuracies that our partners regard as significant. If our data were found to be inaccurate or unreliable due to

Table of Contents

***A failure to accurately estimate incurred but not reported medical expense could adversely affect our results of operations.***

Patient care costs include estimates of future medical claims that have been incurred by the patient but for which the provider has not yet billed. These claim estimates are made utilizing actuarial methods and are continually evaluated and adjusted by management, based upon our historical claims experience and other factors, including an independent assessment by a nationally recognized actuarial firm. Adjustments, if necessary, are made to medical claims expense and capitated revenues when the assumptions used to determine our claims liability change and when actual claim costs are ultimately determined.

Due to the inherent uncertainties associated with the factors used in these estimates and changes in the patterns and rates of medical utilization, materially different amounts could be reported in our financial statements for a particular period under different conditions or using different, but still reasonable, assumptions. It is possible that our estimates of this type of claim may be inadequate in the future. In such event, our results of operations could be adversely impacted. Further, the inability to estimate these claims accurately may also affect our ability to take timely corrective actions, further exacerbating the extent of any adverse effect on our results of operations.

***Negative publicity regarding the managed healthcare industry generally could adversely affect our results of operations or business.***

Negative publicity regarding the managed healthcare industry generally, or the Medicare Advantage program in particular, may result in increased regulation and legislative review of industry practices that further increase our costs of doing business and adversely affect our results of operations or business by:

- requiring us to change our products and services;
- increasing the regulatory, including compliance, burdens under which we operate, which, in turn, may negatively impact the manner in which we provide services and increase our costs of providing services;
- adversely affecting our ability to market our products or services through the imposition of further regulatory restrictions regarding the manner in which plans and providers market to Medicare Advantage enrollees; or
- adversely affecting our ability to attract and retain patients.

***State and federal efforts to reduce Medicaid spending could adversely affect our financial condition and results of operations.***

Certain of our patients are dual-eligible, meaning their coverage comes from both Medicare and Medicaid. In addition, a very small portion of our patients (under 2%) are fully covered by Medicaid. As a result, a small portion of our revenue comes from Medicaid, accounting for approximately 3% of our revenue for each of the years ended December 31, 2018 and 2019, respectively, and 3% and 2% of our revenue for each of the three-month periods ended March 31, 2019 and 2020, respectively. Medicaid is a joint federal-state program purchasing healthcare services for the low income and indigent as well as certain higher-income individuals with significant health needs. Under broad federal criteria, states establish rules for eligibility, services and payment. Medicaid is a state-administered program financed by both state funds and matching federal funds. Medicaid spending has increased rapidly in recent years, becoming a significant component of state budgets. This, combined with slower state revenue growth, has led both the federal government and many states to institute measures aimed at controlling the growth of Medicaid spending, and in some instances reducing aggregate Medicaid spending.

For example, a number of states have adopted or are considering legislation designed to reduce their Medicaid expenditures, such as financial arrangements commonly referred to as provider taxes. Under provider

45

Table of Contents

tax arrangements, states collect taxes from healthcare providers and then use the revenue to pay the providers as a Medicaid expenditure, which allows the states to then claim additional federal matching funds on the additional reimbursements. Current federal law provides for a cap on the maximum allowable provider tax as a percentage of the provider's total revenue. There can be no assurance that federal law will continue to provide matching federal funds on state Medicaid expenditures funded through provider taxes, or that the current caps on provider taxes will not be reduced. Any discontinuance or reduction in federal matching of provider tax-related Medicaid expenditures could have a significant and adverse effect on states' Medicaid expenditures, and as a result could have an adverse effect on our business.

In addition, CMS has recently approved demonstration waivers for the Indiana Medicaid program that, among other things, imposes work or community engagement and income based premiums on certain adult Medicaid beneficiaries, and similar waivers may be applied in other states. Also, as part of the movement to repeal, replace or modify the ACA and as a means to reduce the federal budget deficit, there are renewed congressional efforts to move Medicaid from an open-ended program with coverage and benefits set by the federal government to one in which states receive a fixed amount of federal funds, either through block grants or per capita caps, and have more flexibility to determine benefits, eligibility or provider payments. If those changes are implemented, we cannot predict whether the amount of fixed federal funding to the states will be based on current payment amounts, or if it will be based on lower payment amounts, which would negatively impact those states that expanded their Medicaid programs in response to the ACA.

We expect these state and federal efforts to continue for the foreseeable future. The Medicaid program and its reimbursement rates and rules are subject to frequent change at both the federal and state level. These include statutory and regulatory changes, rate adjustments (including retroactive adjustments), administrative or executive orders and government funding restrictions, all of which may materially adversely affect the rates at which our services are reimbursed by state Medicaid plans.

### *Our primary care centers may be negatively impacted by weather and other factors beyond our control.*

Our results of operations may be adversely impacted by adverse conditions affecting our centers, including severe weather events such as tornadoes and widespread winter storms, public health concerns such as contagious disease outbreaks, violence or threats of violence or other factors beyond our control that cause disruption of patient scheduling, displacement of our patients, employees and Care Teams, or force certain of our centers to close temporarily. In certain geographic areas, we have a large concentration of centers that may be simultaneously affected by adverse weather conditions or other events. Our future operating results may be adversely affected by these and other factors that disrupt the operation of our centers.

### Risks Related to Regulation

### *If we fail to adhere to all of the complex government laws and regulations that apply to our business, we could suffer severe consequences that could have a material adverse effect on our business, results of operations, financial condition, cash flows, reputation and stock price.*

Our operations are subject to extensive federal, state and local government laws and regulations, such as:
- Medicare and Medicaid reimbursement rules and regulations;
- federal and state anti-kickback laws, which prohibits the knowing and willful offer, payment, solicitation or receipt of any bribe, kickback, rebate or other remuneration for referring an individual, in return for ordering, leasing, purchasing or recommending or arranging for or to induce the referral of an individual or the ordering, purchasing or leasing of items or services covered, in whole or in part, by any federal healthcare program, such as Medicare and Medicaid;
- the Self-Referral Law and analogous state self-referral prohibition statutes, which, subject to limited exceptions, prohibits physicians from referring Medicare or Medicaid patients to an entity for the

46

Table of Contents

provision of certain "designated health services" if the physician or a member of such physician's immediate family has a direct or indirect financial relationship (including an ownership interest or a compensation arrangement) with an entity, and prohibit the entity from billing Medicare or Medicaid for such "designated health services";

- the FCA and associated regulations, that imposes civil and criminal liability on individuals or entities that knowingly submit false or fraudulent claims for payment to the government or knowingly making, or causing to be made, a false statement in order to have a false claim paid, including qui tam or whistleblower suits;
- the Civil Monetary Penalty statute and associated regulations, which authorizes the government agent to impose civil money penalties, an assessment, and program exclusion for various forms of fraud and abuse involving the Medicare and Medicaid programs;
- federal and state laws regarding the collection, use and disclosure of patient health information (e.g., HIPAA) and the storage, handling, shipment, disposal and/or dispensing of pharmaceuticals and blood products and other biological materials and many other applicable state and federal laws and requirements;
- state and federal statutes and regulations that govern workplace health and safety;
- federal and state laws and policies that require healthcare providers to maintain licensure, certification or accreditation to enroll and participate in the Medicare and Medicaid programs, to report certain changes in their operations to the agencies that administer these programs and, in some cases, to re-enroll in these programs when changes in direct or indirect ownership occur; and
- federal and state laws pertaining to the provision of services by nurse practitioners and physician assistants certain settings, physician supervision of those services, and reimbursement requirements that depend on the types of services provided and documented and relationships between physician supervisors and nurse practitioners and physician assistants.

In addition to the above laws, Medicare and Medicaid regulations, manual provisions, local coverage determinations, national coverage determinations and agency guidance also impose complex and extensive requirements upon healthcare providers. Moreover, the various laws and regulations that apply to our operations are often subject to varying interpretations and additional laws and regulations potentially affecting providers continue to be promulgated that may impact us. A violation or departure from any of the legal requirements implicated by our business may result in, among other things, government audits, lower reimbursements, significant fines and penalties, the potential loss of certification, recoupment efforts or voluntary repayments. These legal requirements are civil, criminal and administrative in nature depending on the law or requirement.

We endeavor to comply with all legal requirements. We further endeavor to structure all of our relationships with physicians and providers to comply with state and federal anti-kickback physician and Stark laws and other applicable healthcare laws. We utilize considerable resources to monitor laws and regulations and implement necessary changes. However, the laws and regulations in these areas are complex, changing and often subject to varying interpretations. As a result, there is no guarantee that we will be able to adhere to all of the laws and regulations that apply to our business, and any failure to do so could have a material adverse impact on our business, results of operations, financial condition, cash flows and reputation. For example, if an enforcement agency were to challenge the level of compensation that we pay our medical directors or the number of medical directors whom we engage, or otherwise challenge these arrangements, we could be required to change our practices, face criminal or civil penalties, pay substantial fines or otherwise experience a material adverse impact on our business, results of operations, financial condition, cash flows and reputation as a result. Similarly, we may face penalties under the FCA, the federal Civil Monetary Penalty statute or otherwise related to failure to report and return overpayments within 60 days of when the overpayment is identified and quantified. These obligations to report and return overpayments could subject our procedures for identifying and processing overpayments to greater scrutiny. We have made investments in resources to decrease the time it takes to identify, quantify and process overpayments, and may be required to make additional investments in the future.

47

Table of Contents

Additionally, the federal government has used the FCA to prosecute a wide variety of alleged false claims and fraud allegedly perpetrated against Medicare, Medicaid and other federally funded health care programs. Moreover, amendments to the federal Anti-Kickback Statute in the ACA make claims tainted by anti-kickback violations potentially subject to liability under the FCA, including *qui tam* or whistleblower suits. The penalties for a violation of the FCA range from $5,500 to $11,000 (adjusted for inflation) for each false claim plus three times the amount of damages caused by each such claim which generally means the amount received directly or indirectly from the government. On January 29, 2018, the Department of Justice ("DOJ") issued a final rule announcing adjustments to FCA penalties, under which the per claim penalty range increases to a range from $11,181 to $22,363 for penalties assessed after January 29, 2018, so long as the underlying conduct occurred after November 2, 2015. Given the high volume of claims processed by our various operating units, the potential is high for substantial penalties in connection with any alleged FCA violations.

In addition to the provisions of the FCA, which provide for civil enforcement, the federal government can use several criminal statutes to prosecute persons who are alleged to have submitted false or fraudulent claims for payment to the federal government.

If any of our operations are found to violate these or other government laws or regulations, we could suffer severe consequences that would have a material adverse effect on our business, results of operations, financial condition, cash flows, reputation and stock price, including:

- suspension or termination of our participation in government payment programs;
- refunds of amounts received in violation of law or applicable payment program requirements dating back to the applicable statute of limitation periods;
- loss of our required government certifications or exclusion from government payment programs;
- loss of our licenses required to operate healthcare facilities or administer pharmaceuticals in the states in which we operate;
- criminal or civil liability, fines, damages or monetary penalties for violations of healthcare fraud and abuse laws, including the federal Anti-Kickback Statute, Civil Monetary Penalties Law, Stark Law and FCA, or other failures to meet regulatory requirements;
- enforcement actions by governmental agencies and/or state law claims for monetary damages by patients who believe their PHI has been used, disclosed or not properly safeguarded in violation of federal or state patient privacy laws, including HIPAA and the Privacy Act of 1974;
- mandated changes to our practices or procedures that significantly increase operating expenses;
- imposition of and compliance with corporate integrity agreements that could subject us to ongoing audits and reporting requirements as well as increased scrutiny of our billing and business practices which could lead to potential fines, among other things;
- termination of various relationships and/or contracts related to our business, including joint venture arrangements, medical director agreements, real estate leases and consulting agreements with physicians; and
- harm to our reputation which could negatively impact our business relationships, affect our ability to attract and retain patients and physicians, affect our ability to obtain financing and decrease access to new business opportunities, among other things.

We are, and may in the future be, a party to various lawsuits, demands, claims, *qui tam* suits, governmental investigations and audits (including investigations or other actions resulting from our obligation to self-report suspected violations of law) and other legal matters, any of which could result in, among other things, substantial financial penalties or awards against us, mandated refunds, substantial payments made by us, required changes to our business practices, exclusion from future participation in Medicare, Medicaid and other healthcare programs

48

Table of Contents

and possible criminal penalties, any of which could have a material adverse effect on our business, results of operations, financial condition, cash flows and materially harm our reputation.

We may in the future be subject to investigations and audits by state or federal governmental agencies and/or private civil *qui tam* complaints filed by relators and other lawsuits, demands, claims and legal proceedings, including investigations or other actions resulting from our obligation to self-report suspected violations of law.

Responding to subpoenas, investigations and other lawsuits, claims and legal proceedings as well as defending ourselves in such matters will continue to require management's attention and cause us to incur significant legal expense. Negative findings or terms and conditions that we might agree to accept as part of a negotiated resolution of pending or future legal or regulatory matters could result in, among other things, substantial financial penalties or awards against us, substantial payments made by us, harm to our reputation, required changes to our business practices, exclusion from future participation in the Medicare, Medicaid and other healthcare programs and, in certain cases, criminal penalties, any of which could have a material adverse effect on us. It is possible that criminal proceedings may be initiated against us and/or individuals in our business in connection with investigations by the federal government.

We, our affiliated physicians and the facilities in which we operate are subject to various federal, state and local licensing and certification laws and regulations and accreditation standards and other laws, relating to, among other things, the adequacy of medical care, equipment, privacy of patient information, physician relationships, personnel and operating policies and procedures. Failure to comply with these licensing, certification and accreditation laws, regulations and standards could result in our services being found non-reimbursable or prior payments being subject to recoupment, requirements to make significant changes to our operations and can give rise to civil or, in extreme cases, criminal penalties. We routinely take the steps we believe are necessary to retain or obtain all requisite licensure and operating authorities. While we have made reasonable efforts to substantially comply with federal, state and local licensing and certification laws and regulations and standards as we interpret them, we cannot assure you that agencies that administer these programs will not find that we have failed to comply in some material respects.

### If we are unable to effectively adapt to changes in the healthcare industry, including changes to laws and regulations regarding or affecting the U.S. healthcare reform, our business may be harmed.

Due to the importance of the healthcare industry in the lives of all Americans, federal, state, and local legislative bodies frequently pass legislation and promulgate regulations relating to healthcare reform or that affect the healthcare industry. As has been the trend in recent years, it is reasonable to assume that there will continue to be increased government oversight and regulation of the healthcare industry in the future. We cannot assure our stockholders as to the ultimate content, timing or effect of any new healthcare legislation or regulations, nor is it possible at this time to estimate the impact of potential new legislation or regulations on our business. It is possible that future legislation enacted by Congress or state legislatures, or regulations promulgated by regulatory authorities at the federal or state level, could adversely affect our business or could change the operating environment of our primary care centers. It is possible that the changes to the Medicare, Medicaid or other governmental healthcare program reimbursements may serve as precedent to possible changes in other payors' reimbursement policies in a manner adverse to us. Similarly, changes in private payor reimbursements could lead to adverse changes in Medicare, Medicaid and other governmental healthcare programs, which could have a material adverse effect on our business, financial condition and results of operations.

While we believe that we have structured our agreements and operations in material compliance with applicable healthcare laws and regulations, there can be no assurance that we will be able to successfully address changes in the current regulatory environment. We believe that our business operations materially comply with applicable healthcare laws and regulations. However, some of the healthcare laws and regulations applicable to us are subject to limited or evolving interpretations, and a review of our business or operations by a court, law

49

Table of Contents

enforcement or a regulatory authority might result in a determination that could have a material adverse effect on us. Furthermore, the healthcare laws and regulations applicable to us may be amended or interpreted in a manner that could have a material adverse effect on our business, prospects, results of operations and financial condition.

***Our use, disclosure, and other processing of personally identifiable information, including health information, is subject to HIPAA and other federal and state privacy and security regulations, and our failure to comply with those regulations or to adequately secure the information we hold could result in significant liability or reputational harm and, in turn, a material adverse effect on our patient base and revenue.***

Numerous state and federal laws and regulations govern the collection, dissemination, use, privacy, confidentiality, security, availability, integrity, and other processing of PHI and PII. These laws and regulations include HIPAA. HIPAA establishes a set of national privacy and security standards for the protection of PHI by health plans, healthcare clearinghouses and certain healthcare providers, referred to as covered entities, and the business associates with whom such covered entities contract for services.

HIPAA requires covered entities, such as ourselves, and their business associates to develop and maintain policies and procedures with respect to PHI that is used or disclosed, including the adoption of administrative, physical and technical safeguards to protect such information. HIPAA also implemented the use of standard transaction code sets and standard identifiers that covered entities must use when submitting or receiving certain electronic healthcare transactions, including activities associated with the billing and collection of healthcare claims.

HIPAA imposes mandatory penalties for certain violations. Penalties for violations of HIPAA and its implementing regulations start at $100 per violation and are not to exceed $50,000 per violation, subject to a cap of $1.5 million for violations of the same standard in a single calendar year. However, a single breach incident can result in violations of multiple standards. HIPAA also authorizes state attorneys general to file suit on behalf of their residents. Courts may award damages, costs and attorneys' fees related to violations of HIPAA in such cases. While HIPAA does not create a private right of action allowing individuals to sue us in civil court for violations of HIPAA, its standards have been used as the basis for duty of care in state civil suits such as those for negligence or recklessness in the misuse or breach of PHI.

In addition, HIPAA mandates that the Secretary of the Department of Health and Human Services ("HHS") conduct periodic compliance audits of HIPAA covered entities and business associates for compliance with the HIPAA Privacy and Security Standards. It also tasks HHS with establishing a methodology whereby harmed individuals who were the victims of breaches of unsecured PHI may receive a percentage of the Civil Monetary Penalty fine paid by the violator.

HIPAA further requires that patients be notified of any unauthorized acquisition, access, use or disclosure of their unsecured PHI that compromises the privacy or security of such information, with certain exceptions related to unintentional or inadvertent use or disclosure by employees or authorized individuals. HIPAA specifies that such notifications must be made "without unreasonable delay and in no case later than 60 calendar days after discovery of the breach." If a breach affects 500 patients or more, it must be reported to HHS without unreasonable delay, and HHS will post the name of the breaching entity on its public web site. Breaches affecting 500 patients or more in the same state or jurisdiction must also be reported to the local media. If a breach involves fewer than 500 people, the covered entity must record it in a log and notify HHS at least annually.

In addition to HIPAA, numerous other federal and state laws and regulations protect the confidentiality, privacy, availability, integrity and security of PHI and other types of PII, including the Illinois Biometric Information Privacy Act. State statutes and regulations vary from state to state, and these laws and regulations in many cases are more restrictive than, and may not be preempted by, HIPAA and its implementing rules. These laws and regulations are often uncertain, contradictory, and subject to changed or differing interpretations, and we expect new laws, rules and regulations regarding privacy, data protection, and information security to be

50

Table of Contents

proposed and enacted in the future. In the event that new data security laws are implemented, we may not be able to timely comply with such requirements, or such requirements may not be compatible with our current processes. Changing our processes could be time consuming and expensive, and failure to timely implement required changes could subject us to liability for non-compliance. Some states may afford private rights of action to individuals who believe their PII has been misused. This complex, dynamic legal landscape regarding privacy, data protection, and information security creates significant compliance issues for us and potentially restricts our ability to collect, use and disclose data and exposes us to additional expense, adverse publicity and liability. While we have implemented data privacy and security measures in an effort to comply with applicable laws and regulations relating to privacy and data protection, some PHI and other PII or confidential information is transmitted to us by third parties, who may not implement adequate security and privacy measures, and it is possible that laws, rules and regulations relating to privacy, data protection, or information security may be interpreted and applied in a manner that is inconsistent with our practices or those of third parties who transmit PHI and other PII or confidential information to us. If we or these third parties are found to have violated such laws, rules or regulations, it could result in government-imposed fines, orders requiring that we or these third parties change our or their practices, or criminal charges, which could adversely affect our business. Complying with these various laws and regulations could cause us to incur substantial costs or require us to change our business practices, systems and compliance procedures in a manner adverse to our business.

We also publish statements to our patients and partners that describe how we handle and protect PHI. If federal or state regulatory authorities or private litigants consider any portion of these statements to be untrue, we may be subject to claims of deceptive practices, which could lead to significant liabilities and consequences, including, without limitation, costs of responding to investigations, defending against litigation, settling claims, and complying with regulatory or court orders. Any of the foregoing consequences could seriously harm our business and our financial results. Any of the foregoing consequences could have a material adverse impact on our business and our financial results.

***Laws regulating the corporate practice of medicine could restrict the manner in which we are permitted to conduct our business, and the failure to comply with such laws could subject us to penalties or require a restructuring of our business.***

Some states have laws that prohibit business entities, such as us, from practicing medicine, employing physicians to practice medicine, exercising control over medical decisions by physicians or engaging in certain arrangements, such as fee-splitting, with physicians (such activities generally referred to as the "corporate practice of medicine"). In some states these prohibitions are expressly stated in a statute or regulation, while in other states the prohibition is a matter of judicial or regulatory interpretation. All of the states in which we currently operate generally prohibit the corporate practice of medicine, and other states may as well.

Penalties for violations of the corporate practice of medicine vary by state and may result in physicians being subject to disciplinary action, as well as to forfeiture of revenues from payors for services rendered. For lay entities, violations may also bring both civil and, in more extreme cases, criminal liability for engaging in medical practice without a license.

Some of the relevant laws, regulations and agency interpretations in states with corporate practice of medicine restrictions have been subject to limited judicial and regulatory interpretation. Moreover, state laws are subject to change. Regulatory authorities and other parties may assert that, despite the management agreements and other arrangements through which we operate, we are engaged in the prohibited corporate practice of medicine or that our arrangements constitute unlawful fee-splitting. If this were to occur, we could be subject to civil and/or criminal penalties, our agreements could be found legally invalid and unenforceable (in whole or in part) or we could be required to restructure our contractual arrangements. In markets where the corporate practice of medicine is prohibited, we have historically operated by maintaining long-term management contracts with multiple associated professional organizations which, in turn, employ or contract with physicians to provide those professional medical services required by the enrollees of the payors with which the professional

51

Table of Contents

need additional capital and cannot raise it on acceptable terms, or at all, we may not be able to, among other things:

- develop and enhance our patient services;
- continue to expand our organization;
- hire, train and retain employees;
- respond to competitive pressures or unanticipated working capital requirements; or
- pursue acquisition opportunities.

In addition, if we issue additional equity to raise capital, your interest in us will be diluted.

**Risks Related to Our Common Stock and This Offering**

***The Lead Sponsors control us, and their interests may conflict with ours or yours in the future.***

Immediately following this offering, investment entities affiliated with General Atlantic LLC (collectively, "General Atlantic") and Newlight Partners LP ("Newlight" and, together with General Atlantic, the "Lead Sponsors") will, collectively, beneficially own approximately 53.2% of our common stock, or 52.7% if the underwriters exercise in full their option to purchase additional shares, which means that, based on their combined percentage voting power held after the offering, the Lead Sponsors together will control the vote of all matters submitted to a vote of our shareholders, which will enable them to control the election of the members of the Board and all other corporate decisions. Even when the Lead Sponsors cease to own shares of our stock representing a majority of the total voting power, for so long as the Lead Sponsors continue to own a significant percentage of our stock, the Lead Sponsors will still be able to significantly influence the composition of our Board and the approval of actions requiring shareholder approval. Accordingly, for such period of time, the Lead Sponsors will have significant influence with respect to our management, business plans and policies, including the appointment and removal of our officers, decisions on whether to raise future capital and amending our charter and bylaws, which govern the rights attached to our common stock. In particular, for so long as the Lead Sponsors continue to own a significant percentage of our stock, the Lead Sponsors will be able to cause or prevent a change of control of us or a change in the composition of our Board and could preclude any unsolicited acquisition of us. The concentration of ownership could deprive you of an opportunity to receive a premium for your shares of common stock as part of a sale of us and ultimately might affect the market price of our common stock.

In addition, in connection with this offering, we will enter into the Sponsor Director Nomination Agreement (defined herein) that provides each Lead Sponsor the right to designate: (i) three of the nominees for election to our Board for so long as each beneficially owns at least 20% of our common stock then outstanding; (ii) two of the nominees for election to our Board for so long as each beneficially owns less than 20% but at least 10% of our common stock then outstanding; and (iii) one of the nominees for election to our Board for so long as each beneficially owns less than 10% but at least 5% of our common stock then outstanding. The Lead Sponsors may also assign such right to their affiliates. The Sponsor Director Nomination Agreement will also prohibit us from increasing or decreasing the size of our Board without the prior written consent of the Lead Sponsors. See "Certain Relations and Related Party Transactions—Director Nomination Agreements" for more details with respect to the Sponsor Director Nomination Agreement.

The Lead Sponsors and their affiliates engage in a broad spectrum of activities, including investments in the healthcare industry generally. In the ordinary course of their business activities, the Lead Sponsors and their affiliates may engage in activities where their interests conflict with our interests or those of our other shareholders, such as investing in or advising businesses that directly or indirectly compete with certain portions of our business or are suppliers or customers of ours. Our certificate of incorporation to be effective in connection with the closing of this offering will provide that none of the Lead Sponsors, any of their affiliates or any director who is not employed by us (including any non-employee director who serves as one of our officers

58

Table of Contents

in both his director and officer capacities) or its affiliates will have any duty to refrain from engaging, directly or indirectly, in the same business activities or similar business activities or lines of business in which we operate. The Lead Sponsors also may pursue acquisition opportunities that may be complementary to our business, and, as a result, those acquisition opportunities may not be available to us. In addition, the Lead Sponsors may have an interest in pursuing acquisitions, divestitures and other transactions that, in its judgment, could enhance its investment, even though such transactions might involve risks to you.

***Upon listing of our shares on the NYSE, we will be a "controlled company" within the meaning of the rules of the NYSE and, as a result, we will qualify for, and intend to rely on, exemptions from certain corporate governance requirements. You will not have the same protections as those afforded to stockholders of companies that are subject to such governance requirements.***

After completion of this offering, the Lead Sponsors together will continue to control a majority of the voting power of our outstanding common stock. As a result, we will be a "controlled company" within the meaning of the corporate governance standards of the NYSE. Under these rules, a company of which more than 50% of the voting power for the election of directors is held by an individual, group or another company is a "controlled company" and may elect not to comply with certain corporate governance requirements, including:

- the requirement that a majority of our Board consist of independent directors;
- the requirement that we have a nominating and corporate governance committee that is composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities;
- the requirement that we have a compensation committee that is composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities; and
- the requirement for an annual performance evaluation of the nominating and corporate governance and compensation committees.

Following this offering, we intend to utilize these exemptions. As a result, we may not have a majority of independent directors on our Board, our Compensation and our Nominating and Corporate Governance Committees may not consist entirely of independent directors and our Compensation and our Nominating and Corporate Governance Committees may not be subject to annual performance evaluations. Accordingly, you will not have the same protections afforded to stockholders of companies that are subject to all of the corporate governance requirements of the NYSE.

***We are an "emerging growth company" and we expect to elect to comply with reduced public company reporting requirements, which could make our common stock less attractive to investors.***

We are an "emerging growth company," as defined in the JOBS Act. For as long as we continue to be an emerging growth company, we are eligible for certain exemptions from various public company reporting requirements. These exemptions include, but are not limited to, (i) not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act, (ii) reduced disclosure obligations regarding executive compensation in our periodic reports, proxy statements and registration statements, (iii) exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and shareholder approval of any golden parachute payments not previously approved, (iv) not being required to provide audited financial statements for the year ended December 31, 2016, or five years of Selected Consolidated Financial Data in this prospectus and (v) an extended transition period to comply with new or revised accounting standards applicable to public companies. We could be an emerging growth company for up to five years after the first sale of our common stock pursuant to an effective registration statement under the Securities Act, which fifth anniversary will occur in 2024. If, however, certain events occur prior to the end of such five-year period, including if we become a "large accelerated filer," our annual gross revenue exceeds $1.07 billion or we issue more than $1.0 billion of non- convertible debt in any three-year period, we would cease to be an emerging growth company prior to the end of such five-year period. We have made certain elections with regard to the

Table of Contents

reduced disclosure obligations regarding executive compensation in this prospectus and may elect to take advantage of other reduced disclosure obligations in future filings. In addition, we will choose to take advantage of the extended transition period to comply with new or revised accounting standards applicable to public companies. As a result, the information that we provide to holders of our common stock may be different than you might receive from other public reporting companies in which you hold equity interests. We cannot predict if investors will find our common stock less attractive as a result of reliance on these exemptions. If some investors find our common stock less attractive as a result of any choice we make to reduce disclosure, there may be a less active trading market for our common stock and the market price for our common stock may be more volatile.

### *The requirements of being a public company may strain our resources and distract our management, which could make it difficult to manage our business, particularly after we are no longer an "emerging growth company."*

As a public company, we will incur legal, accounting and other expenses that we did not previously incur. We will become subject to the reporting requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act") and the Sarbanes-Oxley Act, the listing requirements of the NYSE and other applicable securities rules and regulations. Compliance with these rules and regulations will increase our legal and financial compliance costs, make some activities more difficult, time-consuming or costly and increase demand on our systems and resources, particularly after we are no longer an "emerging growth company." The Exchange Act requires that we file annual, quarterly and current reports with respect to our business, financial condition and results of operations. The Sarbanes-Oxley Act requires, among other things, that we establish and maintain effective internal controls and procedures for financial reporting. Furthermore, the need to establish the corporate infrastructure demanded of a public company may divert our management's attention from implementing our growth strategy, which could prevent us from improving our business, financial condition and results of operations. We have made, and will continue to make, changes to our internal controls and procedures for financial reporting and accounting systems to meet our reporting obligations as a public company. However, the measures we take may not be sufficient to satisfy our obligations as a public company. In addition, these rules and regulations will increase our legal and financial compliance costs and will make some activities more time-consuming and costly. For example, we expect these rules and regulations to make it more difficult and more expensive for us to obtain director and officer liability insurance, and we may be required to incur substantial costs to maintain the same or similar coverage. These additional obligations could have a material adverse effect on our business, financial condition and results of operations.

In addition, changing laws, regulations and standards relating to corporate governance and public disclosure are creating uncertainty for public companies, increasing legal and financial compliance costs and making some activities more time consuming. These laws, regulations and standards are subject to varying interpretations, in many cases due to their lack of specificity, and, as a result, their application in practice may evolve over time as new guidance is provided by regulatory and governing bodies. This could result in continuing uncertainty regarding compliance matters and higher costs necessitated by ongoing revisions to disclosure and governance practices. We intend to invest resources to comply with evolving laws, regulations and standards, and this investment may result in increased general and administrative expenses and a diversion of our management's time and attention from revenue-generating activities to compliance activities. If our efforts to comply with new laws, regulations and standards differ from the activities intended by regulatory or governing bodies due to ambiguities related to their application and practice, regulatory authorities may initiate legal proceedings against us and there could be a material adverse effect on our business, financial condition and results of operations.

### *Provisions of our corporate governance documents could make an acquisition of us more difficult and may prevent attempts by our shareholders to replace or remove our current management, even if beneficial to our shareholders.*

In addition to the Lead Sponsors' beneficial ownership of a combined 53.2% of our common stock after this offering (or 52.7% if the underwriters exercise in full their option to purchase additional shares), our certificate

60

Table of Contents

contribution of approximately negative $164 per month for fee-for-service patients that have been with us for three or more years. For a discussion of how we allocate our center-level costs among our fee-for-service and at-risk patients, see "—Components of Results of Operations—Revenue." We also care for a very limited number of MA patients (approximately 1% of our total MA patients) for whom we are reimbursed on a fee-for-service basis via their health plan in situations where we do not have a capitation relationship with that particular health plan.

Our fee-for-service revenue, whether received directly from Medicare or from Medicare Advantage plans, on a per patient basis is lower than our per patient revenue for at-risk patients basis in part because our fee-for-service revenue covers only the primary care services that we directly provide to the patient, while the capitation revenue is intended to compensate us for the services directly performed by us as well as the financial risk that we assume related to the third-party medical expenses of at-risk patients.

In terms of the total expense of services provided internally, approximately 40% of our services were provided to patients covered by traditional Medicare for the year ended December 31, 2019 and approximately 44% for the three months ended March 31, 2020. Approximately 60% of our internally provided services in terms of total expense were provided to patients enrolled in MA plans covered by capitation arrangements for the year ended December 31, 2019 and approximately 56% for the three months ended March 31, 2020. Our patients covered by traditional Medicare had on average approximately 7.4 visits to our centers for the year ended December 31, 2019, and our patients enrolled in MA plans covered by capitation arrangements had on average approximately 7.9 visits for the year ended December 31, 2019.

Despite the difference in patient economics between these two groups, we continue to serve both. We do this for a few reasons: (1) we are focused on providing the best healthcare for and improving the wellbeing of all Medicare patients; (2) we are hopeful that in some future period there will be new programs through CMS that allow us to achieve risk-like patient economics on our traditional Medicare patients such as the Direct Contracting program CMS is currently establishing and for which we have applied and been accepted to participate when it begins on April 1, 2021; and (3) our fee-for-service patients often enroll in MA plans at some point in time. We will educate our patients on the different components of Medicare and how they relate to one another. If patients are interested, we will introduce them to an unaffiliated insurance agent who can help them decide the appropriate plan for them based on their individual health needs. If our fee-for-service patients enroll in MA, we are better positioned to continue to serve them as at-risk patients as we are already familiar with their health conditions, they are familiar with our care model and we receive additional data from payors and third-party medical providers to help us care for them once they join a capitation arrangement.

Medicare provides an annual enrollment period during the fall of each year to allow patients to select an MA program or instead select traditional Medicare, with only limited ability for patients to make that selection during other periods of the year. Once patients have selected MA, they can change the selection of their primary care provider at any time. Accordingly, while the annual enrollment period is important to us, we are able to attract new at-risk patients at any time during the year from the existing pool of MA patients and we must work to retain our patients throughout the year.

Our historical financial performance has been, and we expect our financial performance in the future to be, driven by our ability to:

### Add New Patients in Existing Centers

We believe our ability to add new patients is a key indicator of the market's recognition of the attractiveness of the Oak Street Platform, both to our patients and payor partners, and a key growth driver for the business. We have a large embedded growth opportunity within our existing center base. With an average capacity of 3,500 patients, our 54 centers as of March 31, 2020 can support approximately 189,000 patients, compared to our patient base as of March 31, 2020 of approximately 85,000. We also believe that even after COVID-19 subsides, we will continue to conduct a portion of visits by telehealth based on patient preference and clinical need, which could potentially increase the average capacity of our centers beyond 3,500 patients. Additionally, as we add patients to our existing centers, we expect these patients to contribute significant incremental economics to Oak Street Health as we leverage our fixed cost base at each center.

83

Table of Contents

We utilize a proactive strategy to drive growth to our centers. We employ a grassroots approach to patient engagement led by our Outreach team and supplemented by more traditional marketing, including television, digital and social media, print, mail and telemarketing. We leverage our Outreach Team to ensure we are connecting with Medicare-eligible patients across a number of channels to make them aware of their healthcare choices and the services we offer. These efforts have historically included hosting events within our centers and participating in community events. Each of our centers has a community room; a space designated and available for our patients' use whenever the center is open. We also utilize this space to provide fitness and health education classes to our patients and often open-up events to any older adults in the community regardless of their affiliation with Oak Street Health. In 2019, we hosted approximately 18,700 local events in the communities surrounding our centers. At the present time, we are leveraging our community centers as extra waiting room space as needed which allows easier social distancing for patients or their companions. We are continuing to leverage our community-based marketing approach with less focus on in-person interactions and more focus on working with our community partners to identify older adults who need our services. It is our belief that the enhanced awareness of the importance of managing chronic illnesses as well as patient varied preferences on preferred method to interact with providers will continue to drive demand for Oak Street Health amongst older adults. The ultimate effect of our marketing efforts is increased awareness of Oak Street Health and additional patients choosing us as their primary care provider, regardless of whether that patient is covered under MA or traditional Medicare. We believe that our outreach efforts also help to grow our payor partners' membership base as we grow our own patient base and help educate patients about their choices on Medicare, further aligning our model with that of healthcare payers.

Our payor partners will also direct patients to Oak Street. They do this either by assigning patients who have not yet selected a primary care provider to Oak Street Health or through insurance agents who will tell their clients about Oak Street Health, which we believe results in the patient selecting us as their primary care provider when they select an MA plan. Payors dedicate a large share of their internal efforts to reducing medical costs and they have a nearly unlimited desire to engage with solutions proven to achieve that goal. Due to our care delivery model's patient-centric focus, we have been able to consistently help payors manage their costs while raising the quality of their plans, affording them STARS quality bonuses that increase their revenue. We believe that we represent an attractive opportunity for payors to meaningfully improve their overall membership growth in a given market without assuming any financial downside.

*Patient Satisfaction*

Once we bring on new patients we focus on engagement around a care plan and satisfaction. The result is a high patient satisfaction. Our model provides visibility on our financial and growth trajectory given the recurring nature of the revenue we collect from our MA partners once their members begin utilizing the Oak Street Platform. The following table sets out the growth in patients since 2013.



**Total Patients at Period End**

84

**Table of Contents**

CMS allows for MA enrollees to be risk-adjusted in order to compensate the MA plan for the greater medical costs associated with sicker patients, so long as the health plan appropriately and accurately documents the patients' health conditions. Our patients often have historically not engaged with the healthcare system, and therefore their health conditions are poorly documented. Through our care model, we organically determine and assess the health needs of our patients and create a care plan consistent with those needs. We capture and document health conditions as a part of this process. We believe our model is the best aligned with the risk adjustment framework as we scale the clinical intensity of our care model based upon the needs of the individual patient—we invest more dollars and resources towards our sicker patients.

*Expand our Center Base within Existing and New Markets*

We believe that we currently serve less than 3% of the total patients in the markets where we currently have centers. As a result, there is significant opportunity to expand in our existing markets through the acquisition of new patients to existing centers and addition of new centers ("infills"). For the long term, these strategically developed new sites allow us to access additional neighborhoods while leveraging our established brand and infrastructure in a market. We believe our existing markets can support an incremental 450 centers based upon the number of Medicare patients in these markets and the capacity of our current centers.



| *(Year-end unless otherwise indicated)* | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 3/31/2020 |
|---|---|---|---|---|---|---|---|---|
| Centers | 2 | 7 | 15 | 19 | 24 | 39 | 51 | 54 |
| Markets | 1 | 1 | 4 | 6 | 6 | 8 | 12 | 13 |
| Patients[1] | 300 | 3,300 | 12,000 | 24,000 | 35,000 | 50,000 | 80,000 | 85,000 |
| *At-risk* | *0%* | *0%* | *0%* | *49%* | *52%* | *60%* | *61%* | *65%* |
| *Fee-for-Service* | *100%* | *100%* | *100%* | *51%* | *48%* | *40%* | *39%* | *35%* |

1   Patient numbers are approximate.

We estimate that our core addressable market for the Oak Street Platform is approximately 27 million Medicare eligibles in our target demographic. We believe this market represents approximately $325 billion of annual healthcare spend based on multiplying an average annual revenue of $12,000 per member, which is derived from our experience and industry knowledge and which we believe represents a reasonable national assumption, by the number of Medicare

85

Table of Contents

### Our Centers

Our novel approach starts with retail-like, community-based centers that implement a branded and consumer-focused design to create a welcoming environment that engages our patients. These centers are leased or licensed by Oak Street Health MSO, LLC or an affiliated entity and, pursuant to the terms of certain contractual relationships between Oak Street Health MSO, LLC and our affiliated medical practices, made available for use by the medical practices in the provision of primary care services. While traditional healthcare facilities are often located in medical office buildings that are removed from where patients spend a majority of their time, we target locations in highly accessible, convenient locations close to where our patients live. Each of our centers has a consistent look and feel.

  

*Philadelphia, PA*          *Fort Wayne, IN*          *Gary, IN*

Currently, our centers are on average approximately 9,500 square feet and each includes a community center averaging 1,000 square feet. We believe that by creating an open and welcoming environment, we foster a deeper, more comprehensive relationship with our patients and encourage them to take ownership of their health and well-being. Our centers are custom-designed to provide the space required to successfully deliver each element of our care model.

                      

*Ashburn, Chicago, IL*                      *Avalon Park, Chicago, IL*

                      

*Edgewater, Chicago, IL*                      *Lincoln Crossing, Chicago, IL*

117

**Table of Contents**

Our centers implement a uniform, readily repeatable approach to staffing, with each center having its own Outreach Team, Service Team and Care Teams.

- *Outreach team*. The Outreach Team is focused on executing our grassroots community outreach, enabling us to rapidly increase the number of patients we serve. Outreach Teams consist of an Outreach Director, who develops, manages and leads the Outreach Team and Outreach Associates, who work in teams to cultivate prospective patients, develop and support our reputation within the communities we serve by creating relationships with organizations important to our patients, such as faith-based organizations, and schedule welcome visits for prospective patients.
- *Service Team*. The Service Team is responsible for being readily available and delivering an outstanding experience to our patients every day. Service Teams consist of a Welcome Coordinator, who is responsible for the first impression we make on our patients; a Patient Relations Manager, who educates our patients on health plans and coverage options and assists them in navigating insurance benefits; and a Practice Manager, who manages the center and leads all immediate-area operations.
- *Care Teams.* Our Care Teams are cohesive, modular team units of primary care providers responsible for driving improved patient outcomes by leveraging the Oak Street Platform. The average Oak Street center has capacity for six Care Teams and each team can generally serve up to 600 patients, compared to between 1,200 and 1,900 patients that the average primary care physician serves. Our Care Teams are discussed in more detail below.

*Our Interdisciplinary Care Teams*

We utilize a team-based approach in our patient-focused primary care delivery model and staff interdisciplinary Care Teams to execute our model. Each Care Team is led by a Primary Care Physician or Nurse Practitioner who is partnered with a Registered Nurse, a Medical Assistant and a Scribe to deliver value-based, coordinated care. As a center grows, we increase the number of Care Teams serving that center in order to keep the average number of patients per Care Team low to ensure optimal care quality and patient experience.

Our Care Teams are trained in preventive and comprehensive care designed to address the whole person, across medical, social and behavioral attributes, in a welcoming and friendly manner. Our Care Teams meet daily to discuss their approach for each patient they will see that day and have weekly and monthly planning and review sessions for their sickest patients to assess their progress and determine the next steps in improving their health. Care is provided in several different ways, including face-to-face visits, telehealth visits, remote patient monitoring and in-home care.

Each of our team members has a specific role to play in delivering our care model, as described below:

**Care Team**

| | |
|---|---|
| **Primary Care Physician or Nurse Practitioner** | Lead Care Teams and implement our comprehensive, preventive care model |
| **Registered Nurse** | Educate and manage clinical needs between visits and provide group education on chronic disease management |
| **Medical Assistant** | Manage clinical workflows and act as guides for patient visits |
| **Scribe** | Capture structured clinical information and ensure insights reach the point of care to drive our care model |

We structured our Care Team model so that every Care Team member plays a vital role in our ability to deliver improved clinical outcomes. For example, we have differentiated our Care Team model with the inclusion of a Scribe to provide data support for Care Team discussions, assist in obtaining outside medical

118

Table of Contents

records and organize data in Canopy. Our Scribes ensure our clinicians have the right data at the right time so that the right decisions are made for each patient.

### Canopy: Our Purpose-Built, End-to-End Technology

Canopy is a key driver of the success of our care model and underlies every aspect of our day-to-day patient engagement and workflows. Canopy comprises internally developed software that connects a suite of population health analytics and technology applications designed to fit seamlessly into our care delivery model and Care Team virtual and in-person workflows. Canopy unlocks important health insights that are easy to understand, accessible and actionable through its three key functions:

- *Data intake*. Our position in the healthcare ecosystem allows Canopy to access and capture an immense amount of data about our patients from a broad set of sources, including payor claims data, pharmacy data, state level health information exchanges, admission alerts from hospitals, health risk assessments on each patient, Medicare "Blue Button," and medical records from hospitals and specialists. Canopy enhances our ability to quickly structure and sort these disparate data sets to develop a comprehensive view of both our patients and our target demographic across medical, behavioral and social health attributes.

- *Analytics and data science*. We leverage artificial intelligence and machine learning capabilities to create and refine our clinical rules engine (predictive models and prescriptive algorithms) that informs care delivery and addresses hospital admissions and readmissions, medical costs and patient retention. Our algorithms are internally developed and optimized for the primary care setting, undergo rapid iteration cycles and benefit from clinician partnership and input. Our analytics and data science generates insights that we use to directly take action on our patients.

- *Applications.* To support the implementation of our care model, Canopy provides our Care Teams with access to a suite of internally developed and in-licensed applications (such as clinical intervention management, decision support, workflow and operations tools) that are tailored to our clinical approach and have been refined by years of best practices. These applications enable our teams to act upon the insights generated by our analytics as part of their core workflows. By using the applications, our Care Team collects more information for us that is then fed back to data intake and analyzed using machine learning to be further applied. Unlike traditional electronic medical records which generally focus on documentation and billing, the internally developed and in-licensed Canopy applications are engineered for a full value-based model and optimized for the Oak Street Platform.

When paired with our operational expertise, we believe Canopy is a key driver in our ability to scale our platform quickly and consistently, while delivering evidence-based care in a value-based model.

### Our Care Delivery Approach

Our care delivery approach consists of three core components:

- *Personalized Primary Care*. We provide preventative care addressing the needs of the whole person—medical, social, and behavioral. Upon joining Oak Street, our patients undergo a structured geriatric assessment to understand their care needs. We input these assessments, along with other available data, into Canopy, which analyzes multiple patient risk factors using our internally developed algorithms to stratify patients by the risk of their experiencing an acute event. Based on this analysis we create a tailored, individualized care plan that determines the ideal frequency of primary care visits and use of disease-specific programs. Our patients experience the results of this differentiated approach through approximately eight physician visits per year, significantly more visits than a patient can expect with a typical primary care physician, with our sickest patients being seen even more frequently. In addition, we manage the total number of patients assigned to a Care Team at each center to allow each Care Team to spend more time with their patients and reduce wait times. Our physicians typically complete

119

**Table of Contents**

- steady patient growth across vintages.
- we have generated consistent center-level contribution ramps across all of our markets, driven by both core drivers of center contribution:
  - consistent patient contribution across markets; and
  - steady patient growth across markets.

This consistent performance gives us the conviction to continue to invest in identifying and building centers, hiring top-tier talent and attracting patients in existing and new markets in order to drive long-term value creation.

We believe that we have created a repeatable, data-driven playbook to expand our brand and presence across the United States and we have made substantial investments to support each key component of our approach. The fundamental aspects of our playbook include:

- *Identify*. We select new markets based on an algorithmic approach that incorporates a variety of market and demographic data sources. We also benefit from our close relationships with national and local payors, who provide local market knowledge as to where their members could benefit from our model. Our approach is to target highly accessible, convenient locations close to where our patients live and to utilize a consistent look and feel, which differentiates Oak Street and contributes to our success in attracting patients.
- *Hire*. Our focused approach to recruiting and developing talent allows us to attract outstanding physicians, nurse practitioners, other Care Team members, and regional leaders in order to continue to grow and scale our business. We believe that this approach has supported the creation of a strong pipeline of top tier talent for leadership roles within our company and provides a differentiated value proposition for our providers. We have created multiple programs to ensure we continue to attract best-in-class teams and provide the necessary training to foster professional development. In recent years we have added a variety of training and development programs, including regional leadership development, in-house provider recruitment and a medical scribes program. We have demonstrated a consistent ability to attract and retain top clinical talent given our unique value proposition to physicians and nurse practitioners. Our team members also have a deep understanding of the communities in which our patients live, as we strive to hire from within the local community.
- *Attract*. Our organic approach to attracting patients allows us to enter markets independent of existing payor or provider infrastructure and accelerates our ability to expand our footprint. We have an efficient go-to-market model with a focus on engaging the patients we serve through a multichannel marketing approach including in community Outreach Teams, digital advertising, direct response TV and traditional mass advertising.



Each of our centers employs a community outreach team focused on engaging and educating Medicare eligible individuals on the importance of primary care and why Oak Street is a great place to receive that care. We believe that as we have expanded, our brand awareness has grown and potential patients

122

Table of Contents

are more likely to engage with us as we move into their communities. Further, as we deliver on our best-in-class patient experience and outstanding, personalized care, our patients become our promoters.

As we expand into new markets or deepen our presence in existing markets, we use a consistent branding, marketing and advertising approach. We augment our grassroots outreach campaigns with mass advertising, as well as online or digital advertising. We consistently monitor and analyze our various outreach channels and determine opportunities for improvement.

## Our Value Proposition

We believe that, despite a history of net losses, our healthcare ecosystem provides all constituencies involved in our care delivery model with the opportunity to "Win." The Oak Street Platform incentivizes our patients, our payors and our providers to adopt our vision and rewards them each in a meaningful way. Our care model is differentiated from traditional primary care providers in our ability to offer a combination of high-quality, low-cost care and an outstanding patient experience.

### Our Patients "Win" due to Measurably Better Health Outcomes and Patient Experience

Our patients have complex health needs. As of 2017, the average income of our patient base, as self-reported to us, was approximately $20,700. Approximately 42% of our patients are dual eligible for both Medicare and Medicaid. Approximately 40% of our patients have a behavioral health diagnosis and approximately 50% struggle with one or more social risk factors like isolation and lack of access to housing and food that are considered social determinants of health. Our patients have a median age of 69, typically require multiple prescriptions and, for our at-risk patients, approximately 86% have one or more chronic conditions, with the average at-risk patient having three or more chronic conditions. These factors result in our patients having complex health needs, which our Oak Street Platform is designed to help address. We currently provide care to this population in at least seven different languages.

The Oak Street Platform is designed to address these complex health needs and drive top-rated quality performance, outstanding health outcomes and an experience our patients love. This is evidenced by our strong track record of quality outcomes and patient experience metrics. We successfully manage chronic conditions, as evidenced by our approximately 51% reduction in hospital admissions (based on our hospital admission rates per thousand patients of 183 as of March 31, 2020, compared to the Medicare benchmark of 370). We provide better support to our patients following acute episodes, as evidenced by a 42% reduction in 30-day readmission rates (based on our rate of hospital readmissions within 30 days per thousand patients of 11% as of March 31, 2020, compared to the Medicare benchmark of 19%). We proactively engage patients and help them to navigate the healthcare system, as evidenced by a 51% reduction in emergency department visits (based on our rate of emergency department "treat and release" claims per thousand patients of 535 as of December 31, 2019, compared to the Medicare benchmark of 1,091). See "Market and Industry Data" for information on how these Medicare benchmarks are derived. Our platform achieves outstanding results on Medicare quality metrics, as demonstrated by our achievements in addressing HEDIS gaps and adherence to evidence-based care guidelines, and our Net Promoter Score is 90. By making patients the primary focus of our model, we are able to consistently achieve these results.

Our care model creates a rare offering where high-quality care and a positive customer experience come at a lower overall cost. For that reason, we can offer a significantly better product with a full suite of value-added services that are integral to wellbeing at no additional cost to patients.

### Our Payors "Win" as Medical Costs Decline, Membership Volumes Increase and Medicare Quality Metrics Improve

Although we have limited experience managing contracts with full risk, since entering into our first fully capitated contracts in 2016 we have worked closely with key payors to improve outcomes for patients. Our

123

Table of Contents

demonstrated track record of improving patient outcomes enables payors to become net beneficiaries when we open centers in locations where they have insured Medicare members or desire to grow. Payors dedicate a large share of their efforts to reducing medical costs and they have a strong desire to engage with solutions proven to achieve that goal. We believe that our ability to remove unnecessary costs through a comprehensive approach to patient care makes us a partner of choice for payors and allows payors to lock in improved medical cost performance. Also, our strong performance in Medicare quality metrics, as demonstrated by our achievements in addressing HEDIS gaps and adherence to evidence-based care guidelines, supports improvements in payors' quality scores, which increases their revenue. On the whole, we represent an attractive opportunity for payors to meaningfully improve their overall financial position.

As of March 31, 2020, we had contractual relationships with 23 payor partners, including all of the top five national MA payors. A significant portion of our revenue is concentrated with three large payors, Humana, WellCare and Cigna HealthSpring, which together comprised approximately 72% of our capitated revenue for the three months ended March 31, 2020, with 49% from Humana, 12% from WellCare and 11% from Cigna HealthSpring.

A secondary benefit for payors is enhanced membership growth and satisfaction. A key step in our care model is educating patients on their choice in health plans. Many patients elect to participate in MA insurance plans after learning about available benefits and their value proposition from our Care Teams. Our platform also delivers significant levels of patient satisfaction as evidenced by our Net Promoter Score of 90, compared to an average score of 3 for primary care physicians, driving patients' continued engagement with us and improved health experience. Our attractiveness to payors has proven beneficial to us as well, with certain payors offering to subsidize our upfront cost to open new centers in their markets because of the benefits we are able to create within their member base.

As we continue to grow, we believe we will continue delivering value to payors, impacting medical costs and membership on a mass scale. Additionally, with the expansion of our platform and our continued ability to drive improved clinical outcomes, we believe that the entire healthcare ecosystem will ultimately benefit from Medicare eligible citizens receiving higher-quality care and improved outcomes that do not require more taxpayer funding.

### *Our Providers "Win" because the Oak Street Platform Allows Them to Focus on Improving the Lives of Their Patients*

Our provider base consists of physicians and nurse practitioners at all different stages of their careers. They choose to serve patients at Oak Street Health because of a shared belief in our mission and values.

Our providers are supported by integrated Care Teams that partner together to take care of patients and allow providers to spend more time with patients. Additionally, the Oak Street Platform is enabled by technology that our providers leverage to ensure they are aware of each patient's health history and potential risks, helping to inform proper diagnoses. The Oak Street Platform is designed to reward quality, not quantity, of care. Provider compensation is determined by quality measures across the population of patients for which they are responsible and is not linked to visit volume. This dynamic is valued by providers because it reduces the potential for burnout and rewards them for making decisions in the best interest of their patients.

The net result of our model is that our providers have a smaller number of patients to care for, more time with patients, more support from our Care Teams and better technology to help them care for patients.

Satisfaction surveys of our providers from June 30, 2019 exceed benchmarks across all dimensions, with:
- 95% of our providers saying they are likely to be practicing with Oak Street three years from now;
- 95% of our providers saying they would recommend Oak Street as a great place to work;

124

Table of Contents

The PPPM rates for our capitation arrangements are determined as a percent of the premium the MA plan receives from CMS for our at-risk patients. Those premiums are determined via a competitive bidding process with CMS and are based upon the cost of care in a local market and the average utilization of services by the patients enrolled. Medicare pays capitation using a "risk adjustment model," which compensates providers based on health status (acuity) of each individual patient. Payors with higher acuity patients receive more, and those with lower acuity patients receive less. Under the risk adjustment model, capitation is paid on an interim basis based on enrollee data submitted for the preceding year and is adjusted in subsequent periods after the final data is compiled. As premiums are adjusted via the risk adjustment model, our PPPM payments will change in unison with how our payor partners' premiums change with CMS. In certain contracts, PPPM fees also include adjustments for items such as performance incentives or penalties based on the achievement of certain clinical quality metrics as contracted with payors.

The percentage of premiums paid per at-risk patient are often significantly higher than the fees for services provided under fee-for-service arrangements. Consequently, the revenue and, when costs for providing service are effectively managed, profit opportunity available under a capitation arrangement are more attractive. We believe that the advantages, savings and efficiencies made possible by the capitation model are most pronounced when the care demands of the population are the most severe and require the most coordination, such as for the older patients and patients with chronic, complex and follow-on diseases that we serve. While organized coordination of care is central to the capitation model, it is also well suited to the implementation of preventive care and disease management over the long term, since physicians have a financial incentive to improve the overall health of their patient population. Although capitation arrangements also involve a certain degree of risk when patients' medical expenses exceed the capitation amount, we believe that we have the scale, comprehensive medical delivery resources, infrastructure and care management knowledge to spread this risk across a large patient population. See "Risk Factors—Risks Related to our Business—Under most of our agreements with health plans, we assume some or all of the risk that the cost of providing services will exceed our compensation."

*Fee-for-service arrangements*

Under traditional fee-for-service reimbursement models, payors pay a specified amount for each service or procedure performed during a patient visit. As a result, compensation under fee-for-service arrangements is closely tied to the volume of patient visits and procedures performed, thus offering limited financial incentive to focus on cost containment and preventative care.

## Payor Relationships

Our ability to consistently attract patients across multiple geographic markets depends on our ability to contract with payors in each market. By opening centers in locations where our current payor partners have large numbers of insured Medicare members, we believe we are creating net benefits for payors, as we are able to reduce unnecessary costs and consistently raise the quality of the payors' plans, driving Medicare quality bonuses that increase their revenue.

As of March 31, 2020, we had contractual relationships with 23 payor partners, including all of the top five national MA payors. A significant portion of our revenue is concentrated with three large payors, Humana, WellCare and Cigna HealthSpring, which together comprised approximately 72% of our capitated revenue for the three months ended March 31, 2020. See "Risk Factors—Risks Related to Our Business—Our revenues and operations are dependent upon a limited number of key payors." As of March 31, 2020, our average contractual relationship with our payor partners was approximately two years, with a majority of those agreements now being in automatic annual one-year renewal stages. In recent years, however, we have begun to move our contracting relationships to longer-term agreements, with some having initial terms as long as seven years, with annual renewals thereafter. The contracts with our three largest payor partners are entered into on substantially consistent terms. While length of contract and economic terms are often negotiated, payors generally use form contracts that contain usual and customary terms and conditions. All of our contracts with payors, including Humana, WellCare

129

Table of Contents

and Cigna HealthSpring, provide for terms ranging from one to seven years with annual renewals following the initial term. Our agreements with each payor partner may also include terms and conditions to incentivize us and facilitate our ability to provide quality care to that plan's members, such as care coordination or stabilization fees, quality adjustments, marketing support and other usual and customary provisions.

The contracts governing the relationships with our payors include key terms which may include the period of performance, revenue rates, advanced billing terms, service level agreements, termination clauses and right of first refusal clauses. Typically, these contracts provide for a monthly payment to us of a percentage of the MA premium received by the applicable plan. The specified percentage varies depending on the plan and the terms of our particular contract. In some cases, our contracts also include other shared medical savings arrangements. In addition, certain of our contracts provide that if we fail to meet specified implementation targets, we may be subject to financial penalties.

Many of our contracts are terminable for convenience by either the payor or us after a notice period has passed. The related notice period in our contracts is negotiated on a case by case basis and is dependent on many factors, some of which are outside of our control. Most of our contracts include cure periods for certain breaches, during which time we may attempt to resolve any issues that would trigger a payor's ability to terminate the contract. Certain of our contracts may be terminated immediately by the payor if we lose applicable licenses, go bankrupt, lose our liability insurance, become insolvent, file for bankruptcy or receive an exclusion, suspension or debarment from state or federal government authorities. Additionally, if a payor were to lose applicable licenses, go bankrupt, lose liability insurance, become insolvent, file for bankruptcy or receive an exclusion, suspension or debarment from state or federal government authorities, our contract with such payor could in effect be terminated. The loss, termination or renegotiation of any contract could negatively impact our results. In addition, as payors' businesses respond to market dynamics and financial pressures, and as they make strategic business decisions in respect of the lines of business they pursue and programs in which they participate, we expect that certain of our payors will, from time to time, seek to restructure their agreements with us. See "Risk Factors—Risks Related to Our Business—The termination or non-renewal of the Medicare Advantage contracts held by the health plans with which we contract, or the termination or non-renewal of our contracts with those plans, could have a material adverse effect on our revenue and our operations."

The contracts with our payors impose other obligations on us. For example, we typically agree that all services provided under the payor contract and all employees providing such services will comply with the payor's policies and procedures. In addition, in most instances, we have agreed to indemnify our payors against certain third-party claims, which may include claims that our services infringe the intellectual property rights of such third parties.

## Regulation

Our operations and those of our affiliated physician entities are subject to extensive federal, state and local governmental laws and regulations. These laws and regulations require us to meet various standards relating to, among other things, billings and reports to government payment programs, primary care centers and equipment, dispensing of pharmaceuticals, management of centers, personnel qualifications, maintenance of proper records, and quality assurance programs and patient care. If any of our operations or those of our affiliated physicians are found to violate applicable laws or regulations, we could suffer severe consequences that would have a material adverse effect on our business, results of operations, financial condition, cash flows, reputation and stock price, including:

- suspension or termination of our participation in government and/or private payment programs;
- refunds of amounts received in violation of law or applicable payment program requirements dating back to the applicable statute of limitation periods;
- loss of our licenses required to operate healthcare facilities or administer pharmaceuticals in the states in which we operate;
- criminal or civil liability, fines, damages or monetary penalties for violations of healthcare fraud and abuse laws, including the federal Anti-Kickback Statute, Civil Monetary Penalties Law of the Social

130

Table of Contents

Security Act, Stark Law, the FCA and/or state analogs to these federal enforcement authorities, or other regulatory requirements;

- enforcement actions by governmental agencies and/or state law claims for monetary damages by patients who believe their health information has been used, disclosed or not properly safeguarded in violation of federal or state patient privacy laws, including the regulations implementing HIPAA and the Privacy Act;
- mandated changes to our practices or procedures that significantly increase operating expenses or decrease our revenue;
- imposition of and compliance with corporate integrity agreements that could subject us to ongoing audits and reporting requirements as well as increased scrutiny of our billing and business practices which could lead to potential fines, among other things;
- termination of various relationships and/or contracts related to our business, including joint venture arrangements, contracts with payors, real estate leases and provider employment arrangements;
- changes in and reinterpretation of rules and laws by a regulatory agency or court, such as state corporate practice of medicine laws, that could affect the structure and management of our business and its affiliated physician practice corporations;
- negative adjustments to government payment models including, but not limited to, Medicare Parts A, B and C and Medicaid; and
- harm to our reputation, which could negatively impact our business relationships, the terms of payor contracts, our ability to attract and retain patients and physicians, our ability to obtain financing and our access to new business opportunities, among other things.

We expect that our industry will continue to be subject to substantial regulation, the scope and effect of which are difficult to predict. Our activities could be subject to investigations, audits and inquiries by various government and regulatory agencies and private payors with whom we contract at any time in the future. See "Risk Factors—Risks Related to Regulation." Adverse findings from such investigations and audits could bring severe consequences that could have a material adverse effect on our business, results of operations, financial condition, cash flows, reputation and stock price. In addition, private payors could require pre-payment audits of claims, which can negatively affect cash flow, or terminate contracts for repeated deficiencies.

There is no requirement in the states in which we operate for a risk-bearing provider to register as an insurance company and we have not registered as such in any of the states in which we operate.

### Federal Anti-Kickback Statute

The federal Anti-Kickback Statute prohibits, among other things, knowingly and willfully offering, paying, soliciting or receiving remuneration, directly or indirectly, in cash or kind, to induce or reward either the referral of an individual for, or the purchase, order or recommendation of, any good or service, for which payment may be made under federal and state healthcare programs such as Medicare and Medicaid.

Federal criminal penalties for the violation of the federal Anti-Kickback Statute include imprisonment, fines and exclusion of the provider from future participation in the federal healthcare programs, including Medicare and Medicaid. Violations of the federal Anti-Kickback Statute are punishable by imprisonment for up to ten years, fines of up to $100,000 per kickback or both. Larger fines can be imposed upon corporations under the provisions of the U.S. Sentencing Guidelines and the Alternate Fines Statute. Individuals and entities convicted of violating the federal Anti-Kickback Statute are subject to mandatory exclusion from participation in Medicare, Medicaid and other federal healthcare programs for a minimum of five years. Civil penalties for violation of the Anti-Kickback Statute include up to $100,000 in monetary penalties per violation, repayments of up to three

131

Table of Contents

times the total payments between the parties to the arrangement and suspension from future participation in Medicare and Medicaid. Court decisions have held that the statute may be violated even if only one purpose of remuneration is to induce referrals. The ACA amended the federal Anti-Kickback Statute to clarify the intent that is required to prove a violation. Under the statute as amended, the defendant does not need to have actual knowledge of the federal Anti-Kickback Statute or have the specific intent to violate it. In addition, the ACA amended the federal Anti-Kickback Statute to provide that any claims for items or services resulting from a violation of the federal Anti-Kickback Statute are considered false or fraudulent for purposes of the FCA.

The federal Anti-Kickback Statute includes statutory exceptions and regulatory safe harbors that protect certain arrangements. These exceptions and safe harbors are voluntary. Business transactions and arrangements that are structured to comply fully with an applicable safe harbor do not violate the federal Anti-Kickback Statute. However, transactions and arrangements that do not satisfy all elements of a relevant safe harbor do not necessarily violate the law. When an arrangement does not satisfy a safe harbor, the arrangement must be evaluated on a case-by-case basis in light of the parties' intent and the arrangement's potential for abuse. Arrangements that do not satisfy a safe harbor may be subject to greater scrutiny by enforcement agencies.

We enter into several arrangements that could potentially implicate the Anti-Kickback Statute if requisite intent was present, such as:
- *Joint ventures*. We operate certain of our centers under joint ventures with managed care plans or other healthcare providers. For the three months ended March 31, 2020, these joint ventures represented an immaterial portion of our total revenues. Although we do not expressly seek to enter into new joint ventures, it is possible that the payor landscape in certain markets we may attempt to enter in the future may make entering into additional joint ventures attractive. Our relationships with payors may not fully satisfy a safe harbor. Although failure to comply with a safe harbor does not render an arrangement illegal under the federal Anti-Kickback Statute, an arrangement that does not operate within a safe harbor may be subject to increased scrutiny and the Office of Inspector General (the "OIG") of HHS has warned in the past that certain joint venture relationships have a potential for abuse. Joint ventures that fall outside the safe harbors are evaluated on a case-by-case basis under the federal Anti-Kickback Statute. In this regard, we have endeavored to structure our joint ventures to satisfy as many elements of the safe harbor for investments in small entities as we believe are commercially reasonable. For example, we believe that these investments are offered and made by us on a fair market value basis and provide returns to the investors in proportion to their actual investment in the venture. However, since the arrangements may not satisfy all of the requirements of an applicable safe harbor, these arrangements could be subject to scrutiny on the ground that they are intended to induce patient referrals.
- *Lease arrangements*. We lease space for certain of our centers from one of our payor partners. We endeavor to structure these arrangements to comply with the federal Anti-Kickback Statute safe harbor for space rentals in all material respects.
- *Discounts*. Our centers sometimes acquire certain items and services at a discount that may be reimbursed by a federal healthcare program. We endeavor to structure our vendor contracts that include discount or rebate provisions to comply with the federal Anti-Kickback Statute safe harbor for discounts.
- *Sales forces and patient recruitment.* The OIG has expressed concern regarding the use of non-employed sales forces to recruit or facilitate the recruiting of patients or referrals, especially when the sales agent is compensated in a manner that provides rewards or incentives on a volume or value basis. Accordingly, commissions or per-patient based compensation methodologies are closely scrutinized by federal agencies. We employ our own sales force and attempt to meet the Anti-Kickback Safe Harbor for Bona Fide Employment; however, in limited instances we use external companies to assist with certain aspects of these efforts, but only in arrangements that we believe do not violate the Anti-Kickback Statute or other applicable laws.

132

Table of Contents

If any of our business transactions or arrangements, including those described above, were found to violate the federal Anti-Kickback Statute, we could face, among other things, criminal, civil or administrative sanctions, including possible exclusion from participation in Medicare, Medicaid and other state and federal healthcare programs. Any findings that we have violated these laws could have a material adverse impact on our business, results of operations, financial condition, cash flows, reputation and stock price.

As part of HHS's Regulatory Sprint to Coordinated Care ("Regulatory Sprint"), OIG issued a request for information in August 2018 seeking input on regulatory provisions that may act as barriers to coordinated care or value-based care. Specifically, OIG sought to identify ways in which it might modify or add new safe harbors to the Anti-Kickback Statute (as well as exceptions to the definition of "remuneration" in the beneficiary inducements provision of the Civil Monetary Penalty statute) in order to foster arrangements that promote care coordination and advance the delivery of value-based care, while also protecting against harms caused by fraud and abuse. Numerous federal agencies have requested comments and information from the public and have published proposed regulations as part of the Regulatory Sprint on areas that have historically been viewed as barriers to innovative care coordination arrangements. For example, OIG and the CMS each issued a sweeping set of proposed regulations that introduce significant new value-based terminology, safe harbors and exceptions to the federal anti-kickback statute ("AKS") and federal physician self-referral law ("Stark Law"). Additionally, OIG has called for comments and issued proposed regulations related to modernizing the civil monetary penalty law governing inducements provided to Medicare and Medicaid beneficiaries (the "CMPL"). The Office for Civil Rights ("OCR") is also involved, and has called for information from the public regarding ways that the Health Insurance Portability and Accountability Act ("HIPAA") regulations could be modernized to support coordinated, value-based care. Additionally, the Substance Abuse and Mental Health Services Administration ("SAMHSA") published proposed regulations related to the privacy of substance use disorder treatment records, and CMS published proposals to revise its Stark advisory opinion process. On July 15, 2020, SAMHSA issued a final rule on the protection of substance use disorder ("SUD") treatment records under 42 CFR Part 2 (the "Part 2 Rule"). The Part 2 final rule aims to reduce delays and burdens in care coordination by more closely aligning Part 2 with the HIPAA Privacy Rule, while maintaining certain privacy protections specific to Part 2. This final rule is effective August 14, 2020. Also of note, under the Coronavirus Aid, Relief and Economic Security Act ("CARES Act") (Pub. L. 116-136), signed into law on March 27, 2020, Congress itself made significant modifications to the authorizing statute for the Part 2 regulations, with the aim of aligning the Part 2 laws more strongly with the HIPAA privacy rule. The law directs the Secretary of Health and Human Services to revise the Part 2 regulations such that the amendments would apply to uses and disclosures of SUD records the date that is 12 months after the date of enactment of the CARES Act. We anticipate many more proposals and changes into the future as part of this initiative. These changes in federal regulations are anticipated to make a significant impact on health care providers and other stakeholders These and similar changes may cause OIG, CMS or other regulators to change the parameters of rules and regulations that we must follow and thus impact our business, results of operations and financial condition.

### Risk Bearing Provider Regulation

Certain of the states where we currently operate or may choose to operate in the future regulate the operations and financial condition of risk bearing providers like us and our affiliated providers. These regulations can include capital requirements, licensing or certification, governance controls and other similar matters. While these regulations have not had a material impact on our business to date, as we continue to expand, these rules may require additional resources and capitalization and add complexity to our business.

### Stark Law

The Stark Law prohibits a physician who has a financial relationship, or who has an immediate family member who has a financial relationship, with entities providing Designated Health Services ("DHS") from referring Medicare patients to such entities for the furnishing of DHS, unless an exception applies. Although uncertainty exists, federal agencies and at least one court have taken the position that the Stark Law also applies to Medicaid.

133

Table of Contents

DHS is defined to include clinical laboratory services, physical therapy services, occupational therapy services, radiology services including magnetic resonance imaging, computerized axial tomography scans, and ultrasound services, radiation therapy services and supplies, durable medical equipment and supplies, parenteral and enteral nutrients, equipment, and supplies, prosthetics, orthotics and prosthetic devices and supplies, home health services, outpatient prescription drugs, inpatient and outpatient hospital services and outpatient speech-language pathology services. The types of financial arrangements between a physician and an entity providing DHS that trigger the self-referral prohibitions of the Stark Law are broad and include direct and indirect ownership and investment interests and compensation arrangements. The Stark Law prohibits any entity providing DHS that has received a prohibited referral from presenting, or causing to be presented, a claim or billing for the services arising out of the prohibited referral. Similarly, the Stark Law prohibits an entity from "furnishing" a DHS to another entity in which it has a financial relationship when that entity bills for the service. The Stark Law also prohibits self-referrals within an organization by its own physicians, although broad exceptions exist that cover employed physicians and those referring DHS that are ancillary to the physician's practice to the physician group. The prohibition applies regardless of the reasons for the financial relationship and the referral. Unlike the federal Anti-Kickback Statute, the Stark Law is a strict liability violation where unlawful intent need not be demonstrated.

If the Stark Law is implicated, the financial relationship must fully satisfy a Stark Law exception. If an exception is not satisfied, then the parties to the arrangement could be subject to sanctions. Sanctions for violation of the Stark Law include denial of payment for claims for services provided in violation of the prohibition, refunds of amounts collected in violation of the prohibition, a civil penalty of up to $15,000 for each service arising out of the prohibited referral, a civil penalty of up to $100,000 against parties that enter into a scheme to circumvent the Stark Law prohibition, civil assessment of up to three times the amount claimed and potential exclusion from the federal healthcare programs, including Medicare and Medicaid. Amounts collected on claims related to prohibited referrals must be reported and refunded generally within 60 days after the date on which the overpayment was identified. Furthermore, Stark Law violations and failure to return overpayments in a timely manner can form the basis for FCA liability, as discussed below.

If CMS or other regulatory or enforcement authorities determine that claims have been submitted for referrals by us that violate the Stark Law, we would be subject to the penalties described above. In addition, it might be necessary to restructure existing compensation agreements with our physicians. Any such penalties and restructuring or other required actions could have a material adverse effect on our business, results of operations, financial condition and cash flows.

In June 2018, CMS issued a request for information seeking input on how to address any undue regulatory impact and burden of the Stark Law. CMS placed the request for information in the context of the Regulatory Spring and stated that it identified aspects of the Stark Law that pose potential barriers to coordinated care. CMS thus sought comments on the impact and burden of the Stark Law, including whether it prevents or inhibits care coordination. CMS has since issued a sweeping set of proposed regulations that introduce significant new value-based terminology, safe harbors and exceptions to the Stark Law. Those or other changes implemented by CMS may change the parameters of Stark Law exceptions that we rely on and thus impact our business, results of operations and financial condition.

The definition of DHS under the Stark Law does not include outpatient physician services. Since most services furnished to Medicare beneficiaries provided in our centers are physician services, our services generally do not implicate the Stark Law referral prohibition. However, certain ancillary services we may provide, including certain diagnostic testing, may be considered DHS. Also, we refer Medicare beneficiaries to third parties for the provision of DHS and our financial relationships with those third parties must satisfy a Stark Law exception.

We have entered into several types of financial relationships with physicians, including compensation arrangements. If our centers were to bill for a non-exempted service and the financial relationships with the physician did not satisfy an exception, we could be required to change our practices, face civil penalties, pay

134

Table of Contents

substantial fines, return certain payments received from Medicare and beneficiaries or otherwise experience a material adverse effect as a result of a challenge to payments made pursuant to referrals from these physicians under the Stark Law.

### Fraud and Abuse under State Law

Some states in which we operate centers have laws prohibiting physicians from holding financial interests in various types of medical facilities to which they refer patients. Some of these laws could potentially be interpreted broadly as prohibiting physicians who hold shares of our publicly traded stock or are physician owners from referring patients to our centers if the centers perform services for their patients or do not otherwise satisfy an exception to the law. States also have laws similar to or stricter than the federal Anti-Kickback Statute that may affect our ability to receive referrals from physicians with whom we have financial relationships. Some state anti-kickback laws also include civil and criminal penalties. Some of these laws include exemptions that may be applicable to our physician relationships or for financial interests limited to shares of publicly traded stock. Some, however, may include no explicit exemption for certain types of agreements and/or relationships entered into with physicians. If these laws are interpreted to apply to physicians who hold equity interests in our centers or to physicians who hold our publicly traded stock, and for which no applicable exception exists, we may be required to terminate or restructure our relationships with these physicians and could be subject to criminal, civil and administrative sanctions, refund requirements and exclusions from government healthcare programs, including Medicare and Medicaid, which could have a material adverse effect on our business, results of operations, financial condition, cash flows, reputation and stock price.

Similarly, states have beneficiary inducement prohibitions and consumer protection laws that may be triggered by the offering of inducements, incentives and other forms of remuneration to patients and prospective patients. Violations range from civil to criminal and could have a material adverse effect on our business, results of operations and financial condition.

### Corporate Practice of Medicine and Fee-Splitting

The laws and regulations relating to our operations vary from state to state and many states prohibit general business corporations, such as us, from practicing medicine, controlling physicians' medical decisions or engaging in some practices such as splitting professional fees with physicians. We currently contract with affiliated physician-owned professional corporations who provide healthcare services that are required to be provided by licensed healthcare professionals. Pursuant to written agreements, we provide comprehensive suite of administrative services to those professional corporations in exchange for the payment by such professional corporations of a management fee. While we believe that we are in substantial compliance with state laws prohibiting the corporate practice of medicine and fee-splitting, other parties may assert that, despite the way we are structured, we could be engaged in the corporate practice of medicine or unlawful fee-splitting. Were such allegations to be asserted successfully before the appropriate judicial or administrative forums, we could be subject to adverse judicial or administrative penalties, certain contracts could be determined to be unenforceable and we may be required to restructure our contractual arrangements. The laws of other states do not prohibit non-physician entities from employing physicians to practice medicine but may retain a ban on some types of fee-splitting arrangements.

Violations of the corporate practice of medicine vary by state and may result in physicians being subject to disciplinary action, as well as to forfeiture of revenues from payors for services rendered. For lay entities, violations may also bring both civil and, in more extreme cases, criminal liability for engaging in medical practice without a license. Some of the relevant laws, regulations and agency interpretations in states with corporate practice of medicine restrictions have been subject to limited judicial and regulatory interpretation. In limited cases, courts have required management services companies to divest or reorganize structures deemed to violate corporate practice restrictions. Moreover, state laws are subject to change. Any allegations or findings that we have violated these laws could have a material adverse impact on our business, results of operations and financial condition.

135

Table of Contents

***The False Claims Act***

The federal FCA is a means of policing false bills or false requests for payment in the healthcare delivery system. Among other things, the FCA authorizes the imposition of up to three times the government's damages and significant per claim civil penalties on any "person" (including an individual, organization or company) who, among other acts:

- knowingly presents or causes to be presented to the federal government a false or fraudulent claim for payment or approval;
- knowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim;
- knowingly makes, uses or causes to be made or used a false record or statement material to an obligation to pay the government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the federal government; or
- conspires to commit the above acts.

In addition, amendments to the FCA and Social Security Act impose severe penalties for the knowing and improper retention of overpayments collected from government payors. Under these provisions, within 60 days of identifying and quantifying an overpayment, a provider is required to notify CMS or the Medicare Administrative Contractor of the overpayment and the reason for it and return the overpayment. An overpayment impermissibly retained could subject us to liability under the FCA, exclusion from government healthcare programs and penalties under the federal Civil Monetary Penalty statute. As a result of these provisions, our procedures for identifying and processing overpayments may be subject to greater scrutiny.

The penalties for a violation of the FCA range from $5,500 to $11,000 (adjusted for inflation) for each false claim, plus up to three times the amount of damages caused by each false claim, which can be as much as the amounts received directly or indirectly from the government for each such false claim. On January 29, 2018, the Department of Justice issued a final rule announcing adjustments to FCA penalties, under which the per claim penalty range increased to a range from $11,181 to $22,363 for penalties assessed after January 29, 2018, so long as the underlying conduct occurred after November 2, 2015.

The federal government has used the FCA to prosecute a wide variety of alleged false claims and fraud allegedly perpetrated against Medicare and state healthcare programs, including but not limited to coding errors, billing for services not rendered, the submission of false cost or other reports, billing for services at a higher payment rate than appropriate, billing under a comprehensive code as well as under one or more component codes included in the comprehensive code, billing for care that is not considered medically necessary and false reporting of risk-adjusted diagnostic codes to MA plans. The ACA provides that claims tainted by a violation of the federal Anti-Kickback Statute are false for purposes of the FCA. Some courts have held that filing claims or failing to refund amounts collected in violation of the Stark Law can form the basis for liability under the FCA. In addition to the provisions of the FCA, which provide for civil enforcement, the federal government can use several criminal statutes to prosecute persons who are alleged to have submitted false or fraudulent claims for payment to the federal government. Any allegations or findings that we have violated the FCA could have a material adverse impact on our business, results of operations and financial condition.

In addition to the FCA, the various states in which we operate have adopted their own analogs of the FCA. States are becoming increasingly active in using their false claims laws to police the same activities listed above, particularly with regard to Medicaid fee-for-service and Managed Medicaid programs.

136

Table of Contents

*Civil Monetary Penalties Statute*

The Civil Monetary Penalties Statute, 42 U.S.C. § 1320a-7a, authorizes the imposition of civil monetary penalties, assessments and exclusion against an individual or entity based on a variety of prohibited conduct, including, but not limited to:

- presenting, or causing to be presented, claims for payment to Medicare, Medicaid or other third-party payors that the individual or entity knows or should know are for an item or service that was not provided as claimed or is false or fraudulent;
- offering remuneration to a federal health care program beneficiary that the individual or entity knows or should know is likely to influence the beneficiary to order or receive health care items or services from a particular provider;
- arranging contracts with an entity or individual excluded from participation in the federal health care programs;
- violating the federal Anti-Kickback Statute;
- making, using or causing to be made or used a false record or statement material to a false or fraudulent claim for payment for items and services furnished under a federal health care program;
- making, using or causing to be made any false statement, omission or misrepresentation of a material fact in any application, bid or contract to participate or enroll as a provider of services or a supplier under a federal health care program; and
- failing to report and return an overpayment owed to the federal government.

Substantial civil monetary penalties may be imposed under the federal Civil Monetary Penalty Statute and may vary depending on the underlying violation. In addition, an assessment of not more than three times the total amount claimed for each item or service may also apply and a violator may be subject to exclusion from federal and state health care programs.

We could be exposed to a wide range of allegations to which the federal Civil Monetary Penalty Statute would apply. We perform monthly checks on our employees, affiliated providers and certain affiliates and vendors using government databases to confirm that these individuals have not been excluded from federal programs. However, should an individual become excluded and we fail to detect it, a federal agency could require us to refund amounts attributable to all claims or services performed or sufficiently linked to an excluded individual. Likewise, our patient programs, which can include enhancements, incentives and additional care coordination not otherwise covered under traditional Medicare, could be alleged to be intended to influence the patient's choice in obtaining services or the amount or types of services sought. Thus, we cannot foreclose the possibility that we will face allegations subject to the Civil Monetary Penalty Statute with the potential for a material adverse impact on our business, results of operations and financial condition.

*Privacy and Security*

The federal regulations promulgated under the authority of HIPAA require us to provide certain protections to patients and their health information. The HIPAA privacy and security regulations extensively regulate the use and disclosure of "protected health information" ("PHI") and require covered entities, which include healthcare providers and their business associates, to implement and maintain administrative, physical and technical safeguards to protect the security of such information. Additional security requirements apply to electronic PHI. These regulations also provide patients with substantive rights with respect to their health information.

The HIPAA privacy and security regulations also require us to enter into written agreements with certain contractors, known as business associates, to whom we disclose PHI. Covered entities may be subject to penalties for, among other activities, failing to enter into a business associate agreement where required by law or as a

137

Table of Contents

result of a business associate violating HIPAA, if the business associate is found to be an agent of the covered entity and acting within the scope of the agency. Business associates are also directly subject to liability under certain HIPAA privacy and security regulations. In instances where we act as a business associate to a covered entity, there is the potential for additional liability beyond our status as a covered entity.

Covered entities must notify affected individuals of breaches of unsecured PHI without unreasonable delay but no later than 60 days after discovery of the breach by a covered entity or its agents. Reporting must also be made to the HHS Office for Civil Rights and, for breaches of unsecured PHI involving more than 500 residents of a state or jurisdiction, to the media. All impermissible uses or disclosures of unsecured PHI are presumed to be breaches unless the covered entity or business associate establishes that there is a low probability the PHI has been compromised. Various state laws and regulations may also require us to notify affected individuals in the event of a data breach involving personal information without regard to the probability of the information being compromised.

Violations of HIPAA by providers like us, including, but not limited to, failing to implement appropriate administrative, physical and technical safeguards, have resulted in enforcement actions and in some cases triggered settlement payments or civil monetary penalties. Penalties for impermissible use or disclosure of PHI were increased by the HITECH Act by imposing tiered penalties of more than $50,000 per violation and up to $1.5 million per year for identical violations. In addition, HIPAA provides for criminal penalties of up to $250,000 and ten years in prison, with the severest penalties for obtaining and disclosing PHI with the intent to sell, transfer or use such information for commercial advantage, personal gain or malicious harm. Further, state attorneys general may bring civil actions seeking either injunction or damages in response to violations of the HIPAA privacy and security regulations that threaten the privacy of state residents. There can be no assurance that we will not be the subject of an investigation (arising out of a reportable breach incident, audit or otherwise) alleging non-compliance with HIPAA regulations in our maintenance of PHI.

*Healthcare reform*

In March 2010, broad healthcare reform legislation was enacted in the United States through the ACA. Although many of the provisions of the ACA did not take effect immediately and continue to be implemented, and some have been and may be modified before or during their implementation, the reforms could continue to have an impact on our business in a number of ways. We cannot predict how employers, private payors or persons buying insurance might react to federal and state healthcare reform legislation, whether already enacted or enacted in the future, nor can we predict what form many of these regulations will take before implementation.

Other aspects of the 2010 healthcare reform laws may also affect our business, including provisions that impact the Medicare and Medicaid programs. These and other provisions of the ACA remain subject to ongoing uncertainty due to developing regulations and clarifications, including those described above, as well as continuing political and legal challenges at both the federal and state levels. Since 2016, various administrative and legislative initiatives have been implemented that have had adverse impacts on the ACA and its programs. For example, in October 2017, the federal government announced that cost-sharing reduction payments to insurers would end, effective immediately, unless Congress appropriated the funds, and, in December 2017, Congress passed the Tax Cuts and Jobs Act, which includes a provision that eliminates the penalty under the ACA's individual mandate for individuals who fail to obtain a qualifying health insurance plan and could impact the future state of the exchanges. Moreover, in February 2018, Congress passed the Bipartisan Budget Act (the "BBA") which, among other things, repealed the Independent Payment Advisory Board that was established by the ACA and intended to reduce the rate of growth in Medicare spending by extending sequestration cuts to Medicare payments through fiscal year 2027. While certain provisions of the BBA may increase the scope of benefits available under MA for certain chronically ill federal health care program beneficiaries beginning in 2020, the ultimate impact of such changes cannot be predicted.

While there may be significant changes to the healthcare environment in the future, the specific changes and their timing are not yet apparent. As a result, there is considerable uncertainty regarding the future with respect to

138

Table of Contents

the exchanges and other core aspects of the current health care marketplace. Future elections may create conditions for Congress to adopt new federal coverage programs that may disrupt our current commercial payor revenue streams. While specific changes and their timing are not yet apparent, such changes could lower our reimbursement rates or increase our expenses. Any failure to successfully implement strategic initiatives that respond to future legislative, regulatory, and executive changes could have a material adverse effect on our business, results of operations and financial condition.

CMS and state Medicaid agencies also routinely adjust the risk adjustment factor which is central to payment under MA and Managed Medicaid programs in which we participate. The monetary "coefficient" values associated with diseases that we manage in our population are subject to change by CMS and state agencies. Such changes could have a material adverse effect on our financial condition.

### *Other regulations*

Our operations are subject to various state hazardous waste and non-hazardous medical waste disposal laws. These laws do not classify as hazardous most of the waste produced from medical services. Occupational Safety and Health Administration regulations require employers to provide workers who are occupationally subject to blood or other potentially infectious materials with prescribed protections. These regulatory requirements apply to all healthcare facilities, including primary care centers, and require employers to make a determination as to which employees may be exposed to blood or other potentially infectious materials and to have in effect a written exposure control plan. In addition, employers are required to provide or employ hepatitis B vaccinations, personal protective equipment and other safety devices, infection control training, post-exposure evaluation and follow-up, waste disposal techniques and procedures and work practice controls. Employers are also required to comply with various record-keeping requirements.

Federal and state law also governs the dispensing of controlled substances by physicians. For example, the Prescription Drug Marketing Act governs the distribution of drug samples. Physicians are required to report relationships they have with the manufacturers of drugs, medical devices and biologics through the Open Payments Program database. Any allegations or findings that we or our providers have violated any of these laws or regulations could have a material adverse impact on our business, results of operations and financial condition.

In addition, while none of the states in which we currently operated have required it, certain states in which we may desire to do business in the future have certificate of need programs regulating the establishment or expansion of healthcare facilities, including primary care centers. These regulations can be complex and time-consuming. Any failure to comply with such regulatory requirements could adversely impact our business, results of operations and financial condition.

## Intellectual Property

Our continued growth and success depend, in part, on our ability to protect our intellectual property and internally developed technology, including Canopy. We primarily protect our intellectual property through a combination of copyrights, trademarks and trade secrets, intellectual property licenses and other contractual rights (including confidentiality, non-disclosure and assignment-of-invention agreements with our employees, independent contractors, consultants and companies with which we conduct business). Based upon our experience providing care in 54 centers in 13 markets across 8 states, we continuously evaluate the needs of our providers and the tools that Canopy can provide and make improvements and add new features based on those needs. Although we do not currently hold a patent for Canopy, we continually assess the most appropriate methods of protecting our intellectual property and may decide to pursue available protections in the future.

However, these intellectual property rights and procedures may not prevent others from competing with us. We may be unable to obtain, maintain and enforce our intellectual property rights, and assertions by third parties that we violate their intellectual property rights could have a material adverse effect on our business, financial

Table of Contents

condition and results of operations. See "Risk Factors—Risks Related to Our Business—If we are unable to obtain, maintain and enforce intellectual property protection for our technology or if the scope of our intellectual property protection is not sufficiently broad, others may be able to develop and commercialize technology substantially similar to ours, and our ability to successfully commercialize our technology may be adversely affected" and "Risk Factors—Risks Related to Our Business—Third parties may initiate legal proceedings alleging that we are infringing or otherwise violating their intellectual property rights, the outcome of which would be uncertain and could have a material adverse effect on our business, financial condition and results of operations."

## Competition

The U.S. healthcare industry is highly competitive. We compete with large and medium-sized local and national providers of primary care services, such as ChenMed, Iora Health and health system affiliated practices, for, among other things, contracts with payors, recruitment of physicians and other medical and non-medical personnel and individual patients. Our principal competitors for patients and payor contracts vary considerably in type and identity by market. Because of the low barriers of entry into the primary care business and the ability of physicians to own primary care centers and/or also be medical directors for their own centers, competition for growth in existing and expanding markets is not limited to large competitors with substantial financial resources. There have also been increasing indications of interest from non-traditional providers and others to enter the primary care space and/or develop innovative technologies or business activities that could be disruptive to the industry. For example, payors have and may continue to acquire primary care and other provider assets. Our growth strategy and our business could be adversely affected if we are not able to continue to penetrate existing markets, successfully expand into new markets, maintain or establish new relationships with payors, recruit qualified physicians or if we experience significant patient attrition to our competitors. See "Risk Factors—Risks Related to Our Business—The healthcare industry is highly competitive."

We believe the principal competitive factors for serving the healthcare market for adults on Medicare include: patient experience, quality of care, health outcomes, total cost of care, brand identity and trust in that brand. We believe we compete favorably on these factors.

## Legal Proceedings

From time to time, we may be involved in various legal proceedings and subject to claims that arise in the ordinary course of business. Although the results of litigation and claims are inherently unpredictable and uncertain, we are not currently a party to any legal proceedings the outcome of which, if determined adversely to us, are believed to, either individually or taken together, have a material adverse effect on our business, operating results, cash flows or financial condition. Regardless of the outcome, litigation has the potential to have an adverse impact on us because of defense and settlement costs, diversion of management resources, and other factors. See "Risk Factors—Risks Related to Our Business—We may be subject to legal proceedings and litigation, including intellectual property and privacy disputes, which are costly to defend and could materially harm our business and results of operations."

## Insurance

We maintain insurance, excess coverage, or reinsurance for property and general liability, professional liability, directors' and officers' liability, workers' compensation, cybersecurity and other coverage in amounts and on terms deemed adequate by management, based on our actual claims experience and expectations for future claims. We also utilize stop-loss insurance for our patients, protecting us for medical claims per episode in excess of certain levels. Future claims could, however, exceed our applicable insurance coverage. Physicians practicing at our centers are required to maintain their own malpractice insurance.

Table of Contents

## Employees

As of March 31, 2020, we and our affiliated physician entities collectively had approximately 2,300 employees, including approximately 260 primary care providers. We consider our relationship with our employees to be good. None of our employees are represented by a labor union or party to a collective bargaining agreement.

## Properties

Our principal executive offices are located in Chicago, Illinois where we occupy facilities totaling approximately 25,000 square feet under a sublease that expires on December 31, 2021. We use this facility for administration, sales and marketing, technology and development and professional services. We also lease offices elsewhere in the United States, including Charlotte, North Carolina and Oak Brook, Illinois.

We intend to procure additional space as we add team members and expand geographically. We believe that our facilities are adequate to meet our needs for the immediate future, and that, should it be needed, suitable additional space will be available to accommodate any such expansion of our operations. We currently have 29 additional centers in our expansion pipeline, with a new center recently opened in Texas and new centers planned to be opened in Mississippi and New York in 2020.

As of March 31, 2020, we leased approximately 500,000 gross square feet relating to 54 centers located in Illinois, Indiana, Michigan, North Carolina, Ohio, Pennsylvania, Rhode Island and Tennessee, including some that are leased from Humana. See "Risk Factors—Risks Related to Our Business—We lease all of our facilities and may experience risks relating to lease termination, lease expense escalators, lease extensions and special charges." Our leases typically have terms of seven to 15 years, and generally provide for renewal or extension options. Our lease obligations often include annual fixed rent escalators ranging between 2% and 3% or variable rent escalators based on a consumer price index. Generally, our leases are "net" leases, which require us to pay all of the cost of insurance, taxes, maintenance and utilities. We generally cannot cancel these leases at our option.

## Seasonality

Our business experiences some variability depending upon the time of year. We experience the largest portion of our at-risk patient growth during the first quarter, when plan enrollment selections made during the prior AEP take effect. While we also add patients throughout the year, including during Special Enrollment Periods when certain eligible individuals can enroll in MA midyear, we would expect to see approximately half of our at-risk patient growth occur in connection with the annual enrollment period. In addition, in January of each year, CMS revises the risk adjustment factor for each patient based upon health conditions documented in the prior year, leading to an overall increase in per-patient revenue. As the year progresses, our per-patient revenue declines as new patients join us typically with less complete or accurate documentation (and therefore lower risk-adjustment scores) and patient mortality disproportionately impacts our higher-risk (and therefore greater revenue) patients.

Medical costs will vary seasonally depending on a number of factors, but most significantly the weather. Certain illnesses, such as the influenza virus, are far more prevalent during colder months of the year, which will result in an increase in medical expenses during these time periods. We would therefore expect to see higher levels of per-patient medical costs in the first and fourth quarters. Medical costs also depend upon the number of business days in a period.

141

**Table of Contents**

or non-recurring events or transactions, including a change in control, the plan administrator may provide for (1) either the replacement of outstanding rights with other rights or property or termination of outstanding rights in exchange for cash, (2) the assumption or substitution of outstanding rights by the successor or survivor corporation or parent or subsidiary thereof, if any, (3) the adjustment in the number and type of shares of stock subject to outstanding rights, (4) the use of participants' accumulated payroll deductions to purchase stock on a new purchase date prior to the next scheduled purchase date and termination of any rights under ongoing offering periods or (5) the termination of all outstanding rights.

*Plan Amendment*

The plan administrator may amend, suspend or terminate the ESPP at any time. However, stockholder approval will be obtained for any amendment that increases the aggregate number or changes the type of shares that may be sold pursuant to rights under the ESPP or changes the corporations or classes of corporations whose employees are eligible to participate in the ESPP.

### 401(k) Plan

We maintain a tax-qualified retirement plan that provides all regular employees with an opportunity to save for retirement on a tax-advantaged basis. Under our 401(k) plan, participants may elect to defer a portion of their compensation on a pre-tax basis and have it contributed to the plan subject to applicable annual limits under the Code. The Company makes a matching contribution on 100% of employee deferrals up to four percent of the eligible employee's compensation. Contributions are allocated to each participant's individual account and are then invested in selected investment alternatives according to the participants' directions. Employee elective deferrals and matching contributions are 100% vested at all times. As a U.S. tax-qualified retirement plan, contributions to the 401(k) plan and earnings on those contributions are not taxable to the employees until distributed from the 401(k) plan and all contributions are deductible by us when made.

### Non-Employee Director Compensation

We did not pay any compensation, make any equity awards or non-equity awards or pay any other compensation to any of the non-employee members of our Board in 2019 or during the three months ended March 31, 2020.

### Non-Employee Director Compensation Policy

We do not currently have a formal policy with respect to compensating our non-employee directors for service as directors. In connection with this offering, we intend to adopt a director compensation policy pursuant to which our non-employee directors will be eligible to receive compensation for service on our Board and committees of our Board. Pursuant to the policy, directors will receive an annual retainer of $50,000 and an annual grant of RSUs under the 2020 Plan with a grant date fair market value of $200,000. The RSUs will vest in a single installment on the one year anniversary of the grant date.

Table of Contents

## PRINCIPAL SHAREHOLDERS

The following table sets forth information about the beneficial ownership of our common stock as of July 24, 2020 and as adjusted to reflect the sale of the common stock in this offering, for

- each person or group known to us who beneficially owns more than 5% of our common stock immediately prior to this offering;
- each of our directors and director nominees;
- each of our named executive officers; and
- all of our directors, director nominees and executive officers as a group.

Each shareholder's percentage ownership before the offering is based on common stock outstanding as of July 24, 2020. Each shareholder's percentage ownership after the offering is based on common stock outstanding immediately after the completion of this offering. We have granted the underwriters an option to purchase up to additional shares of common stock.

Beneficial ownership for the purposes of the following table is determined in accordance with the rules and regulations of the SEC. These rules generally provide that a person is the beneficial owner of securities if such person has or shares the power to vote or direct the voting thereof, or to dispose or direct the disposition thereof or has the right to acquire such powers within 60 days. Common stock subject to options that are currently exercisable or exercisable within 60 days of July 24, 2020 are deemed to be outstanding and beneficially owned by the person holding the options. These shares, however, are not deemed outstanding for the purposes of computing the percentage ownership of any other person. Except as disclosed in the footnotes to this table and subject to applicable community property laws, we believe that each shareholder identified in the table possesses sole voting and investment power over all common stock shown as beneficially owned by the shareholder.

Unless otherwise noted below, the address of each beneficial owner listed on the table is c/o Oak Street Health, Inc., 30 W. Monroe Street, Suite 1200, Chicago, Illinois 60603. Beneficial ownership representing less than 1% is denoted with an asterisk (*).

| Name of Beneficial Owner | Shares Beneficially Owned Prior to this Offering | | Shares Beneficially Owned After this Offering | | |
| | Number of shares | Percentage | Number of shares | No exercise of underwriters' option Percentage | Full exercise of underwriters' option Percentage |
|---|---|---|---|---|---|
| **5% Stockholders:** | | | | | |
| General Atlantic(1) | 76,411,377 | 34.3% | 76,411,377 | 32.0% | 31.7% |
| Newlight(2) | 50,440,349 | 22.6 | 50,440,349 | 21.1 | 20.9 |
| Humana, Inc.(3) | 12,701,858 | 5.7 | 12,701,858 | 5.3 | 5.3 |
| **Directors, Director Nominees and Named Executive Officers:** | | | | | |
| Mike Pykosz(4)(9) | 9,433,782 | 4.2 | 9,433,782 | 4.0 | 3.9 |
| Geoff Price(4) | 7,817,145 | 3.5 | 7,817,145 | 3.3 | 3.2 |
| Dr. Griffin Myers(4)(10) | 6,494,940 | 2.9 | 6,494,940 | 2.7 | 2.7 |
| Carl Daley | — | — | — | — | — |
| Dr. Mohit Kaushal(5) | 183,030 | * | 183,030 | * | * |
| Kim Keck | — | — | — | — | — |
| Paul Kusserow(6) | 476,404 | * | 476,404 | * | * |
| Robbert Vorhoff | — | — | — | — | — |
| Srdjan Vukovic | — | — | — | — | — |
| Cheryl Dorsey(7) | — | — | — | — | — |
| Julie Klapstein(7) | — | — | — | — | — |
| Directors, director nominees and executive officers as a group (17 individuals)(8) | 28,912,610 | 13.0% | 28,912,610 | 12.1% | 12.0% |

161

Table of Contents

(1)  Includes 76,411,377 shares owned by General Atlantic (OSH) Interholdco, L.P. ("OSH Interholdco"), after giving effect to the restructuring described under "Organizational Transactions." The limited partners of OSH Interholdco are General Atlantic Partners 93, L.P., a Delaware limited partnership ("GAP 93"), General Atlantic Partners 100, L.P., a Delaware limited partnership ("GAP 100"), GAP Coinvestments CDA, L.P., a Delaware limited partnership ("GAPCO CDA"), GAP Coinvestments III, LLC, a Delaware limited liability company ("GAPCO III"), GAP Coinvestments IV, LLC, a Delaware limited liability company ("GAPCO IV"), and GAP Coinvestments V, LLC, a Delaware limited liability company ("GAPCO V" and, together with GAP 93, GAP 100, GAPCO CDA, GAPCO III and GAPCO IV, the "GA Funds"). General Atlantic GenPar, L.P. ("GA GenPar") is the general partner of GAP 93 and GAP 100. General Atlantic (SPV) GP, LLC ("GA SPV") is the general partner of OSH Interholdco. General Atlantic LLC ("GA LLC") is the general partner of GA GenPar and GAPCO CDA, the managing member of GAPCO III, GAPCO IV and GAPCO V, and the sole member of GA SPV. There are eight members of the management committee of GA LLC (the "GA Management Committee"). Mr. Vorhoff is a member of the GA Management Committee and is a Managing Director of GA LLC. OSH Interholdco, GAP 93, GAP 100, GAPCO CDA, GAPCO III, GAPCO IV, GAPCO V, GA GenPar, GA SPV and GA LLC (collectively, the "GA Group") are a "group" within the meaning of Rule 13d-5 of the Exchange Act. Each of the members of the GA Management Committee disclaims ownership of the shares except to the extent he has a pecuniary interest therein. The business address of Mr. Vorhoff and the GA Group is c/o General Atlantic Service Company, L.P., 55 East 52nd Street, 33rd Floor, New York, NY 10055.

(2)  Includes 50,440,349 shares owned by a newly formed SPV ("Newlight Harbour Point SPV"), after giving effect to the restructuring described under "Organizational Transactions." Newlight Partners LP controls Newlight Harbour Point SPV and serves as the exclusive investment manager to its client in respect of the shares held by Newlight Harbour Point SPV (the "Newlight Shares"). The general partner of Newlight Partners is Newlight GP LLC ("Newlight"), which is controlled by David Wassong and Ravi Yadav. In such capacities, each of the entities and individuals referenced in this paragraph may also be deemed to be the beneficial owners having shared voting power and shared investment power with respect to the Newlight Shares as described above. The business address of Newlight Partners LP is 320 Park Avenue, New York, NY 10022.

(3)  The mailing address of Humana, Inc. is 500 W. Main Street, Louisville, KY 40202.

(4)  Includes 5,658,358 restricted shares subject to time-based vesting.

(5)  Includes 3,729,525 restricted shares subject to time-based vesting.

(6)  Includes 2,490,407 restricted shares subject to time-based vesting.

(7)  Ms. Klapstein and Ms. Dorsey are director nominees who we expect to join our Board prior to the completion of this offering.

(8)  Includes 15,417,752 restricted shares subject to time-based vesting.

(9)  Includes 782,038 shares held by the Michael Pykosz Gift Trust.

(10)  Includes 6,494,940 shares held by the Griffin R. Myers Revocable Trust u/a/d 5/26/2020.

Table of Contents

## SHARES ELIGIBLE FOR FUTURE SALE

Before this offering, there has been no public market for our common stock. As described below, only a limited number of shares currently outstanding will be available for sale immediately after this offering due to contractual and legal restrictions on resale. Nevertheless, future sales of substantial amounts of our common stock, including shares issued upon the exercise of outstanding options, in the public market after this offering, or the perception that those sales may occur, could cause the prevailing market price for our common stock to fall or impair our ability to raise capital through sales of our equity securities.

Upon the closing of this offering, based on the number of shares of our common stock outstanding as of March 31, 2020, we will have 238,525,968 outstanding shares of our common stock, after giving effect to the Organizational Transactions and the issuance of shares of our common stock in this offering, assuming no exercise by the underwriters of their option to purchase additional shares.

Of the 238,525,968 shares that will be outstanding immediately after the closing of this offering, we expect that the shares to be sold in this offering will be freely tradable without restriction under the Securities Act unless purchased by our "affiliates," as that term is defined in Rule 144 under the Securities Act. Shares purchased by our affiliates may not be resold except pursuant to an effective registration statement or an exemption from registration, including the safe harbor under Rule 144 of the Securities Act described below. In addition, following this offering, 30,227,330 shares of common stock issuable pursuant to awards granted under certain of our equity plans that are covered by a registration statement on Form S-8 will be freely tradable in the public market, subject to certain contractual and legal restrictions described below.

The remaining 222,900,968 shares of our common stock outstanding after this offering will be "restricted securities," as that term is defined in Rule 144 of the Securities Act, and we expect that approximately 97% of these restricted securities will be subject to the lock-up agreements described below. These restricted securities may be sold in the public market only if the sale is registered or pursuant to an exemption from registration, such as Rule 144 or Rule 701 of the Securities Act, which are summarized below.

### Lock-up Agreements

We, each of our directors and executive officers and other shareholders in the aggregate owning approximately 97% of our common stock outstanding following the Organizational Transactions and prior to this offering, have agreed that, without the prior written consent of J.P. Morgan Securities LLC on behalf of the underwriters, we and they will not, subject to limited exceptions, directly or indirectly sell or dispose of any shares of common stock or any securities convertible into or exchangeable or exercisable for shares of common stock for a period of 180 days after the date of this prospectus. The lock-up restrictions and specified exceptions are described in more detail under "Underwriting."

Prior to the consummation of the offering, certain of our employees, including our executive officers, and/or directors may enter into written trading plans that are intended to comply with Rule 10b5-1 under the Exchange Act. Sales under these trading plans would not be permitted until the expiration of the lock-up agreements relating to the offering described above.

Following the lock-up periods set forth in the agreements described above, and assuming that the representatives of the underwriters do not release any parties from these agreements, all of the shares of our common stock that are restricted securities or are held by our affiliates as of the date of this prospectus will be eligible for sale in the public market in compliance with Rule 144 under the Securities Act.

### Registration Rights Agreement

In connection with this offering, we intend to enter into a registration rights agreement with the Lead Sponsors. The Lead Sponsors will be entitled to request that we register the Lead Sponsors' shares on a

173

Table of Contents

**OAK STREET HEALTH, LLC AND AFFILIATES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
(in thousands, except for unit and per-unit data)
(Unaudited)

Accordingly, the Company determined the fair value of each award on the date of grant using both the income and market approaches, including the backsolve method with the following assumptions used for grants issued for the three months ended March 31, 2020 and 2019:

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| Risk-Free Rate | .23% | 1.58% |
| Volatility | 45.0% | 35.00% |
| Time to Liquidity Event (Years) | 2.06 | 2.19 |

The volatility assumption used in the weighted-average income and market approaches is based on the expected volatility of public companies in similar industries, adjusted to reflect the differences between the Company and public companies in size, resources, time in industry, and breadth of product and service offerings. Expected dividend yield was assumed to be zero given the Company's history of declaring dividends and the Company's lack of intent to pay dividends in the foreseeable future.

The following is a summary of Profits Interests award transactions as well as the Profits Interests outstanding and their corresponding hurdle values as of and for the periods ended March 31, 2020 and December 31, 2019:

| | Profits Interests | Weighted-Average Grant Date Fair Value |
| --- | --- | --- |
| Outstanding, December 31, 2018 | 1,454,148 | 2.35 |
| Granted | 496,763 | 42.35 |
| Vested | 193,375 | 2.32 |
| Forfeited/Repurchased | (40,115) | 5.74 |
| Outstanding, December 31, 2019 | 1,910,796 | 12.68 |
| Granted | 265,500 | 1.41 |
| Vested | 42,720 | 6.45 |
| Forfeited/Repurchased | (5,969) | 4.25 |
| Outstanding, March 31, 2020 | 2,170,327 | 11.32 |
| Vested outstanding, March 31, 2020 | 431,814 | |
| Vested outstanding, December 31, 2019 | 389,531 | |

| | As of March 31, 2020 | | | As of December 31, 2019 | |
| --- | --- | --- | --- | --- | --- |
| | Units Outstanding | Hurdle Value | | Units Outstanding | Hurdle Value |
| | 111,076 | $ 265,158 | | 111,076 | $ 234,834 |
| | 160,054 | 346,107 | | 160,492 | 306,706 |
| | 45,275 | 386,277 | | 42,275 | 342,451 |
| | 259,843 | 685,350 | | 265,374 | 608,955 |
| | 521,225 | 782,361 | | 462,292 | 645,000 |
| | 462,292 | 922,500 | | 521,225 | 697,700 |
| | 345,062 | 1,582,500 | | 345,062 | 1,310,000 |
| | 265,500 | 2,200,000 | | — | — |
| Total | 2,170,327 | | Total | 1,910,796 | |

F-30

**Table of Contents**

**OAK STREET HEALTH, LLC AND AFFILIATES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
(in thousands, except for unit and per-unit data)
(Unaudited)

The Company recognized $1,878 and $256 in unit-based compensation expense related to the Profits Interests for the three-month periods ended March 31, 2020 and 2019, respectively. These amounts are recognized within corporate, general and administrative expenses in the consolidated statements of operations. At March 31, 2020, the Company has approximately $7,386 in unrecognized compensation expense related to non-vested Service-Vesting awards that will be recognized over the weighted-average period of 1.27 years. As of March 31, 2020, the Company has approximately $10,603 in unrecognized compensation expense related to Performance-Vesting units.

**NOTE 15. COMMITMENTS – LITIGATION AND CONTINGENCIES**

*Contingencies*

The Company is presently, and from time to time, subject to various claims and lawsuits arising in the normal course of business. In the opinion of management, the ultimate resolution of these matters will not have a material adverse effect on the Company's financial position or results of operations.

*Uncertainties*

The healthcare industry is subject to numerous laws and regulations of federal, state and local governments. These laws and regulations include, but are not limited to, matters such as licensure, accreditation, Government healthcare program participation requirements, reimbursement for patient services, and Medicare and Medicaid fraud and abuse. Recently, government activity has increased with respect to investigations and allegations concerning possible violations of fraud and abuse statues and regulations by healthcare providers. Violations of these laws and regulations could result in expulsion from government healthcare programs together with imposition of significant fines and penalties, as well as significant repayments for patient services billed.

Management believes that the Company is in compliance with fraud and abuse as well as other applicable government laws and regulations. While no regulatory inquiries have been made, compliance with such laws and regulations is subject to government review and interpretation, as well as regulatory actions unknown at this time.

**NOTE 16. COMMITMENTS – OPERATING LEASES**

The Company leases corporate office space and operating facilities under operating leases. The Company's headquarters is located in Chicago, Illinois. The Company recognized $4,613 and $2,679 of rent expense for the three-month periods ended March 31, 2020 and 2019 respectively, included in corporate, general and administrative expenses in the consolidated statements of operations.

Various lease agreements provide for escalating rent payments over the life of the respective lease and the Company recognizes rent expense on a straight-line basis over the life of the lease. This results in a non-interest-bearing liability (deferred rent) that increases during the early portion of the lease term, as the cash paid is less than the expense recognized, and reverses by the end of the lease term. The Company has recorded $12,974 and $12,901 at March 31, 2020 and December 31, 2019, respectively, of deferred rent that is classified as a long-term liability in the consolidated balance sheets.

In addition to base rent, the centers are generally responsible for their proportionate share of real estate taxes and common area charges. Most of the leases contain renewal options at the Company's election whereby the lease could be extended for terms ranging from five to ten years with base rent escalations.

F-31

**Table of Contents**

**OAK STREET HEALTH, LLC AND AFFILIATES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
(in thousands, except for unit and per-unit data)
(Unaudited)

**NOTE 17. VARIABLE INTEREST ENTITIES**

The Physician Groups (as defined in Note 1) were established to employ healthcare providers, contract with managed care payors, and to deliver healthcare services to patients in the markets that the Company serves.

The Company evaluated whether it has a variable interest in the Physician Groups, whether the Physician Groups are VIEs, and whether the Company has a controlling financial interest in the Physician Groups. The Company concluded that it has variable interests in the Physician Groups on the basis of its Administrative Service Agreement ("ASA") which provides for reimbursement of costs and a management fee payable to the Company from the Physician Groups in exchange for providing management and administrative services which creates risks and a potential return to the Company. The Physician Group's equity at risk, as defined by U.S. GAAP, is insufficient to finance its activities without additional support, and, therefore, the Physician Groups are considered VIEs.

In order to determine whether the Company has a controlling financial interest in the Physician Groups, and, thus, is the Physician's primary beneficiary, the Company considered whether it has i) the power to direct the activities of Physician Groups that most significantly impact its economic performance and ii) the obligation to absorb losses of the Physician Groups that could potentially be significant to it or the right to receive benefits from Physician Groups that could potentially be significant to it. The Company concluded that the unitholders and employees of the Physician Groups are structured in a way that neither unitholder, employees nor their designees has the individual power to direct the activities of the Physician Groups that most significantly impact its economic performance. Under the ASA, MSO is responsible for providing management and administrative services related to the growth of the patient population of the Physician Groups, the management of that population's healthcare needs, and the provision of required healthcare services to those patients. The Company has concluded that the success or failure of MSO in conducting these activities will most significantly impact the economic performance of the Physician Groups. In addition, the Company's variable interests in the Physician Groups provide the Company with the right to receive benefits that could potentially be significant to it. The single member of the Physician Groups is a member and employee of OSH. As a result of this analysis, the Company concluded that it is the primary beneficiary of the Physician Groups and therefore consolidates the balance sheets, results of operations and cash flows of the Physician Groups. The Company performs a qualitative assessment of the Physician Groups on an ongoing basis to determine if it continues to be the primary beneficiary.

The table below illustrates the VIE assets and liabilities and performance for the Physician Groups as of and for the periods ended:

|  | March 31, 2020 | December 31, 2019 |
|---|---|---|
| Total assets | $297,478 | $ 252,629 |
| Total liabilities | 270,421 | 230,527 |

F-32

Table of Contents

**Oak Street Health, LLC and Affiliates**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
December 31, 2019 and 2018
(in thousands, except for unit and per-unit data)

The following is a summary of Profits Interests award transactions as well as the Profits Interests outstanding and their corresponding hurdle values as of and for the years ended December 31, 2019 and 2018:

| | Profits Interests | Weighted-Average Grant Date Fair Value |
|---|---|---|
| Outstanding, December 31, 2017 | 695,858 | $ 2.02 |
| Granted | 892,118 | 2.61 |
| Vested | 131,558 | 1.81 |
| Forfeited/Repurchased | (133,828) | 2.33 |
| Outstanding, December 31, 2018 | 1,454,148 | 2.35 |
| Granted | 496,763 | 42.35 |
| Vested | 193,375 | 2.32 |
| Forfeited/Repurchased | (40,115) | 5.74 |
| Outstanding, December 31, 2019 | 1,910,796 | 12.68 |
| Vested outstanding, December 31, 2019 | 389,531 | |
| Vested outstanding, December 31, 2018 | 205,665 | |

| As of December 31, 2019 | | | As of December 31, 2018 | |
|---|---|---|---|---|
| Units Outstanding | Hurdle Value | | Units Outstanding | Hurdle Value |
| 111,076 | $ 234,834 | | 118,737 | $ 234,834 |
| 160,492 | 306,706 | | 166,929 | 306,712 |
| 45,275 | 342,451 | | 52,050 | 342,451 |
| 265,374 | 608,955 | | 273,421 | 608,966 |
| 462,292 | 645,000 | | 451,908 | 645,000 |
| 521,225 | 696,700 | | 52,201 | 696,723 |
| 345,062 | 1,310,000 | | 338,902 | 1,310,000 |
| **Total** **1,910,796** | | Total | 1,454,148 | |

The Company recognized $4,099 and $806 in unit-based compensation expense related to the Profits Interests for the years ended December 31, 2019 and 2018, respectively. These amounts are recognized within corporate, general and administrative expenses in the consolidated statements of operations. At December 31, 2019, the Company has approximately $8,882 in unrecognized compensation expense related to non-vested Service-Vesting awards that will be recognized over the weighted-average period of 1.13 years. As of December 31, 2019, the Company has approximately $10,569 in unrecognized compensation expense related to Performance-Vesting units.

*Investor Units Options*

In late 2013 and 2014, the Board issued Investor Units options which represented options to purchase redeemable Investor units in the Company's Investor Units II. The Company has not issued any Investor Units options since 2014 and none were forfeited prior to exercise.

F-75

**Table of Contents**

**Oak Street Health, LLC and Affiliates**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
December 31, 2019 and 2018
(in thousands, except for unit and per-unit data)

During the year ended December 31, 2018, all Investor Units options were exercised. No options remained outstanding at the end of the period.

**NOTE 15 - LITIGATION AND CONTINGENCIES**

Contingencies: The Company is presently, and from time to time, subject to various claims and lawsuits arising in the normal course of business. In the opinion of management, the ultimate resolution of these matters will not have a material adverse effect on the Company's financial position or results of operations.

Uncertainties: The healthcare industry is subject to numerous laws and regulations of federal, state and local governments. These laws and regulations include, but are not limited to, matters such as licensure, accreditation, Government healthcare program participation requirements, reimbursement for patient services, and Medicare and Medicaid fraud and abuse. Recently, government activity has increased with respect to investigations and allegations concerning possible violations of fraud and abuse statues and regulations by healthcare providers. Violations of these laws and regulations could result in expulsion from government healthcare programs together with imposition of significant fines and penalties, as well as significant repayments for patient services billed.

Management believes that the Company is in compliance with fraud and abuse as well as other applicable government laws and regulations. While no regulatory inquiries have been made, compliance with such laws and regulations is subject to government review and interpretation, as well as regulatory actions unknown at this time.

**NOTE 16 - COMMITMENTS - OPERATING LEASES**

The Company leases corporate office space and operating facilities under operating leases. The Company's headquarters is located in Chicago, Illinois.

Minimum lease payments with respect to operating leases of the Company are as follows:

| | | |
|---|---|---:|
| 2020 | $ | 11,133 |
| 2021 | | 11,345 |
| 2022 | | 11,472 |
| 2023 | | 10,443 |
| 2024 | | 9,769 |
| Thereafter | | 75,334 |
| | $ | 129,496 |

The Company recognized $14,459 and $7,296 of rent expense in 2019 and 2018, respectively, included in corporate, general and administrative expenses in the consolidated statements of operations.

Various lease agreements provide for escalating rent payments over the life of the respective lease and the Company recognizes rent expense on a straight-line basis over the life of the lease.

This results in a non-interest-bearing liability (deferred rent) that increases during the early portion of the lease term, as the cash paid is less than the expense recognized, and reverses by the end of the lease term. The Company has recorded $12,901 and $7,189 at December 31, 2019 and 2018, respectively, of deferred rent that is classified as a long-term liability in the consolidated balance sheets.

F-76

Table of Contents

**Oak Street Health, LLC and Affiliates**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
December 31, 2019 and 2018
(in thousands, except for unit and per-unit data)

In addition to base rent, the centers are generally responsible for their proportion of real estate taxes and common area charges. Most of the leases contain renewal options at the Company's election whereby the lease could be extended for terms ranging from five to ten years with base rent escalations.

**NOTE 17 - RETIREMENT PLAN**

The Company maintains a profit sharing and retirement savings 401(k) plan (the "401(k) Plan") for full-time employees. Participants may elect to contribute to the 401(k) Plan, through payroll deductions, subject to Internal Revenue Service limitations. At its discretion, the Company makes 4% matching and/or profit-sharing contributions to the 401(k) Plan. The Company recorded expense of $3,102 and $2,413 in salaries and employee benefits in the accompanying consolidated statements of operations during 2019 and 2018, respectively, for discretionary matching and profit-sharing contributions to the 401(k) Plan.

**NOTE 18 - VARIABLE INTEREST ENTITIES**

The Physician Groups (as defined in Note 1) were established to employ healthcare providers, contract with managed care payors, and to deliver healthcare services to patients in the markets that the Company serves.

The Company evaluated whether it has a variable interest in the Physician Groups, whether the Physician Groups are VIEs, and whether the Company has a controlling financial interest in the Physician Groups. The Company concluded that it has variable interests in the Physician Groups on the basis of its Administrative Service Agreement ("ASA") which provides for reimbursement of costs and a management fee payable to the Company from the Physician Groups in exchange for providing management and administrative services which creates risks and a potential return to the Company. The Physician Group's equity at risk, as defined by U.S. GAAP, is insufficient to finance its activities without additional support, and, therefore, the Physician Groups are considered VIEs.

In order to determine whether the Company has a controlling financial interest in the Physician Groups, and, thus, is the Physician's primary beneficiary, the Company considered whether it has i) the power to direct the activities of Physician Groups that most significantly impact its economic performance and ii) the obligation to absorb losses of the Physician Groups that could potentially be significant to it or the right to receive benefits from Physician Groups that could potentially be significant to it. The Company concluded that the unitholders and employees of the Physician Groups are structured in a way that neither unitholder, employees nor their designees has the individual power to direct the activities of the Physician Groups that most significantly impact its economic performance. Under the ASA, MSO is responsible for providing management and administrative services related to the growth of the patient population of the Physician Groups, the management of that population's healthcare needs, and the provision of required healthcare services to those patients. The Company has concluded that the success or failure of MSO in conducting these activities will most significantly impact the economic performance of the Physician Groups. In addition, the Company's variable interests in the Physician Groups provide the Company with the right to receive benefits that could potentially be significant to it. The single member of the Physician Groups is a member and employee of OSH. As a result of this analysis, the Company concluded that it is the primary beneficiary of the Physician Groups and therefore consolidates the balance sheets, results of operations and cash flows of the Physician Groups. The Company performs a qualitative assessment of the Physician Groups on an ongoing basis to determine if it continues to be the primary beneficiary.

F-77