# Exhibit T

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, DC 20549

## FORM 10-Q

**(Mark One)**

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended September 30, 2021

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from to

Commission File Number: 001-39427

# Oak Street Health, Inc.

**(Exact Name of Registrant as Specified in its Charter)**

| | |
|---|---|
| **Delaware** | **84-3446686** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| **30 W. Monroe Street** | |
| **Suite 1200** | |
| **Chicago, Illinois 60603** | **60603** |
| **(Address of principal executive offices)** | **(Zip Code)** |

**Registrant's telephone number, including area code: (312) 733-9730**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| **Common Stock, $0.001 par value** | **OSH** | **NYSE** |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☐ |
| Emerging growth company | ☒ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

As of November 4, 2021, the registrant had 240,927,344 shares of common stock, $0.001 par value per share, outstanding.

Immediately prior to the IPO in 2020, the existing unitholders of OSH LLC exchanged their founders' units, incentive units and profits interests in OSH LLC for common stock of the Company as approved by the Board of Directors of the Company, OSH LLC and OSH Management Holdings, LLC ("OSH MH LLC"). As part of this pre-IPO conversion, certain units were converted to RSAs. The following is a summary of RSA transactions as of and for the nine-months ended September 30, 2021:

| | Unvested Shares | | Grant Date Fair Value |
|---|---|---|---|
| Unvested, December 31, 2020 | 21,599,118 | $ | 11.77 |
| Granted | - | | |
| Vested | (4,631,079) | | 2.76 |
| Canceled and forfeited | (175,905) | | 14.40 |
| Unvested, September 30, 2021 | 16,792,134 | $ | 14.23 |

### *Employee Stock Purchase Plan*

On August 5, 2020, the Board of Directors adopted, and the OSH LLC's and OSH MH LLC's majority unitholders approved, the 2020 Employee Stock Purchase Plan (the "ESPP") for the issuance of up to a total of 2,386,875 shares of common stock. In addition, the number of shares available for issuance under the ESPP will be increased annually on January 1 of each calendar year beginning in 2021 and ending in and including 2030, by an amount equal to the lesser of (A) 1% of the shares outstanding on the final day of the immediately preceding calendar year and (B) such smaller number of shares as is determined by our Board of Directors, subject to an increase each January. In no event will more than 30,000,000 shares of our common stock will be available for issuance under the ESPP. Each offering period will be approximately six months in duration commencing on January and July 1 of each year and terminating on September 30 or December 31. The ESPP allows participants to purchase common stock through payroll deductions of up to 15% of their eligible compensation. The purchase price of the shares will be 85% of the lower of the fair market value of our common stock on the grant date or purchase date.

The first offering period closed on June 30, 2021, and 62,575 shares were distributed to employees during the period.

### *Stock and Unit-Based Compensation Expense*

The Company recognized $0.0 million and $3.6 million in unit-based compensation expense related to the profits interests for the three-months ended September 30, 2021 and 2020, respectively. The Company recognized $0.0 million and $8.8 million in unit-based compensation expense related to the profits interests for the nine-months ended September 30, 2021 and 2020, respectively. The Company recorded the expenses in corporate, general and administrative expenses. The Company recognized $38.7 million and $25.7 million related to RSAs, options and RSUs for the three-months ended September 30, 2021 and 2020, respectively. The Company recorded $37.4 million in corporate, general and administrative expenses, $0.8 million in sales and marketing, and $0.5 million in cost of care for the three-months ended September 30, 2021. The Company recognized $25.7 million in corporate, general, and administrative expenses for the three and nine-months ended September 30, 2020. The Company recognized $121.9 million and $25.7 million related to RSAs, options and RSUs for the nine-months ended September 30, 2021 and 2020, respectively. The Company recorded $118.2 million in corporate, general and administrative expenses, $2.5 million in sales and marketing, and $1.2 million in cost of care for the nine-months ended September 30, 2021.

As part of the pre-IPO equity conversion discussed above and in our Annual Report on Form 10-K for the year ended December 31, 2020, the profits interests that were subject to vesting over a period of continuous employment or service and were unvested upon the conversion were converted into RSAs and options that vest over the remaining requisite service period from the original grant dates. As a result of this conversion and modification of vesting terms from Sponsor's Exit to service-based vesting at the IPO, the Company determined that RSAs and options should be accounted for as a Type III modification (the award was not probable to vest prior to the modification but it was probable of vesting under the modified condition). The stock compensation expense, net of forfeitures, recorded for these modifications was $29.2 million and $87.0 million for the three and nine-months ended September 30, 2021, respectively, and $18.2 million for the three and nine-months ended September 30, 2020.

As of September 30, 2021, the Company had approximately $172.0 million in unrecognized compensation expense related to all non-vested awards (RSAs, options and RSUs) that will be recognized over the weighted-average period of 1.22 years.

28

**NOTE 10. COMMITMENTS AND CONTINGENCIES**

*Uncertainties*

The Company is presently, and from time to time, subject to various claims and lawsuits arising in the normal course of business. In the opinion of management, the ultimate resolution of these matters will not have a material adverse effect on the Company's financial position or results of operations.

The healthcare industry is subject to numerous laws and regulations of federal, state and local governments. These laws and regulations include, but are not limited to, matters such as licensure, accreditation, government healthcare program participation requirements, reimbursement for patient services, and Medicare and Medicaid fraud and abuse. Recently, government activity has increased with respect to investigations and allegations concerning possible violations of fraud and abuse statues and regulations by healthcare providers. Violations of these laws and regulations could result in expulsion from government healthcare programs together with imposition of significant fines and penalties, as well as significant repayments for patient services billed.

On November 1, 2021, the Company received a civil investigative demand ("CID") from the United States Department of Justice. According to the CID, the Department of Justice is investigating whether the Company may have violated the False Claims Act, 31 U.S.C. §§ 3729-3722. The CID requests certain documents and information related to the Company's relationships with third-party marketing agents and related to the Company's provision of free transportation to federal health care beneficiaries and requests information and documents related to such matters. We intend to cooperate with the Department of Justice and produce information and documentation in response to the CID. We are currently unable to predict the outcome of this investigation or whether litigation is probable. Regardless of the outcome, this inquiry has the potential to have an adverse impact on us due to any related defense and settlement costs, diversion of management resources, and other factors.

Management believes that the Company is in compliance with fraud and abuse as well as other applicable government laws and regulations. While no regulatory inquiries have been made, compliance with such laws and regulations is subject to government review and interpretation, as well as regulatory actions unknown at this time.

**NOTE 11. VARIABLE INTEREST ENTITIES**

Oak Street Health Physicians Group PC, OSH-IN Physicians Group PC, OSH-MI Physicians Group PC, OSH-OH Physicians Group LLC, OSH-PA Physicians Group PC, OSH-RI Physicians Group PC, Oak Street Health of Texas, PLLC, Griffin Myers Medical PC, Oak Street Health Physicians Group of South Carolina LLC, Oak Street Health Physicians Group of Louisiana LLC, Oak Street Health Physicians Group of Mississippi LLC, Oak Street Health Physicians Group of Alabama, LLC, Oak Street Health Physicians Group of Kentucky, LLC, Oak Street Health Physicians Group of Missouri, Oak Street Health Physicians Group of New Mexico, LLC, Oak Street Health Physicians Group of Arizona, PLLC and Oak Street Health Physicians Group of Oklahoma, LLC (collectively, the "Physician Groups") employ healthcare providers to deliver primary care services to the Medicare covered population of Alabama, Georgia, Illinois, Indiana, Kentucky, Louisiana, Michigan, Mississippi, New Mexico, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, Rhode Island, South Carolina, Tennessee and Texas. The Physician Groups were established to employ healthcare providers, contract with managed care payors and to deliver healthcare services to patients in the markets that the Company serves. The Company concluded that it has variable interests in the Physician Groups on the basis of its Administrative Service Agreement ("ASA") which provides for reimbursement of costs and a management fee payable to the Company from the Physician Groups in exchange for providing management and administrative services which creates risks and a potential return to the Company. The Physician Group's equity at risk, as defined by U.S. GAAP, is insufficient to finance its activities without additional support, and, therefore, the Physician Groups are considered VIEs.

The table below illustrates the VIE assets and liabilities and performance for the Physician Groups as of and for the periods ended ($ in millions):

| | | September 30, 2021 | | December 31, 2020 |
|---|---|---|---|---|
| Total assets | $ | 509.4 | $ | 286.1 |
| Total liabilities | | 499.7 | | 332.1 |

29

| | Three-Months Ended | | Nine-Months Ended | |
| --- | --- | --- | --- | --- |
| | September 30, 2021 | September 30, 2020 | September 30, 2021 | September 30, 2020 |
| Total revenues | $ 386.4 | $ 213.9 | $ 1,031.3 | $ 622.7 |
| Medical claims expense | 308.5 | 153.4 | 790.4 | 439.4 |
| Cost of care | 36.8 | 14.5 | 104.2 | 44.1 |
| Total operating expenses | $ 345.3 | $ 167.9 | $ 894.6 | $ 483.5 |

There are no restrictions on the Physician Groups' assets or on the settlement of its liabilities. The assets of the Physician Groups can be used to settle obligations of the Company. The Physician Groups are included in the Company's obligated group; thus, creditors of the Company have recourse to the assets owned by the Physician Groups. There are no liabilities for which creditors of the Physician Groups do not have recourse to the general credit of the Company. There are no restrictions placed on the retained earnings or net income of the Physician Groups with respect to potential dividend payments.

## NOTE 12. RELATED PARTIES

*Humana*

Humana holds over 5% of our common stock. Additionally, a Humana representative served on the Board of Directors from 2019 until their retirement, effective September 7, 2021. Humana no longer has a representative on the Board of Directors as of September 7, 2021. The Company has capitated managed care contracts with Humana which result in capitated revenues and related receivables. Within the Company's other patient services revenue, revenues from Humana are included in both fee-for-service revenue and care coordination revenue. The unearned portion of the Care Coordination Payments was recorded as a contract liability in both the short-term and long-term other liabilities accounts. The Company also incurs medical claims expenses related to the Humana payor contracts which are included in third-party medical expenses. Related unpaid claims are included in the liability for unpaid claims financial statement caption.

The Humana Alliance Provision contains an arrangement for a license fee that is payable by the Company to Humana for the Company's provision of health care services in certain centers owned or leased by Humana. The license fee is a reimbursement to Humana for its costs of owning or leasing and maintaining the centers, including rental payments, center maintenance or repair expenses, equipment expenses, special assessments, cost of upgrades, taxes, leasehold improvements, and other expenses identified by Humana and is included in cost of care expenses in the consolidated statement of operations. The Company adopted ASC 842 as of January 1, 2021 and recorded an ROU asset and liability related to Humana leases. The liability was recorded in both the short-term and long-term other liabilities accounts.

The below tables present the balances related to Humana as of September 30, 2021 and December 31, 2020 and for the three- and nine-months ended September 30, 2021 and 2020 ($ in millions):

| | September 30, 2021 | December 31, 2020 |
| --- | --- | --- |
| **Assets:** | | |
| Other patient service receivables | $ 0.1 | $ - |
| Capitated accounts receivables | 118.8 | 65.7 |
| Other current assets | 5.9 | - |
| Operating lease right-of-use assets | 60.8 | - |
| **Liabilities:** | | |
| Liability for unpaid claims | $ 97.8 | $ 78.5 |
| *Other liabilities* | | |
| Short-term license fees | 5.3 | 0.6 |
| Short-term contract liability | 5.4 | 4.0 |
| Short-term operating lease liability | 5.9 | - |
| Long-term operating lease liabilities | 56.6 | - |
| Deferred rent | - | 0.8 |
| *Other long-term liabilities:* | | |
| Long-term license fees | 13.4 | 7.3 |
| Long-term contract liability | 22.8 | 12.8 |
| **Equity:** | | |
| Additional paid-in capital | $ 50.0 | $ 50.0 |

30

**ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

For information regarding our exposure to certain market risks, see "Quantitative and Qualitative Disclosures about Market Risk," in Part II, Item 7A of our Annual Report on Form 10-K for the year ended December 31, 2020. There have been no material changes in our market risk exposures for the nine-months ended September 30, 2021, as compared to those discussed in our Annual Report on Form 10-K for the year ended December 31, 2020, other than as discussed below.

**Interest Rate Sensitivity**

We had cash and cash equivalents of $258.3 million as of September 30, 2021, compared to $419.7 million as of December 31, 2020, held primarily in cash deposits and money market funds for working capital purposes.

We had marketable debt securities of $771.3 million as of September 30, 2021, compared to $0.0 million as of December 31, 2020, consisting of U.S. Treasury obligations, corporate bonds, available-for-sale securities and others. Our investments are made for capital preservation purposes. We do not enter into investments for trading or speculative purposes. All our investments are denominated in U.S. dollars.

Our cash and cash equivalents, marketable debt securities and debt are subject to market risk due to changes in interest rates. Fixed rate securities may have their market value negatively impacted due to a rise in interest rates, while floating rate securities may produce less income than expected if interest rates fall. Due in part to these factors, our future investment income may fall short of expectation due to changes in interest rates or we may suffer losses in principal if we are forced to sell securities that decline in market value due to changes in interest rates.

We do not believe that an increase or decrease in interest rates of 100 basis points would have a material effect on our business, financial condition or results of operations.

**ITEM 4. CONTROLS AND PROCEDURES**

**Evaluation of Disclosure Controls and Procedures**

Under the supervision and with the participation of our management, including the Chief Executive Officer and Chief Financial Officer, we have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as of the end of the period covered by this report. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that these disclosure controls and procedures were effective as of September 30, 2021.

**Changes to our Internal Controls over Financial Reporting**

There were no material changes in our internal control over financial reporting during the nine-months ended September 30, 2021 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. As a result of the COVID-19 pandemic, certain employees began working remotely in March 2020. We have not identified any material changes in our internal control over financial reporting as a result of these changes to the working environment, in part because our internal control over financial reporting was designed to operate in a remote working environment. We are continually monitoring and assessing the COVID-19 situation to determine any potential impact on the design and operating effectiveness of our internal controls over financial reporting.

**PART II. OTHER INFORMATION**

**ITEM 1. LEGAL PROCEEDINGS**

See Note 10, Commitments - Litigation and Contingencies to Oak Street Health, Inc.'s Consolidated Financial Statements in Part I, Item 1 of this Quarterly Report on Form 10-Q.

**ITEM 1A. RISK FACTORS**

There have been no material changes to the risk factors disclosed under Part I, Item 1A "Risk Factors" in our Annual Report on Form 10-K for the year ended December 31, 2020 and our Form 10-Q for the quarters ended March 31, 2021 and June 30, 2021, other than those noted below.

*Risks Related to our Business*

**We have been in the past and may continue to be subject to legal proceedings and litigation, including intellectual property and privacy disputes, which are costly to defend and could materially harm our business and results of operations.**

We have been in the past and may continue to be party to lawsuits and legal proceedings in the normal course of business. These matters are often expensive and disruptive to normal business operations. We may face allegations, lawsuits and regulatory inquiries, audits and investigations regarding data privacy, security, labor and employment, consumer protection and intellectual property infringement, including claims related to privacy, patents, publicity, trademarks, copyrights and other rights. We may also face allegations or litigation related to our acquisitions, securities issuances or business practices, including public disclosures about our business. Litigation and regulatory proceedings may be protracted and expensive, and the results are difficult to predict. Certain of these matters may include speculative claims for substantial or indeterminate amounts of damages and include claims for injunctive relief. Additionally, our litigation costs could be significant. Adverse outcomes with respect to litigation or any of these legal proceedings may result in significant settlement costs or judgments, penalties and fines, or require us to modify our services or require us to stop serving certain patients or geographies, all of which could negatively impact our geographical expansion and revenue growth. We may also become subject to periodic audits, which would likely increase our regulatory compliance costs and may require us to change our business practices, which could negatively impact our revenue growth. Managing legal proceedings, litigation and audits, even if we achieve favorable outcomes, is time-consuming and diverts management's attention from our business.

The results of regulatory proceedings, litigation, claims, and audits cannot be predicted with certainty, and determining reserves for pending litigation and other legal, regulatory and audit matters require significant judgment. There can be no assurance that our expectations will prove correct, and even if these matters are resolved in our favor or without significant cash settlements, these matters, and the time and resources necessary to litigate or resolve them, could harm our reputation, business, financial condition, results of operations and the market price of our common stock.

We also may be subject to lawsuits under the False Claims Act (the "FCA") and comparable state laws for submitting allegedly fraudulent or otherwise inappropriate bills for services to the Medicare and Medicaid programs. These lawsuits, which may be initiated by government authorities as well as private party relators, can involve significant monetary damages, fines, attorney fees and the award of bounties to private plaintiffs who successfully bring these suits, as well as to the government programs. In recent years, government oversight and law enforcement have become increasingly active and aggressive in investigating and taking legal action against potential fraud and abuse.

For example, on November 1, 2021, the Company received a civil investigative demand ("CID") from the United States Department of Justice. According to the CID, the Department of Justice is investigating whether the Company may have violated the False Claims Act, 31 U.S.C. §§ 3729-3722. The CID requests certain documents and information related to the Company's relationships with third-party marketing agents and related to the Company's provision of free transportation to federal health care beneficiaries and requests information and documents related to such matters. We intend to cooperate with the Department of Justice and produce information and documentation in response to the CID. We are currently unable to predict the outcome of this investigation or whether litigation is probable. Regardless of the outcome, this inquiry has the potential to have an adverse impact on us due to any related defense and settlement costs, diversion of management resources, and other factors. See Note 10, Commitments and Contingencies.

Furthermore, our business exposes us to potential medical malpractice, professional negligence or other related actions or claims that are inherent in the provision of healthcare services. These claims, with or without merit, could cause us to incur substantial costs, and could place a significant strain on our financial resources, divert the attention of management from our core business, harm our reputation and adversely affect our ability to attract and retain patients, any of which could have a material adverse effect on our business, financial condition and results of operations.

Although we maintain third-party professional liability insurance coverage, it is possible that claims against us may exceed the coverage limits of our insurance policies. Even if any professional liability loss is covered by an insurance policy, these policies typically have substantial deductibles for which we are responsible.

Professional liability claims in excess of applicable insurance coverage could have a material adverse effect on our business, financial condition and results of operations. In addition, any professional liability claim brought against us, with or without merit, could result in an increase of our professional liability insurance premiums. Insurance coverage varies in cost and can be difficult to obtain, and we cannot guarantee that we will be able to obtain insurance coverage in the future on terms acceptable to us or at all. If our costs of insurance and claims increase, then our earnings could decline.

### *Risks Related to Regulation*

**If we fail to adhere to all of the complex government laws and regulations that apply to our business, we could suffer severe consequences that could have a material adverse effect on our business, results of operations, financial condition, cash flows, reputation and stock price.**

Our operations are subject to extensive federal, state and local government laws and regulations, such as:

- Medicare and Medicaid reimbursement rules and regulations;
- federal and state anti-kickback laws, which prohibits the knowing and willful offer, payment, solicitation or receipt of any bribe, kickback, rebate or other remuneration for referring an individual, in return for ordering, leasing, purchasing or recommending or arranging for or to induce the referral of an individual or the ordering, purchasing or leasing of items or services covered, in whole or in part, by any federal healthcare program, such as Medicare and Medicaid;
- the Self-Referral Law and analogous state self-referral prohibition statutes, which, subject to limited exceptions, prohibits physicians from referring Medicare or Medicaid patients to an entity for the provision of certain "designated health services" if the physician or a member of such physician's immediate family has a direct or indirect financial relationship (including an ownership interest or a compensation arrangement) with an entity, and prohibit the entity from billing Medicare or Medicaid for such "designated health services";
- the FCA and associated regulations, that imposes civil and criminal liability on individuals or entities that knowingly submit false or fraudulent claims for payment to the government or knowingly making, or causing to be made, a false statement in order to have a false claim paid, including qui tam or whistleblower suits;
- the Civil Monetary Penalty statute and associated regulations, which authorizes the government agent to impose civil money penalties, an assessment, and program exclusion for various forms of fraud and abuse involving the Medicare and Medicaid programs;
- federal and state laws regarding the collection, use and disclosure of patient health information (e.g., HIPAA) and the storage, handling, shipment, disposal and/or dispensing of pharmaceuticals and blood products and other biological materials and many other applicable state and federal laws and requirements;
- state and federal statutes and regulations that govern workplace health and safety;
- federal and state laws and policies that require healthcare providers to maintain licensure, certification or accreditation to enroll and participate in the Medicare and Medicaid programs, to report certain changes in their operations to the agencies that administer these programs and, in some cases, to re-enroll in these programs when changes in direct or indirect ownership occur; and
- federal and state laws pertaining to the provision of services by nurse practitioners and physician assistants certain settings, physician supervision of those services, and reimbursement requirements that depend on the types of services provided and documented and relationships between physician supervisors and nurse practitioners and physician assistants.

In addition to the above laws, Medicare and Medicaid regulations, manual provisions, local coverage determinations, national coverage determinations and agency guidance also impose complex and extensive requirements upon healthcare providers. Moreover, the various laws and regulations that apply to our operations are often subject to varying interpretations and additional laws and regulations potentially affecting providers continue to be promulgated that may impact us. A violation or departure from any of the legal requirements implicated by our business may result in, among other things, government audits, lower reimbursements, significant fines and penalties, the potential loss of certification, recoupment efforts or voluntary repayments.

These legal requirements are civil, criminal and administrative in nature depending on the law or requirement.

48

We endeavor to comply with all legal requirements. We further endeavor to structure all of our relationships with physicians and providers to comply with state and federal anti-kickback physician and Stark laws and other applicable healthcare laws. We utilize considerable resources to monitor laws and regulations and implement necessary changes. However, the laws and regulations in these areas are complex, changing and often subject to varying interpretations. As a result, there is no guarantee that we will be able to adhere to all of the laws and regulations that apply to our business, and any failure to do so could have a material adverse impact on our business, results of operations, financial condition, cash flows and reputation. For example, if an enforcement agency were to challenge the level of compensation that we pay our medical directors or the number of medical directors whom we engage, or otherwise challenge these arrangements, we could be required to change our practices, face criminal or civil penalties, pay substantial fines or otherwise experience a material adverse impact on our business, results of operations, financial condition, cash flows and reputation as a result. Similarly, we may face penalties under the FCA, the federal Civil Monetary Penalty statute or otherwise related to failure to report and return overpayments within 60 days of when the overpayment is identified and quantified. These obligations to report and return overpayments could subject our procedures for identifying and processing overpayments to greater scrutiny. We have made investments in resources to decrease the time it takes to identify, quantify and process overpayments, and may be required to make additional investments in the future.

Additionally, the federal government has used the FCA to prosecute a wide variety of alleged false claims and fraud allegedly perpetrated against Medicare, Medicaid and other federally funded health care programs. Moreover, amendments to the federal Anti-Kickback Statute in the ACA make claims tainted by anti-kickback violations potentially subject to liability under the FCA, including qui tam or whistleblower suits. The penalties for a violation of the FCA range from $5,500 to $11,000 (adjusted for inflation) for each false claim plus three times the amount of damages caused by each such claim which generally means the amount received directly or indirectly from the government. On June 19, 2020, the DOJ issued a final rule announcing adjustments to FCA penalties, under which the per claim range increases to a range from $11,665 to $23,331 per claim, so long as the underlying conduct occurred after November 2, 2015. Given the high volume of claims processed by our various operating units, the potential is high for substantial penalties in connection with any alleged FCA violations.

On November 1, 2021, the Company received a civil investigative demand ("CID") from the United States Department of Justice. According to the CID, the Department of Justice is investigating whether the Company may have violated the False Claims Act, 31 U.S.C. §§ 3729-3722. The CID requests certain documents and information related to the Company's relationships with third-party marketing agents and related to the Company's provision of free transportation to federal health care beneficiaries and requests information and documents related to such matters. We intend to cooperate with the Department of Justice and produce information and documentation in response to the CID. We are currently unable to predict the outcome of this investigation or whether litigation is probable. Regardless of the outcome, this inquiry has the potential to have an adverse impact on us due to any related defense and settlement costs, diversion of management resources, and other factors. See Note 10, Commitments and Contingencies.

In addition to the provisions of the FCA, which provide for civil enforcement, the federal government can use several criminal statutes to prosecute persons who are alleged to have submitted false or fraudulent claims for payment to the federal government.

If any of our operations are found to violate these or other government laws or regulations, we could suffer severe consequences that would have a material adverse effect on our business, results of operations, financial condition, cash flows, reputation and stock price, including:

- suspension or termination of our participation in government payment programs;
- refunds of amounts received in violation of law or applicable payment program requirements dating back to the applicable statute of limitation periods;
- loss of our required government certifications or exclusion from government payment programs;
- loss of our licenses required to operate healthcare facilities or administer pharmaceuticals in the states in which we operate;
- criminal or civil liability, fines, damages or monetary penalties for violations of healthcare fraud and abuse laws, including the federal Anti-Kickback Statute, Civil Monetary Penalties Law, Stark Law and FCA, or other failures to meet regulatory requirements;
- enforcement actions by governmental agencies and/or state law claims for monetary damages by patients who believe their PHI has been used, disclosed or not properly safeguarded in violation of federal or state patient privacy laws, including HIPAA and the Privacy Act of 1974;
- mandated changes to our practices or procedures that significantly increase operating expenses;
- imposition of and compliance with corporate integrity agreements that could subject us to ongoing audits and reporting requirements as well as increased scrutiny of our billing and business practices which could lead to potential fines, among other things;
- termination of various relationships and/or contracts related to our business, including joint venture arrangements, medical director agreements, real estate leases and consulting agreements with physicians; and

49

- harm to our reputation which could negatively impact our business relationships, affect our ability to attract and retain patients and physicians, affect our ability to obtain financing and decrease access to new business opportunities, among other things.

We are, and may in the future be, a party to various lawsuits, demands, claims, qui tam suits, governmental investigations and audits (including investigations or other actions resulting from our obligation to self-report suspected violations of law) and other legal matters, any of which could result in, among other things, substantial financial penalties or awards against us, mandated refunds, substantial payments made by us, required changes to our business practices, exclusion from future participation in Medicare, Medicaid and other healthcare programs and possible criminal penalties, any of which could have a material adverse effect on our business, results of operations, financial condition, cash flows and materially harm our reputation.

We may in the future be subject to investigations and audits by state or federal governmental agencies and/ or private civil qui tam complaints filed by relators and other lawsuits, demands, claims and legal proceedings, including investigations or other actions resulting from our obligation to self-report suspected violations of law.

Responding to subpoenas, investigations and other lawsuits, claims and legal proceedings as well as defending ourselves in such matters will continue to require management's attention and cause us to incur significant legal expense. Negative findings or terms and conditions that we might agree to accept as part of a negotiated resolution of pending or future legal or regulatory matters could result in, among other things, substantial financial penalties or awards against us, substantial payments made by us, harm to our reputation, required changes to our business practices, exclusion from future participation in the Medicare, Medicaid and other healthcare programs and, in certain cases, criminal penalties, any of which could have a material adverse effect on us. It is possible that criminal proceedings may be initiated against us and/or individuals in our business in connection with investigations by the federal government.

We, our affiliated physicians and the facilities in which we operate are subject to various federal, state and local licensing and certification laws and regulations and accreditation standards and other laws, relating to, among other things, the adequacy of medical care, equipment, privacy of patient information, physician relationships, personnel and operating policies and procedures. Failure to comply with these licensing, certification and accreditation laws, regulations and standards could result in our services being found non-reimbursable or prior payments being subject to recoupment, requirements to make significant changes to our operations and can give rise to civil or, in extreme cases, criminal penalties. We routinely take the steps we believe are necessary to retain or obtain all requisite licensure and operating authorities. While we have made reasonable efforts to substantially comply with federal, state and local licensing and certification laws and regulations and standards as we interpret them, we cannot assure you that agencies that administer these programs will not find that we have failed to comply in some material respects.