**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| REGINALD T. ALLISON, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> OAK STREET HEALTH, INC., et al., <br><br> Defendants. | Case No. 1:22-cv-00149 <br><br> <u>CLASS ACTION</u> <br><br> Hon. Matthew F. Kennelly |

<u>**LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**</u>

# TABLE OF CONTENTS

Page

I.    PRELIMINARY STATEMENT ........................................................................1

II.   STATEMENT OF FACTS .............................................................................3

    A.    Background ..........................................................................................3

    B.    Oak Street's "Better Mousetrap" Business Is Designed To Exploit Medicare And Medicare Advantage Payments .......................................4

    C.    Desperate To Add Patients To Offset Losses, Oak Street Violates Anti-Kickback Laws ......................................................................................5

         1.    Defendants Needed To Justify Oak Street's IPO Valuation ......................6

         2.    Oak Street Engaged In Aggressive And Improper Patient Acquisition Tactics Before And After The IPO ..........................................7

         3.    Three Public Offerings In Five Months Enabled Insiders To Sell Company Stock At Near Record Prices......................................................9

    D.    After The Insider Sales, The Hidden Truth Becomes Public .................9

III.   ARGUMENT ................................................................................................10

    A.    The Complaint Adequately Alleges Securities Fraud...........................10

         1.    The Complaint Adequately Alleges Falsity.............................................11

         2.    The Complaint Sufficiently Alleges Violations Of Items 303 And 105 Of Regulation S-K .......................................................................23

         3.    The Complaint Raises A Strong Inference Of Scienter...........................27

         4.    The Complaint Adequately Pleads Loss Causation ................................37

    B.    The Complaint Adequately Alleges Strict Liability Securities Act Claims..........39

         1.    The Complaint Adequately Alleges Materially False And Misleading Statements..........................................................................40

         2.    Plaintiffs Have Standing For The Section 11 Claims...............................41

         3.    Plaintiffs Have Standing For Section 12(a)(2) Claims............................42

    C.    The Complaint Adequately Alleges Control Person Claims................44

IV.   CONCLUSION .............................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABN AMRO Inc. v. Cap. Int'l Ltd.*,
595 F. Supp. 2d 805 (N.D. Ill. 2008)...................................................................43

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020) .................................................................................18

*In re Acadia Pharms. Inc. Sec. Litig.*,
2020 WL 2838686 (S.D. Cal. June 1, 2020)................................................. 15, 39

*Adams v. Kinder-Morgan, Inc.*,
340 F.3d 1083 (10th Cir. 2003).............................................................................36

*In re Akorn, Inc. Sec. Litig.*,
240 F. Supp. 3d 802 (N.D. Ill. 2017)........................................................ 22, 37, 44

*In re Allstate Corp. Sec. Litig.*,
2020 WL 7490280 (N.D. Ill. Dec. 21, 2020)........................................................21

*In re Am. Bank Note Holographics, Inc. Sec. Litig.*,
93 F. Supp. 2d 424 (S.D.N.Y. 2000).....................................................................43

*Anderson v. Abbott Lab'ys.*,
140 F. Supp. 2d 894 (N.D. Ill. 2001).....................................................................16

*In re Apple Inc. Sec. Litig.*,
2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ........................................................35

*Ark. Tchr. Ret. Sys. v. Bankrate, Inc.*,
18 F. Supp. 3d 482 (S.D.N.Y. 2014).....................................................................45

*Asher v. Baxter Int'l Inc.*,
377 F.3d 727 (7th Cir. 2004) ...................................................................... 1, 20, 21

*Azar v. Grubhub, Inc.*,
2021 WL 4077327 (N.D. Ill. Sept. 7, 2021) ............................................. 11, 27, 36

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ...............................................................................................13

*Bond v. Clover Health Invs., Corp.*,
2022 WL 602432 (M.D. Tenn. Feb. 28, 2022)................................... 2, 12, 25, 35

*Borsellino v. Goldman Sachs Grp., Inc.*,
477 F.3d 502 (7th Cir. 2007) .................................................................................40

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
  556 F. Supp. 3d 100 (D. Conn. 2021) .................................................................38

*Brasher v. Broadwind Energy, Inc.*,
  2012 WL 1357699 (N.D. Ill. Apr. 19, 2012) ................................................. 31, 45

*In re Carnival Corp. Sec. Litig.*,
  2022 U.S. Dist. LEXIS 58526 (S.D. Fla. Mar. 30, 2022) ...................................16

*Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.*,
  2018 WL 1071442 (N.D. Ill. Feb. 27, 2018) ..............................................*passim*

*Cent. Laborers' Pension Fund v. SIRVA, Inc.*,
  2006 WL 2787520 (N.D. Ill. Sept. 22, 2006) .....................................................41

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
  2021 WL 3727095 (S.D.N.Y. Aug. 23, 2021) ....................................................12

*City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*,
  2013 WL 566805 (N.D. Ill. Feb. 13, 2013) ................................... 23, 28, 32, 36-37

*City of Warren Police & Fire Ret. Sys. v. Zebra Techs. Corp.*,
  8 F.4th 592 (7th Cir. 2021) ...............................................................................23

*Crespo v. Colvin*,
  824 F.3d 667 (7th Cir. 2016) ............................................................................13

*In re Deutsche Bank AG Sec. Litig.*,
  2016 WL 4083429 (S.D.N.Y. July 25, 2016) .....................................................42

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005) .........................................................................................37

*In re Equifax Inc. Sec. Litig.*,
  357 F. Supp. 3d 1189 (N.D. Ga. 2019) ..............................................................17

*Evergreen Fund, Ltd. v. McCoy*,
  2000 WL 1693963 (N.D. Ill. Nov. 6, 2000) .......................................................40

*In re Facebook, Inc. Sec. Litig.*,
  405 F. Supp. 3d 809 (N.D. Cal. 2019).................................................................17

*Flynn v. Exelon Corp.*,
  2021 WL 1561712 (N.D. Ill. Apr. 21, 2021) .................................... 16, 24, 30, 33

*Fryman v. Atlas Fin. Holdings, Inc.*,
  2022 WL 1136577 (N.D. Ill. Apr. 18, 2022) ..............................................*passim*

*In re GeoPharma, Inc. Sec. Litig.*,
  411 F. Supp. 2d 434 (S.D.N.Y. 2006)................................................................35

*Glickenhaus & Co. v. Household Int'l, Inc.*,
787 F.3d 408 (7th Cir. 2015) ............................................. 38

*In re Glob. Crossing, Ltd. Sec. Litig.*,
2005 WL 1907005 (S.D.N.Y. Aug. 8, 2005) ........................ 45

*In re GoHealth, Inc. Sec. Litig.*,
2022 WL 1016389 (N.D. Ill. Apr. 5, 2022) ................... 21, 23, 40

*In re GoHealth, Inc. Sec. Litig.*,
2022 WL 1136576 (N.D. Ill. Apr. 18, 2022) ........................ 45

*In re Groupon, Inc. Sec. Litig.*,
2013 WL 12284524 (N.D. Ill. Sept. 18, 2013) ................... 40, 41

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) ......................................................... 10

*Heavy & General Laborers' Local 472 & 172 Pension & Annuity Funds v. Fifth Third Bancorp*,
2022 WL 1642221 (N.D. Ill. May 24, 2022) ................... 16, 23, 29

*Hedick v. Kraft Heinz Co.*,
2021 WL 3566602 (N.D. Ill. Aug. 11, 2021) .................... *passim*

*Hevesi v. Citigroup Inc.*,
366 F.3d 70 (2d Cir. 2004) .................................................. 41

*Higginbotham v. Baxter Int'l Inc.*,
495 F.3d 753 (7th Cir. 2007) ............................................. 37

*Holwill v. AbbVie Inc.*,
2020 WL 5235005 (N.D. Ill. Sept. 1, 2020) .................... *passim*

*Howard v. Arconic*,
2021 WL 2561895 (W.D. Pa. June 23, 2021) ...................... 19-20

*In re iDreamSky Tech. Ltd. Sec. Litig.*,
236 F. Supp. 3d 824 (S.D.N.Y. 2017) .................................. 42

*Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*,
2022 WL 3591140 (10th Cir. Aug. 23, 2022) ................... 29, 34

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
818 F.3d 85 (2d Cir. 2016) ................................................. 26

*Inst. Inv'rs Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009) ........................................... 28, 37

*In re Intuitive Surgical Sec. Litig.*,
  2017 WL 4355072 (N.D. Cal. Sept. 29, 2017) ...................................................19

*Jones v. Corus Bankshares, Inc.*,
  701 F. Supp. 2d 1014 (N.D. Ill. 2010) .................................................................33

*Lindelow v. Hill*,
  2001 WL 830956 (N.D. Ill. July 20, 2001) .........................................................34

*Lloyd v. CVB Fin. Corp.*,
  811 F. 3d 1200 (9th Cir. 2016) ...........................................................................39

*Loos v. Immersion Corp.*,
  762 F.3d 880 (9th Cir. 2014) ..............................................................................39

*Lopez v. CTPartners Exec. Search Inc*,
  173 F. Supp. 3d 12 (S.D.N.Y. 2016).................................................................25

*Lowry v. RTI Surgical Holdings, Inc.*,
  532 F. Supp. 3d 652 (N.D. Ill. 2021) (Kennelly, J.)...................................... 36, 37

*Macovski v. Groupon Inc.*,
  553 F. Supp. 3d 460 476 (N.D. Ill. 2021) (Kennelly, J.).....................................22

*Makor Issues & Rts., Ltd. v. Tellabs, Inc.*,
  437 F.3d 588 (7th Cir. 2006), *vacated on other grounds*, 551 U.S. 308 (2007)..............*passim*

*Makor Issues & Rts., Ltd. v. Tellabs, Inc.*,
  513 F.3d 702 (7th Cir. 2008) ...........................................................................*passim*

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ..............................................................................................26

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
  540 F.3d 1049 (9th Cir. 2008) ............................................................................29

*In re Midway Games, Inc. Sec. Litig.*,
  332 F. Supp. 2d 1152 (N.D. Ill. 2004)................................................................23

*Mogell v. Calhoun*
  2016 WL 3369233 (C.D. Ill. Mar. 15, 2016).......................................................16

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
  455 F. App'x 10 (2d Cir. 2011) ...........................................................................37

*Norfolk Cnty. Ret. Sys. v. Ustian*,
  2009 WL 2386156 (N.D. Ill. July 28, 2009).......................................................29

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l., Inc.*,
  367 F. Supp. 3d 16 (S.D.N.Y. 2019).................................................................25

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015) .................................................................... 11, 19, 39

*Pension Tr. Fund for Operating Eng'rs v. Assisted Living Concepts, Inc.*,
2013 WL 3154116 (E.D. Wis. June 21, 2013) .................................... 37

*Pension Tr. Fund for Operating Eng'rs v. DeVry Educ. Grp., Inc.*,
2017 WL 6039926 (N.D. Ill. Dec. 6, 2017) ........................................ 16

*In re Petrobras Sec. Litig.*,
152 F. Supp. 3d 186 (S.D.N.Y. 2016) ................................................ 43

*Pierrelouis v. Gogo, Inc.*,
2021 WL 1608342 (N.D. Ill. Apr. 26, 2021) ...................................... 20

*Pinter v. Dahl*,
486 U.S. 622 (1988) ........................................................................ 43

*Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v.*
*Allscripts-Misys Healthcare Sols., Inc.*,
778 F. Supp. 2d 858 (N.D. Ill. 2011)................................................ 27

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
89 F. Supp. 3d 602 (S.D.N.Y. 2015) ................................................ 38

*Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*,
673 F. Supp. 2d 718 (S.D. Ind. 2009) .............................................. 26

*In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*,
387 F. Supp. 2d 1130 (D. Colo. 2005) .............................................. 35

*Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard*
*Co.*,
845 F.3d 1268 (9th Cir. 2017) ......................................................... 16

*Ross v. Career Educ. Corp.*,
2012 WL 5363431 (N.D. Ill. Oct. 30, 2012) (Kennelly, J.) ...................... *passim*

*Rossy v. Merge Healthcare, Inc.*,
169 F. Supp. 3d 774 (N.D. Ill. 2015)................................................ 37

*Rubinstein v. Gonzalez*,
241 F. Supp. 3d 841 (N.D. Ill. 2017)................................................ 36

*Schleicher v. Wendt*,
529 F. Supp. 2d 959 (S.D. Ind. 2007) .............................................. 31

*In re Sears, Roebuck & Co. Sec. Litig.*,
291 F. Supp. 2d 722 (N.D. Ill. 2003)................................................ 33

*SEC v. Ustian*,
　　2019 WL 7486835 (N.D. Ill. Dec. 13, 2019)...................................................13-14

*SEC v. Ustian*,
　　229 F. Supp. 3d 739 (N.D. Ill. 2017)...............................................................19

*Selbst v. McDonald's Corp.*,
　　2005 WL 2319936 (N.D. Ill. Sept. 21, 2005) ....................................................33

*Set Cap. LLC v. Credit Suisse Grp. AG*,
　　996 F.3d 64 (2d Cir. 2021) ...........................................................................27

*Shah v. Zimmer Biomet Holdings, Inc.*,
　　348 F. Supp. 3d 821 (N.D. Ind. 2018)..............................................................20

*Silverman v. Motorola, Inc.*,
　　2008 WL 4360648 (N.D. Ill. Sept. 23, 2008) ...............................................44, 45

*Silverman v. Motorola, Inc.*,
　　798 F. Supp. 2d 954 (N.D. Ill. 2011)...............................................................38

*Singer v. Reali*,
　　883 F.3d 425 (4th Cir. 2018) .........................................................................15

*Singh v. Cigna Corp.*,
　　918 F.3d 57 (2d Cir. 2019) ...........................................................................16

*Stavros v. Exelon Corp.*,
　　266 F. Supp. 2d 833 (N.D. Ill. 2003)...............................................................30

*Stephenson v. Hartford Life & Annuity Ins. Co.*,
　　2003 WL 22232968 (N.D. Ill. Sept. 26, 2003) ..................................................30

*Stransky v. Cummins Engine Co., Inc.*,
　　51 F. 3d 1329 (7th Cir. 1995) ........................................................................13

*Twin Master Fund, Ltd. v. Akorn, Inc.*,
　　2020 WL 564222 (N.D. Ill. Feb. 5, 2020) (Kennelly, J.)....................................24

*U.S. v. George*,
　　171 F. Supp. 3d 810 (N.D. Ill. 2016), *aff'd* 900 F. 3d 405 (7th Cir. 2018)......................6, 13

*In re Ulta Salon, Cosmetics & Fragrance, Inc. Sec. Litig.*,
　　604 F. Supp. 2d 1188 (N.D. Ill. 2009).............................................39, 40, 41, 43

*In re Valeant Pharms. Int'l, Inc. Sec. Litig.*,
　　2017 WL 1658822 (D.N.J. Apr. 28, 2017)........................................................41

*Van Noppen v. InnerWorkings, Inc.*,
　　136 F. Supp. 3d 922 (N.D. Ill. 2015)......................................20, 29, 36, 37

*Veal v. LendingClub Corp.*,
    423 F. Supp. 3d 785 (N.D. Cal. 2019)................................................................17

*Washtenaw Cnty. Emps.' Ret. Sys. v. Walgreen Co.*,
    2019 WL 4597518 (N.D. Ill. Sept. 23, 2019)....................................................38

*W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*,
    495 F. Supp. 3d 622 (N.D. Ill. 2020)............................................. 23, 25, 40, 42

**Statutes & Rules**

Affordable Care Act.............................................................................................8

Securities Act of 1933 §11 .......................................................................3, 39, 40

Securities Act of 1933 §12(a)(2) ..............................................................3, 39, 40

Securities Act of 1933 §15 .............................................................................3, 44

Securities Exchange Act of 1934 §10(b)................................................ 3, 10, 24, 40

Securities Exchange Act of 1934 §20(a)...........................................................3, 44

Fed R. Civ. P. Rule 8.....................................................................................37, 40

Fed R. Civ. P. Rule 9......................................................................................11, 40

Fed R. Civ. P. Rule 12(b)(6).........................................................................10, 29

Fed R. Civ. P. Rule 15(a) ....................................................................................10

42 C.F.R. §1001.952(f) .......................................................................................13

## I.    PRELIMINARY STATEMENT

This securities class action seeks redress for investors who purchased stock in Oak Street Health ("Oak Street" or the "Company") between August 6, 2020 through November 8, 2021, inclusive (the "Class Period").   After Defendants took Oak Street public, the controlling shareholders sold a staggering $1.4 billion of their stake in Oak Street and the Company's CEO and CFO cashed out more than $75 million, before it was revealed that the Company was violating the federal Anti-Kickback Statute ("AKS").   Yet, in their motion to dismiss, Defendants suggest investors had the same opportunity to cash out as the insiders did because Defendants warned them that "there is no guarantee we will be able to adhere to all of the laws and regulations that apply to our business."   ECF No. 59, Defendants' Memorandum of Law in Support of their Motion to Dismiss ("DM") at 2.   But the law is clear that boilerplate warnings of what bad things *could* happen are insufficient to escape liability when the defendants knew, or recklessly disregarded, that those things already *were* happening.   *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 733 (7th Cir. 2004) (holding insufficient to "highlight[] some parts of the business that might cause problems" as, "any issuer could list its lines of business, say 'we could have problems in any of these' and avoid liability").

The Complaint[1] alleges that the Company was violating perhaps the most well-known rule of its business, which prohibits companies from paying kickbacks to recruit patients.   More specifically, Oak Street was providing free transportation to prospective patients and paying third party agents to refer patients.   Such unsustainable and illegal tactics benefited Oak Street's insiders by pumping up the Company's financial performance metrics (and of course its stock price) while

---

[1] "Complaint" refers to Lead Plaintiffs' Complaint for Violations of the Federal Securities Laws.  ECF No. 40.  "¶" refers to paragraphs in the Complaint.  Capitalized terms not defined herein have the meanings assigned in the Complaint.

insiders were selling their shares, but left unwitting investors holding the bag when the government came knocking, which happened at the end of the Class Period. By the time of the filing of the Complaint, Oak Street's stock traded at only $18 per share, more the 70% below Class Period highs of $64 per share.

In addition to relying on generic "warnings," Defendants attempt to escape liability by arguing that the government is only in an "inquiry" phase of its investigation and that Defendants' wrongdoing is yet to be adjudicated. DM at 1. While that argument may hold force in situations where a Company may be relying upon legal or tax advisers to navigate grey areas of the law, the violations here are clear, and have been adequately pled. There is no reason to delay adjudication of this case.

In short, the securities laws were passed to allow investors to hold insiders accountable for their misconduct. Defendants should be held to account in this case. For example, when Defendants bragged about Oak Street's growing patient base and misleadingly claimed it was being achieved "***though our own internal sales and marketing efforts***" and by "***educat[ing] people about the importance of primary care and [why] Oak Street Health is a great place,***" they were obligated to disclose that growth was being achieved through illegal kickbacks. Similarly, Defendants misleadingly assured investors that Oak Street was "***not getting push[ed] patients from someone else***" and that its arrangements with "***external companies [that] assist with certain aspects of [patient acquisition] efforts . . . do not violate the Anti-Kickback Statute or other applicable laws,***" as they paid kickbacks to insurance agents and violated the AKS. While the PSLRA raised the level of specificity required at the pleading stage, it did not move the trial up to the pleading stage to permit Defendants to contest the factual allegations or refute that their tactics violated the kickback laws. *See Bond v. Clover Health Invs., Corp.*, 2022 WL 602432, at *22 (M.D. Tenn. Feb. 28, 2022) (finding PSLRA's pleading standards "are still *pleading* standards –

not evidentiary ones" and rejecting argument plaintiff failed to plead actual AKS violations) (emphasis in original); *Holwill v. AbbVie Inc.*, 2021 WL 1540998 (N.D. Ill. Apr. 19, 2021) (denying interlocutory appeal and finding AKS violations adequately pled despite federal court in same District having dismissed *qui tam* action based on same alleged violations).

As the Seventh Circuit has recognized, "the modern securities laws were designed . . . to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry." *Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 595 (7th Cir. 2006) ("*Tellabs I*"), *vacated on other grounds*, 551 U.S. 308 (2007) ("*Tellabs II*").[2] Defendants' conduct failed to meet that standard and their motion should be denied.

## II.    STATEMENT OF FACTS

### A.    Background

Plaintiffs seek to recover losses on behalf of all persons and entities who purchased or acquired the publicly traded common stock of Oak Street during the Class Period, including those who purchased Oak Street common stock pursuant or traceable to the registration statements and prospectuses issued in connection with Oak Street's Initial Public Offering ("IPO") and/or in the Company's secondary public offerings ("SPOs"). The Complaint asserts: (i) violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") against Oak Street, its CEO Michael Pykosz ("Pykosz"), its CFO Timothy Cook ("Cook" and together with Pykosz, "Individual Defendants", and with Oak Street and Pykosz, "Oak Street Defendants"), and controlling private equity shareholders General Atlantic (¶31) and Newlight (¶32) (together, the "Private Equity Defendants"); and (ii) non-fraud violations of §§11, 12(a)(2), and 15 of the

---

[2] All citations are omitted and emphasis is added unless otherwise noted.

Securities Act of 1933 (the "Securities Act") against the Oak Street Defendants, the Private Equity Defendants, the Director Defendants (¶¶218-229), and the Underwriter Defendants (¶¶231-236).

## B. Oak Street's "Better Mousetrap" Business Is Designed To Exploit Medicare And Medicare Advantage Payments

Founded in 2012 by Defendant Pykosz, Oak Street operates primary care centers for individuals eligible for Medicare – *i.e.,* over age 65. ¶¶33, 40. Most relevant to Oak Street's business, Medicare has a Medicare Advantage ("MA") program, under which the Centers for Medicare & Medicaid Services ("CMS") pays Medicare-approved private health companies to administer Medicare benefits. ¶37. CMS pays the healthcare company a per-person-per-month amount for each beneficiary, known as the "capitated" amount. ¶38. The healthcare companies then turn a profit if the healthcare costs remain below the capitated payments from CMS. ¶39.

Oak Street's operations center on MA beneficiaries for whom Defendant Pykosz claimed Oak Street had "built a better mousetrap." ¶41. Oak Street partners with MA plans by entering "capitation agreements," which allot about 85% of the MA plans' capitated payments to Oak Street if their plan members select Oak Street for primary care services. ¶42. Despite receiving 85% of the capitated payments, Oak Street bears full responsibility for all of the MA beneficiaries' medical costs. ¶42. Oak Street refers to these MA plan beneficiaries as its "at-risk" patients and these at-risk patients account for 97% of the Company's annual revenue. *Id.*

Oak Street must keep its at-risk patients' medical costs below the capitated revenue, or the Company loses money. ¶43. Lacking the cost-saving tools of the health insurance companies administering MA plans (*see* ¶39), Oak Street purports to achieve savings through: (1) superior diagnostic processes to better identify patient risks; and (2) provision of superior primary care. ¶¶44-46. Oak Street sought to open large numbers of centers to increase its odds for recruiting large numbers of patients to achieve profitability. ¶¶7, 48-49, 65-67. Notably, Oak Street has

never reported any profits and has always lost money.  ¶¶5, 47.  But, in seeking investment from the public, the Company suggested profitability would be achieved once enough patients were acquired and it could capitalize on the "total addressable market" of $325 billion.  ¶¶49, 65-67.

### C.    Desperate To Add Patients To Offset Losses, Oak Street Violates Anti-Kickback Laws

As Defendant Pykosz explained, "people aren't shopping for a doctor in the same consumer way they're shopping for other things," so simply opening locations and waiting for patients to enroll would be futile.  ¶50.  Instead, the Company needs to entice new patients to drop their existing primary care physicians and switch to Oak Street.  ¶50.  These sales and marketing efforts directed toward Medicare-eligible senior citizens placed Oak Street in the center of a highly regulated and highly scrutinized industry.  ¶¶50-51.

Two well-known laws relevant to Oak Street's patient recruitment efforts are: (1) the False Claims Act ("FCA"); and (2) the AKS.  ¶53.  The FCA prohibits any person or company from: (i) knowingly presenting or causing to be presented a false or fraudulent claim for payment to the government; or (2) knowingly making or causing to be made a false record or statement material to a false or fraudulent claim.  ¶53.  The AKS prohibits payment of any "remuneration (including any kickback, bribe, or rebate) directly or indirectly . . . in cash or in kind" to induce another person to receive, or refer a person for, services reimbursable under Medicare.  ¶54.  The "main purpose is to protect patients and the federal health care programs from fraud and abuse by curtailing the corrupting influence of money on health care decisions."  ¶54.  The U.S. Office of Inspector General ("OIG") has confirmed that "[r]emuneration from a [healthcare provider] to a patient that is intended to induce the patient to obtain [certain] services implicates the [AKS]."  ¶55.  The AKS and FCA are interrelated because submitting a payment claim to Medicare that is tainted by an AKS violation can give rise to FCA liability.  ¶53.

As noted, kickbacks include direct and indirect payments. ¶54. For example, the Seventh Circuit has held that referral fees paid "on a per-patient basis" are necessarily "based on the volume of referrals and is therefore remuneration for the purposes of the Anti-Kickback Statute." ¶57 (citing *U.S. v. George*, 171 F. Supp. 3d 810, 815 (N.D. Ill. 2016), *aff'd* 900 F. 3d 405 (7th Cir. 2018)). In addition, the OIG has made clear that "[f]ree transportation services offered by a [medical provider] to Federal health care program beneficiaries may have monetary value and implicate the [AKS]." ¶58. Specifically, prospective patients may not receive "free transportation" that is "marketed or advertised" because "there is greater risk that [it] is being offered as an inducement." ¶59. The AKS has a "safe harbor" provision for certain payments, but it does not include (i) payments for referral fees based on the volume of referrals (¶57); or (ii) the provision of free transportation to prospective, rather than established, patients (¶58). The Oak Street Defendants publicly admitted their awareness that violations of the AKS and FCA could expose the Company to "severe consequences that would have a material adverse effect on our business, results of operations, financial condition, cash flows, reputation and stock price." ¶61. Further, Defendants disclosed that violations could result in criminal investigations and prosecution, or even suspension from Medicare (the Company's sole revenue source). ¶¶60-61.

## 1. Defendants Needed To Justify Oak Street's IPO Valuation

Initially, Oak Street deployed its sales and marketing teams to host thousands of events near and at their clinics. ¶62 (citing Oak Street SEC filings reporting approximately 18,700 such events in 2019, prior to its IPO and the Class Period, including bingo events and Zumba classes). At the onset of the COVID-19 pandemic in March 2020, however, Oak Street was forced to suspend these efforts (¶¶63-64), leaving the Company bereft of its customary patient recruitment strategies. In response, Defendants embraced extremely aggressive patient acquisition tactics which violated the AKS and Medicare rules.

Yet, against this uncertain and unprecedented backdrop, Oak Street went public on August 5, 2020 pursuant to an Amended S-1 filed with the SEC (the "IPO Registration Statement"). ¶64. To entice investors to the IPO of a profitless company then unable to host in-person recruitment events, Defendants repeatedly touted the Company's "ability to rapidly scale" the number of new centers it planned to open, and bluntly stated, "Our business strategy is to grow rapidly." ¶¶65-66. The IPO Registration Statement underscored Defendants' awareness of their outsized dependence on attracting new patients to obtain revenue growth and become profitable, representing that Oak Street's "growth strategy . . . depends on our ability to grow organically and attract new patients." ¶67. Based on assurances that the Company could achieve such patient growth, Oak Street's market capitalization upon its August 2020 IPO exceeded $5 billion. ¶49.

The Oak Street IPO freed up billions of dollars of illiquid ownership interests for Defendants Newlight and General Atlantic, New York City-based private equity firms that held interests in Oak Street so large that the Company described itself a "controlled company" in its IPO Registration Statement. ¶¶31-32, 64, 207. Newlight and General Atlantic had invested millions of dollars into Oak Street in the years preceding the IPO – during which time the Company never made a profit – and the IPO and SPOs allowed Newlight and General Atlantic to cash out some of their Oak Street holdings at or near record high prices for Oak Street's stock. ¶¶5, 12.

### 2. Oak Street Engaged In Aggressive And Improper Patient Acquisition Tactics Before And After The IPO

To maintain its valuation before and after the IPO, Oak Street engaged in patient acquisition tactics that violated AKS, drastically increasing the risk of investing in Oak Street due to potential government scrutiny, investigations, fines, penalties, and even suspension or removal from Medicare. ¶¶60-61, 65-99, 131-41.

First, beginning around the time of the IPO, Oak Street started to pay outside insurance agents and brokers at least $200 per-patient for referrals to Oak Street. ¶¶69-71, 79, 85, 95-96, 135, 138-41. This so-called Client Awareness Program ("CAP") included insurance agents cold calling their own client rosters, often with Oak Street personnel on the line during "call part[ies]," intended to convince them to join Oak Street. ¶¶69-71, 78-79, 85, 95-96, 135, 138-41. The Oak Street Defendants acknowledged their awareness of the AKS's prohibitions of such conduct in SEC filings signed by Defendants Pykosz and Cook. ¶56.[3] Moreover, at the end of the Class Period, rather than deny knowledge of such conduct or terminate any rogue employees, Pykosz admitted that "we have engaged, and we pa[id] these agents," resulting in new patients "over the past year or so." ¶135.

Second, Oak Street marketed and provided free transportation services to prospective patients to induce them to sign up with Oak Street for primary care services. *See* ¶¶72-74, 80-82, 84, 87, 97, 99, 129-30. Oak Street's marketing materials touted "The Oak Street Health Difference" and told prospective patients, "We come to you." ¶¶72-74. Indeed, free transportation was the main selling point Oak Street used to entice potential at-risk patients to join Oak Street. ¶¶58, 72, 80-81, 97. Defendants acknowledged their awareness of the AKS prohibitions of such conduct in SEC filings signed by Pykosz and Cook. ¶56; *see also* ¶159. After the Class Period, the Oak Street Defendants modified their SEC disclosures to confirm that they did "offer" or "transfer" remuneration to prospective patients. ¶139.

---

[3] The Affordable Care Act amended the AKS to clarify that for a kickback violation to be "knowing" or "willful," a defendant does not need to have actual knowledge that he or she is violating the statute. ¶55.

### 3. Three Public Offerings In Five Months Enabled Insiders To Sell Company Stock At Near Record Prices

Oak Street held its first SPO in December 2020, only four months after its IPO, at which time Oak Street stock had skyrocketed from $21.00 to $46.00. ¶¶214, 243-44. Insiders took advantage of these prices, as Pykosz, Cook, and others sold more than $298 million worth of Oak Street shares. ¶¶243-45. Wasting no time, Oak Street insiders rushed to conduct two more offerings in 2021. ¶¶107, 110, 170. Specifically, as Oak Street's stock price continued climbing, the Company conducted an SPO in February 2021 at a price of $56 per share, (¶¶170, 249) and then yet another SPO in May 2021 at a price of $62 per share (¶¶170, 254). ***Oak Street's controlling shareholders Newlight and General Atlantic sold more than 24 million shares of stock in the February and May 2021 SPOs at artificially inflated prices receiving more than $1.4 billion***, as they unloaded their shares at nearly three times the IPO price. ¶¶170, 249, 254.

### D. After The Insider Sales, The Hidden Truth Becomes Public

As insiders were cashing out, the Oak Street Defendants were repeatedly assuring the market that its patient recruitment tactics were both successful and fully compliant with the AKS. *See infra* §III.A.1.b-d. On November 8, 2021, not long after insiders had pumped the stock and dumped $1.4 billion of insiders' shares on the public, Oak Street filed its 3Q21 Form 10-Q with the SEC and revealed that that it had "received a civil investigative demand ("CID") from the United States Department of Justice." ¶129. Specifically, the 3Q21 Form 10-Q disclosed that the DOJ was "investigating whether the Company may have violated the False Claims Act, 31 U.S.C. §§3729-3722" and that the "CID requests certain documents and information related to the Company's relationships with third-party marketing agents and related to the Company's provision of free transportation to federal health care beneficiaries." ¶129.

During the Company's earnings call the very next day, on November 9, 2021, Defendant Pykosz said, "[The] Department of Justice [is] seeking information related to our relationships with third-party agents or entities and also regarding any advertising or promotion of our transportation services." ¶130. Analysts responded with shock and slashed their price targets for Oak Street common stock, which plunged more than 20% from $47 per share to $37 per share, as more than $2 billion in market capitalization evaporated. ¶¶131-34. Subsequent disclosures and reports further confirmed the improper conduct in violation of the AKS. *See* ¶¶135-41.

## III. ARGUMENT

The Supreme Court "has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions." *Tellabs II*, 551 U.S. at 313. Here, Defendants concealed their illegal patient acquisition schemes, failed to provide "full disclosure," and ignored the "high standard of business ethics" required for executives and companies that raise money from the public. *Tellabs I*, 437 F.3d at 595.

### A. The Complaint Adequately Alleges Securities Fraud

The Complaint alleges securities fraud in violation of §10(b) of the Exchange Act against the Oak Street Defendants.[4] When reviewing a Rule 12(b)(6) motion to dismiss, the Court "must treat the pleaded facts as true and draw all reasonable inferences in favor of the plaintiff." *Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) ("*Tellabs III*").

---

[4] To state a claim, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014). Defendants do not dispute that elements (3), (4), and (5) are adequately pled. Plaintiffs maintain that what they do challenge – falsity, scienter, and loss causation – are also adequately pled.

### 1. The Complaint Adequately Alleges Falsity

To plead false or misleading statements or omissions under the PSLRA and Rule 9(b), Plaintiffs must identify "what" statements or omissions are alleged to be false or misleading, "who" made them, "when," "where," and "how" they were made," and "explain the reason why the statements were misleading." *Holwill v. AbbVie Inc.*, 2020 WL 5235005, at *2 (N.D. Ill. Sept. 1, 2020) *motion to certify appeal denied*, 2021 WL 1540998 (N.D. Ill. Apr. 19, 2021) (finding AKS violations adequately pled). On a motion to dismiss, the Court does not need to "determine whether [defendants'] statements were in fact misleading," but "need only determine that plaintiffs have alleged sufficient facts showing the circumstances which plaintiffs claim constitute fraud." *Azar v. Grubhub, Inc.*, 2021 WL 4077327, at *4 (N.D. Ill. Sept. 7, 2021).

In addition, the Court must assess the statements in the context investors received them, as "statements, even if literally true, could still be misleading to investors depending on the context and manner of their presentation." *Ross v. Career Educ. Corp.*, 2012 WL 5363431, at *6 (N.D. Ill. Oct. 30, 2012) (Kennelly, J.). As stated by the Supreme Court, "literal accuracy is not enough: [a company] must [] desist from misleading investors by saying one thing and holding back another." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 192 (2015). Ultimately, dismissal is not warranted if "the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Ross*, 2012 WL 5363431, at *6. Finally, once a court finds a false or misleading statement has been adequately alleged as to each defendant, the falsity element has been met, and the court "need not address" and rule on all statements. *See id.* at *8.

### a. The Complaint Adequately Alleges That The Improper Patient Acquisition Tactics Violated The AKS

The Complaint adequately pleads that the undisclosed improper patient acquisition tactics violated the AKS and therefore the submission of such claims also violated the FCA. *See supra* §II.C.2; ¶¶51-61, 68-99, 135-141, 157-162. Motions to dismiss are not a vehicle to refute factual allegations or the application of facts to law, so there is no requirement to allege that such violations have been "adjudicated" or asserted by a government agency to sufficiently plead an AKS violation. *See AbbVie Inc.*, 2020 WL 5235005, at *3 (denying motion to dismiss securities fraud claims and finding violations of AKS based on whistleblower allegations sufficient to establish violations at pleading stage); *Bond*, 2022 WL 602432, at *22 (rejecting defendants' arguments that plaintiffs failed to plead actual AKS and FCA violations in securities fraud action where alleged violations were based upon confidential witnesses and short seller report, but no government action had been filed); *see also In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2021 WL 3727095, at *6 (S.D.N.Y. Aug. 23, 2021) (finding improper accounting practices adequately alleged even though "SEC closed an investigation into [company's] accounting practices after noting that it had not reached any conclusion as to the propriety of those practices").

Here, Defendants erroneously suggest that their statements cannot be misleading until there has been a finding by the government of an AKS or FCA violation. *E.g.*, DM at 1, 12-13. Not only is it incorrect to suggest that enforcement of the securities laws is predicated upon action by or a negotiated compromise of settlement with the government, but Defendants do not offer any case law or OIG opinion even suggesting the improper tactics could be lawful. *See, e.g.*, DM at 6-7, 14-15, 19-22. Instead, Defendants rename the $200 to $250 per-patient referrals "leads" and then argue that "Plaintiffs fail to explain how these leads are the same as 'referrals' prohibited under the AKS." *Id.* at 6-7. But the Complaint does explain how payments based on a per-patient

referral basis are prohibited under the AKS and are outside of the AKS safe harbor. ¶¶9-10, 54-57, 69-71, 140, 161-62. Moreover, when the Oak Street Defendants represented in SEC filings after the Class Period that they purportedly "believe" the payments were covered by the "Personal Services Safe Harbour," they conceded a violation because the "safe harbor" provision only applies to treat as lawful conduct that would – absent the safe harbor – violate the AKS. ¶57. In other words, by claiming the payments fall within the safe harbor (they do not), the Oak Street Defendants conceded that the so-called "leads" are referrals prohibited under the AKS.

Moreover, Plaintiffs have adequately pled that the "Personal Services Safe Harbour" has no applicability to the at least $200 per-patient payments, as "the safe harbor expressly does not apply if payment is based 'on the volume or value of any referrals.' 42 C.F.R. §1001.952(f)." ¶57. Thus, Courts have held that a referral fee paid "on a per-patient basis is based on the volume of referrals and is therefore remuneration for the purposes of the Anti-Kickback Statute." *George*, 171 F. Supp. 3d at 815. *See also* ¶¶ 6-7, 30-31, 57. Defendants fail to explain how, or cite to any authority suggesting, the payments satisfy the elements of the safe harbor. DM at 6-7, 14-15, 19-22*; see also Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016) (holding that "perfunctory and undeveloped arguments . . . are waived").

### b. By Emphasizing Oak Street's Patient Acquisition Strategies And Success, Defendants Were Required To Disclose The Improper Patient Acquisition Tactics

A statement or omission is actionable if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). Thus, "[i]f one speaks, he must speak the whole truth." *Stransky v. Cummins Engine Co., Inc.*, 51 F. 3d 1329, 1331 (7th Cir. 1995). "[I]ncomplete disclosures, or half-truths, implicate

a duty to disclose whatever additional information is necessary to rectify the misleading statements." *SEC v. Ustian*, 2019 WL 7486835, at *32 (N.D. Ill. Dec. 13, 2019).

Here, Defendants made false and misleading statements placing their patient acquisition strategies and tactics directly at issue. For example, the Oak Street Defendants repeatedly emphasized Oak Street's "***grassroots approach to patient engagement***" that was "***supplemented by more traditional marketing***." ¶¶101(b), 107(a), 110. Defendant Pykosz highlighted the Company's "***very consumer-driven***" approach to patient acquisition, including "***meeting individual people . . . online or in the community, and helping educate them why Oak Street is a great place to get primary care***." ¶117(a).[5] Moreover, the Oak Street Defendants placed "referrals," "insurance agents," and "external companies" directly at issue, highlighting for example:

- "***new methods of outreach*** . . . including "***engaging with community partners, such as senior living facilities and faith-based organizations, to obtain referrals***." ¶101(d) (Oak Street Defendants).

- "***[w]e're not setting up events with aggregators*** [e.g., agents]***. We're actually just asking them for referrals, making them introduce us to people that need our care***." ¶106(b) (Pykosz and Oak Street).

- "***It is a B2C [business to consumer] sale. We are selling individuals on becoming a patient on Oak Street Health. We're not getting push[ed] patients from someone else***." ¶108(b) (Pykosz and Oak Street).

- "***We love when insurance advisers or health plan is going to -- we call it push those patients. And we'll take as many as we can get***." ¶117(b) (Pykosz and Oak Street).

- "***we use external companies to assist with certain aspects of [patient acquisition] efforts.***" ¶¶101(h), 107(a), 110-115, 115 (Oak Street Defendants).[6]

---

[5] *See also, e.g.*, ¶108(b) (Pykosz and Oak Street emphasizing patient-acquisition "***channels that we've used over the last 6 months***," including "***digital marketing, [and] direct response TV***"); ¶121 (Pykosz and Oak Street stating Oak Street was "***working with community groups to get in front of older adults in the community and then really educating them on why Oak Street is a great place to get care***").

[6] *See also, e.g.*, ¶120 (Pykosz and Oak Street stating, "***we met patients in a lot of other ways***" in 2020, "***including meeting at different places that are kind of referrals from health – case managers, those types of things***"). ¶108(b) (Pykosz and Oak Street stating "***[w]e really went from very little digital and central***

- 14 -

All these statements were false and misleading because, rather than "speak the whole truth" about Oak Street's purported patient acquisition strategies, referrals, and use of insurance advisors and external companies to acquire patients, the Oak Street Defendants omitted the Company's improper payments to insurance agents for referrals and its marketing and provision of free transportation to prospective patients, which drastically increased the risks investors faced and concealed that the Company's legal practices were insufficient to attract sufficient patients. *See AbbVie*, 2020 WL 5235005, at *3 (finding "statements attributing Humira's success to AbbVie's sales and marketing practices and programs implicated AbbVie's allegedly unlawful kickback scheme"); *see also Singer v. Reali*, 883 F.3d 425, 440 (4th Cir. 2018) (holding "by choosing to inform the market that it was training surgeons on how to obtain reimbursements . . . the Company was obliged to further disclose . . . instructions to surgeons to unlawfully code.").[7]  For the same reasons, the Oak Street Defendants' statements placing patient transportation at issue (*e.g.,* ¶¶101(f)-(g), 103(a)),  were misleading for failing to disclose the Company's use of transportation as a kickback to prospective patients.

Thus, the Complaint does not claim Defendants had an "independent duty" to disclose "uncharged, unadjudicated alleged misconduct." DM at 12-15.  Rather, it alleges that by choosing to speak about patient acquisition tactics, the Oak Street Defendants were obligated not to mislead investors. *See Singer*, 883 F.3d at 441 (holding that "unfortunately for [defendants], the duty to

---

**growth to that being really the main driver of growth today, things like digital marketing, direct response TV and then kind of referral-based telephonic sales**").

[7] *See also In re Acadia Pharms. Inc. Sec. Litig.,* 2020 WL 2838686, at *7 (S.D. Cal. June 1, 2020) (holding that when defendants "chose to discuss their commercialization strategy" for a prescription drug, "they had a duty to disclose that they were allegedly paying [kickbacks]"); *Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.*, 2018 WL 1071442, at *4 (N.D. Ill. Feb. 27, 2018) (holding that by "electing" to discuss claim frequency trends and causes thereof, "defendants had a duty to do so in a manner that was not misleading; that is, by disclosing its reduction in underwriting standards" as a cause).

disclose may extend to uncharged and unadjudicated illegal conduct" when the company's statements "are or become materially misleading in the absence of a disclosure"); *Flynn v. Exelon Corp.*, 2021 WL 1561712, at *8 (N.D. Ill. Apr. 21, 2021) ("Plaintiff is not arguing Defendants were required to accuse themselves of wrongdoing; Plaintiff pleads throughout the Complaint that Defendants were making misleading statements and engaging in [illegal conduct] but representing otherwise. The statements in other words, *were incorrect when they were made*.").

Defendants' reliance on *Heavy & General Laborers' Local 472 & 172 Pension & Annuity Funds v. Fifth Third Bancorp*, is misplaced. 2022 WL 1642221 (N.D. Ill. May 24, 2022). There, general statements about "putting the customer at the center of everything we do" and "Compliance Risk Management provides independent oversight to ensure consistency and sufficiency in the execution of the program" lacked a connection to the specific improper practice of opening unauthorized customer bank accounts. *Id.* at *5, *7.[8] In addition, Defendants' reliance on *Société Générale Sec. Servs., GbmH v. Caterpillar, Inc.*, is unavailing as the Defendants there had **disclosed** the allegedly wrongful conduct and disputed the IRS's view of the tax scheme's impropriety. 2018 WL 4616356, at *6 (N.D. Ill. Sept. 26, 2018). Here, Defendants did not disclose the improper tactics to investors.[9]

---

[8] Because this case does not involve vague statements of general corporate compliance, Plaintiffs are not required to allege, as Defendants claim based solely on out-of-circuit authority (DM at 14-15), a "systemic organizational disregard for compliance." *In re Carnival Corp. Sec. Litig.*, 2022 U.S. Dist. LEXIS 58526, at *56 (S.D. Fla. Mar. 30, 2022) (dismissing general public health statements). Defendants' reliance on other cases dismissing generic and aspirational statements (DM at 13-14) is similarly misplaced. *See Singh v. Cigna Corp.,* 918 F.3d 57, 60, 61 (2d Cir. 2019) (dismissing statements such as the company "established policies and procedures to comply with applicable requirements"); *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1276, 1278 (9th Cir. 2017) (dismissing "transparently aspirational" statements about "ethical leadership").

[9] Defendants' remaining cases are inapplicable. *See Pension Tr. Fund for Operating Eng'rs v. DeVry Educ. Grp., Inc.*, 2017 WL 6039926, at *7 (N.D. Ill. Dec. 6, 2017) (finding misclassification of dozen or so graduates did not render statement about 90% of thousands of graduates misleading); *Mogell v. Calhoun* 2016 WL 3369233, at *5 (C.D. Ill. Mar. 15, 2016) (finding company was not required to provide additional disclosures on top of multiple detailed disclosures regarding investigations); *Anderson v. Abbott Lab'ys.*,

### c.  Defendants' AKS Compliance Statements Were Misleading

The Oak Street Defendants' misleading statements regarding compliance with the AKS reinforced the misleading impression their statements touting the Company's patient acquisition tactics created. Defendants' argument that these are inactionable statements of opinion, and that they cannot be held liable for opinions (DM at 20-21), is wholly without merit.

First, several statements are not merely opinion as they contained embedded statements of fact. *See Hedick v. Kraft Heinz Co.,* 2021 WL 3566602, at *9 (N.D. Ill. Aug. 11, 2021) (finding "embedded . . . statements of fact" not opinion); *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1231 (N.D. Ga. 2019) (finding "Equifax employs strong data security" not opinion).

Here, by describing the patient acquisition strategies Oak Street did use and repeatedly stating that "***[t]he OIG has expressed concern regarding the use of non-employed sales forces to recruit or facilitate the recruiting of patients or referrals, especially when the sales agent is a compensated in a manner that provides rewards or incentives on a volume or value basis***" (*e.g.,* ¶101(h)), the Oak Street Defendants conveyed that they did not make such prohibited payments. Similarly, statements claiming "***[a]ccordingly, commissions or per-patient based compensation methodologies are closely scrutinized by federal agencies***" and, "***in limited instances we use external companies to assist with certain aspects of these efforts, but only in arrangements that we believe do not violate the Anti-Kickback Statute or other applicable laws***" (*e.g.,* ¶101(h)), contained embedded statements of fact that Oak Street's patient acquisition strategies did not include making prohibited payments to third parties for referrals or remuneration to prospective

---

140 F. Supp. 2d 894, 902 (N.D. Ill. 2001) (finding statement disclosed underlying issues and that due to company's six-year history of receiving warnings from the FDA without sanctions, failure to disclose another FDA warning letter was "fairly inconsequential"); *In re Facebook, Inc. Sec. Litig.*, 405 F. Supp. 3d 809, 835-36 (N.D. Cal. 2019) (finding statement Facebook "worked hard" to comply with FTC consent order inactionable "statement of general compliance"); *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 805, 807 (N.D. Cal. 2019) (finding already disclosed FTC investigation unrelated to alleged misstatements).

patients.  These statements were false and misleading because they failed to disclose (i) the payments to "non-employed [agents] to recruit" new patients and "compensat[ing] [them] in a manner that provides rewards or incentive on a volume . . . basis" with at least $200 "per-patient based compensation methodologies;" (ii) the improper marketing and provision of free transportation to prospective patients, or (iii) that these tactics violated AKS.  *See supra* §II.C.2; §III.A.1.a-b.

Defendants did not, as in *Caterpillar* (DM at 21), disclose the payments and free transportation and then offer an opinion attributed to experts that such payments complied with the AKS.  *See* 2018 WL 4616356, at *5 (dismissing complaint where company disclosed tax investigation into its tax returns and expressed "opinion of management" based in part on "in house tax professionals" that ultimate disposition would be immaterial).  Moreover, the facts alleged here, establishing specific conduct that violated established rules of the AKS, are distinct from those in *Ikeda v. Baidu, Inc.* (DM at 20), where the plaintiff did not even "allege[] the specific Chinese regulations with which [the company] was out of compliance," and the regulations "were constantly shifting."  2021 WL 1299046, at *9-10 (N.D. Cal. Apr. 7, 2021).

Second, the Oak Street Defendants' statement that Oak Street used third parties for patient acquisition "***only in arrangements that we believe do not violate the Anti-Kickback Statute or other applicable laws***," was not merely an opinion because it disclosed some facts while concealing other facts relevant to the context for the purported belief.  In other words, "plaintiffs can allege that a statement of opinion, without providing critical context, implied facts that can be proven false."  *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020) (reversing dismissal of alleged opinion statements).  Here, the Oak Street Defendants selectively disclosed the Company's use of third parties for patient acquisition and the regulatory scrutiny over arrangements where a "non-employed" third party is paid for patient recruitment on a "volume"

and "per-patient" basis, and then stated "we believe" Oak Street's "arrangements" with third parties "do not violate the [AKS] or other applicable laws," while concealing the fact that they were making payments based on volume and per patient basis. *See In re Intuitive Surgical Sec. Litig.,* 2017 WL 4355072, at *1-*3 (N.D. Cal. Sept. 29, 2017) (holding that defendants' "several positive opinion statements" regarding the "safety and efficacy" of their robotic surgery device "omitted numerous material facts" from investors, including defendants' "misclassifi[cation] [of] numerous adverse event reports of serious injury"). [10]

Third, even if the statements were opinions requiring Plaintiffs to plead "subjective disbelief," the Complaint adequately alleges that the Oak Street Defendants knew payments based on referral volume and the offering and providing of free transportation violated the AKS based on their statements during the Class Period acknowledging awareness of the AKS prohibition and their post-class period admissions in which they acknowledged such practices had been ongoing for more than a year. *See supra* §III.A.1.a-b.; *infra* §III.A.3.b-d; ¶¶50-61, 117(b), 135, 157-159. Given the violations' clear nature, the Oak Street Defendants had no basis to believe that the conduct did not violate AKS or fall within the safe harbor. *See supra* §III.A.1.a-b.; ¶¶9-10, 54-57, 69-71. 140, 161-162. Thus, the motion should be denied. *See, e.g.*, *SEC v. Ustian*, 229 F. Supp. 3d 739, 771 (N.D. Ill. 2017) (finding "opinion" statement actionable where company had no "reasonable basis to make the statement, and the factual allegations in the complaint support this assertion."); *see also Howard v. Arconic*, 2021 WL 2561895, at *7 (W.D. Pa. June 23, 2021)

---

[10] In *Omnicare*, the Sixth Circuit held that a reasonable jury could find the statements "we believe that our billing practices materially complied with state and federal requirements" and "we believe that we are in compliance" with the law were materially false looking at the "full context of the defendant's statements." 769 F.3d at 478-79; *see also Allstate,* 2018 WL 1071442, at *4 (holding that investors' understanding of defendants' explanations for the causes of claim frequency increases "would have been based on incomplete information because defendants did not disclose that Allstate decreased its underwriting standards while simultaneously asserting that the increase in claims frequency was attributable to external factors").

(finding statement that company "believes it has adopted appropriate risk management and compliance programs" misleading because "a reasonable investor could plausibly take from this risk disclosure statement that [the company] had a reasonable basis for its belief" which "conflicts" with company's alleged [selling] of flammable product for improper use").

### d. Defendants' Risk Warnings Were Also Misleading And Too Generic To Shield Defendants From Liability

While Defendants argue that they cautioned investors "about the extent of its regulatory oversight and the risk of government investigations" (DM at 13), these risk disclosures were misleading. The boilerplate risk warnings Defendants cite do not disclose material adverse facts, namely Oak Street's improper patient acquisition tactics. *See Hedick*, 2021 WL 3566602, at \*16; *Pierrelouis v. Gogo, Inc.*, 2021 WL 1608342, at \*11 (N.D. Ill. Apr. 26, 2021). Further, when a company identifies a hypothetical risk that has already come to fruition, failure to disclose its occurrence is misleading. *See Shah v. Zimmer Biomet Holdings, Inc.*, 348 F. Supp. 3d 821, 838 (N.D. Ind. 2018) (finding that "[e]xpressing [] risks only in the vaguest terms or as a hypothetical when they have already come to fruition, in whole or in part, can be a basis for liability under the securities laws"); *Van Noppen v. InnerWorkings, Inc.*, 136 F. Supp. 3d 922, 949 (N.D. Ill. 2015) (liability where current risk presented "as a risk that could develop in the future"). As stated by the Seventh Circuit, "boilerplate warnings won't do," and it is insufficient to simply "highlight[] some parts of the business that might cause problems." *Asher*, 377 F.3d at 732-33.

Here, Oak Street's SEC filings gave generic warnings that "there is no guarantee that we will be able to adhere to all of the laws and regulations that apply to our business," that hypothetical government "lawsuits" and "investigations" "could have a material adverse impact on [Oak Street's] business," and Oak Street's conduct "could potentially implicate the Anti-Kickback Statute." *See* ¶101(h). But given the specific statements regarding patient acquisition practices

and assurances that prohibited payments were not being made, these "risk disclosures" were insufficient to apprise investors of the risks of the then-occurring conduct and were misleading as they only warned of what could happen while concealing what was happening at the time. *See In re GoHealth, Inc. Sec. Litig.*, 2022 WL 1016389, at *2, *5 (N.D. Ill. Apr. 5, 2022) (finding risk disclosures insufficient where they "did not identify the risks associated with the strategic business change allegedly already implemented").

Moreover, Defendants' argument that their risk warnings had already disclosed all material information is a truth on the market defense, which is not available at the pleading stage. *Asher*, 377 F.3d at 734; *In re Allstate Corp. Sec. Litig.*, 2020 WL 7490280, at *7 (N.D. Ill. Dec. 21, 2020) (holding that "an argument that 'news of the [truth] credibly entered the market and dissipated the effects of the misstatement . . . is a matter for trial'"). The stock-price reaction on the corrective disclosure date refutes Defendants' suggestion that investors were fully informed of the kickbacks. *See* ¶190; *Asher*, 377 F.3d at 734 (if "full truth had reached the market despite any shortcomings in [defendants'] cautionary statements . . . it is hard to understand the sharp drop in the price of its stock.").

### e. Defendants' Remaining Arguments On Falsity Are Without Merit

Defendants' shotgun approach raises additional arguments seeking dismissal of certain statements, which also should be rejected. First, Defendants stretch to characterize statements beyond those discussed *supra* §III.A.1.c. as inactionable opinions. DM at 21-22. But statements that described aspects of Oak Street's patient acquisition tactics, while concealing other facts regarding those tactics, are factual – not opinion – statements. Indeed, Defendants challenge the following statement as an opinion despite its factual claims: "***we have developed, and continue to develop new methods of outreach***" including "***we are engaging community partners such as***

*senior living facilities and faith-based organizations, to obtain referrals*." DM at 21. *See also* ¶¶101(c), 114. Such statements are actionable statements of fact. *Hedick*, 2021 WL 3566602, at *9.

Second, Defendants argue that certain statements are immaterial puffery. Whether a misstatement or omitted fact is material to investors depends upon the specific context in which it is made and therefore is "a fact-specific inquiry that depends on the significance the reasonable investor would place on the withheld or misrepresented information." *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 814 (N.D. Ill. 2017). Thus, materiality determinations "require[] delicate assessments," "are peculiarly ones for the trier of fact," and are "rarely appropriate at the summary judgment stage, let alone on a motion to dismiss." *See Macovski v. Groupon Inc.*, 553 F. Supp. 3d 460 476 (N.D. Ill. 2021) (Kennelly, J.).

In addition, "the market's negative reaction" to disclosure of omitted facts "tends to show that defendants' alleged misstatements were material." *Ross*, 2012 WL 5363431, at *6; *see also Akorn,* 240 F. Supp. 3d at 816 ("A drop in stock price . . . tends to establish materiality."). In this case, disclosure of the CID on November 8, 2021, resulted in a massive, 20% decline in Oak Street's stock price, sufficient to plead materiality. *See Akorn*, 240 F. Supp. 3d at 816 (22% single-day drop confirmed false statements' materiality).

Moreover, in context, the statements were not vague corporate cheerleading but specifically addressed the Company's strategies to acquire patients purportedly in accordance with the law. For example, in the context of the additional statements discussed herein, the Oak Street Defendants' statement that Oak Street "***employ[s] a multichannel marketing strategy that goes directly to our target consumer***" (¶101(a)) was misleading. This statement concealed that Oak Street's purported "multichannel marketing strategy" which it developed to "control" its patient

acquisition destiny employed two channels that violated the AKS.[11]  Given the connection between patient acquisition and the Company's success (including turning from a money-losing to profitable company), statements regarding Oak Street's patient acquisition strategies were critical to its business, as well as to analysts (who tracked and reported on patient acquisition), and investors.  *See* ¶¶103(b), 103(d), 106(b)-(c), 108(c), 114, 117, 121, 149-155, 163-165.  These statements were not puffery. *See City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*, 2013 WL 566805, at *23 (N.D. Ill. Feb. 13, 2013) (finding statement not puffery where "given the context, it is not so lacking in specificity or unconnected from other facts [in the case]" that it is "devoid of any substantive information"); *Tellabs I*, 437 F.3d at 597 (holding statement "went well beyond puffery: it was a direct response to an analyst's inquiry").[12]

## 2.    The Complaint Sufficiently Alleges Violations Of Items 303 And 105 Of Regulation S-K

In addition to making false and misleading statements, the Oak Street Defendants failed to disclose the improper patient acquisition tactics as (i) an uncertainty or trend reasonably likely to have a negative impact on the Company's financials or operations, as required by Item 303 of Regulation S-K; or (ii) a significant factor making investment in Oak Street speculative and risky,

---

[11] *See also* ¶103(d) (statement claiming Oak Street "***innovated and tried new things***" to attract patients after COVID-19 shutdowns, including "***digital marketing, direct response TV, some of the account-based deals – fields***" provided concrete patient acquisition tactics while failing to disclose improper tactics); ¶117 (statement claiming that Oak Street "***really scaled our digital up in a big way***," along with additional disclosures of additional concrete patient acquisition tactics failed to disclose improper tactics).

[12] *See also GoHealth*, 2022 WL 1016389, at *5 (finding statements were actionable and not puffery given that the statements "identified factors that would positively impact its performance").  Defendants' cases are distinct, as they spoke to general or aspirational "beliefs," "growth," "innovation," or "integrity."  *See In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1165 (N.D. Ill. 2004) (finding "Midway believes" was "'the opinion[] of the speaker'"); *W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 653-54 (N.D. Ill. 2020) (finding "outstanding investment opportunity," "ongoing growth," and "robust innovation" inactionable); *Fifth Third*, 2022 WL 1642221, at *18 (finding compliance and ethical aspirations puffery); *City of Warren Police & Fire Ret. Sys. v. Zebra Techs. Corp.*, 8 F.4th 592, 595 (7th Cir. 2021) (finding integration "progressing as planned" was "vague optimism").

as required by Item 105 of Regulation S-K; or. ¶260-261. Violations of Items 303 and 105, which govern the Company's annual reports on Form 10-K and quarterly reports on Form 10-Q, provide a separate basis for §10(b) liability. *See Twin Master Fund, Ltd. v. Akorn, Inc.*, 2020 WL 564222, at *6-8 (N.D. Ill. Feb. 5, 2020) (Kennelly, J.).[13]

Here, Oak Street's improper patient acquisition tactics violated AKS which both was a "significant factor" making Oak Street investments risky and was "reasonably likely to have a negative impact" on the Company due to fines or disqualification from Medicare programs. *See* ¶¶50-61, 260-261. Courts have upheld such claims involving similar undisclosed kickback schemes that violate law. *See Exelon*, 2021 WL 1561712, at *8 (finding Regulation S-K imposes a duty to disclose); *AbbVie*, 2020 WL 5235005, at *4 (upholding §10(b) claim based on Item 105 and Item 303 violations with regard to concealed kickback scheme); *see also Twin Master*, 2020 WL 564222, at *8 (finding compliance failures would "have reasonably been expected to materially impact [the company's] revenues" by exposure to regulatory fines or sanctions).

Ignoring these cases, Defendants advance several flawed arguments. First, relying upon an inapposite, out-of-Circuit case,[14] Defendants claim that the risks were adequately disclosed when Oak Street said its relationships "could" implicate AKS and the Company "could" be subject fines and penalties. DM at 23. But those generic warnings failed to disclose the unlawful referral payments and free transportation, and were thereby insufficient to warn investors of the risk, as

---

[13] Defendants acknowledge this Court's prior holding that Item 303 violations may serve as the basis for a §10(b) claim (*Twin Master*, 2020 WL 564222, at *6-8), yet they request the Court "reconsider" that position. DM at 23 n.8. Defendants note that the Seventh Circuit has not yet decided the issue, but fail to disclose that since *Twin Master*, other in-Circuit courts have found that violations of Items 105 and 303 can give rise to §10(b) liability. *E.g., Flynn v. Exelon Corp.,* 2021 WL 1561712, at *8 (N.D. Ill. Apr. 21, 2021), *motion to certify appeal denied*, 2022 WL 267915 (N.D. Ill. Jan. 28, 2022).

[14] *See* DM at 24 (citing *Nurlybayev v. ZTO Express (Cayman) Inc.*, 2019 WL 3219451, at *8 (S.D.N.Y. July 17, 2019) (finding disclosed uncertainties were immaterial to revenues and operations)).

confirmed by the stock drop upon the corrective disclosures. *See supra* §III.A.1.d-e.; *AbbVie*, 2020 WL 5235005, at *4. Here, the prospect of Medicare excluding Oak Street from participation in its programs threatened Oak Street's <u>entire</u> business, which is material and would have been disastrous for the Company. ¶¶50-61, 126; *see Bond*, 2022 WL 602432, at *4, *9 (finding violations where revenue depended "almost entirely" on Medicare payments as a "ban" would "be disastrous").

Second, Defendants claim that Plaintiffs are required to prove Defendants' "actual knowledge" of the AKS violations (DM at 24), which overstates Plaintiffs' pleading burden. *See Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l., Inc.*, 367 F. Supp. 3d 16, 35 (S.D.N.Y. 2019) (holding Item 303 knowledge met by "'pleading, with some specificity, facts establishing that defendants had actual knowledge of the purported trends'" and finding defendants likely "knew of a trend" in part "by virtue of the importance of [the unit]" as company's "primary profit engine"). Defendants cite *Conagra* as support for their higher standard, but that case also relied upon the *Lexmark* standard. *See* 495 F. Supp. 3d at 647 (quoting 367 F. Supp. 3d at 35).[15] Here, Plaintiffs have not only pled facts demonstrating the Oak Street Defendants' knowledge of the improper tactics and that they violated the AKS (*see infra* §III.A.3.b-d.), but also that Oak Street's patient acquisition tactics are of singular importance to the Company and its "profit engine" (*see infra* §III.A.3.d). Consequently, the Court should find that Plaintiffs have adequately pled knowledge for purposes of their Item 303 claim.

Third, Defendants claim that the AKS violations were not a material negative trend because the referral payments accounted for "less than 10% of patient growth in 2021" and there has been

---

[15] The Court should disregard Defendants' citation to *Lopez v. CTPartners Exec. Search Inc.*, (DM at 24), which involved "actual knowledge" in the context of "[t]he scienter requirement for forward-looking statements" not an Item 303 claim. 173 F. Supp. 3d 12, 25 (S.D.N.Y. 2016).

no disclosure of the impact of the providing and marketing of free transportation to prospective patients. DM at 24. But, again, the stock price reaction confirms materiality. *Supra* §III.A.1.e. Moreover, there is no numerical threshold for materiality, and instead, materiality is established "when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011).

Here, the undisclosed conduct violated the AKS (*supra* §III.A.1.a-b.); impacted the Company's critical patient growth metrics (¶¶148-56); showed the Company's disclosed patient acquisition strategies were failing to achieve sufficient growth prompting resort to the illegal tactics (*supra* §III.A.1.b); and placed the Company at risk of fines, sanctions, and even removal from Medicare, which put at risk *all* of its revenue (¶¶50-61, 153). Such information would "alter the total mix of information," and was material to investors, as confirmed by analysts' and investors' negative reaction. *See* ¶131 (analyst shock and asking if company was actually paying for referrals and how it worked); ¶133 (20% stock decline); ¶134 (analyst reaction); *see also Matrixx*, 563 U.S. at 44, 47 (finding not "statistically significant" reports of drug side effect material because they placed 70% of company's revenue at risk); *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 96 (2d Cir. 2016) (holding undisclosed unlawful contract was material where "it was worth a fraction of [the company's] yearly revenues" but exposed company to liability and placed at risk revenue from other contracts that accounted for 20% of yearly revenue).[16]

Finally, Defendants argue that Plaintiffs fail to plead a violation of Item 105 because they disclosed factors that made an Oak Street investment "speculative or risky." DM at 25 (citing *City*

---

[16] Contrary to Defendants' argument (DM at 24-25), *Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, did not establish a six percent materiality threshold, and instead, found in the context of that case – where a product recall placed at risk some portion of six percent of revenue – materiality was not adequately alleged. 673 F. Supp. 2d 718, 734 n.15 (S.D. Ind. 2009)).

*of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 426 (S.D.N.Y. 2011) (finding Item 105 violation adequately pled)). This argument fails for the same reasons above regarding Defendants' claim that the uncertainty was disclosed. *See also* §III.A.1.d.

### 3.    The Complaint Raises A Strong Inference Of Scienter

Scienter is "knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Tellabs III*, 513 F.3d at 704-705. "Courts must consider the complaint in its entirety" and ask "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs II*, 551 U.S. at 322-23 (emphasis in original). Here, the totality of allegations supports a strong inference of scienter, especially since the inference "need not be irrefutable," "of the smoking-gun genre," or "even the most plausible of competing inferences." *Id.* at 324. Notably, a government investigation, such as the DOJ investigation in this case, contributes to the inference of scienter. *See Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 80 (2d Cir. 2021) (holding investigations "support[] culpable inferences drawn from stronger allegations"). Finally, "where two contrary inferences of scienter are equally probable, the tie goes to the plaintiff." *Fryman v. Atlas Fin. Holdings, Inc.*, 2022 WL 1136577, at *21 (N.D. Ill. Apr. 18, 2022).

Defendants' scienter contentions suffer from two critical flaws. DM at 25-34. First, Defendants argue that direct evidence of knowledge is required (*e.g.,* DM at 26), while ignoring that circumstantial allegations showing "reckless disregard of a substantial risk that the statement is false" are also sufficient. *Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.*, 778 F. Supp. 2d 858, 883 (N.D. Ill. 2011). Second, Defendants scrutinized allegations *in isolation* and cite cases finding an individual allegation alone did not create a strong inference of scienter. DM at 28. *See also Grubhub,* 2021 WL 4077327, at *6 (rejecting defendants' attempts to "attack" scienter allegations "in isolation" because "the Court

considers the complaint in its entirety"); *Inst. Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 273 (3d Cir. 2009) (reversing dismissal and rejecting defendants' argument that "'[t]he sum of several zeros . . . is still zero'" because the "inferential significance of any single allegation can be determined only by reference to all other allegations").

### a. Defendants Had Motive To Conceal The Improper Practices

While motive to commit fraud is not required to sufficiently allege a strong inference of scienter because "there is little if any significance attributable to the absence of an allegation of a personal financial motive" (*Ross*, 2012 WL 5363431, at *11), when present, "motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference." *Hospira*, 2013 WL 566805, at *16. Here, insider stock sales and incentive compensation were extraordinary and therefore support a finding of scienter.

First, the Individual Defendants' and other Oak Street insiders' massive insider selling at prices far above the stock price following the corrective disclosure (¶171), provided a motive to conceal the improper patient acquisition tactics. During the Class Period, Defendant Pykosz sold over *$60 million* in stock at inflated prices and Defendant Cook sold more than *$12 million*, while neither purchased any shares. ¶¶167-68 & n.11. The Company's Chief Operating Officer sold *$82 million* in stock. ¶169. Additionally, in the SPOs, Defendants Newlight and General Atlantic sold more than *$1.4 billion* in stock. ¶170. Such massive, "unusual or suspicious" insider sales in the months leading up to the corrective disclosure, support a strong inference of scienter. *See Fryman*, 2022 WL 1136577, at *30 (finding stock sales by defendants and non-defendants – none of which exceeded $730,000 – "support a [strong] inference of scienter"); *Allstate Corp.*, 2018 WL 1071442, at *2, *5 (sales of $33 million and $6.2 million by individual defendants contributed to strong inference of scienter).

Defendants argue the Court can ignore the massive trading relying upon (i) a "lock up period" that ended well before they made their sales, (ii) the fact that defendants did not sell all of their Oak Street stock, and (iii) 10b5-1 trading plans (adopted during the Class Period). But these facts are "not properly considered in deciding a 12(b)(6) motion to dismiss." *Allstate*, 2018 WL 1071442, at *5 (rejecting argument that sales were not suspicious); *Norfolk Cnty. Ret. Sys. v. Ustian*, 2009 WL 2386156, at *10 (N.D. Ill. July 28, 2009) (finding that executives "pocketed $2 million and $828,655 in bonuses" supported scienter because the court did "not regard such [sums] to be common" or "insignificant"); *Fryman*, 2022 WL 1136577, at *30 (finding sales ranging from 10% to 26% of holdings contributed to scienter); *Van Noppen*, 136 F. Supp. 3d at 944 (giving "no weight at this [pleading] stage" to defendants "affirmative defense" that sales were "made pursuant to a Rule 10b5-1 trading plan").[17] Importantly, even if "nearly" all of Defendants stock sales were made pursuant to a Rule 10b5-1 (DM at 33) that does not negate the inference of scienter because "a defendant who knows the schedule of [his] 10b5-1 plan could be motivated to make material misrepresentations affecting the stock price to their benefit before a scheduled sale or to trigger a sale a particular price." *See Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*, 2022 WL 3591140, at *22 (10th Cir. Aug. 23, 2022).

Second, the Individual Defendants had incentive compensation plans that were tied directly to Oak Street's stock price which contribute to an inference of scienter. Oak Street's March 2021 Proxy Statement reported that Pykosz's "[t]otal" compensation for 2020 was $73.5 million with approximately $360 million in stock options awards. ¶173. Media reported that, with stock and

---

[17] Defendants' citation to *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1067 (9th Cir. 2008) does not help them, as that case did not establish a "37% percent" threshold and instead involved one defendant who did not even sell any stock and the context "suggest[ed] that there was no insider information from which to benefit" for the other. Similarly, *Fifth Third* provides no assistance to Defendants because that case also involved a complaint devoid of "allegations to suggest why [the sales] should be suspect" (*see* 2022 WL 1642221, at *23), unlike Plaintiffs' complaint here.

options awards, Pykosz's 2020 compensation was approximately $568 million, making him the second-highest paid CEO after Elon Musk. *Id*. In addition to being tied to the stock price, Oak Street's executive compensation was tied to increasing the number of Oak Street's at-risk patients. For example, Oak Street's Proxy Statements stated that Pykosz and Cook "were eligible to receive annual cash incentive awards" in 2020 and 2021 based on their performance as assessed against "at-risk patient count targets" set by the Board of Directors. ¶172. Thus, the Individual Defendants had massive financial incentives to boost patient numbers and the stock price, which led them to engage in the improper patient acquisition tactics. *See Exelon*, 2021 WL 1561712, at *10 (finding scienter with motive where defendants "stood to gain from the [unlawful] scheme"); *AbbVie*, 2020 WL 5235005, at *5 (finding scienter where Defendants had motive to maximize sales and individual defendants' "compensation [] tied directly to" kickback scheme).[18]

### b. Defendants' Post-Class Period Admissions Support A Strong Inference Of Scienter

After disclosing the CID, Pykosz admitted that Oak Street had been paying third party agents for patient referrals. ¶135. Notably, Pykosz did not claim that he was unaware of the scheme, nor did he blame lower-level employees. Instead, he admitted the conduct had been occurring for a "year or so." *Id*. Moreover, the Oak Street Defendants' assertion that they allegedly believed such payments fell within the AKS safe harbor confirms their Class Period knowledge of the referral payments and that they were violations of the AKS. *Supra* §III.1.a; ¶¶139-40, 161-62. Contrary to Defendants' arguments, these post-Class Period admissions support a strong inference of scienter. *See Allstate*, 2018 WL 1071442, at *6 (finding post-class

---

[18], The 20-year-old cases relied on by Defendants are inapposite, as they dealt with general allegations that a "desire" to increase compensation supported motive, without tying compensation to the concealed conduct. *See Stephenson v. Hartford Life & Annuity Ins. Co*., 2003 WL 22232968, at *9 (N.D. Ill. Sept. 26, 2003) (describing scienter allegations as "boilerplate" and "commonplace allegations of financial motive"); *Stavros v. Exelon Corp*., 266 F. Supp. 2d 833, 848 (N.D. Ill. 2003) (noting plaintiffs alleged that defendants were "motivated so . . . their compensation packages increased").

period statement "does not merely indicate that [defendant's] assurances to investors . . . were incorrect in retrospect; it suggests that they were incorrect when made").

<blockquote>
c.     **Executive Positions, Personal Knowledge, And Repeated Statements About Patient Acquisition Tactics And The AKS Rules Contribute To A Strong Inference Of Scienter**
</blockquote>

The Seventh Circuit has recognized that "[o]ne of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate." *Tellabs I*, 437 F.3d at 603. Because Pykosz is Oak Street's founder and the only CEO in its history, and Cook served as the Company's CFO leading up to and throughout the Class Period, both were intimately involved in Oak Street's affairs, before, during and after the IPO. *See* ¶¶62-74, 100-22, 129-42. In their positions, each Individual Defendant had access to internal corporate documents, had conversations with officers and employees, and attended management and Board meetings. ¶¶143-46. While such allegations may not alone be sufficient to establish scienter, they can contribute to the inference. *See Brasher v. Broadwind Energy, Inc.*, 2012 WL 1357699, at *24 (N.D. Ill. Apr. 19, 2012) (finding defendant's "deep connections to and an intimate familiarity with [the company's] operations" supported inference of scienter); *Schleicher v. Wendt*, 529 F. Supp. 2d 959, 972 (S.D. Ind. 2007) (stating scienter supported "where the defendants either knew or had access to information showing that their public statements were not accurate").

In addition, during the Class Period, the Individual Defendants repeatedly spoke both about their patient acquisition strategies and about the AKS rules, while also claiming they were monitoring the Company's patient acquisition strategies and their success. *See* ¶163 (citing examples). The Individual Defendants also specifically addressed the use of "referrals" and "transportation" in Oak Street's patient acquisition efforts. *See, e.g.*, ¶¶101(d), 101(h), 106(b),

107(b), 108(b), 120, 155. In SEC filings signed by both Individual Defendants, the Oak Street Defendants discussed and confirmed their knowledge of the referral payments to third party agents, stating, "in limited instances we use external companies to assist with certain aspects of these [patient acquisition] efforts." ¶101(h). Furthermore, Plaintiffs allege that Defendants were aware of Oak Street's tactics to meet its quarterly guidance for the Company's at-risk patient base, which analysts and investors tracked closely. ¶149 ("In three quarters during the Class Period, Oak Street exceeded the mid-point of its quarterly at-risk patient guidance by only around 1%, confirming that all patient acquisition strategies that could impact the number of at-risk patients by even a percentage were material and imperative to meeting investor expectations.").

In other words, it can be inferred that the Oak Street Defendants knew about what they spoke of. *Hedick*, 2021 WL 3566602, at *13 (finding Defendants' "repeated references" to cost-cutting from synergies and post-merger efficiencies contributed to scienter); *AbbVie*, 2020 WL 5235005, at *5 (finding defendants' "numerous statements" on marketing practices "constitute strong circumstantial evidence that Defendants had detailed information regarding" those practices); *Hospira*, 2013 WL 566805, at *25-26 (finding scienter adequately alleged and noting argument that it could be inferred that defendants "knew of what they spoke"); *Ross*, 2012 WL 5363431, at *10 (finding from CEO's statements about the issue that "[o]ne may readily and reasonabl[y] infer from these facts that [the CEO] made it his business to look into" it). And, just as in *AbbVie*, the Oak Street Defendants' "reluctance to delve into details" when asked to "unpack" Oak Street's "alternative engagement channels," including the use of "brokers" (¶106(c)), and "intermediaries like the MA plans or brokers" (¶117(b)), further supports a strong inference of scienter. *See* 2020 WL 5235005, at *5.

The AKS's clear prohibitions on paying referrals on a per-patient basis and on free transportation to prospective patients made Oak Street's violations obvious. *See supra* §III.A.1.a-

d.; *see also Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1029 (N.D. Ill. 2010) (finding "a strong inference of scienter may still be credited where it is almost inconceivable that an individual defendant would be unaware of the matters at issue"). Defendants' statements regarding their knowledge of the patient acquisition practices along with their statements demonstrating their knowledge of the rules (*see, e.g.*, ¶¶50-61, 157-159, 117(b)), are sufficient to infer knowledge of rule violations. For example, the Oak Street Defendants acknowledged that AKS specifically prohibited paying for referrals and providing remuneration to prospective patients. ¶56. And, Oak Street's Code of Conduct, which was adopted by Defendant Pykosz and governed all employees' conduct, confirms the Oak Street Defendants' awareness that AKS banned providing anything of value to prospective patients or others to influence an individual's medical decisions. ¶159. Thus, the Oak Street Defendants cannot escape liability by arguing it is hypothetically "conceivable" that the Oak Street Defendants were unaware of the AKS violations because "it is exceedingly unlikely." *Tellabs III,* 513 F.3d at 711 (rejecting inference that defendant CEO was repeating lies fed to him by others).

### d. The Critical Importance Of Compliance And Patient Acquisition Further Supports A Strong Inference Of Scienter

Courts in this Circuit have found scienter where "it is reasonable to assume top management is aware of matters central to that business's operations." *See Flynn*, 2021 WL 1561712, at *10; *see also In re Sears, Roebuck & Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003) ("Officers of a company can be assumed to know of facts 'critical to a business's core operations or to an important transaction that would affect a company's performance."). Where "the specific problem facing the company . . . affects a significant source of income or a core operation," Defendants' knowledge is inferred. *Selbst v. McDonald's Corp.*, 2005 WL 2319936, at *23 (N.D. Ill. Sept. 21, 2005). In this case, acquiring patients was critical to Oak Street

achieving profitability (¶¶47-49, 62-67, 148-49) and compliance with AKS was critical to Oak Street's ability to avoid removal from Medicare (¶¶50-61). Confirming their importance, the Oak Street Defendants routinely reported on, and analysts tracked and frequently asked about, the Company's patient acquisition strategies and tactics. ¶¶103(b), 103(d), 106(b)-(c), 108(c), 114, 117, 121, 149-155, 163-65. It is fair to infer scienter where, as here, Defendants know the "primary driver" of a company's business. *Pluralsight*, 2022 WL 3591140, at *18-19.[19]

In fact, given their numerous false and misleading statements' regarding the critical patient acquisition strategies, Pykosz and Cook's "failure to have such knowledge [of the undisclosed tactics] equate[s] to reckless disregard." *See Lindelow v. Hill*, 2001 WL 830956, at *8 (N.D. Ill. July 20, 2001) (holding "it is strongly inferential that every officer or director . . . either had the knowledge" of important matter, "or, if not, that his failure to have such knowledge equated to reckless disregard").

### e. The Widespread And Pervasive Misconduct Supports An Inference Of Scienter

The improper referral payments and free transportation were widespread and pervasive at Oak Street, supporting an inference of scienter. *See Ross*, 2012 WL 5363431, at *9 (finding defendants' "widespread and pervasive" "practice" contributed to "strong inference of scienter"). As FEs reported, the practices were widely known within the company. ¶¶78-82, 84-85, 87, 94-97. Moreover, the FEs and the *Capitol Forum* revealed other misconduct to boost financial performance, including up-coding diseases and diagnoses practices to increase revenue (¶¶175-182); signing up mentally unfit patients (¶183); lying to prospective patients (¶98), and targeting

---

[19] Because the Complaint pleads the Individual Defendants' scienter, it also raises a strong inference of Defendant Oak Street's scienter. *See Tellabs III*, 513 F.3d at 708 (corporation charged with "the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issues, or who furnish information or language for inclusion therein, or the like)").

prospective patients at drug treatment facilities (¶98).  Such allegations of related wrongdoing can add to the inference of scienter.  *In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, 387 F. Supp. 2d 1130, 1138-39, 1147 (D. Colo. 2005) (finding "sustained pattern of repeated [conduct]" supports inference of scienter).

Defendants' argument that these allegations are "beyond the misconduct in the DOJ's investigation" is not persuasive as, unlike the cases cited by Defendants, the conduct relates to the improper patient acquisition tactics at issue in this case.  *See* DM at 34 (citing *Knox v. Yingli Green Energy Holding Co. Ltd.*, 2016 WL 6609210, at *16 (C.D. Cal. May 10, 2016) (finding "completely unrelated" allegations did not help establish scienter)).  Additionally, Defendants' insistence that their aggressive pursuit of revenue "evinces an intent to *benefit* shareholders, not defraud them" is refuted by the fact that nearly all fraudulent conduct provided a short-term boost to the stock price and financial performance that ultimately exposed the investors to longer term risks, such as the 70% decline in the stock price in this case.  ¶142.  That is far different than *In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 444 (S.D.N.Y. 2006), where the business transformation had a concrete and non-illusory benefit to all shareholders.  And Defendants' argument that the Court should disregard allegations based on the *Capital Forum* fail because plaintiffs may rely upon "news reports that relied on anonymous sources."  *See In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *11 (N.D. Cal. Nov. 4, 2020); *cf. also Clover*, 2022 WL 602432, at *22 (relying upon allegations based on short-seller reports).

### f. The FE Allegations Support A Strong Inference Of Scienter

Lacking the ability to attack the foregoing overwhelming allegations that, taken together, support a strong inference of scienter, Defendants invoke a red herring, arguing that the FE accounts in the Complaint "must be given a steep discount" as a matter of law.  *See* DM at 27

(citing *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 757 (7th Cir. 2007)). But "it is appropriate for courts to rely on statements from confidential sources," who "provide detailed, firsthand accounts of [defendants'] improper practices." *Lowry v. RTI Surgical Holdings, Inc.*, 532 F. Supp. 3d 652, 663 (N.D. Ill. 2021) (Kennelly, J.). Defendants' argument should be disregarded for at least two reasons.

First, there is no requirement that a complaint include ***any*** FE accounts or direct evidence to plead a strong inference of scienter, much less conversations with the CEO, as Defendants suggest is necessary. *See, e.g., Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1101 (10th Cir. 2003) (holding the "PSLRA did not, however, purport to move up the trial to the pleadings stage"); *Grubhub, Inc*., 2021 WL 4077327, at *4 (holding scienter adequately pled in complaint without allegations regarding internal documents or confidential witnesses); *Rubinstein v. Gonzalez*, 241 F. Supp. 3d 841, 857 (N.D. Ill. 2017) (same). Even at trial "[t]he law makes no distinction between the weight to be given to either direct or circumstantial evidence." Seventh Circuit Pattern Civil Jury Instruction No. 1.12.

Second, "[t]here is no categorical discount of [former employee] allegations where . . . Plaintiff has described the witnesses with enough detail that this Court can determine the [former employees have] a foundation for their allegations." *Van Noppen*, 136 F. Supp. 3d at 934. *See also Lowry*, 532 F. Supp. 3d at 663 (same). Here, the Complaint's allegations include descriptions of the FEs' titles and position, job responsibilities, reporting structure (if any), geographic locations, and tenures. ¶¶76, 83, 86, 93-94. Additionally, the Complaint details how each FE came to possess the information described – usually firsthand while performing his job responsibilities. And the FE accounts corroborate and particularize the allegations of falsity and scienter, and are further corroborated by each other. *See*, *e.g.,* ¶¶78-79, 84-85, 89-90, 95-97, 99, 178-182. Thus, no "steep discount" is warranted. *See Hospira*, 2013 WL 566805, at *17 (crediting

FE allegations that "corrobrate[d] and particularlize[d] the allegations" and plaintiffs had "provided the job title, duration of employment [and] a description of employee responsibilities"); *Lowry*, 532 F. Supp. 3d at 663 (crediting allegations from firsthand knowledge acquired in course of employment); *Pension Tr. Fund for Operating Eng'rs v. Assisted Living Concepts, Inc.*, 2013 WL 3154116, at *3 n.4 (E.D. Wis. June 21, 2013) (crediting FEs who "tend[ed] to corroborate one another").

Indeed, this case stands in stark contrast to *Higginbotham*, as the confidential sources in that case were described "merely as three ex-employees of [the defendant corporation] and two consultants." *See Van Noppen*, 136 F. Supp. 3d at 935. Since *Higginbotham*, the Seventh Circuit clarified that "the absence of proper names does not invalidate the drawing of a strong inference from informants' assertions," and reversed the dismissal of a complaint where, like here, confidential source information was "set forth in convincing detail, with some of [it] corroborated by multiple sources." *Tellabs III*, 513 F.3d at 712.[20]

### 4. The Complaint Adequately Pleads Loss Causation

Plaintiffs' loss causation allegations are subject to Rule 8's notice pleading standard, which requires only a "short and plain" statement to give "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005); *Fryman*, 2022 WL 1136577, at *32; *accord Akorn*, 240 F. Supp. 3d at 821. "Loss causation is a fact-based inquiry that need not be proven until the later stages of litigation."

---

[20] *Tellabs III* aligns with other federal appellate decisions. *E.g.*, *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 (2d Cir. 2011); *Avaya*, 564 F.3d at 263. Defendants' other purported authority is inapposite. First, in *Rossy v. Merge Healthcare, Inc.* the FE allegations, unlike the FEs in this case, were "wholly lacking in detail" and did not "meaningfully corroborate one another." 169 F. Supp. 3d 774, 783-84 (N.D. Ill. 2015). Similarly, in *Zimmer*, the plaintiffs relied upon an "assertion," "recollection," and "general assertion" from confidential witnesses regarding "isolated and immaterial" information, unlike the specific accounts in this case about Oak Street's patient acquisition. *See* 673 F. Supp. 2d at 747

*Fryman*, 2022 WL 1136577, at *33; *see also Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 422-23 (7th Cir. 2015) (loss causation typically resolved at trial). "[T]he Seventh Circuit instructs[] [that] the requirement of loss causation ought not place unrealistic burdens on the plaintiff at the initial pleading stage." *Hedick*, 2021 WL 3566602, at *16.

Here, after the close of trading on November 8, 2021, the Company revealed that it was under investigation by the DOJ for the tactics Defendants had concealed while they cashed out more than $1.5 billion in Oak Street stock. ¶¶13, 129-30. On this news, the next day, the price of Oak Street stock fell by more than 20%, from $47 per share to $37 per share, causing massive investor losses. ¶¶14, 133. Thus, Plaintiffs have pled loss causation. *See AbbVie*, 2020 WL 5235005, at *6 (loss causation adequately pled where "Plaintiffs allege[d] a direct causal connection between the filing" of a complaint alleging misconduct "and the immediate and significant drop in AbbVie's stock price over the following two days.").

Notably, Defendants do not – and cannot – "point to evidence to explain the statistically significant stock-price decline," which further supports loss causation. *Silverman v. Motorola, Inc.*, 798 F. Supp. 2d 954, 983 (N.D. Ill. 2011) (denying summary judgment on loss causation grounds). And, the fact that securities analysts linked the price decline to the new Company-specific information further supports loss causation. *See, e.g.*, ¶¶131, 134; *Washtenaw Cnty. Emps.' Ret. Sys. v. Walgreen Co.*, 2019 WL 4597518, at *8 (N.D. Ill. Sept. 23, 2019).

Defendants' claim that an announcement of an investigation cannot be a corrective disclosure (DM at 35) is incorrect. Where, as here, the announcement of a government investigation regards "the subject of the misstatements alleged," loss causation is adequately pled. *See Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 141 (D. Conn. 2021); *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 620 (S.D.N.Y. 2015).

Further, Defendants' reliance on *Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014) is unavailing.[21]  Subsequent Ninth Circuit decisions have made clear that disclosures of an investigation can – and do – provide grounds for pleading loss causation.  *See Lloyd v. CVB Fin. Corp.*, 811 F. 3d 1200, 1210 (9th Cir. 2016) (reversing errant dismissal based on subpoena's inability to serve as corrective disclosure).  Here, market and analyst reaction confirm that disclosure of the CID began to reveal the improper conduct (*see, e.g.,* ¶131), which was further confirmed in subsequent Defendants' statements admitting to the referral payments (¶¶135, 139-40) and public reports citing first-hand accounts (¶¶136-38).  *See also In re Acadia Pharms. Inc. Sec. Litig.*, 2020 WL 2838686, at *8-9 (S.D. Cal. June 1, 2020 (citing *Loos* and finding FDA investigation announcement and corresponding stock drop sufficient to establish loss causation).

Next, Defendants repeat their argument that they had already disclosed the improper tactics and the risks of an investigation before November 8, 2021.  DM at 35-36.  But these "truth-on-the-market" arguments are improper at the motion to dismiss stage.  *See supra* §III.A.1.d.; *AbbVie, Inc.*, 2020 WL 5235005, at *6 (finding stock price's incorporation of prior disclosures "is a proper subject for discovery and a motion for summary judgment or trial, not a motion to dismiss.").

### B.    The Complaint Adequately Alleges Strict Liability Securities Act Claims

The Securities Act "protects investors by ensuring that [issuers] … make a full and fair disclosure of information relevant to a public offering."  *Omnicare*, 575 U.S. at 178.  To establish a claim under §§11 and 12(a)(2) of the Securities Act, Plaintiffs "need only show that they purchased the security and that there was a material misrepresentation or omission." *In re Ulta Salon, Cosmetics & Fragrance, Inc. Sec. Litig.*, 604 F. Supp. 2d 1188, 1192 (N.D. Ill. 2009).

---

[21] Defendants' suggestion that in *Pugh v. Tribune Co.* established such a rule from *Loos* is incorrect, as *Pugh* involved pleading standards for scienter, not loss causation.  521 F.3d 686, 695 (7th Cir. 2008).

Liability of the issuer of a materially misleading registration statement or prospectus is "virtually absolute, even for innocent misstatements." *Id.*

### 1. The Complaint Adequately Alleges Materially False And Misleading Statements

Defendants argue that Plaintiffs have failed to plead false and misleading statements with the particularity required under Rule 9(b) because the alleged statements are "the very same statements" underlying the §10(b) claims. DM at 37. That argument fails for the same reasons discussed *supra* §III.A.1, as well as because the §§11 and 12(a)(2) claims need only meet the Rule 8 pleading standard. *GoHealth*, 2022 WL 1016389, at *2 (applying Rule 8(a)(2) to §11 claims, requiring only allegations sufficient to "allow[] the court to draw the reasonable inference that the defendant is liable"). Defendants argue that the Complaint "sounds in fraud," so Plaintiffs must satisfy Rule 9(b). DM at 37-38. But the Complaint pleads the non-fraud claims separately from the fraud claims (starting at ¶212) and incorporates only allegations supporting negligence, rather than scienter (*see id.*). Thus, "[i]t is illogical to require plaintiffs to plead more than they would have to prove to succeed on a §11 claim standing alone." *Ulta*, 604 F. Supp. 2d at 1193 (declining to apply Rule 9(b) to §§11 and 12 claims, and stating the court "questions the soundness of any decision requiring a plaintiff to plead fraud and scienter with particularity when neither is an element of the claim.").[22] As shown above, even if Rule 9(b) applied, the Complaint adequately alleges false and misleading statements, and violations of Items 105 and 303 of Regulation S-K.

---

[22] *See also In re Groupon, Inc. Sec. Litig.*, 2013 WL 12284524 at *1, *3 (N.D. Ill. Sept. 18, 2013) (applying Rule 8 to Securities Act claims); *Evergreen Fund, Ltd. v. McCoy*, 2000 WL 1693963, at *5 (N.D. Ill. Nov. 6, 2000) (same). Defendants ignore that the non-fraud claims do not incorporate ¶3, so their attempt to tie this case to *Borsellino v. Goldman Sachs Grp., Inc.,* 477 F.3d 502,507 (7th Cir. 2007) fails. Moreover, Defendants' citation to *Conagra* does not help them, as the complaint there alleged all claims together, and did not separate the fraud and non-fraud claims or statements, or take affirmative steps to rely only on non-fraud allegations. *See* Consolidated Class Action Compl. for Violations of the Fed. Sec. Laws, No. 19-cv-1323, ECF No. 68 (N.D. Ill. July 1, 2019).

## 2.     Plaintiffs Have Standing For The Section 11 Claims

Defendants do not dispute that Plaintiffs have standing to pursue §11 claims for the IPO. DM at 38-39.  And Defendants' argument that Plaintiffs lack standing to pursue §11 claims for the SPOs (*id.*) is without merit.

Section 11 standing is established where a plaintiff alleges that it "purchased shares of [the Company] in the [offering].  That is all that is required."  *Ulta*, 604 F. Supp. 2d at 1194.  Here, Plaintiffs plead that "[a]dditional named plaintiff Dearborn and/or members of the Class acquired Oak Street's stock in the IPO, the December 2020 Offering, February 2021 Offering, and/or May 2021 Offering in which shares were offered and/or sold pursuant to the above-described Offering Materials."  ¶269. This is sufficient to allege standing at the motion to dismiss stage.  *See Ulta*, 604 F. Supp. 2d at 1192; *Cent. Laborers' Pension Fund v. SIRVA, Inc.,* 2006 WL 2787520, at *4 (N.D. Ill. Sept. 22, 2006) (holding that allegation that plaintiff purchased stock "issued pursuant or traceable to the . . . IPO and/or [the] SPO[,] . . . is sufficient to put plaintiff in the class of investors covered by section 11"); *see also In re Valeant Pharms. Int'l, Inc. Sec. Litig.,* 2017 WL 1658822, at *13 (D.N.J. Apr. 28, 2017) (finding allegation that plaintiff purchased "in" the secondary public offering sufficient to establish standing).  Moreover, even if Plaintiffs lacked standing for one or more offerings, Plaintiffs indisputably have standing in the IPO for the §11 claim and are representing a putative class containing individual members who can be shown at a later stage to have standing, which is enough to allow the case to proceed.  *See Groupon*, 2013 WL 12284524, at *2 (holding that issue of standing in class action "can properly be resolved at the class certification stage"); *see also Hevesi v. Citigroup Inc.*, 366 F.3d 70, 82 (2d Cir. 2004) ("[B]ecause the PSLRA mandates that courts must choose a party [as lead plaintiff] who has, among other things, the largest financial stake in the outcome of the case, it is inevitable that, in some cases, the lead plaintiff will not have standing to sue on every claim.").

Defendants rely on *Conagra,* 495 F. Supp. 3d at 668-69, to claim that Plaintiffs need to come forward with more affirmative evidence of standing (DM at 39) but that is at odds with both cases from this District (discussed above), and standards for *pleading* a claim. *See, e.g., supra* §III.A.1.a-b. Notably, the *Conagra* court stated that plaintiffs there alleged that they bought in "and/or traceable to" the offerings, which provides less factual detail than the "purchased in" allegations here. *Conagra,* 495 F. Supp. 3d at 689. And the court relied on the fact offering "accounted for only around 4% of the total outstanding Conagra stock," making it less likely that the plaintiffs bought in the offering. *Id.* But here, Defendants admit the offerings accounted for up to 33% of the stock in the market (DM at 40), confirming the inapplicability of the evidentiary requirements set forth in *Conagra*.

### 3.      Plaintiffs Have Standing For Section 12(a)(2) Claims

Defendants also incorrectly argue that Plaintiffs fail to plead standing for claims under §12(a)(2). DM at 40. To plead standing under §12(a)(2), the Complaint need only "allege that [Plaintiffs] purchased [shares] in connection with the with the [offerings]." *In re iDreamSky Tech. Ltd. Sec. Litig.*, 236 F. Supp. 3d 824, 832 (S.D.N.Y. 2017) ("Plaintiffs are not required to identify the specific defendant from whom they purchased the [shares]"); *see In re Deutsche Bank AG Sec. Litig.*, 2016 WL 4083429, at *35 (S.D.N.Y. July 25, 2016) (sustaining 12(a)(2) claims where securities were "acquired or purchased pursuant to the false and misleading Registration statement and corresponding Prospectus for each Offering"). Here, the Complaint alleges what the law requires for the IPO and SPOs. ¶269.

Additionally, the Individual Defendants and the Private Equity Defendants argue that Plaintiffs do not have standing to pursue §12(a)(2) claims against them because they were not

"statutory sellers" under §12(a)(2).[23]  DM at 40-42.  Defendants contend Plaintiffs lack standing

for the 12(a)(2) claims because "Plaintiffs do not allege that any of these Defendants solicited or

sold Oak Street securities to any Plaintiff."  DM at 41.  However, §12(a)(2) attaches liability not

only to those who "passed title," but also to those who "successfully solicit[ed] the purchase,

motivated at least in part by a desire to serve [their] own financial interests or those of the securities

owner." *Pinter v. Dahl*, 486 U.S. 622, 642, 647 (1988).  Here, the Private Equity Defendants were

statutory sellers because they sold shares in the February 2021 and May 2021 SPOs – unloading

more than 24 million Oak Street shares on unsuspecting investors – resulting in proceeds of more

than $1.4 billion.  ¶170.  Therefore, the Private Equity Defendants were "motivated to actively

solicit sales in order to raise as much money as possible."  *See In re Am. Bank Note Holographics,*

*Inc. Sec. Litig.*, 93 F. Supp. 2d 424, 438 (S.D.N.Y. 2000) (holding selling stockholder was a

statutory seller in firm commitment underwriting).

Second, the Individual Defendants were statutory sellers because they solicited the

purchase of Oak Street shares in the offerings, as they participated in the preparation of, and signed,

the false and misleading registration statements.  ¶216.  *See Ulta*, 604 F. Supp. 2d at 1194 (holding

that the officer defendants were statutory sellers in firm commitment underwriting because they

signed the prospectus, "which by definition is a document that solicits the public to acquire

securities"); *ABN AMRO Inc. v. Cap. Int'l Ltd.*, 595 F. Supp. 2d 805, 832 (N.D. Ill. 2008) (holding

that defendants "actively solicited the sale" by participating in the preparation of sales documents).

Thus, the Court should reject the Individual Defendants' and Private Equity Defendants' Section

12(a)(2) standing arguments.

---

[23] Defendants do not address, and therefore concede, that Oak Street was the issuer in the IPO and is
therefore a statutory seller.  *See In re Petrobras Sec. Litig.*, 152 F. Supp. 3d 186, 195 (S.D.N.Y. 2016) ("For
purposes of [Section 12(a)(2)] . . . ***seller*** shall include the issuer of the securities sold").

## C.    The Complaint Adequately Alleges Control Person Claims

The Complaint states control person liability claims against the Individual Defendants and the Private Equity Defendants under §15 of the Securities Act and §20(a) of the Exchange Act. To do so, a complaint must allege: (1) a primary securities violation; (2) the defendants exercised general control over the issuer's operations; and (3) the defendants "possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised." *Silverman v. Motorola, Inc.*, 2008 WL 4360648, at *16 (N.D. Ill. Sept. 23, 2008). Allegations that defendants exercised control need not be pled with particularity. *Silverman*, 2008 WL 4360648, at *16.

Here, the Individual Defendants do not dispute they controlled Oak Street and, because the Complaint alleges a primary securities violation on the part of Oak Street, the Individual Defendants are liable as control persons. *See Akorn*, 240 F. Supp. 3d at 822. As to the Private Equity Defendants, the Complaint alleges they exercised control over Oak Street and had power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading. ¶¶204-11, 283-90. At this stage, that "is enough." *Motorola*, 2008 WL 4360648, at *16. Indeed, the Company has conceded that it was a "controlled company" due to the Private Equity Defendants' ownership and their "control [of] a majority of the voting power of our outstanding common stock." ¶¶207-208.

The Private Equity Defendants argue that the size of their collective holdings is not enough to establish control liability, citing *Fulton Cnty. Emps. Ret. Sys. v. MGIC*, 675 F.3d 1047 (7th Cir. 2012). But that case only involved allegations of holdings. Here, the Company's SEC filings admitted that, in addition to Oak Street being "controlled" by the Private Equity Defendants (¶286), the Private Equity Defendants "will continue to control the vote of all matters submitted

to a vote of our shareholders, which will enable them to control all other corporate decisions" (¶287), will "be able to significantly influence . . . the approval of actions requiring shareholder approval" (*id.*), and would hold a majority of the seats on the Board of Directors, the size of which could be increased only with the Private Equity Defendants' consent (¶288).  These allegations are more than sufficient to establish control person liability.  *See In re GoHealth, Inc. Sec. Litig.*, 2022 WL 1136576, at *3-4 (N.D. Ill. Apr. 18, 2022) (finding allegations that two shareholders together held controlling interest and could "control matters requiring shareholder approval" and "appoint members of the Company's board" were sufficient to plead control liability, and holding that the fact that two shareholders "may have shared control does not foreclose [their] liability").[24]

## IV.    CONCLUSION

Defendants' motion to dismiss should be denied in its entirety.  Should the motion be granted, in any part, Plaintiffs request leave to amend under Rule 15(a) to comply with the Court's ruling.

---

[24] Defendants' other cases are inapposite.  *See Brasher*, 2012 WL 1357699, at *12 (finding control not pled based on stock holdings and general claim that defendant "influences [the company's] affairs significantly"); *In re Glob. Crossing, Ltd. Sec. Litig.*, 2005 WL 1907005, at *10 (S.D.N.Y. Aug. 8, 2005) (finding control not pled based on fact that entity "had the power to appoint a representative to the [company's] board"); *Ark. Tchr. Ret. Sys. v. Bankrate, Inc.*, 18 F. Supp. 3d 482, 486 (S.D.N.Y. 2014) (no facts "suggesting that the Apax entities had control").

Dated: September 26, 2022

Respectfully Submitted,

**ROBBINS GELLER RUDMAN
  & DOWD LLP**

  */s/ Frank A. Richter*
James E. Barz (Il Bar # 6255605)
Frank A. Richter (Il Bar # 6310011)
Cameran M. Gilliam (Il Bar # 6332723)
200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  312/674-4674
312/674-4676 (fax)
jbarz@rgrdlaw.com
frichter@rgrdlaw.com
CGilliam@rgrdlaw.com

**LABATON SUCHAROW LLP**

  */s/ Christine M. Fox*
CAROL C. VILLEGAS (*pro hac vice*)
CHRISTINE M. FOX (*pro hac vice*)
GUILLAUME BUELL (*pro hac vice*)
JAKE BISSELL-LINSK (*pro hac vice*)
JAMES M. FEE (*pro hac vice*)
140 Broadway
New York, NY 10005
Telephone:  212/907-0700
212/818-0477 (fax)
cvillegas@labaton.com
cfox@labaton.com
gbuell@labaton.com
jbissell-linsk@labaton.com
jfee@labaton.com

*Lead Counsel for Lead Plaintiffs Central
Pennsylvania Teamsters Pension Fund –
Defined Benefit Plan, Central Pennsylvania
Teamsters Pension Fund – Retirement Income
Plan 1987, and Boston Retirement System and
Counsel for Named Plaintiff City of Dearborn
Police & Fire Revised Retirement System*

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on September 26, 2022, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will automatically send notification of such filing to all counsel of record.

/s/ Christine M. Fox
CHRISTINE M. FOX

LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
Telephone:  212/907-0700
212/818-0477 (fax)

Email:  cfox@labaton.com