**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

REGINALD T. ALLISON, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

vs.

OAK STREET HEALTH, INC., et al.,

Defendants.

Case No. 1:22-cv-00149

Judge Matthew F. Kennelly

**THE NEWLIGHT DEFENDANTS' ANSWER**
**TO LEAD PLAINTIFFS' COMPLAINT**

Defendants Newlight Partners LP and Newlight Harbour Point SPV (collectively, the "Newlight Defendants"), by their attorneys, Paul, Weiss, Rifkind, Wharton & Garrison LLP, hereby answer Lead Plaintiffs' Complaint for Violations of the Federal Securities Laws (the "Complaint," Dkt. No. 40), filed on May 25, 2022 by Central Pennsylvania Teamsters Pension Fund – Defined Benefit Plan, Central Pennsylvania Teamsters Pension Fund – Retirement Income Plan 1987, and Boston Retirement System ("Lead Plaintiffs"), and additionally named plaintiff City of Dearborn Police & Fire Revised Retirement System (together with Lead Plaintiffs, "Plaintiffs").

The following matters are incorporated by reference into the Newlight Defendants' response to each paragraph in the Complaint:

A.       The Complaint contains purported excerpts from and references to a number of documents, call transcripts, and third-party publications, which often have been modified and taken out of context.  Such documents, call transcripts, and third-party publications should be

considered, if at all, in context and/or in unmodified form, and the Oak Street Defendants respectfully refer the Court to the respective documents for a complete statement of their contents.

B.     Except as otherwise expressly admitted herein, the Newlight Defendants deny each and every averment or allegation contained in the preamble, headings, subheadings, or footnotes of the Complaint. The Newlight Defendants specifically deny any liability to any Plaintiff or any members of the putative class.

The Newlight Defendants answer the Complaint as follows:

Deny knowledge or information sufficient to form a belief as to the truth of the allegations in the Complaint's introductory paragraph, except admit that Plaintiffs purport to assert claims on behalf of a purported class of all similarly situated.

### SUMMARY OF THE ACTION

1.     This is a federal securities class action on behalf of all persons and entities who or which purchased or otherwise acquired the publicly traded common stock of Oak Street during the period from August 6, 2020 through November 8, 2021, inclusive ("Class Period"), including those who purchased shares of Oak Street common stock pursuant or traceable to the registration statements and prospectuses issued in connection with Oak Street's Initial Public Offering ("IPO") on August 6, 2020, and/or in the Company's secondary public offerings ("SPOs"), which occurred on the following dates: (i) December 2, 2020 ("December 2020 Offering"); (ii) February 10, 2021 ("February 2021 Offering"); and (iii) May 26, 2021 ("May 2021 Offering"), and were damaged thereby (the "Class"), seeking to pursue remedies under §§11, 12, and 15 of the Securities Act of 1933 ("Securities Act") and §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and SEC Rule 10b-5 promulgated thereunder.

**ANSWER:** Aver that Paragraph 1 of the Complaint contains Plaintiffs' description of their own claims, to which no response is required. To the extent a response is required, deny the allegations in Paragraph 1 of the Complaint, except admit that Plaintiffs purport to assert claims on behalf of a purported class of all similarly situated persons or entities who purchased or otherwise acquired Oak Street Health, Inc. ("Oak Street") stock during August 6, 2020 to November 8, 2021, inclusive (the "Class Period"), and purport to base their claims on the cited statutory provisions.

2

2.      The claims are alleged against Oak Street, its Chief Executive Officer ("CEO") Michael Pykosz ("Pykosz"), its Chief Financial Officer ("CFO") Timothy Cook ("Cook"), two of its largest shareholders, Newlight (defined below) and General Atlantic (defined below), the underwriters in the Company's IPO and SPOs, and members of the Company's Board of Directors who signed the registration statements for the IPO and SPOs.

**ANSWER:** Aver that Paragraph 2 of the Complaint contains Plaintiffs' description of their own claims, to which no response is required. To the extent a response is required, deny the allegations in Paragraph 2 of the Complaint, except admit that Plaintiffs purport to assert claims against Oak Street, Timothy Cook ("Cook"), Michael Pykosz ("Pykosz"), General Atlantic LLC (n/k/a General Atlantic, L.P.), General Atlantic (OSH) Interholdco, L.P. (together, "General Atlantic Defendants"), Newlight Partners LP, Newlight Harbour Point SPV (n/k/a Newlight Harbour Point SPV LLC) (together, the "Newlight Defendants"), certain Oak Street directors— Geoff Price, Griffin Myers, Regina Benjamin, Carl Daley, Cheryl Dorsey, Mohit Kaushal, Kim Keck, Julie Klapstein, Paul Kusserow, Robbert Vorhoff, and Srdjan Vukovic (the "Director Defendants")—, and the underwriters of Oak Street's initial public offering and secondary public offerings (altogether, "Defendants").

3.      This case arises from an unfortunate securities fraud pattern wherein insiders boast about the performance of a private company, take it public, cash out massive profits by selling a portion of their shares, and then reveal that things are not as good as public investors were led to believe.

**ANSWER:** Deny the allegations in Paragraph 3 of the Complaint.

4.      Oak Street operates primary care physician offices focused exclusively on patients that are Medicare eligible – *i.e.*, aged 65 or over. Defendant Pykosz, who co-founded Oak Street in 2012, has claimed that Oak Street created a "better mousetrap" in the Medicare industry. He claimed that Oak Street could profit by entering into agreements that would provide Oak Street with lump-sum, Medicare-funded, monthly payments for each patient that signed up with Oak Street, but, in return, required Oak Street to undertake financial responsibility for all of the patient's healthcare costs. According to Pykosz, Oak Street would then provide such superior primary medical care that it would prevent costly procedures and hospitalization, thereby keeping healthcare costs below the lump sum payments, resulting in significant profits.

**ANSWER:** The allegations in Paragraph 4 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 4 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at the other Defendants therein, and respectfully refer the Court to the transcript of the June 1, 2021 William Blair Growth Stock Conference (Virtual) (the "William Blair Conference") its complete and accurate text.

5. While Oak Street and Pykosz touted this model as revolutionary and profitable, it has never made money, unlike Defendant Pykosz who reportedly received compensation worth $568 million in 2020, making him the second-highest paid CEO, second only to Elon Musk. Instead, Oak Street has reported consistent losses, relying on investments from private equity investors – namely, Defendants Newlight and General Atlantic – to allow Oak Street time to scale its business large enough to attract interest from the public markets. Newlight and General Atlantic made their investments in the years preceding the IPO, building up controlling ownership interests in the Company. To create a public market on which a portion of those otherwise illiquid interests could be sold, and to raise more funds to scale Oak Street's model, defendants took the Company public through the IPO in August 2020.

**ANSWER:** Deny the allegations in Paragraph 5 of the Complaint, except deny knowledge and information sufficient to form a belief regarding the allegations directed at Defendants other than the Newlight Defendants, admit that certain entities associated with the Newlight Defendants invested in Oak Street prior to the Class Period and that Newlight Harbour Point SPV LLC was a shareholder of Oak Street during the Class Period, and respectfully refer the Court to Oak Street's public statements, including its SEC filings, for their complete and accurate texts.

6. Issuing stock, and raising money from the public, came with obligations. Oak Street now had to publicly issue financial statements, and Pykosz and Cook had to truthfully answer questions from analysts and investors about the business. Moreover, Oak Street had to demonstrate that there was value to investing in its business, despite having only reported losses in its eight-year history.

**ANSWER:** The allegations in Paragraph 6 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny knowledge and information sufficient to form a belief regarding the allegations directed at Defendants other than

4

the Newlight Defendants, except respectfully refer the Court to Oak Street's public statements, including its SEC filings, for their complete and accurate texts.

7.      On that point, Oak Street's profitability was limited to whatever profit margin Oak Street could obtain on each patient, multiplied by its patient base.  Oak Street, however, had not been profitable, but was suggesting that ramping up its scale, *i.e.*, adding more patients, would make it profitable.  In other words, even assuming Oak Street could reduce medical costs on each of its patients, it needed enough patients to achieve profitability, and thereafter the way for those profits to increase would be to add more and more patients.  Thus, Oak Street's profit growth, and value, was dependent on adding as many new patients as possible.  Oak Street has routinely highlighted "increase patient enrollment" at the top of what it publicly touts as the "key elements" of its growth strategy, adding that "[i]f we are unable to increase our patient enrollment . . . our revenue and our ability to achieve and sustain profitability would be impaired."

**ANSWER:** The allegations in Paragraph 7 of the Complaint are directed at Defendants who are not the Newlight Defendants.  To the extent a response is required, deny the allegations in Paragraph 7 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at the other Defendants therein, and respectfully refer the Court to Oak Street's public statements, including its SEC filings,  for their complete and accurate texts.

8.      To add patients, Oak Street had historically focused on conducting "community outreach," such as hosting exercise classes, bingo nights, or other events for seniors at "community rooms" in its primary care locations.  Once prospective patients arrived for the community outreach events, Oak Street personnel would try to convince those attendees to select Oak Street as their primary care provider.  In March 2020, Oak Street had to cease these community outreach events as "shelter-in-place" orders were issued throughout the country in response to the spread of the COVID-19 virus.  Thereafter, Oak Street focused on "alternative" ways to initiate contact with Medicare-eligible individuals, including by working with churches or other community-based organizations, and using more television and phone-based marketing.  Once contact was made through one of these channels, Oak Street personnel would continue to try to convince the prospective patients to join Oak Street.

**ANSWER:** The allegations in Paragraph 8 of the Complaint are directed at Defendants who are not the Newlight Defendants.  To the extent a response is required, deny the allegations in Paragraph 8 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at the other Defendants therein, and respectfully refer the Court to Oak Street's public statements, including its SEC filings, for their complete and accurate texts.

5

9. Unbeknownst to investors, however, Oak Street was engaged in overly-aggressive patient acquisition and recruitment strategies that placed the Company at heightened and significant risk of government scrutiny and prosecution. First, around the time of the IPO, as Oak Street needed to demonstrate growth to justify its valuation and increase its stock price, Oak Street began paying third-party insurance agents at least $200 as kickbacks for each patient the agents referred to Oak Street. And second, Oak Street was, both leading up to and after the IPO, repeatedly marketing and providing free transportation to prospective patients as a kickback to induce them to join Oak Street, including to induce them to switch from their existing primary care doctor.

**ANSWER:** The allegations in Paragraph 9 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 9 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at the other Defendants therein.

10. However, these tactics exposed Oak Street to criminal investigation, fines, and sanctions. Federal law prohibits Medicare providers, such as Oak Street, from paying third parties kickbacks for patient referrals on a per-referral basis, and also prohibits Medicare providers from marketing or providing any kickbacks, including free transportation, to induce prospective patients in their selection of healthcare providers. For example, the federal False Claims Act prohibits the submission of claims that were the result of such kickbacks in violation of the federal Anti-Kickback Statute and imposes criminal penalties of up to three times damages. Since Oak Street operates in a highly regulated industry and the government has been aggressive in enforcement of the false claims and anti-kickback laws, even the appearance of such misconduct by a recipient of Medicare revenue, like Oak Street, can threaten and compromise future revenue by negatively impacting its reputation, jeopardizing its participation in Medicare programs, and exposing it to costs of defending against allegations of wrongdoing.

**ANSWER:** The allegations in Paragraph 10 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 10 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at the other Defendants therein, and admit that the Plaintiffs purport to describe the False Claims Act and Anti-Kickback Statute, and respectfully refer the Court to those statutes for their complete and accurate texts.

11. Rather than disclose their decision to use these aggressive patient acquisition and recruitment tactics, Defendants Oak Street, Pykosz, and Cook concealed them from the investing public by making false and misleading statements. For example, they claimed that Oak Street "grow[s] [its] patient base *through our own internal sales and marketing efforts*," and asserted

that "*we're not getting push[ed] patients from someone else*" even though Oak Street was, in fact, "getting push[ed] patients" from third party agents who were being paid on a per-referral basis and not part of Oak Street's "own internal sales and marketing efforts." They also falsely and misleadingly claimed that, as to prospective patients, Oak Street merely "*educate[s] people about the importance of primary care [and] why Oak Street Health is a great place*" while omitting that Oak Street was offering and providing free transportation to induce prospective patients to convert their primary care selection to Oak Street.

**ANSWER:** The allegations in Paragraph 11 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 11 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at the other Defendants therein, and respectfully refer the Court to the transcript of the J.P. Morgan 39th Annual Healthcare Virtual Conference (the "2021 JPMorgan Conference"), the transcript of Oak Street's September 17, 2020 earnings call (the "2Q20 Earnings Call"), and Oak Street's SEC filings for their complete and accurate texts.

12. As Defendants Oak Street, Pykosz, and Cook made false and misleading statements and omissions, Oak Street's stock price skyrocketed, going from $21 per share at the time of the August 2020 IPO to more than $60 per share by February 2021. While Oak Street's stock traded at artificially inflated and/or artificially maintained prices, Defendants Newlight and General Atlantic cashed out more than $1.4 billion worth of Oak Street stock, including at prices exceeding $60 per share. Defendants Pykosz and Cook also cashed out more than $75 million worth of Oak Street stock from the time of the IPO through November 2, 2021 while in possession of materially nonpublic information regarding Oak Street's business.

**ANSWER:** Deny the allegations in Paragraph 12 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at the other Defendants therein, admit that the Newlight Defendants sold Oak Street stock during the Class Period, and respectfully refer the Court to the publicly reported prices of Oak Street stock and the publicly available Forms 4 filed by Newlight Partners LP, Newlight Harbour Point SPV LLC, General Atlantic LLC (n/k/a General Atlantic, L.P.), General Atlantic (OSH) Interholdco, L.P., Pykosz, and Cook.

13. Then, after the close of trading on November 8, 2021, the Company revealed that it was under investigation by the U.S. Department of Justice ("DOJ") for the very tactics

7

defendants had concealed while they cashed out nearly $1.5 billion in Oak Street stock. Specifically, Oak Street disclosed that it had "received a civil investigation demand ('CID') from the United States Department of Justice," which was "investigating whether the Company may have violated the False Claims Act, 31 U.S.C. §§3729-3722," adding that the "CID requests certain documents and information related to the Company's relationships with third-party marketing agents and related to the Company's provision of free transportation to federal health care beneficiaries."

**ANSWER:** The allegations in Paragraph 13 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 13 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at the other Defendants therein, and respectfully refer the Court to Oak Street's Form 10-Q filed on November 8, 2021 for its complete and accurate text.

14. On this news, the price of Oak Street stock fell by more than 20%, from $47 per share to $37 per share, wiping out more than $2 billion in market capitalization. In subsequent disclosures, Defendant Pykosz has admitted that "the term third-party agents" from the CID "refers to insurance agents and advisers" and "we have engaged, and we pay these agents." And Oak Street has modified its SEC filings to confirm that it does "offer" and "transfer" "remuneration to prospective" patients. Subsequent reports from investigative news sources, citing Oak Street employees and documents, have further illustrated and confirmed Oak Street's kickbacks and improper practices.

**ANSWER:** The allegations in Paragraph 14 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 14 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at the other Defendants therein, and respectfully refer the Court to the transcript of the November 18, 2021 Wolfe Research Virtual Healthcare Conference (the "Wolfe Research Conference"), Oak Street's 2021 Form 10-K filed on February 28, 2022 (the "2021 Form 10-K"), and articles published by *Capitol Forum* for their complete texts, and to the publicly reported closing prices of Oak Street stock.

15. Oak Street's stock price has continued to decline since November 8, 2021 and currently trades at less than $18, representing a more than 70% decline from Class Period highs.

**ANSWER:** Deny the allegations in Paragraph 15 of the Complaint, and respectfully refer the Court to the publicly reported closing prices of Oak Street stock.

16.     As a result of defendants' misconduct alleged herein, Plaintiffs and members of the Class purchased Oak Street stock at artificially inflated prices and/or artificially maintained prices and suffered significant damages.

**ANSWER:** Deny the allegations in Paragraph 16 of the Complaint.

## JURISDICTION AND VENUE

17.     The claims asserted herein arise under and pursuant to §§11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§77k, 77l(a)(2), and 77o, §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

**ANSWER:** Aver that Paragraph 17 of the Complaint contains Plaintiffs' description of their own claims, to which no response is required.  To the extent a response is required, deny the allegations in Paragraph 17 of the Complaint, except admit that Plaintiffs purport to base their claims on the cited statutory provisions.

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, §22 of the Securities Act, 15 U.S.C. §77v, and §27 of the Exchange Act, 15 U.S.C. §78aa.

**ANSWER:** Deny the allegations in Paragraph 18, except admit that Plaintiffs purport to assert claims under various U.S. securities laws, and therefore, this Court has jurisdiction over those claims.

19.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b)-(c), §22 of the Securities Act, 15 U.S.C. §77v, and §27 of the Exchange Act, 15 U.S.C. §77aa.  Many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District, and the Company's corporate headquarters are located in this District.

**ANSWER:** Aver that Paragraph 19 of the Complaint contains legal conclusions, to which no response is required.  To the extent a response is required, deny the allegations in Paragraph 19 of the Complaint, except admit that Oak Street's corporate headquarters is in Chicago, Illinois, and aver that the Newlight Defendants do not challenge the assertion of venue in this Court.

9

20.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**ANSWER:** Deny the allegations in Paragraph 20 of the Complaint.

21.     Plaintiffs assert securities fraud claims under the Exchange Act for materially false and misleading statements made during the Class Period against Oak Street and certain of its officers and controlling shareholders.

**ANSWER:** Aver that Paragraph 21 of the Complaint contains Plaintiffs' description of their own claims, to which no response is required. To the extent a response is required, deny the allegations in Paragraph 21 of the Complaint, except admit that Plaintiffs purport to bring certain claims under the Exchange Act.

22.     In addition, starting at ¶212 below, Plaintiffs assert non-fraud claims under the Securities Act for false and misleading statements and omissions made in the registration statements and prospectuses issued in connection with the IPO, the December 2020 Offering, the February 2021 Offering, and the May 2021 Offering against Oak Street, certain of its officers, directors, controlling shareholders, and the underwriters of the offerings.

**ANSWER:** Aver that Paragraph 22 of the Complaint contains Plaintiffs' description of their own claims, to which no response is required.  To the extent a response is required, deny the allegations in Paragraph 22 of the Complaint, except admit that Plaintiffs purport to bring certain claims under the Securities Act.

**EXCHANGE ACT CLAIMS**

**Plaintiffs**

23.     Lead Plaintiff Central Pennsylvania Teamsters Pension Fund – Defined Benefit Plan purchased shares of Oak Street common stock during the Class Period and was damaged thereby.  *See* ECF 11-2.

**ANSWER:** Deny the allegations in Paragraph 23 of the Complaint, except deny knowledge or information sufficient to form a belief concerning the allegations regarding Lead Plaintiff

10

Central Pennsylvania Teamsters Pension Fund – Defined Benefit Plan, and respectfully refer the Court to the document filed at ECF 11-2 for its complete and accurate text.

24.     Lead Plaintiff Central Pennsylvania Teamsters Pension Fund – Retirement Income Plan 1987 purchased shares of Oak Street common stock during the Class Period and was damaged thereby.  *See* ECF 11-2.

**ANSWER:** Deny the allegations in Paragraph 24 of the Complaint, except deny knowledge or information sufficient to form a belief concerning the allegations regarding Lead Plaintiff Central Pennsylvania Teamsters Pension Fund – Retirement Income Plan 1987, and respectfully refer the Court to the document filed at ECF 11-2 for its complete and accurate text.

25.     Lead Plaintiff Boston Retirement System purchased shares of Oak Street common stock during the Class Period and was damaged thereby.  *See* ECF 11-2.

**ANSWER:** Deny the allegations in Paragraph 25 of the Complaint, except deny knowledge or information sufficient to form a belief concerning the allegations regarding Lead Plaintiff Boston Retirement System, and respectfully refer the Court to the document filed at ECF 11-2 for its complete and accurate text.

26.     City of Dearborn Police & Fire Revised Retirement System ("Dearborn") is an additionally named plaintiff, purchased shares of Oak Street common stock during the Class Period, and was damaged thereby.  As set forth in the attached Certification, Dearborn purchased shares of Oak Street common stock in the Company's IPO, December 2020 Offering, and February 2021 Offering.

**ANSWER:** Deny the allegations in Paragraph 26 of the Complaint, except deny knowledge or information sufficient to form a belief concerning the allegations regarding additionally named Plaintiff Dearborn Police & Fire Revised Retirement System, and respectfully refer the Court to the document attached as a Certification to ECF 40 for its complete and accurate text.

**Oak Street Defendants**

27.     Defendant Oak Street is headquartered in Chicago, Illinois.  Oak Street operates primary care centers in the United States, focusing exclusively on Medicare beneficiaries.  Oak Street went public through an August 6, 2020 IPO, and its common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "OSH."

11

**ANSWER:** The allegations in Paragraph 27 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 27 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at Oak Street therein, and admit that Oak Street is headquartered in Chicago, Illinois, and that Oak Street common stock traded on the New York Stock Exchange throughout the Class Period under the symbol "OSH," and respectfully refer the Court to Oak Street's public statements, including its SEC filings, for their complete and accurate texts.

28. Defendant Michael Pykosz has served as CEO and Chairman of the Board since he co-founded the Company in 2012.

**ANSWER:** The allegations in Paragraph 28 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, admit the allegations in Paragraph 28 of the Complaint.

29. Defendant Timothy Cook has served as CFO of Oak Street since 2019.

**ANSWER:** The allegations in Paragraph 29 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, admit the allegations in Paragraph 29 of the Complaint.

30. Defendants Pykosz and Cook are collectively referred to herein as the "Individual Defendants."

**ANSWER:** Aver that Paragraph 30 of the Complaint contains Plaintiffs' description of their own allegations, to which no response is required. To the extent a response is required, admit that Plaintiffs purport to use the defined term as alleged.

**Private Equity Defendants**

31. Defendant General Atlantic LLC is a private equity firm headquartered in New York, New York. Defendant General Atlantic (OSH) Interholdco, L.P. is an investment vehicle created for the benefit of General Atlantic LLC to house its ownership of Oak Street common stock. Defendants General Atlantic LLC and General Atlantic (OSH) Interholdco, L.P. are

collectively referred to herein as "General Atlantic." Throughout the Class Period, General Atlantic held a substantial ownership stake in the Company.

**ANSWER:** The allegations in Paragraph 31 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 31 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at the other Defendants therein, and respectfully refer the Court to General Atlantic (OSH) Interholdco, L.P.'s Forms 4 for their complete and accurate text, and admit that Plaintiffs purport to use the defined term as alleged.

32. Defendant Newlight Partners LP is a private equity firm headquartered in New York, New York. Defendant Newlight Harbour Point SPV is an investment vehicle created for the benefit of Newlight Partners LP to house its ownership of Oak Street common stock. Defendants Newlight Partners LP and Newlight Harbour Point SPV are collectively referred to herein as "Newlight." Throughout the Class Period, Newlight held a substantial ownership stake in the Company.

**ANSWER:** Deny the allegations in Paragraph 32 of the Complaint, except admit that Newlight Partners LP is a private equity firm and its address is in New York, New York, that Newlight Partners LP controls Newlight Harbour Point SPV LLC, that Newlight Harbour Point SPV LLC owned Oak Street stock during the Class Period, and respectfully refer the Court to Newlight Partners LP's publicly available Forms 4 for their complete and accurate texts.

**FACTUAL BACKGROUND**

**The Medicare and Medicare Advantage Industry**

33. Medicare is the U.S. government-funded insurance available to individuals that are at least 65 years old. In 2021, approximately 63 million people were enrolled as Medicare beneficiaries.

**ANSWER:** Admit that Plaintiffs purport to describe Medicare in Paragraph 33 of the Complaint, and respectfully refer the Court to the website of the Centers for Medicare & Medicaid Services ("CMS") for more information.

13

34.     In general, there are two types of Medicare through which eligible persons can elect to receive their health insurance: Original Medicare and Medicare Advantage.

**ANSWER:** Admit that Plaintiffs purport to describe Medicare in Paragraph 34 of the Complaint, and respectfully refer the Court to the CMS website for more information.

35.     Original Medicare is administered by the U.S. government through the Centers for Medicare & Medicaid Services ("CMS"). Original Medicare includes "Part A" coverage, which covers hospital care, and "Part B" coverage, which covers services from doctors and other health care providers. Beneficiaries can choose to add "Part D" coverage, which covers prescription drugs.

**ANSWER:** Admit that Plaintiffs purport to describe Medicare in Paragraph 35 of the Complaint, and respectfully refer the Court to the CMS website for more information.

36.     Under Original Medicare, CMS pays healthcare providers directly for medical services, typically on a fee-for-service ("FFS") basis. For example, a person who enrolls to receive Medicare Part B benefits through Original Medicare will be billed for each medical service – *e.g.*, primary care visits, tests, and immunizations – and the beneficiary will pay the costs for each service until they reach a deductible. After that, when the beneficiary receives medical services, CMS pays the majority of the fees for each service.

**ANSWER:** Admit that Plaintiffs purport to describe Medicare in Paragraph 36 of the Complaint, and respectfully refer the Court to the CMS website for more information.

37.     Medicare Advantage ("MA"), also referred to as "Part C" Medicare, unlike Original Medicare, is administered through Medicare-approved private health companies, such as Humana and Cigna, and the coverage generally "bundles" the coverages associated with Original Medicare Part A, Part B, and often Part D.

**ANSWER:** Admit that Plaintiffs purport to describe Medicare in Paragraph 37 of the Complaint, and respectfully refer the Court to the CMS website for more information.

38.     Under MA, CMS pays the healthcare companies a per-person per-month ("capitated") amount for each beneficiary enrolled in their MA plan. The payments are made prospectively each month, and the amount of the capitated payments are based on annually established rates, adjusted for each beneficiary based on a "risk adjustment model." This model compensates MA plans based on the demographic characteristics and health risks of each individual patient. MA plans with higher-risk patients receive more, and those with lower-risk patients receive less. Even though the risk adjustment model attempts to estimate a beneficiary's monthly healthcare costs, MA plans receive the capitated payments without regard to the services that the beneficiaries actually receive.

**ANSWER:** Admit that Plaintiffs purport to describe Medicare in Paragraph 38 of the Complaint, and respectfully refer the Court to the CMS website for more information.

39. The MA plans, in turn, manage all the beneficiary's healthcare costs. The MA plans can only profit if the healthcare costs remain below the capitated payments from CMS. MA plans have a number of tools to make this happen. For example, MA plans are operated by large healthcare companies and have resources, that the government may not, to closely monitor claims and deny or downgrade claims where appropriate. MA plans also maintain networks of providers that, due to their participation in the network, are required to follow paths of care with other in-network doctors or specialists that attempt to resolve issues with less-costly options before escalating to higher-cost care.

**ANSWER:** Admit that Plaintiffs purport to describe Medicare in Paragraph 39 of the Complaint, and respectfully refer the Court to the CMS website for more information.

**Oak Street's Business Model**

40. Founded in 2012, Oak Street operates primary care centers for individuals eligible for Medicare. Traditionally, such primary care centers would bill and earn revenue on a FFS basis, both through Original Medicare and Medicare Advantage. Under Original Medicare, the primary care centers would see the patient, and then submit a bill to CMS for the visit and any tests, additional evaluation, or other services. The same process would apply for MA, but the bill would be submitted to the MA plan administering the Medicare benefits.

**ANSWER:** The allegations in Paragraph 40 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 40 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at the other Defendants therein, and respectfully refer the Court to Oak Street's public statements, including its SEC filings, for their complete and accurate texts.

41. Oak Street billed and earned revenue under this traditional approach for Original Medicare beneficiaries, but it mainly focused on MA beneficiaries where Defendant Pykosz claimed Oak Street had "built a better mousetrap."

**ANSWER:** The allegations in Paragraph 41 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 41 of the Complaint, except deny knowledge or information sufficient to form a belief

as to the allegations directed at the other Defendants therein, and respectfully refer the Court to

Oak Street's public statements, including its SEC filings, for their complete and accurate texts.

42. Specifically, Oak Street enters into "capitation agreements" with MA plans through which the MA plans pass along portions, typically 85%, of the capitated payments they receive from CMS to Oak Street, so long as the beneficiary selects Oak Street as the beneficiary's primary care provider. Oak Street refers to this as its "capitated revenue." In return, Oak Street becomes financially responsible for all of the beneficiary's medical costs, including emergency room visits, other hospital visits, and specialist physician costs. Oak Street refers to such patients that are MA plan beneficiaries for which Oak Street receives capitated payments as its "at-risk" patients. Oak Street's at-risk patient base accounts for more than 97% of annual revenue. The remaining revenue comes from services that Oak Street provides on a FFS basis to, for example, patients on Original Medicare or on MA plans that have not entered a capitation agreement with Oak Street.

**ANSWER:** The allegations in Paragraph 42 of the Complaint are directed at Defendants

who are not the Newlight Defendants. To the extent a response is required, deny the allegations

in Paragraph 42 of the Complaint, except deny knowledge or information sufficient to form a belief

as to the allegations directed at the other Defendants therein, and respectfully refer the Court to

Oak Street's public statements, including its SEC filings, for their complete and accurate texts.

43. Because Oak Street takes full responsibility for the medical costs of at-risk patients, the healthcare companies are able to lock in their gross profits at the amount between the payments their MA plans receive from CMS and the capitated payments the MA plans pass along to Oak Street, typically a 15% margin. As to Oak Street, however, it can only profit if it keeps the beneficiaries' medical costs, combined with Oak Street's additional administrative, marketing, and other costs, below the capitated revenue received from the plans. If it does not, then Oak Street loses money.

**ANSWER:** The allegations in Paragraph 43 of the Complaint are directed at Defendants

who are not the Newlight Defendants. To the extent a response is required, deny the allegations

in Paragraph 43 of the Complaint, except deny knowledge or information sufficient to form a belief

as to the allegations directed at the other Defendants therein, and respectfully refer the Court to

Oak Street's public statements, including its SEC filings, for their complete and accurate texts.

44. Unlike an MA plan, Oak Street does not have the same cost-saving tools that are available to a large healthcare company. For example, Oak Street does not administer physician or hospital networks, so it cannot necessarily restrict where its patients go to receive additional care or ensure that pre-authorization or other procedures are being performed before a patient

16

receives expensive tests, books medical visits, or is admitted into an emergency room or hospital setting. Instead, Oak Street claims it can achieve the necessary cost savings to record profits, on just 85% of the capitated payments from the government, through a two-part strategy.

**ANSWER:** The allegations in Paragraph 44 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 44 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at the other Defendants therein, and respectfully refer the Court to Oak Street's public statements, including its SEC filings, for their complete and accurate texts.

45. First, Oak Street claims to have superior diagnostic processes and technology that better identify patient risks. Oak Street claims that its patients often come into Oak Street centers with inadequately documented risks and medical histories, so Oak Street's purportedly superior system allows doctors to document more risks, providing CMS with more data to increase the "risk adjustment" scores, resulting in higher capitated revenue.

**ANSWER:** The allegations in Paragraph 45 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 45 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at the other Defendants therein, and respectfully refer the Court to Oak Street's public statements, including its SEC filings, for their complete and accurate texts.

46. Second, Oak Street claims to provide superior primary care, as its doctors purportedly often provide more visits per year than average and frequent follow-up visits, which Oak Street says prevents patients from incurring higher-cost medical events, such as hospital visits.

**ANSWER:** The allegations in Paragraph 46 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 46 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at the other Defendants therein, and respectfully refer the Court to Oak Street's public statements, including its SEC filings, for their complete and accurate texts.

47. But even if Oak Street were successful in this two-part strategy of increasing the capitated payments through "risk adjustments" and reducing medical costs through superior care, the profits per patient are finite. Recent reports to Congress by the Medicare Payment Advisory

17

Commission state that, based on available data, MA plans reported net profit margins that averaged 4.5% and 6.5% in 2019 and 2020, respectively. Oak Street receives only 85% of the capitated government payments to MA plans as revenue, and has never reported any profits in its 10-year history.

**ANSWER:** The allegations in Paragraph 47 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 47 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at the other Defendants therein, and respectfully refer the Court to the transcript of the William Blair Conference, the congressional reports submitted by the Medicare Payment Advisory Commission, and Oak Street's public statements, including its SEC filings, for their complete and accurate texts.

48. An example demonstrates how total at-risk patients act as a ceiling on Oak Street's profitability. Oak Street has claimed that it averages "annual revenue of $12,000 per member." If Oak Street could achieve a 10% net profit margin on $12,000 per at-risk patient (double what the MA plans secure and something Oak Street has never done), that would amount to $1,200 in profits per patient. And, at the start of the Class Period, Oak Street had roughly 58,000 at-risk patients. Thus, even assuming that level of success, which the Company had never reached, without new patient growth, Oak Street's maximum profit would be less than $70 million ($1,200 x 58,000 patients = $69.6 million).

**ANSWER:** The allegations in Paragraph 48 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 48 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at the other Defendants therein, admit that $1,200 x 58,000 = $69.6 million, and respectfully refer the Court to Oak Street's public statements, including its SEC filings, for their complete and accurate texts.

49. Nevertheless, the Company touted its unlimited growth potential by claiming that the "total addressable market size" for its business was $325 billion. Based on anticipated future profitability, despite historical losses, Oak Street's market capitalization at the time of the IPO valued Oak Street at more than $5 billion. Unsurprisingly, the Company has stated that it needs to "attract[] patients in existing and new markets in order to drive long-term value creation."

**ANSWER:** The allegations in Paragraph 49 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 49 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at the other Defendants therein, and respectfully refer the Court to Oak Street's public statements, including its SEC filings, for their complete and accurate texts.

**Oak Street's Patient Acquisition Practices Are Highly Regulated**

50. Oak Street cannot add new patients simply by opening a location and expecting people to sign up. As explained by Defendant Pykosz, "people aren't shopping for a doctor in the same consumer way they're shopping for other things," so when Oak Street initially did not have a sales and marketing department, patients did not join. Instead, Oak Street had to engage in sales and marketing activities to acquire new patients and, for many, convince those new patients to switch from their existing primary care physician to Oak Street. But Oak Street's ability to do so was hindered by expansive legislation and regulation.

**ANSWER:** The allegations in Paragraph 50 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 50 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at the other Defendants therein, and respectfully refer the Court to the transcript of the January 10, 2022 JP Morgan 40th Annual Healthcare Conference ("2022 JPMorgan Conference") and Oak Street's public statements, including its SEC filings, for their complete and accurate texts.

51. While all businesses are subject to laws, all of Oak Street's revenues were derived from the U.S. government's Medicare system, placing Oak Street's patient acquisition tactics at the center of a highly-regulated and highly-scrutinized industry. The U.S. Government Accountability Office ("GAO") has designated Medicare a "high risk" program because it is "particularly vulnerable to fraud, waste, abuse, and improper payments." Accordingly, the U.S. government has put into place extensive laws, regulations, and industry guidelines that restrict primary care providers, like Oak Street, from engaging in certain business practices, including certain sales and marketing activities that may be common in other industries.

**ANSWER:** The allegations in Paragraph 51 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations

19

in Paragraph 51 of the Complaint, except deny knowledge or information sufficient to form a belief

as to the allegations directed at the other Defendants therein and as to the allegations regarding the

U.S. Government Accountability Office, and respectfully refer the Court to Oak Street's public

statements, including its SEC filings, for their complete and accurate texts.

52.     As stated by Oak Street in SEC filings, "we operate in a highly regulated industry" and "[o]ur operations are subject to extensive federal, state and local government laws and regulations," including "Medicare and Medicaid reimbursement rules and regulations," "federal and state anti-kickback laws," the "FCA [False Claims Act] and associated regulations," and the "Civil Monetary Penalty statue and associated regulations."

**ANSWER:** The allegations in Paragraph 52 of the Complaint are directed at Defendants

who are not the Newlight Defendants.  To the extent a response is required, deny the allegations

in Paragraph 52 of the Complaint, except deny knowledge or information sufficient to form a belief

as to the allegations directed at the other Defendants therein, and respectfully refer the Court to

Oak Street's public statements, including its SEC filings,  for their complete and accurate texts.

53.     The False Claims Act ("FCA"), for example, provides the government a means of policing false bills or false requests for payment in the Medicare system.  The FCA prohibits any person or company from: (1) knowingly presenting or causing to be presented a false or fraudulent claim for payment to the government; or (2) knowingly making or causing to be made a false record or statement material to a false or fraudulent claim.  As explained by the Company, "the FCA authorizes the imposition of up to three times the government's damages and significant per claim penalties." Significant to this case, the Affordable Care Act, enacted in 2010, provides that any claims submitted to Medicare for items or services resulting from a violation of the federal Anti- Kickback Statute ("AKS") are considered false or fraudulent for purposes of the FCA.  Thus, claims for payment submitted to Medicare that are tainted by AKS violations can be subject to liability under the FCA.

**ANSWER:** The allegations in Paragraph 53 of the Complaint are directed at Defendants

who are not the Newlight Defendants.  To the extent a response is required, deny the allegations

in Paragraph 53 of the Complaint, except deny knowledge or information sufficient to form a belief

as to the allegations directed at the other Defendants therein, admit that Plaintiffs purport to

describe the False Claims Act, the Affordable Care Act, and the Anti-Kickback Statute, and

respectfully refer the Court to Oak Street's public statements, including its SEC filings, for their complete and accurate texts.

54.    According to the U.S. Office of Inspector General ("OIG"), the AKS's "main purpose is to protect patients and the federal health care programs from fraud and abuse by curtailing the corrupting influence of money on health care decisions."[1]  The AKS provides, in part:

> Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person – (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.

**ANSWER:** Deny the allegations in Paragraph 54 of the Complaint, except admit that Plaintiffs selectively quote the November 1999 Fact Sheet on the Federal Anti-Kickback Law and Regulatory Safe Harbors published by the Office of Inspector General ("OIG") and the Anti-Kickback Statute, and respectfully refer the Court to those documents for their complete and accurate texts.  Aver that Footnote 1 purports to contain a citation, to which no response is required.

55.    The OIG has confirmed that "[r]emuneration from a [healthcare provider] to a patient that is intended to induce the patient to obtain [certain] services implicates the [AKS]." OIG Advisory Opinion No. 00-7 at 6.  For purposes of the AKS, "remuneration" includes the transfer of anything of value, including referral fees or free transportation.  Moreover, the Affordable Care Act amended the AKS to clarify that for a kickback violation to be "knowing" or "willful," a defendant does not need to have actual knowledge that he or she is violating the statute.

**ANSWER:** Deny the allegations in Paragraph 55 of the Complaint, except admit that Plaintiffs purport to describe the Anti-Kickback Statute and Affordable Care Act, and admit that

---

[1]    Fact Sheet, Office of Inspector General Office of Public Affairs, "Federal Anti-Kickback Law and Regulatory Safe Harbors," Nov. 1999, *available at* https://oig.hhs.gov/documents/compliance/851/safefs.htm.

Plaintiffs selectively quote the non-binding Advisory Opinion No. 007 issued by the OIG on November 17, 2000 and the Anti-Kickback Statute, and respectfully refer the Court to those documents for their complete and accurate texts.

56. However, here, defendants did know it was unlawful to provide remuneration to prospective patients to induce them to join Oak Street or to provide remuneration to insurance agents to induce them to refer individuals to Oak Street. It is clear they knew this because the Company's SEC filings, signed by Pykosz and Cook, specifically stated that the AKS "prohibits, among other things, knowingly and willfully offering, paying, soliciting or receiving remuneration, directly or indirectly, in cash or kind, to induce or reward either the referral of an individual for, or the purchase, order or recommendation of, any good or service, for which payment may be made under [Medicare]."

**ANSWER:** Deny the allegations in Paragraph 56 of the Complaint, except deny knowledge and information sufficient to form a belief about the allegations directed at the other Defendants therein, and respectfully refer the Court to Oak Street's SEC filings for their complete and accurate texts.

57. If conduct violates the AKS, it may still not be treated as an offense under the AKS if it satisfies certain "safe harbor" regulations established by the OIG. Relevant here, while the OIG has issued a "safe harbor" for the payment of referral fees for "the cost of operating the referral service," the safe harbor expressly does not apply if payment is based "on the volume or value of any referrals." 42 C.F.R. §1001.952(f). Thus, Courts have held that a referral fee paid "on a per-patient basis is based on the volume of referrals and is therefore remuneration for the purposes of the Anti- Kickback Statute." *United States v . George*, 171 F. Supp. 3d 810, 815 (N.D. Ill. 2016), *aff'd*, 900 F. 3d 405 (7th Cir. 2018). Defendants are aware of this, because Company SEC Filings, signed by Pykosz and Cook, state that "[c]ourt decisions have held that the federal [AKS] may be violated even if only one purpose of remuneration is to induce referrals." The OIG has also made clear on its website guidelines for physicians: "In some industries, it is acceptable to reward those who refer business to you. However, in the Federal health care programs, paying for referrals is a crime."[2]

**ANSWER:** Deny the allegations in Paragraph 57 of the Complaint, except deny knowledge and information sufficient to form a belief about the allegations directed at the other Defendants therein, and admit that Plaintiffs purport to describe the OIG safe harbor regulations applicable to the Anti-Kickback Statute, and admit that Plaintiffs selectively quote from OIG safe harbor

---

[2] https://oig.hhs.gov/compliance/physician-education/fraud-abuse-laws/

regulations at 42 C.F.R. § 1001.952(f), the March 22, 2016 opinion in the case of *United States* v. *George*, 171 F. Supp. 3d 810, 815 (N.D. Ill. 2016), *aff'd*, 900 F.3d 405 (7th Cir. 2018), Oak Street's SEC filings, and the OIG's article on "Fraud & Abuse Laws" available online at the OIG's website, and respectfully refer the Court to those documents for their complete and accurate texts. Aver that Footnote 2 purports to contain a citation, to which no response is required.

58. Also relevant here, the OIG has stated since 2000 that "[f]ree transportation services offered by a [medical provider] to Federal health care program beneficiaries may have monetary value and implicate the [AKS]." *See* OIG Advisory Opinion No. 00-7 at 6. While the OIG has issued a safe harbor permitting certain providers and others to provide free transportation to their patients, that safe harbor applies only to "established patient[s]." 42 C.F.R. §1001.952(bb)(1)(iv). An established patient is defined as a "person who has selected and initiated contact to schedule an appointment with a provider . . . or who previously has attended an appointment with the provider." 42 C.F.R. §1001.952(bb)(3)(ii). Thus, free transportation cannot be offered to individuals targeted by Oak Street to be future patients who have not previously initiated contact or attended an appointment with Oak Street.

**ANSWER:** The allegations in Paragraph 58 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 58 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at the other Defendants therein, and admit that Plaintiffs selectively quote the non-binding Advisory Opinion No. 007 issued by the OIG on November 17, 2000 and the OIG safe harbor regulations at 42 C.F.R. §1001.952(bb)(1)(iv) and (3)(ii), and respectfully refer the Court to those documents for their complete and accurate texts.

59. In addition, the safe harbor makes clear that the provider may not publicly market or advertise free or discounted local transportation services. 42 C.F.R. §1001.952(bb)(1)(iii). In interpreting conduct potentially violating the AKS, the OIG has noted that marketing includes person-to-person "sales pitches" or "'informational' sessions," which the OIG has stated "can be extremely coercive" and "highly susceptible to fraud and abuse," as they can lead to "inappropriate medical choices." OIG Advisory Opinion No. 11-08 at 6. The OIG has explained that when "free transportation" is "marketed or advertised, there is greater risk that [it] is being offered as an inducement." OIG Advisory Opinion No. 15-13 at 6-7. The OIG has expressed particular concern about transportation offers that would be "conditioned" on the patients' use of a "particular provider" or could "influence patients to choose [a particular provider] over other practitioners." *Id.* In short, the AKS bars Oak Street from providing free transportation to prospective – *i.e.*, not

"established" – patients and from marketing or advertising free transportation to prospective patients to induce them to select Oak Street.

**ANSWER:** The allegations in Paragraph 59 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 59 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at the other Defendants therein, and admit that Plaintiffs purport to describe the OIG safe harbor regulations applicable to the Anti-Kickback Statute, and admit that Plaintiffs selectively quote the non-binding Advisory Opinion No. 11-08 issued by the OIG on June 14, 2011, and the non-binding Advisory Opinion No. 15-13 issued by the OIG on October 14, 2015, and respectfully refer the Court to those documents for their complete and accurate texts.

60. Violation of the AKS constitutes a felony punishable by a maximum fine of $100,000 per violation, imprisonment up to 10 years, or both. FCA violations may result in fines of up to three times the government's damages plus up to $11,000 per claim filed. Beyond fines or penalties, violation of the AKS or FCA can also result in exclusion from participation in federal healthcare programs, meaning Medicare could choose to eliminate Oak Street from receiving Medicare funds or otherwise sanction Oak Street for its conduct. As stated by Oak Street, "[i]f any of our business transactions or arrangements . . . were found to violate the federal [AKS], we could face, among other things, criminal, civil or administrative sanctions, including possible exclusion from participation in Medicare." Moreover, the Company has recognized that "[i]n recent years, government oversight and law enforcement have become increasingly active and aggressive in investigating and taking legal action against potential fraud and abuse."

**ANSWER:** The allegations in Paragraph 60 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 60 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at the other Defendants therein, and admit that Plaintiffs purport to describe the Anti-Kickback Statute and False Claims Act, and respectfully refer the Court to Oak Street's public statements, including its SEC filings, for their complete and accurate texts.

61. The Company likewise recognized that violations of the FCA or AKS could result in "severe consequences that would have a material adverse effect on our business, results of operations, financial condition, cash flows reputation and stock price," including "suspension or termination of our participation in government payment programs," "criminal or civil liability,

24

fines, damages or monetary penalties," and "harm to our reputation which could negatively impact our business relationship, affect our ability to attract and retain patients and physicians [and] affect our ability to obtain financing and decrease access to new business opportunities."

**ANSWER:** The allegations in Paragraph 61 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 61 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at the other Defendants therein, and respectfully refer the Court to Oak Street's public statements, including its SEC filings, for their complete and accurate texts.

## EVENTS LEADING UP TO THE CLASS PERIOD

**Oak Street Needed to Demonstrate Growth to Justify the Valuation Defendants Were Seeking for the IPO**

62. As discussed, Oak Street's growth and value is dependent on adding new patients. To acquire new patients, prior to March 2020, Oak Street claimed that it "employ[ed] a grassroots approach" to "ensure we are connecting with Medicare-eligible patients across a number of channels to make them aware of their healthcare choices and the services we offer." Most significantly, Oak Street hosted thousands of events near and at their centers, each of which was equipped with a large "community room" designed specially to host such events. Oak Street personnel would attend the events and try to convince attendees to join Oak Street. The events included, for example, bingo nights, Zumba and other fitness classes, and health education classes. In 2019, according to Company SEC filings, Oak Street "hosted approximately 18,700 local events in the communities surrounding [its] centers."

**ANSWER:** The allegations in Paragraph 62 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 62 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at the other Defendants therein, and respectfully refer the Court to Oak Street's public statements, including its SEC filings, for their complete and accurate texts.

63. On March 11, 2020, the World Health Organization declared COVID-19 a global pandemic. In the lead up to and following that declaration, stay at home orders and guidance were put in place throughout the United States. In Illinois, Governor J.B. Pritzker issued the first of several "stay-at-home orders" on March 20, 2020, prohibiting, among other things, gatherings of more than 10 people and in-office operations for non-essential businesses.

25

**ANSWER:** Deny the allegations in Paragraph 63 of the Complaint, except admit that on March 11, 2020, the World Health Organization declared COVID-19 a global pandemic and various polices were implemented that caused many people to remain at home, and that Governor J.B. Pritzker issued Executive Order 2020-10 on March 20, 2020.

64.     As a result, Oak Street "halted community outreach and other marketing initiatives which drive new patients to our platform." Nevertheless, Defendants Newlight and General Atlantic had potentially billions of dollars' worth of illiquid ownership interests that could effectively only be sold on a public market.  Thus, in the middle of COVID-19 shutdowns, defendants took the Company public via the IPO and pursuant to a registration statement filed with the SEC on an Amended Form S-1 on August 5, 2020 ("IPO Registration Statement").  The IPO Registration Statement confirmed that a primary reason for the IPO was to "create a public market for our common stock."

**ANSWER:** Deny the allegations in Paragraph 64 of the Complaint, except deny knowledge and information sufficient to form a belief about the allegations directed at the other Defendants therein, and respectfully refer the Court to Oak Street's IPO registration statement filed with the SEC on August 5, 2020 (the "IPO Registration Statement") and other SEC filings for their complete and accurate texts.

65.     As discussed, to attract investors to purchase Oak Street's stock, and permit defendants to sell a portion of their ownership interests, Oak Street had to portray itself as being on track to add sufficient patients to turn profitable.  For example, financial analysts from Morgan Stanley covering Oak Street upon the IPO provided a post-IPO price target of $50, which assumed membership growth would nearly double from 2020 to 2022, and the analysts identified "[a]t-risk membership growth" as a key "investment driver[]." Likewise, analysts from Truist Securities issued a post-IPO price target for Oak Street of $56, which was based on a model that assumed Oak Street would more than double its at-risk patients from 2020 to 2022 and then again more than double its at-risk patients from 2022 to 2024.

**ANSWER:** Deny the allegations in Paragraph 65 of the Complaint, except deny knowledge and information sufficient to form a belief about the allegations directed at the other Defendants therein, and admit that Plaintiffs selectively quote a Morgan Stanley analyst report dated August 31, 2020, and purport to characterize a Truist Securities analyst report dated August 31, 2020, and respectfully refer the Court to those documents for their complete and accurate texts.

66. Thus, despite the pandemic having halted Oak Street's traditional method of using community events to acquire patients, in the IPO Registration Statement, the Company repeatedly highlighted its "ability to rapidly scale" across the country and the "significant growth opportunities available to [Oak Street], with less than 50% of our current aggregate center capacity utilized due to our recent center openings and a substantial opportunity to increase the number of centers we operate in new and existing markets." More bluntly, the IPO Registration Statement stated: "[o]ur business strategy is to grow rapidly."

**ANSWER:** The allegations in Paragraph 66 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 66 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at the other Defendants therein, and respectfully refer the Court to Oak Street's IPO Registration Statement for its complete and accurate text.

67. The IPO Registration Statement further acknowledged that "[i]n order to support such growth, we must continue to recruit and retain a sufficient number of new patients," adding that "[i]f we are unable to convince the Medicare-eligible population of the benefits of our Oak Street Platform or if potential or existing patients prefer the care provider model of one of our competitors, we may not be able to effectively implement our growth strategy, which depends on our ability to grow organically and attract new patients." Indeed, the IPO Registration Statement identified "Add[ing] New Patients in Existing Centers" as a "Key Factor[] Affecting Our Performance," and stated that adding new patients is "a key growth driver for the business."

**ANSWER:** The allegations in Paragraph 67 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 67 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at the other Defendants therein, and respectfully refer the Court to Oak Street's IPO Registration Statement for its complete and accurate text.

**Oak Street Secretly Engages in Aggressive and Improper Patient Acquisition Tactics, Exposing Oak Street to Significant Risk**

68. Given the importance of demonstrating growth to the public markets, leading up to and following the IPO, Oak Street engaged in overly-aggressive and improper patient acquisition and recruitment tactics, which – unbeknownst to public investors – drastically increased the risk of government scrutiny, including investigations, fines, penalties, or even suspension or removal from Medicare. More specifically, Oak Street began to pay referral fees based, not on the cost of operating the referral center, but on the volume of patients referred, and also continued to market and advertise free transportation services to prospective patients.

27

**ANSWER:** The allegations in Paragraph 68 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 68 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at the other Defendants therein.

69. For example, as admitted by Defendant Pykosz after the Class Period, Oak Street began to "pay" outside insurance agents or brokers for referrals to Oak Street, even though the AKS prohibits payments for referrals.[3] In fact, materials for an insurance agency's September 24, 2021 "Oak Street Health 2022 Agent Training" event state that an Oak Street representative would explain to insurance agents "how you can earn an additional $200 per client." The materials encouraged insurance agents to "Take Part in the $200 Client Awareness Program," (also known as "CAP") which "provides an opportunity for insurance agents to receive $200 for every qualified lead that is warmly transferred to an Oak Street staff member." The same agency also hosted a May 13, 2021 webcast for its agents regarding Oak Street's "Client Awareness Program for Rhode Island." Similarly, an agency based in North Carolina hosted a webinar on September 17, 2021 for agents to receive "a brief overview of Oak Street Health as they highlight their Client Awareness Program."

**ANSWER:** The allegations in Paragraph 69 of the Complaint and Footnote 3 thereto are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 69 of the Complaint and Footnote 3 thereto, except deny knowledge or information sufficient to form a belief as to the allegations directed at the other Defendants therein and as to the allegations concerning the content of materials provided at unnamed third-party insurance agencies' training programs and webinars, and respectfully refer the Court to the transcript of the Wolfe Research Conference for its complete and accurate text.

70. It appears Oak Street began paying insurance agents or brokers on a per-referral basis in or around the time of the IPO because: (i) Oak Street's IPO Registration Statement references that the Company engaged in "arrangements" with "external" parties, which the market only later learned was in reference to the kickback referrals; (ii) Defendant Pykosz said in November 2021 that the program had added "new patients over the past year or so," which would go back to November 2020 or earlier;[4] and (iii) the IPO Registration Statement's reference to "arrangements" with "external parties" remained the same in SEC filings throughout the Class

---

[3] Health insurance agents and health insurance brokers both sell health insurance. Whereas insurance agents typically sell on behalf of one insurance company, brokers can sell on behalf of several companies.

[4] *See also Macovski v. Groupon, Inc.*, 553 F. Supp. 3d 460, 475 (N.D. Ill. 2021) (noting that existence of a problem "at a later date may support an inference that it was present months earlier" (quotation and ellipses omitted)).

28

Period, indicating the same arrangements were in place from the IPO until the end of the Class Period. Notably, when Oak Street changed the disclosure in SEC filings after the Class Period (¶¶139-140), Oak Street did not claim that there had been any changes in its practices with regard to referral payments.

**ANSWER:** The allegations in Paragraph 70 of the Complaint and Footnote 4 thereto are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 70 of the Complaint and Footnote 4 thereto, except deny knowledge or information sufficient to form a belief as to the allegations directed at the other Defendants therein, and respectfully refer the Court to Oak Street's IPO Registration Statement, the transcript of the Wolfe Research Conference, and the 2021 Form 10-K for their complete and accurate texts.

71. Notably, commentators have recognized that "qualified leads" are referrals, and, therefore, compensation for qualified leads must "be paid based upon a flat annual fee set in advance in an arm's length transaction that does not take into account the volume or value of the referrals being generated."[5] The OIG has expressed particular concern about arrangements where, for example, the referring agent: (1) is "affiliated with the health care industry," which MA plan insurance agents are; or (2) "collect[s] health care information, such as payer information [or] medical history," which MA plan insurance agents would; or (3) "target[s] Federal health care program beneficiaries," which is all of Oak Street's prospective patients; or (4) "steer[s] patients to particular [providers]," which was the design of the CAP, as discussed herein. *See* OIG Advisory Opinion 08-19 at *4-*5.

**ANSWER:** The allegations in Paragraph 71 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 71 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at the other Defendants therein, and admit that Plaintiffs selectively quote the cited 2015 article by Denise M. Leard and the non-binding Advisory Opinion No. 08-19 issued by the OIG on October 29, 2008, and respectfully refer the Court to those documents for

---

[5] Denise M. Leard, "Arrangements with Lead Generation Companies Must be Carefully Structured to Avoid Regulatory Pitfalls," 17 No. 4 J. Health Care Compliance 39 (2015).

29

their complete and accurate texts. Aver that Footnote 5 contains a citation, to which no response is required.

72.     In addition, Oak Street offered and provided transportation to non-patients as a way to induce them to join Oak Street over their existing or any other primary care provider, even though the AKS prohibits companies from marketing free transportation or providing free transportation to those who are not "established patients." As an example, a one-page marketing pamphlet used by Oak Street at least in 2018 and 2019, including in "Joliet, IL" advertised that part of "The Oak Street Health Difference" was: "We come to you.  Transportation to and from your Oak Street Health appointments if needed," shown below:



**ANSWER:** The allegations in Paragraph 72 of the Complaint and the image included thereunder are directed at Defendants who are not the Newlight Defendants.  To the extent a response is required, deny the allegations in Paragraph 72 of the Complaint and the image included thereunder, except deny knowledge or information sufficient to form a belief as to the allegations directed at the other Defendants therein.

73.     Likewise, a January 2021 brochure inviting potential patients to an Oak Street center in Michigan to receive "Firehouse Submarine Lunches" provided a phone number for potential patients "to schedule your appointment with free transportation."

**ANSWER:** The allegations in Paragraph 73 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 73 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at the other Defendants therein.

74.     And a July 1, 2021 Oak Street social media post stated:

Looking for a new Medicare Primary Doctor in Philadelphia?  One that provides personalized care, free transportation and will be active in helping maintain your health? Look no further than the 10 locations in Philly for Oak Street Health! Send us a message on Facebook and we will schedule you for a Free Welcome Visit to one of our beautiful medical centers in Philadelphia.  We will even pick you up and take you home!

**ANSWER:** The allegations in Paragraph 74 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 74 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at the other Defendants therein.

**Former Oak Street Employees Have Corroborated Oak Street's Misconduct During the Class Period**

75.     Several former Oak Street employees have provided information that gives further context and corroboration for the allegations herein.[6]

**ANSWER**: The allegations in Paragraph 75 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 75 of the Complaint, except deny knowledge or information sufficient to form a belief concerning the accounts of unnamed former Oak Street employees. Aver that Footnote 6 contains Plaintiffs' description of their own allegations, to which no response is required. To the extent a

---

[6]     For anonymity purposes, "he" or "him" pronouns are used for all former employees herein.

response is required, admit that Plaintiffs purport to use "he" or "him" pronouns for all former employees.

76.     Oak Street Former Employee 1 ("FE1") was a Community Relations Manager for an Oak Street center in Philadelphia, Pennsylvania from October 2018 to July 2020, at which time FE1 became an Outreach Executive 1 for Oak Street. FE1 remained in the Outreach Executive 1 role through January 2021. FE1 was responsible for the new patient outreach at FE1's center. During FE1's time at Oak Street, FE1 scheduled and participated in outreach events and met with prospective patients to try to convince them to join Oak Street.

**ANSWER**: The allegations in Paragraph 76 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 76 of the Complaint, except deny knowledge or information sufficient to form a belief concerning the account of an unnamed former Oak Street employee.

77.     According to FE1, when the COVID-19 pandemic emerged in March 2020, the "crap hit the fan" for Oak Street. FE1 explained that it had been the outreach team's "bread and butter" to have activities and events in the center's community room and to host large events outside of the center, which they were no longer able to do. FE1 advised that from March to April 2020, the outreach teams across the Oak Street organization were working from home, and then the majority of the outreach teams were furloughed from May to July 2020. When outreach personnel returned to work, FE1 stated that Oak Street had set unattainable goals for new patients that were similar to the pre-COVID-19 expectations, which were "impossible" given the lack of resources. FE1 explained that "once COVID hit it became a bit of desperation."

**ANSWER**: The allegations in Paragraph 77 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 77 of the Complaint, except deny knowledge or information sufficient to form a belief concerning the account of an unnamed former Oak Street employee.

78.     According to FE1, when the outreach employees were brought back to employment, Oak Street had changed its entire outreach model and became "very heavily reliant on insurance agents." FE1 explained that, traditionally, the Oak Street/insurance agent relationship was mutually beneficial because the more prospective patients that the agents directed to Oak Street, the higher up Oak Street's list of preferred agents that agent would go. Then, when a new patient joined Oak Street and wanted to sign up for an MA plan or otherwise change their insurance option, Oak Street would be more likely to direct the patient to the agent. FE1 stated that insurance agents even had a designated area onsite at Oak Street clinics to meet with individuals.

**ANSWER:** The allegations in Paragraph 78 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 78 of the Complaint, except deny knowledge or information sufficient to form a belief concerning the account of an unnamed former Oak Street employee.

79. According to FE1, by November 2020, Oak Street had launched the Client Awareness Program ("CAP") in Pennsylvania, which involved personnel from Oak Street's outreach team being paired up with an outside insurance agent. According to FE1, outreach employees were instructed to then have a "call party" where the agent would open his or her personal book of business and "'sell Oak Street to their clients,'" and, if the person contacted by the agent was interested in or ready to schedule an initial visit at Oak Street, the agent would then pass the phone to (or unmute) the outreach employee from Oak Street, and the outreach employee would schedule the patient for an initial visit. According to FE1, as part of the CAP, Oak Street paid the agent for each such person that scheduled an initial visit at Oak Street. It was FE1's understanding that the CAP program came about because "desperate times called for desperate measures." FE1 stated that, contrary to claims he had heard from Defendant Pykosz in a public statement in January 2021, insurance agents were not used to "educate" prospective patients, but instead were used to sign up as many people with Oak Street as possible because they were only being paid if they were able to "provide a patient" to Oak Street.[7]

**ANSWER:** The allegations in Paragraph 79 of the Complaint and Footnote 7 thereto are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 79 of the Complaint and Footnote 7 thereto, except deny knowledge or information sufficient to form a belief concerning the account of an unnamed former Oak Street employee, and respectfully refer the Court to the transcript of the 2022 JPMorgan Conference for its complete and accurate text.

80. According to FE1, many prospective patients already had primary care doctors, and it was "extremely difficult" to persuade them to change their choice of primary care physician. FE1 said that the patient recruitment model at Oak Street was to "throw everything" at the prospective patients including gift cards, showing up at their homes, and free transportation. FE1 explained that the offer of free transportation was the main part of what sold prospective patients on Oak Street and the best way for outreach personnel "to convince" prospective clients to go to Oak Street. FE1 added that because many prospective patients had existing primary care doctors, the offer of free transportation was used to differentiate Oak Street from the prospective patient's existing doctor. For example, if a prospective patient stated that he or she already had a doctor,

---

[7] During a JPMorgan Healthcare Conference on January 10, 2022, Defendant Pykosz stated, "We have engaged and we compensate some agents to help educate older adults about Oak Street."

FE1 said that outreach personnel would often respond, "but does your doctor pick you up?" According to FE1, the offer of free transportation "often made the difference," and Oak Street would often advertise the offer of free transportation prior to the DOJ investigation. For example, FE1 stated that the one page marketing document set forth in ¶72 "came from central marketing and each center would receive them in the mail when you ordered them for your center."

**ANSWER:** The allegations in Paragraph 80 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 80 of the Complaint, except deny knowledge or information sufficient to form a belief concerning the account of an unnamed former Oak Street employee.

81.     When asked if outreach personnel would try convincing prospective patients to join Oak Street based on the care they would receive, FE1 explained that there was not enough time to do so because of the pressure to recruit so many patients per month, and so offers like free transportation were more effective. FE1 stated that free transportation was offered to "everyone" with no exceptions, and it did not matter if the person was "not signed up yet" with Oak Street or if the patient had Original Medicare or MA. FE1 added that during FE1's employment, Oak Street employees "were told all patients are eligible for transportation," and "there were no eligibility requirements and it did not depend on your insurance at all," as "no one ever verified" whether insurance covered transportation. According to FE1, outside insurance agents and Oak Street personnel would likewise "dangle" the offer of "free transportation" to prospective patients during the CAP call parties.

**ANSWER:** The allegations in Paragraph 81 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 81 of the Complaint, except deny knowledge or information sufficient to form a belief concerning the account of an unnamed former Oak Street employee.

82.     In addition, FE1 stated that when outreach personnel returned to work in July 2020, they were required to make at least 20 calls to senior-focused businesses in the center's territory each day and to also make at least 20 calls to seniors in the area, referred to as "prospects." The lists of "prospects" were generated from, for example, old lists of prior prospective patients that had not joined Oak Street, and "push lists" provided from various sources, including insurance agents or brokers. According to FE1, during these calls, outreach employees frequently offered free transportation to the prospective patients in order to convince them to schedule an initial visit with Oak Street. FE1 explained that the offer of free transportation was the first and most effective selling point used during the calls.

**ANSWER:** The allegations in Paragraph 82 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations

34

in Paragraph 82 of the Complaint, except deny knowledge or information sufficient to form a belief concerning the account of an unnamed former Oak Street employee.

83.     Oak Street Former Employee 2 ("FE2") was a Divisional Operations Partner at Oak Street from September 2018 through March 2021.  In that role, FE2 reported to Oak Street's corporate offices and acted as a liaison between Oak Street's corporate offices and all Oak Street centers in the state of Pennsylvania, and he was responsible for training at Oak Street centers and the implementation of new policies.

**ANSWER:** The allegations in Paragraph 83 of the Complaint are directed at Defendants who are not the Newlight Defendants.  To the extent a response is required, deny the allegations in Paragraph 83 of the Complaint, except deny knowledge or information sufficient to form a belief concerning the account of an unnamed former Oak Street employee.

84.     FE2 stated that part of their job was to train the front-end desk staff at all Pennsylvania centers.  FE2 stated that "growth teams" and front-end staff were specifically instructed, as part of their training, to advertise and offer free transportation to all prospective patients.  FE2 added that this instruction came from the corporate office which FE2 knows because it was his responsibility to train employees on policies instituted by corporate.  More specifically, the training materials that came from the Learning and Development department in the corporate office included instructions on how to speak with prospective patients regarding the provision of free transportation.  Additionally, FE2 stated it was his belief that this instruction was organization-wide because FE2 completed his onboarding and training with employees from other states and because FE2 often spoke with cohorts throughout the country and they were also told to train their staff on the same transportation instruction.  FE2 stated that "free transportation was one of the selling points" to potential clients who walked into Oak Street facilities and free transportation was advertised on materials used to market Oak Street events.

**ANSWER:** The allegations in Paragraph 84 of the Complaint are directed at Defendants who are not the Newlight Defendants.  To the extent a response is required, deny the allegations in Paragraph 84 of the Complaint, except deny knowledge or information sufficient to form a belief concerning the account of an unnamed former Oak Street employee.

85.     According to FE2, Oak Street personnel and insurance agents would have "call parties" on Saturdays at Oak Street facilities.  While FE2 did not attend any call parties, FE2 was informed by employees that attended that the Oak Street personnel and insurance agents would jointly call prospective patients and try to sign them up with Oak Street and with an MA plan that contracted with Oak Street.  FE2 explained that the prospective patients could be on lists from Oak Street events or could be former Oak Street patients, and that the insurance agents would often bring their own list of clients to try to sign them up with Oak Street.  FE2 recalled that Oak Street

35

paid the insurance agents "200 bucks" when "the deal went through," i.e., when the person selected Oak Street as their primary physician.

**ANSWER:** The allegations in Paragraph 85 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 85 of the Complaint, except deny knowledge or information sufficient to form a belief concerning the account of an unnamed former Oak Street employee.

86. <u>Oak Street Former Employee 3 ("FE3")</u> is a physician and a former Oak Street Center Medical Director in the Heartland Region from third quarter 2020 to second quarter 2021. FE3 reported to the Regional Medical Director and supervised all the clinical operations and staff (including all doctors, nurses, medical assistants, and medical scribes) at the center. FE3 also saw patients at his center. FE3 explained that at his center there was an Outreach Director who oversaw the recruiting team and would identify and recruit patients by going out into the community.

**ANSWER:** The allegations in Paragraph 86 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 86 of the Complaint, except deny knowledge or information sufficient to form a belief concerning the account of an unnamed former Oak Street employee.

87. FE3 explained that free transportation was touted during his orientation and training. FE3 advised that the center he worked in was in an underserved community where a lot of the seniors were isolated or did not have access to transportation. FE3 recounted how he was told that the offer of free transportation distinguished Oak Street from other medical facilities. According to FE3, the offer of free transportation was pitched to him as a "good offering" and integral in Oak Street's operations and recruitment. FE3 confirmed that free transportation was offered to the prospective patients for their Welcome Visit ("WV"), testing/labs (i.e.: QuantaFlo), and Welcome Return Visit ("WRV"). According to FE3, he was told by Oak Street that the offer of transportation was "necessary" to get the prospective patients to the clinics for these appointments.

**ANSWER:** The allegations in Paragraph 87 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 87 of the Complaint, except deny knowledge or information sufficient to form a belief concerning the account of an unnamed former Oak Street employee.

88. According to FE3, prospective patients were recruited into the Oak Street clinics with incentives such as gift cards, swag, and goody bags, and that once they came into the clinics,

there were representatives from Humana or WellCare to meet with prospective patients. According to FE3, prospective patients were given gift cards ranging from $20 to $50 if they showed up for their second visit. According to FE3, at his center, they recruited thousands of new patients in this manner.

**ANSWER:** The allegations in Paragraph 88 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 88 of the Complaint, except deny knowledge or information sufficient to form a belief concerning the account of an unnamed former Oak Street employee.

89.     FE3 reported that he asked someone from corporate about the presence of insurance representatives at the clinics. FE3 attended a virtual orientation where the Company discussed the set-up of every clinic, and as part of this orientation, they did a virtual tour of the clinics which included an empty room for insurance agents. According to FE3, he was told that the insurance agents were his colleagues and that they were there to answer questions about insurance. During his first week onsite at the Oak Street clinic, FE3 questioned the insurance agents' presence given that at all of his previous clinics, he had never had insurance agents come into those clinics. FE3 confirmed that the insurance agent's office was near the waiting room in each clinic and that it was "in the walking flow" of the front desk, Patient Relations Manager ("PRM"), and insurance agent. FE3 explained that the insurance agent's role "was a question mark to me." FE3 stated that he was advised that the agents were not at Oak Street to recruit patients, and he was never aware of insurance agents receiving any incentives or payments to refer or recommend patients to Oak Street. FE3 did not believe it would be proper for such incentives or payments to exist.

**ANSWER:** The allegations in Paragraph 89 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 89 of the Complaint, except deny knowledge or information sufficient to form a belief concerning the account of an unnamed former Oak Street employee.

90.     FE3 reported that he immediately started to question the gift giving and also the presence of the insurance agents from Humana and WellCare in the center. FE3 recounted how he asked his boss for contact information for the corporate compliance officer, because he was concerned that he did not "know what was discussed" in the room between the prospective patient and the insurance agent, or whether the patient felt pressured to sign-up with Oak Street. FE3 also questioned if this was a conflict of interest. FE3 recalled that he questioned Oak Street's legal and compliance group during an orientation with that team. FE3 could not recall who from corporate was on the call except that it was corporate lawyers and compliance, and FE3 specifically recalled that a man addressed his questions. FE3 recounted how when he questioned the presence of the insurance agents at the clinics, he was told by the compliance and legal team that those agents were there to "just answer questions." FE3 confirmed that he also was assured by his boss that this was "above board."

**ANSWER:** The allegations in Paragraph 90 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 90 of the Complaint, except deny knowledge or information sufficient to form a belief concerning the account of an unnamed former Oak Street employee.

91. FE3 explained that when he joined Oak Street in the third quarter of 2020, WV and WRV events were "very low" because Oak Street was unable to have big events due to the pandemic. FE3 stated that instead, Outreach Executives from his center were going out into the community where people were already gathering, including nursing homes, food banks/pantries, shelters, community centers, and Walmart to recruit new patients. FE3 also recounted how the Outreach Executives would frequently stand in front of buildings or in other high-traffic areas to recruit prospective patients. FE3 reported that he and his colleagues would frequently encounter new patients who would come to the center and say "I met the Outreach Executive A at the food bank and they told me all this" and the patients came in "with all of these expectations." FE3 stated that there were times when he and his clinical group felt that these recruited individuals were in a "vulnerable state" and questioned the practice of recruiting people from a food pantry, as an example.

**ANSWER:** The allegations in Paragraph 91 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 91 of the Complaint, except deny knowledge or information sufficient to form a belief concerning the account of an unnamed former Oak Street employee.

92. FE3 explained that at the first visit, or WV, the prospective patient met with the PRM who "gives them all the information about Oak Street, walks them through the details about what plans they're eligible for, and what those plans cover, and help people make decisions about what plans they'd like to be on." FE3 explained that at the WV, while the prospective patients met with the clinical team, FE3 and the others on that team "were not supposed to do diagnostics or treatment at that visit because they were not officially the primary care physician of record at that visit." FE3 added that they would take background information on the patient's medical history and gather information on the patient, but could only treat them if there was an emergency.

**ANSWER:** The allegations in Paragraph 92 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 92 of the Complaint, except deny knowledge or information sufficient to form a belief concerning the account of an unnamed former Oak Street employee.

93. <u>Oak Street Former Employee 4 ("FE4")</u>. FE4 was an Outreach Executive, from January 2021 to August 2021, at one of Oak Street's Indiana clinics. FE4 was one of four Outreach Executives who reported to the Outreach Director who reported to the Regional Director of Growth.

**ANSWER:** The allegations in Paragraph 93 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 93 of the Complaint, except deny knowledge or information sufficient to form a belief concerning the account of an unnamed former Oak Street employee.

94. FE4 advised that he was responsible for patient recruitment and had significant quotas that rose exponentially throughout his tenure at the Company. According to FE4, if you did not get at least 12 new patients in per month for two consecutive months, you were automatically fired. FE4 confirmed that Oak Street's Senior Vice President of Outreach held countrywide meetings where he would give a directive that outreach personnel quotas were increasing "from 12 to 15 to 20."

**ANSWER:** The allegations in Paragraph 94 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 94 of the Complaint, except deny knowledge or information sufficient to form a belief concerning the account of an unnamed former Oak Street employee.

95. According to FE4, CAP was in place at his center when he started. As part of CAP, an Outreach Executive would be paired up with an outside insurance agent, and that agent would likewise be assigned to the specific Outreach Executive. At one point, FE4 was paired up with as many as seven outside insurance agents. FE4 estimated that approximately 50% of his sales were made through CAP, whereas the average was likely closer to 25% for his center as a whole. As part of CAP, the Outreach Executive and insurance agent would participate in "call blocks." During a call block, the Outreach Executive and agent would set aside an hour or two, during which the agent would bring a list of their clients, and the Outreach Executive and agent would call those clients. According to FE4, the agent would do "most of the talking" about Oak Street and then transfer the call to the Oak Street Outreach Executive to schedule an initial visit. If the visit was scheduled, the agent would receive $200 or $250.

**ANSWER:** The allegations in Paragraph 95 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 95 of the Complaint, except deny knowledge or information sufficient to form a belief concerning the account of an unnamed former Oak Street employee.

96.     FE4 stated that the process of setting up call blocks for CAP was part of national training provided by Oak Street.  For example, the "Orientation Schedule" for FE4's start in January 2021 had a course regarding "Engaging with IAs," which included discussion of CAP. FE4 explained that during his time at Oak Street, employees would not refer to insurance agents in writing, and instead used the abbreviation IAs.  FE4 also stated that, once a month, Adam Peck[8] would address outreach teams in a given region.  During those monthly calls, Outreach Executives were encouraged to focus on their insurance agent relations, including CAP.  Also under CAP, an Oak Street Outreach Executive would attend events hosted by the agent.  For example, insurance agents would host events at food banks, at which the agents would bring snacks and other foods to entice people to talk to them.  For each person that provided their name, phone number, address, and Medicare number to Oak Street, the insurance agent would receive $200 or $250.

**ANSWER:** The allegations in Paragraph 96 and Footnote 8 of the Complaint are directed at Defendants who are not the Newlight Defendants.  To the extent a response is required, deny the allegations in Paragraph 96 and Footnote 8 of the Complaint, except deny knowledge or information sufficient to form a belief concerning the account of an unnamed former Oak Street employee, and respectfully refer the Court to what purports to be Adam Peck's LinkedIn profile for its complete text.

97.     FE4 stated that he would focus on food pantries, treatment centers, and other stores or locations where he could talk to potential clients for Oak Street.  FE4 used a sales pitch provided by Oak Street, that included "nine selling points" to convince prospective patients to join Oak Street.  Outreach Executives were instructed to incorporate at least two of the selling points in each sales pitch to potential patients.  FE4 stated that free transportation was one of the selling points, and by far the most effective.  FE4 included free transportation in every sales pitch with potential patients because it was so effective.  FE4 also stated that Oak Street used printed materials to hand out to potential patients, and those materials would advertise "free transportation."  FE4 also stated that the outside insurance agents would emphasize Oak Street's "free transportation" during call blocks with potential clients before transferring the call to an Oak Street Outreach Executive.

**ANSWER:** The allegations in Paragraph 97 of the Complaint are directed at Defendants who are not the Newlight Defendants.  To the extent a response is required, deny the allegations in Paragraph 97 of the Complaint, except deny knowledge or information sufficient to form a belief concerning the account of an unnamed former Oak Street employee.

98.     FE4 described other recruitment tactics at Oak Street that he considered concerning. FE4 advised that he and other outreach personnel were encouraged, through Oak Street training

---

[8]     Adam Peck's LinkedIn profile states that he is Vice President, Outreach at Oak Street.

materials, to tell prospective patients that they would get treatments complimentary, but this was not entirely true. FE4 also recalled a "big push" for Oak Street to do labs prior to the patient's first official visit. FE4 developed a relationship with a drug addiction treatment center, but because those individuals were in treatment, frequently for problems with injectable drugs such as heroin and other opioids, FE4 would explicitly say "no blood test" on the first visit because of how "triggering" that can be for a recovering addict, and then he would see the patients walk out with tourniquets. At first, FE4 thought this was just a mistake, but then he realized that despite his explicit instructions, Oak Street was forcing those patients to have blood tests at their first visit. Ultimately, FE4 decided that he could not recruit at the drug treatment facility in good faith given Oak Street's aggressive insistence on performing blood tests.

**ANSWER:** The allegations in Paragraph 98 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 98 of the Complaint, except deny knowledge or information sufficient to form a belief concerning the account of an unnamed former Oak Street employee.

99. FE4 advised that with respect to transportation, the transportation schedule would fill- up and then Oak Street would cancel transportation for people who had medical appointments in favor of prospective patients who needed transportation to their initial appointments or welcome visits. FE4 explained that Oak Street would offer Lyfts or Ubers for initial or welcome visits. FE4 was told that Oak Street had a partnership with Lyft and they could provide car service for welcome visits. FE4 stated that individuals who had been recently discharged from the hospital or had an illness, were not always provided free transportation. FE4 attributed this to the way Oak Street has its Outreach Executives focused on getting more patients rather than advocating for care for their existing patients. FE4 added that there was a singular focus at Oak Street on getting new patients to welcome visits, so you did whatever you had to do in order to make your quotas.

**ANSWER:** The allegations in Paragraph 99 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 99 of the Complaint, except deny knowledge or information sufficient to form a belief concerning the account of an unnamed former Oak Street employee.

### DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

100. Throughout the Class Period, Oak Street and the Individual Defendants made false and misleading statements regarding the true state of the Company's patient acquisition and recruitment practices. As noted, the Class Period starts on August 6, 2020 with Oak Street's IPO, and ends on November 8, 2021, when Oak Street disclosed the DOJ investigation.

**ANSWER:** The allegations in Paragraph 100 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations therein. Aver that the second sentence of Paragraph 100 of the Complaint contains Plaintiffs' description of their own claims, to which no response is required. To the extent a response is required, admit that Plaintiffs accurately describe the time period of the purported Class Period.

**August and September 2020 Statements**

101. On <u>August 5, 2020</u>, Oak Street filed the IPO Registration Statement with the SEC, which was signed by Defendants Pykosz and Cook. The IPO Registration Statement included the following false and misleading statements:

(a) The IPO Registration Statement claimed that "*[w]e employ a multichannel marketing strategy that goes directly to our target consumer. We fundamentally control our own destiny and can scale the number of centers on our platform rapidly and fill them with any interested patients we attract*." ("Multichannel Statement").[9]

(b) In describing Oak Street patient acquisition efforts, the IPO Registration Statement asserted:

> We utilize a proactive strategy to drive growth to our centers. *We employ a grassroots approach to patient engagement* led by our Outreach team *and supplemented by more traditional marketing, including television, digital and social media, print, mail and telemarketing. We are continuing to leverage our community-based marketing approach with* less focus on in-person interactions and *more focus on working with our community partners to identify older adults who need our services.* [("Marketing Strategy Statement")].

(c) The IPO Registration Statement added:

> *Our payor partners will also direct patients to Oak Street. They do this either by assigning patients who have not yet selected a primary care provider to Oak Street Health or through insurance agents who will tell their clients about Oak Street Health, which we believe results in the patient selecting us as their primary care provider when they select an MA plan*. Payors dedicate a large share of their internal efforts to reducing medical costs and they have a nearly unlimited desire to engage with solutions proven to achieve that goal. We believe that we represent an attractive opportunity for payors to meaningfully improve their overall

---

[9] Plaintiffs allege that the statements highlighted in **bold and italics** within this Section were materially false, misleading, and omitted to disclose material information.

membership growth in a given market without assuming any financial downside. [("Insurance Agents Statement")].

(d)     The Registration Statement noted that, in first quarter 2020 and second quarter 2020, the Company "[t]emporarily halted community outreach and other marketing initiatives which drive new patients to our platform," but assured investors that

> *we have developed, and continue to develop, new methods of outreach that we believe will be effective in the current environment.*  For example, *we are engaging community partners, such as senior living facilities and faith-based organizations, to obtain referrals of older adults who could benefit from our services and care model.*  [("Community Partners Statement")].

(e)     The IPO Registration Statement claimed: "*Each of our centers employs a community outreach team focused on engaging and educating Medicare eligible individuals on the importance of primary care and why Oak Street is a great place to receive that care.*" ("Educating Individuals Statement").

(f)     The IPO Registration Statement claimed that "*our contracted and employed drivers . . . typically transport patients to our centers*."  ("Transportation Statement").

(g)     In describing the Company's "Cost of Care" financial metric, the IPO Registration Statement stated that it "*includes the costs we incur to operate our centers, including* care team and patient support employee-related costs, occupancy costs, *patient transportation*, medical supplies, insurance and other operating costs.  *These costs exclude any expenses associated with sales and marketing activities incurred at the local level to support our patient growth strategies* . . ." ("Cost of Care Statement").

(h)     The IPO Registration Statement acknowledged that it "enter[s] into several arrangements that could potentially implicate the Anti-Kickback Statute," adding that:

> *The OIG has expressed concern regarding the use of non-employed sales forces to recruit or facilitate the recruiting of patients or referrals, especially when the sales agent is compensated in a manner that provides rewards or incentives on a volume or value basis.  Accordingly, commissions or per-patient based compensation methodologies are closely scrutinized by federal agencies.*  We employ our own sales force and attempt to meet the Anti-Kickback Safe Harbor for Bona Fide Employment; *however, in limited instances we use external companies to assist with certain aspects of these efforts, but only in arrangements that we believe do not violate the Anti-Kickback Statute or other applicable laws.* [("AKS Statement")].

**ANSWER:** The allegations in Paragraph 101 of the Complaint are directed at Defendants who are not the Newlight Defendants.  To the extent a response is required, deny the allegations in Paragraph 101 of the Complaint, except deny knowledge or information sufficient to form a

43

belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to the IPO Registration Statement for its complete and accurate text. Aver that Footnote 9 contains Plaintiffs' description of their own allegations, to which no response is required. To the extent a response is required, admit that Plaintiffs purport to use bold and italics in the manner described.

102. On September 16, 2020, Oak Street issued a release announcing financial results for second quarter 2020 ("2Q20") and filed with the SEC its quarterly report on form 10-Q for 2Q20 ("2Q20 10-Q"). The 2Q20 10-Q was signed by Defendant Cook, and contained signed certifications by Defendants Pykosz and Cook. The 2Q20 10-Q included the following false and misleading statements:

(a) The 2Q20 10-Q stated: "*We grow our patient base through our own internal sales and marketing efforts, which drives most of our new patient growth, as well as assignments from our MA plan partners.*" ("Internal Efforts Statement").

(b) The 2Q20 10-Q also included the same *Transportation Statement* (¶101(f)), as in the IPO Registration Statement.

**ANSWER:** The allegations in Paragraph 102 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 102 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants, and respectfully refer the Court to Oak Street's Form 10-Q filed on September 16, 2020 (the "2Q20 Form 10-Q") for its complete and accurate text.

103. The next day, September 17, 2020, Defendants Pykosz and Cook held a conference call to discuss the 2Q 2020 results, and made the following false and misleading statements:

(a) In discussing events that occurred in 2Q 2020, Defendant Pykosz noted that Oak Street's "fleet of over 100 green vans . . . *typically provide patient transportation for our patients to get to and from our centers.*"

(b) Responding to an analyst question about the Company's "marketing efforts" and specifically about "new approaches" being taken in light of the COVID-19 pandemic, Defendant Pykosz emphasized Oak Street's "*multichannel marketing approach*" and stated that "*what we're [turning toward is] central marketing channels, such as digital, direct response TV, et cetera. We also have our community-based field marketing channels.*"

(c)     Defendant Pykosz described Oak Street's communications with prospective clients as, "*we educate people about the importance of primary care in why Oak Street Health is a great place to get that primary care.*"

(d)     When again asked about Oak Street's community outreach efforts and "how much of an impact COVID is having on those outreach efforts," Defendant Pykosz responded, in part, that even if "the world returns to more normalcy" with a COVID-19 vaccine, Oak Street could add community outreach "back in, *while also keeping all the things we've expanded, such as our digital marketing, direct response TV, some of the account-based deals – fields,*" adding that "*we've innovated and tried new things that are showing good results.*"

**ANSWER:** The allegations in Paragraph 103 of the Complaint are directed at Defendants who are not the Newlight Defendants.  To the extent a response is required, deny the allegations in Paragraph 103 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to the transcript of the 2Q20 Earnings Call for its complete and accurate text.

104.     The statements set forth in ¶¶101-103 above were false and misleading when made. The true facts, which were then known to or recklessly disregarded by Defendants, were:

(a)     Defendants Oak Street's, Pykosz's, and Cook's statements purporting to describe the various aspects of Oak Street's "grassroots," "multichannel," "internal," and "new," "expanded," and "innovated" patient acquisition strategies, including "working with our community partners," "television," "direct response TV," "digital and social media," "print," and "mail and telemarketing," were false and misleading because they omitted to disclose material improper patient acquisition tactics that exposed the Company to government investigations, fines, penalties, or even suspension or removal from Medicare, including: (1) paying external insurance agents kickbacks of at least $200 for each patient the agents referred to Oak Street; and (2) marketing and providing free transportation to prospective patients as a kickback to induce them to select Oak Street as their primary care provider.

(b)     Defendants Oak Street's, Pykosz's, and Cook's statements referencing "assignments from our MA plan partners," including "through insurance agents who will tell their clients about Oak Street" and "referrals" from "community partners" were false and misleading because while highlighting referrals, assignments, and insurance agents, they omitted to disclose that Oak Street was improperly paying external insurance agents kickbacks of at least $200 for each patient the agents referred to Oak Street, which exposed the Company to government investigations, fines, penalties, or even suspension or removal from Medicare.

(c)     Defendants Oak Street's, Pykosz's, and Cook's statements that, in communicating with prospective patients, Oak Street and its teams "educate[] . . . individuals" and were "focused on educating Medicare individuals" on "why Oak Street is a great place to receive [primary] care" were false and misleading because they failed to disclose that Oak Street's outreach teams were

not soliciting patients based solely on educating them about care but based upon improper marketing and providing free transportation to prospective patients as a kickback to induce them to select Oak Street as their primary care provider, which exposed the Company to government investigations, fines, penalties, or even suspension or removal from Medicare.

(d)     Defendants Oak Street's, Pykosz's, and Cook's statements that Oak Street's drivers "typically transport patients" and that Oak Street's Cost of Care costs included "patient transportation" but not "expenses associated with sales and marketing" were false and misleading because they omitted to disclose that Oak Street was both advertising and marketing its free transportation services to the public and also providing free transportation services to prospective patients as a kickback to induce them to select Oak Street as their primary care provider, which exposed the Company to government investigations, fines, penalties, or even suspension or removal from Medicare.

(e)     Defendants Oak Street's, Pykosz's, and Cook's statement specifically describing the OIG's "concern regarding the use of non-employed sales forces to recruit [patients]" and that "per-patient based compensation methodologies are closely scrutinized," but assuring investors that "in limited instances we use external companies to assist . . . only in arrangements that we believe do not violate the [AKS] or other applicable laws" was false and misleading because it omitted to disclose: (1) the directly on-point "per-patient based compensation" "arrangements" Oak Street had with "external" insurance agents wherein Oak Street improperly paid the agents kickbacks of at least $200 for each patient the agents referred to Oak Street, exposing the Company to government investigations, fines, penalties, or even suspension or removal from Medicare; and (2) that the referral payments were *prima facie* kickbacks subject to the AKS, which Oak Street ultimately disclosed after the Class Period, and the payments did not fall within any "[s]afe [h]arbor" because they were based on the number of patients referred.

**ANSWER:** The allegations in Paragraph 104 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 104 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein.

**November 2020 through January 2021 Statements**

105.     On November 9, 2020, Oak Street issued a release announcing third quarter 2020 ("3Q20") financial results. The next day, November 10, 2020, Oak Street filed with the SEC its quarterly report on form 10-Q for 3Q20 ("3Q20 10-Q"). The 3Q20 10-Q was signed by Defendant Cook, and contained signed certifications by Defendants Pykosz and Cook. The 3Q20 10-Q included the same *Transportation Statement* (¶101(f)), as in the IPO Registration Statement, and the same *Internal Efforts Statement* (¶102(a)), as in the 2Q20 10-Q.

**ANSWER:** The allegations in Paragraph 105 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations

in Paragraph 105 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to Oak Street's Form 8-K filed on November 9, 2020 and Form 10-Q filed on November 10, 2020 (the "3Q20 Form 10-Q") for their complete and accurate texts.

106.    Also on November 10, 2020, Defendants Pykosz and Cook held a conference call to discuss the 3Q 2020 results, and made the following false and misleading statements:

(a)    Defendant Pykosz stated: "We have continued to deliver strong patient growth despite being forced by COVID to limit many of our core community events-based patient acquisition channels.  Due to this, *we have developed alternative engagement channels that can be effective despite the limitations caused by COVID.*"

(b)    When asked about "the general ramp" in adding patients going forward, Defendant Pykosz highlighted the "*changes on our outreach model [Oak Street made] to let us be successful in bringing in new patients in a world where some of our core channels, we can't do right now*" including "*more digital marketing, a lot more kind of relationship-based selling with aggregators,*" adding that "*[w]e're not setting up events with aggregators.  We're actually just asking them for referrals, making them introduce us to people that need our care.*"

(c)    An analyst referenced "some of the alternative engagement channels" including "brokers" discussed earlier in the call, and asked defendants to "unpack that a little in terms of what you're doing different today versus a year ago?" Defendant Pykosz responded, in part:

> One of the great things about having the level of scale we have and frankly, having the level of scale we're going to have over the next couple of years as we continue to grow is it gives us more and more resources to build out additional channels, build out additional care model programs, et cetera. *And so some of the channels we're doing, whether, as we talked about, digital or working more with insurance and trying more programs there, it's not a question of like, "Oh, something has changed.  Now this works.*" I mean obviously, more people are engaging digitally.  And that's [bringing more patients], and that's helping.

**ANSWER:** The allegations in Paragraph 106 of the Complaint are directed at Defendants who are not the Newlight Defendants.  To the extent a response is required, deny the allegations in Paragraph 106 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to the transcript of the November 10, 2020 earnings call (the "3Q20 Earnings Call") for its complete and accurate text.

47

107.    On <u>November 30, 2020,</u> Oak Street filed with the SEC a registration statement on Form S-1 for a December 2020 secondary public offering of Oak Street common stock ("December 2020 Registration Statement").

(a)     The December 2020 Registration Statement was signed by Defendants Pykosz and Cook and contained the same *Multichannel Statement* (¶101(a)), *Marketing Strategy Statement* (¶101(b)), *Insurance Agents Statement* (¶101(c)), *Educating Individuals Statement* (¶101(e)), *Transportation Statement* (¶101(f)), *Cost of Care Statement* (¶101(g)), and *AKS Statement* (¶101(h)), as in the IPO Registration Statement.

(b)     The December 2020 Registration Statement also stated that after Oak Street had "made the decision to suspend community-based outreach events and scale back our central marketing" at the end of March 2020, Oak Street

"***used this pause*** in our traditional marketing efforts to reassess and realign our marketing strategy ***to focus on other growth channels***.  For example, ***we are engaging community partners, such as senior living facilities and faith-based organizations, through an account management model to gain referrals of older adults who could benefit from our services and care model.***"  [("Other Growth Channels Statement")].

**ANSWER:** The allegations in Paragraph 107 of the Complaint are directed at Defendants who are not the Newlight Defendants.  To the extent a response is required, deny the allegations in Paragraph 107 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to Oak Street's registration statement filed on November 30, 2020 on Form S-1 for a December 2020 secondary public offering (the "December 2020 Offering") of Oak Street common stock (the "December 2020 Registration Statement") for its complete and accurate text.

108.    On <u>January 11, 2021,</u> Defendants Pykosz and Cook presented at the JPMorgan Healthcare Conference on behalf of Oak Street, during which they made the following false and misleading statements:

(a)     During prepared remarks, Defendant Pykosz emphasized that "we do need to fill the centers up with patients," and claimed, "***that's where our B2C [business to consumer] community marketing approach comes in.  And so what we do is we really spend our time pre COVID in the communities, and now a lot of it is online and telephonic, but really educating older adults on the importance of primary care.***"

(b)     Defendant Pykosz later again emphasized that "[i]t's all about patient acquisition," adding:

*And so we're going to continue the expansion of the channels that we've used over the last 6 months. We really went from very little digital and central growth to that being really the main driver of growth today, things like digital marketing, direct response TV and then kind of referral-based telephonic sales from both our central and community-based salespeople.* If I would talk to you a year ago, I would have told you that the vast majority of our patients were coming from community events and kind of in-person interactions in the community, which has basically gone to 0 today.

(c) During the question and answer portion, an analyst noted that he "get[s] this question from investors a lot" and asked, "How does Oak Street acquire new patients." Defendant Pykosz responded, in part:

*It is a B2C sale. We are selling individuals on becoming a patient on Oak Street Health. We're not getting push[ed] patients from someone else, et cetera. Is not a B2B contract with a plan. And we're educating people on why they need to get primary care. . . .*

*And so we're really educating people, look, you have to come in for longitudinal primary, come in when you're healthy and keep coming in.*

**ANSWER:** The allegations in Paragraph 108 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 108 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to the transcript of the January 2021 JPMorgan Conference =for its complete and accurate text.

109. The statements set forth in ¶¶105-108 above were false and misleading when made. The true facts, which were then known to or recklessly disregarded by Defendants, were:

(a) Defendants Oak Street's, Pykosz's, and Cook's Transportation Statement, Internal Efforts Statement, Multichannel Statement, Marketing Strategy Statement, Insurance Agents Statement, Educating Individuals Statement, Cost of Care Statement, and AKS Statement were false and misleading for the same reasons as set forth in ¶¶104(a)-(e).

(b) Defendant Oak Street's, Pykosz's, and Cook's statement emphasizing "other growth channels," including "engaging with community partners" and "gain[ing] referrals" was misleading because it omitted to disclose material improper patient acquisition tactics that exposed the Company to government investigations, fines, penalties, or even suspension or removal from Medicare, including: (1) paying external insurance agents kickbacks of at least $200 for each patient the agents referred to Oak Street; and (2) marketing and providing free transportation to prospective patients as a kickback to induce them to select Oak Street as their primary care provider.

(c)     Defendant Pykosz's statements purporting to describe the various aspects of Oak Street's "alternative engagement [patient acquisition] channels," "outreach" channels, "B2C community marketing approach," and the continued "expansion of the channels that we've used [since August 2020]," including "digital marketing," "online and telephonic" channels, and "direct response TV" were false and misleading because they omitted to disclose material improper patient acquisition tactics that exposed the Company to government investigations, fines, penalties, or even suspension or removal from Medicare, including: (1) paying external insurance agents kickbacks of at least $200 for each patient the agents referred to Oak Street; and (2) marketing and providing free transportation to prospective patients as a kickback to induce them to select Oak Street as their primary care provider.

(d)     Contrary to Defendant Pykosz's statement that "[w]e're not getting push[ed] patients from someone else" and it "[i]s not a B2B contract with a plan," Oak Street was being pushed patients from insurance agents and Oak Street and the agents had "a B2B contract," under which Oak Street was paying the insurance agents kickbacks of at least $200 for each patient the agents referred to Oak Street, which exposed the Company to government investigations, fines, penalties, or even suspension or removal from Medicare.

(e)     Defendant Pykosz's statements referencing "relationship-based selling with aggregators," "asking . . . for referrals," "working more with insurance," "referral-based telephonic sales," and "referrals" from "community partners" were false and misleading because while highlighting referrals, referral-based sales, and relationships with aggregators and insurance, Pykosz omitted to disclose that Oak Street was improperly paying external insurance agents kickbacks of at least $200 for each patient the agents referred to Oak Street, which exposed the Company to government investigations, fines, penalties, or even suspension or removal from Medicare.

(f)     Defendant Pykosz's statements that, in communicating with prospective patients, Oak Street and its teams just spend time "educating older adults" and "educating people" about "the importance of" and "why they need to get primary care" were false and misleading because they failed to disclose that Oak Street's outreach teams were not soliciting patients based solely on educating them about care but based upon improper marketing and providing free transportation to prospective patients as a kickback to induce them to select Oak Street as their primary care provider, which exposed the Company to government investigations, fines, penalties, or even suspension or removal from Medicare.

**ANSWER:** The allegations in Paragraph 109 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 109 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein.

**February through May 2021 Statements**

50

110. On <u>February 8, 2021</u>, Oak Street filed with the SEC a registration statement on Form S-1 for a secondary public offering of Oak Street common stock ("February 2021 Registration Statement"). The February 2021 Registration Statement was signed by Defendants Pykosz and Cook and contained the same ***Transportation Statement*** (¶101(f)), ***Multichannel Statement*** (¶101(a)), ***Marketing Strategy Statement*** (¶101(b)), ***Insurance Agents Statement*** (¶101(c)), ***Educating Individuals Statement*** (¶101(e)), ***Cost of Care Statement*** (¶101(g)), and ***AKS Statement*** (¶101(h)), as in the IPO Registration Statement, and the same ***Other Growth Channels Statement*** (¶107(b)), as in the December 2020 Registration Statement.

**ANSWER:** The allegations in Paragraph 110 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 110 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to the registration statement that Oak Street filed on Form S-1 with the SEC on February 8, 2021 for a February 2021 secondary public offering (the "February 2021 Offering") of Oak Street common stock (the "February 2021 Registration Statement") for its complete and accurate text.

111. On March 9, 2021, Oak Street issued a release announcing fourth quarter 2020 ("4Q20") and full year 2020 financial results. The next day, <u>March 10, 2021</u>, Oak Street filed with the SEC its annual report on form 10-K for full year 2020 ("2020 10-K"). The 2020 10-K was signed by Defendants Pykosz and Cook and contained the same ***Multichannel Statement*** (¶101(a)), ***Transportation Statement*** (¶101(f)), ***Cost of Care Statement*** (¶101(g)), and ***AKS Statement*** (¶101(h)) as in the IPO Registration Statement.

**ANSWER:** The allegations in Paragraph 111 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 111 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to Oak Street's Form 8-K filed on March 9, 2021 and Form 10-K filed on March 10, 2021 (the "2020 Form 10-K") for their complete and accurate texts.

112. Also on March 10, 2021, Defendants Pykosz and Cook held a conference call to discuss the 4Q 2020 results. After reporting increased revenue growth for full year 2020, Defendant Pykosz stated that "*[w]e achieved this growth despite essentially turning off our sales and marketing function for much of the spring and summer and needed to replace our community event-based marketing approach with new essential channels.*" He later added that,

regarding new patient outreach efforts, "2020 was a little bit of a strange year on that front because as we talk about a lot, *we had to* stop a lot of the things that worked really well and *develop a whole lot of new things*."

**ANSWER:** The allegations in Paragraph 112 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 112 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to the transcript of the March 10, 2021 earnings call (the "4Q20 Earnings Call") for its complete and accurate text.

113. On May 10, 2021, Oak Street issued a release announcing first quarter 2021 ("1Q21") financial results and filed with the SEC its quarterly report on form 10-Q for 1Q21 ("1Q21 10-Q"). The 1Q21 10-Q was signed by Defendant Cook, and contained signed certifications by Defendants Pykosz and Cook. The 1Q21 10-Q included the same the same *Transportation Statement* (¶101(f)) as in the IPO Registration Statement, and the same *Internal Efforts Statement* (¶102(a)) as in the 2Q20 10-Q.

**ANSWER:** The allegations in Paragraph 113 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 113 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to the transcript of the March 10, 2021 earnings call (the "4Q20 Earnings Call") for its complete and accurate text.

114. The next day, May 11, 2021, Defendants Pykosz and Cook held a conference call to discuss the 1Q 2021 results, and, when asked about whether Oak Street, following the larger roll-out of COVID-19 vaccines, would "reallocate dollars more towards community marketing" or "continue with some of the digital initiatives you did last year along with the community [marketing]," Defendant Pykosz responded: "Definitely the latter. *The channel is working*. It's bringing in patients below kind of our cost of acquisition ["CAC"] threshold," and added, "*I guess we can get the best of both worlds having our central and – digital and other central channels up and running* and have our field base up and running without having actually a significant increase to our sales and marketing."

**ANSWER:** The allegations in Paragraph 114 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 114 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to the transcript of the May 11, 2021 earnings call (the "1Q21 Earnings Call") for its complete and accurate text.

115. On May 24, 2021, Oak Street filed with the SEC a registration statement on Form S-1 for a secondary public offering of Oak Street common stock ("May 2021 Registration Statement"). The May 2021 Registration Statement was signed by Defendants Pykosz and Cook, incorporated by reference the 2020 10-K and the 1Q21 10-Q, and thereby contained the same *Multichannel Statement* (¶101(a)), *Transportation Statement* (¶101(f)), *Cost of Care Statement* (¶101(g)), and *AKS Statement* (¶101(h)), as in the IPO Registration Statement and the same *Internal Efforts Statement* (¶102(a)) as in the 2Q20 10-Q.

**ANSWER:** The allegations in Paragraph 115 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 115 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to Oak Street's Form S-1 filed on May 24, 2021 for a May 2021 secondary public offering (the "May 2021 Offering") of Oak Street common stock (the "May 2021 Registration Statement"), the 2020 10-K, and the 1Q21 10-Q for their complete and accurate text.

116. The statements set forth in ¶¶110-115 above were false and misleading when made. The true facts, which were then known to or recklessly disregarded by Defendants, were:

(a) Defendants Oak Street's, Pykosz's, and Cook's Transportation Statement, Multichannel Statement, Marketing Strategy Statement, Insurance Agents Statement, Educating Individuals Statement, Cost of Care Statement, AKS Statement, Other Growth Channels Statement, and Internal Efforts Statement were false and misleading for the same reasons as set forth in ¶¶104(a)-(e) and 109(b).

(b) Defendants Pykosz's statements purporting to describe various aspects of Oak Street's patient acquisition strategies, including "essential channels," strategies that were "developed" in response to COVID-19, channels that were "working," and "digital and other central channels" were false and misleading because they omitted to disclose material improper

53

patient acquisition tactics that exposed the Company to government investigations, fines, penalties, or even suspension or removal from Medicare, including: (1) paying external insurance agents kickbacks of at least $200 for each patient the agents referred to Oak Street; and (2) marketing and providing free transportation to prospective patients as a kickback to induce them to select Oak Street as their primary care provider.

**ANSWER:** The allegations in Paragraph 116 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 116 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein.

**June through September 2021 Statements**

117.    On June 1, 2021, Defendants Pykosz and Cook participated in the William Blair Growth Stock Conference on behalf of Oak Street, during which they made the following false and misleading statements:

(a)     In response to an analyst request that Defendants "share with the audience how you drive that member acquisition and really drive the growth, both at ramping new centers and then continuing to grow your existing patient base," Defendant Pykosz stated, in part, "***Oak Street's growth engine from a patient perspective is . . . very consumer-driven. And it's us meeting individual people, whether that's online or in the community, and helping to educate them why Oak Street is a great place to get primary care***," adding that Oak Street had "***really scaled our digital up in a big way***," "***built on our telesales capabilities***," and "***done other things like a little bit of DRTV and things like that***," and that Oak Street would "***keep doing the central channels [because] [t]hey work***."

(b)     When specifically asked about how much "recruiting of the MA plan members" is "driven internally by your digital marketing, your marketing and your social initiatives, versus given to you by intermediaries like the MA plans or brokers," Defendant Pykosz responded:

> Yes. I think the -- on the first one, look, ***the vast majority of our patients come through our efforts. We love when insurance advisers or health plan is going to -- we call it push those patients. And we'll take as many as we can get. But there's a limit -- there's a lot of limits on what they can actually do, right? There's a lot of rules that Medicare has around [steering] and kind of inducement and things like that where they can't -- health plan can't stand up and say Oak Street has the best doctor [in my network]***. We should go to Oak Street. Because that would be to be steerage. And I think it's kind of an old-fashioned rule, but it is the rule. So it is what it is.
>
> ***So we get most of our patients from meeting people in the community one by one, not through kind of the -- and we get some from the health plans and***

*we'll obviously work to get more, but I think that's -- their hands are kind of tied* (inaudible) not to mention.

**ANSWER:** The allegations in Paragraph 117 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 117 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to the transcript of the William Blair Conference for its complete and accurate text.

118. On June 9, 2021, Defendants Pykosz and Cook presented at the Goldman Sachs Global Healthcare Conference on behalf of Oak Street, during which Defendant Pykosz stated that "*the vast majority of Oak Street growth comes from us meeting people in the community, comes from our own digital marketing efforts. It comes from our call centers. It comes from our own marketing efforts*. And as individual consumers joining Oak Street Health as their doctors offer because they feel like we provide a better experience."

**ANSWER:** The allegations in Paragraph 118 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 118 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to the transcript of the June 9, 2021 Goldman Sachs Global Healthcare Conference for its complete and accurate text.

119. On August 9, 2021, Oak Street issued a release announcing second quarter 2021 ("2Q21") financial results and filed with the SEC its quarterly report on form 10-Q for 2Q21 ("2Q21 10-Q"). The 2Q21 10-Q was signed by Defendant Cook, and contained signed certifications by Defendants Pykosz and Cook. The 2Q21 10-Q contained the same the same *Transportation Statement* (¶101(f)) as in the IPO Registration Statement, and the same *Internal Efforts Statement* (¶102(a)) as in the 2Q20 10-Q.

**ANSWER:** The allegations in Paragraph 119 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 119 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to

Oak Street's Form 10-Q filed on August 9, 2021 (the "2Q21 Form 10-Q") for its complete and accurate text.

120. The next day, August 10, 2021, Defendants Pykosz and Cook held a conference call to discuss the 2Q 2021 results. During the call, in trying to explain away higher medical costs for the quarter, Defendant Pykosz stated that in 2020:

> *we met patients in a lot of other ways* [and] . . . I do wonder if part of the reason we're seeing kind of a higher disease burden of incoming patients is you're meeting less of the people who are coming to a Zumba class, and *you're meeting more people who you are meeting at different places that are kind of referrals from health – case managers, those types of things*.

**ANSWER:** The allegations in Paragraph 120 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 120 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to the transcript of the August 10, 2021 earnings call (the "2Q21 Earnings Call") for its complete and accurate text.

121. On September 9, 2021, Defendants Pykosz and Cook presented at the Morgan Stanley Global Healthcare Conference on behalf of Oak Street. When asked "[h]ow should we think about membership growth going forward," Defendant Pykosz stated:

> And our model is very consumer-focused when we talk about kind of acquiring patients. *We're not a B2B business*. We're not buying or partnering with existing physician groups. We are opening up centers, which we are focused on older adults on Medicare. And we feel like those centers and -- have the results to show those centers offer much higher quality of care, much better patient outcomes and a much better patient experience.
>
>            \*        \*        \*
>
> Every day, our team of -- we call them outreach executives, but essentially think of a cross between a salesperson and a community health worker. *Every day, they're out there, they're meeting new older adults, they're working with community groups to get in front of older adults in the community and then really educating them on why Oak Street is a great place to get care*. And when people are ready to make the choice to try Oak Street Health out, we do a kind of intro visit with our doctor, and the vast majority stay and become patients for hopefully life.

56

So that's really the driver of the model. So it really is kind of -- it's not like there's an open enrollment season or ***it's not like we're trying to sign key account contracts. It's really about individually educating people why Oak Street Health is the best place to get their care***. And the great news is the bigger we get and the longer we've been in communities, the more people have already heard about us and the kind of the easier that sale is going to be.

**ANSWER:** The allegations in Paragraph 121 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 121 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to the transcript of the Morgan Stanley Global Healthcare Conference for its complete and accurate text.

122. The statements set forth in ¶¶117-121 above were false and misleading when made. The true facts, which were then known to or recklessly disregarded by Defendants, were:

(a) Defendants Oak Street's, Pykosz's, and Cook's Transportation Statement and Internal Efforts Statement were false and misleading for the same reasons as set forth in ¶¶104(a),(d).

(b) Defendant Pykosz's statements that Oak Street was not engaged in "B2B" marketing or relying on "account contracts," and instead emphasizing Oak Street's "consumer driven" patient acquisition "growth engine" and purporting to identify various aspects of Oak Street's patient acquisition strategies, including "digital," "telesales capabilities," "a little bit of DRTV and things like that," "our own digital marketing efforts," "our call centers," and other "central channels," were false and misleading because they omitted to disclose material improper patient acquisition tactics that exposed the Company to government investigations, fines, penalties, or even suspension or removal from Medicare, including: (1) paying external insurance agents kickbacks of at least $200 for each patient the agents referred to Oak Street; and (2) marketing and providing free transportation to prospective patients as a kickback to induce them to select Oak Street as their primary care provider.

(c) Defendant Pykosz's statement that "we love when insurance advisors . . . push" patients to Oak Street while noting that there are a lot of limits on what a health plan "can actually do" and referencing new patients "from the health plans" and "referrals from health – case managers" were false and misleading because while highlighting referrals, and the legal limitations on referrals, Pykosz omitted to disclose that Oak Street was improperly paying external insurance agents kickbacks of at least $200 for each patient the agents referred to Oak Street, which exposed the Company to government investigations, fines, penalties, or even suspension or removal from Medicare.

(d)     Defendant Pykosz's statements that, in communicating with prospective patients, Oak Street and its teams just spend time "educating" older adults on "why Oak Street is a great place to get care" and "educating" them on why "Oak Street Health is the best place to get their care" were false and misleading because they failed to disclose that Oak Street's outreach teams were not soliciting patients based solely on educating them about care but based upon improper marketing and providing free transportation to prospective patients as a kickback to induce them to select Oak Street as their primary care provider, which exposed the Company to government investigations, fines, penalties, or even suspension or removal from Medicare.

**ANSWER:** The allegations in Paragraph 122 of the Complaint are directed at Defendants who are not the Newlight Defendants.  To the extent a response is required, deny the allegations in Paragraph 122 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein.

## DEFENDANTS FAILED TO DISCLOSE INFORMATION REQUIRED UNDER ITEMS 105 AND 303 OF REGULATION S-K

123.     In addition to making false and misleading statements, Oak Street and the Individual Defendants failed to disclose mandatory material information in the annual report and quarterly reports filed with the SEC during the Class Period.

**ANSWER:** The allegations in Paragraph 123 of the Complaint are directed at Defendants who are not the Newlight Defendants.  To the extent a response is required, deny knowledge or information sufficient to form a belief as to the allegations in Paragraph 123 of the Complaint.

124.     Item 7 of SEC Regulation S-K required that Oak Street's annual reports on Form 10- K and quarterly reports on Form 10-Q contain "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A").  According to the SEC, MD&A is intended to "give investors an opportunity to look at the [Company] through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with particular emphasis on the [Company's] prospects for the future."

**ANSWER:** The allegations in Paragraph 124 of the Complaint are directed at Defendants who are not the Newlight Defendants.  To the extent a response is required, deny the allegations in Paragraph 124 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and admit that Plaintiffs purport

to describe Item 7 of SEC Regulation S-K, and that Plaintiffs selectively quote Exchange Act Release No. 6835, and respectfully refer the Court to those documents for their complete and accurate texts.

125. Pursuant to Item 303 of SEC Regulation S-K, 17 C.F.R. §229.30 ("Item 303"), Oak Street's Class Period Form 10-K and Form 10-Qs were required to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303(a)(3)(ii).

**ANSWER:** The allegations in Paragraph 125 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 125 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and admit that Plaintiffs selectively quote Item 303 of SEC Regulation S-K, and respectfully refer the Court to that regulation for its complete and accurate text.

126. In violation of Item 303, the 2Q20 10-Q, 3Q20 10-Q, 2020 10-K, 1Q21 10-Q, and 2Q21 10-Q, all signed or certified by Defendants Pykosz and Cook, failed to disclose the Company's improper patient acquisition tactics of: (1) paying external insurance agents kickbacks of at least $200 for each patient the agents referred to Oak Street; and (2) marketing and providing free transportation to prospective patients as a kickback to induce them to select Oak Street as their primary care provider, which put at risk a material portion of the Company's revenue. Oak Street and the Individual Defendants knew that these practices presented a significant uncertainty given that they were kickbacks under AKS, and created a known uncertainty that the government could seek fines or penalties, and Medicare could seek Oak Street's exclusion from participation, thus compromising *all* of Oak Street's revenue. *See* ¶¶50-61.

**ANSWER:** The allegations in Paragraph 126 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 126 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to the 2Q20 Form 10-Q, the 3Q20 Form 10-Q, the 2020 Form 10-K, the 1Q21 Form 10-Q, and the 2Q21 Form 10-Q for their complete and accurate texts.

127.    Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), specifically required Oak Street's Form 10-K and Form 10-Qs to provide "a discussion of the material factors that make an investment in the registrant or offering speculative or risky."

**ANSWER:** The allegations in Paragraph 127 of the Complaint are directed at Defendants who are not the Newlight Defendants.  To the extent a response is required, deny the allegations in Paragraph 127 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and admit that Plaintiffs selectively quote Item 105 of SEC Regulation S-K, and respectfully refer the Court to that regulation for its complete and accurate text.

128.    In violation of Item 105, the 2Q20 10-Q, 3Q20 10-Q, 2020 10-K, 1Q21 10-Q, and 2Q21 10-Q, all signed or certified by Defendants Pykosz and Cook, failed to discuss the following significant factor that made investment in Oak Street risky: the Company was engaged in improper patient acquisition tactics that placed Oak Street at substantial risk of criminal investigation, fines, and sanctions, compromising *all* of Oak Street's revenue, including: (1) paying external insurance agents kickbacks of at least $200 for each patient the agents referred to Oak Street; and (2) marketing and providing free transportation to prospective patients as a kickback to induce them to select Oak Street as their primary care provider.

**ANSWER:** The allegations in Paragraph 128 of the Complaint are directed at Defendants who are not the Newlight Defendants.  To the extent a response is required, deny the allegations in Paragraph 128 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to the 2Q20 Form 10-Q, the 3Q20 Form 10-Q, the 2020 Form 10-K, the 1Q21 Form 10-Q, and the 2Q21 Form 10-Q for their complete and accurate texts.

### SUBSEQUENT EVENTS

129.    The truth about the Company's failed business model and improper business practices with regard to both paying improper referral fees and providing and publicly marketing free transportation to prospective patients in violation of the AKS (and FCA) began to emerge on November 8, 2021, causing declines in the price of Oak Street common stock.  On that date, after the close of trading, Oak Street filed with the SEC its quarterly report for third quarter 2021 ("3Q21 10-Q").  In the 3Q21 10-Q, the Company revealed that it had "received a civil investigation demand ('CID') from the United States Department of Justice." The 3Q21 10-Q disclosed that the

DOJ was "investigating whether the Company may have violated the False Claims Act, 31 U.S.C. §§3729- 3722" and that the "CID requests certain documents and information related to the Company's relationships with third-party marketing agents and related to the Company's provision of free transportation to federal health care beneficiaries."

**ANSWER:** The allegations in Paragraph 129 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 129 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to the 3Q21 Form 10-Q for its complete and accurate text.

130. As trading opened on November 9, 2021, Defendants Pykosz and Cook hosted an earnings call to discuss 3Q21 results. During that call, Defendant Pykosz stated that the "Department of Justice [is] seeking information related to our relationships with third-party agents or entities and also regarding any advertising or promotion of our transportation services."

**ANSWER:** The allegations in Paragraph 130 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 130 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to the transcript of the November 9, 2021 earnings call (the "3Q21 Earnings Call") for its complete and accurate text.

131. The market expressed shock about Oak Street potentially paying outside agents for referrals to obtain patients. For example, during the question-and-answer portion of the November 9, 2021 call, the first analyst to pose questions pressed:

> [A]re you buying leads from third-party agents, like eHealth, et cetera? And how does that work? Do you find – are you finding your patients that way? And do you think that's standard industry practice? Do you – have you been doing more of this more recently? And then I guess just lastly, is there are any relationship between these third-party agent relationships and provider transportation, do you think?

**ANSWER:** The allegations in Paragraph 131 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations

in Paragraph 131 of the Complaint, except deny knowledge or information sufficient to form a belief as to the state of mind of third-party analysts, and respectfully refer the Court to the transcript of the 3Q21 Earnings Call for its complete and accurate text.

132.    Notably, Defendant Pykosz did not deny the existence of such payments or deny his personal knowledge of such payments.  Instead, he refused to provide a direct answer and evasively responded, "[w]e have a number of different patient acquisition channels, the vast majority of which we talked about are through our community-based marketing approach and then followed by our kind of central digital channels. . .  So there's a number of different programs out there and things we do to get patients."

**ANSWER:** The allegations in Paragraph 132 of the Complaint are directed at Defendants who are not the Newlight Defendants.  To the extent a response is required, deny the allegations in Paragraph 132 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to the transcript of the 3Q21 Earnings Call for its complete and accurate text.

133.    On this news, the price of Oak Street stock fell on November 9, 2021, by more than 20%, from $47 per share to $37 per share, wiping out more than $2 billion in market capitalization. The next day, the price of Oak Street stock fell even further to $36 per share.

**ANSWER:** Deny the allegations in Paragraph 133 of the Complaint, and respectfully refer the Court to the publicly reported closing prices of Oak Street common stock.

134.    Several analysts cut their targets in response to the news.  For example, on November 9, 2021, analysts from J.P. Morgan reduced their price target by 10%, noting that "[w]eakness in OSH shares today was primarily driven by the company's disclosure that it is the subject of a DOJ investigation" into "OSH's relationships with third-party marketing agents and the provision of free transportation for Medicare beneficiaries," the disclosure of which "meaningfully increases OSH's risk profile."  The same day, analysts from Canaccord Genuity likewise reduced their price target by nearly 20%, stating that the "disclosure that the [DOJ] is seeking information from OSH related to 1) relationships with 3rd-party marketing agents and 2) OSH providing free transportation to Medicare members is the primary cause of the dramatic pullback in the stock."

**ANSWER:** Deny the allegations in Paragraph 134 of the Complaint, except deny knowledge or information sufficient to form a belief as to the state of mind of third-party analysts,

62

and admit that Plaintiffs selectively quote a J.P. Morgan analyst report dated November 9, 2021

and a Canaccord Genuity analyst report dated November 9, 2021, and respectfully refer the Court

to those documents for their complete and accurate texts.

135.     Defendants and independent outlets subsequently provided additional information and the stock price continued to decline.  For example, during a November 18, 2021 analyst call, Defendant Pykosz admitted that "we believe that the term third-party agents" from the CID "refers to insurance agents and advisers" and "we have engaged, and we pay these agents."  The program, Pykosz explained, had added new patients "over the past year or so."

**ANSWER:** The allegations in Paragraph 135 of the Complaint are directed at Defendants

who are not the Newlight Defendants.  To the extent a response is required, deny the allegations

in Paragraph 135 of the Complaint, except deny knowledge or information sufficient to form a

belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to

the transcript of the Wolfe Research Conference for its complete and accurate text.

136.     On November 22, 2021, *The Capitol Forum*, a subscriber-only news service, published a report adding examples of Oak Street's over-aggressive patient acquisition and recruitment tactics, entitled, "Oak Street Health: Company Events and Other Recruitment Tactics Likely Violate Medicare Inducement Guidelines."  The article reported, in part, that while the OIG has stated that "offering valuable gifts to beneficiaries to influence their choice of a Medicare or Medicaid provider raises quality and cost concerns," and "the HHS OIG has defined valuable gifts as those exceeding $15 per gift, with an annual cap of $75 per patient . . . regardless of cost, inducements cannot be in the form of 'cash or cash equivalents' like gift cards," at Oak Street, "[f]our former employees . . . who worked in patient recruitment told *The Capitol Forum* that compliance with these regulations was rarely discussed at the Company and that high quotas placed on recruitment created an anything-goes mentality for getting new enrollees."  The article added that "[t]he former employees said that they regularly gave out incentives and staged events that were over the $15 per person limit" and "the employees say that gift cards were regularly used as an inducement to get new patients to come to the clinics."  For example, "[f]ormer employees of Oak Street Health told *The Capitol Forum* that they regularly gave out gift cards to businesses like CVS and Walgreens as inducements for potential patients to come to their centers, and one employee said that they sometimes gave our prepaid Visa gift cards that could be used anywhere." *The Capitol Forum* added, "the employees said[] there was little discussion at their clinics regarding compliance and no system in place to track how much had been spent on each enrollee."

**ANSWER:** The allegations in Paragraph 136 of the Complaint are directed at Defendants

who are not the Newlight Defendants.  To the extent a response is required, deny the allegations

in Paragraph 136 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and admit that Plaintiffs selectively quote the article published by *Capitol Forum* on November 22, 2021, and respectfully refer the Court to that document for its complete text.

137. *The Capitol Forum* article further discussed Oak Street's close relationship with insurance agents, stating that:

> If [a] new patient ha[d] an insurance that [wa]s not accepted by Oak Street Health, they [we]re directed to insurance agents who can enroll them in a compatible Medicare plan, the former employees said.
>
> "People would come in for the welcome visit, and there would be a Humana or Anthem insurance agent at the clinic," one former outreach executive said, "they sat in a separate room. One day it would be a Humana rep, the next day it would be an Anthem rep."
>
> A former senior executive at Oak Street Health told *The Capitol Forum* that enrollment and community engagement employees "would get written up if they didn't work with an assigned insurance agent," and they "had to ensure that their Humana agent, for example, got nine new people per day."

**ANSWER:** The allegations in Paragraph 137 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 137 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and admit that Plaintiffs selectively quote the article published by *Capitol Forum* on November 22, 2021, and respectfully refer the Court to that document for its complete text.

138. On February 22, 2022, *The Capitol Forum* published another report on Oak Street entitled, "Oak Street Health: DOJ Investigation Likely Focuses on Program That May Be Problematic Under Federal Antikickback Laws," which reported, in part, the following:

> . . . . While the company has not shared many details about the scope of the investigation, one of the areas of the DOJ's focus is likely its Client Awareness Program (CAP), which pays insurance agents $200 for every eligible Medicare beneficiary they refer to one of the company's clinics.

*   *   *

64

According to a former employee of Oak Street Health familiar with CAP, the program was launched towards the end of 2020 when the pandemic limited the company's ability to market and recruit new patients. Rapid growth in the company's patient population has been a major part of Oak Street Health's overall business strategy.

In 2018, the company operated 39 centers in eight markets and served 50,000 patients; as of January 2022, those figures had grown to 129 centers serving roughly 112,500 patients in 19 states, according to company presentations. The company expects the number of centers to grow to 199 by the end of the year and estimates that it can serve roughly three times its current patient population in its existing footprint.

**Company presentation to insurance agents advertises large financial benefits to agents**. At a JP Morgan Healthcare conference last month, Oak Street Health CEO Michael Pykosz provided some information on the DOJ's investigation, saying that "as far as what they're [the DOJ] looking for, again, one of the things I've talked about looking for is our relationship with third-party agents."

"We have engaged and we compensate some agents to help educate older adults about Oak Street. And when the—it is requested by the older adult, they will connect the older adult to our teams if they're interested learning more about Oak Street Health," Pykosz continued, "And so that's a relatively small program and we shared, it's kind of single digits as far as the percentage of our new patients it brings on. We're very proud of our compliance program at Oak Street Health, and we do make sure both our team and external parties have reviewed everything, but that's our understanding of what they're really looking for."

While the company has given few details about CAP, the presentation given in North Carolina last September [2021] lays out the structure of the program. This presentation was similar to one given by an Oak Street Health representative in Rhode Island a month later, and a former employee in Pennsylvania said that CAP was in effect while they were working at their clinic. A review of Oak Street Health agent leads submission page indicates that clinics in sixteen other states can receive leads from insurance agents using methods similar to CAP.

[Graphic Omitted]

According to the presentation, Oak Street Health will pay insurance representatives $200 for every qualified Medicare beneficiary they direct to the clinics. Oak Street Health defines a qualified beneficiary as a person who is eligible for Medicare Part B, resides within a clinic's service area, is not a pre-existing patient of Oak Street Health, and must be aware that they are being connected to an Oak Street Health representative in order to schedule a visit to the center or learn more about it.

[Graphic Omitted]

The program, according to the representative who gave the presentation, is only for Medicare patients, and while a beneficiary does not have to schedule a visit for the agent to be paid, the representative made it clear that the company only wants leads that potentially could become Oak Street Health patients.

The hand-off of the patient has to be performed either during a three-way phone call during which the Oak Street Health representative is on mute and then brought on, through a voicemail left by the beneficiary, or by bringing the beneficiary to the clinic in person, according to the Oak Street Health representative.

*　　*　　*

These $200 payments can quickly add up to tens of thousands of dollars, according to the representative, and do not have to be spent as reimbursement for costs associated with referring that beneficiary.

"You don't have to spend it on marketing.  I want to make that clear.  There's no requirement.  If you want to just take the money and go on vacation, I really don't care what you do with the money," the representative said.

"We've had agents last year, I'm not saying this is every agent, but we have some agents that really focus in our neighborhoods have really accepted and engaged the partnership with Oak street who made between $30,000 and $40,000 just during AEP [Annual Enrollment Period] last year off this program," he added, "So you know, a couple of things they did is they really spent a lot of money on marketing our neighborhoods doing lead generation, doing grassroots efforts, getting out there in the community."

The representative also advised that these patients did not have to be new beneficiaries to the Medicare program that would require extra time and money to reach.  Instead, agents who made a lot of money also "looked at their existing book of business.  They already had a lot of clients.  In our community, they would look through the existing book of business and find, say, 10 people that they knew lived around the center...  They would come in with that list of 10 names, sit down, you know, spend a couple of hours at Oak Street in the morning, sit down with a member of outreach, call through those names, hand the phone, over to the outreach person."

"As soon as they handed that phone over to the outreach person they were $200 richer right there.  So, an agent would come in and, you know, 10 times $200 is $2,000.  They come and make $2,000 just for spending a couple hours at Oak Street in the morning."

**ANSWER:** The allegations in Paragraph 138 of the Complaint are directed at Defendants who are not the Newlight Defendants.  To the extent a response is required, deny the allegations in Paragraph 138 of the Complaint, except deny knowledge or information sufficient to form a

66

belief as to the allegations directed at other Defendants therein, and admit that Plaintiffs selectively

quote the article published by *Capitol Forum* on February 22, 2021, and respectfully refer the

Court to that document for its complete text.

139.     Then, on February 28, 2022, Oak Street filed with the SEC its annual report on form 10-K for full-year 2021 ("2021 10-K"), signed by Defendants Pykosz and Cook.  In the 2021 10-K, Oak Street changed its prior AKS Statement to now state, in part, that Oak Street:

> use[s] external companies to assist with certain aspects of these [sales] efforts <u>and attempt to structure to meet the Personal Services Safe Harbour.  In doing so, we believe that these arrangements do not violate the [AKS].  Additionally, the provision of free or discounted items, services or other renumeration [sic] in connection with patient recruitment has been scrutinized by OIG.  We attempt to structure any offer or actual transfer of renumeration [sic] to prospective or current patients in a manner consistent with applicable exceptions</u>.

(Emphasis added to show changed text).

ANSWER: The allegations in Paragraph 139 of the Complaint are directed at Defendants

who are not the Newlight Defendants.  To the extent a response is required, deny the allegations

in Paragraph 139 of the Complaint, except deny knowledge or information sufficient to form a

belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to

the 2021 Form 10-K for its complete and accurate text.

140.     Thus, the 2021 10-K confirms that during the Class Period, Oak Street and the Individual Defendants were aware of the payments to external agents and were still attempting to defend them, not as in compliance with the anti-kickback provisions of the AKS, but as part of a "safe harbor."  However, as discussed herein, the payments do not fall within the narrow safe harbor.  Notably, the 2021 10-K did not explain, nor did Pykosz or Cook explain in calls following disclosure of the CID, how payments based on volume of patients referred (e.g., $200 per patient) could possibly satisfy the safe harbor which applied to payments directed at the costs of operating the referral service.  The modifications to the 2021 10-K also confirm that Oak Street and the Individual Defendants knew that the "offer or actual transfer of renumeration [sic] to prospective or current patients" was part of Oak Street marketing tactics.  At no time during the conference calls following disclosure of the CID or in the 2021 10-K did Defendants Oak Street, Pykosz, or Cook deny knowledge of the free transportation or attempt to claim that it had not been offered or marketed to prospective patients.

ANSWER: The allegations in Paragraph 140 of the Complaint are directed at Defendants

who are not the Newlight Defendants.  To the extent a response is required, deny the allegations

in Paragraph 140 of the Complaint, except deny knowledge or information sufficient to form a

belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to

the 2021 Form 10-K for its complete and accurate text.

141.    On March 4, 2022, The Capitol Forum published a report entitled, "Oak Street Health: Company Updates 10K to Include Safe Harbor for Potential Anti-Kickback Violations, But Former AUSAs Say Safe Harbor Likely Not Applicable," which reported, in part that:

> The Personal Services Safe Harbor . . . allows for payments which are at fair market value for the services provided, not for the value of the referral, according to Jacob Elberg, a Professor of Health Care Fraud at Seton Hall Law School and a former Assistant United States Attorney who supervised a team of federal prosecutors focused on health care fraud offenses.
>
> "To fit the safe harbor, payments must be based on the value of the work performed and not based on the value of the referral – it doesn't fit the safe harbor to pay someone a substantial sum of money for spending a few minutes making a referral," Elberg said.
>
> Another former Assistant United States Attorney who spoke on background agreed with Elberg and noted that the $200 payment seemed to represent the value of the additional business brought by the patient.
>
> Presentations given by Oak Street Health representatives about CAP appear to show disconnect between the payment and the work being performed by the agent.

**ANSWER:** The allegations in Paragraph 141 of the Complaint are directed at Defendants

who are not the Newlight Defendants.  To the extent a response is required, deny the allegations

in Paragraph 141 of the Complaint, except deny knowledge or information sufficient to form a

belief as to the allegations directed at other Defendants therein, and admit that Plaintiffs selectively

quote the article published by *Capitol Forum* on March 4, 2022, and respectfully refer the Court

to that document for its complete text.

142.    In the time since Oak Street's improper tactics began to be revealed to the market, Oak Street stock has continued to decline, and it is now trading at less than $18 per share, a more than 70% collapse from Class Period highs.

**ANSWER:** The allegations in Paragraph 142 of the Complaint are directed at Defendants

who are not the Newlight Defendants.  To the extent a response is required, deny the allegations

in Paragraph 142 of the Complaint, and respectfully refer the Court to the publicly reported closing

prices of Oak Street stock.

## ADDITIONAL SCIENTER ALLEGATIONS

**The Individual Defendants Controlled the Company's Messaging to the Investing Public**

143.    Defendants Pykosz and Cook have long determined the Company's strategies, decisions, and messaging to the investing public.  Pykosz co-founded Oak Street in 2012 and has served as the Company's only CEO.  Cook has served as the CFO of Oak Street since 2019.

**ANSWER:** The allegations in Paragraph 143 of the Complaint are directed at Defendants

who are not the Newlight Defendants.  To the extent a response is required, deny the allegations

in Paragraph 143 of the Complaint, except deny knowledge or information sufficient to form a

belief as to the allegations directed at other Defendants therein, and admit that Pykosz has been

CEO of Oak Street since he co-founded the Company in 2012 and that Cook has served as the

CFO of Oak Street since 2019.

144.    In their respective roles as CEO (Pykosz) and CFO (Cook), the Individual Defendants were able to, and did, determine the content of the various SEC filings and other public statements pertaining to Oak Street during the Class Period.  Pykosz and Cook signed or certified Oak Street's annual and quarterly reports filed with the SEC.  *See* ¶¶102, 105, 111, 113, 119.  In addition, Pykosz and Cook attended conference calls and spoke on behalf of Company throughout the Class Period.  *See* ¶¶103, 106, 108, 112, 114, 117-118, 120-121.  Since going public in 2020, Pykosz and Cook are the only Oak Street employees to have signed or certified every annual and quarterly report filed with the SEC.  Pykosz and Cook are also the only Oak Street employees that have answered analyst questions on behalf of the Company during quarterly earnings calls.

**ANSWER:** The allegations in Paragraph 144 of the Complaint are directed at Defendants

who are not the Newlight Defendants.  To the extent a response is required, deny the allegations

in Paragraph 144 of the Complaint, except deny knowledge or information sufficient to form a

belief as to the allegations directed at other Defendants therein, and admit that Pykosz and Cook

signed or certified certain of Oak Street's filings with the SEC and attended certain conference

calls and answered analyst questions on behalf of the Company.

69

145.     Further, Defendants Pykosz and Cook participated in the drafting, preparation, and/or approval of such public statements and were provided with copies of the documents alleged herein to be false and misleading prior to or shortly after their issuance and had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, Pykosz and Cook were responsible for ensuring the accuracy of the public reports and releases detailed herein and for verifying that the facts supported the statements and there were no material omissions. They are therefore liable for the misrepresentations and omissions therein.

**ANSWER:** The allegations in Paragraph 145 of the Complaint are directed at Defendants

who are not the Newlight Defendants.  To the extent a response is required, deny knowledge or

information sufficient to form a belief as to the allegations in Paragraph 145 of the Complaint.

146.     As the most senior executive officers of Oak Street, Pykosz and Cook were privy to confidential and proprietary information concerning Oak Street, its payments to insurance agents for referrals, and its marketing and provision of free transportation to Medicare beneficiaries.  Each of them also: (i) had access to, *inter alia*, internal corporate documents, conversations with corporate officers, and employees; (ii) attended management and Board meetings and committees thereof; and (iii) reviewed reports and other information provided to them in connection therewith.  Because of their possession of such information, Pykosz and Cook knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

**ANSWER:** The allegations in Paragraph 146 of the Complaint are directed at Defendants

who are not the Newlight Defendants.  To the extent a response is required, deny knowledge or

information sufficient to form a belief as to the allegations in Paragraph 146 of the Complaint.

**Oak Street and the Individual Defendants Closely Monitored Patient Growth and Oak Street's Patient Acquisition Tactics, Which Were Critical to Oak Street**

147.     In their roles as CEO (Pykosz) and CFO (Cook), the Individual Defendants were required to not only keep themselves informed of the Company's day-to-day business and operations, but to keep Oak Street's non-management directors apprised of the state of the Company's business, operations, and trends.

**ANSWER:** The allegations in Paragraph 147 of the Complaint are directed at Defendants

who are not the Newlight Defendants.  To the extent a response is required, deny knowledge or

information sufficient to form a belief as to the allegations in Paragraph 147 of the Complaint.

148.     As discussed above, ¶¶47-49, 62-67, monitoring and maximizing at-risk patient growth was critical to Oak Street's operations and growth because Oak Street could meaningfully increase its revenue and profit base only by adding at-risk patients.  Recognizing that patient

70

acquisition and strategies to acquire patients following the suspension of community outreach in March 2020 were essential information to the market, the Individual Defendants discussed at-risk patient growth in every quarterly earnings call throughout the Class Period.

**ANSWER:** The allegations in Paragraph 148 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 148 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to the transcripts of Oak Street's quarterly earnings calls for their complete and accurate texts.

149. Moreover, Oak Street set guidance for increasing its quarterly at-risk patient base, which analysts and investors tracked closely. In three quarters during the Class Period, Oak Street exceeded the mid-point of its quarterly at-risk patient guidance by only around 1%, confirming that all patient acquisition strategies that could impact the number of at-risk patients by even a percentage were material and imperative to meeting investor expectations.[10]

**ANSWER:** The allegations in Paragraph 149 of the Complaint and Footnote 10 thereto are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 149 of the Complaint and Footnote 10 thereto, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and deny knowledge or information sufficient to form a belief as to the allegations concerning unnamed third-party analysts, and respectfully refer the Court to the transcript of the Wolfe Research Conference for its complete and accurate text.

150. As leaders of Oak Street, Defendants Pykosz and Cook determined business strategy and made and approved Oak Street's patient acquisition strategies and policies. In their roles, Pykosz and Cook understood the importance of monitoring all patient acquisition strategies used by the Company to track their effectiveness. In fact, during the Class Period, Pykosz reassured investors that Oak Street and the Individual Defendants were monitoring Oak Street's patient acquisition strategies to ensure that costs of the strategies were worth the spend.

---

[10] Given that Defendant Pykosz has only vaguely disclosed that CAP added "less than 10% of our new patients over the past year or so" in November 2021, it is reasonable to infer that CAP added close to 10% of the new patients, the elimination of which in any quarter during the Class Period would have caused the Company to drastically miss guidance.

**ANSWER:** The allegations in Paragraph 150 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny knowledge or information sufficient to form a belief as to the allegations in Paragraph 150 of the Complaint.

151. For example, in September 2020, Pykosz stated that Oak Street had "innovated and tried new" patient acquisition strategies and, reflecting the Individual Defendants' knowledge of and monitoring of those strategies, represented that the strategies "are showing good results." Similarly, in May 2021, Pykosz assured investors that marketing channels were "working" and "bringing in patients . . . kind of [below] our cost of acquisition threshold." And, in June 2021, Pykosz stated that channels following COVID-19 shutdowns "work" and "the cost of acquisitions [are] well under our threshold."

**ANSWER:** The allegations in Paragraph 151 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 151 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to the 2Q20 Earnings Call, the 1Q21 Earnings Call, and the transcript of the William Blair Conference for their complete and accurate texts.

152. More specifically, in their roles, Pykosz and Cook understood the importance of monitoring Oak Street's strategies of paying insurance agents a $200 per referral fee for patients that signed up with Oak Street, and using transportation to induce non-Oak Street patients to select Oak Street over their existing doctor or others. As to referral fees, Pykosz and Cook signed or certified five SEC filings during the Class Period reflecting their understanding that "per-patient based compensation methodologies are closely scrutinized by federal agencies" and assuring the market that they had reviewed the Company's "arrangements" with "external companies to assist with certain [patient acquisition] efforts."

**ANSWER:** The allegations in Paragraph 152 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny knowledge or information sufficient to form a belief as to the allegations in Paragraph 152 of the Complaint.

153. As discussed, Oak Street and the Individual Defendants were aware that violations of the FCA and AKS could result in significant fines, penalties, and even suspension of Oak Street from Medicare derived payments, its sole source of revenue. *See* ¶¶50-61. Defendants also recognized that "[c]ertain of our contracts [with MA plans] may be terminated immediately by the partner if we . . . receive an exclusion, suspension or debarment from state or federal government authorities."

72

**ANSWER:** The allegations in Paragraph 153 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 153 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to Oak Street's public statements, including its SEC filings, for their complete and accurate texts.

154. Defendant Pykosz made clear that Oak Street and the Individual Defendants were, in fact, monitoring patient acquisitions secured through insurance agents during the Class Period. For example, in November 2020, Pykosz stated that "some of the channels" Oak Street was engaged in, including "working with insurance" were "helping." And in June 2021, he represented that Oak Street and the Individual Defendants were aware that "insurance advisers or health plans" had "push[ed]" patients to Oak Street and that "a lot of rules" imposed by Medicare put "a lot of limits on what they can actually do."

**ANSWER:** The allegations in Paragraph 154 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 154 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to the transcripts of the 3Q20 Earnings Call and the William Blair Conference for their complete and accurate texts.

155. As to free transportation, Pykosz's Class Period statements reflected that Oak Street and the Individual Defendants were aware of the effectiveness of offering free transportation to prospective patients in inducing them to join Oak Street. For example, in January 2021, Pykosz stated that "[t]hings like transportation . . . really provide a much better consumer proposition to patients," and "Oak Street Health is a really natural place" for seniors to receive primary care "because we offer free transportation," which provides a "really strong consumer value proposition." Later, in June 2021, Pykosz stated that the fact that Oak Street "offer[s] transportation, too (sic), from our visits," was a differentiating selling point for the Company to patients. And, in August 2021, in describing efforts to get more patients, Defendant Pykosz stated, "[w]e are out there every day trying to meet people and trying to get them engaged and out there, and what we're telling them is hi, come to Oak Street Health, we take great care of you. Here's our vehicle center."

**ANSWER:** The allegations in Paragraph 155 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations

in Paragraph 155 of the Complaint, except deny knowledge or information sufficient to form a

belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to

the transcripts of the 2021 JPMorgan Conference and the 2Q21 Earnings Call for their complete

and accurate texts.

156.    Thus, Oak Street and the Individual Defendants were aware of or recklessly disregarded that Oak Street's patient acquisition strategies, which were critical to the Company and actively monitored by defendants, included the payment of per-patient referral fees to outside agents and the marketing and offering of free transportation to non-established patients.

**ANSWER:** The allegations in Paragraph 156 of the Complaint are directed at Defendants

who are not the Newlight Defendants.  To the extent a response is required, deny knowledge or

information sufficient to form a belief as to the allegations in Paragraph 156 of the Complaint.

**Oak Street and the Individual Defendants Were Aware That the Tactics Violated Provisions of the AKS and the Company's Code of Conduct**

157.    Oak Street's and the Individual Defendants' Class Period statements confirm that they were aware that the AKS prohibited Oak Street from providing anything of value to: (i) outside parties to induce them to refer prospective patients to Oak Street; or (ii) prospective patients to induce them to select Oak Street as their primary care provider.  *See* ¶¶50-61.

**ANSWER:** The allegations in Paragraph 157 of the Complaint are directed at Defendants

who are not the Newlight Defendants.  To the extent a response is required, deny knowledge or

information sufficient to form a belief as to the allegations in Paragraph 157 of the Complaint.

158.    Moreover, Oak Street's Code of Conduct, adopted by Defendant Pykosz and the other members of the Board of Directors, confirms their awareness that, "[a]s a provider of healthcare and related services, the laws rules, and regulations that impact Oak Street's fundamental business operations include . . . [t]he Anti-Kickback Statute (AKS)." The Code of Conduct makes clear that "[a] kickback is an improper payment, gift, service, or item of value offered or received in return for increased business, including, but not limited to, patient referrals," and it states that employees and contractors "cannot accept, solicit, or provide kickbacks in return for patient referral."

**ANSWER:** The allegations in Paragraph 158 of the Complaint are directed at Defendants

who are not the Newlight Defendants.  To the extent a response is required, deny the allegations

in Paragraph 158 of the Complaint, except deny knowledge or information sufficient to form a

belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to Oak Street's Code of Conduct for its complete and accurate text.

159. Oak Street's Code of Conduct further confirms Oak Street's and the Individual Defendants' awareness of the AKS's ban on providing anything of value to prospective patients or others to influence an individual's medical decisions, as it states that employees and contractors "are prohibited from offering, giving, providing, or accepting, a gift unless: the value is $15 or less and is not being offered to induce or motivate a patient to seek care from Oak Street."

**ANSWER:** The allegations in Paragraph 159 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 159 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to Oak Street's Code of Conduct for its complete and accurate text.

160. Thus, Oak Street's and the Individual Defendants' own statements and Code of Conduct demonstrate that they were aware of AKS, its application to Oak Street, and its prohibition of the improper tactics alleged herein.

**ANSWER:** The allegations in Paragraph 160 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny knowledge or information sufficient to form a belief as to the allegations in Paragraph 160 of the Complaint.

161. Oak Street's and the Individual Defendants' *post hoc* claim in the 2021 10-K that, with respect to the referral agreements, Oak Street attempted to meet the "Personal Services" safe harbor only confirms that they were aware that the agreements were *prima facie* violations of AKS. Moreover, the safe harbor for "Personal services and management contracts and outcomes-based payment arrangements" is set forth at 42 C.F.R. §1001.952(d), and states that "'remuneration'" for purposes of the AKS "does not include" certain payments made to an agent, but **only** if "[t]he methodology for determining the compensation paid to the agent . . . is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare."

**ANSWER:** The allegations in Paragraph 161 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 161 of the Complaint, except deny knowledge or information sufficient to form a

75

belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to the 2021 Form 10-K and 42 C.F.R. §1001.952(d) for their complete and accurate texts.

162.    As set forth herein, Oak Street's referral agreements provided for Oak Street to pay the agents $200 for each referral, which is compensation that takes into account the volume of referrals to Oak Street for primary care, and for which payment is made in whole or in part under Medicare. *See also* ¶¶50-61, 68-71. Oak Street's and the Individual Defendants' generic claim that they "believed" the referral payments satisfied the Safe Harbor without any explanation of how paying $200 per patient could possibly be considered a payment relating to costs of operating a referral service, rather than directly being tied to the volume of patients, makes clear they had no good faith belief that the payments were in compliance. Similarly, Oak Street and the Individual Defendants did not even attempt to defend the Company's widespread public marketing of free transportation.

**ANSWER:** The allegations in Paragraph 162 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny knowledge or information sufficient to form a belief as to the allegations in Paragraph 162 of the Complaint.

**Individual Defendants' Public Statements Support a Strong Inference of Scienter**

163.    Defendants Pykosz and Cook held themselves out to investors and the market as the persons directly involved in, and most knowledgeable about, Oak Street's business and its patient acquisition strategies and growth. Their repeated statements to the investing public during the Class Period demonstrate knowledge of the topics on which they directly spoke, including Oak Street's patient acquisition strategies, including all components of those strategies and their success, and changes to patient acquisition strategies (*e.g.*, ¶¶101(a)-(b), 101(d)-(e), 103(b)-(d), 106(a)-(b), 108(a)-(c), 110, 112, 114-115, 117(a)); Oak Street's use of insurance agents for patient acquisition (*e.g.*, ¶¶101(c), 106(c), 110, 117(b)); and the AKS's prohibition on the provision of incentives and use of per-patient referral fees (*e.g.*, ¶¶56-57, 60-61, 101(h)).

**ANSWER:** The allegations in Paragraph 163 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny knowledge or information sufficient to form a belief as to the allegations in Paragraph 163 of the Complaint.

164.    The Individual Defendants' repeated statements regarding, and their direct involvement in the decisions impacting, these topics, supports an inference that at the time they spoke they were actively monitoring and had access to, and knew or recklessly disregarded the facts that rendered their statements false and misleading.

**ANSWER:** The allegations in Paragraph 164 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny knowledge or information sufficient to form a belief as to the allegations in Paragraph 164 of the Complaint.

165. Moreover, the Individual Defendants' refusal and reluctance to provide details on, for example, Oak Street's $200 per-patient referral arrangements with third party agents further supports a strong inference of scienter. Throughout the Class Period, Oak Street and the Individual Defendants were incentivized to advise the market of everything they were doing to add more patients, as the issue was important to the market. Indeed, Oak Street and the Individual Defendants did disclose tactic after tactic that they were using in their marketing efforts. *See, e.g.*, ¶¶107-108. Yet, Defendants deliberately refused to disclose that Oak Street was marketing and providing free transportation to prospective patients and was paying $200 per-referral to third party agents as part of its patient acquisition strategies, even when specifically asked to "unpack" Oak Street's "alternative engagement channels," including the use of "brokers," (¶106(c)), and specifically asked about marketing by "intermediaries like the MA plans or brokers," (¶117(b)), instead providing only vague answers avoiding any reference to the kickback arrangements.

**ANSWER:** Aver that Paragraph 165 of the Complaint contains legal conclusions, to which no response is required. The allegations in Paragraph 165 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein.

**Defendants' Insider Sales and Incentive Compensation Support a Strong Inference of Scienter**

166. Defendants had a massive informational advantage and were uniquely situated to gain enormous financial rewards by going public and portraying the Company in a positive light during the periods following the IPO. Based on Oak Street's and the Individual Defendants' Class Period statements, Oak Street's stock price increased from $21 per share at the time of the IPO to $45 by December 2020 and $64 per share by February 2021.

**ANSWER:** The allegations in Paragraph 166 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 166 of the Complaint, and respectfully refer the Court to the publicly reported closing prices of Oak Street common stock.

167.     Between December 7, 2020 and October 19, 2021, Defendant Pykosz sold over 1.2 million shares of Oak Street stock, including at prices over $60.00 per share, for more than $60 million in gross insider sale proceeds.  Of the $60 million in insider sales, $40 million worth of those sales occurred within seven months of the November 2021 corrective disclosure, $14 million worth of which occurred within just three months or less of the November 2021 corrective disclosure.  Then, on November 2, 2021 – just one day after the DOJ served the CID on Oak Street, but before Oak Street disclosed the CID to investors, Defendant Pykosz sold an additional 50,000 shares of Oak Street stock for more than $2.25 million in additional gross proceeds.

**ANSWER:** The allegations in Paragraph 167 of the Complaint are directed at Defendants who are not the Newlight Defendants.  To the extent a response is required, deny the allegations in Paragraph 167 of the Complaint, and respectfully refer the Court to the publicly filed Forms 4 for their complete and accurate texts.

168.     In addition, during the Class Period, Defendant Cook sold over 230,000 shares of Oak Street stock, including at prices over $60.00 per share, for more than $12 million in gross proceeds.  Of the $12 million in insider sales, $7.6 million worth of those sales occurred within seven months of the November 2021 corrective disclosure, $2.2 million worth of which occurred within just three months of the November 2021 corrective disclosure.  In total, the Individual Defendants obtained more than $76 million in gross proceeds from their Class Period sales at inflated prices.[11]

**ANSWER:** The allegations in Paragraph 168 of the Complaint and Footnote 11 thereto are directed at Defendants who are not the Newlight Defendants.  To the extent a response is required, deny the allegations in Paragraph 168 of the Complaint and Footnote 11 thereto, and respectfully refer the Court to the publicly filed Forms 4 for their complete and accurate texts.

169.     Non-defendant executives who were closely involved in the disclosures set forth herein also sold a significant amount of stock.  For example, the Chief Operating Officer of Oak Street, Geoff Price, who was also a cofounder and Director, sold over 1.5 million shares of Oak Street stock during the Class Period, including at prices over $60.00 per share, for more than $82 million in gross insider sale proceeds.

**ANSWER:** The allegations in Paragraph 169 of the Complaint are directed at Defendants who are not the Newlight Defendants.  To the extent a response is required, deny the allegations

---

[11]     It appears the Individual Defendants entered into Rule 10b5-1 trading plans during the middle of Class Period and after the fraud had already begun.  Tellingly, neither of the Individual Defendants purchased shares of Oak Street stock during the Class Period.

in Paragraph 169 of the Complaint, except deny knowledge or information sufficient to form a

belief as to the allegations directed at other Defendants therein, and admit that Geoffrey Price

("Price") is a co-founder and director of Oak Street, was the Chief Operating Officer until January

1, 2022 and then became the Chief Innovation Officer, and respectfully refer the Court to the

publicly filed Forms 4 for their complete and accurate texts.

170. Defendants also commenced secondary public offerings, which, rather than focus primarily on raising more money to invest in the business, principally allowed Defendants Newlight and General Atlantic to take full advantage of the liquidity opportunity and unload artificially inflated shares on the investing public. Through the February 2021 Offering and May 2021 Offering, Defendants Newlight and General Atlantic sold more than 24 million shares of Oak Street Stock, at artificially inflated prices of more than $50 per share and more than $60 per share, for more than $1.4 billion in gross insider sale proceeds.

**ANSWER:** Deny the allegations in Paragraph 170 of the Complaint, except deny

knowledge or information sufficient to form a belief as to the allegations directed at other

Defendants therein, and respectfully refer the Court to the publicly filed Forms 4 for their complete

and accurate texts.

171. Many of the foregoing insider sales occurred at prices near the Class Period high of over $60, far greater than the $36 price the shares had fallen to at the end of the Class Period, and more than triple the less than $18 per share the stock trades at today.

**ANSWER:** Deny the allegations in Paragraph 171 of the Complaint, and respectfully refer

the Court to the publicly reported closing prices of Oak Street common stock.

172. Moreover, Oak Street's executive compensation was tied directly to increasing the number of Oak Street's at-risk patients. For example, in discussing Oak Street's executive compensation for 2020 and 2021, Oak Street's Proxy Statements filed with the SEC on March 24, 2021 and March 18, 2022 stated that Defendants Pykosz and Cook "were eligible to receive annual cash incentive awards" based on their performance as assessed, for example, against "at-risk patient count targets" set by the Board of Directors. In other words, the Individual Defendants' cash awards increased based on the number of new at-risk patients added as a result of the Company's patient acquisition tactics. Thus, the Individual Defendants had significant incentive to advance and conceal the improper patient acquisition tactics being employed by Oak Street to increase Oak Street's at- risk patient base, particularly given that Oak Street was tracking below, and ultimately did not meet, the at-risk membership "Target" set by the Board in 2021.

**ANSWER:** The allegations in Paragraph 172 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 172 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to Oak Street's Proxy Statements filed with the SEC on March 24, 2021 (the "March 2021 Proxy Statement") and March 18, 2022 (the "March 2022 Proxy Statement") for their complete and accurate texts.

173. The Individual Defendants, especially Defendant Pykosz, were also incentivized to conceal Oak Street's improper patient acquisition tactics and other improper conduct described herein in order maximize their compensation for 2020, the year the Company went public. Indeed, Oak Street's March 2021 Proxy Statement reported that Pykosz's "[t]otal" compensation for 2020 was $73.5 million, and reported approximately $360 million in stock options awards.[12] Media reported that, with stock and options awards, Pykosz's 2020 compensation was approximately $568 million, making him reportedly the second-highest paid CEO, second only to Elon Musk.[13]

**ANSWER:** The allegations in Paragraph 173 of the Complaint and Footnote 12 thereto are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 173 of the Complaint and Footnote 12 thereto, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to the March 2021 Proxy Statement, the August 11, 2021 article published by *Entrepreneur*, and the March 21, 2022 article published by Yahoo! Finance for their complete and accurate texts. Aver that Footnote 13 contains citations, to which no response is required.

**Oak Street's Widespread Tactics of Aggressively Pursuing Revenue at All Costs Supports a Strong Inference of Scienter**

---

[12] According to the March 2021 Proxy Statement, the Company recorded Pykosz's stock and option awards at "the grant date fair value of [the] stock options" purportedly to "reflect the accounting cost for these stock options" which "d[id] not correspond to the actual economic value that may be ultimately realized" by Pykosz and the other executives.

[13] https://finance.yahoo.com/news/rich-highest-paid-ceos-america-110019140.html; https://www.entrepreneur.com/article/379955.

174. As discussed herein, Oak Street's overly-aggressive (and undisclosed) patient acquisition and recruitment tactics were utilized by centers and employees throughout the country, at the direction of Oak Street's corporate offices without regard to compliance with federal laws and regulations, and as a means to meet significant and unreasonable sales pressure. *See, e.g.*, ¶¶68-99, 129-141.

**ANSWER:** The allegations in Paragraph 174 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny knowledge or information sufficient to form a belief as to the allegations in Paragraph 174 of the Complaint.

175. Indeed, Oak Street repeatedly and aggressively sought to increase revenue at all costs, even beyond the misconduct referenced in the DOJ's investigation. For example, as discussed, Oak Street can increase its capitated revenue by documenting additional risk factors for its patient base, resulting in increased "risk adjustment" scores. But by participating in Medicare and MA, Oak Street was required to ensure that all diagnosis codes for risk adjustment were accurate, complete, and truthful, and failure to do so could give rise to prosecution under the FCA. Nevertheless, reports and former employee statements have indicated that Oak Street was engaged in improper diagnoses practices in order to inflate the risk adjustments scores, and thus the level of Medicare reimbursements, for their patients.

**ANSWER:** The allegations in Paragraph 175 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 175 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein.

176. For example, on December 16, 2021, *The Capitol Forum*, published another report on Oak Street entitled, "Oak Street Health: Former Clinical Staff Say Company Pressured Them to Diagnose Diseases with High Rates of Reimbursement," which reported, in part:

> Former doctors, nurses, medical assistants, and medical coders at Oak Street Health (OSH), a provider of primary care for Medicare Advantage beneficiaries, tell *The Capitol Forum* that the company often pressured them to diagnose patients with certain medical conditions despite lacking appropriate clinical documentation. These diagnoses were pushed, in the opinion of the former employees, because companies that care for sicker and more medically complex patients receive higher rates of reimbursement from Medicare.

> At Oak Street Health, these financial incentives often led patients to be diagnosed with serious illnesses on relatively little clinical evidence, according to former employees who worked at clinics in four different states.

*       *       *

81

The former employees recalled that the conditions that they were commonly pushed to diagnose patients with and the approximate annual rate increase for the typical Medicare patient according to Medicare's 2019 risk adjustment guide, included pulmonary fibrosis ($1,260), peripheral vascular disease ($3,660), congestive heart failure ($2,376), coagulation defects of the blood ($1,608), and drug and alcohol dependence ($4,128).

*       *       *

According to the nurse coder, the purpose of finding relevant support for a diagnosis was in case Oak Street Heath was audited by Medicare. The nurse coder added that they were worried that their accreditation from the American Academy of Professional Coders would be revoked in the event of an audit for these practices, a concern shared by another nurse coder.

Internal Oak Street Health documents reviewed by *The Capitol Forum* appear to corroborate the assertions of former employees. A training presentation created by an outside consultancy advised employees about what diagnoses and stages of disease did and did not adjust a patients' risk score, and care reports for patients suggested diagnoses for several high-reimbursing conditions for physicians to approve.

*       *       *

In search of lucrative diagnoses, former Oak Street Health employees say that they regularly tested new and existing patients for many of the same conditions multiple times per year. These tests, former employees say, often skewed towards conditions that were lucratively reimbursed by Medicare. . . . "Testing was essentially a fishing expedition to find potential risk adjusting codes. . . ." a former physician said. . . . A presentation given by the outside consultancy Capstone Performance Systems which advertises itself as providing "expert Medicare risk adjustment services to ensure compliance and optimize revenue," to Oak Street employees appears to corroborate their accounts.

*       *       *

According to former employees, their performance was often judged on how many of these recommended diagnoses they could approve. Diagnoses that clinicians were unable to prove, however, were rarely removed from Canopy [Oak Street's technology platform], but rather reappeared every few months.

**ANSWER:** The allegations in Paragraph 176 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 176 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and admit that Plaintiffs selectively

82

quote the article published by *Capitol Forum* on December 16, 2021, and respectfully refer the Court to that document for its complete text.

177. On February 4, 2022, *The Capitol Forum* published a report on Oak Street entitled, "Oak Street Health: Internal Company Documents, Former Medical Staff Detail Efforts to Increase Patient Risk Scores; Company Diagnosis Rates of Chronic Conditions Much Higher Than National Averages" which reported, in part, the following:

> Oak Street Health (OSH), an operator of primary care clinics for Medicare beneficiaries, appears to encourage physicians to diagnose chronic conditions in their patients even when the diagnosis may not be appropriate, according to internal company documents reviewed by *The Capitol Forum* and interviews with former medical staff at the company.

> The internal documents also indicate that Oak Street Health physicians are diagnosing certain chronic conditions at substantially higher rates than the average for Medicare beneficiaries, with the company suggesting ways to further increase those diagnosis rates.

> The higher rates of diagnosis are important because Oak Street Health largely works with Medicare Advantage program. Under the Medicare Advantage plan, Medicare pays companies more money for caring for sicker patients, a structure that critics have said incentivizes companies to make their patients appear sicker in order to increase reimbursement. [F]ormer physicians, nurse practitioners, and medical coders have previously told *The Capitol Forum* that they did feel pressured to diagnose patients with conditions that would increase their risk adjustment scores, the metric used by Medicare to calculate a patient's medical complexity.

> The former employees also said that the company had them seek out and diagnose certain conditions with high risk adjustments, and that the basis for those diagnoses was often tenuous. Some of the conditions mentioned by former providers as a focus of Oak Street Health included congestive heart failure, peripheral vascular disease, chronic obstructive pulmonary disease, and pulmonary fibrosis.

> Internal Oak Street Health documents suggest that this pressure may have had a large impact on the diagnosis rates for several of those risk adjusting conditions.

> \*　　\*　　\*

> Former medical providers at Oak Street Health have told *The Capitol Forum* that employees would routinely comb through old medical records and exams to find any indication of disease. For example, providers said they were often presented with old chest X-Rays of patients that showed slight scarring, known as granuloma, and asked to diagnose pulmonary fibrosis, a diagnosis that the physicians felt was not justified solely by the existence of granuloma. According to a former physician at Oak Street Health, "testing was essentially a fishing expedition to find potential

83

risk adjusting codes," and patients of Oak Street Health have complained on the company's Facebook page about having to go into their clinics often to take what they felt were repetitive and unnecessary tests.

A *Capitol Forum* analysis found that, if the 2018 prevalence rates were applied to Oak Street Health's current population of roughly 132,000 patients, Medicare could potentially be paying hundreds of millions of dollars per year over what it would pay if Oak Street Health prevalence rates were in line with national averages for Medicare beneficiaries.

**ANSWER:** The allegations in Paragraph 177 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 177 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and admit that Plaintiffs selectively quote the article published by *Capitol Forum* on February 4, 2022, and respectfully refer the Court to that document for its complete text.

178. Similarly, according to FE3 (¶86), at the WRV, he and the other clinicians were encouraged to "capture as many diagnoses for the year as possible." FE3 explained that he and the clinicians would get a communication that the patient had elected to make Oak Street their primary care provider from the PRM and two minutes later, they were examining the patient and were encouraged to find as many Hierarchical Condition Categories ("HCC") codes as they could for that patient. FE3 explained that Oak Street trained their doctors and other clinical personnel to "look for all the codes as much as possible" in 30 minutes. According to FE3, this was extremely complicated because many of the patients coming to Oak Street for the WRV had pent-up medical needs and the WRVs were "usually rushed." FE3 reported that he and his colleagues were "pressured to up-code" by Oak Street corporate and that there was "a very heavy pressure on clinicians to document HCC codes and discuss those at the expense of discussing what the patients' concerns are."

**ANSWER:** The allegations in Paragraph 178 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 178 of the Complaint, except deny knowledge or information sufficient to form a belief concerning the account of an unnamed former Oak Street employee.

179. FE3 stated there was pressure from local leadership to "extract as many HCC codes" in order to "risk adjust" the patients as high as possible which allowed Oak Street to extract more money from Medicare for each patient. What FE3 took issue with specifically was the stretching of the diagnostic criteria. FE3 explained that Oak Street would encourage their

clinicians to code for conditions such as COPD and PAD[14] even if the patients did not have these conditions. According to FE3, Oak Street encouraged the clinicians to diagnose the patients with these conditions and others if they had risk factors even if the patient did not have the condition and a diagnosis had been ruled out by testing. As a specific example, at a meeting with FE3's Regional Medical Director on coding and billing, FE3 and his colleagues were told that if a patient is suspected to have PAD, but the Quantaflo screening test for PAD was negative, the doctors should still document PAD because they were managing their risk factors. FE stated that he ignored this instruction because he did not believe that it complied with CMS guidelines.

**ANSWER:** The allegations in Paragraph 179 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 179 of the Complaint, except deny knowledge or information sufficient to form a belief concerning the account of an unnamed former Oak Street employee. Aver that Footnote 14 contains the definition of certain acronyms, to which no response is required. To the extent a response is required, admit that Plaintiffs accurately describe the acronyms in Footnote 14 of the Complaint.

180. FE3 explained that Oak Street held an online documentation course for clinics one to three times a month, which were attended by, for example, physicians, nurse practitioners, and scribes. The training directed the clinic medical providers on how to read records and conduct patient visits so that they can extract as many HCC codes as possible. FE3 explained that Oak Street had him spend a lot of time taking trainings on how to adhere to their financial model. FE3 recalled how he would attend corporate "documentation trainings" frequently and at these meetings, senior corporate personnel told him and others at the meeting that if they raised risk scores by even just "0.2 or 2/10 of a point" that they could make an additional $2 million for Oak Street across 1,000 patients per year.

**ANSWER:** The allegations in Paragraph 180 are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 180 of the Complaint, except deny knowledge or information sufficient to form a belief concerning the account of an unnamed former Oak Street employee.

181. FE3 explained that he spoke with his Regional Director after attending a meeting in which he and the other attendees were encouraged to up-code or "up-bill." FE3 recalled the Regional Director telling him that everyone was calling him with concerns about this directive.

---

[14] COPD and PAD are acronyms for chronic obstructive pulmonary disease and peripheral arterial disease, respectively.

85

FE3 reported that he and his staff were subjected to "ninety-day chart reviews" where they had to defend their medical decisions. FE3 explained that he, his medical scribe, and the entire provider team would meet with the Regional Medical Director at the ninety-day chart reviews. According to FE3, at these meetings, they would need to either defend or "acquiesce" to the Regional Medical Director on their medical decisions related to how they coded a patient.

**ANSWER:** The allegations in Paragraph 181 are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 181 of the Complaint, except deny knowledge or information sufficient to form a belief concerning the account of an unnamed former Oak Street employee.

182. FE3 explained that he left Oak Street because "the coding and documentation practices I felt were incredibly aggressive" and he was told by "clinicians that they felt bullied to document diseases that they did not feel were appropriate but were high HCC coding." FE3 confirmed that he made the decision as the Center Medical Director to "pushback" and created binders for his center that included CMS coding materials rather than the Oak Street directives that supported the more aggressive coding protocols. FE3 described this as his "security blanket" in that if anyone questioned how they were coding patients that he could say that they were using CMS guidance.

**ANSWER:** The allegations in Paragraph 182 are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 182 of the Complaint, except deny knowledge or information sufficient to form a belief concerning the account of an unnamed former Oak Street employee.

183. Finally, further illustrating Oak Street's aggressive patient recruitment tactics at all costs, on February 14, 2022, *The Capitol Forum* published another report on Oak Street entitled, "Oak Street Health: Former Employees Raise Concerns Over Marketing and Enrollment Practices; Say Many Patients Were Unaware They Were Assigning Care to Oak Street During Welcome Visits or [Were] Incapable of Providing Consent," which reported, in part, that former Oak Street employees "say that they felt that the company used deceptive practices when enrolling new participants, with many new patients not realizing that they had signed paperwork making Oak Street Health their new primary care provider." The article added:

> Additionally, several of the former medical employees said that they examined new patients who, in their opinion, were not mentally fit to have signed consent forms at the time, either because they were intoxicated or because of mental disabilities.
>
> The dozen former employees, who all worked at different clinics across the country, pointed to Oak Street Health's use of "Welcome Visits" to enroll participants into the program as potentially deceptive. While these welcome visits are designed to

give potential enrollees a tour of the clinic, former employees say that they can often result in patients unwittingly signing consent forms and beginning to receive medical treatment that day. Several of the former employees said that they found this concerning, because, in their opinion, Oak Street Health could not provide the level of care that the patient had been receiving from their previous health plan.

\* \* \*

Internal Oak Street Health documents viewed by *The Capitol Forum* also appear to indicate that employees were supposed to get medical records during welcome visits.

\* \* \*

Every employee that spoke with *The Capitol Forum* for this article said that they felt that their clinic had enrolled some new patients that they did not feel had the capacity to make decisions for themselves . . . [and that] outreach executives often solicited new patients from homeless shelters and food banks, inducing them to come to the clinic for a welcome visit by offering them gift cards.

**ANSWER:** The allegations in Paragraph 183 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 183 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and admit that Plaintiffs selectively quote the article published by *Capitol Forum* on February 14, 2022, and respectfully refer the Court to that document for its complete text.

184. Oak Street's widespread aggressive tactics focusing on increasing revenue at all costs further supports a strong inference of scienter.

**ANSWER:** The allegations in Paragraph 184 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 184 of the Complaint, which, *inter alia*, constitute legal conclusions to which no response is required.

## LOSS CAUSATION AND ECONOMIC LOSS

185. During the Class Period, as detailed herein, Oak Street and the Individual Defendants made false and misleading statements and engaged in a scheme to deceive the market

87

and a course of conduct that artificially inflated the price of Oak Street common stock and operated as a fraud or deceit on Class Period purchasers of Oak Street common stock by misrepresenting its patient acquisition tactics and compliance with AKS and FCA, and omitting to disclose Oak Street's overly- aggressive patient acquisition strategies that exposed the Company to government investigations, fines, penalties, or even suspension or removal from Medicare, including: (1) paying external insurance agents kickbacks of at least $200 for each patient the agents referred to Oak Street; and (2) marketing and providing free transportation to prospective patients as a kickback to induce them to select Oak Street as their primary care provider.

**ANSWER:** The allegations in Paragraph 185 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 185 of the Complaint, which, *inter alia*, constitute legal conclusions to which no response is required, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein.

186.    Oak Street's and the Individual Defendants' false and misleading statements had their intended effect and directly and proximately caused Oak Street common stock to trade at artificially inflated levels, reaching a Class Period high of $64 per share.

**ANSWER:** The allegations in Paragraph 186 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 186 of the Complaint, which, *inter alia*, constitute legal conclusions to which no response is required, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein.

187.    As a result of Oak Street's and the Individual Defendants' fraudulent conduct as alleged herein, the price at which Oak Street common stock traded was artificially inflated throughout the Class Period. When Plaintiff and other members of the Class purchased their Oak Street common stock, the true value of such common stock was substantially lower than the prices actually paid. As a result of purchasing Oak Street common stock during the Class Period at artificially inflated prices, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under federal securities laws, when such artificial inflation dissipated.

**ANSWER:** The allegations in Paragraph 187 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 187 of the Complaint, which, *inter alia*, constitute legal conclusions to which no

response is required, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein.

188.    As a result of Oak Street's and the Individual Defendants' materially false and misleading statements, as well as the adverse, undisclosed information known to Oak Street and the Individual Defendants, Plaintiffs and other members of the Class relied, to their detriment, on such statements and documents, and/or the integrity of the market, in purchasing their Oak Street common stock at artificially inflated prices during the Class Period.  Had Plaintiffs and other members of the Class known the truth, they would not have taken such actions.

**ANSWER:** The allegations in Paragraph 188 of the Complaint are directed at Defendants who are not the Newlight Defendants.  To the extent a response is required, deny the allegations in Paragraph 188 of the Complaint, which, *inter alia*, constitute legal conclusions to which no response is required, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein.

189.    When the misrepresentations and omissions that Oak Street and the Individual Defendants had concealed from the market were revealed on November 8-9, 2021, the price of Oak Street common stock fell dramatically, causing substantial losses to investors.

**ANSWER:** The allegations in Paragraph 189 of the Complaint are directed at Defendants who are not the Newlight Defendants.  To the extent a response is required, deny the allegations in Paragraph 189 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to the publicly reported prices of Oak Street common stock.

190.    After the market closed on November 8, 2021, Oak Street revealed that it was under investigation for the improper tactics that had been concealed from the investing public during the Class Period.  As a result, Oak Street's stock price dropped from a close of $47 on November 8, 2021 to a close of $37 on November 9, 2021, and analysts cut their ratings and targets.  ¶¶133-134.

**ANSWER:** The allegations in Paragraph 190 of the Complaint are directed at Defendants who are not the Newlight Defendants.  To the extent a response is required, deny the allegations in Paragraph 190 of the Complaint, except deny knowledge or information sufficient to form a

belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to the publicly reported prices of Oak Street common stock.

191.    The timing and magnitude of the decline in the price of Oak Street common stock negates any inference that losses suffered by Plaintiffs and other Class members were caused by changed market conditions, macroeconomic factors, or Company-specific facts unrelated to Oak Street's and the Individual Defendants' fraudulent conduct.    From the close of trading on November 8, 2021 through the close of trading on November 9, 2021, during which time Oak Street's stock price fell 21% as a result of Oak Street's and the Individual Defendants' fraud being revealed, the New York Stock Exchange Composite Index and the S&P 500 Index declined less than 0.4%, as illustrated in the following chart:



**ANSWER:** The allegations in Paragraph 191 of the Complaint are directed at Defendants who are not the Newlight Defendants.  To the extent a response is required, deny the allegations in Paragraph 191 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to the publicly reported prices of Oak Street common stock.

192.    Analyst reports reflected that the revelation of the previously undisclosed information was responsible for the stock decline.  *See* ¶134.

**ANSWER:** Deny the allegations in Paragraph 192 of the Complaint, except deny knowledge or information sufficient to form a belief concerning the contents of unidentified analyst reports.

193.    As a result of their purchases of Oak Street common stock during the Class Period and the subsequent decline in the value of those shares when the truth was revealed to the market, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

**ANSWER:** Deny the allegations in Paragraph 193 of the Complaint.

## PRESUMPTION OF RELIANCE

194.    At all relevant times, the market for Oak Street common stock was an efficient market for the following reasons, among others:

(a)    Oak Street common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    According to the Company's 3Q21 10-Q, the Company had more than 240 million shares of common stock outstanding as of November 4, 2021, demonstrating a very active and broad market for Oak Street common stock;

(c)    As a regulated issuer, Oak Street filed periodic public reports with the SEC;

(d)    Oak Street regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures; and

(e)    Oak Street was followed by numerous securities analysts employed by major brokerage firms, such as Truist Securities, JP Morgan, SVB Leerink, Evercore ISI, BTIG Securities, BofA Global Research, Morgan Stanley, Canaccord Genuity, Cowen and Company, and Piper Sandler Companies, who wrote reports that were distributed to the brokerage firms' sales forces and the public.

**ANSWER:** The allegations in Paragraph 194 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 194 of the Complaint, which, *inter alia*, constitute legal conclusions to which no response is required, except deny knowledge or information sufficient to form a belief as to the

allegations directed at other Defendants therein, and respectfully refer the Court to Oak Street's

public statements, including its SEC filings, for their complete and accurate texts.

195.     As a result of the foregoing, the market for Oak Street common stock promptly digested current information regarding Oak Street from publicly available sources and reflected such information in Oak Street's common stock price.  Under these circumstances, a presumption of reliance applies to Plaintiffs' purchases of Oak Street common stock.

**ANSWER:** The allegations in Paragraph 195 of the Complaint are directed at Defendants

who are not the Newlight Defendants.  To the extent a response is required, deny the allegations

in Paragraph 195 of the Complaint, which, *inter alia*, constitute legal conclusions to which no

response is required, except deny knowledge or information sufficient to form a belief as to the

allegations directed at other Defendants.

196.     A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because Plaintiffs' claims are based, in significant part, on Oak Street and the Individual Defendants' material omissions.  Because this action involves Oak Street and the Individual Defendants' failure to disclose material adverse information regarding Oak Street's business and operations, positive proof of reliance is not a prerequisite for recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the material omissions set forth above, that requirement is satisfied here.

**ANSWER:** The allegations in Paragraph 196 of the Complaint are directed at Defendants

who are not the Newlight Defendants.  To the extent a response is required, deny the allegations

in Paragraph 196 of the Complaint, which, *inter alia*, constitute legal conclusions to which no

response is required, except deny knowledge or information sufficient to form a belief as to the

allegations directed at other Defendants therein.

**NO SAFE HARBOR**

197.     The false and misleading statements alleged herein were not forward-looking.  To the extent any of the alleged false and misleading statements were forward-looking, the federal statutory safe harbor for forward-looking statements under certain circumstances does not apply. Many of the specific statements alleged were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements accompanying them.  To be meaningful, cautionary statements must identify

92

important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Such cautions were absent from Oak Street's Class Period filings and oral disclaimers.

**ANSWER:** The allegations in Paragraph 197 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 197 of the Complaint, which, *inter alia*, constitute legal conclusions to which no response is required, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein.

198. Alternatively, to the extent that the statutory safe harbor could apply to any forward- looking statements pleaded herein, Oak Street and the Individual Defendants are liable for those false and misleading forward-looking statements because, at the time each of those forward-looking statements were made, the speaker knew that the particular forward-looking statement was false or misleading and the forward-looking statement was authorized and approved by an executive officer of Oak Street who knew that those statements were false or misleading when made.

**ANSWER:** The allegations in Paragraph 198 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 198 of the Complaint, which, *inter alia*, constitute legal conclusions to which no response is required, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein.

## COUNT I

### For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5
### Against Defendants Oak Street, Pykosz, and Cook

199. Plaintiffs incorporate the foregoing paragraphs by reference.

**ANSWER:** Repeat and incorporate by reference the responses to each and every paragraph contained above.

200. During the Class Period, Defendants Oak Street, Pykosz, and Cook disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose

material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

**ANSWER:** The allegations in Paragraph 200 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 200 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants.

201. These defendants violated §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder in that they:

(a) Employed devices, schemes, and artifices to defraud;

(b) Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and other members of the Class in connection with their purchases of Oak Street common stock.

**ANSWER:** The allegations in Paragraph 201 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 200 of the Complaint, which, *inter alia*, constitute legal conclusions to which no response is required, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein.

202. As a direct and proximate result of Oak Street's and the Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their respective purchases of Oak Street common stock during the Class Period, because, in reliance on the integrity of the market, Plaintiffs and other members of the Class paid artificially inflated prices for Oak Street common stock and experienced losses when the artificial inflation was released from Oak Street common stock as a result of the leakage and disclosure of information and price declines detailed herein. Plaintiffs and other members of the Class would not have purchased Oak Street common stock at the prices paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by the false and misleading statements.

**ANSWER:** The allegations in Paragraph 202 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 202 of the Complaint, which, *inter alia*, constitute legal conclusions to which no response is required, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein.

203. By virtue of the foregoing, Defendants Oak Street, Pykosz, and Cook have each violated §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

**ANSWER:** The allegations in Paragraph 203 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 203 of the Complaint, which, *inter alia*, constitute legal conclusions to which no response is required, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein.

## COUNT II

**For Violation of §20(a) of the Exchange Act**
**Against Defendants Pykosz, Cook, Newlight, and General Atlantic**

204. Plaintiffs incorporate the foregoing paragraphs by reference.

**ANSWER:** Repeat and incorporate by reference the responses to each and every paragraph contained above.

205. Defendants Pykosz, Cook, Newlight, and General Atlantic acted as controlling persons of Oak Street within the meaning of §20(a) of the Exchange Act.

**ANSWER:** Deny the allegations in Paragraph 205 of the Complaint, which, *inter alia*, constitute legal conclusions to which no response is required, except deny knowledge and information sufficient to form a belief concerning the allegations directed at other Defendants therein.

206. By virtue of their high-level positions, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's disclosures, practices, and

95

business model, Pykosz and Cook had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading. Pykosz and Cook were provided with, or had unlimited access to copies of, the Company's public filings and other statements alleged by Plaintiffs to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

**ANSWER:** The allegations in Paragraph 206 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny knowledge or information sufficient to form a belief as to the allegations in Paragraph 206 of the Complaint.

207. Defendants Newlight and General Atlantic further controlled Oak Street by virtue of their share ownership, power to appoint directors, and agreements with the Company. For example, the IPO Registration Statement characterized Oak Street as a "'controlled company,'" stating that after the IPO, Newlight and General Atlantic would "continue to control a majority of the voting power of our outstanding common stock," meaning Oak Street is a "'controlled company.'" The December 2020 Registration Statement likewise stated that, following the December 2020 Offering, Newlight and General Atlantic will "beneficially own approximately 52.4% of our common stock, which means that, based on their combined percentage voting power held after the offering," Newlight and General Atlantic "will continue to control the vote of all matters submitted to a vote of our shareholders, which will enable them to control the election of the members of the Board and all other corporate decisions."

**ANSWER:** Deny the allegations in Paragraph 207 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to the IPO Registration Statement and December 2020 Registration Statement for their complete and accurate texts.

208. Newlight and General Atlantic's stock ownership fell below 50% for the first time upon the February 2021 Offering, but they continued to have the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading. For example, Oak Street's 2020 10-K noted that Newlight and General Atlantic "beneficially own approximately 48.0% of our issued and outstanding shares of common stock," and stated, in pertinent part:

> Even though we are no longer a controlled company, for so long as the [Newlight and General Atlantic] continue to own a significant percentage of our stock, [Newlight and General Atlantic] will still be able to significantly influence the composition of our Board and the approval of actions requiring shareholder approval. Accordingly, for such period of time, [Newlight and General Atlantic]

will continue to have significant influence with respect to our management, business plans and policies, including the appointment and removal of our officers, decisions on whether to raise future capital and amending our charter and bylaws, which govern the rights attached to our common stock. In particular, for so long as [Newlight and General Atlantic] continue to own a significant percentage of our stock, [Newlight and General Atlantic] will be able to cause or prevent a change of control of us or a change in the composition of our Board and could preclude any unsolicited acquisition of us.

**ANSWER:** Deny the allegations in Paragraph 208 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to the 2020 Form 10-K for its complete and accurate text.

209. Moreover, the 2020 10-K stated that, by way of a "Sponsor Director Nomination Agreement," Newlight and General Atlantic could each designate three nominees for election to Oak Street's Board of Directors. Newlight and General Atlantic have exercised this agreement, as during the Class Period, six of the Board's 12 members were designated by Newlight or General Atlantic. In addition, the Sponsor Director Nomination Agreement provides that "so long as General Atlantic has the right to nominate at least one director and any such nominee is serving on our Board, General Atlantic may designate one director as Tie-Breaking Director who shall have the tie-breaking vote if the Board is deadlocked on any matter requiring the approval of the Board." During the Class Period, General Atlantic has exercised this provision, as General Atlantic has designated Robert Vorhoff, an Oak Street director and a General Atlantic Managing Director and its Global Head of Healthcare, as the Tie-Breaking Director. Thus, Newlight and General Atlantic could collectively control the vote of any matter requiring approval of the Board. The Sponsor Director Nomination Agreement prohibits Oak Street from increasing or decreasing the size of its Board without the written consent of Newlight and General Atlantic.

**ANSWER:** Deny the allegations in Paragraph 209 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to the 2020 10-K, Sponsor Nomination Agreement, and the March 2021 Proxy Statement for their complete and accurate texts.

210. Defendants Newlight and General Atlantic were provided with or had unlimited access to copies of, the Company's public filings and other statements alleged by Plaintiffs to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. Srdjan Vukovic, a Partner at Newlight, signed the IPO Registration Statement, the December 2020 Registration Statement, the February 2021 Registration Statement, the May 2021 Registration Statement, and the 2020 10-K. Dr. Mohit Kaushal, a Senior Advisor at General Atlantic, and Robert Vorhoff, a Managing

Director and Global Head of Healthcare at General Atlantic, each signed the IPO Registration Statement, the December 2020 Registration Statement, the February 2021 Registration Statement, the May 2021 Registration Statement, and the 2020 10-K.

**ANSWER:** Deny the allegations in Paragraph 210 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and admit that the purported signature of Srdjan Vukovic, a Partner at Newlight Partners LP, appears in the IPO Registration Statement, the December 2020 Registration Statement, the February 2021 Registration Statement, the May 2021 Registration Statement, and the 2020 Form 10-K, and respectfully refer the Court to those documents for their complete and accurate texts.

211. As set forth above, Oak Street violated §10(b) and Rule 10b-5 promulgated thereunder by its acts and omissions as alleged in this complaint. By virtue of their positions as controlling persons, and as a result of their aforementioned conduct, Pykosz, Cook, General Atlantic, and Newlight are liable pursuant to §20(a) of the Exchange Act for the §10(b) violations. As a direct and proximate result of these defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class Period, as evidenced by, among others, the stock price declines discussed above, when the artificial inflation was released from the Company's stock.

**ANSWER:** Deny the allegations in Paragraph 211 of the Complaint, which, *inter alia*, constitute legal conclusions to which no response is required, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein.

## NON-FRAUD SECURITIES ACT CLAIMS

212. The claims set forth below in Counts III through V allege violations of §§11, 12(a)(2), and 15 of the Securities Act ("Securities Act Claims"). The Securities Act Claims are based solely on strict liability and negligence – *i.e.*, not on intentional or reckless conduct – and Plaintiffs specifically disclaim any allegations of fraud, scienter, or recklessness in connection with these non-fraud claims. The Securities Act Claims are presented separate and apart from Count I and Count II, and incorporate only the allegations from ¶¶17-20, 23-61, 69-99, 129-139.

**ANSWER:** Aver that Paragraph 212 of the Complaint contains Plaintiffs' description of their own claims, to which no response is required. To the extent a response is required, deny the

allegations in Paragraph 212 of the Complaint, except admit that Plaintiffs purport to assert claims under Sections 11, 12(a)(2), and 15 of the Securities Act.

**Background to the Securities Act Claims**

213.    Oak Street issued registration statements and prospectuses in connection with Oak Street's: (i) IPO, (ii) December 2020 Offering, (iii) February 2021 Offering, and (iv) May 2021 Offering.  Under the Securities Act, Oak Street, the individuals who signed the offering materials, and the underwriters to the offerings, are liable jointly and severally for materially false or misleading statements or omissions in the offering documents.

**ANSWER:** The allegations in Paragraph 213 of the Complaint are directed at Defendants who are not the Newlight Defendants.  To the extent a response is required, deny the allegations in Paragraph 213 of the Complaint, which, *inter alia*, constitute legal conclusions to which no response is required, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and admit that Oak Street issued registration statements and prospectuses in connection with Oak Street's IPO, December 2020 Offering, February 2021 Offering, and May 2021 Offering.

214.    The offering materials issued in connection with the IPO, the December 2020 Offering, the February 2021 Offering, and the May 2021 Offering contained false and misleading statements, which misrepresented the business and value of Oak Street.  Defendants priced the IPO at $21 per share, the December 2020 Offering at $46 per share, the February 2021 Offering at $56 per share, and the May 2021 Offering at $62 per share.  As of the date of the filing of this complaint, with the true facts about Oak Street having been revealed, Oak Street's stock is trading at less than $18 per share, resulting in millions of dollars of investor losses.

**ANSWER:** The allegations in Paragraph 214 of the Complaint are directed at Defendants who are not the Newlight Defendants.  To the extent a response is required, deny the allegations in Paragraph 214 of the complaint, except deny knowledge and information sufficient to form a belief concerning the allegations directed at other Defendants therein, and respectfully refer the Court to Oak Street's registration statements and prospectuses for the IPO, the December 2020 Offering, the February 2021 Offering, and the May 2021 Offering, and to the publicly reported prices of Oak Street common stock.

215. The Securities Act Claims seek to recover such losses suffered by Class members who purchased shares of Oak Street common stock pursuant or traceable to the false and misleading offering materials.

**ANSWER:** Aver that Paragraph 215 of the Complaint contains Plaintiffs' description of their own claims, to which no response is required. To the extent a response is required, deny the allegations in Paragraph 215 of the Complaint.

**Securities Act Defendants**

216. Defendants Oak Street, Pykosz, Cook, Newlight, and General Atlantic (¶¶27-32) are re-alleged as defendants for the Securities Act Claims. Defendants Pykosz and Cook signed the Registration Statements and Prospectuses (defined below) for the IPO, December 2020 Offering, February 2021 Offering, and May 2021 Offering. Defendants Pykosz and Cook were selling shareholders in the December 2020 Offering. Defendants Newlight and General Atlantic were selling shareholders in the February 2021 Offering and May 2021 Offering.

**ANSWER:** Aver that Paragraph 216 of the Complaint contains Plaintiffs' description of their own claims, to which no response is required. To the extent a response is required, deny the allegations in Paragraph 216 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and admit that (i) Plaintiffs purport to assert claims against Oak Street, Pykosz, Cook, Newlight Partners LP, Newlight Harbour Point SPV LLC, General Atlantic LLC, and General Atlantic (OSH) Interholdco, L.P., and (ii) Newlight Harbour Point SPV LLC sold shares in the February 2021 Offering and May 2021 Offering, and respectfully refer the Court to (i) Oak Street's SEC filings and (ii) Newlight Harbour Point SPV LLC's and General Atlantic (OSH) Interholdco, L.P.'s publicly filed Forms 4.

217. The Securities Act Claims are also brought against current and former Oak Street Board Directors who signed the offering materials at issue.

**ANSWER:** Aver that Paragraph 217 of the Complaint contains Plaintiffs' description of their own claims, to which no response is required. To the extent a response is required, deny the

allegations in Paragraph 217 of the Complaint, except admit that Plaintiffs purport to bring claims against current and former directors on Oak Street's board.

218. Defendant Geoff Price was Oak Street's Chief Operating Officer and was a director on Oak Street's Board during the Class Period. Defendant Price signed the Registration Statements and Prospectuses (defined below) for the IPO, December 2020 Offering, February 2021 Offering, and May 2021 Offering. Defendant Price was a selling shareholder in the December 2020 Offering.

**ANSWER:** The allegations in Paragraph 218 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 218, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, admit that Price was Oak Street's Chief Operating Officer and a director on Oak Street's board during the Class Period, and respectfully refer the Court to (i) Oak Street's registration statements and prospectuses for the IPO, the December 2020 Offering, the February 2021 Offering, the May 2021 Offering, and (ii) the publicly filed Forms 4 for their complete and accurate texts.

219. Defendant Griffin Myers was Oak Street's Chief Medical Officer and was a director on Oak Street's Board during the Class Period. Defendant Myers signed the Registration Statements and Prospectuses (defined below) for the IPO, December 2020 Offering, February 2021 Offering, and May 2021 Offering. Defendant Myers was a selling shareholder in the December 2020 Offering.

**ANSWER:** The allegations in Paragraph 219 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 219, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, admit that Griffin Myers was Oak Street's Chief Medical Officer and a director on Oak Street's board during the Class Period, and respectfully refer the Court to (i) Oak Street's registration statements and prospectuses for the IPO, the December 2020 Offering, the February 2021 Offering, and the May 2021 Offering and (ii) the publicly filed Forms 4 for their complete and accurate texts.

220.     Defendant Regina Benjamin was a director on Oak Street's Board during the Class Period.  Defendant Benjamin signed the Registration Statements and Prospectuses (defined below) for the December 2020 Offering, February 2021 Offering, and May 2021 Offering.

**ANSWER:** The allegations in Paragraph 220 of the Complaint are directed at Defendants who are not the Newlight Defendants.  To the extent a response is required, deny the allegations in Paragraph 220, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, admit that Regina Benjamin was a director on Oak Street's board during the Class Period, and respectfully refer the Court to Oak Street's registration statements and prospectuses for the December 2020 Offering, the February 2021 Offering, and the May 2021 Offering for their complete and accurate texts.

221.     Defendant Carl Daley was a director on Oak Street's Board during the Class Period. Defendant Daley signed the Registration Statements and Prospectuses (defined below) for the IPO, December 2020 Offering, February 2021 Offering, and May 2021 Offering.

**ANSWER:** The allegations in Paragraph 221 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 221, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, admit that Carl Daly was a director on Oak Street's board during the Class Period, and respectfully refer the Court to Oak Street's registration statements and prospectuses for the IPO, the December 2020 Offering, the February 2021 Offering, and the May 2021 Offering for their complete and accurate texts..

222.     Defendant Cheryl Dorsey was a director on Oak Street's Board during the Class Period.  Defendant Dorsey signed the Registration Statements and Prospectuses (defined below) for the December 2020 Offering, February 2021 Offering, and May 2021 Offering.

**ANSWER:** The allegations in Paragraph 222 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 222 except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, admit that Cheryl Dorsey was a director on Oak

102

Street's board during the Class Period, and respectfully refer the Court to Oak Street's registration statements and prospectuses for the December 2020 Offering, the February 2021 Offering, and the May 2021 Offering for their complete and accurate texts.

223. Defendant Mohit Kaushal was a director on Oak Street's Board during the Class Period. Defendant Kaushal signed the Registration Statements and Prospectuses (defined below) for the IPO, December 2020 Offering, February 2021 Offering, and May 2021 Offering.

**ANSWER:** The allegations in Paragraph 223 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 223, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, admit that Mohit Kaushal was a director on Oak Street's board during the Class Period, and respectfully refer the Court to Oak Street's registration statements and prospectuses for the IPO, the December 2020 Offering, the February 2021 Offering, and the May 2021 Offering for their complete and accurate texts.

224. Defendant Kim Keck was a director on Oak Street's Board during the Class Period. Defendant Keck signed the Registration Statements and Prospectuses (defined below) for the IPO, December 2020 Offering, February 2021 Offering, and May 2021 Offering.

**ANSWER:** The allegations in Paragraph 224 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 224, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, admit that Kim Keck was a director on Oak Street's board during the Class Period, and respectfully refer the Court to Oak Street's registration statements and prospectuses for the IPO, the December 2020 Offering, the February 2021 Offering, and the May 2021 Offering for their complete and accurate texts.

225. Defendant Julie Klapstein was a director on Oak Street's Board during the Class Period. Defendant Klapstein signed the Registration Statements and Prospectuses (defined below) for the December 2020 Offering, February 2021 Offering, and May 2021 Offering.

**ANSWER:** The allegations in Paragraph 225 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 225, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, admit that Julie Klapstein was a director on Oak Street's board during the Class Period, and respectfully refer the Court to Oak Street's registration statements and prospectuses for the December 2020 Offering, the February 2021 Offering, and the May 2021 Offering for their complete and accurate texts.

226. Defendant Paul Kusserow was a director on Oak Street's Board during the Class Period. Defendant Kusserow signed the Registration Statements and Prospectuses (defined below) for the IPO, December 2020 Offering, February 2021 Offering, and May 2021 Offering.

**ANSWER:** The allegations in Paragraph 226 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 226, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, admit that Paul Kusserow was a director on Oak Street's board during the Class Period, and respectfully refer the Court to Oak Street's registration statements and prospectuses for the IPO, the December 2020 Offering, the February 2021 Offering, and the May 2021 Offering for their complete and accurate texts.

227. Defendant Robbert Vorhoff was a director on Oak Street's Board during the Class Period. Defendant Vorhoff signed the Registration Statements and Prospectuses (defined below) for the IPO, December 2020 Offering, February 2021 Offering, and May 2021 Offering.

**ANSWER:** The allegations in Paragraph 227 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 227, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, admit that Robbert Vorhoff was a director on Oak Street's board during the Class Period, and respectfully refer the Court to Oak Street's registration

104

statements and prospectuses for the IPO, the December 2020 Offering, the February 2021 Offering, and the May 2021 Offering for their complete and accurate texts.

228. Defendant Srdjan Vukovic was a director on Oak Street's Board at all relevant times. Defendant Vukovic signed the Registration Statements and Prospectuses (defined below) for the IPO, December 2020 Offering, February 2021 Offering, and May 2021 Offering.

**ANSWER:** Deny the allegations in Paragraph 228 of the Complaint, except admit that Srdjan Vukovic was a director on Oak Street's board during the Class Period, and respectfully refer the Court to Oak Street's registration statements and prospectuses for the IPO, the December 2020 Offering, the February 2021 Offering, and the May 2021 Offering for their complete and accurate texts.

229. Defendants Price, Myers, Benjamin, Daley, Dorsey, Kaushal, Keck, Klapstein, Kusserow, Vorhoff, and Vukovic are referred to herein as the "Director Defendants."

**ANSWER:** Aver that Paragraph 229 of the Complaint does not state an allegation to which a response is required. To the extent a response is required, admit that Plaintiffs purport to use the defined term as alleged.

230. The Securities Act Claims are also brought against certain underwriters for the offerings at issue.

**ANSWER:** Aver that Paragraph 230 of the Complaint contains Plaintiffs' description of their own claims, to which no response is required. To the extent a response is required, deny the allegations in Paragraph 230 of the Complaint, except admit that Plaintiffs purport to bring claims against certain underwriters for the offerings at issue.

231. Defendant J.P. Morgan Securities LLC ("J.P. Morgan") served as an underwriter for the IPO, December 2020 Offering, February 2021 Offering, and May 2021 Offering.

**ANSWER:** The allegations in Paragraph 231 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, admit the allegations in Paragraph 231 of the Complaint.

232.    Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") served as an underwriter for the IPO, December 2020 Offering, February 2021 Offering, and May 2021 Offering.

**ANSWER:** The allegations in Paragraph 232 of the Complaint are directed at Defendants who are not the Newlight Defendants.  To the extent a response is required, admit the allegations in Paragraph 232 of the Complaint.

233.    Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") served as an underwriter for the IPO, December 2020 Offering, February 2021 Offering, and May 2021 Offering.

**ANSWER:** The allegations in Paragraph 233 of the Complaint are directed at Defendants who are not the Newlight Defendants.  To the extent a response is required, admit the allegations in Paragraph 233 of the Complaint.

234.    Defendant William Blair & Company, L.L.C. ("William Blair") served as an underwriter for the IPO, December 2020 Offering, February 2021 Offering, and May 2021 Offering.

**ANSWER:** The allegations in Paragraph 234 of the Complaint are directed at Defendants who are not the Newlight Defendants.  To the extent a response is required, admit the allegations in Paragraph 234 of the Complaint.

235.    Defendant Piper Sandler & Co. ("Piper Sandler") served as an underwriter for the IPO, December 2020 Offering, and February 2021 Offering.

**ANSWER:** The allegations in Paragraph 235 of the Complaint are directed at Defendants who are not the Newlight Defendants.  To the extent a response is required, admit the allegations in Paragraph 235 of the Complaint.

236.    Defendants J.P. Morgan, Goldman Sachs, Morgan Stanley, William Blair, and Piper Sandler are referred to herein as the "Underwriter Defendants."

**ANSWER:** Aver that Paragraph 236 of the Complaint does not state an allegation to which a response is required.  To the extent a response is required, admit that Plaintiffs purport to use the defined term as alleged.

106

**The IPO Registration Statement and Prospectus Was False and Misleading**

237.    Oak Street was taken public in August 2020 through an IPO of its common stock at $21 per share.  Defendants J.P. Morgan, Goldman Sachs, Morgan Stanley, William Blair, and Piper Sandler acted as underwriters for the IPO.

**ANSWER:** The allegations in Paragraph 237 of the Complaint are directed at Defendants who are not the Newlight Defendants.  To the extent a response is required, deny the allegations in Paragraph 237 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to Oak Street's public statements, including its SEC filings, for their complete and accurate texts.

238.    The IPO was sold pursuant to a prospectus for a secondary offering of Oak Street common stock filed with the SEC on Form 424B4 on August 7, 2020, which incorporated a registration statement for the offering filed on Form S-1 on July 10, 2020, and amended July 22, 2020, July 29, 2020, August 4, 2020, and August 5, 2020 (collectively, the "IPO Registration Statement and Prospectus").  The IPO Registration Statement and Prospectus was signed by Defendants Pykosz, Cook, and certain of the Director Defendants (see ¶¶218-228).

**ANSWER:** The allegations in Paragraph 238 of the Complaint are directed at Defendants who are not the Newlight Defendants.  To the extent a response is required, deny the allegations in Paragraph 238 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to Oak Street's Form 424B4 filed with the SEC on August 7, 2020, registration statement filed on Form S-1 with the SEC on July 10, 2020, and amended registration statements filed with the SEC on July 22, 2020, July 29, 2020, August 4, 2020, and August 5, 2020 (collectively, the "IPO Registration Statement and Prospectus")for their complete and accurate texts.

239.    The IPO closed on August 11, 2020, and including the underwriters' over-allotment, included 17,968,750 shares of Oak Street's common stock at a price of $21.00 per share.  Each of these shares was issued and sold pursuant to the IPO Registration Statement and Prospectus.  Gross proceeds to Oak Street, before deducting underwriting discounts and commissions and offering expenses, were approximately $377 million.

**ANSWER:** The allegations in Paragraph 239 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 239 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to Oak Street's public statements, including its SEC filings, for their complete and accurate texts.

240. The IPO Registration Statement and Prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation. Specifically, the IPO Registration Statement and Prospectus included the following false and misleading statements:[15]

(a) The IPO Registration Statement and Prospectus claimed that "*[w]e employ a multichannel marketing strategy that goes directly to our target consumer. We fundamentally control our own destiny and can scale the number of centers on our platform rapidly and fill them with any interested patients we attract*." ("Multichannel Statement").

(b) In describing Oak Street patient acquisition efforts, the IPO Registration Statement and Prospectus asserted:

> We utilize a proactive strategy to drive growth to our centers. *We employ a grassroots approach to patient engagement* led by our Outreach team *and supplemented by more traditional marketing, including television, digital and social media, print, mail and telemarketing. We are continuing to leverage our community-based marketing approach with* less focus on in-person interactions and *more focus on working with our community partners to identify older adults who need our services*. [("Marketing Strategy Statement")].

(c) The IPO Registration Statement and Prospectus added:

> *Our payor partners will also direct patients to Oak Street. They do this either by assigning patients who have not yet selected a primary care provider to Oak Street Health or through insurance agents who will tell their clients about Oak Street Health, which we believe results in the patient selecting us as their primary care provider when they select an MA plan.* Payors dedicate a large share of their internal efforts to reducing medical costs and they have a nearly unlimited desire to engage with solutions proven to achieve that goal. We believe that we represent an attractive opportunity for payors to meaningfully improve their overall membership growth in a given market without assuming any financial downside. [("Insurance Agents Statement")].

---

[15] Plaintiffs allege that the statements highlighted in ***bold and italics*** within this Section were materially false, misleading, and omitted to disclose material information.

(d)      The Registration Statement and Prospectus noted that, in 1Q20 and 2Q20, the Company "[t]emporarily halted community outreach and other marketing initiatives which drive new patients to our platform," but assured investors that:

> *we have developed, and continue to develop, new methods of outreach that we believe will be effective in the current environment.  For example, we are engaging community partners, such as senior living facilities and faith-based organizations, to obtain referrals of older adults who could benefit from our services and care model*.  [("Community Partners Statement")].

(e)      The IPO Registration Statement and Prospectus claimed, "*Each of our centers employs a community outreach team focused on engaging and educating Medicare eligible individuals on the importance of primary care and why Oak Street is a great place to receive that care.*" ("Educating Individuals Statement").

(f)      The IPO Registration Statement and Prospectus claimed that "*our contracted and employed drivers . . . typically transport patients to our centers.*" ("Transportation Statement").

(g)      In describing the Company's "Cost of Care" financial metric, the IPO Registration Statement and Prospectus stated that it:

> *includes the costs we incur to operate our centers, including* care team and patient support employee-related costs, occupancy costs, *patient transportation*, medical supplies, insurance and other operating costs.  *These costs exclude any expenses associated with sales and marketing activities incurred at a local level to support our patient growth strategies*[("Cost of Care Statement")].

(h)      The IPO Registration Statement and Prospectus acknowledged that it "enter[s] into several arrangements that could potentially implicate the Anti-Kickback Statute," adding that:

> *The OIG has expressed concern regarding the use of non-employed sales forces to recruit or facilitate the recruiting of patients or referrals, especially when the sales agent is compensated in a manner that provides rewards or incentives on a volume or value basis.  Accordingly, commissions or per-patient based compensation methodologies are closely scrutinized by federal agencies.*  We employ our own sales force and attempt to meet the Anti-Kickback Safe Harbor for Bona Fide Employment; *however, in limited instances we use external companies to assist with certain aspects of these efforts, but only in arrangements that we believe do not violate the Anti-Kickback Statute or other applicable laws.*  [("AKS Statement")].

**ANSWER:** The allegations in Paragraph 240 of the Complaint are directed at Defendants who are not the Newlight Defendants.  To the extent a response is required, deny the allegations

in Paragraph 240 of the Complaint, except deny knowledge or information sufficient to form a

belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to

the IPO Registration Statement and Prospectus for their complete and accurate texts.

241. The statements set forth in ¶240 were materially false and misleading for the following reasons:

(a) The IPO Registration Statement and Prospectus's assertions purporting to describe the various aspects of Oak Street's "grassroots," "multichannel," and "new," patient acquisition and recruitment strategies, including "engaging" and "working" with "community partners" and "television, digital and social media, print, mail and telemarketing" were false and misleading because they omitted to disclose material improper patient acquisition and recruitment tactics that exposed the Company to government investigations, fines, penalties, or even suspension or removal from Medicare, including: (1) paying external insurance agents kickbacks of at least $200 for each patient the agents referred to Oak Street; and (2) marketing and providing free transportation to prospective patients as a kickback to induce them to select Oak Street as their primary care provider.

(b) The IPO Registration Statement and Prospectus's statements referencing assignments from payor partners "through insurance agents who tell their clients about Oak Street" and "referrals" from "community partners" were false and misleading because while highlighting referrals, assignments, and insurance agents, they omitted to disclose that Oak Street was improperly paying external insurance agents kickbacks of at least $200 for each patient the agents referred to Oak Street, which exposed the Company to government investigations, fines, penalties, or even suspension or removal from Medicare.

(c) The IPO Registration Statement and Prospectus's statements about communicating with prospective patients, including that Oak Street and its teams "[e]ducate[] [i]ndividuals" and were "focused on . . . educating Medicare eligible individuals" on "why Oak Street is a great place to receive [primary] care" were false and misleading because they failed to disclose that Oak Street's outreach teams were not soliciting patients based solely on educating them about care but based upon improper marketing and providing free transportation to prospective patients as a kickback to induce them to select Oak Street as their primary care provider, which exposed the Company to government investigations, fines, penalties, or even suspension or removal from Medicare.

(d) The IPO Registration Statement and Prospectus's statements that Oak Street's drivers "typically transport patients" and that Oak Street's Cost of Care costs included "patient transportation" but not "expenses associated with sales and marketing" were false and misleading because they omitted to disclose that Oak Street was both advertising and marketing its free transportation services to the public and also providing free transportation services to prospective patients as a kickback to induce them to select Oak Street as their primary care provider, which exposed the Company to government investigations, fines, penalties, or even suspension or removal from Medicare.

(e)     The IPO Registration Statement and Prospectus's assertions specifically describing the OIG's "concern regarding the use of non-employed sales forces to recruit [patients]" and that "per-patient based compensation methodologies are closely scrutinized," but assuring investors that "in limited instances we use external companies to assist . . . only in arrangements that we believe do not violate the [AKS] or other applicable laws" was false and misleading because it omitted to disclose: (1) the directly on-point "per-patient based compensation" "arrangements" Oak Street had with "external" insurance agents wherein Oak Street improperly paid the agents kickbacks of at least $200 for each patient the agents referred to Oak Street, exposing the Company to government investigations, fines, penalties, or even suspension or removal from Medicare; and (2) that the referral payments were *prima facie* kickbacks subject to the AKS, which Oak Street ultimately disclosed after the Class Period, and the payments did not fall within any "safe harbor" because they were based on the number of patients referred.

**ANSWER:** The allegations in Paragraph 241 of the Complaint are directed at Defendants who are not the Newlight Defendants.  To the extent a response is required, deny the allegations in Paragraph 241 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to the IPO Registration Statement and Prospectus for their complete and accurate texts.

242.    While the IPO Registration Statement and Prospectus enumerated certain generic "risk factors," these risk factors did not disclose the specific risks associated with Oak Street's patient acquisition and recruitment activities, which exposed the Company to government investigations, fines, penalties, or even suspension or removal from Medicare.

**ANSWER:** The allegations in Paragraph 242 of the Complaint are directed at Defendants who are not the Newlight Defendants.  To the extent a response is required, deny knowledge or information sufficient to form a belief as to the allegations in Paragraph 242 of the Complaint.

**The December 2020 Registration Statement and Prospectus Was False and Misleading**

243.    Only four months after the IPO, with Oak Street's stock trading at near $50 per share (more than double the IPO price), defendants conducted the December 2020 Offering to allow Defendants Pykosz, Cook, Price, Myers, and other selling shareholders to profit from the sale of approximately 6.5 million shares of Oak Street common stock.  Defendants J.P. Morgan, Goldman Sachs, Morgan Stanley, William Blair, and Piper Sandler acted as underwriters for the December 2020 Offering.  In total, after the underwriters exercised their options to purchase additional shares, the selling shareholders received $298 million from selling Oak Street shares at inflated prices in the December 2020 Offering.

**ANSWER:** The allegations in Paragraph 243 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 243 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to the December 2020 Registration Statement for its complete and accurate text.

244. The December 2020 Offering was sold pursuant to a prospectus for a secondary offering of Oak Street common stock filed with the SEC on Form 424B4 on December 4, 2020, which incorporated a registration statement for the offering filed on Form S-1 on November 30, 2020 (collectively, the "December 2020 Registration Statement and Prospectus"). The December 2020 Registration Statement and Prospectus was signed by Defendant Pykosz, Defendant Cook, and the Director Defendants.

**ANSWER:** The allegations in Paragraph 244 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 244 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to the prospectus filed by Oak Street on Form 424B4 on December 4, 2020 for the December 2020 Offering (the "December 2020 Prospectus") and the December 2020 Registration Statement for their complete and accurate texts.

245. The December 2020 Offering closed on December 7, 2020, and including the underwriters' over-allotment of Oak Street stock, included 6,477,294 shares of Oak Street's common stock at $46.00 per share. Each of these shares was issued and sold pursuant to the Registration Statement and Prospectus. Gross proceeds, before deducting underwriting discounts and commissions and offering expenses to be received by the selling shareholders, were approximately $298 million. Oak Street was not a selling shareholder in the December 2020 Offering.

**ANSWER:** The allegations in Paragraph 245 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 245 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to

the December 2020 Registration Statement and the December 2020 Prospectus for their complete and accurate texts.

246. The December 2020 Registration Statement and Prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation. Specifically, the December 2020 Registration Statement and Prospectus contained the same *Multichannel Statement* (¶240(a)), *Marketing Strategy Statement* (¶240(b)), *Insurance Agents Statement* (¶240(c)), *Educating Individuals Statement* (¶240(e)), *Transportation Statement* (¶240(f)), *Cost of Care Statement* (¶240(g)), and *AKS Statement* (¶240(h)), as in the IPO Registration Statement.

**ANSWER:** The allegations in Paragraph 246 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 246 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to the December 2020 Registration Statement and the December 2020 Prospectus for their complete and accurate texts.

247. The December 2020 Registration Statement and Prospectus also stated that after Oak Street had "made the decision to suspend community-based outreach events and scale back our central marketing" at the end of March 2020, Oak Street, "*used this pause* in our traditional marketing efforts to reassess and realign our marketing strategy *to focus on other growth channels*. For example, *we are engaging community partners, such as senior living facilities and faith-based organizations, through an account management model to gain referrals of older adults who could benefit from our services and care model*." ("Other Growth Channels Statement").

**ANSWER:** The allegations in Paragraph 247 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 247 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to the December 2020 Registration Statement and the December 2020 Prospectus for their complete and accurate texts.

248. The statements set forth in ¶¶246-247 were materially false and misleading for the reasons set forth in ¶241, and because while emphasizing "other growth channels," including "engaging with community partners" and "gain[ing] referrals," the December 2020 Registration Statement omitted to disclose material improper patient acquisition tactics that exposed the Company to government investigations, fines, penalties, or even suspension or removal from Medicare, including: (1) paying external insurance agents kickbacks of at least $200 for each patient the agents referred to Oak Street; and (2) marketing and providing free transportation to prospective patients as a kickback to induce them to select Oak Street as their primary care provider. Further, while the December 2020 Registration Statement and Prospectus enumerated certain generic "risk factors," these risk factors did not disclose the specific risks associated with Oak Street's patient acquisition and recruitment activities which exposed the Company to government investigations, fines, penalties, or even suspension or removal from Medicare.

**ANSWER:** The allegations in Paragraph 248 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 248 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein.

**The February 2021 Registration Statement and Prospectus Was False and Misleading**

249. Only two months after the December 2020 Offering, with Oak Street's stock trading at Class Period highs of more than $60 per share, defendants conducted the February 2021 Offering to allow Defendants Newlight and General Atlantic to profit from the sale of more than 12 million shares of Oak Street common stock. Defendants J.P. Morgan, Goldman Sachs, Morgan Stanley, William Blair, and Piper Sandler acted as underwriters for the February 2021 Offering. In total, Defendants Newlight and General Atlantic received more than $670 million from selling Oak Street shares at inflated prices in the February 2021 Offering.

**ANSWER:** Deny the allegations in Paragraph 249 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to the February 2021 Registration Statement for its complete and accurate text, and to the publicly reported closing prices of Oak Street stock.

250. The February 2021 Offering was sold pursuant to a prospectus for a secondary offering of Oak Street common stock filed with the SEC on Form 424B4 on February 12, 2021, which incorporated a registration statement for the offering filed on Form S-1 on February 8, 2021 (collectively, the "February 2021 Registration Statement and Prospectus"). The February 2021 Registration Statement and Prospectus was signed by Defendant Pykosz, Defendant Cook, and the Director Defendants.

114

**ANSWER:** The allegations in Paragraph 250 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 250 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to the prospectus Oak Street filed on Form 424B4 on February 12, 2021 for the February 2021 Offering (the "February 2021 Prospectus") and the February 2021 Registration Statement for their complete and accurate texts.

251. The February 2021 Offering closed on February 16, 2021, and including the underwriters' over-allotment of Oak Street stock, included 12,332,394 shares of Oak Street's common stock at $56.00 per share. Each of these shares was issued and sold pursuant to the Registration Statement and Prospectus. Gross proceeds, before deducting underwriting discounts and commissions and offering expenses to be borne by the selling shareholders, were approximately $690 million. Oak Street was not a selling shareholder in the February 2021 Offering.

**ANSWER:** The allegations in Paragraph 251 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 251 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to the February 2021 Registration Statement and the February 2021 Prospectus for their complete and accurate texts.

252. The February 2021 Registration Statement and Prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation. Specifically, the February 2021 Registration Statement and Prospectus contained the same *Transportation Statement* (¶240(f)), *Multichannel Statement* (¶240(a)), *Marketing Strategy Statement* (¶240(b)), *Insurance Agents Statement* (¶240(c)), *Educating Individuals Statement* (¶240(e)), *Cost of Care Statement* (¶240(g)), and *AKS Statement* (¶240(h)), as in the IPO Registration Statement, and the same *Other Growth Channels Statement* (¶247), as in the December 2020 Registration Statement.

**ANSWER:** The allegations in Paragraph 252 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations

115

in Paragraph 252 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to the February 2021 Registration Statement and the February 2021 Prospectus for their complete and accurate texts.

253.     The statements set forth in ¶252 were materially false and misleading for the reasons set forth in ¶¶241, 248.  Further, while the February 2021 Registration Statement and Prospectus listed certain generic "risk factors," these risk factors did not disclose the specific risks associated with Oak Street's patient acquisition and recruitment activities, which exposed the Company to government investigations, fines, penalties, or even suspension or removal from Medicare.

**ANSWER:** The allegations in Paragraph 253 of the Complaint are directed at Defendants who are not the Newlight Defendants.  To the extent a response is required, deny the allegations in Paragraph 253 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein.

**The May 2021 Registration Statement and Prospectus Was False and Misleading**

254.     Three months after the February 2021 Offering, with Oak Street's stock trading at Class Period highs of approximately $60 per share, defendants conducted the May 2021 Offering to allow Defendants Newlight and General Atlantic to profit from the sale of another 12 million shares of Oak Street common stock.  J.P. Morgan, Goldman Sachs, Morgan Stanley, and William Blair acted as underwriters for the May 2021 Offering.  In total, after the Underwriter Defendants exercised their options to purchase additional shares, Defendants Newlight and General Atlantic received more than $730 million from selling Oak Street shares at inflated prices in the May 2021 Offering.

**ANSWER:** The Court dismissed the claims relating to the May 2021 Offering, and as such, no response is required.  To the extent a response is required, deny the allegations in Paragraph 254 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to the May 2021 Registration Statement for its complete and accurate text, and  to the publicly reported closing prices of Oak Street stock.

116

255. The May 2021 Offering was sold pursuant to a prospectus for a secondary offering of Oak Street common stock filed with the SEC on Form 424B4 on May 28, 2021, which incorporated a registration statement for the offering filed on Form S-1 on May 24, 2021 (collectively, the "May 2021 Registration Statement and Prospectus"). The May 2021 Registration Statement and Prospectus expressly incorporated by reference the following documents filed with the SEC: 2020 10-K; 1Q21 10-Q; March 24, 2021 Proxy Statement; August 5, 2021 Form 8-A; and various Oak Street filings on Form 8-K. Documents incorporated by reference are deemed to be part of the May 2021 Registration Statement. None of these documents disclosed any of the specific risks associated with Oak Street's patient acquisition and recruitment activities which exposed the Company to government investigations, fines, penalties, or even suspension or removal from Medicare.

**ANSWER:** The allegations in Paragraph 255 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 255 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to the prospectus Oak Street filed with the SEC on Form 424B on May 28, 2021 (the "May 2021 Prospectus"), the May 2021 Registration Statement, the 2020 Form 10-K, the 1Q21 Form 10-Q, the March 24, 2021 Proxy Statement, Oak Street's August 6, 2021 Form 8A, and Oak Street's filings on Forms 8-K for their complete and accurate texts.

256. The May 2021 Offering closed on June 1, 2021, and including the Underwriter Defendants' over-allotment of Oak Street stock, included 12,052,258 shares of Oak Street's common stock at $62.00 per share. Each of these shares was issued and sold pursuant to the Registration Statement and Prospectus. Gross proceeds, before deducting underwriting discounts and commissions and offering expenses to be borne by the selling shareholders, were approximately $747 million. Oak Street was not a selling shareholder in the May 2021 Offering.

**ANSWER:** The Court dismissed the claims relating to the May 2021 Offering, and as such, no response is required.

The allegations in Paragraph 256 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 256 of the Complaint, except deny knowledge or information sufficient to form a belief as to the

allegations directed at other Defendants therein, and respectfully refer the Court to the May 2021

Registration Statement and the May 2021 Prospectus for their complete and accurate texts.

257. The May 2021 Registration Statement and Prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation. Specifically, the May 2021 Registration Statement and Prospectus incorporated by reference the 2020 10-K, and thereby contained the same *Multichannel Statement* (¶240(a)), *Transportation Statement* (¶240(f)), *Cost of Care Statement* (¶240(g)), and *AKS Statement* (¶240(h)), as in the IPO Registration Statement. The May 2021 Registration Statement also incorporated by reference the 1Q21 10-Q and thereby stated, "*We grow our patient base through our own internal sales and marketing efforts, which drives most of our new patient growth, as well as assignments from our MA plan partners.*"

**ANSWER:** The Court dismissed the claims relating to the May 2021 Offering, and as such,

no response is required. The allegations in Paragraph 257 of the Complaint are also directed at

Defendants who are not the Newlight Defendants. To the extent a response is required, deny the

allegations in Paragraph 257 of the Complaint, except deny knowledge or information sufficient

to form a belief as to the allegations directed at other Defendants therein, and  respectfully refer

the Court to the May 2021 Registration Statement, the 2020 10-K, and the 1Q21 10-Q for their

complete and accurate texts.

258. The statements set forth in ¶257 were materially false and misleading for the reasons set forth in ¶241, and because rather than growing solely through "internal sales and marketing efforts" or "assignments" from MA plans, Oak Street was improperly paying external insurance agents kickbacks of at least $200 for each patient the agents referred to Oak Street. Further, while the May 2021 Registration Statement and Prospectus listed certain generic "risk factors," these risk factors did not disclose the specific risks associated with Oak Street's patient acquisition and recruitment activities, which exposed the Company to government investigations, fines, penalties, or even suspension or removal from Medicare.

**ANSWER:** The Court dismissed the claims relating to the May 2021 Offering, and as such,

no response is required. The allegations in Paragraph 258 of the Complaint are directed at

Defendants who are not the Newlight Defendants. To the extent a response is required, deny the

allegations in Paragraph 258 of the Complaint, except deny knowledge or information sufficient

to form a belief as to the allegations directed at other Defendants therein.

**The Registration Statements and Prospectuses Violated Item 303 and Item 505**

259. In addition to the misstatements and omissions set forth above, the IPO Registration Statement and Prospectus, December 2020 Registration and Prospectus, February 2021 Registration Statement and Prospectus, and May 2021 Registration and Prospectus were false and misleading because they failed to disclose material information that was required to be disclosed pursuant to the regulations governing their preparation.

**ANSWER:** The allegations in Paragraph 259 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 259 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein.

260. Specifically, Item 303 required the Registration Statements and Prospectuses to "[d]escribe any known trends or uncertainties that have had or that [the Company reasonably expects is] likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations," 17 C.F.R. §229.303(b)(2)(ii), and Item 105 required the Registration Statements and Prospectuses to provide "a discussion of the material factors that make an investment in the registrant or offering speculative or risky," 17 C.F.R. §229.105.

**ANSWER:** The allegations in Paragraph 260 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 260 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and admit that Plaintiffs selectively quote 17 C.F.R. §229.303(b)(2)(ii) and 17 C.F.R. §229.105, and respectfully refer the Court to that regulation for its complete and accurate text.

261. In negligent violation of Item 303 and Item 105, the Registration Statements and Prospectuses failed to disclose the Company's improper patient acquisition tactics of: (1) paying external insurance agents kickbacks of at least $200 for each patient the agents referred to Oak Street; and (2) marketing and providing free transportation to prospective patients as a kickback to induce them to select Oak Street as their primary care provider, which put at risk a material portion of the Company's revenue. These practices were known to management, presented a significant uncertainty, and made investment in Oak Street risky given that they were kickbacks under AKS, and created a known uncertainty and risk that the government would seek fines or penalties, and Medicare would seek Oak Street's exclusion from participation, thus compromising *all* of Oak Street's revenue. See ¶¶50-61.

**ANSWER:** The allegations in Paragraph 261 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 261 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein.

**Subsequent Events**

262. As set forth in ¶¶129-139 above, subsequent disclosures have confirmed that the Registration Statements and Prospectuses contained materially false and misleading statements and failed to disclose required information, in that they omitted to disclose, for example, Oak Street's improper patient acquisition tactics of: (1) paying external insurance agents kickbacks of at least $200 for each patient the agents referred to Oak Street; and (2) marketing and providing free transportation to prospective patients as a kickback to induce them to select Oak Street as their primary care provider. Since the IPO, December 2020 Offering, February 2021 Offering, and May 2021 Offering, the price of Oak Street common stock has declined by approximately 14%, 61%, 68%, and 71%, respectively, as of this filing.

**ANSWER:** The allegations in Paragraph 262 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 262 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein.

## COUNT III

**Violation of §11 of the Securities Act Against Oak Street, the Individual Defendants, the Director Defendants, and the Underwriter Defendants**

263. Plaintiffs incorporate ¶¶212-262 by reference.

**ANSWER:** Repeat and incorporate by reference herein the Newlight Defendants' responses to Paragraphs 212 through 262 of the Complaint, and otherwise deny the allegations in Paragraph 263 of the Complaint.

264. This Count is brought under §11 of the Securities Act, 15 U.S.C. §77k. This Count does not sound in fraud. With respect to this Count, Plaintiffs do not claim that any of the defendants committed intentional or reckless misconduct or that any of the defendants acted with scienter or fraudulent intent. This claim is based on strict liability or negligence.

**ANSWER:** Aver that the allegations in Paragraph 264 of the Complaint contain Plaintiffs' description of their own claims, to which no response is required. To the extent a response is required, deny the allegations in Paragraph 264 of the Complaint, except admit that Plaintiffs assert claims under Sections 11 and 15 of the Securities Act.

265. The IPO Registration Statement and Prospectus, December 2020 Registration Statement and Prospectus, February 2021 Registration Statement and Prospectus, and May 2021 Registration Statement and Prospectus (collectively, "Offering Materials") were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

**ANSWER:** The allegations in Paragraph 265 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 265 of the Complaint, except deny knowledge and information sufficient to form a belief about the allegations directed at the other Defendants therein.

266. Oak Street is the registrant for the shares of Oak Street stock, and as such is strictly liable for the false and misleading statements in the Offering Materials. The Underwriter Defendants were responsible for the contents and dissemination of the Offering Materials used in the offerings for which they served as underwriters (¶¶231-235). The Individual Defendants and Director Defendants were responsible for the contents and dissemination of the Offering Materials that they signed (¶¶216, 218-228).

**ANSWER:** The allegations in Paragraph 266 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 266 of the Complaint, which, *inter alia*, constitute legal conclusions to which no response is required, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and admit that Oak Street was the registrant for Oak Street's shares.

267. None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Materials were true and without omissions of material facts and were not misleading. By virtue of each of the defendants' failure to exercise reasonable care, the Offering Materials contained

misrepresentations of material facts and omissions of material facts necessary to make the statements therein not misleading.

**ANSWER:** Deny the allegations in Paragraph 267 of the Complaint, which, *inter alia*, constitute legal conclusions to which no response is required, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein.

268.    None of the untrue statements or omissions of material facts in the Offering Materials alleged herein were forward-looking statements.  Rather, each such statement or omission concerned existing facts.  Moreover, the Offering Materials did not properly identify any of the alleged false or misleading statements as forward-looking statements and did not disclose information that undermined the putative validity of those statements.

**ANSWER:** The allegations in Paragraph 268 of the Complaint are directed at Defendants who are not the Newlight Defendants.  To the extent a response is required, deny the allegations in Paragraph 268 of the Complaint, which, *inter alia*, constitute legal conclusions to which no response is required, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein.

269.    Additional named plaintiff Dearborn and/or members of the Class acquired Oak Street's stock in the IPO, the December 2020 Offering, February 2021 Offering, and/or May 2021 Offering in which shares were offered and/or sold pursuant to the above-described Offering Materials.  At the time of their purchases, additional named plaintiff Dearborn and members of the Class were without knowledge of the facts concerning the omissions alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

**ANSWER:** Deny the allegations in Paragraph 269 of the Complaint, except deny knowledge or information sufficient to form a belief as to the truth of the allegations concerning the Plaintiffs and/or members of the purported class.

270.    Dearborn and/or members of the Class have sustained damages.  The value of Oak Street's stock purchased or otherwise acquired pursuant or traceable to the materially false and misleading Offering Materials has declined substantially from the dates of the offerings to the date of this filing.

122

**ANSWER:** Deny the allegations in Paragraph 270 of the Complaint, except deny knowledge or information sufficient to form a belief as to the truth of the allegations concerning the Plaintiffs and/or members of the purported class.

271. By reason of the conduct herein alleged, Oak Street, the Individual Defendants, the Director Defendants, and the Underwriter Defendants each violated Section 11 of the Securities Act.

**ANSWER:** The allegations in Paragraph 271 of the Complaint are directed at Defendants who are not the Newlight Defendants. To the extent a response is required, deny the allegations in Paragraph 271 of the Complaint, which, *inter alia*, constitute legal conclusions to which no response is required, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein.

**COUNT IV**

**Violation of §12(a)(2) of the Securities Act Against Oak Street, the Individual Defendants, the Director Defendants, the Underwriter Defendants, and Defendants Newlight and General Atlantic**

272. Plaintiffs incorporate ¶¶212-271 by reference.

**ANSWER:** Repeat and incorporate by reference herein the Newlight Defendants' responses to Paragraphs 212 through 271 of the Complaint, and otherwise deny the allegations in Paragraph 272 of the Complaint.

273. This Count is brought under §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2). This Count does not sound in fraud. With respect to this Count, Plaintiffs do not claim that any of the defendants committed intentional or reckless misconduct or that any of the defendants acted with scienter or fraudulent intent. This claim is based on strict liability or negligence.

**ANSWER:** Aver that the allegations in Paragraph 273 of the Complaint contain Plaintiffs' description of their own claims, to which no response is required. To the extent a response is required, deny the allegations in Paragraph 273 of the Complaint, except admit that Plaintiffs assert claims under Section 12(a)(2) of the Securities Act.

274.    Section 12(a)(2) grants a private right of action against any person who offers or sells a security "by means of a prospectus . . . which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading."  15 U.S.C. §77l(a)(2).

**ANSWER:** Admit that Plaintiffs selectively quote Section 12(a)(2) of the Securities Act,

and respectfully refer the Court to the Securities Act for its complete and accurate text.

275.    The Offering Materials were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

**ANSWER:** Deny the allegations in Paragraph 275 of the Complaint.

276.    Oak Street was a seller, offeror, and/or solicitor of purchasers of its common stock pursuant to the defective Offering Materials and directly solicited the purchase of its common stock through the means of the Offering Materials.

**ANSWER:** The allegations in Paragraph 276 of the Complaint are directed at Defendants

who are not the Newlight Defendants.  To the extent a response is required, deny the allegations

in Paragraph 276 of the Complaint, which, *inter alia*, constitute legal conclusions to which no

response is required, except deny knowledge or information sufficient to form a belief as to the

allegations directed at other Defendants therein.

277.    The Director Defendants (for the Offering Materials that they signed, ¶¶216, 218-228), the Underwriter Defendants (for the Offering Materials used in the offerings for which they served as underwriters, ¶¶231-235), the Individual Defendants, and Defendants Newlight and General Atlantic (for the Offering Materials used in offerings for which they were selling shareholders, ¶216) were sellers, offerors, and/or solicitors of purchasers of Oak Street's common stock pursuant to the defective Offering Materials, and directly solicited the purchase of Oak Street's common stock through the means of the Offering Materials.  Acts of solicitation included participating in the preparation of, or signing, the false and misleading Offering Materials, and/or selling shares of stock pursuant to the false and misleading Offering Materials.

**ANSWER:** Deny the allegations in Paragraph 277 of the Complaint, which, *inter alia*,

constitute legal conclusions to which no response is required, except deny knowledge or

information sufficient to form a belief as to the allegations directed at other Defendants therein.

278.    None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Materials were true

124

and without omissions of material facts and were not misleading. By virtue of each of the defendants' failure to exercise reasonable care, the Offering Materials contained misrepresentations of material facts and omissions of material facts necessary to make the statements therein misleading.

**ANSWER:** Deny the allegations in Paragraph 278 of the Complaint, which, *inter alia*, constitute legal conclusions to which no response is required, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein.

279. None of the untrue statements or omissions of material facts in the Offering Materials alleged herein were forward-looking statements. Rather, each such statement or omission concerned existing facts. Moreover, the Offering Materials did not properly identify any of the alleged false or misleading statements as forward-looking statements and did not disclose information that undermined the putative validity of those statements.

**ANSWER:** Deny the allegations in Paragraph 279 of the Complaint, which, *inter alia*, constitute legal conclusions to which no response is required.

280. Additional named plaintiff Dearborn and/or members of the Class acquired Oak Street's stock in the IPO, December 2020 Offering, February 2021 Offering, and/or May 2021 Offering in which shares were offered and/or sold pursuant to the above-described Offering Materials. At the time of their purchases, additional named plaintiff Dearborn and members of the Class were without knowledge of the facts concerning the omissions alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

**ANSWER:** Deny the allegations in Paragraph 280 of the Complaint, except deny knowledge or information sufficient to form a belief as to the truth of the allegations concerning the Plaintiffs and/or members of the purported class.

281. By reason of the conduct herein alleged, Oak Street, the Individual Defendants, the Director Defendants, the Underwriter Defendants, and Defendants Newlight and General Atlantic each violated §12(a)(2) of the Securities Act.

**ANSWER:** Deny the allegations in Paragraph 281 of the Complaint, which, *inter alia*, constitute legal conclusions to which no response is required.

282. Accordingly, members of the Class who hold the common stock issued pursuant to the defective Offering Materials have the right to rescind and recover the consideration paid for their shares and hereby tender their common stock to defendants sued herein, and Class members who have sold their common stock that was issued pursuant to the defective Offering Materials seek damages to the extent permitted by law.

125

**ANSWER:** Deny the allegations in Paragraph 282 of the Complaint, which, *inter alia*, constitute legal conclusions to which no response is required.

## COUNT V

**Violation of §15 of the Securities Act Against the Individual Defendants, and Defendants Newlight and General Atlantic**

283. Plaintiffs incorporate ¶¶212-282 by reference.

**ANSWER:** Repeat and incorporate by reference herein the Newlight Defendants' responses to Paragraphs 212 through 282 of the Complaint, and otherwise deny the allegations in Paragraph 283 of the Complaint.

284. This Count is brought under §15 of the Securities Act, 15 U.S.C. §77o. This Count does not sound in fraud. With respect to this Count, Plaintiffs do not claim that any of the defendants committed intentional or reckless misconduct or that any of the defendants acted with scienter or fraudulent intent. This claim is based on control person liability.

**ANSWER:** Aver that Paragraph 284 of the Complaint contains Plaintiffs' description of their own claims, to which no response is required. To the extent a response is required, deny the allegations in Paragraph 284 of the Complaint, except admit that Plaintiffs assert claims under Section 15 of the Securities Act.

285. Each of the Individual Defendants, Defendant Newlight, and Defendant General Atlantic acted as controlling persons of Oak Street within the meaning of §15 of the Securities Act by virtue of their positions as a directors, senior officers, and/or controlling or significant shareholders. By reason of their positions at the Company, the Individual Defendants individually and acting pursuant to a common plan, had the power to influence and exercised such power to cause Oak Street to engage in the conduct alleged herein.

**ANSWER:** Deny the allegations in Paragraph 285 of the Complaint, which, *inter alia*, constitute legal conclusions to which no response is required.

286. Defendants Newlight and General Atlantic acted as controlling persons by virtue of their share ownership, power to appoint directors, and agreements with the Company. For example, the IPO Registration Statement characterized Oak Street as a "controlled company," stating that after the IPO, Newlight and General Atlantic would "continue to control a majority of the voting power of our outstanding stock," meaning Oak Street is a "controlled company." The December 2020 Registration Statement likewise stated that, following the December 2020

126

Offering, Newlight and General Atlantic will "beneficially own approximately 52.4% of our common stock, which means that, based on their combined percentage voting power held after the offering," Newlight and General Atlantic "will continue to control the vote of all matters submitted to a vote of our shareholders, which will enable them to control the election of the members of the Board and all other corporate decisions."

**ANSWER:** Deny the allegations in Paragraph 286 of the Complaint, which, *inter alia*, constitute legal conclusions to which no response is required, except admit that Plaintiffs selectively quote the IPO Registration Statement and the December 2020 Registration Statement, and respectfully refer the Court to those documents for their complete and accurate texts.

287. Newlight and General Atlantic's stock ownership fell below 50% for the first time after the February 2021 Registration Statement and Prospectus was issued, but they continued to have the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the Offering Materials. For example, Oak Street's 2020 10-K (filed on March 10, 2021) noted that "[f]ollowing the offering dated February 11, 2021," Newlight and General Atlantic "beneficially own approximately 48.0% of our issued and outstanding shares of common stock," and stated, in pertinent part:

> Even though we are no longer a controlled company, for so long as the [Newlight and General Atlantic] continue to own a significant percentage of our stock, [Newlight and General Atlantic] will still be able to significantly influence the composition of our Board and the approval of actions requiring shareholder approval. Accordingly, for such period of time, [Newlight and General Atlantic] will continue to have significant influence with respect to our management, business plans and policies, including the appointment and removal of our officers, decisions on whether to raise future capital and amending our charter and bylaws, which govern the rights attached to our common stock. In particular, for so long as [Newlight and General Atlantic] continue to own a significant percentage of our stock, [Newlight and General Atlantic] will be able to cause or prevent a change of control of us or a change in the composition of our Board and could preclude any unsolicited acquisition of us.

**ANSWER:** Deny the allegations in Paragraph 287 of the Complaint, except respectfully refer the Court to Oak Street's 2020 Form 10-K for its complete and accurate text.

288. Moreover, the 2020 10-K stated that, by way of a "Sponsor Director Nomination Agreement," Newlight and General Atlantic could each designate three nominees for election to Oak Street's Board of Directors. Newlight and General Atlantic have exercised this agreement, as during the Class Period, six of the Board's 12 members were designated by Newlight or General Atlantic. In addition, the Sponsor Director Nomination Agreement provides that "so long as General Atlantic has the right to nominate at least one director and any such nominee is serving

127

on our Board, General Atlantic may designate one director who shall have the tie-breaking vote . . . if the Board is deadlocked on any matter requiring the approval of the Board." During the Class Period, General Atlantic has exercised this provision, as General Atlantic has designated Robert Vorhoff, an Oak Street director and a General Atlantic Managing Director and its Global Head of Healthcare, as the Tie-Breaking Director. Thus, Newlight and General Atlantic can collectively control the vote of any matter requiring approval of the Board. The Sponsor Director Nomination Agreement prohibits Oak Street from increasing or decreasing the size of its Board without the written consent of Newlight and General Atlantic.

**ANSWER:** Deny the allegations in Paragraph 288 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, and respectfully refer the Court to the 2020 10-K, the Sponsor Nomination Agreement, and the March 2021 Proxy Statement for their complete and accurate texts.

289. Each of the Individual Defendants, Defendant Newlight, and Defendant General Atlantic either signed the Offering Materials and/or otherwise participated in the process which allowed the sale of the shares of Oak Street common stock to be successfully completed.

**ANSWER:** Deny the allegations in Paragraph 289 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations directed at other Defendants therein, admit that Newlight Harbour Point SPV LLC sold shares in the February 2021 Offering and May 2021 Offering, and respectfully refer the Court to the SPO Registration Statements and Forms 4 for their complete and accurate texts.

290. As set forth above, Oak Street violated §§11 and 12(a)(2) of the Securities Act in connection with the IPO, December 2020 Offering, February 2021 Offering, and May 2021 Offering. By virtue of their positions as controlling persons, and as a result of their aforementioned conduct, the Individual Defendants, Defendant Newlight, and Defendant General Atlantic are liable pursuant to Section 15 of the Securities Act for the §§11 and 12 violations.

**ANSWER:** Aver that the allegations in Paragraph 290 of the Complaint contain Plaintiffs' description of their own claims, to which no response is required. To the extent a response is required, deny the allegations in Paragraph 290 of the Complaint, which, *inter alia*, constitute legal conclusions to which no response is required, except admit that Plaintiffs assert claims under Sections 11 and 12(a)(2) of the Securities Act.

## CLASS ACTION ALLEGATIONS

291. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons and entities who or which purchased or otherwise acquired the publicly traded common stock of Oak Street Health during the period from August 6, 2020 through November 8, 2021, inclusive ("Class Period"), including those who purchased shares of Oak Street common stock pursuant or traceable to the Registration Statements and Prospectuses issued in connection with Oak Street's IPO, December 2020 Offering, February 2021 Offering and May 27, 2021 Offering, and were damaged thereby (the "Class"). Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Oak Street during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Oak Street's employee retirement and employee benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

ANSWER: Aver that the allegations in Paragraph 291 of the Complaint contain Plaintiffs' description of their own claims, to which no response is required. To the extent a response is required, deny the allegations in Paragraph 291 of the Complaint, which, *inter alia*, constitute legal conclusions to which no response is required.

292. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Oak Street common stock was actively traded on the NYSE. According to the Company's 3Q 2021 10-Q, the Company had more than 240 million shares of common stock outstanding as of November 4, 2021. While the exact number of Class members can only be determined by appropriate discovery, Plaintiffs believe that Class members number at least in the hundreds, if not thousands, and that they are geographically dispersed.

ANSWER: Deny the allegations in Paragraph 292 of the Complaint, which, *inter alia*, constitute legal conclusions to which no response is required, except admit that throughout the Class Period, Oak Street common stock was traded on the NYSE, and respectfully refer the Court to Oak Street's Form 10-Q filed on November 4, 2021 for its complete and accurate text.

293. Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs' and all the Class members' damages arise from and were caused by the same representations and omissions made by or chargeable to Defendants. Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

ANSWER: Deny the allegations in Paragraph 293 of the Complaint, which, *inter alia*, constitute legal conclusions to which no response is required.

294.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

**ANSWER:** Deny the allegations in Paragraph 294 of the Complaint, which, *inter alia*, constitute legal conclusions to which no response is required.

295.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    Whether statements made by or chargeable to Defendants during the Class Period misrepresented or omitted material facts;

(c)    Whether the price of Oak Street common stock was artificially inflated during the Class Period; and

(d)    To what extent the members of the Class have sustained damages and the proper measure of damages.

**ANSWER:** Deny the allegations in Paragraph 295 of the Complaint, which, *inter alia*, constitute legal conclusions to which no response is required.

296.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for members of the Class to individually redress the wrongs done to them.  Plaintiffs are not aware of any difficulty in the management of this action as a class action.

**ANSWER:** Deny the allegations in Paragraph 296 of the Complaint, which, *inter alia*, constitute legal conclusions to which no response is required.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.    Declaring this action to be a class action properly maintained pursuant to Rule 23(a) and b(3) of the Federal Rules of Civil Procedure and certifying Plaintiffs as Class Representatives and Robbins Geller Rudman & Dowd LLP and Labaton Sucharow LLP as Class Counsel;

130

B.      Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs reasonable costs and expenses incurred in this action, including attorneys' fees, experts' fees, and other costs and disbursements; and

D.      Awarding such further relief, including any equitable/injunctive relief, as the Court may deem just and proper.

**ANSWER:** Answering Plaintiffs' prayer for relief, the Newlight Defendants deny that Plaintiffs are entitled to the requested relief.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

**ANSWER:** Admit that Plaintiffs purport to demand a jury trial.

## ADDITIONAL DEFENSES

As additional defenses, the Newlight Defendants allege, assert, and aver the following, which apply to each and every cause of action asserted in the Complaint against the Newlight Defendants to which such defense is or may be applicable.  By virtue of alleging these further defenses, the Newlight Defendants do not assume any burden of proof, persuasion, or production not otherwise legally assigned to them.  The Newlight Defendants also do not concede that facts contrary to one or more of the averments that follow would support liability as to the Newlight Defendants.  The Newlight Defendants reserve all rights to assert other defenses as appropriate.

131

## FIRST DEFENSE

The Newlight Defendants are not liable under Section 20(a) of the Exchange Act because they acted in good faith and did not disseminate, culpably participate in, nor directly or indirectly induce, the making of any false or misleading statements or omissions.

## SECOND DEFENSE

The Newlight Defendants are not liable under Section 15 of the Securities Act because at all times, and with respect to all matters contained herein, the Newlight Defendants acted in good faith, exercised reasonable care, and did not know of, or had no reasonable ground to believe, the purported untruths, misstatements and/or omissions alleged in the Complaint.

## ADDITIONAL DEFENSES RESERVED

The Newlight Defendants hereby give notice that they may rely on other defenses if and when such defenses become known during the course of the litigation, and hereby reserve the right to amend their answer and to assert any additional defenses, cross-claims, counterclaims, and third-party claims as they become known or available.

## PRAYER FOR RELIEF

**WHEREFORE**, the Newlight Defendants pray for relief and judgment:

A. Denying Plaintiffs the relief sought in the Complaint;

B. Dismissing the Complaint with prejudice;

C. Ordering that Plaintiffs take nothing and that judgment be entered against Plaintiffs;

D. Awarding the Newlight Defendants costs and expenses, including counsel and expert fees; and

E. Granting such other and further relief as the Court may deem just and proper.

Dated: April 10, 2023

Respectfully submitted,

/s/ *Andrew J. Ehrlich*

Andrew J. Ehrlich (*pro hac vice*)
Staci Yablon (*pro hac vice*)
Daniel S. Sinnreich (*pro hac vice*)
Alison R. Benedon (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: 212-373-3000
Facsimile: 212-373-3990
Email: aehrlich@paulweiss.com
Email: syablon@paulweiss.com
Email: dsinnreich@paulweiss.com
Email: abenedon@paulweiss.com

-and-

Peter A. Silverman (Il. ARDC # 6196081)
Lisa M. Mazzone (Il. ARDC #6303922)
**SMITH, GAMBRELL & RUSSELL, LLP**
311 South Wacker Drive, Suite 3000
Chicago, IL 60606
Telephone: 312-264-1004
Facsimile: 312-251-4610
Email: psilverman@sgrlaw.com
Email: lmazzone@sgrlaw.com

***Counsel for the Newlight Defendants***

133

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that he caused a copy of the attached **Newlight Defendants' Answer to Lead Plaintiffs' Complaint** to be electronically filed with the Clerk of the Court on April 10, 2023.  Notice of this filing will be served upon counsel of record via Electronic Notification by the District Court's ECF Filing System.

/s/ *Andrew J. Ehrlich*
Andrew J. Ehrlich