**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| REGINALD T. ALLISON, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> OAK STREET HEALTH, INC., et al., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) |

Case No. 1:22-cv-00149

<u>CLASS ACTION</u>

Hon. Jeffrey I. Cummings

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' OPPOSED MOTION FOR CLASS CERTIFICATION AND**
<u>**APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL**</u>

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES .................................................................................................. iii

I.     INTRODUCTION ....................................................................................................... 1

II.    SUMMARY OF ALLEGATIONS COMMON TO THE CLASS .................................. 3

       A.     Oak Street's Business ......................................................................................... 3

       B.     Defendants Concealed Oak Street's Aggressive Patient Acquisition
              Tactics and AKS Violations ............................................................................... 5

       C.     The Truth Was Belatedly Revealed .................................................................... 6

III.   PROCEDURAL BACKGROUND ................................................................................ 6

IV.    THE PROPOSED CLASS REPRESENTATIVES ........................................................ 7

V.     THE PROPOSED CLASS SATISFIES THE STANDARDS FOR CLASS
       CERTIFICATION UNDER RULE 23 .......................................................................... 8

       A.     Securities Cases Are Particularly Well-Suited for Class Certification ................ 8

       B.     The Proposed Class Satisfies the Standards for Class Certification Under
              Rule 23(a) .......................................................................................................... 9

              1.     The Class Is So Numerous that Joinder is Impracticable ........................... 9

              2.     Questions of Law and Fact Are Common to the Class .............................. 10

              3.     The Claims of the Proposed Class Representatives Are Typical of
                     Those of the Class .................................................................................... 11

              4.     The Proposed Class Representatives Will Continue to Fairly and
                     Adequately Protect the Interests of the Class ........................................... 12

              5.     Proposed Class Counsel Are Adequate and Satisfy Rule 23(g) ................ 14

       C.     The Proposed Class Satisfies the Standards for Class Certification Under
              Rule 23(b)(3) ..................................................................................................... 14

              1.     Predominance Is Established for the Securities Act Claims ...................... 15

              2.     Predominance Is Established for the Exchange Act Claims ...................... 16

                     a.     Common Issues of Falsity, Materiality, Loss Causation, and
                            Scienter Predominate ..................................................................... 17

b.     Common Issues of Reliance Predominate Based on the "Fraud-on-the-Market" Presumption ............................................... 17

(1)     Oak Street's Common Stock Was Listed and Traded on the NYSE .......................................................... 18

(2)     *Cammer* Factor 1: High Weekly Trading Volume ............ 19

(3)     *Cammer* Factor 2: Significant Financial Analyst Coverage ............................................................... 19

(4)     *Cammer* Factor 3: Numerous Market Makers ................... 20

(5)     *Cammer* Factor 4: SEC Form S-3 Eligibility ..................... 21

(6)     *Cammer* Factor 5: The Cause-and-Effect Relationship Between Oak Street-Specific News and Oak Street's Stock Price .............................................. 21

(7)     Additional Factors Confirm Market Efficiency ................. 23

c.     Common Issues of Reliance Predominate Based on the *Affiliated Ute* Presumption ............................................................ 25

3.     Damages May Be Calculated on a Class-Wide Basis Using a Common Methodology ................................................................. 26

4.     A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of This Controversy ...................................... 28

VI.     CONCLUSION ................................................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Advanced Auto Parts, Inc. Sec. Litig.*,
    2020 WL 6544637 (D. Del. Nov. 6, 2020) ........................................................18, 21

*Affiliated Ute Citizens of Utah v. United States*,
    406 U.S. 128 (1972)..........................................................................3, 16, 25, 26

*Allison v. Oak St. Health, Inc.*,
    2023 WL 1928119 (N.D. Ill. Feb. 10, 2023) .............................................7, 16, 26

*In re Allstate Corp. Sec. Litig.*,
    966 F.3d 595 (7th Cir. 2020) ..........................................................................17

*In re Alstom SA Sec. Litig.*,
    253 F.R.D. 266 (S.D.N.Y. 2008) .....................................................................25

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013).....................................................................................8, 15

*In re Anadarko Petrol Corp. Sec. Litig.*,
    2022 WL 4544235 (S.D. Tex. Sept. 28, 2022) .....................................................19

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)................................................................................ *passim*

*Beaver Cnty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*,
    2016 WL 4098741 (D. Minn. July 28, 2016) ........................................................25

*Boston Ret. Sys. v. Alexion Pharms., Inc.*,
    2023 WL 2932485 (D. Conn. Apr. 13, 2023)................................................ 27-28

*Cammer v. Bloom*,
    711 F. Supp. 1264 (D.N.J. 1989) ............................................................... *passim*

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
    310 F.R.D. 69 (S.D.N.Y. 2015) .......................................................................20

*City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*,
    2018 WL 4931543 (N.D. Cal. Oct. 11, 2018)........................................................28

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)........................................................................................28

*In re Constar Int'l Inc. Sec. Litig.*,
    585 F.3d 774 (3d Cir. 2009)............................................................................27

*Dougherty v. Esperion Therapeutics, Inc.*,
2020 WL 6793326 (E.D. Mich. Nov. 19, 2020) ................................................23

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011) ...............................................................................15, 16

*In re Facebook, Inc., IPO Sec. & Deriv. Litig.*,
312 F.R.D. 332 (S.D.N.Y. 2015) .............................................................27

*In re Groupon, Inc. Sec. Litig.*,
2014 WL 5245387 (N.D. Ill. Sept. 23, 2014) ................................... *passim*

*In re Groupon, Inc. Sec. Litig.*,
2015 WL 1043321 (N.D. Ill. Mar. 5, 2015) ..................................... *passim*

*Gruber v. Gilbertson*,
2019 WL 4439415 (S.D.N.Y. Sep. 17, 2019) ................................... 25-26

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) .............................................................................3, 16, 17

*Haw. Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*,
338 F.R.D. 205 (S.D.N.Y. 2021) .............................................................15

*Holwill v. AbbVie Inc.*,
2021 WL 7366274 (N.D. Ill. Sept. 23, 2021) ................................... 1, 9

*In re Honest Co. Sec. Litig.*,
2023 WL 3190506 (C.D. Cal. May 1, 2023) ....................................14

*Keele v. Wexler*,
149 F.3d 589 (7th Cir. 1998) ..................................................................11

*Kleen Prods. LLC v. Int'l Paper*,
306 F.R.D. 585, 601 (N.D. Ill. 2015) ....................................................26

*Krogman v. Sterritt*,
202 F.R.D. 467 (N.D. Tex. 2001) ....................................................23, 24

*Luna v. Carbonite, Inc.*,
2023 WL 4539855 (D. Mass. July 14, 2023) ................................14

*In re Lyft Inc. Sec. Litig.*,
2021 WL 3711470 (N.D. Cal. Aug. 20, 2021) ....................................15

*Makor Issues & Rts., Ltd. v. Tellabs, Inc.*,
256 F.R.D. 586 (N.D. Ill. 2009) ....................................................12, 14

*McIntire v. China MediaExpress Holdings, Inc.*,
38 F. Supp. 3d 415 (S.D.N.Y. 2014) ....................................18, 22, 23, 25

*Messner v. Northshore Univ. HealthSystem*,
669 F.3d 802 (7th Cir. 2012) ................................................................................ 14-15

*In re Nature's Sunshine Prod.'s Inc. Sec. Litig.*,
251 F.R.D. 656 (D. Utah 2008) ...................................................................................20

*In re Neopharm, Inc. Sec. Litig.*,
225 F.R.D. 563 (N.D. Ill. 2004)........................................................................... 9-10, 29

*Petrie v. Elec. Game Card, Inc.*,
308 F.R.D. 336 (S.D. Cal. 2015) .................................................................................24

*Pub. Emps.' Ret Sys. of Miss. v. TreeHouse Foods, Inc.*,
2020 WL 919249 (N.D. Ill. Feb. 26, 2020) ....................................................... *passim*

*Purple Mountain Tr. v. Wells Fargo & Co.*,
2022 WL 3357835 (N.D. Cal. Aug. 15, 2022) ...........................................................19

*Rosario v. Livaditis*,
963 F.2d 1013 (7th Cir. 1992) ........................................................................... 12-13

*Roth v. Aon Corp.*,
238 F.R.D. 603 (N.D. Ill. 2006)....................................................................1, 9, 29

*Schleicher v. Wendt*,
618 F.3d 679 (7th Cir. 2010) ...................................................................................1, 17

*Silverman v. Motorola, Inc.*,
259 F.R.D. 163 (N.D. Ill. 2009)........................................................................11, 12

*St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co.*,
2022 WL 4598044 (M.D. Tenn. Sept. 30, 2022).............................................16, 26

*Strougo v. Barclays PLC*,
312 F.R.D. 307 (S.D.N.Y. 2016) .................................................................................21

*Suchanek v. Sturm Foods, Inc.*,
764 F.3d 750 (7th Cir. 2014) ........................................................................... 10-11

*In re Sys. Software Assocs., Inc. Sec. Litig.*,
2000 WL 1810085 (N.D. Ill. Dec. 8, 2000)........................................................10

*Tatz v. Nanophase Techs. Corp.*,
2003 WL 21372471 (N.D. Ill. June 13, 2003)..........................................1, 9, 10, 25

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)..........................................................................................9

*In re Teva Sec. Litig.*,
2021 WL 872156 (D. Conn. Mar. 9, 2021) ...........................................................23

*Uhl v. Thoroughbred Tech. & Telecomms. Inc.*,
  309 F.3d 978 (7th Cir. 2002) ............................................................................13

*Washtenaw Cnty. Emps.' Ret. Sys. v. Walgreen Co.*,
  2018 WL 1535156 (N.D. Ill. Mar. 29, 2018).................................................9, 27

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
  2016 WL 4138613 (E.D. Pa. Aug. 4, 2016) .......................................................21

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)..................................................................................... 10-11

*Weiner v. Tivity Health, Inc.*,
  334 F.R.D. 123 (M.D. Tenn. 2020) ....................................................................22

**Statutes & Rules**

Securities Exchange Act of 1934 §10(b) ................................................................ *passim*

Securities Exchange Act of 1934 §20(a) ......................................................................7

Securities Act of 1933 §11, 15 U.S.C. §77k........................................................... *passim*

Securities Act of 1933 §12, 15 U.S.C. §77l.................................................................7

Securities Act of 1933 §15, 15 U.S.C. §77o................................................................7

Fed. R. Civ. P. 23 .................................................................................................. *passim*

**Other Authorities**

William B. Rubenstein, NEWBERG & RUBENSTEIN ON CLASS ACTIONS § 22:81
  (6th ed. 2023)....................................................................................................28

Pursuant to Federal Rule of Civil Procedure ("Rule") 23, Lead Plaintiffs Central Pennsylvania Teamsters Pension Fund – Defined Benefit Plan (the "CPTPF Benefit Plan"), Central Pennsylvania Teamsters Pension Fund – Retirement Income Plan 1987 (the "CPTPF Retirement Plan" and together with the CPTPF Benefit Plan, the "CPTPF Plans"), and Boston Retirement System ("BRS"), along with named Plaintiff City of Dearborn Police & Fire Revised Retirement System ("Dearborn") (collectively, "Plaintiffs"), respectfully submit this Memorandum of Law in support of their Opposed Motion for Class Certification and Appointment of Class Representatives and Class Counsel (the "Motion").

## I.   INTRODUCTION

It has long been "established law in the Northern District of Illinois and the Seventh Circuit that class certifications are the preferred method of dealing with securities fraud cases." *Roth v. Aon Corp.*, 238 F.R.D. 603, 605 (N.D. Ill. 2006); *see also Holwill v. AbbVie Inc.*, 2021 WL 7366274, at *2 (N.D. Ill. Sept. 23, 2021) (noting that securities fraud claims "generally meet[] the standards for certifying a class action").[1]   Indeed, "[c]ourts in this district recognize that[] securities fraud cases are uniquely situated to class action treatment since the claims of individual investors are often too small to merit separate lawsuits." *Tatz v. Nanophase Techs. Corp.*, 2003 WL 21372471, at *3 (N.D. Ill. June 13, 2003).  As the Seventh Circuit explained: "[w]hen a large, public company makes statements that are said to be false, securities-fraud litigation regularly proceeds as a class action." *Schleicher v. Wendt*, 618 F.3d 679, 681 (7th Cir. 2010).  Thus, in securities actions, "class certification is routine." *Id.* at 682.  This case is no exception.

---

[1] Unless otherwise noted: (i) all internal citations and quotations are omitted and all emphasis is added; (ii) citations to "Ex. __" are to the exhibits attached hereto; (iii) capitalized terms have the same meanings as in Lead Plaintiffs' Complaint for Violations of the Federal Securities Laws (ECF 40) (the "Complaint"); and (iv) citations to "¶__" refer to paragraphs in the Complaint.

As discussed below, class certification is proper in this case, and a class action provides the best vehicle for wronged investors to be made whole. Accordingly, Plaintiffs respectfully request that the Court certify the following class (the "Class"):

All persons and entities who or which purchased or otherwise acquired the publicly traded common stock of Oak Street Health during the period from August 6, 2020 through November 8, 2021, inclusive ("Class Period"), including those who purchased shares of Oak Street common stock pursuant to or traceable to the Registration Statements and Prospectuses issued in connection with Oak Street's IPO, December 2020 Offering, and February 2021 Offering, and were damaged thereby.[2]

The proposed Class plainly satisfies Rule 23(a)'s prerequisites for class certification. First, Rule 23(a)(1)-(2)'s numerosity and commonality requirements are satisfied because the Class is comprised of hundreds, and likely thousands, of investors whose claims under federal securities laws are based on Defendants' common course of conduct and concern the same facts. Second, Rule 23(a)(3)'s typicality requirement is satisfied because Plaintiffs' and members of the Class were similarly injured by purchasing or acquiring Oak Street common stock during the Class Period at prices artificially inflated by Defendants' false and misleading statements or omissions. Plaintiffs and the Class members suffered losses when the truth was revealed, and the artificial inflation was removed. And third, Plaintiffs satisfy Rule 23(a)(4)'s adequacy requirement because they have and will continue to zealously represent the Class in prosecuting this action.

In addition, this action meets Rule 23(b)(3)'s predominance and superiority requirements. As to predominance, numerous common issues of fact and law are subject to common proof and predominate over any individual issues. For example, class-wide reliance is presumed for

---

[2] Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Oak Street during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Oak Street's employee retirement and employee benefit plan(s); (vi) Humana, Inc.; and (vii) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

purchasers of securities that traded in an efficient market. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 279 (2014) ("*Halliburton II*"); *Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988). Here, as demonstrated in the report of expert financial economist Chad Coffman, Oak Street common stock traded in an efficient market throughout the Class Period. *See* Ex. 1 (Expert Report of Chad Coffman, CFA ("Coffman Rpt.")), ¶¶24-25.[3] Further establishing predominance, Mr. Coffman also explains damages under §10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and §11 of the Securities Act of 1933 (the "Securities Act") may be calculated based on a class-wide methodology that is consistent with Plaintiffs' theory of liability. *Id.*, ¶¶78-87. Moreover, the class action device is the superior means of litigating Class members' claims because a class action provides redress to investors who would otherwise be unable to pursue individual claims, and a class action is more manageable and less taxing on judicial resources than the prosecution of various individual actions. *See* Fed. R. Civ. 23(b)(3).

Finally, proposed Class Counsel, Robbins Geller Rudman & Dowd LLP ("Robbins Geller") and Labaton Sucharow LLP ("Labaton"), possess the requisite experience and resources to prosecute this case as a class action through trial and any possible appeal. For the reasons below, Plaintiffs respectfully request that the Court grant their Motion.

## II.      SUMMARY OF ALLEGATIONS COMMON TO THE CLASS

### A.      Oak Street's Business

Defendant Michael Pykosz founded Oak Street in 2012 to operate primary care physician centers for individuals eligible for Medicare. Specifically, Oak Street focuses on patients enrolled in Medicare Advantage ("MA") plans, to which the Centers for Medicare & Medicaid Services ("CMS") pay Medicare-approved health plans to administer Medicare benefits. ¶¶33, 37, 40.

---

[3] Reliance is also presumed under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) because the claims are based largely on omissions of material fact. *See* §IV.C.2.

Through the MA program, CMS pays a fixed per-person amount for each beneficiary, known as the "capitated" amount, and the private health companies turn a profit if an enrolled patient's healthcare costs stay below the capitated payments from CMS. ¶¶38-39. Oak Street claims to have "built a better mousetrap" for MA beneficiaries and partners with MA plans through "capitation agreements," which allot approximately 85% of the MA plans' capitated payments from CMS to Oak Street when the MA plan members select the Company to provide primary care services. ¶¶41-42. Responsible for all of the MA beneficiaries' costs, Oak Street in turn only makes money off these MA patients if their health care costs stay below the capitated amount allotted from the MA plans (85%) to Oak Street. ¶47. So, the Company has opened hundreds of centers to recruit large numbers of patients to increase its odds of achieving profitability, though the Company has never reported any profits. ¶¶7, 43-49, 65-67.

Because, in Defendant Pykosz's own words, "people aren't shopping for a doctor in the same consumer way they're shopping for other things" (¶50), Oak Street needed to convince Medicare-eligible patients to drop their existing primary care physicians and switch to Oak Street. But, any sales and marketing practices employed in its efforts to acquire new patients were subject to extensive regulation in a highly scrutinized industry. ¶¶50-52. Specifically, Oak Street's patient acquisition activities fall within the purview of the False Claims Act ("FCA") and Anti-Kickback Statute ("AKS"). Prior to the COVID-19 pandemic, Oak Street hosted events to attract new patients. *See, e.g.,* ¶62 (citing Oak Street SEC filings reporting 18,700 such events in 2019, including bingo and Zumba). However, with the onset of stay-at-home orders due to the COVID-19 pandemic and limitations on public gatherings, Oak Street could not employ its traditional patient acquisition tactics and resorted to aggressive tactics that violated the AKS and Medicare rules. ¶¶63-64, 68-99.

- 4 -

**B.** **Defendants Concealed Oak Street's Aggressive Patient Acquisition Tactics and AKS Violations**

Under pressure to maintain its valuation before and after the August 2020 IPO, Oak Street engaged in patient acquisition tactics that were overly aggressive, highly risky, and violated the AKS, making investment in Oak Street risky due to the increased risk of scrutiny, investigations, fines, penalties, and even suspension or removal from Medicare. ¶¶60-61, 65-99, 131-41. Although Class Period SEC filings, signed by Defendants Pykosz and Cook, acknowledged Defendants' awareness of the AKS's prohibitions of such kickback schemes and providing things of such value to influence the selection of a primary care provider, the Company engaged in several tactics that violated such prohibitions. ¶56. First, Oak Street started to pay outside insurance agents and brokers at least $200 per-patient for referrals to Oak Street through its so-called Client Awareness Program ("CAP"). ¶¶69-71, 78-79, 85, 95-96, 135, 138-41. And, second, Oak Street marketed and provided free transportation services for prospective patients to travel to Oak Street clinics to induce them to select Oak Street for primary care services. ¶¶72-74, 80-82, 84, 87, 97, 99, 129-30. Both tactics violated the AKS. *See* ¶¶53-61.

During the Class Period, Defendants repeatedly touted the success of certain Oak Street patient acquisition tactics – such as community events, TV ads, call centers, and obtaining referrals from community members – while concealing that Oak Street was also engaged in the highly aggressive tactics of paying for referrals and marketing free transportation to prospective patients. *See, e.g.*, ¶¶103-04, 108-09, 117-22. Defendants also assured the market that Oak Street's patient acquisition tactics were successful and fully compliant with the AKS, when, in fact, several of them violated the AKS. *See, e.g.*, ¶¶109(b), 122(b). Defendants held three secondary public offerings ("SPOs") over the course of five months while Oak Street engaged in the undisclosed and illegal patient acquisition tactics, enabling insiders to take advantage of the sky-high price of Oak Street's stock, which was propped up by Defendants' false and misleading statements and

- 5 -

omissions. ¶¶214, 243-48 (December 2020 SPO, $46.00 per share), ¶¶170, 249-53 (February 2021 SPO, $56.00 per share), ¶¶170, 254-58 (May 2021 SPO, $62.00 per share). During the February and May 2021 SPOs, Defendants Newlight and General Atlantic sold more than 24 million shares of Oak Street stock for proceeds of $1.4 billion. ¶¶170, 249, 254-56.

### C. The Truth Was Belatedly Revealed

On November 8, 2021, the truth of the aggressive and risky patient acquisition tactics began to be revealed, as Oak Street disclosed that the Company had "received a civil investigative demand ("CID") from the United States Department of Justice." ¶129. Specifically, Oak Street disclosed that the DOJ was "investigating whether the Company may have violated the False Claims Act, 31 U.S.C. §§3729-3722" and that the "CID requests certain documents and information related to the Company's relationships with third-party marketing agents and related to the Company's provision of free transportation to federal health care beneficiaries." *Id*.; *see also* ¶¶130-32. Analysts responded with shock and slashed their price targets for Oak Street common stock, which plunged more than 20% from $47 to $37 per share, as more than $2 billion in market capitalization evaporated. ¶¶131-34. For example, on November 9, 2021, analysts from J.P. Morgan reduced their price target by 10%, noting that "[w]eakness in OSH shares today was primarily driven by the company's disclosure that it is the subject of a DOJ investigation" into "OSH's relationships with third-party marketing agents and the provision of free transportation for Medicare beneficiaries," which "meaningfully increases OSH's risk profile." ¶134. Subsequent disclosures and reports further confirmed the aggressive and improper conduct. *See* ¶¶135-41.

## III. PROCEDURAL BACKGROUND

This action was initially filed in January 2022. ECF 1. On March 25, 2022, the CPTPF Plans and BRS were appointed as Lead Plaintiffs, and Robbins Geller and Labaton were appointed as co-Lead Counsel. ECF 30. Lead Plaintiffs filed the operative Complaint on May 25, 2022,

alleging violations of (i) §§11, 12, and 15 of the Securities Act arising out of alleged misstatements and omissions made in connection with Oak Street's IPO and subsequent public offerings in December 2020, February 2021, and May 2021; and (ii) §§10(b) and 20(a) of the Exchange Act arising out of alleged misstatements and omissions made during the Class Period. ECF 40. Defendants moved to dismiss the Complaint in its entirety. ECF 57, 59. Judge Kennelly denied the motion to dismiss, except only with respect the §12 claim and §11 claim in connection with the May 2021 Offering. *Allison v. Oak St. Health, Inc.*, 2023 WL 1928119 (N.D. Ill. Feb. 10, 2023). Since then, the Parties have been engaged in fact discovery. *See* ECF 126 at 5-6.

## IV. THE PROPOSED CLASS REPRESENTATIVES

The proposed Class Representatives, the CPTPF Plans, BRS, and Dearborn have expended substantial time and effort in working with counsel to vigorously prosecute this action on behalf of the Class. They have, for example, overseen the litigation, communicated frequently with Co-Lead Counsel, and responded to Defendants' discovery requests. Plaintiffs have worked, and will continue to work, aggressively to obtain critical evidence supporting the Class' claims.

The CPTPF Plans, BRS, and Dearborn are large institutional investors. The CPTPF Benefit Plan is a multiemployer defined benefit pension plans with over $1.2 billion in investments that it oversees for the benefit of more than 27,000 participants and their beneficiaries. *See* Ex. 2 (Declaration of Joseph Samolewicz), ¶2. The CPTPF Retirement Plan is a multiemployer defined contribution pension plan with over $900 million in investments that it oversees for the benefit of more than 9,000 participants and their beneficiaries. *See id.* BRS is a governmental defined benefit plan with approximately $6.4 billion in assets under management overseen for the benefit of more than 34,000 members and beneficiaries. *See* Ex. 3 (Declaration of Timothy J. Smyth), ¶2. Dearborn is a governmental defined benefit plan with approximately $302.3 million in assets under

management overseen for the benefit of more than 553 members and beneficiaries. *See* Ex. 4 (Declaration of Robert Festerman), ¶2.

## V. THE PROPOSED CLASS SATISFIES THE STANDARDS FOR CLASS CERTIFICATION UNDER RULE 23

### A. Securities Cases Are Particularly Well-Suited for Class Certification

Rule 23(a) permits class treatment where: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). In addition, a proposed class action must satisfy at least one of the three conditions imposed by Rule 23(b). Here, Plaintiffs move for class certification under Rule 23(b)(3), which permits certification where: "the questions of law or fact common to class members predominate over any questions affecting only individual members"; and a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

In determining whether class certification is appropriate, courts focus on the narrow question of whether the requirements of Rule 23 are satisfied. *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465-66 (2013). While the Court's analysis should be "rigorous," Rule 23 does not grant courts "license to engage in free-ranging merits inquiries at the class certification stage." *Id.* at 460, 465-66 ("the office of a Rule 23(b)(3) certification ruling is not to adjudicate the case"). As the issue is often decided prior to the completion of fact discovery, the question is not whether Plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met. *See In re Groupon, Inc. Sec. Litig.*, 2014 WL 5245387, at *2 (N.D. Ill. Sept. 23, 2014) ("*Groupon I*") ("The court should not turn the class certification proceedings into a dress rehearsal for the trial on the merits.").

Courts in this Circuit routinely find securities law claims, such as those here, to be uniquely appropriate for class treatment. *See AbbVie*, 2021 WL 7366274, at *2 (granting class certification and noting "securities fraud claims against a large, public company for alleged misrepresentations affecting the company's stock price . . . generally meet[] the standards for certifying a class action"). Indeed, the Supreme Court has "long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007). Accordingly, Rule 23's requirements should be "liberally construed in favor of maintaining securities fraud class actions." *Washtenaw Cnty. Emps.' Ret. Sys. v. Walgreen Co.*, 2018 WL 1535156, at *2 (N.D. Ill. Mar. 29, 2018).[4]

In short, while Plaintiffs must demonstrate that the proposed Class satisfies Rule 23's prerequisites, "the showing need not be to a degree of absolute certainty." *Pub. Emps.' Ret Sys. of Miss. v. TreeHouse Foods, Inc.*, 2020 WL 919249, at *2 (N.D. Ill. Feb. 26, 2020) (granting class certification). Instead, "[i]t is sufficient if each disputed requirement has been proven by a preponderance of evidence." *Id.* As set forth below, all of the requirements of Rule 23 are met and Plaintiffs' motion should be granted in its entirety.

**B.** **The Proposed Class Satisfies the Standards for Class Certification Under Rule 23(a)**

**1.** **The Class Is So Numerous that Joinder is Impracticable**

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). A plaintiff need not identify the exact number of class members, but rather may rely on reasonable inferences drawn from available facts. *See In re*

---

[4] *See also Roth*, 238 F.R.D. at 605-06 (recognizing that there is a "strong policy favoring class certification" in securities actions, and Rule 23 is therefore "liberally construe[d]"); *Tatz*, 2003 WL 21372471, at *3 ("The Seventh Circuit Court . . . has liberally construed Rule 23 in shareholder suits.").

*Neopharm, Inc. Sec. Litig.*, 225 F.R.D. 563, 565 (N.D. Ill. 2004) ("In order to establish numerosity, a plaintiff need not allege the exact number of members of the proposed class."); *Tatz*, 2003 WL 21372471, at *6 (inferring hundreds of class members based on 13 million shares traded over the entire relevant time period). While there is no bright line test, courts have found that classes with "as few as 10 to 40 members" satisfy numerosity. *Tatz,* 2003 WL 21372471, at *5. In securities fraud actions involving "nationally traded securities, numerosity may be assumed." *In re Sys. Software Assocs., Inc. Sec. Litig.*, 2000 WL 1810085, at *1-2 (N.D. Ill. Dec. 8, 2000).

Numerosity is clear here. The proposed Class easily exceeds 40 members, as Oak Street had between 240.7 million and 240.9 million shares of common stock outstanding during the Class Period. *See* Coffman Rpt., ¶66. Additionally, during the Class Period, 454 institutional investors owned Oak Street common stock, the Company had an average market capitalization of $12.76 billion, and the average weekly trading volume of Oak Street common stock was approximately 5.72 million shares on the New York Stock Exchange ("NYSE"). *See id*., ¶¶25, 28, 65, 67, 72. As such, there are hundreds, and likely thousands, of members of the proposed Class who are geographically dispersed. *See Groupon I*, 2014 WL 5245387, at *1 (certifying securities class action and noting that 40.25 million shares of stock were outstanding and "343 record holders existed . . . which likely represent thousands of individual shareholders of Groupon common stock"); *TreeHouse*, 2020 WL 919249, at *2 (holding that average weekly trading volume of 4.02 million shares was "more than enough to meet the numerosity requirement").

### 2. Questions of Law and Fact Are Common to the Class

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To be sure, commonality does not "require[] that *every* question be common." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014) (emphasis in original); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) (holding that "[e]ven a single [common]

question" will suffice (alterations in original)). Rather, the commonality requirement is usually satisfied by showing a "common nucleus of operative fact," which typically is found when "the defendants have engaged in standardized conduct towards members of the proposed class." *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998).

Courts in this District routinely conclude that the commonality requirement is satisfied in securities actions like this one because the alleged violations involve a defendant corporation's false and misleading statements to the public that artificially inflated the corporation's stock price, and ultimately resulted in damages sustained by the stockholders. *See, e.g., Groupon I*, 2014 WL 5245387, at \*1 (finding commonality "because at the heart of Lead Plaintiff's claims, and common to the class, are whether Defendants materially misrepresented or omitted" information in their statements to the market). This case is no exception because the common questions likewise include whether Defendants' statements and omissions were materially false or misleading, whether (certain) Defendants acted with scienter, and whether the market price of Oak Street common stock was artificially inflated due to the alleged conduct by Defendants. These common issues of law and fact readily satisfy Rule 23(a)(2). *See TreeHouse*, 2020 WL 919249, at \*3 (holding "commonality is a low hurdle that is easily surmounted in securities fraud cases such as this" and finding commonality "easily" met on same common issues).

### 3. The Claims of the Proposed Class Representatives Are Typical of Those of the Class

Rule 23(a)(3) requires that "the claims . . . of the representative parties [be] typical of the claims . . . of the class." Fed. R. Civ. P. 23(a)(3). Typicality is met where the class representative's claims share the "same essential characteristics as the claims of the class at large." *Silverman v. Motorola, Inc.*, 259 F.R.D. 163, 169 (N.D. Ill. 2009). "Typical does not mean identical, and the typicality requirement is liberally construed." *TreeHouse*, 2020 WL 919249, at \*3.

- 11 -

Here, Plaintiffs and all other Class members allege that Defendants made or were responsible for material misrepresentations and omissions in connection with the Company's IPO and SPOs, as well as during the Class Period, regarding Oak Street's patient acquisition tactics and compliance with federal laws. Furthermore, the injury that Plaintiffs suffered is the same injury that other Class members suffered – Plaintiffs and all other members of the Class purchased or acquired Oak Street common stock at prices that were artificially inflated by Defendants' false and misleading statements or omissions. *See* ¶187; Coffman Rpt., ¶12. Plaintiffs, just like all other Class members, suffered losses when the truth about Defendants' misleading statements and omissions was revealed and the artificial inflation was removed from the price of Oak Street common stock. *See* ¶¶187-93. Thus, the proposed Class Representatives' claims are typical. *See, e.g., Groupon I*, 2014 WL 5245387, at *1 (finding typicality because lead plaintiff in securities fraud case, like other class members, purchased stock during class period and "all were affected by the materially false and misleading statements alleged").

### 4. The Proposed Class Representatives Will Continue to Fairly and Adequately Protect the Interests of the Class

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To demonstrate adequacy, Plaintiffs must show that: "(1) their claims are not antagonistic to or in conflict with those of the proposed class; [and] (2) they have sufficient interest in the outcome of the case." *Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, 256 F.R.D. 586, 599 (N.D. Ill. 2009). Meeting this standard is not difficult: "[a]n understanding of the basic facts underlying the claims, some general knowledge, and a willingness and ability to participate in discovery are sufficient." *Motorola*, 259 F.R.D. at 173. Plaintiffs satisfy both requirements.

First, Plaintiffs do not have "antagonistic or conflicting claims" because Plaintiffs' and the Class member's claims arise from the same conduct and legal theory. *Rosario v. Livaditis*, 963

F.2d 1013, 1018 (7th Cir. 1992); *see also Groupon I*, 2014 WL 5245387, at *2. Plaintiffs, like all other Class members, purchased Oak Street common stock at artificially inflated prices in connection with the upheld public offerings (*see* §III) and during the Class Period and were injured by Defendants' misconduct. *See* ¶¶23-26, 187. Thus, Plaintiffs are adequate representatives because they "[are] in the same position as all class members." *See Uhl v. Thoroughbred Tech. & Telecomms. Inc.*, 309 F.3d 978, 986 (7th Cir. 2002); *see also TreeHouse,* 2020 WL 919249, at *6 (holding typicality met where plaintiff's claims shared the "same essential characteristics as the claims of the class at large").

In addition, Plaintiffs understand their fiduciary duties to the Class, and have, over the past two years, been actively overseeing this litigation, demonstrating their commitment to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Among other things, Plaintiffs: (1) have supervised and monitored the progress of the litigation; (2) have participated in discussions with Lead Counsel concerning case developments; (3) have reviewed Court filings and discovery; (4) understand their duty to the Class; and (5) are committed to vigorously prosecuting this action to maximize the recovery for all Class members. *See* Exs. 2-4; *see also Groupon I*, 2014 WL 5245387, at *2 (adequacy established where plaintiff "has already begun participating in discovery and has retained counsel who is highly experienced in securities class action litigation").

Second, given their significant losses as a result of Defendants' conduct, Plaintiffs have "a real stake in all aspects of the case." *Uhl*, 309 F.3d at 986. Additionally, Plaintiffs are large retirement plans and systems, which are the "exact type of sophisticated institutional investor that Congress intended to lead securities class actions." *See TreeHouse*, 2020 WL 919249, at *6-7 (certifying class and rejecting adequacy attacks against institutional investor).

- 13 -

**5.** **Proposed Class Counsel Are Adequate and Satisfy Rule 23(g)**

Rule 23 also requires that "class counsel [] be experienced and competent." *TreeHouse*, 2020 WL 919249, at *3. As their firm résumés demonstrate, Robbins Geller and Labaton have extensive experience litigating securities class actions before courts in this Circuit and throughout the country, receiving substantial and record-setting recoveries. *See* Ex. 5 (Robbins Geller Firm Résumé; Ex. 6 Labaton Firm Résumé).

Since their appointment as Co-Lead Counsel, Robbins Geller and Labaton have "committed substantial time and effort" prosecuting this action. *Tellabs,* 256 F.R.D. at 602. Co-Lead Counsel have, for example: (1) identified, analyzed, and investigated claims on behalf of the Class resulting in the detailed Complaint; (2) successfully opposed Defendants' omnibus motion to dismiss, which was denied in near entirety; (3) issued discovery to Defendants and third parties; (4) responded to discovery with and on behalf of Plaintiffs; (5) prepared the instant motion for class certification; and (6) litigated vigorously against experienced defense counsel. Plaintiffs and their counsel thus satisfy the adequacy requirements. *See TreeHouse*, 2020 WL 919249, at *3; *see also Luna v. Carbonite, Inc.*, 2023 WL 4539855, at *11 (D. Mass. July 14, 2023) (finding Robbins Geller meets Rule 23(g) requirements); *In re Honest Co. Sec. Litig.*, 2023 WL 3190506, at *8-*9 (C.D. Cal. May 1, 2023) (finding Labaton meets Rule 23(g) requirements).

**C.** **The Proposed Class Satisfies the Standards for Class Certification Under Rule 23(b)(3)**

Plaintiffs seek class certification under Rule 23(b)(3) because, as set forth below, "questions of law or fact common to class members predominate over any questions affecting only individual members" and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

In assessing predominance, courts assess whether a "common nucleus of operative facts and issues underlies the claims brought by the proposed class." *Messner v. Northshore Univ.*

*HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012). As the Seventh Circuit has explained, however, "Individual questions need not be absent. The text of Rule 23(b)(3) itself contemplates that such individual questions will be present. The rule requires only that those questions not predominate over the common questions affecting the class as a whole." *Id.* at 815. Furthermore, "[p]redominance is a test readily met in [] cases alleging . . . securities fraud." *Id.* at 814-15.

### 1. Predominance Is Established for the Securities Act Claims

Determining whether common questions predominate over individual questions "begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) ("*Halliburton I*"). The two core elements of Plaintiffs' claims pursuant to the Securities Act – falsity and materiality – present common questions of law and fact because proving these elements raises a question "common to all members of the class" that must be assessed by an "objective standard" that would be applied "equally for all investors composing the class." *Amgen*, 568 U.S. at 459-60.[5] Indeed, each proposed Class member's claims will rise or fall on common proof concerning, among other things, whether the Offering Documents in connection with the Offerings contained untrue statements or omissions of material fact. *See Haw. Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.,* 338 F.R.D. 205, 214 (S.D.N.Y. 2021) (certifying class and finding predominance established for Securities Act claims where "two major issues" were whether the offering documents contained misrepresentations or omissions and whether the misrepresentations or omissions were material); *see also In re Lyft Inc. Sec. Litig.*, 2021 WL 3711470, at \*5-\*7 (N.D. Cal. Aug. 20, 2021) (same). Thus, the Securities Act claims in this case are sufficiently determinable on a class-wide basis to satisfy Rule 23(b)'s predominance requirement.

---

[5] As discussed below, §IV.C.3, damages for the Securities Act claims can also be calculated on a class-wide basis.

### 2. Predominance Is Established for the Exchange Act Claims

As to the elements of Plaintiffs' claims pursuant to the Exchange Act, in addition to (1) material misstatements or omissions, plaintiffs must also show (2) the misstatements or omissions were made in "connection [with] the purchase or sale of a security;" (3) defendants acted with the requisite state of mind – scienter; (4) class members relied on the misstatements or omissions; (5) economic loss; and (6) "loss causation." *Oak St. Health*, 2023 WL 1928119, at \*4. As discussed, courts have recognized that in cases like this one based on public statements, elements (1)-(3) and (5)-(6) clearly rise and fall on common evidence. *See* §IV.B.2. Thus, whether common questions predominate in Exchange Act claims often turns on the element of reliance. *Halliburton I*, 563 U.S. at 810. Reliance in this case is established through two long-standing presumptions.

First, the *Basic* presumption of reliance provides that a proposed class representative may:

> satisfy the reliance element of the Rule 10b-5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation.

*Halliburton II*, 573 U.S. at 283-84; *see also Basic*, 485 U.S. at 241-47. To invoke the *Basic* presumption, a plaintiff must establish that (1) the alleged misrepresentations were public, (2) the security traded in an efficient market, and (3) the relevant transactions took place between the time the misrepresentations were made and the time the truth was revealed. *Halliburton I*, 563 U.S. at 811. Second, in the alternative, the *Affiliated Ute* presumption provides that "in securities actions involving primarily a failure to disclose, positive proof of reliance is not a prerequisite" and reliance may be presumed. *St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co.*, 2022 WL 4598044, at \*8 (M.D. Tenn. Sept. 30, 2022) (citing *Affiliated Ute*, 406 U.S. at 131).

As set forth below, Plaintiffs have established predominance for the Exchange Act claims, including by making the requisite showing to establish each of the presumptions of reliance.

- 16 -

### a. Common Issues of Falsity, Materiality, Loss Causation, and Scienter Predominate

As in the vast majority of securities fraud class actions, Defendants' public statements and omissions during the Class Period "affect[ed] [all] investors alike" and proof of the violations, including whether the statements were materially false or misleading, made with scienter, and caused class member losses, will "be made on a classwide basis[.]" *Shleicher*, 618 F.3d at 685, 687; *see also In re Allstate Corp. Sec. Litig.,* 966 F.3d 595, 604 (7th Cir. 2020) (noting that "[a] case built on public statements to markets is based on common evidence" for the elements of falsity, materiality, and scienter); §IV.B.1. Likewise, whether statements are made in "connection to the purchase or sale of a security[] will also rest on common evidence in class actions against public companies" because "price information for publicly traded securities is common and readily available." *Allstate*, 966 F.3d at 604. As discussed below, the remaining elements – reliance and damages – are also subject to common proof that will predominate.

### b. Common Issues of Reliance Predominate Based on the "Fraud-on-the-Market" Presumption

"In a securities fraud class action, the fraud-on-the-market doctrine makes it rather easy for a lead plaintiff to establish that common questions predominate over individual ones." *Groupon I*, 2014 WL 5245387, at *2. This presumption, first established by the Supreme Court in *Basic*, and later reaffirmed in *Halliburton II*, provides that "a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation." *Halliburton II*, 573 U.S. at 283-84. Here, Plaintiffs allege that Defendants made misleading statements that distorted the Company's stock price, and therefore, a showing that Oak Street's common stock traded "in a generally efficient market" triggers the class-wide presumption of reliance. *Id.* at 279.

- 17 -

In assessing market efficiency, courts routinely consider whether the security in question traded on a presumptively "efficient" major securities exchange, such as the NYSE or NASDAQ. *See Groupon I*, 2014 WL 5245387, at *2. Courts also look to the widely-accepted factors set forth in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989). *See TreeHouse*, 2020 WL 919249, at *4 (finding market efficiency based on five *Cammer* factors). The *Cammer* factors are:

> (1) average weekly trading volume during the class period; (2) number of security analysts who followed and reported on the stock during the class period; (3) number of market makers; (4) whether the company was entitled to file an S-3 Registration Statement; and (5) whether empirical facts demonstrate a cause-and-effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price.

*In re Groupon, Inc. Sec. Litig.*, 2015 WL 1043321, at *3 (N.D. Ill. Mar. 5, 2015) ("*Groupon II*"), objections overruled, 2015 WL 13628131 (N.D. Ill. May 12, 2015).[6] A plaintiff need not demonstrate that all of the *Cammer* factors are satisfied to demonstrate market efficiency because these factors are an "analytical tool[,]" not a "checklist." *In re Advanced Auto Parts, Inc. Sec. Litig.*, 2020 WL 6544637, at *3 (D. Del. Nov. 6, 2020); *see also McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 432 (S.D.N.Y. 2014). Nevertheless, all the factors are met, and Mr. Coffman, a highly qualified expert economist, has concluded that Oak Street stock traded in an efficient market. Coffman Rpt., ¶6.

### (1) Oak Street's Common Stock Was Listed and Traded on the NYSE

That Oak Street common stock was traded on the NYSE (Coffman Rpt., ¶11), one of the largest, most developed markets in the world, supports a strong presumption of market efficiency.

---

[6] Though the Seventh Circuit has not explicitly adopted the *Cammer* factors, judges in this District have recognized that "a number of other courts, including courts in this district have adopted the *Cammer* factors." *Id.* (citing cases); *see also TreeHouse*, 2020 WL 919249, at *4 (citing cases from this District in noting that *Cammer* "is frequently used to determine whether a market for given security is efficient").

*See In re Anadarko Petrol Corp. Sec. Litig.*, 2022 WL 4544235, at *6 (S.D. Tex. Sept. 28, 2022) (certifying class and holding that company's stock trading on NYSE "alone [wa]s indicia of market efficiency"); *Purple Mountain Tr. v. Wells Fargo & Co.*, 2022 WL 3357835, at *5 (N.D. Cal. Aug. 15, 2022) (certifying class and holding that company's stock trading "on the NYSE, a highly regarded and well-regulated exchange, strongly indicates that it trade[d] in an efficient market").

### (2)     *Cammer* Factor 1: High Weekly Trading Volume

A large weekly trading volume "suggests there is an efficient market [] because it implies significant investor interest in the company." *Cammer*, 711 F. Supp. at 1286; *see also* Coffman Rpt., ¶¶26-30. As the *Cammer* court explained, "[t]urnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption." *Cammer*, 711 F. Supp. at 1293. Here, the average weekly trading volume for Oak Street's common stock during the Class Period was approximately 5.72 million shares, or 2.38% of the outstanding shares. Coffman Rpt., ¶¶26-28, Coffman Ex. 3. Accordingly, the trading volume for Oak Street common stock justifies, at least, a "strong presumption" of market efficiency. *Cammer*, 711 F. Supp. at 1293.

### (3)     *Cammer* Factor 2: Significant Financial Analyst Coverage

Significant coverage of a company's stock by a large number of analysts supports a finding of market efficiency because it shows that the company is closely followed by investment professionals, who in turn make buy/sell recommendations to investors. *See Cammer*, 711 F. Supp. at 1286; Coffman Rpt., ¶¶25, 31-33.

Here, analysts from at least 20 different firms were following Oak Street during the Class Period, including major financial firms such as J.P. Morgan, Truist, Raymond James & Associates, and Piper Sandler Companies. Coffman Rpt., ¶33; Coffman Ex. 4; *see also Groupon II*, 2015 WL 1043321, at *4 (certifying class where 17 sell-side analysts covered stock). These analysts

- 19 -

disseminated publicly available information along with commentary, analysis, and recommendations. Coffman Rpt., ¶33. Indeed, at least 128 analysts' reports were generated during the Class Period. *Id.*

In addition to analyst coverage, courts also recognize that widespread media coverage supports a finding of market efficiency. *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 92 (S.D.N.Y. 2015) (finding that "regular press coverage throughout the Class Period" weighed in favor of finding market efficiency). Here, 675 unique articles concerning Oak Street were published during the Class Period. Coffman Rpt., ¶35. The public also had access to information about Oak Street from numerous SEC filings and other public sources. *Id.*

The extensive analyst coverage and the substantial dissemination of news and other information regarding Oak Street evidence the robust and active market for public information about Oak Street and further supports a finding of market efficiency. *Id.*, ¶¶20, 31-35; *see also In re Nature's Sunshine Prod.'s Inc. Sec. Litig.*, 251 F.R.D. 656, 663 (D. Utah 2008) (finding that coverage by four analysts supported finding of market efficiency).

### (4)    *Cammer* Factor 3: Numerous Market Makers

Market makers are firms that are ready to buy or sell a particular stock on a regular and continuous basis. Coffman Rpt., ¶37. The existence of market makers ensures "completion of the market mechanism" by reacting "swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Cammer*, 711 F. Supp. at 1286-87. According to *Cammer*, "[t]en market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption." *Id.* at 1293. During the Class Period, there were at least 98 market makers who traded Oak Street common stock, supporting a finding of market efficiency. Coffman Rpt., ¶41.

(5)     *Cammer* **Factor 4: SEC Form S-3 Eligibility**

Companies that are "entitled to issue new securities using SEC Form S-3 would almost by definition involve stocks trading in an open and developed market." *Cammer*, 711 F. Supp. at 1276-77; *see also* Coffman Rpt., ¶¶42-43. Aside from timing requirements (due to the IPO being at the start of the Class Period), the Company met the requirements for issuing securities pursuant to a Form S-3 during the Class Period because it filed all documents in timely manner and did not fail to meet its debt obligations. *Id.*, ¶44. This factor supports a finding of efficiency. *Id.*

(6)     *Cammer* **Factor 5: The Cause-and-Effect Relationship Between Oak Street-Specific News and Oak Street's Stock Price**

The fifth *Cammer* factor examines whether a plaintiff can illustrate "over time, a cause and effect relationship between company disclosures and resulting movements in stock price." *Cammer*, 711 F. Supp. at 1291. While "[c]ourts have rejected the idea that the fifth *Cammer* factor is necessary to establish market efficiency[,]" empirical evidence of a cause-and-effect relationship between corporate news events and a company's share-price movements further supports a finding of market efficiency. *See W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2016 WL 4138613, at *12 (E.D. Pa. Aug. 4, 2016); *see also Strougo v. Barclays PLC*, 312 F.R.D. 307, 320 (S.D.N.Y. 2016) (rejecting argument that fifth *Cammer* factor was necessary to demonstrate efficiency); *Advanced Auto Parts*, 2020 WL 6544637, at *3 (same). In securities class actions, "[e]xperts use an event study to satisfy the fifth *Cammer* factor[.]" *Groupon II*, 2015 WL 1043321, at *4. An event study measures how much a security price rises or falls in response to new, company-specific information and has been considered prima facie evidence of the existence of a causal relationship. *See id.*; Coffman Rpt., ¶¶46-64.

After performing an event study and conducting statistical analysis, Plaintiffs' expert, Mr. Coffman, determined there was a cause-and-effect relationship between the disclosure of new,

Company-specific information and significant movements in Oak Street's stock price. *See* Coffman Rpt., ¶¶55-64. Mr. Coffman's event study analysis first focused on Oak Street's earnings announcements during and after the Class Period.[7] *See id.*, ¶¶48-63. Using statistical analysis, Mr. Coffman isolated the portion of Oak Street stock movements that were not attributable to market or sector factors, *i.e.*, the "abnormal return," and determined whether the abnormal return was statistically significant. *Id.*, ¶¶48-53. A statistically significant abnormal return indicates that the stock price movement was caused by new, company-specific information. *Id.*, ¶¶53, 64.

Mr. Coffman's event study shows that, for five of the ten earnings announcements tested, there was a statistically significant price reaction above the 95% confidence level. *Id.,* ¶¶57, 59.[8] Mr. Coffman the compared that result against 105 days with no Oak Street-related news, for which there were only two statistically significant stock price reactions, resulting in more than a 25 to 1 ratio of statistically significant stock price reactions to earnings announcements than to non-news days. *Id.*, ¶¶59-60. Mr. Coffman concluded that these event study results provided "powerful scientific evidence of a cause-and-effect relationship between new publicly released information concerning the Company and changes in the price of Oak Street Health Common Stock." *Id.*, ¶59;

---

[7] Mr. Coffman applied an "Analysis Period" of August 6, 2020, through February 7, 2023. Coffman Rpt., ¶25 n.24. He selected that period to capture the market day of Oak Street's IPO (*i.e.*, August 6, 2020) to the day before CVS announced it would acquire Oak Street Health (*i.e.*, February 8, 2023), which resulted in a total of 10 earnings announcements to analyze, instead of only 5 during the Class Period itself. *Id.; see also Weiner v. Tivity Health, Inc.*, 334 F.R.D. 123, 137-38 (M.D. Tenn. 2020) (finding fifth *Cammer* factor satisfied based on Mr. Coffman's event study for analysis period that was broader than class period).

[8] Of course, "the absence of a price change on a potentially material news day is not inconsistent with an inefficient market" because "if the market had anticipated the potentially material news, that news was already incorporated into the market price, and the share price would not change in response to the news." *McIntire*, 38 F. Supp. 3d at 430. For example, the Company's September 16, 2020 earnings announcement provided results and guidance that were "in-line" with analysts' expectations (*e.g.,* Ex. 7) and Mr. Coffman did not find a statistically significant stock price reaction (Coffman Rpt., Ex. 7). By contrast, the August 9, 2021 earnings announcement disclosed "negative quarter[ly] results" and "greater than expected . . . loss[,]" and the statistically significant stock price decline provided "scientific evidence that Oak Street Health Common Stock reacted rapidly to this new information." Coffman Rpt., ¶56.

*see also id.*, ¶¶60-64 (discussing additional data and concluding that event study analysis "demonstrate[s] a clear cause-and-effect relationship between new material news and changes in the market price of Oak Street Common Stock during the Analysis Period, and thus the Class Period"). As such, Plaintiffs have presented direct evidence of an efficient market. *See Dougherty v. Esperion Therapeutics, Inc.*, 2020 WL 6793326, at *4-5 (E.D. Mich. Nov. 19, 2020) (finding event study by Mr. Coffman provided "direct evidence of cause and effect" where "twenty-six percent of news days resulted in statistically significant movements, which Courts have found to be indicative of efficiency"); *McIntire,* 38 F. Supp. 3d at 433 (finding event study showing statistically significant stock price reaction to 42% of news days versus 7% of non-news days, a 6 to 1 ratio, supported market efficiency); *see also TreeHouse*, 2020 WL 919249, at *4 (holding plaintiffs, supported by expert report and event study conducted by Mr. Coffman, "satisfied the baseline test for market efficiency").

### (7)     Additional Factors Confirm Market Efficiency

In addition to the *Cammer* factors, some courts have looked to the following factors in examining market efficiency: (i) market capitalization; (ii) bid-ask spread; (iii) institutional ownership; (iv) float; and (v) autocorrelation. *See, e.g.*, *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001) (describing capitalization, bid-ask, and float factors); *Groupon II,* 2015 WL 1043321, at *9-10 (citing *Krogman* factors); *In re Teva Sec. Litig.*, 2021 WL 872156, at *9 (D. Conn. Mar. 9, 2021) (finding shares traded in efficient market after considering *Cammer* and *Krogman* factors, as well as institutional ownership and autocorrelation). Each of these factors provides additional evidence of market efficiency with respect to Oak Street stock.

**Market Capitalization**. Market capitalization "may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations." *Krogman*, 202 F.R.D. at 478; *see also* Coffman Rpt., ¶¶65-68. During the Class

- 23 -

Period, Oak Street's market capitalization averaged $12.76 billion – meaning that Oak Street had higher market capitalization than at least 85% of the firms on the combined NYSE and NASDAQ exchanges. *Id*., ¶67; Coffman Exs. 9 & 10. Oak Street's large market capitalization supports a finding of market efficiency. *Groupon II*, 2015 WL 1043321, at *10 ($800 million market capitalization "far exceed[s] the $75 million threshold" indicative of efficiency).

**Small Bid-Ask Spread**. The bid-ask spread is "the difference between the price at which investors are willing to buy the stock and the price at which current stockholders are willing to sell their shares." *Krogman*, 202 F.R.D. at 478; *see also* Coffman Rpt., ¶¶69-70. A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade." *Krogman*, 202 F.R.D. at 478. Throughout the Class Period, Oak Street's bid-ask spread ranged between 0.035% and 0.419%. Coffman Rpt., ¶70; Coffman Ex. 11. This bid-ask spread is "below the average bid-ask spread" six months after the IPO and "below the median bid-ask spread" exhibited by a random sample of 100 publicly traded stocks on the NYSE and NASDAQ in October 2020, which was the full month during the Class Period when Oak Street had its largest percentage bid-ask spread. *Id*. The narrow bid-ask spread for Oak Street stock supports a finding of market efficiency. *See, e.g.*, *Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 356 (S.D. Cal. 2015) (finding spread of more than 2.5% supported finding of market efficiency)

**Public Float and Institutional Ownership**. A stock's float is the number of shares outstanding, excluding the shared held by insiders and affiliated corporate entities. Coffman Rpt., ¶71. A large public float supports market efficiency because "the prices of stocks that have greater holdings by insiders are less likely to accurately reflect all available information about the security." *Krogman*, 202 F.R.D. at 478. During the Class Period, as much as 38% of the total outstanding stock was held by the public with about 62% of all outstanding shares of Oak Street stock being held by insiders. Institutions held 74% on average of the 38% public float. Coffman

Rpt., ¶71; Coffman Ex. 12. During the Class Period, 454 institutions reported owning Oak Street common stock. Coffman Rpt., ¶72; Coffman Ex. 12. These facts support a finding of market efficiency. *See McIntire*, 38 F. Supp. 3d at 433 (public float of 31% to 43% "consistent with a finding of market efficiency"); *Tatz*, 2003 WL 21372471, at *7 (finding market efficiency where "11% to 13% of the total outstanding common stock . . . was held by numerous large institutional investors"); *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008) (substantial percentage of institutional ownership "facilitate[s] the efficiency of the market.").

**Autocorrelation**. Significant "autocorrelation" – the degree to which previous price movements of a security can predict future price movements – could suggest market inefficiency. *See* Coffman Rpt., ¶¶73-74. Here, Mr. Coffman found no statistically significant autocorrelation. *See* Coffman Rpt., ¶¶75-76; Coffman Ex. 13; *Beaver Cnty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*, 2016 WL 4098741, at *10 (D. Minn. July 28, 2016) (noting that Mr. Coffman's finding of a lack of autocorrelation supported market efficiency).[9]

In sum, as confirmed by Mr. Coffman and application of the foregoing factors, Oak Street common stock traded in an efficient market during the Class Period. Thus, the *Basic* presumption applies, and class-wide issues of reliance will predominate over individual ones.

### c. Common Issues of Reliance Predominate Based on the *Affiliated Ute* Presumption

In addition to the *Basic* presumption, because of the "practical impossibility for a plaintiff in a non-disclosure case to demonstrate reliance[,]" class-wide reliance may be presumed under *Affiliated Ute*, where there is "an omission of material fact by one with a duty to disclose.'" *Tile Shop*, 2016 WL 4098741, at *6-8 (certifying class and applying *Affiliated Ute* presumption"). To

---

[9] In addition to all the foregoing, there was a large amount of options trading in Oak Street common stock during the Class Period, which has been shown to improve efficiency by permitting an expansion of the contingencies that are covered by the market. *See* Coffman Rpt., ¶77.

be entitled to the presumption, "all that needs to be shown is that the 'facts withheld be material in the sense that a reasonable investor might have considered them important in making [his] decision.'" *Gruber v. Gilbertson*, 2019 WL 4439415, *6 (S.D.N.Y. Sep. 17, 2019) (certifying class and applying *Affiliated Ute* presumption).

Here, Plaintiffs' claims are based primarily on the omission of material facts – that Defendants failed to disclose that the Company was paying for referrals and marketing free transportation to acquire patients, exposing the Company to substantial and undisclosed risks. *See Oak St. Health*, 2023 WL 1928119, at *6-7 (holding statements were misleading because Defendants "omitted the fact that Oak Street engaged in the two specific practices" and "omitted that Oak Street . . . . pays its agents on precisely a per-patient bas[is]").

In addition, Plaintiffs' claims arising from violations of Items 105 and 303 of Regulation S-K are based solely on the omission of that information, without any affirmative statement. *Id.* at *8 (finding violations of Regulation S-K based on omission of "practices of paying agents for referrals on a per-patient basis and offering free transportation to prospective patients[]"). Thus, since the claims are based on omitted facts, Plaintiffs are entitled to the *Affiliated Ute* presumption of class-wide reliance. *See, e.g.*, *Acadia,* 2022 WL 4598044, at *8 (applying *Affiliated Ute* because plaintiffs alleged "Defendants' failure to disclose certain information is what makes the alleged misrepresentations misleading or false").

### 3. Damages May Be Calculated on a Class-Wide Basis Using a Common Methodology

Courts have recognized that "the presence of individualized questions regarding damages does not prevent certification." *See Kleen Prods. LLC v. Int'l Paper*, 306 F.R.D. 585, 601 (N.D. Ill. 2015). Even so, damages in this case can be calculated on a class-wide basis using common methodologies.

- 26 -

First, for the Securities Act Claims, the statute provides a damages formula. *See* 15 U.S.C. §77k(e). In his report, Mr. Coffman describes the class-wide methodology for application of this statutory formula. Coffman Rpt., ¶¶84-87. Thus, damages are based on a straightforward statutory formula common to all Class members. *See In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 785 (3d Cir. 2009) ("The formulaic nature of § 11 [of the Securities Act] leaves defendants with little room to maneuver[]" in opposing class certification); *In re Facebook, Inc., IPO Sec. & Deriv. Litig.*, 312 F.R.D. 332, 350 (S.D.N.Y. 2015) (holding predominance was satisfied for Securities Act claim because the "statutory formula for damages[]" sufficiently reduced any individual questions, meaning the "predominance of the common questions, answers, and facts remains.").

Second, for the Exchange Act claim, Plaintiffs' expert will use the viable, widely accepted, and generally applied "out-of-pocket" methodology. *See Walgreen*, 2018 WL 1535156, at *3 (recognizing the out-of-pocket method is "a commonly used method which measures damages as the artificial inflation per share at the time of purchase less the artificial inflation at the time of sale[]" that is also "generally regarded as reliable"); Coffman Rpt., ¶¶78-83. To do so, valuation tools, including an event study, would be used to establish if the alleged misrepresentations and omissions caused Oak Street's stock price to be artificially inflated, and if the corrective disclosure caused the inflation to dissipate. *Id.*, ¶¶80-81. The daily artificial inflation in the price of Oak Street stock caused by the alleged misrepresentations and omissions will then be calculated on a uniform method common to all Class members. *Id.*, ¶¶80-82. Damages per share would be the difference between inflation on the share purchase date and inflation on the share sale date, with necessary adjustments for the PSLRA's 90-day lookback provision. *Id.*, ¶¶78 n.91, 82.

This methodology fits with Plaintiffs' theory of liability, supports class certification, and is used to calculate damages on a class-wide basis in virtually every securities fraud class action across the country. *Boston Ret. Sys. v. Alexion Pharms., Inc.*, 2023 WL 2932485, at *14 (D. Conn.

Apr. 13, 2023) ("The plaintiffs' damages model, the 'out-of-pocket' methodology, is a recognized measurement of damages in Section 10(b) securities cases."); William B. Rubenstein, NEWBERG & RUBENSTEIN ON CLASS ACTIONS § 22:81 (6th ed. 2023) ("[I]t is a rare—perhaps even nonexistent—securities case that raises damages issues that are so individualized as to defeat the predominance of the critical common issues in the case."). Courts in this District have previously noted that the Supreme Court's decision in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), which addressed whether the plaintiff in an antitrust case could match its theories of liability to its theories of damages, to be "inapposite in a securities fraud class action[.]" *See Groupon I*, 2014 WL 5245387, at *2. Even if the Court considers *Comcast*, however, courts have consistently found that Mr. Coffman's out-of-pocket approach satisfies *Comcast* and is appropriate at class certification. *See, e.g.*, *TreeHouse*, 2020 WL 919249, at *9 (certifying class, recognizing that Mr. Coffman's use of "an event study to determine out of pocket losses due to inflation is 'widely considered an accepted method for the evaluation of [] damages to a class of stockholders in a defendant corporation,' even in the face of confounding information[,]" and collecting cases concluding Mr. Coffman's use of the out-of-pocket method does not let individual questions predominate).[10] Thus, common issues of damages will predominate for the Securities Act and Exchange Act claims.

### 4. A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of This Controversy

Finally, Rule 23(b)(3) also requires that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Indeed,

---

[10] *See also City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 2018 WL 4931543, at *3 (N.D. Cal. Oct. 11, 2018) ("Courts regularly reaffirm that the out-of-pocket, or event study, method matches plaintiffs' theory of liability under Section 10(b) of the Securities Exchange Act, making it the standard method for calculating damages in virtually every Section 10(b) class action.").

"the superiority of the class mechanism to individual suits in securities fraud cases such as this is generally taken as a given." *TreeHouse*, 2020 WL 919249, at *8 n.7; *see also* §IV.A (citing cases finding securities class actions are well suited for class certification).

In assessing superiority, Rule 23(b)(3) requires courts to consider: (i) class members' interest in individually controlling the prosecution of separate actions; (ii) the extent and nature of any litigation concerning the claims already begun by class members; (iii) the desirability or undesirability of concentrating the litigation in the particular forum; and (iv) "the likely difficulties in managing the class action." Fed. R. Civ. P. 23(b)(3)(A)-(D). Each of these factors is satisfied.

First, "[a]s with many securities law cases, this case involves a large number of investors who are likely to be geographically dispersed. Many of these investors are also likely to have relatively small claims making it expensive to seek recovery through individual litigation." *Neopharm*, 225 F.R.D. at 568. Second, Plaintiffs are unaware of any other litigation concerning the same claims commenced by Class members. Third, it is without question that the parties and the Court have an interest in this litigation proceeding in a single forum to prevent inconsistent rulings and promote judicial economy. *See Roth*, 238 F.R.D. at 608 ("'Judicial economy and efficiency' will be promoted by certifying this class, and resolving these matters in one suit."). And fourth, Plaintiffs do not foresee any management difficulties that will preclude this action from being maintained as a class action. Lead Counsel has handled numerous similar actions, and the appropriate procedures and techniques for the management of such suits are well-established.

In addition to meeting all the foregoing requirements of Rule 23, the proposed Class also meets the "implicit requirement of 'ascertainbility'" because it is "defined clearly and based on objective criteria." *TreeHouse*, 2020 WL 919249, at *2, *8 n.7. Specifically, the proposed Class, defined above, is confined to a specific time period (Class Period), security (Oak Street common stock), and group (purchasers or acquirers of common stock), making the Class readily

ascertainable. *See id.* (certifying class and finding ascertainability met because class was defined with "boundaries set both temporally and as to an identified type of security").

## VI. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that their motion be granted in its entirety and that the Court enter an Order: (1) certifying this case as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3); (2) appointing Plaintiffs as Class Representatives; and (3) approving Robbins Geller and Labaton as Class Counsel pursuant to Federal Rule of Civil Procedure 23(g).

Dated: December 15, 2023

Respectfully Submitted,

**ROBBINS GELLER RUDMAN
  & DOWD LLP**
JAMES E. BARZ (IL Bar # 6255605)
FRANK A. RICHTER (IL Bar # 6310011)
CAMERAN M. GILLIAM (IL Bar # 6332723)

*/s/ Frank A. Richter*
FRANK A. RICHTER

200 South Wacker Drive, 31st Floor
Chicago, IL 60606
Telephone: 630/696-4107
jbarz@rgrdlaw.com
frichter@rgrdlaw.com
cgilliam@rgrdlaw.com

*Counsel for Lead Plaintiffs Central Pennsylvania
Teamsters Pension Fund – Defined Benefit Plan
and Central Pennsylvania Teamsters Pension
Fund – Retirement Income Plan 1987, and Lead
Counsel for the Class*

**LABATON SUCHAROW LLP**
CAROL C. VILLEGAS (*pro hac vice*)
CHRISTINE M. FOX (*pro hac vice*)
JAMES M. FEE (*pro hac vice*)

*/s/ Christine M. Fox*
CHRISTINE M. FOX

140 Broadway
New York, NY 10005
Telephone:  212/907-0700
212/818-0477 (fax)
cvillegas@labaton.com
cfox@labaton.com
jfee@labaton.com

*Counsel for Lead Plaintiff Boston Retirement
System and Counsel for Named Plaintiff City of
Dearborn Police & Fire Revised Retirement
System, and Lead Counsel for the Class*

- 31 -

- 32 -

**LAW OFFICE OF RACINE &**
  **ASSOCIATES**
MARIE T. RACINE
1001 Woodward Avenue
Suite 1100
Detroit, MI 48226
Telephone: 313/961-8930
313/961-8945 (fax)
mracine@racinelaw.us

*Additional Counsel for Dearborn Police & Fire*
*Revised Retirement System*

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on December 15, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will automatically send notification of such filing to all counsel of record.

*/s/ Christine M. Fox*
CHRISTINE M. FOX

# Mailing Information for a Case 1:22-cv-00149 Allison v. Oak Street Health, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **James E Barz**
  jbarz@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Alison Rebecca Benedon**
  abenedon@paulweiss.com,docketing@jenner.com

- **Jake E. Bissell-Linsk**
  JBissell-Linsk@labaton.com,ndonlon@labaton.com,1106607420@filings.docketbird.com,lpina@labaton.com,electroniccasefiling@labaton.com

- **Guillaume Buell**
  gbuell@labaton.com,lpina@labaton.com,5797651420@filings.docketbird.com,electroniccasefiling@labaton.com

- **Andrew Ehrlich**
  aehrlich@paulweiss.com,mao_fednational@paulweiss.com

- **James M. Fee**
  JFee@labaton.com,lpina@labaton.com,7935099420@filings.docketbird.com,electroniccasefiling@labaton.com

- **Christine Marie Fox**
  cfox@labaton.com,ndonlon@labaton.com,vvibar@labaton.com,lpina@labaton.com,kjudd@labaton.com,6312349420@filings.docketbird.com,electroniccasefiling@la

- **Jonathan Gardner**
  jgardner@labaton.com,lpina@labaton.com,4027988420@filings.docketbird.com,fmalonzo@labaton.com,acarpio@labaton.com,electroniccasefiling@labaton.com

- **Carol V Gilden**
  cgilden@cohenmilstein.com,lhoeksema@cohenmilstein.com,enotices@cohenmilstein.com

- **Cameran Gilliam**
  cgilliam@rgrdlaw.com

- **Jarrett Heaton Gross**
  jarrett.gross@sidley.com,jarrett--gross-5012@ecf.pacerpro.com,efilingnotice@sidley.com

- **Rebecca Rejeanne Kaiser**
  rkfournier@henderson-parks.com

- **Marcella Louise Lape**
  marcella.lape@skadden.com,marcie-lape-8076@ecf.pacerpro.com,chdocket@skadden.com

- **Clare Lilek**
  Clare.Lilek@Skadden.com,clare-lilek-7840@ecf.pacerpro.com,chdocket@skadden.com

- **Lisa Michelle Mazzone**
  lmazzone@sgrlaw.com

- **Francis P. Mcconville**
  fmcconville@labaton.com,lpina@labaton.com,drogers@labaton.com,9849246420@filings.docketbird.com,electroniccasefiling@labaton.com

- **Marvin Alan Miller**
  Mmiller@millerlawllc.com,ajewell@millerlawllc.com,LFanning@millerlawllc.com,drobinson@millerlawlllc.com,JRamirez@millerlawllc.com

- **Scott D. Musoff**
  scott.musoff@skadden.com,scott-musoff-8208@ecf.pacerpro.com

- **Danielle S. Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Brian William O'Connor**
  brian.oconnor@skadden.com,chdocket@skadden.com,brian-oconnor-1952@ecf.pacerpro.com

- **Frank Anthony Richter**
  frichter@rgrdlaw.com,tperius@rgrdlaw.com,E_File_SD@rgrdlaw.com,bengfelt@rgrdlaw.com

- **Peter A. Silverman**
  psilverman@sgrlaw.com

- **John M Skakun , III**
  jskakun@sidley.com,efilingnotice@sidley.com,john-skakun-5349@ecf.pacerpro.com

- **Bonnie K. St. Charles**
  bstcharles@sidley.com

- **Carol C. Villegas**
  cvillegas@labaton.com,ndonlon@labaton.com,vvibar@labaton.com,5739893420@filings.docketbird.com,lpina@labaton.com,kjudd@labaton.com,agreenbaum@labat

- **Staci Yablon**
  syablon@paulweiss.com,mao_fednational@paulweiss.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

`City of Dearborn Police & Fire Revised Retirement System`
`,`