# Exhibit 30

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| REGINALD T. ALLISON, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:22-cv-00149 |
| Plaintiff, | <u>CLASS ACTION</u> |
| vs. | Judge Jeffrey I. Cummings |
| OAK STREET HEALTH, INC., et al., | |
| Defendants. | |

**EXPERT REPORT OF JACK R. WIENER**

**TABLE OF CONTENTS**

I.  Introduction & Assignment ..................................................................................... 1

II.  Qualifications ......................................................................................................... 5

III.  History and Background of DTC ............................................................................ 8

IV.  DTC's Intermediated System of Securities Holding ........................................... 12

    A.  Overview of the DTC System ................................................................... 13

    B.  The Nature of DTC's Fungible Bulk of Securities .................................... 20

    C.  Tracing Shares in the DTC System ........................................................... 24

V.  The Oak Street IPO and Secondary Public Offerings ......................................... 26

    A.  The IPO ...................................................................................................... 26

    B.  The December 2020 Offering .................................................................... 27

    C.  The February 2021 Lock-Up Expiration .................................................... 28

    D.  February and May 2021 Offerings ............................................................ 28

VI.  I Am Not Aware of Any Way for Oak Street Shareholders to Trace Their Shares to Any Registration Statement After Shares Issued in the December 2020 Offering Were Delivered to DTC. ...................................................................... 29

VII.  It Remained Impossible for Oak Street Shareholders to Trace Their Shares to Any Registration Statement After Each Additional SPO and Expiration of the Lock-Up Period. ..................................................................................................... 31

VIII.  Dearborn Cannot Trace Shares of Oak Street Stock It Acquired On or After December 7, 2020 to a Registration Statement. ................................................... 32

IX.  CPAT and BRS Cannot Trace Their Shares of Oak Street Stock to Any Registration Statement. ........................................................................................ 35

## I.  Introduction & Assignment

1.  I have been retained as an expert witness by counsel to Oak Street Health, Inc. ("Oak Street"), Michael Pykosz, Timothy Cook (together, the "Oak Street Defendants"); Geoff Price, Griffin Myers (together, the "Individual Officer Defendants"); Regina Benjamin, Carl Daley, Cheryl Dorsey, Mohit Kaushal, Kim Keck, Julie Klapstein, Paul Kusserow, Robbert Vorhoff, Srdjan Vukovic (together, the "Independent Director Defendants"); General Atlantic LLC, General Atlantic (OSH) Interholdco, L.P., Newlight Partners, LP, Newlight Harbour Point SPV (together, the "Sponsor Defendants"); J.P. Morgan Securities, Inc., Goldman Sachs & Co. LLC, Morgan Stanley & Co. LLC, William Blair & Company, LLC, and Piper Sandler Companies (together, the "Underwriter Defendants," and collectively with all other defendants, "Defendants"), in connection with the above-captioned matter.

2.  Oak Street issued shares of common stock ("Oak Street Common Shares") in an Initial Public Offering on August 6, 2020 (the "IPO") and secondary public offerings on December 2, 2020 (the "December 2020 Offering"); February 10, 2021 (the "February 2021 Offering"); and May 26, 2021 (the "May 2021 Offering," and, collectively with the IPO, the December 2020 Offering, and the February 2021 Offering, the "Offerings"). Before the IPO, Oak Street had approximately 223 million Oak Street Common Shares issued and outstanding, none of which had been registered under the Securities Act of 1933 (the "Securities Act").

3.  In connection with the IPO, 17,968,750 Oak Street Common Shares were registered under the Securities Act pursuant to offering materials that included a registration statement and prospectus filed with the SEC (the "IPO Registration Statement"). In connection with the December 2020 Offering, 6,477,293 additional Oak Street Common Shares were registered under the Securities Act pursuant to offering materials that included a registration statement and prospectus filed with the SEC (the "December 2020 Registration Statement"). In connection with

the February 2021 Offering, 12,332,394 additional Oak Steet Common Shares were registered under the Securities Act pursuant to offering materials that included a registration statement and prospectus filed with the SEC (the "February 2021 Registration Statement"). Finally, in connection with the May 2021 Offering, 12,052,258 additional Oak Street Common Shares were registered under the Securities Act pursuant to offering materials that included a registration statement and prospectus filed with the SEC (the "May 2021 Registration Statement," and, collectively with the IPO Registration Statement, the December 2020 Registration Statement, the February 2021 Registration Statement, and the May 2021 Registration Statement, the "Registration Statements").[1]

4.      I understand that named plaintiff City of Dearborn Police & Fire Revised Retirement System ("Dearborn"), along with Lead Plaintiffs Central Pennsylvania Teamsters Pension Fund – Defined Benefit Plan, Central Pennsylvania Teamsters Pension Fund – Retirement Income Plan 1987 (together, "CPAT"), and Boston Retirement System ("BRS," and together with Dearborn and CPAT, "Plaintiffs") challenge certain statements made in the Registration Statements under Sections 11 and 15 of the Securities Act.[2]  I also understand that Plaintiffs have moved to certify a class of plaintiffs in this action, and that they did not submit an expert report providing evidence that any Oak Street Common Shares acquired by Dearborn, CPAT, BRS, or any putative class members are in fact traceable following Oak Street's SPOs.

5.      Defendants' counsel have asked me to assess two things.

---

[1] Oak Street's Form 424B4 (August 7, 2020) relating to the Oak Street's Registration Statement on Form S-1/A, as amended (August 5, 2020), and Oak Street's Form 8-K (Aug. 11, 2020); Oak Street's Form 424B4 (Dec. 4, 2020), which incorporated by reference Form S-1 (Nov. 30, 2020), and Oak Street's Form S-1MEF (December 2, 2020); Oak Street's  Form 424B4 (Feb. 12, 2021), which incorporated by reference Form S-1 (Feb. 8, 2021), and Oak Street's Form S-1MEF (Feb. 10, 2021); and Oak Street's Form 424B4 (May 28, 2021), which incorporated by reference Form S-1 (May 24, 2021), and Oak Street's Form S-1MEF (May 26, 2021).

[2] *Reginald T. Allison v. Oak Street Health, Inc., et. al.*, No. 1:22-cv-00149 (N.D. Ill.), Lead Plaintiffs' Complaint, ECF No. 40 ("Amended Complaint"), ¶¶ 212–90, 269. Plaintiffs' Section 11 claims are asserted against the Oak Street Defendants, the Individual Officer Defendants, the Independent Director Defendants, and the Underwriter Defendants. Plaintiffs' Section 15 claims are asserted against the Individual Officer Defendants and the Sponsor Defendants.

- ***First***, I assess the impact on traceability of multiple offerings of Oak Street Common Shares pursuant to different Registration Statements, which are ultimately held at The Depository Trust Company ("DTC"). Specifically, I assess whether it is possible for holders of Oak Street Common Shares, including each Plaintiff, to trace their shares to a particular Registration Statement after multiple offerings of Oak Street Common Shares pursuant to different Registration Statements, when such Oak Street Common Shares were held at DTC or its sub-custodian in the street name of DTC, and were represented by the same CUSIP number.

- ***Second***, I assess the impact on traceability of unregistered Oak Street Common Shares, *i.e.*, shares that were never registered pursuant to any Registration Statement, being held by DTC along with registered Oak Street Common Shares. Specifically, I assess whether it is possible for holders of Oak Street Common Shares, and each Plaintiff in particular, to trace their Oak Street Common Shares to any Registration Statement after unregistered Oak Street Common Shares were commingled with registered Oak Street Common Shares on February 2, 2021. At this point, Oak Street Common Shares were held at DTC or its sub-custodian in the street name of DTC, and were represented by the same CUSIP number.

6. Throughout this report, as instructed by counsel, when I use the terms "trace," "tracing," or "traceability," I am referring to a shareholder's ability to show that specific shares it acquired were issued pursuant to a particular Registration Statement. A shareholder that can show as much can "trace" its shares. My opinion takes into account that Oak Street Common Shares registered in connection with the IPO were deposited with DTC. This process was repeated for the Oak Street Common Shares sold in the December 2020 Offering, the February 2021 Offering, and the May 2021 Offering.[3] On February 2, 2021, unregistered Oak Street Common Shares that were previously deposited with DTC could be traded on the New York Stock Exchange ("NYSE") for the first time.

---

[3] Declaration of Kimberlee Koskiewicz of the American Stock Transfer & Trust Company, LLC ("AST Declaration" or "AST Decl."); AST Shareholder List Dated February 1, 2021 (showing ███████████████████████ ███████████████████████████████████. The AST Declaration reflects the delivery of only 4,902,941 shares to DTC in the February 2021 Offering and the delivery of only 4,791,569 shares to DTC in the May 2021 Offering. The shares that were registered and issued in the February 2021 and May 2021 Offerings belonged to the Sponsor Defendants. *See* Oak Street's Form 424B4 (February 12, 2021) at 156; Oak Street's Form 424B4 (May 28, 2021) at 24. ████████████████████████████████████

████████████████████████████████████████████

██████ *See* JPMC-00177571; JPMC-00185434.

7.    In brief, my opinions are:

- ***First***, I am not aware of any way that an investor who purchased Oak Street Common Shares—held at DTC—could trace those Oak Street Common Shares to any particular Registration Statement, after multiple offerings. On each of August 6, 2020, December 2, 2020, February 10, 2021, and May 26, 2021, Oak Street Common Shares registered pursuant to different Registration Statements entered the market. All Oak Street Common Shares from each of those offerings were held by DTC in a fungible bulk, bore the same CUSIP number, and were all registered in the street name of Cede & Co., DTC's partnership nominee. Practically speaking, this means that after the Oak Street Common Shares issued in the December 2020 Offering were delivered to DTC, there was no way to distinguish between Oak Street Common Shares issued pursuant to the December 2020 Registration Statement and Oak Street Common Shares issued pursuant to the August 2020 IPO Registration Statement, as they were commingled and held in fungible bulk and indistinguishable from one another.

- ***Second***, I am not aware of any way that an investor who purchased Oak Street Common Shares, held at DTC, can trace his shares to any particular Registration Statement after Oak Street Common Shares became freely tradeable after Oak Street's lock-up period ended on February 2, 2021. On this date, both registered and unregistered Oak Street Common Shares were held by DTC in a fungible bulk, bearing the same CUSIP number and registered in the name of Cede & Co. This commingling of registered and unregistered shares means that from at least as early as February 2, 2021, there was no way for a shareholder to trace any share held at DTC to any Registration Statement.

8.    I have prepared my report to state my expert opinions, to describe the bases for those opinions, to disclose the facts and data on which I relied in reaching my opinions, and to make all other appropriate disclosures. I do not express any legal opinions in this report.  In particular, when I discuss "traceability," and apply the meaning as described in paragraph 6 above, I am conducting my analysis as a factual and practical matter based on my experience in securities markets, and am not offering any legal conclusions. The work that I conducted in this matter has been informed by my education, knowledge, and experience in securities clearance, settlement, custody, and servicing. The information in this report is based upon discovery to date in this action and the information that is currently available to me. In forming my opinions and preparing this report, I have considered the sources of information set forth in **Appendix 1**. In particular, I have

4

reviewed, among other things: (1) documents regarding Plaintiffs' purchases of Oak Street Common Shares, including the declarations attached to the operative complaint and motions and documents produced in this action; (2) the Registration Statements and Oak Street's other SEC filings associated with the Offerings; (3) communications relevant to the Offerings among Oak Street, the Underwriter Defendants (the underwriters of the IPO and SPOs), and AST (the transfer agent/registrar); and (4) transcripts of depositions of Dearborn, CPAT, BRS, Peregrine Capital Management, and Westfield Capital Management representatives.

9. I will review, evaluate, and analyze additional facts, data, and information as they become available. I reserve the right to amend or supplement my opinions based upon further information learned, produced, or relied upon, or in response to opinions raised in any reports, declarations, or depositions of any other expert put forward in this matter. Therefore, my analyses and opinions described herein are subject to change based upon future discovery or other developments.

10. My billing rate is $1,400 per hour. My compensation in this matter is not contingent on any opinion that I reach or the outcome of this litigation.

## II. Qualifications

11. My curriculum vitae, attached as **Appendix 2** to this report, describes my professional qualifications beyond the description set forth below.

12. I graduated from Brooklyn College *summa cum laude* (B.A., Phi Beta Kappa) in 1979. I subsequently graduated from the University of Pennsylvania Law School, where I was an editor of the *University of Pennsylvania Law Review*, with a J.D. in 1982. From 1982 to 1989, I practiced as a corporate and securities lawyer at Pepper, Hamilton & Scheetz, Willkie Farr & Gallagher, and Webster & Sheffield.

13. From 1989 to 2005, I was an officer of and attorney for The Depository Trust & Clearing Corporation ("DTCC") as well as DTC, which is a wholly owned subsidiary of DTCC and the world's largest custodian of securities. I held a number of positions at DTCC and DTC until I became Managing Director and Deputy General Counsel of both companies in 2001. At DTCC and DTC, I was largely responsible for supporting the companies' activities in the areas of securities clearance and settlement, custody, and servicing, as well as regulatory oversight.

14. Those 17 years at DTCC and DTC constitute a significant portion of my four decades of professional experience, which has largely focused on securities clearance and settlement, custody, and servicing, primarily as they relate to DTC's system. While my time at DTC does not cover the period under review in this action, the fundamentals of how DTC operates have not changed in any material way with respect to the matters on which I am opining. I remain current on how DTC operates through my ongoing conversations with DTC staff, my review of DTC rules, rule filings, and notices, as well as SEC orders related to DTC, coverage of DTC in the press, and my participation in litigation matters in which a DTC employee has testified or provided a written declaration.

15. From 2007 to 2008, I was a Managing Director of the Securities Industry and Financial Markets Association ("SIFMA"), the largest securities industry lobbying organization in the United States. In that role, I represented the 650 largest brokers, banks, and asset managers before the SEC, the Financial Industry Regulatory Authority ("FINRA"), and the Federal Reserve Bank. One of my duties was representing broker-dealer and bank members on matters relating to custody, clearance and settlement, and servicing of securities, especially with regard to DTC's clearance and settlement system.

16.     Since 2009, I have been a U.S. State Department-appointed delegate negotiating securities law treaties for the United States. I have negotiated two multilateral, 40-nation treaties on the law of the custody, transfer, and pledging of securities.

17.     Also since 2009, I have been the Chief Executive Officer of Financial Services Consulting. In that capacity, I have advised clients with regard to clearance and settlement, custody, transactions, regulation, compliance, and litigation in the areas of securities, derivatives, banking, and broker-dealer law and operations, and white-collar defense. I have advised banks, investment banks, broker-dealers, hedge funds, clearing firms, investment advisors, issuers, and regulators from the United States, Canada, France, Germany, the United Kingdom, Ireland, Sweden, Israel, China, and the Cayman Islands in securities structuring, operations, and litigation matters relating to DTC's clearance and settlement system. I have also advised the Israeli Ministry of Finance on restructuring its bond offerings in the United States in a manner that would most efficiently leverage DTC's clearance and settlement system. I have been retained by both plaintiffs and defendants in litigation matters.

18.     I have also served as an expert witness on DTC operations, practices, and processes, including on the clearance, settlement, and custody of securities through DTC, for: (a) the U.S. Attorney's Office, Southern District of New York, for which I also served as an expert on international securities law; (b) for a Swedish hedge fund, with regard to litigation in Sweden; (c) two European banks, in litigation regarding the loss through fraud of $1.8 billion in asset-backed commercial paper; (d) a British bank, with regard to multi-billion dollar litigation matters in both Ireland and in the Cayman Islands related to the Madoff Ponzi scheme; (e) a U.S. clearing firm, regarding attempted manipulation of DTC's processes; (f) a French custodian bank, regarding the theft by means of fraud of $400 million in securities that were subsequently transferred through

7

DTC's settlement system; and (g) various issuers and underwriters, regarding the ability to trace shares of a security held at or for DTC in the street name of DTC to a particular registration statement when multiple issuances of the same security bearing the same CUSIP number, issued under different registration statements are deposited at DTC.

19.     I have taught as an adjunct Professor of Law at Brooklyn Law School since 2012, focusing on, among other things, the law of the sale, clearance and settlement, servicing, and custody of securities, especially through DTC.

20.     The list of all cases in which I have testified as an expert, at trial, at an arbitration hearing, or by deposition during the past four years is attached to this report as **Appendix 3**.

## III.     History and Background of DTC

21.     DTC was established in 1973 to provide securities clearance, settlement, and custody services to buyers and sellers in an efficient, cost-effective, and streamlined manner.[4] Headquartered in New York City, DTC is the world's largest custodian and securities depository, serving as a custodian for more than 3.5 million uniquely-issued securities.[5] The Oak Street Common Shares in this action constitute just one of those 3.5 million issues. In 2022, DTC was the custodian of and provided asset servicing for $72 trillion in securities from more than 150 countries and territories, and DTC handled $2.5 quadrillion in securities transactions.[6] As of

---

[4] *See* DTCC, *The Depository Trust Company (DTC)*, https://www.dtcc.com/about/businesses-and-subsidiaries/dtc (last visited Jan. 29, 2024).

[5] *See* VIRGINIA B. MORRIS & STUART Z. GOLDSTEIN, LIFE CYCLE OF A SECURITY, i (2010), https://books.google.com/books?id=Hv8ipHbVoGUC&printsec=frontcover&source=gbs_ge_summary_r&cad=0 #v=onepage&q&f=false (last visited Jan. 29, 2024) (referring to DTC as "the world's largest central securities depository"); NASDAQ, *The Depository Trust Company*, https://www nasdaq.com/glossary/d/depository-trust-company (last visited Jan. 29, 2024) (defining DTC as "the world's largest central securities depository."); DTCC, *Blanket Issuer Letter of Representations Template*, https://www.dtcc.com/-/media/Files/Downloads/legal/issue-eligibility/eligibility/BLOR-Template.pdf (last visited Jan. 29, 2024).

[6] Press Release, DTCC, *DTCC Comments on SEC Ruling around Expanded US Treasury Clearing* (Dec. 14, 2023), https://www.dtcc.com/news/2023/december/14/dtcc-comments-on-sec-ruling-around-expanded-us-treasury- clearing (last visited Jan. 29, 2024) ("In 2022, DTCC's subsidiaries processed securities transactions valued at U.S. $2.5

December 29, 2023, DTC had 236 Participants,[7] which in turn acted both for themselves and for their customers.

22. Some Participants have more than 60 million customers.[8] As discussed below, Oak Street Common Shares were held by DTC, on behalf of DTC Participants, which in turn held shares ultimately on behalf of the Plaintiffs and others. For a sense of the scale of the industry, while only 236 institutions are DTC Participants, there are approximately 3,400 broker-dealer firms registered with FINRA, and 32,021 investment advisor firms overseen by the SEC or state regulators.[9] Many broker-dealers in turn act on behalf of independent investment advisors to clear trades. For example, Fidelity Institutional (a division of Fidelity Investments) provides such services to approximately 13,500 institutional clients, which in turn service 8.1 million end investor (beneficial owner) accounts.[10] Most large U.S. broker-dealers and banks are DTC

---

quadrillion and its depository subsidiary provided custody and asset servicing for securities issues from over 150 countries and territories valued at U.S. $72 trillion.").

[7] A DTC "Participant" is an entity that DTC has admitted to be a member of the depository and to maintain a securities account at DTC. DTC Participants include banks, broker-dealers, and other firms that act as underwriters of new issues, as well as other types of financial service institutions. *See* DTCC, *FAQ: How Issuers Work with DTC*, https://www.dtcc.com/settlement-and-asset-services/issuer-services/how-issuers-work-with-dtc (last visited Jan. 29, 2024). Applicants need to be approved to become a DTC Participant pursuant to DTC's bylaws. *See* DTCC, *Rules, By-Laws and Organization Certificate of The Depository Trust Company* (Aug. 2023), at 11, 21– 26, https://www.dtcc.com/~/media/Files/Downloads/legal/rules/dtc_rules.pdf (last visited Jan. 29, 2024). DTC sometimes refers to Participants as DTC's "Direct Participants," "customers," "clients," and "members." To avoid confusion, I refer to them in this report simply as Participants in order to draw a clear distinction between a DTC account holder (*i.e.*, a Participant) and any person who holds interests in securities indirectly through a Participant, such as the Participant's customers. For a list of DTC Participants, *see* DTCC, *DTC Member Directories* (updated Dec. 29, 2023), http://www.dtcc.com/client-center/dtc-directories (last visited Jan. 29, 2024). As of December 29, 2023, there were 863 DTC Participant accounts listed in DTC's member directory, but some entities have multiple DTC Participant accounts. Morgan Stanley, for example, has five DTC Participant accounts (account numbers 0050, 0101, 1821, 5127, and 5224). My above tally of 236 Participants counts Morgan Stanley as only one Participant, even though it has five Participant accounts, and does the same for other entities with multiple Participant accounts.

[8] One Participant, J.P. Morgan Chase, served more than 60 million households in 2022. *See* Rohan Amin, *Chase's 2022 Digital Banking Trends*, J.P. MORGAN CHASE, https://www.jpmorgan.com/technology/news/chase-2022-digital- banking-trends (last visited Jan. 29, 2024).

[9] *See* FINRA, *2023 FINRA Industry Snapshot* (Aug. 23, 2023), at 15, https://www.finra.org/sites/default/files/2023-04/2023-industry-snapshot.pdf (last visited Jan. 29, 2024).

[10] *See* Fidelity Investments, *About Fidelity Institutional* https://clearingcustody fidelity.com/app/item/RD_13569_42626/about.html (last visited Jan. 29, 2024). *See also* Fidelity Investments, *Q3 2022 Business Update*, https://www fidelity.com/bin-public/060_www_fidelity_com/documents/about-fidelity/Q3-2022_BusinessUpdates.pdf (last

Participants, meaning that they deposit and hold securities at DTC.[11] That system was created to provide an efficient means of clearing and settling securities transactions.

23.     Since the 1700s, the most common way in which an interest in securities such as shares of stock of a company were transferred in the United States was by transferring a paper securities certificate representing a beneficial interest in the stock.[12] The certificate was evidence that the owner's name, as reflected on the certificate, was listed on the company's records (or the records of the company's registrar and transfer agent) as a security holder, holding rights represented by the certificate.[13]

24.     A sharp increase in the volume of securities traded in the late 1960s and early 1970s prompted the creation of DTC.[14] Daily trade volumes on the New York Stock Exchange ("NYSE") averaged around 3 million shares in 1960. Daily trade volumes increased significantly over the next decade. For example, on February 9, 1971, a new record was set when more than 28 million shares were traded on a single day.[15] Each purchase and sale required the cancellation, creation,

---

visited Jan. 29, 2024). Throughout this report, I use the term "beneficial owner" to refer to an individual or entity that has the ultimate ownership interest in shares of a company's stock. Beneficial owners may be shareholders and/or investors.

[11] *See, e.g.*, SEC, *DTC Chills and Freezes* (May 1, 2012), https://www.sec.gov/oiea/investor-alerts- bulletins/ib _dtcfreezes html (last visited Jan. 29, 2024); DTCC, *FAQS: How Issuers Work with DTC*, https://www.dtcc.com/settlement-and-asset-services/issuer-services/how-issuers-work-with-dtc (last visited Jan. 29, 2024) ("DTC holds eligible securities on behalf of Participants[.]").

[12] SEC, *Transfer Agent Regulations*, 17 C.F.R. Part 240, Release No. 34-76743, File No. S7-27-15, at 11–13 (Dec. 22, 2015), https://www.sec.gov/rules/concept/2015/34-76743.pdf (last visited Jan. 29, 2024).

[13] *See id.*

[14] *See* DTC, *1997 Annual Report* 5 (1997), https://www.sechistorical.org/collection/papers/1990/1997_0101 _DTCAR.pdf (last visited Jan. 29, 2024); *see also* Press Release, DTCC, *DTCC Celebrates 40 Years of Service* (June 3, 2013), https://web.archive.org/web/20210507040651/https://www.dtcc.com/news/2013/june/03/dtcc-celebrates- 40- years-of-service (last visited Jan. 29, 2024).

[15] *See* DTC, *1997 Annual Report* 5 (1997), https://www.sechistorical.org/collection/papers/1990/1997_ 0101_DTCAR.pdf (last visited Jan. 29, 2024); New York Stock Exchange, Inc., *Crisis in the Securities Industry, A Chronology: 1967–1970*, at 31, 50, (Aug. 2, 1971), http://3197d6d14b5f19f2f440- 5e13d29c4c016cf96cbbfd197c579b45 r81.cf1rackcdn.com/collection/papers/1970/1971_0730_NYSECrisis.pdf (last visited Jan. 29, 2024) ("A new record for a single day's trading was set on February 2, [1971,] when more than 22 million shares changed hands. That record fell on February 8, when volume soared to 25.6 million shares which, in turn, was eclipsed the next day by volume of more than 28 million shares."); Larry E. Bergmann, *Speech by SEC Staff:*

10

signing, and handling of engraved stock certificates and, typically, more than 30 associated paper forms (including a transmittal letter, receipt, transfer instructions, power of attorney or stock power, guarantee, and transfer journal).[16] Those documents were generally carried by messengers from the seller to the seller's broker, to the company's transfer agent/registrar, and from the company's transfer agent/registrar, to the buyer's broker, and eventually to the buyer.[17] It was a cumbersome and time-consuming process.

25.    The increase in the volume of securities trading caused  the "paperwork crisis."[18] Banks, broker-dealers, transfer agents, and their messengers were unable to, in a timely manner, move and manually process the stock certificates and paper forms necessary to effect changes in ownership from seller to buyer. Stock certificates and associated documents "were piled 'halfway to the ceiling' in some offices."[19] Between 1968 and 1970, approximately 100 financial firms went

---

*International Securities Settlement Conference — "The U.S. View of the Role of Regulation in Market Efficiency"*, SEC (Feb. 10, 2004), https://www.sec.gov/news/speech/spch021004leb.htm; (Feb. 10, 2004), https://www.sec.gov/news/speech/spch021004leb htm (last visited Jan. 29, 2024); Terry Robards, *Stocks: Dam Is Holding*, N.Y. TIMES (Feb. 14, 1971), https://www nytimes.com/1971/02/14/archives/stocks-dam-is-holding-this-time-so-far-trading-flood-is-controlled html (last visited Jan. 29, 2024) ("For several weeks now, volume has been averaging over 20 million shares a day."). To put this in historical perspective and to explain how the old, pre-1970s method of securities clearance and settlement could not have handled the dramatic increases in trading that were to come, on October 11, 2008, *The Wall Street Journal* reported that the total trading volume of stocks listed on the NYSE hit a record of 11.16 billion shares—398 times 1971's highest daily trading volume of 28 million shares. *See* E.S. Browning, et al., *Wild Day Caps Worst Week Ever for Stocks*, WALL STREET J. (Oct. 11, 2008), https://www.wsj.com/articles/SB122368071064524779 (last visited Jan. 29, 2024).

[16] *See* SEC, Transfer Agent Regulations, 17 C.F.R. Part 240 Release No. 34-76743, File No. S7-27-15, at 13–17 (Dec. 22, 2015), https://www.sec.gov/rules/concept/2015/34-76743.pdf; (last visited Jan. 29, 2024); Larry E. Bergmann, *Speech by SEC Staff: International Securities Settlement Conference — "The U.S. View of the Role of Regulation in Market Efficiency"*, SEC (Feb. 10, 2004), https://www.sec.gov/news/speech/spch021004leb htm (last visited Jan. 29, 2024).

[17] SEC, *Transfer Agent Regulations*, Release No. 34-76743, File No. S7-27-15, at 13–17 (Dec. 22, 2015), https://www.sec.gov/rules/concept/2015/34-76743.pdf (last visited Jan. 29, 2024); Larry E. Bergmann, *Speech by SEC Staff: International Securities Settlement Conference — "The U.S. View of the Role of Regulation in Market Efficiency"*, SEC (Feb. 10, 2004), https://www.sec.gov/news/speech/spch021004leb htm (last visited Jan. 29, 2024).

[18] Larry E. Bergmann, *Speech by SEC Staff: International Securities Settlement Conference — "The U.S. View of the Role of Regulation in Market Efficiency"*, SEC (Feb. 10, 2004), https://www.sec.gov/news/speech/spch021004leb.htm (last visited Jan. 29, 2024)..

[19] Suellen M. Wolfe, Escheat and the Challenge of Apportionment: A Bright Line Test to Slice a Shadow, 27 ARIZ. ST. L.J. 173, 181 n.49 (1995) (citation omitted).

out of business because they were not able to keep up with their paperwork, and thus failed to settle many of their trades.[20] The crisis compelled the NYSE to shorten its trading hours, and even to close completely on some days, so that the paper could be processed and the clearance and settlement of securities could catch up with the trading volume.[21]

26.     In response to this crisis, and in an effort to increase the speed, safety, and accuracy of the clearance and settlement of securities, the U.S. government and the banking and securities industries launched an initiative to reduce reliance on paper certificates to settle securities transactions. They created a new system of clearance and settlement.[22]

## IV.     DTC'S INTERMEDIATED SYSTEM OF SECURITIES HOLDING

27.     DTC was created to address this paperwork crisis. Rather than physically move paper securities certificates from seller to buyer, as had historically been done, certificates were immobilized at DTC in an intermediated system of securities holding (also known as the "indirect holding system").[23] Today, as has been the case for a number of years, DTC holds the vast majority

---

[20] DTC, 1997 Annual Report 5 (1997), https://www.sechistorical.org/collection/papers/1990/1997_0101_DTCAR.pdf (last visited Jan. 29, 2024); SEC, *Study of Unsafe and Unsound Practices of Brokers and Dealers*, H.R. Doc. No. 92-231 at 28 (Dec. 1971), http://3197d6d14b5f19f2f440- 5e13d29c4c016cf96cbbfd197c579b45r81.cf1 rackcdn.com/collection/papers/1970/1971_1201_SECUnsafe_01. pdf (last visited Jan. 29, 2024).

[21] SEC, *Study of Unsafe and Unsound Practices of Brokers and Dealers*, H.R. Doc. No. 92-231 at 28 (Dec. 1971) http://3197d6d14b5f19f2f440-5e13d29c4c016cf96cbbfd197c579b45r81.cf1rackcdn.com/collection/papers/ 1970/1971_1201_SECUnsafe_01. pdf (last visited Jan. 29, 2024). In 1971, the SEC described the crisis as "the most prolonged and severe crisis in the securities industry" since the Great Depression. *See id.* at 1, 27.

[22] N.Y. Stock Exchange, Inc., *Crisis in the Securities Industry, A Chronology: 1967–1970* (Aug. 2, 1971), http://3197d6d14b5f19f2f440-5e13d29c4c016cf96cbbfd197c579b45r81.cf1 rackcdn.com/collection/papers/1970/1971_0730_NYSECrisis.pdf (last visited Jan. 29, 2024); *see also* DTC, *1989 Annual Report* 6-10 (1989) http://3197d6d14b5f19f2f440- 5e13d29c4c016cf96cbbfd197c579b45r81.cf1 rackcdn.com/collection/papers/1980/1989_0101_DTCAR.pdf (last visited Jan. 29, 2024).

[23] DTCC, *Disclosure Framework for Covered Clearing Agencies and Financial Market Infrastructures* (Mar. 2023), https://www.dtcc.com/-/media/Files/Downloads/legal/policy-and-compliance/DTC_Disclosure_Framework.pdf (last visited Jan. 29, 2024).

of publicly traded stock and corporate bonds issued in the United States, and nearly all U.S. municipal securities.[24]

### A. Overview of the DTC System

28. **Figure 1** illustrates the structure of DTC's intermediated system of securities holding.

**Figure 1 – DTC's Intermediated System of Securities Holding**



29. In DTC's intermediated system of securities holding, securities are typically issued by a company in DTC's "street name"—that is, in the name of DTC's partnership nominee, Cede & Co.[25]

---

[24] *See* MORRIS & GOLDSTEIN, *supra* note 5, at i, 3.

[25] A security held in "street name" is a security that is registered not in the name of the beneficial owner, but rather in the name of DTC, a brokerage firm, or another nominee. *See, e.g.*, John C. Wilcox et al., *"Street Name" Registration & The Proxy Solicitation Process*, in AMY GOODMAN ET AL., EDS. A PRACTICAL GUIDE TO SEC PROXY AND COMPENSATION RULES, 11-3 (6th ed. 2018), https://books.google.com/books?id=4FOEDwAAQBAJ& newbks=1&newbks_redir=0&printsec=frontcover&dq=A+PRACTICAL+GUIDE+TO+SEC+PROXY+AND+COM PENSATION+RULES&hl=en#v=onepage&q=A%20PRACTICAL%20GUIDE%20TO%20SEC%20PROXY%20A ND%20COMPENSATION%20RULES&f=false (last visited Jan. 29, 2024) ("The vast majority of publicly traded shares in the United States are registered on companies' books not in the name of beneficial owners . . . but rather in the name of 'Cede & Co.' the nominee name used by [DTC]. Shares registered in this manner are commonly referred to as being held in 'street name.'"); *see also, e.g.*, SEC, *Glossary: Holding Your Securities*, https://www.investor.gov/introduction- investing/investing-basics/glossary/holding-your-securities (last visited Jan.

30.     This practice of financial companies issuing securities in "street name" has been a common one for over a century, going back to at least World War I, long preceding the 1933 enactment of the Securities Act.[26]

31.     Thus, Cede & Co. becomes the registered owner of these securities on the books of the company (whose books are maintained by the company's registrar/transfer agent).[27] For example, when a company issues new shares of common stock of a book-entry-only issue[28] and

---

29, 2024) ("[Y]ou can hold your securities in 'street name' where your securities positions are recorded on the books of your brokerage firm.").

[26] *See, e.g.*, LEGISLATIVE HISTORY OF THE REVENUE ACT OF 1932: P.L. 72-154: 47 STAT. 169, 1229 (1932), https://books.google.com/books?id=BCjVAAAAMAAJ&pg=PA1229&lpg=PA1229&dq=%22%22Revenue+Act+o f+1932%22+AND+%221229%22+AND+%22in+all+of+these+cases+it+is+necessary+for+the+broker+to+transfer +the+certificate+into+a+street+name%22&source=bl&ots=S14dyJv8Yx&sig=ACfU3U0ajD4hxFywXnr8wXaVhkF 9wthdlg&hl=en&sa=X&ved=2ahUKEwjL1caz5IWEAxWUGTQIHSQwAmUQ6AF6BAgMEAM#v=onepage&q= %22%22Revenue%20Act%20of%201932%22%20AND%20%221229%22%20AND%20%22in%20all%20of%20t hese%20cases%20it%20is%20necessary%20for%20the%20broker%20to%20transfer%20the%20certificate%20into %20a%20street%20name%22&f=false (last visited Jan. 29, 2024) (discussing scenarios in which "it is necessary for the broker to transfer the certificate into a street name before he delivers it on a contract of sale"); MILTON N. NELSON, READINGS IN CORPORATION FINANCE, 338 (1st ed. 1926),https://books.google.com/books?hl=en&lr=&id=IQdDAAAAIAAJ&oi=fnd&pg=PA1&dq=Milton+nelson&o ts= NXUvAB7FLR&sig=DCCmVmak3JwJz0dcHLjTvhU6_c8#v=onepage&q=Milton%20nelson&f=false (last visited Jan. 29, 2024) (noting that "no inconvenience results from leaving [an investor's] stock in 'street name'"); U.S. Congress, *Trading with the Enemy: Hearings before the Subcommittee of the Committee on Commerce, United States Senate*, Sixty-Fifth Congress, First Session on H. R. 4960 at 67 (1917), https://books.google.com/books?id=pQgQAAAAIAAJ&printsec=frontcover#v=onepage&q&f=false (last visited Jan. 29, 2024) ("For convenience, the stocks, when bought, are generally registered in a street name, as we call it, either the name of a brokerage house or of some clerk in a brokerage house."); *Reichard v. Hutton*, 142 N.Y.S. 935, 941 (App. Div. 1913) (noting that certain stocks "stood in 'street names,' indorsed in blank, and were transferrable by delivery under the sage of Wall street."); William V. Holohan, *Contribution Among Securities Pledged by a Defaulting Stock Broker*, 4 S. CAL. L. REV. 1, 3 (1930) ("Frequently it happens that a broker has simply for safekeeping, and as bailee for a customer who has paid in full and owes the broker nothing, securities that are either in a 'street name' or in the customer's name and endorsed in blank by him. The broker's dealing with these securities other than as bailee, his exercising any dominion over them, or his using them for his own purposes is a conversion."); SEC, *Final Report of the Securities and Exchange Commission on the Practice of Recording the Ownership of Securities in the Records of the Issuer in Other Than the Name of the Beneficial Owner of Such Securities*, No. 80-014 at 1(Dec. 3, 1976) https://original-ufdc.uflib.ufl.edu/AA00022450/00001 (last visited Jan. 29, 2024) ("American institutions first began extensively to register securities in nominee name in the 1930's in an effort to escape onerous transfer requirements placed on corporations and fiduciaries by issuers seeking to protect themselves from judicially imposed liability for improper transfers.").

[27] DTCC, *FAQs: How Issuers Work With DTC*, https://www.dtcc.com/settlement-and-asset-services/issuer-services/how-issuers-work-with-dtc (last visited Jan. 29, 2024) ("When an investor holds shares [in street name] . . . DTC's nominee name (Cede & Co.) is listed as the registered owner on the records of the issuer maintained by its transfer agent.").

[28] In a "book-entry-only" issue, beneficial owners do not receive certificates. Instead, they receive only statements containing "book entries" reflecting their position.

14

delivers them to DTC, and those shares consist of all of the shares that the company has ever issued, the books and records of the company (or its registrar/transfer agent) reflect that the sole registered owner of all shares of common stock of the company is Cede & Co.

32. The shares are then typically held by and reflected on the books of DTC (and sometimes of a sub-custodian of DTC, such as what DTC refers to as a FAST Agent).[29] As a result, DTC directly or indirectly holds the position for those DTC Participants who are in turn holding positions in securities through DTC.[30]

33. The company and its transfer agent have no visibility into the identities of the beneficial owners whose securities of the company are held at DTC. As shown in **Figure 1**, interests in those securities are held by DTC Participants. Those Participants are in turn holding interests in the securities either for themselves or for beneficial owners or intermediaries (with the interests in the securities potentially being held through a series of intermediaries before they reach the beneficial owner). Similarly, DTC has no visibility into the identity of its Participants' customers on whose behalf interests in the securities may be held. Nor can DTC tell how many of the shares owned by a Participant are held for that Participant's own account, as opposed to being held by the Participant on behalf of the Participant's customers.

34. Each issue of a company's securities held by DTC bears a CUSIP number.[31] A CUSIP number is a 9-character alphanumeric code that uniquely identifies a security issue offered

---

[29] DTC's Fast Automated Securities Transfer Program ("FAST") is a contract between DTC and certain transfer agents that eliminates the movement of physical securities by allowing transfer agents to act as custodians for DTC. *See* DTCC, *The Fast Program*, https://www.dtcc.com/settlement-and-asset-services/agent-services/fast (last visited Jan. 29, 2024).

[30] A DTC Participant's position in the securities issue is sometimes referred to as a "book-entry" position, reflecting the fact that the Participant's position is reflected only on the books and records of DTC, rather than in the form of a paper certificate made available to the Participant.

[31] CUSIP's database contains issue identifiers and related data for millions of issues of securities, including corporate securities. In 1964, the New York Clearing House Association asked the American Bankers Association ("ABA") to develop a standard method of identifying securities in order to improve securities clearance and settlement operating

15

in the United States or in Canada.[32] Although it is possible that different offerings (or "issuances") of a security, such as an IPO and a subsequent public offering made pursuant to different registration statements, bear different CUSIP numbers, the common practice—as is the case with Oak Street—is for such securities to bear the same CUSIP number across multiple offerings.[33]

35.      DTC holds all securities bearing the same CUSIP number in one fungible, aggregate bulk, meaning that there are no specifically identifiable shares directly owned by DTC Participants.[34] Once deposited into the fungible bulk, the securities issued at different times pursuant to different registration statements are wholly commingled in such a manner that the securities cannot be distinguished from one another, not even by date of issuance pursuant to a particular registration statement.[35]

---

efficiencies. The Committee on Uniform Security Identification Procedures ("CUSIP") was created, the CUSIP system developed, the CUSIP Service Bureau was formed to administer the system, and now CUSIP Global Services ("CGS") is the overarching entity for CUSIP. CGS is managed on behalf of the ABA by FactSet Research Systems Inc. *See* CUSIP Global Services, *About Us*, https://www.cusip.com/about/index html (last visited Jan. 29, 2024). The CUSIP system is endorsed by the SEC. *See* CUSIP Global Services, *Inside the CGS Identification System* (Aug. 2010), https://web.archive.org/web/20211102145159/https://www.cusip.com/pdf/CUSIP_Intro_03.14.11.pdf (last visited Jan. 29, 2024). When DTC holds shares as described above, it identifies them by their CUSIP number. *See* DTCC, *Operational Arrangements* 23 (Oct. 2023) ("CUSIP Number Assignment"), https://www.dtcc.com/~/media/Files/Downloads/legal/issue-eligibility/eligibility/operational-arrangements.pdf (last visited Jan. 29, 2024).

[32] CUSIP Global Services, *Universally Recognized Identifier for Financial Instruments*, https://www.cusip.com/identifiers html#/CUSIP (last visited Jan. 29, 2024).

[33] *See* AST Decl.; Declaration of Ann Marie Bria of The Depository Trust & Clearing Corporation ("DTC Decl.").

[34] *See* SEC, *Issuer Restrictions or Prohibitions on Ownership by Securities Intermediaries*, 17 C.F.R. Part 240, Release No. 34-50758A, File No. S7-24-04, RIN 3235-AJ26 (Mar. 7, 2005), https://www.sec.gov/rules/final/34- 50758a htm (last visited Jan. 29, 2024) ("Securities registered in the name of the securities intermediary or its nominee allows the securities to be immobilized and held in fungible bulk thereby significantly reducing the number of certificates that need to be delivered and transferred. This in turn reduces the risk and cost associated with transferring the securities. . . . The securities deposited with DTC are registered in DTC's nominee name and are held in fungible bulk for the benefit of its participants and their customers. Each participant having an interest in securities of a given issue credited to its account has a pro rata interest in the securities of that issue held by DTC.") (footnotes omitted); *see also* SEC, *Staff Legal Bulletin No. 14f (CF)* (Oct. 18, 2011), https://www.sec.gov/corpfin/staff-legal-bulletin-14f- shareholder-proposals? (last visited Jan. 29, 2024). There are certain discrete exceptions to this general rule. For example, some securities may be restricted, and not available for open-market trading. *See also* SEC, Rule 144: Selling Restricted and Control Securities (Jan. 16, 2013), https://www.sec.gov/reportspubs/investor-publications/investorpubsrule144 (last visited Jan. 29, 2024).

[35] *See* SEC, *Issuer Restrictions or Prohibitions on Ownership by Securities Intermediaries*, 17 C.F.R. Part 240, Release No. 34-50758A, File No. S7-24-04, RIN 3235-AJ26 at n.23 (Mar. 7, 2005), https://www.sec.gov/rules/final/34-50758a.htm ("Fungible bulk means that no participant or customer of a participant has any claim or ownership rights

16

36.     When a company uses the same CUSIP number for multiple offerings of the same security, and shares of that security bearing that CUSIP (from multiple offerings) are held by DTC in a fungible bulk, it is impossible to identify the date that any specific share of that security was issued. This is because the nature of any interest in the blended fungible bulk is that of a *pro rata* interest in that commingled bulk, rather than an interest in any pre-commingling share of that security. For the same reason, it is impossible to determine under which particular registration statement any specific share held by DTC was issued, inasmuch as the originally deposited shares no longer exist in their prior form, and have instead been wholly blended with the other shares of that CUSIP that are held by DTC. The beneficial owners receive a *pro rata* interest in that fungible bulk, rather than an interest in any particular shares.

37.     Under the DTC system of intermediated holding of securities, the registrar of a book-entry-only issue may list only DTC's partnership nominee Cede & Co. as the owner of a position in an issue on the registrar's register.[36] DTC acts as a securities intermediary and, in turn, maintains securities accounts for its Participants.[37] DTC knows only the identities of DTC Participants that hold positions in the issue at DTC; DTC does not know the identities of those persons or entities who in turn may hold positions directly or indirectly through those

---

to any particular certificate held by DTC. Rather, participants have a securities entitlement to obtain a certificate representing securities held in their DTC accounts.").

[36] DTCC, *FAQs: How Issuers Work with DTC*, https://www.dtcc.com/settlement-and-asset-services/issuer-services/how-issuers-work-with-dtc (last visited Jan. 29, 2024) ("When an investor holds shares this way, the investor's name is listed on its brokerage firm's books as the beneficial owner of the shares. The brokerage firm's name is listed in DTC's ownership records. DTC's nominee name (Cede & Co.) is listed as the registered owner on the records of the issuer maintained by its transfer agent.").

[37] *Id.* ("The Depository Trust Company (DTC) . . . provides depository and book-entry services and operates a securities settlement system. In this regard, DTC holds eligible securities on behalf of Participants and its activities include transfers and pledges of securities, and the settlement of transactions for Participants by book-entry, free of payment or delivery versus payment."). For ease of discussion, I refer herein to Participants owning (whether as a nominee or as a beneficial owner) securities in their DTC accounts, but this refers technically to Participants having security entitlements. A "security entitlement" in the intermediated holding system is a bundle of property and contract rights in the contents of a security account that an entitlement holder—a customer of a securities intermediary, such as a Participant of DTC or a beneficial owner holding through such Participant—has with a securities intermediary.

Participants.[38] DTC, as a matter of operational clearance and settlement practice pursuant to Article 8 of the Uniform Commercial Code ("UCC"), holds the deposited securities in fungible bulk.[39]

38. As the SEC has explained, in DTC's indirect holding system, a beneficial owner does not own any specific or particular share of stock:

> In the United States, most . . . investors hold their shares through brokers, and thus have an interest in a pool of shares. Approximately 85% of exchange-traded securities are held by securities intermediaries, such as broker-dealers and banks, on behalf of themselves or their customers. The vast majority of these securities are deposited with The Depository Trust Company (DTC) . . . and held in fungible bulk for the benefit of DTC participants. As a result, broker-dealer participants of DTC own a pro rata interest in the aggregate number of shares of an issue held by DTC, and their beneficial owners (*i.e.*, the broker-dealers' customers) own an interest in the shares in which their broker-dealers have an interest. Consequently there are no specific shares directly owned by either the broker-dealer participants or the underlying beneficial owner.[40]

Rather than a direct property or contract interest in any ***specific*** security certificate held by DTC, beneficial owners hold a "pro rata interest" in the "fungible bulk" of securities bearing the same CUSIP and held by DTC on behalf of various Participants.[41]

---

[38] *Id.* ("DTC is able to provide position information on a security at the DTC participant level."); *id.* ("DTC does NOT have beneficial owner information.").

[39] DTCC, *Disclosure Framework for Covered Clearing Agencies and Financial Market Infrastructures* 76 (Mar. 2023),https://www.dtcc.com/-/media/Files/Downloads/legal/policy-and compliance/DTC_Disclosure_Framework.pdf (last visited Jan. 29, 2024); UCC § 8 (2019), https://law.justia.com/codes/new-york/2019/ucc/article-8/ (last visited Jan. 29, 2024). *See also, e.g.*, SEC, *Self-Regulatory Organizations; The Depository Trust Company; Notice of Filing and Immediate Effectiveness of a Proposed Rule Change to Amend the DTC Deposits Service Guide Relating to Procedures for the Deposit of Nontransferable Securities*, Release No. 34-86897 (Sept. 6, 2019), https://www.sec.gov/rules/sro/dtc/2019/34-86897.pdf (last visited Jan. 29, 2024) ("Security certificates are eligible for Deposit at DTC when they are delivered to DTC in accordance with the Rules and Procedures and pursuant to Article 8 . . . of the NYUCC."); SEC, *DTC Chills and Freezes* (May 1, 2012), https://www.sec.gov/oiea/investor-alerts-bulletins/ib_dtcfreezes html.

[40] SEC, *Roundtable on Proxy Voting Mechanics* (May 23, 2007), https://www.sec.gov/spotlight/proxyprocess/proxyvotingbrief htm (last visited Jan. 29, 2024).

[41] *Id.*; *see also* SEC, *Staff Legal Bulletin No. 14f (CF)* (Oct. 18, 2011), https://www.sec.gov/corpfin/staff-legal-bulletin-14f-shareholder- proposals? (last visited Jan. 29, 2024) ("[E]ach DTC participant holds a pro rata interest or position in the aggregate number of shares of a particular issuer held at DTC. Correspondingly, each customer of a DTC participant – such as an individual investor – owns a pro rata interest in the shares in which the DTC participant has a pro rata interest.").

39. Consistent with this framework, as Comment 1 to Section 8-503 of the UCC points out: "securities intermediaries generally do not segregate securities in such fashion that one could identify particular securities as the ones held for customers."[42] In the indirect holding system, a beneficial owner of a security does not have a direct right of ownership in any securities. A Participant holding a position in an issue through DTC, or a beneficial owner holding a position in that issue through a Participant that in turn holds a position in the issue at DTC, does not have a direct property or contract interest in any *specific* security certificate held by DTC. Instead, the holder has a *pro rata* property and contract interest in the fungible bulk of securities bearing the same CUSIP held by DTC on behalf of various entitlement holders, as discussed below.[43]

40. The benefit of the United States' system of intermediated securities holding is that it allows for the efficient and accurate clearance and settlement of over two quadrillion dollars' worth of securities transactions a year. The recasting of securities settlement into the intermediated system of holdings that I discuss in this report has allowed the United States not only to solve the paperwork crisis of the late 1960s and early 1970s, but also to handle massively larger volumes of transactions today. It has also enabled the United States to shorten the securities clearance and settlement time cycle, thereby reducing risk in the financial markets.[44]

---

[42] UCC § 8-503, Official Comment, Property Interest of Entitlement Holder in Financial Asset Held by Securities Intermediary.

[43] For ease of discussion, I refer herein to Participants owning (whether as a nominee or as a beneficial owner) securities in their DTC accounts, but this refers technically to Participants having security entitlements. A "security entitlement" in the intermediated holding system is a bundle of property and contract rights in the contents of a security account that an entitlement holder—a customer of a securities intermediary, such as a Participant of DTC or a beneficial owner holding through such Participant—has with a securities intermediary.

[44] SEC, *Shortening the Securities Transaction Settlement Cycle*, (Exchange Act Release No. 34-94196), at 9, 19–20, 146, 148–149, 161–162 (February 15, 2023), https://www.sec.gov/rules/2023/02/shortening- securities-transaction-settlement-cycle#34-94196 (last visited Jan. 29, 2024).

### B. The Nature of DTC's Fungible Bulk of Securities

41. To understand the nature of the blended, fungible, aggregate bulk of securities that DTC holds for each CUSIP, it may prove helpful to consider the following analogy. Let's imagine a deposit of wine, rather than the deposit of securities. It is as though a company, on behalf of three Participants, were to deposit with DTC 10 gallons of red wine from the same vineyard—but of different vintages—as follows:

- On behalf of Participant A – one gallon of Chicago Winery Merlot 2019;

- On behalf of Participant B – two gallons of Chicago Winery Merlot 2020; and

- On behalf of Participant C – seven gallons of Chicago Winery Merlot 2021.

42. DTC, in turn, pours the aggregate 10 gallons of Chicago Winery Merlot, of three different vintages, into a single vat.

43. As shown in **Figure 2**, the 10 gallons of red wine in the vat is the fungible, aggregate bulk that DTC holds. The gallons of wine from the three vintages are all commingled and blended in the vat. Each Participant has a right to its respective *pro rata* share of the contents of the vat (Participant A, for example, owns a 10% interest in the wine in the vat). But no Participant directly owns any specifically identifiable wine—indeed, due to the wine having all been commingled in the vat, none of the wine is specifically identifiable to one vintage, or to one gallon that had been poured into the vat. If Participant C were to seek to transfer one gallon of wine to Participant A, DTC would simply note on its records that Participant C now owned 60% of the wine in the vat, and Participant A now owned 20% of the wine in the vat. If, alternatively, Participant B seeks to withdraw from DTC its *pro rata* share of wine, in the event that withdrawal is allowed, DTC in effect simply dips a ladle into the vat and scoops out 20% of the wine that is in the vat—two gallons—and delivers it to Participant B, updating its records accordingly. Because

the 10 gallons of Chicago Winery Merlot of three different vintages were all commingled in the vat, no Participant (or any other person) is able to determine that any particular drop or cup of wine in the vat came from a particular gallon or vintage.

**Figure 2 – Illustration of the Blended Nature of DTC's Fungible Bulk**



44.     Using DTC's system, transfers of security entitlements from one Participant to another Participant are effected on DTC's computers through "book-entry" changes reflected on the "books" of DTC. Similarly, Participants acting (whether directly or indirectly) for a seller or buyer make book-entry changes on their own records, reflecting (directly or indirectly) the positions of the seller and the buyer. In the event that there are tiers of ownership, which is common today, corresponding book-entry changes are reflected by the relevant intermediary entity on the entity's books at each tier, down to the entity holding for the ultimate beneficial owner.

45.     This system removes the need to: (a) obtain, cancel, and then destroy the seller's physical securities certificate; (b) create, sign, and transfer another physical securities certificate

21

for the buyer; and (c) generate, process, and deliver all the otherwise-required associated paper forms.

46.     When securities, such as common stock, are held via DTC's intermediated system, Participants, customers of Participants, and beneficial owners holding through such customers and/or Participants do not have their names reflected as the owners on any share certificates. As described above, the system of intermediated securities holding described above necessarily obviates the possibility of identifying any particular share of a security as being owned by any individual Participant, its customer, or any underlying beneficial owner holding through such a Participant or customer.

47.     At the end of each day, DTC debits from or credits to each Participant's account (or accounts, as the case may be) the net securities, and net dollar payments, for all of that Participant's activities that day in each securities issue. DTC does not know the identities of, nor does it track the activity of, any customer of any Participant, let alone any lower-tier holders—including beneficial owners. Rather, DTC records only net positions of each Participant, which represent the net activities of the Participant.

48.     For example, if a Participant begins a trading day with 10 shares of Company X in its DTC account, and one customer of the Participant buys five shares of Company X that day, while another customer of the same Participant sells five shares of Company X, the Participant would still have 10 shares of Company X in its DTC account at the end of the trading day. This netting occurs at each level of DTC's intermediated system of securities holding.

49.     In addition, many large brokerage firms hold inventory of securities of multiple companies on their own balance sheets. They often do this in order to help "make a market" in the

securities and support liquidity.[45] When a customer of a broker seeks to buy a security that the broker is already holding on its own balance sheet, or the customer seeks to sell a security that the broker would like to buy, the broker may engage in a principal transaction with its customer, buying or selling the security for its own account.[46] The resulting change in stock ownership is reflected only on the broker's own books between its principal account (shares that it owns for itself) and its custodial account (shares that it owns on behalf of its client). In a principal transaction, the total number of shares of a security held by the broker at DTC does not change; only the allocation on the broker's own books between its principal and custodial accounts changes. In that event, no net change in share ownership resulting from that transaction is even reported to DTC, let alone reflected on DTC's records.

50. Within the intermediated system of securities holding described above, an offering of book-entry-only securities made eligible at DTC—such as in an IPO and secondary public offerings—would generally proceed in the following basic steps:

- Step 1: Upon payment from the lead underwriter or the underwriters, who are the initial purchasers of the shares in the offering, the issuer issues the securities in DTC's street name, Cede & Co., and Cede & Co. is identified by the issuer's registrar as the registered owner of the shares on the issuer's books.

- Step 2: The issuer delivers the Cede & Co. shares to DTC.[47] If DTC already is holding shares in the same CUSIP (*e.g.*, previously issued registered shares or unregistered shares), DTC adds the shares that have just been delivered to it to those

---

[45] *See* CFI Team, *Market Maker*, CORPORATE FINANCE INSTITUTE, https://corporatefinanceinstitute.com/resources/career-map/sell-side/capital-markets/market-maker (last visited Jan. 29, 2024) ("Market maker refers to a firm or an individual that engages in two-sided markets of a given security. It means that it provides bids and asks in tandem with the market size of each security. A market maker seeks to profit off of the difference in the bid-ask spread and provides liquidity to financial markets."); *see also* Maureen O'Hara & George S. Oldfield, The Microeconomics of Market Making, 21 J. FIN. & QUANTITATIVE ANALYSIS 361, 361 (1986).

[46] *See* CFI Team, Market Maker, CORPORATE FINANCE INSTITUTE, https://corporatefinanceinstitute.com/resources/career-map/sell-side/capital-markets/market-maker (last visited Jan. 29, 2024).

[47] Alternatively, as described above and as was the case with the December 2020 Offering, where the issue is held for DTC by a Fast Agent, the Fast Agent sub-custodies the issue on behalf of DTC.

shares in the same CUSIP that are already on deposit at DTC. At that point, both the "old" shares and the "new" shares are commingled in a fungible bulk, and none of them can be identified as the "old" shares or the "new" shares.

- Step 3: DTC then credits the DTC accounts of its Participants accordingly. DTC credits the DTC Participant accounts of the underwriters (or to the lead underwriter, as representative of the underwriting syndicate, who then in turn delivers the appropriate numbers of shares to the other underwriters). This is effectuated through increases in the book-entry positions of the underwriters' DTC Participant accounts, not by deliveries of paper stock certificates. As explained above, "shares" here refers, in fact, to *pro rata* interests in the fungible bulk held by DTC in the CUSIP in question.

- Step 4: The underwriters then proceed to sell shares to their customers. Deliveries associated with those sales are effectuated by changes in the book-entry positions of Participants on their books. When DTC Participants then transact between themselves, either for their proprietary account or for their customers, corresponding book-entry changes are made at the DTC level and every level below it, as appropriate, without any paper certificates changing hands.

51. As described in more detail below, the Oak Street IPO and secondary public offerings at issue in this action were effectuated in this fashion.

### C. Tracing Shares in the DTC System

52. While the vast majority of publicly traded securities in the United States are held in DTC's street name[48]—that is, in the name Cede & Co.—there are several scenarios in which shareholders might be able to trace their shares to a particular registration statement or prospectus. However, as I discuss in Sections VIII and IX below, none of these scenarios are applicable to Plaintiffs' holdings in Oak Steet stock after December 6, 2020.

53. **One Single Issuance**. First, tracing is straightforward when all shares of an issue were issued under the same registration statement, such as when there is only an IPO, and ***there is no other issuance of the security***. In such a situation, all shares of that single issuance of the

---

[48] *See* Wilcox et al., *supra* note 26 at 11-3 ("The vast majority of publicly traded shares in the United States are registered on companies' books not in the name of beneficial owners . . . but rather in the name of 'Cede & Co.' the nominee name used by [DTC].").

security are traceable to the one registration statement. This is because all issued shares necessarily came from that single issuance of the security under that single registration statement.

54.     **Physical Certificates**. Second, some companies still offer physical paper securities certificates to beneficial owners. When a company issues a physical certificate reflecting a beneficial owner's name, and the company's registrar registers the transaction including the beneficial owner's name on the company's records at the registrar, that certificate represents the beneficial owner's ownership of the security.[49] It is therefore possible in such an instance for the beneficial owner to trace its shares of the security to a particular registration statement.

55.     **Direct Registration**. Third, some companies allow for the possibility of "direct registration." Direct registration provides beneficial owners with an alternative to holding their securities in DTC's street name. Under this method of registration, beneficial owners can elect— through DTC's Direct Registration System—to have their securities registered in their name or in the name of a third-party custodian, such as a broker or bank, on the company's (or transfer agent/registrar's) books and records.[50] It is therefore theoretically possible that beneficial owners who have directly registered their shares of a security may be able to trace them to a particular registration statement.  This requires that their shares were never part of a fungible bulk containing shares from multiple offerings, held by DTC or another intermediary.

56.     **Different CUSIP Numbers**. Finally, a company may apply for a different unique CUSIP number identifier for each offering. If such a request were granted, a beneficial owner receiving shares in an offering would be able to trace its shares to that offering by virtue of the unique CUSIP number.

---

[49] SEC, *Investor Bulletin: Holding Your Securities* (July. 12, 2023), https://www.sec.gov/reportspubs/investor-publications/investorpubsholdsechtm html (last visited Jan. 29, 2024).

[50] *Id.*

## V.     The Oak Street IPO and Secondary Public Offerings

57.     Prior to the IPO, Oak Street issued approximately 223 million shares of common stock. These "unregistered" shares were not registered pursuant to any Registration Statement.[51] I understand that approximately 97% of these unregistered pre-IPO shares were subject to lock-up agreements entered into in connection with the IPO, under which the beneficial owners of the locked-up shares could not trade the shares for 180 days (the "Lock-Up Period").[52]

### A.     The IPO

58.     On August 6, 2020, Oak Street issued, offered, and sold pursuant to the IPO Registration Statement, 17,968,750 Oak Street Common Shares.[53] On August 10, 2020, Oak Street instructed its registrar and transfer agent AST to record those shares in the name of Cede & Co. and to deliver those shares to DTC via DTC's Full Fast Program. AST did so on August 10, 2020, and DTC began to hold such shares under the CUSIP 67181A107. AST instructed DTC to credit the DTC account of J.P. Morgan Securities LLC ("J.P. Morgan"), with an interest in 17,968,750 shares.[54] J.P. Morgan could then distribute shares to other DTC Participant accounts (and retain a portion of the shares in its own account). Because the shares were registered in the name of Cede & Co., all deliveries of shares to other DTC Participant accounts were recorded as book entry changes at DTC. J.P. Morgan and the other DTC Participants holding position in the CUSIP were then able to reflect any holdings through them by their customers on their own books and records, as is the normal course in the intermediated system of securities holdings.

---

[51] Form 424B4 (Aug. 7, 2020) at 173.

[52] *Id.*

[53] *See* Form 424B4 (Aug. 7, 2020); Form S-1/A (Aug. 5, 2020); Form 8-K (Aug. 11, 2020).

[54] AST Decl. ¶¶ 3-4.

### A. The December 2020 Offering

59. The December 2020 Offering took place in the same manner on December 2, 2020. In that offering, Oak Street issued, registered, and sold pursuant to the December 2020 Registration Statement 6,477,293 Oak Street Common Shares.[55]

60. .[56] "DWAC" refers to DTC's Deposit and Withdrawal at Custodian service, which provides DTC Participants "with the ability to make electronic book-entry deposits and withdrawals of eligible securities into and out of their DTC book-entry accounts . . . eliminat[ing] the movement of physical securities certificates for transfers of securities registered in the name of DTC's nominee, Cede & Co, on the transfer agent's books."[57] AST registered the Oak Street Common Shares issued in the December 2020 Offering in the name of Cede & Co. and delivered them to DTC on the same date.[58] That process occurred as follows:

- ███████████████████████████████████████████ ███████████████████████████████████████████ █████████████████████████████.[59]

- Emails among Oak Street, AST, underwriters, and counsel show that ███████ ███████████████████████████████████████████ ██████████████████████████████[60]

---

[55] *See* Form 424B4 (Dec. 4, 2020); Form S-1 (Nov. 30, 2020).

[56] NEWLIGHT-OSH-00078928; AST Decl. ¶¶ 5-6, 11.

[57] DTCC, *Deposit/Withdrawal at Custodian*, https://www.dtcc.com/settlement-and-asset-services/securities-processing/deposit-withdrawal-at-custodian (last accessed Jan. 25, 2024).

[58] AST Decl. ¶¶ 5-6.

[59] NEWLIGHT-OSH_00078928.

[60] JPMC-00168201.

- On December 7, 2020, AST registered these shares in the name of Cede & Co. and transferred them to DTC, where such shares were held by DTC and credited to J.P. Morgan through book-entry-only, as instructed.[61]

61. On or after December 7, 2020, Oak Street Common Shares issued in the IPO and December 2020 Offering were all registered in the name of Cede & Co. and held at DTC.[62] All of these Oak Street Common Shares—including the more than 6.4 million shares issued in the December 2020 Offering—bore the same CUSIP number: 67181A107, and were held in the same fungible bulk at DTC.[63]

### C. February 2021 Lock-Up Expiration

62. On February 2, 2021, the Lock-Up Period expired, and the beneficial owners of those unregistered, previously-locked up Oak Street Common Shares were free to trade them.

63. I understand that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[64] These unregistered shares were held by DTC as part of the fungible bulk that it held under CUSIP number 67181A107.[65]

### A. February and May 2021 Offerings

64. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[61] AST Decl. ¶¶ 5-6.

[62] *Id.* ¶ 3-6, 11.

[63] *See, e.g*, SEC, *Section 13(f) Securities List, 3rd Quarter 2020*, at 370, https://www.sec.gov/divisions/investment/13f/13flist2020q3.pdf (last accessed Jan. 26, 2024) (reflecting 67181A107 as CUSIP number for common stock issuance); SEC, *Section 13(f) Securities List, 4th Quarter 2020*, at 384, https://www.sec.gov/divisions/investment/13f/13flist2020q4.pdf (last accessed Jan. 26, 2024) (reflecting 67181A107 as CUSIP number for common stock issuance); AST Decl. ¶¶ 3-6, 11; DTC Decl. ¶¶ 2-3.

[64] AST Shareholder List dated February 2, 2021 (showing ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Oak Street Form 424B (December 4, 2020) at 173 (identifying approximately 54 million freely tradeable, publicly issued shares following the December 2020 Offering).

[65] DTC Decl. ¶ 2.

███████████████████████████████.[66] All 24,384,652 Oak Street Common Shares issued in the February and May 2021 Offerings were registered in the name of Cede & Co., delivered to DTC, and the position held by DTC as a fungible, indistinguishable bulk was increased to reflect the new shares.[67]

65.     All of the Oak Street Common Shares issued in the Offerings, as well as pre-IPO unregistered Oak Street Common Shares, bore the CUSIP: 67181A107.[68]  When registered in the name of Cede & Co. and delivered to DTC, they were held by DTC in a commingled, fungible bulk.[69]  DTC Participants holding positions in Oak Street Common Shares (as well as their customers hold Oak Street Common Shares through them) held a *pro rata* beneficial interest in Cede & Co.'s aggregate holding of the fungible bulk of Oak Street Common Shares.[70]  Moreover, as confirmed by AST, no physical certificates were issued to beneficial owners, either before, during, or after the Offerings.[71]

**VI.     I Am Not Aware of Any Way for Oak Street Shareholders to Trace Their Shares to Any Registration Statement After Shares Issued in the December 2020 Offering Were Delivered to DTC.**

66.     Oak Street Common Shares acquired on or after December 7, 2020—the day shares from the December 2020 Offering were delivered to DTC—are not traceable to any *particular* Registration Statement.

---

[66] AST Decl. ¶¶ 7-11; NEWLIGHT-OSH_00087509; NEWLIGHT-OSH_00078906; JPMC-00177571; JPMC-00185434.

[67] AST Decl. ¶¶ 7-11; DTC Decl. ¶¶ 2-3.

[68] AST Decl. ¶¶ 2-11; AST Shareholder List dated February 2, 2021.

[69] DTC Decl. ¶ 2.

[70] DTC Decl. ¶ 3.

[71] AST Decl. ¶¶ 11.

29

67. When shares issued in the December 2020 Offering were delivered to DTC, DTC received shares registered in the name of Cede & Co., held them in its fungible bulk in CUSIP 67181A107, and credited its Participant J.P. Morgan a *pro rata* interest in such fungible bulk. The shares were not traceable to any Registration Statement from the moment they were deposited with DTC, which held them in a fungible bulk commingled with pre-existing Oak Street Common Shares issued pursuant to the IPO Registration Statement bearing the 67181A107 CUSIP. Instead, consistent with the operations and mechanics of DTC, via a DWAC transfer, J.P. Morgan's "position in its DTC account [wa]s increased" when the December 2020 Offering was effectuated.[72] What J.P. Morgan received, via the electronic entry in its DTC Participant account, was an increase in its *pro rata* interest in the fungible bulk of the aggregate of Oak Street Common Shares that were held by DTC. Any Participant, or direct or indirect customer of any Participant, that held a position in Oak Street Common Shares that were in turn held by DTC on or after December 7, 2020, therefore, cannot establish that it held IPO shares, nor that it held December 2020 Offering Shares. That is because from that point on it held neither—it would only have a *pro rata* interest in the fungible bulk of Oak Street Common Shares held at DTC, which included an indistinguishable commingling of IPO shares and December 2020 Offering Shares.

68. As such, on or after December 7, 2020, acquirers of Oak Street Common Shares cannot trace their position in such shares to any Registration Statement because: (a) shares issued pursuant to multiple Registration Statements were commingled in DTC's fungible bulk, making it impossible to trace position in shares held by DTC to any specific Registration Statement; (b) no investors (including Plaintiffs) received paper stock certificates for their Oak Street Common

---

[72] DTCC, *Deposit/Withdrawal at Custodian*, https://www.dtcc.com/settlement-and-asset-services/securities-processing/deposit-withdrawal-at-custodian (last accessed Jan. 25, 2024).

Shares, such that they could potentially trace their shares to a particular offering; (c) Oak Street

Common Shares issued in the offerings were registered in the name of Cede & Co., not in the

names of their beneficial owners via DTC's Direct Registration System;[73] and (d) Oak Street did

not use unique CUSIPs for its different offerings, but rather all shares issued in the Offerings were

held in street name and deposited with DTC under the same CUSIP. Tracing from the time that

DTC held shares issued pursuant to different offerings was thus impossible.

**VII.    It Remained Impossible for Oak Street Shareholders to Trace Their Shares to Any Registration Statement After Each Additional SPO and Expiration of the Lock-Up Period.**

69.    It became further complicated—though sufficient complications already existed as

to make tracing impossible beforehand—for any shareholder who acquired Oak Street Common

Shares held through DTC to trace those shares to any Registration Statement on or after February

2, 2021, when Oak Street's Lock-Up Period expired, and pre-IPO, unregistered Oak Street

Common Shares became eligible to trade. In essence, harking back to the wine analogy, it is as

though even after the vat consisted of a blend of two vintages, even more vintages of the wine

were poured into the vat.

70.    I understand that, ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████.[74] I understand

---

[73] *See* AST Decl. ¶ 11; JPMC-00177571; JPMC-00185434.

[74] AST Shareholder List dated February 1, 2021 (showing ████████████████████████████.); Oak Street Form 424B (December 4, 2020) at 173 (identifying approximately 54 million freely tradeable, publicly issued shares following the December 2020 Offering).

that ██████████████████████████████████████████████████

████████████████████████████████████████ ████ [75]

71.     Because registered and unregistered Oak Street Common Shares were delivered to DTC, which thereafter held them in an indistinguishable and commingled fungible bulk, at least as early as February 2, 2021, no holder of Oak Street Common Shares who held such shares directly or indirectly through DTC held either shares that were registered or unregistered—just a *pro rata* interest in a fungible bulk that included both.

72.     The February 2021 Offering and the May 2021 Offering only further complicated this situation. The 12,332,394 Oak Street Common Shares issued in the February 2021 Offering and the 12,052,583 Oak Street Common Shares issued in the May 2021 Offering were all registered in the name of Cede & Co., delivered to DTC, and simply mixed by DTC into the existing fungible bulk that DTC already held of Oak Street Common Shares bearing the same CUSIP number.[76]  After the May 2021 Offering, the fungible bulk at DTC included 48,830,695 Oak Street Common Shares issued in the Offerings, ██████████████████████████.[77]

## VIII.    Dearborn Cannot Trace Shares of Oak Street Stock It Acquired On or After December 7, 2020 to a Registration Statement.

73.     I understand that Dearborn claims to have purchased Oak Street Common Shares "offered and/or sold pursuant to" the Registration Statements for Oak Street's IPO and secondary

---

[75] AST Shareholder List dated March 1, 2021 (showing ████████████████████████████████ );
Oak Street Form 424B (February 12, 2021) at 170 (identifying approximately 66 million publicly issued shares following the February 2021 Offering).

[76] AST Decl. ¶¶ 7–11; DTC Decl. ¶¶ 2-3; JPMC-00177571; JPMC-00185434.

[77] AST Shareholder list dated June 1, 2021 (showing ████████████████████████████████
████████████████████████████████████████████████
████████████ ); Form 424B4 (May 28, 2021), at 38 (identifying 76,575,876 freely tradeable, unrestricted shares).

public offerings.[78] But as a result of the mechanics of the intermediated system of securities holding, it is impossible for Dearborn to trace any shares held at DTC on or after December 7, 2020, to a particular Registration Statement, or to *any* Registration Statement at all.

74.     Neither Dearborn's allegations, nor any other evidence I have reviewed, has altered my opinion—based on my experience and my understanding of how the modern securities clearance and settlement system that these securities were held in actually works—that there is no way for Dearborn to show that the Oak Street Common Shares that it acquired (or, more accurately, the fungible bulk of Oak Street Common Shares in which it acquired a *pro rata* position) were in fact issued pursuant to or traceable to any Registration Statement. Based on my review of the trading records produced by Dearborn[79]—as confirmed by Plaintiffs' own allegations in the operative complaint—I understand that from December 7, 2020 to November 8, 2021, Dearborn acquired 1,609 Oak Street Common Shares. Because those shares were held by DTC in DTC's street name, Cede & Co., none of those shares are traceable to any Registration Statement.

75.     As described in Section IV.C. above, I am aware of only four ways in which a shareholder can trace its shares to a particular Registration Statement. After December 6, 2020, none of those situations apply to Dearborn's Oak Street Common Shares.[80]

76.     *First*, **after December 6, 2020, all Oak Street Common Shares in the market were not issued under the same Registration Statement.**  After December 6, 2020, 6,477,293 Oak Street Common Shares were issued under the December 2020 Registration Statement,

---

[78] Amended Complaint ¶ 280; *See also* OSH_DEARBORN_00000019, at -294; OSH_DEARBORN_00000603, at -908; OSH_DEARBORN_00001313, at -1556; PEREGRINE_005875.

[79] Amended Complaint, Exhibit A to Certification of Michael Kennedy; PEREGRINE_005875.

[80] This report does not opine on the traceability of Dearborn's Oak Street Common Shares purchased before December 7, 2020, and I express no opinion at this stage as to whether those shares are traceable to any particular registration statement.

registered in the name of Cede & Co, and delivered to DTC to be added to the fungible bulk that already included Oak Street Common Shares issued pursuant to the IPO Registration Statement. Dearborn's acquisitions of Oak Street Common Shares after December 6, 2020 were acquisitions of a *pro rata* interest in a fungible bulk comprised of shares issued under multiple Registration Statements. In an additional, though unnecessary (given that shares could not be traced after December 6, 2020), indication of the impossibility of tracing here, unregistered Oak Street Common Shares and Oak Street Common Shares issued pursuant to the February 2021 Registration Statement and the May 2021 Registration Statement were also subsequently added to DTC's fungible bulk, further complicating Dearborn's ability to trace to any Registration Statement.

77. ***Second*, Dearborn did not hold physical paper stock certificates.** AST confirmed that no physical certificates were issued to beneficial owners of Oak Street Common Shares at any time, before or after the Offerings.[81] Because Oak Street did not issue physical stock certificates to Dearborn, Dearborn is not able to trace any shares based on this exception.

78. ***Third*, Dearborn's shares were not directly registered.** Dearborn did not hold Oak Street Common Shares through DTC's Direct Registration System.[82]

79. ***Fourth*, all Oak Street Common Shares had the same CUSIPs.** As discussed above, Oak Street did not use unique CUSIPs for its Offerings, so Oak Street Common Shares cannot be traced by CUSIP number.

---

[81] AST Decl. ¶ 11. Dearborn's representative testified at his deposition that ███████████████ ███████████████████████████████████████████████████████████████ Dearborn Dep. Tr. 113, 115.

[82] Oak Street Common Shares issued in the offerings were registered in the name of Cede & Co., not in the names of their beneficial owners via DTC's Direct Registration System. *See* AST Decl. ¶ 11; JPMC-00177571; JPMC-00185434.

80.     In light of these facts, I am not aware of, and do not believe that there exists, any way for Dearborn to show that its Oak Street Common Shares held on or after December 7, 2020 through DTC were issued pursuant to or are traceable to any Registration Statement.

## IX.     CPAT and BRS Cannot Trace Their Shares of Oak Street Stock to Any Registration Statement.

81.     Both CPAT and BRS first acquired Oak Street Common Shares on March 8, 2021,[83] after the IPO, the December 2020 Offering, the expiration of the Lock-Up Period, and the February 2021 Offering had concluded. CPAT and BRS therefore cannot trace any shares they acquired to any Registration Statement for the same reasons that Dearborn cannot.

82.     *First*, by March 8, 2021, Oak Street Common Shares issued pursuant to multiple Registration Statements, as well as unregistered Oak Street Common Shares, traded in the market and had been delivered to DTC to be added to its fungible bulk of Oak Street Common Shares. *Second*, because none were issued, ███████████████████████████████████████[84] *Third*, because none of the Offerings of Oak Street Common Shares was made via DTC's Direct Registration System, neither CPAT nor BRS held its Oak Street Common Shares in direct registration. *Fourth*, all Oak Street Common Shares had the same CUSIP.

83.     As a result, neither CPAT nor BRS can trace its shares to any Registration Statement. When they purchased Oak Street Common Shares, CPAT and BRS acquired *pro rata*

---

[83] Exhibit B to Motion for Appoint as Lead Plaintiff and Approval of Lead Plaintiff's Selection of Lead Counsel (ECF No. 11-2) at 3, 6.

[84] In his deposition, CPAT's representative ████████████████████████████████████████████████ ████████████████████. CPAT Dep. Tr. 124. He testified that ███████████████████████████ ███████████████████████████████████████████████████. CPAT Dep. Tr. 124-25. BRS's representative testified in a deposition that ██████████████████████████████████████████. BRS Dep. Tr. 116. He acknowledged that ████████████████████████████████████████ ████████████████████████ *Id.* BRS's representative in fact testified that ███████████████ ████████████████████████████████████████████. *Id.*

35

interests in a fungible bulk that included Oak Street Common Shares issued pursuant to multiple

Registration Statements, as well as unregistered shares. Tracing was never possible for them.

*****

Respectfully submitted this 20th day of February 2024.

New York, New York

_____

Jack R. Wiener

# **Appendix 1**

**<u>Sources of Information Considered in Forming Expert Report</u>**

1.      The following publicly-available materials:

- DTCC, *The Depository Trust Company (DTC)*,
  https://www.dtcc.com/about/businesses-and-subsidiaries/dtc (last visited Jan. 29,
  2024)

- VIRGINIA B. MORRIS & STUART Z. GOLDSTEIN, LIFE CYCLE OF A
  SECURITY (2010),
  https://books.google.com/books?id=Hv8ipHbVoGUC&printsec=frontcover&sour
  ce=gbs_ge_summary_r&cad=0_#v=onepage&q&f=false (last visited Jan. 29,
  2024)

- NASDAQ, *The Depository Trust Company*,
  https://www.nasdaq.com/glossary/d/depository-trust-company (last visited Jan.
  29, 2024)

- DTCC, *Blanket Issuer Letter of Representations Template*,
  https://www.dtcc.com/-/media/Files/Downloads/legal/issue-
  eligibility/eligibility/BLOR-Template.pdf (last visited Jan. 29, 2024)

- Press Release, DTCC, *DTCC Comments on SEC Ruling around Expanded US
  Treasury Clearing* (Dec. 14, 2023),
  https://www.dtcc.com/news/2023/december/14/dtcc-comments-on-sec-ruling-
  around-expanded-us-treasury-clearing

- DTCC, *FAQ: How Issuers Work with DTC*, https://www.dtcc.com/settlement-
  and-asset-services/issuer-services/how-issuers-work-with-dtc (last visited Jan. 29,
  2024)

- DTCC, *Rules, By-Laws and Organization Certificate of The Depository Trust
  Company* (Aug. 2023),
  https://www.dtcc.com/~/media/Files/Downloads/legal/rules/dtc_rules.pdf

- DTCC, *DTC Member Directories* (updated Dec. 29, 2023),
  http://www.dtcc.com/client-center/dtc-directories. \Rohan Amin, *Chase's 2022
  Digital Banking Trends*, J.P. MORGAN CHASE,
  https://www.jpmorgan.com/technology/news/chase-2022-digital-banking-trends
  (last visited Jan. 29, 2024)

- FINRA, 2023 FINRA INDUSTRY SNAPSHOT (Aug. 23, 2023), https://www
  finra.org/sites/default/files/2023-04/2023-industry-snapshot.pdf.

- Fidelity Investments, *About Fidelity Institutional*,
  https://clearingcustody.fidelity.com/app/item/RD_13569_ 42626/about.html (last
  visited Jan. 29, 2024)

- Fidelity Investments, *Q3 2022 Business Update*, https://www.fidelity.com/bin-public/060_www_fidelity_com/documents/about-fidelity/Q3-2022_BusinessUpdates.pdf (last visited Jan. 29, 2024)

- SEC, *DTC Chills and Freezes* (May 1, 2012), https://www.sec.gov/oiea/investor-alerts-bulletins/ib_dtcfreezes.html

- SEC, *Transfer Agent Regulations*, 17 C.F.R. Part 240 Release No. 34-76743, File No. S7-27-15 (Dec. 22, 2015), https://www.sec.gov/rules/concept/2015/34-76743.pdf

- Press Release, DTCC, *DTCC Celebrates 40 Years of Service* (June 3, 2013), https://web.archive.org/web/20210507040651/https://www.dtcc.com/news/2013/june/03/dtcc-celebrates-40-years-of-service (last visited Jan. 29, 2024)

- DTC, 1997 ANNUAL REPORT (1997), https://www.sechistorical.org/collection/papers/1990/1997_ 0101_DTCAR.pdf

- NEW YORK STOCK EXCHANGE, INC., CRISIS IN THE SECURITIES INDUSTRY, A CHRONOLOGY: 1967–1970 (Aug. 2, 1971), http://3197d6d14b5f19f2f440-5e13d29c4c016cf96cbbfd197c579b45 r81.cf1rackcdn.com/collection/papers/1970/1971_0730_NYSECrisis.pdf

- Larry E. Bergmann, *Speech by SEC Staff: International Securities Settlement Conference — "The U.S. View of the Role of Regulation in Market Efficiency"*, SEC (Feb. 10, 2004), https://www.sec.gov/news/speech/spch021004leb.htm

- Terry Robards, *Stocks: Dam Is Holding*, N.Y. TIMES (Feb. 14, 1971), https://www.nytimes.com/1971/02/14/archives/stocks-dam-is-holding-this-time-so-far-trading-flood-is-controlled.html

- E.S. Browning, et al., *Wild Day Caps Worst Week Ever for Stocks*, WALL ST. J. (Oct. 11, 2008), https://www.wsj.com/articles/SB122368071064524779

- Suellen M. Wolfe, *Escheat and the Challenge of Apportionment: A Bright Line Test to Slice a Shadow*, 27 ARIZ. ST. L.J. 173 (1995)

- SEC, *Study of Unsafe and Unsound Practices of Brokers and Dealers*, H.R. Doc. No. 92-231 (Dec. 1971), http://3197d6d14b5f19f2f440-5e13d29c4c016cf96cbbfd197c579b45r81.cf1rackcdn.com/collection/papers/1970/1971_1201_SECUnsafe_01.pdf

- DTC, 1989 ANNUAL REPORT (1989), http://3197d6d14b5f19f2f440-5e13d29c4c016cf96cbbfd197c579b45r81.cf1rackcdn.com/collection/papers/1980/1989_0101_DTCAR.pdf

- DTCC, DISCLOSURE FRAMEWORK FOR COVERED CLEARING AGENCIES AND FINANCIAL MARKET INFRASTRUCTURES (Mar. 2023), https://www.dtcc.com/-/media/Files/Downloads/legal/policy-and-compliance/DTC_Disclosure_Framework.pdf

- John C. Wilcox et al., *"Street Name" Registration & The Proxy Solicitation Process*, in AMY GOODMAN ET AL., EDS., A PRACTICAL GUIDE TO SEC PROXY AND COMPENSATION RULES (6th ed. 2018), https://books.google.com/books?id=4FOEDwAAQBAJ& newbks=1&newbks_redir=0&printsec=frontcover&dq=A+PRACTICAL+GUIDE +TO+SEC+PROXY+AND+COMPENSATION+RULES&hl=en#v=onepage&q= A%20PRACTICAL%20GUIDE%20TO%20SEC%20PROXY%20AND%20CO MPENSATION%20RULES&f=false

- SEC, *Glossary: Holding Your Securities*, https://www.investor.gov/introduction-investing/investing-basics/glossary/holding-your-securities (last visited Jan. 29, 2024)

- LEGISLATIVE HISTORY OF THE REVENUE ACT OF 1932: P.L. 72-154: 47 STAT. 169 (1932), https://books.google.com/books?id=BCjVAAAAMAAJ&pg=PA1229&lpg=PA1 229&dq=%22%22Revenue+Act+of+1932%22+AND+%221229%22+AND+%22 in+all+of+these+cases+it+is+necessary+for+the+broker+to+transfer+the+certific ate+into+a+street+name%22&source=bl&ots=S14dyJv8Yx&sig=ACfU3U0ajD4 hxFywXnr8wXaVhkF9wthdlg&hl=en&sa=X&ved=2ahUKEwjL1caz5IWEAxW UGTQIHSQwAmUQ6AF6BAgMEAM#v=onepage&q=%22%22Revenue%20Ac t%20of%201932%22%20AND%20%221229%22%20AND%20%22in%20all%2 0of%20these%20cases%20it%20is%20necessary%20for%20the%20broker%20to %20transfer%20the%20certificate%20into%20a%20street%20name%22&f=false

- MILTON N. NELSON, READINGS IN CORPORATION FINANCE (1st ed. 1926), https://books.google.com/books?hl=en&lr=&id=IQdDAAAAIAAJ&oi=fnd&pg= PA1&dq=Milton+nelson&ots= NXUvAB7FLR&sig=DCCmVmak3JwJz0dcHLjTvhU6_c8#v=onepage&q=Milto n%20nelson&f=false

- U.S. Congress, *Trading with the Enemy: Hearings before the Subcommittee of the Committee on Commerce, United States Senate*, Sixty-Fifth Congress, First Session on H. R. 4960 (1917), https://books.google.com/books?id=pQgQAAAAIAAJ&printsec=frontcover#v=o nepage&q&f=false

- *Reichard* v. *Hutton*, 142 N.Y.S. 935 (App. Div. 1913).

- William V. Holohan, *Contribution Among Securities Pledged by a Defaulting Stock Broker*, 4 S. CAL. L. REV. 1 (1930

3

- SEC, FINAL REPORT OF THE SECURITIES AND EXCHANGE COMMISSION ON THE PRACTICE OF RECORDING THE OWNERSHIP OF SECURITIES IN THE RECORDS OF THE ISSUER IN OTHER THAN THE NAME OF THE BENEFICIAL OWNER OF SUCH SECURITIES, No. 80-014 (Dec. 3, 1976), https://original-ufdc.uflib.ufl.edu/AA00022450/00001

- DTCC, *The Fast Program*, https://www.dtcc.com/settlement-and-asset-services/agent-services/fast (last visited Jan. 29, 2024).

- CUSIP Global Services, *About Us*, https://www.cusip.com/about/index.html (last visited Jan. 29, 2024).

- CUSIP Global Services, *Inside the CGS Identification System* (Aug. 2010), https://web.archive.org/web/20211102145159/https://www.cusip.com/pdf/CUSIP_Intro_03.14.11.pdf

- DTCC, OPERATIONAL ARRANGEMENTS (Oct. 2023), https://www.dtcc.com/~/media/Files/Downloads/legal/issue-eligibility/eligibility/operational-arrangements.pdf

- CUSIP Global Services, *Universally Recognized Identifier for Financial Instruments*, https://www.cusip.com/identifiers.html#/CUSIP (last visited Jan. 29, 2024)

- SEC, *Issuer Restrictions or Prohibitions on Ownership by Securities Intermediaries*, 17 C.F.R. Part 240 Release No. 34-50758A, File No. S7-24-04, RIN 3235-AJ26 (Mar. 7, 2005), https://www.sec.gov/rules/final/34-50758a.htm

- SEC, *Staff Legal Bulletin No. 14f (CF)* (Oct. 18, 2011), https://www.sec.gov/corpfin/staff-legal-bulletin-14f-shareholder-proposals?

- SEC, *Rule 144: Selling Restricted and Control Securities* (Jan. 16, 2013), https://www.sec.gov/reportspubs/investor-publications/investorpubsrule144

- UCC § 8 (2019), https://law.justia.com/codes/new-york/2019/ucc/article-8/

- SEC, *Self-Regulatory Organizations; The Depository Trust Company; Notice of Filing and Immediate Effectiveness of a Proposed Rule Change to Amend the DTC Deposits Service Guide Relating to Procedures for the Deposit of Nontransferable Securities*, Release No. 34-86897 (Sept. 6, 2019), https://www.sec.gov/rules/sro/dtc/2019/34-86897.pdf

- SEC, *Roundtable on Proxy Voting Mechanics* (May 23, 2007), https://www.sec.gov/spotlight/proxyprocess/proxyvotingbrief.htm

- SEC, *Shortening the Securities Transaction Settlement Cycle*, Exchange Act Release No. 34-94196) (Feb. 15, 2023),

4

https://www.sec.gov/rules/2023/02/shortening-securities-transaction-settlement-cycle#34-94196

- CFI Team, *Market Maker*, CORPORATE FINANCE INSTITUTE, https://corporatefinanceinstitute.com/resources/career-map/sell-side/capital-markets/market-maker (last visited Jan. 29, 2024)

- Maureen O'Hara & George S. Oldfield, *The Microeconomics of Market Making*, 21 J. FIN. & QUANTITATIVE ANALYSIS 361 (1986)

- SEC, *Investor Bulletin: Holding Your Securities* (July 12, 2023), https://www.sec.gov/reportspubs/investor-publications/investorpubsholdsechtm.html

- DTCC, *Deposit/Withdrawal at Custodian*, https://www.dtcc.com/settlement-and-asset-services/securities-processing/deposit-withdrawal-at-custodian (last accessed Jan. 26, 2022).

- SEC, *Section 13(f) Securities List, 3rd Quarter 2020*, at 370, https://www.sec.gov/divisions/investment/13f/13flist2020q3.pdf (last accessed Jan. 26, 2024).

- (xx) SEC, *Section 13(f) Securities List, 4th Quarter 2020*, at 384, https://www.sec.gov/divisions/investment/13f/13flist2020q4.pdf (last accessed Jan. 26, 2024).

2. Documents produced in this action bearing the following Bates numbers:

- JPMC-00177571

- JPMC-00185434

- NEWLIGHT-OSH_00078928

- JPMC-00168201

- NEWLIGHT-OSH_00087509

- NEWLIGHT-OSH_00078906

- OSH_DEARBORN_00000019

- OSH_DEARBORN_00000603

- OSH_DEARBORN_00001313

- PEREGRINE_005875

5

3.       Amended Complaint, Exhibit A to Certification of Michael Kennedy; Exhibit B to Motion for Appoint as Lead Plaintiff and Approval of Lead Plaintiff's Selection of Lead Counsel (ECF No. 11-2).

4.       Declaration of Kimberlee Koskiewicz of the American Stock Transfer & Trust Company, LLC ("AST Decl.").

5.       Declaration of Ann Marie Bria of The Depository Trust & Clearing Company ("DTC Decl.").

6.       AST Shareholder Lists Dated February 1, 2021; March 1, 2021; and June 1, 2021

7.       Transcripts of depositions of corporate representatives of the following:

      a)       Dearborn

      b)       CPAT

      c)       BRS

      d)       Peregrine

      e)       Westfield

# **<u>Appendix 2</u>**

**JACK R. WIENER**

300 E. 74th St.; 19G                                                    C: (917) 626-0154
NY, NY 10021-3715                                         Jackrwiener@gmail.com


**EXPERIENCE:**

**FINANCIAL SERVICES CONSULTING**, New York, NY                          2009-present
   **Chief Executive Officer**

> Founded consulting firm that provides advice and expert witness support with regard to transactions, clearance & settlement, custody, regulation, compliance, and litigation in the areas of securities, derivatives, banking law and operations, and white collar defense. Advise banks, investment banks, broker-dealers, hedge funds, investment advisors, clearing firms, regulators, governments, individuals, and issuers from the US, Canada, France, Germany, the United Kingdom, Sweden, Israel, China, and the Cayman Islands in structuring and litigation matters. Serve as expert witness for US Attorney's Office (SDNY) on clearance & settlement and international securities law, for law firms and global custodian banks at trials in Ireland and the Cayman Islands in multi-billion dollar Madoff-related litigation, for European banks in litigation regarding loss of $1.8 billion in asset-backed commercial paper, for clearing firm in dividend litigation, and for various parties in Section 11 securities class action litigation. Advise Israel Ministry of Finance on restructuring bond offerings. In addition, represent athletes in sports law and SafeSport matters.

- **US Delegate**. Represent the US in two multi-lateral, 40-nation treaty negotiations on the law of custody and transfer of securities. Negotiating the Hague Securities Convention (cross-border pledging of securities) and the Unidroit Securities Convention (harmonizing substantive international securities law/regulation). Appointed by US State Department.

- **Adjunct Professor of Law** at Brooklyn Law School, 2012-present. Teach International Securities Regulation & Compliance, and International Sales of Securities and Goods, and the Law of War.

**SECURITIES INDUSTRY & FINANCIAL MARKETS ASSN,** New York, NY          2007-08
   **Managing Director & Associate General Counsel**

> **Legal, Regulatory, Compliance, Advocacy, and Market Practice Activities:** Headed securities, fixed income, and derivatives market practice, legal, regulatory, and compliance initiatives of corporate credit market, primary market, and money market divisions for the largest securities industry lobby organization in the US. Advised the general counsels and investment advisors committees on securities and custody law, practice, regulation, and compliance. Represented interests of 650 largest global underwriters and asset managers with the Federal Reserve Bank, CFTC, SEC, FINRA, and European Commission. Liaised with ISDA on derivatives matters. Led various international initiatives.

**Credit Rating Agencies, Rule 144A, and MAAU:** Led global industry task force that developed credit rating agency recommendations agreed upon by underwriters, buy-side firms, banks, and issuers. Recommendations have driven global advocacy in the US and Europe, and are Presidents Working Group-endorsed. Liaised with senior members of the PWG, Treasury Department, and US and European regulators. Led task force of 16 largest global underwriters that developed an industry Guidance for Rule 144A issues, and an industry-wide Master Agreement Among Underwriters.

**THE DEPOSITORY TRUST & CLEARING CORPORATION,** New York, NY

| | |
|---|---:|
| **Deputy General Counsel & Managing Director** | 2001-05 |
| **General Counsel, Global Asset Solutions LLC** | 2003-05 |
| **Senior Counsel & Vice President** | 1999-2001 |
| **Associate Counsel & Vice President** | 1995-99 |
| **Associate Counsel** | 1989-95 |

*DTCC is the parent company of DTC, GSCC, NSCC, and GAS. Custodies $72 trillion in securities, handles $2.4 quadrillion in transactions annually, and operates Deriv/SERV for derivatives. Regulated by the Fed, SEC, and NYS Banking Dept.*

**Corporate Support:** Responsible for the company's activities in the areas of securities custody and transfer. Provided strategic legal counsel to senior management, the Board of Directors, and the Underwriting, Operations, Derivatives, Compliance, Risk, Internal Audit, International, Strategy, Dividends, Reorganization, Membership, Human Resources, and Systems Departments, and to subsidiaries (DTC, Deriv/SERV, GSCC, NSCC, and GAS). Structured broad range of transactions. Negotiated and drafted various agreements, including custodian and sub-custodian agreements with some of the world's largest custodians of securities, and MOUs and membership, joint venture, acquisition, and technology agreements. Represented DTC on the Securities Clearing Group and the Unified Clearing Group, comprised of the US clearance and settlement self-regulatory organizations, which focus on identifying and minimizing risk. Participated in the design and implementation of several systems critical to the custody and processing of securities. Managed 12 staff members.

**Regulatory:** Liaised with regulators on application of existing and proposed banking and securities laws and regulations, risk, compliance, audits, reviews, company practices, clearance-and-settlement offerings, changes in services, regulatory filings, derivatives, and anti-money-laundering. Responsible for regulatory examinations and investigations. Interfaced with the SEC, Federal Reserve Bank of NY, and NY State Banking Dept., as well as the Treasury Department, OFAC, NASD, NYSE, GAO, and the UK's Financial Services Authority ("FSA"). Submitted comment letters to and worked closely with regulators on revisions, relating to the custody of securities, to the '40 Act (Rule 17f) and the '34 Act (Section 17A). Advised management on existing and proposed SEC, Fed, and CFTC rules and regulations.

**Compliance/Risk:** Developed and oversaw the enforcement of compliance and risk management rules, controls, policies, and procedures for securities custody and transactions, haircuts, underwritings, counter-party exposure, capital requirements, credit

2

risk, stress-testing, Basel II, and membership. Performed investigations of fraud and breaches of compliance policies. Liaised with regulators as to appropriate risk control measures, including standards for Participant admissions.

**International:** Headed international clearance-and-settlement law practice. Structured and negotiated cross-border links and transactions with U.S. and non-US regulators, and with non-US custodian banks, broker-dealers, and depositories, supporting global trading for issues such as ordinary shares of UBS and DaimlerChrysler. Established, obtained regulatory approval of, and handled legal issues for UK and China offices. Negotiated new international securities processing standards to standardize global practices, as a member of the G-30 Legal Working Group.

**Underwriting:** Headed staff providing counsel on securities law aspects of debt and equity global offerings. Advised with regard to clearance & settlement, including IPOs, exchanges, book-entry-only and uncertificated issues, and private placements.

**General Counsel of Global Asset Solutions LLC:** General Counsel to major operating subsidiary handling all start-up business of parent, including a corporate actions validation service.

**Treaty Negotiations:** Serve on US Delegations negotiating the Hague Securities Convention and the Unidroit Securities Convention with 40 nations. Appointed by the US State Department.

**WEBSTER & SHEFFIELD,** New York, NY                                       1987-89

**WILLKIE FARR & GALLAGHER,** New York, NY                            1985-87

**PEPPER, HAMILTON & SCHEETZ,** Philadelphia, PA                    1982-85

As a securities associate, negotiated and drafted agreements for a wide range of securities, banking, and corporate transactions. Worked primarily on mergers & acquisitions, leveraged buy-outs, and divestitures. Represented bidders, purchasers, and sellers. Drafted and filed a variety of SEC filings, including '33 & '34 Act filings.

## EDUCATION:

**J.D., UNIVERSITY OF PENNSYLVANIA LAW SCHOOL,** Philadelphia, PA        1982

Honors: Editor, **University of Pennsylvania Law Review**
Activities: Morris Fellow; Phi Delta Phi

**B.A., BROOKLYN COLLEGE,** Brooklyn, NY                                    1979

Class Standing:    3.98 G.P.A.; *summa cum laude*
Double Major:      Political Science & Psychology (with honors)
Honors:            Phi Beta Kappa; Dean's List; Scholars Program
Awards:            Sive Award; Regents Scholarship; Social Science Scholarship

Activities:    Fencing – NCAA épée semi-finalist 1977, 1979; Team MVP & Captain, 1978-79

**ADMITTED:** New York, DC, and Pennsylvania

**PRESENTATIONS:**

Presented speeches in the US, United Kingdom, Germany, Switzerland, Israel, China, Peru, and Argentina on various topics, including on the custody and transfer of securities, derivatives, Rule 144A/Reg. S offerings, Rule 17f of the '40 Act, credit ratings, bitcoins, and international legal harmonization.

4

# **Appendix 3**

**<u>Deposition, Trial, and Arbitration Testimony</u>**

I have not provided trial or arbitration testimony in the last four years. I have provided deposition testimony in the last four years as follows:

1.  Deposition testimony in *In re Talis Biomedical Sec. Litig.*, Case No. 3:22-cv-00105-SI (N.D. Cal.) (Feb. 5, 2024).

2.  Deposition testimony in *In re AdaptHealth Corp., Sec. Litig.*, Case No. 2:21-cv-03382-HB (E.D. Pa.) (May 8, 2023).

3.  Deposition testimony in *In re Cloudera, Inc. Sec. Litig.*, Case No. 19-CV-03221-LHK (N.D. Cal.) (August 1 & August 3, 2022).

4.  Deposition testimony in *Hound Partners Offshore Fund LP et al v. Valeant Pharmaceuticals International, Inc.*, Case No. 18-8705 (D. NJ.) (June 24 & June 27, 2022).

5.  Deposition testimony in *Hayden v. Portola Pharm.*, Case No. 20-cv-00367-VC (N.D. Cal) (May 18, 2022).

6.  Deposition testimony in *In re Evoqua Water Technologies Corp. Sec. Litig.*, Case No. 1:18-cv-10320-JPC (S.D.N.Y.) (March 25, 2021).

7.  Deposition testimony in *In re American Realty Capital Properties, Inc. Litig.*, Case No. 1:15-mc-00040-AKH (S.D.N.Y.) (June 28, 2019).

8.  Deposition testimony in *Oklahoma Law Enforcement Retirement System v. Adeptus Health Inc., et al.*, Case No. 4:17-cv-0449 (E.D. Tx.) (March 7, 2019).