# Exhibit 37

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

REGINALD T. ALLISON,                )
Individually and on behalf of       )
All Others Similarly Situated,      )
                                    )
            Plaintiffs,             )
                                    )
      vs                            )   No. 1:22-cv-00149
                                    )
                                    )
OAK STREET HEALTH, INC., et al,    )
                                    )
            Defendants.             )

        The videorecorded deposition of CHAD

 COFFMAN, CFA, called by the Defendants for

examination, pursuant to notice and pursuant to

the Rules of Civil Procedure for the United States

District Courts pertaining to the taking of

depositions, taken before Diane J. Corona, CSR,

License No. 084-00257, at One South Dearborn

Street, Chicago, Illinois, on Tuesday, January 23,

2024, commencing at the hour of 9:00 o'clock a.m.


 Magna Legal Services
 866.624.6221
 www.MagnaLS.com, by:
 Diane J. Corona, CSR



Page 2

APPEARANCES:
LABATON SUCHAROW
140 Broadway
New York, New York 10005, by:
JAMES M FEE, ESQ ,

EMAIL: JFee@labaton com

-and-

ROBBINS GELLER RUDMAN & DOWD
200 South Wacker Drive, 31st Floor
Chicago, Illinois 60606, by:
FRANK RICHTER, ESQ ,
appeared on behalf of the Plaintiffs,

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas,
New York, New York 10019, by:
STACI YABLON, ESQ
JOSEPH M DaSILVA, ESQ

EMAIL: syablon@paulweiss com
Jdasilva@paulweiss com
appeared on behalf of Oak Street
Health, et al ,

SIDLEY AUSTIN, LLP
One South Dearborn
Chicago, Illinois 60603, by:
JARRETT H GROSS, ESQ
PATRICK MUSGRAVE, ESQ
EMAIL: jarrett gross@sidley com
patrick musgrave@sidley com,

appeared on behalf of the Independent
Director Defendants;

Page 3

APPEARANCES: (Cont'd)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive, Suite 2800
Chicago, Illinois 60606, by:
CLARE LILEK, ESQ. (Via Zoom)

EMAIL: clare.lilek@skadden.com

appeared on behalf of the Underwriter
Defendants.

ALSO PRESENT: BRANDON RACKOWSKI, Videographer

* * * *

Page 4

I N D E X

THE WITNESS: CHAD COFFMAN

EXAMINATION BY:                     PAGE
                    5
Ms. Yablon
                    316
Mr. Richter
                    319
Ms. Yablon

COFFMAN           DESCRIPTION        PAGE
EXHIBITS

No. 1    Expert Report of Chad Coffman    11

No. 2    Redline report - Shupe v.    94
         Rocket report compared with Oak
         Street Health report
No. 3    SEC form S-1 Registration    179
         Statement

No. 4    Email from Hoffman re: Oak    189
         Street Health newsletter
         8.31.20
No. 5    Oak Street Health: Refreshing    216
         Approach to Healthcare

Page 5

THE VIDEOGRAPHER: We are now on the record. This begins Videotape No. 1 in the deposition of Chad Coffman in the matter of Reginald T. Allison versus Oak Street Health, Incorporated, et al., in the United States District Court, Northern District of Illinois. Today is Tuesday, January 23, 2024 and the time is 9:03 a.m. This deposition is being taken at Sidley Austin, LLP located at One South Dearborn, Chicago, Illinois 60603 at the request of Paul, Weiss, Rifkind, Wharton & Garrison, LLP.

The videographer is Brandon Rackowski of Magna Legal Services and the court reporter is Diane Corona of Magna Legal Services. All counsel will be noted on the record.

Will the court reporter please swear in the witness.

(Witness sworn.)

CHAD COFFMAN, CFA, having been first duly sworn, was examined and testified as follows:

E X A M I N A T I O N

BY MS. YABLON:

Q     Good morning. Can you state your



Page 6

name for the record, please?

A    Chad William Coffman.

Q    And your address?

A    Business address?

Q    Sure.

A    125 South Wacker Drive, Suite 2610.

Q    My name is Staci Yablon and I am an attorney at Paul, Weiss and represent certain of the defendants in this case including Oak Street Health, two of the sponsor defendants, several individuals as well, and I'm going to be here asking you questions today.  Okay?

A    Okay.

Q    And I understand you've been designated by plaintiffs as an expert witness in this case; right?

A    That's correct.

Q    And you've been deposed as an expert witness prior to today; correct?

A    Correct.

Q    About how many times?

A    I don't have an exact count, but certainly several dozen.

Q    Several dozen.  More than 50?

Page 7

A    Probably, yes.

Q    More than a hundred?

A    Not sure.  It would be probably around in that area.  Probably less than a hundred, I think, but probably close.

Q    Understood.

And for purposes of today, what topics are you offering your expert opinion on?

A    The market efficiency of Oak Street Health stock and the applicability of classified damages methodologies in this case.

Q    And prior to today, how many times have you been deposed as an expert on market efficiency?

A    I don't know an exact number.

Q    Approximately?

A    Again, it would be several dozen probably.

Q    In each of the several dozen cases you've previously referenced, did you opine on market efficiency?

A    Not necessarily.

Q    So a subset of the cases in which

Page 8

you've previously testified?

A    Yes.

Q    And a majority of that subset?

A    I don't know.  That's not something I've ever calculated.

Q    Okay.  And how many times have you previously been deposed as an expert on whether calculating Section 10(b) damages is subject to common methodology in a -- across a class?

A    Again, it would be at least several dozen.

Q    More than the number of times where you've been an expert with respect to market efficiency?

A    No, probably not.

Q    Less than the number of times?

A    Probably a few less, not a lot.

Q    Okay.  And how many times have you previously been deposed as an expert on whether calculating Section 11 damages is subject to common methodology across a class?

A    At least a few times but -- but less.

Q    Less than both market efficiency -- or less than market efficiency?

Page 9

A    Yes.

Q    And also less than the number of times you've testified with respect to Section 10(b) damages; is that correct?

A    That's correct, yes.

Q    Have you ever been deposed in your personal capacity?

A    No.

Q    So at this point you are well familiar with deposition practices, but I'll just go over a few very brief ones to make sure that we're on the same page.

If any of my questions are unclear, please speak up.  Okay?

A    Okay.

Q    If you don't speak up, I'm going to under -- believe that you understood the question.  Okay?

A    Okay.

Q    Please respond audibly as you're doing right now so the court reporter can make a record.  Okay?

A    Okay.

Q    Please don't start answering a



Page 10

question until I've had a chance to finish the question. Okay?

A    Okay.

Q    And in turn, I will try to let you finish your answers before I ask the next question. Okay?

A    Okay.

Q    We're going to take plenty of breaks today and I'm happy to accommodate any time you need one, with the only exception when there is a question pending I'd ask that you finish the question before we go off the record. Okay?

A    Okay.

Q    And you understand you're under oath today; right?

A    I do.

Q    And you understand that the sworn testimony may be played for a judge or jury at some point in the future; right?

A    Yes.

Q    Is there any reason you are unable to give complete and truthful testimony today?

A    No.

Q    Do you have any questions of me

Page 11

before we begin?

A    No.

MR. RICHTER:  Can we go off the record real quick?

MR. FEE:  Sure.

THE VIDEOGRAPHER:  We are going off the record.  The time is 9:08 a.m.

(Discussion off the record.)

THE VIDEOGRAPHER:  Beginning of Media No. 2 in the deposition of Chad Coffman.  Going on the record, the time is 9:11 a.m.

BY MS. YABLON:

Q    Thank you.  I'm going to mark as Exhibit Coffman 1 a copy of your expert report, which was filed on December 15, 2023 in this case.  Okay?

A    Okay.

(Coffman Exhibit No. 1 was marked for identification.)

BY MS. YABLON:

Q    Are you familiar with this document?

A    It appears to be a copy of my report, I think the exhibit number on the front is not something I produced, but the rest of the pages

Page 12

appear to be a copy of a report I prepared.

Q    Yes.  And for your information the exhibit number on the front I assume was prepared by counsel for plaintiffs, as this was an exhibit to one of their -- to their brief for class certification.

Other than the exhibit number on first page, does the rest of this look like the expert report you authored in this matter?

A    Yes.

Q    And can you turn to Page 41.

MR. FEE:  Is that on the PACER stamp?

BY MS. YABLON:

Q    It's the last page of the report before we get into the exhibits.

A    Okay.

Q    And you see it says executed on December 15, 2023 there?

A    Yes.

Q    And there's a signature below that?

A    Yes.

Q    Is that your signature?

A    It is.

Q    Did you sign this report on

Page 13

December 15, 2023?

A    I did.

Q    And after that page, you'll see that there are 13 exhibits to the report, if you want to flip through them.

A    Yes.

Q    There's also an Appendix A titled Documents Considered.

A    Uh-huh.

Q    And then after that your CV; right?

A    Correct.

Q    Okay.  And when you look at Appendix A, which is Page 56 of 79 at the very top it says that with the filing information.

Do you see where I am?

A    Uh-huh.

Q    Does this Appendix A list the documents and data you relied upon in forming your opinion that's included in this report?

A    It does.  Some of the items are summaries of things I -- I considered, so I didn't list every single document.  For example, in the analyst report section I, you know, describe generally the analyst report I had -- analyst



Page 14

reports I had, but I don't list every single one. So if -- there are some summary items here, but, yes, this reflects at least a summary of all the material I considered.

Q    So you're drawing my attention to the second page of this Appendix A where it says Oak Street Health, Inc. Analyst Reports?

A    Yes.

Q    And you're saying within -- there's, I guess, two main bullets and one sub-bullet here, and this does not comprise all of the analyst reports you considered; is that right?

A    Well, no, it does. What I'm saying is it's a summary. So for example, the first bullet point says "analyst reports supplied by counsel and S&P Capital IQ for the period August 6, 2020 to February 7, 2023, including but not limited to," and then I list one of the particular analyst reports. But there were dozens and dozens of analyst reports I consider, they're just not listed individually here.

Q    And if they're not listed individually, does that mean the report does not take them into account?

Page 15

A    No, it takes them into account. I -- I or my staff have reviewed those reports.

Q    So if after today's deposition I ask for a list of all the analyst reports that you or your staff considered, you'd be able to provide that?

A    Yes. I believe -- I believe that would normally have already been provided if there was a request for my backup materials.

Q    Okay. And so sitting here today your understanding is that all of the analyst reports that you or your staff considered is included in the backup materials that counsel provided to us?

A    Yes.

MR. FEE:  Objection to form.

BY MS. YABLON:

Q    And today are you able to testify to all aspects of this report including the appendicis?

A    Yes.

Q    And I'm going to refer to the entirety of the report, appendices and exhibits as your report. You'll understand when I'm saying that that I'm talking about the entirety of this

Page 16

document; correct?

A    Yes.

Q    Is there an updated version of your report that you wish to share today?

A    No.

Q    Do you have any revisions to the report that you'd like to identify for us today?

A    It's not --

MR. FEE:  Objection to form.

THE WITNESS:  It's not a revision, but since the filing of this report and today I've changed employers.

BY MS. YABLON:

Q    Okay. And we're going to get to that shortly.

Other than changing employers, is there anything else to change in the report to today?

A    No.

Q    Is there anything in the report sitting here today that you believe to be inaccurate?

A    Not that I'm aware of, no.

Q    Does your report contain a complete

Page 17

statement of all opinions you intend to express in this matter?

MR. FEE:  Objection to form.

THE WITNESS:  It contains all the opinions that I've been asked to date to form in this case.

BY MS. YABLON:

Q    Okay. But you may form other opinions as the case continues; correct?

MR. FEE:  Objection to form.

THE WITNESS:  Possibly. I don't know. I have not been asked to yet.

BY MS. YABLON:

Q    Does your report contain a complete statement of the basis and reasons for your opinions that you have expressed in the report?

MR. FEE:  Objection to form.

THE WITNESS:  It contains what -- the -- a summary of the bases. Obviously, through my years of experience and education, I know that -- I have a lot of expertise in these areas. I didn't commit to paper every single thing I might have thought about or considered that -- that formed the bases, but I believe it provides a



Page 18

summary of the bases, yes.

BY MS. YABLON:

Q     And it provides the conclusions that you reached?

A     Yes.

Q     All of the conclusions you reached with respect to the two issues that you were opining on?

MR. FEE:  Objection to form.

THE WITNESS:  Well, it certainly provides my overall opinion that I'm giving in this case.  Obviously, underneath those there are sub-opinions related to, for example, some of the efficiency factors that are described in my report.  And then within each of those I'm applying, like I said, expertise and experience that goes beyond the boundaries of the report itself, but I think it describes the bases for those opinions.

BY MS. YABLON:

Q     And to form your opinions in this matter, did you rely on anything that is not listed or summarized in Exhibit A?

MR. FEE:  Objection to form.  Asked

Page 19

and answered.

THE WITNESS:  Again, it would have been, just by my personal experience and expertise would go beyond what's listed on Appendix A.  But beyond that, I can't think of anything.

BY MS. YABLON:

Q     How did you identify materials to rely on in this case?

A     Well, I have a lot of experience in -- in being asked to opine on these matters.  So I have a fairly standard process in place when asked to evaluate market efficiency of what analyses I undertake; and, therefore, we could go, you know, factor by factor, but essentially I -- I collected the data that would be necessary to analyze the -- the issues that I was being asked in the case and communicated to my staff what -- what analyses I wanted to complete and what data to collect to do that.

Q     And who compiled the data that you used for purposes of your analysis?

MR. FEE:  Objection to form.

THE WITNESS:  When you say compiled, I mean, there was certainly data that was

Page 20

collected at my direction by my staff.  So there were a number of people that assisted me in this report.  If you're asking me who they are it's -- oh, okay.

BY MS. YABLON:

Q     Go ahead.  You can give me the names.

A     It's Mark Hedstrom, Jaida Smith, and Ashley Hwang were the primary people involved.  There may have been others that did certain tasks, but those were the primary people on the matter.

Q     And just to confirm, the documents and data that's reflected in Ex -- Appendix A, excuse me, were provided to your counsel for purposes of the backup material supporting your report; is that correct?

MR. FEE:  Objection to form.

THE WITNESS:  I recall getting a request for the backup to my report.  I instructed my staff to prepare all the backup that would normally be provided for a report such as this, and my understanding is it was provided.  I was not directly involved in that process.

BY MS. YABLON:

Q     Is there anything to your knowledge

Page 21

in Appendix A that was not included in the backup materials?

MR. FEE:  Objection to form.

THE WITNESS:  Not that I'm -- not that I'm aware of.  Again, obviously, the Complaint in the case and memorandum and order in the case, I don't know that that would have been provided since that was something, obviously, that everybody in the case has access to.  But in terms of any data and articles or analyst reports, I believe was turned over, yes.

BY MS. YABLON:

Q     Did you review any documents that the parties produced in this case?

MR. FEE:  Objection to form.

THE WITNESS:  Outside of what's in the Complaint, no, I don't believe so.

BY MS. YABLON:

Q     Did you review any documents that defendants provided or produced to plaintiffs in this case?

MR. FEE:  Objection to form.  Asked and answered.

THE WITNESS:  I don't believe so, no.



Page 22

BY MS. YABLON:

Q   Why not?

A   It wasn't necessary to form -- to analyze and form the opinions I'm giving in this case.

Q   If you flip to Page 60, which is your CV.  Are you there?

A   Yes.

Q   You have a bachelor's degree; right?

A   I do.

Q   And that's from where?

A   Knox College.

Q   And what was your major?

A   Economics.

Q   Did you take coursework on market efficiency while at college?

A   Not that was specifically focused on market efficiency.  I believe the idea was covered and certainly the underlying principles -- a lot of the underlying principles of market efficiency were covered, but there wasn't like a course on market efficiency or anything like that.

Q   Did you study calculation of damages in securities fraud cases while you were at

Page 23

college?

A   No, that was not a specific topic. But, obviously, the -- the underlying economic principles of microeconomics and valuation were covered.

Q   And after graduating from Knox College, you then went on to get a master's of public policy; right?

A   That's correct.

Q   And you received that from the University of Chicago?

A   That's correct.

Q   And did that degree have a particular focus?

MR. FEE:  Objection to form.

THE WITNESS:  Not a formal focus.  I made an effort to focus on economics and statistics within that degree, but not a -- not a defined focus that's recognized.

BY MS. YABLON:

Q   Did you take any coursework on market efficiency while at University of Chicago?

A   Again, it was certainly a topic that was covered, but I don't -- there was not an

Page 24

entire course devoted to it or anything like that. And certainly the economic principles underlying it were covered in the classes that I took there.

Q   And what about calculation of damages in securities fraud actions?

A   I don't recall that being a specific topic, but, again, the principles underlying it were certainly part of the coursework.

Q   And you do not have a master's degree in economics; correct?

A   I do not.

MR. FEE:  Objection to form.

BY MS. YABLON:

Q   And you do not have a Ph.D. in economics; correct?

MR. FEE:  Objection to form.

THE WITNESS:  I do not.

BY MS. YABLON:

Q   Have you ever enrolled in a Ph.D. program?

A   No.

Q   Have you ever applied to a Ph.D. program?

A   No.

Page 25

Q   Do you have any certifications in finance?

MR. FEE:  Objection to form.

THE WITNESS:  Well, I have the -- I'm a CFA charter-holder, so that involved -- that's a designation that involves finance.

BY MS. YABLON:

Q   And it's the CFO -- the CFA, excuse me, is bestowed by the CFA Institute; is that correct?

A   That's correct, yes.

Q   It's not a credential awarded by a university or college; correct?

A   Correct.

MR. FEE:  Objection to form.

BY MS. YABLON:

Q   And the -- what are the prerequisites for receiving a CFA?

MR. FEE:  Objection to form.

THE WITNESS:  There are a series of three exams that have to be passed and then a certain number of years of practical experience.

BY MS. YABLON:

Q   And when you received the CFA, did



Page 26

you pass the three-part exam?

A    I did.

MR. FEE:  Objection to form.

BY MS. YABLON:

Q    Were any aspects of the CFA exam related to market efficiency?

MR. FEE:  Objection to form.

THE WITNESS:  Yes.

BY MS. YABLON:

Q    And what about, were aspects of the CFA exams related to the calculation of damages in a securities fraud case?

MR. FEE:  Objection to form.

THE WITNESS:  Again, I don't think that was a topic specifically that was covered on the exam, but the principles underlying it were.

BY MS. YABLON:

Q    And what about, were any aspect of the CFA exams related to measuring artificial inflation in stock prices?

MR. FEE:  Objection to form.

THE WITNESS:  Again, I don't recall that being a specific topic, but certainly valuation of securities and how to approach

Page 27

valuation of securities and what types of things can affect the valuation of securities was absolutely a part of that program.

BY MS. YABLON:

Q    Have you received any formal trainer -- training, excuse me, in statistical analysis?

A    Yes.

Q    What was that training?

A    I took undergraduate statistical courses, courses in statistics.  I took graduate-level courses in statistics.  That would be formal.  And then I spent many years at Chicago Partners working for University of Chicago professors performing statistical analyses, so that's less formal but certainly very relevant experience in performing statistical analyses.

Q    Do you currently teach any classes?

A    No.

Q    Have you ever taught any classes?

A    No.  I've served as a teaching assistant and I've tutored people before, but, no, I have not taught a formal class.

Q    Your CV lists two publications that you co-authored; is that correct?

Page 28

A    Yes.

Q    That is the "Railroad Construction and Land Value"; right?

A    That was one of them, yes.

Q    And "An Empirical Analysis of the Impact of Legacy Preferences on Alumni Given at Top Universities."

THE REPORTER:  Given at what, I'm sorry?

MS. YABLON:  At top universities.

THE WITNESS:  That's correct.

BY MS. YABLON:

Q    Were either of these publications peer reviewed?

A    Yes.

Q    Did you author any publications beyond these two articles?

A    No.

Q    Have you ever authored any publications on market efficiency?

A    No.

Q    Have you ever authored any publication on calculation of damages in a Section 10(b) case?

Page 29

A    No.

Q    And have you ever authored any articles on the calculation of damages in a Section 11 case?

A    No.

Q    Do you consider yourself to have a primary area of professional expertise?

MR. FEE:  Objection to form.  Vague and ambiguous.

THE WITNESS:  I guess I don't know what you mean by primary.

BY MS. YABLON:

Q    Is there a focus of your professional -- is there a particular focus where you think you have expertise?

MR. FEE:  Same objection.

THE WITNESS:  No, I would claim expertise in the general area of application of economics and statistics and finance and valuation and some experience in accounting -- some expertise in accounting as well.  I'm not a CPA, but I'm well aware of -- generally well aware of accounting principles.

BY MS. YABLON:



MAGNA
LEGAL SERVICES

Page 30

Q    And earlier you testified that you have previously served as an expert with respect to market efficiency; correct?

A    I have, yes.

Q    And Section 10 -- Section 11 damages; correct?

MR. FEE:  Objection to form.

THE WITNESS:  I have testified on Section 11 damages before, yes.

BY MS. YABLON:

Q    And 10(b) damages as well; correct?

A    I have, yes.

Q    Beyond those three areas of testimony, are there additional subjects on which you've given expert opinions?

MR. FEE:  Objection to form.

THE WITNESS:  I've testified on Section 14 claims, I believe.  I've testified in a number of labor-related matters.

BY MS. YABLON:

Q    Would you consider yourself to be an expert in market efficiency?

MR. FEE:  Objection to form.

THE WITNESS:  As it's defined in my

Page 31

report, yes.

BY MS. YABLON:

Q    How long would you consider yourself to have been an expert in market efficiency?

MR. FEE:  Objection to form.

THE WITNESS:  So if we're talking about the period over which I have specific or -- the period over which I have formal training and practical experience related to analyzing issues of market efficiency, it would probably be since the late 1990s.

BY MS. YABLON:

Q    And do you recall when was the first time you issued a report with respect to market efficiency?

A    Probably would have been in the -- around the 2009, 2010 that's an estimate.  I could figure that out more specifically, but that would be my best estimate I can give as I sit here.

Q    And do you consider yourself to be an expert on estimating damages in Section 10(b) cases?

MR. FEE:  Objection to form.

THE WITNESS:  I do.

Page 32

BY MS. YABLON:

Q    And in your view, how long have you been an expert in that area?

A    If we're talking about the period over which I had the formal economics and finance and statistics training as well as practical experience in evaluating those issues, again, since probably 1996, 1997.

Q    And when was the first time you issued a report in connection with Section 10(b) case -- with a Section 10(b) case, excuse me?

A    I believe right around 2008 or 2009.

Q    So before you issued a report with respect to market efficiency, you believe that you issued a report with respect to a 10(b); is that correct?

A    That's correct.

MR. FEE:  Objection to form.

BY MS. YABLON:

Q    And are you an expert on estimating damages in Section 11 cases?

MR. FEE:  Objection to form.

THE WITNESS:  I would consider myself that, yes.

Page 33

BY MS. YABLON:

Q    And how long have you been an expert in estimating Section 11 damages?

A    Again, based on when I had both formal training in economics and finance and statistics along with practical experience with addressing Section 11 damages since the late 1990s.

Q    And when was the first time you served as an expert in a Section 11 case?

A    I don't have a specific recollection, but I would estimate it would have been around 2009 or 2010.

Q    So similar timing with respect to when you were first an expert for market efficiency?

A    That sounds about right, yes.  Again, that's an estimate.  It's somewhere around that time.

Q    Understood.

Who is your current employer?

A    Peregrine Economics.

Q    And what is Peregrine Economics?

A    It's a firm that specializes in the



9 (Pages 30 to 33)

Page 34

application of economics and statistics, finance and valuation principles to questions we're asked as a -- by clients.

Q    Is there any relationship between Peregrine Economics and Peregrine Capital Management?

A    No.

MR. FEE:  Objection to form.

BY MS. YABLON:

Q    How long have you work at Peregrine Economics?

A    Since the first of the year.

Q    Congratulations.

What is your current role at Peregrine Economics?

A    I am the president and a cofounder.

Q    What are your primary responsibilities?

A    To perform consulting activities and help manage the firm.

Q    And in that capacity are you held out as a potential expert by Peregrine Economics?

MR. FEE:  Objection to form; vague.

THE WITNESS:  I think our -- our

Page 35

website makes clear I have that experience, so in that way, yes.

BY MS. YABLON:

Q    And are there particular topics for which you are held out as a potential expert?

A    Well, I think there's things I described as part of my specific experience, but consider myself qualified to perform analysis in the areas of economics, statistics, valuation -- I think I'll stop there.

Q    Who are the clients of Peregrine Economics?

MR. FEE:  Objection to form.

THE WITNESS:  Well, I think there's a number of different types of clients.  There's -- we have law firm clients; we have corporate clients.

BY MS. YABLON:

Q    Are Peregrine Economics' clients involved in litigation?

MR. FEE:  Objection to form; vague.

THE WITNESS:  Some are, yes.

BY MS. YABLON:

Q    And for those that are involved in

Page 36

litigation, are any of the clients defendants?

MR. FEE:  Objection to form; vague.

THE WITNESS:  Yes.

BY MS. YABLON:

Q    So sitting here today, certain of Peregrine Economics' clients are defendants in litigation; is that correct?

A    Yes.

Q    I realize you've been at Peregrine now for about three weeks, but in those three weeks have you turned down any work with respect to market efficiency?

MR. FEE:  Objection to form.

THE WITNESS:  Possibly.  I was contacted by a client with respect to a particular case and told them I was not interested in taking it.  I don't know if I was going to be asked about market efficiency in that case.

BY MS. YABLON:

Q    Without sharing anything that may be subject to privilege, is there anything more you can tell us about that, the rationale as to why you did not take on that client?

MR. FEE:  Objection to form.

Page 37

THE WITNESS:  I will say timing was a factor, but there were other reasons as well that I'm not willing to share.

BY MS. YABLON:

Q    Not willing to share because you cannot share it?

MR. FEE:  Objection to form.

BY MS. YABLON:

Q    Or cannot share them, I should say.

MR. FEE:  Testimony stands for itself.

THE WITNESS:  I think it would potentially violate confidentiality or privilege.

BY MS. YABLON:

Q    At the time you filed your report in December of 2023, your employer was Global Economics Group; correct?

A    Yes.



MAGNA
LEGAL SERVICES

Page 38



Q   What was your last day at Global Economics Group?

A   December 31st, 2023.

Q   And what was your position through December 31st, 2023?

A   I was a member and the president.

Q   And what is Global Economics Group?

A   It's a firm that, very similar to Peregrine, in the sense that it's a collection of individuals that it -- that are experts in applying the principles of economics, statistics, finance, accounting and valuation.

Q   And how long did you work there?

A   Since 2008, so roughly 15 years. Little -- yeah, about 15 years.

Page 39

Q   And what were your primary responsibilities there?

MR. FEE:  Objection to form.

THE WITNESS:  Performing consulting duties and helping to manage the firm.

BY MS. YABLON:

Q   While you were employed by Global -- Global Economics Group, did you serve as a testifying expert in cases?

A   Yes.

Q   And while you were at Global Economics Group, did you ever turn down potential work related to market efficiency?

MR. FEE:  Objection to form.

THE WITNESS:  Yes.

BY MS. YABLON:

Q   Was your basis for turning down that work -- what was your basis for turning down that work?

MR. FEE:  Objection to form; vague.

THE WITNESS:  I think it varied. Sometimes it related to timing or what the case was, sometimes it related to performing cursory analysis and not believing that I would be able to

Page 40

provide an opinion in support of market efficiency.

BY MS. YABLON:

Q   Meaning -- just to make sure I understand that last piece -- that you were asked to opine that the market was efficient, and your conclusion was that you may not be able to support that?

MR. FEE:  Objection.

BY MS. YABLON:

Q   Your assessment was that you were not able to support that conclusion?

A   There were --

MR. RICHTER:  Objection to form.

THE WITNESS:  There were times that occurred, yes.

BY MS. YABLON:

Q   And in those instances you did not serve as the expert that the party engaged; correct?

MR. FEE:  Objection to form.

THE WITNESS:  I don't think it's that simple.  I think -- I think I probably did in some of those circumstances, but not for all the

Page 41

securities that they may have wished for me to opine on market efficiency for originally.  So in certain cases, in other words, I may have been asked to look at both common stock and other types of securities, and declined to give an efficiency opinion with respect to some of the other securities.

BY MS. YABLON:

Q   And what about loss causation.  Are there instances in which you turned down work with respect to a request to be an expert on loss causation?

MR. FEE:  Objection to form; vague.

THE WITNESS:  Yes.

BY MS. YABLON:

Q   And tell me more about those instances.

MR. FEE:  Objection to form.

THE WITNESS:  I don't know that I have perfect recollection of all of them, but I certainly remember a couple where just the loss causation theory didn't make sense to me and so I turned down the work.

BY MS. YABLON:

MAGNA
LEGAL SERVICES

Page 42

Q    And what about calculation of 10(b) damages? Are there instances in which you were asked whether a common methodology was possible?

A    I'm sorry --

MR. FEE:  Objection to form.  Can you restate the question?

BY MS. YABLON:

Q    Sure.  Are there instances in which you turned down work when you were asked to opine on whether a common methodology for calculation of 10(b) damages was possible?

MR. FEE:  Objection to form.

THE WITNESS:  I don't recall a circumstance where that happened independent of just turning down a case more generally.

BY MS. YABLON:

Q    What about with respect to Section 11 damages?

MR. FEE:  Objection to form.

THE WITNESS:  Well, since that's just a statutory formula, I don't believe I would have ever concluded it wasn't possible to calculate damages.

BY MS. YABLON:

Page 43



Page 44

BY MS. YABLON:

Q    What is Market Platform Dynamics, LLC?

A    That was a company that provided

Page 45

management consulting services to large companies that were involved in two-sided markets, so things like platform companies, like software companies for credit card companies.  That's a company that was dissolved recently.

Q    And you were CFO and COO of that company; is that correct?

A    I was, yes.

Q    And what were your responsibilities as CFO and COO?

A    Espec -- essentially, to manage the finances of the company.  That was a company that for -- was active for -- or fairly active for a few years and then the business in that company died down over time to almost nothing.  So I spent -- I spent very little of my time on that company.

Q    Were you ever engaged as a testifying expert while employed or I should say -- strike that.

While employed by Market Platform Dynamics, were you ever engaged as a testifying expert?

MR. FEE:  Objection to form.

THE WITNESS:  I never served as an

MAGNA
LEGAL SERVICES

Page 46

expert in my capacity with Market Platform Dynamics.

BY MS. YABLON:

Q    Was Market Platform Dynamics involved in litigation consulting?

A    That was not its primary area of business. I can't say that it never was, but I -- that was not generally the type of engagement that they were involved in.

Q    Prior to founding Global Economics Group, where did you work?

A    Chicago Partners.

Q    And how long were you at Chicago Partners?

A    From 1995 to 2008, so 13 years or so.

Q    And what did you do while at Chicago Partners?

MR. FEE:  Objection to form, vague.

THE WITNESS:  I did a variety of things. Over time I -- I worked as a consultant on many, many cases in many areas, both litigation matters and non-litigation matters. I also helped in terms of staff recruiting and training. I developed a practice as a -- as a neutral expert

Page 47

in class action securities litigation and other areas. But primarily, it was performing consulting duties for clients.

BY MS. YABLON:

Q    When you say you developed a practice as a neutral expert in class action securities litigation, what does that mean?

A    There's a prominent mediator and former judge named Dan Weinstein who began engaging me to help him mediate cases and evaluate the strengths and weaknesses of the expert analyses on both sides of cases.

Q    So you were supporting the neutral mediator?

A    Yes.

Q    Have you worked with any other mediators other than Dan Weinstein?

A    Yes.

Q    Is that -- what portion of your -- strike that.

How often do you work with mediators?

A    It's varied over time. I would say now not so often. But for a time it was a fair

Page 48

percentage of what I was doing.

Q    And did the -- did any of the instances involve cases with securities fraud?

A    Yes. At least the allegation of securities fraud, yes.

Q    Fair.

While you were at Chicago Partners, did you submit any expert reports under your own name?

A    Yes.

Q    Did you ever testify at trial?

A    I was at a trial ready to testify but was not called.

Q    What about deposition? Did you testify in a deposition while at Chicago Partners?

A    You're testing my memory. I don't recall being -- I don't recall testifying at a deposition while at Chicago Partners.

Q    So you were prepared to testify at trial but had not been deposed?

A    That's correct.

Q    Prior to working at Global Economics Group, which I think you said it was 2008 if I'm not mistaken --

Page 49

A    That's correct.

Q    -- had you ever served as a testifying expert?

A    Yes.

Q    When was the first time you recall serving as a testifying expert?

A    It would have been in the last couple of years I was at Chicago Partners, so around 2006, 2007 somewhere in that time frame.

Q    Your CV indicates that one of your personal activities is pro bono consulting for Cook County State's Attorney Office; is that right?

A    That's something I've done in the past. It's not something I'm active in now, but it's something I've done in the past.

Q    What kind of cases did you consult with for the Cook County State's Attorney's Office?

A    One was responding to the public assessment of the effectiveness of the Cook County State's Attorney --

THE REPORTER:  What was that? Assessment of?



Page 50

THE WITNESS: The Cook County State's Attorney's performance in certain areas. Another was assisting one of the prosecutors in a high-profile case.

BY MS. YABLON:

Q Can you disclose what that case was?

A I don't think I can. I think that would violate privilege.

Q Other than those two cases you've just identified, are there any other cases in which you consulted with the Cook County State's Attorney's office?

A Again, I wouldn't characterize the first thing I listed as a case. Let me think about that for just a second.

Those are the two things that come to mind.

Q If you turn back to your CV starting at, on the second page of the CV which is Page 61 of 79. Do you see where I am?

A Yes.

Q It says Professional Experience.

A Uh-huh.

Q Does -- starting here on Page 2 and I

Page 51

think it goes through Page 19, if you want to just scroll or flip through. Do these pages contain a complete list of your expert testimony and testifying experience?

MR. FEE: Just for the record, the last page of the section is on 78 of 79.

THE WITNESS: I believe it contains a list of all of my testifying experience. I think there's one matter in which since I filed this report that I gave a deposition, but other than that I think it's a complete list.

BY MS. YABLON:

Q Does this list include engagements where you submitted an expert report but did not testify at a deposition?

A Yes.

Q The first category of cases in Professional Experience says "Securities, Valuation and Market Manipulation Cases"; right?

A Yes.

Q And in this category there are about 125 cases; is that right?

A I have not done a count, but I trust your counting if you counted them. That does not

Page 52

sound like a number I would dispute.

Q The number seems to be in the ballpark?

A Yes.

MR. FEE: Objection to form.

BY MS. YABLON:

Q Of those 125 cases, approximately how many were securities fraud class actions involving publicly traded securities?

A I don't know an exact number, but it would be the vast majority.

Q And focusing on the vast majority, how many of those cases had class periods that started with or included an IPO?

MR. FEE: Objection to form.

THE WITNESS: I don't know the answer to that. I know there are at least some but I don't know.

BY MS. YABLON:

Q To your recollection, was it a significant portion of the cases?

MR. FEE: Objection to form; vague.

THE WITNESS: That's not something I ever calculated or specifically looked at. So I

Page 53

just don't know as I sit here. I would have to go back and look at each case.

BY MS. YABLON:

Q Of the 125 cases, do you have a sense as to how many involved Section 10(b) claims?

A I would say it's definitely the majority, but that's not something I've ever calculated.

Q And what about Section 11 claims?

A Again, if you're asking me to do a rough estimate, that's not something I've ever calculated, but it would be a minority of them, but there's certainly a -- numerous examples of them in there.

Q And in how many of these cases, approximately, have you offered an opinion on market efficiency?

A Again, it's probably a majority, but I would have to go back and check to be sure.

Q What about -- how many cases with Section 10(b) damages have you offered an opinion?

A Are you talking about --

Q I'm talking about the 125 cases that are listed here, approximately how many did you



14 (Pages 50 to 53)

Page 54

offer an opinion about Section 10(b) damages being subject to common methodology?

MR. FEE: Objection; asked and answered.

THE WITNESS: Again, it's probably a majority. I would have to go back and check to be sure, but it's certainly a fair number of them, probably a majority.

BY MS. YABLON:

Q And Section 11?

MR. FEE: Objection. Asked and answered.

THE WITNESS: A minority, but certainly there are numerous examples in there of cases that involved Section 11 damages being subject to a class-wide calculation.

BY MS. YABLON:

Q And you see in the Professional Experience Section the first bullet, if you will, says "Testifying Expert". Do you see that?

A I do.

Q What does testifying expert mean as used here in this CV?

MR. FEE: Objection to form.

Page 55

THE WITNESS: Cases where I was engaged to be a testifying expert and then testified either through report -- and then provided testimony either through reports or depositions.

BY MS. YABLON:

Q So in each of the cases that is listed here, you provided an expert report; is that correct?

A Yes.

Q And in some of the cases listed here, you testified at deposition; is that correct?

A I believe in the four -- within the bullet point you're referring to, I believe I gave deposition testimony in each of those.

When I answered the question before, I thought you were referring to the whole list of 125.

Q So throughout the rest of the pages in -- you issued a report in all of these that are listed with Testifying Expert; is that correct?

MR. FEE: Objection; form.

THE WITNESS: I'm trying to remember if there was an occasion. I mean, I could go

Page 56

through it page by page. I'm trying to remember an example of one of these cases where I didn't file a report of any kind.

BY MS. YABLON:

Q Well, let me draw your attention to maybe one. If you go to Page 10 of 20, which is Page 69 of 79 if you look at the filing at the top. The fourth to bottom bullet point says "consulting expert". Do you see that?

A I'm sorry, the fourth from the bottom?

Q Yes, consulting expert.

A Yeah, in that case I filed a declaration about the plan of allocation.

Q Right. You did not file an expert report there; correct?

A That's correct. I don't believe I did. I mean, it would have been on the subject of -- I think my declaration would have been on the subject generally of how the plan as constructed reflected the -- or attempted to reflect the calculation of damages in some way, but I don't -- I think technically that's a declaration, not an expert report.

Page 57

Q Are there any cases brought under the securities laws where you have been engaged as an expert that do not appear on this list?

A Yes.

MR. FEE: Objection to form.

BY MS. YABLON:

Q How many?

A That's not something I've ever counted.

Q More than 50?

A Yes.

Q What type of cases are included within the more than 50 --

MR. FEE: Objection to form.

BY MS. YABLON:

Q -- cases?

MR. FEE: Vague.

THE WITNESS: Cases involving -- so there's numerous cases I've been involved as a consulting expert to provide consulting with respect to issues of -- of market efficiency and damages for which there was -- I was never asked to file a report, so for whatever reason, either the case settled or was dismissed or there could



Page 58

be a whole host of reasons, but there are many cases that I was involved and asked to look at market efficiency, Section 10(b) damages, Section 11 damages, Section 14 damages, Section 12 damages. A number of cases in -- I forget if your question was specific to securities litigation, I think it was, under the securities laws.

There may have been other types as well, but those are the -- I would say the vast majority fall under those categories.

BY MS. YABLON:

Q    And if you look at this section Securities, Valuation, and Market Manipulation Cases that we've been discussing --

THE REPORTER:  I'm sorry, what was that?

BY MS. YABLON:

Q    Securities, Valuation, and Market Manipulation Cases, in approximately how many of these cases did you testify on behalf of plaintiffs?

MR. FEE:  Objection to form.

THE WITNESS:  Again, I could go through one by one and try to figure it out.  It's

Page 59

the vast majority.

BY MS. YABLON:

Q    Do you recall any cases in the last ten years that are listed in this section in which you testified on behalf of defendants?

MR. FEE:  Objection to form.

THE WITNESS:  I don't recall one as I sit here, but I would have to go through the list to be sure.  Certainly even if there was a couple, it's not many.

BY MS. YABLON:

Q    Are there any engagements or any of your engagements in the last ten years for cases in which you were engaged on behalf of defendants?

A    Yes.

Q    And are those cases -- and would there be cases that are not listed here within the Securities, Valuation and Market Manipulation Cases section?

A    You're speaking -- just so I understand your question, you're talking about times I was engaged to potentially be a testifying expert in securities litigation over the last ten years --

Page 60

Q    By defendants.

A    -- by defendants?  Yes.

Q    Correct.

Approximately how many times?

A    I remember one for sure.  There may have been a second.

Q    And did you issue a report in those instances?

A    No, it never got to that stage.

Q    The case settled before it was necessary?

A    I don't recall what the disposition of the case was.  I just recall it never got to the point where I was asked to file a report.

Q    Were you terminated as an expert before you issued the report?

A    No.

MR. FEE:  Objection to form.

BY MS. YABLON:

Q    To your recollection, when was the last time you were retained by a defendant in a securities fraud class action?

MR. FEE:  Objection to form.

THE WITNESS:  The one that comes to

Page 61

mind, I don't recall the exact year.  I would estimate it would have been about six or seven years ago is the best of my -- to the best of my recollection.  I just -- I would have to go back and check my records to be sure.

BY MS. YABLON:

Q    And what case was that?

MR. RICHTER:  Hold on, are you asking him to disclose what case he was engaged in as a consulting expert?

BY MS. YABLON:

Q    Sitting here today when you are referencing a case six or seven years ago, was that when you were engaged as a consulting expert alone on behalf of defendants?

A    No, I was engaged as a potential testifying expert but never actually gave testimony.

Q    Was it disclosed that you were engaged as a potential testifying expert in that case?

A    I don't believe so, no.

Q    Then don't tell me.

Other than that one instance



Page 62

six or seven years ago that you recall, are there any other times in the last ten years in which you were engaged by defendants in a securities fraud class action?

MR. FEE: Objection; asked and answered.

THE WITNESS: Again, there might have been a second time, I just -- my memory is failing. I certainly remember the one. I think there may have been a second, but I don't have a clear recollection of. Beyond that, I don't believe there were others.

BY MS. YABLON:

Q    Has a court ever limited any of your opinions?

MR. FEE: Objection; vague and ambiguous.

THE WITNESS: I think -- are you referring to like excluding some portion of my testimony?

BY MS. YABLON:

Q    That would be one example, yes.

A    Yes, that's occurred.

Q    Under what circumstances or what

Page 63

basis did the court exclude your testimony?

MR. FEE: Objection.

THE WITNESS: One example that comes to mind was in the DVI case. That was a case in which I issued a damages opinion under two different theories, one was the traditional out-of-pocket methodology using an event study and the other was something I think I referred to as the insolvency method, and the court ruled that the insolvency method didn't sufficiently fit within the law. It's not that they ruled I did anything wrong, but it just didn't sufficiently fit with the law for me to testify about that at trial.

I think there's a recent decision that's under seal in the Valeant matter that partially limits my testimony.

BY MS. YABLON:

Q    Any other cases that come to mind?

A    I believe also within the DVI case there were -- there were certain corrective disclosures neither I nor the defendant's expert was permitted to testify about at trial. Those are the ones that come to mind.

Page 64

Q    Have you ever testified that the market for security was inefficient?

MR. FEE: Objection to form.

THE WITNESS: No. Again, there have been times that based on analysis I performed I didn't think there was sufficient evidence to conclude it was efficient, but I don't recall ever concluding that a market was inefficient.

BY MS. YABLON:

Q    And did you issue reports in which you found that the evidence was insufficient to conclude that the market was efficient?

A    Not with respect to those particular securities that I might have made that conclusion on. In other words, I can think of a couple of matters where I was asked to opine on market efficiency for multiple securities. And for those that I determined there was insufficient evidence, I don't think I was asked to offer an opinion on market efficiency for those securities. So I still would have written a report with respect to the other securities, but would not have given an opinion on the securities I wasn't being asked to opine on.

Page 65

Q    So if the reports in which you issued an opinion on market security -- strike that.

Sitting here today, each of the reports in which you issued an opinion on market security, in each of those reports you found that the market was efficient for the securities covered in the report?

MR. FEE: Objection; you mean market efficiency?

MS. YABLON: Market efficiency, I'm sorry. Thank you.

THE WITNESS: Could I have that read back or restated, please.

BY MS. YABLON:

Q    Yes. I'm not going to read it back.

In each of the reports in which you issued an opinion on market efficiency you found that the securities covered were part of an efficient market; is that correct?

MR. FEE: Objection; asked and answered.

THE WITNESS: I believe that when I've filed a report opining on market efficiency it's been in support of market efficiency when



17 (Pages 62 to 65)

Page 66

I've issued a report, yes.

BY MS. YABLON:

Q    But you testified just a few minutes ago that there were times when you determined that the -- that you could not conclude that the market was efficient as to particular securities; is that correct?

A    That's correct.  On a number of occasions I've been asked to evaluate market efficiency and concluded there was insufficient evidence to support an opinion that the market was efficient, and in those cases I would not have opined that the market was efficient.

Q    So you do not have any reports in which you opine that the market was not efficient; is that correct?

MR. FEE:  Objection to form.  Asked and answered.

THE WITNESS:  That's correct.  In the times that I told a client that I couldn't support market efficiency, they did not ask me to write a report regarding market efficiency with respect to those securities.

Page 67

BY MS. YABLON:

Q    In any of your reports, have you ever reached a conclusion that damages were not calculable by a common methodology for purposes of Section 10(b)?

MR. FEE:  Objection to form.

THE WITNESS:  I don't believe so, no.

BY MS. YABLON:

Q    And have you ever issued a report saying damages were not -- or concluding the damages were not calculable by a common methodology for a Section 11 case?

MR. FEE:  Objection to form.  They're a statutory formula.

THE WITNESS:  I don't recall ever opining that.

MS. YABLON:  I'm happy to keep going, but if you want to take a short break?

THE WITNESS:  Yes, if we could take a really short break that would be great.

MS. YABLON:  Of course.

THE VIDEOGRAPHER:  We are going off the record.  The time is 10:10 a.m.

Page 68

(After a brief recess, the proceedings continued as follows:)

THE VIDEOGRAPHER:  Beginning of media No. 3 in the deposition of Chad Coffman.  Going on the record the time is 10:29 a.m.

BY MS. YABLON:

Q    Mr. Coffman, when was the first time you were contacted about working on this matter?

MR. FEE:  Objection to form.

THE WITNESS:  I don't recall, but it would have been like it was certainly in 2023 but I don't recall exactly when.

BY MS. YABLON:

Q    The first half of 2023?

A    I just don't recall.

Q    Who contacted you?

MR. FEE:  Objection to form.

THE WITNESS:  It would have either been Mr. Fee or it was someone at Labaton, either -- either Mr. Fee or Ms. Fox.

BY MS. YABLON:

Q    And after they contacted you, what happened?

Page 69

MR. FEE:  Objection to form.  You can answer, but nothing privileged.

THE WITNESS:  I recall at some point there was a proposed deadline for a -- for a filing of a class certification-related report. And so at some point I was asked to go ahead and begin work on evaluating whether the market was efficient and whether damages could be calculated on a classified basis.  I don't recall exactly how that was conveyed.

BY MS. YABLON:

Q    You said a few minutes ago you don't recall when you were initially contacted.  Do you know whether it was before the Amended Complaint was filed?

A    I don't --

MR. FEE:  Objection to form.

THE WITNESS:  I don't believe it was before the Amended Complaint was filed.

BY MS. YABLON:

Q    It was before the -- strike that.

Have you performed any work in this case unrelated to your market efficiency and damages methodology?





Page 70

MR. FEE: Objection; form.

MR. RICHTER: Just to be clear, are you asking him has he been asked to testify about anything else?

BY MS. YABLON:

Q    Correct. I don't want to ask what you've been asked to do in a consulting capacity, that's privileged.

A    I have not been asked to testify on any other area of this case besides what's in my report.

Q    And have you performed any analyses that are not currently reflected in your report?

MR. FEE: Objection to form.

THE WITNESS: There would have been things I looked at in robustness tests and double-checks I did that I wouldn't have necessarily been -- described explicitly in my report. But in terms of the -- the factors I considered, those are all in my report.

BY MS. YABLON:

Q    In addition to Oak Street Health securities class action in which you're testifying today, have you been otherwise retained by Labaton

Page 71

in other matters?

A    Yes.

MR. FEE: Objection; vague.

BY MS. YABLON:

Q    How many times?

A    I don't have a count of that, I don't know.

Q    More than a dozen?

A    Yes.

Q    More than two dozen?

A    That's probably the case, yes.

Q    More than three?

A    I don't know. I would have to check.

Page 72

Q    In addition to this matter, have you been retained by Robbins Geller for other matters?

A    I have, yes.

Q    How many times?

A    I don't know.

Q    More frequently than you've been engaged by Labaton?

MR. FEE: Objection to form.

THE WITNESS: No, it would be less.

BY MS. YABLON:

Q    I think you previously testified that you had been engaged by Labaton at least two dozen times; correct?

A    Yes.

Q    Have you been engaged by Robbins Geller at least one dozen times?

A    As you know on a number of cases there can be multiple firms and co-counsel. I don't recall Robbins Geller being the primary contact a dozen times. They may have been co-counsel on cases, and I may not have had -- with a less active role than being the primary contact with me a dozen times, but I don't recall it -- Robbins Geller being the primary contact

Page 73

more than a dozen times, no.

Q    And what is your assignment in this case?

MR. FEE: Objection to form.

THE WITNESS: I was asked to evaluate whether the market for Oak Street Health was efficient during the Class Period and opine on whether there was a class-wide method for calculating damages.

BY MS. YABLON:

Q    And that's described in Paragraph 1 of your report; correct?

A    Yes, that describes my assignment.

Q    Is this the entire scope of your assignment as described in Paragraph 1?

A    As it relates to what I'm being asked to testify about, yes.

Q    Were you asked to make any assumptions in connection with the opinions you offered in this report?

MR. FEE: Objection to form.

You can answer to the extent there's no privileged information.

THE WITNESS: Well, I took the

MAGNA
LEGAL SERVICES

Page 74

proposed Class Period as an assumption. That was not something I would not determine myself. I took -- I mean, obviously, I reviewed the Complaint and discussed the overarching theory of the complaint with plaintiffs' counsel, and verified with counsel that the way I describe their allegations in Section 4 of my report is consistent with what they were asking me to assume the case was about. Beyond that, I don't believe I was given any assumptions.

BY MS. YABLON:

Q     And you didn't independently investigate the allegations in Section 4; correct?

MR. FEE: Objection to form.

THE WITNESS: Meaning did I evaluate whether they committed securities fraud? No, I did not.

BY MS. YABLON:

Q     On whose behalf are you appearing today as an expert?

A     I think of myself as an independent expert not appearing on behalf of anyone. I was hired by plaintiffs' counsel to evaluate the questions I've been asked. But I'm not a party to

Page 75

this litigation, so I don't feel I'm here on behalf of anyone.

Q     When you say you were hired by plaintiffs' counsel, that would include counsel for Central Pennsylvania Teamsters Pension Fund Defined Benefit Plan; correct?

A     That's who I understand their -- their client is, plaintiffs' counsels' client is. That's one of the clients.

Q     And also Central Pennsylvania Teamsters Pension Fund Retirement Income Plan 1987; correct?

A     I understand they are a plaintiff in this action, yes, and that the -- and that plaintiffs' counsel represents them.

Q     And Boston Retirement System?

A     Same answer. I understand that's a client of plaintiffs' counsel.

Q     And the City of Dearborn Police and Fire Revised Retirement System; correct?

A     Correct. They are a client of plaintiffs' counsel is my understanding.

Q     So for purposes of today, if you hear me reference CPAT, do you understand I'm referring

Page 76

to the Central Pennsylvania Teamsters Pension Funds collectively?

A     Yes.

Q     And that CPAT is a plaintiff in this case; correct?

A     That's my understanding.

Q     And for purposes of today, I may refer to Boston Retirement System as BRS. Okay?

A     Okay.

Q     And you will agree BRS is a plaintiff in the case; correct?

A     That's my understanding.

Q     And for purposes of today, I may refer to the City of Dearborn Police and Fire Revised Retirement System as Dearborn. Okay?

A     Okay.

Q     And you'll understand when I refer to Dearborn, that I'm referring to the plaintiff -- one of the plaintiffs in this case; correct?

A     Yes.

Q     Have you ever communicated with anyone employed by CPAT?

MR. FEE: Objection to form.

THE WITNESS: No.

Page 77

BY MS. YABLON:

Q     Have you ever communicated with anyone employed by BRS?

A     No.

MR. FEE: Objection; form.

BY MS. YABLON:

Q     Have you ever communicated with anyone employed by Dearborn?

MR. FEE: Objection to form.

THE WITNESS: No.

BY MS. YABLON:

Q     Have you ever been retained by CPAT for matters besides the current case in which you're testifying today?

MR. FEE: Objection to form.

THE WITNESS: My engagement is with lead counsel, and typically for these types of matters it's for lead counsel. Whether that plaintiff was also a plaintiff in another case I was involved in, I just don't recall.

BY MS. YABLON:

Q     Okay. So have you ever been engaged by lead counsel in this case on behalf of or in connection with the case in which lead counsel was



Page 78

representing BRS?

MR. FEE: Objection to form.

THE WITNESS: I just don't know.

BY MS. YABLON:

Q    Same question for Dearborn.

MR. FEE: Objection to form.

THE WITNESS: I don't know.

BY MS. YABLON:

Q    Do you have an engagement letter with Robbins Geller and Labaton for your work in connection with this case?

MR. FEE: Objection to form.

THE WITNESS: It's my general practice to -- for at the time the engagement starts with Global Economics Group to have an engagement letter. I can't say that that's always followed through on a hundred percent. I believe there is in this matter but I don't know for certain myself.

BY MS. YABLON:

Q    Do you know who the parties are to that agreement?

A    That agreement was -- if there is one was between Global Economics Group and -- I forget

Page 79

if it was both Labaton and Robbins Geller or just Labaton, I just don't recall.

Q    And recognizing you don't recall the specifics, do you -- do your engagement letters generally describe your assignment in connection with the matters in which you're engaged?

MR. FEE: Objection to form; vague.

THE WITNESS: It doesn't usually get into the details of what I -- what I'm exactly being asked to testify on. It just says engaged as a testifying expert. Sometimes it may say with respect to the particular case, but I don't think it usually goes into the subject areas.

BY MS. YABLON:

Q    Do you typically have engagement letters specific to cases?

A    Yes.

MR. FEE: Objection to form.

BY MS. YABLON:

Q    So it's not a general engagement letter as between you and Labaton, for example?

MR. FEE: Objection to form.

THE WITNESS: That is correct. No such engagement letter exists.

Page 80

BY MS. YABLON:

Q    Do you own any shares of Oak Street common stock?

MR. FEE: Objection to form. Oak Street common stock is not publicly traded.

BY MS. YABLON:

Q    During the course of the case, did you own any shares of Oak Street common stock? During the Class Period, excuse me.

A    Not directly. I'm sure it's part of -- it may have been part of mutual funds or other indices that I've -- that I owned, but I don't recall ever making a direct investment in any Oak Street security.

Q    Do you recall ever making a sale in any Oak Street security?

A    I don't, no.

Q    Do you own any CVS stock?

MR. FEE: Objection to form.

THE WITNESS: Same answer. I don't think directly, no. Through things likes ETFs and index funds, possibly, but not directly, no, not that I'm aware of.

Page 81

BY MS. YABLON:

Q    And you're being compensated at a rate of $950 an hour; correct?

A    My firm is for the work I'm performing.

Q    Is that the same rate that you charge for other work that you do?

MR. FEE: Objection to form; vague.

THE WITNESS: That was my standard rate for matters I took on in 2023.

BY MS. YABLON:

Q    Who is paying your bills for this case?

MR. FEE: Objection to form.

THE WITNESS: I forget if it's a combination of the law firms or just Labaton, but the law firms -- I understand the law firms in this, that are serving as lead counsel are paying first Global Economics Group, now Peregrine, for work that's being performed after the first of the year.

BY MS. YABLON:

Q    Approximately how many hours have you spent working on this case thus far?



21 (Pages 78 to 81)

Page 82

MR. FEE: Objection to form.

THE WITNESS: I don't know an exact number. There's obviously billing records that reflect that. I would say it's probably more than 20, less than a hundred, so somewhere in that range.

BY MS. YABLON:

Q And when you say more than 20 and less than a hundred, is that hours you personally have worked on the matter or your team?

A Me personally, that's how I understood the question.

Q And do you have a sense as to how many hours your team has worked -- members of your team have work on this matter?

A That would be over a hundred.

Q Cumulative? Combined? You referenced previously three different team members. When you say over a hundred, across the three of them it's over a hundred?

A Yes.

Q Okay. Have you submitted invoices to Labaton and/or Robbins Geller to date?

A Yes.

Page 83

Q Approximately how much have you billed them to date?

MR. FEE: Objection to form.

THE WITNESS: I don't know as I sit here.

BY MS. YABLON:

Q Have you been paid for certain of the invoices?

MR. FEE: Objection to form; foundation.

THE WITNESS: I believe we have, but I honestly haven't looked at that in a while so I just don't know.

BY MS. YABLON:

Q Do you expect to be paid for your testimony today?

A Yes.

MR. FEE: Objection to form.

BY MS. YABLON:

Q On an hourly basis?

A Yes.

Q At $950 an hour?

A Yes.

Q How much time have you spent

Page 84

preparing for today's deposition?

A Going back to the prior question. Again, when you said do you expect to be paid, it's actually my firm that's being paid, not me personally.

Q Understood. Thanks for the clarification.

How much time have you spent preparing for today's deposition?

A Probably 8 to 10 hours.

Q And when did you spend the 8 to 10 hours preparing for today's deposition?

MR. FEE: Objection to form.

THE WITNESS: I would have spent a few hours last week. I spent a few hours over the weekend and then a few hours yesterday.

BY MS. YABLON:

Q And was counsel for plaintiffs present at each of those three meetings you just -- each of those three instances you just referenced?

A No. The first two were just me preparing on my own, and then yesterday I met with plaintiffs' counsel.

Page 85

Q Who from plaintiffs' counsel was present at the meeting yesterday?

A Mr. Richter and Mr. Fee were present personally and then Ms. Fox was via Zoom.

Q Was anyone else present?

A No.

Q And I think according to your report you write that the standard hourly rate for your staff members was between $240 and $475 an hour; is that right?

A That's correct.

BY MS. YABLON:

Q That would be the three individuals that you referenced earlier this morning; correct?

A Again, I think I said those were the primary members. There may have been others who did smaller things, but those were the primary



Page 86

three. [REDACTED]

Q    Did anyone assist you in preparing your report that we're looking at?

MR. FEE:  Objection to form.  Asked and answered.

THE WITNESS:  Yes, the three members of my staff I mentioned worked at my direction and assisted in preparing the report.

BY MS. YABLON:

Q    What about representatives from Labaton?

MR. FEE:  Objection to form.

THE WITNESS:  There was nobody at Labaton that assisted in preparing the report.  I believe at some point I would have provided a draft to Labaton and they may have provided us comments, and I would have gone through each one and evaluated whether it was something I agreed with or disagreed with, and it was ultimately my decision what to -- whether there were any

Page 87

proposed edits that I thought I wanted to make.

BY MS. YABLON:

Q    Did counsel from Robbins Geller provide any input?

A    Again, I --

MR. FEE:  Objection to form.

THE WITNESS:  Again, I recall submitting a draft to plaintiffs' counsel.  I don't have a specific recollection of which law firm made any particular comments, but I would have collected whatever comments there were from either firm and evaluated them.

BY MS. YABLON:

Q    Do you recall getting comments from the law firms representing plaintiffs in this case?

MR. FEE:  Objection to form.

You can answer to the extent you don't reveal anything privileged.

BY MS. YABLON:

Q    I didn't ask you what the contents were, I asked if you recalled receiving comments.  You can certainly answer that question.

A    I have a clear recollection of

Page 88

providing a draft.  I don't have a clear recollection of any particular comment or edit that was made or suggested.

BY MS. YABLON:

Q    I'm not asking you if you recall particular comments, I'm asking if you recall receiving any comments.  Not the substance; whether you received comments.

MR. FEE:  Objection to form.

THE WITNESS:  I don't have a clear recollection of that, no.

BY MS. YABLON:

Q    Who wrote the first draft of your report?

A    An early draft would have been prepared at my direction by the three individuals I mentioned earlier.

Q    How many hours approximately did you spend working on this report?

A    Are you talking about the drafting the language in the report or working on the underlying analyses as well?

Q    Both.

A    That's what I understood your earlier

Page 89

question was as to how many hours I spent working on this matter.

Q    So that would be the 20 to 100 range you previously testified to?

A    Yes.

Q    And how many hours approximately did you spend drafting the actual report?

A    Again I --

MR. FEE:  Objection to form.

THE WITNESS:  I did a very thorough review of the report and made a number of -- of edits to it.  It probably would have been -- if you're asking me to estimate, four, five hours.  I'm just trying to remember -- I would say a reasonable estimate is three to five hours.

BY MS. YABLON:

Q    So as I understand it, one or multiple of your team members drafted the first draft of this report and then you spent three to five hours reviewing the report; is that correct?

MR. FEE:  Objection to form.

THE WITNESS:  Well, I would have spent a lot more time -- just add some context to that answer.  You know, I filed a fairly large



23  (Pages 86 to 89)

Page 90

number of these types of reports opining on market efficiency and class-wide damages. The process by which I and my team go through is very familiar to us. I would have given them substantial direction in terms of what types of analyses I wanted performed and what data to collect and reviewing the results of what -- of those analyses. And then I would have directed them to essentially write up the results of those analyses and put them into the usual form that I do for this.

So there's -- there wasn't a need for me to personally spend a ton of hours doing an initial draft of this report, and my staff is very experienced in putting together these sorts of reports at my direction. So it didn't require me more than three to five hours in terms of reviewing and editing the specific sections that I wanted to do that for.

BY MS. YABLON:

Q     Did you analyze whether there was anything unique about the circumstances of this case?

A     Yes, that's something I'm always on the lookout for.

Page 91

Q     And did you conclude that there was anything unique with respect to the analyses you were performing for market efficiency?

MR. FEE: Objection to form; vague.

THE WITNESS: I don't recall coming across anything in this case that I haven't seen multiple times before.

BY MS. YABLON:

Q     You've just testified that you've provided expert reports in many cases on the topic of market efficiency; correct?

A     Yes.

Q     And that you have a standard process when you were engaged to provide such a report; correct?

A     Certain --

MR. FEE: Objection to form. Misstates prior testimony.

THE WITNESS: Certainly a standard process in general the types of factors I look at and the data that I look at. Sometimes there can be unique circumstances in a case that make me look at -- at different things that I wouldn't always look at, but the starting approach is very

Page 92

consistent.

BY MS. YABLON:

Q     And in this case, you testified that you did not find any unique circumstances; correct?

A     Well, when you say unique --

MR. FEE: Objection to form.

THE WITNESS: -- I think the question is did I see anything in this case that I had never seen before and I don't think I have. There are certainly, you know, with any and every case there are certain details that are, you know, different than other cases. But I don't recall seeing anything in this case that, like I said, I haven't seen multiple times before.

BY MS. YABLON:

Q     So the question that I had asked you was not whether you saw anything in this case that you have not seen before, the question in fact was did you conclude that there was anything unique with respect to the analyses you were performing for market efficiency?

MR. FEE: And I objected to that as vague. So if you could make it clearer by what

Page 93

you mean by unique.

MS. YABLON: You are allowed to give an objection as to form, that is the only objection you are allowed. Either he answers and understands or doesn't answer, but he does not need coaching from you.

THE WITNESS: Can I have the pending question reread, please.

(Whereupon, the question was read.)

THE WITNESS: I understood unique to mean is there something about this case that's fundamentally different than anything else I've seen in any other case, and I don't think there is. Now, there are -- you know, every case has some of its own unique features, but nothing in the Cammer factor analyses or the market efficiency analyses that I ran is there anything in this case that makes it outside the bounds of what I -- what I've seen in prior cases.

So I mean, if you have a specific thing in mind I'm happy to try to answer. I don't recall seeing anything, you know, about this market or its structure or any of the data



Page 94

I'm observing that puts it outside the normal bounds of what I would expect to see in this type of matter.

BY MS. YABLON:

Q    Do you recall previously providing a report in the Shupe and Pearlman versus Rocket Companies case?

A    Yes.

Q    And in that case, you provided an opinion on market efficiency for a Class Period of two and a half months.  Do you recall that?

A    I do.

Q    And Rocket Companies was a case in which the Class Period did not include the date of the IPO; is that correct?

A    That's correct.

Q    And in the Oak Street Health case in which you're testifying today, the Class Period begins on the date of an IPO; correct?

A    Yes.

MS. YABLON:  I'm going to introduce as Exhibit Coffman 2.

(Coffman Exhibit No. 2 was marked for identification.)

Page 95

BY MS. YABLON:

Q    This is a redline of the report that you submitted in Shupe and Pearlman versus Rocket Companies as compared against the report that you submitted in the Oak Street Health case.  Take your time to look through it.

MR. RICHTER:  Just for the record, this is the first time plaintiffs' counsel has seen this.  We have no basis to accept or take a position on the admissibility of this evidence.

MS. YABLON:  I'm happy to send them to look at.

MR. RICHTER:  I have it now.

THE WITNESS:  Okay.  I see this seems to be a redline comparison of my report in the Rocket case and the report in this case.  But -- so what's your question?

BY MS. YABLON:

Q    And you understand in this redline the words in black are the -- reflect no changes as between the two reports; correct?

A    That's my understanding.

Q    And the words that are in colors reflect changes or differences between the two

Page 96

reports; correct?

MR. FEE:  Objection to form.  Were these filed?

MS. YABLON:  Yes.  We pulled it off the file.

THE WITNESS:  It's not clear to me what the difference between the blue and green coloring is, but it appears that the colored text, I believe, is what appears in the Oak Street report that does not appear in the Rocket report.

BY MS. YABLON:

Q    Okay.  And it's, for purposes of today, unimportant as to which report, the language up here.  And the question is simply, you would agree with me that the colored language suggests a difference as between the two reports?

A    Yes, including the red strikeouts of what was in Rocket that's not in Oak Street.

Q    Correct.  So to the extent there's red or blue or green, those signify differences as between the two reports; correct?

A    I believe so, yes.

Q    The vast majority of the report up through the exhibits appears in black; correct?

Page 97

MR. FEE:  Object to form, vague.

THE WITNESS:  I don't know that I would agree with that characterization.

BY MS. YABLON:

Q    All right.  Let's look at a few of those pages.  I'm flipping open to 10 and 11, for example.

A    Sure.  Well, Pages 10 and 11 are talking about my general understanding and context of the reliance element, and that there would be no substantive or meaningful difference between the two cases in describing that.

Q    Right.

A    So other sections obviously describing the allegations of the case and in other areas, and obviously all the substantive numbers regarding the metrics related to the market that's being analyzed are obviously all different.

Q    So if you flip, for example, to 20 to 21 you're talking about Cammer Factor 3:  Market Makers.  Do you see that?

A    I see that, yes.

Q    And you would agree with me that the



Page 98

bulk of the language, as drafted in this section of the report, is in black; correct?

MR. FEE: Objection to form.

THE WITNESS: Of course. Because the first part of that section just describes the factor itself and what it is, that obviously doesn't change from case to case. Paragraph 39 is just ref -- reflecting that the stock traded on a major exchange. There would be no need to change any of the language there other than the name of the case, as long as it's true for both stocks, which it is here. And, obviously, the -- the metric itself, which is reflected in Paragraph 41 updates the specific number of market makers for Oak Street Health versus Rocket, so there really wouldn't be a need to change much of the language in this section. It's a fairly straightforward counting of market makers. So I wouldn't see a reason to redraft this language that's used -- that I used over and over again across these reports in describing this factor.

BY MS. YABLON:

Q    So you plug in the relevant information into the reports that you use over and

Page 99

over again; correct?

MR. FEE: Objection to form.

THE WITNESS: Well, again, I think it differs from factor to factor and it differs depending on whether there's some reason for it to differ based on the underlying analysis I performed. Clearly, if the factor's just counting market makers, there's no need for the underlying analysis for the description of why it's relevant to change from case to case for that particular factor. Obviously, in describing case-specific information or anything that's different between the cases there would be a difference.

BY MS. YABLON:

Q    And other than describing case-specific information or plugging in different numbers, what are the differences?

MR. FEE: Objection to form; vague. In this section or the whole report?

BY MS. YABLON:

Q    You can answer.

A    Again, for example, in the cause-and-effect section, which is where I performed the event study to test whether there's

Page 100

differences between market movements on earnings announcement dates versus no news dates, that event study has -- has different control factors and reflects a highly detailed, case-specific event study analysis that I performed. Some of the language that I use just generally to describe event studies obviously wouldn't change. But where I describe the underlying data analysis that I performed and what the results were, that's obviously different.

And then I'll note the, you know, the exhibits -- which there are similar types of exhibits, but I think your redline reflects that the exhibits are -- all of the language in the exhibits and the data itself are -- are completely different.

Q    You previously testified that you met with attorneys for plaintiffs yesterday for several hours; correct?

A    Yes.

Q    What materials did you review to prepare for today's deposition?

A    Specifically at that meeting?

Q    Yes.

Page 101

MR. FEE: Objection to form.

THE WITNESS: I had a copy of my report open on my computer, that's the only document I recall looking at. There might have been a couple analyst reports I looked at as well.

BY MS. YABLON:

Q    And you testified that last week and over the weekend you also prepared for several hours on your own; correct?

A    Yes.

Q    What materials did you review to prepare during those sessions?

A    I skimmed the Complaint again. I reread most of -- not word for word but a good chunk of the memoranda, the motion to dismiss. I reread my report. I reviewed some of the backup material to my report, some analyst reports. I believe I reviewed a couple of the earnings conference calls and SEC filings. My exhibits to my report. I think that covers it.

Q    Did you review any materials preparing for today's deposition that you had not reviewed before submitting your report?

A    No.

MAGNA
LEGAL SERVICES

Page 102

Q    Did you discuss today's deposition with anyone other than plaintiffs' counsel?

A    No.  Other than to just request to be sent a couple things from my staff, but other than that, no.

Q    To be sent a couple of things from your staff for purposes of today's deposition?

A    For reviewing them in preparation for my deposition.  Things that I had already reviewed, just asking to see them again.

Q    What is your understanding of plaintiffs' allegations in this case?

MR. FEE:  Objection to form.

THE WITNESS:  My understanding is there's an allegation that defendants had engaged in marketing tactics and compliance violations that were not disclosed to the market that ultimately resulted in them coming under an FBI -- I'm sorry.  Sorry.  An FBI investigation or is it DOJ.  Sorry.  I'm blanking for the moment.

BY MS. YABLON:

Q    A regulatory investigation.

A    Regulatory investigation, yes, thank you.

Page 103

Q    Fair enough.

A    Let me remind myself actually before we move on.

Yes, DOJ investigation.  Thank you.

Q    And starting at Page 6 of your report there is a section called Overview of the Company and Allegations; correct?

A    There is, yes.

Q    When you were preparing your report, I think you previously testified that you did not independently investigate the allegations in the Complaint; is that correct?

MR. FEE:  Objection to form.

THE WITNESS:  Well, I didn't investigate them.  I thought about them.  I evaluated whether they were economically coherent.  But did I -- I didn't do any investigation of my own as to the truth of the allegations in the Complaint.

BY MS. YABLON:

Q    Was it important for you to understand the facts of the Complaint for purposes of issuing your market efficiency and damages

Page 104

methodology report?

MR. FEE:  Objection to form; vague.

THE WITNESS:  I don't think it was important for the market efficiency question.  I could be asked to evaluate market efficiency for any company over any period of time without regard to fraud claims.  It's just I view that as a separate analysis from whether there is or isn't fraud or what the nature of the fraud was, so no to that piece.

For the applicability of a damages methodology, I did consider and think it's important to consider the general theory.  Not every specific fact or circumstance, but to have at least a general understanding of why it's economically coherent that what they're alleging could lead to artificial inflation in the price, and that the type of disclosures that they're alleging as corrective disclosures could reveal the relevant truth that's allegedly being withheld.  But beyond that, I didn't investigate, you know, the veracity of any specific facts.  I think it was important for me to understand the general theory of the case.

Page 105

BY MS. YABLON:

Q    And what do you understand to be the general theory of this case?

MR. FEE:  Objection to form.

THE WITNESS:  I think it's described in Section 4 of my report.  So it's essentially that investors in Oak Street Health bought --

THE REPORTER:  I'm sorry.  Do that again.

THE WITNESS:  It's essentially that they bought Oak Street Health stock at an inflated price, as a result of the alleged misstatements and/or omissions, and that ultimately those investors were harmed when the price fell upon the disclosure of the DOJ investigation.

BY MS. YABLON:

Q    When you were preparing your report, did you speak with anyone with knowledge of the facts of this case?

MR. FEE:  Objection to form.

THE WITNESS:  I spoke with plaintiffs' counsel about -- to make sure I understood what their theory of the case was after having read the Complaint and having discussions

MAGNA
LEGAL SERVICES

Page 106

with them. Beyond that, no.

BY MS. YABLON:

Q    Did you review the documents that lead plaintiffs relied upon when drafting the Amended Complaint?

A    No. I would have looked at what was in the Complaint, not the underlying documents.

Q    Are you offering any opinion as to the accuracy of plaintiffs' allegations in the Complaint?

MR. FEE: Objection to form. Asked and answered.

THE WITNESS: Related to like whether there were things like falsity or scienter or anything like that? No.

With respect to certain basic claims that are made like that it was a publicly traded security and what the market prices were at different points in time, I certainly reviewed and/or -- I certainly looked at those facts, but not about the -- sort of the facts supporting a claim of fraud.

BY MS. YABLON:

Q    Take a look at Paragraph 16 in your

Page 107

report. The first sentence begins, "As stated in Basic and reaffirmed in Halliburton II, in an open, developed, and efficient market, market prices reflect what is publicly known about a company."

Did I read that right?

A    Yes.

Q    Is it your understanding this is what plaintiffs need to show in order to invoke the Basic presumption?

MR. FEE: Objection to form. Calls for a legal conclusion.

THE WITNESS: My understanding generally is that plaintiffs can establish reliance based on there being a semi-strong efficient market is my general understanding. Again, I'm not a lawyer, but that's my understanding of what is relevant in that context.

BY MS. YABLON:

Q    And what does a semi-strong, efficient market mean as you've just used that term?

A    It means that widely available public information is incorporated into a market price

Page 108

rapidly.

THE WITNESS: Could we just take a very short break? I just need to make a quick trip.

MS. YABLON: Of course. Want to take five minutes?

THE VIDEOGRAPHER: We are going off the record. The time is 11:16 a m.

(After a brief recess, the proceedings continued as follows:)

THE VIDEOGRAPHER: Beginning of Media No. 4 in the deposition of Chad Coffman. Going on the record. The time is 11:26 a m.

BY MS. YABLON:

Q    Mr. Coffman, right before the break I read aloud the first sentence of Paragraph 16 of your report. Do you recall that?

A    Yes.

Q    And you see there's reference to a market being open. Do you see that?

A    Yes.

Q    What does it mean for a market to be open?

Page 109

A    I think I define that specifically later in the report. Give me just a second.

It's in Paragraph 21. I quote a source that says, "An open market is one in which anyone, or at least a large number of persons, can buy or sell."

Q    And with reference here to at least a large number of persons can buy or sell, is there a specific threshold that must be met for a market to be open?

A    I'm not aware of a specific threshold. But when we're talking about a -- a stock that trades on one of the major exchanges, I think essentially anyone with a brokerage account and the ability to trade electronically can buy or sell, so I -- that's -- this is -- Oak Street Health certainly has an open market. But I'm not aware of -- aware of a specific threshold that's being referenced there.

Q    And are you aware of a minimum that's required?

A    I'm not aware of a well-recognized minimum, no. But again, I think it's clear that in this case Oak Street Health traded in an open

MAGNA
LEGAL SERVICES

Page 110

market.

Q    And is it your testimony that if a stock trades on NYSE or another open -- another exchange it is, per se, open for purposes of your analysis?

MR. FEE:  Objection to form.

THE WITNESS:  I think stocks that trade on the major exchanges, so the NYSE or NASDAQ, yes, I think would be considered open markets by virtually any financial companies.

BY MS. YABLON:

Q    And in that sentence I just read from Paragraph 16, there's also reference to a market being developed.

Do you see that?

A    Yes.

Q    And what does it mean for a market to be developed?

A    I also cite a source that describes what that is in Paragraph 21.  So "A developed market is one which has a relatively high level of activity and frequency, and for which trading information (e.g., price and volume) is widely available.  It is principally a secondary market

Page 111

in outstanding securities.  It usually, but not necessarily, has continuity and liquidity, which are the ability to absorb a reasonable amount of trading with relatively small price changes."

Q    So is it your understanding that a developed market can exist without continuity?

MR. FEE:  Objection to form.

THE WITNESS:  Yes, in the sense that you can have substantial activity and you can have trading information available widely.  But continuity really refers to sort of there being a continuous ability to trade without having a big impact on price, and that I think can theoretically at least vary over time.

Again, for a stock that trades on the NYSE or NASDAQ, continuity is -- especially on the NYSE, the continuity is virtually guaranteed based on the specialist system, so Oak Street Health certainly traded with continuity. But, theoretically, if you're asking me can you have a developed market that doesn't have continuity at all points in time?  Yes, you could theoretically have that.

Page 112

BY MS. YABLON:

Q    And is it your testimony that Oak Street Health traded with continuity from the first day of the Class Period through the last day of the Class Period?

MR. FEE:  Objection to form.

THE WITNESS:  I'm not aware of -- there's nothing I saw in my analysis of this case that suggested there was a lack of continuity at any time in Oak Street Health.

BY MS. YABLON:

Q    And you see here in what you just read in Paragraph 21, it says, "it usually, but not necessarily, has continuity and liquidity."

Do you see that?

A    Yes.

Q    So a developed market can exist without liquidity; is that right?

MR. FEE:  Objection to form.

THE WITNESS:  Again, I think continuity and liquidity are matters of degree. It's not just it has or it -- it does or doesn't have continuity or liquidity.  I think the -- but, theoretically, you can have a developed market

Page 113

that has, at least at periods of time, lower liquidity.

BY MS. YABLON:

Q    And is there a threshold with respect to liquidity?

A    I'm not aware of a specific quantitative threshold that people have applied to determine whether a market is, quote, unquote, is liquid or illiquid.  I think again it exists on a continuum the types of things people normally look at for liquidity relate to the -- the amount of trading that's taking place as well as the bid-ask spread can be a measure of liquidity as well.

So in answer to your question, I'm not aware of a well-accepted, sort of minimum threshold of liquidity.

Q    You're sitting here today as an expert on market efficiency; right?

A    Yes.

Q    And in your view is there a minimum threshold for liquidity for which you would find a market to be efficient -- in which you would find a market to be efficient, excuse me?

MR. FEE:  Objection to form.

MAGNA
LEGAL SERVICES

Page 114

THE WITNESS: Again, I think the factors that I analyze, at least a couple of them address the question of liquidity. Those include the amount of volume, the average weekly trading volume I think is a -- is a measure of how liquid the market is or at least reflects the condition -- a condition necessary for -- or a condition that suggests liquidity as well as the bid-ask spread.

So my approach isn't to think of a specific minimum, but to say, does this stock exhibit characteristics that suggest it has far less liquidity than the typical stock that's traded on the major exchanges, and in this case, Oak Street Health did not. So I don't approach it from a minimum threshold as much as do these factors generally support that there was a liquid market.

BY MS. YABLON:

Q    And your report continues, "An efficient market is one which rapidly reflects new information and price."

Do you see that?

A    Yes.

Page 115

Q    And that reflects your definition of market efficiency?

A    I think that's a -- I think it's a shorthand version of it. It's certainly an accurate description of it, but I think the way I normally articulate it is that an efficient market is one where widely disseminated public information is rapidly incorporated into the market price.

Q    And that would be, if you take a look at Paragraph 18 of your report. In this paragraph you are talking about semi-strong form efficiencies.

Do you see that?

A    Yes. I mean, again, I'm -- here I'm talking specifically about what Dr. Fama defined as semi-strong form efficiency in one of his seminal papers. So here I'm talking about theoretically -- theoretical market -- semi-strong market efficiency, yes.

Q    And you write, "This implies that security prices adjust to new publicly available information rapidly;" right?

A    That's part of the definition, yes.

Page 116

Q    And you write, "and in an unbiased fashion;" right?

A    Yes.

Q    What does it mean to be -- to adjust rapidly and in an unbiased fashion?

A    So rapidly to me means within a day or some very small number of days so that new information is reflected quickly in the market price. And in an unbiased fashion means that the stock doesn't consistently overreact or underreact to the fundamental value of that information.

Q    How do you measure whether a security price adjusts to a new -- to new publicly available information in an unbiased fashion?

MR. FEE: Objection to form.

THE WITNESS: Well, theoretically, you could measure whether it did relative to some fundamental valuation principle. That's very hard to do because there are lots of factors that could influence what sort of an unbiased price reaction is. I think the one test that looks at that to a degree is the autocorrelation test because that's evaluating whether the stock price -- a stock price movement today is somehow predictive of a

Page 117

stock price movement the next day. And in an efficient market, you wouldn't expect to see that in a consistent direction or a consistent, you know, pattern of that over time. Because if you had biased price reactions in a particular direction, then you -- you might see evidence of autocorrelation. So that's the one test that speaks to that a bit.

But I think there's wide recognition in the literature that there's no direct dispositive test for unbiased price movements.

BY MS. YABLON:

Q    And you testified just a few moments ago that rapidly, I'm quoting you, to mean within a day or some very small number of days.

Is there a threshold in your view as to how many days is the maximum amount for information to be rapidly incorporated into a stock price?

MR. FEE: Objection to form.

THE WITNESS: I think when you're evaluating how long it takes a market to fully impound new information, there's a number of



Page 118

different factors to look at, which could mean that it could take, you know, less than a day. Sometimes it could take multiple days. And I think it depends on if there's also follow-up analysis of that information that's being injected into the market over some small number of days after it's initially disclosed, so I think it can really be context specific.

I don't recall having any analysis that I've ever done that looks at a window of more than four days, but I'm not going to set an arbitrary threshold that I -- based on context I wouldn't look at something longer than that. But I think in most cases I'm looking at -- and for most types of information and certainly in this report, I'm using the one-day threshold for testing cause and effect. But certainly in many cases, there's evidence and literature to support that the full price reaction to a particular piece of information can be somewhat longer than a day, but some small number of days.

BY MS. YABLON:

Q    So for purposes of your analyses, you looked at a one-day threshold in this matter;

Page 119

correct, for your event study?

A    For the purposes of my cause-and-effect test, yes, I was looking at one-day price movements as the basis for doing that test.

Q    Did you evaluate how long it would take to fully integrate the new news here in this case?

MR. FEE: Objection to form.

THE WITNESS: Well, again, I think it's generally -- daily event studies are something that's generally accepted in the literature. It's often seen when looking at these types of analyses. So a one-day event window to use across events was -- is something that I see standard and consistent with market efficiency. Now -- with testing for market efficiency. I think as I testified earlier there can be specific circumstances under which there might be particular disclosures or announcements that it might take the market more than one day to fully process the information, but I think it's the one-day event window is a -- is a well-accepted methodology for evaluating market efficiency.

Page 120

BY MS. YABLON:

Q    There might be specific circumstances under which it might take the market more than one day to incorporate a particular disclosure announcement is your testimony sitting here today?

A    Fully incorporate.

Q    Fully incorporate.

And are there specific circumstances in which it might take a market less than one day to fully incorporate a particular disclosure?

THE VIDEOGRAPHER: I'm sorry, Staci, could you repeat that question. Something is covering your microphone.

MS. YABLON: My hand, sorry.

BY MS. YABLON:

Q    Are there specific circumstances in which it might take a market less than one day to fully incorporate a particular disclosure?

MR. FEE: Objection to form.

THE WITNESS: That can certainly happen, yes.

BY MS. YABLON:

Q    And in this case, you did not

Page 121

evaluate whether it took more than one day to fully incorporate the disclosure; is that correct?

A    Are you talking about the corrective disclosure?

Q    Yes.

A    I did not perform a specific analysis of whether it would or would not take more than a full day to incorporate that particular disclosure.

Now, I did look at that disclosure as part of my event study and the cause-and-effect test and applied a one-day window to it, but I have not made an independent evaluation of whether there would be evidence to support looking at a longer event window for that day.

Q    Did you consider whether it would take less than one day to fully incorporate the corrective disclosure?

MR. FEE: Objection to form.

THE WITNESS: I didn't explicitly perform any alternative tests, but there are certainly plenty of examples of market price movements generally, not just with Oak Street

MAGNA
LEGAL SERVICES

Page 122

Health, but just generally where it's pretty clear the market impounds the information fully in less than a day, but I have not specifically analyzed that date to evaluate that question for that particular date.

BY MS. YABLON:

Q    So you're not issuing an opinion today as to how quickly the market reacted to news for a corrective disclosure with Oak Street Health; is that right?

MR. FEE:  Objection to form.

THE WITNESS:  Well, I'm opining that the market is semi-strong efficient.  So I'm opining that whatever the impact of that disclosure was would be rapidly reflected. There's certainly evidence of the stock price moving statistically significantly within one day of that disclosure.  Whether there's evidence that might be brought to bear to suggest it took less than that full day or more than that full day I've not evaluated.

BY MS. YABLON:

Q    But you did not consider whether there might be evidence that it would take less

Page 123

than one full day to fully incorporate; is that right?

MR. FEE:  Objection to form.  Asked and answered.

THE WITNESS:  I had no reason to specifically consider that, no.

BY MS. YABLON:

Q    And you also did not consider whether it might take more than one day to fully incorporate the information; is that also correct?

MR. FEE:  Objection to form.  Asked and answered.

THE WITNESS:  I did not specifically consider whether there is evidence to support using a longer than one-day event window when evaluating the full impact of that disclosure.  I was just simply testing for a cause-and-effect relationship between news and price movements. And in order to do that, I thought it was appropriate and reasonable to use one- day event windows for that purpose.

BY MS. YABLON:

Q    How do you measure whether a security price has fully incorporated new publicly

Page 124

available information?

MR. FEE:  Objection to form.

THE WITNESS:  Well, again, when I'm asked to evaluate specific disclosures and the price impacts of specific disclosures, my initial default approach is to look at a one-day event window and then evaluate whether there are important reasons to deviate from that.

So the types of evidence that might lead me to a different event window than a one full day would include evidence of additional statistically significant price movements beyond that one day; evidence of heightened volume beyond that one day; evidence of analysts or other news coverage beyond that one day that is further analyzing the new information that has been provided, and then I would also look at whether looking at shorter event windows than one day would be useful in dealing with any issues of disaggregation.

BY MS. YABLON:

Q    For purposes of your analyses in connection with this case, did you look at evidence of additional statistically significant

Page 125

price movements beyond the one day you used in your event study?

A    I would have looked at it, but not for purposes of my cause-and-effect analysis.  I was -- as I typically approach this -- that particular question of whether there's evidence in cause and effect, I was not going to deviate from the one-day window.  If asked to evaluate specific price impact related to specific information, I might choose a different event window or evaluate an event window.  I did not specifically evaluate whether there was evidence of further significant price movements the day after the corrective disclosure in this case.  I may have looked at it, I may have seen it, but I didn't do any specific analysis around that.

Q    Do you discuss in your report at any point what you looked at with respect to price movement in the day after?

A    I don't believe I had any specific discussion of that in my report, no.  That wasn't part of my -- what I'm relying on as part of my cause-and-effect test.

Q    So sitting here today you're offering

Page 126

no opinion on whether there was price movement in the day after?

MR. FEE: Objection to form.

THE WITNESS: Well, I think it speaks for itself from my backup material whether there was a statistically significant price movement on that day, but I haven't reached any particular conclusion on what may or may not have caused that, and I don't recall off the top of my head whether there was a significant movement in the day after the corrective disclosure. In the second day after the corrective disclosure, just to be clear.

There was a statistically significant negative price movement in the one-day window following the corrective disclosure. I understand you're asking about the following days. I did not perform a specific analysis of that, although it's reflected in my backup material whether there was or was not statistically significant price movements on those days.

BY MS. YABLON:

Q Sitting here today, you don't recall whether there was a statistically significant

Page 127

price movement the day after, so November 10th; is that correct?

A Well, no, November 10th is the first market date.

Q Sorry, November 11th. I take it back. The next business day after November 10th, let's say it that way.

A I don't recall off the top of my head whether November 11th had a statistically significant price movement.

Q And without recalling whether the next business day it a statistically significant price movement, you're still able to conclude that the market was efficient?

MR. FEE: Objection to form.

THE WITNESS: Yes, based upon on the cause-and-effect test I did with one-day windows as well as my analysis of all the other factors in my report.

BY MS. YABLON:

Q And you testified a few moments ago that there was a threshold at which it was -- that four days would be too long for a market to fully integrate new information and still be considered

Page 128

efficient; is that right?

MR. FEE: Objection; misstates prior testimony.

THE WITNESS: I think what I said is I recall having performed analysis in other matters that led me to conclude a time period of up to four days in a specific circumstance was relevant to consider. I don't think I've ever considered a period longer than that, although I would have to go back and check to be sure. But in the vast, vast majority of cases that I've ever worked on or looked at, I don't recall circumstances where price movements after like three or four days without additional news being announced would be, you know, that it would take more than that for information to be fully reflected. Typically the evidence is consistent with the market fully reacting within a day or two and sometimes three, but usually within one or two days. And there's academic literature out there that suggests that on average the amount of time it takes the market to fully reflect information disclosed at the end of securities class periods is between one and two days.

Page 129

BY MS. YABLON:

Q You performed no analyses to exclude the possibility that it took more than one day for the market to fully appreciate or incorporate the news for Oak Street stock; is that right?

MR. FEE: Objection; asked and answered.

THE WITNESS: I didn't do any specific analysis of that. There was clearly a statistically significant stock price reaction within the one-day window, so I did explicitly test whether there was a statistically significant reaction. Whether that -- whether there could have continued to be some continued reaction after that is not something I've ruled out or analyzed specifically in this case. But there is -- there is clear convincing evidence that the market price of Oak Street Health reacted statistically significantly within one day to the news that was released on the corrective disclosure date alleged by plaintiffs.

BY MS. YABLON:

Q But you didn't measure whether the news had been fully incorporated into the stock

MAGNA
LEGAL SERVICES

Page 130

price within that one day; is that correct?

MR. FEE: Objection to form.

THE WITNESS: I have not evaluated whether there's evidence of continued reaction after that. I just -- but I did conclude there was a significant reaction within one day.

BY MS. YABLON:

Q    And because of the significant reaction within one day, you concluded that the market was efficient; correct?

MR. FEE: Objection to form.

THE WITNESS: My evaluation of cause and effect involved looking at far more than one day. It involved looking at an entire sample of days in which there was clearly firm, specific information, which are the earnings announcement days and comparing that to a placebo effect, which is the days in which there were no news. So it's a much more involved study of looking at a sample of news days and a sample of no news days and comparing the results. So, no, I did not conclude the market was efficient just by looking at the significant result on that one day.

Page 131

BY MS. YABLON:

Q    But when you looked at the entire sample of days, which we'll discuss in a bit, you were looking at it on a day-by-day basis, in other words, 24 hours; is that right?

MR. FEE: Objection to form.

THE WITNESS: That was the design of the test, yes, was to look at market price reaction from close of one day to the close of next day, so 24 hours, or it could be over a weekend it's more than 24 hours, but it's one full trading day.

BY MS. YABLON:

Q    And that's the same analysis you conducted with respect to the market reaction to news of the corrective disclosure within one full trading day, if you will; correct?

MR. FEE: Objection to form. Asked and answered.

THE WITNESS: I treated that day consistently with how I treated the other dates I was analyzing, yes.

BY MS. YABLON:

Q    And did you measure whether the

Page 132

market had fully incorporated news in less than one day after the -- within the one day after the corrective disclosure came out?

MR. FEE: Objection to form. Asked and answered.

THE WITNESS: That was not part of my test design, no.

BY MS. YABLON:

Q    Why not?

A    Because it is a standard practice when looking at cause-and-effect tests -- and it's my standard practice and I've seen it in a number of other expert reports and I've seen dozens, if not hundreds, of academic articles when they're testing for whether different types of information affect market prices, they use daily event studies and one-day windows. It's not the only thing you can do, but it's a very standard thing to do.

Q    Why would you use -- I think you testified on this earlier, but remind me why you would use an intraday study versus a daily?

A    Well, it depends on the question being asked. You know, if -- in the literature there are some academics researching precisely how

Page 133

quick markets respond to certain types of information. They look at intraday pricing and look at shorter than one day windows.

In my work there have been times I've looked at intraday windows, especially if there are multiple events on one day that are separated at least somewhat in time. I've also used intraday analyses when some sort of disclosure came out in the middle of the market day or towards the very end of the market day and wanted to look at not just the time on that day but also part of the next day to get to a full day price movement. So there are a number of circumstances under which looking at less than one day might be relevant for a -- for evaluating the reaction to a specific announcement.

Q    Did you evaluate whether there were multiple events separated in time with respect to the day after the corrective disclosure in this case?

MR. FEE: Objection to form.

BY MS. YABLON:

Q    Strike that. Let me ask that a different way.



Page 134

Did you evaluate whether there were multiple events released in and around the time of the corrective disclosure?

MR. FEE: Objection to form.

THE WITNESS: Well, I think Oak Street Health's general practice was to have an earnings press release and then some sort of conference call, and then also filing of a quarterly report with the SEC. And those things didn't always occur simultaneously, I was aware of that.

BY MS. YABLON:

Q Did you investigate whether there was any press reaction -- price reaction, excuse me, in relation to the earnings press release?

MR. FEE: Objection; form.

THE WITNESS: Specifically on the corrective disclosure event?

BY MS. YABLON:

Q Yes.

A I did not attempt to isolate the price impact of any of the specific disclosures on that day. I just looked at the one-day window for all the information that was conveyed on that day.

Page 135

Q And you just testified that one of the reasons why you would do an intraday analysis is if there were multiple events separated in time on a specific day; correct?

A If the question related to trying to isolate the price impact of one of those relative to the others, potentially, yes. For a general cause and effect when looking at earnings announcements generally, I don't think it would make sense to necessarily do that.

Q So you're -- you are not in this case looking at the price impact of one of these events relative to others, is that your testimony sitting here today?

A If you're talking about between the press release versus the quarterly filing with the SEC versus the conference call?

Q Correct.

A I was not looking to -- whether there was a price impact of any one of those individually, no.

Q So your conclusion was that in the aggregate there was a price impact after the 24 hours within -- after the one day -- with the

Page 136

one day?

MR. FEE: Objection to form.

THE WITNESS: Yeah. When I talk about earnings announcements, I'm talking about the collection of those things and whether or not there's evidence of a price reaction to the collection of those things, not any one of them individually.

BY MS. YABLON:

Q You used the phrase value relevant a few times in your report; right?

A I believe I do, yes.

Q And if you just want one example, if you look at Paragraph 53, for example. You write, "By contrast, if on a particular day one observes an abnormal return that has a t-statistic of a magnitude greater than 1.96 (statistically significant at the 95 percent confidence level) and one observes new value relevant firm-specific information."

Do you see that?

A Yes.

Q What does it mean for information to be value relevant?

Page 137

A It would be information that a reasonable or rational investor would consider when trying to evaluate the value of a particular company.

Q Can you give me an example?

A Sure. So new value relevant information could include the quarterly earnings of the company or it could include the guidance provided by the company for future financial performance, or it could be qualitative discussion about the future of the company. But it needs to be something about when -- you know, when we talk about value in these contexts, it usually is referring to things that would impact the market's perception of the present value of the future cash flows of the company.

So that's what I was thinking of when things are value relevant, it would have to have some relevance to how investors would perceive the profitability of the company going forward.

Q And you started the answer to that question saying new value relevant information. Is it your testimony that in order for information



35 (Pages 134 to 137)

Page 138

to be value relevant, it must be new?

A    New in the context -- yes, is the short answer, but let me clarify that. So it needs to be new information in that within the current context it's being disclosed it's new.

So just to be clear, where there could be some confusion on that is if a company announces that they think their earnings are going to be, you know, a hundred million dollars, and then they come out and announce our earnings are a hundred million dollars. You know, one -- even though that's consistent with expectations, that's still new information that they actually performed that. Or if a company goes through a lot of changes then and it wouldn't necessarily be expected to earn a hundred million dollars or even have the same balance in its bank account, let's say, but then they come out and announce the exact same amount of earnings or a balance in their bank account, that's still new information because it's with a new context. So with that caveat, yes.

Q    So in the example you just gave about a company coming out and announcing that it

Page 139

thought its earnings were going to be a hundred million dollars, and then it later came out with information that, in fact, its earning were a hundred million dollars, it's your testimony that both instances would contain value relevant information; is that correct?

A    Yes.

Q    And the first instance is -- the first time that news comes out it's speculation as to what the earnings would be; correct?

A    I don't know if it's speculation as much as it would be that there's still some degree of uncertainty associated with it.

Q    And despite the fact that there was some degree of uncertainty, it's still value relevant information; correct?

A    Yes.

Q    And then when the announcement came out that confirmed that, in fact, it was a hundred million dollars in revenue, that is also value relevant information; correct?

A    I think I said earnings rather than revenue.

Q    Sorry. My apologies.

Page 140

A    But, yes, is the short answer.

Q    Is all new news value relevant?

A    Not necessarily, no.

MR. FEE: Objection; form.

BY MS. YABLON:

Q    And the cases in which new news would not be value relevant is where the information is not such that investors cared about it?

MR. FEE: Objection to form.

THE WITNESS: That it would not logically alter an investor's evaluation of the value of the company.

BY MS. YABLON:

Q    In an efficient market, is it only value relevant news that's incorporated into a securities price?

MR. FEE: Objection to form.

THE WITNESS: No, I think market values reflect all value relevant and nonrelevant -- nonvalue --

THE REPORTER: I'm sorry. I'm sorry.

THE WITNESS: Let me start again.

No, I think in an efficient market, the market price reflects all value

Page 141

relevant information and all nonvalue relevant information. I think the distinction that's -- is that you wouldn't expect the new disclosure of information that has no value relevance to impact the market price.

BY MS. YABLON:

Q    For a stock that's traded in an efficient market, information released during nontrading hours would be rapidly incorporated in the open trades on the following day; correct?

MR. FEE: Objection to form.

THE WITNESS: Not necessarily. It can take some time. I mean, there might be some initial reaction, but it wouldn't necessarily be fully reflected by the opening trades. It can sometimes take time for the market to fully reflect the information.

BY MS. YABLON:

Q    So it may be -- the price may be impacted in the opening trades, but it would take some time, quoting you, before it's fully incorporated -- the news is fully incorporated; correct?

A    That's my view, yes, is that you



Page 142

cannot look at an opening price and assume that that fully reflects all of the value relevant information that may have come out after hours. It sometimes or often could take actual trading and actual, you know, a substantial number of people trading on that information before the market fully reflects the value of that information.

Q     And in this case, the alleged corrective disclosure was announced after trading hours on November 8, 2021; correct?

A     That's correct. And that reminds me, before we had a discussion on the record about which day was the one day I was measuring for the price reaction after the date that has the alleged corrective disclosure, and I think we were talking about maybe it was the 10th. I think this is reminding me now that the disclosure was on the evening of the 8th and the market reacted to that on the 9th. And so when we were talking before about the day that I -- the one-day window I was analyzing was the 9th. And when you were asking me questions about the 11th, we should have actually been talking about the 10th.

Page 143

Q     Right. Thank you for that clarification.

A     But, yes, in answer to your current question, my understanding is it came out after market hours on the 8th, November 8, 2021.

Q     And the alleged corrective disclosure in this case was the announcement of a DOJ investigation; right?

MR. FEE: Objection; form.

THE WITNESS: That's my understanding of what plaintiffs are alleging was corrective about that announcement; yes.

BY MS. YABLON:

Q     And you have not opined that the alleged corrective disclosure was complex information; correct?

MR. FEE: Objection to form.

THE WITNESS: I don't explicitly offer that opinion in my report. I haven't evaluated whether I would characterize it that way or not.

BY MS. YABLON:

Q     You haven't evaluated whether you would characterize the information in the alleged

Page 144

corrective disclosure as being complex or not, is that your testimony sitting here today?

A     Correct. I have not made that evaluation.

Q     Isn't that an important factor when considering whether a market is efficient?

MR. FEE: Objection to form.

THE WITNESS: I think what you're asking me is whether one specific piece of information was complex and whether that's important to evaluate when performing a market efficiency analysis for a security over a long period of time, and I think the answer to that is no.

BY MS. YABLON:

Q     Your testimony sitting here today is whether or not the market understood the corrective disclosure to be complex or not does not impact your ultimate conclusion that the market was efficient over the course of the Class Period, including through November 8th?

MR. FEE: Objection to form.

THE WITNESS: That's correct.

Page 145

BY MS. YABLON:

Q     But you would agree with me that announcements of a DOJ investigation are commonplace; right?

MR. FEE: Objection to form.

THE WITNESS: I mean, I've certainly seen instances of DOJ investigations being announced. I don't know that they're commonplace.

BY MS. YABLON:

Q     That they are not complex; right?

MR. FEE: Objection to form.

THE WITNESS: It could be very complex. It would depend on the situation and the circumstance.

BY MS. YABLON:

Q     In this particular matter, there is one corrective disclosure; correct?

A     I have not evaluated that independently. I understand that the Complaint alleges one corrective disclosure, but there have been numerous cases where I've been asked to evaluate loss causation where I've identified corrective disclosures that weren't in the Complaint or found corrective disclosures alleged

MAGNA
LEGAL SERVICES

Page 146

in the Complaint that I didn't think were corrective disclosures. So I have not evaluated whether there's only one corrective disclosure in this case.

Q    Your report assumes that there is one corrective disclosure in this case; is that correct?

A    Again, for --

MR. FEE: Objection.

THE WITNESS: For purposes of my market efficiency analysis, I'm not making any assumption to whether or not there's a corrective disclosure. I was asked to analyze whether there's evidence that the market was efficient over a particular period of time. That doesn't require an allegation of fraud or a corrective disclosure or any of those things, so I'm not assuming anything about there being corrective disclosure in giving my opinion that the market was efficient.

When giving my opinion about the applicability of a class-wide method for calculating damages, I considered plaintiffs' overall theory and how they pled loss causation

Page 147

and that there was an alleged corrective disclosure and what the nature of that was.

So for that opinion, I certainly evaluated and got to the point where I understood that there was an economically coherent theory behind plaintiffs' allegation, but I did not investigate or come to any conclusion about whether it is actually a corrective disclosure or not.

BY MS. YABLON:

Q    Understood. You also did not investigate or come to any conclusion that there were additional dates on which a corrective disclosure could be found; correct?

A    Correct.

MR. FEE: Objection to form.

BY MS. YABLON:

Q    And I think we spoke about this earlier, but just to confirm, you did not do any analysis to determine how quickly the market price of Oak Street stock integrated the information contained in the alleged corrective disclosure; is that correct?

MR. FEE: Objection; asked and

Page 148

answered.

THE WITNESS: Well, I think my analysis shows that the market price of Oak Street Health responded statistically significantly within one day of the earnings announcement that contains the alleged corrective disclosure. So I am giving that opinion. I think that answers your question.

BY MS. YABLON:

Q    If a piece of information has already been disseminated to the market previously, it would not be considered new information; correct?

MR. FEE: Objection to form.

THE WITNESS: Again, the short answer to that is correct. But if the context is changed, then the repetition of information could be considered new.

BY MS. YABLON:

Q    Can commentary on previously disseminated information constitute new information?

MR. FEE: Objection to form.

THE WITNESS: I can certainly think of examples where that's true, yes.

Page 149

BY MS. YABLON:

Q    And I believe you testified before, speculation can constitute new information; is that correct?

MR. FEE: Objection to form.

THE WITNESS: Well, I think in -- if you're talking about my answer earlier about that forecast which have some degree of uncertainty can constitute new information, yes.

In terms of speculation more generally, I think I would need to know much more context to be able to evaluate whether certain types of speculation might constitute new information.

BY MS. YABLON:

Q    Do you agree that in an efficient market information would only cause a stock price reaction if it is both new and value relevant?

MR. FEE: Objection to form.

THE WITNESS: Could I have that read back, please?

(Whereupon, the question was read.)

THE WITNESS: Generally speaking,



Page 150

that's the case, yes.

BY MS. YABLON:

Q    What would typify a market that is not efficiently processing new and value relevant information?

MR. FEE: Objection. Vague.

THE WITNESS: Well, I don't know that I can provide an all-encompassing answer of that. It would depend on certain facts and circumstances and maybe there's other things. But the types of things that would come to mind would be if there's obviously new important value relevant information and the market price doesn't move for several days and then it moves after that, or it moves wildly with little explanation frequently. You know, those are the sorts of things one would want to look at, but -- or might raise questions of market efficiency.

But I'm sure there's lots of other scenarios one could imagine where you would question market efficiency, but those come -- are the first things that come to my mind.

BY MS. YABLON:

Q    If a stock price moved, for example,

Page 151

in response to old information?

A    Well, stock prices can move for lots of reasons, sometimes just due to random movement. So if a stock moves when there's old information or repeated information, it may not be -- it would certainly not necessarily be appropriate to conclude that the market price movement was caused by the repetition of that information. It may have been caused by something else or even the result of random movement. But typically, you would not expect a stock price to react to repeated information as long as the context hasn't changed.

Q    And I think when we spoke a few minutes ago, part of the definition for market efficiency had to do with reactions to public information. Am I correct about that?

A    I think I said widely disseminated public information, yes.

Q    Why does the information need to be public?

A    Because then it would be something that's available to investors to have as part of the information set, their processing, to come to

Page 152

an evaluation of the value of the company.

Q    What happens in circumstances where an investor has access to value relevant information that is not public?

MR. FEE: Objection to form.

THE WITNESS: I generally -- I have a general understanding that investors are -- let me think about that for a second.

Are you necessarily talking about inside information or just some private investor who has done some analysis of things that are just not widely publicly available?

BY MS. YABLON:

Q    Talking more about the insider. Let's focus on that for now.

A    My general understanding is that people that possess material, nonpublic information are not supposed to trade on that information.

Q    You understand that in this particular matter several defendants are private equity funds that own significant shares of Oak Street stock; correct?

A    I generally understand that's the

Page 153

case, yes.

Q    And you understand that those private equity funds designated representatives to sit on the Board of Directors of Oak Street Health?

A    I was generally aware of that. I don't recall how many or which ones had which directors, but I generally recall that structure, yes.

Q    And as board members of Oak Street Health, they would be privy to information about the company that the public would not know; correct?

MR. FEE: Objection to form.

THE WITNESS: I don't know that for a fact in this case. Generally speaking, my understanding is board members may be privy to information the public doesn't know. But whether that occurred in this case or not, I don't know.

BY MS. YABLON:

Q    And you understand that these private equity funds owned a significant amount of Oak Street stock; correct?

MR. FEE: Objection to form.

THE WITNESS: I haven't studied it

MAGNA
LEGAL SERVICES

Page 154

carefully, but that's my general understanding, yes.

BY MS. YABLON:

Q    When conducting your market efficiency analyses, did you take into account that a significant portion of Oak Street stock was owned by these private equity funds?

A    I took into account that there was a substantial number of stock that was not publicly tradeable, yes.

Q    Okay.  In Paragraph 64 of your report.

And in case anyone is getting hungry, I'm shortly going be at a good breaking point if that works.

Here in Paragraph 64 you see reference to the word "material."  Let me read it onto the record.  It says, "In conclusion, the events study analysis presented in this section demonstrates a clear cause-and-effect relationship between new material news and changes in the market price of Oak Street Health common stock during the Analysis Period, and thus the Class Period."

Page 155

Did I read that correctly?

A    Yes.

Q    What does "material" in this context mean?

MR. FEE:  Objection; form.

THE WITNESS:  To me, that means information that would generally be considered to be important value relevant information by shareholders.

BY MS. YABLON:

Q    So is material a synonym for value relevant?

MR. FEE:  Objection to form.

THE WITNESS:  In this context, yes. In other context, the word material might mean something else, but in this context, that's what it means.

BY MS. YABLON:

Q    Understood.

Is it possible for a stock that trades in an efficient market to overreact to new information?

MR. FEE:  Objection to form.

THE WITNESS:  It depends on what you

Page 156

mean by overreact.  If you mean that it's not properly reflecting what the consensus is among investors at that moment in time, I think the answer is, no, it doesn't overreact or it's not expected to overreact.

If you mean does the market get some news, and based on what it knows at that time it assesses some value and it turns out later based on later news or later events that the market was overly concerned or not concerned enough, sure, it could do that all the time.  But at the moment in time that it's being evaluated, I think it reflects the consensus view of the impact on the value of the company.  And I don't -- in an efficient market you wouldn't expect it to regularly overreact or underreact to information.

BY MS. YABLON:

Q    And we earlier a few minutes ago spoke about the market reaction to speculative news; correct?

A    Again, you used the term "speculative."  I would draw a distinction between sort of informed forecast and pure speculation, but it certainly reacts to news that is not

Page 157

completely certain.

Q    Let's talk briefly about the alleged corrective disclosure in this case.  Okay?

A    Okay.

Q    We already discussed that it revealed the existence of a DOJ investigation; right?

A    That's my understanding is what's alleged is corrective about the disclosures on that day, yes.

Q    It did not confirm anything improper related to Oak Street's relationships with third-party marketing agents; correct?

MR. FEE:  Objection to form.  Calls for a legal conclusion.

THE WITNESS:  Well, it certainly disclosed an investigation into that is my understanding.  But I don't recall it factually saying that that had occurred.

BY MS. YABLON:

Q    And the alleged corrective disclosure in this case did not reveal anything improper related to the company's provision of free transportation to federal healthcare beneficiaries, did it?

**MAGNA**
LEGAL SERVICES

Page 158

MR. FEE: Objection to form. Calls for a legal conclusion.

THE WITNESS: Again, I think it's certainly correct to think that it changed the market's view of the likelihood that that had occurred, but I don't recall that it disclosed that it had actually occurred, that improper activity had actually occurred -- with certainty, sorry.

BY MS. YABLON:

Q     So as of November 9th, investors did not know what would happen with regard to the DOJ investigation; is that correct?

MR. FEE: Objection to form.

THE WITNESS: I don't think investors could predict exactly what was ultimately going to happen with the investigation, but it certainly would have raised in investors' minds the likelihood that the company had engaged in the practices that were being alleged in that -- or that were being investigated.

BY MS. YABLON:

Q     Investors' reactions to the news was based on what they thought would happen; correct?

Page 159

MR. FEE: Objection to form.

THE WITNESS: No, it's based on what they -- what did happen, which was the announcement of the investigation in consideration of what the presence of that investigation might ultimately mean for the company.

BY MS. YABLON:

Q     It was based upon -- sorry. The announcement of the investigation and what that might ultimately mean for the company, is that what your testimony is?

A     Yes.

Q     And when you say what it might ultimately mean for the company, that's their prediction as to the impact it might have on the company; correct?

A     I think the market price would reflect investors' sort of aggregate consensus of what the impact on the value of the company was as a result of the announcement of that investigation, yes.

Q     To your knowledge, has the DOJ announced the results of its investigation of Oak Street Health?

Page 160

MR. FEE: Objection to form.

THE WITNESS: I'm not aware of it. I just don't know.

BY MS. YABLON:

Q     Has Oak Street announced that it reached an agreement with the DOJ?

MR. FEE: Objection to form.

THE WITNESS: I'm not aware of that.

BY MS. YABLON:

Q     Has CVS?

MR. FEE: Objection to form.

THE WITNESS: I'm not aware of that one way or the other.

BY MS. YABLON:

Q     Have you heard of any agreement reached between Oak Street Health and the Department of Justice?

MR. FEE: Objection to form.

THE WITNESS: I'm not aware of one.

BY MS. YABLON:

Q     What happens if Oak Street is cleared of any wrongdoing?

MR. FEE: Objection to form. Calls for a legal conclusion.

Page 161

THE WITNESS: I don't know.

BY MS. YABLON:

Q     In that circumstance, would it be fair to attribute the stock drop on November 9, 2021, to mere prediction as to the impact of what would happen to the company?

MR. FEE: Objection to form. Calls for a legal conclusion and misstates prior testimony.

THE WITNESS: Could I have that read back, please?

(Whereupon, the question was read.)

THE WITNESS: I think regardless of what the ultimate outcome of the investigation is, it's fair that the market price reaction on November 9, 2021, reflects the market's overall aggregate assessment of the value relevance of that disclosure. What would happen or how -- what relevance it would have for the case or loss causation I'm not going to speculate about.

BY MS. YABLON:

Q     Before we break for lunch, just going back. We were talking about the market

MAGNA
LEGAL SERVICES

Page 162

overreacting to new information earlier; right?

A    I think you asked me a question about that market overreaction, yes.

Q    Is autocorrelation something that indicates whether a market has overreacted to information?

MR. FEE:  Objection to form.

THE WITNESS:  Well, I think with an autocorrelation test you can evaluate whether there's evidence over a longer period of time of the stock contin -- regularly exhibiting signs of overreacting or under-reacting.  I don't think an autocorrelation test can look at one particular event and evaluate whether the market over or underreacted to it.

BY MS. YABLON:

Q    But it's one way to measure whether over a period of time the stock exhibits signs of overreacting or underreacting; correct?

MR. FEE:  Objection to form.

THE WITNESS:  Yes.  One potential explanation, if you do observe significant autocorrelation in a persistent way in the same direction over a longer period of time, that might

Page 163

indicate -- or at least one explanation for that could be that the stock price tends to underreact or overreact.

MS. YABLON:  I think we can go off the record.

THE VIDEOGRAPHER:  We are going off the record.  The time is 12:28 p.m.

(After a brief recess, the proceedings continued as follows:)

THE VIDEOGRAPHER:  Beginning of Media No. 5 in the deposition of Chad Coffman.  Going on the record, the time is 1:18 p.m.

BY MS. YABLON:

Q    Mr. Coffman, before the lunch break we were talking about market efficiency generally; correct?

A    That's my recollection.

Q    And going back to that topic, is it possible for a market for a security to begin as an efficient market and later become an inefficient market?

A    I guess that's theoretically possible.

Page 164

Q    Is it theoretically possible for the reverse to happen?  In other words, for a market to begin as inefficient and later become efficient?

A    Again, that's theoretically possible.

Q    Have you ever seen that happen?

A    I've seen matters where the indicia of market efficiency get better over time.  I don't recall a scenario where one was clearly inefficient for a period and then it became efficient later.  I just don't have a recollection of seeing that.

Q    And were you ever involved in offering an expert opinion in situations where the indicia of market efficiency get better over time?

A    Yes, I've seen that before.

Q    And in those circumstances, did you conclude that the market was in -- efficient, excuse me, over the entirety of the time period at issue?

A    In that -- in the one case I'm thinking about, I don't remember the name of the case, but I remember the substance of one case I did, yes.

Page 165

Q    In this particular case, as we discussed this morning, the first day of the proposed Class Period is the date of the IPO of Oak Street stock; correct?

A    Yes.

Q    Did you consider the impact of the IPO when analyzing market efficiency here?

A    Yes.

Q    And you concluded that the IPO's inclusion in the Class Period did not -- strike that.

The IPO's inclusion in the Class Period did not alter your conclusion that the market was efficient; correct?

A    It did not.  The -- all of the indicia I looked at led me to believe the market was efficient from immediately after the IPO.

Q    And did you specifically look at the indicia in and around the date of the IPO?

A    Well, I certainly included data in all my analyses from immediately after the IPO, and I looked at certain metrics right at the time of the IPO or in the immediate aftermath of the IPO, yes.

**MAGNA**
LEGAL SERVICES

Page 166

Q    Are you aware that certain courts have found that the market for an IPO shares is not efficient?

MR. FEE:  Objection to form.

THE WITNESS:  Well, that's -- that's a different question.  That's not what I assumed you were asking me about.

BY MS. YABLON:

Q    Separate question here.  Are you aware that there are courts that have found that the market for an IPO shares of stock are not efficient?

MR. FEE:  Objection to form.

THE WITNESS:  I don't remember a specific court case.  I'm certainly aware that there are additional questions, substantive questions around whether an IPO itself, whether the pricing is efficient or not or reasons that may or may not be.  As I sit here, I don't remember a specific court decision.

BY MS. YABLON:

Q    But you're not surprised sitting here today if I were to represent that there are courts that have found that the market for IPO shares are

Page 167

not efficient; correct?

MR. FEE:  Objection to form.

THE WITNESS:  As long as you're talking about in the pricing of the IPO itself and not the secondary market pricing immediately after the IPO, I would agree with you, that would not surprise me.

BY MS. YABLON:

Q    Let's do Tab 10.  Actually -- strike that.

Are you aware of certain journal articles where the authors concluded that IPO markets are inefficient?

MR. FEE:  Objection to form.

THE WITNESS:  I don't remember that specific conclusion as much as I remember seeing journal articles and reading journal articles about what conditions there are in IPO markets themselves and why that might lead one to believe they're less than perfectly efficient.  But what specific conclusions certain articles drew or whether they claimed they were actually inefficient, I don't recall.

Page 168

BY MS. YABLON:

Q    Did you consider these articles when reaching the conclusion that the market was efficient for the entire Class Period in this case?

MR. FEE:  Objection to form.

THE WITNESS:  Well, again, I said that I was calling upon my overall knowledge and experience in these areas when evaluating market efficiency, and, you know, I'm obviously opining about market efficiency with respect to the secondary market trading on the exchanges, and took into account all of my knowledge and understanding and experience in doing that.  I'm generally aware of literature that might call into question the market efficiency of the IPO prices themselves in the initial offering but not the secondary market trading of.

BY MS. YABLON:

Q    Are you aware that certain academics believe that there is pricing volatility following IPOs?

MR. FEE:  Objection to form.

THE WITNESS:  Yes, there have been

Page 169

academic findings that show that the market price of securities, that recent IPOs can tend to be -- or can be more volatile than at other times, yes.

BY MS. YABLON:

Q    Did you look at whether the market was more volatile after the Oak Street IPO than later in the Class Period?

A    Exhibit 6 to my report shows the volatility that I measured after controlling for market factors, and it shows at the beginning of the Class Period in the first 120 days after the IPO it was around just over 3.3 percent was the standard deviation of the errors.  After that a decline for some period and then it went back up for some period.  So in the immediate 120 days following the IPO, the volatility was probably about on average as it was over the remainder of the Class Period.

Q    You're looking at Exhibit 6?

A    Exhibit 6 of my report, yes.

Q    And for the first hundred -- we're going to go to this later, but just so the record is clear.

For the first 120 days, you

MAGNA
LEGAL SERVICES

Page 170

see a flat line here; right?

A    Correct.

Q    And why is that line flat?

A    Because for the other portions of the Class Period I was looking at each day and estimating the volatility over the prior 120 days. Obviously, right after the IPO, there aren't 120 days prior, so the first 120 days constitutes one estimation window of that 120 days.

Q    So the fact that there's a flat line here is not indicating that it's not volatile during this period of time; correct?

MR. FEE:  Objection to form.

THE WITNESS:  Well, what I'm saying is on average the volatility over that period wasn't substantially higher than at other times during the Class Period.  So, for example, if you look over the second half of the Class Period, the volatility is actually for a number of periods above that 3.3 percent.  So I'm just saying it doesn't look fundamentally different than it did over the remainder of the Class Period.

Q    You're comparing the first 120 days as, I'm going to use the term block, but as a set

Page 171

as compared to the rest; is that correct?

A    That's what I was referring to, yes

Q    Okay.  Understood.

And you understand that IPOs commonly involve lock-up agreements; correct?

A    Yes.

Q    And the 120 days that we were just discussing is the period of time when Oak Street shares were locked up -- certain of Oak Street shares were locked up; correct?

A    Yeah, obviously the shares offered in the IPO itself aren't locked up.  Those are freely available to trade.  But I understand there were other portions of Oak Street shares that were subject to a lock-up period, yes.

Q    And lock-up agreements restrict at least certain shareholders from selling a company's stock; correct?

A    For some period of time, yes.

Q    And, therefore, if there is, for example, bad news about a company, the shareholders of locked up shares cannot sell their stock; correct?

MR. FEE:  Objection to form.

Page 172

THE WITNESS:  Those particular shareholders my understanding would not be able to sell, but other shareholders that received shares in the IPO certainly could.

BY MS. YABLON:

Q    So those shareholders who hold locked up shares cannot sell their stock during the lock-up period; correct?

A    That's my general understanding.  I don't know if there can be exceptions to that, et cetera.  But generally speaking, that's my understanding of how lock-ups work.

Q    And that could prevent the stock price from falling; correct?

MR. FEE:  Objection to form.

THE WITNESS:  No, not necessarily. Certainly it doesn't prevent the share price from falling.  I mean, there were -- my understanding, there were over 80 million tradeable shares.  So if people amongst those 80 million shares could sell and would reflect any lower valuation and could certainly cause the stock price to fall.  So just because certain shareholders can't sell doesn't mean that market prices aren't going to

Page 173

reflect negative information.

BY MS. YABLON:

Q    The question I asked was not whether it would prevent the stock price from falling, it was that it could prevent the stock price from falling.  Is it possible that a lock-up would have -- strike that.

Could a lock-up impact a stock price movement?

MR. FEE:  Objection to form.

THE WITNESS:  As long as there are sufficient shares out there to trade and sufficient volume, I don't see any logical reason to believe that the price wouldn't reflect the true value of the stock.  I don't think that the very fact that there are locked up shares doesn't imply the stock isn't going to respond as it would as if those shares were trading.

BY MS. YABLON:

Q    And your answer just now said as long as there are sufficient shares out there to trade and sufficient volume.  What's the threshold?

A    Well, I don't know if there's a minimum threshold, but certainly when you're

MAGNA
LEGAL SERVICES

Page 174

talking about, you know, a stock that has over 80 million shares outstanding and it trades frequently as I've documented in this report Oak Street Health does, I don't think there's any reason to believe that the presence of lock-up shares would prevent the price from reflecting the stock's fundamental value.

Q    So in a case where the majority -- and by majority I mean over 50 percent of the shares are locked up, your testimony sitting here today is that that would not impact the stock's fundamental value?

MR. FEE:  Objection to form.

THE WITNESS:  I don't believe there's -- in an efficient market there's not a reason to believe the price would be different simply because there's a majority of the shares locked up.

BY MS. YABLON:

Q    A lock-up affects how quickly and correctly a security incorporates new value relevant information; correct?

MR. FEE:  Objection to form.

THE WITNESS:  Can I have that read

Page 175

back, please?

(Whereupon, the question was read.)

THE WITNESS:  I don't think it would fundamentally change that, no.

BY MS. YABLON:

Q    So your testimony sitting here today is that a lock-up would not affect how quickly a security incorporates new value relevant information?

MR. FEE:  Objection to form.

THE WITNESS:  I think in a situation where all the other indicia of market efficiency are present, there being lock-ups I don't think would materially impact market efficiency or the ability of the stock price to quickly reflect information.

Now could it have some de minimus affect or, you know, could there be circumstances theoretically if, you know, 98 percent of the shares were locked up, that might be different.  But in a situation like with Oak Street Health where there's 80 million shares freely tradeable and the sort of volume that we

Page 176

observed and the other indicia of market efficiency like cause and effect and the robustness of the event study regression, I don't think that the presence of locked up shares would materially impact market efficiency, no.

BY MS. YABLON:

Q    You've referenced a few times the fact that there were 80 million shares freely tradeable; right?

A    At least -- at some point during the Class Period, yes.  I have a --

Q    Do you have an understanding as to what percentage of overall shares, including those that were locked up, that 80 million comprises?

A    I think it's roughly a third.

Q    So if a -- sitting here today, your testimony is that as long as a third of the shares trading were not locked up that is sufficient for you to reach a conclusion as to a market's efficiency?

MR. FEE:  Objection to form.

THE WITNESS:  I would never just look at that one-third and say that's, you know, the only thing to look at.  I don't think you can tell

Page 177

one way or the other whether the  market is efficient just looking at that one-third.  I think it's a matter of looking at all the factors and seeing whether there's measurable evidence of market efficiency through cause and effect and also looking at the liquidity and the cost to trade and all the factors that I looked at.  That alone isn't dispositive one way or the other.

BY MS. YABLON:

Q    But it confirms, it supports your view that the market was efficient; correct?

MR. FEE:  Objection to form.

THE WITNESS:  I think the fact that there were 80 million shares freely tradeable is supportive of market efficiency.  I don't think that the fact that there were locked up shares impedes market efficiency in a material way when you see the sorts of indicia of efficiency that I've documented in my report.

BY MS. YABLON:

Q    Did you consider whether there were any lock-up agreements expiring in the months following Oak Street Health's IPO?

MR. FEE:  Objection to form.

MAGNA
LEGAL SERVICES

Page 178

THE WITNESS: I think on Exhibit 2 to my report I have a text box that explicitly shows when I understood there was an expiration of a 180-day lock-up period that applied to the number of shares.

BY MS. YABLON:

Q    So for purposes of your analysis with respect to Exhibit 2, you considered the impact of the lock-up period, is that your testimony?

A    I was certainly aware of it and considered it, yes.

Q    What about for purposes of other of the analyses you conducted in connection with your report?

A    It's certainly a background factor that I was aware of and thought about. I don't think there's any way in which it explicitly enters the analysis, but it was certainly a factor I was aware of.

Q    And you see in Exhibit 2, for example, the expiration of the 100-day lock-up period is listed as February 2, 2021; correct?

A    I think it's -- you said 100-day, I think it's 180-day. But that's the date I listed,

Page 179

yes.

Q    Sorry, thank you. The 180-day lock-up expired on February 2, 2021; correct?

A    That's my understanding, yes.

MS. YABLON: I believe this is Exhibit Coffman 3 maybe. This is a copy of the Form S-1 Registration Statement for Oak Street Health.

By all means, take a look at the entire document, but I'm going to focus your attention to Page 173.

(Coffman Exhibit No. 3 was marked for identification.)

THE WITNESS: Okay. You know, if your questions about this require me to look at other parts of the documents, I will, but I've reviewed Page 173.

BY MS. YABLON:

Q    I think 173 is sufficient for now, but if you need to review any other pages, you just let me know.

A    Okay.

Q    So you see here under the section Shares Eligible For Future Sale, that there is

Page 180

reference -- I am in the second paragraph, "Upon the closing of this offering, based on the number of shares of our common stock outstanding as of March 31, 2020, we will have 238,525,968 outstanding shares of our common stock."

Do you see that?

A    Yes.

Q    And then it continues, of these 200 and -- approximately 238 million shares -- I'm in the third paragraph now, "that will be outstanding immediately after the closing of this offering".

Do you see that?

A    Yes.

Q    "We expect that the shares to be sold in this offering will be freely tradeable."

Are you following me?

A    Yes.

Q    And then skipping ahead two sentences, it says, In addition, following this offering -- I'm approximating -- 30 million shares of common stock issuable.

Do you see where I am?

A    Yes.

Page 181

Q    "Pursuant to awards granted under certain of our equity plans that are covered by a registration statement on Form S-8 will be freely tradeable."

Do you see where I am?

A    Yes.

Q    So if I'm doing the math correctly, which I may not be doing, if you add up the approximately 238 million shares referenced at the beginning of that paragraph with the $30 million shares approximately referenced here, we end up with approximately 268 million shares; correct?

A    Give me just a second. That would be the -- those 30 million I understand would be issuable but not necessarily issued. So it's not clear there would immediately be 268 million shares outstanding.

Q    So at the very least, there would immediately be 238 million approximately; is that correct?

A    That's my understanding, yes.

Q    And then it continues and says, "The remaining 222,900,968 shares of common stock outstanding after this offering will be restricted



Page 182

securities."

Do you see that? I'm in the next paragraph.

A    Yes, give me just a second.

Okay, I see that.

Q    And it continues, "We expect approximately 97 percent of these restricted securities will be subject to the lock-up agreements described below."

Do you see that?

A    I see that, yes.

Q    So 97 percent of the 222 approximate -- approximately 222 million shares of common stock are locked up -- are subject to the lock-up; correct?

A    Give me just a second.

Q    Take your time.

A    Yes. So I think when I was referring to the 80 million shares, I was referring to 80 million that were not held by insiders. The number that may have been tradeable immediately after the IPO may have been less than that, which is consistent with what this is suggesting.

Q    Okay. So continuing with what this

Page 183

is suggesting, it's saying that 97 percent of the 200 -- almost 223 million shares of common stock are subject to the lock-up.

Do you see that?

A    Well, what's confusing me is in the next paragraph when it's talking about the 97 percent, it's talking about following the organizational transactions and prior to this offering.

So my understanding is the initial offering is for approximately 18 million shares.

Q    Well, let's look at the fourth paragraph on this page, shares eligible for future sale.

Are you there with me?

A    I'm there with you.

Q    And it starts with, "The remaining 222,900,968 shares of common stock outstanding --"

Do you see that?

A    Yes.

Q    "-- after this offering will be 'restricted securities'" -- quote/unquote.

Do you see that?

Page 184

A    I see that.

Q    " -- as that terms is defined in Rule 144 of the Securities Act."

Following me?

A    Yep.

Q    "And we expect that approximately 97 percent of these restricted securities," and the restricted securities as I just read references the 222,900,968 shares of common stock.

Do you see that?

A    Yes. So we're talking about 97 percent of the 222.9 million.

Q    Correct.

A    Yep.

Q    Which -- and, though that number, which if I did the -- if I entered the numbers correctly on my calculator is approximately 216,213?

A    216 million.

Q    Sorry, thank you, yes. I've cut off a few zeros. Let me do it exactly.

Yes. So 97 percent of the approximately 223 million shares of common stock -- assuming I entered the numbers correctly

Page 185

on my calculator, which I believe I did -- is approximately 216 million shares.

A    Okay.

Q    So that means that we have 216 million shares that are subject to the lock-up. You agree with me?

A    That's what this paragraph seems to suggest, yes.

Q    And the previous paragraph started saying that immediately after the closing of the offering, there were approximately -- or actually 238,525,968 shares available.

Do you see that?

A    Yes, I think this may exclude shares that might be issued to underwriters as part of an over allotment. But, yes, I generally agree with you.

Q    So if you were to do the math, which I have done to you -- done for you and you can certainly do on your own or with counsel, if you were to divide the 216 million shares over the approximately 238 million shares that were immediately available, you would come up with a percentage of roughly 90 percent.

**MAGNA**
LEGAL SERVICES

Page 186

So roughly 90 percent of the shares were subject to the lock-up immediately after the IPO?

A    That's correct.  There were, as you know, secondary offerings that introduced more tradeable shares as you went along through the Class Period.  But, yes, initially that sounds right.

Q    So, initially, less than ten percent of the total outstanding shares were freely tradeable for Oak Street common stock; correct?

A    That's consistent with the stock event, yes.

Q    Did you consider that when you issued your opinion concluding that the market was efficient including immediately after the IPO?

A    Yes, because I relied upon the factors described in my report, and I believe those provide sufficient evidence of market efficiency.

Q    So despite the fact that less than ten percent of the total number of outstanding shares were freely tradeable, you looked at the other factors and ultimately concluded that the

Page 187

market for Oak Street Health stock was efficient; correct?

MR. FEE:  Objection to form.

THE WITNESS:  Yes, I was well aware there was a large percentage of the stock that was subject to lock-up and analyzed the factors I normally do to evaluate market efficiency and concluded that the market was efficient.

BY MS. YABLON:

Q    And when you reference the fact that you analyzed the factors that you normally do to evaluate market efficiency, did you analyze those factors specifically at the time period around the IPO?

A    I considered all of the factors including the time period right around the IPO.  So, for example, in doing my analysis of volume and bid-ask spread and --

THE REPORTER:  Bid-ask?

THE WITNESS:  -- bid-ask spreads and other metrics, I considered data from immediately after the IPO, as well as at other points during the Class Period and Analysis Period for cause and effect.

Page 188

BY MS. YABLON:

Q    Are you aware that pursuant to SEC rules IPOs commonly involve quiet periods?

MR. FEE:  Objection to form.  Vague.

THE WITNESS:  I'm generally aware that there are quiet period rules following an IPO.

BY MS. YABLON:

Q    What is a quiet period?

A    At one point in time I knew all the details of this, but my general understanding and recollection is that there's a period of time during which the company and underwriters and analysts working for underwriters cannot comment on the stock for some period of time after the IPO.

Q    So you would agree with me that the quiet period would affect informational efficiency; correct?

MR. FEE:  Objection to form.

THE WITNESS:  It can limit the amount of information out in the market relative to if there wasn't a quiet period.  But in my view, the typical disclosures around the IPO process

Page 189

including this S-1 and other sources of information are sufficient to support an efficient market.

BY MS. YABLON:

Q    Did you look to see whether there was a quiet period that expired after Oak Street's IPO?

MR. FEE:  Objection to form.

THE WITNESS:  I assume there was some form of quiet period.  I don't recall a specific date when it ended.

MS. YABLON:  I'm going to introduce as Exhibit Coffman 4.

(Coffman Exhibit No. 4 was marked for identification.)

BY MS. YABLON:

Q    This is an August 31, 2020 email from Caroline Hoffman at Walker Sands to various individuals at Oak Street Health with the subject Oak Street Health Newsletter, August 31, 2020.

By all means, take a look at this document.  It bears the Bates No. OakStreet02245696 and the last Bates number ends 698.  Specifically drawing your attention to the

MAGNA
LEGAL SERVICES

Page 190

second page.

A    Okay, I see that.

Q    And you see here that in the second block of text it says, U.S. IPO Calendar; August 31st to September 4, 2020.

Do you see where I am?

A    Yes.

Q    And it says, August -- The Street - August 30, 2020.

Do you see that?

A    Yes.

Q    And "Summary: Oak Street Health listed as one of 15 companies ending its quiet period today."

Do you see that?

A    I do.

Q    And Oak Street Health's IPO was on August 6, 2020; correct?

A    Yes.

Q    And August 30, 2020 would be 25 days after Oak Street Health's IPO; correct?

MR. FEE: Objection.

THE WITNESS: That math seems right, yes.

Page 191

BY MS. YABLON:

Q    So at least this document seems to be referring to the ending of a quiet period after 25 days; correct?

A    It seems to be making reference to that. Whether that's actually the case or not, I don't know. But this document seems to be making that claim.

Q    Do you have any reason to doubt that this document is accurate?

A    I don't have any specific reason to doubt that it's accurate.

Q    In conducting your analysis, did you consider whether there was a quiet period expiring after the IPO?

A    I generally understood there's typically a quiet period after the IPO and I took that into consideration, yes.

Q    Did you ask whether -- did you ask anyone whether there was a quiet period after Oak Street's IPO?

MR. FEE: Objection; form.

THE WITNESS: I did not. I just assumed there was one. That's my general

Page 192

understanding is after IPOs there's a quiet period.

BY MS. YABLON:

Q    And did you assume -- what length did you assume the quiet period was for Oak -- after Oak Street's IPO?

A    I don't recall assuming a particular end to the quiet period. I know it's usually some relatively short period of time and certainly saw analyst coverage right around the first earnings announcement, so I knew that the quiet period ended by that point, but I didn't assess a particular date.

Q    And you understand that the purpose of the quiet period is to let the stock settle down -- the pricing of the stock to settle down; correct?

MR. FEE: Objection to form.

THE WITNESS: I don't -- I don't know what all the rationales behind there being a quiet period are. That may be one of them. I'm not sure.

BY MS. YABLON:

Q    Well, you earlier testified that you

Page 193

understood during the quiet period analysts don't publicly speak about the security; correct?

A    At least analysts that were associated with the underwriting of the security I don't believe can. I forget if -- I just don't recall the details of whether other analysts are restricted in a similar way.

Q    And why do you understand it? What is the purpose of excluding or prohibiting analysts from commenting on the stock immediately after an IPO?

MR. FEE: Objection to form.

THE WITNESS: I don't recall all the rationales or -- for the quiet period.

BY MS. YABLON:

Q    But at least one of them has concerns of giving time for the stock price to settle down or stabilize after an IPO; correct?

MR. FEE: Objection to form.

THE WITNESS: I recall in reading articles about this that the volatility of the stock was one issue in why, for instituting quiet periods.

MAGNA
LEGAL SERVICES

Page 194

BY MS. YABLON:

Q     Have you heard the term price stabilizing transactions before?

A     Yes.

Q     And are you aware that underwriters in IPOs frequently engage in price stabilizing transactions in and around the IPO?

MR. FEE:  Objection to form.

THE WITNESS:  I don't know how frequently they do.  I'm aware that they have the capability of doing that.

BY MS. YABLON:

Q     And price stabilizing transactions could involve making bids for common stock in the open market for the purpose of preventing a decline in the market price of common stock; is that correct?

MR. FEE:  Objection to form.

THE WITNESS:  That's my understanding of one potential implication of them, yes.

BY MS. YABLON:

Q     It could also involve purchasing and selling common stock for the purpose of preventing a decline in the market price of common stock

Page 195

during an offering; is that correct?

MR. FEE:  Objection; form.

THE WITNESS:  Purchasing, yes.  Selling, I'm not so sure that that would have that impact.

BY MS. YABLON:

Q     So prices may be inflated during the price stabilizing transactions; correct?

MR. FEE:  Objection; form.

BY MS. YABLON:

Q     Strike that.  Let me ask it another way.

Without the price stabilizing transactions, the prices may, in fact, have been higher; correct?

MR. FEE:  Objection to form.

THE WITNESS:  No, I think you said that the opposite way.

BY MS. YABLON:

Q     Yes, I did.  Thank you.

Without the price stabilizing transactions, the prices would have been lower; correct?

MR. FEE:  Objection to form.

Page 196

THE WITNESS:  Not necessarily.  The types of transactions underwriters might engage in to attempt to stabilize the price, there's no guarantee those would be successful or have the impact that is desired.  And it's a free market at that point and other purchasers and sellers would have a tendency to drive it to its fundamental value, not necessarily inflate or deflate it.

BY MS. YABLON:

Q     But this price stabilization would affect informational efficiency; right?

MR. FEE:  Objection to form.

THE WITNESS:  I think under certain conditions it theoretically could.  Whether it actually does is an empirical question, and certainly there's no guarantee that any sort of attempt at price stabilization would necessarily be successful or impact the market price.

BY MS. YABLON:

Q     Did you consider whether there were price stabilizing transactions in connection with Oak Street Health's IPO?

MR. FEE:  Objection to form.

THE WITNESS:  Not explicitly, no.

Page 197

BY MS. YABLON:

Q     Did you consider whether -- strike that.

You opined that Oak Street common stock traded in an efficient market after looking at each of the Cammer factors; correct?

MR. FEE:  Objection to form.

THE WITNESS:  After looking at them in total, yes.  Not after -- I mean, I described how each factor supported market efficiency, but my conclusion is based on looking at them all collectively.

BY MS. YABLON:

Q     But you found that each of the factors individually supported your conclusion that the market was efficient; correct?

A     Yes.

Q     Throughout the entirety of the Class Period; correct?

A     Yes.  I think I acknowledged at certain points in my report how the metrics differed somewhat over the Class Period, especially bid-ask.  And I considered what they were, how those metrics did change over the Class


MAGNA
LEGAL SERVICES

Page 198

Period, and I believe overall each of the factors supports the finding of market efficiency for the Class Period, yes.

Q   Despite the fact that certain of the metrics differed over the Class Period, you still concluded that each of the factors supported the finding of market efficiency over the entirety of the Class Period; correct?

MR. FEE:  Objection to form.

THE WITNESS:  Yes.  You know, just as an example, in looking at the bid-ask spread, I noted that it was higher earlier in the Class Period.  But even in the very first month when it was at, I believe, at its highest, it was still below the average bid-ask spread for all stocks trading on the major exchanges.  So, yes, that's just an example of how I looked at that particular pattern and information and concluded it still supported market efficiency.

BY MS. YABLON:

Q   And you concluded that Oak Street common stock traded in an efficient market after considering each of the Krogman factors; correct?

MR. FEE:  Objection to form.

Page 199

THE WITNESS:  Yes.

BY MS. YABLON:

Q   And you also considered certain additional factors as well in reaching your conclusion that the stock traded in an efficient market; correct?

A   I did, yes.

Q   What were those additional factors you considered?

A   Institutional ownership, autocorrelation, and options.

Q   And you found that each of these factors that would include Cammer factors, Krogman factors and the additional factors you just referenced, supports the conclusion -- I'm reading from Paragraph 24 -- "that the market for Oak Street Health common stock was efficient throughout the Class Period;" right?

MR. FEE:  Objection to form.

THE WITNESS:  I believe each of those factors helped support that the market was efficient during the Class Period, yes.

BY MS. YABLON:

Q   And you understand that the Class

Page 200

Period alleged in this case is August 6, 2020, the date of the IPO, through and including November 8, 2021; correct?

A   Yes.

Q   Did you analyze any of the factors for the quiet period alone?

MR. FEE:  Objection to form.

THE WITNESS:  No, I did not.  I mean, obviously, that's part of the period, so with the material I've collected and the backup material one could do that, but I did not explicitly do that, no.

BY MS. YABLON:

Q   And you also did not analyze the factors from the IPO through the end of the lock-up period on its own; correct?

A   I didn't calculate any specific numbers, but I certainly looked at the pattern of the data and looked at the data for those periods as part of my conclusion in reaching my conclusions.

Q   So you did not analyze whether any of the factors were different in the quiet period as compared to the entire Class Period; correct?

Page 201

MR. FEE:  Objection to form, vague.

THE WITNESS:  Again, I considered the totality of the evidence for each of the factors including looking at data from the quiet period and concluded that the evidence is that the market was efficient.

BY MS. YABLON:

Q   But you just testified you didn't separately analyze any of those factors for the quiet period alone; correct?

A   I didn't explicitly calculate any separate statistics for the quiet period itself, but I certainly looked at the pattern of volume and bid-ask spread and -- and in the context of all the factors I looked at, looked at data throughout the Class Period.

Q   But you didn't explicitly compare the factors in the quiet period to the rest or the entirety of the Class Period; correct?

A   I didn't perform those explicit calculations, no.

Q   And the same could be said with respect to the lock-up period, you didn't specifically or explicitly compare the factors as

MAGNA
LEGAL SERVICES

Page 202

applied strictly to the lock-up period to the entire Class Period; correct?

A    I did not explicitly calculate those things, no.

Q    Let's turn to Paragraph 26 in your report, which is where you start with the first Cammer factor, Cammer Factor 1:  Average weekly trading volume.

Do you see where I am?

A    Yes.

Q    And you write at the top of Page 14, "Turnover measured by average weekly trading of 2 percent or more of the outstanding shares would justify a strong presumption" on the market for the security is an efficient one -- "that the market for the security is an efficient one;" excuse me, "one percent would justify a substantial presumption."

Do you see where I am?

A    Yeah.  Those aren't my words.  I'm quoting the Cammer decision there.

Q    But those are included in your report and you're endorsing them; correct?

A    That's what I understand is the

Page 203

threshold that the Cammer court set out and has been applied in numerous cases.

Q    And you opined in your report that the 2.38 percent average weekly trading volume for Oak Street common stock during the class was -- that 2.3 percent -- 2.38 percent of shares outstanding was the average during the Class Period.

Do you see that?  I'm in Paragraph 28.

A    Yes.  I think I also have a footnote that says in Footnote 29 that Oak Street Health's shares --

THE REPORTER:  I'm sorry?

THE WITNESS:  I'm sorry.

"Oak Street Heath, Inc.'s shares not sold in their initial offering were subject to a 180-day lock-up period, which expired on February 2, 2021.  Oak Street Health's average weekly trading volume as a percentage of tradeable shares was 7.04."

So it was substantially higher than the 2.3.  But, yes, I see where you're reading the 2.38.

Page 204

BY MS. YABLON:

Q    And you -- the report continues that the 2.38 number is -- exceeds the 1 percent or 2 percent threshold cited by Cammer; correct?  I'm at the top of Page 15.

A    Yes.

Q    And that Exhibit 3 plots Oak Street Health common stock's trading volume as a fraction of shares outstanding for each week during the Class Period;" correct?

A    That's correct, yes.

Q    So let's turn to Exhibit 3, please, which is on Page 45 of 79.

A    Yes.

Q    And the analysis for Exhibit 3 is limited to August 6, 2020 through November 8, 2021; correct?

A    That's the time period covered by this analysis, yes.

Q    And that's the Class Period or the purported Class Period in this case; correct?

A    Yes.

Q    This exhibit does not consider the Analysis Period as defined in your report;

Page 205

correct?

A    That's correct.  That was really developed just for the cause-and-effect test.

Q    And each of the vertical bars in this exhibit corresponds to a week of trading; correct?

MR. FEE:  Objection to form.

THE WITNESS:  Yes.  To five trading days.  So it might not be a calendar week, but each one is a five-trading-day period.

BY MS. YABLON:

Q    Each of the vertical bars corresponds to a trading week?

A    To five trading days, yes.

Q    And if we look -- we discussed earlier that the quiet period was approximately 25 days; right?

A    Yes.  At least that's what that document suggested.

Q    And you had no reason to dispute its accuracy; right?

A    As I sit here right now, I don't.  But I haven't independently verified that.

Q    Understood.  And if you look at the first four bars that would correspond -- actually

MAGNA
LEGAL SERVICES

Page 206

the first five bars, that would correspond to the quiet period; correct?

MR. FEE: Objection to form.

THE WITNESS: It could be the first three or four bars. It might fall in -- the ending of the quiet period, according to that document, might fall in between -- somewhere in between the third and fourth bar I think.

BY MS. YABLON:

Q   And if we look at the first four bars, three of those four bars are below the one percent threshold; correct?

A   Relative to the total shares outstanding, yes. Relative to the number of tradeable shares at that point in time, it would -- I don't think it would be below one percent. But, yes, relative to the shares outstanding, three of the four bars are less than one percent.

Q   Well, you put forth this exhibit to support your conclusion that the average weekly trading volume hit or exceeded the one or two percent thresholds; correct?

A   On average, yes, and I also presented in the text box at the top and center of Exhibit 3

Page 207

what those statistics on average would be as a fraction of the actual tradeable shares. So that was something I was also considering.

Q   But you would agree with me that three of the four vertical bars are below the one percent threshold; correct?

A   If the shares outstanding is the denominator, yes, I would agree with that.

Q   And the only vertical bar that is above the one or two percent threshold is the week of the IPO; correct?

A   Yes.

Q   Did you analyze this particular period of 25 days immediately after the IPO?

MR. FEE: Objection to form. Asked and answered.

THE WITNESS: It's certainly part of what I analyzed. I did not explicitly calculate any separate statistics for that particular point in time.

BY MS. YABLON:

Q   You would agree with me that this period of four vertical lines for the period represented by these four vertical lines did not

Page 208

meet the Cammer threshold of 1 percent or 2 percent; right?

MR. FEE: Objection to form.

THE WITNESS: No, I think if you take the average of those four bars it easily could be greater than one percent and probably is greater than one percent, and it may be greater than two percent.

So, for example, if the first bar is 5 percent and let's say that the average of the following three is -- are about .75 percent, adding those all together, you get close to 3 percent. So somewhere between 7 and 8 percent divided by four --

BY MS. YABLON:

Q   You're under the 2 percent threshold.

A   You're above the 1 percent threshold. You would be slightly under the 2 percent threshold. And, again, that's using the entirety of the shares outstanding as the denominator rather than the tradeable shares, which would probably be the more meaningful statistic.

Q   Why is it more meaningful to focus on the tradeable shares?

Page 209

A   Because you're evaluating what's the likelihood of any given share to trade, or how frequently are shares that actually could trade changing hands. And as we just went through, there was a substantial amount of shares that couldn't be traded.

So in creating a statistic that you could actually compare across companies, and especially those that have -- you know, where most of the shares outstanding aren't -- are tradeable with companies where most of the shares outstanding aren't tradeable, you would want to take that into account and focus on the volume as a percentage of tradeable shares would be a more meaningful statistic. Here I'm showing both.

Q   The lock-up period in this case ended on February 2, 2021; correct?

A   That's my understanding, yes.

Q   And if you look at the chart and the vertical lines before February 2, 2021, you would agree with me that the vast majority of them are below the 1 percent threshold; right?

A   Many of them are. I don't know if I'd say the vast majority, but many of them are,

MAGNA
LEGAL SERVICES

Page 210

yes. It's unclear--

Q You can feel free to count, but by our count, it's 19 of the 26 are below the 1 percent threshold. Feel free to check our math.

MR. RICHTER: Staci, he was in the middle of the answer, so if you could not cut him off.

MS. YABLON: Sorry.

THE WITNESS: It looks like 19 out of the 26 or 19 out of 27 depending on which bar you treat as the cutoff. So certainly a majority. But what the weighted average is, you know, some of those bars are well above the 1 percent. But I will agree that the majority are below the 1 percent. Relative to the shares outstanding denominator, I don't think that would be the case for the tradeable shares denominator.

BY MS. YABLON:

Q Does this chart -- or does this bar graph track the percentage of tradeable shares?

A The bars do not. The average in the box shown at the top of Exhibit 3 does do it with respect to tradeable shares.

Q Right. But that's the average across

Page 211

the entire period of time; correct?

A Correct.

Q So your analysis here does not include on a per five-trading-day basis the percentage of tradeable shares; correct?

A I think it could be seen from my backup materials, but I don't summarize it here, no.

Q But that's not what you included in your report; correct?

A Well, I included both measures in my report for the entire Class Period. You're choosing now to point me to specific sub-periods, and I did not calculate that average for those specific sub-periods, but one could from the backup material I provided.

Q But you didn't calculate the average weekly volume as a percentage of tradeable shares for any specific five-day trading period; correct?

MR. FEE: Objection to form.

THE WITNESS: Again, I think that would be reflected in my backup material, but I don't show it, each individual bar here, no.

Page 212

BY MS. YABLON:

Q You don't show any such bars here; correct?

MR. FEE: Objection to form.

THE WITNESS: I did not do a separate bar chart showing it as a percentage of tradeable shares. I just summarized it in that text box.

BY MS. YABLON:

Q On an aggregate level across the entirety of the Class Period; right?

A Correct.

Q Let's turn to Analyst Coverage. You opine that during the Class Period there were at least 128 reports issued by 20 separate firms. That's Paragraph 33, I believe.

A Yes.

Q And you see that the first sentence of Paragraph 33 begins, "During the Class Period there was consistent analyst coverage for Oak Street Health;" correct?

A Yes.

Q What does "consistent" mean as used here in this -- in your report?

A I noted there was analyst coverage

Page 213

following -- or right around the time, usually both before and after, but certainly after each earnings announcement throughout the Class Period.

Q Did you analyze how many -- or did you consider how many analyst reports were issued during the quiet period alone?

A Sitting here today, I don't recall how many there were during the quiet period.

Q I'll represent to you that using your backup materials we identified only one analyst report during the quiet period, and that analyst was Seeking Alpha.

Does that refresh your recollection?

A Like I said, I don't recall specifically looking at that, so that would not surprise me.

Q Do you know whether anyone on your team looked at the Seeking Alpha report issued during the quiet period?

A I don't have a recollection of anyone specifically mentioning that.

Q And you would agree with me that one analyst report is not sufficient to satisfy Cammer

MAGNA
LEGAL SERVICES

Page 214

Factor 2; correct?

MR. FEE: Objection to form.

THE WITNESS: If we're talking about over a very long period of time, obviously not. But would it be surprising to not see a lot of analyst coverage in the first few weeks after an IPO, that would not surprise me at all.

BY MS. YABLON:

Q Did you do anything to analyze the number of analyst reports during the lock-up period?

MR. FEE: Objection to form.

THE WITNESS: Again, I was certainly aware of there being analysts issuing reports during the lock-up period because I looked at analysts' reports around the dates of the earnings -- each and every one of the earnings announcements. So I know there was analyst coverage around each of those earnings announcements including during the lock-up period.

BY MS. YABLON:

Q Sitting here today do you have an understanding as to how many such reports were issued during the lock-up period?

Page 215

A I don't recall off the top of my head how many there were, no.

Q And your report references that Exhibit 4 shows there were at least 128 reports issued during the Class Period, and it lists 20 separate firms that had equity analysts issue reports on Oak Street Health; correct?

THE WITNESS: Could I have that back, please?

(Whereupon, the question was read.)

THE WITNESS: Generally that's right. Seeking Alpha doesn't employ their own analysts so they're not issuing reports on behalf of Seeking Alpha, but they're issuing reports that are posted on Seeking Alpha, so that's the only distinction I would draw.

BY MS. YABLON:

Q And you're specifically referencing the report from the quiet period that we just discussed; correct?

MR. FEE: Objection to form.

THE WITNESS: If you're representing that was a Seeking Alpha report then, yes, that

Page 216

would be true of that.

BY MS. YABLON:

Q And you're talking also here about No. 13 here under the analyst name, Seeking Alpha; is that correct?

A That's correct, yes.

MS. YABLON: I'm going to turn over Coffman Exhibit 5, which we pulled from your backup materials. This is Oak Street Health: Refreshing Approach to Healthcare, August 7, 2020.

(Coffman Exhibit No. 5 was marked for identification.)

BY MS. YABLON:

Q You should take time to read this, but I just have one or two questions on it.

A Sure. Let me just read.

Q Please.

A Okay.

Q And you see here in the very last page it says "Seeking Alpha's Disclosure".

Do you see where I am?

A Yes.

Q In the fourth sentence, it says, "Seeking Alpha is not a licensed security dealer,

Page 217

broker or U.S. investment adviser or investment bank."

Do you see that?

A Yes.

Q And Seeking Alpha is listed on Exhibit 4. I think it was Exhibit 4 to your report in the list of analyst names issued for Oak Street Health; correct?

A Correct.

Q And this particular report that we just looked at is August 7, 2020; correct?

A Yes. Although it's certainly including data after that, so I don't know if it's been updated at certain points in time. But it -- it seems at least an original version of this article was posted on August 7, 2020.

Q And that was during the quiet period; correct?

A Yes.

Q Does reviewing this article now refresh your recollection as to whether you considered it when issuing your report?

A If it's part of the backup material, then it's something that certainly I or my staff

MAGNA
LEGAL SERVICES

Page 218

considered as -- as being a report that's analyzing the company that was issued during Class Period, yes.

Q    And you see that this -- the author of this appears to be The Value Investor, Investing Group Leader.  I'm on the first page.

A    Yes.

Q    And if you look at the second to the last page, the very bottom it says, "This article was written by The Value Investor."

Do you see that?

A    Yes.

Q    24.69K followers.

A    Yes.

Q    So there's roughly 25,000 follower of The Value Investor?

A    That's what that suggests, yes.

Q    Are you familiar with The Value Investor?

A    No.

Q    Do you frequently use The Value Investor as a source of analyst reports?

A    I'm trying to remember if I've seen that name before.  I don't think I relied on it

Page 219

frequently, no.

Q    Do you follow The Value Investor?

A    I do not.

Q    Did you review each of the 128 reports that you identified in Exhibit 4 of your report?

A    No, that wasn't necessary for the opinion I'm giving.  I did review a lot of them that occurred around the earnings announcement dates.

Q    Without reviewing all the information in these reports, how are you able to conclude or know which reports "served the purpose of disseminating publicly available information along with commentary, news, updates, analyses and recommendations of the analyst to investors"?

I was quoting Paragraph 33?

MR. FEE:  Objection to form.

THE WITNESS:  Because the one -- the analyst reports I did review around the earnings announcement dates certainly served that purpose.  I'm generally familiar with the types of reports that these companies issue.  And Seeking Alpha is just one company that posts analysis of third

Page 220

parties, I thought it was important to include that -- that channel of information dissemination.  So in my view, based on my review of the analyst reports I did see, that they were serving that purpose.

BY MS. YABLON:

Q    You didn't think it was necessary to review the 128 analyst reports cited in Exhibit 4 because you're generally familiar with the types of reports that these companies issue, is that your testimony today?

MR. FEE:  Objection to form.

THE WITNESS:  I said I explicitly looked at a number of analyst reports, especially those around the earnings announcements dates and saw the types of information that they were reporting on and confirmed that they were the types of analyst reports I typically see when looking at analyst coverage of companies, and that they were fulfilling that role, and I'm familiar with the types of reports that these companies issue more generally.  And so given that there were over 100 -- you know, given that there were 128 reports filed during this Class Period, that

Page 221

suggested to me there was substantial analyst coverage of this company, and it filled the roles that are described in my report and -- I'll stop my answer there.

BY MS. YABLON:

Q    But you didn't actually look at the 128 analyst reports that you cite to in your report to reach the conclusion that you reached?

MR. FEE:  Objection to form.  Misstates prior testimony.

THE WITNESS:  I didn't read cover to cover all 128 analyst reports.  As I testified, I looked at a substantial number of analyst reports, especially those around the earnings announcements.  I obviously provided all 128 in my backup materials, but I did not read every single one of them cover to cover.

BY MS. YABLON:

Q    You just testified that you looked at a substantial number of the analyst reports.  You previously testified that you looked at a sampling of the analyst reports, and before that you said you looked at the analyst reports surrounding the earnings.

Page 222

How many analyst reports did you review?

MR. FEE: Objection to form.

THE WITNESS: I don't think I ever said a sampling of them. I think I said I looked at -- generally looked at the analyst reports that were published around the earnings announcement dates. And taken together, I believe that's a substantial number of analyst reports. I don't think there was any inconsistency there.

BY MS. YABLON:

Q    The next factor that you considered at least for ordering of your report was the number of market makers; correct? That begins Paragraph 37.

A    Yes.

Q    You opine there were 98 market makers for Oak Street common stock throughout the Class Period; correct? And I'm looking specifically at Paragraph 41.

A    Yes, that's the number of market makers I identified during the Class Period.

Q    And you wrote here, "Throughout the Class Period there were 98 market makers for Oak

Page 223

Street Health common stock;" correct?

A    Well, I think I'm saying that when looking throughout the Class Period I identified 98 different market makers that served as market makers for Oak Street Health common stock. I'm not saying that each and every one of them was a market maker throughout the Class Period.

Q    And that this supported a finding of market efficiency; right?

A    Well, I think that's part of it. I think you're ignoring that for the vast majority of this section I'm talking about how the Cammer -- this particular Cammer factor was focused on an-over-the-counter market without volume reporting. And in that circumstance, it would be helpful to look at the number of market makers.

I go on to describe how this isn't an over-the-counter stock without volume reporting; it trades on one of the major exchanges. And given that fact, that counting the number of market makers isn't a particularly informative statistic, and that the concept behind this that there be -- looking at whether there's a liquid and continuous market is virtually

Page 224

guaranteed by the fact that it traded on one of the major exchanges. So counting the number of market makers themselves is really not that meaningful in this context. But even so, when I do, there were 98 that were identified as being market makers during the Class Period.

Q    Did you do anything to analyze how many market makers there were during the quiet period?

MR. FEE: Objection to form.

THE WITNESS: I did not specifically look at that, no.

BY MS. YABLON:

Q    Did you do anything to analyze how many market makers there were during the lock-up period?

MR. FEE: Objection to form.

THE WITNESS: I did not calculate that specific number, no.

BY MS. YABLON:

Q    The next Cammer factor that you considered for purposes of your report is Factor 4, SEC Form S-3 eligibility; right?

A    Yes.

Page 225

Q    Did Oak Street Health file a Form S-3 during the Class Period?

A    I don't believe so.

Q    And yet you still concluded in your report that each of the Cammer factors including Cammer Factor 4 supported your finding of market efficiency; correct?

A    Yes, because the Cammer -- the language of the Cammer factor itself says "it would be helpful to allege the company was entitled to file an S-3 registration statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met."

So my understanding is that for some period they were probably ineligible just because of timing, but otherwise met the factors.

Q    Do you know what that timing period is?

A    I believe -- I might not get the wording of it exactly right. But I believe it has something to do with filing at least a year's

MAGNA
LEGAL SERVICES

Page 226

worth of earnings reports or covering a year's worth of earnings, something to that effect is my general understanding of the timing issue.

Q    And you understand that the Class Period in this case extends beyond a year; correct?

A    Yes.

Q    And in Paragraph 44 of your report, you wrote, "While Oak Street Health did not file a Form S-3 ASR during the Class Period, in part due to the timing requirements," do you see where I am, "after it's IPO"?

A    Yes.

Q    You're referencing the fact that Oak Street Health did not file the Form S-3 in part due to the timing requirements; correct?

A    That at least for some portion -- what I'm trying to say there is that for at least some portion of the Class Period they were likely ineligible due to the timing requirements.

Q    And did you ask whether they were ineligible for the entirety of the Class Period?

MR. FEE:  Objection to form.

THE WITNESS:  I'm not aware of

Page 227

anything that would have made them ineligible throughout -- through the entire Class Period.

BY MS. YABLON:

Q    Yet, nevertheless, you reached the conclusion that Cammer Factor 4 supports your conclusion of market efficiency even though you are not aware that there was anything that made --

MS. YABLON:  Hold on, I can't read it.

THE REPORTER:  Inefficiency -- or ineligible.

BY MS. YABLON:

Q    You nevertheless reached the conclusion that Cammer Factor 4 supports your conclusion of market efficiency even though you are not aware of anything that made them ineligible to file the Form S-3 throughout the entire Class Period?

MR. FEE:  Objection to form.

THE WITNESS:  Right, so my understanding is that the only thing that rendered them ineligible for some period of time were the timing requirements.  I'm not aware of any minimum requirement the company didn't meet in terms of

Page 228

S-3 eligibility.  I'm not aware of anything like failure to timely file the reports or things like that that would make them ineligible.  So in my view, yes, it supports market efficiency.

The only reason they -- that I understand they were ineligible for a period of time from not filing S-3 was due to timing and that there's nothing else that made them ineligible during the Class Period.

BY MS. YABLON:

Q    You've now said a few times that you understand for a period of time they were not eligible for an S-3 filing; correct?

MR. FEE:  Objection to form.

THE WITNESS:  Due to timing; correct.

BY MS. YABLON:

Q    Due to timing.

But that's only a portion of the Class Period.  It's a period within a sub -- it's only a portion of the Class Period that you believe they were not eligible to file the S-3; correct?

MR. FEE:  Objection to form.

THE WITNESS:  Correct.  And outside

Page 229

of that period, I believe they were eligible. I've seen nothing to suggest they were ineligible.

BY MS. YABLON:

Q    Do you know whether they filed an S-3 within the Class Period?

A    I don't know they did, but that doesn't mean that they're not -- they weren't eligible to.

Q    Did you ask why they didn't file the S-3 during the Class Period?

MR. FEE:  Objection to form.

THE WITNESS:  No.  Just because they filed it after the Class Period doesn't mean they couldn't have filed one during the Class Period.

BY MS. YABLON:

Q    Did you ask whether they were eligible to file the S-3 during the Class Period?

MR. FEE:  Objection to form.

THE WITNESS:  I didn't see any indication that there was anything that would have made them ineligible outside of the timing issues for a period of -- for a portion of the Class Period.

MAGNA
LEGAL SERVICES

Page 230

BY MS. YABLON:

Q    Did you investigate whether there was anything that would have made them ineligible for filing the S-3 during the Class Period?

MR. FEE:  Objection to form.  Asked and answered.

THE WITNESS:  Yes.  I looked to see if there were any SEC filings that were untimely, or if they were below some of the minimum threshold requirements for filing S-3 and they were not.

MS. YABLON:  We can keep going, but do you want to take a break?

THE WITNESS:  Short break would be great.

THE VIDEOGRAPHER:  We are going off the record.  The time is 2:40 p.m.

(After a brief recess, the proceedings continued as follows:)

THE VIDEOGRAPHER:  Beginning of Media No. 6 in the deposition of Chad Coffman.  Going on the record.  The time is 2:55 p.m.

Page 231

BY MS. YABLON:

Q    Mr. Coffman, we've been discussing this afternoon certain of the Cammer factors; right?

A    Yes.

Q    I'm going to draw your attention to Cammer Factor 5:  Price Reaction to New Information which begins on Paragraph 45 of your report.

A    Okay.

Q    You ran an event study in this case "to determine whether Oak Street Health common stock reacted to earnings announcements in a manner significantly different from how the stock moved on days with no Oak Street Health related news"; correct?

A    That's a fair summary of the general test design, yes.

Q    And I -- so the record is clear, I was reading verbatim from Paragraph 48 of your report.

A    I'm sorry, Paragraph 48?

Q    Uh-huh.  "I performed an event study to determine."  Do you see where I am?

Page 232

A    Yes.

Q    And you concluded -- this is also in Paragraph 48, that there is a clear cause-and-effect relationship between new public information about Oak Street Health and the market price of Oak Street Health common stock.

Do you see that?

A    Yes.

Q    And you conducted the event study in this case by testing ten earnings announcements that occurred during your, quote, "Analysis Period," end quote; right?

A    That's correct.  Yes.

Q    And what was your Analysis Period in this case?

A    The Analysis Period ran from the beginning of the Class Period or the IPO date up until the day before CVS announced its intention to acquire the company.

Q    Do you recall approximately what that date was?

A    Yes, I specified that date.  Give me just a second.

Yes, I define the Analysis

Page 233

Period in Footnote 25 of the report.  I think I mentioned it elsewhere, but it's from August 26, 2020 through February 7, 2023.

Q    So the Analysis Period extends approximately a year and let's say four months after the end of the Class Period?

A    That sounds about right, yes.  A year and three months maybe.

Q    Three months.

And the ten earnings -- among the ten earning announcements that you studied in your event study, five earnings announcements occurred during the Class Period and five occurred in the Analysis Period after the Class Period ended; correct?

A    Yes, although the sixth one is at the very end of the Class Period, so it's really the announcement is -- signifies the end of the Class Period.  So I would treat the sixth as really attached to the Class Period as well.

Q    But you see in Paragraph 55, you wrote, "This includes five earnings announcements that occurred during the Class Period as well as the five quarters after the end of the Class



Page 234

Period in order to have a more robust set of observations;" right?

A    I agree I wrote that. And I'm just saying that the sixth one falls literally at the end of the Class Period, so it's -- it's contiguous to the Class Period.

Q    Why did you include an Analysis Period in your event study?

A    Because in order -- so the design of my study is to look at a sample of earnings announcements dates against a sample of no news dates and compare the results between them. And in order to have a statistically robust sample size, I determined it was important to go beyond the Class Period to get more earnings announcements to study. This is a technique I've used in a number of other cases to look at earnings announcements outside of the Class Period to assist in performing a -- to make the statistical study more robust, and I did that here as well.

Q    Does market efficiency with respect to earnings announcements necessarily demonstrate market efficiency with respect to the corrective

Page 235

disclosure issue in our case?

MR. FEE:  Objection to form.

THE WITNESS:  Well, the corrective disclosure was announced on an earnings announcement, and I believe it generally speaks to whether or not there is evidence of cause-and-effect relationship between important new news and the market -- and market price changes in Oak Street Health so, yes, I believe it provides evidence that's highly suggestive of whether or not the market would react to any value relevant information.

BY MS. YABLON:

Q    Are you aware of the alleged misstatements in this case?

MR. FEE:  Objection to form.

THE WITNESS:  I'm generally aware of them. I recall reviewing them at one point. I don't have them committed all to memory, but I have a general understanding of the nature of the misstatements.

BY MS. YABLON:

Q    You would agree with me that the alleged misstatements convey information that is

Page 236

qualitatively different from the information conveyed in an earnings announcement; right?

MR. FEE:  Objection to form.

THE WITNESS:  Well, if you're saying are the individual misstatements themselves qualitatively different than the type of information that's coming from an entire earnings announcement and all of the attendant statements around earnings announcements, yes, those are qualitatively different.

BY MS. YABLON:

Q    How then can you conclude that the efficiency for earnings announcements necessarily means that the market was efficient for the type of information and the alleged misstatements in this case?

A    Because I'm not testing just generally whether there's efficiency relative to earnings announcements, I'm testing whether there's efficiency relative to value relevant news, and I'm just using earnings announcements as an example of value relevant news dates.

Q    Did you consider using any other type of information to test value relevant news beyond

Page 237

earnings statements?

MR. FEE:  Objection; form.

THE WITNESS:  I thought about whether that was necessary in this case and concluded it was not.

BY MS. YABLON:

Q    Why not? Why did you conclude it was not?

A    Because there were -- this particular company, given the business it's in, earnings announcements would represent highly value relevant information. They made regular earnings announcements throughout the Class Period and during the remainder of the Analysis Period, so I thought that was a particularly good objective set of dates to test.

Q    In your report at Page 27, footnote 65, you wrote, "It is not unusual to observe many earnings announcements that are not statically significant."

Did I read that correctly?

A    Yes.

Q    "This happens, for instance, in quarters were there was insufficient surprise



Page 238

and/or the firm roughly met expectations, if the firm offered little change in guidance, and/or if there was a mix of both positive and negative information." Correct?

A    Correct.

Q    Insufficient surprise means that the market expected the information and the earnings announcement; correct?

MR. FEE:  Objection to form.

THE WITNESS:  Or maybe not expected the exact information.  I mean, it's hard for the market to predict exactly what's going to happen, but it was not far off of consensus expectations or what the market was expecting to yield.  That would be one reason you wouldn't necessarily see a statistically significant price reaction to an earnings announcement.  That sort of thing happens all the time.

BY MS. YABLON:

Q    And that would mean that it's possible that an earnings announcement would not be releasing any new value relevant information; correct?

A    No, I completely disagree with that.

Page 239

I think every earnings announcement is releasing important value relevant information, it just may not be different than what was expected.

Q    And in that case there would be no -- there could be no statistically significant price change; correct?

A    That's correct.  You would not -- you could not conclude from the absence of a statistically significant movement that there was no value relevant information.

Q    Your event study looked at a cause-and-effect relationship; correct?

A    Well, the event study was used to evaluate a cause-and-effect relationship is the way I would say it.

Q    Did you consider whether Oak Street stock moved in the direction you would have expected based upon the news that was disclosed in the earnings statement?

MR. FEE:  Objection; form.

THE WITNESS:  That's something I considered to determine whether or not -- it's not like I looked at each date and predicted which way it would move, but after reviewing each one I

Page 240

asked -- essentially asked the question did this stock price move in a way that's clearly inconsistent with what you would expect from market efficiency, and I concluded there were no earnings announcements where I reached that conclusion.

So I did look at directionality generally by evaluating the -- the news in which way the stock price moved, but I didn't do an ex-ante prediction of which way the stock price moved.

THE REPORTER:  I didn't do a?

THE WITNESS:  An ex-ante prediction of which way the stock price would move, especially because on a number of these events there was a large mix of both positive and negative information.

BY MS. YABLON:

Q    Where in your report do you discuss your evaluation of the large mix of positive and negative information on these events?

A    I don't -- I don't talk about it in the text of the report.  It's just part of a robustness check that I did in evaluating the

Page 241

cause-and-effect test.

Q    And you said here, I did look at directionality generally by evaluating the news in which way the stock price moved; right?

A    Yes.

Q    Where in your report do you discuss your analysis of directionality generally?

A    I don't discuss it in my -- in the text of the report.  Like I said in doing that analysis, one of my robustness checks is to evaluate whether the price movement I was observing was inherently inconsistent with what would be expected in an efficient market.

In other words, if, you know, all of the information was positive and the stock price went down or vice versa, that might call into question whether that was an applicable date that should be used, and I did not find any dates that that was an issue for.

Q    You extended your analysis for the event study beyond the Class Period in order to have a more robust set of observations; right?

MR. FEE:  Objection to form.

THE WITNESS:  Yes.



MAGNA
LEGAL SERVICES

Page 242

BY MS. YABLON:

Q    And that's because ten data points is more reliable than five; right?

MR. FEE:  Objection to form.

THE WITNESS:  All else equal, the more data you have the more robust a statistical test is.  You also have to counterbalance that against looking at time periods that are too distant from the period of issue, so I think there's a balance that has to happen there.  In my view, extending out to get ten data points was an appropriate methodology.

BY MS. YABLON:

Q    Because among other reasons it enhanced the power of your statistical test; correct?

A    Yes, regardless of the results of the test itself having those additional -- having ten data points is more powerful than having five, yes.

Q    So having ten data points is more powerful than having five; right?

A    All else equal, yes.

Q    Is there less power to an event study

Page 243

with five earnings releases?

MR. FEE:  Objection to form.

THE WITNESS:  Just in terms of statistical power there is because you have less observations.  So the formulas that take into account the probability of seeing things just by chance take into account that you only have five data points instead of ten.  So mathematically speaking, a statistical test with five data points is less powerful than one with ten data points.

BY MS. YABLON:

Q    So mathematically speaking it would follow that two earnings releases would be less statistically powerful than ten earnings releases included; correct?

A    All else equal, yes.

Q    Can you draw conclusions from an event study that's limited to only two earnings releases?

A    Well, I think you could draw conclusions that were more anecdotal than statistical.  Sometimes two might be enough to -- I guess it depends on the question and it depends on the context, but I think it's challenging to do

Page 244

a statistical analysis for anything just on two data points when there is sufficient volatility and -- so doing the type of analysis I'm doing with only two data points would be difficult.  Not impossible, but difficult.

Just because by chance one or both of those events might not be statistically significant, for the types of reason I was describing.  There might not be much of a surprise or just due to a mix of information -- and if I saw that, you know, looking at only two earnings announcements and neither of them were statistically significant, would I immediately jump to the conclusion that the market was inefficient or doesn't respond to information, I wouldn't.  That's too small of a sample size to draw that kind of conclusion from.

Q    Is it possible to test for market efficiency using an event study where there were no earnings announcements?

MR. FEE:  Objection to form.

THE WITNESS:  Sure.  You could -- you could try to define other types of information releases that might be usable.  But again, I think

Page 245

earnings announcements are uniquely suited to this sort of test because all companies have them on a regular basis.  There's a lot of academic support for why that's value relevant information, and it's an objective set of dates to identify, but you could certainly conceive of other tests that look at other types of information.

BY MS. YABLON:

Q    And you concluded, based on your analysis of the event study for the Analysis Period, that the market for Oak Street stock was efficient; right?

A    Well, that's one of the factors I analyzed.  And I believe that there's very strong evidence of a cause-and-effect relationship here.  That chance of observing what we observed here in the absence of a cause-and-effect relationship is remarkably small.  And so given that over a period of time there's clear evidence of a cause-and-effect relationship, this in my view clearly supports that there was an efficient market, or is one piece of evidence supporting an efficient market.

Q    And based on your finding that there

MAGNA
LEGAL SERVICES

Page 246

was a clear cause-and-effect relationship between new material news and changes in the market price of Oak Street common stock during the Analysis Period, you also reached the conclusion that there was a clear cause-and-effect relationship between new material news and changes in the market price of Oak Street Health common stock during the Class Period; right?

A    Yes.  The Class Period is a subset of the Analysis Period, and I don't see any reason to believe that the portion of the Analysis Period that's after the Class Period is fundamentally different in any way than the period during the Class Period, there's -- in terms of the market structure and all of the things supporting market efficiency.

Q    Did you do any analysis of the period -- in the Analysis Period postdating the end of the Class Period?

MR. FEE:  Objection to form.

(Whereupon, the question was read.)

THE WITNESS:  I guess I'm not clear what type of analysis you're talking about there.

Page 247

BY MS. YABLON:

Q    So you just testified that you didn't see any reason to believe that the portion of the Analysis Period that's after the Class Period is fundamentally different in any way than the period during the Class Period; correct?

A    Uh-huh.

Q    And I'm essentially asking what is the basis of that conclusion.  Did you compare the post- Class Period Analysis Period to the Class Period?

A    Sure.  I conducted an autocorrelation test that looked throughout the Analysis Period. I studied the earnings announcements after the Class Period and as part of the Analysis Period. I'm aware that they continued to trade on a major exchange through the Analysis Period.  I didn't quantify the report, but I certainly looked and saw that there was substantial volume after the Class Period during the Analysis Period.  So I was convinced that -- there was nothing I came across in any of my review that suggested there was some structural change in the market after the Class Period before the announcement of the CVS

Page 248

acquisition, which obviously is a fundamental change for the company.  And I stopped the Analysis at -- the Analysis Period at that point.

Q    I believe you earlier testified that the only factor for what you considered the Analysis Period as compared to the Class Period was with respect to Cammer Factor 5, the event study; is that correct?

A    Well, I think that I said that that's the only factor where I'm relying on the Analysis Period.  I think I do say, with respect to autocorrelation, I think I did note that I reviewed that for the Analysis Period as well.

Q    And for purposes of your event study, did you compare the four or five earnings statements in the Analysis Period to the five or six earnings statements in the Class Period and the market reaction?

MR. FEE:  Objection to form.

THE WITNESS:  Well, Exhibit 7 to my report provides the detail on a earnings-announcement-by-earnings-announcement basis as to what the results of my event study were for those earnings announcements --

Page 249

THE REPORTER:  Wait, as a result?

THE WITNESS:  Of the -- I think I said as a result of the earnings announcements.

And you can see there that three of the five that postdate the Class Period, again the sixth one is really contiguous of the Class Period.  But of those five, three of those were statistically significant.

BY MS. YABLON:

Q    Correct.  But what I'm getting at and I understand is that you testified that you didn't see any reason to believe that the portion of the Analysis Period after the Class Period was fundamentally different than the period during the Class Period.  And I'm asking specifically with regard to your event study whether you compared the market reaction to the five earnings statements -- five or six earning statements in the Class Period with the four or five earnings statements in the Analysis Period after the Class Period ended?

MR. FEE:  Objection to form.

THE WITNESS:  I think you're asking did I do some sort of statistical analysis to



Page 250

evaluate whether the reactions were somehow different between those two periods within the earnings announcements? No, I don't believe I did any of those tests.

BY MS. YABLON:

Q But yet you concluded that they were sufficiently similar or consistent across the class and Analysis Period; correct?

MR. FEE: Objection to form.

THE WITNESS: Well.

BY MS. YABLON:

Q Strike that. Let me ask it a different way.

You concluded that they were not fundamentally different in any way as between the Class Period and the Analysis Period after the Class Period; correct?

MR. FEE: Objection to form.

THE WITNESS: I think what I testified was that the market structure and the things supporting efficiency I saw nothing to suggest that that had changed between the Class Period and the remainder of the Analysis Period. I also reviewed each and every earnings

Page 251

announcement and what was announced and the direction of the price movement and evaluated what was being announced on those earnings and announcements. And I believe that there's no reason the Analysis Period can't serve as a representative of the Class Period when doing this analysis.

BY MS. YABLON:

Q Let's take a look at Exhibit 7, which I think is where you were. It's Page 49 I believe.

A Yes.

Q This identifies, Exhibit 7, the ten earnings announcements tested as part of your event study; correct?

A Correct.

Q And it identifies Oak Street stock returns on each the trading days associated with these earnings announcements; correct?

A That's correct, yes.

Q What does an abnormal return mean as used in this exhibit?

A That means that's the percentage change in the price from the prior day that is not

Page 252

explained by the control variables in the regression.

Q And how do you determine the abnormal return?

A It's the raw return, which is in the prior column, minus the expected return. And the expected return is calculated based upon the regression coefficients and the actual observed changes in the control variables. So I think there's a paragraph in my report that describes that process of calculating the expected return.

Q And then you -- after calculating the abnormal return, you determine whether the abnormal return was statistically significant; correct?

A Correct.

Q And if so, at what will level; correct?

A Correct. In this particular table, I labeled it with one star if it was significant at the 90 percent level. We don't see any of those. Two stars if it's significant at the 95 percent level and then 3 stars if it's significant at the 99 percent level.

Page 253

Q And this chart indicates that five of the ten dates there are three asterisks, indicating statistical significance at the 99 percent confidence level or greater; correct?

A Correct.

Q And the first date in this exhibit is September 16, 2020; correct?

A That's the first earnings announcement, yes.

Q And that postdates the end of the quiet period; correct?

A It does, yes. According to the -- according to what that one document said the quiet period was, which I didn't independently evaluate. But taking that as the end of the quiet period, yes, it postdates that.

Q And within the first year after the IPO, this event study considers four different earnings; correct?

A Yes, yes. Within -- yeah, the only reason I was pausing is the fifth one is almost within that year, within a couple of days of that year. But, yes, within the first year after the IPO are the four -- the first four earnings

MAGNA
LEGAL SERVICES

Page 254

announcements.

Q   And this chart would indicate that the earnings announcement on November 9, 2020 was associated with a statistically significant abnormal return; correct?

A   Yes.

Q   And it was statistically significant at the 99th percentile; correct?

A   Correct.

Q   And the same can be said for the August 9, 2021 earnings announcement; correct?

A   Yes.

Q   And the same for the November 8, 2021 earnings announcement; correct?

A   Yes.

Q   And the same can be said for the February 28, 2022 earnings announcement; correct?

A   Yes.

Q   And lastly for the November 7, 2022 earnings announcement; correct?

A   Correct.

Q   And each of these were statistically significant at the 99th percentile; right?

A   Yes.

Page 255

Q   The remaining five earnings releases were not associated with statistically significant abnormal returns; correct?

A   Correct.

Q   And that is true as of the 90th percentile, 95th percentile and 99th confidence percentile; right?

A   Correct.

Q   So half of the days associated with earnings announcements that you evaluated did not have any level of statistically significant abnormal returns; correct?

A   Correct.

Q   Earlier, at some point this morning, I believe it was early afternoon you testified that it was theoretically possible that markets can start out as inefficient and later become efficient; correct?

A   It's theoretically possible, yes.

Q   You see in this Exhibit 7 that the earnings announcements associated with a statistically significant abnormal return increase in frequency in the second half or the bottom half of the table; correct?

Page 256

A   I don't know that that's a statistically significant difference.  I mean, there are three out of the five in the bottom of table and two out of five in the top. Numerically, there's more during the second half but I don't know that that's a statistically meaningful difference.  In fact, I doubt it would be.

Q   You would agree that there are two in the shaded gray, if you will, and three thereafter; right?

A   Yes.

Q   The first date in Exhibit 7, as we just discussed, postdates the 25-day quiet period; right?

A   It postdates the potential quiet period we were discussing earlier, yes.

Q   So you have no analysis as part of your event study for the quiet period; right?

MR. FEE:  Objection to form.

THE WITNESS:  Well, there could be no news dates that are part of that quiet period, so they would be incorporated into my overall analysis.  There's not an earnings announcement

Page 257

during that quiet period.

BY MS. YABLON:

Q   And only one of the earnings announcements -- there were two earnings announcements evaluated during the lock-up period; correct?

A   Yes.

Q   And only one was associated with a statistically significant abnormal return; right?

A   There was one that was, yes; correct.

Q   And you earlier testified that an event study with only two earnings releases would be difficult to rely upon two earnings releases when reaching a conclusion for market efficiency; right?

MR. FEE:  Objection to form.

THE WITNESS:  Just because that's such a small sample, it would be difficult to rely on just two.  I don't think that would be a particularly robust test design if -- if there was an ability to look at more.

BY MS. YABLON:

Q   You didn't include -- strike that.

Your event study also tested

MAGNA
LEGAL SERVICES

Page 258

days on which you determined that there was no news disclosed; right?

A    Correct.

Q    How did you determine whether or not a date contained news for purposes of your Cammer Factor 5 analysis?

A    So I performed a Factiva news search, that was one element, and I then also looked at whether there were any of the analyst reports that I noted in Exhibit 2 occurred on a given day or any SEC filings occurred on a given day. If none of those things were present, then I considered it a no news days.

Q    And you searched to see whether Oak Street Health was referenced in any of those reports; is that correct?

MR. FEE: Objection to form.

THE WITNESS: Well, for the reports -- sorry, are you talking about the Factiva news search?

BY MS. YABLON:

Q    Yes.

A    So I defined the search itself earlier in the report. Give me just a second.

Page 259

I did a search of Factiva, which is a third-party database, where they were -- Factiva has a data field that they label with a company name. So if they've labeled it a news story that was about a particular company, that will be marked. And so I searched all Factiva sources for where that -- Oak Street Health was identified as -- in the company field. And then I also did a separate search among major news and business sources with just the -- looking for the text Oak Street Health.

So I relied on a combination of any article that Factiva itself identified as being related to the company, and then did a broader search among major news and business sources for any time the words Oak Street Health occurred. So it was a combination of those two things.

Q    Did you analyze whether the news articles contained anything new about Oak Street Health?

MR. FEE: Objection to form.

THE WITNESS: No. So if a date had an article, I didn't independently verify whether

Page 260

that was new value relevant news, I just -- I just select for my -- for purposes of the no news dates, just selected days for which there were no articles.

BY MS. YABLON:

Q    So your -- you included as days in which there were -- there was news, dates in which the news was repetitive of previous news that had been released; correct?

MR. FEE: Objection to form.

THE WITNESS: I'm not sure I understand your question. Could you rephrase it?

BY MS. YABLON:

Q    Sure. Included in your days with the news of Oak Street would be days in which the news was not new value relevant information; correct?

MR. FEE: Objection to form.

THE WITNESS: So in my test of news dates versus no news dates, I defined the news dates as the earnings announcements. Then I identified dates where there's no news, and then I think now you're talking about dates where there was some news but not an earnings announcement.

Page 261

BY MS. YABLON:

Q    Correct.

A    And within that set, its certainly possible that some of the news articles on those days were not new value relevant information. I did not make an assessment of that.

BY MS. YABLON:

Q    There are more than 600 trading days in your Analysis Period; correct?

A    That sounds right. I don't remember the exact number, but that sounds right, yes.

Q    And you classify ten of those as news dates?

MR. FEE: Objection to form.

BY MS. YABLON:

Q    Correct?

A    No, I classify ten of those as earnings announcement dates.

Q    And there were 105 non-news dates you considered? This is Exhibit 8 of your report.

A    Correct.

Q    So there are approximately 500 days in the Analysis Period that were not tested as either earnings dates or non-news dates; correct?



Page 262

A    Correct.  Given my test design, they were not part of either of the two samples I identified to compare against each other.

Q    Did you look at any of these 500 dates to see whether they had contained new value relevant information?

MR. FEE:  Objection to form.

THE WITNESS:  I did not go through each one to evaluate whether there was new value relevant information.  I'm sure there were probably days that there were and I'm sure there were probably many days there wasn't.

Again, I was trying to identify, you know, clear objective days with value relevant specific news, which I identified were the earnings announcement dates.  And I was trying to identify a set of dates that clearly had no new value relevant news, and so I identified the 105 days with no news.  I did not seek to classify the remaining days into either no news days or news days based on the content of the information.

BY MS. YABLON:

Q    Have you tested to see whether Oak

Page 263

Street stock price responded to company press releases beyond earnings releases?

MR. FEE:  Objection to form.

THE WITNESS:  Not in a general way, no.  Again, obviously, as you mentioned, earnings releases were published through press releases, but other press releases beyond that, no, I did not specifically test those.

BY MS. YABLON:

Q    Did you test whether Oak Street stock price responded to news reports or analyst reports?

A    Not --

MR. FEE:  Object to form.

THE WITNESS:  Not specifically, no.  On a number of the news -- on a number of the earnings announcement days there were analyst reports and the market would certainly take into account what was published in those analyst reports when evaluating the value relevance of those days.

So on the earnings announcement dates, it certainly would have been incorporated, but I didn't do a separate test for

Page 264

analyst reports or news reports outside of the earnings announcement days.

BY MS. YABLON:

Q    If we turn back to your -- the text of your report, before we get to the exhibits, and you look at Page 33.  We are now moving into the Krogman factors.  And I'm going to Krogman Factor 2, the bid-ask spread.

Do you see where I am?

A    Yes.

Q    And you opine that the bid-ask spread is an important indicator of the degree to which a market is developed; correct?

A    Yes.

Q    And you did this by comparing the average bid-ask spread of Oak Street Health common stock during the Class Period to the average bid-ask spread of a randomly selected group of 100 other stocks on the NYSE and NASDAQ for October 2020; correct?

That's report paragraph 70 if that helps.

A    Yes.

Q    How did you select this random group

Page 265

of a hundred other stocks on the NYSE and NASDAQ?

A    I believe we start with a list of all those stocks, and then there's essentially a random number generator that's associated -- I believe it's done in -- I forget if we do it in SAS or Excel.

But basically, we say, we have a list of all the tickers of all the stocks trading on the NYSE and NASDAQ, for each one we then generate a random number.  And then I believe we sort it, and I forget if we take the largest hundred or the smallest hundred, but we just pick, you know, among those random numbers either the top hundred or bottom hundred and then analyze those hundred companies.

Q    Is a hundred stocks a sufficiently large dataset for this to be reliable metric?

A    I believe it is, yes.

Q    Earlier -- this was definitely this morning I showed you a redline of your report in this case to your report in the Rocket Mortgage case.  Do you recall that?

A    Yes.

Q    Can you pull that redline back up

MAGNA
LEGAL SERVICES

Page 266

please and look at Paragraph 70.

A    Yes.

Q    And you see here in the report you also selected a random group of a hundred other stocks on the NYSE and the NASDAQ in the Rocket Mortgage case; right?

A    Yes.

Q    And the bid-ask spread for that hundred other stocks on the NYSE and NASDAQ for Rocket Mortgage was .27 percent; correct?

MR. FEE:  Staci, where are you reading?

MS. YABLON:  I will tell you in a second.  On the top of Page 36.  Do you see it's kind of --

MR. FEE:  Yep.

MS. YABLON:  -- the red.

THE WITNESS:  Yes, I see that.

BY MS. YABLON:

Q    That's well below the average bid-ask spread for the October 2020 random group of a hundred stocks that you considered in our case; right?

MR. FEE:  Objection to form.

Page 267

BY MS. YABLON:

Q    If you look, for example, at Paragraph 70 in this report in this case, you write, "Exhibit 11 demonstrates that Oak Street Health common stock had a monthly average bid-asked spread of .419 percent in October of 2020."

Do you see where I am?

A    Yes, sorry, let me get back there.  I was looking at something else.

Q    No problem.

A    Give me a second to refresh myself to this.

Q    Go ahead.

A    Sorry.  You were saying Paragraph 70?

Q    Yes.  If you look at Paragraph 70, you'll see it says, "Exhibit 11 demonstrates that Oak Street Health common stock had a monthly average bid-ask spread of .419 percent in October of 2020."

Do you see that?

A    Yes.

Q    "While a randomly selected group of a hundred other common stocks on the NYSE and NASDAQ

Page 268

had an average bid-ask spread of .6 percent."

Do you see that?

A    I see that, yes.

Q    "Accordingly, Oak Street Health's common stock bid-ask spread further supports market efficiency for Oak Street Health's common stock."

Do you see that?

A    I do.

Q    And that's because the Oak Street Health common stock had a monthly average bid-ask spread that was less than your randomly selected group of a hundred other common stocks on the NYSE and NASDAQ; correct?

A    Yes, that's part of it.  And it also had a -- it was also below the median for most of the months as well.  But, yes, that's part of what supports my conclusion that that's consistent with market efficiency.

Q    So you would agree with me that your analysis of this factor depends entirely on the group of a hundred other common stocks on the NYSE and NASDAQ that you select as a comparator; correct?

Page 269

MR. FEE:  Objection to form.

THE WITNESS:  That comparison is obviously influenced by the results from the hundred company random sample, yes.

BY MS. YABLON:

Q    It's more than influenced, however, you're comparing the monthly average bid-ask spread in Paragraph 70 of October 2020 with respect to Oak Street Health as compared to 100 other common stocks on the NYSE and NASDAQ, and you're reaching the conclusion that because it's less -- because the monthly average bid-ask spread for Oak Street Health stock is less than the average bid-ask spread for the hundred other common stocks on the NYSE and NASDAQ, that this supports your conclusion that the bid-ask spread factor supports market efficiency?

MR. FEE:  Objection to form.

THE WITNESS:  That comparison is one of the things I'm relying on, yes.

BY MS. YABLON:

Q    And that comparison is -- strike that.

A    Part of what you may be missing is



Page 270

that from Rocket it was a different time period.

Q    Understood.

You've testified this morning that you've previously submitted dozens and dozens of expert reports with regard to market efficiency; correct?

A    Yes.

Q    In any report in which you have previously submitted an opinion supporting a finding of market efficiency, has the bid-ask spread that you obtained from the randomly selected group of NYSE and NASDAQ stocks ever been lower than the average bid-ask spread of the stock that you were analyzing in that particular report?

MR. FEE:  Objection; form.

THE WITNESS:  I don't off the top of my head recall a case where the average over the whole Class Period was above that, whether it was during one particular month or a particular time period, that I don't recall.

BY MS. YABLON:

Q    Did you consider limiting your hundred other common stocks on the NYSE or NASDAQ to healthcare companies, for example, for purposes

Page 271

of your analysis in this case?

MR. FEE:  Objection to form.

THE WITNESS:  No, I don't think that would be a relevant comparison.  Again, I think the reason I'm comparing against stocks generally on the NYSE and NASDAQ is because stocks that trade on those exchanges are generally considered to have the conditions necessary for market efficiency, and so comparing against a random sample of other common stocks I think is the relevant comparison.  It's not because it's in a particular industry.

BY MS. YABLON:

Q    You'd agree with me that the average or mean of a set of numbers can easily be skewed by a small proportion of extremely large or extremely small numbers; right?

MR. FEE:  Objection to form.

THE WITNESS:  Yes, that can happen.

BY MS. YABLON:

Q    And for that reason the median may be a better representative of the center of a dataset than the mean; correct?

A    If by center of a dataset you mean

Page 272

the central tendency of a variable within a dataset, then sometimes the median can better reflect the central tendency if there are outliers, yes.

Q    Let's look at the report, Exhibit 11 please, which is Page 55.

A    Okay.

Q    Again, the lock-up period, which is not denoted on this exhibit, is February 2021, which is approximately in the -- let's say slightly left of center of this bar graph; correct?

A    Yes.

Q    And if you draw a line separating February 2021 from March 2021, you'll see that in the period of time before that line, five of the bars exceed the .20 percent bid-ask spread that you've designated with a dotted line across; correct?

A    I think that's .21 percent is the median, not .20 percent.  But, yes, five of the bars are above the median.

Q    And during the quiet period, the bid-ask spread is well above the median of the

Page 273

random group; correct?

A    It's above the median.  I would say economically it's still low, it's below one half of 1 percent.  So generally speaking, that's a low transaction cost, but, yes, it's above the median.

Q    Did you consider the bid-ask spread during the quiet period alone for purposes of your analysis?

MR. FEE:  Objection to form.

THE WITNESS:  Not the quiet period itself.  I mean, I certainly saw the pattern on this chart, and I saw that the bid-ask spread was higher when you were early in the Class Period and closer to the IPO, and that it declined substantially over time.  But I didn't think at any point during the Class Period was it abnormally high relative to what you would expect from a stock trading on the exchange.

In other words, having a bid-ask spread of still less than .50 percent or 50 basis points is still a fairly low transaction cost.  So I don't see that as that value itself as abnormally large or an impediment to market efficiency.

MAGNA
LEGAL SERVICES

Page 274

So, yes, I considered the entire range of the data that's plotted on this chart.

BY MS. YABLON:

Q    Nevertheless, the analysis that you conducted in your report is comparing the bid-ask spread for Oak Street Health common stock to the hundred common stocks trading on the NYSE and NASDAQ; right?

A    Yes, and I compared it against both the median and the average; the mean and the median.

Q    The last Krogman factor that you considered was public float; correct? And that's Paragraph 71 I believe.

MR. FEE: Which exhibit are we looking at?

MS. YABLON: Paragraph 71.

MR. FEE: The redline or the --

MS. YABLON: We're in our report.

THE WITNESS: Okay. Yes.

BY MS. YABLON:

Q    And you wrote in Paragraph 71, "As shown in Exhibit 12, during the Class Period

Page 275

insiders held, on average, 62 percent of all outstanding shares of Oak Street Health common stock;" correct?

A    Yes.

Q    So the majority of outstanding Oak Street Health common stock was held by insiders during the Class Period; correct?

A    Yes.

Q    Nevertheless, you still found that Krogman Factor 3, public float, still weighed in favor of a finding of market efficiency; right?

A    For the reasons described there, yes.

Q    And that's because institutions held 74 percent of the remaining non-insider public float; correct?

A    That's part of it, and there's also a substantial percentage, roughly 38 percent that was held by non-insiders, generally.

Q    And that's across the entire Class Period; correct?

A    That's the average over the Class Period, yes.

Q    Let's look at Exhibit 12 of your report. The first date included in Exhibit 12 is

Page 276

September 30, 2020; correct?

A    That's correct.

Q    And that's after the end of the quiet period; correct?

A    That's correct. Because that's the end of the third quarter, which is when there would be reporting for institutional holdings. So that would be the first date on which there is reporting of institutional holdings after the IPO.

Q    And the percentage of shares outstanding with insider holdings, that's column seven, is 70.07 percent as of that date, September 30, 2020; correct?

A    Yes.

Q    And institutional holdings percentage of public float on that date, this is column ten, is 47 percent; right?

A    Yes.

Q    So institutions held about 14 percent of the outstanding shares on that date; right?

A    Correct.

Q    The next date in this exhibit is December 31, 2020; right?

A    Yes.

Page 277

Q    And on December 31, 2020, the insider holdings, this is column seven, is about just under 69 percent; correct?

A    Yes.

Q    And institutions held about 57 percent of the outstanding shares on this date; correct?

MR. FEE: Objection to form.

THE WITNESS: 57 percent of the public float.

BY MS. YABLON:

Q    Sorry. Excuse me, of the public float, correct.

And institutions only held about 18 percent of the outstanding shares on this date; correct?

MR. FEE: Objection to form.

THE WITNESS: 19 percent is the number.

BY MS. YABLON:

Q    And March 31, 2021 is the next day in the exhibit; right?

A    Yes.

Q    And that's after the end of the



MAGNA
LEGAL SERVICES

Page 278

lock-up period; correct?

A    That's my understanding, yes.

Q    So the two dates in this exhibit that occurred during the lock-up were September 30, 2020 and December 31, 2020; correct?

A    Yes.

Q    And the institutional holdings percentage of public float during these two dates were 47 percent and 57 percent respectively; correct?

A    Yes.

Q    And that both those numbers are less than the Class Period average across the Class Period average; correct?

A    Yes.

Q    So they are less supportive of market efficiency than the Class Period average?

MR. FEE:  Objection to form.

THE WITNESS:  I still think it shows a substantial portion of institutions holding the stock.  And so while the number is less, I don't know that I would characterize it as being just less supportive of efficiency.  This shows that a substantial number of -- a substantial percentage

Page 279

of the public float was held by institutions. That's how I would characterize it.

BY MS. YABLON:

Q    It shows that a not substantial portion of the shares outstanding were held by institutions; correct?

MR. FEE:  Objection to form.

THE WITNESS:  Well, I think that's a reflection of the fact that there was a substantial amount of the stock held by insiders. So of the shares that institutions could publicly hold, it is a substantial percentage.

BY MS. YABLON:

Q    You also looked at autocorrelation; correct?

A    Correct.

Q    Go to Paragraph 76 of your report. It starts on Paragraph 73, excuse me.

A    Okay.

Q    You say in your report that "autocorrelation means the price movements are not fully reflected in the current price which would suggest market inefficiency".

A    I think it's important to include the

Page 280

word past price movements.  You said price movements.  The past price movements as part of that sentence.

Q    Correct.

What does that mean?

A    Well, meaning if today's -- or yesterday's, let's say it that way.  If yesterday's stock price movement was somehow predictive of today's stock price movement, then that would indicate that the market had either not fully responded to previous public information or had overreacted in some consistent way to past public information.  So there shouldn't be a predictive correlation between past price movements and current price movements in an efficient market.

Q    In an efficient market, past prices should be fully reflected in current prices; correct?

A    Yes.

MR. FEE:  Objection to form.

BY MS. YABLON:

Q    Why does the notion that an investor could not consistently predict abnormal movements

Page 281

and earn arbitrage profits support the conclusion that Oak Street Health common stock traded in an efficient market throughout the Class Period? That's paragraph 76.

MR. FEE:  Objection to form.

THE WITNESS:  Because if there's an absence of autocorrelation, that suggests there's at least weak form efficiency, which is that past price movements can't predict future price movements.

BY MS. YABLON:

Q    Let's look at Exhibit 13 of your report.  And you see here that this Exhibit 13 says Test For Autocorrelation During the Class Period?

A    Yes.

Q    And as you noted earlier, footnote one says that "I also found no evidence of autocorrelation during the Analysis Period"?

A    Yes.

Q    And here you consider autocorrelation by quarter; correct?

A    Well, I do it for the entire Class Period, that's the main embolden number, and then



Page 282

I also look at it on a quarterly basis to see if there's consistency in the direction of any autocorrelation. So if there was really persistent autocorrelation, you would expect to see the sign on the coefficient to not change over time.

Q    Why did you consider quarters in this particular exhibit, whereas other exhibits we've looked at today included weeks?

A    Well, the Cammer Factor 1 explicitly is a calculation of average weekly trading volume. So that's why I looked at weeks for the Cammer Factor 1.

I don't think I looked at weeks for any other analysis. Weeks would be too short of a period over which to analyze autocorrelation. You need a larger sample than that to evaluate autocorrelation.

Quarters, I think, are sufficiently long and have enough data that you could analyze autocorrelation to at least see what the sign of the coefficient is and whether or not there's evidence of statistically significant autocorrelation. And then it's important to look

Page 283

at the pattern of how that changed. And there's obviously other analyses I did by quarter within the report in terms of looking at institutional holdings. So I think looking at it quarterly is a -- is a reasonable way to look at it over sub-periods.

Q    And you see here that for the third quarter 2021 there are two asterisks; correct?

A    Correct.

Q    And that denotes statistical significance at the 95 percent confidence level or greater; correct?

A    Sure. So there can be autocorrelation for some short period of time just due to the pattern of news events or random chance. So just seeing one statistically significant quarter doesn't imply that there's autocorrelation.

Again, the concern would appear if the coefficient were consistently one direction and statistically significant over a longer period of time.

Q    Did you investigate to see if the -- what the pattern of news was during the third

Page 284

quarter of 2021 leading to the autocorrelation having a statistically significant level of 95 percent or greater?

MR. FEE: Objection to form.

THE WITNESS: I would have looked at that. I don't have a specific recollection of what that -- what the pattern was that occurred that I felt comfortable with there, but I would have looked at it, yes. I just don't recall the details. And certainly given the lack of significant autocorrelation over the wider period and the fact the sign on the autocorrelation was not consistently one direction, I was sufficiently convinced that there was not an arbitrage opportunity to take advantage of autocorrelation in Oak Street Health's stock.

I do remember looking at that, I just don't remember the details of what -- what dates were really behind causing that significant result for that one quarter.

BY MS. YABLON:

Q    You're testifying that you recall looking at it. Is there anywhere in the report where you include that analysis of what you looked

Page 285

at with respect to the autocorrelation finding for the third quarter of 2021?

MR. FEE: Objection to form.

THE WITNESS: I didn't include any text in the report about that, no.

BY MS. YABLON:

Q    The last market efficiency factor you considered that's included in this report is options trading; right? And that's Paragraph 77.

A    Yes.

Q    You concluded that there was considerable options trading during the Class Period; correct?

MR. FEE: Objection to form.

MS. YABLON: I'm literally reading his report.

MR. FEE: What's it conclude?

THE WITNESS: Yes.

BY MS. YABLON:

Q    And this was based upon the "39,409 Oak Street Health common stock put contracts and 60,219 Oak Street Health common stock call contracts that traded during the Class Period". I'm reading footnote 87. Correct?



MAGNA
LEGAL SERVICES

Page 286

A    That's correct, yes.

Q    And you opined that this also supported a finding that the Oak Street Health common stock traded in an efficient market; right?

A    Based on the academic literature that finds that when there are option listings associated with a company, that that can increase -- that can enhance market efficiency for that security, yes.

Q    Did you look whether there was any options trading during the quiet period?

MR. FEE:  Objection to form.

THE WITNESS:  I don't recall looking at that specific question.

BY MS. YABLON:

Q    I'll represent to you based upon your backup data that there were no put or call contracts traded during the quiet period.  Is that indicative of market efficiency during that period?

MR. FEE:  Objection to form.

THE WITNESS:  If that were true, then I don't think this factor necessarily supports market efficiency during that period, but it does

Page 287

for the Class Period more broadly.

BY MS. YABLON:

Q    Did you look at options trading during the lock-up period?

MR. FEE:  Objection to form.

THE WITNESS:  I don't recall specifically looking -- separating it between the lock-up period and the non-lock-up period, no.

BY MS. YABLON:

Q    I'll represent to you that there were 924 put contracts and 4,389 call contracts traded during the lock-up period.  That's a small percentage of the total put and call contracts traded during the Class Period; right?

MR. FEE:  Objection to form.

THE WITNESS:  It would be a small percentage of those traded during the Class Period, but it would reflect that there was -- there were option contracts and option trading available during that period.

MS. YABLON:  Let's go off record, please.

THE VIDEOGRAPHER:  We are going off the record.  The time is 4:06 p.m.

Page 288

(After a brief recess, the proceedings continued as follows:)

THE VIDEOGRAPHER:  Beginning of Media No. 7 in the deposition of Chad Coffman.  Going on the record.  The time is 4:25 p.m.

BY MS. YABLON:

Q    Mr. Coffman, have you conducted any analysis of the price impact of the alleged misstatements in this case?

A    No.

Q    Why not?

A    I have not been asked to perform a loss causation or price impact analysis.

Q    Do you have any view as to whether the misstatements in this case introduced artificial inflation into Oak Street's common stock?

MR. FEE:  Objection to form.

THE WITNESS:  I considered whether it's an economically coherent theory, but I have not evaluated or tested or come to any conclusions about whether they, in fact, introduced artificial inflation.

Page 289

BY MS. YABLON:

Q    Do you have a view as to whether the alleged misstatements in this case maintained artificial inflation in Oak Street's common stock?

A    I have not evaluated that question.

Q    Do you know what plaintiffs' view of the case is, having read the Complaint?

MR. FEE:  Objection to form.

THE WITNESS:  I understand their allegation is that the -- there was artificial inflation in the stock price.  Whether it's properly characterized as maintenance or some other legal theory, I don't know.

BY MS. YABLON:

Q    We are now going to spend a few minutes or more than a few minutes on the section of your report related to your damages methodology.  Okay?

You state in your report that, I'm quoting Paragraph 7, "I have also formed the opinion that damages in this action can be calculated on a class-wide basis using a common methodology;" right?

A    Yes.

73 (Pages 286 to 289)

**MAGNA**
LEGAL SERVICES

Page 290

Q    Let's first talk about Section 10(b) damages. Okay?

A    Okay.

Q    Is it correct that the common methodology you intend to rely on is the out-of-pocket method which states, and I'm reading Paragraph 78, "Damages are equal to the artificial inflation in the share price at the time of the purchase minus the artificial inflation per share at the time of the sale."

MR. FEE: Objection to form.

THE WITNESS: Yes, I think I also talk about some statutory limitations to that, but that's the general economic form -- economic methodology for calculating out-of-pocket damages, yes.

BY MS. YABLON:

Q    And in Paragraph 80 you write that "Separate and apart from whether there was a common method for computing damages is the question of how to quantify the artificial inflation per share that is an input to the damages methodology;" right?

A    Yes.

Page 291

Q    Why do you consider calculating inflation to be separate and apart from the existence of a common methodology for computing damages?

A    Because the common method is what I described in Paragraph 78 and 79, and that can be applied regardless of what the quantification of the artificial inflation per share is. And that my understanding is quantification of the artificial inflation per share requires a detailed loss causation analysis to do that, and at least my understanding is that that's not -- certainly not something I was asked to do and I understand it's generally not required at the class certification stage.

Q    So you have not, in your report, described a methodology to determine the artificial inflation in this matter; correct?

A    Well, I think I describe in Paragraph 81 how -- what the most widely used technique or at least starting point is for calculating artificial inflation, which would be looking at market price reactions to the corrective disclosures, and then evaluating those

Page 292

disclosures to see if you can tie the declines, to the extent there are some on those days, to the corrective information. That would at least be the starting point for evaluating what the inflation per share was during the Class Period.

Q    But you just testified -- you'll excuse me because part of this I cannot read -- is that the artificial -- assessing the artificial inflation per share requires a detailed loss causation analysis, and that's not something you were asked to do here; correct?

A    That's not something I've been asked to do here, that's correct.

Q    If you have not considered the loss causation analysis for purposes of assessing loss -- purposes, excuse me, of assessing artificial inflation, how is it that you know that your damages calculation would be consistent with plaintiffs' liability theory?

MR. FEE: Objection to form.

THE WITNESS: Because in order -- so to properly evaluate their -- plaintiffs' liability theory, you have to calculate the artificial inflation consistent with their

Page 293

liability theory, and whatever that result is, whether it's -- I'm just making up numbers here -- ten cents a share, a dollar a share, $20 a share, whatever the answer is, it's common across the class and then you can use the out-of-pocket formula that's described in my report.

So the use of the common methodology I'm describing does not depend on the quantitative outcome of what that analysis is. So it requires the loss causation analysis to be consistent with plaintiffs' liability theory. Once that -- once that input is determined, whatever it is, it can even be zero, the out-of-pocket methodology I describe in my report is the proper class-wide methodology to be used.

BY MS. YABLON:

Q    But you just testified that you were not engaged to perform that loss causation analysis; correct?

A    I have not been asked to perform that loss causation analysis in this case, no.

Q    And the common methodology that you're talking about requires a loss causation analysis to be consistent with plaintiffs'



Page 294

liability theory; correct?

MR. FEE: Objection to form.

THE WITNESS: Well, again, the common methodology I described, the out-of-pocket methodology is entirely consistent with their -- with plaintiffs' liability theory.

Plaintiffs are alleging there was an inflated prices that people paid, artificial inflation, and then were damaged when the stock price fell and that inflation dissipated. So the out-of-pocket methodology that I described is absolutely consistent within plaintiffs' liability theory.

What you're now asking me is how do you calculate the inputs to that calculation; namely, how do you actually quantify the artificial inflation per share, and I'm saying that requires a detailed loss causation analysis which also would be applied class-wide, it doesn't depend on any individual shareholder, but that that's a separate analysis.

BY MS. YABLON:

Q Without having done it, how can you determine that you can quantify the artificial

Page 295

inflation on a per share basis?

A Because there are methods that have been applied in hundreds of cases I've seen to attempt to measure that, and I'm describing in Paragraph 81 and 82 what some of those methods and techniques are, and some of the considerations that are needed in that detailed loss causation analysis. And I don't think there's any reason one couldn't do that sort of analysis in this case, especially given that there's a clear alleged corrective disclosure here, and that my event study already shows that there's a statistically significant stock price decline within the 24-hour period after that alleged corrective disclosure.

Now, it would still require a detailed loss causation analysis to evaluate whether there was any confounding information and things like that, but at least a starting point of the analysis, the event study, I've already demonstrated that shows that there is a significant price movement associated with that corrective disclosure.

Q In Paragraph 78 you state that "The

Page 296

out-of-pocket method has been applied in virtually every matter in which I have observed or participated in as consulting, testifying or neutral expert;" right?

A Yes.

Q Have you ever seen another method applied in a matter in which you observed, consulted, testified or served as a neutral expert?

A Again, I think I testified earlier today about the DVI case where the -- I think it would still fall generally under the out-of-pocket method, but it really relied less on price changes at the time of corrective disclosures.

And then the BP case which I was involved in, I was explicitly asked to assume that plaintiff could collect in excess of the amount by which the stock price would have fallen even if there were a full corrective disclosure in the pre-spill for the pre-spill class. So that's one example where I really deviated from the out-of-pocket methodology. That's why I say virtually, because I have seen a couple of examples where it's deviated from the

Page 297

out-of-pocket methodology.

Q In has virtually every securities --

THE REPORTER: I'm sorry, do that again.

BY MS. YABLON:

Q Has virtually every securities litigation in which you have been involved have the same theory of liability?

MR. FEE: Object to form.

THE WITNESS: I would say the vast majority include the general overarching liability theory of there being either an inflated or deflated price, some sort of price distortion that then is corrected by a corrective disclosure. But every single case is different in terms of the context and economics of what's being alleged was withheld, and so and how that -- how the alleged concealed information was ultimately disclosed.

So there could be a lot of case-specific differences in what the exact theory of liability is. But they share the common thread that I just described, which is usually an allegation of a distorted price that is then corrected later.

MAGNA
LEGAL SERVICES

Page 298

BY MS. YABLON:

Q  Do you have an understanding of what the alleged misrepresentations or omissions were that caused the artificial inflation in Oak Street Health stock price on the first day of the Class Period, August 6, 2020?

MR. FEE:  Objection to form.

THE WITNESS:  And I have a general understanding that the allegation is that the defendants' failed to disclose that they were engaged in allegedly improper activities with respect to providing things of value to prospective customers, as well as improperly paying insurance agents money for certain activities, and that that was undisclosed until -- and the market was unaware of those activities until the DOJ investigation was announced.  That's my general understanding is that from the beginning of the Class Period, those activities were -- had occurred or were occurring and defendants failed to disclose it.

BY MS. YABLON:

Q  That was my next question.  Do you have an understanding as to whether those

Page 299

activities had occurred prior to the date of the IPO?

MR. FEE:  Objection to form.

THE WITNESS:  My general understanding is that that's the date on which the Class Period starts and the plaintiffs are alleging there were disclosure violations.  I have not studied carefully what activities alleged to have occurred prior to that date versus after that date during the Class Period.

BY MS. YABLON:

Q  Can your proposed damages methodology account for the potential for a non-constant inflation band?

A  Yes.

Q  If you use stock price drops to estimate inflation, isn't the resulting estimate only as of the time of the alleged corrective disclosures?

MR. FEE:  Objection to form.

THE WITNESS:  Well, the event study -- if we all agree there was an event study that demonstrated what the dissipation of artificial inflation was as of the corrective disclosure at

Page 300

the end of a period, then that would show what the inflation was as of that time.  It then requires further analysis to determine whether it's appropriate to backcast that inflation on either a constant dollar basis or constant percentage basis or some hybrid of those or some alternative method based on information learned in discovery or assumptions that are provided.  So it doesn't need to be just either of those.

But that's a separate analysis than the event study itself, which just tells you what the stock price drop was at the time of the corrective disclosure.

BY MS. YABLON:

Q  Would you agree with me that it's possible for the value implications of a given piece of information to change over time?

A  Yes.

Q  Is it possible then that the same alleged corrective disclosure could have different value implications at different points of the Class Period?

MR. FEE:  Objection; form.

THE WITNESS:  It's possible that --

Page 301

so I think the easiest way to say is through an example.  If there's a corrective disclosure -- again, I'm just making up numbers -- that cause the stock price to fall $3 at the end of the a Class Period, does that mean that necessarily it's $3 worth of inflation at all points during the Class Period?  No.  The value of that -- the value of a -- the right question to be asking is how much would the stock price have fallen at earlier points with a full corrective disclosure at that point in time and that could be different from $3. So it doesn't necessarily need to be the same as at the time of the corrective disclosure.

BY MS. YABLON:

Q  So you would agree that the stock price inflation at the end of the Class Period may not equal the inflation at the beginning of the Class Period; correct?

A  That's certainly possible.

Q  Based on your understanding of the facts in this case, do you believe that the inflation evolved or changed over the course of the Class Period?

MR. FEE:  Objection to form.

MAGNA
LEGAL SERVICES

Page 302

THE WITNESS: That's not something I've evaluated carefully enough and I would just be speculating, so I don't know.

BY MS. YABLON:

Q    Are there any circumstances where the stock price drops upon the alleged corrective disclosure and that is not a reliable measure of inflation?

MR. FEE: Objection to form.

THE WITNESS: Well, there can be a number of reasons that a stock price declines at the end of a Class Period upon a corrective disclosure might not be the right measure of inflation at earlier points. One possibility could be that there's confounding information on that day. One possibility, as you suggested, is that the value of the misinformation could have been changing over time. There may be other reasons, but those are two obvious reasons.

BY MS. YABLON:

Q    Have you ever proposed a damages methodology in a securities case where you did not use the price drop following a corrective disclosure to measure inflation?

Page 303

MR. FEE: Objection; form.

THE WITNESS: Yes.

BY MS. YABLON:

Q    What type of damages methodology did you use in that case or cases?

A    Well, again, just when we are talking about damages methodology, I want to be clear. There's a damages methodology which is the out-of-pocket methodology which doesn't change from case to case.

And here when you say damages methodology, I understand you to be talking about a loss causation analysis to determine the artificial inflation per share. So in many cases, I've evaluated alleged corrective disclosures and determined that there was confounding information, so you couldn't just take the entire stock price decline and say that that was the proper measure of inflation.

There have been a number of cases in which I've opined that the inflation was really a constant percentage of stock price rather than a constant dollar amount, so as you move through the Class Period, the artificial inflation

Page 304

per share was changing based on that.

In certain cases there were additional misstatements during the middle of the Class Period where it was clear the inflation was different before and after those particular statements, so that the artificial inflation had to be adjusted in some way to deal with that.

There's another case that comes to mind where we actually had data on a daily basis of what the additional losses that plaintiffs were alleging should have been disclosed to the market were, and so we were able to change the inflation on a daily basis to reflect the nature of what should have been disclosed.

So those are just some examples of cases where I have -- and let me cite a final one which was -- there was one case that had a corrective disclosure at the end of the Class Period where there was not a statistically significant price movement at all, but that was because at the same time the company announced -- moved up their earnings announcement to announce very positive earnings on the same day they

Page 305

disclosed that the company had been indicted for murder. And obviously, the combination of that positive and negative news meant that the stock price didn't react significantly, but everybody understood the company being indicted for murder was bad news and would have had a negative impact on the stock price absent the earnings announcements. So I needed to develop a method to quantify the impact of that earnings announcement in order to estimate what the inflation was that dissipated on that day.

So those are the types of things that -- it's rarely as simple as just taking the price decline at the end of the period and projecting it back. It's usually not that simple. Sometimes it is, but usually not.

Q    But as of today or at least included in your report, you've done no analysis to determine whether there was confounding information, for example, that would explain a portion or the entirety of the stock price decline; correct?

MR. FEE: Objection to form.

THE WITNESS: I have not done an

MAGNA
LEGAL SERVICES

Page 306

analysis of that, no.

BY MS. YABLON:

Q   And you have not done an analysis of misstatements during the middle of the Class Period to see whether the artificial inflation had to be adjusted in some way to those misstatements; correct?

MR. FEE:  Objection to form.

THE WITNESS:  I have not studied that in this case, no.

BY MS. YABLON:

Q   Nevertheless, based upon your experience serving as an expert in dozens and dozens of securities cases, you are confident that there will be a damages methodology appropriate to match plaintiffs' theory of the case -- theory of liability in this case; correct?

A   Well, I think I've already articulated what that is, it's the out-of-pocket methodology.  If now you're referring to can there be a loss causation analysis done in this case, I believe there can be, yes.

Q   But you didn't conduct it; correct?

A   I have not been asked to conduct

Page 307

that, no.

Q   In your report you reference that there are valuation techniques that can help address confounding news.  That's Paragraph 81; right?

A   Yes.

Q   What are these valuation techniques that you're referencing?

A   Well, I think I provide examples later in that paragraph.  I talk about valuation techniques include, but are not limited to, fundamental valuation analysis such as discounted cash flow methods, valuation multiple methods; i.e., price-to-earnings multiples, price-to-EBITDA multiples, price-to-revenue multiples, et cetera; use of academic studies regarding the value of certain types of information and other available valuations, whether from securities analysts or made available through discovery.

Q   Under what circumstances is it appropriate to use valuation methods?

A   Well, I don't know if I can easily describe all the times it may be useful, but certainly if there's a disclosure where the stock

Page 308

prices cause -- the stock price change is caused by let's say unexpectedly poor earnings, and some portion of the earnings is related to whatever fraud is being alleged and some portion is related to non-fraud related pieces, then use of valuation information and internal company documents may allow one to fairly easily separate the earnings impacts of one thing versus the other, so that would be one example.

And then even if you do that, you have to evaluate whether just breaking up proportionally makes sense or whether earning surprises in the area that are related to the fraud would be -- the company would be more sensitive or less sensitive to earning surprises in other parts of the company.

So those are the sorts of things that would have to be considered.  Another example would be if one component of a disclosure is related to earnings and another is related to something unrelated to earnings, one might be able to use valuation methods to determine the value of the earnings component and then assign the remainder --

Page 309

THE REPORTER:  And then what?

THE WITNESS:  Assign the non-earnings portion of the disclosure to the remainder of the stock price movement.

So those are just a couple of examples of when valuation techniques might be useful and relevant.

BY MS. YABLON:

Q   Is it always possible to reliably disaggregate a company-specific price reaction into multiple pieces?

MR. FEE:  Objection to form.

THE WITNESS:  My experience is that there's always been some reasonable methodology to make progress on that question.  Sometimes it's required being just conservative rather than precise.  Sometimes it's -- there's a range of reasonable outcomes that -- that I've reported on, but I don't think there's ever been a time you just throw up your hands and say there's nothing I can do to, you know, reasonably try to estimate this.  Or there might just be assumptions that are provided in order to -- based on evidence that one party or the other has developed that could inform

MAGNA
LEGAL SERVICES

Page 310

that sort of analysis.
BY MS. YABLON:
Q    Let's talk briefly about Section 11 damages. Do you understand that to have standing for Section 11 damages an investor needs to be able to trace his or her shares back to the exact allegedly misleading registration statement pursuant to which they were issued?
MR. FEE: Objection to form. Calls for a legal conclusion.
THE WITNESS: I'm aware generally as an economist that's worked in this area that in order -- that Section 11 requires tracing. I'm aware there's disputes over what's really required for tracing, and I'm not here to offer a legal conclusion on what the standard of proof would be.
BY MS. YABLON:
Q    Do you understand here that shares were issued pursuant to an IPO registration statement and then three subsequent registration statements during the Class Period of this case?
A    I recall there's an IPO and then several secondary public offerings. I believe whether the later one shared a registration

Page 311

statement or there were separate ones, I just don't recall off the top of my head. I believe there were additional registration statements, yes.
Q    And do you have an understanding that each of these registration statements contained different alleged misrepresentations?
MR. FEE: Objection to form.
THE WITNESS: I remember there being a series of different alleged misstatements in various different places. I don't have them committed to memory which appeared in which places.
BY MS. YABLON:
Q    And do you have any knowledge that Oak Street sold its shares at different prices in each of these -- in the IPO and the three subsequent secondary public offerings?
MR. FEE: Objection to form.
THE WITNESS: I'm aware those were conducted at different prices, yes.
BY MS. YABLON:
Q    And you have an understanding that after the lock-up period ended unregistered shares

Page 312

entered the market?
MR. FEE: Objection to form.
THE WITNESS: You mean previously unregistered shares became registered?
BY MS. YABLON:
Q    Correct.
A    Correct.
Q    Do you have an understanding that Oak Street shares were held at the DTCC in fungible bulk?
MR. FEE: Objection; calls for a legal conclusion.
THE WITNESS: I have not investigated that detail.
BY MS. YABLON:
Q    Would that surprise you if I told you that?
MR. FEE: Objection to form.
THE WITNESS: No, I'm aware securities are often held at the DTC. What legal meaning that may have I'm not going to speculate on.
BY MS. YABLON:
Q    Do you have any reason to believe

Page 313

that Oak Street shares were not held at the DTC?
MR. FEE: Objection to form.
THE WITNESS: I have not investigated if there's something unique about Oak Street with respect to that.
BY MS. YABLON:
Q    And the fact that the shares were held at the DTC in fungible bulk will make it functionally impossible for the holders of these shares issued pursuant to multiple registration statements to trace their shares back to individual registration statements; correct?
MR. FEE: Objection to form. Calls for a legal conclusion.
THE WITNESS: That's not a conclusion I necessarily agree with. I don't know.
BY MS. YABLON:
Q    Is it something you considered for purposes of your report?
MR. FEE: Objection to form.
THE WITNESS: No, I don't think it affects anything in my report.
BY MS. YABLON:
Q    Then how is it that you purport to

MAGNA
LEGAL SERVICES

Page 314

calculate Section 11 damages on a class-wide basis in this report?

A   Well, my understanding is there is a statutory formula for Section 11 damages.  That for anyone who acquires shares for which they have standing to have a Section 11 claim, there's a common statutorily prescribed method for computing damages.

So I don't think whether there's a dispute about traceability or not and whatever the outcome of that is doesn't change whether there's a common classified methodology.

Q   And just to be clear, your report does not address how to handle Oak Street Health shareholders' individualized obligations to trace their shares to particular registration statements, does it?  Correct?

MR. FEE:  Objection to form.

THE WITNESS:  My report does not address that issue.

BY MS. YABLON:

Q   Have you been engaged to potentially testify in court in this matter?

MR. FEE:  Objection; form.

Page 315

THE WITNESS:  My understanding is if there's a reason to testify what I've been asked to opine in my report, yes.

BY MS. YABLON:

Q   Are there topics about which you would testify that are not included in your report?

MR. FEE:  Objection; form.

THE WITNESS:  Not as of today.  I've formed no opinions outside of what's in my reports.  Whether I would be asked at some later point of this litigation to perform additional analysis or give other opinions is undetermined.

BY MS. YABLON:

Q   Do you continue to stand by all of the statements included in your report?

A   Yes.

MS. YABLON:  Can we go off the record for two minutes, please.

THE VIDEOGRAPHER:  We are going off the record.  The time is 4:57 p.m.

(After a brief recess, the
proceedings continued as
follows:)

Page 316

THE VIDEOGRAPHER:  Beginning of Media No. 8 in the deposition of Chad Coffman.  Going on the record the time is 5:08 p.m.

MS. YABLON:  I'm going to pass the deposition over to plaintiffs but reserve the right to ask additional questions after theirs.

E X A M I N A T I O N

BY MR. RICHTER:

Q   Mr. Coffman, as you know I am Frank Richter for the plaintiffs.  I just want to follow up on some questioning from earlier today.

Do you recall being asked about the corrective disclosures in this case?

A   Yes.

Q   And just to confirm, you've not been asked to submit an opinion on loss causation; correct?

A   Correct.

Q   And you've not been asked to submit an opinion on price impact?

A   Correct.

Q   And the questioning from defense counsel focused on the disclosure of a DOJ investigation.  Do you recall that?

Page 317

A   That that's the part of the corrective disclosure that's in the Complaint, yes.

Q   And do you know what date that disclosure occurred?

A   I believe it's November 8, 2021.

Q   And that was after market closed?

A   Correct.

Q   And what did that disclosure include?

MS. YABLON:  Objection; form.

THE WITNESS:  I believe it was part of a 10-Q filing that contained a lot of information, but it included that there was a DOJ investigation into certain marketing tactics used by the company.

BY MR. RICHTER:

Q   And when you say certain marketing tactics, that was a part of the description of the DOJ investigation?

A   I believe it was, yes.

Q   And is it your understanding that the complaint alleges that that disclosure began to reveal the existence of those practices to the market?

MAGNA
LEGAL SERVICES

Page 318

A     That's my understanding of what plaintiffs are alleging, yes.

Q     And could the existence of those -- the disclosure of the existence of those practices alone constitute a corrective disclosure?

MS. YABLON:  Objection to form.

THE WITNESS:  Sure.  My understanding is what the plaintiffs are alleging is the defendants themselves could have made a corrective disclosure before the announcement of the DOJ just disclosing the existence of those practices.

BY MR. RICHTER:

Q     And it's your understanding that there was a conference call the next day?

A     I believe there was a conference call the next day, yes, on November 9th.

Q     And could information disclosed during that conference call also impact the stock decline on November 9th?

A     It could, yes.

Q     Are you aware that the Complaint alleges that subsequent to November 9th the existence of those practices was corroborative or confirmed by additional information?

Page 319

A     I understand the Complaint alleges that, yes.

Q     And would that be information you would consider in reaching an opinion on loss causation?

A     It's certainly something one should and would consider, yes.

Q     And is there -- strike that.

Would the existence or nonexistence of the alleged practices be impacted, whether or not the DOJ entered any kind of consent decree with the company?

MS. YABLON:  Objection; form.

THE WITNESS:  No, it either occurred or didn't occur.

MR. RICHTER:  I have no further questions at this time.

FURTHER EXAMINATION

BY MS. YABLON:

Q     Just a few short questions.  To confirm, you did not conduct any type of loss causation analysis; correct?

A     That's correct.

Q     And I think you just answered,

Page 320

Mr. Richter asked would the existence or nonexistence of the alleged practices be impacted whether or not the DOJ entered any kind of consent decree with the company.  Do you recall that testimony?

A     Yes.

Q     Is it your testimony or your understanding that plaintiffs' Complaint is based upon the disclosure of the fact that the company engaged in certain practices?

THE WITNESS:  Can I have that read back, please.

BY MS. YABLON:

Q     Strike that.  Let me ask it a different way.

Is it your understanding that the Complaint is alleging a stock drop because of the disclosure of certain alleged practices engaged in by the company?

A     I think that's part of what they're alleging is the DOJ investigation signaled to the market that these practices existed.

Q     That's not -- thank you, that's not the question I asked.

Page 321

My question that I asked is is it your understanding -- read what I asked -- that the Complaint is alleging a stock drop because the disclosure of certain of the company's practices.  Is that your understanding as to what the Complaint is alleging?

MR. RICHTER:  Objection to the form.

THE WITNESS:  I think that's part of what's being alleged is that there was an event that disclosed to the market facts that raised the market's knowledge about the potential existence of these practices.

BY MS. YABLON:

Q     But the disclosure -- and I believe this is what you were just testifying earlier is that there was a DOJ investigation into these particular facts; correct?

A     I think that's part of what was disclosed, yes.

Q     And that is the corrective disclosure at issue in this case; correct?

MR. RICHTER:  Object to form.

THE WITNESS:  I think there was that disclosure and then there was follow-on discussion

MAGNA
LEGAL SERVICES

Page 322

in the earnings call. And then I also understand there's an allegation that there was corroborating evidence after that.

But my understanding is that the corrective information on the -- on November 8th and 9th consisted of the announcement of the DOJ investigation and then responses to questions during the conference call the next morning.

BY MS. YABLON:

Q Your analysis for purposes of this report did not include investigating the conference call on November 9th; correct?

A It didn't involve either. My report is focused on market efficiency and whether there's a common methodology for computing damages. It wasn't investigating the price impact of any individual component of the disclosures on November 8th or November 9, 2021. So I -- my report doesn't deal with that issue at all.

Q And you didn't consider whether there was corroborating evidence, for example, after the corrective disclosure came out; correct?

MR. RICHTER: Object to form.

Page 323

THE WITNESS: I am aware the Complaint alleges that, but I did not investigate it myself.

MS. YABLON: Okay.

MR. RICHTER: Anything further?

MS. YABLON: Nothing from me.

MR. RICHTER: Anybody else?

MR. GROSS: Nothing from me.

THE VIDEOGRAPHER: Before I take us off the record, are there any orders for the video today?

MS. YABLON: Yes.

THE VIDEOGRAPHER: I will get the information once we are off.

We are off the record at 5:15 p.m. and this concludes today's testimony given by Chad Coffman.

THE REPORTER: Does anyone else need a rough draft?

MR. FEE: We do.

(Whereupon, the deposition concluded at 5:16.)

Page 324

NAME OF CASE: Allison vs Oak Street Health,
DATE OF DEPOSITION: 01/23/2024
DEPONENT: CHAD COFFMAN, CFA
1 To clarify the record
2 To conform to the facts
3 To correct transcription error

Page _____ Line _____ Reason _____
From_____ to _____

Page _____ Line _____ Reason _____
From_____ to _____
Page _____ Line _____ Reason _____
From_____ to _____

Page _____ Line _____ Reason _____
From_____ to _____
Page _____ Line _____ Reason _____
From_____ to _____

Page _____ Line _____ Reason _____
From_____ to _____
Page _____ Line _____ Reason _____
From_____ to _____

Page _____ Line _____ Reason _____
From_____ to _____
Page _____ Line _____ Reason _____
From_____ to _____

Page _____ Line _____ Reason _____
From_____ to _____
Page _____ Line _____ Reason _____
From_____ to _____

Page _____ Line _____ Reason _____
From_____ to _____
Page _____ Line _____ Reason _____
From_____ to _____

Page 325

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

)
REGINALD T. ALLISON, et al., )
    Plaintiffs, ) Case No.:
    vs. ) 1:22-cv-00149
)
OAK STREET HEALTH, et al., )
    Defendants. )
)

I, CHAD COFFMAN, CFA, do hereby state that I have read the foregoing transcript of the testimony given by me at my deposition on January 23, 2024, and that the said transcript is a true and correct record of the testimony given by me at said deposition except as may be indicated on the errata sheets, if any, attached hereto.

ERRATA SHEET(S) ATTACHED: _____YES_ _____NO

_____
    CHAD COFFMAN, CFA

SUBSCRIBED AND SWORN TO
before me this_____day
of_____, 20__.

_____
   Notary Public

MAGNA
LEGAL SERVICES

Page 326

STATE OF ILLINOIS          )
                           )  SS.
COUNTY OF C O O K          )

I, Diane J. Corona, a certified shorthand reporter in the State of Illinois, do hereby certify that CHAD COFFMAN was by me first duly sworn to testify to the truth, and that the above matter was recorded stenographically by me and reduced to writing by me.

I FURTHER CERTIFY that the foregoing transcript of the said matter is a true, correct and complete transcript of the testimony given by the said witness at the time and place specified herein before.

I FURTHER CERTIFY that I am not a relative or employee of any of the parties, nor a relative or employee of the attorneys of record, or financially interested directly or indirectly in the action.

IN WITNESS WHEREOF, I have hereunto set my hand this 28th day of January, 2024.

_____
Certified Shorthand Reporter
Illinois CSR License No. 084-00257



## A

**ability**
109:15 111:3,12
175:16 257:21
**able**
15:5,17 39:24 40:7
40:12 127:13
149:12 172:2
219:12 304:12
308:21 310:6
**abnormal**
136:16 251:21 252:3
252:13,14 254:5
255:3,12,22 257:9
280:24
**abnormally**
273:17,23
**absence**
239:8 245:17 281:7
**absent**
305:7
**absolutely**
27:3 294:12
**absorb**
111:3
**academic**
128:20 132:14 169:1
245:3 286:5 307:16
**academics**
132:24 168:20
**accept**
95:9
**accepted**
119:12
**access**
21:9 152:3
**accommodate**
10:9
**account**
14:24 15:1 109:14
138:18,20 154:5,8
168:13 209:13
243:6,7 263:19
299:13
**accounting**

29:20,21,23 38:5,21
**accuracy**
106:9 205:20
**accurate**
115:5 191:10,12
**acknowledged**
197:20
**acquire**
232:19
**acquires**
314:5
**acquisition**
248:1
**Act**
184:3
**action**
47:1,6 60:22 62:4
70:23 75:14 289:21
326:12
**actions**
24:5 52:8
**active**
45:13,13 49:15 72:22
**activities**
34:19 49:11 298:11
298:15,16,19 299:1
299:8
**activity**
110:22 111:9 158:8
**actual**
89:7 142:4,5 207:2
252:8
**add**
89:23 181:8
**adding**
208:12
**addition**
70:22 72:1 180:20
**additional**
30:14 124:11,24
128:14 147:13
166:16 199:4,8,14
242:18 304:3,10
311:3 315:12 316:6
318:24
**address**

6:3,4 114:3 307:4
314:14,20
**addressing**
33:7
**adjust**
115:22 116:4
**adjusted**
304:7 306:6
**adjusts**
116:13
**admissibility**
95:10
**advantage**
284:15
**adviser**
217:1
**affect**
27:2 132:16 175:8,19
188:18 196:11
**aftermath**
165:23
**afternoon**
231:3 255:15
**agents**
157:12 298:14
**aggregate**
135:23 159:18
161:18 212:9
**ago**
61:3,13 62:1 66:4
69:12 117:15
127:21 151:15
156:18
**agree**
76:10 96:15 97:3,24
145:2 149:16 167:6
185:6,16 188:17
207:4,8,22 209:21
210:14 213:23
234:3 235:23 256:9
268:20 271:14
299:22 300:15
301:15 313:16
**agreed**
86:22
**agreement**

78:22,23 160:6,15
**agreements**
171:5,16 177:22
182:9
**ahead**
20:6 69:6 180:19
267:14
**al**
1:8 2:15 5:5 325:4,6
**allegation**
48:4 102:15 146:16
147:6 289:10
297:23 298:9 322:2
**allegations**
74:7,13 97:15 102:12
103:8,12,19 106:9
**allege**
225:10
**alleged**
105:12 129:20 142:9
142:15 143:6,15,24
145:24 147:1,22
148:6 157:2,8,20
158:20 200:1
235:14,24 236:15
288:9 289:3 295:11
295:14 297:16,17
298:3 299:8,18
300:20 302:6
303:15 308:4 311:7
311:10 319:10
320:2,18 321:9
**allegedly**
104:20 298:11 310:7
**alleges**
145:20 317:22
318:22 319:1 323:2
**alleging**
104:16,19 143:11
294:7 299:7 304:11
318:2,8 320:17,21
321:3,6
**Allison**
1:4 5:4 324:1 325:4
**allocation**
56:14



**allotment**
185:16
**allow**
308:7
**allowed**
93:2,4
**all-encompassing**
150:8
**aloud**
108:17
**Alpha**
213:12,19 215:13,15
215:16,24 216:4,24
217:5 219:23
**Alpha's**
216:20
**alter**
140:11 165:13
**alternative**
121:22 300:6
**Alumni**
28:6
**ambiguous**
29:9 62:17
**Amended**
69:14,19 106:5
**Americas**
2:11
**amount**
111:3 113:11 114:4
117:18 128:21
138:19 153:21
188:21 209:5
279:10 296:18
303:23
**analyses**
19:12,17 27:14,16
47:12 70:12 88:22
90:5,7,9 91:2 92:21
93:17,18 118:23
119:14 124:22
129:2 133:8 154:5
165:21 178:13
219:15 283:2
**analysis**
19:21 27:6 28:5 35:8

39:24 64:5 99:6,9
100:5,8 104:8 110:5
112:8 118:5,10
121:6 125:4,16
126:18 127:18
128:5 129:9 131:14
135:2 144:12
146:11 147:20
148:3 152:11
154:19,23 178:7,18
187:17,23 191:13
204:15,19,24 211:3
219:24 232:11,14
232:16,24 233:4,14
234:7 237:14 241:7
241:10,20 244:1,3
245:10,10 246:3,10
246:11,17,18,24
247:4,10,13,15,17
247:20 248:3,3,6,10
248:13,16 249:13
249:20,24 250:8,16
250:23 251:5,7
256:18,24 258:6
261:9,23 268:21
271:1 273:8 274:5
281:19 282:15
284:24 288:9,14
291:11 292:10,15
293:9,10,19,21,24
294:18,21 295:8,9
295:17,20 300:3,10
303:13 305:18
306:1,3,21 307:12
310:1 315:13
319:22 322:11
**analyst**
13:23,24,24 14:7,11
14:15,19,20 15:4,11
21:10 101:5,17
192:10 212:12,19
212:24 213:5,10,11
213:24 214:6,10,18
216:4 217:7 218:22
219:16,20 220:3,8
220:14,18,19 221:1

221:7,12,13,20,22
221:23 222:1,6,9
258:9 263:11,17,19
264:1
**analysts**
124:14 188:14 193:1
193:3,6,10 214:14
214:16 215:6,13
307:18
**analyze**
19:15 22:4 90:20
114:2 146:13
187:12 200:5,14,22
201:9 207:13 213:4
214:9 224:7,14
259:19 265:14
282:16,21
**analyzed**
97:18 122:3 129:15
187:6,11 207:18
245:14
**analyzing**
31:9 124:16 131:22
142:22 165:7 218:2
270:14
**and/or**
82:23 105:13 106:20
238:1,2
**anecdotal**
243:21
**announce**
138:10,19 304:23
**announced**
128:15 142:10 145:8
159:23 160:5
232:18 235:4 251:1
251:3 298:17
304:22
**announcement**
100:2 120:5 130:16
133:16 139:18
143:7,12 148:5
159:4,9,20 192:11
213:3 219:9,21
222:7 233:18 235:5
236:2,8 238:8,17,21

239:1 247:24 251:1
253:9 254:3,11,14
254:17,20 256:24
260:23 261:18
262:16 263:17,23
264:2 304:23 305:9
318:10 322:6
**announcements**
119:20 135:9 136:4
145:3 214:18,20
220:15 221:15
231:13 232:10
233:11,12,22
234:11,16,18,23
236:9,13,19,21
237:11,13,19 240:5
244:12,20 245:1
247:14 248:24
249:3 250:3 251:4
251:14,19 254:1
255:10,21 257:4,5
260:20 305:8
**announces**
138:8
**announcing**
138:24
**answer**
52:16 69:2 73:22
75:17 80:20 87:18
87:23 89:24 93:5,22
99:21 113:14
137:22 138:3 140:1
143:3 144:13
148:14 149:7 150:8
156:4 173:20 210:6
221:4 293:4
**answered**
19:1 21:23 54:4,12
55:16 62:6 65:21
66:18 86:9 106:12
123:4,12 129:7
131:19 132:5 148:1
207:16 230:6
319:24
**answering**
9:24


MAGNA
LEGAL SERVICES

**answers**
10:5 93:4 148:7
**Anybody**
323:7
**an-over-the-counter**
223:14
**apart**
290:19 291:2
**apologies**
139:24
**appear**
12:1 57:3 96:10
283:20
**APPEARANCES**
2:1 3:1
**appeared**
2:9,15,21 3:5 311:12
**appearing**
74:19,22
**appears**
11:22 96:8,9,24
218:5
**appendices**
15:22
**appendicis**
15:19
**Appendix**
13:7,12,17 14:6 19:4
20:12 21:1
**applicability**
7:11 104:11 146:22
**applicable**
241:17
**application**
29:18 34:1
**applied**
24:22 113:7 121:12
178:4 202:1 203:2
291:7 294:19 295:3
296:1,7
**applying**
18:16 38:20
**appreciate**
129:4
**approach**
4:17 26:24 91:24

114:10,15 124:6
125:5 216:10
**appropriate**
123:20 151:6 242:12
300:4 306:15
307:21
**approximate**
182:12
**approximately**
7:17 44:9 52:7 53:16
53:24 58:19 60:4
81:23 83:1 88:18
89:6 180:9 181:9,11
181:12,19 182:7,13
183:11 184:6,17,23
185:2,11,22 205:15
232:20 233:5
261:22 272:10
**approximating**
180:21
**arbitrage**
281:1 284:14
**arbitrary**
118:12
**area**
7:4 29:7,18 32:3 46:6
70:10 308:13
310:12
**areas**
17:21 30:13 35:9
38:6 46:21 47:2
50:2 79:13 97:16
168:9
**ARPS**
3:2
**article**
217:16,20 218:9
259:13,24
**articles**
21:10 28:17 29:3
132:14 167:12,17
167:17,21 168:2
193:21 259:20
260:4 261:4
**articulate**
115:6

**articulated**
306:19
**artificial**
26:19 104:17 288:17
288:23 289:4,10
290:7,9,21 291:8,10
291:18,22 292:8,8
292:16,24 294:9,17
294:24 298:4
299:23 303:14,24
304:6 306:5
**Ashley**
20:8
**asked**
17:5,12 18:24 19:10
19:11,16 21:22 34:2
36:17 40:5 41:4
42:3,9 54:3,11
57:22 58:2 60:14
62:5 64:16,19,23
65:20 66:9,17 69:6
70:3,7,9 73:5,16,18
74:24 79:10 86:8
87:22 92:17 104:5
106:11 123:3,11
124:4 125:8 129:6
131:18 132:4,23
145:21 146:13
147:24 162:2 173:3
207:15 230:5 240:1
240:1 288:13
291:13 292:11,12
293:20 296:16
306:24 315:2,11
316:12,16,19 320:1
320:24 321:1,2
**asking**
6:12 20:3 53:10 61:8
70:3 74:8 88:5,6
89:13 102:10
111:20 126:17
142:22 144:9 166:7
247:8 249:15,23
294:14 301:8
**aspect**
26:18

**aspects**
15:18 26:5,10
**ASR**
226:10
**assess**
192:12
**assesses**
156:8
**assessing**
292:8,15,16
**assessment**
40:11 49:21,24
161:18 261:6
**assign**
308:23 309:2
**assignment**
73:2,13,15 79:5
**assist**
86:6 234:19
**assistant**
27:21
**assisted**
20:2 86:12,18
**assisting**
50:3
**associated**
139:13 193:4 251:18
254:4 255:2,9,21
257:8 265:4 286:7
295:22
**assume**
12:3 74:8 142:1
189:9 192:4,5
296:16
**assumed**
166:6 191:24
**assumes**
146:5
**assuming**
146:18 184:24 192:7
**assumption**
74:1 146:12
**assumptions**
73:19 74:10 300:8
309:22
**asterisks**



253:2 283:8
**attached**
233:20 325:14,16
**attempt**
134:21 196:3,17
295:4
**attempted**
56:21
**attendant**
236:8
**attention**
14:5 56:5 179:11
189:24 231:6
**attorney**
6:8 49:12,22
**attorneys**
100:18 326:11
**Attorney's**
49:18 50:2,12
**attribute**
161:4
**audibly**
9:20
**August**
14:17 189:17,20
190:5,8,9,18,20
200:1 204:16
216:10 217:11,16
233:2 254:11 298:6
**Austin**
2:17 5:9
**author**
28:16 218:4
**authored**
12:9 28:19,22 29:2
**authors**
167:12
**autocorrelation**
116:22 117:7 162:4,9
162:13,23 199:11
247:12 248:12
279:14,21 281:7,14
281:19,21 282:3,4
282:17,18,21,24
283:14,18 284:1,11
284:12,15 285:1

**available**
107:23 110:24
111:10 115:22
116:14 124:1
151:23 152:12
171:13 185:12,23
219:14 287:20
307:17,19
**Avenue**
2:11
**average**
114:4 128:21 169:17
170:15 198:15
202:7,12 203:4,7,19
206:20,23 207:1
208:5,10 210:12,21
210:24 211:14,17
264:16,17 266:20
267:5,19 268:1,11
269:7,12,14 270:13
270:17 271:14
274:11 275:1,21
278:13,14,17
282:11
**awarded**
25:12
**awards**
181:1
**aware**
16:23 21:5 29:22,22
80:23 109:11,18,18
109:20,22 112:7
113:6,15 134:10
153:5 160:2,8,12,19
166:1,10,15 167:11
168:15,20 178:10
178:16,19 187:4
188:2,5 194:5,10
214:14 226:24
227:7,16,23 228:1
235:14,17 247:16
310:11,14 311:20
312:19 318:21
323:1
**a.m**
1:20 5:8 11:7,11

67:23 68:6 108:8,14

_____
**B**
_____

**bachelor's**
22:9
**back**
50:18 53:2,19 54:6
61:5 65:13,15 84:2
127:6 128:10
149:21 161:11,24
163:19 169:14
175:1 215:8 264:4
265:24 267:9
305:15 310:6
313:11 320:12
**backcast**
300:4
**background**
178:15
**backup**
15:9,13 20:14,18,19
21:1 101:16 126:5
126:19 200:10
211:7,16,22 213:10
216:9 217:23
221:16 286:17
**bad**
171:21 305:6
**balance**
138:17,20 242:10
**ballpark**
52:3
**band**
299:14
**bank**
138:17,20 217:2
**banking**
38:5
**bar**
206:8 207:9 208:10
210:10,19 211:23
212:6 272:11
**bars**
205:4,11,24 206:1,5
206:11,11,18 207:5
208:5 210:13,21

212:2 272:17,22
**based**
33:4 64:5 99:6
107:15 111:18
118:12 127:16
156:7,9 158:24
159:2,8 180:2
197:11 220:3
239:18 245:9,24
252:7 262:21
285:20 286:5,16
300:7 301:20 304:1
306:12 309:23
320:8
**bases**
17:19,24 18:1,18
**basic**
106:16 107:2,10
**basically**
265:7
**basis**
17:15 39:17,18 63:1
69:9 83:20 95:9
119:4 131:4 211:4
245:3 247:9 248:23
273:21 282:1
289:22 295:1 300:5
300:5 304:10,13
314:1
**Bates**
189:22,23
**bear**
122:19
**bears**
189:22
**began**
47:9 317:22
**beginning**
11:9 68:4 108:12
163:11 169:10
181:10 230:21
232:17 288:4
298:19 301:17
316:1
**begins**
5:2 94:19 107:1



212:18 222:14
231:8
**behalf**
1:4 2:9,15,21 3:5
58:20 59:5,14 61:15
74:19,22 75:2 77:23
215:14
**believe**
9:17 15:7,7 16:21
17:24 21:11,17,24
22:18 30:18 32:12
32:14 42:21 51:7
55:13,14 56:17
61:22 62:12 63:20
65:22 67:7 69:18
74:9 78:17 83:11
86:19 96:9,22
101:18 125:20
136:12 149:2
165:16 167:19
168:21 173:14
174:5,14,16 179:5
185:1 186:18 193:5
198:1,14 199:20
212:15 222:8 225:3
225:22,23 228:21
229:1 235:5,9
245:14 246:11
247:3 248:4 249:12
250:3 251:4,11
255:15 265:2,5,10
265:18 274:15
301:21 306:22
310:23 311:2
312:24 317:6,11,20
318:15 321:14
**believing**
39:24
**beneficiaries**
157:24
**Benefit**
75:6
**best**
31:19 61:3,3
**bestowed**
25:9

**better**
38:7 164:8,15 271:22
272:2
**beyond**
18:17 19:4,5 28:17
30:13 62:11 74:9
104:21 106:1
124:12,13,15 125:1
226:5 234:14
236:24 241:21
263:2,7
**biased**
117:5
**bids**
194:14
**bid-ask**
113:12 114:8 187:18
187:19,20 197:23
198:11,15 201:14
264:8,11,16,18
266:8,20 267:19
268:1,5,11 269:7,12
269:14,16 270:10
270:13 272:17,24
273:6,12,20 274:6
**bid-asked**
267:6
**big**
111:12
**billed**
83:2
**billing**
82:3
**bills**
81:12
**bit**
117:8 131:3
**black**
95:20 96:24 98:2
**blanking**
102:20
**block**
170:24 190:4
**blue**
96:7,20
**board**

153:4,9,16
**bono**
49:11
**Boston**
75:16 76:8
**bottom**
56:8,11 218:9 255:23
256:3 265:14
**bought**
105:7,11
**boundaries**
18:17
**bounds**
93:19 94:2
**box**
178:2 206:24 210:22
212:7
**BP**
296:15
**Brandon**
3:7 5:12
**break**
67:18,20 108:3,16
161:23 163:15
230:13,14
**breaking**
154:14 308:11
**breaks**
10:8
**brief**
9:11 12:5 68:1 108:9
163:8 230:18 288:1
315:22
**briefly**
157:2 310:3
**broader**
259:15
**broadly**
287:1
**Broadway**
2:2
**broker**
217:1
**brokerage**
109:14
**brought**

57:1 122:19
**BRS**
76:8,10 77:3 78:1
**bulk**
98:1 312:10 313:8
**bullet**
14:15 54:19 55:14
56:8
**bullets**
14:10
**business**
6:4 37:23 38:8 45:14
46:7 127:6,12
237:10 259:10,15
**buy**
109:6,8,15

---
**C**

**C**
326:2
**calculable**
67:4,11
**calculate**
42:22 200:17 201:11
202:3 207:18
211:14,17 224:18
292:23 294:15
314:1
**calculated**
8:5 43:6,21,23 44:1
44:10,13 52:24 53:8
53:12 69:8 71:18
252:7 289:22
**calculating**
8:8,20 73:9 146:23
252:11,12 290:15
291:1,22
**calculation**
22:23 24:4 26:11
28:23 29:3 42:1,10
54:16 56:22 282:11
292:18 294:16
**calculations**
201:21
**calculator**
184:17 185:1



MAGNA
LEGAL SERVICES

**calendar**
 190:4 205:8
**call**
 134:8 135:17 168:15
  241:16 285:22
  286:17 287:11,13
  318:14,15,18 322:1
  322:8,13
**called**
 1:13 48:13 103:7
**calling**
 168:8
**calls**
 101:19 107:11
  157:13 158:1
  160:23 161:7 310:9
  312:11 313:13
**Cammer**
 93:17 97:21 197:6
  199:13 202:7,7,21
  203:1 204:4 208:1
  213:24 223:12,13
  224:21 225:5,6,8,9
  227:5,14 231:3,7
  248:7 258:5 282:10
  282:12
**capability**
 194:11
**capacity**
 9:7 34:21 46:1 70:7
**Capital**
 14:16 34:5
**card**
 45:4
**cared**
 140:8
**carefully**
 154:1 299:8 302:2
**Caroline**
 189:18
**case**
 6:9,16 7:12 11:15
  17:6,9 18:12 19:8
  19:16 21:6,7,9,14
  21:21 22:5 26:12
  28:24 29:4 32:11,11

33:10 36:16,18
39:22 42:15 50:4,6
50:14 53:2 56:13
57:24 60:10,13 61:7
61:9,13,21 63:4,4
63:20 67:12 69:23
70:10 71:11 73:3
74:9 76:5,11,19
77:13,19,23,24
78:11 79:12 80:7
81:13,24 87:16
90:22 91:6,22 92:3
92:9,11,14,18 93:12
93:14,15,19 94:7,9
94:13,17 95:5,16,16
97:15 98:7,7,11
99:10,10 102:12
104:24 105:3,19,23
109:24 112:8
114:14 119:8
120:24 124:23
125:14 129:16
133:20 135:11
142:9 143:7 146:4,6
150:1 153:1,15,18
154:13 157:3,21
161:20 164:21,23
164:23 165:1
166:15 168:5 174:8
191:6 200:1 204:21
209:16 210:16
226:5 231:11
232:10,15 235:1,15
236:16 237:4 239:4
265:21,22 266:6,22
267:3 270:17 271:1
288:10,16 289:3,7
293:21 295:10
296:11,15 297:15
301:21 302:22
303:5,10,10 304:8
304:18 306:10,16
306:17,21 310:21
316:13 321:21
324:1 325:4
**cases**

7:20,24 22:24 31:22
 32:21 39:9 41:3
 44:17 46:21 47:10
 47:12 48:3 49:17
 50:9,10 51:17,19,22
 52:7,13,21 53:4,15
 53:20,23 54:15 55:1
 55:7,11 56:2 57:1
 57:12,16,18,19 58:2
 58:5,14,19,20 59:3
 59:13,16,17,19
 63:19 66:12 72:17
 72:21 79:16 91:10
 92:13 93:20 97:12
 99:13 118:14,18
 128:11 140:6
 145:21 203:2
 234:17 295:3 303:5
 303:14,21 304:2,17
 306:14
**case-specific**
 99:11,16 100:4
  297:20
**cash**
 137:15 307:13
**categories**
 58:10
**category**
 51:17,21
**causation**
 41:9,12,22 145:22
  146:24 161:21
  288:14 291:11
  292:10,15 293:10
  293:18,21,23
  294:18 295:7,17
  303:13 306:21
  316:16 319:5,22
**cause**
 118:17 125:7 130:12
  135:8 149:17
  172:22 176:2 177:5
  187:23 301:3 308:1
**caused**
 126:8 151:7,9 298:4
  308:1

**cause-and-effect**
 99:23 119:3 121:12
  123:17 125:4,23
  127:17 132:11
  154:20 205:3 232:4
  235:7 239:12,14
  241:1 245:15,17,20
  246:1,5
**causing**
 284:19
**caveat**
 138:22
**center**
 206:24 271:22,24
  272:11
**central**
 75:5,10 76:1 272:1,3
**cents**
 293:3
**certain**
 6:8 20:9 25:22 36:5
  41:3 50:2 63:21
  78:19 83:7 91:16
  92:12 106:16 133:1
  149:12 150:9 157:1
  165:22 166:1
  167:11,21 168:20
  171:9,17 172:23
  181:2 196:13
  197:21 198:4 199:3
  217:14 231:3
  298:14 304:2
  307:17 317:14,17
  320:10,18 321:4
**certainly**
 6:23 18:10 19:24
  22:19 23:23 24:2,8
  26:23 27:15 41:21
  43:6 53:13 54:7,14
  59:9 62:9 68:12
  87:23 91:19 92:11
  106:19,20 109:17
  111:19 115:4
  118:15,17 120:21
  121:23 122:16
  145:6 147:4 148:23



151:6 156:24 157:15 158:4,17 165:20 166:15 172:4,17,22 173:24 178:10,15,18 185:20 192:9 196:16 200:18 201:13 207:17 210:11 213:2 214:13 217:12,24 219:21 245:6 247:18 261:3 263:18,23 273:11 284:10 291:12 301:19 307:24 319:6

**certainty**
158:8

**certification**
12:6 291:15

**certifications**
25:1

**certification-related**
69:5

**certified**
326:3,22

**certify**
326:4,7,10

**cetera**
172:11 307:15

**CFA**
1:13 5:19 25:5,8,9,18 25:24 26:5,11,19 324:2 325:8,19

**CFO**
25:8 45:6,10

**Chad**
1:12 4:2,11 5:3,19 6:2 11:10 68:5 108:13 163:12 230:22 288:5 316:2 323:17 324:2 325:8 325:19 326:4

**challenging**
243:24

**chance**

10:1 243:7 244:6 245:16 283:16

**change**
16:17 98:7,9,16 99:10 100:7 175:5 197:24 238:2 239:6 247:23 248:2 251:24 282:5 300:17 303:9 304:13 308:1 314:11

**changed**
16:12 148:16 151:13 158:4 250:22 283:1 301:22

**changes**
95:20,24 111:4 138:15 154:21 235:9 246:2,6 252:9 296:13

**changing**
16:16 209:4 302:18 304:1

**channel**
220:2

**characteristics**
114:12

**characterization**
97:3

**characterize**
50:13 143:20,24 278:22 279:2

**characterized**
289:12

**charge**
81:6

**chart**
209:19 210:19 212:6 253:1 254:2 273:12 274:3

**charter-holder**
25:5

**check**
53:19 54:6 61:5 71:13 128:10 210:4 240:24

**checks**
241:10

**Chicago**
1:19 2:7,18 3:3 5:10 23:11,22 27:12,13 46:12,13,16 48:7,15 48:18 49:8

**choose**
125:10

**choosing**
211:13

**chunk**
101:15

**circumstance**
42:14 104:14 128:7 145:14 161:3 223:15

**circumstances**
40:24 62:24 90:21 91:22 92:4 119:19 120:2,9,17 128:13 133:14 150:9 152:2 164:17 175:20 302:5 307:20

**cite**
110:19 221:7 304:17

**cited**
204:4 220:8

**City**
75:19 76:14

**Civil**
1:15

**claim**
29:17 106:22 191:8 314:6

**claimed**
167:22

**claims**
30:18 53:5,9 104:7 106:17

**CLARE**
3:3

**clare.lilek@skadde...**
3:4

**clarification**
84:7 143:2

**clarify**
138:3 324:3

**class**
8:9,21 12:5 27:22 47:1,6 52:8,13 60:22 62:4 69:5 70:23 73:7 74:1 80:9 94:10,14,18 112:4,5 128:23 144:20 154:23 165:3,10,13 168:4 169:7,11,18 170:5 170:17,18,22 176:11 186:7 187:23 197:18,22 197:24 198:3,5,8,12 199:18,22,24 200:24 201:16,19 202:2 203:5,7 204:10,20,21 211:12 212:10,13 212:18 213:3 215:5 218:2 220:24 222:18,22,24 223:3 223:7 224:6 225:2 226:4,10,19,22 227:2,18 228:9,19 228:20 229:5,10,13 229:14,17,22 230:4 232:17 233:6,13,14 233:17,18,20,23,24 234:5,6,15,18 237:13 241:21 246:7,9,12,14,19 247:4,6,10,10,15,20 247:23 248:6,17 249:5,7,13,15,19,20 250:8,16,17,22 251:6 264:17 270:18 273:13,16 274:24 275:7,19,21 278:13,13,17 281:3 281:14,23 285:12 285:23 287:1,14,17 291:14 292:5 293:5 296:20 298:5,19



299:6,10 300:22
301:5,7,16,18,23
302:12 303:24
304:4,20 306:4
310:21
**classes**
24:3 27:17,19
**classified**
7:11 69:9 314:12
**classify**
261:12,17 262:20
**class-wide**
54:16 73:8 90:2
146:22 289:22
293:15 294:19
314:1
**clear**
35:1 62:11 70:2
87:24 88:1,10 96:6
109:23 122:1
126:13 129:17
138:6 154:20
169:23 181:16
231:19 232:3
245:19 246:1,5,23
262:14 295:10
303:7 304:4 314:13
**cleared**
160:21
**clearer**
92:24
**clearly**
99:7 129:9 130:15
164:9 240:2 245:21
262:17
**client**
36:15,23 66:20 75:8
75:8,18,21
**clients**
34:3 35:11,15,16,17
35:19 36:1,6 47:3
75:9
**close**
7:5 43:22 131:9,9
208:12
**closed**

317:7
**closer**
273:14
**closing**
180:2,11 185:10
**coaching**
93:6
**coefficient**
282:5,22 283:20
**coefficients**
252:8
**Coffman**
1:13 4:2,9,11 5:3,19
6:2 11:10,14,18
68:5,8 94:22,23
108:13,16 163:12
163:15 179:6,12
189:13,14 216:8,11
230:22 231:2 288:5
288:8 316:2,9
323:17 324:2 325:8
325:19 326:4
**cofounder**
34:16
**coherent**
103:17 104:16 147:5
288:21
**collect**
19:18 90:6 296:17
**collected**
19:14 20:1 87:11
200:10
**collection**
38:18 136:5,7
**collectively**
76:2 197:12
**college**
22:12,16 23:1,7
25:13
**colored**
96:8,15
**coloring**
96:8
**colors**
95:23
**column**

252:6 276:11,16
277:2
**combination**
81:16 259:12,17
305:2
**Combined**
82:17
**come**
50:17 63:19,24
138:10,18 142:3
147:7,12 150:11,21
150:22 151:24
185:23 288:22
**comes**
60:24 63:3 139:9
304:9
**comfortable**
284:8
**coming**
91:5 102:18 138:24
236:7
**commencing**
1:20
**comment**
88:2 188:14
**commentary**
148:19 219:15
**commenting**
193:10
**comments**
86:21 87:10,11,14,22
88:6,7,8
**commit**
17:22
**committed**
74:16 235:19 311:12
**common**
8:9,21 41:4 42:3,10
54:2 67:4,11 80:3,5
80:8 154:22 180:3,5
180:22 181:23
182:13 183:2,19
184:9,23 186:11
194:14,16,23,24
197:5 198:22
199:17 203:5 204:8

222:18 223:1,5
231:12 232:6 246:3
246:7 264:16 267:5
267:18,24 268:5,6
268:11,13,22
269:10,15 270:23
271:10 274:7,8
275:2,6 281:2
285:21,22 286:4
288:17 289:4,22
290:4,20 291:3,5
293:4,7,22 294:3
297:21 314:7,12
322:16
**commonly**
171:5 188:3
**commonplace**
145:4,8
**communicated**
19:17 76:21 77:2,7
**companies**
45:1,3,3,4 94:7,13
95:4 110:10 190:13
209:8,11 219:23
220:10,19,21 245:2
265:15 270:24
**company**
44:24 45:4,7,12,12
45:14,16 103:7
104:6 107:5 137:4,8
137:9,11,16,20
138:8,14,24 140:12
152:1 153:11
156:14 158:19
159:6,10,14,16,19
161:6 171:21
188:13 218:2
219:24 221:2
225:10 227:24
232:19 237:10
248:2 259:4,5,8,14
263:1 269:4 286:7
304:22 305:1,5
308:6,14,16 317:15
319:12 320:4,9,19
**company's**



157:22 171:18 321:4

**company-specific**
309:10

**comparator**
268:23

**compare**
201:17,24 209:8 234:12 247:9 248:15 262:3

**compared**
4:13 95:4 171:1 200:24 248:6 249:16 269:9 274:10

**comparing**
130:17,21 170:23 264:15 269:7 271:5 271:9 274:6

**comparison**
95:15 269:2,19,22 271:4,11

**compensated**
81:2

**compiled**
19:20,23

**complaint**
21:6,17 69:14,19 74:4,5 101:13 103:13,20,23 105:24 106:5,7,10 145:19,24 146:1 289:7 317:2,22 318:21 319:1 320:8 320:17 321:3,6 323:2

**complete**
10:22 16:24 17:14 19:18 51:3,11 326:8

**completely**
100:16 157:1 238:24

**complex**
143:15 144:1,10,18 145:10,13

**compliance**
102:16

**component**
308:19,23 322:18

**comprise**
14:11

**comprises**
176:14

**computer**
101:3

**computing**
290:20 291:3 314:7 322:16

**concealed**
297:18

**conceive**
245:6

**concept**
223:22

**concern**
283:19

**concerned**
156:10,10

**concerns**
193:16

**conclude**
64:7,12 66:5 91:1 92:20 127:13 128:6 130:5,21 151:7 164:18 219:12 236:12 237:7 239:8 285:17

**concluded**
42:22 66:10 130:9 165:9 167:12 186:24 187:8 198:6 198:18,21 201:5 225:4 232:2 237:4 240:4 245:9 250:6 250:14 285:11 323:22

**concludes**
323:16

**concluding**
64:8 67:10 186:15

**conclusion**
40:7,12 64:14 67:3 107:12 126:8

135:22 144:19 147:7,12 154:18 157:14 158:2 160:24 161:8 165:13 167:16 168:3 176:19 197:11,15 199:5,15 200:20 206:20 221:8 227:5,6,14,15 240:6 244:14,17 246:4 247:9 257:14 268:18 269:11,16 281:1 310:10,16 312:12 313:14,15

**conclusions**
18:3,6 167:21 200:21 243:17,21 288:22

**condition**
114:6,7,7

**conditions**
167:18 196:14 271:8

**conduct**
306:23,24 319:21

**conducted**
131:15 178:13 232:9 247:12 274:6 288:8 311:21

**conducting**
154:4 191:13

**conference**
101:19 134:8 135:17 318:14,15,18 322:8 322:13

**confidence**
136:18 253:4 255:6 283:11

**confident**
306:14

**confidentiality**
37:13

**confirm**
20:11 147:19 157:10 316:15 319:21

**confirmed**
139:19 220:17 318:24

**confirms**
177:10

**conform**
324:3

**confounding**
295:18 302:15 303:16 305:19 307:4

**confusing**
183:5

**confusion**
138:7

**Congratulations**
34:13

**connection**
32:10 73:19 77:24 78:11 79:5 124:23 178:13 196:21 225:12

**consensus**
156:2,13 159:18 238:13

**consent**
319:11 320:3

**conservative**
309:16

**consider**
14:20 29:6 30:21 31:3,20 32:23 35:8 104:12,13 121:17 122:23 123:6,8,14 128:8 137:2 165:6 168:2 177:21 186:14 191:14 196:20 197:2 204:23 213:5 236:23 239:16 270:22 273:6 281:21 282:7 291:1 319:4,7 322:21

**considerable**
285:12

**consideration**
159:4 191:18

**considerations**
295:6



13:8,21 14:4,12 15:5,12 17:23 70:20 110:9 127:24 128:9 146:23 148:12,17 155:7 178:8,11 187:15,21 197:23 199:3,9 201:2 217:22 218:1 222:12 224:22 239:22 248:5 258:12 261:20 266:22 271:7 274:1 274:14 285:8 288:20 292:14 308:18 313:18

**considering**
144:6 198:23 207:3

**considers**
253:18

**consisted**
322:6

**consistency**
282:2

**consistent**
74:8 92:1 117:3,3 119:16 128:17 138:12 182:23 186:12 212:19,22 250:7 268:18 280:12 292:18,24 293:11,24 294:5,12

**consistently**
116:10 131:21 280:24 283:20 284:13

**constant**
300:5,5 303:22,23

**constitute**
148:20 149:3,9,13 318:5

**constitutes**
170:8

**constructed**
56:20

**Construction**
28:2

**consult**
49:17

**consultant**
46:20

**consulted**
50:11 296:8

**consulting**
34:19 39:4 43:3 44:4 45:1 46:5 47:3 49:11 56:9,12 57:20 57:20 61:10,14 70:7 296:3

**consulting-type**
38:5

**contact**
72:20,23,24

**contacted**
36:15 68:9,17,23 69:13

**contain**
16:24 17:14 51:2 139:5

**contained**
147:22 258:5 259:20 262:5 311:6 317:12

**contains**
17:4,18 51:7 148:6

**content**
262:21

**contents**
87:21

**context**
89:23 97:9 107:18 118:8,13 138:2,5,21 148:15 149:12 151:12 155:3,14,15 155:16 201:14 224:4 243:24 297:16

**contexts**
137:13

**contiguous**
234:6 249:6

**contin**
162:11

**continue**

315:15

**continued**
68:2 108:10 129:14 129:14 130:4 163:9 230:19 247:16 288:2 315:23

**continues**
17:9 114:20 180:8 181:22 182:6 204:2

**continuing**
182:24

**continuity**
111:2,6,11,16,17,19 111:22 112:3,9,14 112:21,23

**continuous**
111:12 223:24

**continuum**
113:10

**contracts**
285:21,23 286:18 287:11,11,13,19

**contrast**
136:15

**control**
100:3 252:1,9

**controlling**
169:9

**Cont'd**
3:1

**convey**
235:24

**conveyed**
69:10 134:24 236:2

**convinced**
38:6 247:21 284:14

**convincing**
129:17

**COO**
45:6,10

**Cook**
49:12,18,21 50:1,11

**copy**
11:14,22 12:1 101:2 179:6

**Corona**

1:17,24 5:14 326:3

**corporate**
35:16

**correct**
6:17,19,20 9:4,5 13:11 16:1 17:9 20:15 23:9,12 24:10 24:15 25:10,11,13 25:14 27:24 28:11 30:3,6,11 32:16,17 36:7 37:17 40:20 45:7 48:21 49:1 55:9,12,21 56:16,17 60:3 65:19 66:7,8 66:16,19 70:6 72:13 73:12 74:13 75:6,12 75:20,21 76:5,11,19 79:23 81:3 85:11,21 86:4,5 89:20 91:11 91:15 92:5 94:15,16 94:19 95:21 96:1,19 96:21,24 98:2 99:1 100:19 101:9 103:8 103:13 119:1 121:2 123:10 127:2 130:1 130:10 131:17 135:4,18 139:6,10 139:16,21 141:10 141:23 142:11,12 143:16 144:3,23 145:17 146:7 147:14,15,23 148:12,15 149:4 151:17 152:23 153:12,22 156:20 157:12 158:4,13,24 159:16 162:19 163:17 165:4,14 167:1 170:2,12 171:1,5,10,18,23 172:8,14 174:22 177:11 178:22 179:3 181:12,20 182:15 184:13 186:4,11 187:2 188:19 190:18,21



191:4 192:17 193:2 193:18 194:17 195:1,8,15,23 197:6 197:16,19 198:8,23 199:6 200:3,16,24 201:10,19 202:2,23 204:4,10,11,17,21 205:1,2,5 206:2,12 206:22 207:6,11 209:17 211:1,2,5,10 211:19 212:3,11,20 214:1 215:7,21 216:5,6 217:8,9,11 217:18 222:14,19 223:1 225:7 226:6 226:16 228:13,15 228:22,24 231:16 232:13 233:15 238:4,5,8,23 239:6 239:7,12 242:16 243:15 247:6 248:8 249:10 250:8,17 251:15,16,19,20 252:15,16,18,19 253:4,5,7,11,19 254:5,8,9,11,14,17 254:20,21 255:3,4,8 255:12,13,18,24 257:6,10 258:3,16 260:9,16 261:2,9,16 261:21,24 262:1 264:13,20 266:10 268:14,24 270:6 271:23 272:12,19 273:1 274:14 275:3 275:7,15,20 276:1,2 276:4,5,13,21 277:3 277:7,13,16 278:1,5 278:10,14 279:6,15 279:16 280:4,19 281:22 283:8,9,12 285:13,24 286:1 290:4 291:18 292:11,13 293:19 294:1 301:18 305:22 306:7,17,23

312:6,7 313:12 314:17 316:17,18 316:21 317:8 319:22,23 321:17 321:21 322:13,23 324:4 325:12 326:7

**corrected**
297:14,24

**corrective**
63:21 104:19 121:3 121:19 122:9 125:14 126:11,12 126:16 129:20 131:16 132:3 133:19 134:3,18 142:10,16 143:6,11 143:15 144:1,18 145:17,20,23,24 146:2,3,6,12,16,18 147:1,8,13,22 148:6 157:3,8,20 234:24 235:3 291:24 292:3 295:11,15,23 296:14,19 297:14 299:18,24 300:13 300:20 301:2,10,13 302:6,12,23 303:15 304:19 316:13 317:2 318:5,9 321:20 322:5,23

**correctly**
155:1 174:21 181:7 184:17,24 237:21

**correlation**
280:14

**correspond**
205:24 206:1

**corresponds**
205:5,11

**corroborating**
322:2,22

**corroborative**
318:23

**cost**
177:6 273:5,22

**counsel**

5:15 12:4 14:16 15:13 20:13 74:5,6 74:23 75:4,4,15,18 75:22 77:17,18,23 77:24 81:18 84:18 84:24 85:1 87:3,8 95:8 102:2 105:22 185:20 316:23

**counsels**
75:8

**count**
6:22 51:23 71:6 210:2,3

**counted**
51:24 57:9

**counterbalance**
242:7

**counting**
51:24 98:18 99:7 223:20 224:2

**County**
49:12,18,21 50:1,11 326:2

**couple**
41:21 49:7 59:9 64:15 101:5,18 102:4,6 114:2 253:22 296:23 309:5

**course**
22:21 24:1 67:21 80:7 98:4 108:5 144:20 301:22

**courses**
27:10,10,11

**coursework**
22:15 23:21 24:8

**court**
1:1 5:6,13,16 9:21 62:14 63:1,9 166:15 166:20 203:1 314:23 325:1

**courts**
1:16 166:1,10,23

**cover**
221:11,12,17,17

**coverage**
124:15 192:10 212:12,19,24 214:6 214:19 220:19 221:2

**covered**
22:18,21 23:5,24 24:3 26:15 65:7,18 181:2 204:18

**covering**
120:14 226:1

**covers**
101:20

**co-authored**
27:24

**co-counsel**
72:18,21

**co-found**
37:20

**CPA**
29:21

**CPAT**
75:24 76:4,22 77:12

**creating**
209:7

**credential**
25:12

**credit**
45:4

**CSR**
1:17,24 326:22

**Cumulative**
82:17

**current**
33:21 34:14 77:13 138:5 143:3 279:22 280:15,18

**currently**
27:17 70:13

**cursory**
39:23

**customers**
298:13

**cut**
184:20 210:6

**cutoff**



210:11
**CV**
13:10 22:7 27:23
49:10 50:18,19
54:23
**CVS**
80:18 160:10 232:18
247:24

---

**D**

**D**
4:1
**daily**
119:11 132:16,21
304:10,13
**damaged**
294:9
**damages**
7:12 8:8,20 9:4 22:23
24:4 26:11 28:23
29:3 30:5,9,11
31:21 32:21 33:3,7
42:2,11,18,23 53:21
54:1,15 56:22 57:22
58:3,4,4,5 63:5 67:3
67:10,11 69:8,24
73:9 90:2 103:24
104:12 146:23
289:17,21 290:2,7
290:15,20,23 291:4
292:18 299:12
302:21 303:4,7,8,11
306:15 310:4,5
314:1,4,8 322:17
**Dan**
47:9,17
**DaSILVA**
2:12
**data**
13:18 19:15,18,20,24
20:12 21:10 90:6
91:21 93:24 100:8
100:15 165:20
187:21 200:19,19
201:4,15 217:13
242:2,6,11,19,21

243:8,9,10 244:2,4
259:3 274:2 282:20
286:17 304:9
**database**
259:2
**dataset**
265:17 271:22,24
272:2
**date**
17:5 82:23 83:2
94:14,19 122:4,5
127:4 129:20
142:15 165:3,19
178:24 189:11
192:13 200:2
232:17,21,22
239:23 241:17
253:6 256:13 258:5
259:23 275:24
276:8,12,16,20,22
277:6,16 299:1,5,9
299:10 317:4 324:1
**dates**
100:2,2 131:21
147:13 214:16
219:10,21 220:15
222:8 234:11,12
236:22 237:16
241:18 245:5 253:2
256:22 260:3,7,19
260:19,20,21,22
261:13,18,19,24,24
262:5,16,17 263:23
278:3,8 284:19
**day**
38:10 112:4,4 116:6
117:1,16 118:2,20
119:4,21 120:4,10
120:18 121:1,8,16
121:18 122:3,17,20
122:20 123:1,9,20
124:11,13,14,15,18
125:1,13,19 126:2,7
126:11,12 127:1,6
127:12 128:18
129:3,19 130:1,6,9

130:14,23 131:9,10
131:12,17,20 132:2
132:2 133:3,6,10,10
133:11,12,12,15,19
134:23,24 135:4,24
136:1,15 141:10
142:14,14,21 148:5
157:9 165:2 170:5
232:18 251:24
258:10,11 277:21
298:5 302:16
304:24 305:11
318:14,16 325:21
326:14
**days**
116:7 117:16,18
118:3,6,11,21
126:17,21 127:23
128:7,14,20,24
130:15,17,18,20,20
131:3 150:13
169:11,15,24 170:6
170:8,8,9,23 171:7
190:20 191:4 205:8
205:13,16 207:14
231:15 251:18
253:22 255:9 258:1
258:13 260:3,6,14
260:15 261:5,8,22
262:11,12,14,19,20
262:21,21 263:17
263:21 264:2 292:2
**day-by-day**
131:4
**de**
175:18
**deadline**
69:4
**deal**
304:7 322:20
**dealer**
216:24
**dealing**
124:19
**Dearborn**
1:18 2:17 5:9 75:19

76:14,15,18 77:8
78:5
**December**
11:15 12:18 13:1
37:16 38:12,14
276:23 277:1 278:5
**decision**
63:16 86:24 166:20
202:21
**declaration**
56:14,19,23
**decline**
169:14 194:16,24
295:13 303:18
305:14,22 318:19
**declined**
41:5 273:14
**declines**
292:1 302:11
**decree**
319:12 320:4
**default**
124:6
**defendant**
60:21
**defendants**
1:9,13 2:22 3:6 6:9
6:10 21:20 36:1,6
43:11 44:5,5,12,17
59:5,14 60:1,2
61:15 62:3 102:15
152:21 298:10,21
318:9 325:6
**defendant's**
63:22
**defense**
316:22
**define**
109:1 232:24 244:23
**defined**
23:19 30:24 75:6
115:16 184:2
204:24 258:23
260:19
**definitely**
53:6 265:19


MAGNA
LEGAL SERVICES

**definition**
115:1,24 151:15
**deflate**
196:8
**deflated**
297:13
**degree**
22:9 23:13,18 24:9
112:21 116:22
139:12,15 149:8
264:12
**demonstrate**
234:23
**demonstrated**
295:21 299:23
**demonstrates**
154:20 267:4,17
**denominator**
207:8 208:20 210:16
210:17
**denoted**
272:9
**denotes**
283:10
**Department**
160:17
**depend**
145:13 150:9 293:8
294:20
**depending**
99:5 210:10
**depends**
118:4 132:22 155:24
243:23,23 268:21
**DEPONENT**
324:2
**deposed**
6:18 7:14 8:7,19 9:6
48:20
**deposition**
1:12 5:3,8 9:10 11:10
15:3 48:14,15,18
51:10,15 55:12,15
68:5 84:1,9,12
100:22 101:22
102:1,7,9 108:13

163:12 230:22
288:5 316:2,5
323:21 324:1
325:10,13
**depositions**
1:17 55:5
**derived**
43:3 44:3,12
**describe**
13:23 74:6 79:5
100:6,8 223:17
291:19 293:14
307:23
**described**
18:14 35:7 70:18
73:11,15 105:5
182:9 186:18 197:9
221:3 275:12 291:6
291:17 293:6 294:4
294:12 297:22
**describes**
18:18 73:13 98:5
110:19 252:10
**describing**
97:12,15 98:21 99:11
99:15 244:9 293:8
295:4
**description**
4:9 99:9 115:5
317:18
**design**
131:7 132:7 231:18
234:9 257:20 262:1
**designated**
6:15 153:3 272:18
**designation**
25:6
**desired**
196:5
**despite**
139:14 186:21 198:4
**detail**
248:21 312:14
**detailed**
100:4 291:10 292:9
294:18 295:7,17

**details**
79:9 92:12 188:11
193:6 284:10,18
**determine**
74:2 113:8 147:20
231:12,24 239:22
252:3,13 258:4
291:17 294:24
300:3 303:13
305:19 308:22
**determined**
64:18 66:4 234:14
258:1 293:12
303:16
**develop**
305:8
**developed**
46:24 47:5 107:3
110:14,18,20 111:6
111:21 112:17,24
205:3 264:13
309:24
**deviate**
124:8 125:7
**deviated**
296:21,24
**deviation**
169:13
**devoted**
24:1
**Diane**
1:17,24 5:14 326:3
**died**
45:15
**differ**
99:6
**differed**
197:22 198:5
**difference**
96:7,16 97:11 99:13
256:2,7
**differences**
95:24 96:20 99:17
100:1 297:20
**different**
35:15 63:6 82:18

91:23 92:13 93:13
97:19 99:12,16
100:3,10,16 106:19
118:1 124:10
125:10 132:15
133:24 166:6
170:21 174:16
175:22 200:23
223:4 231:14 236:1
236:6,10 239:3
246:13 247:5
249:14 250:2,13,15
253:18 270:1
297:15 300:20,21
301:11 304:5 311:7
311:10,11,16,21
320:15
**differs**
99:4,4
**difficult**
244:4,5 257:13,18
**direct**
80:13 117:11
**directed**
90:8
**direction**
20:1 86:11 88:16
90:4,15 117:3,6
162:24 239:17
251:2 282:2 283:21
284:13
**directionality**
240:8 241:3,7
**directly**
20:22 80:10,21,22
326:11
**Director**
2:22
**directors**
153:4,7
**disaggregate**
309:10
**disaggregation**
124:20
**disagree**
238:24



**disagreed**
86:23
**disclose**
50:6 61:9 298:10,21
**disclosed**
61:19 102:17 118:7
128:23 138:5
157:16 158:6
239:18 258:2
297:18 304:12,15
305:1 318:17
321:10,19
**disclosing**
318:11
**disclosure**
105:15 120:4,11,19
121:2,4,9,11,19
122:9,15,18 123:16
125:14 126:11,12
126:16 129:20
131:16 132:3 133:9
133:19 134:3,18
141:3 142:10,16,18
143:6,15 144:1,18
145:17,20 146:3,6
146:13,17,19 147:2
147:8,14,22 148:6
157:3,20 161:19
216:20 235:1,4
295:11,15,23
296:19 297:14
299:7,24 300:13,20
301:2,10,13 302:7
302:13,24 304:19
307:24 308:19
309:3 316:23 317:2
317:5,9,22 318:4,5
318:10 320:9,18
321:4,14,20,24
322:23
**disclosures**
63:22 104:18,19
119:20 124:4,5
134:22 145:23,24
146:2 157:8 188:24
291:24 292:1

296:14 299:19
303:15 316:13
322:18
**discounted**
307:12
**discovery**
300:7 307:19
**discuss**
102:1 125:17 131:3
240:19 241:6,8
**discussed**
74:4 157:5 165:2
205:14 215:21
256:14
**discussing**
58:14 171:8 231:2
256:17
**discussion**
11:8 125:21 137:10
142:13 321:24
**discussions**
105:24
**dismiss**
101:15
**dismissed**
57:24
**disposition**
60:12
**dispositive**
117:11 177:8
**dispute**
52:1 205:19 314:10
**disputes**
310:14
**disseminated**
115:7 148:11,20
151:18
**disseminating**
219:14
**dissemination**
220:2
**dissipated**
294:11 305:11
**dissipation**
299:23
**dissolved**

45:5
**distant**
242:9
**distinction**
141:2 156:22 215:16
**distorted**
297:23
**distortion**
297:13
**District**
1:1,2,16 5:6,6 325:1
325:2
**divide**
185:21
**divided**
208:14
**DIVISION**
1:2 325:2
**document**
11:21 13:22 16:1
101:4 179:10
189:22 191:2,7,10
205:18 206:7
253:13
**documented**
174:3 177:19
**documents**
13:8,18 20:11 21:13
21:19 106:3,7
179:16 308:6
**doing**
9:21 48:1 90:13
119:4 168:14 181:7
181:8 187:17
194:11 241:9 244:3
244:3 251:6
**DOJ**
102:20 103:4 105:15
143:7 145:3,7 157:6
158:12 159:22
160:6 298:17
316:23 317:13,19
318:10 319:11
320:3,21 321:16
322:7
**dollar**

293:3 300:5 303:23
**dollars**
138:10,11,17 139:2,4
139:20
**dotted**
272:18
**double-checks**
70:17
**doubt**
191:9,12 256:7
**DOWD**
2:6
**dozen**
6:23,24 7:18,20 8:11
71:8,10 72:12,16,20
72:23 73:1
**dozens**
14:19,20 132:13
270:4,4 306:13,14
**Dr**
115:16
**draft**
86:20 87:8 88:1,13
88:15 89:19 90:13
323:19
**drafted**
89:18 98:1
**drafting**
88:20 89:7 106:4
**draw**
56:5 156:22 215:17
231:6 243:17,20
244:17 272:14
**drawing**
14:5 189:24
**drew**
167:21
**drive**
2:7 3:2 6:6 196:7
**drop**
161:4 300:12 302:23
320:17 321:3
**drops**
299:16 302:6
**DTC**
312:20 313:1,8



**DTCC**
312:9
**due**
151:3 226:10,16,20
228:7,15,17 244:10
283:15
**duly**
5:20 326:4
**duties**
39:5 47:3
**DVI**
63:4,20 296:11
**Dynamics**
44:22 45:21 46:2,4

---
**E**
---
**E**
4:1 5:22 316:7
**earlier**
30:1 85:21 88:17,24
119:18 132:20
147:19 149:7
156:18 162:1
192:24 198:12
205:15 248:4
255:14 256:17
257:11 258:24
265:19 281:17
296:10 301:9
302:14 316:11
321:15
**early**
88:15 255:15 273:13
**earn**
138:16 281:1
**earning**
139:3 233:11 249:18
308:12,15
**earnings**
100:1 101:18 130:16
134:7,15 135:8
136:4 137:7 138:8
138:11,19 139:1,10
139:22 148:5
192:10 213:3
214:17,17,19 219:9

219:20 220:15
221:14,24 222:7
226:1,2 231:13
232:10 233:10,12
233:22 234:10,15
234:18,23 235:4
236:2,7,9,13,19,21
237:1,10,12,19
238:7,17,21 239:1
239:19 240:5 243:1
243:13,14,18
244:11,20 245:1
247:14 248:15,17
248:24 249:3,17,19
250:3,24 251:3,14
251:19 253:8,19,24
254:3,11,14,17,20
255:1,10,21 256:24
257:3,4,12,13
260:20,23 261:18
261:24 262:16
263:2,5,17,22 264:2
304:23,24 305:7,9
308:2,3,7,20,21,23
322:1
**earnings-announce...**
248:22
**easiest**
301:1
**easily**
208:5 271:15 307:22
308:7
**EASTERN**
1:2 325:2
**economic**
23:3 24:2 43:1 44:4
290:14,14
**economically**
103:17 104:16 147:5
273:3 288:21
**economics**
22:14 23:17 24:10,15
29:19 32:5 33:5,22
33:23 34:1,5,11,15
34:22 35:9,12,19
36:6 37:17,19,20

38:3,11,16,20 39:8
39:12 44:11 46:10
48:22 71:14 78:15
78:24 81:19 297:16
**economist**
310:12
**edit**
88:2
**editing**
90:17
**edits**
87:1 89:12
**education**
17:20
**effect**
118:17 125:7 130:13
130:17 135:8 176:2
177:5 187:24 226:2
**effectiveness**
49:21
**efficiencies**
115:13
**efficiency**
7:10,15,22 8:14,23
8:24 18:14 19:12
22:16,18,20,22
23:22 26:6 28:20
30:3,22 31:4,10,15
32:14 33:16 36:12
36:18 39:13 40:2
41:2,5 53:17 57:21
58:3 64:17,20 65:9
65:10,17,23,24
66:10,21,22 69:23
90:2 91:3,11 92:22
93:18 94:10 103:24
104:4,5 113:18
115:2,17,20 119:16
119:17,24 144:12
146:11 150:18,21
151:16 154:5
163:16 164:8,15
165:7 168:10,11,16
175:13,15 176:2,5
176:20 177:5,15,17
177:18 186:20

187:7,12 188:19
196:11 197:10
198:2,7,19 223:9
225:7 227:6,15
228:4 234:22,24
236:13,18,20 240:4
244:19 246:16
250:21 257:14
268:6,19 269:17
270:6,10 271:9
273:24 275:11
278:17,23 281:8
285:7 286:8,19,24
322:15
**efficient**
40:6 64:7,12 65:6,19
66:6,12,13,15 69:8
73:7 107:3,16,21
113:22,23 114:21
115:6 117:2 122:13
127:14 128:1
130:10,22 140:14
140:23 141:8 144:6
144:20 146:14,20
149:16 155:21
156:15 163:21
164:4,11,18 165:14
165:17 166:3,12,18
167:1,20 168:4
174:15 177:2,11
186:16 187:1,8
189:2 197:5,16
198:22 199:5,17,22
201:6 202:15,16
236:14 241:13
245:12,21,23
255:18 280:16,17
281:3 286:4
**efficiently**
150:4
**effort**
23:17
**either**
28:13 55:3,4 57:23
68:19,20,21 87:12
93:4 261:24 262:2



**MAGNA**
LEGAL SERVICES

262:20 265:13
280:10 297:12
300:4,9 319:14
322:14
**electronically**
109:15
**element**
97:10 258:8
**eligibility**
224:23 228:1
**eligible**
179:24 183:14
228:13,21 229:1,8
229:17
**email**
2:4,13,20 3:4 4:15
189:17
**embolden**
281:24
**empirical**
28:5 196:15
**employ**
215:13
**employed**
39:7 45:18,20 76:22
77:3,8
**employee**
326:10,11
**employer**
33:21 37:16
**employers**
16:12,16
**ended**
189:11 192:12
209:16 233:15
249:21 311:24
**endorsing**
202:23
**ends**
189:23
**engage**
194:6 196:2
**engaged**
40:19 45:17,21 55:2
57:2 59:14,22 61:9
61:14,16,20 62:3

72:7,12,15 77:22
79:6,10 91:14
102:15 158:19
293:18 298:11
314:22 320:10,19
**engagement**
46:8 77:16 78:9,14
78:16 79:4,15,20,24
**engagements**
51:13 59:12,13 71:16
**engaging**
47:10
**enhance**
286:8
**enhanced**
242:15
**enrolled**
24:19
**entered**
184:16,24 312:1
319:11 320:3
**enters**
178:18
**entire**
24:1 73:14 130:14
131:2 168:4 179:10
200:24 202:2 211:1
211:12 227:2,18
236:7 274:2 275:19
281:23 303:17
**entirely**
268:21 294:5
**entirety**
15:22,24 164:19
197:18 198:7
201:19 208:19
212:10 226:22
305:21
**entitled**
225:11
**equal**
242:5,23 243:16
290:7 301:17
**equity**
152:22 153:3,21
154:7 181:2 215:6

**errata**
325:14,16
**error**
324:4
**errors**
169:13
**Espec**
45:11
**especially**
111:16 133:5 197:23
209:9 220:14
221:14 240:15
295:10
**ESQ**
2:3,8,12,12,18,19 3:3
**essentially**
19:14 45:11 90:8
105:6,10 109:14
240:1 247:8 265:3
**establish**
107:14
**estimate**
31:17,19 33:12,18
53:11 61:2 89:13,15
299:17,17 305:10
309:21
**estimating**
31:21 32:20 33:3
170:6
**estimation**
170:9
**et**
1:8 2:15 5:5 172:10
307:15 325:4,6
**ETFs**
80:21
**evaluate**
19:12 47:10 66:9
73:5 74:15,23 104:5
119:6 121:1 122:4
124:4,7 125:8,10,11
133:17 134:1 137:3
144:11 145:22
149:12 162:9,14
187:7,12 239:14
241:11 250:1

253:14 262:9
282:18 292:22
295:17 308:11
**evaluated**
86:22 87:12 103:17
122:21 130:3
143:20,23 145:18
146:2 147:4 156:12
251:2 255:10 257:5
288:22 289:5 302:2
303:15
**evaluating**
32:7 69:7 116:23
117:23 119:24
123:16 133:15
168:9 209:1 240:8
240:24 241:3
263:20 291:24
292:4
**evaluation**
121:14 130:12
140:11 144:4 152:1
240:20
**evening**
142:19
**event**
63:7 99:24 100:3,5,7
119:1,11,14,23
121:11,15 123:15
123:20 124:6,10,18
125:2,10,11 132:16
134:18 162:14
176:3 186:13
231:11,23 232:9
233:12 234:8
239:11,13 241:21
242:24 243:18
244:19 245:10
248:7,14,23 249:16
251:15 253:18
256:19 257:12,24
295:12,20 299:21
299:22 300:11
321:9
**events**
119:15 133:6,18



134:2 135:3,12 154:19 156:9 240:15,21 244:7 283:15

**everybody**
21:9 305:4

**evidence**
64:6,11,18 66:11 95:10 117:6 118:18 121:14 122:16,18 122:24 123:14 124:9,11,13,14,24 125:6,12 128:17 129:17 130:4 136:6 146:14 162:10 177:4 186:19 201:3 201:5 235:6,10 245:15,19,22 281:18 282:23 309:23 322:3,22

**evolved**
301:22

**Ex**
20:12

**exact**
6:22 7:16 43:14 52:10 61:1 82:2 138:19 238:11 261:11 297:20 310:6

**exactly**
68:13 69:9 79:9 158:16 184:21 225:23 238:12

**exam**
26:1,5,16

**examination**
1:14 4:4 319:18

**examined**
5:20

**example**
13:22 14:14 18:13 56:2 62:22 63:3 79:21 97:7,20 99:22 136:13,14 137:5 138:23 150:24

170:17 171:21 178:21 187:17 198:11,17 208:9 236:22 267:2 270:24 296:21 301:2 305:20 308:9 308:19 322:22

**examples**
53:13 54:14 121:23 148:24 296:24 304:17 307:9 309:6

**exams**
25:21 26:11,19

**exceed**
272:17

**exceeded**
206:21

**exceeds**
204:3

**Excel**
265:6

**exception**
10:10

**exceptions**
172:10

**excess**
296:17

**exchange**
98:9 110:4 247:17 273:18

**exchanges**
109:13 110:8 114:14 168:12 198:16 223:20 224:2 271:7

**exclude**
63:1 129:2 185:14

**excluding**
62:19 193:9

**excuse**
20:13 25:8 27:6 32:11 44:5 80:9 113:23 134:14 164:19 202:17 277:12 279:18 292:7,16

**executed**

12:17

**exhibit**
11:14,18,23 12:3,4,7 18:23 94:22,23 114:12 169:8,19,20 178:1,8,20 179:6,12 189:13,14 204:7,12 204:15,23 205:5 206:19,24 210:22 215:4 216:8,11 217:6,6 219:5 220:8 248:20 251:9,13,22 253:6 255:20 256:13 258:10 261:20 267:4,17 272:5,9 274:16,24 275:23,24 276:22 277:22 278:3 281:12,13 282:8

**exhibiting**
162:11

**exhibits**
4:9 12:15 13:4 15:22 96:24 100:12,13,14 100:15 101:19 162:18 264:5 282:8

**exist**
111:6 112:17

**existed**
320:22

**existence**
157:6 291:3 317:23 318:3,4,11,23 319:9 320:1 321:11

**exists**
79:24 113:9

**expect**
83:15 84:3 94:2 117:2 141:3 151:11 156:15 180:15 182:6 184:6 240:3 273:17 282:4

**expectations**
138:13 238:1,13

**expected**
138:16 156:5 238:7

238:10 239:3,18 241:13 252:6,7,11

**expecting**
238:14

**experience**
17:20 18:16 19:3,9 25:22 27:16 29:20 31:9 32:7 33:6 35:1 35:7 50:22 51:4,8 51:18 54:19 168:9 168:14 306:13 309:13

**experienced**
90:14

**expert**
4:11 6:15,18 7:8,14 8:7,13,19 11:14 12:9 30:2,15,22 31:4,21 32:3,20 33:2,10,15 34:22 35:5 39:9 40:19 41:11 45:18,22 46:1 46:24 47:6,11 48:8 49:3,6 51:3,14 54:20,22 55:2,8,21 56:9,12,15,24 57:3 57:20 59:23 60:15 61:10,14,17,20 63:22 74:20,22 79:11 91:10 113:18 132:13 164:14 270:5 296:4,9 306:13

**expertise**
17:21 18:16 19:3 29:7,15,18,21

**experts**
38:19

**expiration**
178:3,21

**expired**
179:3 189:6 203:18

**expiring**
177:22 191:14

**explain**
305:20



**explained**
252:1
**explanation**
150:15 162:22 163:1
**explicit**
201:20
**explicitly**
70:18 121:21 129:11
143:18 178:2,17
196:24 200:11
201:11,17,24 202:3
207:18 220:13
282:10 296:16
**express**
17:1
**expressed**
17:16
**extended**
241:20
**extending**
242:11
**extends**
226:5 233:4
**extent**
73:22 87:18 96:19
292:2
**extremely**
271:16,17
**ex-ante**
240:10,13
**e.g**
110:23

---

**F**

**fact**
92:19 104:14 139:3
139:14,19 153:15
170:10 173:16
176:8 177:13,16
186:21 187:10
195:14 198:4
223:20 224:1
226:14 256:7 279:9
284:12 288:23
313:7 320:9
**Factiva**

258:7,19 259:1,3,6
259:13
**factor**
19:14,14 37:2 93:17
97:21 98:6,21 99:4
99:4,11 144:5
178:15,18 197:10
202:7,7 214:1
222:12 223:13
224:21,22 225:6,9
227:5,14 231:7
248:5,7,10 258:6
264:7 268:21
269:17 274:13
275:10 282:10,13
285:7 286:23
**factors**
18:14 70:19 91:20
100:3 114:2,17
116:19 118:1
127:18 169:10
177:3,7 186:18,24
187:6,11,13,15
197:6,15 198:1,6,23
199:4,8,13,13,14,14
199:21 200:5,15,23
201:3,9,15,18,24
225:5,14,19 231:3
245:13 264:7
**factor's**
99:7
**facts**
103:23 104:22
105:19 106:20,21
150:9 301:21
321:10,17 324:3
**factually**
157:17
**failed**
298:10,21
**failing**
62:9
**failure**
228:2
**fair**
47:24 48:6 54:7

103:1 161:4,16
231:17
**fairly**
19:11 45:13 89:24
98:17 273:21 308:7
**fall**
58:10 172:22 206:5,7
296:12 301:4
**fallen**
296:18 301:9
**falling**
172:14,18 173:4,6
**falls**
234:4
**falsity**
106:14
**Fama**
115:16
**familiar**
9:10 11:21 90:3
218:18 219:22
220:9,20
**far**
81:24 114:12 130:13
238:13
**fashion**
116:2,5,9,14
**favor**
275:11
**FBI**
102:18,19
**features**
93:16
**February**
14:17 178:22 179:3
203:19 209:17,20
233:3 254:17 272:9
272:15
**federal**
157:23
**Fee**
2:3 11:5 12:12 15:15
16:9 17:3,10,17
18:9,24 19:22 20:16
21:3,15,22 23:15
24:12,16 25:3,15,19

26:3,7,13,21 29:8
29:16 30:7,16,23
31:5,23 32:18,22
34:8,23 35:13,21
36:2,13,24 37:7,10
37:21 39:3,14,20
40:9,21 41:13,18
42:5,12,19 43:4,12
43:19 44:6,18 45:23
46:18 51:5 52:5,15
52:22 54:3,11,24
55:22 57:5,14,17
58:22 59:6 60:18,23
62:5,16 63:2 64:3
65:8,20 66:17 67:6
67:13 68:10,18,20
68:21 69:1,17 70:1
70:14 71:3,17 72:8
73:4,21 74:14 76:23
77:5,9,15 78:2,6,12
79:7,18,22 80:4,19
81:8,14 82:1 83:3,9
83:18 84:13 85:3,14
86:8,16 87:6,17
88:9 89:9,21 91:4
91:17 92:7,23 96:2
97:1 98:3 99:2,18
101:1 102:13
103:14 104:2 105:4
105:20 106:11
107:11 110:6 111:7
112:6,19 113:24
116:15 117:21
119:9 120:20
121:20 122:11
123:3,11 124:2
126:3 127:15 128:2
129:6 130:2,11
131:6,18 132:4
133:21 134:4,16
136:2 140:4,9,17
141:11 143:9,17
144:7,22 145:5,11
146:9 147:16,24
148:13,22 149:5,19
150:6 152:5 153:13



153:23 155:5,13,23
157:13 158:1,14
159:1 160:1,7,11,18
160:23 161:7 162:7
162:20 166:4,13
167:2,14 168:6,23
170:13 171:24
172:15 173:10
174:13,23 175:11
176:21 177:12,24
187:3 188:4,20
189:8 190:22
191:22 192:18
193:12,19 194:8,18
195:2,9,16,24
196:12,23 197:7
198:9,24 199:19
200:7 201:1 205:6
206:3 207:15 208:3
211:20 212:4 214:2
214:12 215:22
219:18 220:12
221:9 222:3 224:10
224:17 226:23
227:19 228:14,23
229:11,18 230:5
235:2,16 236:3
237:2 238:9 239:20
241:23 242:4 243:2
244:21 246:20
248:19 249:22
250:9,18 256:20
257:16 258:17
259:22 260:10,17
261:14 262:7 263:3
263:14 266:11,16
266:24 269:1,18
270:15 271:2,18
273:9 274:16,19
277:8,17 278:18
279:7 280:21 281:5
284:4 285:3,14,17
286:12,21 287:5,15
288:19 289:8
290:11 292:20
294:2 297:9 298:7

299:3,20 300:23
301:24 302:9 303:1
305:23 306:8
309:12 310:9 311:8
311:19 312:2,11,18
313:2,13,20 314:18
314:24 315:8
323:20
**feel**
75:1 210:2,4
**fees**
85:12,17 86:2
**fell**
105:14 294:10
**felt**
38:7 284:8
**field**
259:3,8
**fifth**
253:21
**figure**
31:18 58:24
**file**
56:3,15 57:23 60:14
96:5 225:1,11 226:9
226:15 227:17
228:2,21 229:9,17
**filed**
11:15 37:15 51:9
56:13 65:23 69:15
69:19 89:24 96:3
220:24 229:4,13,14
**filing**
13:14 16:11 56:7
69:5 134:8 135:16
225:24 228:7,13
230:4,10 317:12
**filings**
101:19 230:8 258:11
**filled**
221:2
**final**
304:18
**finance**
25:2,6 29:19 32:5
33:5 34:1 38:21

**finances**
45:12
**financial**
110:10 137:9
**financially**
326:11
**find**
92:4 113:21,22
241:18
**finding**
198:2,7 223:8 225:6
245:24 270:10
275:11 285:1 286:3
**findings**
169:1
**finds**
286:6
**finish**
10:1,5,11
**Fire**
75:20 76:14
**firm**
33:24 34:20 35:16
38:8,9,17 39:5 81:4
84:4 87:10,12
130:15 238:1,2
**firms**
72:18 81:16,17,17
87:15 212:14 215:6
**firm-specific**
136:19
**first**
5:20 12:8 14:14
31:13 32:9 33:9,15
34:12 49:5 50:14
51:17 54:19 68:8,15
81:19,20 84:22
88:13 89:18 95:8
98:5 107:1 108:17
112:4 127:3 139:8,9
150:22 165:2
169:11,21,24 170:8
170:23 192:10
198:13 202:6
205:24 206:1,4,10
208:9 212:17 214:6

218:6 253:6,8,17,23
253:24 256:13
275:24 276:8 290:1
298:5 326:4
**fit**
63:10,13
**five**
89:13,15,20 90:16
108:6 205:7,13
206:1 233:12,13,22
233:24 242:3,19,22
243:1,7,9 248:15,16
249:5,7,17,18,19
253:1 255:1 256:3,4
272:16,21
**five-day**
211:19
**five-trading-day**
205:9 211:4
**flat**
170:1,3,10
**flip**
13:5 22:6 51:2 97:20
**flipping**
97:6
**float**
274:14 275:10,15
276:16 277:10,13
278:8 279:1
**FLOM**
3:2
**Floor**
2:7
**flow**
307:13
**flows**
137:16
**focus**
23:14,16,17,19 29:13
29:14 38:3 152:15
179:10 208:23
209:13
**focused**
22:17 223:13 316:23
322:15
**focusing**



52:12
**follow**
 219:2 243:13 316:10
**followed**
 78:17
**follower**
 218:15
**followers**
 218:13
**following**
 126:16,17 141:10
   168:21 169:16
   177:23 180:17,20
   183:7 184:4 188:6
   208:11 213:1
   302:23
**follows**
 5:21 68:3 108:11
   163:10 230:20
   288:3 315:24
**follow-on**
 321:24
**follow-up**
 118:4
**footnote**
 203:11,12 233:1
   237:17 281:17
   285:24
**forecast**
 149:8 156:23
**foregoing**
 325:9 326:7
**forget**
 58:5 78:24 81:15
   193:5 265:5,11
**form**
 4:14 15:15 16:9 17:3
   17:5,8,10,17 18:9
   18:21,24 19:22
   20:16 21:3,15,22
   22:3,4 23:15 24:12
   24:16 25:3,15,19
   26:3,7,13,21 29:8
   30:7,16,23 31:5,23
   32:18,22 34:8,23
   35:13,21 36:2,13,24

37:7,21 38:8 39:3
39:14,20 40:14,21
41:13,18 42:5,12,19
43:4,12,19 44:6,18
45:23 46:18 52:5,15
52:22 54:24 55:22
57:5,14 58:22 59:6
60:18,23 64:3 66:17
67:6,13 68:10,18
69:1,17 70:1,14
71:17 72:8 73:4,21
74:14 76:23 77:5,9
77:15 78:2,6,12
79:7,18,22 80:4,19
81:8,14 82:1 83:3,9
83:18 84:13 85:14
86:8,16 87:6,17
88:9 89:9,21 90:10
91:4,17 92:7 93:3
96:2 97:1 98:3 99:2
99:18 101:1 102:13
103:14 104:2 105:4
105:20 106:11
107:11 110:6 111:7
112:6,19 113:24
115:12,17 116:15
117:21 119:9
120:20 121:20
122:11 123:3,11
124:2 126:3 127:15
130:2,11 131:6,18
132:4 133:21 134:4
134:16 136:2 140:4
140:9,17 141:11
143:9,17 144:7,22
145:5,11 147:16
148:13,22 149:5,19
152:5 153:13,23
155:5,13,23 157:13
158:1,14 159:1
160:1,7,11,18,23
161:7 162:7,20
166:4,13 167:2,14
168:6,23 170:13
171:24 172:15
173:10 174:13,23

175:11 176:21
177:12,24 179:7
181:3 187:3 188:4
188:20 189:8,10
191:22 192:18
193:12,19 194:8,18
195:2,9,16,24
196:12,23 197:7
198:9,24 199:19
200:7 201:1 205:6
206:3 207:15 208:3
211:20 212:4 214:2
214:12 215:22
219:18 220:12
221:9 222:3 224:10
224:17,23 225:1,16
226:10,15,23
227:17,19 228:14
228:23 229:11,18
230:5 235:2,16
236:3 237:2 238:9
239:20 241:23
242:4 243:2 244:21
246:20 248:19
249:22 250:9,18
256:20 257:16
258:17 259:22
260:10,17 261:14
262:7 263:3,14
266:24 269:1,18
270:15 271:2,18
273:9 277:8,17
278:18 279:7
280:21 281:5,8
284:4 285:3,14
286:12,21 287:5,15
288:19 289:8
290:11,14 292:20
294:2 297:9 298:7
299:3,20 300:23
301:24 302:9 303:1
305:23 306:8
309:12 310:9 311:8
311:19 312:2,18
313:2,13,20 314:18
314:24 315:8

317:10 318:6
319:13 321:7,22
322:24
**formal**
 23:16 27:5,12,15,22
   31:8 32:5 33:5
**formed**
 17:24 289:20 315:10
**former**
 47:9
**forming**
 13:18
**formula**
 42:21 67:14 293:6
   314:4
**formulas**
 243:5
**forth**
 206:19 225:15
**forward**
 137:21
**found**
 64:11 65:6,18 145:24
   147:14 166:2,10,24
   197:14 199:12
   275:9 281:18
**foundation**
 83:10 85:15
**founding**
 46:10
**four**
 55:13 89:13 118:11
   127:23 128:7,14
   205:24 206:5,10,11
   206:18 207:5,23,24
   208:5,14 233:5
   248:15 249:19
   253:18,24,24
**fourth**
 56:8,10 183:13 206:8
   216:23
**Fox**
 68:21 85:4
**fraction**
 204:8 207:2
**frame**



**frame**
49:9
**Frank**
2:8 316:9
**fraud**
22:24 24:5 26:12
44:17 48:3,5 52:8
60:22 62:3 74:16
104:7,9,9 106:22
146:16 308:4,14
**free**
157:22 196:5 210:2,4
**freely**
171:12 175:24 176:8
177:14 180:16
181:3 186:10,23
**frequency**
110:22 255:23
**frequently**
72:6 150:15 174:3
194:6,10 209:3
218:21 219:1
**front**
11:23 12:3
**fulfilling**
220:20
**full**
118:19 121:8 122:20
122:20 123:1,16
124:11 131:11,16
133:12 296:19
301:10
**fully**
117:23 119:7,21
120:6,7,10,19 121:2
121:18 122:2 123:1
123:9,24 127:23
128:16,18,22 129:4
129:24 132:1
141:15,16,21,22
142:2,7 279:22
280:11,18
**functionally**
313:9
**Fund**
75:5,11

**fundamental**
116:11,18 174:7,12
196:7 248:1 307:12
**fundamentally**
93:13 170:21 175:5
246:12 247:5
249:14 250:15
**funds**
76:2 80:11,22 152:22
153:3,21 154:7
**fungible**
312:9 313:8
**further**
124:15 125:12 268:5
300:3 319:16,18
323:5 326:7,10
**future**
10:19 137:9,11,15
179:24 183:14
281:9

_____
**G**
_____
**Garrison**
2:10 5:11
**Geller**
2:6 72:2,16,19,24
78:10 79:1 82:23
87:3
**general**
29:18 71:21 78:13
79:20 91:20 97:9
104:13,15,24 105:3
107:16 134:6 135:7
152:7,16 154:1
172:9 188:11
191:24 226:3
231:17 235:20
263:4 290:14
297:11 298:8,18
299:4
**generally**
13:24 29:22 42:15
46:8 56:20 79:5
100:6 107:14
114:17 119:11,12
121:24 122:1 135:9

149:11,24 152:6,24
153:5,7,15 155:7
163:16 168:15
172:11 185:16
188:5 191:16
215:12 219:22
220:9,22 222:6
235:5,17 236:18
240:8 241:3,7 271:5
271:7 273:4 275:18
291:14 296:12
310:11
**generate**
265:10
**generator**
265:4
**getting**
20:17 87:14 154:13
249:10
**give**
10:22 20:6 31:19
41:5 93:2 109:2
137:5 181:13 182:4
182:16 232:22
258:24 267:12
315:13
**given**
28:6,8 30:15 64:22
74:10 90:4 209:2
220:22,23 223:20
237:10 245:18
258:10,11 262:1
284:10 295:10
300:16 323:17
325:10,12 326:8
**giving**
18:11 22:4 146:19,21
148:7 193:17 219:8
**Global**
37:16,19 38:2,10,16
39:7,8,11 43:1 44:4
44:11 46:10 48:22
71:14 78:15,24
81:19
**go**
9:11 10:12 11:3 19:4

19:13 20:6 53:1,19
54:6 55:24 56:6
58:23 59:8 61:4
69:6 90:3 128:10
163:4 169:22
223:17 234:14
262:8 267:14
279:17 287:21
315:18
**goes**
18:17 51:1 79:13
138:15
**going**
6:11 9:16 10:8 11:6
11:10,13 15:21
16:14 36:17 65:15
67:17,22 68:5 84:2
94:21 108:7,13
118:11 125:7
137:20 138:9 139:1
154:14 158:16
161:21,23 163:6,12
163:19 169:22
170:24 172:24
173:17 179:10
189:12 216:7
230:12,16,22 231:6
238:12 264:7
287:23 288:5
289:15 312:21
315:20 316:2,4
**good**
5:24 101:14 154:14
237:15
**graduate**
27:10
**graduating**
23:6
**granted**
181:1
**graph**
210:20 272:11
**gray**
256:10
**great**
67:20 230:15


MAGNA
LEGAL SERVICES

**greater**
136:17 208:6,6,7
  253:4 283:12 284:3
**green**
96:7,20
**GROSS**
2:18 323:8
**group**
37:17,20 38:3,4,11
  38:16 39:8,12 43:1
  44:4,11 46:11 48:23
  71:15 78:15,24
  81:19 218:6 264:18
  264:24 266:4,21
  267:23 268:13,22
  270:12 273:1
**guarantee**
196:4,16
**guaranteed**
111:18 224:1
**guess**
14:10 29:10 163:23
  243:23 246:23
**guidance**
137:8 238:2

**H**

**H**
2:18
**half**
43:18 44:2,12 68:15
  94:11 170:18 255:9
  255:23,23 256:5
  273:3
**Halliburton**
107:2
**hand**
120:15 326:14
**handle**
314:14
**hands**
209:4 309:20
**happen**
120:22 158:12,17,24
  159:3 161:6,19
  164:2,6 238:12

242:10 271:19
**happened**
42:14 68:24
**happens**
152:2 160:21 237:23
  238:17
**happy**
10:9 67:17 93:22
  95:11
**hard**
116:18 238:11
**harmed**
105:14
**head**
126:9 127:8 215:1
  270:17 311:2
**Health**
1:8 2:15 4:13,16,17
  5:4 6:10 7:11 14:7
  70:22 73:6 94:17
  95:5 98:15 105:7,11
  109:17,24 111:19
  112:3,10 114:15
  122:1,10 129:18
  148:4 153:4,10
  154:22 159:24
  160:16 174:4
  175:23 179:8 187:1
  189:19,20 190:12
  199:17 204:8
  212:20 215:7 216:9
  217:8 223:1,5 225:1
  226:9,15 231:12,15
  232:5,6 235:9 246:7
  258:15 259:7,11,16
  259:21 264:16
  267:5,18 268:11
  269:9,13 274:7
  275:2,6 281:2
  285:21,22 286:3
  298:5 314:14 324:1
  325:6
**healthcare**
4:17 157:23 216:10
  270:24
**Health's**

134:6 177:23 190:17
  190:21 196:22
  203:12,19 268:4,6
  284:16
**hear**
75:23
**heard**
160:15 194:2
**Heath**
203:16
**Hedstrom**
20:7
**heightened**
124:13
**held**
34:21 35:5 182:20
  275:1,6,13,18
  276:19 277:5,14
  279:1,5,10 312:9,20
  313:1,8
**help**
34:20 47:10 307:3
**helped**
46:22 199:21
**helpful**
223:16 225:10
**helping**
39:5
**helps**
264:22
**hereto**
325:15
**hereunto**
326:13
**high**
50:3 110:21 273:17
**higher**
170:16 195:15
  198:12 203:22
  273:13
**highest**
198:14
**highly**
100:4 235:10 237:11
**hired**
74:23 75:3

**hit**
206:21
**Hoffman**
4:15 189:18
**hold**
61:8 172:6 227:8
  279:12
**holders**
313:9
**holding**
278:20
**holdings**
276:7,9,11,15 277:2
  278:7 283:4
**honestly**
83:12
**host**
58:1
**hour**
1:20 81:3 83:22 85:9
**hourly**
83:20 85:8
**hours**
81:23 82:9,14 84:10
  84:12,15,15,16
  88:18 89:1,6,13,15
  89:20 90:12,16
  100:19 101:9 131:5
  131:10,11 135:24
  141:9 142:3,11
  143:5
**hundred**
7:2,5 78:17 82:5,9,16
  82:19,20 138:9,11
  138:16 139:1,4,19
  169:21 265:1,12,12
  265:14,14,15,16
  266:4,9,22 267:24
  268:13,22 269:4,14
  270:23 274:8
**hundreds**
132:14 295:3
**hungry**
154:14
**Hwang**
20:8



**hybrid**
300:6

**I**

**idea**
22:18 71:19
**identification**
11:19 94:24 179:13
189:15 216:12
**identified**
50:10 145:22 213:10
219:5 222:22 223:3
224:5 259:8,13
260:21 262:3,15,18
**identifies**
251:13,17
**identify**
16:7 19:7 245:5
262:14,17
**ignoring**
223:11
**II**
107:2
**Illinois**
1:2,19 2:7,18 3:3 5:6
5:10 325:2 326:1,4
326:22
**illiquid**
113:9
**imagine**
150:20
**immediate**
165:23 169:15
**immediately**
165:17,21 167:5
180:11 181:16,19
182:21 185:10,23
186:2,16 187:21
193:10 207:14
244:13
**impact**
28:6 111:13 122:14
123:16 125:9
134:22 135:6,12,20
135:23 137:14
141:4 144:19

156:13 159:15,19
161:5 165:6 173:8
174:11 175:15
176:5 178:8 195:5
196:5,18 288:9,14
305:6,9 316:20
318:18 322:17
**impacted**
141:20 319:10 320:2
**impacts**
124:5 308:8
**impedes**
177:17
**impediment**
273:23
**implication**
194:20
**implications**
300:16,21
**implies**
115:21
**imply**
173:17 283:17
**important**
103:22 104:4,13,23
124:8 144:5,11
150:12 155:8 220:1
234:14 235:7 239:2
264:12 279:24
282:24
**impossible**
244:5 313:9
**impound**
117:24
**impounds**
122:2
**improper**
157:10,21 158:7
298:11
**improperly**
298:13
**inaccurate**
16:22
**include**
51:13 75:4 94:14
114:3 124:11 137:7

137:8 199:13 211:4
220:1 234:7 257:23
279:24 284:24
285:4 297:11
307:11 317:9
322:12
**included**
13:19 15:12 21:1
52:14 57:12 165:20
202:22 211:9,11
243:15 260:6,14
275:24 282:9 285:8
305:17 315:6,16
317:13
**includes**
233:22
**including**
6:9 14:17 15:18
96:17 144:21
176:13 186:16
187:16 189:1 200:2
201:4 214:20
217:13 225:5
**inclusion**
165:10,12
**Income**
75:11
**inconsistency**
222:10
**inconsistent**
240:3 241:12
**incorporate**
120:4,6,7,10,19
121:2,8,18 123:1,10
129:4
**incorporated**
5:5 107:24 115:8
117:19 123:24
129:24 132:1
140:15 141:9,22,22
256:23 263:24
**incorporates**
174:21 175:9
**increase**
255:22 286:7
**independent**

2:21 42:14 74:21
121:13
**independently**
74:12 103:12 145:19
205:22 253:14
259:24
**index**
80:22
**indicate**
163:1 254:2 280:10
**indicated**
325:14
**indicates**
49:10 162:5 253:1
**indicating**
170:11 253:3
**indication**
229:20
**indicative**
286:19
**indicator**
264:12
**indices**
80:12
**indicia**
164:7,15 165:16,19
175:13 176:1
177:18
**indicted**
305:1,5
**indirectly**
326:11
**individual**
211:23 236:5 294:20
313:12 322:18
**individualized**
314:15
**individually**
1:4 14:21,23 135:21
136:8 197:15
**individuals**
6:11 38:19 85:20
88:16 189:19
**industry**
271:12
**inefficiency**



227:10 279:23
**inefficient**
64:2,8 163:22 164:3
164:10 167:13,23
244:15 255:17
**ineligibility**
225:13
**ineligible**
225:13,18 226:20,22
227:1,11,17,22
228:3,6,9 229:2,21
230:3
**inflate**
196:8
**inflated**
105:11 195:7 294:8
297:12
**inflation**
26:20 104:17 288:17
288:24 289:4,11
290:8,9,22 291:2,8
291:10,18,22 292:5
292:9,17,24 294:9
294:10,17 295:1
298:4 299:14,17,24
300:2,4 301:6,16,17
301:22 302:8,14,24
303:14,19,21,24
304:4,6,13 305:10
306:5
**influence**
116:20
**influenced**
269:3,6
**inform**
309:24
**information**
12:2 13:14 73:23
98:24 99:12,16
107:24 110:23
111:10 114:22
115:8,23 116:8,11
116:14 117:19,24
118:5,15,20 119:22
122:2 123:10 124:1
124:16 125:9

127:24 128:16,22
130:16 132:15
133:2 134:24
136:20,23 137:1,7
137:23,24 138:4,13
138:21 139:3,6,16
139:21 140:7 141:1
141:2,4,8,17 142:3
142:6,8 143:16,24
144:10 147:21
148:10,12,16,20,21
149:3,9,14,17 150:5
150:12 151:1,4,5,8
151:12,17,19,20,24
152:4,10,18,19
153:10,17 155:7,8
155:22 156:16
162:1,6 173:1
174:22 175:10,17
188:22 189:2
198:18 219:11,14
220:2,16 231:8
232:5 235:12,24
236:1,7,15,24
237:12 238:4,7,11
238:22 239:2,10
240:17,21 241:15
244:10,15,23 245:4
245:7 260:16 261:5
262:6,10,22 280:11
280:13 292:3
295:18 297:18
300:7,17 302:15
303:16 305:20
307:17 308:6
317:13 318:17,24
319:3 322:5 323:14
**informational**
188:18 196:11
**informative**
223:22
**informed**
156:23
**inherently**
241:12
**initial**

90:13 124:5 141:14
168:17 183:11
203:17
**initially**
69:13 118:7 186:7,9
**injected**
118:5
**input**
87:4 290:22 293:12
**inputs**
294:15
**inside**
152:10
**insider**
152:14 276:11 277:1
**insiders**
182:20 275:1,6
279:10
**insolvency**
63:9,10
**instance**
61:24 139:8 237:23
**instances**
40:18 41:10,17 42:2
42:8 48:3 60:8
84:20 139:5 145:7
**Institute**
25:9
**instituting**
193:22
**institutional**
199:10 276:7,9,15
278:7 283:3
**institutions**
275:13 276:19 277:5
277:14 278:20
279:1,6,11
**instructed**
20:18
**instructions**
225:15
**insufficient**
64:11,18 66:10
237:24 238:6
**insurance**
298:14

**integrate**
119:7 127:24
**integrated**
147:21
**intend**
17:1 290:5
**intention**
232:18
**interested**
36:16 326:11
**internal**
308:6
**intraday**
132:21 133:2,5,8
135:2
**introduce**
94:21 189:12
**introduced**
186:5 288:16,23
**investigate**
74:13 103:12,16
104:21 134:13
147:7,12 230:2
283:23 323:2
**investigated**
158:21 312:13 313:3
**investigating**
322:12,17
**investigation**
102:19,22,23 103:4
103:18 105:15
143:8 145:3 157:6
157:16 158:13,17
159:4,5,9,21,23
161:15 298:17
316:24 317:14,19
320:21 321:16
322:7
**investigations**
145:7
**Investing**
218:6
**investment**
80:13 217:1,1
**investor**
137:2 152:3,11 218:5



MAGNA
LEGAL SERVICES

218:10,16,19,22
219:2 280:23 310:5
**investors**
105:7,14 137:19
140:8 151:23 152:7
156:3 158:11,15,18
158:23 159:18
219:16
**investor's**
140:11
**invoices**
82:22 83:8
**invoke**
107:9
**involve**
48:3 171:5 188:3
194:14,22 322:14
**involved**
20:8,22 25:5 35:20
35:24 45:2 46:4,9
53:5 54:15 57:19
58:2 77:20 130:13
130:14,19 164:13
296:16 297:7
**involves**
25:6
**involving**
52:8 57:18
**IPO**
52:14 94:15,19 165:3
165:7,17,19,21,23
165:24 166:2,11,17
166:24 167:4,6,13
167:18 168:16
169:6,12,16 170:7
171:12 172:4
177:23 182:22
186:3,16 187:14,16
187:22 188:7,16,24
189:7 190:4,17,21
191:15,17,21 192:6
193:11,18 194:7
196:22 200:2,15
207:11,14 214:7
226:12 232:17
253:18,24 273:14

276:9 299:2 310:19
310:22 311:17
**IPOs**
168:22 169:2 171:4
188:3 192:1 194:6
**IPO's**
165:9,12
**IQ**
14:16
**isolate**
134:21 135:6
**issuable**
180:22 181:15
**issue**
60:7 64:10 164:20
193:22 215:6
219:23 220:10,22
226:3 235:1 241:19
242:9 314:20
321:21 322:20
**issued**
31:14 32:10,13,15
55:20 60:16 63:5
65:1,4,17 66:1 67:9
181:15 185:15
186:14 212:14
213:5,19 214:24
215:5 217:7 218:2
310:8,19 313:10
**issues**
18:7 19:16 31:9 32:7
57:21 124:19
229:21
**issuing**
103:24 122:7 214:14
215:14,15 217:22
**items**
13:20 14:2
**i.e**
307:14

_____
**J**
_____
**J**
1:17,24 326:3
**Jaida**
20:7

**JAMES**
2:3
**January**
1:19 5:7 325:11
326:14
**JARRETT**
2:18
**jarrett.gross@sidl...**
2:20
**Jdasilva@paulwei...**
2:14
**JFee@labaton.com**
2:4
**JOSEPH**
2:12
**journal**
167:12,17,17
**judge**
10:18 47:9
**jump**
244:14
**jury**
10:18
**Justice**
160:17
**justify**
202:14,17

_____
**K**
_____
**K**
326:2
**keep**
67:17 230:12
**kind**
49:17 56:3 244:17
266:15 319:11
320:3
**knew**
188:10 192:11
**know**
7:16 8:4 13:23 17:12
17:20 19:13 21:7
29:10 36:17 41:19
43:14,22 44:8,13
52:10,16,17,18 53:1
69:14 71:7,13 72:5

72:17 78:3,7,18,21
82:2 83:4,13 89:24
92:11,12 93:15,23
97:2 100:12 104:22
117:4 118:2 128:15
132:23 137:12
138:9,11 139:11
142:5 145:8 149:11
150:7,15 153:11,14
153:17,18 158:12
160:3 161:1 168:10
172:10 173:23
174:1 175:19,20
176:23 179:14,21
186:5 191:7 192:8
192:19 194:9
198:10 209:9,23
210:12 213:18
214:18 217:13
219:13 220:23
225:20 229:4,6
241:14 244:11
256:1,6 262:14
265:13 278:22
289:6,13 292:17
302:3 307:22
309:21 313:16
316:9 317:4
**knowledge**
20:24 105:18 159:22
168:8,13 311:15
321:11
**known**
107:4
**knows**
156:7
**Knox**
22:12 23:6
**Krogman**
198:23 199:13 264:7
264:7 274:13
275:10

_____
**L**
_____
**Labaton**
2:2 68:20 70:24



71:16 72:7,12 78:10
79:1,2,21 81:16
82:23 86:15,18,20
**label**
259:3
**labeled**
252:20 259:4
**labor-related**
30:19
**lack**
112:9 284:10
**Land**
28:3
**language**
88:21 96:14,15 98:1
98:10,16,19 100:6
100:15 225:9
**large**
45:1 89:24 109:5,8
187:5 240:16,20
265:17 271:16
273:23
**larger**
282:17
**largest**
265:11
**lastly**
254:19
**late**
31:11 33:7
**law**
35:16 63:11,13 81:16
81:17,17 87:9,15
**laws**
57:2 58:7
**lawyer**
107:17
**lead**
77:17,18,23,24 81:18
104:17 106:4
124:10 167:19
**Leader**
218:6
**leading**
284:1
**learned**

300:7
**leave**
37:19
**led**
128:6 165:16
**left**
272:11
**Legacy**
28:6
**legal**
1:22 5:13,14 107:12
157:14 158:2
160:24 161:8
289:13 310:10,15
312:12,20 313:14
**length**
192:4
**letter**
78:9,16 79:21,24
**letters**
79:4,16
**let's**
97:5 127:7 138:18
152:15 157:2 167:9
183:13 202:5
204:12 208:10
212:12 233:5 251:9
272:5,10 275:23
280:7 281:12
287:21 290:1 308:2
310:3
**level**
27:11 110:21 136:18
212:9 252:17,21,23
252:24 253:4
255:11 283:11
284:2
**liability**
292:19,23 293:1,11
294:1,6,13 297:8,11
297:21 306:17
**License**
1:18 326:22
**licensed**
216:24
**likelihood**

158:5,19 209:2
**likes**
80:21
**LILEK**
3:3
**limit**
188:21
**limitations**
290:13
**limited**
14:18 62:14 204:16
243:18 307:11
**limiting**
270:22
**limits**
63:17
**line**
170:1,3,10 272:14,16
272:18 324:5,6,8,9
324:11,12,14,15,17
324:18,20,21,23
**lines**
207:23,24 209:20
**liquid**
113:9 114:5,17
223:24
**liquidity**
111:2 112:14,18,21
112:23 113:2,5,11
113:13,16,21 114:3
114:8,13 177:6
**list**
13:17,22 14:1,18
15:4 51:3,8,11,13
55:18 57:3 59:8
217:7 265:2,8
**listed**
14:21,22 18:23 19:4
50:14 53:24 55:8,11
55:21 59:4,17
178:22,24 190:13
217:5
**listings**
286:6
**lists**
27:23 215:5

**literally**
234:4 285:15
**literature**
117:10 118:18
119:13 128:20
132:23 168:15
286:5
**litigation**
35:20 36:1,7 43:3
44:3 46:5,21 47:1,7
58:6 59:23 75:1
297:7 315:12
**little**
38:24 45:16 150:15
238:2
**LLC**
44:23
**LLP**
2:10,17 3:2 5:9,11
**located**
5:9
**locked**
171:9,10,12,22 172:6
173:16 174:10,18
175:21 176:4,14,18
177:16 182:14
**lock-up**
171:5,15,16 172:8
173:6,8 174:5,20
175:8 177:22 178:4
178:9,21 179:3
182:8,14 183:3
185:5 186:2 187:6
200:16 201:23
202:1 203:18
209:16 214:10,15
214:20,24 224:15
257:5 272:8 278:1,4
287:4,8,12 311:24
**lock-ups**
172:12 175:14
**logical**
173:13
**logically**
140:11
**long**



31:3 32:2 33:2
34:10 38:22 46:13
98:11 117:23 119:6
127:23 144:12
151:12 167:3
173:11,20 176:17
214:4 282:20
**longer**
118:13,20 121:15
123:15 128:9
162:10,24 283:22
**look**
12:8 13:12 41:4 53:2
56:7 58:2,12 91:20
91:21,23,24 95:6,12
97:5 106:24 113:10
115:10 118:1,13
121:10 124:6,17,23
131:8 133:2,3,11
136:14 142:1
150:17 162:13
165:18 169:5
170:18,21 176:22
176:24 179:9,15
183:13 189:5,21
205:14,23 206:10
209:19 218:8 221:6
223:16 224:12
234:10,17 240:7
241:2 245:7 251:9
257:21 262:4 264:6
266:1 267:2,16
272:5 275:23
281:12 282:1,24
283:5 286:10 287:3
**looked**
52:24 70:16 83:12
101:5 106:6,20
118:24 125:3,15,18
128:12 131:2 133:5
134:23 165:16,22
177:7 186:23
198:17 200:18,19
201:13,15,15
213:19 214:15
217:11 220:14

221:13,19,21,23
222:5,6 230:7
239:11,23 247:13
247:18 258:8
279:14 282:9,12,14
284:5,9,24
**looking**
86:7 101:4 118:14
119:3,13 121:15
124:18 130:13,14
130:19,22 131:4
132:11 133:14
135:8,12,19 169:19
170:5 177:2,3,6
197:6,8,11 198:11
201:4 213:16
220:19 222:19
223:3,23 242:8
244:11 259:10
267:10 274:17
283:3,4 284:17,23
286:13 287:7
291:23
**lookout**
90:24
**looks**
116:21 118:10 210:9
**loss**
41:9,11,21 145:22
146:24 161:20
288:14 291:11
292:9,14,15 293:10
293:18,21,23
294:18 295:7,17
303:13 306:21
316:16 319:4,21
**losses**
304:10
**lot**
8:17 17:21 19:9
22:19 89:23 138:15
214:5 219:8 245:3
297:19 317:12
**lots**
116:19 150:19 151:2
**low**

273:3,4,21
**lower**
113:1 172:21 195:22
270:13
**lunch**
161:23 163:15

_____ M _____

**M**
2:3,12 5:22 316:7
**Magna**
1:22 5:13,14
**magnitude**
136:17
**main**
14:10 281:24
**maintained**
289:3
**maintenance**
289:12
**major**
22:13 98:9 109:13
110:8 114:14
198:16 223:19
224:2 247:16 259:9
259:15
**majority**
8:3 43:7,9 52:11,12
53:7,18 54:6,8
58:10 59:1 96:23
128:11 174:8,9,17
209:21,24 210:11
210:14 223:11
275:5 297:11
**maker**
223:7
**makers**
97:22 98:14,18 99:8
222:14,17,22,24
223:4,5,16,21 224:3
224:6,8,15
**making**
80:13,15 146:11
191:5,7 194:14
293:2 301:3
**manage**

34:20 39:5 45:11
**management**
34:6 38:4 45:1
**Manipulation**
51:19 58:13,19 59:18
**manner**
231:14
**March**
180:4 272:15 277:21
**mark**
11:13 20:7
**marked**
11:19 94:24 179:13
189:15 216:12
259:6
**market**
7:10,14,22 8:13,23
8:24 19:12 22:15,18
22:20,22 23:21 26:6
28:20 30:3,22 31:4
31:10,14 32:14
33:15 36:12,18
39:13 40:1,6 41:2
44:22 45:20 46:1,4
51:19 53:17 57:21
58:3,13,18 59:18
64:2,8,12,16,20
65:2,5,6,8,10,17,19
65:23,24 66:5,9,11
66:13,15,21,22 69:7
69:23 73:6 90:1
91:3,11 92:22 93:17
93:24 94:10 97:18
97:21 98:14,18 99:8
100:1 102:17
103:24 104:4,5
106:18 107:3,3,16
107:21,24 108:21
108:23 109:4,9,17
110:1,13,17,21,24
111:6,21 112:17,24
113:8,18,22,23
114:6,18,21 115:2,6
115:9,19,20 116:8
117:2,23 118:6
119:16,17,21,24


MAGNA
LEGAL SERVICES

120:3,9,18 121:23
122:2,8,13 127:4,14
127:23 128:18,22
129:4,17 130:10,22
131:8,15 132:1,16
133:9,10 140:14,18
140:24,24 141:5,8
141:16 142:7,19
143:5 144:6,11,17
144:20 146:11,14
146:19 147:20
148:3,11 149:17
150:3,13,17,21
151:7,15 154:4,22
155:21 156:6,10,15
156:19 159:17
161:16,24 162:3,5
162:14 163:16,20
163:21,22 164:2,8
164:15,18 165:7,14
165:16 166:2,11,24
167:5 168:3,9,11,12
168:16,18 169:1,5
169:10 172:24
174:15 175:13,15
176:1,5 177:1,5,11
177:15,17 186:15
186:19 187:1,7,8,12
188:22 189:3
194:15,16,24 196:5
196:18 197:5,10,16
198:2,7,19,22 199:6
199:16,21 201:5
202:14,16 222:14
222:17,21,24 223:4
223:4,7,9,14,16,21
223:24 224:3,6,8,15
225:6 227:6,15
228:4 232:5 234:22
234:24 235:8,8,11
236:14 238:7,12,14
240:4 241:13
244:14,18 245:11
245:22,23 246:2,6
246:14,15 247:23
248:18 249:17

250:20 257:14
263:18 264:13
268:6,19 269:17
270:5,10 271:8
273:23 275:11
278:16 279:23
280:10,16,17 281:3
285:7 286:4,8,19,24
291:23 298:16
304:12 312:1 317:7
317:24 320:22
321:10 322:15
**marketing**
102:16 157:12
317:14,17
**markets**
45:2 110:10 133:1
167:13,18 255:16
**market's**
137:14 158:5 161:17
176:19 321:11
**master's**
23:7 24:9
**match**
306:16
**material**
14:4 20:14 101:17
126:5,19 152:17
154:17,21 155:3,11
155:15 177:17
200:10,10 211:16
211:22 217:23
246:2,6
**materially**
175:15 176:5
**materials**
15:9,13 19:7 21:2
100:21 101:11,21
211:7 213:10 216:9
221:16
**math**
181:7 185:18 190:23
210:4
**mathematically**
243:8,12
**matter**

5:3 12:9 17:2 18:22
20:10 51:9 63:16
68:9 72:1 78:18
82:10,15 85:17 89:2
94:3 118:24 145:16
152:21 177:3
291:18 296:2,7
314:23 326:5,7
**matters**
19:10 30:19 46:22,22
64:16 71:1 72:2
77:13,18 79:6 81:10
112:21 128:6 164:7
**maximum**
117:18
**MEAGHER**
3:2
**mean**
14:23 19:24 29:11
47:7 54:22 55:24
56:18 65:8 74:3
93:1,12,21 107:21
108:23 110:17
115:15 116:4
117:15 118:1
136:23 141:13
145:6 155:4,15
156:1,1,6 159:6,10
159:14 172:18,24
174:9 197:9 200:8
212:22 229:7,13
238:11,20 251:21
256:2 271:15,23,24
273:11 274:11
280:5 301:5 312:3
**meaning**
40:4 74:15 280:6
312:21
**meaningful**
97:11 208:22,23
209:15 224:4 256:7
**means**
107:23 116:6,9 155:6
155:17 179:9 185:4
189:21 236:14
238:6 251:23

279:21
**meant**
305:3
**measurable**
177:4
**measure**
113:13 114:5 116:12
116:17 123:23
129:23 131:24
162:17 295:4 302:7
302:13,24 303:18
**measured**
169:9 202:12
**measures**
211:11
**measuring**
26:19 142:14
**media**
11:9 68:4 108:12
163:11 230:21
288:4 316:1
**median**
268:16 271:21 272:2
272:21,22,24 273:2
273:5 274:11,12
**mediate**
47:10
**mediator**
47:8,14
**mediators**
47:17,22
**meet**
208:1 227:24
**meeting**
85:2 100:23
**meetings**
84:19
**member**
38:15
**members**
82:14,19 85:9,23
86:3,10 89:18 153:9
153:16
**memoranda**
101:15
**memorandum**



21:6
**memory**
48:16 62:8 235:19
311:12
**mentioned**
86:11 88:17 233:2
263:5
**mentioning**
213:22
**mere**
161:5
**met**
84:23 100:17 109:9
225:16,19 238:1
**method**
63:9,10 73:8 146:22
290:6,20 291:5
296:1,6,13 300:6
305:8 314:7
**methodologies**
7:12
**methodology**
8:9,21 42:3,10 54:2
63:7 67:4,12 69:24
104:1,12 119:24
242:12 289:18,23
290:5,15,23 291:3
291:17 293:8,14,15
293:22 294:4,5,11
296:22 297:1
299:12 302:22
303:4,7,8,9,12
306:15,20 309:14
314:12 322:16
**methods**
295:2,5 307:13,13,21
308:22
**metric**
98:13 265:17
**metrics**
97:17 165:22 187:21
197:21,24 198:5
**microeconomics**
23:4
**microphone**
120:14

**middle**
133:9 210:6 304:3
306:4
**million**
138:9,11,16 139:2,4
139:20 172:19,20
174:2 175:23 176:8
176:14 177:14
180:9,21 181:9,10
181:12,14,16,19
182:13,19,20 183:2
183:11 184:12,19
184:23 185:2,5,21
185:22
**mind**
50:17 61:1 63:4,19
63:24 93:22 150:11
150:22 304:9
**minds**
158:18
**minimum**
109:20,23 113:15,20
114:11,16 173:24
225:14 227:23
230:9
**minimus**
175:19
**minority**
53:12 54:13 71:23
**minus**
252:6 290:9
**minutes**
66:3 69:12 108:6
151:15 156:18
289:16,16 315:19
**misinformation**
302:17
**misleading**
310:7
**misrepresentations**
298:3 311:7
**missing**
269:24
**misstatements**
105:12 235:15,21,24
236:5,15 288:10,16

289:3 304:3 306:4,6
311:10
**misstates**
44:7 91:18 128:2
161:8 221:10
**mistaken**
48:24
**mix**
238:3 240:16,20
244:10
**moment**
102:20 156:3,12
**moments**
117:14 127:21
**money**
298:14
**month**
198:13 270:19
**monthly**
267:5,18 268:11
269:7,12
**months**
94:11 177:22 233:5,8
233:9 268:17
**morning**
5:24 85:21 165:2
255:14 265:20
270:3 322:9
**Mortgage**
265:21 266:6,10
**motion**
101:15
**move**
103:3 150:13 151:2
239:24 240:2,14
303:23
**moved**
150:24 231:15
239:17 240:9,11
241:4 304:23
**movement**
116:24 117:1 125:19
126:1,6,10,15 127:1
127:10,13 133:13
151:3,7,10 173:9
239:9 241:11 251:2

280:8,9 295:22
304:21 309:4
**movements**
100:1 117:12 119:4
121:24 123:18
124:12 125:1,13
126:21 128:13
279:21 280:1,2,2,15
280:15,24 281:9,10
**moves**
150:14,14 151:4
**moving**
122:17 264:6
**multiple**
64:17 72:18 89:18
91:7 92:15 118:3
133:6,18 134:2
135:3 307:13
309:11 313:10
**multiples**
307:14,15,15
**murder**
305:2,5
**MUSGRAVE**
2:19
**mutual**
80:11

---
**N**
---

**N**
4:1 5:22,22 316:7,7
**name**
6:1,7 48:9 98:10
164:22 216:4
218:24 259:4 324:1
**named**
47:9
**names**
20:6 217:7
**NASDAQ**
110:9 111:16 264:19
265:1,9 266:5,9
267:24 268:14,23
269:10,15 270:12
270:23 271:6 274:9
**nature**


MAGNA
LEGAL SERVICES

104:9 147:2 235:20 304:14

**necessarily**
7:23 70:18 111:2 112:14 135:10 138:16 140:3 141:12,14 151:6 152:9 172:16 181:15 196:1,8,17 234:23 236:13 238:15 286:23 301:5,12 313:16

**necessary**
19:15 22:3 60:11 114:7 219:7 220:7 237:4 271:8

**need**
10:10 90:12 93:6 98:9,16 99:8 107:9 108:3 149:11 151:20 179:20 282:17 300:8 301:12 323:18

**needed**
295:7 305:8

**needs**
137:11 138:4 310:5

**negative**
126:15 173:1 238:3 240:17,21 305:3,6

**neither**
63:22 244:12

**neutral**
46:24 47:6,13 296:4 296:8

**never**
43:22 44:9 45:24 46:7 57:22 60:9,13 61:17 71:18 92:10 176:22

**nevertheless**
227:4,13 274:5 275:9 306:12

**new**
2:3,3,11,11 38:8 114:21 115:22

116:7,13,13 117:24 119:7 123:24 124:16 127:24 136:19 137:6,23 138:1,2,4,5,13,20 138:21 140:2,6 141:3 148:12,17,20 149:3,9,13,18 150:4 150:12 154:21 155:22 162:1 174:21 175:9 231:7 232:4 235:8 238:22 246:2,6 259:20 260:1,16 261:5 262:5,9,18

**news**
100:2 119:7 122:8 123:18 124:14 128:14 129:5,19,24 130:18,20,20 131:16 132:1 139:9 140:2,6,15 141:22 154:21 156:7,9,20 156:24 158:23 171:21 219:15 231:16 234:11 235:8 236:21,22,24 239:18 240:9 241:3 246:2,6 256:22 258:2,5,7,13,19 259:4,9,15,19 260:1 260:2,7,8,8,15,15 260:18,19,19,21,23 261:4,12 262:15,18 262:19,20,21 263:11,16 264:1 283:15,24 305:3,6 307:4

**newsletter**
4:16 189:20

**nonexistence**
319:10 320:2

**nonpublic**
152:17

**nonrelevant**
140:20

**nontrading**
141:9

**nonvalue**
140:20 141:1

**non-constant**
299:13

**non-earnings**
309:2

**non-fraud**
308:5

**non-insider**
275:14

**non-insiders**
275:18

**non-litigation**
46:22

**non-lock-up**
287:8

**non-news**
261:19,24

**normal**
94:1

**normally**
15:8 20:20 113:10 115:6 187:7,11

**North**
3:2

**Northern**
1:2 5:6 325:2

**Notary**
325:23

**note**
100:11 248:12

**noted**
5:15 198:12 212:24 258:10 281:17

**notice**
1:14

**notion**
280:23

**November**
127:1,3,5,6,9 142:11 143:5 144:21 158:11 161:4,17 200:2 204:16 254:3 254:13,19 317:6

318:16,19,22 322:6 322:13,19,19

**number**
7:16 8:12,16 9:2 11:23 12:3,7 20:2 25:22 30:19 35:15 37:22 43:15 52:1,2 52:10 54:7 58:5 66:8 71:24 72:17 82:3 89:11 90:1 98:14 109:5,8 116:7 117:16,24 118:6,21 132:12 133:13 142:5 154:9 170:19 178:4 180:2 182:21 184:15 186:22 189:23 204:3 206:14 214:10 220:14 221:13,20 222:9,14,21 223:16 223:21 224:2,19 234:17 240:15 261:11 263:16,16 265:4,10 277:19 278:21,24 281:24 302:11 303:20

**numbers**
97:17 99:17 184:16 184:24 200:18 265:13 271:15,17 278:12 293:2 301:3

**Numerically**
256:5

**numerous**
53:13 54:14 57:19 145:21 203:2

**NYSE**
110:3,8 111:16,17 264:19 265:1,9 266:5,9 267:24 268:13,22 269:10 269:15 270:12,23 271:6 274:8

---

**O**

O



5:22 316:7 326:2,2
**Oak**
1:8 2:15 4:13,15,17
5:4 6:9 7:10 14:6
70:22 73:6 80:2,4,8
80:13,16 94:17 95:5
96:9,18 98:15 105:7
105:11 109:16,24
111:18 112:2,10
114:15 121:24
122:9 129:5,18
134:5 147:21 148:3
152:22 153:4,9,21
154:6,22 157:11
159:23 160:5,16,21
165:4 169:6 171:8,9
171:14 174:3
175:23 177:23
179:7 186:11 187:1
189:6,19,20 190:12
190:17,21 191:20
192:5,6 196:22
197:4 198:21
199:16 203:5,12,16
203:19 204:7
212:19 215:7 216:9
217:7 222:18,24
223:5 225:1 226:9
226:14 231:12,15
232:5,6 235:9
239:16 245:11
246:3,7 251:17
258:14 259:7,11,16
259:20 260:15
262:24 263:10
264:16 267:4,18
268:4,6,10 269:9,13
274:7 275:2,5 281:2
284:16 285:21,22
286:3 288:17 289:4
298:4 311:16 312:8
313:1,4 314:14
324:1 325:6
**OakStreet02245696**
189:23
**oath**

10:14
**Object**
97:1 263:14 297:9
321:22 322:24
**objected**
92:23
**objection**
15:15 16:9 17:3,10
17:17 18:9,24 19:22
20:16 21:3,15,22
23:15 24:12,16 25:3
25:15,19 26:3,7,13
26:21 29:8,16 30:7
30:16,23 31:5,23
32:18,22 34:8,23
35:13,21 36:2,13,24
37:7,21 39:3,14,20
40:9,14,21 41:13,18
42:5,12,19 43:4,12
43:19 44:6,18 45:23
46:18 52:5,15,22
54:3,11,24 55:22
57:5,14 58:22 59:6
60:18,23 62:5,16
63:2 64:3 65:8,20
66:17 67:6,13 68:10
68:18 69:1,17 70:1
70:14 71:3,17 72:8
73:4,21 74:14 76:23
77:5,9,15 78:2,6,12
79:7,18,22 80:4,19
81:8,14 82:1 83:3,9
83:18 84:13 85:14
86:8,16 87:6,17
88:9 89:9,21 91:4
91:17 92:7 93:3,4
96:2 98:3 99:2,18
101:1 102:13
103:14 104:2 105:4
105:20 106:11
107:11 110:6 111:7
112:6,19 113:24
116:15 117:21
119:9 120:20
121:20 122:11
123:3,11 124:2

126:3 127:15 128:2
129:6 130:2,11
131:6,18 132:4
133:21 134:4,16
136:2 140:4,9,17
141:11 143:9,17
144:7,22 145:5,11
146:9 147:16,24
148:13,22 149:5,19
150:6 152:5 153:13
153:23 155:5,13,23
157:13 158:1,14
159:1 160:1,7,11,18
160:23 161:7 162:7
162:20 166:4,13
167:2,14 168:6,23
170:13 171:24
172:15 173:10
174:13,23 175:11
176:21 177:12,24
187:3 188:4,20
189:8 190:22
191:22 192:18
193:12,19 194:8,18
195:2,9,16,24
196:12,23 197:7
198:9,24 199:19
200:7 201:1 205:6
206:3 207:15 208:3
211:20 212:4 214:2
214:12 215:22
219:18 220:12
221:9 222:3 224:10
224:17 226:23
227:19 228:14,23
229:11,18 230:5
235:2,16 236:3
237:2 238:9 239:20
241:23 242:4 243:2
244:21 246:20
248:19 249:22
250:9,18 256:20
257:16 258:17
259:22 260:10,17
261:14 262:7 263:3
266:24 269:1,18

270:15 271:2,18
273:9 277:8,17
278:18 279:7
280:21 281:5 284:4
285:3,14 286:12,21
287:5,15 288:19
289:8 290:11
292:20 294:2 298:7
299:3,20 300:23
301:24 302:9 303:1
305:23 306:8
309:12 310:9 311:8
311:19 312:2,11,18
313:2,13,20 314:18
314:24 315:8
317:10 318:6
319:13 321:7
**objective**
237:15 245:5 262:14
**obligations**
314:15
**observations**
234:2 241:22 243:5
**observe**
162:22 237:18
**observed**
176:1 245:16 252:8
296:2,7
**observes**
136:15,19
**observing**
94:1 241:12 245:16
**obtained**
270:11
**obvious**
302:19
**obviously**
17:19 18:12 21:5,8
23:3 74:3 82:3
97:14,16,18 98:6,12
99:11 100:7,10
150:12 168:10
170:7 171:11 200:9
214:4 221:15 248:1
263:5 269:3 283:2
305:2


MAGNA
LEGAL SERVICES

occasion
55:24
occasions
66:9
occur
134:10 319:15
occurred
40:16 62:23 153:18
157:18 158:6,7,8
219:9 232:11
233:13,13,23
258:10,11 259:17
278:4 284:7 298:20
299:1,9 317:5
319:14
occurring
298:20
October
264:20 266:21 267:6
267:19 269:8
offer
54:1 64:19 143:19
310:15
offered
53:16,21 73:20
171:11 238:2
offering
7:8 106:8 125:24
164:14 168:17
180:2,12,16,21
181:24 183:9,11,22
185:11 195:1
203:17
offerings
186:5 225:12 310:23
311:18
office
49:12,19 50:12
oh
20:4
okay
6:12,13 8:6,18 9:14
9:15,18,19,22,23
10:2,3,6,7,12,13
11:16,17 12:16
13:12 15:10 16:14

17:8 20:4 76:8,9,15
76:16 77:22 82:22
95:14 96:12 154:11
157:3,4 171:3
179:14,22 182:5,24
185:3 190:2 216:18
231:10 272:7
274:21 279:19
289:18 290:2,3
323:4
old
151:1,4
omissions
105:13 298:3
once
293:12,12 323:14
ones
9:11 63:24 153:6
311:1
one-day
118:16,24 119:14,23
121:12 123:15
124:6 125:8 126:15
127:17 129:11
132:17 134:23
142:21
one-third
176:23 177:2
open
97:6 101:3 107:3
108:21,24 109:4,10
109:17,24 110:3,4,9
141:10 194:15
opening
141:15,20 142:1
opine
7:21 19:10 40:6 41:2
42:9 64:16,24 66:15
73:7 212:13 222:17
264:11 315:3
opined
66:13 143:14 197:4
203:3 286:2 303:21
opining
18:8 65:23 67:16
90:1 122:12,14

168:10
opinion
7:8 13:19 18:11 40:1
41:6 53:16,21 54:1
63:5 64:19,23 65:2
65:4,17 66:11 94:10
106:8 122:7 126:1
143:19 146:19,21
147:3 148:7 164:14
186:15 219:8 270:9
289:21 316:16,20
319:4
opinions
17:1,5,9,16 18:19,21
22:4 30:15 62:15
73:19 315:10,13
opportunity
284:15
opposite
195:18
option
286:6 287:19,19
options
199:11 285:9,12
286:11 287:3
order
21:6 107:9 123:19
137:24 234:1,9,13
241:21 292:21
305:10 309:23
310:13
ordering
222:13
orders
323:10
organizational
183:8
original
217:15
originally
41:2
outcome
161:15 293:9 314:11
outcomes
309:18
outliers

272:4
outside
21:16 93:19 94:1
228:24 229:21
234:18 264:1
315:10
outstanding
111:1 174:2 180:3,5
180:11 181:17,24
183:19 186:10,22
202:13 203:7 204:9
206:14,17 207:7
208:20 209:10,12
210:15 275:2,5
276:11,20 277:6,15
279:5
out-of-pocket
63:7 290:6,15 293:5
293:14 294:4,11
296:1,12,22 297:1
303:9 306:19
overall
18:11 146:24 161:17
168:8 176:13 198:1
256:23
overarching
74:4 297:11
overly
156:10
overreact
116:10 155:21 156:1
156:4,5,16 163:3
overreacted
162:5 280:12
overreacting
162:1,12,19
overreaction
162:3
Overview
103:7
over-the-counter
223:18
owned
80:12 153:21 154:7
ownership
199:10



**o'clock**
 1:20

**P**

**PACER**
 12:12
**page**
 4:4,9 9:12 12:8,11,14
   13:3,13 14:6 22:6
   50:19,19,24 51:1,6
   56:1,1,6,7 103:6
   179:11,17 183:14
   190:1 202:11 204:5
   204:13 216:20
   218:6,9 237:17
   251:10 264:6
   266:14 272:6 324:5
   324:6,8,9,11,12,14
   324:15,17,18,20,21
   324:23
**pages**
 11:24 51:2 55:19
   97:6,8 179:20
**paid**
 83:7,15 84:3,4 85:13
   294:8
**paper**
 17:22
**papers**
 115:18
**paragraph**
 73:11,15 98:7,13
   106:24 108:17
   109:3 110:13,20
   112:13 115:11,11
   136:14 154:11,16
   180:1,10 181:10
   182:3 183:6,14
   185:7,9 199:16
   202:5 203:10
   212:15,18 219:17
   222:15,20 226:8
   231:8,20,22 232:3
   233:21 252:10
   264:21 266:1 267:3
   267:15,16 269:8

 274:15,18,23
 279:17,18 281:4
 285:9 289:20 290:7
 290:18 291:6,20
 295:5,24 307:4,10
**part**
 24:8 27:3 35:7 65:18
   80:10,11 98:5
   115:24 121:11
   125:22,22 132:6
   133:12 151:15,23
   185:15 200:9,20
   207:17 217:23
   223:10 226:10,15
   240:23 247:15
   251:14 256:18,22
   262:2 268:15,17
   269:24 275:16
   280:2 292:7 317:1
   317:11,18 320:20
   321:8,18
**partially**
 63:17
**participated**
 296:3
**particular**
 14:19 23:13 29:14
   35:4 36:15 64:13
   66:6 79:12 87:10
   88:2,6 99:10 117:5
   118:19 119:20
   120:4,10,19 121:8
   122:5 125:6 126:7
   136:15 137:3
   145:16 146:15
   152:21 162:13
   165:1 172:1 192:7
   192:13 198:17
   207:13,19 217:10
   223:13 237:9
   252:19 259:5
   270:14,19,19
   271:12 282:8 304:5
   314:16 321:17
**particularly**
 223:21 237:15

 257:20
**parties**
 21:14 78:21 220:1
   326:10
**partners**
 27:13 38:2 46:12,14
   46:17 48:8,15,18
   49:8
**parts**
 179:16 308:16
**party**
 40:19 74:24 309:24
**pass**
 26:1 316:4
**passed**
 25:21
**PATRICK**
 2:19
**patrick.musgrave...**
 2:20
**pattern**
 117:4 198:18 200:18
   201:13 273:11
   283:1,15,24 284:7
**Paul**
 2:10 5:10 6:8
**pausing**
 253:21
**paying**
 81:12,18 298:14
**Pearlman**
 94:6 95:3
**peer**
 28:14
**pending**
 10:11 93:7
**Pennsylvania**
 75:5,10 76:1
**Pension**
 75:5,11 76:1
**people**
 20:2,8,10 27:21 38:4
   113:7,10 142:6
   152:17 172:20
   294:8
**perceive**

 137:20
**percent**
 44:9 78:17 85:17
   86:2 136:18 169:12
   170:20 174:9
   175:21 182:7,12
   183:1,7 184:7,12,22
   185:24 186:1,9,22
   202:13,17 203:4,6,6
   204:3,4 206:12,16
   206:18,22 207:6,10
   208:1,2,6,7,8,10,11
   208:13,13,16,17,18
   209:22 210:4,13,15
   252:21,22,24 253:4
   266:10 267:6,19
   268:1 272:17,20,21
   273:4,20 275:1,14
   275:17 276:12,17
   276:19 277:3,6,9,15
   277:18 278:9,9
   283:11 284:3
**percentage**
 43:2,10,14 44:20
   48:1 71:15,22 85:12
   176:13 185:24
   187:5 203:20
   209:14 210:20
   211:5,18 212:6
   251:23 275:17
   276:10,15 278:8,24
   279:12 287:13,17
   300:5 303:22
**percentile**
 254:8,23 255:6,6,7
**perception**
 137:15
**Peregrine**
 33:22,23 34:5,5,10
   34:15,22 35:11,19
   36:6,9 37:20 38:18
   81:19
**perfect**
 41:20
**perfectly**
 167:20



**perform**
34:19 35:8 121:6,22
126:18 201:20
288:13 293:18,20
315:12
**performance**
50:2 137:10
**performed**
64:5 69:22 70:12
81:20 90:6 99:7,24
100:5,9 128:5 129:2
138:14 231:23
258:7
**performing**
27:14,16 39:4,23
47:2 81:5 91:3
92:21 144:11
234:19
**period**
14:16 31:7,8 32:4
73:7 74:1 80:9
94:10,14,18 104:6
112:4,5 128:6,9
144:13,21 146:15
154:23,24 162:10
162:18,24 164:10
164:19 165:3,10,13
168:4 169:7,11,14
169:15,18 170:5,12
170:15,17,18,22
171:8,15,19 172:8
176:11 178:4,9,22
186:7 187:13,16,23
187:23 188:6,9,12
188:15,18,23 189:6
189:10 190:14
191:3,14,17,20
192:2,5,8,9,11,15
192:21 193:1,14
197:19,22 198:1,3,5
198:8,13 199:18,22
200:1,6,9,16,23,24
201:4,10,12,16,18
201:19,23 202:1,2
203:8,18 204:10,18
204:20,21,24 205:9

205:15 206:2,6
207:14,23,23
209:16 211:1,12,19
212:10,13,18 213:3
213:6,8,11,20 214:4
214:11,15,20,24
215:5,20 217:17
218:3 220:24
222:19,22,24 223:3
223:7 224:6,9,16
225:2,18,20 226:5
226:10,19,22 227:2
227:18,22 228:6,9
228:12,19,19,20
229:1,5,10,13,14,17
229:22,23 230:4
232:12,14,16,17
233:1,4,6,13,14,14
233:17,19,20,23
234:1,5,6,8,15,18
237:13,14 241:21
242:9 245:11,18
246:4,8,9,10,11,12
246:13,14,17,18,19
247:4,4,5,6,10,10
247:11,13,15,15,17
247:20,20,24 248:3
248:6,6,11,13,16,17
249:5,7,13,13,14,15
249:19,20,21 250:8
250:16,16,17,23,23
251:5,6 253:11,14
253:15 256:14,17
256:19,22 257:1,5
261:9,23 264:17
270:1,18,20 272:8
272:16,23 273:7,10
273:13,16 274:24
275:7,20,22 276:4
278:1,13,14,17
281:3,15,19,24
282:16 283:14,22
284:11 285:13,23
286:11,18,20,24
287:1,4,8,8,12,14
287:18,20 292:5

295:14 298:6,19
299:6,10 300:1,22
301:5,7,16,18,23
302:12 303:24
304:4,20 305:14
306:5 310:21
311:24
**periods**
52:13 113:1 128:23
170:19 188:3
193:23 200:19
242:8 250:2
**permitted**
63:23
**persistent**
162:23 282:4
**personal**
9:7 19:3 49:11
**personally**
82:9,11 84:5 85:4,13
85:18 90:12
**persons**
109:6,8
**pertaining**
1:16
**phrase**
136:10
**Ph.D**
24:14,19,22
**pick**
265:12
**piece**
40:5 104:10 118:19
144:9 148:10
245:22 300:17
**pieces**
308:5 309:11
**place**
19:11 113:12 326:8
**placebo**
130:17
**places**
311:11,13
**plaintiff**
75:13 76:4,10,18
77:19,19 296:17

**plaintiffs**
1:6 2:9 6:15 12:4
21:20 58:21 74:5,23
75:4,8,15,18,22
76:19 84:18,24 85:1
87:8,15 95:8 100:18
102:2,12 105:22
106:4,9 107:9,14
129:21 143:11
146:23 147:6 289:6
292:19,22 293:11
293:24 294:6,7,13
299:6 304:11
306:16 316:5,10
318:2,8 320:8 325:4
**plan**
56:14,20 75:6,11
**plans**
181:2
**platform**
44:22 45:3,21 46:1,4
**played**
10:18
**please**
5:16 6:1 9:14,20,24
65:13 93:8 149:21
161:11 175:1
204:12 215:9
216:17 266:1 272:6
287:22 315:19
320:12
**pled**
146:24
**plenty**
10:8 121:23
**plots**
204:7
**plotted**
274:2
**plug**
98:23
**plugging**
99:16
**point**
9:9 10:19 14:15
55:14 56:8 60:14



69:3,6 86:19 125:18
147:4 154:15
176:10 188:10
192:12 196:6
206:15 207:19
211:13 235:18
248:3 255:14
273:16 291:21
292:4 295:19
301:11 315:12
**points**
106:19 111:22
187:22 197:21
217:14 242:2,11,19
242:21 243:8,9,10
244:2,4 273:21
300:21 301:6,10
302:14
**Police**
75:19 76:14
**policy**
23:8
**poor**
308:2
**portion**
44:14 47:19 52:21
62:19 154:6 226:17
226:19 228:18,20
229:22 246:11
247:3 249:12
278:20 279:5
305:21 308:3,4
309:3
**portions**
170:4 171:14
**position**
38:13 95:10
**positive**
238:3 240:16,20
241:15 304:24
305:3
**possess**
152:17
**possibility**
129:3 302:14,16
**possible**

42:3,11,22 44:11
155:20 163:20,24
164:1,5 173:6
238:21 244:18
255:16,19 261:4
300:16,19,24
301:19 309:9
**possibly**
17:11 36:14 80:22
**post**
247:10
**postdate**
249:5
**postdates**
253:10,16 256:14,16
**postdating**
246:18
**posted**
215:15 217:16
**posts**
219:24
**potential**
34:22 35:5 39:12
61:16,20 162:21
194:20 256:16
299:13 321:11
**potentially**
37:13 59:22 135:7
314:22
**power**
242:15,24 243:4
**powerful**
242:19,22 243:10,14
**practical**
25:22 31:9 32:6 33:6
**practice**
46:24 47:5 78:14
132:10,12 134:6
**practices**
9:10 158:20 317:23
318:4,11,23 319:10
320:2,10,18,22
321:4,12
**precise**
71:24 309:17
**precisely**

132:24
**predict**
158:16 238:12
280:24 281:9
**predicted**
239:23
**prediction**
159:15 161:5 240:10
240:13
**predictive**
116:24 280:9,14
**Preferences**
28:6
**preparation**
102:8
**prepare**
20:19 100:22 101:12
**prepared**
12:1,3 48:19 88:16
101:8
**preparing**
84:1,9,12,23 86:6,12
86:18 101:22
103:10 105:17
**prerequisites**
25:17
**prescribed**
314:7
**presence**
159:5 174:5 176:4
**present**
3:7 84:19 85:2,3,5
137:15 175:14
258:12
**presented**
154:19 206:23
**president**
34:16 38:15
**press**
134:7,14,15 135:16
263:1,6,7
**presumption**
107:10 202:14,18
**pretty**
122:1
**prevent**

172:13,17 173:4,5
174:6
**preventing**
194:15,23
**previous**
185:9 260:8 280:11
**previously**
7:21 8:1,7,19 30:2
72:11 82:18 89:4
94:5 100:17 103:11
148:11,19 221:21
270:4,9 312:3
**pre-spill**
296:20,20
**price**
104:17 105:12,14
107:24 110:23
111:4,13 114:22
115:9 116:9,13,20
116:23,24 117:1,5
117:11,20 118:19
119:4 121:23
122:16 123:18,24
124:5,12 125:1,9,13
125:18 126:1,6,15
126:21 127:1,10,13
128:13 129:10,17
130:1 131:8 133:13
134:14,22 135:6,12
135:20,23 136:6
140:16,24 141:5,19
142:1,15 147:20
148:3 149:17
150:13,24 151:7,11
154:22 159:17
161:16 163:2 169:1
172:14,17,22 173:4
173:5,9,14 174:6,16
175:16 193:17
194:2,6,13,16,24
195:8,13,21 196:3
196:10,17,18,21
231:7 232:6 235:8
238:16 239:5 240:2
240:9,11,14 241:4
241:11,16 246:2,6



251:2,24 263:1,11
279:21,22 280:1,1,2
280:8,9,14,15 281:9
281:9 288:9,14
289:11 290:8
291:23 294:10
295:13,22 296:13
296:18 297:13,13
297:23 298:5
299:16 300:12
301:4,9,16 302:6,11
302:23 303:17,22
304:21 305:4,7,14
305:21 308:1 309:4
309:10 316:20
322:17

**prices**
26:20 106:18 107:4
115:22 132:16
151:2 168:16
172:24 195:7,14,22
280:17,18 294:8
308:1 311:16,21

**price-to-earnings**
307:14

**price-to-EBITDA**
307:14

**price-to-revenue**
307:15

**pricing**
133:2 166:18 167:4,5
168:21 192:16

**primarily**
47:2

**primary**
20:8,10 29:7,11
34:17 39:1 46:6
72:19,22,24 85:23
85:24 86:3

**principally**
110:24

**principle**
116:18

**principles**
22:19,20 23:4 24:2,7
26:16 29:23 34:2

38:20

**prior**
6:19 7:13 44:7 46:10
48:22 84:2 91:18
93:20 128:2 161:8
170:6,8 183:8
221:10 251:24
252:6 299:1,9

**private**
152:10,21 153:2,20
154:7

**privilege**
36:21 37:13 50:8

**privileged**
69:2 70:8 73:23
87:19

**privy**
153:10,16

**pro**
49:11

**probability**
243:6

**probably**
7:1,3,4,5,19 8:15,17
31:10,16 32:8 40:23
53:18 54:5,8 71:11
82:4 84:10 89:12
169:16 208:6,22
225:18 262:11,12

**problem**
267:11

**Procedure**
1:15

**proceedings**
68:2 108:10 163:9
230:19 288:2
315:23

**process**
19:11 20:22 90:2
91:13,20 119:22
188:24 252:11

**processing**
150:4 151:24

**produced**
11:24 21:14,20

**professional**

29:7,13 50:22 51:18
54:18

**professors**
27:14

**profile**
50:4

**profitability**
137:20

**profits**
281:1

**program**
24:20,23 27:3

**progress**
309:15

**prohibiting**
193:9

**projecting**
305:15

**prominent**
47:8

**proof**
310:16

**proper**
293:15 303:18

**properly**
156:2 289:12 292:22

**proportion**
271:16

**proportionally**
308:12

**proposed**
69:4 74:1 87:1 165:3
299:12 302:21

**prosecutors**
50:3

**prospective**
298:13

**provide**
15:5 40:1 57:20 87:4
91:14 150:8 186:19
307:9

**provided**
15:8,13 20:13,20,21
21:8,20 44:24 55:4
55:8 86:19,20 91:10
94:9 124:17 137:9

211:16 221:15
300:8 309:23

**provides**
17:24 18:3,11 235:10
248:21

**providing**
88:1 94:5 298:12

**provision**
157:22

**public**
23:8 49:20 107:23
115:7 151:16,19,21
152:4 153:11,17
225:12 232:4
274:14 275:10,14
276:16 277:10,12
278:8 279:1 280:11
280:13 310:23
311:18 325:23

**publication**
28:23

**publications**
27:23 28:13,16,20

**publicly**
52:9 80:5 106:17
107:4 115:22
116:13 123:24
152:12 154:9 193:2
219:14 279:11

**published**
222:7 263:6,19

**pull**
265:24

**pulled**
96:4 216:8

**purchase**
290:9

**purchasers**
196:6

**purchasing**
194:22 195:3

**pure**
156:23

**purport**
313:24

**purported**



204:21
**purpose**
123:21 192:14 193:9
194:15,23 219:13
219:21 220:5
**purposes**
7:7 19:21 20:14 67:4
75:23 76:7,13 96:12
102:7 103:23 110:4
118:23 119:2
124:22 125:4
146:10 178:7,12
224:22 248:14
258:5 260:2 270:24
273:7 292:15,16
313:19 322:11
**pursuant**
1:14,14 181:1 188:2
310:8,19 313:10
**put**
90:9 206:19 285:21
286:17 287:11,13
**puts**
94:1
**putting**
38:3 90:14
**p.m**
163:7,13 230:17,23
287:24 288:6
315:21 316:3
323:16

**Q**

**qualified**
35:8
**qualitative**
137:10
**qualitatively**
236:1,6,10
**quantification**
291:7,9
**quantify**
247:18 290:21
294:16,24 305:9
**quantitative**
113:7 293:9

**quarter**
276:6 281:22 283:2,8
283:17 284:1,20
285:2
**quarterly**
134:9 135:16 137:7
282:1 283:4
**quarters**
233:24 237:24 282:7
282:19
**question**
9:17 10:1,2,6,11,12
42:6 55:16 58:6
59:21 78:5 82:12
84:2 87:23 89:1
92:8,17,19 93:8,9
95:17 96:14 104:4
113:14 114:3
120:13 122:4 125:6
132:22 135:5
137:23 143:4 148:8
149:22 150:21
161:12 162:2 166:6
166:9 168:16 173:3
175:2 196:15
215:10 240:1
241:17 243:23
246:21 260:12
286:14 289:5
290:21 298:23
301:8 309:15
320:24 321:1
**questioning**
316:11,22
**questions**
6:12 9:13 10:24 34:2
74:24 142:23
150:17 166:16,17
179:15 216:15
316:6 319:17,20
322:8
**quick**
11:4 108:3 133:1
**quickly**
116:8 122:8 147:20
174:20 175:8,16

**quiet**
188:3,6,9,18,23
189:6,10 190:13
191:3,14,17,20
192:1,5,8,11,15,20
193:1,14,22 200:6
200:23 201:4,10,12
201:18 205:15
206:2,6 213:6,8,11
213:20 215:20
217:17 224:8
253:11,13,15
256:14,16,19,22
257:1 272:23 273:7
273:10 276:3
286:11,18
**quote**
109:3 113:8 232:11
232:12
**quote/unquote**
183:23
**quoting**
117:15 141:21
202:21 219:17
289:20

**R**

**Rackowski**
3:7 5:13
**Railroad**
28:2
**raise**
150:17
**raised**
158:18 321:10
**ran**
93:18 231:11 232:16
**random**
151:3,10 264:24
265:4,10,13 266:4
266:21 269:4 271:9
273:1 283:15
**randomly**
264:18 267:23
268:12 270:11
**range**

82:6 89:3 274:2
309:17
**rapidly**
108:1 114:21 115:8
115:23 116:5,6
117:15,19 122:15
141:9
**rarely**
305:13
**rate**
81:3,6,10 85:8
**rational**
137:2
**rationale**
36:22
**rationales**
192:20 193:14
**raw**
252:5
**reach**
176:19 221:8
**reached**
18:4,6 67:3 126:7
160:6,16 221:8
227:4,13 240:5
246:4
**reaching**
168:3 199:4 200:20
257:14 269:11
319:4
**react**
151:11 235:11 305:4
**reacted**
122:8 129:18 142:19
231:13
**reacting**
128:18
**reaction**
116:20 118:19
129:10,13,14 130:4
130:6,9 131:9,15
133:16 134:14,14
136:6 141:14
142:15 149:18
156:19 161:16
231:7 238:16



248:18 249:17 309:10

**reactions**
117:5 151:16 158:23 250:1 291:23

**reacts**
156:24

**read**
65:12,15 93:10 105:24 107:6 108:17 110:12 112:13 149:20,23 154:17 155:1 161:10,13 174:24 175:3 184:8 215:11 216:14,16 221:11 221:16 227:8 237:21 246:22 289:7 292:7 320:11 321:2 325:9

**reading**
167:17 193:20 199:15 203:24 231:20 266:12 285:15,24 290:6

**ready**
48:12

**reaffirmed**
107:2

**real**
11:4

**realize**
36:9

**really**
67:20 98:15 111:11 118:8 205:2 224:3 233:17,19 249:6 282:3 284:19 296:13,21 303:22 310:14

**reason**
10:21 57:23 98:19 99:5 123:5 173:13 174:5,16 191:9,11 205:19 228:5 238:15 244:8

246:10 247:3 249:12 251:5 253:21 271:5,21 295:8 312:24 315:2 324:5,6,8,9,11,12 324:14,15,17,18,20 324:21,23

**reasonable**
89:15 111:3 123:20 137:2 283:5 309:14 309:18

**reasonably**
309:21

**reasons**
17:15 37:2,23 38:8 58:1 124:8 135:2 151:3 166:18 242:14 275:12 302:11,19,19

**recall**
20:17 24:6 26:22 31:13 42:13 48:17 48:17 49:5 59:3,7 60:12,13 61:1 62:1 64:7 67:15 68:11,13 68:16 69:3,9,13 72:19,23 77:20 79:2 79:3 80:13,15 87:7 87:14 88:5,6 91:5 92:13 93:23 94:5,11 101:4 108:18 118:9 126:9,23 127:8 128:5,12 153:6,7 157:17 158:6 164:9 167:23 189:10 192:7 193:6,13,20 213:7,15 215:1 232:20 235:18 265:22 270:17,20 284:9,22 286:13 287:6 310:22 311:2 316:12,24 320:4

**recalled**
87:22

**recalling**
127:11

**receive**
85:16

**received**
23:10 25:24 27:5 88:8 172:3

**receiving**
25:18 87:22 88:7

**recess**
68:1 108:9 163:8 230:18 288:1 315:22

**recognition**
117:10

**recognized**
23:19

**recognizing**
79:3

**recollection**
33:11 41:20 52:20 60:20 61:4 62:11 87:9,24 88:2,11 163:18 164:11 188:12 213:14,21 217:21 284:6

**recommendations**
219:16

**record**
5:2,15 6:1 9:22 10:12 11:4,7,8,11 51:5 67:23 68:6 95:7 108:8,14 142:13 154:18 163:5,7,13 169:22 230:17,23 231:19 287:21,24 288:6 315:18,21 316:3 323:10,15 324:3 325:12 326:11

**recorded**
326:5

**records**
61:5 82:3

**recruiting**
46:23

**red**
96:17,20 266:17

**redline**
4:12 95:2,15,19 100:13 265:20,24 274:19

**redraft**
98:19

**reduced**
326:6

**ref**
98:8

**refer**
15:21 76:8,14,17

**reference**
75:24 108:20 109:7 110:13 154:17 180:1 187:10 191:5 307:2

**referenced**
7:21 82:18 84:21 85:21 109:19 176:7 181:9,11 199:15 258:15

**references**
184:9 215:3

**referencing**
61:13 215:19 226:14 307:8

**referred**
63:8

**referring**
55:14,17 62:19 75:24 76:18 137:14 171:2 182:18,19 191:3 306:20

**refers**
111:11

**reflect**
56:21 82:4 95:20,24 107:4 128:22 140:19 141:17 159:18 172:21 173:1,14 175:16 272:3 287:18 304:14

**reflected**
20:12 56:21 70:13



98:13 116:8 122:15 126:19 128:17 141:15 211:22 279:22 280:18
**reflecting**
98:8 156:2 174:6
**reflection**
279:9
**reflects**
14:3 100:4,14 114:6 114:21 115:1 140:24 142:2,7 156:13 161:17
**refresh**
213:13 217:21 267:12
**Refreshing**
4:17 216:10
**regard**
104:6 158:12 249:16 270:5
**regarding**
66:22 97:17 307:16
**regardless**
161:14 242:17 291:7
**Reginald**
1:4 5:4 325:4
**registered**
312:4
**registration**
4:14 179:7 181:3 225:11 310:7,19,20 310:24 311:3,6 313:10,12 314:16
**regression**
176:3 252:2,8
**regular**
237:12 245:3
**regularly**
156:16 162:11
**regulatory**
102:22,23
**relate**
113:11
**related**
18:13 26:6,11,19

31:9 39:13,22,23 97:17 106:13 125:9 135:5 157:11,22 231:15 259:14 289:17 308:3,4,5,13 308:20,20
**relates**
73:16
**relation**
134:15
**relationship**
34:4 123:18 154:20 232:4 235:7 239:12 239:14 245:15,17 245:20 246:1,5
**relationships**
157:11
**relative**
116:17 135:6,13 188:22 206:13,14 206:17 210:15 236:18,20 273:17 326:10,10
**relatively**
110:21 111:4 192:9
**release**
134:7,15 135:16
**released**
129:20 134:2 141:8 260:9
**releases**
243:1,13,14,19 244:24 255:1 257:12,13 263:2,2,6 263:6,7
**releasing**
238:22 239:1
**relevance**
137:19 141:4 161:18 161:20 263:20
**relevant**
27:15 98:23 99:9 104:20 107:18 128:8 133:15 136:10,19,24 137:6 137:18,23 138:1

139:5,16,21 140:2,7 140:15,19 141:1,1 142:2 149:18 150:4 150:12 152:3 155:8 155:12 174:22 175:9 235:12 236:20,22,24 237:12 238:22 239:2,10 245:4 260:1,16 261:5 262:6,10,15,18 271:4,11 309:7
**reliable**
242:3 265:17 302:7
**reliably**
309:9
**reliance**
97:10 107:15
**relied**
13:18 106:4 186:17 218:24 259:12 296:13
**rely**
18:22 19:8 257:13,18 290:5
**relying**
125:22 248:10 269:20
**remainder**
169:17 170:22 237:14 250:23 308:24 309:3
**remaining**
181:23 183:18 255:1 262:20 275:14
**remarkably**
245:18
**remember**
41:21 55:23 56:1 60:5 62:9 89:14 164:22,23 166:14 166:20 167:15,16 218:23 261:10 284:17,18 311:9
**remind**
103:2 132:20

**reminding**
142:18
**reminds**
142:12
**rendered**
227:21
**repeat**
120:13
**repeated**
151:5,12
**repetition**
148:16 151:8
**repetitive**
260:8
**rephrase**
260:12
**report**
4:11,12,13,13 11:14 11:22 12:1,9,14,24 13:4,19,23,24 14:23 15:18,22,23 16:4,7 16:11,17,20,24 17:14,16 18:15,17 20:3,15,18,20 31:1 31:14 32:10,13,15 37:15 51:10,14 55:3 55:8,20 56:3,16,24 57:23 60:7,14,16 64:21 65:7,23 66:1 66:22 67:9 69:5 70:11,13,19,20 73:12,20 74:7 85:7 86:7,12,18 88:14,19 88:21 89:7,11,19,20 90:13 91:14 94:6 95:2,4,15,16 96:10 96:10,13,23 98:2 99:19 101:3,16,17 101:20,23 103:6,10 104:1 105:6,17 107:1 108:18 109:2 114:20 115:11 118:16 125:17,21 127:19 134:9 136:11 143:19 146:5 154:12 169:8



169:20 174:3 177:19 178:2,14 186:18 197:21 202:6,22 203:3 204:2,24 211:10,12 212:23 213:11,19 213:24 215:3,20,24 217:7,10,22 218:1 219:6 221:3,8 222:13 224:22 225:5 226:8 231:9 231:21 233:1 237:17 240:19,23 241:6,9 247:18 248:21 252:10 258:24 261:20 264:5,21 265:20,21 266:3 267:3 270:8 270:14 272:5 274:6 274:20 275:24 279:17,20 281:13 283:3 284:23 285:5 285:8,16 289:17,19 291:16 293:6,14 305:18 307:2 313:19,22 314:2,13 314:19 315:3,7,16 322:12,14,20

**reported**
309:18

**reporter**
5:14,16 9:21 28:8 49:23 58:15 105:8 140:21 187:19 203:14 227:10 240:12 249:1 297:3 309:1 323:18 326:4 326:22

**reporting**
220:17 223:15,19 276:7,9

**reports**
14:1,7,12,15,19,20 15:2,4,11 21:10 48:8 55:4 64:10 65:1,4,5,16 66:14

67:2 90:1,15 91:10 95:21 96:1,16,21 98:21,24 101:5,17 132:13 212:14 213:5 214:10,14,16 214:23 215:4,7,14 215:15 218:22 219:5,12,13,20,22 220:4,8,10,14,18,21 220:24 221:7,12,13 221:20,22,23 222:1 222:6,9 226:1 228:2 258:9,16,18 263:11 263:12,18,20 264:1 264:1 270:5 315:11

**represent**
6:8 166:23 213:9 237:11 286:16 287:10

**representative**
251:6 271:22

**representatives**
86:14 153:3

**represented**
207:24

**representing**
78:1 87:15 215:23

**represents**
75:15

**request**
5:10 15:9 20:18 41:11 102:3

**require**
90:16 146:16 179:15 295:16

**required**
109:21 291:14 309:16 310:14

**requirement**
227:24

**requirements**
225:15 226:11,16,20 227:23 230:10

**requires**
291:10 292:9 293:10 293:23 294:18

300:2 310:13

**reread**
93:8 101:14,16

**researching**
132:24

**reserve**
316:5

**respect**
8:13 9:3 18:7 30:2 31:14 32:14,15 33:14 36:11,15 41:6 41:11 42:17 57:21 64:13,21 66:22 79:12 91:2 92:21 106:16 113:4 125:18 131:15 133:18 168:11 178:8 201:23 210:23 234:22,24 248:7,11 269:9 285:1 298:12 313:5

**respectively**
278:9

**respond**
9:20 133:1 173:17 244:15

**responded**
148:4 263:1,11 280:11

**responding**
49:20

**response**
151:1

**responses**
322:7

**responsibilities**
34:18 39:2 45:9

**rest**
11:24 12:8 55:19 171:1 201:18

**restate**
42:6

**restated**
65:13

**restrict**
171:16

**restricted**
181:24 182:7 183:23 184:7,8 193:7

**result**
105:12 130:23 151:10 159:20 249:1,3 284:20 293:1

**resulted**
102:18

**resulting**
299:17

**results**
90:7,9 100:9 130:21 159:23 234:12 242:17 248:23 269:3

**retained**
60:21 70:24 72:2 77:12

**Retirement**
75:11,16,20 76:8,15

**return**
136:16 251:21 252:4 252:5,6,7,11,13,14 254:5 255:22 257:9

**returns**
251:18 255:3,12

**reveal**
87:19 104:19 157:21 317:23

**revealed**
157:5

**revenue**
44:3,11 71:15 139:20 139:23

**revenues**
43:2

**reverse**
164:2

**review**
21:13,19 89:11 100:21 101:11,21 106:3 179:20 219:4 219:8,20 220:3,8 222:2 247:22


MAGNA
LEGAL SERVICES

**reviewed**
15:2 28:14 74:3
101:16,18,23
102:10 106:19
179:17 248:13
250:24
**reviewing**
89:20 90:6,17 102:8
217:20 219:11
235:18 239:24
**Revised**
75:20 76:15
**revision**
16:10
**revisions**
16:6
**Richter**
2:8 4:6 11:3 40:14
61:8 70:2 85:3 95:7
95:13 210:5 316:8
316:10 317:16
318:12 319:16
320:1 321:7,22
322:24 323:5,7
**Rifkind**
2:10 5:11
**right**
6:16 9:21 10:15,19
13:10 14:12 22:9
23:8 28:3 32:12
33:17 49:13 51:19
51:22 56:15 85:10
97:5,13 107:6
108:16 112:18
113:18 115:23
116:2 122:10 123:2
128:1 129:5 131:5
136:11 143:1,8
145:4,10 157:6
162:1 165:22 170:1
170:7 176:9 186:8
187:16 190:23
192:10 196:11
199:18 205:16,20
205:21 208:2
209:22 210:24

212:10 213:1
215:12 223:9
224:23 225:23
227:20 231:4
232:12 233:7 234:2
236:2 241:4,22
242:3,22 245:12
246:8 254:23 255:7
256:11,15,19 257:9
257:15 258:2
261:10,11 266:6,23
271:17 274:9
275:11 276:17,20
276:23 277:22
285:9 286:4 287:14
289:23 290:23
296:4 301:8 302:13
307:5 316:6
**Robbins**
2:6 72:2,15,19,24
78:10 79:1 82:23
87:3
**robust**
234:1,13,20 241:22
242:6 257:20
**robustness**
70:16 176:3 240:24
241:10
**Rocket**
4:13 94:6,13 95:3,16
96:10,18 98:15
265:21 266:5,10
270:1
**role**
34:14 72:22 220:20
**roles**
221:2
**rough**
53:11 323:19
**roughly**
38:23 176:15 185:24
186:1 218:15 238:1
275:17
**RUDMAN**
2:6
**Rule**

184:3
**ruled**
63:9,11 129:15
**rules**
1:15 188:3,6

_____ S _____

**s**
203:16
**sale**
80:15 179:24 183:15
290:10
**sample**
130:14,19,20 131:3
234:10,11,13
244:16 257:18
269:4 271:10
282:17
**samples**
262:2
**sampling**
221:21 222:5
**Sands**
189:18
**SAS**
265:6
**satisfy**
213:24
**saw**
92:18 112:8 192:9
220:16 244:11
247:19 250:21
273:11,12
**saying**
14:9,13 15:23 44:2,9
67:10 137:23
157:18 170:14,20
183:1 185:10 223:2
223:6 234:4 236:4
267:15 294:17
**says**
12:17 13:13 14:6,15
50:22 51:18 54:20
56:8 79:10 109:4
112:13 154:18
180:20 181:22

190:4,8 203:12
216:20,23 218:9
225:9 267:17
281:14,18
**scenario**
164:9
**scenarios**
150:20
**scienter**
106:14
**scope**
73:14
**scroll**
51:2
**se**
110:4
**seal**
63:16
**search**
258:7,20,23 259:1,9
259:15
**searched**
258:14 259:6
**SEC**
4:14 101:19 134:9
135:17 188:2
224:23 230:8
258:11
**second**
14:6 50:15,19 60:6
62:8,10 109:2
126:12 152:8
170:18 180:1
181:13 182:4,16
190:1,3 218:8
232:23 255:23
256:5 258:24
266:14 267:12
**secondary**
110:24 167:5 168:12
168:18 186:5
310:23 311:18
**section**
8:8,20 9:3 13:23
28:23 29:4 30:5,5,9
30:18 31:21 32:10



32:11,21 33:3,7,10
42:17 51:6 53:5,9
53:21 54:1,10,15,19
58:3,4,4,4,12 59:4
59:19 67:5,12 74:7
74:13 98:1,5,17
99:19,23 103:7
105:6 154:19
179:23 223:12
289:16 290:1 310:3
310:5,13 314:1,4,6
**sections**
90:18 97:14
**securities**
22:24 24:5 26:12,24
27:1,2 41:1,5,7
44:17 47:1,6 48:3,5
51:18 52:8,9 57:2
58:6,7,13,18 59:18
59:23 60:22 62:3
64:14,17,20,22,23
65:7,18 66:6,23
70:23 74:16 111:1
128:23 140:16
169:2 182:1,8
183:23 184:3,7,8
297:2,6 302:22
306:14 307:18
312:20
**security**
64:2 65:2,5 80:14,16
106:18 115:22
116:12 123:23
144:12 163:20
174:21 175:9 193:2
193:4 202:15,16
216:24 286:9
**see**
12:17 13:3,15 50:20
54:18,20 56:9 92:9
94:2 95:14 97:22,23
98:18 102:10
108:20,21 110:15
112:12,15 114:23
115:14 117:2,6
119:15 136:21

154:16 170:1
173:13 177:18
178:20 179:23
180:6,13,23 181:5
182:2,5,10,11 183:4
183:20,24 184:1,10
185:13 189:5 190:2
190:3,6,10,15 202:9
202:19 203:9,23
212:17 214:5
216:19,21 217:3
218:4,11 220:4,18
226:11 229:19
230:7 231:24 232:7
233:21 238:15
246:10 247:3 249:4
249:12 252:21
255:20 258:14
262:5,24 264:9
266:3,14,18 267:8
267:17,21 268:2,3,8
272:15 273:22
281:13 282:1,5,21
283:7,23 292:1
306:5
**seeing**
92:14 93:23 164:12
167:16 177:4 243:6
283:16
**seek**
262:19
**Seeking**
213:12,19 215:13,14
215:16,24 216:4,20
216:24 217:5
219:23
**seen**
91:6 92:10,15,19
93:14,20 95:9
119:13 125:15
132:12,13 145:7
164:6,7,16 211:6
218:23 229:2 295:3
296:6,23
**select**
260:2 264:24 268:23

**selected**
260:3 264:18 266:4
267:23 268:12
270:12
**sell**
109:6,8,16 171:22
172:3,7,21,23
**sellers**
196:6
**selling**
171:17 194:23 195:4
**seminal**
115:18
**semi-strong**
107:15,20 115:12,17
115:19 122:13
**send**
95:11
**sense**
38:18 41:22 43:2,10
53:4 71:21 82:13
111:8 135:10
308:12
**sensitive**
308:15,15
**sent**
102:4,6
**sentence**
107:1 108:17 110:12
212:17 216:23
280:3
**sentences**
180:20
**separate**
104:8 166:9 201:12
207:19 212:5,14
215:6 259:9 263:24
290:19 291:2
294:21 300:10
308:7 311:1
**separated**
133:7,18 135:3
**separately**
201:9
**separating**
272:14 287:7

**September**
190:5 253:7 276:1,13
278:4
**series**
25:20 311:10
**serve**
39:8 40:19 251:5
**served**
27:20 30:2 33:10
45:24 49:2 219:13
219:21 223:4 296:8
**services**
1:22 5:13,14 45:1
**serving**
49:6 81:18 220:4
306:13
**sessions**
101:12
**set**
118:12 151:24
170:24 203:1
225:15 234:1
237:15 241:22
245:5 261:3 262:17
271:15 326:13
**settle**
192:15,16 193:17
**settled**
57:24 60:10
**seven**
61:3,13 62:1 276:12
277:2
**shaded**
256:10
**share**
16:4 37:3,5,6,9
172:17 209:2 290:8
290:9,22 291:8,10
292:5,9 293:3,3,3
294:17 295:1
297:21 303:14
304:1
**shared**
310:24
**shareholder**
294:20


MAGNA
LEGAL SERVICES

**shareholders**
155:9 171:17,22
172:2,3,6,23 314:15
**shares**
80:2,8 152:22 166:2
166:11,24 171:9,10
171:11,14,22 172:3
172:7,19,20 173:12
173:16,18,21 174:2
174:6,10,17 175:21
175:23 176:4,8,13
176:17 177:14,16
178:5 179:24 180:3
180:5,9,15,21 181:9
181:11,12,17,23
182:13,19 183:2,12
183:14,19 184:9,23
185:2,5,12,14,21,22
186:2,6,10,23
202:13 203:6,13,17
203:21 204:9
206:13,15,17 207:2
207:7 208:20,21,24
209:3,5,10,11,14
210:15,17,20,23
211:5,18 212:7
275:2 276:10,20
277:6,15 279:5,11
310:6,18 311:16,24
312:4,9 313:1,7,10
313:11 314:5,16
**sharing**
36:20
**sheets**
325:14
**SHEET(S)**
325:16
**short**
67:18,20 108:3 138:3
140:1 148:14 192:9
230:14 282:16
283:14 319:20
**shorter**
124:18 133:3
**shorthand**
115:4 326:3,22

**shortly**
16:15 154:14
**show**
107:9 169:1 211:23
212:2 300:1
**showed**
265:20
**showing**
209:15 212:6
**shown**
210:22 274:24
**shows**
148:3 169:8,10 178:2
215:4 278:19,23
279:4 295:12,21
**Shupe**
4:12 94:6 95:3
**sides**
47:12
**Sidley**
2:17 5:9
**sign**
12:24 282:5,22
284:12
**signaled**
320:21
**signature**
12:20,22
**significance**
253:3 283:11
**significant**
52:21 124:12,24
125:13 126:6,10,15
126:21,24 127:10
127:12 129:10,12
130:6,8,23 136:18
152:22 153:21
154:6 162:22
237:20 238:16
239:5,9 244:8,13
249:8 252:14,20,22
252:23 254:4,7,23
255:2,11,22 256:2
257:9 282:23
283:17,21 284:2,11
284:19 295:13,22

304:21
**significantly**
122:17 129:19 148:4
231:14 305:4
**signifies**
233:18
**signify**
96:20
**signs**
162:11,18
**similar**
33:14 38:17 100:12
193:7 250:7
**Similarly**
1:5
**simple**
40:23 305:13,16
**simply**
96:14 123:17 174:17
**simultaneously**
134:10
**single**
13:22 14:1 17:22
221:16 297:15
**sit**
31:19 53:1 59:8 83:4
153:3 166:19
205:21
**sitting**
15:10 16:21 36:5
44:2 61:12 65:3
113:17 120:5
125:24 126:23
135:13 144:2,16
166:22 174:10
175:7 176:16 213:7
214:22
**Situated**
1:5
**situation**
145:13 175:12,22
**situations**
164:14
**six**
61:2,13 62:1 248:17
249:18

**sixth**
233:16,19 234:4
249:6
**size**
234:14 244:16
**SKADDEN**
3:2
**skewed**
271:15
**skimmed**
101:13
**skipping**
180:19
**SLATE**
3:2
**slightly**
208:18 272:11
**small**
111:4 116:7 117:16
118:6,21 244:16
245:18 257:18
271:16,17 287:12
287:16
**smaller**
44:20 85:24
**smallest**
265:12
**Smith**
20:7
**software**
45:3
**sold**
180:15 203:17
311:16
**somewhat**
118:20 133:7 197:22
**sorry**
28:9 42:4 56:10
58:15 65:11 102:19
102:19,20 105:8
120:12,15 127:5
139:24 140:21,21
158:9 159:8 179:2
184:20 203:14,15
210:8 231:22
258:19 267:9,15


MAGNA
LEGAL SERVICES

277:12 297:3
**sort**
 106:21 111:11
   113:15 116:20
   133:8 134:7 156:23
   159:18 175:24
   196:16 238:17
   245:2 249:24
   265:11 295:9
   297:13 310:1
**sorts**
 90:15 150:16 177:18
   308:17
**sound**
 52:1
**sounds**
 33:17 186:7 233:7
   261:10,11
**source**
 109:4 110:19 218:22
**sources**
 189:1 259:7,10,16
**South**
 1:18 2:7,17 5:9 6:6
**speak**
 9:14,16 105:18 193:2
**speaking**
 59:20 149:24 153:15
   172:11 243:9,12
   273:4
**speaks**
 117:8 126:4 235:5
**specialist**
 111:18
**specializes**
 33:24
**specific**
 23:2 24:6 26:23 31:7
   33:11 35:7 38:1
   58:6 79:16 87:9
   90:17 93:22 98:14
   104:14,22 109:9,11
   109:18 113:6
   114:11 118:8
   119:18 120:2,8,17
   121:6 124:4,5 125:8

125:9,16,20 126:18
128:7 129:9 130:15
133:16 134:22
135:4 144:9 166:15
166:20 167:16,21
189:10 191:11
200:17 211:13,15
211:19 224:19
262:15 284:6
286:14
**specifically**
 22:17 26:15 31:18
   44:16 52:24 100:23
   109:1 115:16 122:3
   123:6,13 125:11
   129:16 134:17
   165:18 187:13
   189:24 201:24
   213:16,22 215:19
   222:19 224:11
   249:15 263:8,15
   287:7
**specifics**
 79:4
**specified**
 232:22 326:8
**speculate**
 161:21 312:21
**speculating**
 302:3
**speculation**
 139:9,11 149:3,10,13
   156:23
**speculative**
 156:19,22
**spend**
 84:11 88:19 89:7
   90:12 289:15
**spent**
 27:12 45:15,16 81:24
   83:24 84:8,14,15
   89:1,19,23
**spoke**
 105:21 147:18
   151:14 156:19
**sponsor**

6:10
**spread**
 113:13 114:9 187:18
   198:11,15 201:14
   264:8,11,16,18
   266:8,21 267:6,19
   268:1,5,12 269:8,12
   269:14,16 270:11
   270:13 272:17,24
   273:6,12,20 274:7
**spreads**
 187:20
**SS**
 326:1
**stabilization**
 196:10,17
**stabilize**
 193:18 196:3
**stabilizing**
 194:3,6,13 195:8,13
   195:21 196:21
**Staci**
 2:12 6:7 120:12
   210:5 266:11
**staff**
 15:2,5,12 19:17 20:1
   20:19 46:23 85:9,17
   86:11 90:14 102:4,7
   217:24
**stage**
 60:9 291:15
**stamp**
 12:12
**stand**
 315:15
**standard**
 19:11 81:9 85:8
   91:13,19 119:16
   132:10,12,18
   169:13 310:16
**standing**
 310:4 314:6
**stands**
 37:10
**star**
 252:20

**stars**
 252:22,23
**start**
 9:24 140:22 202:6
   255:17 265:2
**started**
 52:14 137:22 185:9
**starting**
 50:18,24 91:24 103:6
   291:21 292:4
   295:19
**starts**
 78:15 183:18 279:18
   299:6
**state**
 5:24 289:19 295:24
   325:8 326:1,4
**stated**
 107:1
**statement**
 4:14 17:1,15 179:7
   181:3 225:11
   239:19 310:7,20
   311:1
**statements**
 236:8 237:1 248:16
   248:17 249:18,18
   249:20 304:6
   310:21 311:3,6
   313:11,12 314:17
   315:16
**states**
 1:1,15 5:5 290:6
   325:1
**State's**
 49:12,18,22 50:1,11
**statically**
 237:19
**statistic**
 208:22 209:7,15
   223:22
**statistical**
 27:6,9,14,16 234:20
   242:6,15 243:4,9,22
   244:1 249:24 253:3
   283:10



**statistically**
122:17 124:12,24
126:6,14,20,24
127:9,12 129:10,12
129:18 136:17
148:4 234:13
238:16 239:5,9
243:14 244:7,13
249:8 252:14 254:4
254:7,22 255:2,11
255:22 256:2,6
257:9 282:23
283:16,21 284:2
295:13 304:20
**statistics**
23:18 27:10,11 29:19
32:6 33:6 34:1 35:9
38:20 201:12 207:1
207:19
**statutorily**
314:7
**statutory**
42:21 67:14 290:13
314:4
**stay**
38:9
**stenographically**
326:5
**stock**
7:11 26:20 41:4 80:3
80:5,8,18 98:8
105:11 109:13
110:3 111:15
114:11,13 116:10
116:23,23 117:1,20
122:16 129:5,10,24
141:7 147:21
149:17 150:24
151:2,4,11 152:23
153:22 154:6,9,22
155:20 161:4
162:11,18 163:2
165:4 166:11
171:18,23 172:7,13
172:22 173:4,5,8,15
173:17 174:1

175:16 180:3,5,22
181:23 182:14
183:2,19 184:9,24
186:11,12 187:1,5
188:15 192:15,16
193:10,17,22
194:14,16,23,24
197:5 198:22 199:5
199:17 203:5
222:18 223:1,5,18
225:15 231:13,14
232:6 239:17 240:2
240:9,11,14 241:4
241:15 245:11
246:3,7 251:17
263:1,10 264:17
267:5,18 268:5,7,11
269:13 270:13
273:18 274:7 275:3
275:6 278:21
279:10 280:8,9
281:2 284:16
285:21,22 286:4
288:18 289:4,11
294:10 295:13
296:18 298:5
299:16 300:12
301:4,9,15 302:6,11
303:17,22 305:3,7
305:21 307:24
308:1 309:4 318:18
320:17 321:3
**stocks**
98:11 110:7 198:15
264:19 265:1,3,8,16
266:5,9,22 267:24
268:13,22 269:10
269:15 270:12,23
271:5,6,10 274:8
**stock's**
174:7,11 204:8
**stop**
35:10 221:3
**stopped**
248:2
**story**

259:5
**straightforward**
98:17
**Street**
1:8,19 2:15 4:13,16
4:17 5:4 6:9 7:10
14:7 70:22 73:6
80:2,5,8,14,16
94:17 95:5 96:9,18
98:15 105:7,11
109:16,24 111:19
112:3,10 114:15
121:24 122:9 129:5
129:18 134:6
147:21 148:3
152:23 153:4,9,22
154:6,22 159:24
160:5,16,21 165:4
169:6 171:8,9,14
174:4 175:23
177:23 179:7
186:11 187:1
189:19,20 190:8,12
190:17,21 196:22
197:4 198:21
199:17 203:5,12,16
203:19 204:7
212:20 215:7 216:9
217:8 222:18 223:1
223:5 225:1 226:9
226:15 231:12,15
232:5,6 235:9
239:16 245:11
246:3,7 251:17
258:15 259:7,11,16
259:20 260:15
263:1,10 264:16
267:4,18 268:4,6,10
269:9,13 274:7
275:2,6 281:2
284:16 285:21,22
286:3 298:4 311:16
312:9 313:1,4
314:14 324:1 325:6
**Street's**
157:11 189:6 191:21

192:6 288:17 289:4
**strengths**
47:11
**strictly**
202:1
**strike**
45:18 47:20 65:2
69:21 133:23
165:10 167:9 173:7
195:11 197:2
250:12 257:23
269:22 319:8
320:14
**strikeouts**
96:17
**strong**
202:14 245:14
**structural**
247:23
**structure**
93:24 153:7 246:15
250:20
**studied**
153:24 233:11
247:14 299:8 306:9
**studies**
100:7 119:11 132:16
307:16
**study**
22:23 63:7 99:24
100:3,5 119:1
121:11 125:2
130:19 132:21
154:19 176:3
231:11,23 232:9
233:12 234:8,10,16
234:20 239:11,13
241:21 242:24
243:18 244:19
245:10 248:8,14,23
249:16 251:15
253:18 256:19
257:12,24 295:12
295:20 299:21,22
300:11
**sub**



228:19
**subject**
8:8,20 36:21 54:2,16
56:18,20 79:13
171:15 182:8,14
183:3 185:5 186:2
187:6 189:19
203:18
**subjects**
30:14
**submit**
48:8 316:16,19
**submitted**
51:14 82:22 95:3,5
270:4,9
**submitting**
87:8 101:23
**SUBSCRIBED**
325:20
**subsequent**
310:20 311:18
318:22
**subset**
7:24 8:3 246:9
**substance**
88:7 164:23
**substantial**
43:14,17 44:14 90:4
111:9 142:5 154:9
202:18 209:5 221:1
221:13,20 222:9
247:19 275:17
278:20,24,24 279:4
279:10,12
**substantially**
170:16 203:22
273:15
**substantive**
97:11,16 166:16
**sub-bullet**
14:10
**sub-opinions**
18:13
**sub-periods**
211:13,15 283:6
**successful**

38:7 196:4,18
**SUCHAROW**
2:2
**sufficient**
64:6 173:12,13,21,22
176:18 179:19
186:19 189:2
213:24 244:2
**sufficiently**
63:10,12 250:7
265:16 282:20
284:13
**suggest**
114:12 122:19 185:8
229:2 250:22
279:23
**suggested**
88:3 112:9 205:18
221:1 247:22
302:16
**suggesting**
182:23 183:1
**suggestive**
235:10
**suggests**
96:16 114:8 128:21
218:17 281:7
**Suite**
3:2 6:6
**suited**
245:1
**summaries**
13:21
**summarize**
211:7
**summarized**
18:23 212:7
**summary**
14:2,3,14 17:19 18:1
190:12 231:17
**supplied**
14:15
**support**
40:1,7,12 65:24
66:11,20 114:17
118:18 121:15

123:14 189:2
199:21 206:20
245:3 281:1
**supported**
197:10,15 198:6,19
223:8 225:6 286:3
**supporting**
20:14 47:13 106:21
245:22 246:15
250:21 270:9
**supportive**
177:15 278:16,23
**supports**
177:10 198:2 199:15
227:5,14 228:4
245:21 268:5,18
269:16,17 286:23
**supposed**
152:18
**sure**
6:5 7:3 9:11 11:5
40:4 42:8 53:19
54:7 59:9 60:5 61:5
80:10 97:8 105:22
128:10 137:6
150:19 156:11
192:22 195:4
216:16 244:22
247:12 260:11,14
262:10,11 283:13
318:7
**surprise**
167:7 213:17 214:7
237:24 238:6 244:9
312:16
**surprised**
166:22
**surprises**
308:13,15
**surprising**
214:5
**surrounding**
221:23
**swear**
5:17
**sworn**

5:18,20 10:17 325:20
326:5
**syablon@paulweis...**
2:13
**synonym**
155:11
**system**
75:16,20 76:8,15
111:18
**S&P**
14:16
**S-1**
4:14 179:7 189:1
**S-3**
224:23 225:1,11,16
226:10,15 227:17
228:1,7,13,21 229:4
229:10,17 230:4,10
**S-8**
181:3

—————————
**T**
—————————

**T**
1:4 5:4,22 316:7
325:4
**Tab**
167:9
**table**
252:19 255:24 256:4
**tactics**
102:16 317:14,18
**take**
10:8 14:24 22:15
23:21 36:23 67:18
67:19 95:5,9 106:24
108:2,5 115:10
118:2,3 119:7,21
120:3,9,18 121:7,18
122:24 123:9 127:5
128:15 141:13,16
141:20 142:4 154:5
179:9 182:17
189:21 208:4
209:13 216:14
230:13 243:5,7
251:9 263:18


MAGNA
LEGAL SERVICES

265:11 284:15 303:17 323:9

**taken**
1:17 5:8 222:8

**takes**
15:1 117:23 128:22

**talk**
136:3 137:12 157:2 240:22 290:1,13 307:10 310:3

**talking**
15:24 31:6 32:4 44:10 53:22,23 59:21 88:20 97:9,21 109:12 115:12,16 115:18 121:3 135:15 136:4 142:16,20,24 149:7 152:9,14 161:24 163:16 167:4 174:1 183:6,7 184:11 214:3 216:3 223:12 246:24 258:19 260:22 293:23 303:6,12

**tasks**
20:9

**taught**
27:19,22

**teach**
27:17

**teaching**
27:20

**team**
82:10,14,15,18 89:18 90:3 213:19

**Teamsters**
75:5,11 76:1

**team's**
85:12

**technically**
56:23

**technique**
234:16 291:21

**techniques**
295:6 307:3,7,11

309:6

**tell**
36:22 41:16 61:23 176:24 266:13

**tells**
300:11

**ten**
59:4,13,23 62:2 186:9,22 232:10 233:10,11 242:2,11 242:18,21 243:8,10 243:14 251:13 253:2 261:12,17 276:16 293:3

**tend**
169:2

**tendency**
196:7 272:1,3

**tends**
163:2

**term**
107:22 156:21 170:24 194:2

**terminated**
60:15

**terms**
21:9 46:23 70:19 90:5,17 149:10 184:2 227:24 243:3 246:14 283:3 297:15

**test**
99:24 116:21,22 117:7,11 119:3,5 121:12 125:23 127:17 129:12 131:8 132:7 162:9 162:13 205:3 231:18 236:24 237:16 241:1 242:7 242:15,18 243:9 244:18 245:2 247:13 257:20 260:18 262:1 263:8 263:10,24 281:14

**tested**

251:14 257:24 261:23 262:24 288:22

**testified**
5:21 8:1 9:3 30:1,8 30:17,18 55:3,12 59:5 64:1 66:3 72:11 89:4 91:9 92:3 100:17 101:7 103:11 117:14 119:18 127:21 132:20 135:1 149:2 192:24 201:8 221:12,19,21 247:2 248:4 249:11 250:20 255:15 257:11 270:3 292:6 293:17 296:8,10

**testify**
15:17 48:11,12,15,19 51:15 58:20 63:13 63:23 70:3,9 73:17 79:10 314:23 315:2 315:6 326:5

**testifying**
39:9 45:17,22 48:17 49:3,6 51:4,8 54:20 54:22 55:2,21 59:22 61:17,20 70:23 77:14 79:11 94:18 284:22 296:3 321:15

**testimony**
10:18,22 30:14 37:10 44:7 51:3 55:4,15 61:18 62:20 63:1,17 83:16 91:18 110:2 112:2 120:5 128:3 135:13 137:24 139:4 144:2,16 159:11 161:9 174:10 175:7 176:17 178:9 220:11 221:10 320:5,7 323:16 325:10,12 326:8

**testing**
48:16 118:17 119:17 123:17 132:15 232:10 236:17,19

**tests**
70:16 121:22 132:11 245:6 250:4

**text**
96:8 178:2 190:4 206:24 212:7 240:23 241:9 259:11 264:4 285:5

**thank**
11:13 65:11 102:23 103:4 143:1 179:2 184:20 195:20 320:23

**Thanks**
84:6

**theirs**
316:6

**theoretical**
115:19

**theoretically**
111:14,20,23 112:24 115:19 116:16 163:23 164:1,5 175:20 196:14 255:16,19

**theories**
63:6

**theory**
41:22 74:4 104:13,24 105:3,23 146:24 147:6 288:21 289:13 292:19,23 293:1,11 294:1,6,13 297:8,12,20 306:16 306:16

**thing**
17:22 50:14 93:22 132:17,18 176:24 227:21 238:17 308:8

**things**
13:21 27:1 35:6 45:2


MAGNA
LEGAL SERVICES

46:20 50:16 70:16 80:21 85:24 91:23 102:4,6,9 106:14 113:10 134:9 136:5 136:7 137:14,18 146:17 150:10,11 150:16,22 152:11 202:4 228:2 243:6 246:15 250:21 258:12 259:18 269:20 295:19 298:12 305:13 308:18

**think**
7:5 11:23 18:18 19:5 26:14 29:14 34:24 35:6,10,14 37:12 39:21 40:22,23,23 43:21 48:23 50:7,7 50:14 51:1,8,11 56:19,23 58:7 62:9 62:18 63:8,15 64:6 64:15,19 72:11 74:21 79:12 80:21 85:7,22 92:8,10 93:14 99:3 100:13 101:20 103:11 104:3,12,23 105:5 109:1,14,23 110:7,9 111:13 112:20,23 113:9 114:1,5,10 115:3,3,5 116:21 117:9,22 118:4,7,14 119:10,18,22 126:4 128:4,8 132:19 134:5 135:9 138:8 139:22 140:18,23 141:2 142:16,17 144:8,13 146:1 147:18 148:2,7,23 149:6,11 151:14,18 152:8 156:3,13 158:3,4,15 159:17 161:14 162:2,8,12 163:4 173:15 174:4 175:4,12,14 176:4

176:15,24 177:2,13 177:15 178:1,17,23 178:24 179:19 182:18 185:14 195:17 196:13 197:20 203:11 206:8,16 208:4 210:16 211:6,21 217:6 218:24 220:7 222:4,5,10 223:2,10 223:11 233:1 239:1 242:9 243:20,24 244:24 248:9,11,12 249:2,23 250:19 251:10 252:9 257:19 260:22 271:3,4,10 272:20 273:15 278:19 279:8,24 282:14,19 283:4 286:23 290:12 291:19 295:8 296:10,11 301:1 306:18 307:9 309:19 313:21 314:9 319:24 320:20 321:8,18,23

**thinking**
137:17 164:22

**third**
176:15,17 180:10 206:8 219:24 276:6 283:7,24 285:2

**third-party**
157:12 259:2

**thorough**
89:10

**thought**
17:23 55:17 87:1 103:16 123:19 139:1 158:24 178:16 220:1 237:3 237:15

**thread**
297:21

**three**
25:21 30:13 36:10,10

71:12 82:18,20 84:19,20 85:20 86:1 86:3,10 88:16 89:15 89:19 90:16 128:14 128:19 206:5,11,18 207:5 208:11 233:8 233:9 249:5,7 253:2 256:3,10 310:20 311:17

**three-part**
26:1

**threshold**
109:9,12,18 113:4,7 113:16,21 114:16 117:17 118:12,16 118:24 127:22 173:22,24 203:1 204:4 206:12 207:6 207:10 208:1,16,17 208:19 209:22 210:4 230:10

**thresholds**
206:22

**throw**
309:20

**tickers**
265:8

**tie**
292:1

**time**
5:7 10:9 11:7,11 31:14 32:9 33:9,19 37:15 45:15,16 46:20 47:23,24 49:5 49:9 60:21 62:8 67:23 68:6,8 71:14 78:14 83:24 84:8 89:23 95:6,8 104:6 106:19 108:8,14 111:14,22 112:10 113:1 117:4 128:6 128:21 133:7,11,18 134:3 135:3 139:9 141:13,16,21 144:13 146:15 156:3,8,11,12

162:10,18,24 163:7 163:13 164:8,15,19 165:22 170:12 171:8,19 182:17 187:13,16 188:10 188:12,15 192:9 193:17 204:18 206:15 207:20 211:1 213:1 214:4 216:14 217:14 227:22 228:7,12 230:17,23 238:18 242:8 245:19 259:16 270:1,19 272:16 273:15 282:6 283:14,22 287:24 288:6 290:8 290:10 296:14 299:18 300:2,12,17 301:11,13 302:18 304:22 309:19 315:21 316:3 319:17 326:8

**timely**
228:2

**times**
6:21 7:13 8:6,12,16 8:18,22 9:3 40:15 59:22 60:4 62:2 64:5 66:4,20 71:5 72:4,13,16,20,23 73:1 91:7 92:15 133:5 136:11 169:3 170:16 176:7 228:11 307:23

**timing**
33:14 37:1 39:22 225:14,19,20 226:3 226:11,16,20 227:23 228:7,15,17 229:21

**titled**
13:7

**today**
5:7 6:12,19 7:7,13 10:9,15,22 15:10,17



16:4,7,11,18,21
36:5 44:2 61:12
65:3 70:24 74:20
75:23 76:7,13 77:14
83:16 94:18 96:13
113:17 116:24
120:5 122:8 125:24
126:23 135:14
144:2,16 166:23
174:11 175:7
176:16 190:14
213:7 214:22
220:11 282:9
296:11 305:17
315:9 316:11
323:11
**today's**
15:3 84:1,9,12
100:22 101:22
102:1,7 280:6,9
323:16
**told**
36:16 66:20 312:16
**ton**
90:12
**top**
13:13 28:7,10 56:8
126:9 127:8 202:11
204:5 206:24
210:22 215:1 256:4
265:14 266:14
270:16 311:2
**topic**
23:2,23 24:7 26:15
26:23 91:10 163:19
**topics**
7:8 35:4 315:5
**total**
186:10,22 197:9
206:13 287:13
**totality**
201:3
**trace**
310:6 313:11 314:15
**traceability**
314:10

**tracing**
310:13,15
**track**
210:20
**trade**
109:15 110:8 111:12
152:18 171:13
173:12,21 177:7
209:2,3 247:16
271:7
**tradeable**
154:10 172:19
175:24 176:9
177:14 180:16
181:4 182:21 186:6
186:11,23 203:20
206:15 207:2
208:21,24 209:11
209:12,14 210:17
210:20,23 211:5,18
212:6
**traded**
52:9 80:5 98:8
106:18 109:24
111:19 112:3
114:14 141:7 197:5
198:22 199:5 209:6
224:1 281:2 285:23
286:4,18 287:11,14
287:17
**trades**
109:13 110:3 111:15
141:10,15,20
155:21 174:2
223:19
**trading**
110:22 111:4,10
113:12 114:4
131:12,17 142:4,6
142:10 168:12,18
173:18 176:18
198:16 202:8,12
203:4,20 204:8
205:5,7,12,13
206:21 211:19
251:18 261:8 265:9

273:18 274:8
282:11 285:9,12
286:11 287:3,19
**traditional**
63:6
**trainer**
27:5
**training**
27:6,8 31:8 32:6 33:5
46:23
**transaction**
273:5,21
**transactions**
183:8 194:3,7,13
195:8,14,22 196:2
196:21
**transcript**
325:9,11 326:7,8
**transcription**
324:4
**transportation**
157:23
**treat**
210:11 233:19
**treated**
131:20,21
**trial**
48:11,12,20 63:14,23
**trip**
108:4
**true**
98:11 148:24 173:15
216:1 255:5 286:22
325:12 326:7
**trust**
51:23
**truth**
103:19 104:20 326:5
**truthful**
10:22
**try**
10:4 58:24 93:22
244:23 309:21
**trying**
55:23 56:1 89:14
135:5 137:3 218:23

226:18 262:13,17
**Tuesday**
1:19 5:7
**turn**
10:4 12:11 39:12
50:18 202:5 204:12
212:12 216:7 264:4
**turned**
21:11 36:11 41:10,23
42:9
**turning**
39:17,18 42:15
**Turnover**
202:12
**turns**
156:8
**tutored**
27:21
**two**
6:10 14:10 18:7
27:23 28:17 50:9,16
63:5 71:10 72:12
84:22 94:11 95:21
95:24 96:16,21
97:12 128:18,19,24
180:19 206:21
207:10 208:7
216:15 243:13,18
243:22 244:1,4,11
250:2 252:22 256:4
256:9 257:4,12,13
257:19 259:17
262:2 278:3,8 283:8
302:19 315:19
**two-sided**
45:2
**type**
46:8 57:12 94:2
104:18 236:6,14,23
244:3 246:24 303:4
319:21
**types**
27:1 35:15 41:4 58:9
77:17 90:1,5 91:20
100:13 113:10
118:15 119:14


MAGNA
LEGAL SERVICES

124:9 132:15 133:1 149:13 150:10 196:2 219:22 220:9 220:16,18,21 244:8 244:23 245:7 305:12 307:17
**typical** 114:13 188:24
**typically** 77:17 79:15 125:5 128:17 151:10 191:17 220:18
**typify** 150:3
**t-statistic** 136:16

___

### U

**Uh-huh** 13:9,16 50:23 231:23 247:7
**ultimate** 144:19 161:15
**ultimately** 85:18 86:23 102:18 105:13 158:16 159:6,10,14 186:24 297:18
**unable** 10:21
**unaware** 298:16
**unbiased** 116:1,5,9,14,20 117:11
**uncertainty** 139:13,15 149:8
**unclear** 9:14 210:1
**undergraduate** 27:9
**underlying** 22:19,20 23:3 24:2,7 26:16 88:22 99:6,8 100:8 106:7
**underneath**

18:12
**underreact** 116:10 156:16 163:2
**underreacted** 162:15
**underreacting** 162:19
**understand** 6:14 10:14,17 15:23 40:5 44:1 59:21 75:7,13,17,24 76:17 81:17 89:17 95:19 103:23 104:23 105:2 126:17 145:19 152:20,24 153:2,20 171:4,13 181:14 192:14 193:8 199:24 202:24 226:4 228:6 228:12 249:11 260:12 289:9 291:13 303:12 310:4,18 319:1 322:1
**understanding** 15:11 20:21 75:22 76:6,12 95:22 97:9 102:11,14 104:15 107:8,13,16,18 111:5 143:4,10 152:7,16 153:16 154:1 157:7,17 168:14 172:2,9,12 172:18 176:12 179:4 181:21 183:10 188:11 192:1 194:19 209:18 214:23 225:17 226:3 227:21 235:20 278:2 291:9,12 298:2,9,18,24 299:5 301:20 311:5,23 312:8 314:3 315:1 317:21 318:1,7,13 320:8,16 321:2,5

322:4
**understands** 93:5
**understood** 7:6 9:17 33:20 82:12 84:6 88:24 93:11 105:23 144:17 147:5,11 155:19 171:3 178:3 191:16 193:1 205:23 270:2 305:5
**undertake** 19:13
**Underwriter** 3:5
**underwriters** 185:15 188:13,14 194:5 196:2
**underwriting** 193:4
**under-reacting** 162:12
**undetermined** 315:13
**undisclosed** 298:15
**unexpectedly** 308:2
**unimportant** 96:13
**unique** 90:21 91:2,22 92:4,6 92:20 93:1,11,16 313:4
**uniquely** 245:1
**United** 1:1,15 5:5 325:1
**universities** 28:7,10
**university** 23:11,22 25:13 27:13
**unquote** 113:8
**unregistered** 311:24 312:4

**unrelated** 69:23 308:21
**untimely** 230:8
**unusual** 237:18
**updated** 16:3 217:14
**updates** 98:14 219:15
**usable** 244:24
**use** 98:24 100:6 119:15 123:20 132:16,19 132:21 170:24 218:21 293:5,7 299:16 302:23 303:5 307:16,21 308:5,22
**useful** 124:19 307:23 309:7
**usual** 90:10
**usually** 79:8,13 111:1 112:13 128:19 137:13 192:8 213:1 297:22 305:15,16
**U.S** 190:4 217:1

___

### V

**v** 4:12
**vague** 29:8 34:23 35:21 36:2 39:20 41:13 46:18 52:22 57:17 62:16 71:3 79:7 81:8 91:4 92:24 97:1 99:18 104:2 150:6 188:4 201:1
**Valeant** 63:16
**valuation**



23:4 26:24 27:1,2
29:19 34:2 35:9
38:21 51:19 58:13
58:18 59:18 116:18
172:21 307:3,7,10
307:12,13,21 308:5
308:22 309:6
**valuations**
307:18
**value**
28:3 116:11 136:10
136:19,24 137:3,6
137:13,15,18,23
138:1 139:5,15,20
140:2,7,12,15,19,24
141:4 142:2,7
149:18 150:4,12
152:1,3 155:8,11
156:8,14 159:19
161:18 173:15
174:7,12,21 175:9
196:8 218:5,10,16
218:18,21 219:2
235:11 236:20,22
236:24 237:11
238:22 239:2,10
245:4 260:1,16
261:5 262:5,9,15,18
263:20 273:22
298:12 300:16,21
301:7,7 302:17
307:16 308:22
**values**
140:19
**variable**
272:1
**variables**
252:1,9
**varied**
39:21 47:23
**variety**
46:19
**various**
189:18 311:11
**vary**
111:14

**vast**
52:11,12 58:10 59:1
96:23 128:11,11
209:21,24 223:11
297:10
**veracity**
104:22
**verbatim**
231:20
**verified**
74:6 205:22
**verify**
259:24
**versa**
241:16
**version**
16:3 115:4 217:15
**versus**
5:4 94:6 95:3 98:15
100:2 132:21
135:16,17 260:19
299:9 308:8
**vertical**
205:4,11 207:5,9,23
207:24 209:20
**vice**
241:16
**video**
323:10
**videographer**
3:7 5:1,12 11:6,9
67:22 68:4 108:7,12
120:12 163:6,11
230:16,21 287:23
288:4 315:20 316:1
323:9,13
**videorecorded**
1:12
**Videotape**
5:2
**view**
32:2 104:7 113:20
117:18 141:24
156:13 158:5
177:11 188:23
220:3 228:4 242:11

245:20 288:15
289:2,6
**violate**
37:13 50:8
**violations**
102:16 299:7
**virtually**
110:10 111:17
223:24 296:1,23
297:2,6
**volatile**
169:3,6 170:11
**volatility**
168:21 169:9,16
170:6,15,19 193:21
244:2
**volume**
110:23 114:4,5
124:13 173:13,22
175:24 187:17
201:13 202:8 203:4
203:20 204:8
206:21 209:13
211:18 223:14,18
247:19 282:11
**vs**
1:7 324:1 325:5

---
**W**
---

**Wacker**
2:7 3:2 6:6
**Wait**
249:1
**Walker**
189:18
**want**
13:4 51:1 67:18 70:6
108:5 136:13
150:16 209:12
230:13 303:7
316:10
**wanted**
19:18 38:3 87:1 90:5
90:18 133:11
**wasn't**
22:3,21 38:6 42:22

64:23 90:11 125:21
170:16 188:23
219:7 262:12
322:17
**way**
35:2 56:22 74:6
115:5 127:7 133:24
143:20 160:13
162:17,23 177:1,8
177:17 178:17
193:7 195:12,18
239:15,23 240:2,9
240:10,14 241:4
246:13 247:5
250:13,15 263:4
280:7,12 283:5
301:1 304:7 306:6
320:15
**weak**
281:8
**weaknesses**
47:11
**website**
35:1
**week**
84:15 101:7 204:9
205:5,8,12 207:10
**weekend**
84:16 101:8 131:11
**weekly**
114:4 202:7,12 203:4
203:20 206:20
211:18 282:11
**weeks**
36:10,11 214:6 282:9
282:12,15,15
**weighed**
275:10
**weighted**
210:12
**Weinstein**
47:9,17
**Weiss**
2:10 5:11 6:8
**well-accepted**
113:15 119:23



**well-recognized**
109:22
**went**
23:7 169:14 186:6
209:4 241:16
**weren't**
145:23 229:7
**we'll**
131:3
**we're**
9:12 10:8 16:14 31:6
32:4 34:2 44:10
86:7 109:12 169:21
184:11 214:3
274:20
**we've**
58:14 231:2 282:8
**Wharton**
2:10 5:11
**WHEREOF**
326:13
**wide**
117:9
**widely**
107:23 110:23
111:10 115:7
151:18 152:12
291:20
**wider**
284:11
**wildly**
150:14
**William**
6:2
**willing**
37:3,5
**window**
118:11 119:14,23
121:12,15 123:15
124:7,10 125:8,10
125:11 126:16
129:11 134:23
142:21 170:9
**windows**
123:21 124:18
127:17 132:17

133:3,5
**wish**
16:4
**wished**
41:1
**withheld**
104:21 297:17
**witness**
4:2 5:17,18 6:15,19
16:10 17:4,11,18
18:10 19:2,23 20:17
21:4,16,24 23:16
24:17 25:4,20 26:8
26:14,22 28:11
29:10,17 30:8,17,24
31:6,24 32:23 34:24
35:14,22 36:3,14
37:1,12,22 39:4,15
39:21 40:15,22
41:14,19 42:13,20
43:5,13,20 44:8,19
45:24 46:19 50:1
51:7 52:16,23 54:5
54:13 55:1,23 57:18
58:23 59:7 60:24
62:7,18 63:3 64:4
65:12,22 66:19 67:7
67:15,19 68:11,19
69:3,18 70:15 71:18
72:9 73:5,24 74:15
76:24 77:10,16 78:3
78:7,13 79:8,23
80:20 81:9,15 82:2
83:4,11 84:14 85:16
86:10,17 87:7 88:10
89:10,22 91:5,19
92:8 93:7,11 95:14
96:6 97:2 98:4 99:3
101:2 102:14
103:15 104:3 105:5
105:10,21 106:13
107:13 108:2 110:7
111:8 112:7,20
114:1 116:16
117:22 119:10
120:21 121:21

122:12 123:5,13
124:3 126:4 127:16
128:4 129:8 130:3
130:12 131:7,20
132:6 134:5,17
136:3 140:10,18,22
141:12 143:10,18
144:8,23 145:6,12
146:10 148:2,14,23
149:6,20,24 150:7
152:6 153:14,24
155:6,14,24 157:15
158:3,15 159:2
160:2,8,12,19 161:1
161:10,14 162:8,21
166:5,14 167:3,15
168:7,24 170:14
172:1,16 173:11
174:14,24 175:4,12
176:22 177:13
178:1 179:14 187:4
187:20 188:5,21
189:9 190:23
191:23 192:19
193:13,20 194:9,19
195:3,17 196:1,13
196:24 197:8
198:10 199:1,20
200:8 201:2 203:15
205:7 206:4 207:17
208:4 210:9 211:21
212:5 214:3,13
215:8,12,23 219:19
220:13 221:11
222:4 224:11,18
226:24 227:20
228:15,24 229:12
229:19 230:7,14
235:3,17 236:4
237:3 238:10
239:21 240:13
241:24 242:5 243:3
244:22 246:23
248:20 249:2,23
250:10,19 256:21
257:17 258:18

259:23 260:11,18
262:8 263:4,15
266:18 269:2,19
270:16 271:3,19
273:10 274:21
277:9,18 278:19
279:8 281:6 284:5
285:4,18 286:13,22
287:6,16 288:20
289:9 290:12
292:21 294:3
297:10 298:8 299:4
299:21 300:24
302:1,10 303:2
305:24 306:9 309:2
309:13 310:11
311:9,20 312:3,13
312:19 313:3,15,21
314:19 315:1,9
317:11 318:7
319:14 320:11
321:8,23 323:1
326:8,13
**word**
101:14,14 154:17
155:15 280:1
**wording**
225:23
**words**
41:3 64:15 95:20,23
131:5 164:2 202:20
241:14 259:16
273:19
**work**
34:10 36:11 38:5,22
39:13,18,19 41:10
41:23 42:9 43:10
44:5 46:11 47:21
69:7,22 78:10 81:4
81:7,20 82:15 133:4
172:12
**worked**
46:20 47:16 82:10,14
86:11 128:12
310:12
**working**



27:13 48:22 68:9 81:24 88:19,21 89:1 188:14

**works**
154:15

**worth**
226:1,2 301:6

**wouldn't**
50:13 70:17 91:23 98:16,18 100:7 117:2 118:13 138:15 141:3,14 156:15 173:14 238:15 244:16

**write**
66:21 85:8 90:9 115:21 116:1 136:14 202:11 267:4 290:18

**writing**
326:6

**written**
64:21 218:10

**wrong**
63:12

**wrongdoing**
160:22

**wrote**
88:13 222:23 226:9 233:22 234:3 237:18 274:23

**www.MagnaLS.com**
1:23

---

**X**

**X**
4:1 5:22 316:7

---

**Y**

**Yablon**
2:12 4:5,7 5:23 6:7 11:12,20 12:13 15:16 16:13 17:7,13 18:2,20 19:6 20:5 20:23 21:12,18 22:1 23:20 24:13,18 25:7

25:16,23 26:4,9,17 27:4 28:10,12 29:12 29:24 30:10,20 31:2 31:12 32:1,19 33:1 34:9 35:3,18,23 36:4,19 37:4,8,14 37:24 39:6,16 40:3 40:10,17 41:8,15,24 42:7,16,24 43:8,16 43:24 44:15,21 46:3 47:4 50:5 51:12 52:6,19 53:3 54:9 54:17 55:6 56:4 57:6,15 58:11,17 59:2,11 60:19 61:6 61:11 62:13,21 63:18 64:9 65:10,14 66:2 67:1,8,17,21 68:7,14,22 69:11,20 70:5,21 71:4,20 72:10 73:10 74:11 74:18 77:1,6,11,21 78:4,8,20 79:14,19 80:1,6 81:1,11,22 82:7 83:6,14,19 84:17 85:19 86:13 87:2,13,20 88:4,12 89:16 90:19 91:8 92:2,16 93:2 94:4 94:21 95:1,11,18 96:4,11 97:4 98:22 99:14,20 101:6 102:21 103:21 105:1,16 106:2,23 107:19 108:5,15 110:11 112:1,11 113:3 114:19 117:13 118:22 120:1,15,16,23 122:6,22 123:7,22 124:21 126:22 127:20 129:1,22 130:7 131:1,13,23 132:8 133:22 134:12,19 136:9 140:5,13 141:6,18

143:13,22 144:15 145:1,9,15 147:10 147:17 148:9,18 149:1,15 150:2,23 152:13 153:19 154:3 155:10,18 156:17 157:19 158:10,22 159:7 160:4,9,14,20 161:2 161:22 162:16 163:4,14 166:8,21 167:8 168:1,19 169:4 172:5 173:2 173:19 174:19 175:6 176:6 177:9 177:20 178:6 179:5 179:18 187:9 188:1 188:8 189:4,12,16 191:1 192:3,23 193:15 194:1,12,21 195:6,10,19 196:9 196:19 197:1,13 198:20 199:2,23 200:13 201:7 204:1 205:10 206:9 207:21 208:15 210:8,18 212:1,8 214:8,21 215:18 216:2,7,13 220:6 221:5,18 222:11 224:13,20 227:3,8 227:12 228:10,16 229:3,15 230:1,12 231:1 235:13,22 236:11 237:6 238:19 240:18 242:1,13 243:11 245:8 247:1 249:9 250:5,11 251:8 257:2,22 258:21 260:5,13 261:1,7,15 262:23 263:9 264:3 266:13,17,19 267:1 269:5,21 270:21 271:13,20 274:4,18 274:20,22 277:11

277:20 279:3,13 280:22 281:11 284:21 285:6,15,19 286:15 287:2,9,21 288:7 289:1,14 290:17 293:16 294:22 297:5 298:1 298:22 299:11 300:14 301:14 302:4,20 303:3 306:2,11 309:8 310:2,17 311:14,22 312:5,15,23 313:6 313:17,23 314:21 315:4,14,18 316:4 317:10 318:6 319:13,19 320:13 321:13 322:10 323:4,6,12

**yeah**
38:24 56:13 136:3 171:11 202:20 253:20

**year**
34:12 61:1 81:21 226:5 233:5,7 253:17,22,23

**years**
17:20 25:22 27:12 38:23,24 45:14 46:15 49:8 59:4,13 59:24 61:3,13 62:1 62:2

**year's**
225:24 226:1

**Yep**
184:5,14 266:16

**yesterday**
84:16,23 85:2 100:18

**yesterday's**
280:7,8

**yield**
238:14

**York**
2:3,3,11,11



**Z**

**zero**
44:20 293:13
**zeros**
184:21
**Zoom**
3:3 85:4

**$**

**$20**
293:3
**$240**
85:9
**$3**
301:4,6,11
**$30**
181:10
**$475**
85:9
**$950**
81:3 83:22

**0**

**01/23/2024**
324:1
**084-00257**
1:18 326:22

**1**

**1**
4:11 5:2 11:14,18
73:11,15 202:7
204:3 208:1,17
209:22 210:3,13,14
273:4 282:10,13
324:3
**1.96**
136:17
**1:18**
163:13
**1:22-cv-00149**
1:7 325:5
**10**
30:5 56:6 84:10,12
97:6,8 167:9
**10th**

127:1,3,6 142:17,24
**10(b)**
8:8 9:4 28:24 30:11
31:21 32:10,11,15
42:1,11 53:5,21
54:1 58:3 67:5
290:1
**10-Q**
317:12
**10:10**
67:23
**10:29**
68:6
**100**
89:3 220:23 264:18
269:9
**100-day**
178:21,23
**10005**
2:3
**10019**
2:11
**105**
261:19 262:19
**11**
4:11 8:20 29:4 30:5,9
32:21 33:3,7,10
42:17 53:9 54:10,15
58:4 67:12 97:6,8
267:4,17 272:5
310:3,5,13 314:1,4
314:6
**11th**
127:5,9 142:23
**11:16**
108:8
**11:26**
108:14
**12**
58:4 274:24 275:23
275:24
**12:28**
163:7
**120**
169:11,15,24 170:6,8
170:8,9,23 171:7

**125**
6:6 51:22 52:7 53:4
53:23 55:18
**128**
212:14 215:4 219:4
220:8,24 221:7,12
221:15
**1285**
2:11
**13**
13:4 46:15 216:4
281:12,13
**14**
30:18 58:4 202:11
276:19
**140**
2:2
**144**
184:3
**15**
11:15 12:18 13:1
38:23,24 190:13
204:5
**155**
3:2
**16**
106:24 108:17
110:13 253:7
**173**
179:11,17,19
**179**
4:14
**18**
115:11 183:11
277:15
**180-day**
178:4,24 179:2
203:18
**189**
4:15
**19**
51:1 210:3,9,10
277:18
**1987**
75:12
**1990s**

31:11 33:8
**1995**
46:15
**1996**
32:8
**1997**
32:8

**2**

**2**
4:12 11:10 50:24
94:22,23 178:1,8,20
178:22 179:3
202:12 203:19
204:3 208:1,16,18
209:17,20 214:1
258:10 264:8 324:3
**2.3**
203:6,23
**2.38**
203:4,6,24 204:3
**2:40**
230:17
**2:55**
230:23
**20**
56:6 82:5,8 85:17
86:2 89:3 97:20
212:14 215:5
272:17,21 325:21
**200**
2:7 180:9 183:2
**2006**
49:9
**2007**
49:9
**2008**
32:12 38:23 46:15
48:23
**2009**
31:17 32:12 33:13
**2010**
31:17 33:13
**2020**
14:17 180:4 189:17
189:20 190:5,9,18



190:20 200:1 204:16 216:10 217:11,16 233:3 253:7 254:3 264:20 266:21 267:7,20 269:8 276:1,13,23 277:1 278:5,5 298:6

**2021** 142:11 143:5 161:5 161:17 178:22 179:3 200:3 203:19 204:17 209:17,20 254:11,13 272:9,15 272:15 277:21 283:8 284:1 285:2 317:6 322:19

**2022** 254:17,19

**2023** 11:15 12:18 13:1 14:17 37:16 38:12 38:14 68:12,15 81:10 233:3

**2024** 1:20 5:7 325:11 326:14

**21** 97:21 109:3 110:20 112:13 272:20

**216** 4:17 184:19 185:2,4 185:21

**216,213** 184:18

**222** 182:12,13

**222,900,968** 181:23 183:19 184:9

**222.9** 184:12

**223** 183:2 184:23

**23** 1:19 5:7 325:11

**238** 180:9 181:9,19

185:22

**238,525,968** 180:4 185:12

**24** 131:5,10,11 135:24 199:16

**24-hour** 295:14

**24.69K** 218:13

**25** 190:20 191:4 205:16 207:14 233:1

**25,000** 218:15

**25-day** 256:14

**26** 202:5 210:3,10 233:2

**2610** 6:6

**268** 181:12,16

**27** 210:10 237:17 266:10

**28** 203:10 254:17

**28th** 326:14

**2800** 3:2

**29** 203:12

_____
        **3**
_____

**3** 4:14 68:5 97:21 179:6,12 204:7,12 204:15 206:24 208:12 210:22 252:23 275:10 324:4

**3.3** 169:12 170:20

**30**

180:21 181:14 190:9 190:20 276:1,13 278:4

**31** 180:4 189:17,20 276:23 277:1,21 278:5

**31st** 2:7 38:12,14 190:5

**316** 4:6

**319** 4:7

**33** 212:15,18 219:17 264:6

**36** 266:14

**37** 222:15

**38** 275:17

**39** 98:7

**39,409** 285:20

_____
        **4**
_____

**4** 4:15 74:7,13 105:6 108:13 189:13,14 190:5 215:4 217:6,6 219:5 220:8 224:23 225:6 227:5,14

**4,389** 287:11

**4:06** 287:24

**4:25** 288:6

**4:57** 315:21

**41** 12:11 98:13 222:20

**419** 267:6,19

**44** 226:8

**45** 204:13 231:8

**47** 276:17 278:9

**48** 231:20,22 232:3

**49** 251:10

_____
        **5**
_____

**5** 4:5,17 163:12 208:10 216:8,11 231:7 248:7 258:6

**5:08** 316:3

**5:15** 323:16

**5:16** 323:22

**50** 6:24 44:9 57:10,13 174:9 273:20,21

**500** 261:22 262:4

**53** 136:14

**55** 233:21 272:6

**56** 13:13

**57** 277:6,9 278:9

_____
        **6**
_____

**6** 14:17 103:6 169:8,19 169:20 190:18 200:1 204:16 230:22 268:1 298:6

**60** 22:6

**60,219** 285:22



**600**
261:8
**60603**
2:18 5:10
**60606**
2:7 3:3
**61**
50:19
**62**
275:1
**64**
154:11,16
**65**
237:18
**69**
56:7 277:3
**698**
189:24

---
**7**

**7**
14:17 208:13 216:10
217:11,16 233:3
248:20 251:9,13
254:19 255:20
256:13 288:5
289:20
**7.04**
203:21
**70**
264:21 266:1 267:3
267:15,16 269:8
**70.07**
276:12
**71**
274:15,18,23
**73**
279:18
**74**
275:14
**75**
208:11
**76**
279:17 281:4
**77**
285:9

**78**
51:6 290:7 291:6
295:24
**79**
13:13 50:20 51:6
56:7 204:13 291:6

---
**8**

**8**
84:10,11 142:11
143:5 200:2 204:16
208:13 254:13
261:20 316:2 317:6
**8th**
142:19 143:5 144:21
322:6,19
**8.31.20**
4:16
**80**
172:19,20 174:1
175:23 176:8,14
177:14 182:19,19
290:18
**81**
291:20 295:5 307:4
**82**
295:5
**866.624.6221**
1:23
**87**
285:24

---
**9**

**9**
161:4,17 254:3,11
322:19
**9th**
142:20,22 158:11
318:16,19,22 322:6
322:13
**9:00**
1:20
**9:03**
5:8
**9:08**
11:7

**9:11**
11:11
**90**
185:24 186:1 252:21
**90th**
255:5
**924**
287:11
**94**
4:12
**95**
136:18 252:22
283:11 284:3
**95th**
255:6
**97**
182:7,12 183:1,7
184:7,12,22
**98**
175:21 222:17,24
223:4 224:5
**99**
252:24 253:4
**99th**
254:8,23 255:6

