# Exhibit A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| REGINALD T. ALLISON, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>OAK STREET HEALTH, INC., et al.,<br><br>Defendants. | Case No. 1:22-cv-00149<br><br>Honorable Jeffrey I. Cummings<br><br>**ORAL ARGUMENT REQUESTED** |

**DEFENDANTS' <u>CORRECTED</u> MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF <u>CLASS REPRESENTATIVES AND CLASS COUNSEL</u>**

February 20, 2024

Andrew J. Ehrlich (*pro hac vice*)
Staci L. Yablon (*pro hac vice*)
Alison R. Benedon (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: 212-373-3000
Facsimile: 212-373-3990
Email: aehrlich@paulweiss.com
Email: syablon@paulweiss.com
Email: abenedon@paulweiss.com

-and-

Peter A. Silverman (Il. ARDC #6196081)
Lisa M. Mazzone (Il. ARDC #6303922)
**SMITH, GAMBRELL & RUSSELL, LLP**
10 S. LaSalle Street, Suite 3600
Chicago, IL 60603
Telephone: 312-264-1004
Facsimile: 312-251-4610
Email: psilverman@sgrlaw.com
Email: lmazzone@sgrlaw.com

*Counsel for Oak Street Health, Inc., Michael Pykosz, Timothy Cook, Geoff Price, Griffin Myers, General Atlantic LLC n/k/a/ General Atlantic, L.P., General Atlantic (OSH) Interholdco, L.P., Newlight Partners LP, and Newlight Harbour Point SPV*

Marcella L. Lape (Il. ARDC # 6286676)
Clare Lilek (Il. ARDC # 6336261)
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
155 North Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 407-0700
Email: marcie.lape@skadden.com
Email: clare.lilek@skadden.com

-and-

Scott D. Musoff (*pro hac vice*)
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
One Manhattan West
New York, New York 10001
Telephone: (212) 735-7852
Email: scott.musoff@skadden.com

*Counsel for J.P. Morgan Securities LLC, Goldman Sachs & Co. LLC, Morgan Stanley & Co. LLC, William Blair & Company L.L.C., and Piper Sandler Companies*

Sara B. Brody (*pro hac vice*)
**SIDLEY AUSTIN LLP**
555 California Street, Suite 2000
San Francisco, California 94104
Telephone: 415/772-1200
Email: sbrody@sidley.com

John M. Skakun III (IL Bar # 6297636)
Jarrett H. Gross (IL Bar # 6323993)
Bonnie K. St. Charles (IL Bar # 6339720)
**SIDLEY AUSTIN LLP**
One South Dearborn Street
Chicago, IL 60603
Telephone: 312/853-7000
Email: jskakun@sidley.com
Email: jarrett.gross@sidley.com
Email: bstcharles@sidley.com

ii

iii

*Counsel for Regina Benjamin, Carl Daley, Cheryl Dorsey, Mohit Kaushal, Kim Keck, Julie Klapstein, Paul Kusserow, Robbert Vorhoff, and Srdjan Vukovic*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................. 1

BACKGROUND ................................................................................................................... 4

ARGUMENT ......................................................................................................................... 7

I.     PLAINTIFFS ARE NOT ADEQUATE OR TYPICAL CLASS REPRESENTATIVES ...... 8

    A.    Dearborn Is Atypical and Inadequate. .................................................................. 9

    B.    BRS and CPAT Are Atypical and Inadequate ................................................... 15

    D.    Plaintiffs Are Not Capable of Supervising Their Counsel. ................................. 19

II.    ANY CLASS THAT IS CERTIFIED AS TO PLAINTIFFS' SECURITIES ACT
CLAIMS SHOULD BE SIGNIFICANTLY CURTAILED ................................................. 20

    A.    Any Class Period Should End on December 6, 2020. ......................................... 23

    B.    In the Alternative, Any Class Period Should End on February 1, 2021. ........... 25

    C.    The Only Proposed Class Representative with Potential Section 11 Standing is
Inadequate and Atypical. .................................................................................... 26

III.   ANY CLASS THAT IS CERTIFIED AS TO PLAINTIFFS' EXCHANGE ACT
CLAIMS MUST BE SHORTENED. ............................................................................... 27

    A.    Plaintiffs Have Not Met Their Burden to Show That the Market for Oak Street's
Common Stock Was Efficient During the IPO or the Quiet Period. ................... 28

        1.    *Cammer* Factor 1: Weekly Average Trading Volume ................................. 30

        2.    *Cammer* Factor 2: Analyst Coverage ........................................................ 31

        3.    *Cammer* Factor 5: Price Reaction to New Information ............................. 31

        4.    *Krogman* Factor 2: Bid-Ask Spread ......................................................... 32

        5.    *Krogman* Factor 3: Public Float ............................................................... 32

        6.    Additional Factor: Options Trading ........................................................... 33

    B.    Plaintiffs Are Not Entitled to the *Affiliated Ute* Presumption During the Quiet
Period or Otherwise. .......................................................................................... 34

CONCLUSION .................................................................................................................... 35

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Affiliated Ute Citizens of Utah* v. *United States*,
406 U.S. 128 (1972)................................................................................................4, 34, 35

*In re Allergan PLC Sec. Litig.*,
2020 WL 5796763 (S.D.N.Y. Sept. 29, 2020).......................................................................20

*In re Allstate Corp. Sec. Litig.*,
966 F.3d 595 (7th Cir. 2020) ..............................................................................................9

*In re Arris Cable Modem Consumer Litig.*,
327 F.R.D. 334 (N.D. Cal. 2018).........................................................................................15

*Basic Inc.* v. *Levinson*,
485 U.S. 224 (1988)................................................................................................. *passim*

*Berwecky* v. *Bear, Stearns & Co.*,
197 F.R.D. 65 (S.D.N.Y. 2000) ...........................................................................................28

*Blanchard* v. *Edgemark Fin. Corp.*,
175 F.R.D. 293 (N.D. Ill. 1997)...........................................................................................17

*Cammer* v. *Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) ............................................................................30, 31, 33

*Carbajal* v. *Capital One*,
219 F.R.D. 437 (N.D. Ill. 2004)............................................................................................8

*CE Design Ltd.* v. *King Architectural Metals, Inc.*,
637 F.3d 721 (7th Cir. 2011) .............................................................................................14

*In re Cendant Corp.*,
260 F.3d 183 (3d Cir. 2001)...............................................................................................19

*In re Century Aluminum Co. Sec. Litig.*,
729 F. 3d 1104 (9th Cir. 2013) ..........................................................................................22

*In re Cloudera, Inc. Sec. Litig.*,
2019 WL 6842021 (N.D. Cal. Dec. 16, 2019).......................................................................20

*Darvin* v. *Int'l Harvester Co.*,
610 F. Supp. 255 (S.D.N.Y. 1985) ......................................................................................14

*Dhamer* v. *Bristol-Myers Squibb Co.*,
183 F.R.D. 520 (N.D. Ill. 1998)..........................................................................................15

*In re Enron Corp. Sec. Deriv. & ERISA Litig.*,
  529 F. Supp. 2d 644 (S.D. Tex. 2006) ...................................................................28

*In re Fluidmaster, Inc. Water Connector Components Prods. Liab. Litig.*,
  2017 WL 1196990 (N.D. Ill. Mar. 31, 2017)............................................................7

*Freeman* v. *Laventhol & Horwath*,
  915 F.2d 193 (6th Cir. 1990) ...................................................................28, 29

*George* v. *China Auto Sys., Inc.*,
  2013 WL 3357170 (S.D.N.Y. July 3, 2013) .......................................................9, 15

*In re Global Crossing, Ltd. Sec. Litig.*,
  313 F. Supp. 2d 189 (S.D.N.Y. 2003)...................................................................21

*Grossman* v. *Waste Mgmt., Inc.,*
  589 F. Supp. 395 (N.D. Ill. 1984) .......................................................................34

*In re Honest Co. Sec. Litig.*,
  2023 WL 3190506 (C.D. Cal. May 1, 2023) .............................................21, 22, 25

*Howard* v. *Liquidity Servs. Inc.*,
  322 F.R.D. 103 (D.D.C. 2017)...............................................................................10

*In re Initial Public Offering Sec. Litig.*,
  227 F.R.D. 65 (S.D.N.Y. 2004), .............................................................21, 22, 24, 25

*In re Initial Public Offerings Sec. Litig.*,
  471 F.3d 24 (2d Cir. 2006)........................................................................21, 27, 28, 29

*In re Intelligroup Sec. Litig.*,
  527 F. Supp. 2d 262 (D.N.J. 2007) ......................................................................28

*J.H. Cohn & Co.* v. *Am. Appraisal Assocs., Inc.*,
  628 F.2d 994 (7th Cir. 1980) ..............................................................................8, 15

*Kaplan* v. *Pomerantz*,
  132 F.R.D. 504 (N.D. Ill. 1990)..........................................................................14

*Kline* v. *Wolf*,
  702 F.2d 400 (2d Cir. 1983)...............................................................................14

*Kohen* v. *Pac. Inv. Mgmt. Co. LLC*,
  571 F.3d 672 (7th Cir. 2009) ..............................................................................26

*Krim* v. *pcOrder.com, Inc.*,
  210 F.R.D. 581 (W.D. Tex. 2002) ......................................................................26

vi

*Krogman* v. *Sterritt*,
  202 F.R.D. 467 (N.D. Tex. 2001) ..................................................................................30, 32, 33

*Lawrence E. Jaffe* v. *Household Int'l, Inc.*,
  2005 WL 3801463 (N.D. Ill. 2005) ..........................................................................................16

*Lawrence E. Jaffe* v. *Household Int'l, Inc.*,
  756 F. Supp. 2d 928 (N.D. Ill. 2010) ...................................................................................9, 12

*McIntire* v. *China MediaExpress Holdings, Inc.*,
  38 F. Supp. 3d 415 (S.D.N.Y. 2014)........................................................................................31

*McNichols* v. *Leob Rhoades & Co., Inc.*,
  97 F.R.D. 331 (N.D. Ill. 1982)..................................................................................................16

*In re MDC Holdings Sec. Litig.*,
  754 F. Supp. 785 (S.D. Cal. 1990)............................................................................................28

*In re Merix Corp. Sec. Litig.*,
  2009 WL 10692857 (D. Or. Nov. 5, 2009)...............................................................................24

*New Jersey Carpenters Health Fund* v. *Residential Cap., LLC*,
  272 F.R.D. 160 (S.D.N.Y. 2011), *aff'd*, 477 F. App'x 809 (2d Cir. 2012) .............................10

*In re Northfield Labs., Inc.*,
  267 F.R.D. 536 (N.D. Ill. 2010)..............................................................................8, 14, 27, 30

*Ocampo* v. *GC Servs. Ltd. P'ship*,
  2018 WL 6198464 (N.D. Ill. 2018) ..........................................................................................13

*Paper Sys. Inc.* v. *Mitsubishi Corp.*,
  193 F.R.D. 601 (E.D. Wis. 2000) .............................................................................................17

*Passman* v. *Peloton Interactive, Inc.*,
  2023 WL 3195941 (S.D.N.Y. May 2, 2023) .......................................................................15, 17

*In re Prestige Brands Holdings, Inc. Securities Litigation*,
  2007 WL 2585088 (S.D.N.Y. Sept. 5, 2007)............................................................................25

*In re Puda Coal Sec. Inc. Litig.*,
  2013 WL 5493007 (S.D.N.Y. Oct. 1, 2013) .......................................................................20, 21

*Rowe* v. *Maremont Corp.*,
  650 F. Supp. 1091 (N.D. Ill. 1986) ...........................................................................................34

*Rowe* v. *Maremont Corp.*,
  850 F.2d 1226 (7th Cir. 1988) ..................................................................................................34

*Schmidt* v. *Smith & Wollensky, LLC*,
268 F.R.D. 323 (N.D. Ill. 2010)..................................................................................8

*In re SCOR Holding (Switzerland) AG Litig.*,
537 F. Supp. 2d 556 (S.D.N.Y. 2008)............................................................... *passim*

*Scott* v. *NYC Dist. Council of Carpenters Pension Plan*,
224 F.R.D. 353 (S.D.N.Y. 2004) ...............................................................................13

*ScripsAmerica, Inc.* v. *Ironridge Global LLC*,
119 F. Supp. 3d 1213 (C.D. Cal. 2015) .....................................................................31

*Sgouros* v. *TransUnion Corp.*,
2023 WL 6690474 (N.D. Ill. Oct. 12, 2023)..............................................................14

*Slack Techs., LLC* v. *Pirani*,
143 S. Ct. 1433 (2023)...............................................................................................20

*Stanaford* v. *Genovese*,
2016 WL 4198146 (S.D. Fla. Mar. 14, 2016)....................................................30**, 31**

*Tsirekidze* v. *Syntax-Brillian Corp.*,
2009 WL 2151838 (D. Ariz. July 17, 2009)..........................................................23, 24

*In re Under Armour Sec. Litig.*,
631 F. Supp. 3d 285 (D. Md. 2022) ...........................................................................10

*Villella* v. *Chem. & Mining Co. of Chile Inc.*,
2018 WL 2958361 (S.D.N.Y. June 12, 2018) ...........................................................10

*In re Vivendi Universal, S.A. Sec. Litig.*,
123 F. Supp. 424 (S.D.N.Y. 2015) ...........................................................................16

*In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Prods. Liab.*
*Litig.*,
2 F.4th 1199 (9th Cir. 2021) ....................................................................................35

*Waggoner* v. *Barclays PLC*,
875 F.3d 79 (2d Cir. 2017)........................................................................................35

*West Palm Beach Firefighters' Pension Fund* v. *Conagra Brands, Inc.*,
495 F. Supp. 3d 622 (N.D. Ill. 2020) ...................................................................21, 24

*Zandman* v. *Joseph*,
102 F.R.D. 924 (N.D. Ind. 1984)...............................................................................12

**Statutes**

15 U.S.C. § 77k(e) ..........................................................................................................24

**Other Authorities**

Fed. R. Civ. P. 23(a) ...............................................................................................................2, 7, 8

Fed. R. Civ. P. 23(a)(3)-(4).............................................................................................................8

Fed. R. Civ. P. 23(a)(4)....................................................................................................................8

Fed. R. Civ. P. 23(b) ......................................................................................................................4

Fed. R. Civ. P. 23(b)(3)............................................................................................... *passim*

Defendants[1] respectfully submit this memorandum of law in opposition to Plaintiffs'[2] Motion for Class Certification and Appointment of Class Representatives and Class Counsel (Dkt. 134) (the "Motion").

## PRELIMINARY STATEMENT

This lawsuit is based upon the fundamentally flawed premise that the announcement of a government information request—not government charges, much less an adjudication of wrongdoing—somehow revealed to the market that Oak Street's strategies for bringing in new patients were improper. The case has no merit, for numerous reasons, including that the market was well aware of Oak Street's patient acquisition strategies, so there was no "revelation," and Oak Street always strove to comply with applicable law, so there was no intent to deceive.

Nevertheless, seeking to capitalize on a stock drop coincident with the announcement of the government information request (and other events, such as an earnings announcement), Plaintiffs' counsel filed this lawsuit and put forward three institutional investors that looked good on paper in the hope that they could rely upon the presumption of reliance and represent a class to pursue these misguided claims. But none of the three Plaintiffs stands up to scrutiny. Nor does their proposed class, as Plaintiffs have overreached on both the front and the back end.

---

[1] Defendants are collectively Oak Street Health, Inc. ("Oak Street" or the "Company"), Michael Pykosz, Timothy Cook, Geoff Price, Griffin Myers (the "Oak Street Executive Defendants"), General Atlantic LLC, General Atlantic (OSH) Interholdco, L.P. (the "General Atlantic Defendants"), Newlight Partners LP, Newlight Harbour Point SPV LLC (the "Newlight Defendants" and together with the General Atlantic Defendants, the "Sponsor Defendants"), Regina Benjamin, Carl Daley, Cheryl Dorsey, Mohit Kaushal, Kim Keck, Julie Klapstein, Paul Kusserow, Robbert Vorhoff, Srjdan Vukovic (the "Independent Director Defendants"), J.P. Morgan Securities LLC, Goldman Sachs & Co., LLC, Morgan Stanley & Co. LLC, William Blair & Company L.L.C., and Piper Sandler & Co. (the "Underwriter Defendants").

[2] Plaintiffs are collectively Boston Retirement System ("BRS"), Central Pennsylvania Teamsters Pension Fund – Defined Benefit Plan, and Central Pennsylvania Teamsters Pension Fund – Retirement Income Plan 1987 ("CPAT"), and additionally named Plaintiff City of Dearborn Police & Fire Revised Retirement System ("Dearborn").

*First*, not one of the Plaintiffs is an adequate or typical class representative as required by Federal Rule of Civil Procedure 23(a). Plaintiffs—all three of which are pension funds—outsourced full investment discretion to their investment managers. Those investment managers did not rely on any of Plaintiffs' alleged misstatements. In fact, prior to investing in Oak Street, they were well aware of the practices that Plaintiffs allege were concealed. The investment managers knew that ███████████████████████████████████████████. One even believed that Oak Street's transportation offerings ██████████████████████████ ███████████████████████████████████ And they understood that ████████████ ███████████████████████████████████████████████████████████ ████████████████████. Unsurprisingly, neither of them believed that ███████████████ ███████████████████████████████████████████. Instead, they thought that ███████████████████████████████████████████████████ ████████████████████████████ One continued to believe that ████████████████████ ███████████ The other ████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████" In sum, Plaintiffs' investment managers (and thereby Plaintiffs) █████████████ ███████████████████████████████████. These facts subject Plaintiffs to colorable defenses on the element of reliance, which will undoubtedly require substantial time and attention and distract from class-wide issues, making Plaintiffs inadequate and atypical class representatives.

Plaintiffs are further inadequate because they are not working cohesively to supervise their counsel, making this precisely the type of lawyer-driven litigation prohibited by the Private Securities Litigation Reform Act ("PSLRA"). All responsibility for managing this case has been

abdicated to Plaintiffs' counsel. Plaintiffs have had ████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████. For example, Dearborn ████████████████████████████████████████

████████████████████████████████████████████ Moreover, discovery has revealed

████████████████████████████████████████████████████████████████████████████,

making it clear that it cannot be trusted to act as a fiduciary to the absent class members here.

*Second*, Plaintiffs cannot meet the Federal Rule of Civil Procedure 23(b)(3) predominance requirement for the entire period for which they seek certification of their claims under Sections 11 and 15 of the Securities Act. To have standing under Section 11 (and thus Section 15), a plaintiff must (1) either have purchased shares in an offering associated with an allegedly misleading registration statement or (2) be able to "trace" its shares back to that offering document. In the modern system of electronic securities delivery and clearing, where shares are held within a "fungible bulk" at the Depository Trust Company ("DTC"), it is functionally impossible to meet this standard without individualized inquiry once shares issued pursuant to multiple registration statements are deposited at the DTC. Here, at best, Plaintiffs can assert Section 11 (and Section 15) claims predicated on Oak Street's initial public offering registration statement through December 6, 2020. That is the sole period during which only shares issued pursuant to Oak Street's initial public offering registration statement were publicly exchanged and held within the "fungible bulk" of Oak Street shares at DTC. After that, the requirement of tracing shares issued pursuant to a specific registration statement—which has implications on, among other things, the proper measure of damages for any given class member—becomes an individualized inquiry defeating classwide adjudication. The only way putative class members can satisfy Section 11's tracing requirement is by tracing the chain of ownership of their shares back to the registration statements

3

of their origin, which is an inherently individualized analysis. Accordingly, after December 6, 2020, individualized questions of fact or law predominate over common ones, so Plaintiffs' Securities Act class cannot extend past this date.

*Third*, Plaintiffs cannot meet the Federal Rule of Civil Procedure 23(b) predominance requirement for their claims under Sections 10(b) and 20(a) of the Exchange Act. In a securities class action like this one, Plaintiffs may avoid proving reliance (an inherently individualized inquiry) by invoking the presumption of reliance established in *Basic Inc.* v. *Levinson*, which requires, as a threshold issue, a showing that the market for the securities at issue was efficient. 485 U.S. 224, 242 (1988).[3] However, Plaintiffs have not met their burden to show that the market was efficient during the entirety of the class period. In particular, Plaintiffs and their expert have completely ignored case law and academic literature that finds that markets may not be—and in this case are not—efficient on an initial public offering date and during the quiet period thereafter. Therefore, the period from Oak Street's initial public offering through the end of its quiet period the ("Quiet Period") must be excluded from the class period for Plaintiffs' Exchange Act claims.

**BACKGROUND**

Plaintiffs assert claims under Sections 11 and 15 of the Securities Act for alleged misstatements and omissions made in connection with Oak Street's initial and secondary public offerings, as well as securities fraud claims under Sections 10(b) and 20(a) of the Exchange Act for alleged misstatements and omissions made during the purported class period. Compl.[4] ¶¶ 199–211, 263–71, 283–90. Plaintiffs seek to certify a class of persons and entities who acquired Oak

---

[3] Plaintiffs also half-heartedly suggest that they are entitled to the presumption of reliance established in *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128 (1972). Mot. 25–26. As explained below, because Plaintiffs' case relies on affirmative misrepresentations in addition to omissions, *Affiliated Ute* has no applicability here.

[4] Citations to "Compl." are to Plaintiffs' Amended Complaint (Dkt. 40).

4

Street stock between August 6, 2020 through November 8, 2021, inclusive, including those who purchased Oak Street shares "pursuant to or traceable to" the offering documents from Oak Street's initial and secondary public offerings. Mot.[5] 2. Plaintiffs' allegations stem from the November 8, 2021 announcement that Oak Street received a civil investigative demand ("CID") from the Department of Justice ("DOJ"), which was investigating whether certain of Oak Street's patient acquisition strategies caused the submission of claims that violated the False Claims Act. *Id.* 6.

Oak Street was founded in 2012 with the mission of building "a primary care delivery platform that directly addresses rising costs and poor outcomes." Ex.[6] 1 at 6. Prior to the August 6, 2020 initial public offering of Oak Street common stock (the "IPO"), Oak Street had approximately 223 million unregistered shares issued and outstanding. *Id.* at 27. In its August 6, 2020 IPO, Oak Street registered approximately 18 million shares of Oak Street common stock and offered them to the public. Ex. 2 at 3. In connection with the IPO, holders of Oak Street's pre-IPO, unregistered shares agreed not to sell their shares during a 180-day "lock-up" period, which expired on February 2, 2021. Ex. 1 at 27. After its IPO, Oak Street registered additional shares through three secondary public offerings (each an "SPO"), each with its own registration statement, on December 2, 2020, *see* Ex. 3, February 10, 2021, *see* Ex. 4, and May 26, 2021, *see* Ex. 5.

Oak Street's business model depends upon, among other things, its ability to attract new patients, providing those patients with excellent medical care, and keeping the cost of their medical care low. *See* Ex. 1 at 6, 28. By providing proactive, high quality care, rather than a high volume of services, Oak Street can "align[] the incentives of [its] patients, [its] providers and [its] payors

---

[5] Citations to "Mot." are to Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion (Dkt. 135.)

[6] "Ex." refers to exhibits attached to the Declaration of Staci Yablon, dated February 20, 2024, submitted herewith. With the exception of citations to expert reports, declarations, or deposition transcripts, pincites are to the page number indicated in the ECF banner of each exhibit.

by simultaneously improving health outcomes and care quality, lowering medical costs and improving the patient experience."[7]  *Id.* at 6.  Oak Street's business model also involves the provision of free transportation for eligible patients to and from medical appointments.  *Id.* at 16 (describing "contracted and employed drivers" who "typically transport patients to our centers").  Historically, Oak Street's patient recruitment efforts involved hosting events for the elderly population, as well as meeting Medicare-eligible individuals in the community.  *Id.* at 24.  Oak Street's focus on community-based recruitment efforts necessarily shifted with the onset of the COVID-19 pandemic.  *Id.* at 15–16.  The Client Awareness Program (the "CAP"), ████████

██████████████████████████████████████████████████████████████

████████.  *See* Ex. 6 at 16.  Under the CAP, ████████████████████████

██████████████████████████████████████████████████████████████

████████████████████.  Ex. 7 at 12.

Plaintiffs' overarching theory is that Oak Street engaged in overly aggressive patient recruitment tactics that it knew violated the Anti-Kickback Statute ("AKS")—namely, the CAP and provision of free transportation to prospective patients—while publicly touting the success of Oak Street's other patient recruitment tactics and claiming to be compliant with applicable law.  Mot. 5–6.  Plaintiffs point to dozens of alleged misstatements in the Company's IPO and SPO registration statements, as well as in other public filings, earnings calls, and in public conferences.  *See* Compl. ¶¶ 101–22.  These alleged misstatements relate to Oak Street's general approach to patient recruitment, its relationships with third parties, and its regulatory compliance, such as:

- "We employ a multichannel marketing strategy that goes directly to our target consumer. . . ."  *Id.* ¶ 101(a).

---

[7] Oak Street's model in fact leads to a "measurably higher-quality alternative to the status quo, including an approximately 51% reduction in hospital admissions, 42% reduction in 30-day readmission rates and 51% reduction in emergency department visits."  Ex. 1 at 7.

6

- "We utilize a proactive strategy to drive growth to our centers. We employ a grassroots approach to patient engagement led by our Outreach team and supplemented by more traditional marketing, including television, digital and social media, print, mail and telemarketing . . . ." *Id.* ¶ 101(b).

- "[W]e employ our own sales force and attempt to meet the Anti-Kickback Safe Harbor for Bona Fide Employment; however, in limited instances we use external companies to assist with certain aspects of these efforts, but only in arrangements that we believe do not violate the Anti-Kickback Statute or other applicable laws." *Id.* ¶ 101(h)

- "[O]ur contracted and employed drivers . . . typically transport patients to our centers." *Id.* ¶ 101(f).

- "[W]e are engaging community partners, such as senior living facilities and faith-based organizations, through an account management model to gain referrals of older adults who could benefit from our services and care model." *Id.* ¶ 107(b).

- "So we get most of our patients from meeting people in the community one by one, not through the kind of the — and we get some from health plans and we'll obviously work to get more, but I think that's — their hands are kind of tied (inaudible) not to mention." *Id.* ¶ 101(d).

Plaintiffs allege that Oak Street's November 8, 2021 announcement of the CID revealed "[t]he truth about the Company's failed business model and improper business practices." *Id.* ¶ 129. This lawsuit followed.

## ARGUMENT

Plaintiffs suggest that because they bring securities fraud claims, class certification is a foregone conclusion. Mot. 1. However, no class can be certified unless Plaintiffs meet their burden of proving that their proposed class satisfies the requirements of Rule 23(a) and one of the requirements of Rule 23(b). *In re Fluidmaster, Inc. Water Connector Components Prods. Liab. Litig.*, 2017 WL 1196990, at *3 (N.D. Ill. Mar. 31, 2017). To satisfy Rule 23(a), Plaintiffs must show that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and

7

adequately protect the interests of the class." *Schmidt* v. *Smith & Wollensky, LLC*, 268 F.R.D. 323, 325 (N.D. Ill. 2010).[8] Plaintiffs proceed under Rule 23(b)(3), which requires them to show that "questions of law or fact common to class members predominate over any questions affecting only individual members," and that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### I.    PLAINTIFFS ARE NOT ADEQUATE OR TYPICAL CLASS REPRESENTATIVES

Rule 23(a) requires that a class representative's claims or defenses be "typical" of those of the class and that the representative "adequately" protect the class's interests. Fed. R. Civ. P. 23(a)(3)-(4). "The claims of a proposed class representative are considered atypical if the representative is subject to a unique defense that is reasonably likely to be a major focus of the litigation," *Carbajal* v. *Capital One*, 219 F.R.D. 437, 440 (N.D. Ill. 2004), and the Seventh Circuit has made clear that "the presence of even an *arguable* defense peculiar to the named plaintiff" can "bring into question the adequacy of the named plaintiff's representation." *J.H. Cohn & Co.* v. *Am. Appraisal Assocs., Inc.*, 628 F.2d 994, 999 (7th Cir. 1980); *see also In re Northfield Labs., Inc.*, 267 F.R.D. 536, 541 (N.D. Ill. 2010) ("The typicality and adequacy requirements tend to merge, as they serve as guideposts for determining whether the named plaintiff's claims and the class claims are so interrelated that the interests of the class will be fairly and adequately protected in their absence."). As the Seventh Circuit explained, "[t]he fear is that the named plaintiff will become distracted by the presence of a possible defense applicable only to him so that the representation of the rest of the class will suffer." *Id.*

---

[8] Unless indicated otherwise, all citations and internal quotations are omitted, and all emphasis is added.

Plaintiffs invoke the fraud-on-the-market theory and the class-wide presumption of reliance as set forth in *Basic*, 485 U.S. 224. Under *Basic*, if a plaintiff can prove that the market for a security is efficient, it may seek to certify a securities fraud class action without establishing reliance on an individual basis because the market price for the security is presumed to take into account the alleged misstatements. *Id.* at 247. But that presumption is rebuttable, and "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." *Id.* at 248. To rebut the presumption, "defendants can try to show that plaintiffs did not in fact rely on the integrity of the market price when they traded[.]" *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 605–06 (7th Cir. 2020). Defendants can also rebut the presumption by showing that the plaintiff was "privy to the truth about the" alleged fraud. *Id.*; *see also Lawrence E. Jaffe* v. *Household Int'l, Inc.*, 756 F. Supp. 2d 928, 931, 934 (N.D. Ill. 2010).

For the reasons set forth below, each of the proposed class representatives is subject to numerous unique defenses and is an atypical and inadequate class representative. Absent an adequate and typical class representative, Plaintiffs' Motion should be denied.

## A.     Dearborn Is Atypical and Inadequate

Dearborn cannot adequately represent the proposed class because the evidence shows that the alleged fraud was irrelevant to its investment. Courts have refused to certify a class where the proposed class representative was subject to "unique inquiries regarding . . . why they made investment decisions" and "whether the fraud was in fact irrelevant to their purchasing and sale decisions." *George* v. *China Auto Sys., Inc.*, 2013 WL 3357170, at *7 (S.D.N.Y. July 3, 2013).

Dearborn is a pension fund that bought and sold Oak Street shares ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ("Peregrine"). Ex. 8 at 27:18-28:4. Dearborn ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* at 89:6-91:13; Ex. 9 at 64:22-

9

65:8; Ex. 10 at 2 ("█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ It is thus Peregrine's knowledge that is relevant in determining whether Dearborn is subject to unique defenses. *See, e.g.*, *Villella* v. *Chem. & Mining Co. of Chile Inc.*, 2018 WL 2958361, at *4–5 (S.D.N.Y. June 12, 2018) ("[C]ourts may look to a non-party investment adviser's knowledge in determining reliance, where that investment adviser invests on behalf of institutional plaintiffs" and where "a plaintiff wholly outsources their decision making to an investment adviser who acts as their agent, that agent's decision-making calculus is relevant to the reliance inquiry.").[9]

Dearborn invested in Oak Street stock through Peregrine's ████████████████████ ██████████████████████████████████████████████████ *See* Ex. 9 at 60:22-61:11. Peregrine ███████████████████████████████████," an analysis that involves ███████████ ████████████████████████████ *Id.* at 62:1-63:11. This investment strategy "is designed to exploit information gaps – disconnects between a stock's price and its underlying earnings growth prospects." Ex. 11 at 10. And, as Peregrine's corporate designee conceded, ██ ████████ ████████████████████████████████████████████████████████████████████ ███████████████████████ Ex. 9 at 69:6-10.

Peregrine first purchased Oak Street stock on behalf of Dearborn on August 6, 2020, the date of the IPO. Ex. 12 at 2. Peregrine participated in a ████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████

---

[9] Numerous courts have considered an investment manager's knowledge when considering whether a proposed class plaintiff is subject to unique reliance defenses. *See, e.g.*, *In re Under Armour Sec. Litig.*, 631 F. Supp. 3d 285, 305 (D. Md. 2022); *New Jersey Carpenters Health Fund* v. *Residential Cap., LLC*, 272 F.R.D. 160, 168–169 (S.D.N.Y. 2011), *aff'd*, 477 F. App'x 809 (2d Cir. 2012); *Howard* v. *Liquidity Servs. Inc.*, 322 F.R.D. 103, 119–27 (D.D.C. 2017).

██████. Ex. 9 at 107:13-108:11.[10]  Before investing in Oak Street, Peregrine also ██████

████████████████████████████  Peregrine's corporate designee testified that ██████

█████████████████████████████████ and he recalled that ██████████

████████████████████████████ *Id.* at 112:7-17, 113:1-114:12.  Indeed,

Peregrine  recognized  that  the  ████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████ in Oak Street.  *Id.* at 113:25-114:12, 115:3-11.

Peregrine was also aware, at the time that it invested Dearborn's money in Oak Street, that

Oak Street was ████████████████████████████████████████

██████████████████████████.[11]  *Id.*  at  179:19-180:8,  181:16-182:5.

Peregrine  conceded  that  ████████████████████████████████—*i.e.*,  the  very

information that Plaintiffs now claim was concealed—"████████████████████████"  nor

████████████████████████████, *id.* at 180:5-13, and Peregrine did not

███████████████████████████████████████████████."  *Id.* at

142:24-143:3.  The fact that Peregrine was "privy to the truth" about the alleged fraud rebuts the

---

[10] *See also* Ex. 13 ████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████ Ex. 14 ████████████████████████████████
████████████████████████████████████████████████████████
████████████████████ Ex. 15 ████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████ Ex. 16 ████████████████████████████████████
████████████████████████████████████████████████████████
████████████████

[11] Defendants do not concede the characterization of the facts or law by either of Plaintiffs'
investment managers, including that ████████████████████████████████████
████████████████████ or that ████████████████████████████████████
Putting aside their precise verbiage, the point is that Plaintiffs' investment managers ████████
████████████████████████████████████████████████████████

11

presumption of reliance as to Dearborn. *Lawrence E. Jaffe*, 756 F. Supp. at 931. These admissions from Dearborn's investment manager clearly make Dearborn subject to unique defenses of non-reliance.

Further, Peregrine ███████████████████████████████████████ ██████████████. Indeed, on November 8, 2021, Peregrine noted that ███████████████████ █████████████████████████████████████ and that Oak Street's stock ████████████████ ████████████████████ Ex. 17 at 2. Peregrine's corporate designee confirmed that it is "██ █████" for healthcare companies "███████████████," that "██████████████████████ ████████████████████████████████████████" and that Peregrine ████████████ █████████████████████████████████████████. Ex. 9 at 154:7-156:23. Peregrine unsurprisingly ████████████████████████████████████████████████ ██████████. *Id.* at 156:25-158:3. Instead, days after the CID was announced, in a █████████████ ████████████████████████████████████████████████████████████████ ████████████████ thereby suggesting to ██████████████████████████████████████████. Ex. 15 at 3. Even months after the CID, Peregrine ████████████████████████████ ████████████████ Ex. 9 at 172:24-173:2.

In order for this Court to conclude that Dearborn is an inappropriate class representative, Dearborn (by way of Peregrine) need only be "subject to the colorable defense of non-reliance on the market." *See Zandman* v. *Joseph*, 102 F.R.D. 924, 931 (N.D. Ind. 1984). Here, that non-reliance is clear. For one, Peregrine was ████████████████████████████████████ ████████████████████████████████████—it therefore cannot claim that it was deceived. Moreover, Peregrine █████████████████████████████████████. Peregrine █████████ ██████████████████████████████████████████. Peregrine also █████████████

12

████████████████████████████████████████████████████████████████████████.

Each of these factors is alone sufficient to raise a "colorable" defense of non-reliance; together, they leave no doubt as to Dearborn's non-reliance on the market.

Additionally, Dearborn is an inadequate class representative because its corporate designee displayed a stunning lack of even the most basic understanding of the theory of its own case, and its credibility will draw attention from class-wide issues. For example, when asked ████████████ ████████████████████████████████████████████████████████████████████████, Dearborn's corporate designee testified: ████████████████████████████████████"—the *sole* alleged corrective disclosure—"████████████████████." Ex. 8 at 156:23-157:6. Perhaps not surprisingly, then, he also testified that Dearborn ████████████████████████████████████ ████████████████████████. *Id.* at 29:1-5. Indeed, Dearborn's representative testified ████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████ *Id.* at 31:18-24, 130:24-131:21. Dearborn's complete lack of understanding about the case Plaintiffs are pursuing is disqualifying. *See Ocampo* v. *GC Servs. Ltd. P'ship*, 2018 WL 6198464, at *9–10 (N.D. Ill. 2018) (plaintiff's lack of understanding of the legal basis for its claim and basic facts of the case, among other things, rendered him an inadequate class representative); *Scott* v. *NYC Dist. Council of Carpenters Pension Plan*, 224 F.R.D. 353, 356 (S.D.N.Y. 2004) (denying class certification because plaintiffs had an "alarming lack of familiarity with the suit," including not knowing what the allegations were in the complaint).

Further, Dearborn submitted a declaration, signed by its corporate designee—the very same witness whose testimony is cited here—in support of the Motion, in which it swore that Dearborn "did not hold or acquire" Oak Street stock "in order to participate in this private action *or any*

13

*other litigation under the federal securities laws*." Dkt. 135-5 ¶ 3. However, on ███████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ " Ex. 18 at 3. At his deposition, ██████████

██████████████, Dearborn's corporate representative conceded that the ████████████████

████████████████████. Ex. 8 at 126:23-129:24. Courts have held that a plaintiff's "credibility

problems" are an independent basis for refusing to appoint a proposed class representative. *CE

Design Ltd.* v. *King Architectural Metals, Inc.*, 637 F.3d 721, 726 (7th Cir. 2011) ("A named

plaintiff who has serious credibility problems or who is likely to devote too much attention to

rebutting an individual defense may not be an adequate class representative."); *Sgouros* v.

*TransUnion Corp.*, 2023 WL 6690474, at *4 (N.D. Ill. Oct. 12, 2023) ("Having reviewed Sgouros'

deposition testimony, the Court finds that there is significant admissible evidence from Sgouros'

deposition testimony that challenges credibility such that prevents him from serving as an adequate

representative."); *see also Kline* v. *Wolf*, 702 F.2d 400, 403 (2d Cir. 1983); *Darvin* v. *Int'l

Harvester Co.*, 610 F. Supp. 255, 257 (S.D.N.Y. 1985). At best, ██████████████████████

████████████████████████████████████. At worst, ██████████████████████

████████████████████████████████████████. *See In re Northfield*, 267

F.R.D. at 543 (false testimony renders lead plaintiff inadequate to represent interests of the class);

*Kaplan* v. *Pomerantz*, 132 F.R.D. 504, 510 (N.D. Ill. 1990) (same). Either way, it would be an

inappropriate distraction before the jury.

For all of these reasons, Dearborn is an inadequate and atypical representative of the class

Plaintiffs seek to certify.

14

## B.      BRS and CPAT Are Atypical and Inadequate

BRS and CPAT are pension funds, both of which ███████████████ ███████████████████████████████████████████████████ ("Westfield"). Ex. 19 at 31:16-32:2, 101:18-103:2; Ex. 20 at 30:11-15, 78:5-80:2, 89:6-13.[12]   The typicality requirement is "designed to prevent an instance where the legal theories of the named plaintiff may potentially conflict with those of absent plaintiffs." *Dhamer* v. *Bristol-Myers Squibb Co.*, 183 F.R.D. 520, 526 (N.D. Ill. 1998).[13]   But here, both BRS and CPAT ██████████████ ███████████████████████████████████████████████████ ████████████████████. Further, as the Seventh Circuit has noted, "even an *arguable* defense" may render a proposed class representative inadequate. *J.H. Cohn*, 628 F.2d at 999.  Here, if permitted to proceed as class representatives, "unique inquiries regarding . . . why [Westfield] made investment decisions" and "whether the fraud was in fact irrelevant to their purchasing and sale decisions" would undoubtedly distract from resolution of class-wide issues. *George*, 2013 WL 3357170, at *7.

Plaintiffs pursue securities fraud claims based on Defendants' alleged failure to disclose the CAP and that it was marketing and providing free transportation in supposed violation of the AKS.  But Westfield's corporate designee conceded that, ███████████████████ ███████████████████████████████████████████████████ ███████" Ex. 21 at 152:7-153:19.  He testified that "███████████████████████████████████"



---

[12] As set forth above, Section I.A., the Court should therefore look to Westfield's knowledge in assessing whether BRS and CPAT are subject to unique defenses of non-reliance.

[13] *See also Passman* v. *Peloton Interactive, Inc.*, 2023 WL 3195941, at *12 (S.D.N.Y. May 2, 2023) ("The typicality requirement is intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees."); *In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 359 (N.D. Cal. 2018) (rejecting a proposed class representative whose testimony "conflicts with one of Plaintiffs' two theories of liability").

██████████████████████████████████████████████ and part of why Westfield was

"████████████████████████████████████████████████████████████████

██████████████████████████ *Id.* at 144:15-147:18. Westfield's designee further testified that

Westfield █████████████████████████████████████████████████

████████████████████████████████████████████████████ " of the Medicare laws.

*Id.* at 154:5-156:1. In other words, Westfield—and by extension BRS and CPAT—admitted it

█████████████████████████████████████████. Nonetheless, at the time

Westfield acquired Oak Street stock on behalf of BRS and CPAT, Oak Street's patient acquisition

strategy ████████████████████████████████." *Id.* at 151:21-152:5; *see also id.* at

156:15-18 (conceding ███████████████████████████████████████

████████. Because Westfield knew of and was "indifferent to" the practices alleged to have

been concealed in this case, BRS and CPAT are subject to individualized inquiries regarding their

reliance. *Lawrence E. Jaffe* v. *Household Int'l, Inc.*, 2005 WL 3801463, at *3 (N.D. Ill. Apr. 18,

2005) (one of the "ways that a defendant can rebut the presumption of reliance" is "showing that

an individual plaintiff would have purchased anyway had he known of the falsity of the

representation"); *McNichols* v. *Loeb Rhoades & Co., Inc.*, 97 F.R.D. 331, 339 (N.D. Ill. 1982)

("[C]ourts concluded that the question of reliance, or rather nonreliance, may be raised against a

named plaintiff and may vitiate the typicality of that plaintiff's claims."); *In re Vivendi Universal,*

*S.A. Sec. Litig.*, 123 F. Supp. 424, 438 (S.D.N.Y. 2015) (presumption of reliance rebutted with

respect to plaintiff that was "indifferent to the fraud").

Plaintiffs claim that Oak Street's announcement of the CID on November 8, 2021 revealed

the "truth of the aggressive and risky patient acquisition tactics" and Oak Street's stock "plunged

more than 20%" as a result of the disclosure. Mot. 6. But Westfield thought that "█████



(Ex. 22 at 3) and had ▮▮▮▮▮ ▮▮▮▮▮" when it decided to invest in Oak Street. Ex. 21 at 220:7-221:2. Unsurprisingly, Westfield believed ▮▮▮▮▮" and ▮▮▮▮▮ ▮▮▮▮▮ *Id.* at 227:7-229:1. Westfield did not even ▮▮▮▮▮ ▮▮▮▮▮ *Id.* at 229:10-230:17. Westfield ▮▮▮▮▮ ▮▮▮▮▮ *Id.* at 246:9-17. These concessions render BRS and CPAT atypical of the class they seek to represent. *Passman*, 2023 WL 3195941, at *12 ("The typicality requirement is intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees.").

Moreover, Westfield's relationship with BRS, in particular, raises serious questions about BRS's ability to function in a fiduciary capacity. "Class representatives owe fiduciary duties to the absent members of the class, and are entrusted with the responsibility to advance and protect their interests." *Paper Sys. Inc.* v. *Mitsubishi Corp.*, 193 F.R.D. 601, 610 (E.D. Wis. 2000); *Blanchard* v. *Edgemark Fin. Corp.*, 175 F.R.D. 293, 298 (N.D. Ill. 1997) ("[A] class representative, by assuming a representative role on behalf of the absent class members, voluntarily accepts a fiduciary obligation toward the class[.]"). But BRS cannot be trusted to protect the interests of absent class members when it has proven an inability to appropriately supervise Westfield, notwithstanding the fact that BRS, as a pension fund, owes fiduciary duties to its beneficiaries.

17

An investment management agreement ("IMA") is the vehicle by which an entity (here, BRS) gives an investment manager (here, Westfield) authority to manage funds on behalf of investors, and it can set guidelines by which the manager must abide. *See* Ex. 19 at 95:21-96:7, 101:22-102:17. Although Westfield's corporate designee testified that ████████████████ █████████████████████████████████████████," Ex. 21 at 67:4-68:1, the last IMA between BRS and Westfield expired in 2017. Ex. 19 at 92:20-23. BRS's corporate designee admitted that they "████████████████████████," which he described as ███████████." *Id.* at 131:7-17. While BRS and Westfield ████████████████████████████████ ████████████████████████████████████████████████ ███████. For example, ███████████████████████████████████ ██████████████████████████████. Ex. 23 at 9. But Westfield purchased Oak Street stock on BRS and CPAT's behalf when, during the class period, Oak Street's market capitalization was over $11 billion. *See* Ex. 19 at 105:16-106:22 (BRS's corporate designee █████████ ███████████████████████████████████████████████████ ██████████. Although BRS now █████████████████████████████ ████████████████████████████, *id.* at 131:7-17, this complete lapse in oversight should raise serious questions about BRS's ability to represent the class.[14]

Moreover, during the class period, BRS's formal investment objectives and guidelines provided that ███████████████████████████████████. Ex. 25 at 11. However,



---

[14] Westfield also represented to its SMID Cap investors (including BRS and CPAT) █████████ ████████████████████████████████████████████████████ ██████████████████████████████████. Ex. 24 at 2; Ex. 21 at 235:8-236:13. Westfield's 30(b)(6) witness described ████████████████████████ Ex. 21 at 236:3-238:12. This misrepresentation calls into question how BRS or CPAT can rely upon any news regarding Oak Street in November 2021 since both █████████████████████████████ █████████████████████████████████.

the ████████████████████████████████████████████████████, stated that Westfield ████████████████████████████████████—an entirely separate fund with entirely separate objective guidelines.  Ex. 23 at 3.  BRS was in fact invested in Westfield's ████████████████████████.  *See* Ex. 21 at 69:18-70:19; Ex. 19 at 122:17-123:5; Ex. 26 at 2; Ex. 27 at 2.  BRS's failure to document the contours of its fiduciary relationship with Westfield in real time raises serious questions about BRS's competence to do much of anything, let alone take on additional responsibilities as a fiduciary to all absent class members.

### D. Plaintiffs Are Not Capable of Supervising Their Counsel

"Congress' clear intent in enacting the PSLRA was to transfer control of securities class actions from the attorneys to the class members."  *In re Cendant Corp.*, 260 F.3d 183, 197 (3d Cir. 2001).  But lawyer-driven litigation is exactly what this case has become.  Plaintiffs are ████ ████████████████████████████████████████████.  Ex. 8 at 136:5-14, 136:20-137:3; Ex. 20 at 154:15-155:8, 165:16-166:8; Ex. 19 at 142:9-21, 149:12-18.  Plaintiffs have had little contact with one another.  Dearborn ████████████████████████ ████████████████, during which the parties ████████████████████████████ ████████████████████████████████.  Ex. 8 at 135:23-136:4, 138:2-20.  BRS and CPAT ████████████████████████.  Ex. 20 at 158:15-22, 168:22-169:21, 174:5-24. ████████████████████████████████████, Ex. 8 at 138:21-24; Ex. 20 at 161:18-162:14, 171:22-172:12, ████████████████████████████ ████████████.  Ex. 8 at 138:25-139:3; Ex. 20 at 163:7-164:23, 172:20-173:6; Ex. 19 at 152:22-153:11.

Plaintiffs' abdication of the management of this case to their lawyers is especially concerning because BRS has previously been found to be inadequate to serve as a class

19

representative because it either failed to "acquiesce in [the court's] directive, or [was] incapable of controlling its lawyers." *In re Allergan PLC Sec. Litig.*, 2020 WL 5796763, at \*9 (S.D.N.Y. Sept. 29, 2020). And Dearborn ███████████████████████████████████. Ex. 8 at 135:2-8. Plaintiffs are therefore inadequate because "the group [has] not sufficiently demonstrate[d] that it can adequately monitor counsel and make important decisions together." *See In re Cloudera, Inc. Sec. Litig.*, 2019 WL 6842021, at \*6 (N.D. Cal. Dec. 16, 2019).[15]

## II. ANY CLASS THAT IS CERTIFIED AS TO PLAINTIFFS' SECURITIES ACT CLAIMS SHOULD BE SIGNIFICANTLY CURTAILED

Plaintiffs here are pursuing claims under the Securities Act and the Exchange Act and seek to certify a single class of persons and entities who purchased Oak Street shares "from August 6, 2020 through November 8, 2021 . . . including those who purchased shares of Oak Street common stock pursuant to or traceable to the Registration Statements and Prospectuses issued in connection with Oak Street's IPO, December 2020 Offering, and February 2021 Offering, and were damaged thereby." Mot. 2. But Plaintiffs have not affirmatively satisfied Rule 23(b)(3)'s requirement that common issues of fact and law predominate over individual issues for the entire period for which they seek to certify their Securities Act claims. Nor can they.

"To bring a claim under § 11, the securities held by the plaintiff must be traceable to the particular registration statement alleged to be false or misleading." *Slack Techs., LLC* v. *Pirani*, 143 S. Ct. 1433, 1440–41 (2023). Thus, Section 11 standing requires a plaintiff to prove that the shares that it acquired were issued under the specific registration statement challenged and therefore are "directly traceable" to the offering at issue. *In re Puda Coal Sec. Inc. Litig.*, 2013

---

[15] In *In re Cloudera*, the court determined that BRS and another proposed co-lead plaintiff did "not satisfy the adequacy requirements of Rule 23" where they were "unrelated investors with no disclosed decision-making structure." 2019 WL 6842021, at \*6.

WL 5493007, at *6 (S.D.N.Y. Oct. 1, 2013); *see also In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 207 (S.D.N.Y. 2003) ("[P]laintiffs bear the burden of proving securities are traceable.").[16]

A plaintiff can demonstrate traceability "either through proof of a direct chain of title from the original offering" to the plaintiff, "or through proof that the [plaintiff] bought her shares in a market containing only shares issued pursuant to the allegedly defective registration statement." *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 31 n.1 (2d Cir. 2006) ("*In re IPO Cir. Ct.*"). However, "[t]he modern practice of electronic delivery and clearing of securities trades, in which all deposited shares of the same issue are held together in fungible bulk, makes it virtually impossible to trace shares to a registration statement once additional unregistered shares have entered the market." *In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. 65, 118 (S.D.N.Y. 2004), *rev'd on other grounds*, 471 F.3d 24 (2d Cir. 2006) ("*In re IPO Dist. Ct.*"); *In re Puda Coal*, 2013 WL 5493007, at *8 (stating that the "fungibility of shares" held at DTC is "fatal to traceability" because "[o]nce a part of the DTC[] group of [company] shares, they lose any specific identity"). A plaintiff may likewise struggle to demonstrate traceability where "the challenged statements are connected to a discrete offering of stock and the company previously issued stock in other offerings." *West Palm Beach Firefighters*, 495 F. Supp. 3d at 668. Plaintiffs ignore this and plead a single, overbroad class that would encompass Securities Act claims stemming from numerous different offerings at times where tracing will be "virtually impossible." *In re Honest Co. Sec. Litig.*, 2023 WL 3190506, at *3 (C.D. Cal. May 1, 2023).

---

[16] Without standing to bring a primary liability claim under Section 11, plaintiffs cannot bring Section 15 claims, which are control person claims. *See West Palm Beach Firefighters' Pension Fund* v. *Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 672–73 (N.D. Ill. 2020).

21

To the extent Plaintiffs argue that the Court need not address the individualized inquiry resulting from the tracing requirement at the class certification stage, courts that have considered the argument have recognized that individualized questions of traceability go to commonality and predominance, which are central to class certification. In *In re Honest Company Securities Litigation*, for example, the proposed class was defined as "[a]ll persons and entities that purchased or otherwise acquired Honest's publicly traded common stock pursuant and/or traceable to the offering Documents for Honest's IPO." *Id.* at *3. The plaintiff argued that the court need not consider at class certification whether the class should be limited to those who purchased shares before unregistered shares became commingled with registered shares because the lead plaintiff herself had purchased her shares of Honest stock before then. *Id.* at *4–5. The court rejected this argument, concluding that the "proposed class definition must be modified to satisfy the predominance and commonality requirements of Rule 23." *Id.* at *5. Modification meant limiting the class definition to include only those who acquired Honest's publicly traded common stock "pursuant and traceable to" Honest's offering documents before the date on which "non-IPO shares became commingled" with IPO shares. *Id.*

Here, although Plaintiffs' proposed class is in theory limited to those who purchased Oak Street stock "pursuant to or traceable to" various registration statements, "[w]ithout a properly cabined class definition individual class members would be required to prove that they can trace their shares" to a particular registration statement, and Plaintiffs' "claims would not be 'capable of classwide resolution'" as is required under Rule 23. *Id.* Because traceability "is a context-specific task" once shares are commingled, *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1107 (9th Cir. 2013), courts routinely deny class certification or limit class periods where members of the putative class may have tracing issues. *E.g., In re IPO Dist. Ct.*, 227 F.R.D. at 118 (tracing

inquiry "would fragment the class action into myriad mini-trials"); *Tsirekidze* v. *Syntax-Brillian Corp.*, 2009 WL 2151838, at *7 (D. Ariz. July 17, 2009).

### A.      Any Class Period Should End on December 6, 2020

Any class period for Plaintiffs' Securities Act claims should be limited from August 6, 2020 through December 6, 2020, because that is the only period of time in which Plaintiffs could possibly satisfy Rule 23(b)(3)'s requirements.

Publicly tradeable shares of Oak Street stock were held at the DTC. AST Decl.[17] ¶¶ 3–11; DTC Decl.[18] ¶¶ 2–3. As confirmed by the DTC and explained in the expert report of Jack R. Wiener, Esq., DTC held Oak Street's shares as part of a single, commingled "fungible bulk" of Oak Street stock under a single CUSIP number, such that unregistered shares and shares registered pursuant to the IPO and each of the SPOs were indistinguishable from one another. DTC Decl. ¶¶ 2–3; Wiener Rpt.[19] ¶ 67. Oak Street shares held at the DTC was registered in the "street name" of DTC's nominee, Cede & Co., rather than the name of the beneficial owner. Wiener Rpt. ¶ 67; DTC Decl. ¶ 2. In practice, the beneficial owners of Oak Street shares owned a *pro rata* share of the fungible bulk of indistinguishable, commingled Oak Street shares held at DTC. Wiener Rpt. ¶ 67; DTC Decl. ¶ 3.

On December 7, 2020, shares issued pursuant to the December 2020 SPO registration statement were delivered to DTC and became commingled within DTC's fungible bulk of Oak Street shares with shares issued pursuant to the IPO registration statement, making tracing of shares thereafter impossible. AST Decl. ¶¶ 5–6; DTC Decl. ¶¶ 2–3; Wiener Rpt. ¶¶ 66–68; *see*

---

[17] "AST Decl." refers to the Declaration of Kimberlee Koskiewicz, dated February 15, 2024 (Ex. 28).

[18] "DTC Decl." refers to the Declaration of Ann Marie Bria, dated February 15, 2024 (Ex. 29).

[19] "Wiener Rpt." refers to the Expert Report of Jack R. Wiener, dated February 20, 2024 (Ex. 30).

23

*also West Palm Beach Firefighters*, 495 F. Supp. 3d at 668 ("[W]here . . . the challenged statements are connected to a discrete offering of stock and the company previously issued stock in other offerings, [the tracing requirement] is harder to satisfy."). As explained by Mr. Wiener, on December 7, 2020, it became effectively impossible to determine the origin of any individual share of Oak Street stock traded on the market. Wiener Rpt. ¶ 68. Any attempts by putative class members to trace their shares by linking transactions back to particular Oak Street offerings would "fragment the class action into myriad mini trials on the subject of tracing," *In re IPO Dist. Ct.*, 227 F.R.D. at 118, defeating predominance.

The inability to trace shares to the IPO registration statement as opposed to the December 2020 SPO registration statement presents a meaningful problem for Plaintiffs, as the two registration statements contain different alleged misrepresentations. *See* Compl. ¶ 107 (alleging "Other Growth Channels Statement" unique to December 2020 SPO registration statement). Moreover, Oak Street shares issued in the IPO were priced at $21.00, and shares issued in the December 2020 SPO were priced at $46.00. *See* Ex. 31 at 2; Ex. 32 at 2. Thus, shares issued under each registration statement would give rise to different damages analyses. *See* 15 U.S.C. § 77k(e) (capping the amount paid for a security, for the purposes of measuring damages, at "the price at which the security was offered to the public").

Accordingly, to the extent this Court determines that any class can be certified here, the class period for Plaintiffs' Securities Act claims must end on December 6, 2020. *See, e.g.*, *In re Merix Corp. Sec. Litig.*, 2009 WL 10692857, at *3 (D. Or. Nov. 5, 2009) (limiting class to only those investors who purchased securities directly from the underwriters on the date of the secondary offering); *Tsirekidze*, 2009 WL 2151838, at *7 (same).

24

**B.      In the Alternative, Any Class Period Should End on February 1, 2021**

In the alternative, any class period should certainly be limited to the period of August 6, 2020 through February 1, 2021, at the latest.  The vast majority of Oak Street's outstanding shares—77% after the December 2020 SPO[20]—were unregistered[21] shares subject to "lock up agreements" through which their owners agreed not to sell or dispose any of their shares for the following 180 days.  Ex. 1 at 25, 27; Wiener Rpt. ¶ 57.  After that 180-day period, on February 2, 2021, the lock-up agreements expired, and the pre-IPO, unregistered shares became eligible for sale in the public market.[22]  Tens of millions of these shares had previously been delivered to DTC and were joined in the same fungible bulk of Oak Street shares that contained the shares issued in the IPO and December 2020 SPO.  Wiener Rpt. ¶¶ 70–71; DTC Decl. ¶¶ 2–3.  Accordingly, anyone transacting in Oak Street shares on or after February 2, 2021 could not know whether they were trading in registered or unregistered shares.

This makes tracing functionally impossible after February 1, 2021, including on a classwide basis.  *See, e.g.*, *In re Honest Co.*, 2023 WL 3190506, at *5 (narrowing class period to before unregistered, non-IPO shares were traded because "[t]racing a particular share to the IPO is impossible once non-IPO shares became commingled"); *In re IPO Dist. Ct.*, 227 F.R.D. at 117–

---

[20] See Ex. *See* Ex. 32 at 21.

[21] Meaning they had not been registered under an effective registration statement.  These unregistered pre-IPO common shares were held by, among others, Oak Street's officers, directors, and investors, including the Sponsor Defendants.  Ex. 1 at 25, 27.

[22] And they did in fact trade in the market without restrictive legends following that date.  *See, e.g.*, Ex. 33 (Rule 144 opinion letter indicating that certain unregistered shares could trade without a restrictive legend); Ex. 34 (reflecting March 25, 2021 sale of unregistered securities discussed in Ex. 33); Ex. 35 (reflecting April 8, 2021 sale of unregistered securities discussed in Ex. 33).  This case is therefore distinguishable from *In re Prestige Brands Holdings, Inc. Securities Litigation*, in which the court rejected the defendants' traceability defense at the class certification stage because "[n]o evidence has so far been presented that non-IPO shares entered the market in any significant number during the class period." 2007 WL 2585088, at *5 (S.D.N.Y. Sept. 5, 2007).

20 (narrowing Section 11 class to the period before "unregistered shares became tradeable" because "the necessity of trying individual [tracing] issues . . . disqualif[ies] the class under the Rule 23(b)(3) predominance requirement").

**C.      The Only Proposed Class Representative with Potential Section 11 Standing is Inadequate and Atypical**

Before the Court can certify any class as to the Securities Act claims, it must determine that at least one of the proposed class representatives has standing to pursue those claims. *See Kohen* v. *Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009) (holding that "one named plaintiff with standing . . . is all that is necessary.").

Here, regardless of which cutoff date this Court applies to any class it may certify, it is undisputed that only Dearborn has standing to pursue Section 11 (or Section 15) claims. As BRS admitted, ███████████████████████████████████████████████████

████████████████████████████████████████████." Ex. 19 at 150:13-151:1. BRS's and CPAT's first purchases of Oak Street shares occurred in March 2021, *see* Dkt. 11-2 at 3, 6 (certifications of BRS and CPAT), at which point the fungible bulk of Oak Street shares held at DTC included unregistered pre-IPO shares and shares registered in the IPO, the December 2020 Offering, and February 2021 Offering. Wiener Rpt. ¶ 82. Accordingly, there is no way for BRS or CPAT to trace their shares back to any particular registration statement. Wiener Rpt. ¶ 83. Plaintiffs' failure to allege that BRS or CPAT purchased traceable shares or sustained Section 11 damages concedes as much. Compl. ¶¶ 269–70.

Dearborn is the only proposed class representative with arguable Section 11 standing. But Dearborn is hopelessly inadequate and atypical, as set forth above. *See supra* Section I.A. Absent an adequate and typical class representative with standing to pursue the Securities Act claims, Plaintiffs cannot certify a class as to those claims. *See Krim* v. *pcOrder.com, Inc.*, 210 F.R.D. 581,

586–87 (W.D. Tex. 2002) (denying class certification because lead plaintiffs who purchased after insider shares entered the market could not trace and lacked standing to sue under Section 11).

## III. ANY CLASS THAT IS CERTIFIED AS TO PLAINTIFFS' EXCHANGE ACT CLAIMS MUST BE SHORTENED

Plaintiffs fail to meet their burden of establishing that Oak Street shares traded in an efficient market during the entire class period. If the Court certifies any class for Plaintiffs' Exchange Act claims, it should exclude the 25-day period beginning with Oak Street's IPO.

Plaintiffs seek to satisfy Rule 23(b)(3)'s predominance requirement for their Exchange Act claims by invoking the "rebuttable presumption" of classwide reliance established by *Basic* v. *Levinson*, 485 U.S. 224 (1988). Mot. 16. To do so, they must show that Oak Street shares traded in an efficient market across the *entire* class period. *See In re Northfield Labs., Inc. Sec. Litig.*, 267 F.R.D. 536, 549 (N.D. Ill. 2010) (denying class certification where plaintiffs failed to show that the market was efficient for first two years of class period). If Plaintiffs cannot rely on the *Basic* presumption of reliance, they need to prove reliance on an individual basis, "which means individual issues will predominate over class issues," and the putative class does not meet the requirements of Rule 23(b)(3). *Id.*

Plaintiffs have not met their burden to establish that the market for Oak Street was efficient throughout the entire class period. Plaintiffs conclude, based on the analysis of their market efficiency expert Chad Coffman, that "Oak Street common stock traded in an efficient market during the Class Period." Mot. 25. But the class period begins with Oak Street's IPO, and Plaintiffs have overlooked critical caselaw and academic literature that establishes that a market for shares is not efficient on the day of an initial public offering or during the 25-day quiet period (which includes the initial public offering date). *E.g.*, *In re IPO Cir. Ct.*, 471 F.3d at 42. Neither Plaintiffs nor their expert performed any analysis specific to Oak Street's IPO date or Quiet

27

Period—despite well-recognized, unique circumstances militating against a finding of efficiency during such periods. And, in fact, the same factors, methodologies, and thresholds considered by Plaintiffs' expert do not support the conclusion that the market for Oak Street common stock was efficient during the IPO or Quiet Period. Accordingly, Plaintiffs have not met their burden, and the class period for Plaintiffs' Exchange Act claims should not begin until August 31, 2020, after the Quiet Period ended.[23]

**A. Plaintiffs Have Not Met Their Burden to Show That the Market for Oak Street's Common Stock Was Efficient During the IPO or the Quiet Period**

Plaintiffs' and Mr. Coffman's failure to perform any analysis of the efficiency of the market for Oak Street's common stock on the date of the IPO or the 25-day Quiet Period was a glaring oversight. The Second and Sixth Circuits, and numerous district courts, have concluded as a matter of law that "the market for IPO shares is not efficient." *In re IPO Cir. Ct.*, 471 F.3d at 42; *see also Freeman* v. *Laventhol & Horwath*, 915 F.2d 193, 199 (6th Cir. 1990) (finding that a primary market "as a matter of law is not efficient"); *In re SCOR Holding (Switzerland) AG Litig.*, 537 F. Supp. 2d 556, 557, 575–79 (S.D.N.Y. 2008) (market during quiet period presumably inefficient); *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 308 (D.N.J. 2007) ("IPO cases fall outside the presumption of reliance enunciated in *Basic.*"); *In re Enron Corp. Sec. Deriv. & ERISA Litig.*, 529 F. Supp. 2d 644, 771–72, 772 n.148 (S.D. Tex. 2006); *Berwecky* v. *Bear, Stearns & Co.*, 197 F.R.D. 65, 68 n.5 (S.D.N.Y. 2000); *In re MDC Holdings Sec. Litig.*, 754 F. Supp. 785, 806 (S.D. Cal. 1990) ("By definition, an initial public offering of a new security does not involve an efficient, well-developed market because there is no market. The presumption of reliance is based on the

---

[23] Although not a trained economist, Westfield's corporate designee ██████████████ ████████████████████████████████████████████████████████████. *See* Ex. 21 at 183:3-19.

assumption of a well-developed market.").  As explained by expert economist Cliff Ang, this body of case law is well supported by academic literature.  Ang Rpt.[24] ¶¶ 17–23.  Mr. Coffman was well aware of this literature, making his decision not to independently test the efficiency of the market on the IPO date all the more surprising.  *See* Ex. 37 at 167:11-169:3.

The evidence here supports the conclusions in the case law and academic literature.  By the close of trading on the date of the IPO, the value of Oak Street's common stock nearly doubled its offering price on extraordinarily high trading volume.  Ang Rpt. ¶ 25; *see also* Ex. 9 at 129:6-22 (Peregrine's corporate designee confirming that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇).  This is indicative of inefficiency.  As recognized by the court in *In re SCOR Holding (Switzerland) AG Litigation*, "during the period immediately following the IPO . . . investors are likely in the process of becoming informed and 'assimilat[ing] available information,' . . . and thus it is difficult to find based on the [high] trading volume . . . that the market already reflected all 'available material information regarding the company and its business' during that time."  537 F. Supp. 2d at 578.

Similarly, Plaintiffs have failed to demonstrate that the market for Oak Street stock was efficient during the Quiet Period.  As the Second Circuit explained, "during the 25–day 'quiet period,' analysts cannot report concerning securities in an IPO, . . . thereby precluding the contemporaneous 'significant number of reports by securities analysts' that are a characteristic of an efficient market," preventing plaintiffs from carrying their burden to establish market efficiency during the quiet period.  *In re IPO Cir. Ct.*, 471 F.3d at 43 (quoting *Freeman*, 915 F.2d at 199).  Plaintiffs' expert, Mr. Coffman, did not even know if there was a Quiet Period; he only "assume[d] there was some form of quiet period," did not know for sure whether it existed, or if it did exist,

---

[24] "Ang Rpt." refers to the Expert Report of Cliff Ang (Ex. 36).

when it ended. Ex. 37 at 189:5-11, 192:4-13. Nor did Mr. Coffman perform any analysis specific to the Quiet Period. *Id.* at 200:5-12. Instead, Mr. Coffman applied the "fairly standard process [he has] in place when asked to evaluate market efficiency." *Id.* at 19:7-19. What is more, Mr. Coffman candidly admitted at his deposition that markets can start out as inefficient and later become efficient, and that a quiet period "can limit the amount of information out in the market." *Id.* at 188:17-189:3, 255:14-19. Plaintiffs have thus failed to carry their burden, and cannot rely on the *Basic* presumption to establish reliance during this time.

Indeed, the very same factors, analyses, and thresholds relied on by Plaintiffs (Mot. 18-25) to conclude that the market for Oak Street was efficient during the entire class period lead to the exact opposite conclusion for the period from Oak Street's IPO through the end of its Quiet Period. Mr. Ang reviewed the same *Cammer*, *Krogman*, and additional factors identified by Plaintiffs and Mr. Coffman, and, using the same analysis, determined that they did not **necessarily** support ~~the conclusion~~**Mr. Coffman's assumption** that the market for Oak Street was efficient during that time. Ang Rpt. ¶¶ 30–44.

### 1. *Cammer* Factor 1: Weekly Average Trading Volume

According to the court in *Cammer* v. *Bloom*, an average weekly trading volume of 2% or more of outstanding shares supports a "strong presumption that the market for a security is an efficient one" and a weekly average trading volume of 1% would support a "substantial presumption." 711 F. Supp. 1264, 1293 (D.N.J. 1989). Here, the average weekly trading volume of Oak Street common stock during the Quiet Period was 1.69%, below the 2% threshold identified by the *Cammer* Court. Ang Rpt. ¶ 33. However, the average *daily* trading volume was only 0.38% during the Quiet Period. *Id.* ¶ 34; *see In re Northfield*, 267 F.R.D. at 547–48 (considering daily trading volumes in market efficiency analysis). Trading volume therefore does not support Mr. Coffman's conclusion of efficiency including during the Quiet Period. *Id.* ¶ 35; *see, e.g.*, *Stanaford*

30

v. *Genovese*, 2016 WL 4198146, at *8 (S.D. Fla. Mar. 14, 2016) (concluding that .3% median weekly trading volume and a .8% mean indicated that the company had a "low trading volume"); *ScripsAmerica, Inc.* v. *Ironridge Global LLC*, 119 F. Supp. 3d 1213, 1254 (C.D. Cal. 2015) (finding that trading volume "weigh[ed] against a finding that there was an efficient market" where "on only six . . . days did the number of shares traded exceed one percent").

### 2. *Cammer* Factor 2: Analyst Coverage

According to the *Cammer* Court, "it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period." 711 F. Supp. at 1286. During the Quiet Period, only a single analyst issued just one report regarding Oak Street. Ang Rpt. ¶ 36. That one analyst was The Value Investor, an anonymous account blogging on Seeking Alpha. *Id.* ¶ 36 n.56. Mr. Coffman testified that he was not familiar with The Value Investor. Ex. 37 at 217:5-219:3. Here too, this factor does not support Mr. Coffman's conclusion of an efficient market. Ang Rpt. ¶ 38; *see In re SCOR*, 537 F. Supp. 2d at 577–78 (finding that one analyst report issued during class period is not indicative of market efficiency); *McIntire* v. *China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 432–33 (S.D.N.Y. 2014) (finding that even thirty-two "reports" from "non-traditional, online publications such as Seeking Alpha" did not support a "strong showing" under *Cammer*).

### 3. *Cammer* Factor 5: Price Reaction to New Information

The *Cammer* Court held that "it would be helpful . . . to allege empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in stock price." 711 F. Supp. at 1287. Mr. Coffman compared the price reaction of Oak Street common stock on dates following the company's earnings announcements to dates on which there was "no news." Ang Rpt. ¶ 38. However, there were no earnings announcements to test during the Quiet Period and therefore none were analyzed. *Id.*; Ex. 37 at

31

256:18-257:1.  This factor defeats Mr. Coffman's conclusion that the market for Oak Street was efficient during the Quiet Period.  *In re SCOR*, 537 F. Supp. 2d at 578 (concluding that plaintiff's failure to offer evidence that the market reacted to new information during the quiet period "weigh[ed] against a finding of efficiency during the quiet period").

### 4.  *Krogman* Factor 2: Bid-Ask Spread

The court in *Krogman* v. *Sterritt* held that "[a] large-bid-ask spread is indicative of an inefficient market because it suggests that the stock is too expensive to trade."  202 F.R.D. 467, 478 (N.D. Tex. 2001).  Mr. Coffman tested Oak Street's monthly average bid-ask spread against the average bid-ask spread of a randomly selected group of 100 other companies that traded on the NYSE and NASDAQ during the month of October 2020.  Coffman Rpt.[25] ¶ 70.  Mr. Coffman's randomly selected group had an average bid-ask spread of 0.63% and a median of 0.21% in October 2020.  Coffman Rpt. Ex. 11.  The bid-ask spread for Oak Street common stock during the Quiet Period was 0.477%, more than double the median of Coffman's sample.[26]  Ang Rpt. ¶ 40.  Therefore, when applied to the Quiet Period, this factor provides less ~~to no~~ support for the conclusion that the market for Oak Street common shares was efficient.  *Id.*.

### 5.  *Krogman* Factor 3: Public Float

The *Krogman* court held that public float is relevant to the efficiency analysis "[b]ecause insiders may have private information that is not yet reflected in stock prices," so "the prices of stocks that have greater holdings by insiders are less likely to accurately reflect all available information about the security."  202 F.R.D. at 478.  Mr. Coffman opined that this factor weighed

---

[25] "Coffman Rpt." refers to the Expert Report of Chad Coffman (Dkt. 135-2).

[26] This is a more helpful statistic than the average.  As Mr. Coffman testified, the median—as compared to the average—"can better reflect the central tendency" of a data set.  Ex. 37 at 271:14-272:4.

32

in favor of a finding of market efficiency because, during the course of the entire class period, institutions held 74% of Oak Street's non-insider float. Coffman Rpt. ¶ 71. But this is not the relevant inquiry for this factor, and it double counts the institutional ownership factor Mr. Coffman later considered in his report. Coffman Rpt. ¶ 72.

According to Mr. Coffman's own report, as of September 30, 2020—a month after the end of the Quiet Period—70% of Oak Street common stock shares were still owned by insiders. Coffman Rpt. Ex. 12. Courts regularly find that public floats greater than the one during the Quiet Period weigh against findings of market efficiency. *See Krogman*, 202 F.R.D. at 478 (finding that 54% ownership of stock by insiders weighed against market efficiency). This factor therefore does not support Mr. Coffman's conclusion of market efficiency during the class period.

### 6. Additional Factor: Options Trading

Mr. Coffman found that there was also "considerable options trading" in Oak Street common stock during the class period, which supported a finding of market efficiency. Coffman Rpt. ¶ 77. During the Quiet Period, however, there were no put or call contracts traded for Oak Street stock. Ang Rpt. ¶ 42. Messrs. Ang and Coffman agree that this is not indicative of market efficiency. *Id.*; Ex. 37 at 286:16-287:1.[27]

Thus, the factors, analyses, and thresholds considered by Plaintiffs and their expert do not support their conclusion that the market for Oak Street was efficient during the Quiet Period. Accordingly, Plaintiffs have failed to meet their burden and cannot invoke the *Basic* presumption

---

[27] The remaining two *Cammer* factors (Form S-3 eligibility and presence of market makers), *Krogman* factor (market capitalization), and other factors (institutional ownership and autocorrelation) are either neutral, redundant, or weigh in favor of a finding of efficiency. However, as explained by Mr. Coffman, "it is important to consider the identified efficiency factors as a whole because none of the individual tests or metrics is determinative as to whether a particular market is efficient." Coffman Rpt. ¶ 11.

33

on Oak Street's IPO date or during the Quiet Period. *See In re SCOR*, 537 F. Supp. 2d at 577–579 (concluding that the market during quiet period was not efficient where there was only one analyst report, no ability to file S-3, no evidence of market makers, and no evidence of price reaction to new information, but evidence of "abnormally high" trading volume and that the stock "traded within a relatively tight range"). The Court should therefore limit the class period for Plaintiffs' Exchange Act claims to purchases of Oak Street common stock made after the Quiet Period, meaning on or after August 31, 2020.

**B.      Plaintiffs Are Not Entitled to the *Affiliated Ute* Presumption During the Quiet Period or Otherwise**

The Court should reject Plaintiffs' half-hearted argument that they are also entitled to the *Affiliated Ute* presumption of reliance because their case is "based primarily on the omission of material facts." Mot. 25–26. The *Affiliated Ute* presumption only applies to cases involving "pure omissions," not ones involving "misstatements and half-truths." *Rowe* v. *Maremont Corp.*, 850 F.2d 1226, 1233 n.4 (7th Cir. 1988). "[T]he *Affiliated Ute* presumption of reliance 'exists primarily because of the practical impossibility of proving reliance where no statements are made,' and therefore its 'underlying rationale does not logically apply in a case in which the 'omissions' are the type that can be said to exist only because of other, positive statements that the [defendant] has made.'" *See Rowe* v. *Maremont Corp.*, 650 F. Supp. 1091, 1105 (N.D. Ill. 1986) (quoting *Grossman* v. *Waste Mgmt., Inc.,* 589 F. Supp. 395 (N.D. Ill. 1984)).

Plaintiffs are not entitled to *Affiliated Ute* because their "'omissions' are the type that can be said to exist only because of other, positive statements." *Id.* Plaintiffs' complaint identifies more than 60 allegedly false affirmative statements, Compl. ¶¶ 100–128, including the following:

- "[I]n limited instances, we use external companies to assist with certain aspects of [recruiting or facilitating the recruiting of patients or referrals], but only in arrangements that we believe do not violate the [AKS] or other applicable laws." *Id.* ¶ 101(h).

34

- "Our payor partners will also direct patients to Oak Street. They do this either by assigning patients who have not yet selected a primary care provider to Oak Street Health or through insurance agents who will tell their clients about Oak Street Health, which we believe results in the patient selecting us as their primary care provider when they select an MA plan." *Id.* ¶ 101(c).

- Oak Street's "fleet of over 100 green vans . . . typically provide patient transportation for our patients to get to and from our centers." *Id.* ¶ 103(a).

Plaintiffs claim that these statements were false because they failed to disclose that Oak Street was allegedly "paying external insurance agents kickbacks of at least $200 for each patient the agents referred to Oak Street" and "marketing and providing free transportation to prospective patients as a kickback to induce them to select Oak Street as their primary care provider." *Id.* ¶ 104(b), (d), (e).

Courts routinely reject attempts to twist affirmative statements—like those alleged here—into omissions in an attempt to invoke the *Affiliated Ute* presumption. *See In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Prods. Liab. Litig.*, 2 F.4th 1199, 1208–09 (9th Cir. 2021) ("[A]ll misrepresentations are also nondisclosures" so courts "cannot allow such concealment to transform affirmative misstatements into implied omissions" for the purposes of *Affiliate Ute.*); *Waggoner* v. *Barclays PLC*, 875 F.3d 79, 96 (2d Cir. 2017) (*Affiliated Ute* presumption does not apply where the "only omission is the truth that the statement misrepresents."). The Court should do the same here.

## CONCLUSION

For the reasons discussed above, Plaintiffs' Motion should be denied.

Dated: February 20, 2024    Respectfully submitted,

    By: */s/Andrew J. Ehrlich*

Andrew J. Ehrlich (*pro hac vice*)
Staci L. Yablon (*pro hac vice*)
Alison R. Benedon (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone:  212-373-3000
Facsimile:  212-373-3990
Email: aehrlich@paulweiss.com
Email: syablon@paulweiss.com
Email: abenedon@paulweiss.com

-and-

Peter A. Silverman (Il. ARDC #6196081)
Lisa M. Mazzone (Il. ARDC #6303922)
**SMITH, GAMBRELL & RUSSELL, LLP**
10 S. LaSalle Street, Suite 3600
Chicago, IL 60603
Telephone: 312-264-1004
Facsimile: 312-251-4610
Email: psilverman@sgrlaw.com
Email: lmazzone@sgrlaw.com

***Counsel for Oak Street Health, Inc., Michael Pykosz, Timothy Cook, Geoff Price, Griffin Myers, General Atlantic LLC n/k/a/ General Atlantic, L.P., General Atlantic (OSH) Interholdco, L.P., Newlight Partners LP, and Newlight Harbour Point SPV***

By: */s/ Marcella L. Lape*

Marcella L. Lape (Il. ARDC # 6286676)
Clare Lilek (Il. ARDC # 6336261)
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
155 North Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 407-0700
Email: marcie.lape@skadden.com

36

Email: clare.lilek@skadden.com

-and-

Scott D. Musoff (*pro hac vice*)
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
One Manhattan West
New York, New York 10001
Telephone: (212) 735-7852
Email: scott.musoff@skadden.com

*Counsel for J.P. Morgan Securities LLC, Goldman Sachs & Co. LLC, Morgan Stanley & Co. LLC, William Blair & Company L.L.C., and Piper Sandler Companies*

By: */s/ Sara B. Brody*
Sara B. Brody (*pro hac vice*)
**SIDLEY AUSTIN LLP**
555 California Street, Suite 2000
San Francisco, California 94104
Telephone: 415/772-1200
Email: sbrody@sidley.com

John M. Skakun III (IL Bar # 6297636)
Jarrett H. Gross (IL Bar # 6323993)
Bonnie K. St. Charles (IL Bar # 6339720)
**SIDLEY AUSTIN LLP**
One South Dearborn Street
Chicago, IL 60603
Telephone: 312/853-7000
Email: jskakun@sidley.com
Email: jarrett.gross@sidley.com
Email: bstcharles@sidley.com

*Counsel for Regina Benjamin, Carl Daley, Cheryl Dorsey, Mohit Kaushal, Kim Keck, Julie Klapstein, Paul Kusserow, Robbert Vorhoff, and Srdjan Vukovic*

37