**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| REGINALD T. ALLISON, Individually and on Behalf of All Others Similarly Situated, | ) ) | Case No. 1:22-cv-00149 |
| Plaintiff, | ) ) ) | <u>CLASS ACTION</u> |
| vs. | ) ) ) | Hon. Jeffrey I. Cummings |
| OAK STREET HEALTH, INC., et al., | ) ) ) | |
| Defendants. | ) ) ) | |
| | ) | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' OPPOSED MOTION FOR CLASS CERTIFICATION AND
<u>APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL</u>**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................. iii

I. INTRODUCTION ....................................................................................................1

II. ARGUMENT ...........................................................................................................4

    A. Plaintiffs Are Adequate and Typical Class Representatives...................................4

        1. Defendants' Meritless Attacks on The Plaintiffs Do Not Defeat
            Adequacy and Typicality ...........................................................................10

            a. Lead Plaintiff BRS....................................................................10

            b. Lead Plaintiff CPAT ................................................................12

            c. Named Plaintiff Dearborn........................................................12

        2. Plaintiffs' Investment Managers Do Not Subject Plaintiffs to
            Unique Defenses Nor Defeat Adequacy or Typicality ..............................13

            a. Delegating Full Discretion to Outside Investment Managers
               Is Common...............................................................................14

            b. Plaintiffs Do Not Need to Show the Investment Managers
               Relied on the Alleged False Statements.......................................14

            c. An Investment Manager's Purported Views of the Case Are
               Irrelevant ...................................................................................16

    B. Defendants' "Tracing" Arguments Fail .................................................................20

        1. Defendants Concede Dearborn Has Section 11 Standing..........................21

        2. Tracing is a Fact-Intensive Merits Question Not Appropriate for
            Determination at Class Certification..........................................................22

        3. Contrary to Defendants' Arguments, Tracing Can Be Done with a
            Full Discovery Record at the Merits Stage ...............................................24

        4. "Tracing" Will Be Addressed with a Class-Wide Methodology...............25

    C. The Market for Oak Street Common Stock Was Efficient Throughout the
       Class Period ...........................................................................................................26

        1. Defendants' Expert Only Challenges Market Efficiency During the
            Quiet Period ...............................................................................................26

2.      Defendants' Expert Fails to Rebut Mr. Coffman's Conclusion that Oak Street Traded in an Efficient Market During the Quiet Period ..........28

        a.      The Quiet Period Is Not Inefficient "As a Matter of Law"............29

        b.      The Fact That There Was Not Substantial Analyst Coverage During the Quiet Period Does Not Show That The Market for Oak Street Stock Was Inefficient ........................30

        c.      The Remaining *Cammer* and *Krogman* Factors Support Market Efficiency During the Quiet Period..................................32

        d.      Defendants Do Not Challenge Market Efficiency During the Remainder of the Class Period...................................................33

3.      The *Affiliated Ute* Presumption of Reliance Applies During the Entire Class Period Including the Quiet Period .........................................34

III.     CONCLUSION..................................................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972)............................................................................................34

*In re Allergan PLC Sec. Litig.*,
  2020 WL 5796763 (S.D.N.Y. Sept. 29, 2020)............................................10, 11

*Allison v. Oak Street Health, Inc.*,
  2023 WL 1928119 (N.D. Ill. Feb. 10, 2023) ........................................17, 20, 21

*In re Allstate Corp. Sec. Litig.*,
  966 F.3d 595 (7th Cir. 2020) .............................................................................12

*Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013)......................................................................................23, 25

*In re Apple Inc. Sec. Litig.*,
  2022 WL 354785 (N.D. Cal. Feb. 4, 2022) ........................................................13

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)............................................................................................16

*Beach v. Healthways, Inc.*,
  2010 WL 1408791 (M.D. Tenn. Apr. 2, 2010).....................................................19

*Berwecky v. Bear, Stearns & Co.*,
  197 F.R.D. 65 (S.D.N.Y. 2000) ..........................................................................30

*Black v. Finantra Cap., Inc.*,
  418 F.3d 203 (2d Cir. 2005)................................................................................16

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
  2023 WL 2932485 (D. Conn. Apr. 13, 2023)..................................................9, 15

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
  No. 19-cv-06361 (N.D. Cal. July 26, 2022)........................................................11

*Bridgeview Health Care Ctr. Ltd. v. Clark*,
  2011 WL 4628744 (N.D. Ill. Sept. 30, 2011) .......................................................2

*In re Century Aluminum Co. Sec. Litig.*,
  729 F.3d 1104 (9th Cir. 2013) ......................................................................20, 21

*Cheney v. Cyberguard Corp.*,
  213 F.R.D. 484 (S.D. Fla. 2003)........................................................................31

*City of Livonia Emps.' Ret. Sys. v. Wyeth*,
284 F.R.D. 173 (S.D.N.Y. 2012) ...................................................................................16

*City of Pontiac Gen. Emps.' Ret. Sys. v. Dell Inc.*,
2018 WL 1558571 (W.D. Tex. Mar. 29, 2018) ...........................................................18

*City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira*,
2012 WL 1339678 (N.D. Ill. Apr. 18, 2012) .................................................................9

*In re Cloudera, Inc. Sec. Litig.*,
2019 WL 6842021 (N.D. Cal. Dec. 16, 2019) ...............................................................9

*In re Comput. Scis. Corp.*,
288 F.R.D. 112 (E.D. Va. 2012) ..................................................................................16

*In re Conduent Inc. Sec. Litig.*,
2022 WL 17406565 (D.N.J. Feb. 28, 2022) ...................................................................9

*In re Diasonics Sec. Litig.*,
599 F. Supp. 447 (N.D. Cal. 1984) .................................................................................8

*In re Discovery Zone Sec. Litig.*,
169 F.R.D. 104 (N.D. Ill. 1996) ......................................................................................8

*Dollens v. Zoints*,
2001 WL 1543524 (N.D. Ill. Dec. 4, 2011) ...................................................................5

*In re Eagle Comput. Sec. Litig.*,
1986 WL 12574 (N.D. Cal. Mar. 31, 1986) .................................................................23

*Eggleston v. Chi. Journeyman Plumbers' Loc. Union No. 130*,
657 F.2d 890 (7th Cir. 1981) ..........................................................................................8

*In re Enron Corp. Sec. Derivative & "ERISA" Litig.*,
529 F. Supp. 2d 644 (S.D. Tex. 2006) .........................................................................30

*Freeman v. Laventhol & Horwath*,
915 F.2d 193 (6th Cir. 1990) ........................................................................................29

*George v. China Auto Sys., Inc.*,
2013 WL 3357170 (S.D.N.Y. July 3, 2013) ................................................................16

*Haw. Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*,
338 F.R.D. 205 (S.D.N.Y. 2021) .............................................................................21, 25

*Hedick v. Kraft Heinz Co.*,
2019 WL 4958238 (N.D. Ill. 8, 2019) ...........................................................................9

*Herkert v. MRC Receivables Corp.*,
254 F.R.D. 344 (N.D. Ill. 2008) ................................................................................6, 7

*Hevesi v. Citigroup Inc.*,
   366 F.3d 70 (2d Cir. 2004)......................................................................................12

*Howard v. Liquidity Servs. Inc.*,
   322 F.R.D. 103 (D.D.C. 2017).........................................................................15, 19

*In re Infineon Techs. AG Sec. Litig.*,
   266 F.R.D. 386 (N.D. Cal. 2009)............................................................................29

*In re Initial Public Offering Sec. Litig.*,
   471 F.3d 24 (2d Cir. 2006).....................................................................................29

*In re Intelligroup Sec. Litig.*,
   527 F. Supp. 2d 262 (D.N.J. 2007) ........................................................................30

*In re Jeld-wen Holding, Inc. Sec. Litig.*,
   2021 WL 1186326 (E.D. Va. Mar. 29, 2021) ........................................................29

*In re Juniper Networks, Inc. Sec. Litig.*,
   264 F.R.D. 584 (N.D. Cal. 2009)............................................................................18

*La. Mun. Police Emps. Ret. Sys. v. Dunphy*,
   2008 WL 700181 (D.N.J. Mar. 13, 2008)...............................................................18

*Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*,
   2005 WL 3801463 (N.D. Ill. Apr. 18, 2005) ..........................................................16

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
   2024 WL 1588706 (Apr. 12, 2024) ........................................................................34

*Makor Issues & Rts., Ltd. v. Tellabs, Inc.*,
   256 F.R.D. 586 (N.D. Ill. 2009)..........................................................................6, 12

*McNichols v. Loeb Rhoades & Co., Inc.*,
   97 F.R.D. 331 (N.D. Ill. 1982)................................................................................16

*Morrison v. Ocean State Jobbers, Inc.*,
   290 F.R.D. 347 (D. Conn. 2013)...............................................................................7

*Mortimer v. Diplomat Pharmacy Inc.*,
   2019 WL 4934602 (N.D. Ill. Oct. 7, 2019).............................................................12

*N.J. Carpenters Health Fund v. Residential Cap., LLC*,
   272 F.R.D. 160 (S.D.N.Y. 2011) ............................................................................16

*In re NetSol Techs., Inc. Sec. Litig.*,
   2016 WL 7496724 (C.D. Cal. July 1, 2016)...........................................................31

*Petrie v. Elec. Game Card, Inc.*,
   308 F.R.D. 336 (C.D. Cal. 2015)............................................................................31

*In re Pfizer Inc. Sec. Litig.*,
    282 F.R.D. 38 (S.D.N.Y. 2012) ....................................................................................15, 16

*Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*,
    2020 WL 919249 (N.D. Ill. Feb. 26, 2020) ...................................................... *passim*

*Retsky Family P'ship v. Price Waterhouse LLP*,
    1999 WL 543209 (N.D. Ill. July 23, 1999)....................................................................7, 14

*In re Schering-Plough Corp./ENHANCE Sec. Litig.*,
    2012 WL 4482032 (D.N.J. Sept. 25, 2012) ...............................................................22

*Schleicher v. Wendt*,
    2009 WL 761157 (S.D. Ind. Mar. 20, 2009)...............................................................19

*Schleicher v. Wendt*,
    618 F.3d 679 (7th Cir. 2010) ....................................................................................10

*In re SCOR Holding (Switzerland) AG Litig.*,
    537 F. Supp. 2d 556 (S.D.N.Y. 2008).......................................................................29

*Set Cap. LLC v. Credit Suisse Grp. AG*,
    2023 WL 2535175 (S.D.N.Y. Mar. 16, 2023) ..........................................................25

*Set Cap. LLC v. Credit Suisse Grp. AG*,
    2024 WL 895084 (S.D.N.Y. Mar. 1, 2024) ...............................................................22

*Shapiro v. Matrixx Initiatives, Inc.*,
    284 F.R.D. 464 (D. Ariz. 2012) ............................................................................ 7-8

*Silverman v. Motorola, Inc.*,
    259 F.R.D. 163 (N.D. Ill. 2009)............................................................................ 15-16

*In re Smart Techs., Inc. S'holder Litig.*,
    295 F.R.D. 50 (S.D.N.Y. 2013) ...............................................................22, 23, 25

*In re Smith Barney Transfer Agent Litig.*,
    290 F.R.D. 42 (S.D.N.Y. 2013) ...............................................................................34

*In re Snap Inc. Sec. Litig.*,
    334 F.R.D. 209 (C.D. Cal. 2019).............................................................................23

*In re Solar City Corp. Sec. Litig.*,
    2017 WL 363274 (N.D. Cal. Jan. 25, 2017) .............................................................13

*Sudunagunta v. NantKwest, Inc.*,
    2018 WL 3917865 (C.D. Cal. Aug. 13, 2018)............................................................22

*Tapia-Rendon v. United Tape & Finishing Co. Inc.*,
    2024 WL 406513 (N.D. Ill. Feb. 2, 2024) ............................................................ 6-7

*Tatz v. Nanophase Tech. Corp.*,
2003 WL 21372471 (N.D. Ill. June 13, 2003) ..................................................................33

*Tseretelli v. Residential Asset Securitization Tr. 2006-A8*,
283 F.R.D. 199 (S.D.N.Y. 2012) .........................................................................................8

*Utesch v. Lannett Co.*,
2021 WL 3560949 (E.D. Pa. Aug. 12, 2021) ....................................................................18

*Villella v. Chem. & Mining Co. of Chile Inc.*,
2018 WL 2958361 (S.D.N.Y. June 12, 2018) ...................................................................16

*In re Vivendi Universal, S.A. Sec. Litig.*,
123 F. Supp. 3d 424 (S.D.N.Y. 2015)................................................................................16

*Wallace v. IntraLinks*,
302 F.R.D. 310 (S.D.N.Y. 2014) .......................................................................................22

*Wilson v. LSB Indus., Inc.*,
2018 WL 3913115 (S.D.N.Y. Aug. 13, 2018)...................................................................31

*In re Worlds of Wonder Sec. Litig.*,
1990 WL 61951 (N.D. Cal. Mar. 23, 1990)........................................................................23

*In re Xcelera.com Sec. Litig.*,
430 F.3d 503 (1st Cir. 2005)..............................................................................................31

*Xiang v. Inovalon Holdings, Inc.*,
327 F.R.D. 510 (S.D.N.Y. 2018) .......................................................................................18

**Statutes & Rules**

Federal Rule of Civil Procedure 23 .................................................................... *passim*

Private Securities Litigation Reform Act of 1995 ("PSLRA") .........................................2

Securities Exchange Act of 1934 § 10(b) .........................................................................34

**Docket Entries**

Order, *In re Barclays PLC Sec. Litig.*, No. 22-cv-8172 (S.D.N.Y.), ECF No. 39.........................11

Order, *Shapiro v. TG Therapeutics, et al.*, No. 22-cv-6106 (S.D.N.Y.), ECF No.
41......................................................................................................................................11

Order, *In re Silvergate Cap. Corp. Sec. Litig.*, No. 22-cv-1936 (S.D. Cal.), ECF
No. 21...............................................................................................................................11

Order, *In re Telefonaktiebolaget LM Ericsson Sec. Litig.*, No. 22-cv-1167
(E.D.N.Y.), ECF No. 34...................................................................................................11

Order, *Vazquez v. Masimo Corp., et al.*, No. 23-cv-1546 (S.D. Cal.), ECF No. 19 ......................11

Lead Plaintiffs (i) Central Pennsylvania Teamsters Pension Fund – Defined Benefit Plan (the "CPTPF Benefit Plan"), (ii) Central Pennsylvania Teamsters Pension Fund – Retirement Income Plan 1987 (the "CPTPF Retirement Plan," and together with the CPTPF Benefit Plan, "CPAT"), (iii) Boston Retirement System ("BRS") (collectively, "Lead Plaintiffs"), along with named Plaintiff City of Dearborn Police & Fire Revised Retirement System ("Dearborn," and together with Lead Plaintiffs, "Plaintiffs"), have met all the prerequisites for class certification under Federal Rule of Civil Procedure ("Rule") 23.

## I.   INTRODUCTION

Securities fraud actions are well-suited for class certification. *See* Mem. of Law in Support of Pls.' Opposed Mot. For Class Certification and Appointment of Class Representatives and Class Counsel ("Opening Brief" or "Br."), ECF 135 at 1 (citing, *e.g., Holwill v. AbbVie Inc*., 2021 WL 7366274, at *2 (N.D. Ill. Sept. 23, 2021) (noting that securities claims "generally meet[] the standards for certifying a class action")).[1]   Defendants do not challenge that this case readily satisfies the majority of Rule 23's requirements, including numerosity, commonality, and superiority.   Defendants similarly do not challenge the availability of the fraud-on-the-market presumption of reliance for nearly all of the Class Period or the adequacy of Class Counsel. Despite Defendants' thirty-five pages of briefing, they have offered no legitimate argument, authority, or evidence to deny Class certification or Plaintiffs' appointment as Class Representatives.   *See* Defs.' Corrected Mem. of Law in Opp'n to Pls.' Mot. for Class Certification and Appointment of Class Representatives and Class Counsel ("Corr. Opp." or "Opposition"), ECF 158 at 8-20.

---

[1] Unless otherwise noted, all emphasis is added, and internal citations and quotations are omitted throughout.  Capitalized terms are as defined in Lead Plaintiffs' Complaint for Violations of the Federal Securities Laws (the "Complaint"), and citations "¶__" refer to paragraphs therein.  ECF 40.

- 1 -

Defendants lodge perfunctory challenges to Plaintiffs' adequacy and typicality, all of which fail. Plaintiffs are all the "exact type of sophisticated institutional investor that Congress intended to lead securities class actions" pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*, 2020 WL 919249, at \*6 (N.D. Ill. Feb. 26, 2020). Each purported reason Defendants put forth to defeat Plaintiffs' adequacy and typicality fails to establish the required "admissible evidence so severely undermining" Plaintiffs' credibility that their representation would be a "detriment of the absent class members' claims." *See Bridgeview Health Care Ctr. Ltd. v. Clark*, 2011 WL 4628744, at \*5 (N.D. Ill. Sept. 30, 2011) (rejecting adequacy challenges and granting class certification).

Here, each of these Plaintiffs has been actively engaged in the prosecution of this action by reviewing filings and updates, consulting with counsel, participating in discovery, and testifying at a deposition. Contrary to Defendants' patchwork of cherry-picked sound bites from Plaintiffs' depositions, Plaintiffs are knowledgeable about the facts and allegations of this case and have diligently stayed informed of the litigation's status. That exceeds the "relatively low bar for demonstrating [Plaintiffs'] adequacy." *See TreeHouse Foods, Inc.*, 2020 WL 919249, at \*7 (holding representative need "maintain only an 'understanding of the basic facts underlying the claims, some general knowledge, and a willingness and ability to participate in discovery'"). Defendants' attempts to fabricate any adequacy challenge based upon nothing more than the early stage of litigation and Plaintiffs' appropriate reliance on counsel's extensive class action experience should be rejected. Courts routinely hold in securities fraud class actions that plaintiffs can, and should, rely on experienced counsel to make litigation decisions.

Defendants also argue that Plaintiffs are subject to unique defenses because Plaintiffs' investment managers purportedly did not rely on the alleged misstatements and/or were familiar with the regulated nature of the healthcare business, and thus the investment managers' views were

- 2 -

inconsistent with Plaintiffs' theory of the case.  Courts regularly dismiss such arguments.  Putting aside that Defendants' arguments are not supported by the investment managers' testimony, the bottom line is that Plaintiffs, through their investment managers, relied upon the integrity of Oak Street's market price when purchasing Oak Street shares, rendering them typical.

Defendants also try to claim that Section 11 "tracing" requires the Class Period for Section 11 claims to end on December 6, 2020, or alternatively, February 1, 2021, rather than November 8, 2021.  *See* Corr. Opp. at 23-26.  However, tracing is a fact-intensive merits question that courts routinely do not address at class certification.  As Plaintiffs' expert, Joshua Mitts, Ph.D., illustrates in his report: (i) Defendants' expert's so-called "tracing" conclusions are inaccurate and unreliable; (ii) there is a reliable methodology to track "chain of title" using standard accounting methods that do not amount to "statistical tracing;" and (iii) tracing purchases of Oak Street shares to each registration statement is amenable to Class-wide proof.[2]  In addition, Dearborn purchased shares "in" the offerings at issue, Defendants concede that "it is undisputed" that Dearborn has standing to pursue the Securities Act claims (Corr. Opp. at 26), and Plaintiffs' proposed Class expressly limits the Securities Act claims to only those Class members who can establish that they purchased or otherwise acquired "shares of Oak Street common stock pursuant to or traceable to the Registration Statements and Prospectuses issued in connection with Oak Street's IPO, December 2020 Offering, and February 2021 Offering" (*id.* at 20).  Thus, there is no need to decide on the merits, at this stage, which purchasers in addition to those who purchased "in" the offerings are able to trace their purchases to the offerings.

Finally, Defendants attempt to trim Class-wide damages for Plaintiffs' Exchange Act claims by suggesting that the market for Oak Street common stock may not have been efficient

---

[2] *See* **Exhibit 1**, the Expert Report of Professor Joshua Mitts, Ph.D., dated April 22, 2024 ("Mitts Rpt.").

during the first twenty-five calendar days of the Class Period after the Company's IPO, known as the "Quiet Period," which encompassed a mere seventeen trading days. Contrary to Defendants' arguments based on outdated and factually inapposite cases, a Quiet Period is not inefficient "as a matter of law." Under the facts here, including the extensive empirical analysis performed by Plaintiffs' expert economist, Chad Coffman, CFA, Oak Street common stock traded in an efficient market throughout the entire Class Period, including the Quiet Period. *See* Expert Report of Chad Coffman, CFA dated December 15, 2023 ("Coffman Opening Rpt."), ECF 135-2, ¶¶24-37. Notably, Defendants were forced to correct their Opposition because their purported economic expert, Clifford S. Ang, did not determine—as their original Opposition claimed—that the factors applied by Mr. Coffman, failed to support market efficiency during the Quiet Period.[3] *See* Defendants' Notice, ECF 159 (claiming correcting was "to clarify imprecise language regarding the findings of Defendants' expert Clifford Ang"). In fact, Mr. Ang could not opine that the market for Oak Street was inefficient during the Quiet Period or at any other point during the Class Period.

## II.    ARGUMENT

### A.    Plaintiffs Are Adequate and Typical Class Representatives

Plaintiffs' Opening Brief establishes that Lead Plaintiffs CPAT and BRS, along with additional Plaintiff Dearborn, are adequate and typical Class Representatives. Br. at 11-14. Indeed, Plaintiffs are exactly the type of institutional investors Congress intended to serve as class representatives in securities cases when enacting the PSLRA. *See* H.R. Rep. No.104-369 (1995) (Conf. Rep.), *as reprinted in* 1995 U.S.C.C.A.N. 730, 733; *Treehouse* 2020 WL 919249, at *7 (appointing institutional investor as class representative and finding that accepting defendants'

---

[3] Submitted with Defendants' original Opposition (ECF 145) was the Expert Report of Clifford Ang, CFA, AVIA dated February 20, 2024 (ECF 145-36). On April 3, 2024, Defendants served, but did not file, a Corrected Expert Report of Clifford Ang, CFA, AVIA dated April 3, 2024. *See* **Exhibit 2**, the Corrected Expert Report of Clifford Ang, CFA, CFA, AVIA, dated April 3, 2024 (hereinafter, "Ang Rpt. ¶__").

adequacy challenges "would be in conflict with the PSLRA's purpose to 'increase the likelihood that institutional investors will serve as lead plaintiffs"); *Dollens v. Zoints*, 2001 WL 1543524, at *5 (N.D. Ill. Dec. 4, 2011) (discussing Congress' "desire for institutional investors to take control of private class action securities litigation").

Plaintiffs have demonstrated their adequacy by retaining counsel with considerable experience in securities class actions. Further, during their depositions, each Plaintiff testified that it is willing to serve as Class Representative, that it has been and will continue to zealously oversee the litigation, and that it understands the duties and obligations of a class representative. *See infra,* **Figure 1**. In addition, each Plaintiff also has demonstrated that it is knowledgeable about the case, proved its active participation in this litigation, and declared to continue to provide fair and adequate representation on behalf of the Class. *Id*. Further, consistent with their dedication to overseeing this litigation, Plaintiffs have actively engaged and continue to willingly participate in discovery (*e.g.* having testified at depositions, reviewed and responded to Defendants' written discovery requests and searched for, collected, and produced documents responsive to such requests). ECFs 135-3 ¶5, 135-4 ¶5, 135-5 ¶5.

**Figure 1.**

| Plaintiffs' Deposition Citations | | | |
|---|---|---|---|
| Topic of Testimony | BRS – Timothy Smyth | Dearborn – Robert Festerman | CPAT – Joseph Samolewicz |
| Knowledge of Allegations | 25:1-31:15, 32:13-34:19, 134:16-135:7, 177:14-178:10, 180:23-182:24 | 22:2-24:3, 27:4-11, 28:17-30:20, 148:24-149:16, 149:25-151:3, 151:23-152:15 | 24:4-28:16; 29:1-30:3; 32:1-35:20; 191:3-192:9; 194:1-199:23 |
| Review of Case Materials and Participation in Action | 35:8-37:24, 41:14-44:17, 133:6-18, 135:13-137:16, 171:24-173:4, 176:16-21, 186:2-22, 188:6-8; 201:22-15 | 32:16-34:11, 38:4-41:24, 43:7-15, 141:21-142:19, 145:16-148:15, 151:20-22, 157:14-18, 159:20-161:17 | 36:3-51:15; 144:9-13; 153:7-154:10; 155:1-156:8; 158:9-161:16; 166:18-167:8; 168:22-170:16; 174:5-179:23; 182:18-184:6; 187:8-191:2; 200:15-202:14; 207:10-209:3 |
| Understands Duties and Obligations and Is Fulfilling Those Duties and Obligations | 137:17-139:19, 174:1-175:1, 193:2-195:9 | 133:3-135:1, 143:10-144:5 | 145:11-149:20; 186:8-187:21 |
| Knowledge of and Communication with Other Plaintiffs | 141:13-141:24, 142:9-143:5, 146:4-148:15, 151:12-153:15 | 135:15-138:17, 139:17-141:4 | 24:16-25:18; 145:11-146:1; 146:24-147:11; 152:8-174:24; 176:24-177:1-180:11-17; 200:15-201:5 |

Plaintiffs' level of supervision, involvement, and knowledge of the facts in this Action are more than sufficient to demonstrate their adequacy. *See Makor Issues & Rts., Ltd. v. Tellabs, Inc.,* 256 F.R.D. 586, 600  (N.D. Ill. 2009) (appointing class representative in part because they were "familiar with the class allegations and basic facts underlying the class claims"); *Herkert v. MRC Receivables Corp.*, 254 F.R.D. 344, 352 (N.D. Ill. 2008) ("[t]o be adequate, a class representative . . . only need have a basic understanding of the claims and some general knowledge."). A typical class representative is one who "posses[es] the same interest and suffer[s] the same injury as the

class members." *Tapia-Rendon v. United Tape & Finishing Co. Inc.*, 2024 WL 406513, at *1 (N.D. Ill. Feb. 2, 2024). Such is the case for Plaintiffs CPAT, BRS, and Dearborn here.

Notwithstanding, Defendants cherry-pick quotes from Plaintiffs' and their investment managers' depositions to argue that none of the Plaintiffs are adequate Class Representatives. But these attacks on Plaintiffs' knowledge of and willingness or ability to supervise this litigation are hyperbolic and consist of taking deposition testimony out of context.

First, against the evidence of Plaintiffs' adequacy, Defendants claim that this Action is "lawyer-driven litigation" based on testimony concerning reliance on counsel. *See* Corr. Opp. at 19. However, just as a patients rely on their doctors, it is well-established that "plaintiffs in securities fraud class actions need not have a detailed understanding of their complaint and may rely on the knowledge and expertise of their attorneys in prosecuting their securities fraud claims." *See Retsky Family P'ship v. Price Waterhouse LLP*, 1999 WL 543209, at *7-8 (N.D. Ill. July 23, 1999); *see also Herkert*, 254 F.R.D. at 352 ("It is permissible for class counsel to be the driving force behind the more complicated legal theories, as long as the named plaintiff has some general knowledge and understanding of the issues, and a willingness to participate in the suit."); *Morrison v. Ocean State Jobbers, Inc.*, 290 F.R.D. 347, 355 (D. Conn. 2013) (finding plaintiff's "reli[ance] on his attorneys to manage issues relating to discovery and dealing with the other class members does not demonstrate . . . his inability to serve as class representative, it demonstrates [his] ability to appreciate the limits of his knowledge and rely on those with the relevant experience"); *Shapiro v. Matrixx Initiatives, Inc.,* 284 F.R.D. 464, 467 (D. Ariz. 2012) ("[plaintiff] reviews court filings before and after they are filed, and has confirmed he actively monitors counsel. Combined with his knowledge of the case, [plaintiff] has demonstrated he will adequately supervise counsel rather

- 7 -

than blindly rely on counsel.").[4]  Given the complex issues at the heart of this litigation, Plaintiffs have appropriately relied on the expertise of their experienced attorneys and will continue to monitor and rely on their counsel.

Second, Defendants raise arguments concerning the working relationship among the Plaintiffs, claiming that Plaintiffs have had insufficient contact with one another and did not have any pre-existing relationship, a joint prosecution agreement, or a formal agreement for resolving conflicts.  Corr. Opp. at 19.  The Court should pay no heed to Defendants' attempt to manage both sides of the litigation as crediting such arguments would be "like permitting a fox . . . to take charge of the chicken house."  *See Eggleston v. Chi. Journeyman Plumbers' Loc. Union No. 130*, 657 F.2d 890, 895 (7th Cir. 1981); *see also In re Diasonics Sec. Litig.*, 599 F. Supp. 447, 451 (N.D. Cal. 1984) (same).  Defendants' specious attacks on Plaintiffs fail as a matter of fact and law.

As to the "working relationship" of Plaintiffs, because the case is still in the relatively early early stages—*i.e.,* motion to dismiss and document discovery—Plaintiffs have testified that they have been regularly communicating through counsel and have cooperated with each other effectively thus far with no conflicts.  *See* **Fig. 1**.  Lead Plaintiffs held a joint call and were appointed by the Court.  ECF 11, ¶¶5-6.  Additionally, after Defendants' motion to dismiss the Complaint was denied and discovery had progressed, Plaintiffs held another joint call.  Two of the Plaintiffs flew to Los Angeles to attend the mediation in this case.  There have been no settlement proposals to discuss, summary judgment motions or trial strategy issues to address, or any conflicts to resolve, so Defendants' argument that Plaintiffs should have had more direct meetings than

---

[4] *See also Tseretelli v. Residential Asset Securitization Tr. 2006-A8*, 283 F.R.D. 199, 209 (S.D.N.Y. 2012) (certifying class, noting "adequacy rightly is found where '[a] great deal of reliance on expert counsel is to be expected.'"); *In re Discovery Zone Sec. Litig.*, 169 F.R.D. 104, 110 (N.D. Ill. 1996) (finding in "legally complex actions such as securities fraud litigation, a plaintiff need not have expert knowledge of all aspects to qualify as a class representative").

communications through counsel is baseless. *See, e.g., Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 2023 WL 2932485, at \*10-11 (D. Conn. Apr. 13, 2023) (rejecting argument that plaintiffs had "not coordinated" enough where, as here, they were "managing the litigation through their attorneys and are committed to addressing issues as they arise"); *In re Conduent Inc. Sec. Litig.*, 2022 WL 17406565, at \*3 (D.N.J. Feb. 28, 2022) ("[d]efendants do not identify any past or present conflicts between [p]laintiffs, and primarily argue that [p]laintiffs lack adequate procedures to resolve hypothetical future conflicts. Such speculation will not defeat [p]laintiffs' appointment as class representatives.").

Defendants' reliance on *In re Cloudera, Inc. Sec. Litig.*, 2019 WL 6842021, at \*6 (N.D. Cal. Dec. 16, 2019) for the proposition that "the group [has] not sufficiently demonstrate[d] that it can adequately monitor counsel and make important decisions together" (Corr. Opp. at 20) is unavailing. *Cloudera* was a lead plaintiff decision where the court declined to appoint an unrelated group at the start of a case, and instead appointed a single lead plaintiff.[5] Here, the Court appointed Lead Plaintiffs BRS and CPAT together early in this litigation (ECF 30), and Defendants cannot dispute that Lead Plaintiffs, together with Plaintiff Dearborn, have effectively been supervising this litigation since the Amended Complaint was filed almost two years ago, on May 25, 2022. ECF 40. Defendants' individual attacks fare no better.

---

[5] By contrast, judges in this District have repeatedly appointed groups as lead plaintiffs. *See, e.g., Hedick v. Kraft Heinz Co.*, 2019 WL 4958238, at \*6 (N.D. Ill. 8, 2019) (appointing group and noting "the 'trend' has been to allow small groups of investors to act as lead plaintiff even if they do not have pre-existing relationships" (citing cases)); *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira*, 2012 WL 1339678, at \*6 (N.D. Ill. Apr. 18, 2012) (finding "the plain language of the PSLRA contemplates the selection of a group of individuals as lead plaintiff" and appointing group of four investors with no pre-existing relationship because they were "sophisticated and knowledgeable investors with aligned interests").

### 1. Defendants' Meritless Attacks on The Plaintiffs Do Not Defeat Adequacy and Typicality

The Seventh Circuit has made clear that "[w]hen a large, public company makes statements that are said to be false, securities-fraud litigation regularly proceeds as a class action" and "class certification is routine." *Schleicher v. Wendt*, 618 F.3d 679, 681-82 (7th Cir. 2010). Through their respective declarations and deposition testimony, Plaintiffs demonstrate not only that they understand their fiduciary responsibilities as Class Representatives, but also that they have been adequately discharging those responsibilities including by reviewing case documents, communicating with proposed Class Counsel as necessary, and participating in discovery.

### a. Lead Plaintiff BRS

Notwithstanding the full record of BRS's active representation of the proposed Class for the last two years, Defendants attempt to defeat the adequacy of BRS by pointing to a case where the court declined to appoint BRS as a class representative. *See In re Allergan PLC Sec. Litig.*, 2020 WL 5796763, at *6 (S.D.N.Y. Sept. 29, 2020). But *Allergan* is readily distinguishable from this case because, in *Allergan*, when the court appointed BRS as lead plaintiff, it ordered that only one plaintiff's firm could act as lead counsel (*id.*), and the appointed counsel engaged additional counsel. *See id.* at *6-*8. ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮. *See* Deposition Transcript of Timothy Smyth ("Smyth Tr."), ECF 145-20 at 202:21-204:9 (BRS representative adding that ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮" in counsel). Neither proposed Class Counsel here, Labaton nor Robbins Geller, was counsel for BRS in the *Allergan* case. Additionally, unlike in *Allergan*, where a second un-appointed firm was "effectively play[ing] the role of co-lead counsel" contrary to court order, the Lead Plaintiff Order here (ECF 30) appointed two firms, Labaton and Robbins Geller, as Co-Lead Counsel, and those two firms have been working together to prosecute this action as lead counsel.

Underscoring the futility of Defendants' unwarranted attack on BRS, since *Allergan* was decided, BRS has been appointed lead or co-lead plaintiff in at least six cases including this one.[6] BRS also has been certified as a class representative after *Allergan*.  *See* Order Granting Motion for Class Certification, *Bos. Ret. Sys. v. Uber Techs., Inc.*, No. 19-cv-06361 (N.D. Cal. July 26, 2022), ECF 217.  Thus, the unique circumstances of *Allergan* have no bearing on BRS's adequacy and typicality to serve as a class representative in this case or any other.

Similarly, the fact that BRS and its investment manager, Westfield, inadvertently failed to enter a renewed agreement is not, as Defendants claim, a "complete lapse in oversight" that "raises serious questions about BRS's ability to represent the class."  Corr. Opp. at 17.[7]  Westfield has been an investment manager for BRS in the Small Cap or Small/Mid Cap space for more than twenty years.  Recently, they cured the agreement oversight raised by Defendants, executing an additional amendment to their Investment Management Agreement extending the agreement and their relationship for another seven years, through April 1, 2030.  Similarly, the fact that Westfield has changed the funds in which BRS is invested in with BRS's consent (from Small Cap Growth to Small/Mid Cap) over their more than twenty-year history (Corr. Opp. at 17-18) is entirely irrelevant to BRS's adequacy or typicality.  Defendants do not cite to any case or even attempt to explain how any of this could undermine BRS's demonstrated ability to prosecute the claims.

---

[6] *See* Order, *Vazquez v. Masimo Corp., et al.*, No. 23-cv-1546 (S.D. Cal.), ECF No. 19; Order, *In re Barclays PLC Sec. Litig.*, No. 22-cv-8172 (S.D.N.Y.), ECF No. 39; Order, *Shapiro v. TG Therapeutics, et al.*, No. 22-cv-6106 (S.D.N.Y.), ECF No. 41; Order, *In re Silvergate Cap. Corp. Sec. Litig.*, No. 22-cv-1936 (S.D. Cal.), ECF No. 21; Order, *In re Telefonaktiebolaget LM Ericsson Sec. Litig.*, No. 22-cv-1167 (E.D.N.Y.), ECF No. 34).

[7] *See* Smyth Tr. 94:6-19 (███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████).

- 11 -

"Without more, [there is] no conflict with the rest of the class and no reason to doubt that lead plaintiff . . . will not vigorously pursue this case." *See, e.g.*, *Tellabs*, 256 F.R.D. at 601 (rejecting argument that failure to produce responsive emails rendered plaintiff inadequate where defendants did "not claim[] prejudice" and plaintiffs "testimony d[id] not suggest [plaintiff] intentionally withheld these emails").

### b. Lead Plaintiff CPAT

Aside from meritless arguments addressed in §II.A above and §II.A.2 below, Defendants do not separately claim that CPAT is otherwise inadequate or atypical in any way.

### c. Named Plaintiff Dearborn

Defendants also challenge Dearborn's adequacy because this is the first case in which Dearborn has participated as a proposed Class Representative. Corr Opp. at 13, 20. But there must always be a first time and adding an additional Class Representative is routine and was designed here to ensure adequate representation of potential Class members who acquired Oak Street common stock in the IPO and SPOs.[8] Defendants have cited no authority requiring that additional named Plaintiffs, like Dearborn, must have extensive class action experience.

Next, Defendants claim that Dearborn has "credibility" problems because a sentence in Dearborn's declaration in support of the motion for class certification ("Dearborn Declaration") is purportedly untrue.[9] Corr. Opp. at 13-14. But that is a gross distortion of the record. Before

---

[8] *See, e.g., In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 616 (7th Cir. 2020) (affirming order permitting addition of a class representative that "may be able to help" advance the class' claims); *Mortimer v. Diplomat Pharmacy Inc.*, 2019 WL 4934602, at *4-5 (N.D. Ill. Oct. 7, 2019) ("the practice of adding additional named plaintiffs . . . is not 'unprecedented'") (collecting cases); *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 83 (2d Cir. 2004) ("the PSLRA does not in any way prohibit the addition of named plaintiffs to aid the lead plaintiff in representing a class.").

[9] *See* Declaration of Robert Festerman on Behalf of City of Dearborn Police & Fire Revised Retirement System in Support of Lead Plaintiffs' Motion for Class Certification (ECF 135-5) ¶ 3("Dearborn did not hold or acquire Oak Street Health, Inc. common stock at the direction of its counsel in this matter, Labaton[], or in order to participate in this private action or any other litigation under the federal securities laws.")

becoming involved in this class action litigation, Dearborn was considering issuing a books and records demand to Oak Street in Delaware and instructed its investment manager to "███████ ████████████████████████████████████████████████." Deposition of Robert Festerman ("Festerman Tr."), ECF 145-9 at 121:21-125:1. After defense counsel badgered Dearborn's witness to the point where he was confused, ████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████. *Id.* at 128:6-129:24. But it was not. The Dearborn Declaration stated that Dearborn did not hold Oak Street stock to participate in an "litigation under federal securities laws" (ECF 135-5 ¶3), and ████████████████████ ████████████████████████████████████████████████ █████████████████████. Festerman Tr. at 132:6-12, 165:14-167:18. Moreover, Defendants know that a books and record demand is brought pursuant to Chapter 220 of the Delaware Corporate Code, not the federal securities laws. Thus, ████████████████████████ ████████████████████████████████ (*id.* at 165:14-167:18), and the Court should reject Defendants' contorted argument to the contrary. Corr. Opp. at 14.[10]

### 2. Plaintiffs' Investment Managers Do Not Subject Plaintiffs to Unique Defenses Nor Defeat Adequacy or Typicality

Defendants also argue Plaintiffs are subject to unique defenses because: (i) Plaintiffs delegated investment authority to investment managers who erroneously believed Oak Street was a good investment; (ii) Plaintiffs' investment managers purportedly did not rely on the alleged

---

[10]Even had there been an error in the Dearborn Declaration, courts routinely find errors do not weigh against adequacy, unless there was "bad faith or an intent to deceive." *See In re Apple Inc. Sec. Litig.,* 2022 WL 354785, at *5 (N.D. Cal. Feb. 4, 2022); *In re Solar City Corp. Sec. Litig.*, 2017 WL 363274, at * 6 (N.D. Cal. Jan. 25, 2017) (similar). That is not the case here and Dearborn's declaration is nothing like the false testimony in *In re Northfield Lab'ys., Inc. Sec. Litig.*, 267 F.R.D. 536, 543 (N.D. Ill. 2010), cited by Defendants (Corr. Opp. at 14), where the plaintiff falsely denied his briefcase contained documents.

- 13 -

misstatements and/or considered factors in addition to the stock price in making investment decisions; and (iii) Plaintiffs' investment managers were familiar with some of the Company's conduct and risk disclosures, and thus their views could be inconsistent with Plaintiffs' theory of the case. Such arguments have been repeatedly rejected by courts in and outside of this District and the Court should find the same given the "relatively low bar for demonstrating [plaintiffs'] adequacy." *TreeHouse*, 2020 WL 919249, at *7. The bottom line is that Plaintiffs, through their investment managers, relied upon the integrity of Oak Street's market price when purchasing Oak Street shares, rendering them typical.

### a. Delegating Full Discretion to Outside Investment Managers Is Common

Defendants attempt to contest typicality or adequacy based on the relationship Plaintiffs have with their investment managers ("Westfield" for CPAT and BRS, and "Peregrine" for Dearborn). *See* Corr, Opp. at 9-10, 15. However, Plaintiffs' delegation of investment decisions to their investment managers does not render them inadequate or atypical, because "relying on an investment advisor to make decisions about investments is commonplace." *See Retsky*, 1999 WL 543209, at *6; *see also Treehouse*, 2020 WL 919249, at *5 (holding plaintiff's "reliance on a third party [investment manager] does not subject it to unique defenses.").

### b. Plaintiffs Do Not Need to Show the Investment Managers Relied on the Alleged False Statements

Defendants also claim that because Peregrine considered factors in addition to the market price in making investment decisions, Dearborn is inadequate. *See* Corr. Opp. at 10. Similarly, Defendants challenge Plaintiffs' adequacy and typicality because both Peregrine and Westfield testified that the misstatements or Oak Street's patient acquisition tactics did not play a "central" role in their purchasing decisions. *See id.* at 9-12, 15-17.

- 14 -

However, an investment manager's individual reasons for purchasing a stock are "largely irrelevant" to deciding a motion for class certification where, as here, Plaintiffs invoke a presumption of reliance based on the integrity of the stock market price, rather than showing individualized reliance upon the alleged false and misleading statements. *See, e.g., Alexion*, 2023 WL 2932485, at *5-6. So long as the investment decision does not "explicitly disclaim[] reliance on the market price," a trading strategy will "not render [a plaintiff] subject to a unique defense" to refute adequacy or typicality. *Treehouse*, 2020 WL 919249, at *5; *see also In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 45 (S.D.N.Y. 2012) (holding "it is well established that reliance on the advice of third parties does not, in and of itself, constitute non-reliance, so long as the third party, in turn, relied on the integrity of the market."). In fact, courts recognize that class members can have different strategies or approaches to investing, which does not present unique issues and "does not negate typicality [a]s long as the investment decision rests to some degree on public information." *See, e.g., Howard v. Liquidity Servs. Inc.*, 322 F.R.D. 103, 124 (D.D.C. 2017).

Here, neither Peregrine nor Westfield are alleged to have traded on non-public information regarding Oak Street. *See also* Deposition Transcript of Garth Jonson ("Westfield Tr."), ECF 145-22 at 252:16-253:8 (testifying that Westfield is not allowed to trade on non-public information because "[i]t's against the law"). And, although Defendants claim Peregrine did not rely "exclusively" on market prices, they do not—and cannot—argue that Peregrine or Westfield disclaimed reliance on the market price for Oak Street stock. *See also* Deposition Transcript of Paul Von Kuster ("Peregrine Tr."), ECF 145-10 at 174:12-175:14 (testifying that market price is a "factor" Peregrine considered); Westfield Tr. at 242:15-19, 251:3-21 (testifying that Westfield made decision to invest in Oak Street based in part on the market price and that Westfield would not disregard market price in purchasing stock). Thus, Defendants cannot refute Plaintiffs' showing of reliance and render it atypical. *See Silverman v. Motorola, Inc.,* 259 F.R.D. 163, 173

(N.D. Ill. 2009) (finding adequacy established where there was "no evidence that Plaintiffs'

respective investment managers relied on information about [the company] other than that publicly

available"); *see also Black v. Finantra Cap., Inc.,* 418 F.3d 203, 210 (2d Cir. 2005) (holding fact

that plaintiff "also took other considerations . . . into account in making his investment decision

does not foreclose a finding of material reliance upon market price"); *City of Livonia Emps.' Ret.*

*Sys. v. Wyeth*, 284 F.R.D. 173, 179 (S.D.N.Y. 2012) (rejecting arguments that investment

managers "did not rely on . . . [the] alleged misstatements and omissions" because such arguments

are "largely irrelevant" when invoking the fraud-on-the-market presumption).[11]  As the Supreme

Court has explained, "it is hard to imagine that there ever is a buyer or seller who does not rely on

market integrity." *Basic Inc. v. Levinson*, 485 U.S. 224, 246-47 (1988).[12]

**c.      An Investment Manager's Purported Views of the Case<br>Are Irrelevant**

Finally, Defendants argue that Peregrine and Westfield were "privy to the truth" about the

alleged fraud, were "indifferent to' the practices alleged to have been concealed," and have views

---

[11] *See also In re Pfizer Inc. Sec. Litig.,* 282 F.R.D. 38, 45–46 (S.D.N.Y. 2012) (holding evidence that investment managers "took market price and other considerations into account when deciding whether to invest" was "insufficient to defeat" typicality); *In re Comput. Scis. Corp.,* 288 F.R.D. 112, 123 (E.D. Va. 2012) (that an investment advisor believes that "the market is inefficient in the short term—thus mispricing company stock," does not prevent certifying the class).

[12] Defendants' cases are inapposite.  *See* Corr. Opp. at 9-10 & n. 9 (citing *Villella v. Chem. & Mining Co. of Chile Inc.,* 2018 WL 2958361, at *4–5 (S.D.N.Y. June 12, 2018) (deciding discovery motion, rather than class certification); *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, 2005 WL 3801463, at *4 (N.D. Ill. Apr. 18, 2005) (same); *N.J. Carpenters Health Fund v. Residential Cap., LLC,* 272 F.R.D. 160, 168–169 (S.D.N.Y. 2011), *aff'd*, 477 F. App'x 809 (2d Cir. 2012) (finding predominance not satisfied where investment managers had met routinely with the defendants about the lax underwriting standards at issue in the case); *George v. China Auto Sys., Inc.,* 2013 WL 3357170 (S.D.N.Y. July 3, 2013) (finding individual plaintiff-traders who increased their holdings post-disclosure of fraud in stock that traded in an apparently inefficient market were atypical); *McNichols v. Loeb Rhoades & Co., Inc*., 97 F.R.D. 331, 340-41 (N.D. Ill. 1982) (forty-year-old case involving allegations of "oral misrepresentations" made to plaintiff "personally" which could not be subject to fraud-on-the-market presumption); *In re Vivendi Universal, S.A. Sec. Litig*., 123 F. Supp. 3d 424, 436-38 (S.D.N.Y. 2015) (post-verdict finding that investor who stated market price was "not important," relied on "resources unavailable to the average investor," started purchasing the stock only after several corrective disclosures, and on whom the "fraud, and its disclosure, had only a positive impact" could not establish presumption of reliance)).

- 16 -

inconsistent with the theories of this case, rendering Plaintiffs inadequate and atypical. Corr. Opp. at 11-13, 15, 17. This argument fails for two reasons.

First, it is factually wrong. In Defendants' brief, they say testimony from the investment manager representatives show the managers knew at the time of their investments that: (i) "Oak Street was '***engaging insurance agents for referrals***,' and understood that those insurance agents were being paid in connection with those efforts" (Corr. Opp. at 11 (emphasis in original)); (ii) "***Oak Street 'used brokers to acquire patients' and that 'brokers don't work for free'***" (*id.* at 15 (emphasis in original)); (iii) and "Oak Street's transportation offerings '***might have been in violation of the statue by the letter of the law***, but they weren't in violation by the spirit' of the Medicare laws" (*id.* at 16 (emphasis in original)). But, Plaintiffs' claims are not based on the mere concealment that Oak Street was "engaging insurance agents for referrals," that it "used brokers to acquire patients," or that it had "transportation offerings." In fact, Judge Kennelly upheld Oak Street's disclosures of such practices as false and misleading because they failed to disclose Oak Street's "improper payments to insurance agents for referrals"—*i.e.,* paying ($200) per-patient referred—and "its marketing and provision of free transportation to prospective patients." *Allison v. Oak Street Health, Inc.*, 2023 WL 1928119, at *5 (N.D. Ill. Feb. 10, 2023) (finding statements that Oak Street "ask[s] [insurance agents] for referrals, making them introduce us to people that need our care," that Defendants "love when insurance advisors . . . push those patients," and that Oak Street will "provide patient transportation for our patients to get to and from our centers" were false and misleading (alterations in original)).[13] None of Defendants' cherry-picked quotes come close to showing the investment managers knew ***Oak Street was paying insurance agents $200***

---

[13] *See also id.* at *5 (noting Plaintiffs allege Defendants violated the securities laws "through omissions and misrepresentations of two of Oak Street's marketing practices: (1) ***providing referral payments of $200 per patient*** to insurance agents and (2) offering free transportation ***to prospective patients***").

*per referral*, marketing and providing free transportation *to prospective patients*, or violating the Anti-Kickback Statute, thereby confirming they were not "privy to the truth."[14]

Second, it is irrelevant. Investment managers' speculation on the merits of the litigation is both inadmissible at trial, since they have no direct knowledge of the facts and are not a party, but also has no bearing on Plaintiffs' adequacy because an investment manager's view cannot defeat class certification. *See Xiang v. Inovalon Holdings, Inc.,* 327 F.R.D. 510, 531 (S.D.N.Y. 2018) (granting class certification and finding testimony from investment manager that he was aware of purportedly concealed issues, that the alleged statements were not misleading, and that any decline in the stock value was not attributable to an alleged corrective disclosure "does not change the conclusion" that plaintiffs were adequate); *La. Mun. Police Emps. Ret. Sys. v. Dunphy*, 2008 WL 700181, at *5 (D.N.J. Mar. 13, 2008) (certifying class even though defendants argued that the testimony of the "investment manager contradicts the allegations in its complaint").[15]

Thus, inadmissible speculation about the impact of an alleged corrective disclosure such as the fact that neither investment manager was aware of the fraud after the disclosure of the DOJ

---

[14] *See id.*at *6 (holding that by "choosing to tell the market it paid insurance agents for referrals, the defendants were obligated to disclose the practice" of "paying agents on a per-patient basis" and that by "cho[osing] to explain that Oak Street provided patient transportation" defendants were obligated to disclose Oak Street "also relied on offering transportation to *prospective* patients") (emphasis in original).

[15] Many courts have found that an investment manager's views on the merits of a complaint's allegations or knowledge of certain information are irrelevant to the class certification analysis. *See, e.g., Utesch v. Lannett Co.*, 2021 WL 3560949, at *8-9 (E.D. Pa. Aug. 12, 2021), *aff'd sub nom. Univ. of P.R. Ret. Sys. v. Lannett Co.,* 2023 WL 2985120 (3d Cir. Apr. 18, 2023) (finding investment managers' beliefs about risks to defendant corporation's business—including "fully appreciate[ing]" the risk that company would be implicated in government investigations and enforcement actions were insufficient to rebut presumption of reliance); *City of Pontiac Gen. Emps.' Ret. Sys. v. Dell Inc.*, 2018 WL 1558571, at *3 (W.D. Tex. Mar. 29, 2018) (granting class certification while finding that "[a]ssuming [investment manager's] testimony contradicts the allegations in the amended complaint, [d]efendants will be able to proffer that testimony at trial; but it does not show [plaintiff] is not typical to represent the class [and] [d]efendants have not shown the statements [] are binding on [plaintiff] at this time[]"); *In re Juniper Networks, Inc. Sec. Litig.*, 264 F.R.D. 584, 589 (N.D. Cal. 2009) (granting class certification and finding "fact that some of [p]laintiffs' investment managers received a market report" regarding subject matter of lawsuit's disclosure "is not sufficient to show [p]laintiffs will be preoccupied with a unique defense").

- 18 -

investigation on November 8, 2021 or that investment managers seemed nonplussed by the announcement of the DOJ investigation[16] are irrelevant to Plaintiffs' adequacy and typicality, as long as Plaintiffs' investment managers relied on the integrity of the price of Oak Street common stock in making trading decisions. And, again, both investment managers did rely on the price of Oak Street common stock in making investment decisions. §II.A.2.b. Similarly, Defendants' attempt to solicit inadmissible, non-expert testimony from any investment manager about the legality of Oak Street's patient acquisition tactics is irrelevant because neither investment manager was aware they were acquiring Oak Street common stock at a value artificially inflated by Defendants' fraud. Westfield Tr. at 249:10-251:2; Peregrine Tr. at 175:15-179:8.[17]

While Defendants argue that the proposed Class Representatives and their investment managers need only be "subject to the colorable defense of non-reliance on the market" (Corr. Opp. at 12), Defendants have failed to establish any such colorable defense. *See Schleicher v. Wendt*, 2009 WL 761157, at *3 (S.D. Ind. Mar. 20, 2009), *aff'd*, 618 F.3d 679 (7th Cir. 2010) ("[c]olorable" still requires more than mere speculation). In any event, neither Plaintiffs nor their investment managers traded on non-public information (*see supra*), so whether Plaintiffs were purportedly "privy to the truth" would be based on public information and determined on a class-wide basis. *Beach v. Healthways, Inc.*, 2010 WL 1408791, at *3 (M.D. Tenn. Apr. 2, 2010) (granting class certification and rejecting defendants' argument that the investment manager

---

[16] Peregrine Tr. at 154:5-156:18; 170:10-173:10, 180:18-183:25.

[17] Defendants rely upon *Howard*, 322 F.R.D. at 122-124 but that case supports plaintiffs because there the court certified the class, finding that defendants failed to show that the investment manager knew the extent of the concealed facts. Here, Defendants also failed to show that either investment manager knew that Oak Street's stock price was inflated from the concealment of the details regarding the tactics and risks that Oak Street was violating the AKS and FCA with their improper patient acquisition tactics. That the investment managers were aware the healthcare industry is highly regulated, that Oak Street recruited patients through direct marketing to grow its business, and that insurance brokers were compensated somehow by someone, fails to undermine Plaintiffs' adequacy. Peregrine Tr. at 179:19-182:10; Westfield Tr. at 150:20-153:19.

"actually knew of the allegedly misleading information" because "defense that the truth was available in the market is a class-wide question of fact").

### B. Defendants' "Tracing" Arguments Fail

Pursuant to Section 11, a plaintiff can demonstrate it purchased directly in an offering, like Dearborn, or that it purchased shares that are traceable to a relevant offering. *Oak Street*, 2023 WL 1928119, at *12 (citing *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1106 (9th Cir. 2013)). Here, Defendants concede "it is undisputed" that Dearborn has standing to pursue the Securities Act claims on behalf of the proposed Class. Corr. Opp. at 26. Yet, in their Opposition, Defendants claim that Plaintiffs cannot meet the predominance requirement under Rule 23(b)(3) for the entire proposed Class Period for the Securities Act claims because, they say Section 11 "tracing" requires the class period for Securities Act claims to end on December 6, 2020, the date of the first SPO, or alternatively, on February 1, 2021, the day before Oak Street's IPO lockup expired when additional Oak Street shares entered the market. Corr. Opp. at 23-26.[18] This argument fails for three reasons.

First, it ignores that any tracing arguments do not impact those who purchased "in" the IPO and SPOs, including the February 2021 SPO held after February 1, 2021. Second, tracing is a fact-intensive merits inquiry that courts routinely do not address at class certification. Here, Lead Plaintiffs' proposed class definition expressly limits the Class to only those who can establish that they purchased or otherwise acquired "shares of Oak Street common stock pursuant or traceable to the registration statements and prospectuses issued in connection with Oak Street's" IPO and SPOs, so investors who purchased shares not traceable to the Offerings would be excluded from the Class. And third, while class certification is not the time to engage in a fact-intensive tracing

---

[18] Only one Answer filed by Defendants—the Independent Director Defendants' Answer—even mentions traceability as a potential affirmative defense. *See* ECF 99.

- 20 -

inquiry, Plaintiffs have demonstrated that their Securities Act claims are subject to a Class-wide tracing methodology, as explained in the Mitts Report. Professor Mitts explains that transactional records that identify individual purchases of Oak Street shares make it possible to reconstruct a reliable "chain of title," and trace using standard accounting methods. Mitts Rpt., ¶¶11, 42. Thus, instead of accepting Defendants' premature and outdated arguments on tracing, the Court should certify the proposed Class and address tracing later in the case on a more fully developed record.

### 1. Defendants Concede Dearborn Has Section 11 Standing

Courts throughout the country recognize that investors, like Dearborn, that purchase directly *in* an offering do so pursuant to the underlying registration statement and prospectus and have standing to pursue Securities Act claims. *See, e.g., Century Aluminum*, 729 F.3d at 1106 (holding that purchasing shares "directly in the secondary offering itself . . . would obviously eliminate any questions about the lineage of plaintiffs' shares."); *Oak Street*, 2023 WL 1928119, at * 13 (holding that allegation that Dearborn purchased shares "in" the offerings . . . [wa]s sufficient to allege statutory standing for section 11 purposes"). Thus, Defendants' "tracing" argument is only potentially relevant to the §11 standing of those who bought outside the offerings. *Haw. Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*, 338 F.R.D. 205, 215 (S.D.N.Y. 2021) (certifying class over defendants' tracing arguments, noting that only "some class members, i.e.[,] those who bought on the secondary market instead of directly from the underwriters, will then have to show that 'their purchases can [be] traced back to the Registration Statement'"). Because Dearborn purchased its shares directly in the offerings, there is no issue as to whether its, or similarly situated Class members', shares were bought pursuant or traceable to the IPO and SPOs.

### 2.   Tracing is a Fact-Intensive Merits Question Not Appropriate for Determination at Class Certification

Plaintiffs agree that for Class members that did not purchase directly in an offering, they must be able to trace their purchases back to a registration statement and/or prospectus issued in connection with one of the offerings to assert claims under the Securities Act.  But contrary to Defendants' arguments, "tracing is a merits issue that the court need not consider at the class certification stage." *Set Cap. LLC v. Credit Suisse Grp. AG*, 2024 WL 895084, at *2 (S.D.N.Y. Mar. 1, 2024); *see also Wallace v. IntraLinks*, 302 F.R.D. 310, 319 (S.D.N.Y. 2014) (same); *In re Schering-Plough Corp./ENHANCE Sec. Litig.*, 2012 WL 4482032, at *11 (D.N.J. Sept. 25, 2012) (finding defendants' argument that "not every member of the proposed [c]lass can 'trace' its shares" premature when raised in connection with class certification).  Indeed, "accepting this [tracing] argument at this stage would require the Court to assess an[ ] aspect of the merits unrelated to a Rule 23 requirement." *In re Smart Techs., Inc. S'holder Litig.*, 295 F.R.D. 50, 61 (S.D.N.Y. 2013).[19]

Furthermore, it is not necessary to address "tracing" now because the proposed Class is limited to shares issued "pursuant to or traceable to the Registration Statements and Prospectuses issued in connection with Oak Street's IPO, December 2020 Offering, and February 2021 Offering, and were damaged thereby." Br. at 2. Since the proposed Class already contemplates that investors who purchased shares that cannot be traced to one of the included Offerings would be excluded from the Class, the Court should reject both temporal cut offs that Defendants propose for Plaintiffs' Securities Act claims.  *See Sudunagunta v. NantKwest, Inc.*, 2018 WL 3917865, at

---

[19] Defendants' citation to *In re Puda Coal Securities Litigation* is of no moment, as the portion they cite relates to motions for summary judgment, not a motion for class certification.  Corr. Opp.  at 20-21 (citing 2013 WL 5493007, at *6, *8 (S.D.N.Y. Oct. 1, 2013)).  Furthermore, unlike Dearborn, the plaintiff in *Puda Coal*, "had no information regarding the provenance of his shares until well after the [c]omplaint was filed in this action." *See id.* at *7.

*9 (C.D. Cal. Aug. 13, 2018) ("The definition of the proposed class already addresses traceability.").

Courts have long declined to resolve "tracing" arguments at class certification. *See id.*; *In re Snap Inc. Sec. Litig.*, 334 F.R.D. 209, 224 (C.D. Cal. 2019) ("declin[ing] to narrow the relevant [c]lass [p]eriod for the Securities Act claims" based on entry of non-IPO shares); *In re Worlds of Wonder Sec. Litig.*, 1990 WL 61951, at *9 (N.D. Cal. Mar. 23, 1990) (tracing "goes to the merits of their claims and should not be addressed in a class certification motion"); *In re Eagle Comput. Sec. Litig.*, 1986 WL 12574, at *8 (N.D. Cal. Mar. 31, 1986) (certifying Section 11 class and finding "defendant's tracing argument must be deferred").

Because "tracing" is a merits issue, it requires fact and expert discovery—neither of which are part of assessing whether Plaintiffs meet the requirements of Rule 23, which "grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). Consequently, there is no basis to "preemptively preclude" all purchases after December 6, 2020 (or February 1, 2021 as Defendants argue in the alternative) "without providing an opportunity to develop the factual issues on which resolution of the tracing question may turn." *Smart Techs.*, 295 F.R.D. at 62.[20] Here, fact discovery has not closed, and expert discovery has not yet begun, so this issue should be deferred until a later stage in the case when there is a more complete record.

---

[20] Defendants' citation to *In re Honest Company Securities Litigation* is of no moment to the instant case. *See* Corr. Opp. at 21-22 (citing 2023 WL 3190506, at *6 (C.D. Cal. May 1, 2023)). In *Honest*, the plaintiff did not offer any expert testimony about a tracing methodology or address the defendants' evidence. Here, Professor Mitts explains how tracing can be performed with a class-wide methodology and illustrates why Defendants' evidence purportedly supporting curtailing the Class Period actually supports that such a tracing methodology exists.

### 3. Contrary to Defendants' Arguments, Tracing Can Be Done with a Full Discovery Record at the Merits Stage

Defendants' expert asserts that, in "the modern system of electronic securities delivery and clearing," it is not possible to "trace" Oak Street shares back to any particular registration statement as shares are purportedly held at the Depository Trust Company ("DTC") within a "single, commingled 'fungible bulk' of Oak Street stock under a single CUSIP number, such that unregistered shares and shares registered pursuant to the IPO and each of the SPOs [a]re indistinguishable from one because shares are effectively commingled where multiple registration statements are involved." Corr. Opp. at 22. Thus, Defendants argue that on December 7, 2020, when Oak Street conducted its first SPO, "it became effectively impossible to determine the origin of any individual share of Oak Street stock traded on the market." Id. at 24; Wiener Rpt. ¶68. Alternatively, Defendants argue that tracing was "functionally impossible" after the lockup of Oak Street stock (from the IPO) expired on February 1, 2021.

But this is not only outdated information, it also ignores the current record keeping systems maintained by DTC and other third-parties. Mitts Rpt. ¶34. For example, as explained by Professor Mitts, the Wiener Report inaccurately states that "DTC records only net positions of each Participant, which represent the net activities of the Participant." Id. ¶36 (citing Wiener Rpt. ¶47). The Mitts Report makes clear that share ownership is recorded as electronic book entries before they are registered to Cede & Co. and remain as electronic book entries thereafter. Id. ¶31. And, at the same time, the electronic book entry is recorded at Cede & Co., it is recorded as an electronic book entry credit at a bank. Id. ¶28. Professor Mitts further shows that individual deposit, withdrawal and transfer transactions are recorded on Participant Daily Activity Statements, a detailed ledger maintained by DTC for each DTC participant on each settlement day. Id. ¶34. Professor Mitts explains that DTC Participant Daily Activity Statements record incoming and outgoing share transfers such that the idea that shares are commingled without regard to their

chain of title is a fiction. *Id.* ¶¶25-40. Further, Professor Mitts adds, transfers between DTC participant accounts are not subject to netting and nothing in this process results in shares "no longer exist[ing] in their prior form," as the Wiener Report inaccurately claims. *Id.* ¶¶31-33, 38-39.

Thus, the Mitts Report establishes that records maintained by DTC, FINRA and broker-dealers permit identifying and segregating purchases of shares by individual customers, thereby making it possible to reconstruct a reliable "chain of title" for Oak Street common stock in this case. *Id.* ¶41. For example, "[i]t is straightforward to trace purchases of shares from [participant DTC] accounts using records produced in discovery along with an accounting method such as first-in-first-out ("FIFO") or last-in-first-out ("LIFO")." *Id.* ¶42. As Professor Mitts explains, these accounting methods do not involve "statistical tracing" nor probabilistic reasoning, and instead yield "a single conclusion regarding who owns each share at each point in time." *Id.* ¶43. Accordingly, the Mitts Report shows it is possible to reconstruct a reliable "chain of title" for purchasers of Oak Street common stock in the IPO, December 2020 SPO, and February 2021 SPO. *Id.* ¶¶11, 42.

### 4. "Tracing" Will Be Addressed with a Class-Wide Methodology

The Supreme Court has made clear that Rule 23(b)(3) does not require that a "plaintiff seeking class certification to prove that each element of her claim is susceptible to class-wide proof." *Amgen*, 568 U.S. at 469. Indeed, in a class action, "generalized liability questions must be more substantial than the issues subject only to individualized proof." *AMC*, 338 F.R.D. at 215. In assessing a Section 11 claim, "the liability issue, which involves the class-wide issue of whether the Offering Documents contain material misstatements and omissions as alleged by [p]laintiffs, clearly predominates over individualized tracing inquiries." *Set Cap. LLC v. Credit Suisse Grp. AG*, 2023 WL 2535175, at *10 (S.D.N.Y. Mar. 16, 2023); *AMC*, 338 F.R.D. at 215; *Smart Techs.*,

295 F.R.D. at 61. The case is no different here and Defendants' tracing arguments cannot defeat predominance.

Even so, as described above and in the Mitts Report, at ¶¶45-47, for shares purchased, data obtainable in discovery from DTC and other third-party sources, paired with standard accounting methods, permit the reconstruction of a reliable "chain of title" showing the ownership of each Oak Street share at any point in time. *Id.* ¶¶44-46.[21] This methodology can be applied on a Class-wide basis. *Id.* ¶¶44-47.

### C. The Market for Oak Street Common Stock Was Efficient Throughout the Class Period

#### 1. Defendants' Expert Only Challenges Market Efficiency During the Quiet Period

Defendants claim the Class Period must be "shortened" because Plaintiffs purportedly failed to establish that Oak Street stock "traded in an efficient market during the entire class period." Corr. Opp. at 27. That argument fails. Plaintiffs' expert economist, Mr. Coffman, submitted an expert report concluding that Oak Street stock traded in an efficient market throughout the Class Period. ECF 135-2, ¶¶1, 88. Defendants' expert, ███████████████

████████████████████████████████████

███████████████ including the so-called "Quiet Period" that covered the first 17 trading days. *See* **Exhibit 4**, Deposition Transcript of Clifford Ang ("Ang. Tr.") at 37:25-38:6 ("███████████

████████████████████████████████████

████████████████████████████████[22]

---

[21] This methodology is not "statistical tracing," as it yields a definite conclusion on ownership. Mitts Rpt. ¶43.

[22] Although the Ang report discusses whether the IPO offering price could be inefficient (Ang Rpt., ¶¶18-19), the starting point for Mr. Coffman's market efficiency analyses was the secondary trading on the NYSE on the IPO date, not the IPO offering price. *See* Coffman Rebuttal Rpt., ¶12.

Defendants' original brief overstated Mr. Ang's opinion, and they were forced to correct their brief after his deposition. Initially, Defendants' brief claimed that Mr. Ang "reviewed the same *Cammer*, *Krogman*, and additional factors identified by Plaintiffs and Mr. Coffman, and, using the same analysis, <u>determined that they did not support the conclusion that the market for Oak Street [common stock] was efficient during that time</u>." ECF 145 at 30. However, at his deposition, Mr. Ang said, "███████████████████████████████ (Ang Tr. at 51:12-13), because his conclusion was that the reviewed factors offered "no or less support" for market efficiency during the Quiet Period than during the rest of the Class Period (Ang Rpt. ¶30), which is <u>not</u> a finding that the factors did not support market efficiency during the Quiet Period. Mr. Ang made clear, "████████████████████████████████████████████████

████████████████████████████████████." Ang Tr. at 48:1-3; *see also id.* at 52:20-24 ("████████████████████████████████████

████████████████████████████████████████

███████████████████████.").

On April 8, 2024, four days after Mr. Ang's deposition, Defendants abruptly pivoted and filed a supposed "corrected" version of their Opposition.[23] Defendants did not "correct" their Opposition; rather, they changed it because they had inaccurately claimed Mr. Ang determined the factors did not support market efficiency during the Quiet Period, which he did not. Thus, while Mr. Ang offers criticisms of Mr. Coffman's approach, Mr. Coffman's opinion on market efficiency is not rebutted by any contrary opinion. Mr. Ang's deposition made this clear.

---

[23] By addressing the Corr. Opp. in this brief, Plaintiffs neither concede that Defendants' filing of that brief was proper nor that the Court should consider it in determining whether to certify the Class. Pursuant to the Court-ordered schedule in this case (ECF 131), Defendants' Opposition to Plaintiffs' motion for class certification was due on February 20, 2024—not April 8, 2024.

Rather than assert that the *Cammer* factors "did not support the conclusion that the market for Oak Street [common stock] was efficient during that time" (ECF 145 at 30), Defendants now assert a much watered-down position that the *Cammer*, *Krogman*, and additional factors "did not necessarily support Mr. Coffman's assumption that the market for Oak Street [common stock] was efficient during that time" (Corr Opp. at 30). Additionally, Defendants deleted the words "to no" from their Opposition's contention that the "bid-ask spread" provides "less to no support for the conclusion that the market for Oak Street common shares was efficient." *Compare* ECF 145 at 30 with Corr. Opp. at 32. Providing less support is not the same as providing no support and these changes gut Defendants' arguments.

**2.    Defendants' Expert Fails to Rebut Mr. Coffman's Conclusion that Oak Street Traded in an Efficient Market During the Quiet Period**

Defendants' expert, Mr. Ang, does not argue that Mr. Coffman's analysis of any factors demonstrates that the market for Oak Street stock was *inefficient*. Mr. Ang simply points out that each factor is not definitive proof of market efficiency. But in doing so, Mr. Ang ignores these factors *do* add supporting evidence to the conclusion that the market was efficient. *See* **Exhibit 3**, the Expert Rebuttal Report of Chad Coffman, CFA, dated April 22, 2024 ("Coffman Rebuttal Rpt.") ¶31. The *Cammer, Krogman*, and additional factors signify that the predicates for market efficiency are present, and these predicates are present throughout the Class Period that encompasses the Quiet Period. Mr. Ang's attempts to demonstrate that the Quiet Period and/or IPO Date are somehow sufficiently different than the Class Period are flawed. *Id.* In addition, separately analyzing the *Cammer* factors for the IPO date alone and/or over the Quiet Period alone does not make any logical sense. *Id.* ¶19.

a.   **The Quiet Period Is Not Inefficient "As a Matter of Law"**

Defendants assert that the market during the Quiet Period was inefficient "as a matter of law." Corr. Opp. at 28. Defendants are incorrect. Indeed, Defendants' purported authority, *In re SCOR Holding (Switzerland) AG Litig.*, 537 F. Supp. 2d 556, 575 (S.D.N.Y. 2008) found that this argument "goes too far," and instead explained that there is a "rebuttable presumption" of inefficiency during the Quiet Period. Here, even if that authority were adopted by the Seventh Circuit, Plaintiffs have rebutted that presumption. First, Mr. Coffman shows that the "evidence" in the "academic literature" relied on by Mr. Ang to support that markets "may" be inefficient on the date of the IPO and during the Quiet Period did not exist for Oak Street stock. Coffman Rebuttal Rpt., ¶¶13-18 (further noting that Mr. Ang ignored updates contradicting articles he cited). Second, market efficiency is established for the Quiet Period under the *Cammer*, *Krogman*, and additional market efficiency factors. *See id.* ¶¶19-32; *see also In re Jeld-wen Holding, Inc. Sec. Litig.*, 2021 WL 1186326, at *5-6 (E.D. Va. Mar. 29, 2021) (holding quiet periods are not inefficient "as a matter of law" and finding market efficiency established during Quiet Period when some *Cammer* factors met); *In re Infineon Techs. AG Sec. Litig.*, 266 F.R.D. 386, 396 (N.D. Cal. 2009) (same). Mr. Coffman's reports and testimony have established that all relevant *Cammer* and *Krogman* factors supported market efficiency ***throughout*** the Class Period, including ***during*** the Quiet Period. *Jeld-wen*, 2021 WL 1186326, at *6; *Infineon*, 266 F.R.D. at 396.

In support of their over-extended position, Defendants also rely on *In re Initial Public Offering Securities Litigation*, 471 F.3d 24 (2d Cir. 2006) ("*IPO*") which had language that relied on a decision from the Sixth Circuit Court of Appeals that concerned only the market for municipal bonds—not publicly traded common stock. *See Freeman v. Laventhol & Horwath*, 915 F.2d 193, 199 (6th Cir. 1990) (stating that "a primary market for newly issued ***municipal bonds*** as a matter of law is not efficient"). Defendants misleadingly present the *Freeman* holding in their Opposition

as "finding that a primary market 'as a matter of law is not efficient'" (Corr. Opp. at 28), leaving out the critical information that the *Freeman* holding unequivocally relates to municipal bonds only. For the same reasons, other cases Defendants rely upon are inapposite. *In re Enron Corp. Sec. Derivative & "ERISA" Litig.*, 529 F. Supp. 2d 644, 769 (S.D. Tex. 2006) (assessing market for Enron's bonds and citing *Freeman* while noting "[t]here is a line of cases conclusorily holding that primary bond markets *per se* are not open"); *Berwecky v. Bear, Stearns & Co.*, 197 F.R.D. 65, 68 n.5 (S.D.N.Y. 2000) (citing dicta in a market manipulation case granting class certification).[24]

Defendants also cite to *In re MDC Holdings Securities Litigation*, (Corr. Opp. at 28-29), but that case involved "undeveloped markets" where "no market existed for MDC's subordinated notes at the time they were issued." *MDC,* 754 F. Supp. 785, 805 (S.D. Cal. 1990). In *MDC*, the court noted that the plaintiffs' "theory is ***an extension*** of the presumption of reliance from an existing, developed, efficient market." *Id*.

Here, the market for Oak Street's common stock following the IPO was well-developed— it traded on the NYSE, a far cry from the "undeveloped market" for "subordinated notes" in *MDC. See id.* Defendants' expert, Mr. Ang, agrees with Mr. Coffman's conclusion that "██████████ ████████████████████████████████████████ ████████████████████████████████████████." Ang Tr. at 124:18-23.

### b.      The Fact That There Was Not Substantial Analyst Coverage During the Quiet Period Does Not Show That The Market for Oak Street Stock Was Inefficient

Defendants' main criticism of Mr. Coffman's opinion is that he failed to separately consider each of the *Cammer, Krogman*, and additional factors during the 17-trading day "Quiet

---

[24] One case is a motion to dismiss opinion that has no bearing on this class certification motion. *See In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262 (D.N.J. 2007).

- 30 -

Period" immediately following the IPO. Corr. Opp. at 28-34. Defendants' expert points out that Quiet Period rules typically restrict the publication of analyst reports and financial forecasts, and select academic literature which Mr. Ang claims "may impede market efficiency." Ang Rpt. ¶¶20–21. But this argument is off base.

First, "[t]here is no bright-line rule regarding" the number of analysts necessary to satisfy *Cammer* factor two and one analyst has been found to be enough. *See Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 350 (C.D. Cal. 2015); *see also In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 514-15 (1st Cir. 2005) (one analyst issuing a single report); *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 499 (S.D. Fla. 2003) (two analysts).

Second, courts consider a number of different sources when analyzing *Cammer* factor two, including *Seeking Alpha* reports. *See, e.g.*, *Wilson v. LSB Indus., Inc.*, 2018 WL 3913115, at *11 (S.D.N.Y. Aug. 13, 2018) (*Cammer* factor two supported where commentators including those that "were not well-known in the market"); *In re NetSol Techs., Inc. Sec. Litig.*, 2016 WL 7496724, at *6 (C.D. Cal. July 1, 2016) (*Cammer* factor two supported because commentators issued reports, one of which was from *Seeking Alpha*). Additionally, information from the prospectus, road shows, and nearly daily media articles further support that information about Oak Street was freely flowing to investors during the Quiet Period, supporting market efficiency. *See* Coffman Rebuttal Rpt. ¶¶25-26.

Third, Mr. Coffman shows that there is a lack of evidence of significant change in price when analysts issued reports at end of the Quiet Period which is also inconsistent with a change in market efficiency at that point. *Id.* ¶17. Further, as Mr. Coffman noted in his deposition, a lack of analyst coverage following an IPO is unsurprising given a regulatory requirement that generally prohibit firms and underwriters from publishing opinions during the Quiet Period which further explains the lack of analyst coverage. *Id.* ¶25 n. 57.

Finally, Mr. Ang's identification of news articles during the Quiet Period supports the idea that information was available in the news about Oak Street. *Id.* ¶25. *See also* Ang Tr. at 97:12—98:24. Thus, the fact that there was not substantial analyst coverage over the first seventeen days of Oak Street's trading does not imply that the market was inefficient during the Quiet Period. Coffman Rebuttal Rpt. ¶¶ 24-25.

### c. The Remaining *Cammer* and *Krogman* Factors Support Market Efficiency During the Quiet Period

No one factor is dispositive on market efficiency (Br. at 18), ***the other Cammer and Krogman market efficiency factors are met during the Quiet Period***, and Mr. Ang's "analysis" does not support his implication that the market was less efficient during the Quiet Period or on the IPO Date.

During his deposition, ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ " for the remainder of the Class Period. Ang Dep. at 126:11 – 127:5. Thus, ██████████████████████ *Cammer* factors 3 (market makers) and 4 (S-3 eligibility), and the additional factors of NYSE listing, market capitalization, and lack of autocorrelation all support market efficiency during the Quiet Period. *See* Br. at 18-25. In addition, Mr. Coffman explains that for the other *Cammer* and *Krogman* factors that were addressed in the text of the Ang Report, they also support market efficiency.[25] For example, (i) *Cammer* Factor 1 (average weekly trading volume), is still supported by average weekly trading volume of 1.69% to 1.89% during the Quiet period, easily meeting the threshold cited by *Cammer*

---

[25] The lack of options trading during the Quiet Period noted by Mr. Ang is not a *Cammer* or *Krogman* factor. And while that lack of options trading does not provide additional support for market efficiency during the Quiet Period as it does for other portions of the Class Period, it also does not suggest the market was inefficient during the Quiet Period. *Id.* ¶29.

for a "substantial presumption" of market efficiency (Coffman Rebuttal Rpt. ¶23);[26] (ii) *Cammer* Factor 5 (cause and effect) remains supportive of market efficiency because Mr. Ang provides no evidence to suggest the cause-and-effect analysis Mr. Coffman provided in his opening report, which incorporated the Quiet Period, is somehow inapplicable to the Quiet Period. (*id*. ¶27); (iii) the "bid-ask" spread of 0.477% during the Quiet Period was lower than the average spread of a 100-stock sample and does not disturb Mr. Coffman's market efficiency opinion (*id.*, ¶28); and (iv) Mr. Coffman's conclusions about insider and institutional holdings are unrebutted by the Ang Report because Mr. Ang relied on flawed critiques of the data relied on by Mr. Coffman, which are reported on a quarterly basis (*id.*, ¶30). Simply stated, "Mr. Ang's claims related to the IPO Date and Quiet Period do not disturb [Mr. Coffman's] opinion that Oak Street Health Common Stock traded in an efficient market throughout the Class Period." *Id.* at ¶32.

### d. Defendants Do Not Challenge Market Efficiency During the Remainder of the Class Period

Defendants only challenge market efficiency during the Quiet Period, conceding that the market for Oak Street common stock was efficient for the remainder of the Class Period. Indeed, Defendants' expert does not offer any criticism or purported evidence to call into question Mr. Coffman's opinion that Oak Street common stock traded in an efficient market for approximately 95% of the Class Period (the remaining 301 trading days from August 31, 2020 through November 8, 2021). *Id.* ¶9. Considering all the relevant factors, Plaintiffs have proved that the market during the entire Class Period was efficient. *See TreeHouse*, 2020 WL 919249, at *4; *Tatz v. Nanophase Tech. Corp.*, 2003 WL 21372471 (N.D. Ill. June 13, 2003).

---

[26] Mr. Ang cited "average daily trading" volume in his report, but he did so based on a single case provided by counsel and without any supporting economic literature, even though *Cammer* refers to average "weekly" trading volume and Mr. Coffman is not aware of any basis for applying an average "daily" metric in assessing market efficiency. *See* Ang Dep. at 88:7-93:6; Coffman Rebuttal Rpt., ¶24 & n.53.

### 3. The *Affiliated Ute* Presumption of Reliance Applies During the Entire Class Period Including the Quiet Period

At the end of their Opposition brief, Defendants make a perfunctory attempt to rebut Plaintiffs' invocation, in the alternative, of the *Affiliated Ute* presumption. Corr. Opp. at 34-35. In *Affiliated Ute*, the Supreme Court reaffirmed that the federal securities laws are to be "construed 'not technically and restrictively, but flexibly to effectuate its remedial purposes.'" 406 U.S. at 151. Reliance is presumed under *Affiliated Ute* when "[r]equiring a plaintiff to show a speculative set of facts, *i.e.*, how he would have behaved if omitted material information had been disclosed, places an unrealistic evidentiary burden on the 10(b) plaintiff." *In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 47 (S.D.N.Y. 2013). This is just such a case.

Defendants wrongly assert that because the Complaint's alleged omissions are connected to affirmative statements made in the case, the *Affiliated Ute* presumption of reliance is not available to Plaintiffs. But the statements were misleading due to omissions, triggering the *Affiliated Ute* presumption of reliance. *See* Br. at 25-26.[27]

## III. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that their motion be granted in its entirety and that the Court enter an Order: (1) certifying this case as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3); (2) appointing Plaintiffs CPAT, BRS, and Dearborn as Class Representatives; and (3) approving Robbins Geller and Labaton as Class Counsel pursuant to Federal Rule of Civil Procedure 23(g).

---

[27] Although Plaintiffs' Opening Brief argued that *Affiliate Ute* should apply to their Item 303 claims based "solely on the omission of [withheld] information, without any affirmative statement" (Br. at 26), Plaintiffs are no longer pursuing that argument for the Section 10(b) claim in light of the Supreme Court's recent decision in *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 2024 WL 1588706, at *2-3 (Apr. 12, 2024).

Dated: April 22, 2024

Respectfully Submitted,

**ROBBINS GELLER RUDMAN
  & DOWD LLP**
JAMES E. BARZ (IL Bar # 6255605)
FRANK A. RICHTER (IL Bar # 6310011)
CAMERAN M. GILLIAM (IL Bar # 6332723)

*/s/ Frank A. Richter*
FRANK A. RICHTER

200 South Wacker Drive, 31st Floor
Chicago, IL 60606
Telephone: 630/696-4107
jbarz@rgrdlaw.com
frichter@rgrdlaw.com
cgilliam@rgrdlaw.com

*Counsel for Lead Plaintiffs Central Pennsylvania
Teamsters Pension Fund – Defined Benefit Plan
and Central Pennsylvania Teamsters Pension
Fund – Retirement Income Plan 1987, and Lead
Counsel for the Class*

**LABATON SUCHAROW LLP**
CAROL C. VILLEGAS (*pro hac vice*)
CHRISTINE M. FOX (*pro hac vice*)
JAMES M. FEE (*pro hac vice*)

*/s/ Christine M. Fox*
CHRISTINE M. FOX

140 Broadway
New York, NY 10005
Telephone:  212/907-0700
212/818-0477 (fax)
cvillegas@labaton.com
cfox@labaton.com
jfee@labaton.com

*Counsel for Lead Plaintiff Boston Retirement
System and Counsel for Named Plaintiff City of
Dearborn Police & Fire Revised Retirement
System, and Lead Counsel for the Class*

- 35 -

- 36 -

**LAW OFFICE OF RACINE &
  ASSOCIATES**
MARIE T. RACINE
1001 Woodward Avenue
Suite 1100
Detroit, MI 48226
Telephone: 313/961-8930
313/961-8945 (fax)
mracine@racinelaw.us

*Additional Counsel for Dearborn Police & Fire
Revised Retirement System*

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on April 22, 2024, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will automatically send notification of such filing to all counsel of record.

*/s/ Christine M. Fox*
CHRISTINE M. FOX