# EXHIBIT 1

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF ILLINOIS

### EASTERN DIVISION

| | |
|---|---|
| REGINALD T. ALLISON, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:22-cv-00149 |
| Plaintiff, | **CLASS ACTION** |
| v. | |
| OAK STREET HEALTH, INC., et al., | |
| Defendants. | |

# EXPERT REPORT OF

# PROFESSOR JOSHUA MITTS, PH.D.

**April 22, 2024**

**I.**     **INTRODUCTION**

**A.**     **Qualifications**

1.     I am the David J. Greenwald Professor of Law at Columbia University.  I am also the principal of M Analytics LLC, a consulting firm specializing in financial economics.  I hold a Ph.D. in Finance & Economics from Columbia University, a J.D. from Yale University, and a B.A. in Liberal Studies from Georgetown University.

2.     I have published extensively in the fields of economics, finance, and law.  My articles have appeared in peer-reviewed journals, including the *Journal of Finance* (winner of the Dimensional Fund Advisors Distinguished Paper Prize (2020)), the *Journal of Law and Economics*, the *Journal of Legal Studies*, the *Journal of Institutional and Theoretical Economics*, the *International Review of Law and Economics*, the *Journal of Financial Regulation*, the *Business Lawyer*, and the *Harvard Business Law Review*, among others.

3.     I have been invited to present my research at numerous conferences and workshops in finance and law and economics, including the Annual Meeting of the American Finance Association, the Annual Meeting of the American Law & Economics Association, the Conference on Empirical Legal Studies, the Columbia Business School Conference on News and Finance, and the 8th Symposium on Intelligent Investing at Ivey Business School, and at workshops at Harvard University, Columbia University, New York University, The University of Texas at Austin, and Vanderbilt University.

4.     I have reviewed articles for peer-reviewed journals in finance and law and economics, including *The Review of Financial Studies*, *The Journal of Law and Economics*, *The Journal of Legal Studies*, *International Review of Law and Economics*, and *Journal of*

1

*Empirical Legal Studies*. My research and commentary have been featured in *The Wall Street Journal*, *Reuters*, *Bloomberg*, *The Washington Post*, *MarketWatch*, *Law360*, *Bloomberg Law*, *Bloomberg View*, *Bloomberg BNN*, and *The Globe and Mail*.

5. In addition to my research and teaching and academic responsibilities, I advise on the analysis of trading data in connection with securities violations. I have extensive experience supporting the U.S. Department of Justice. My research and expert opinions have been presented to the U.S. Securities and Exchange Commission and other regulatory bodies.

6. At Columbia University, I have taught courses on securities regulation, law and economics, data science, and contracts. My courses encompass economic theory, quantitative methods of valuation, asset pricing, investments, and data analytics as well as the economics of securities fraud, market manipulation, and insider trading.

7. My qualifications, publications, and expert witness testimony over the past five years are summarized in detail in my *curriculum vitae*, attached to this report as Appendix A.

**B.  Summary of Conclusions**

8. I have reviewed the (i) Expert Report of Jack R. Wiener (the "Wiener Report"), dated February 20, 2024; (ii) the Declaration of Ann Marie Bria (the "Bria Declaration"), dated February 15, 2024; (iii) and the Declaration of Kimberlee Koskiewicz (the "Koskiewicz Declaration"), dated February 15, 2024. The Wiener Report was attached as Exhibit 30, the Bria Declaration as Exhibit 29, and the Koskiewicz Declaration as Exhibit 28 to Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class

2

Certification and Appointment of Class Representatives and Class Counsel, filed on February 20, 2024.

9. I have been retained by counsel for the Plaintiffs in this matter to opine on the following questions:

    i. *First*, whether the Wiener Report's conclusions, including that the Depository Trust Company ("DTC") "records only net positions of each Participant, which represent the net activities of the Participant," are accurate and reliable;

    ii. *Second*, whether timestamped transactional records are maintained by DTC, Financial Industry Regulatory ("FINRA"), and/or broker-dealers that identify individual purchases of Oak Street shares by DTC participants and their customers, making it possible to a reliable "chain of title" using standard accounting methods like first in-first out (FIFO) or last in-first out (LIFO) that do not amount to "statistical tracing"; and

    iii. *Finally*, whether tracing purchases of Oak Street shares to each registration statement is amenable to Class-wide proof.

10. In reaching these opinions, I have relied upon various publicly available materials, which are cited in this report. The research and analysis upon which my opinions are based has been conducted by me with the assistance of personnel working under my direction and supervision. I reserve the right to modify this report and my conclusions based on additional information and materials I might review, including materials that have not yet been made available for review. I am being compensated at a rate of $1,600 per hour for

3

my work in this matter.  I have been assisted in this matter by staff at M Analytics LLC working under my direction, and I receive further compensation based on those billings. M Analytics LLC and my compensation are not dependent on my opinions expressed in this report or the outcome of this matter.

11.    Based on my analysis to date, my review of available materials, my experience, and my professional judgment, I have formed the opinion that: (i) the Wiener Report's conclusions are inaccurate and unreliable; (ii) timestamped transactional records are maintained by DTC, FINRA and broker-dealers that identify individual purchases of Oak Street shares by DTC participants and their customers, making it possible to reconstruct a reliable "chain of title" using standard accounting methods like first in-first out (FIFO) or last in-first out (LIFO) that do not amount to "statistical tracing;" and (iii) tracing purchases of Oak Street shares to each registration statement is amenable to Class-wide proof.  The remainder of this report discusses these opinions in detail.

## II.    FACTUAL OVERVIEW

12.    In this section, I describe the relevant facts underlying this case as I understand them based on Lead Plaintiffs' Amended Complaint (the "Complaint"), filed on May 25, 2022,[1] Plaintiffs' Motion for Class Certification, filed on December 15, 2023 ("Mot."),[2] and the

---

[1] Lead Plaintiffs' Compl. For Violations of the Federal Securities Laws, May 25, 2022, ECF No. 40 (hereinafter "Compl."); Unless otherwise noted, emphasis is in the original.

[2] Mem. of Law in Supp. of Pls.' Opposed Mot. for Class Certification and Appointment of Class Representatives and Class Counsel, Dec. 15, 2023, ECF. No 135 (hereinafter "Mot"); Unless otherwise noted, emphasis is in the original.

February 10, 2023 Memorandum Opinion and Order of the U.S. District Court for the Northern District of Illinois on Defendants' Motion to Dismiss Plaintiffs' Complaint.[3]

13.     In August 2020, Defendant Oak Street Health, Inc. ("Oak Street" or the "Company") went public via an initial public offering ("IPO").[4] This was followed, in the next nine months, by three secondary public offerings ("SPOs"), which took place on the following dates: December 2, 2020 ("December 2020 Offering"); February 10, 2021 ("February 2021 Offering"), and May 26, 2021 ("May 2021 Offering").[5]

14.     Throughout the course of its IPO, which closed on August 11, 2020, Oak Street sold 17,968,750 shares of its common stock at $21 per share, and raised (before deducting underwriting discounts and commissions and offering expenses) approximately $377 million.[6] In its December 2020 Offering, Oak Street sold a total of 6,477,294 shares of its common stock at $46 per share[7]; 12,332,394 shares of its common stock at $56.00 per share in the February 2021 Offering[8]; and 12,052,258 shares of its common stock at $62.00

---

[3] Allison v. Oak St. Health, Inc., 2023 WL 1928119 (N.D. Ill. Feb. 10, 2023).

[4] Compl. at ¶ 27.

[5] Compl. at ¶ 1.

[6] Compl. at ¶ 239.

[7] Compl. at ¶ 245.

[8] Compl. at ¶ 251.

per share in the May 2021 Offering.[9]  The shares sold in each of these offerings – the IPO and the SPOs – were issued pursuant to discrete Registration Statements.[10]

15.    Oak Street operates primary care physician offices focused exclusively on Medicare-eligible patients.[11]  The Company's business strategy was to "enter[] into agreements that would provide Oak Street with lump-sum, Medicare-funded, monthly payments for each patient that signed up with Oak Street," in return for which Oak Street would "undertake financial responsibility for *all* of the patient's healthcare costs."[12]  The crux of Oak Street's strategy was to "provide such superior primary medical care [to its enrolled patients] that it would prevent costly procedures and hospitalization, thereby keeping healthcare costs below the lump sum payments, resulting in significant profits."[13]

16.    Marketing to Medicare-eligible individuals is subject to laws and regulations, including the False Claims Act ("FCA") and Anti-Kickback Statute ("AKS").[14]  These regulations

---

[9] Compl. at ¶ 256.

[10] *See* Compl. at ¶ 238 (detailing that the IPO was sold pursuant to a prospectus for an offering of "Oak Street common stock filed with the SEC on Form 424B4 on August 7, 2020, which incorporated a registration statement for the offering filed on Form S-1 on July 10, 2020, and amended July 22, 2020, July 29, 2020, August 4, 2020, and August 5, 2020 (collectively, the "IPO Registration Statement and Prospectus"); *see also* Compl. at ¶ 244 ("The December 2020 Offering was sold pursuant to a prospectus for a secondary offering of Oak Street common stock filed with the SEC on Form 424B4 on December 4, 2020, which incorporated a registration statement for the offering filed on Form S-1 on November 30, 2020 (collectively, the "December 2020 Registration Statement and Prospectus"); *see also* Compl. at ¶ 250(("The February 2021 Offering was sold pursuant to a prospectus for a secondary offering of Oak Street common stock filed with the SEC on Form 424B4 on February 12, 2021, which incorporated a registration statement for the offering filed on Form S-1 on February 8, 2021 (collectively, the "February 2021 Registration Statement and Prospectus"); *see also* Compl. at ¶ 255 (("The May 2021 Offering was sold pursuant to a prospectus for a secondary offering of Oak Street common stock filed with the SEC on Form 424B4 on May 28, 2021, which incorporated a registration statement for the offering filed on Form S-1 on May 24, 2021 (collectively, the "May 2020 Registration Statement and Prospectus").

[11] Compl. at ¶ 4.

[12] *Id.* (emphasis added).

[13] *Id*.

[14] *Oak St.*, 2023 WL 1928119, at *2.  FCA liability can arise from AKS violations.

6

restrict the use of, among other things, financial incentives/payments to third-parties for medical referrals, and other outreach strategies to potential patients. On November 8, 2021, Oak Street disclosed that it had received a Civil Investigative Demand ("CID") from the U.S. Department of Justice, that the U.S. Department of Justice was "investigating whether the Company may have violated the False Claims Act" and that the "CID request certain documents and information related to the Company's relationships with third-party marketing agents and related to the Company's provision of free transportation to federal health care beneficiaries."[15] Lead Plaintiffs allege that additional disclosures followed the next day and after.[16] Lead Plaintiffs allege that Oak Street had engaged in "overly aggressive patient acquisition and recruitment strategies that placed the Company at heightened and significant risk of government scrutiny"[17], and did not disclose but rather "concealed [these strategies] from the investing public by making false and misleading statements."[18]

17. Specifically, I understand that Lead Plaintiffs have alleged that Oak Street "around the time of the IPO … began paying third-party insurance agents at least $200 as kickbacks for each patient the agents referred to Oak Street … [and], both leading up to and after the IPO, repeatedly marketing and providing free transportation to prospective patients as a

---

[15] Compl. at ¶¶ 13, 129.

[16] Compl. at ¶¶ 130-142.

[17] Compl. at ¶ 9.

[18] Compl. at ¶ 11.

kickback to induce them to join Oak Street, including to induce them to switch from their existing primary care doctor."[19]

18. I understand that Lead Plaintiffs have alleged Defendants[20] made false and misleading statements and omissions throughout the Class Period about the Company's marketing and patient acquisition strategies. For example, Lead Plaintiffs claim that statements in Oak Street's IPO Registration Statement about the Company "employ[ing] a grassroots approach to patient engagement led by our Outreach team and supplemented by more traditional marketing, including television, digital and social media, print, mail and telemarketing"[21] were false and misleading when made because they omitted to disclose the "material improper patient acquisition tactics that exposed the Company to government investigations, fines, penalties, or even suspension or removal from Medicare."[22] Lead Plaintiffs have pointed to similar statements made by Defendants and in SEC filings for the December 2020 and February 2021 Secondary Offerings.[23]

19. Oak Street revealed the CID after the close of trading on November 8, 2021. Oak Street's closing price on November 8, prior to the announcement, was $47.00 per share. The following day (November 9, 2021), after the investigation had been announced, saw Oak

---

[19] Compl. at ¶ 9.

[20] Defendants include Oak Street, its CEO (Michael Pykosz), its CFO (Timothy Cook), and two Private Equity entities (Newlight and General Atlantic) which together owned – varying throughout the Class Period – a small majority / or large minority portion of Oak Street's stock. *See Oak St.*, 2023 WL 1928119, at *1.

[21] Compl. at ¶ 101.

[22] Compl. at ¶ 104.

[23] *See* Compl. at ¶ 105; *see also* Compl. at ¶ 107.

Street's stock drop to a closing price of $37.00 per share, and "analysts cut their ratings and targets."[24]

20.    I understand Lead Plaintiffs have brought claims under Section 10(b) and 20(a) of the Exchange Act as well under and Sections 11, 12 and 15 of the Securities Act "on behalf of all persons and entities who or which purchased or otherwise acquired the publicly traded common stock of Oak Street during the period from August 6, 2020 through November 8, 2021" including those who "purchased shares of Oak Street common stock pursuant or traceable to the registration statements and prospectuses issued in connection" with the IPO and December 2020, February 2021, and May 2021 SPOs.[25]  I also understand that these claims have been narrowed by the Court's February 10, 2023 Opinion and Order on Defendants' Motion to Dismiss Plaintiffs' Complaint – specifically, Plaintiffs' Section 12(a)(2) and Section 11 claims based on misrepresentations and omissions in the May 2021 SPO have been dismissed.[26]  I understand Lead Plaintiffs have filed a motion requesting that the Court certify a class of "[a]ll persons and entities who or which purchased or otherwise acquired the publicly traded common stock of Oak Street Health during the period from August 6, 2020 through November 8, 2021," including those who "purchased shares of Oak Street common stock pursuant to or traceable to the Registration Statements and Prospectuses issued in connection" with the IPO, the December 2020 SPO and February 2021 SPO.

---

[24] Compl. at ¶ 190.

[25] Compl. at ¶ 1.

[26] *Oak St.*, 2023 WL 1928119, at *16.

**III.     THE WIENER REPORT'S CONCLUSIONS ARE INACCURATE AND UNRELIABLE**

21.     The Wiener Report sets out two opinions.  The first opinion is that "on each of August 6, 2020, December 2, 2020, February 10, 2021, and May 26, 2021, Oak Street Common Shares registered pursuant to different Registration Statements entered the market," making it impossible to "distinguish between Oak Street Common Shares issued pursuant to the December 2020 Registration Statement and Oak Street Common Shares issued pursuant to the August 2020 IPO Registration Statement, as they were commingled and held in fungible bulk and indistinguishable from one another."[27]  The second opinion is that "from at least as early as February 2, 2021, there was no way for a shareholder to trace any share held at DTC to any Registration Statement."[28]

22.     The basis for these opinions is Mr. Wiener's theory that when a corporation registers shares to DTC through its nominee entity Cede & Co., "the securities issued at different times pursuant to different registration statements are wholly commingled in such a manner that the securities cannot be distinguished from one another."[29] Mr. Wiener claims that the "originally deposited shares no longer exist in their prior form, and have instead been wholly blended with the other shares of that CUSIP that are held by DTC."[30]  In this Report, I refer to this theory as the "Wiener Metamorphosis Theory."

---

[27] Expert Report of Jack R. Wiener, Feb. 20, 2024, ECF No. 145-31(hereinafter "Wiener Rpt."), at ¶ 7.

[28] *Id*.

[29] Wiener Rpt. at ¶ 35.

[30] Wiener Rpt. at ¶ 36.

23.     As I will explain, the Wiener Metamorphosis Theory is fiction. Share ownership takes the form of electronic book entries before transfers to Cede & Co. and remains in the form of electronic book entries thereafter. As I will explain, when shares are registered to Cede & Co., a DTC participant account is individually credited with those shares. Deposits in one DTC account are not "wholly blended" with deposits into other DTC accounts.[31]

24.     A related assertion in the Wiener Report is that "DTC records only net positions of each Participant, which represent the net activities of the Participant."[32] As I will explain, this assertion is incorrect. Individual deposit, withdrawal and transfer transactions are recorded on Participant Daily Activity Statements, a detailed ledger maintained by DTC for each DTC participant on each settlement day. Transfers between DTC participant accounts are not subject to netting in the Participant Daily Activity Statements. Curiously, the Participant Daily Activity Statements are not mentioned at all in the Wiener Report. As nearly twenty years have elapsed since Mr. Wiener was at DTC, he may have forgotten about these detailed records on individual deposit, withdrawal and transfer transactions by each DTC participant.

**A.      The Wiener Metamorphosis Theory is fiction.**

25.     The Wiener Report claims that "[o]nce deposited into the fungible bulk. . . originally deposited shares no longer exist in their prior form, and have instead been wholly blended with the other shares of that CUSIP that are held by DTC."[33] As I previously noted, I refer

---

[31] *See infra* footnote 49 and accompanying text.

[32] Wiener Rpt. at ¶ 47.

[33] Wiener Rpt. at ¶¶ 35-36.

to this theory as the "Wiener Metamorphosis Theory." I will now explain more fully why the Wiener Metamorphosis Theory is fiction.

26. As the Wiener Report acknowledges, companies do not issue paper share certificates.[34] A company's transfer agent records the issuance of shares to specific parties, typically on a "transfer journal." A transfer journal lists both issuances by the company to a party as well as transfers of shares between parties.

27. In my extensive professional experience supporting the U.S. Department of Justice and advising on the analysis of trading data in connection with high-frequency market manipulation and securities violations, transfer journals are generally maintained as electronic book entries rather than physical stock certificates. In the SEC's words: "When securities are referred to as being in "book-entry" form, it means that the investor does not receive a certificate. Instead, a custodian, usually a broker *or transfer agent*, maintains *electronic records* showing that the investor owns the particular security."[35] The transfer agent for Oak Street, Equiniti Trust Company, LLC ("Equiniti") describes "[i]nvestments with ownership recorded electronically, such as *stocks and bonds*" as "*book-entry*

---

[34] Wiener explains that while "some companies still offer physical paper securities certificates to beneficial owners" *Wiener Rpt.* at ¶ 54, the DTC was created to address, and largely obviated, the cumbersome practice of "physically mov[ing] paper securities certificates from seller to buyer" *Id*. at ¶ 27.

[35] SEC, Transfer Agent Regulations, 17 C.F.R. Part 240, Release No. 34-76743, File No. S7-27-15, at *7 n.3 (Dec. 22, 2015), https://www.sec.gov/rules/concept/2015/34-76743.pdf (last visited Apr. 10, 2024) (emphasis added); *see also* DTCC, *Cross-Business Glossary of Terms*, https://dtcclearning.com/helpfiles/cross_bus/glossary/Content/Topics/gloss.htm (last visited Apr. 10, 2024) (describing how under the Fast Automated Securities Transfer Program ("FAST"), "transfer agents of issuers also act as agents of DTC … [and] *electronically* reconcile securities holdings daily." (emphasis added); *see also* DTCC, *From Physical to Digital: Advancing the Dematerialization of U.S. Securities*, at *8 (Sept. 2020), https://www.dtcc.com/-/media/Files/PDFs/DTCC-Dematerialization-Whitepaper-092020.pdf (last visited Apr. 10, 2024) ("Transfer agents play a central role in driving dematerialization" of the securities marketplace).

12

*shares*."[36]  In another publication, Equiniti describes its direct registration service as allowing shareholders to be registered "on the records of the corporation in ***book-entry form***, with no need for a physical stock certificate."[37]  Indeed, the Koskiewicz Declaration states, "No physical securities certificates were issued to beneficial owners, at any time, before or after the Offerings."[38]

28.  As the Wiener Report acknowledges, for shares to be eligible for clearing and settlement, they must be deposited into DTC participant accounts.[39]  This occurs through two steps. ***First***, the transfer agent's electronically records a book-entry transfer to Cede & Co. ***Second***, a corresponding electronic "direct deposit" book entry is recorded into the participant account for the benefit of a depositing DTC participant.[40]

29.  The Koskiewicz Declaration describes this straightforward process: "As transfer agent and registrar, AST received registration instructions from Oak Street, for 17,968,750 new Oak Street Shares to be registered in the name of Cede & Co. (the partnership nominee of The Depository Trust Company ("DTC")), and delivered to DTC via DTC's Full Fast Program

---

[36] Equiniti Trust Company, *Shareholder Toolkit*, at *10 https://equiniti.com/media/15035/88934equs_shareholder-guide_v2.pdf (last visited Apr. 10, 2024) (emphasis added).

[37] Equiniti Trust Company, *FAQs & Contact Us*, *Direct Registration (DRS)*, *What is Direct Registration (DRS)?*, https://shareowneronline-rops.equiniti.com/help (last visited Apr. 10, 2024) (emphasis added).

[38] Decl. of Kimberlee Koskiewicz, Feb. 15, 2024, ECF No. 145-28 (hereinafter "Koskiewicz Decl."), at ¶ 11 (emphasis added).

[39] *See* Wiener Rpt. at ¶ 22 ("Most large U.S. broker-dealers and banks are DTC Participants, *meaning that they deposit and hold securities at DTC*.") (emphasis added).

[40] *See infra* note 49 and accompanying text.

13

*at the DTC account of the lead underwriter for the Offerings, JP Morgan Securities LLC ("JP Morgan") (DTC# 352).*"[41]

30. The Koskiewicz Declaration shows that this process happened repeatedly. On December 7, 2020, 6,477,293 shares were deposited into JP Morgan's DTC account (DTC # 352).[42] On February 16, 2021, 4,902,941 shares were deposited into JP Morgan's DTC account (DTC # 352).[43] On June 1, 2021, 4,791,569 shares were deposited into JP Morgan's DTC account (DTC # 352).[44] The Koskiewicz Declaration reiterates that "all 34,140,553 Oak Street Shares issued in the Offerings were . . . deposited with DTC, to be credited by DTC to JP Morgan's DTC participant account #352 by electronic book-entry."[45]

31. Nothing in this process results in shares "no longer exist[ing] in their prior form," as the Wiener Report claims.[46] Share ownership was recorded as electronic book entries *before* they were registered to Cede & Co. and *remained* as electronic book entries thereafter. That electronic book-entry transfer of shares to Cede & Co. was accompanied by an electronic book-entry credit to JPMorgan Securities LLC.[47]

---

[41] Koskiewicz Decl. at ¶ 3 (emphasis added).

[42] Koskiewicz Decl. at ¶ 5.

[43] Koskiewicz Decl. at ¶ 7.

[44] Koskiewicz Decl. at ¶ 9.

[45] Koskiewicz Decl. at ¶ 11.

[46] Wiener Rpt. at ¶ 36.

[47] Koskiewicz Decl. at ¶ 3. *See also* Koskiewicz Decl. at ¶ 11, which confirms that "No physical securities certificates were issued to beneficial owners, at any time, before or after the Offerings."

32.    Moreover, because these shares were individually credited to JPMorgan Securities, LLC, they were not "wholly blended with the other shares of that CUSIP that are held by DTC."[48] Each deposit was credited to one DTC participant and that participant alone.[49]  No deposit was "blended" with other shares held by DTC or credited to other DTC participants.

33.    Similarly, the Wiener Report's "wine vintage" analogy—namely, that DTC registration is akin to blending vintages of wine together[50]—is but a mirage.  As the Koskiewicz Declaration states, each deposit was made to the DTC participant account *of JPMorgan Securities LLC* (account # 352)—not blended with other DTC participant accounts.[51]  By ignoring evidence contrary to its conclusions, the Wiener Report appears to dogmatically close its eyes to the fact that each share deposit was made into one DTC participant account and to that account only.

---

[48] Wiener Rpt. at ¶ 36.

[49] The process for FAST transfer agent deposits, as occurred here, is given in DTCC publications.  DTCC, *Deposit/Withdrawal At Custodian*, https://www.dtcc.com/settlement-and-asset-services/securities-processing/deposit-withdrawal-at-custodian (last visited Apr. 19, 2024) ("Participants submit their physical securities and/or transfer instructions for approval directly to their FAST transfer agent. When the transfer agent approves the transfer, the participant enters the transaction via the PDWC function on DTC's Participant Terminal System (PTS), the Part Direct Deposit/Withdrawal function on DTC's Participant Browser System (PBS), or the CF2DWX file protocol. The transfer agent then approves the transaction via the CDWC function on PTS or the TA Direct Deposit/Withdrawal function on PBS. *For DWAC deposits, the requesting participant's position in its DTC account is increased* as is DTC's FAST balance in the issue.") (emphasis added).

[50] Wiener Rpt. at ¶¶ 41-43.

[51] Koskiewicz Decl. at ¶ 11 ("all 34,140,553 Oak Street shares issued in the Offerings were registered in the name of Cede & Co., and deposited with DTC, to be credited by DTC to JP Morgan's DTC participant account # 352 by electronic book-entry.").

**B.     The Wiener Report incorrectly asserts that "DTC records only net positions of each Participant" and omits any discussion of Participant Daily Activity Statements.**

34.     The Wiener Report asserts that "DTC records only net positions of each Participant, which represent the net activities of the Participant."[52]  This assertion is incorrect.  Individual deposit, withdrawal and transfer transactions are recorded on Participant Daily Activity Statements, a detailed ledger maintained by DTC for each DTC participant on each settlement day.  Participant Daily Activity Statements are described in multiple DTC publications.  The DTC Settlement Service Guide refers to these statements repeatedly:

*In addition, nothing contained in Information made available to Participants and other authorized users shall relieve them of their responsibility under DTC's Rules and Procedures or other applicable contractual obligations to check the accuracy, where applicable, of Participant Daily Activity Statements and all other statements and reports received from DTC and to notify DTC of any discrepancies.[53]*

And again:

*Investment Identification activity is recorded on your Participant Daily Activity Statement. Check your statement to be sure **your transactions** were properly processed and recorded.[54]*

And yet again:

*Warning! Under DTC's Rules and Procedures you are responsible for verifying the accuracy of your Participant Daily Activity Statement. You must report discrepancies to DTC's Reconciliation division as soon as possible after you receive the statement.[55]*

35.     Elsewhere, DTC writes: "Your activities and money involving securities are recorded by DTC on your Participant Daily Activity Statement available from the PBS SMART/Search

---

[52] Wiener Rpt. at ¶ 47.

[53] DTCC, *Settlement: Service Guide*, at *2 (Mar. 7, 2024), https://www.dtcc.com/-/media/Files/Downloads/legal/service-guides/Settlement.pdf (last visited Apr. 19, 2024).

[54] *Id*. at * 47 (emphasis added).

[55] *Id.*

16

facility as well as the Participant Account Statement in the Settlement Web."[56]  When describing the software available to DTC participants to access this transactional information, DTC writes: "The Settlement Web provides the ability to monitor *transaction activity* and research daily position balances at the account and entity level. . . . Typical activities are *deliver orders, payment orders, stock loans, pledge inputs and releases, and reclaims of these activities*. All activities carry with them Activity codes which describe a DTC service such as deliver orders."[57]

36. The Wiener Report claims: "if a Participant begins a trading day with 10 shares of Company X in its DTC account, and one customer of the Participant buys five shares of Company X that day, while another customer of the same Participant sells five shares of Company X", it is the case that "DTC records only net positions of each Participant, which represent the net activities of the Participant."[58]  This assertion is incorrect.

37. Based on my professional experience reviewing tens of thousands of pages of Participant Daily Activity Statements produced by DTC in certain other litigation matters listed on my C.V., I have prepared an original mockup of a Participant Daily Activity Statement that is representative of an actual Statement:

---

[56] DTCC Learning, *Viewing Activity and Position* (Oct. 18, 2021), https://dtcclearning.com/products-and-services/settlement/view-activity-position.html (last visited Apr. 19, 2024).

[57] DTCC Learning, *Settlement Web*, *Viewing Activity & Position*, https://dtcclearning.com/products-and-services/settlement/settlement-web.html (last visited Apr. 19, 2024) (emphasis added).

[58] Wiener Rpt. at ¶¶ 47-48.

```
                                           THE DEPOSITORY TRUST COMPANY                              PAGE    1,529
PARTICIPANT:   9090                 PARTICIPANT DAILY ACTIVITY STATEMENT – 07/15/20
  HYPOTHETICAL PARTICIPANT                                                                  SDFS & NDFS – COMMINGLED

____ACTIVITY_DESCRIPTION_____/___CODE__  __AFFECTED__ACCOUNT__  _QUANTITY_  ($)_DOLLAR_VALUE  OTHER__PARTY     ____OTHER_INFO____

CUSIP____71595R_20_5__EXAMPLE_COMPANY_INC____+                                       PREVIOUS_ACTIVITY__07/14/20____SDFS

  DELIVER ORDER               (026-000) GENERAL FREE      010      9,000-                        1111 C
    TRANSFER OF CUSTOMER ACCOUNT 040                                                           BANK A
  DELIVER ORDER               (026-000) GENERAL FREE      010      2,000-                        2222 C
    TRANSFER OF CUSTOMER ACCOUNT 040                                                           BANK B
  DELIVER ORDER               (026-000) GENERAL FREE      010      7,000-                        2222 C
    TRANSFER OF CUSTOMER ACCOUNT 040                                                           BANK B
  DELIVER ORDER               (026-000) GENERAL FREE      010      6,500+                        2222 C
    TRANSFER OF CUSTOMER ACCOUNT 040                                                           BANK B
  DELIVER ORDER               (026-000) GENERAL FREE      010        95+                     NSCC/0888 C
  DELIVER ORDER               (026-000) GENERAL FREE      010         5+                         8902 C
                                                                                             ACATS CNS


        ____ACCOUNT_SUMMARY____           OPENING_BALANCES      LONG_(+)      SHORT_(-)      CLOSING_BALANCES

        GENERAL FREE    (010) **TOTAL**         500,000            6,600         18,000            488,600
```

38.    This representative mockup of a typical Participant Daily Activity Statement produced in discovery shows one ***incoming*** transfer of 6,500 shares from Bank B with identifier 2222 *to* the Hypothetical Participant with identifier 9090. That same mockup Participant Daily Activity Statement also shows, on the same date, two ***outgoing*** transfers of 2,000 and 7,000 shares *from* the Hypothetical Participant with identifier 9090 to Bank B with identifier 2222. These three incoming and outgoing transactions are ***not*** netted with each other in DTC records. While this example is only a mockup, I have personally reviewed many pages of Participant Daily Activity Statements that show an absence of netting.

39.    Thus, the claim in the Wiener Report that "DTC records only net positions of each Participant, which represent the net activities of the Participant"[59] is incorrect. Rather,

---

[59] Wiener Rpt. at ¶ 47.

18

DTC records individual custodial transfers between DTC participant accounts, and these individual custodial transfers are not subject to netting.[60]

40.     The Participant Daily Activity Statements are not mentioned at all in the Wiener Report. This is a curious omission. Based on a review of Mr. Wiener's C.V., it appears that he has not worked at DTC since 2005. As nearly twenty years have elapsed since Mr. Wiener worked at DTC, he may have forgotten about these detailed records containing individual deposit, withdrawal, and transfer transactions for each individual DTC participant account.

**IV.     PURCHASES OF SHARES ISSUED IN THE OAK STREET IPO AND SECONDARY OFFERINGS ARE TRACEABLE USING DTC, FINRA AND BROKER-DEALER RECORDS PRODUCED IN DISCOVERY AND STANDARD ACCOUNTING METHODS**

41.     Relying on the fictitious Wiener Metamorphosis Theory and the incorrect factual assertion that DTC only records net positions, the Wiener Report claims that tracing is possible only in a limited set of scenarios.[61]  In fact, records maintained by the Depository Trust Company ("DTC"), the Financial Industry Regulatory Authority ("FINRA") and broker-dealers permit identifying and segregating purchases of shares by individual customers. This is the case even though "securities deposited at DTC . . . are maintained in 'fungible bulk;' *i.e.*, each Participant to whose DTC account securities of that issue have been credited has a *pro rata* (proportionate) interest in DTC's entire inventory of that issue."[62]

---

[60] By contrast, as I discuss *infra*, the National Securities Clearing Corporation (NSCC) provides multilateral netting services for many transactions on the open market. Net transfers to and from NSCC are also recorded in DTC records under the participant identifier "888".

[61] Wiener Rpt. at ¶¶ 52-56.

[62] Br. of the Depository Tr. Co. as *Amicus Curiae* Not In Supp. of Any Party at 10, *In re Petrobras Securities Litigation*, No. 16-1914 (2d. Cir. Sep. 16, 2016), ECF No. 293.

42. As the Koskiewicz Declaration shows, each deposit of shares—whether issued pursuant to a Registration Statement or transferred to DTC following the expiration of lockup agreements—are deposited to specific DTC participant accounts. It is straightforward to trace purchases of shares from those accounts using records produced in discovery along with an accounting method such as first-in-first-out ("FIFO") or last-in-first-out ("LIFO").[63] Based on my professional experience, broker-dealers, exchanges, FINRA, and DTC maintain detailed, time-stamped transactional records which can be obtained through discovery.[64] These records show when securities in one account are transferred to another account, whether within the same broker-dealer or between different broker-dealers. This makes it possible to reconstruct a reliable "chain of title" using standard accounting methods like first in-first out (FIFO) or last in-first out (LIFO).

43. Accounting methods like FIFO and LIFO do not amount to "statistical tracing" nor do they involve probabilistic reasoning. They do not make inferences regarding specific purchases from statistics about the population as a whole. Rather, the application of an accounting method yields a single conclusion regarding who owns each share at each point in time.

---

[63] My opinions in this regard are consistent with the Br. for *Amicus Curiae* Law and Business Professors ISO Resp't, *Slack Techs., LLC v. Pirani*, 143 S. Ct. 1433 (2023), https://www.supremecourt.gov/DocketPDF/22/22-200/256386/20230306171423271_22-200%20Amicus%20Brief.pdf. Along with Jack C. Coffee, Jr., the Adolf A. Berle Professor of Law at Columbia University, I served as co-counsel to those amici. *Id.*; *see also* Decl. of Dr. Jonathan A. Brogaard, Ex. J to Decl. of Matthew S. Kahn ISO Defs.' Opp'n to Pls.' Mot. for Class Certification - Public Redacted Version at 21, *In re Slack Technologies Inc. Stockholder Litigation*, Lead Case No. 19-Civ-05370 (Cal. Sup. Ct., San Mateo Cnty., Jan. 18, 2022), Doc. No. 273 (conceding that it may be "theoretically possible to trace a single putative class member's purchases of Slack Stock to a seller who held the shares prior to the Direct Listing").

[64] As previously discussed, DTC maintains Participant Daily Activity Statements with individual transactions for each participant. Other examples include records maintained by broker-dealers pursuant to their regulatory reporting obligations. 17 CFR § 240.17a-3(a)(6)(i)(A) (broker-dealers maintain detailed records on individual orders including "the time the order was received, the time of entry, the price at which executed, the identity of each associated person, if any, responsible for the account . . . and, to the extent feasible, the time of execution or cancellation").

20

Nor is it the case that every aftermarket purchaser would have standing for every share—rather, only those who purchased the securities newly issued and registered under the Registration Statement, as determined by a deterministic tracing analysis.

44.     As of the date of this Report, I am tracing purchases of securities to registration statements in certain ongoing litigation matters listed on my C.V. by applying these standard methods to records produced in discovery by DTC, FINRA and broker-dealers.  I have also developed a patent-pending methodology for accelerating the tracing analysis from a computational standpoint.[65]  Thus, the Wiener Report's conclusion that "there was no way for a shareholder to trace any share held at DTC to any Registration Statement"[66] in this matter is contradicted by my own experience tracing the purchase of shares in other matters similar to this one, where multiple series of shares were issued under different Registration Statements.

## V.     TRACING PURCHASES OF OAK STREET SHARES TO EACH REGISTRATION STATEMENT IS AMENABLE TO CLASS-WIDE PROOF

45.     These tracing methods can be applied on a Class-wide basis using data readily available in discovery and do not require an individualized inquiry into the circumstances of each purchase and sale.  For example, in my professional experience, Participant Daily Activity Statements are regularly produced by DTC in discovery.[67]  Related records are produced by the NSCC in discovery as well.  Similarly, time-stamped transactional records are

---

[65] Post Hoc Attribution of Homogenizable Sequential Data, Prov. App. No. 53/561,668 (Oct. 19, 2023).

[66] Wiener Rpt. at ¶ 7.

[67] I understand from counsel that Defendants served a subpoena on DTC but no documents have been produced.  I do not have any information as to why no documents from DTC have been produced.

maintained by FINRA, exchanges and broker-dealers, which are also regularly produced in discovery. These records may be used to reach a conclusive determination regarding who holds the registered shares without engaging in an individualized inquiry into the facts and circumstances of purchases by individual members of the Class.

46.    Moreover, accounting methods like FIFO and LIFO do not depend on facts and circumstances which are unique to each Plaintiff. In my professional experience, records produced in discovery often show that no matter which accounting method is chosen, a given member of the Class holds shares registered under a given Registration Statement.

47.    Even if different methods yield different conclusions regarding who holds those shares, the choice of an appropriate tracing methodology is a Class-wide determination which does not turn on individualized facts and circumstances of each member of the Class.

## VI.    CONCLUSION

48.    Based on my analysis to date, my review of available materials, my experience, and my professional judgment, I have formed the opinion that: the Wiener Report's conclusions are inaccurate and unreliable. Moreover, timestamped transactional records are maintained by DTC, FINRA and broker-dealers that identify individual purchases of Oak Street shares by DTC participants and their customers, making it possible to a reliable "chain of title" using standard accounting methods like first in-first out (FIFO) or last in-first out (LIFO) that do not amount to "statistical tracing." Finally, tracing purchases of Oak Street shares to each registration statement is amenable to Class-wide proof.

22

49. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

_____
JOSHUA R. MITTS, PH.D.

April 22, 2024

# Appendix A

## JOSHUA R. MITTS

435 West 116 Street • New York, NY 10027 • (202) 460-0003 • joshua.mitts@law.columbia.edu

Professor Joshua Mitts uses advanced data science for his research on corporate and securities law. Mitts employs empirical methods, including statistical analysis and machine learning, to study short selling, insider trading on cybersecurity breaches and corporate disclosures, and information leakage following hedge-fund activism. Professor Mitts also advises on the analysis of trading data in connection with high-frequency market manipulation and securities violations. He has extensive experience supporting the U.S. Department of Justice.

### ACADEMIC APPOINTMENTS

**Columbia University**, New York, NY
*David J. Greenwald Professor of Law* (July 1, 2023 – present)
*Professor of Law* (July 1, 2022 – June 30, 2023)
*Associate Professor of Law* (2017 – 2022)
*Milton Handler Fellow* (2020-22)
Member, *Advisory Committee on Socially Responsible Investing* (2021-2023)
        Subcommittees: Racial Justice, Fossil Fuels

### EDUCATION

**Columbia Business School**, Ph.D. in Finance & Economics, 2018

**Yale Law School**, J.D., 2013

**Georgetown University**, B.A in Liberal Studies, *summa cum laude*, 2010

### PUBLICATIONS & WORKING PAPERS

Post-Appointment (2017 – present)

***Trading on Terror*** (with Robert J. Jackson, Jr.) (working paper, 2023), https://ssrn.com/abstract_id=4652027

***Slack v. Pirani and the Future of Section 11 Claims*** (with John C. Coffee, Jr.) (working paper, 2023), https://ssrn.com/abstract_id=4644888

***Passive Exit***, 28 STAN. J.L. BUS. & FIN. 155 (2023), https://ssrn.com/abstract_id=3716249

***Calamity: Event-Driven Suits and the Rethinking of Securities Litigation*** (with Merritt B. Fox), 78 BUS. LAW. 1 (2023).

***Index-Fund Governance: An Empirical Study of the Lending-Voting Tradeoff*** (revise & resubmit, J. LEG. STUD., 2021) (with Edwin Hu & Haley Sylvester), https://ssrn.com/abstract_id=3673531

***Insider Trading and Strategic Disclosure*** (working paper, 2020), https://ssrn.com/abstract_id=3741464

***Short and Distort,*** 49 J. LEG. STUD. 287 (2020), https://ssrn.com/abstract_id=3198384

***A Legal Perspective on Technology and the Capital Markets: Social Media, Short Activism and the Algorithmic Revolution*** (conference article, COLUM. / FINRA TECH. CONF., 2019), https://ssrn.com/abstract_id=3447235

***Trading Against the Random Expiration of Private Information: A Natural Experiment***, 75 J. FIN. 5 (2020) (with Mohammadreza Bolandnazar, Robert J. Jackson, Jr. & Wei Jiang), https://ssrn.com/abstract_id=2544128

   *Winner, Journal of Finance Dimensional Fund Advisors Distinguished Paper Prize (2020)*

***Asking the Right Question: The Statutory Right of Appraisal and Efficient Markets***, 74 BUS. LAW. 1015 (2019) (with Jonathan R. Macey), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3279838

   Cited and relied upon by the Delaware Supreme Court in *Fir Tree v. Jarden* (2020).

*I Promise to Pay*, 62 J. L. & ECON. 117 (2019), https://ssrn.com/abstract_id=2994192

*What Can we Learn from Stock Prices?: Cash Flow, Risk and Shareholder Welfare,* 175 J. INST. & THEO. ECON. 178 (2019) (conference issue), https://ssrn.com/abstract_id=3285605

*Trial by Skype: A Causality-Oriented Replication Exploring the Use of Remote Video Adjudication in Immigration Removal,* 59 INT'L REV. L. & ECON. 82 (2019) (with Dane Thorley) (replication issue), https://www.sciencedirect.com/science/article/abs/pii/S0144818818303326

*Informed Trading and Cybersecurity Breaches*, 9 HARV. BUS. L. REV. 1 (2019) (with Eric Talley), https://www.hblr.org/wp-content/uploads/sites/18/2019/11/Final_MittsTalley.pdf

*Activist Directors and Agency Costs: What Happens When an Activist Director Goes on the Board?*, 104 CORNELL L. REV. 381 (2019) (with Robert Bishop, John C. Coffee, Jr. & Robert J. Jackson, Jr.), https://www.cornelllawreview.org/2019/01/15/activist-directors-and-agency-costs-what-happens-when-an-activist-director-goes-on-the-board/

> One of the Top 10 Corporate and Securities Articles of 2019 Chosen By *Corporate Practice Commentator*

*The Cost of Transparency* (2019) (with Yifeng Guo)

Pre-Appointment (2012-2017)

*The 8-K Trading Gap* (2016) (with Alma Cohen & Robert J. Jackson, Jr.)

*Systemic Risk and Managerial Incentives in the Dodd-Frank Orderly Liquidation Authority*, 1 J. FIN. REG. 51 (2015)

*Finding Order in the Morass: The Three Real Justifications for Piercing the Corporate Veil*, 100 CORNELL L. REV. 99 (2014) (with Jonathan R. Macey)

*Anti-Herding Regulation*, 5 HARV. BUS. L. REV. 1 (2014) (with Ian Ayres)

*Mechanism Design in M&A Auctions*, 38 DEL. J. CORP. L. 873 (2014) (with Steven J. Brams), *cited in* In re *Appraisal of Dell Inc.*, C.A. No. 9322-VCL (Del. Ch., May 31, 2016)

*Three Proposals for Regulating the Distribution of Home Equity*, 31 YALE J. ON REG. 77 (2014) (with Ian Ayres)

*Law and Mechanism Design: Procedures to Induce Honest Bargaining*, 68 NYU ANN. SURV. AM. L. 729 (2013) (with Steven J. Brams)

*Snake Oil Salesmen or Purveyors of Knowledge: Off-Label Promotions and the Commercial Speech Doctrine*, 23 CORNELL J. L. & PUB. POL'Y 337 (2013) (with Constance E. Bagley & Richard Tinsley)

*A Private Ordering Solution to Blockholder Disclosure*, 35 N.C. CENT. L. REV. 203 (2013)

Comment, *Recoupment Under Dodd-Frank: Punishing Financial Executives and Perpetuating "Too Big to Fail,"* 122 YALE L.J. 507 (2012)

## RULEMAKING PETITIONS

*SEC Rulemaking Petition on Short and Distort* (filed on February 12, 2020) (co-drafted with John C. Coffee, Jr.), https://www.sec.gov/rules/petitions/2020/petn4-758.pdf

**Other Signatories: James D. Cox**, Brainerd Currie Professor of Law, Duke University School of Law; **Edward F. Greene**, General Counsel, Securities & Exchange Commission (1981-82); Director, Division of Corporation Finance (1979-81); Senior Counsel, Cleary Gottlieb Steen & Hamilton, Co-Director, Program on Law, Economics & Capital Markets, Columbia Law School; **Meyer Eisenberg**, Deputy General Counsel and Acting Director, Division of Investment Management Securities & Exchange Commission (1998-2006); **Colleen Honigsberg**, Associate Professor of Law, Stanford Law School; **Donald Langevoort**, Thomas Aquinas Reynolds Professor of Law, Georgetown University Law Center; **Peter Molk**, Associate Professor of Law, University of Florida Levin College of Law; **Randall Thomas**, John S. Beasley II Chair in Law and Business, Vanderbilt Law School, Professor of Management. Owen Graduate School of Management; **Robert B. Thompson**, Peter P. Weidenbruch, Jr. Professor of Business Law, Georgetown University Law Center; **Andrew Verstein**, Professor of Law, Wake Forest University School of Law; and **Charles K. Whitehead**, Myron C. Taylor Alumni Professor of Business Law, Cornell Law School.

## OTHER PUBLICATIONS

*Petition for Rulemaking on Short and Distort*, COLUM. LAW SCH. BLUE SKY BLOG (Feb. 18, 2020) (with John C. Coffee, Jr.)

*Long-Run Short Selling*, COLUM. LAW SCH. BLUE SKY BLOG (Dec. 9, 2019) (with John C. Coffee, Jr.)

*Short Selling and the New Market Manipulation*, COLUM. LAW SCH. BLUE SKY BLOG (Mar. 18, 2019) (with John C. Coffee, Jr.)

*Why Investors Pay So Much for Dual Class Firms*, COLUM. LAW SCH. BLUE SKY BLOG (Jan. 2, 2019)

*What Can We Learn From Stock Prices?*, COLUM. LAW SCH. BLUE SKY BLOG (Dec. 18, 2018)

*Short and Distort*, COLUM. LAW SCH. BLUE SKY BLOG (Nov. 13, 2018)

*Asking the Right Question: The Statutory Right of Appraisal and Efficient Markets*, HARV. LAW SCH. FORUM ON CORP. GOV. & FIN. REG. (Nov. 12, 2018) (with Jonathan Macey)

*A Data-Driven Defense to "Short and Distort"*, NEW YORK LAW JOURNAL (Sep. 13, 2018)

*Quarterly Reporting and Market Liquidity*, COLUM. LAW SCH. BLUE SKY BLOG (Aug. 27, 2018)

*What Happens When an Activist Goes on the Board?*, COLUM. LAW SCH. BLUE SKY BLOG (Jan. 29, 2018) (with John C. Coffee, Jr.)

*Informed Trading and Cybersecurity Breaches*, HARV. LAW SCH. FORUM ON CORP. GOV. & FIN. REG. (Jan. 26, 2018) (with Eric Talley)

*Proactive Regulation*, REGBLOG: PENN PROGRAM ON REGULATION (Jun. 23, 2014)

*The Three Justifications for Piercing the Corporate Veil*, HARV. L. SCH. FORUM ON CORP. GOV. & FIN. REG. (Mar. 27, 2014) (with Jonathan R. Macey)

*Why the CFPB's Qualified Mortgage Rule Misses the Mark*, FREAKONOMICS BLOG (Jan. 17, 2014), *republished in* COLUM. L. SCH. BLUE SKY BLOG (Feb. 10, 2014) (with Ian Ayres)

*An Incentive-Compatible Alternative to "Don't Ask Don't Waive" Standstills*, COLUM. L. SCH. BLUE SKY BLOG (May 28, 2013) (with Steven J. Brams)

## TEACHING EXPERIENCE

**Columbia Law School**, New York, NY                                                      2017 – present
*Data and Predictive Coding for Lawyers (January 2018, January 2019, May 2021)*
*Corporations (Fall 2022, Fall 2023)*
*Securities Regulation (Spring 2018, Spring 2019, Spring 2020, Spring 2021, Spring 2022)*
*Contracts (Fall 2018, Fall 2019)*

## PROFESSIONAL EXPERIENCE

**Sullivan & Cromwell LLP**, New York, NY                                                    2013 – 2014
*Associate*

## PRESENTATIONS

### 2021-22

Conference on Empirical Legal Studies Harvard Law School and the Program on International Financial Systems (PIFS) for Comissão de Valores Mobiliários (CVM); IOSCO/PIFS-Harvard Law School Global Certificate Program for Regulators of Securities Markets (GCP); Reichman University (Israel); Regulatory Fundamentals Group; Ira M. Millstein Center for Global Markets and Corporate Ownership

**2019-20**

2020 UF Business Law Conference; 2020 George A. <u>Leet</u> Symposium, Columbia Law School Blue Sky Workshop; Harvard-NYU Corporate Law Academic Workshop Series; Junior Corporate Law Academic Workshop; Columbia Law School Faculty Workshop; American Law & Economics Association Annual Meeting; Cornell Law & Tech Workshop; Cadwalader, Wickersham & Taft, New York, NY; Richards, Layton & Finger, Wilmington, DE; Columbia Business School News and Finance Conference, New York, NY; Texas Law & Economics Workshop, Austin, TX; Securities Law Roundtable at Tulane Corporate Law Institute, New Orleans, LA; Vanderbilt Law & Economics Workshop, Nashville, TN; 8th Symposium on Intelligent Investing at Ivey Business School, Toronto, Canada

**2017-18**

Conference on Empirical Legal Studies; Junior Corporate Law Scholars Workshop at Columbia Law School; American Law & Economics Association Annual Meeting; Securities & Exchange Commission; Seminar on Corporate and Capital Markets Law and Policy at Harvard Law School (February 2018 and October 2018); Experimental Methods in Legal Scholarship III Conference at Columbia Law School; Law, Economics & Organization Workshop at Harvard Law School; Penn Law School Corporate Roundtable; Symposium of Journal of Institutional and Theoretical Economics; UVA/Santa Fe. Institute Conference on Computational Study of the Law; Columbia Law Faculty Workshop; Columbia Law Blue Sky Workshop; Journal Corporate Law Scholars Workshop at NYU Law School

**2013-16**

American Law & Economics Association Annual Meeting (2016, 2015, 2014, 2013); Conference on Empirical Legal Studies (2015, 2014, 2013); Columbia Finance Faculty Workshop (2016); American Finance Association Annual Meeting (2016); Minnesota Law & Economics Seminar (2015); Georgetown Law & Economics Workshop (2014); Virginia Law Symposium on Disclosure (2014); Federal Reserve Conference on Community Banking in the 21st Century (2014); Symposium on Crises-Driven Regulation, University of St. Thomas School of Law (2014); University of Connecticut School of Law, Junior Scholars Workshop (2013)

## EXPERT TESTIMONY (PUBLIC)

*In re The RealReal, Inc. Securities Litigation* (Ca. Sup. Ct., County of Marin, 2024)
*In re Talis Biomedical Securities Litigation* (C.D. Ca., 2023)
*Crews v. Rivian* (C.D. Ca., 2023)
In re *Hewlett Packard Enterprise Co. Shareholder Litigation* (Ca. Sup. Ct., County of Santa Clara, 2023)
In re *Turquoise Hill Resources Securities Litigation* (S.D.N.Y., 2023)
In re *Bayer Securities Litigation* (N.D.C.A., 2022)
*Set Capital v. Credit Suisse* (S.D.N.Y., 2022)
In re *Tesla Inc. Securities Litigation*, Case No. 3:18-cv-04865-EMC (N.D.C.A)
*Brookfield v. IPL,* Alberta Securities Commission (2021)
*Burford v. LSE*, CL-2019-000604 (Business and Property Courts of England and Wales Commercial Court (QBD))
*Farmland Partners v. Fortunae*, No. 1:18-cv-02351-KLM (D. Colo.)
Additional nonpublic matters

## PEER REVIEW

Journal of Legal Studies
Journal of Law, Economics & Organization
International Review of Law & Economics
Review of Law & Economics
Review of Financial Studies
Conference on Empirical Legal Studies

## BAR ADMISSION

New York

4