# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

REGINALD T. ALLISON, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

OAK STREET HEALTH, INC., et al.,

Defendants.

Case No. 1:22-cv-00149

**CORRECTED EXPERT REPORT OF CLIFFORD S. ANG, CFA, AVIA**

**April 3, 2024**

## I.  Qualifications

1.  My name is Clifford S. Ang. I am an Executive Vice President at Compass Lexecon based in Oakland and Chicago. I have worked on hundreds of engagements across a broad spectrum of industries concerning a wide range of financial and economic issues, including issues involving market efficiency.

2.  I am the author of *Applied Valuation: A Pragmatic Approach* (DeGruyter, 2023) and *Analyzing Financial Data and Implementing Financial Models Using R* (Springer, 2nd ed., 2021). In these books, I discuss the efficient markets hypothesis, including some tests of market efficiency found in the academic literature, such as event studies and tests of return predictability.

3.  I have previously taught at DePaul University, the University of the Philippines, and Ateneo de Manila University. I have taught a number of finance courses, including investments and corporate finance in which I taught students the efficient markets hypothesis.

4.  I am a CFA Charterholder and hold the Accredited Valuation Institute Analyst designation. I am an Expert Member and Accredited Member of the Business Valuation Institute UK. I am also a member of the CFA Institute and CFA Society San Francisco.

5.  I hold a B.S. in Business Administration majoring in Finance and Accounting from Washington University in St. Louis. I also hold an M.S. in Finance from the University of the Philippines.

6.  My CV is attached hereto as Appendix A.

## II.  Background

7.  Oak Street Health, Inc. ("Oak Street Health," "OSH," or the "Company") "operates primary care centers within the United States serving Medicare beneficiaries."[1] Oak Street Health's initial public offering ("IPO") registration statement became effective and its IPO was priced at $21 per share on August 5, 2020.[2] Oak Street Health's stock started trading on the New York Stock Exchange ("NYSE") on August 6, 2020 (i.e., the "IPO Date") under the ticker

---

[1] OSH, Form 10-K for the year ended December 31, 2020 ("OSH 2020 10-K"), at 4.

[2] OSH, Form EFFECT, filed on August 5, 2020; OSH Press Release; "Oak Street Health Announces Pricing of Initial Public Offering," August 5, 2020.

"OSH."[3] Oak Street Health's stock price closed at $40 on the IPO Date.[4] Including the full exercise of the underwriters' overallotment option, Oak Street Health issued 17,968,750 shares in the IPO.[5]

8.       After its IPO, Oak Street Health had 240,869,718 shares outstanding.[6] Of these shares, 222,900,968 or approximately 92.5% had been issued before the IPO to Oak Street Health's founders, employees, and pre-IPO investors.[7] Of these 222,900,968 shares, 216,213,939, or 97%, were subject to a 180-day lock-up provision during which those shares cannot be sold.[8] In this case, the lock-up expired on February 2, 2021.[9] This means that 89.8% of Oak Street Health stock could not be traded between August 6, 2020 and February 2, 2021.[10]

9.       Following an IPO, analysts from firms that participated as an underwriter or dealer in the IPO are prohibited from publishing or distributing analyst reports for a certain period of time.[11] This period is commonly referred to as the quiet period. I understand that the quiet period for Oak Street Health's IPO ended on August 30, 2020 (the "Quiet Period").[12] This

---

[3] OSH Press Release, "Oak Street Health Announces Pricing of Initial Public Offering," August 5, 2020.

[4] Bloomberg L.P. On the IPO Date, the trading volume of Oak Street Health common stock as a percentage of shares outstanding is 3.4% (= 8.2 million shares traded / 240.9 million shares outstanding). *See* Expert Report of Chad Coffman, CFA, December 15, 2023 Backup Materials, "Oak Street Health Market Efficiency Exhibits.xlsx" at tab "Stock Data" Cells C2 & E2.

[5] OSH Press Release, "Oak Street Health Announces Closing of Initial Public Offering and Full Exercise of the Underwriters' Option to Purchase Additional Shares," August 11, 2020.

[6] OSH Form S-1 Amendment No. 4 , August 5, 2020 ("OSH Form S-1"), at 16.

[7] OSH Form S-1, at 17.

[8] OSH Form S-1, at 173.

[9] *RTTNews,* "IPO Lockup Expiration Alert: Oak Street Health (OSH)," February 1, 2021, https://www.nasdaq.com/articles/ipo-lockup-expiration-alert:-oak-street-health-osh-2021-02-01 (last accessed January 27, 2024) ("The lockup period of Oak Street Health (OSH) expires tomorrow, i.e., February 2, 2021.").

[10] 89.8% = 216,213,939 / 240,869,718.

[11] FINRA, Regulatory Notice 15-30, "SEC Approves Consolidated Rule to Address Conflicts of Interest Relating to the Publication and Distribution of Equity Research Reports," August 2015 ("FINRA Regulatory Notice 15-30"), at 5 ("Rule 2241(b)(2)(I) requires that the written policies and procedures define quiet periods of a minimum of 10 days following the date of an IPO, and a minimum of three days following the date of a secondary offering, during which the member must not publish or otherwise distribute research reports, and research analysts must not make public appearances, relating to the issuer if the member has participated as an underwriter or dealer in the IPO or, with respect to the quiet periods after a secondary offering, acted as a manager or comanager of that offering.").

[12] *See* OAKSTREET02245696 (an email from Caroline Hoffman to Griffin Myers and others with the subject "Oak Street Health Newsletter 8.31.20" dated August 31, 2020 stating: "Oak Street Health listed as one of 15 companies ending its quiet period today.")

is consistent with the seven IPO underwriters first issuing reports on Oak Street Health on August 31, 2020.[13]

### III. Plaintiffs' Allegations and Coffman Report

10.  On May 25, 2022, Plaintiffs filed the operative complaint in this lawsuit alleging that Defendants made allegedly false and/or misleading statements and omissions from August 6, 2020 through November 8, 2021 ("Proposed Class Period").[14]

11.  On December 15, 2023, Plaintiffs submitted the Expert Report of Chad Coffman, CFA ("Coffman Report"). In that report, Mr. Coffman states that he has "formed the opinion that the market for Oak Street Health's Common Stock was efficient during the [Proposed] Class Period."[15] To support his conclusion, Mr. Coffman analyzed 11 market efficiency factors over the entire Proposed Class Period.

12.  While Mr. Coffman includes five *Cammer* factors and three *Krogman* factors in his market efficiency analysis, he includes more than one metric for some of these factors even though the additional metrics were not mentioned by the courts in *Cammer* and *Krogman*.[16] For example, under "Cammer Factor 1: Average Weekly Trading Volume," Mr. Coffman analyzed the (i) average weekly trading volume as a percentage of shares outstanding, (ii) average weekly trading volume as a percentage of tradeable shares, and (iii) annualized turnover velocity.[17] I understand that only the average weekly trading volume as a percentage of shares outstanding was cited in the *Cammer* court's decision.

### IV. Assignment

13.  I have been asked by counsel for Defendants to (i) review and analyze the academic literature on stock price efficiency on the date of an IPO, as well as during the quiet period following an IPO, and (ii) apply the market efficiency factors used in the Coffman Report, including the *Cammer* and *Krogman* factors, to the Oak Street Health Quiet Period. I did not

---

[13] Coffman Report Backup, "Analyst Report Exhibit.xlsx" at tab "AR;" OSH Form S-1 (listing the underwriters in the Oak Street Health IPO on the 2nd cover page).

[14] *Reginald T. Allison v. Oak Street Health, Inc., et al.*, Lead Plaintiffs' Complaint for Violations of the Federal Securities Laws, United States District Court, Northern District of Illinois, Case No. 1:22-cv-00149, filed on May 25, 2022.

[15] Coffman Report, ¶ 6.

[16] *Cammer, v. Bloom,* 711 F. Supp. 1264 (D.N.J. 1989); *Krogman v. Sterritt,* 202 F.R.D. 467 (N.D. Tex. 2001).

[17] Coffman Report, § VII.

independently analyze the market efficiency for Oak Street Health's stock during the entire Proposed Class Period and I am not conceding that Oak Street Health's stock was efficient throughout the Proposed Class Period. The scope of my report is to apply the 11 market efficiency factors Mr. Coffman analyzed to the IPO Date and the Quiet Period, as applicable.

14.    In performing this task, I have been assisted by staff at Compass Lexecon. The materials I have relied upon are listed in Appendix B.

15.    My analyses, opinions, and conclusions are based solely on the work performed by me and those under my supervision through the date of this report. Compass Lexecon is being compensated for my work on this matter at an hourly rate of $1,090, including for any testimony I may provide in this matter. My compensation and that of Compass Lexecon are not contingent upon my opinions and conclusions, or the outcome of this matter.

## V.    Summary of Opinions

16.    Based on my review of the Coffman Report and backup materials, other materials listed in Appendix B, and my analysis, training, and experience, I have arrived at the following conclusions:

a.  The academic literature finds that the market for a company's stock is volatile and oftentimes inefficient on the stock's first day of trading. Additionally, the academic literature suggests that the market for a company's stock may not be efficient during the quiet period.

b.  Mr. Coffman failed to independently analyze the market efficiency for Oak Street Health's stock on the IPO Date despite evidence that is not consistent with market efficiency on that date. He also has not established that it would have been appropriate to apply the market efficiency factors that he considered on the IPO Date.

c.  Mr. Coffman also failed to independently analyze the market efficiency for Oak Street Health's stock during the Quiet Period. Using Mr. Coffman's methodology and data, I find that, as applied to the Quiet Period, a majority of the market efficiency factors during the Quiet Period either provide less or no support for a finding of market efficiency as compared to the entire Proposed Class Period.

## VI.    The Academic Literature Finds that the Market for a Company's Stock May Not Be Efficient on the IPO Date and During the Quiet Period

17.    The academic literature finds that the market for a company's stock can be inefficient on the IPO date (i.e., first trading day) and during the quiet period.

4

### A.    IPO Date

18.    The IPO offer price is set by the IPO underwriters after considering the company's prospects and communications with prospective investors and discussions with the company.[18] Hence, the IPO offer price is not set by an open and well-developed (i.e., efficient) securities market. Academic literature shows that when companies go public, the shares they sell tend to be underpriced resulting in a share price jump on the first trading day, which some authors interpret as evidence of market inefficiency. For example, Loughran and Ritter (2002) conclude: "Because offer prices only adjust partially to public information, first-day returns are predictable based on lagged market returns."[19] However, if markets are efficient, returns should not be predictable.[20] Mr. Coffman testified that he is aware of the academic literature on this issue.[21] There are various explanations for this underpricing, such as IPO underwriters underpricing the shares to generate interest for the stock and IPO underwriters compensating institutional investors for their willingness to provide information on the stock to help underwriters with the pricing of the IPO.[22] This literature indicates that the first-day return following an IPO is not based on an efficient IPO offer price.

19.    In addition, the academic literature finds that prices on the first trading day following an IPO may also not be efficient. One potential reason is the impact of short-sale constraints following an IPO. There are institutional controls that make short sales difficult during the post-offering period. For example, "few brokerage firms or institutional investors will lend IPO shares to short sellers" and the SEC "bars firms in the underwriting syndicate from

---

[18] *See*, *e.g.*, Z. Bodie, A. Kane, and A. Marcus, 2014, *Investments,* 10th ed., McGraw-Hill, at 61-62 & R. Brealey, S. Myers, and F. Allen, 2011, *Principles of Corporate Finance,* 10th ed., McGraw-Hill, at 369-370.

[19] T. Loughran and J. Ritter, 2002, "Why Don't Issuers Get Upset About Leaving Money on the Table in IPOs?," *The Review of Financial Studies,* Vol. 15, 413-443, at 437.

[20] *See, e.g.,* J. Campbell, A. Lo, and A.C. MacKinlay, 1997, *Econometrics of Financial Markets,* Princeton University Press, at 20 ("In an informationally efficient market … price changes must be unforecastable if they are properly anticipated, i.e., if they fully incorporate the expectations and information of all participants.").

[21] Deposition of Chad Coffman dated January 23, 2024 ("Coffman Dep. Tr."), at 168:14-169:3 ("[Mr. Coffman:] I'm generally aware of literature that might call into question the market efficiency of the IPO prices themselves in the initial offering but not the secondary market trading of. BY MS. YABLON: Q Are you aware that certain academics believe that there is pricing volatility following IPOs? MR. FEE: Objection to form. [Mr. Coffman]: Yes, there have been academic findings that show that the market price of securities that recent IPO can tend to be -- or can be more volatile than at other times, yes.").

[22] *See, e.g.,* Z. Bodie, A. Kane, and A. Marcus, 2014, *Investments,* 10th ed., McGraw-Hill, at 62 ("… the underwriter needs to offer the security at a bargain price to these investors to induce them to participate in bookbuilding and share their information.").

5

lending allocated shares until 30 days after the IPO."[23] Moreover, shares not issued in the IPO may be subject to lock-up provisions.[24] As Patatoukas et al. (2019) note, "short selling promotes price efficiency and protects unsophisticated investors from buying overpriced securities,"[25] but "[r]estrictions on short selling can be severe in the IPO setting, since new issuers are subject to significant valuation uncertainty and a limited supply of lendable shares."[26] In other words, "investors with relatively optimistic opinions buy the stock in the immediate aftermarket, while investors with relatively pessimistic opinions are unable to register their negative views due to short-sales constraints."[27] The authors find that "short selling is constrained [in the immediate IPO aftermarket]—as indicated by the high stock loan fees, high active supply utilization and high fails-to-deliver—especially for IPOs that *ex ante* [are] more likely to become overpriced. Overall, our evidence suggests that while short sellers attempt to actively arbitrage overpricing in the IPO aftermarket, short-sales constraints limit their ability to eliminate mispricing."[28]

---

[23] *See, e.g.,* T. Houge, T. Loughran, G. Suchanek, and X. Yan, 2001, "Divergence of Opinion, Uncertainty, and the Quality of Initial Public Offerings," *Financial Management,* Vol. 30, 5-23, at 6 ("We argue that institutional controls make short sales difficult in the early post-offering period. National Association of Securities Dealers (NASD) Rule 3370 requires brokers to guarantee delivery of borrowed shares before allowing customers to sell short, and a few brokerage firms or institutional investors will lend IPO shares to short sellers. The Securities and Exchange Commission (SEC) also bars firms in the underwriting syndicate from lending allocated shares until 30 days after the IPO."). *See also* Yahoo Finance, "Lyft's Stock Price Crash Has Short Sellers Salivating," April 2, 2019, available at https://finance.yahoo.com/news/lyfts-stock-price-crash-has-short-sellers-salivating-113027127.html ("… SEC regulations prohibiting IPO underwriters from lending shares to cover short sales for 30 days …").

[24] P.N. Patatoukas, R.G. Sloan, and A.Y. Wang, 2019, "Short-Sales Constraints and Aftermarket IPO Pricing," Working Paper, at 3 ("Shares outstanding in the company that are not offered in the IPO are typically subject to lockup agreements that prohibit the sale or loan of the shares for 180 days following the offering.").

[25] P.N. Patatoukas, R.G. Sloan, and A.Y. Wang, 2019, "Short-Sales Constraints and Aftermarket IPO Pricing," Working Paper, at 6.

[26] *See, e.g.,* P.N. Patatoukas, R.G. Sloan, and A.Y. Wang, 2019, "Short-Sales Constraints and Aftermarket IPO Pricing," Working Paper, at abstract ("We use the IPO setting to provide new evidence on the surprisingly large and predictable mispricing that can result from short-sales constraints in equity markets. The IPOs that we predict to be most susceptible to mispricing have first-day returns of 44% and lockup expiration returns of −10%. These IPOs experience severe short-sales constraints that peak around the expiration of IPO share lockups, with average indicative lending fees topping 15%, average active utilization rates topping 75%, and average fails-to-deliver topping 20 times normal rates. While prior studies are inconclusive with respect to the importance of short-sales constraints, we provide direct evidence of severe short-sales constraints that are associated with extreme mispricing in equity markets.") & 37; *see also* P.A.C. Saffi and K. Sigurdsson, 2011, "Price Efficiency and Short Selling," *The Review of Financial Studies* 24(3), 821-852 at abstract ("[L]ending supply has a significant impact on efficiency. Stocks with higher short-sale constraints, measured as low lending supply, have lower price efficiency.")

[27] P.N. Patatoukas, R.G. Sloan, and A.Y. Wang, 2019, "Short-Sales Constraints and Aftermarket IPO Pricing," Working Paper, at 2.

[28] P.N. Patatoukas, R.G. Sloan, and A.Y. Wang, 2019, "Short-Sales Constraints and Aftermarket IPO Pricing," Working Paper, at 5 (emphasis in original).

### B. Quiet Period

20.     IPOs are typically followed by quiet periods during which underwriters are not allowed to issue analyst reports, and issuers are not allowed to issue financial forecasts (like in the case of Oak Street Health's IPO).[29] The purpose of the quiet period is to "establish, maintain and enforce written policies and procedures reasonably designed to identify and effectively manage conflicts of interest related to the preparation, content and distribution of research reports and public appearances by research analysts."[30] Thus, during the quiet period, there is a restriction on the dissemination of information to investors, which may impede market efficiency.

21.     The academic literature provides evidence of stock price inefficiency during quiet periods as evidenced by a predictable stock price jump immediately prior to and on the day of the expiration of the quiet period. For example, Bradley, et al. (2003) show that "firms [with analyst coverage initiation at the expiration of the quiet period] experience a five-day abnormal return of 4.1 percent versus 0.1 percent for firms with no coverage. The abnormal returns are concentrated in the days just before the quiet period expires."[31] The authors also state that "[a]s with previous studies of IPO lockup expirations, ***these results raise a significant market efficiency issue,*** since the end of the quiet period is known well in advance with complete certainty" (emphasis added).[32]

22.     Moreover, there are institutional controls, which as I discussed above, that also make short selling difficult during the quiet period.[33]

---

[29] FINRA Regulatory Notice 15-30, at 5.

[30] FINRA Regulatory Notice 15-30, at 3.

[31] D.J. Bradley, B.D. Jordan, and J.R. Ritter, 2003, "The Quiet Period Goes out with a Bang," *The Journal of Finance,* Vol. 58, 1-36, at abstract. *See also*, *e.g.,* B. Bushee, M. Cedergren, and J. Michels, 2020, "Does the media Help or Hurt Retail Investors During the IPO Quiet Period?," *Journal of Accounting and Economics*, Vol. 69, 1-19, at 2 ("… market frictions in the immediate post-IPO period—such as costly short-selling, underwriter price support, and lock-up agreements—make any correction of mispricing by sophisticated investors difficult.").

*See also In re Initial Public Offering Securities Lit.*, 471 F.3d 24 (2nd Cir. 2006) ("As just one example of why an efficient market, necessary for the Basic presumption to apply, cannot be established with an IPO, we note that during the 25-day 'quiet period,' analysts cannot report concerning securities in an IPO […] thereby precluding the contemporaneous 'significant number of reports by securities analysts' that are a characteristic of an efficient market.").

[32] D.J. Bradley, B.D. Jordan, and J.R. Ritter, 2003, "The Quiet Period Goes out with a Bang," *The Journal of Finance,* Vol. 58, 1-36, at 2.

[33] *See supra* ¶ 19.

23. The above indicates that the market for Oak Street Health's shares may not be efficient on the IPO Date and during the Quiet Period. Despite this, Mr. Coffman failed to analyze the market efficiency for Oak Street Health's stock during these periods.[34]

**VII. Mr. Coffman Failed to Independently Analyze the Market Efficiency for Oak Street Health's Stock on the IPO Date Despite Evidence that the Market May Not Be Efficient on that Date**

24. Mr. Coffman did not perform a separate analysis specifically for the IPO Date. Mr. Coffman has not established which, if any, of his market efficiency factors can be appropriately applied on the IPO Date. It is not feasible to apply certain of the factors that Mr. Coffman analyzed for the entire Proposed Class Period to the IPO Date because some of the factors cannot even be calculated on the IPO Date because (a) the IPO Date is only one trading day (e.g., average weekly trading volume and autocorrelation) and (b) there is no data available to estimate some of the factors that Mr. Coffman used (e.g., price reaction to new information and institutional holdings as a percentage of shares outstanding). For this reason, I rely on the findings of the academic literature to analyze Oak Street Health's market efficiency on the IPO Date.

25. As discussed above, the academic literature finds that the large first day return on the IPO Date is evidence that the IPO pricing process may not be efficient.[35] Consistent with this, Oak Street Health's IPO price was set at $21 per share on August 5, 2020[36] and Oak Street Health's stock closed at $40 on the IPO Date,[37] a 90% first day return.[38]

---

[34] Coffman Dep. Tr., at 200:5-12 ("Q Did you analyze any of the factors for the quiet period alone? [Mr. Coffman]: No, I did not. I mean, obviously that's part of the period, so with the material I've collected and the backup material one could do that, but I did not explicitly do that, no.").

[35] *See supra* ¶ 18.

[36] OSH Press Release, "Oak Street Health Announces Pricing of Initial Public Offering," August 5, 2020.

[37] OSH's closing stock price as of August 6, 2020 per Bloomberg L.P.

[38] As an example of the high variability in prices that an actual investor in Oak Street Health experienced on the IPO Date, the City of Dearborn Police & Fire Revised Retirement System, an additional named Plaintiffs in this case, made three purchases of Oak Street Health stock on August 6, 2020. It bought 243 shares at $21 per share, 438 shares at $36.54 per share (74% higher relative to the offer price), and 972 shares at $42.50 per share (102% higher relative to the offer price). *See Reginald T. Allison v. Oak Street Health, Inc., et al.*, Lead Plaintiffs' Complaint for Violations of the Federal Securities Laws, United States District Court, Northern District of Illinois, Case No. 1:22-cv-00149, filed on May 25, 2022 ¶ 26 and PEREGRINE_005875, at -875.

26.    In addition, the academic literature finds that traded prices on the IPO Date may also not be efficient due to short selling constraints.[39] In this case, following the Oak Street Health IPO, the company had 240.9 million shares outstanding.[40] Of this amount, 216.2 million shares or approximately 90% were subject to a 180-day lock-up[41] and, therefore, were not lendable. While not subject to the lock-up provision, another 6.7 million shares or 3% were held by Oak Street Health's founders, employees, and pre-IPO investors.[42] The remaining 18 million shares were issued as part of the IPO.[43] I understand that some or all of the non-locked up shares would have been subject to the SEC rule prohibiting underwriters from lending shares within 30 days of an IPO.[44] Moreover, investors in an IPO (who are expecting to profit from the increase in stock price) may not have been willing to lend their shares to short sellers who would profit from driving down the share price.[45]

27.    The above implies that Oak Street Health's first day return (i.e., the return on the IPO Date) may not have been efficient.

28.    Despite the above, Mr. Coffman failed to independently analyze the market efficiency of Oak Street Health stock on the IPO Date.

**VIII.    Mr. Coffman also Failed to Independently Analyze the Market Efficiency for Oak Street Health's Stock During the Quiet Period. Using Mr. Coffman's Methodology and Data, I Find that, as Applied to the Quiet Period, a Majority of the Market Efficiency Factors During the Quiet Period Provide Either Less or No Support for a Finding of Market Efficiency, as Compared to the Entire Proposed Class Period**

29.    Mr. Coffman did not perform a separate analysis looking only at the Quiet Period.[46] Again, he focused only on the market efficiency factors applied to the entire Proposed

---

[39] *See supra* ¶ 19.

[40] *See supra* ¶ 8 n.6.

[41] *See supra* ¶ 8.

[42] *See supra* ¶ 8. 6.7 million = 222.9 million – 216.2 million; 3% = 6.7 million / 240.9 million.

[43] *See supra* ¶ 7 n.5.

[44] *See supra* ¶ 19 n.23.

[45] *See, e.g.,* T. Houge, T. Loughran, G. Suchanek, and X. Yan, 2001, "Divergence of Opinion, Uncertainty, and the Quality of Initial Public Offerings," *Financial Management,* Vol. 30, 5-23, at 6 ("… few brokerage firms or institutional investors will lend IPO shares to short sellers.").

[46] *See* Coffman Dep. Tr., at 200:5-12 ("Q Did you analyze any of the factors for the quiet period alone? . . . . [Mr. Coffman]: No, I did not. I mean, obviously, that's part of the period, so with the material I've collected and the backup material one could do that, but I did not explicitly do that, no.").

9

Class Period, of which the Quiet Period was a portion. However, as discussed above, the evidence from the academic literature suggests that the Quiet Period may not be efficient.[47]

30.     In addition, as Exhibit A shows, the Proposed Class Period is much longer than the Quiet Period, making those results for the Proposed Class Period inapplicable to the Quiet Period as a stand-alone period. Indeed, as discussed below (*see also* Appendix C), using Mr. Coffman's methodology and, as applicable, the thresholds he identified,[48] a majority of the market efficiency factors during the Quiet Period provide either no or less support of market efficiency as compared to the entire Proposed Class Period. Therefore, without independently analyzing the market efficiency of Oak Street Health stock during the Quiet Period, Mr. Coffman has not provided a reliable economic basis that the market for Oak Street Health stock was efficient during the Quiet Period.

**Exhibit A**
**Oak Street Health Proposed Class Period and Quiet Period**



31.     I discuss in detail below the market efficiency factors used in the Coffman Report that provide less or no support for a finding of market efficiency in the Quiet Period as compared to the Proposed Class Period.

---

[47] *See supra* ¶¶ 20-22.

[48] In a few instances, which I identify below, I had to obtain data similar to what Mr. Coffman used because the data for the Quiet Period was not available in his backup materials. In addition, for many of his factors, Mr. Coffman does not provide a threshold to determine whether that factor supports market efficiency. Thus, for those factors, I can only make conclusions as to whether the result for the Quiet Period is either more supportive, the same, or less supportive of market efficiency relative to Mr. Coffman's reported results during the Proposed Class Period.

     *i. Average Weekly Trading Volume*

32. Mr. Coffman concluded that "Oak Street Health Common Stock surpasses the threshold level of average weekly trading volume necessary for an efficient market."[49] Mr. Coffman cited the *Cammer* court's threshold of an average weekly trading volume of 2% of shares outstanding to justify a strong presumption of market efficiency and an average weekly trading volume of 1% of shares outstanding to justify a substantial presumption of market efficiency.[50] He found that, during the entire Proposed Class Period, Oak Street Health stock's average weekly trading volume was 2.38% of shares outstanding.[51]

33. Using Mr. Coffman's methodology and data, I find that the average weekly trading volume of Oak Street Health shares during the Quiet Period was 1.69% of Oak Street Health's shares outstanding, which is below Mr. Coffman's 2% threshold that "would justify a strong presumption that the market for the security is an efficient one" but above Mr. Coffman's 1% threshold that would justify a "substantial presumption" of market efficiency.

34. However, it is my understanding that the court *In re Northfield Labs* relied on daily trading volume as a percentage of shares outstanding and held that "an average daily trading volume [for Northfield of] .75% of outstanding shares" was "too low to be considered evidence that Northfield shares traded in an efficient market."[52] Applying the same analysis, I find that the average daily trading volume during the Quiet Period is 0.38%, which is less than the 0.75% daily trading volume found to be too low to support market efficiency by the court in *In re Northfield Lab.*[53]

35. Thus, Oak Street Health's trading volume during the Quiet Period provides less or no support for a finding of market efficiency, as compared to Mr. Coffman's analysis of Oak Street Health common stock during the entire Proposed Class Period.

     *ii. Analyst Coverage*

36. Mr. Coffman analyzed the number of unique firms and analyst reports issued by those firms. According to Mr. Coffman, "extensive coverage of Oak Street Health by securities

---

[49] Coffman Report, ¶ 28.

[50] Coffman Report, ¶¶ 26 and 28.

[51] Coffman Report, ¶ 28.

[52] *In re Northfield Labs., Inc.*, 267 F.R.D. 536, 547.

[53] Coffman Report Backup Materials, "Oak Street Health Market Efficiency Exhibits.xlsx" at tab "Stock Data."

analysts supports the conclusion that Oak Street Health Common Stock traded in an efficient market throughout the [Proposed] Class Period."[54] For Mr. Coffman, "extensive coverage" by analysts is suggestive of market efficiency.[55] Based on his data, I find that only one firm that issued one report or 0.04 reports per day during the Quiet Period,[56] which is less than the 20 firms Mr. Coffman found that issued 128 analyst reports or 0.28 reports per day during the Proposed Class Period.[57]

37.     Mr. Coffman also analyzed the number of Oak Street Health news articles during the period. I find that there were 23 unique articles or 0.92 unique articles published per day during the Quiet Period, which is less than Mr. Coffman's finding of 675 unique articles or 1.47 unique articles published per day during the Proposed Class Period.[58]

38.     The lower analyst coverage and fewer news articles during the Quiet Period provide less support for a finding of market efficiency, as compared to Mr. Coffman's analysis of Oak Street Health common stock during the entire Proposed Class Period.

### iii.     Price Reaction to New Information

39.     According to Mr. Coffman, "[e]stablishing a causal connection between new company-specific events and movements in the market price is convincing evidence of market efficiency."[59] He explains: "To analyze cause-and-effect, I examined the price response of Oak

---

[54] Coffman Report, ¶ 33.

[55] Coffman Report, ¶ 33.

[56] 0.04 report per day = 1 report issued during the Quiet Period / 25 calendar days in the Quiet Period.

I understand the quiet period applies to firms that participated in the IPO. *See supra* ¶ 9 n.11. The one analyst that issued a report during the Quiet Period is Seeking Alpha, which "is not a licensed security dealer, broker or U.S. investment adviser or investment bank." Seeking Alpha, "Oak Street Health: Refreshing Approach To Healthcare," August 7, 2020, at PDF page 5.

[57] 0.28 reports per day = 128 reports issued during the Proposed Class Period / 460 calendar days during the Proposed Class Period.

Coffman Report, ¶ 33.

[58] Coffman Report, ¶ 35. 0.92 articles per day = 23 unique articles published during the Quiet Period / 25 calendar days in the Quiet Period; 1.47 articles per day = 675 unique articles published during the Proposed Class Period / 460 calendar days in the Proposed Class Period.

I obtained news articles by performing the same search during the Quiet Period as Mr. Coffman's news search for the Proposed Class Period, which is described in Coffman Report ¶ 35 and n.36. Based on my review of the backup materials to Mr. Coffman's analysis for the Proposed Class Period, I also excluded articles with "BUZZ-U.S. STOCKS ON THE MOVE," "U.S. RESEARCH ROUNDUP," and "52-week highs and lows" in the headline when counting the number of news articles issued during the Quiet Period.

[59] Coffman Report, ¶ 46.

12

Street Health Common Stock to ten earnings announcements during the Analysis Period. This includes the five earnings announcements that occurred during the [Proposed] Class Period as well as the five quarters after the end of the [Proposed] Class Period in order to have a more robust set of observations."[60] Mr. Coffman then compares the percentage of statistically significant earnings announcement dates with the percentage of statistically significant days that Mr. Coffman identified as having no Oak Street Health-related news.[61] However, during the Quiet Period, there were no earnings announcement dates. Thus, unlike in the Proposed Class Period, Mr. Coffman cannot use this methodology to provide evidence of cause-and-effect during the Quiet Period. In addition, Mr. Coffman offered no other methodology to assess evidence of cause-and-effect during the Quiet Period.

### iv. Bid-Ask Spread

40.     Mr. Coffman analyzed the average bid-ask spread of Oak Street Health common stock.[62] According to Mr. Coffman, "a narrow bid-ask spread supports the presence of an efficient market where the prices reflect publicly available information."[63] Using Mr. Coffman's data, I find that the average bid-ask spread during the Quiet Period is 0.477%, which is higher than the range of 0.035% to 0.458% of the average monthly bid-ask spread Mr. Coffman calculated during the Proposed Class Period. The 0.477% average bid-ask spread is also higher than the median bid-ask spread of Mr. Coffman's randomly selected group of 100 stocks trading on the NYSE and NASDAQ during October 2020 of 0.21% and during the Quiet Period of 0.15%.[64] The higher bid-ask spread during the Quiet Period provides less support of market efficiency, as compared to Mr. Coffman's analysis of Oak Street Health common stock during the entire Proposed Class Period.

41.     Additionally, if we exclude August 2020, which virtually overlaps with the Quiet Period except for one day, from Mr. Coffman's calculation of the average monthly bid-ask

---

[60] Coffman Report, ¶ 55. For Oak Street Health's price reaction to new information, Mr. Coffman also examines the "Analysis Period," which is the period from August 6, 2020 through February 7, 2023 "to enhance the power of [his] statistical tests." Coffman Report, ¶ 25 n.25.

[61] Coffman Report, ¶ 59.

[62] Mr. Coffman calculates a time-weighted average bid-ask spread, which he "calculated by taking the average of the spread during trading hours on the primary exchange of each security, weighted by the amount of time each quote prevails in the market." Coffman Report, ¶ 70 n.79.

[63] Coffman Report, ¶ 69.

[64] Coffman Report, Exhibit 11.

13

spread during the Proposed Class Period, the range of the average monthly bid-ask spread for the remainder of the Proposed Class Period is 0.035% to 0.419%.[65] The bid-ask spread during the Quiet Period exceeds that range, highlighting the differences between the Quiet Period and the remainder of the Proposed Class Period.

> *v. Options Trading*

42. According to Mr. Coffman, "options written on existing assets can improve efficiency by permitting an expansion of the contingencies that are covered by the market."[66] He found "considerable option trading in Oak Street Health Common Stock during the [Proposed] Class Period."[67] Based on this, he concluded that this factor "supports that Oak Street Health Common Stock traded in an efficient market throughout the [Proposed] Class Period."[68] By contrast, using Mr. Coffman's data, I did not find any Oak Street Health call or put options trading during the Quiet Period. The lack of options trading during the Quiet Period does not support market efficiency, as acknowledged by Mr. Coffman during his deposition.[69]

> *vi. Insider Holdings as a Percentage of Shares Outstanding and Institutional*
> *Holdings as a Percentage of Shares Outstanding*

43. For insider holdings as a percentage of shares outstanding and institutional holdings as a percentage of shares outstanding, Mr. Coffman's methodology for the entire Proposed Class Period starts with data as of September 30, 2020.[70] Thus, the methodology he used for the Proposed Class Period for these two factors cannot be applied to the Quiet Period.

44. Given the above, Mr. Coffman has not provided a reliable economic basis that the market for Oak Street Health stock was efficient during the Quiet Period.

---

[65] Coffman Report, ¶ 70.

[66] Coffman Report, ¶ 77.

[67] Coffman Report, ¶ 77.

[68] Coffman Report, ¶ 77.

[69] Coffman Dep. Tr., at 286:16-287:1 ("Q I'll represent to you based upon your backup data that there were no put or call contracts traded during the quiet period. Is that indicative of market efficiency during that period? …. THE WITNESS: If that were true, then I don't think this factor necessarily supports market efficiency during that period, but it does for the Class Period more broadly.").

[70] Coffman Report Exhibit 12.

April 3, 2024

_____
Clifford S. Ang

15

**Appendix A**

**CLIFFORD S. ANG, CFA, AVIA**
Executive Vice President
cang@compasslexecon.com

510-285-1285

| **Oakland Address:** | **Chicago Address:** |
|---|---|
| 1111 Broadway Ste 1500 | 332 S Michigan Ave Ste 1300 |
| Oakland, CA 94607 | Chicago, IL 60604 |

**PROFESSIONAL EXPERIENCE**

Compass Lexecon, Chicago, IL & Oakland, CA
       Executive Vice President, 2021 – Present
       Senior Vice President, 2019 – 2021
       Vice President, 2013 – 2019
       Senior Economist, 2010 – 2013
       Economist, 2007 – 2010
       Senior Analyst, 2006
       Analyst, 2005 – 2006

Multi World, Philippines
       Vice President for Finance, 1999 – 2004

**TEACHING EXPERIENCE**

Instructor, DataCamp, 2017 – Present
Adjunct Professor, DePaul University, 2010 – 2013
Lecturer, Ateneo de Manila University, 2003 – 2004
Lecturer, University of the Philippines, 2002 – 2003

**EDUCATION AND CERTIFICATIONS**

CFA Charterholder, CFA Institute
Accredited Valuation Institute Analyst, Business Valuation Institute UK
PhD in Finance Student, Washington University in St. Louis
MS in Finance, University of the Philippines
BSBA, Finance and Accounting, Washington University in St. Louis

**BOOKS**

- Applied Valuation: A Pragmatic Approach, De Gruyter (2023)

- Analyzing Financial Data and Implementing Financial Models Using R, Springer (1st ed., 2015; 2nd ed., 2021)

1

**ARTICLES AND PRESENTATIONS**

- "The Absence of a Size Effect: Why We Should Let Go of the Size Premium," Society of Share & Business Valuers Webinar (September 7, 2022).

- "Side Effect of COVID-19: Beta Changes Impacting Business Valuation" with A. Roper, Business Valuation Resources Webinar (December 10, 2020)

- "The Absence of a Size Effect: Letting Go of the Size Premium," Business Valuation Resources Webinar (December 1, 2020)

- "How The Pandemic Is Changing Stock Volatility Calculations" with A. Roper, Law360 (September 17, 2020)

- "It's Time For Valuation Experts To Let Go Of The Size Premium," Law360 (June 22, 2020)

- "If an Investment Strategy Looks Too Good to Be True, Look under the Hood" with M. Lyon, CFA Enterprising Investor (May 4, 2020)

- "The Valuation Impact of Using the Wrong Leverage Ratio to Unlever Betas" with A. Lin, NACVA QuickRead (April 29, 2020)

- "Terminal Values in DCFs and Runaway Valuations," NACVA QuickRead (November 20, 2019)

- "The Absence of a Size Effect Relevant to the Cost of Equity," Business Valuation Review, Vol. 37 (2018), 87-92

- "Financial Modeling: Enhance Excel by Programming in R," Special Series on Advanced Modeling and Methodologies: A Business Valuation Resources Webinar (June 19, 2018)

- "Why You May Want to Consider Cash-Adjusting CAPM Betas," Bloomberg Exam Prep CFA Blog (June 8, 2018)

- "Why We Shouldn't Add a Size Premium to the CAPM Cost of Equity," NACVA QuickRead (February 15, 2017)

- "Estimating Debt Betas and Beta Unlevering Formulas," NACVA QuickRead (February 8, 2017)

- "Understatement of the Valuation Impact of Future Stock-Based Compensation Grants: Implications from the Ancestry.com Opinion" with A. Lin, The Value Examiner (Sep/Oct. 2015), 34-38

- "Estimating the Market Value of Illiquid Debt Using WRDS TRACE Data" with M. Lyon, R in Finance Conference, Chicago, IL (May 2012)

- "Executive Stock Options, Stock Price Volatility, and Agency Costs: A Study in the Philippine Setting" with D. Borja, Philippine Review of Economics, Vol. 40 (2003), 117-124

**MEMBERSHIPS**

Expert Member & Accredited Member, Business Valuation Institute UK
CFA Institute
CFA Society San Francisco
American Finance Association

**HONORS AND AWARDS**

2023 Distinguished Alumni Award, University of the Philippines Virata School of Business
2017 #1 and #2 Highest Rated Articles, NACVA QuickRead
2004 – 2005, Doctoral Fellowship, Washington University in St. Louis
2004 Top MS in Finance Graduate Award, University of the Philippines

**Appendix B**

**Materials Relied Upon**

## I.       Case-Related Documents

1. *Reginald T. Allison v. Oak Street Health, Inc., et al.*, Lead Plaintiffs' Complaint for Violations of the Federal Securities Laws, United States District Court, Northern District of Illinois, Case No. 1:22-cv-00149, filed on May 25, 2022
2. Expert Report of Chad Coffman, CFA, December 15, 2023 and Backup Materials
3. Deposition of Chad Coffman dated January 23, 2024
4. OAKSTREET02245696
5. PEREGRINE_005875-6

## II.      SEC Filings

6. Oak Street Health, Form EFFECT, filed on August 5, 2020
7. Oak Street Health, Form S-1 Amendment No. 4 , August 5, 2020
8. Oak Street Health, Form 10-K for the year ended December 31, 2020

## III.     Academic Articles and Books

9. Z. Bodie, A. Kane, and A. Marcus, 2014, *Investments,* 10th ed., McGraw-Hill
10. D.J. Bradley, B.D. Jordan, and J.R. Ritter, 2003, "The Quiet Period Goes out with a Bang," *The Journal of Finance,* Vol. 58, 1-36
11. R. Brealey, S. Myers, and F. Allen, 2011, *Principles of Corporate Finance,* 10th ed., McGraw-Hill
12. B. Bushee, M. Cedergren, and J. Michels, 2020, "Does the media Help or Hurt Retail Investors During the IPO Quiet Period?," *Journal of Accounting and Economics*, Vol. 69, 1-19
13. J. Campbell, A. Lo, and A.C. MacKinlay, 1997, *Econometrics of Financial Markets,* Princeton University Press
14. T. Houge, T. Loughran, G. Suchanek, and X. Yan, 2001, "Divergence of Opinion, Uncertainty, and the Quality of Initial Public Offerings," *Financial Management,* Vol. 30, 5-23
15. T. Loughran and J. Ritter, 2002, "Why Don't Issuers Get Upset About Leaving Money on the Table in IPOs?," *The Review of Financial Studies*, Vol. 15, 413-443
16. P. Patatoukas, R.G. Sloan, and A.Y. Wang, 2019, "Short-Sales Constraints and Aftermarket IPO Pricing," Working Paper
17. Saffi, P.A.C. and Sigurdsson, K., 2011, "Price Efficiency and Short Selling," *The Review of Financial Studies* 24(3), 821-852

## IV.      News Articles, Press Releases, and Analyst Reports

18. Yahoo Finance, "Lyft's Stock Price Crash Has Short Sellers Salivating," April 2, 2019
19. Oak Street Health Press Release, "Oak Street Health Announces Pricing of Initial Public Offering," August 5, 2020
20. Seeking Alpha, "Oak Street Health: Refreshing Approach To Healthcare," August 7, 2020
21. Oak Street Health Press Release, "Oak Street Health Announces Closing of Initial Public

Offering and Full Exercise of the Underwriters' Option to Purchase Additional Shares," August 11, 2020

22. *RTTNews,* "IPO Lockup Expiration Alert: Oak Street Health (OSH)," February 1, 2021

## V.     Other Documents

23. *Cammer, v. Bloom,* 711 F. Supp. 1264 (D.N.J. 1989)
24. FINRA, Regulatory Notice 15-30, "SEC Approves Consolidated Rule to Address Conflicts of Interest Relating to the Publication and Distribution of Equity Research Reports," August 2015
25. *In re Initial Public Offering Securities Lit.*, 471 F.3d 24 (2nd Cir. 2006)
26. *Krogman v. Sterritt,* 202 F.R.D. 467 (N.D. Tex. 2001)
27. *In re Northfield Labs., Inc.*, 267 F.R.D. 536, 547

## VI.     Data Sources

28. Bloomberg L.P.
29. Factiva
30. Tick API

All other materials cited in the report and Appendix C.

2

**Appendix C**

**Oak Street Health, Inc.**
**Mr. Coffman's Market Efficiency Factors**
**During the Proposed Class Period and Quiet Period**

| | Mr. Coffman's Market Efficiency Factor [A] | Proposed Class Period: 8/6/20 - 11/8/21[1] [B] | Quiet Period: 8/6/20-8/30/20 [C] |
|---|---|---|---|
| [1] | Average (Median) Weekly Trading Volume as % of Shares Outstanding; Threshold: 2% of weekly trading volume or more "would justify a strong presumption that the market for the security is an efficient one," and 1% "would justify a substantial presumption" | 2.38% (2.05%), above the 1% and 2% thresholds. 2.38% is above the 2.36% average weekly trading volume of NYSE and NASDAQ stocks during the Proposed Class Period | 1.69% (0.65%), below the 2% (below the 1%) threshold. 1.69% is below the 2.30% average weekly trading volume of NYSE and NASDAQ stocks during the Quiet Period |
| | Average (Median) Weekly Trading Volume as % of Tradeable Shares, with a higher percentage providing more support for market efficiency | 7.04% (5.21%) | 22.69% (8.76%) |
| | Annualized Turnover Velocity, with a higher percentage providing more support for market efficiency | 118.81%, below the NYSE and NASDAQ average of 123.21% during the Class Period | 84.63%, below the NYSE and NASDAQ average of 119.54% during the Quiet Period |
| [2] | Analyst Coverage, with "extensive coverage" by analysts providing support for market efficiency | 20 firms issued 128 analyst reports | 1 firm issued 1 analyst report |
| | News Articles, with more news articles providing more support for market efficiency | 675 unique articles | 23 unique articles |
| [3] | Market Makers, with more market makers providing more support for market efficiency | Trading on the NYSE  98 market makers | Trading on the NYSE  52 market makers |
| [4] | SEC Form S-3 Eligibility | Ineligible due to timing requirement for first 12 months | Ineligible due to timing requirement |
| [5] | Price Reaction to New Information, with | 2 out of 5 days with significant abnormal returns | No earnings announcements to test |

[1] For certain of the factors described in this column, the date range of Mr. Coffman's analysis does not cover the entire Proposed Class Period. Where that is the case, the time period for Mr. Coffman's analysis is indicated.

1

| | Mr. Coffman's Market Efficiency Factor [A] | Proposed Class Period: 8/6/20 - 11/8/21[1] [B] | Quiet Period: 8/6/20-8/30/20 [C] |
|---|---|---|---|
| | "[e]stablishing a causal connection between new company-specific events and movements in the market price [being] convincing evidence of market efficiency" | | |
| | Percentage of Days Significant at the 95% Confidence Level | Difference in percentage of significant dates is statistically significant using the Fischer' Exact Test and the Chi-Square Test | No earnings announcements to test |
| | Average Absolute Abnormal Return | Difference in absolute abnormal return is statistically significant | No earnings announcements to test |
| | Average Daily Trading Volume | Difference in average volume is statistically significant | No earnings announcements to test |
| [6] | Market Capitalization, with higher values providing more support for market efficiency | $12.87 billion and $7.98 billion, as of September 30, 2020 and December 31, 2021, respectively, which is at least the 85th percentile of all NYSE and NASDAQ stocks | $9.4 billion to $11.2 billion during the Quiet Period |
| [7] | Bid-Ask Spread, with a narrower spread providing more support for market efficiency | Average monthly bid-ask spread between 0.035% and 0.458%, which is below the average bid-ask spread of 0.63% and after the 6th month of trading below the median bid-ask spread of 0.21% of a random sample of 100 other common stocks trading on the NYSE and NASDAQ in October 2020 | Average monthly bid-ask spread of 0.477%, which is below the average bid-ask spread of 0.50% and above the median bid-ask spread of 0.15% of Mr. Coffman's random sample of 100 other common stocks trading on the NYSE and NASDAQ during the Quiet Period |
| [8] | Insider Holdings as % of Shares Outstanding, with a lower percentage providing more support for market efficiency | Average of insider holdings as % of shares outstanding from September 30, 2020 to December 31, 2021 of 62% | N/A per Mr. Coffman's methodology |
| [9] | Institutional Holdings as % of Shares Outstanding, with a higher percentage providing more support for market efficiency | 454 institutions holding 32% of shares outstanding from September 30, 2020 to December 31, 2021 | N/A per Mr. Coffman's methodology |

| | Mr. Coffman's Market Efficiency Factor [A] | Proposed Class Period: 8/6/20 - 11/8/21[1] [B] | Quiet Period: 8/6/20-8/30/20 [C] |
|---|---|---|---|
| | Institutional Holdings as % of Public Float, with a higher percentage providing more support for market efficiency | Average of quarterly institutional holdings as % of public float from September 30, 2020 to December 31, 2021of 74% | N/A per Mr. Coffman's methodology |
| [10] | Autocorrelation, with no autocorrelation providing support for market efficiency | No | No |
| [11] | Options Trading, with the presence of traded options providing support for market efficiency | 39,409 put contracts and 60,219 call contracts traded | 0 put contracts and 0 call contracts traded |

Notes for Quiet Period:

[1] (a) Average (Median) Weekly Trading Volume as % of Shares Outstanding is calculated by changing the variable CLASSEND in the SAS code "Average Weekly Turnover.sas" of the Coffman Backup Materials to reflect the end of the Quiet Period. (b) Average (Median) Weekly Trading Volume as % of Tradeable Shares is calculated by making the changes discussed above and also replacing the variable "shares_out_" with the variable "Tradeable_Shares_Outstanding" per "Oak Street Health Market Efficiency Exhibits.xlsx" tab "Stock Data" in the Coffman Backup Materials. (c) Annualized Turnover Velocity is calculated as the Average Weekly Trading Volume as % of Shares Outstanding times 50. (d) Average Weekly Trading Volume and Annualized Turnover Velocity for the NYSE and NASDAQ stocks calculated per August 2020 data in "NASDAQ and NYSE Annualized Data.xlsx" in the Coffman Backup Materials.

[2] (a) Analyst Coverage is estimated identifying entries with a "Market_Date" variable in "Analyst Report Exhibit.xlsx" of the Coffman Backup Materials that falls within the Quiet Period. (b) News Articles obtained by running the same search as the news search described in ¶ 35 n.36 of the Coffman Report for the Quiet Period. Based on my replication of Mr. Coffman's Proposed Class Period analysis, I exclude articles with "BUZZ-U.S. STOCKS ON THE MOVE," "U.S. RESEARCH ROUNDUP," and "52-week highs and lows" in the headline during the Quiet Period and exclude duplicates as defined by Factiva.

[3] Per Bloomberg using the RANK function for "All Broker Types" for the Quiet Period.

[4] Per Coffman Report ¶¶ 43 and 44 and www.sec.gov/about/forms/forms-3.pdf.

[5] Per Coffman Report Exhibit 7.

[6] Per "Oak Street Health Market Efficiency Exhibits.xlsx" tab "Stock Data" in the Coffman Backup Materials.

[7] (a) Bid-Ask Spread estimated by changing the variable CLASSEND in the SAS code "Bid-Ask - Company's Spread.sas" of the Coffman Backup Materials to reflect the end of the Quiet Period. (b) I used the same sample of 100 stocks Mr. Coffman used but estimated the average bid-ask spread for that sample of firms for the Quiet Period using TICK data. "FBIK" and "UMN" were excluded because those two stocks did not have bid-ask spread data in the TICK dataset.

[8, 9] Mr. Coffman's methodology for the entire Proposed Class Period starts with data as of September 30, 2020. Thus, the methodology he used for the Proposed Class Period cannot be applied to the Quiet Period.

[10] Autocorrelation is calculated by changing the variable classend in the SAS code "Autocorrelation - Class Period.sas" of the Coffman Backup Materials to reflect the end of the Quiet Period.

[11] Per "osh_options_data.sas7bdat" of the Coffman Backup Materials.

Sources: Coffman Report and Backup Materials; Bloomberg, L.P.; Factiva; TICK data.

3