UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| REGINALD T. ALLISON, Individually and on Behalf of All Others Similarly Situated,<br><br>      Plaintiff,<br><br>vs.<br><br>OAK STREET HEALTH, INC., et al.,<br><br>      Defendants. | CASE NO. 1:22-CV-00149<br><br><u>CLASS ACTION</u><br><br>JUDGE JEFFREY I. CUMMINGS |

**DECLARATION OF CHRISTINE M. FOX IN SUPPORT OF:
(I) LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION
SETTLEMENT AND APPROVAL OF PLAN OF ALLOCATION; AND (II) CO-LEAD
COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES, EXPENSES, AND
AWARDS TO PLAINTIFFS PURSUANT TO THE PRIVATE
<u>SECURITIES LITIGATION REFORM ACT OF 1995</u>**

I, Christine M. Fox, declare as follows pursuant to 28 U.S.C. §1746:

1.      I am a partner of the law firm of Labaton Keller Sucharow LLP ("Labaton"). Labaton and Robbins Geller Rudman & Dowd LLP ("Robbins Geller") serve as Court-appointed Co-Lead Counsel for Lead Plaintiffs Central Pennsylvania Teamsters Pension Fund - Defined Benefit Plan, Central Pennsylvania Teamsters Pension Fund - Retirement Income Plan 1987 (the "CPTPF Plans"), and Boston Retirement System ("BRS," collectively with the CPTPF Plans, "Lead Plaintiffs"), and additionally named plaintiff City of Dearborn Police & Fire Revised Retirement System ("Dearborn," collectively with Lead Plaintiffs, "Plaintiffs"), and the proposed Settlement Class in the Action.[1]  I have been actively involved in prosecuting and resolving the Action, am familiar with its proceedings, and have personal knowledge of the matters set forth herein based upon my supervision or participation in the Action.

2.      I respectfully submit this declaration in support of Lead Plaintiffs' motion for final approval of the proposed Settlement and approval of the proposed Plan of Allocation for the distribution of the proceeds of the Settlement, as well as Co-Lead Counsel's motion for an award of attorneys' fees, payment of litigation expenses, and awards to Plaintiffs, pursuant to the Private

---

[1]      All capitalized terms used herein that are not otherwise defined shall have the meanings provided in the Stipulation and Agreement of Settlement, dated as of August 13, 2024 (ECF No. 174) (the "Stipulation"), which was entered into by and among (a) Lead Plaintiffs, on behalf of themselves and the Settlement Class; and (b) Defendants Oak Street Health, Inc.; Michael Pykosz; Timothy Cook; Geoff Price; Griffin Myers; General Atlantic LLC; General Atlantic (OSH) Interholdco, L.P. (together with General Atlantic LLC n/k/a General Atlantic, L.P., "GA"); Newlight Partners LP; and Newlight Harbour Point SPV LLC (together with Newlight Partners LP, "Newlight"), Regina Benjamin, Carl Daley, Cheryl Dorsey, Mohit Kaushal, Kim Keck, Julie Klapstein, Paul Kusserow, Robbert Vorhoff, Srdjan Vukovic, J.P. Morgan Securities, Inc., Goldman Sachs & Co. LLC, Morgan Stanley & Co. LLC, William Blair & Company, LLC, and Piper Sandler Companies (collectively "Defendants").

Securities Litigation Reform Act of 1995 (the "PSLRA").[2] Both motions have the support of Plaintiffs. *See* Declaration of Joseph Samolewicz in Support of Lead Plaintiffs' Motion for Final Approval of Settlement ("CPTPF Plans Decl."), attached hereto as Ex. 1; Declaration of Boston Retirement System in Support of Approval of Proposed Settlement and Request for Attorneys' Fees and Expenses ("BRS Decl."), attached hereto as Ex. 2; Declaration of Dearborn Police & Fire Revised Retirement System in Support of Approval of Proposed Settlement and Request for Attorneys' Fees and Expenses ("Dearborn Decl."), attached hereto as Ex. 3.

3. This declaration provides the Court with details about the litigation, the events leading to the Settlement, and the basis upon which Lead Plaintiffs and Co-Lead Counsel respectfully request approval of the Settlement, the proposed Plan of Allocation, and awards of attorneys' fees and payment of expenses.

4. The Court is also referred to the accompanying Declaration of James E. Barz in Support of: (1) Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation; and (2) Co-Lead Counsel's Motion for an Award of Attorneys' Fees and Expenses and Awards to Plaintiffs Pursuant to the PSLRA ("Barz Declaration"), attached hereto as Ex. 4, for additional information relevant to the Court's consideration of the motions.

## I.  PRELIMINARY STATEMENT

5. Subject to Court approval, Plaintiffs and Co-Lead Counsel have obtained a guaranteed and substantial recovery for the Settlement Class of $60,000,000 in cash (the "Settlement Amount"), which avoids the uncertainty of continued litigation against the

---

[2] Plaintiffs seek modest awards pursuant to the PSLRA, as detailed in their accompanying declarations, submitted herewith.

Defendants, including the risk of recovering less than the Settlement Amount, after significant delay and litigation efforts, or nothing at all.

6.     In entering into the Settlement with the Defendants, Lead Plaintiffs and Co-Lead Counsel were fully informed about the strengths and weaknesses of the claims and defenses in the Action. As set forth more fully below, Co-Lead Counsel: (i) conducted a thorough investigation; (ii) filed a comprehensive Complaint for Violations of the Federal Securities Laws (the "Complaint") based on Co-Lead Counsel's investigation; (iii) opposed a motion to dismiss filed by Defendants, which was granted in part and denied in part; (iv) moved for class certification; (v) engaged in fact discovery which included serving and negotiating discovery requests, resulting in obtaining and analyzing more than 3.5 million pages of documents from Defendants and third parties, negotiating discovery and privilege disputes in numerous meet and confers, and taking, defending, or participating in 19 depositions; (vi) consulted with experts; and (vii) engaged in well-informed, arm's-length negotiations between and among highly-experienced counsel in order to fully resolve the claims arising out of the alleged wrongdoing.

7.     As discussed in further detail below, given the facts, the applicable law, and the challenges and expense of continued litigation against the Defendants, the proposed Settlement is fair, reasonable, and adequate, represents a significant result under the circumstances presented, and is in the best interests of the Settlement Class. The Defendants asserted defenses that presented numerous challenges to Plaintiffs' ability to prove liability, particularly with respect to the required elements of falsity and scienter, as well as loss causation and the amount of damages suffered by Plaintiffs and the Settlement Class. Despite these obstacles, Plaintiffs and Co-Lead Counsel obtained a highly favorable settlement that will result in a certain recovery for the Settlement Class.

8.      In addition to seeking approval of the Settlement, Lead Plaintiffs seek approval of the proposed Plan of Allocation, which was prepared in consultation with Lead Plaintiffs' damages consultant.  As described below, the Plan of Allocation's objective is to equitably distribute the Net Settlement Fund among Settlement Class Members who suffered economic losses allegedly as a result of their purchases and acquisitions of Oak Street Health common stock during the Class Period (August 6, 2020 through November 8, 2021), including those who purchased Oak Street Health shares in and/or traceable to the August 6, 2020 IPO, December 2, 2020 SPO, and/or the February 10, 2021 SPO.  Under the proposed Plan of Allocation, the Net Settlement Fund will be distributed on a *pro rata* basis to members of the Settlement Class who submit timely and valid Claim Forms, based on their "Recognized Claim," as calculated under the Plan of Allocation.

9.      Additionally, Co-Lead Counsel, on behalf of Plaintiffs' Counsel, request an award of attorneys' fees, payment of litigation expenses, and PSLRA awards to Plaintiffs.  Specifically, Co-Lead Counsel are applying for a fee award of 29% of the Settlement Fund (*i.e.*, $17,400,000, plus accrued interest), payment of litigation expenses in the amount of $888,947.35, plus accrued interest, and PSLRA awards totaling $21,305 for Plaintiffs.

10.      The requests for attorneys' fees and expenses are reasonable in light of the benefits conferred on the Settlement Class, the quality of the representation, and the nature and extent of the legal services provided.  Plaintiffs support the Fee and Expense Application.  *See* Exs. 1-3.

II.      **HISTORY OF THE ACTION**

A.      **Appointment of Lead Plaintiffs and the Consolidated Complaint**

11.      On January 10, 2022, a securities class action complaint was filed in this Court asserting claims against defendants alleging violations under the Securities Exchange Act of 1934 ("Exchange Act").  ECF No. 1.

12.     Thereafter, several movant groups moved for appointment as lead plaintiff and approval of lead counsel (*see generally* ECF Nos. 5, 8, 11), including the motion filed by Lead Plaintiffs and their counsel, Labaton and Robbins Geller (ECF No. 11).

13.     On March 25, 2022, the Court appointed Central Pennsylvania Teamsters Pension Fund – Defined Benefit Plan, Central Pennsylvania Teamsters Pension Fund – Retirement Income Plan 1987 and Boston Retirement System as Lead Plaintiffs and the firms Robbins Geller and Labaton as Co-Lead Counsel.  ECF No. 30.

14.     Co-Lead Counsel conducted a comprehensive investigation into the facts, circumstances, and claims, which included, among other things, a review and analysis of: (i) U.S. Securities and Exchange Commission ("SEC") filings by Oak Street; (ii) Company press releases and conference call transcripts; (iii) information posted on the Company's website; (iv) analyst reports and media reports about the Company and the healthcare industry; (v) online resources and articles regarding Medicare and related statutes and regulations; (vi) public court dockets and filings; (vii) insiders' trades of Oak Street stock; and (viii) other publicly available information. As part of the investigation, Co-Lead Counsel interviewed former employees, four of whom were cited in the Complaint.  Based on this investigation, Co-Lead Counsel prepared the consolidated complaint.

15.     On May 25, 2022, Lead Plaintiffs filed the operative 296-paragraph Complaint. ECF No. 40.  The Complaint alleges violations of §§11, 12, and 15 of the Securities Act of 1933 ("Securities Act") arising out of alleged misstatements and omissions made in connection with Oak Street's IPO and subsequent public offerings in December 2020, February 2021, and May 2021, and violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange

Act"), and SEC Rule 10b-5 promulgated thereunder, arising out of alleged misstatements and omissions made during the Class Period.

16. The Complaint alleges that during the Class Period, *inter alia*, Defendants made false and misleading statements and omissions to investors concerning Oak Street Health's patient acquisition tactics, and that Defendants allegedly concealed that Oak Street Health was paying for referrals for prospective patients on a per patient basis and marketing free transportation to prospective patients, which Plaintiffs claim violates the federal Anti-Kickback Statute ("AKS") and/or False Claims Act ("FCA"). Plaintiffs allege that these purportedly false and misleading statements and omissions caused Oak Street Health's stock price to be artificially inflated, and when the truth was eventually disclosed on November 8, 2021, when Oak Street announced it received a Civil Investigative Demand from the Department of Justice, the price of Oak Street Health's stock declined, resulting in substantial damages to the class. ECF No. 40.

**B. Defendants' Motion to Dismiss**

17. On July 25, 2022, Defendants filed their omnibus motion to dismiss the Action. ECF No. 59. The motion to dismiss was comprehensive and urged dismissal of the Action on multiple grounds, including, with respect to Lead Plaintiffs' Exchange Act claims, their purported failure to plead material misstatements and omissions, failure to plead scienter, and failure to plead loss causation; and with respect to the Securities Act claims, the failure to adequately allege that the Plaintiffs purchased shares in or traceable to certain of Oak Street's public offerings, or directly from any Defendant.

18. On September 26, 2022, Plaintiffs filed their opposition to the motion to dismiss, rebutting each argument raised by Defendants. ECF No. 63. Defendants filed their replies on October 26, 2022. ECF No. 69.

**C.      Court's Order and Opinion on Motion to Dismiss**

19.      On February 10, 2023, the Court (Judge Matthew F. Kennelly) issued a Memorandum Opinion and Order granting in part and denying in part Defendants' motion to dismiss.  ECF No. 74; *Allison v. Oak Street Health, Inc.*, No. 22-C-149, 2023 WL 1928119 (N.D. Ill. Feb. 10, 2023).  The Court granted Defendants' motion with respect to the Section 12(a)(2) claim in its entirety and the Section 11 claim only with respect to alleged misrepresentations and omissions from Oak Street's May 26, 2021 secondary offering. The motion to dismiss was otherwise denied.

20.      In particular, regarding statements about Oak Street's marketing practices, the Court found that Defendants were obligated to disclose that Oak Street paid insurance agents on a per patient basis and offered free transportation to prospective patients in their marketing materials, and that the "statements [were] not misleading because Oak Street was independently required to disclose the existence of the DOJ investigation or confess to violating the AKS, but rather because the statements omitted the fact that Oak Street engaged in the two specific practices alleged to be illegal." *Id*. at *6.

21.      Regarding scienter, among other things, the Court found a strong inference of scienter where the Individual Defendants "were eligible to receive annual cash incentive awards" in 2020 and 2021 based on their assessed performance against "at-risk patient count targets" set by Oak Street's board. *Id*. at *9.  The Court also credited Plaintiffs' argument that the fact that these practices violated the AKS was "obvious" and that Defendants acknowledged that the "AKS specifically prohibited paying for referrals and providing remuneration to prospective patients" in statements and in Oak Street's Code of Conduct, supporting a strong inference of scienter. *Id*. at *10.

22.     With respect to loss causation, the Court found that Plaintiffs have adequately pled loss causation, noting that Oak Street's stock price dropped the same day that Oak Street announced that the DOJ was investigating its "relationships with third-party marketing agents" and "provision of free transportation to federal health care beneficiaries." *Id*. at *11.

23.     Regarding the Securities Act claims, the Court granted Defendants' motion to dismiss with respect to the Section 12(a)(2) claim and the Section 11 claim only with respect to misrepresentations and omissions from the May 2021 SPO.

24.     On October 26, 2023, the case was reassigned from Judge Matthew F. Kennelly to Judge Jeffrey I. Cummings.  ECF No. 123.

## III.    CLASS CERTIFICATION

25.     On December 15, 2023, Plaintiffs filed a motion for class certification, supported by a market efficiency expert declaration of Chad Coffman (CFA), then President of Global Economics Group (now Co-Founder and President Peregrine Economics), seeking to certify the class and appoint BRS, the CPTPF Plans, and additionally named plaintiff Dearborn as class representatives and Robbins Geller and Labaton as Class Counsel.  ECF Nos. 134, 135.

26.     On February 20, 2024, after deposing representatives from BRS, the CPTPF Plans, Dearborn, and the investment managers that executed the transactions in Oak Street Health stock during the Class Period on behalf of each of the Plaintiffs, Defendants filed their opposition to Plaintiffs' motion for class certification. ECF No. 145.  Defendants focused on the alleged lack of adequacy and typicality of the Plaintiffs, arguing that Plaintiffs are not adequate because: (i) they were not actively engaged in the litigation; (ii) they delegated investment authority to investment managers who believed Oak Street was a good value; (iii) they could not trace their shares to certain offerings at issue; and (iv) the investment managers purportedly were aware of the alleged fraud.

27. On April 22, 2024, Plaintiffs filed their reply in further support of their motion for class certification. ECF No. 162. In support, Plaintiffs submitted a rebuttal market efficiency declaration by Mr. Coffman and an expert declaration of Professor Joshua Mitts (Ph.D.), the David J. Greenwald Professor of Law at Columbia University, to rebut Defendants' "tracing" arguments and expert report. ECF Nos. 162-2, 162-3.

28. The motion was pending when the Parties agreed to resolve the Action.

## IV. DISCOVERY

29. As set forth below, Plaintiffs: (i) prepared and served detailed discovery requests on Defendants, including requests for production of documents on all Defendants, and interrogatories and requests for admission on certain Defendants; (ii) met and conferred with each constituency of Defendants' counsel on numerous occasions concerning the discovery served by all sides and the search terms and protocols to be used to collect documents and data responsive to those discovery requests; (iii) prepared and served 14 subpoenas on non-parties and negotiated the production of information pursuant to many of those subpoenas; (iv) received and analyzed more than 3.5 million pages of production documents; (v) took, defended, or otherwise participated in 19 depositions, including (a) taking the deposition of 10 fact witnesses (and preparing for many more), (b) preparing and defending the depositions of the three Plaintiffs as well as Plaintiffs' market efficiency expert, Mr. Coffman, (c) taking the deposition of Defendants' market efficiency expert, Clifford S. Ang, (d) participating in the deposition of two of Plaintiffs' investment managers, and (e) participating in the depositions of two confidential witnesses ("CWs"); (vi) negotiated and resolved myriad discovery disputes; and (vii) engaged and consulted frequently with experts in the fields of Medicare, loss causation and damages, and securities tracing/fungible bulk.

30. Prior to document production by the Parties, Co-Lead Counsel and Defendants' Counsel negotiated a comprehensive confidentiality agreement, detailing two levels of confidentiality. The Confidentiality Order was So Ordered by the Court on March 21, 2023. ECF No. 85.

31. During discovery, Co-Lead Counsel operated efficiently and flexibly, altering the size of the litigation team to fit the needs of the case and designating individuals or groups to handle the many different aspects of discovery.

### A. Discovery Propounded on Defendants

32. Plaintiffs served document requests on all Defendants, and interrogatories and requests for admission on certain Defendants, beginning in February 2023 and were actively engaged in fact discovery when the case settled.

33. The Parties engaged in numerous meet-and-confer conferences and exchanged multiple meet-and-confer letters and emails as to the scope and manner of the requested document productions, interrogatories, requested admissions, including issues pertaining to search terms and document custodians, privilege and work product protections, relevance, burden, and other disputes related to the requests. Through this comprehensive effort, the Parties were able to reach an understanding as to the scope of Defendants' discovery, and many compromises without having to seek the Court's intervention.

34. Co-Lead Counsel conducted an efficient review of the documents produced in discovery through a Relativity eDiscovery database hosted by Robbins Geller. A team of experienced document review attorneys reviewed and analyzed the productions. Many of these attorneys had worked on prior securities cases and are experienced in utilizing the latest technology with respect to document review.

35. The review of Defendants' documents began in early May 2023 with attorneys ultimately analyzing approximately 2.5 million pages of documents produced by Oak Street Health, 175,000 pages produced by General Atlantic, 142,000 pages produced by Newlight, 18,000 pages produced by certain Independent Directors, 130,000 pages produced by Goldman Sachs, 230,000 pages produced by JP Morgan, and 170,000 pages produced by Morgan Stanley.

36. The team of attorneys assembled by Plaintiffs' Counsel to review these productions varied at different times during the litigation, *i.e.*, when the production of documents increased, more attorneys were added to the review team. During the review, many members of the review teams focused on identifying potential deponents and preparing for depositions, marshalling evidence for summary judgment and trial, and preparing for mediation. Thus, these attorneys were integral to Plaintiffs' Counsel's prosecution of the Action.

37. To efficiently focus on the most relevant documents, these attorneys used the Relativity eDiscovery platform's search and data analytic software tools to analyze the data and to target the most significant communications, workpapers, and reports. The review was conducted with a combination of linear review, using the Relativity eDiscovery analytic tools, targeted search terms, and custodial document review.

38. The attorneys conducted targeted searching through text, file names, document type (*e.g.,* emails, memoranda, SEC filings, and correspondence), dates, bates numbers, etc. to identify relevant, irrelevant, and "hot" documents for additional review, and to create collections of documents sorted by issue. Documents also were allocated to be reviewed by specific experts retained by Co-Lead Counsel. Through experience and their increasing familiarity with the documents, the review team identified additional swaths of important documents, which were also run through the analytics and search functions to derive the most significant documents for use in

connection with depositions, evidence development, expert discovery, and Plaintiffs' mediation statement. The review team analyzed and coded documents, prepared for regular document review meetings, prepared meaningful work product, conducted privilege log review, and conducted deposition preparation.

39. Building upon the knowledge learned through the document discovery process, Co-Lead Counsel took 10 depositions of fact witnesses, and actively prepared for many more.

40. Plaintiffs took depositions of the following current and former Oak Street Health executives, Oak Street Health board members, and others (in chronological order): (1) Colleen Wold (Oak Street Health- Vice President and Controller) on April 18, 2024; (2) Armaan Pai (General Atlantic – Vice President) on April 18, 2024; (3) Josh Nadeau (Oak Street Health – Regional Partnership Manager) on April 25, 2024; (4) James Antoniotti (Newlight - Principal) on April 25, 2024; (5) Paul Kusserow (Oak Street Health – Board Member) on May 7, 2024; (6) Katie Rehberger (Oak Street Health – Chief Growth Officer) on May 8, 2024; (7) Adam Peck (Oak Street - Vice President of Outreach) on May 9, 2024; (8) Kim Keck (Oak Street Health – Board Member) on May 9, 2024; (9) Mohit Kaushal (Oak Street Health – Board Member) on May 14, 2024; and (10) Lindsay Moore (Oak Street Health - Vice President Field Marketing) on May 15, 2024. The Parties had scheduled and were heavily preparing for an additional 17 fact depositions, including the depositions of the three Individual Defendants, to occur between May 17, 2024 and June 28, 2024, when the Parties agreed to settle. Plaintiffs also took the deposition of Defendants' market efficiency expert, Clifford S. Ang, in connection with class certification, on April 4, 2024.

41. Collectively, the depositions provided substantial evidence and insight into events reflecting upon the allegations in the Complaint. However, as discussed herein, they also provided

13

a preview of the issues of presenting evidence through adverse witnesses aligned with the Defendants and the battle of the experts that would be on display at trial.

**B.      Discovery Propounded on Plaintiffs**

42.      Defendants also aggressively sought discovery from Plaintiffs.  Defendants served document requests and interrogatories on the Plaintiffs.  Plaintiffs objected to many of the requests on the basis that they were overbroad and sought information that was protected by various privileges and other protections.  The Parties engaged in meet-and-confer conferences and exchanged correspondence to negotiate the scope of production.  Plaintiffs produced approximately 5,000 pages of documents.

43.      Defendants took the depositions of the following Plaintiffs, each of whose deposition was defended by Co-Lead Counsel: (1) Robert Festerman (Dearborn) on January 12, 2024; (2) Joe Samolewicz (CPTPF Plans) on January 18, 2024; (3) Tim Smyth (BRS) on January 25, 2024.  Defendants also took the depositions of the following investment managers (1) Peregrine Capital Management, LLC – Paul Von Kuster (Dearborn Investment Manager) on February 4, 2024; and (2) Westfield Capital Management Co., LLC – Garth Jonson (CPTPF Plans and BRS Investment Manager) on February 13, 2024.  Co-Lead Counsel participated in these investment manager depositions.

44.      Defendants also took the depositions of two former employees cited in the Complaint in May 2024.  Co-Lead Counsel participated in these depositions.

45.      Defendants also deposed Plaintiffs' market efficiency expert, Chad Coffman, CFA, Co-Founder & President of Peregrine Economics, on January 23, 2024. Co-Lead Counsel defended this deposition.

14

### C.       Non-Party Discovery

46.      In addition to the documents collected from Defendants, Co-Lead Counsel also served 14 subpoenas for the production of documents on third parties that Co-Lead Counsel believed had documentary evidence relevant to the claims in the Action. Defendants also served document requests on non-parties. In total, and by the time the Parties had entered into the Settlement, Plaintiffs had received approximately 120,000 pages of documents from 23 third parties.

### D.       Discovery Disputes

47.      As described above, discovery in this matter was both intense and voluminous. The Parties held numerous meet-and-confer sessions throughout discovery. The Parties also exchanged correspondence concerning: (i) Defendants' responses and objections to Plaintiffs' requests for documents; (ii) certain Defendants' responses and objections to Plaintiffs' interrogatories and requests for admission; (iii) Plaintiffs' responses and objections to Defendants' requests for documents; and (iv) Defendants' privilege and work product assertions and logs accompanying their productions.

48.      Through productive meet and confers on these issues, the Parties were able to resolve all of these issues.

## V.       SETTLEMENT NEGOTIATIONS

49.      On March 12, 2024, following the submission of briefing, the Parties participated in an in-person mediation session with an experienced and well-respected mediator, Robert A. Meyer of JAMS, to assist them in determining whether a negotiated resolution of the Action was possible. At the mediation, the Parties exchanged their respective views on Plaintiffs' claims, Defendants' defenses, potentially available insurance coverage, and issues related to liability and damages.

50.     The negotiations were hard-fought and although the Parties remained too far apart in their respective positions to resolve the Action at the mediation, the discussions allowed each Party to better understand the others' positions.

51.     Following nearly two months of additional negotiations and discussions, Mr. Meyer issued a mediator's proposal to settle the Action, which Lead Plaintiffs and the Defendants accepted on May 16, 2024. The Parties executed the Stipulation on August 13, 2024. ECF No. 174. On August 16, 2024, Lead Plaintiffs moved for preliminary approval of the proposed Settlement, including authorization to notify the Settlement Class of the Settlement and the scheduling of a Final Approval Hearing. ECF Nos. 172-73.

52.     On September 19, 2024, the Court entered an order approving the form and manner of notice to the Settlement Class and scheduling the Final Approval Hearing for December 12, 2024, at 11:00 a.m. ECF No. 184 (the "Notice Order").

## VI.     TERMS OF THE SETTLEMENT

53.     Pursuant to the Settlement, Oak Street Health has caused the payment of $60 million into the Escrow Account for the benefit of the Settlement Class. *See* Stipulation. ¶ 2.1. The $60 million Settlement Amount is four times greater than the median settlement value in securities class action settlements in 2023, which was reported by Cornerstone Research to be $15 million. *See* Laarni T. Bulan and Laura E. Simmons, *Securities Class Action Settlements – 2023 Review and Analysis* at 1 (Cornerstone Research 2024), attached hereto as Ex. 5.

54.     In exchange for this payment, upon the Effective Date of the Settlement, Plaintiffs, each of the Settlement Class Members (who have not validly opted out of the Settlement Class), and their respective Related Parties in their capacities as such, shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever released, relinquished, compromised, settled, resolved, waived, and discharged against the Released Defendant Parties

16

(whether or not such Settlement Class Members execute and deliver Proof of Claim forms) any and all Released Plaintiffs' Claims (including, without limitation, Unknown Claims). Claims to enforce the Settlement are not released. *See* Stipulation ¶ 5.1. Upon the Effective Date, Plaintiffs and each of the Settlement Class Members (who have not validly opted out of the Settlement Class in writing pursuant to the Notice Order), and their respective Related Parties, in their capacities as such, shall be permanently barred and enjoined from the direct or indirect assertion, institution, maintenance, prosecution, or enforcement against any Released Defendant Parties, in any state or federal court or arbitral forum, or in the court of any foreign jurisdiction, of any and all Released Plaintiffs' Claims (including, without limitation, Unknown Claims). *See* Stipulation ¶ 5.2.

55. The definition of Released Plaintiffs' Claims and Unknown Claims has been tailored to release only claims and causes of action that Plaintiffs or any other member of the Settlement Class: (a) asserted in the Action, including in any complaint or pleading therein; or (b) could have asserted in the Action or any forum that arise out of, are based upon, or relate to, both: (1) the allegations, transactions, facts, matters or occurrences, representations or omissions involved, set forth, or referred to in the complaints filed in the Action and (2) the purchase, acquisition, sale, or disposition of Oak Street Health publicly traded common stock during the Class Period. Released Plaintiffs' Claims do not include claims to enforce the Settlement or any governmental or regulatory claims against the Defendants and their Related Parties, including any arising out of any investigation of Oak Street Health by the United States Department of Justice. *See* Stipulation ¶ 1.28.

56. Also on the Effective Date, each of the Released Defendant Parties shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever released, relinquished, and discharged Plaintiffs, each and all of the Settlement Class Members, and the

other Released Plaintiff Parties from all Released Defendants' Claims (including Unknown Claims), and shall be permanently barred and enjoined from the direct or indirect assertion, institution, maintenance, prosecution, or enforcement against any Released Plaintiff Parties, in any state or federal court or arbitral forum, or in the court of any foreign jurisdiction, of any and all Released Defendants' Claims (including, without limitation, Unknown Claims *See* Stipulation ¶5.4.

57. Pursuant to Rule 23(e)(3), the only agreements made by the Parties in connection with the Settlement are the Stipulation and the confidential Supplemental Agreement, dated August 13, 2024, concerning the circumstances under which Oak Street Health may terminate the Settlement based upon the number of exclusion requests. *See* Stipulation ¶ 8.4. It is standard to keep such agreements confidential so a large investor, or a group of investors, cannot intentionally try to leverage a better recovery for themselves by threatening to opt out, at the expense of the class. The Supplemental Agreement was filed with the Court under seal.

58. After approval of the Settlement and the Plan of Allocation for the proceeds of the Settlement, the Claims Administrator, JND Legal Administration ("JND") will process all claims received and will implement the plan of allocation approved by the Court. At the completion of the administration, JND will distribute the Net Settlement Fund to eligible Claimants and will make supplemental distributions of unclaimed funds as long as it is economically feasible to make distributions. *See* Stipulation ¶ 6.10. This is not a "claims-made" settlement, and the entire Net Settlement Fund is for the benefit of the Settlement Class, regardless of how many claims are submitted. ¶ 6.11. When it is no longer feasible to make additional distributions, because of the small amount of funds left in the Net Settlement Fund, Lead Plaintiffs propose that the unclaimed balance be donated to Consumer Federation of America, or such other non-profit organization

serving the public interest approved by the Court.[3]  *Id*. ¶ 6.10.  The Settlement, once it becomes effective, does not contain any reversion to Defendants.

## VII.    REACTION OF THE SETTLEMENT CLASS TO DATE

59.    In accordance with the Notice Order, the Court-appointed Claims Administrator, JND, has notified potential Settlement Class Members who could be identified of the Settlement, the proposed Plan of Allocation, and Co-Lead Counsel's motion for attorneys' fees and expenses by, among other things, mailing and emailing the Notice and Claim Form ("Notice Packet").  *See* Declaration of Luiggy Segura Regarding: (A) Dissemination of the Notice Packet; (B) Publication/Transmission  of the Summary Notice; (C) Establishment of Call Center Services and Website; and (D) Requests for Exclusion Received to Date, dated November 6, 2024 ("Mailing Decl."), attached hereto as Ex.  6.  The scope of JND's efforts to date is described in the Mailing Declaration.

60.    The deadline for the receipt of objections or requests for exclusion from the Settlement Class is November 21, 2024.

61.    To date, no Settlement Class Member has objected to any aspect of the Settlement or Co-Lead Counsel's request for attorneys' fees, litigation expenses, or awards to Plaintiffs pursuant to the PSLRA.

---

[3] CFA is an association of non-profit consumer organizations that was established in 1968 to advance the consumer interest through research, advocacy, and education. *See generally* www.consumerfed.org. With respect to victims of financial fraud, CFA has an Investor Protection program that works nationwide to promote consumer-oriented policies that safeguard investors against fraud through: (i) the development of educational material for investors; (ii) drafting policies and legislation; (iii) and providing testimony and comments on legislation and regulations. See www.consumerfed.org/issues/investor-protection. CFA has been approved as a *cy pres* beneficiary in numerous securities settlements, including, *In re Intuitive Surgical Sec. Litig.*, Case No. 5:13-cv-01920-EJD (N.D. Cal.); *DePalma v. Rent-A-Center, et al.*, No. 16-CV-00978 (E.D. Tex.); and *In re Broadcom Corp. Sec. Litig.,* No. 01-CV-00275-MLR (C.D. Cal.).

62. To date, no Settlement Class Member has requested exclusion from the Settlement Class.

## VIII. CHALLENGES OF CONTINUED LITIGATION

63. At the time of settlement, there were considerable challenges facing Plaintiffs with respect to ultimately establishing both the liability of the Defendants and the damages caused by their alleged conduct. Lead Plaintiffs carefully considered these risks, and their impact on a future recovery for the Settlement Class, during the months leading up to the Settlement and throughout the settlement discussions with Defendants and the mediator.

64. Although Plaintiffs' allegations survived Defendants' motion to dismiss, Defendants would no doubt continue to pursue their defenses in summary judgment and trial. The costs, risks, and delays of continued litigation would only increase as the Parties continued to engage in deposition discovery and then turn to additional expert discovery, summary judgment briefing, pre-trial litigation, trial, and appeal.

65. In agreeing to settle, Lead Plaintiffs and Co-Lead Counsel weighed, among other things, the substantial and certain cash benefit to the Settlement Class against: (i) the difficulties involved in proving falsity, materiality, scienter, loss causation, and damages; and (ii) the delays that would follow even a favorable final judgment, including appeals. They have determined that the Settlement is in the best interest of the Settlement Class after weighing the substantial benefits of the Settlement against the numerous obstacles to a better recovery after continued litigation.

### A. Risks Concerning Establishing the Falsity of the Defendants' Statements

66. Regarding falsity, the Court previously found that if Oak Street had been employing the alleged patient acquisition tactics and concealed them from investors, this could render the alleged statements false and misleading. *See Oak Street Health, Inc.*, 2023 WL 1928119 at *6.

For Plaintiffs to prevail against the Defendants on their claims at summary judgment and at trial, they would primarily have to marshal evidence to establish that the Defendants made material misrepresentations or omitted to disclose material information. Defendants would, of course, argue that their statements were not materially false or misleading statements or omissions.

67. More specifically, Defendants would have continued to argue, among other things, that none of the alleged statements were false or misleading because Oak Street Health had no independent duty to disclose the allegedly improper patient acquisition tactics before they were even the subject of an investigation by the DOJ, emphasizing that neither the DOJ nor any other regulatory entity had filed any complaint or action against Oak Street.

68. Defendants would also argue that Plaintiffs cannot prove an actionable misstatement or omission because Oak Street says it disclosed the very practices Plaintiffs claim were concealed, arguing that in the IPO Registration Statement, and consistently thereafter, Oak Street disclosed that it worked with insurance agents to recruit patients. Additionally, Defendants would likely continue to argue that Plaintiffs would not be able to demonstrate that the Client Awareness Program ("CAP") itself was material to Oak Street's overall patient acquisition efforts.

69. Regarding Defendants' alleged marketing of free transportation to prospective patients in violation of the Anti-Kickback Statute, Defendants would likely continue to argue, among other things, that a public marketing campaign cannot be the basis for an omission theory of liability, because firms are not required to disclose information that is already in the public domain. Defendants would likely seek to put forth evidence that providing transportation to patients was an important, permitted, and known component of Oak Street Health's model.

21

70.     Plaintiffs would dispute all such arguments, but the actionability of the statements would be resolved through a determination of mixed questions of law and fact, and it was uncertain how they would be resolved.

**B.      Risks Related to Proving Defendants Acted with Scienter**

71.     In addition to Defendants' continued efforts to contest material falsity, Defendants would also maintain, with respect to the Exchange Act claims, that Plaintiffs did not adequately plead that Defendants acted with scienter.  Defendants would likely argue that they believed at the time they made the alleged misstatements and omissions that they were acting legally and properly, undercutting any inference that the statements were false or were made with scienter.  For example, Defendants would no doubt seek to set forth evidence showing that Defendants sincerely believed that Oak Street's patient acquisition strategies complied with applicable law.  Defendants would also continue to argue that there is no evidence to show that any Defendant was motivated to mislead shareholders when making any of the challenged statements.

72.     As with falsity, continued litigation of these fact-intensive questions would present significant risks to the ability of Plaintiffs to obtain a recovery for the Settlement Class.

**C.      Risks Related to Proving Loss Causation and Damages**

73.     Even if liability was established, Plaintiffs faced further risk and uncertainty regarding proof of loss causation and damages.

74.     Defendants would likely argue that, with respect to the Exchange Act claims, loss causation could not be established.  Defendants have claimed, for example, that the Company's disclosure after market close on November 8, 2021 that, *inter alia*, the DOJ was investigating Oak Street's patient acquisition tactics could not support Plaintiffs' claims because "courts have explicitly held that 'the announcement of an investigation, standing alone, is insufficient to establish loss causation.'" ECF No. 59 at 35. Even if a jury were to determine that the disclosure

22

did support loss causation, Defendants were likely to continue to argue that the subsequent stock price decline was caused by "other events, such as an earnings announcement" on the same evening of the alleged corrective disclosure.

75. Assuming loss causation was generally established, Defendants would have also retained experts to opine that not all of the alleged losses correlate to damages attributable to the alleged misstatements, and they would have argued that some or all of the losses were caused by factors unrelated to the alleged wrongdoing.

76. Regarding Plaintiffs' Section 11 claims, Defendants argued, and would continue to argue, that the claims fail on the basis that Defendants would be able to establish negative causation. Defendants would also likely continue to argue that Plaintiffs who purchased after December 6, 2020 lacked standing because they could not trace their shares to a specific registration statement.

77. The difficulties and cost of quantifying damages in a case such as this one would have been significant. These causation and damages issues would have devolved into a proverbial "battle of the experts." The damages ultimately awarded would be determined by a jury after a costly and time-consuming examination of competing experts, with no guarantee of a favorable outcome for the Settlement Class. Indeed, Plaintiffs' consulting damages expert has estimated that, if Plaintiffs were able to recover the entirety of Oak Street Health's abnormal stock price decline from the close of the market on November 8, 2021 to the close of the market on November 9, 2021, damages could amount to upwards of $880 million. However, a portion of the decline leading to the alleged $880 million in damages occurred before the alleged corrective disclosure, making recovery of that portion of the decline unrealistic. Therefore, the more likely recoverable class wide damages, consistent with the Plan of Allocation and factoring in certain negative

causation defenses and certain disaggregation of the abnormal price decline on November 9, 2021, would be approximately $386 million. If Defendants failed to establish a negative causation defense for the Securities Act claims, meaning Section 11 damages could be recovered for stock declines beyond the November 9, 2021 decline, the estimated $386 million in damages could increase to approximately $542 million.

78. The $386 million estimate represents Plaintiffs' most reasonable estimate that likely would be achieved if the case had not settled. It assumes a 100% claims rate and that the claims survived in full through summary judgment, trial, and appeals.

79. Moreover, even if Plaintiffs succeeded in achieving and maintaining class certification, overcoming likely summary judgment challenges directed at many of the issues outlined above, proving all the required elements of their claims at trial and obtaining a favorable jury verdict, Defendants would almost certainly appeal. An appeal not only would have renewed all the risks faced by Plaintiffs and the Settlement Class during the litigation, as Defendants would undoubtedly reassert all the arguments summarized above, but also would engender significant additional delay and costs, undoubtedly reducing available insurance coverage, before Settlement Class Members could receive any recovery from the Action.

## IX.    PLAN OF ALLOCATION FOR DISTRIBUTING SETTLEMENT PROCEEDS TO ELIGIBLE CLAIMANTS

80. Pursuant to the Notice Order, and as set forth in the Notice and Claim Form, all members of the Settlement Class who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the Settlement Fund less any (a) Taxes, (b) Notice and Administration Costs, (c) litigation expenses and PSLRA awards as awarded by the Court, and (d) attorneys' fees awarded by the Court) must submit a valid Claim Form no later than November 21, 2024. As set forth in the Notice and plan of allocation, the Net Settlement Fund will be distributed on a *pro rata*

24

basis among members of the Settlement Class who submit eligible claims according to the plan of allocation approved by the Court.

81. Co-Lead Counsel developed the proposed plan of allocation for the Net Settlement Fund (the "Plan of Allocation") in consultation with their damages' expert. The Plan of Allocation provides a fair and reasonable method to equitably distribute the Net Settlement Fund among Authorized Claimants who suffered economic losses allegedly as a result of the asserted violations of the federal securities laws.

82. The Plan of Allocation is set forth at pages 8 to 15 of the Notice. *See* Mailing Decl. at Ex. A. The calculations pursuant to the plan are a method to weigh the claims of Authorized Claimants against one another to make *pro rata* allocations of the Net Settlement Fund.

83. In general, Recognized Loss Amounts are calculated under the Plan of Allocation using formulas consistent with Plaintiffs' damages theories.

84. For losses to be compensable damages under the Exchange Act, the disclosure of the allegedly misrepresented information must be the cause of the decline in the price of the securities at issue. It is alleged that corrective information released to the market on November 8, 2021, after the market closed, impacted the market price of Oak Street Health common stock on November 9, 2021 in a statistically significant manner and removed alleged artificial inflation from the Oak Street Health common stock share price. Accordingly, in order to have a compensable loss in this Settlement under the Exchange Act, shares of Oak Street Health common stock must have been purchased or acquired during the Class Period and held through November 8, 2021.

85. Securities Act claims were asserted with respect to shares of Oak Street Health common stock purchased or otherwise acquired during the Class Period pursuant or traceable to the IPO and the two SPOs. The Plan of Allocation presumes that, because the IPO was an initial

offering of Oak Street Health's shares, all shares purchased from the initial offering of the security on August 6, 2020 through December 1, 2020 are traceable to the IPO and potentially eligible for recovery under the Securities Act. The first SPO occurred on December 2, 2020, and the second SPO occurred on February 10, 2021. As set forth in the Plan of Allocation, certain shares of Oak Street Health common stock that were purchased at the offering prices and at the times of the offerings are presumed to have been purchased/acquired pursuant or traceable to the first and second SPOs under the Plan of Allocation, and such shares are potentially eligible for recovery under the Securities Act.

86. To conserve administrative costs for the Settlement Class, no distribution under $10.00 will be made.

87. In sum, the Plan of Allocation was designed to equitably allocate the Net Settlement Fund among eligible Settlement Class Members according to their losses.

## X.  THE APPLICATION FOR ATTORNEYS' FEES AND EXPENSES

88. In addition to seeking approval of the Settlement and Plan of Allocation, Co-Lead Counsel are also applying, on behalf of all Plaintiffs' Counsel, for an award of attorneys' fees and expenses, including Plaintiffs' expenses pursuant to the PSLRA.

89. The legal authorities supporting the requested fees and expenses are set forth in the accompanying Memorandum of Points and Authorities in Support of Co-Lead Counsel's Motion for an Award of Attorneys' Fees and Expenses and Awards to Plaintiffs Pursuant to the PSLRA (the "Fee Memorandum"), filed contemporaneously herewith.

### A.  The Requested Fee Is Fair and Reasonable

90. Consistent with the Notice to the Settlement Class, Co-Lead Counsel seek a fee award of 29% of the Settlement Amount, plus accrued interest. For the reasons discussed below

26

and in the accompanying Fee Memorandum, such an award is reasonable and appropriate under the circumstances before the Court.

### 1. The Time and Labor Expended by Counsel

91.     The work undertaken by Counsel in prosecuting the Action and arriving at the Settlement has been time-consuming and challenging. From the outset, Co-Lead Counsel appreciated the significant risks inherent in this litigation. As set forth in detail above, the claims against the Defendants were resolved only after Co-Lead Counsel conducted a thorough investigation, filed a comprehensive amended complaint, opposed a motion to dismiss, engaged in extensive fact discovery, moved for class certification, and engaged in extensive settlement negotiations.

92.     Listed in the accompanying declarations submitted by Co-Lead Counsel are summaries of their time in the Action, as well as the litigation expenses incurred by category (the "Fee and Expense Schedules"). *See* Declaration of Frank A. Richter Filed on Behalf of Robbins Geller Rudman & Dowd LLP in Support of Application for Award of Attorneys' Fees and Expenses ("Robbins Geller Decl."), Ex. 7 - A & B; Declaration of Christine M. Fox Filed on Behalf of Labaton Keller Sucharow LLP in Support of Application for Award of Attorneys' Fees and Expenses ("Labaton Decl."), Ex. 8 - A & B. The Fee and Expense Schedules indicate the amount of time spent on this litigation by each attorney and other professional, and the lodestar calculations based on their current hourly rates.

93.     Co-Lead Counsel have collectively expended more than 25,900 hours in the investigation and prosecution of the Action. *See* Summary Table of Time and Expenses, attached as Ex. 9 hereto. The resulting collective lodestar is $13,804,468.00, which does not include any time that will be spent in the future to prepare additional documents in connection with obtaining final approval of the Settlement, assist members of the Settlement Class with their Claim Forms,

27

shepherd the claims process, respond to Settlement Class Member inquiries, and distribute the Net Settlement Fund.

### 2. The Skill Required and Quality of the Legal Work

94. The expertise and experience of counsel are important considerations in setting a fair fee. As demonstrated by the accompanying firm résumés, Labaton and Robbins Geller are experienced and skilled class action securities litigators with successful track records in securities cases throughout the country—including within this Circuit—but are also not deterred from taking cases to trial. *See* Robbins Geller Decl., Ex. 7 - E; Labaton Decl., Ex. 8 - G.

95. The substantial result achieved for the Settlement Class here also reflects the superior quality of this representation.

### 3. Standing and Caliber of Opposing Counsel

96. The quality of the work performed by Co-Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of opposing counsel. Here, the Defendants were represented by well-known defense firms Paul, Weiss, Rifkind, Wharton & Garrison LLP; Skadden, Arps, Slate, Meagher & Flom LLP; and Sidley Austin LLP. These firms are skilled and experienced securities attorneys with vast resources. Faced with this knowledgeable and formidable defense, Co-Lead Counsel nonetheless developed a case sufficiently strong to persuade the Defendants to settle on terms favorable to the Settlement Class.

### 4. The Risks of Litigation and the Contingent Nature of the Fee

97. Although Lead Plaintiffs and Co-Lead Counsel believe the case against the Defendants is strong, as discussed above, this Action presented substantial challenges from the start. The specific risks Plaintiffs faced in proving liability, loss causation, and damages, along with the challenges and risks of proceeding to trial, are detailed in Section VIII, above. These

case-specific risks are in addition to the more typical risks accompanying contingent securities class action litigation.

98. Here, from the outset of the Action, Co-Lead Counsel understood that they were embarking on a complex, expensive, risky, and potentially lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the Action would require. In undertaking this responsibility, Co-Lead Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and to cover the considerable costs that a case such as this Action requires. Given these concerns, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.

99. Co-Lead Counsel know from experience that the commencement of a class action does not guarantee a settlement. Co-Lead Counsel are aware of many hard-fought lawsuits where, because of the discovery of facts unknown when the action was commenced, or changes in the law during the pendency of the action, or a decision of a judge or jury following a trial on the merits, excellent professional efforts of members of the plaintiffs' bar produced no fee for counsel. Prosecuting securities class actions on a contingent basis is akin to navigating a minefield of hurdles. The PSLRA hardened the landscape. Even with the most vigorous and competent of efforts, success in contingent-fee litigation, such as this, is never assured—even after a successful trial.

100. Federal circuit court cases include numerous opinions affirming dismissals with prejudice in securities cases. The many appellate decisions affirming summary judgment dismissals show that even surviving a motion to dismiss is not a guarantee of recovery. *See, e.g.*, *McCabe v. Ernst & Young, LLP*, 494 F.3d 418 (3d Cir. 2007); *In re Oracle Corp. Sec. Litig.*, 627

F.3d 376 (9th Cir. 2010); *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999); *Phillips v. Scientific-Atlanta, Inc.*, 489 F. App'x. 339 (11th Cir. 2012); *In re Smith & Wesson Holding Corp. Sec. Litig*, 669 F.3d 68 (1st Cir. 2012); *In re Digi Int'l Inc. Sec. Litig.*, 14 F. App'x. 714 (8th Cir. 2001); *Geffon v. Micrion Corp.*, 249 F.3d 29 (1st Cir. 2001).

101.    Even plaintiffs who succeed at trial may find their verdict overturned by a post-trial motion for a directed verdict or on appeal. *See, e.g.*, *In re BankAtlantic Bancorp, Inc.,* No. 07-cv-61542 (S.D. Fla. 2010) (in securities class action tried by Labaton, after plaintiffs' jury verdict, court granted defendants' motion for judgment as a matter of law on loss causation grounds), *aff'd,* 688 F. 3d 713 (11th Cir. 2012) (trial court erred, but defendants entitled to judgment as matter of law on lack of loss causation); *Ward v. Succession of Freeman*, 854 F.2d 780 (5th Cir. 1998) (reversing plaintiffs' jury verdict for securities fraud); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation); *Glickenhaus & Co., et al. v. Household Int'l, Inc., et al.*, 787 F.3d 408 (7th Cir. 2015) (remanding for additional trial after jury verdict in favor of plaintiffs and 13 years of litigation); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (reversing $81 million jury verdict and dismissing case with prejudice).   And, the path to maintaining a favorable jury verdict can be arduous and time-consuming. *See, e.g.*, *In re Apollo Grp., Inc. Sec. Litig.*, Case No. CV-04-2147-PHX-JAT, 2008 WL 3072731 (D. Ariz. Aug. 4, 2008), *rev'd*, No. 08-16971, 2010 WL 5927988 (9th Cir. June 23, 2010) (securities class action litigated for seven years; trial court rejected unanimous verdict for plaintiffs, which was later reinstated by the Ninth Circuit Court of Appeals, and judgment re-entered (*id.*) after denial by the Supreme Court of the United States of defendants' Petition for Writ of Certiorari (*Apollo Grp. Inc. v. Police Annuity and Benefit Fund*, 562 U.S. 1270 (2011)).

102.    It takes hard work and diligence by skilled counsel to develop the facts and theories needed to sustain a complaint, win at trial or, as particularly relevant in this Action, present a strong argument necessary to obtain a significant recovery in settlement discussions. Courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies.

**B.      Application for Payment of Litigation Expenses**

103.    Co-Lead Counsel also seek payment of $888,947.35 in litigation expenses and costs in connection with commencing and pursuing the claims against the Defendants.  The Notice apprises potential Settlement Class Members that Co-Lead Counsel intend to seek payment of expenses in an amount not to exceed $1,000,000.  The total amount of the litigation expenses requested is less than what was stated in the Notice.  These expenses were all reasonably and necessarily incurred in connection with the prosecution of this Action on behalf of the Settlement Class.

104.    As set forth in the Fee and Expense Schedules in the accompanying declarations, Co-Lead Counsel's litigation expenses total $888,947.35.  *See* Robbins Geller Decl., Ex. 7 - B; Labaton Decl., Ex. 8 - B; Ex. 9.  The expenses are reflected on the books and records maintained by Co-Lead Counsel.  These books and records are prepared from expense vouchers, check records, and other source materials, and are an accurate record of the expenses incurred.

105.    From the inception of the Action, Co-Lead Counsel were aware that they might not recover any of the expenses incurred in prosecuting the claims against Defendants and, at a minimum, would not recover any expenses until the Action was successfully resolved.  Co-Lead Counsel also understood that, even if the Action was ultimately successful, an award of expenses would not compensate counsel for the lost use or opportunity costs of funds advanced to prosecute

the claims against Defendants. Thus, Co-Lead Counsel were motivated to take steps to manage expenses without jeopardizing the vigorous and efficient prosecution of the case. Co-Lead Counsel maintained control over the primary expenses in the Action by managing a joint litigation fund ("Litigation Expense Fund" or "Litigation Fund"). Co-Lead Counsel collectively contributed $578,077.14 to the Litigation Expense Fund, which incurred $578,077.14 in expenses. A description of the expenses incurred by the Litigation Fund by category is included in the Robbins Geller Decl., Ex. 7 at ¶ 7(d) and Ex. D. Upon the Court's approval of the expense request, Co-Lead Counsel's contributions will be reimbursed.

106. The largest component of Co-Lead Counsel's expenses (*i.e.,* $527,032.64, or approximately 59% of total expenses) was incurred for consulting and testifying experts, such as those relied upon in connection with Lead Plaintiffs' motion for class certification. *See* Robbins Geller Decl., Ex. 7 - D; Labaton Decl., Ex. 8 at ¶ 6(d). These experts were essential to the prosecution of the Action.

107. Co-Lead Counsel also incurred $34,653.88 in expenses in connection with the retention of counsel for the confidential witnesses referenced in the Complaint, who were subpoenaed by Defendants. *See* Labaton Decl., Ex. 8 at ¶ 6(d)(iii).

108. Co-Lead Counsel's litigation expenses include approximately $62,913.52 for work-related transportation expenses, meals, and lodging related to, among other things, traveling in connection with court hearings, depositions, the mediations, and meetings. *See* Robbins Geller Decl., Ex. 7 - B, ¶ 7(a); Labaton Decl., Ex. 8 - B, ¶ 6(b).

109. Another substantial component of Co-Lead Counsel's expenses ($85,580.34) was RGRD fees for document hosting and management related to electronic discovery produced in the case. Co-Lead Counsel used RGRD's Relativity database, at significant savings, to host the

Defendants' productions, Plaintiff productions, and third-party productions on their sophisticated electronic database and litigation support platforms. *See* Ex. 7 – B, ¶ 7(c). Co-Lead Counsel used this electronic database to, among other things: (i) maintain potentially relevant documents collected for review and production in response to Defendants' discovery demands, (ii) maintain the electronic database through which the approximately 3.5 million pages of documents produced by Defendants and third parties were analyzed; (iii) process documents so that they would be in a searchable format, including the conversion and upload of any hard copy documents; and (iv) apply data analysis tools to focus the review on the most significant documents to efficiently target information counsel needed to support their allegations. Labaton also retained a third-party vendor to host Plaintiff BRS and Dearborn's production documents. Labaton Decl., Ex. 8 - B.

110. Co-Lead Counsel incurred $13,359.48 in connection with the services of the Mediator. *See* Robbins Geller Decl., Ex. 7 - D.

111. Another substantial component of Co-Lead Counsel's litigation expenses ($62,425.97) was the cost of court reporters, videographers, and transcripts in connection with the depositions taken or defended during the course of the Action, as well as hearings before the Court. *See* Robbins Geller Decl., Ex. 7 - D; Labaton Decl., Ex. 8 - B.

112. The other expenses for which Co-Lead Counsel seek payment are the types of expenses that are necessarily incurred in complex commercial litigation and routinely paid in non-contingent cases. These expenses include, among others, court and service fees, duplicating costs, electronic research costs, and overnight delivery expenses. All of the litigation expenses incurred by Co-Lead Counsel were reasonable and necessary to the successful litigation of the Action.

## XI. PSLRA Reimbursement to Plaintiffs Is Fair and Reasonable

113. The PSLRA specifically provides that an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class" may be made to "any

33

representative party serving on behalf of a class." 15 U.S.C. § 77z-1(a)(4). Accordingly, Plaintiffs seek reimbursement of permitted reasonable costs and expenses incurred in connection with their efforts on behalf of the Class. Specifically, Boston Retirement System seeks reimbursement in the amount $6,000 for the 65 hours it dedicated to the Action, which included preparing for and being deposed and attending the mediation in person. Ex. 2 at ¶¶ 5-6, 9-11. The CPTPF Plans seek reimbursement in the total amount of $12,500 for both the 43 hours they dedicated to the Action, which included preparing for and being deposed ($5,000), as well as $7,500 for the amount they paid to long-standing fund counsel to assist them during the course of the Action. Ex. 1 at ¶¶ 7-10. Dearborn seeks reimbursement in the amount of $2,805 for the 51 hours it dedicated to the Action, which included preparing for and being deposed and attending the mediation in person. Ex. 3 at ¶¶5-6, 9-11. Plaintiffs' efforts required them to devote considerable time and resources to this Action that would otherwise have been devoted to their regular professional endeavors.

114. As discussed in the Fee Memorandum and in Plaintiffs' supporting declarations, Plaintiffs have been fully committed to pursuing the Settlement Class's claims. The efforts expended by Plaintiffs during the course of this Action, as set forth in their declarations, included communicating with counsel, reviewing pleadings and motion papers, gathering and reviewing documents in response to discovery requests, responding to written interrogatories, preparing for depositions and being deposed, and communicating with counsel regarding the mediation and settlement negotiations (and in the case of BRS and Dearborn, attending the March 12, 2024 mediation in person). These are the types of activities courts have found to support reimbursement to representatives, and fully support the request for reimbursement here.

## XII. CONCLUSION

115. In view of the favorable recovery for the Settlement Class and the substantial challenges presented by the claims against the Defendants and the facts presented in this Action,

as described above and in the accompanying declarations and memorandum of law, I respectfully submit that the Settlement should be approved as fair, reasonable, and adequate and that the proposed Plan of Allocation should likewise be approved as fair, reasonable and adequate. In view of the recovery achieved and the quality of work performed, among other things, as described above and in the accompanying declarations and memorandum of law, I respectfully submit that the Fee and Expense Application should be approved in full.

I declare, under penalty of perjury, that the foregoing facts are true and correct. Executed November 7, 2024.


_____
CHRISTINE M. FOX

35

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on November 7, 2024, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will automatically send notification of such filing to all counsel of record.

*/s/ James E. Barz*
JAMES E. BARZ